**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| WONDERWORK, INC., | Case No. 16-13607 (SMB) |
| Debtor. | **Hearing Date: February 23, 2017 at 10:00 a.m.** |
| | **Objection Deadline: February 16, 2017 at 4:00 p.m.** |

### HELP ME SEE, INC.'S MOTION FOR THE ENTRY OF AN ORDER DIRECTING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE

Help Me See, Inc. ("HelpMeSee"), by and through its undersigned attorneys, move this court (the "Motion") for entry of an order directing the appointment of a Chapter 11 trustee in the above-captioned Chapter 11 case in accordance with sections 105(a) and 1104(a) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 2007.1 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). In support hereof, HelpMeSee respectfully states as follows:

### PRELIMINARY STATEMENT

1.      This is the paradigmatic case for appointment of a trustee. The current CEO of WonderWork, Inc. ("Debtor"), Brian Mullaney ("Mullaney"), has a long history of financial improprieties spanning decades across multiple charitable institutions. HelpMeSee, a blindness charity and Debtor's largest creditor, is only Mullaney's latest victim. HelpMeSee entered into a fundraising agreement (the "Agreement") with Debtor in August 2011. Rather than raise funds and build a world class fundraising machine for HelpMeSee, as Debtor contracted and promised to do, Mullaney caused Debtor to breach almost every material provision in the Agreement as

well as its fiduciary duties by hijacking HelpMeSee's charitable work and mission to raise funds

for itself.  Thereafter, Debtor brazenly commenced arbitration against HelpMeSee seeking $1.33

million in damages for HelpMeSee's alleged premature termination of the Agreement.

HelpMeSee counterclaimed seeking over $8 million in damages for claims relating to, *inter alia*,

breach of contract and breach of fiduciary duty.

      2.    What followed was a three-year arbitration during which Debtor, through

Mullaney, made a mockery of the process by repeatedly and consistently making false statements

under oath and intentionally withholding clearly relevant discovery in an effort to conceal

Mullaney and Debtor's malfeasance.  In awards dated October 13 (the "Partial Final Award")

and December 21, 2016 (the "Final Award,"[1] together the "Awards"), AAA Arbitrator John H.

Wilkinson, Esq. (the "Arbitrator") awarded HelpMeSee damages, attorneys' fees, and costs

totaling $13,198,431.85, which today amounts to over $16 million.  A reader of the lengthy

Awards issued by a highly respected and experienced neutral AAA Arbitrator can come to no

conclusion other than that Mullaney is a serial fraudster who has exploited and deceived a host of

charitable institutions including HelpMeSee, Smile Train, Inc. ("Smile Train"), Operation Smile,

and Mercy Ships.  The Arbitrator described Mullaney and Debtor's conduct as "reprehensible,"

and found Mullaney not to be a "credible witness."  After unsuccessfully seeking to vacate the

Partial Final Award, Debtor filed an appeal, which challenges the Awards on policy grounds but

does not contest any of the Arbitrator's factual findings, and then filed for bankruptcy on

December 29, 2016.

---

[1] A true and correct copy of the Final Award is attached as Exhibit ("Ex.") A to the Declaration
of Benjamin Mintz, dated January 18, 2016 ("Mintz Decl.").  The Partial Final Award and Final
Award are identical except for the addition of attorneys' fees and costs in the Final Award.

3.      Given Mullaney's long and extensive history of fraudulent conduct, financial impropriety, and dishonesty as set forth in detail in the Awards, Mullaney should not be permitted to run Debtor during the pendency of the bankruptcy proceedings.  There can be no dispute that there is more than sufficient cause for the appointment of a Chapter 11 trustee.  The Arbitrator's findings of Mullaney and his staff's misconduct both before and during the arbitration make it clear that present management is unfit to run Debtor.  The Arbitrator found, among other things, that:

- While HelpMeSee paid Debtor $2 million per year to use its "best efforts" to provide a "turnkey," world-class fundraising solution for HelpMeSee, including, most importantly, the solicitation of major donors known personally to Mullaney, Debtor instead covertly used its access to HelpMeSee's work, accomplishments and donors to fundraise from those very same donors *for itself* in breach of its contractual and fiduciary obligations.

- During the arbitration process, Debtor violated discovery orders from start to finish, which made the arbitration process "decidedly less efficient and cost-effective" as HelpMeSee and the Arbitrator were forced to chase down documents that Debtor should have produced at the outset.

- When Mullaney served as President of Smile Train, Mullaney submitted personal and/or unsubstantiated expenses for approval to present WonderWork CFO and former Smile Train CFO Hana Fuchs ("Fuchs") and directed Fuchs to defer his salary, which resulted in his W-2s underrepresenting his income by $1.1 million over several years.

4.      Mullaney's conduct, which the Arbitrator described as "unconscionable," constitutes a pattern of behavior in which Mullaney (enabled by Debtor's senior management, including Fuchs) systematically exploited various charities to benefit himself at the charities' detriment.  As a result of the detailed findings set forth in the Awards, Mullaney and Debtor's reputations have been irrevocably tainted.  Debtor itself likely has claims against Mullaney, senior management, and/or Debtor's Board of Directors for, among other causes of action, breach of fiduciary duty, mismanagement, and indemnification.  Consequently, it would not be in the best interest of the creditors to leave Mullaney in control of Debtor.  In addition, there is abundant evidence of Debtor's senior management's incompetent and/or intentional

mismanagement of Debtor's books and records.  The appointment of an independent fiduciary is critical to ensure that this Chapter 11 proceeding is conducted in a fair and honest manner, including that Debtor pursue all options available to maximize recovery to the creditors.

**STATEMENT OF FACTS**

A.      **The Arbitration Proceeding**

5.      Debtor is a not-for-profit corporation organized pursuant to § 101 of the General Corporation Law of the State of Delaware, which is exempt from federal taxes under section 501(c)(3) of the Internal Revenue Code.  Debtor describes itself as an "umbrella charity" that provides services to various charitable causes, each of which is focused on a different medical issue including blindness, burns, and clubfoot.

6.      HelpMeSee is a 501(c)(3) charity whose mission is to eliminate cataract blindness worldwide.  On August 31, 2011, HelpMeSee entered into an Agreement with Debtor pursuant to which Debtor agreed that it would create, manage, and monitor various fundraising and marketing programs for HelpMeSee in exchange for a $2 million per year fee.  Mintz Decl., Ex. B, Agreement at 1.  The Agreement provided that any disputes between the parties would be submitted to arbitration through the American Arbitration Association (the "AAA").  *Id.* at 16-17.

7.      HelpMeSee terminated the Agreement for cause effective August 17, 2012. Mintz Decl., Ex. A, at ¶ 120.  On March 21, 2013, Debtor filed a Demand for Arbitration with the AAA, seeking $1,333,333.28 in damages based on its assertion that HelpMeSee terminated the Agreement without cause, plus costs and attorneys' fees.  On May 9, 2013, HelpMeSee counterclaimed for breach of contract, breach of fiduciary duty, fraudulent inducement,

copyright infringement and an accounting, and sought damages, both compensatory and punitive, as well as an injunction, costs and attorneys' fees.

8.       On June 1, 2013, the parties mutually selected AAA Arbitrator John H. Wilkinson, Esq., as their sole neutral arbitrator.  Hearings commenced on March 4, 2014 and were completed, more than two years later, on March 11, 2016.  *Id.* at ¶ 90.  The Arbitrator heard testimony from 16 live witnesses over 49 hearing days (including 13 days of testimony from Mullaney), received into evidence over one thousand exhibits, and reviewed hundreds of pages of pre and post hearing briefing.

9.       Due to the provisions in the Agreement directly at issue, including those that referenced Smile Train (*see* Mintz Decl., Ex. B, §§ 2.3; 5.3; 7.3), and HelpMeSee's fraudulent inducement claim, the Arbitrator evaluated Mullaney's conduct while at Smile Train as well as his actions toward HelpMeSee.  As a result, the arbitration exposed Mullaney's repeated pattern of defrauding the charities he purported to serve, including Operation Smile, Smile Train, and HelpMeSee, as well as his repeated violations of the intellectual property rights of Mercy Ships, a HelpMeSee partner.

10.      Mullaney's first victim was Operation Smile, a cleft charity that sends doctors on missions to perform surgeries.  Mullaney convinced billionaire Charles Wang ("Wang") to donate $10 million to Operation Smile.  Mullaney and Wang decided to leave Operation Smile to form Smile Train, a cleft charity that empowered local doctors to perform cleft surgeries, and Wang understood his $10 million donation would be used as seed money for Smile Train.  Mintz Decl., Ex. A, at ¶ 6.  In actuality, Mullaney had "been asked to leave Operation Smile after he had seriously disparaged the organization in a number of ways, including the attempted

overthrow of the Operation Smile Board; and . . . $5 million of the $10 million Wang had contributed to Operation Smile had simply disappeared." *Id.*

11.     Mullaney then served as President of Smile Train until he was "fired" by the Board of Directors in September 2011 because, among other reasons, he had "misled the Board with respect to the [number of remaining clefts] for the sole purpose of promoting Mullaney's personal agenda; . . . quietly pursued and spent money on areas other than cleft, and [then] continued even after the Board" ordered him to stop; and had "manipulated Smile Train's books and records in various ways designed to further his own personal agenda." *Id.* ¶¶ at 28-29. Mullaney also unilaterally doubled the monthly retainer of a consultant, Freakonomics, to $30,000 to "buy [their] cooperation" in furnishing data to help justify Mullaney's personal agenda to expand Smile Train's mission. *Id.* at ¶ 18.  He and his staff, who make up the senior management of Debtor today, then lied to the Smile Train Board regarding the existence of Freakonomics' work. *Id.* at ¶¶ 18-19; *see* Declaration of Brian Mullaney Co-Founder and CEO of the Debtor, Inc., First Day Pleadings (the "First Day Declaration") [Dkt. No. 2], at Ex. N.

12.     Following Mullaney's termination, Smile Train retained accounting firm Grant Thornton to conduct an independent investigation into Mullaney's activities during the timeframe in which Fuchs was acting as Smile Train's CFO.  *See* Mintz Decl., Ex. A, at ¶ 30. "Grant Thornton uncovered numerous additional transgressions and concluded that Mullaney had expenses amounting to $335,000 that were not appropriate in that they were either unsubstantiated or were personal to Mullaney and without business purpose or both." *Id.*  Grant Thornton "also found that Mullaney had deferred substantial amounts of" his salary as President "which would not then be included on his W-2 forms.  As a result, Mullaney's W-2s had to be amended and reissued to reflect $1.13 million of additional income." *Id.*

13.     After Smile Train, Mullaney focused his sights on HelpMeSee, a fledgling charity at the time.  *See id.* at ¶¶ 27; 42-44.  Mullaney intentionally misrepresented his history with Operation Smile and Smile Train so that HelpMeSee would not be dissuaded from entering into the Agreement.  Mullaney entered into the Agreement on behalf of Debtor, pursuant to which he agreed to solicit his contacts, including Smile Train major donors, exclusively for HelpMeSee and provide a "turnkey" fundraising solution in exchange for a $2 million per year fee.  *Id.* at ¶ 44; 46.

14.     Throughout the term of the Agreement, Debtor "secretly competed against HelpMeSee and used HelpMeSee's work and accomplishments to convince Mullaney's contacts . . . to write large checks to [WonderWork]."  *Id.* at ¶ 123.  For example, Debtor "regularly sent letters to . . . major donors in which it discussed [WonderWork's] purported work for blindness, without revealing that it was actually HelpMeSee which was working on blindness and that [WonderWork] was just collecting a fee to be HelpMeSee's marketer."  *Id.* at ¶ 93.  Mullaney also "covertly courted HelpMeSee's few major donors in an effort to convince them to give to [WonderWork] instead of HelpMeSee.  As a result, rather than donating to the organization that actually provided charitable services, donors were misled into giving it to [WonderWork]."  *Id.* at ¶ 123.  The Arbitrator found Mullaney's conduct, including "acting through [WonderWork] to take HelpMeSee's money, while exploiting HelpMeSee to raise money to pursue his own personal interests," to be "unconscionable."  *Id.* at ¶¶ 93; 123.

15.     In addition, Debtor repeatedly violated a memorandum of understanding (the "MOU") it signed with another charity and one of HelpMeSee's partners, Mercy Ships, by covertly using Mercy Ships' photos and videos to promote Debtor in violation of the MOU.  *Id.* at ¶¶ 81-88.  After being caught red-handed breaching the MOU, Mullaney lied to both

HelpMeSee and Mercy Ships, including by claiming falsely that Debtor would not use the Mercy Ships photos and video again without permission and that Debtor had raised no money for itself with these images. *Id.* at ¶ 87. Moreover, notwithstanding repeated heated communications with both Mercy Ships and HelpMeSee over the incident, the receipt of a cease and desist letter from Mercy Ships, and Debtor's statement that it would cease utilizing the photos and video, Debtor "thereafter breached the MOU on multiple occasions." *Id.* at ¶¶ 87-88.[2]

16.     Debtor's conduct during the arbitration was no different; it evaded its document production obligations "from beginning to end." *Id.* at ¶ 125. At the outset, Debtor asserted that "its employees would pick and choose which documents to produce because it was not 'IBM' and, as a result, [Debtor] refused to produce documents responsive to nine of [HelpMeSee's] twenty document requests because it unilaterally decided that HelpMeSee's claims were 'without merit.'" *Id.* The Arbitrator warned Debtor "that it was 'putting the cart before the horse,'" and on August 18, 2013, ordered Debtor "to perform a thorough collection of requested documents, including electronic files." *Id.*

17.     Despite the Arbitrator's warning, Debtor's document productions that immediately followed that order "continued to be palpably deficient, missing whole categories of responsive documents," which on December 12, 2013 resulted in the Arbitrator directing

---

[2]  Mullaney's disregard of both HelpMeSee and Mercy Ship's intellectual property rights are not isolated incidents; his conduct at Smile Train was equally outrageous. The Smile Train Board discovered that Mullaney had entered into a self-dealing contract with Hyperion Books to write a book about Smile Train during his tenure as Smile Train President – which obligated Smile Train to purchase copies of the book – and ordered Mullaney to refrain from taking any actions regarding the book. When Mullaney instead went forward with publication of the book, the Smile Train Board terminated the deal, including by entering into a "monetary settlement with Hyperion." *Id.* at ¶¶ 31-34. Two years after he was fired from Smile Train, Mullaney self-published the book, sent it out to between 1,200-1,400 of Smile Train's largest donors, and in the afterward "told the donors about WonderWork and provided his contact information," resulting in litigation between Smile Train and Mullaney. *Id.* at ¶ 35.

Debtor's former counsel, Joseph Vogel, to certify that "there had been 'a reasonably comprehensive search for documents to [HelpMeSee's] document requests' and that 'based on that search, [Debtor] has produced all documents responsive to those requests,'" which he did. *Id.* at ¶ 126.

18.    After the hearings commenced, it "repeatedly became apparent that [Debtor's] document production remained seriously flawed."  *Id.* at ¶ 127.  This led to HelpMeSee's counsel writing five additional letters requesting documents, which Debtor "thereafter turned over in a trickle over the course of the next year."  *Id.*  In addition, the Arbitrator concluded it "likely that there were responsive documents that were never produced" by Debtor in the arbitration.  *Id.*

19.    On October 13, 2016, the Arbitrator issued the Partial Final Award, in which he found Debtor to be in substantial breach of its Agreement with HelpMeSee (*id.* at ¶¶ 91-95) having breached most of the provisions in the Agreement (*see id.* ¶¶ at 91-95; 101-111), in clear breach of its fiduciary duty to HelpMeSee (*id.* at ¶¶ 96-100), and liable for conversion[3] (*id.* at 113). The Arbitrator ordered Debtor to "immediately" pay HelpMeSee $8,342,314.68 in damages equal to all amounts raised by Debtor during the Agreement term plus interest.  *Id.* at ¶¶ 123-124; 133.  The Arbitrator also awarded HelpMeSee reasonable costs and attorneys' fees incurred in connection with the arbitration, but provided that the amount would be the subject of a separate award.  *Id.* at ¶¶ 130-33.

20.    In awarding costs and attorneys' fees to HelpMeSee, the Arbitrator found that Mullaney was "not a credible witness;" that "WonderWork declined to comply with discovery

---

[3] The Arbitrator did not award damages for conversion solely because they were duplicative of the damages already awarded. *Id.* at ¶ 113.

orders from the beginning to the end of this arbitration, with the result that the conduct of the arbitration was decidedly less efficient and cost-effective than would otherwise have been the case"; and described the conduct of Debtor and Mullaney as "reprehensible." *Id.* at ¶ 132.

21.    On November 29, 2016, the Supreme Court of the State of New York confirmed the Partial Final Award and denied Debtor's cross motion to vacate the Partial Final Award. During the hearing on the motions, Debtor argued that the Partial Final Award should be vacated on policy grounds primarily because some of its funds were purportedly "restricted" and, as evidence of those alleged restrictions, presented new affidavits from donors signed a few days prior to the hearing, which, in fact, stated just the opposite – that the donations were unrestricted.[4]  Mintz. Decl., Ex. C.

22.    On December 2, 2016, judgment was entered against Debtor in the amount of $11,124,170.78, inclusive of pre-judgment interest and costs and disbursements (the "Judgment").  Mintz Decl., Ex. D.  On the same day, Debtor filed a notice of appeal.  Debtor also filed a motion for stay of judgment pending appeal on December 8, 2016, and moved for interim emergency relief, which was denied.

23.    On December 21, 2016, the Arbitrator issued a Final Award, which in addition to the $8,342,314.68 in compensatory damages plus interest, awarded $4,706,553.18 in attorneys' fees plus interest, and $149,563.99 in arbitration costs.  Mintz Decl., Ex. A, at ¶ 137.  The Arbitrator explained that the award of fees and costs was warranted both because both sides requested costs and fees and therefore conferred authority on the Arbitrator to make a

---

[4] *See, e.g.*, Mintz Decl., Ex. C, Affidavit of William E. Conway, Jr. ¶ 8 (" . . . Bedford Falls intended its donation as a gift to WonderWork, to be distributed as WonderWork determined was necessary and advisable in accomplishing its charitable mission . . .").

determination in that regard, as well as a sanction under Rule 58 of the AAA Commercial Arbitration Rules, which provides that "[t]he arbitrator may, upon a parties' request, order appropriate sanctions where a party fails to comply with its obligations under these rules or with an order of the arbitrator." *Id.* at ¶¶ 130-131.

24.     Shortly after the judgment was entered, HelpMeSee took steps to execute, including restraining Debtor's assets.   During this time, Debtor provided responses to a questionnaire that was served in connection with an information subpoena by HelpMeSee in which it provided information regarding its accounts and financials, but made no mention of any restricted funds.  Mintz Decl., Ex. E.

### B.     Filing of Bankruptcy Proceeding

25.     On December 29, 2016 (the "<u>Petition Date</u>"), Debtor filed a voluntary petition (the "<u>Petition</u>") for relief under Chapter 11 of the Bankruptcy Code.  Debtor has continued to operate its business and manage its property as debtor-in-possession in accordance with sections 1107 and 1108 of the Bankruptcy Code.

26.     Mullaney is responsible for overseeing the operations of Debtor in every respect including   administration,   community   programs,   development,   finance,   and marketing/communications, as well as the hiring and supervision of staff directors and/or senior managers in the aforementioned program and support areas.  First Day Declaration ¶ 1.  Debtor's current senior management is comprised of Mullaney's former staff from Smile Train: Fuchs, CFO; DeLois Greenwood, Chief Programs Officer; and Karen Lazarus, Director Strategic Projects (together with Mullaney, the "<u>Debtor's Management</u>").  First Day Declaration, Ex. N.

27.     Mullaney represented to the Court in his First Day Declaration that a "substantial portion" of Debtor's assets are restricted and therefore unavailable to general unsecured

creditors, but provided no specificity or support. First Day Declaration ¶ 23. Accordingly, the

U.S. Trustee requested and the Court directed Debtor to provide a schedule of restricted assets by

January 12, 2017, with a copy to HelpMeSee. *See* Mintz Decl., Ex. F, Transcript of Proceedings

at 25:22-26:13; 21:20-25 (Jan. 5, 2017). To date, Debtor has failed to provide any such

schedule.

28.     On January 12, 2017, Debtor filed its remaining schedules, (Schedules A/B, D,

E/F, G, H (together, the "Schedules") [Dkt. No. 12], and its Statement of Financial Affairs for

Non-Individuals Filing for Bankruptcy (the "Statement of Financial Affairs") [Dkt. No. 13]). As

set forth below, those documents raised additional questions because, among other issues, they

contradict the Debtor's prior representations to this Court.

## DISCUSSION

### A.     The Appointment of a Chapter 11 Trustee is Required

29.     It is well recognized that a debtor-in-possession owes fiduciary duties to the

bankruptcy estate and must, among other things, "protect and . . . conserve property in [its]

possession for the benefit of creditors" and "refrain [] from acting in a manner which could

damage the estate, or hinder a successful reorganization of the business." *In re Ionosphere

Clubs, Inc.*, 113 B.R. 164, 169 (Bankr. S.D.N.Y. 1990) (quoting *In re Sharon Steel Corp.*, 86

B.R. 455, 457 (Bankr. W.D. Pa. 1988)). "The willingness of Congress to leave a debtor-in-

possession is premised on an expectation that current management can be depended upon to

carry out the fiduciary responsibilities of a trustee." *In re V. Savino Oil & Heating Co., Inc.*, 99

B.R. 518, 526 (Bankr. E.D.N.Y. 1989). Debtor's Management cannot be trusted to carry out

Debtor's fiduciary responsibilities due to their (and, in particular, Mullaney's) history, which

includes findings of breach of fiduciary duty, conversion, extensive financial mismanagement

and dishonesty, and Debtor's recent disclosures that reveal widespread inconsistent recordkeeping.

30.     The Bankruptcy Code sets forth two separate standards under which the Court can appoint a trustee: Section 1104(a)(1) and (a)(2).  The sections provide, in pertinent part:

(a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—

(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

(2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104(a).

### i.    Cause Is Established Under 11 U.S.C. § 1104(a)(1)

31.     "The sole question presented in a Section 1104(a)(1) motion is whether the acts or omissions of current management, whether committed before or after filing the Chapter 11 petition, supply the 'cause', as defined, to trigger the appointment of a trustee."  *See In re V. Savino Oil & Heating*, 99 B.R. at 526; *In re Ancona*, No. 14-10532, 2016 Bankr. LEXIS 4114, at *32 (Bankr. S.D.N.Y. Nov. 30, 2016) ("A court may consider both pre-and post-petition misconduct of the current management when making a determination of whether 'cause' exists under section 1104(a).").  Once the party moving for the appointment of a trustee demonstrates the existence of one of the factors mentioned in Section 1104(a)(1), appointment of a trustee becomes mandatory.  *See* 11 U.S.C. § 1104(a) (providing that the court "shall order" appointment of trustee where cause exists); *In re V. Savino Oil & Heating*, 99 B.R. at 525 (holding that where a court finds cause under section 1104(a)(1), "there is no discretion; an

independent trustee must be appointed"); *In re Ashley River Consulting, LLC*, No. 14-13406/07, 2015 Bankr. LEXIS 1008, at *29 (Bankr. S.D.N.Y. Mar. 31, 2015) (same).

32.     The conduct of Debtor's Management, and clearly Mullaney's conduct, satisfies all the factors for cause under subsection (a)(1) of section 1104 of the Bankruptcy Code: fraud, dishonesty, incompetence, and management's gross mismanagement of affairs.   This Court has found cause for appointing a trustee in cases with noticeably similar facts. *See, e.g.*, *In re Ashley River*, 2015 Bankr. LEXIS 1008, at *29-30 (granted motion for trustee where debtor's current management was found guilty of fraud, gross, wanton, and willful misconduct, and diverting and commingling funds, such that arbitrator awarded over $2 million in punitive damages).

33.     Mullaney is a serial fraudster who has used deceit and misrepresentation to take advantage of charities for his own personal agenda.  A neutral Arbitrator found his and Debtor's conduct to be "reprehensible" because Debtor, among other things, secretly competed against HelpMeSee and used HelpMeSee's work and accomplishments to convince Mullaney's contacts to donate to Debtor, rather than HelpMeSee; covertly courted HelpMeSee's few major donors in an effort to convince them to give to Debtor instead of HelpMeSee; and, as a result, misled the donors into giving the money to Debtor rather than donating to the organization actually providing charitable services.  Debtor was ordered to pay HelpMeSee substantial damages in the amount of $8,342,314.68 plus interest and an award of attorneys' fees and costs totaling $4,856,117.17 as a result of its conduct.  Indeed, the Arbitrator's finding that Mullaney was "not a credible witness" establishes further cause for the appointment of a Chapter 11 trustee.   Mintz Decl., Ex. A, at ¶ 132.

34.     Debtor also engaged in dishonest and abusive discovery tactics throughout the entirety of the arbitration proceeding which resulted in the arbitration being "decidedly less

efficient and cost-effective than would otherwise have been the case." *Id*. Debtor withheld and concealed documents that were harmful to its positions and only produced some of those documents after HelpMeSee had spent considerable time and expense obtaining them. The Arbitrator concluded that, despite these orders, Debtor never turned over all responsive documents. The Arbitrator expressly went out of his way to point out that the discovery shortcomings lay with Debtor's Management and not with counsel, explaining that "while the Arbitrator does not know the reasons for the shortcomings, he would be most surprised if they were attributable to any shortcomings on the part of Joseph Vogel," Debtor's counsel. *Id*. at ¶ 129. Were Debtor's Management to remain as debtor-in-possession in this proceeding, there is a substantial and unjustifiable risk that it would play the same cat and mouse game in an attempt to hamper the bankruptcy proceedings and conceal its true financial condition.

35. Finally, nothing in Debtor's filings indicates any change in the nature of its business practices; instead, they reveal additional instances of mismanagement. In his First Day Declaration, Mullaney claims that a "substantial portion" of Debtor's assets are "restricted" funds, yet provides no specificity as to the amount of these allegedly restricted funds nor proof of the donors' restrictions. First Day Declaration ¶ 23. Despite Debtor having made this same argument regarding allegedly restricted funds throughout the entirety of the arbitration, the only "evidence" of these alleged restrictions that Debtor has ever produced was affidavits drafted in connection with its motion to vacate the Partial Final Award, which actually state that the donations were unrestricted. HelpMeSee has yet to receive any additional information regarding these restricted funds despite Debtor being directed by this Court to provide information by

January 12, 2017, nor has it received a budget despite the Court's agreement that one should be provided.[5]

36.    Each financial disclosure produced by Debtor to date presents new and contradictory information that, at best, appears to reflect incompetence and inadequate oversight over Debtor's financial condition.  For instance, Debtor is opaque with respect to the status of insider payments.  In Exhibit O to the First Day Declaration, Debtor indicated that its "Payments to Officers and Directors" over a one month period are $61,250, but in response to Question 30 to its Statement of Financial Affairs states that there have been no insider payments for the past year and does not list any transfers to Mullaney nor any of the other members of Debtor's Management in the 90 days preceding the filing (*see* Statement of Financial Affairs, "Attachment to Statement of Financial Affairs, Part 2 Transfers to Creditors Within 90 Days of Filing" [Dkt. No. 13]).  Mullaney also informed the Court that he has not drawn a salary since October 2015, (Mintz Decl., Ex. F, at 13:6-7), but neither Mullaney nor any other of Debtors' Officers or Directors appear on any schedule as creditors as they should if they have deferred salary.  *See* Schedules E/F [Dkt. No. 12].  In its Application for Approval of Employment of Attorney, Debtor indicated that it paid Carter Ledyard $254,454.36 for its work in opposing the confirmation of the Partial Final Award during the preference period, (Application For Approval of Employment of Attorney, at ¶ 11 [Dkt. No. 3]), but does not list Carter Ledyard on its list of 90 day transfers (*see* Statement of Financial Affairs, "Attachment to Statement of Financial Affairs, Part 2 Transfers to Creditors Within 90 Days of Filing" [Dkt. No. 13]).

---

[5] Mintz Decl., Ex. F, at 25:22-26:13; 21:20-25.  Debtor also has not added any disclosure on its websites to provide donors and the public with notice that it filed for Chapter 11 bankruptcy despite the Court remarking that "if you're soliciting donations, the public ought to know that this is an entity in bankruptcy.  And they may be donating to an entity that may not be here." *Id.* at 19:19-22.

37.    Debtor's schedules are also incomplete.    Under the pretense of it being a charitable organization, Debtor refuses to answer Question 9 to its Statement of Financial Affairs regarding charitable contributions and directs the reader to Debtor's "informational tax returns" for information regarding grants (Statement of Financial Affairs, "Attachment to Statement of Financial Affairs Part 4" [Dkt. No. 13]), but its last publicly available document only goes through June 30, 2015.    Debtor's ability to secrete assets overseas as "donations" or "grants" while insolvent is clearly of paramount concern to its creditors.    Indeed, Debtor's ability to continue in the ordinary course means that Debtor is actually giving its assets away for no consideration while its creditors are forced to satisfy themselves with an ever dwindling pie. Equally troubling is the fact that Debtor may be paying certain creditors without adequate disclosures.    Nine of the purported twenty largest creditors listed on Exhibit F to the First Day Declaration with claims totaling $337,500 are not included on Schedules E/F,[6] which supposedly lists all unsecured creditors.    Finally, while Debtor fails to provide its Officer and Director Information as required in response to Question 28 of its Statement of Financial Affairs, it states in response to Question 29 that certain individuals, including Ravi Kant and Richard Steele, are no longer Officers or Directors of Debtor, but both of their names still appear on Debtor's website as current members of the Board of Directors.

38.    Additionally, Debtor's Management's past conduct at Smile Train, including submitting and authorizing improper expenditures and covertly deferring substantial portions of Mullaney's salary to avoid income tax resulting in his employer having to reissue his W-2s, makes clear that Debtor's dispute with HelpMeSee is not the only example of Debtor's

---

[6] The creditors are: Sadguru Netra Chikitsalaya; Vivekananda Mission Asram; Ispahani Islamia Eye Institute & Hospital; Siliguri Greater Lions Eye Hospital; Dr. Shroff's Charity Eye Hospital; Tejas Eye Hospita; Drashti Netralaya; Lumbini Eye Institute; and Gombai Netralaya.

Management's misconduct.  Accordingly, this Court should appoint a Chapter 11 trustee in this case pursuant to 11 U.S.C. § 1104(a)(1).

### ii.    The Appointment of a Chapter 11 Trustee Is in the Interests of Creditors Pursuant to 11 U.S.C. § 1104(a)(2)

39.    In addition to there being sufficient cause for appointment of a Chapter 11 trustee, the Court should also appoint a trustee on the separate grounds that a trustee is necessary to protect the interests of HelpMeSee and its fellow creditors.  *See* 11 U.S.C. § 1104(a)(2); *see also In re Deena Packaging Indus., Inc.*, 29 B.R. 705, 706 (Bankr. S.D.N.Y. 1983).  With regard to the "best interest" test of section 1104(a)(2), courts have been clear that improper conduct by a debtor's management, while not rising to the level of "cause" required in subsection (a)(1), nonetheless mandates appointment of a trustee to protect creditors' interest.  *In re Euro-Am. Lodging Corp.*, 365 B.R. 421, 428 (Bankr. S.D.N.Y. 2007).  When determining whether a trustee should be appointed under section 1104(a)(2) of the Bankruptcy Code, courts "eschew rigid absolutes and look [] to the practical realities and necessities."  *In re Ionosphere*, 113 B.R. at 168.  "The twin goals of the standard for appointment of a trustee should be protection of the public interest and the interests of creditors … and facilitation of a reorganization that will benefit both the creditors and the debtors . . . ."  *Id.* (quoting H.R. Rep. No. 595, 95th Cong., 1st Sess. 232 (1977)).  In essence, section 1104(a)(2) of the Bankruptcy Code reflects "the practical reality that a trustee is needed."  *In re Ridgemour Meyer Prop., LLC*, 413 B.R. 101, 113 (Bankr. S.D.N.Y. 2008) (internal citation omitted).

40.    Among the "best interest" factors considered are: (a) the trustworthiness of the debtor; (b) the debtor-in-possession's past and present performance and prospects for the debtor's rehabilitation; (c) the confidence or lack thereof of the business community and of creditors in present management; and (d) the benefits derived by the appointment of a trustee,

balanced against the cost of the appointment.  *In re Euro-Am. Lodging*, 365 B.R. at 427 (quoting

*In re Ionosphere*, 113 B.R. at 168).    All of these factors heavily weigh in favor of the

appointment of a trustee.

41.    A trustee is necessary to protect the creditors and prevent Debtor's Management

from engaging in fraud, dishonesty, and litigation abuses during the bankruptcy proceeding.

Mullaney is not trustworthy – a neutral and well-respected AAA Arbitrator found him not to be

credible and described his conduct as reprehensible.  *See In re Ashley River*, 2015 Bankr. LEXIS

1008, at *34-35 (in addition to finding cause, court held that trustee was in best interest of

creditors because based on debtor's prior fraud and misconduct, debtor was not trustworthy and

did not deserve the confidence of the creditors).    Moreover, it is well established that where

acrimony and substantial adversity of interest exists between the debtor and creditor, as there is

here, the appointment of a Chapter 11 trustee is the proper remedy.  *See, e.g.*, *In re Ridgemour

Meyer*, 413 B.R. at 113 ("An independent trustee should be appointed under § 1104(a)(2) when

they suffer from material conflicts of interest, and cannot be counted on to conduct independent

investigations of questionable transactions in which they were involved."); *In re Eurospark

Indus., Inc.*, 424 B.R. 621, 630 (Bankr. E.D.N.Y. 2010) (recognizing that "acrimony between the

creditors and the debtor's management, standing alone, has been found to be a basis to appoint a

chapter 11 trustee under § 1104(a)(2)") (citing *In re Marvel Entm't Grp., Inc.*, 140 F.3d 463, 474

(3d Cir. 1998)).

42.    After deceiving HelpMeSee, Debtor forced HelpMeSee into a lengthy arbitration,

the results of which the parties are still litigating before the First Department, rendering any

prospect of rehabilitation highly improbable.   HelpMeSee has lost all confidence in Debtor's

Management based both on the actions of Debtor's Management, which were the subject of the

arbitration, as well as the actions they took during and after the arbitration to undermine the integrity of the arbitration process.  Where, as here, the parties with the greatest economic stake in the case have lost confidence in management, the "need for a chapter 11 trustee … outweighs the cost of the appointment." *See In re Eurospark*, 424 B.R. at 632 (citations omitted).

43.    In addition, as a result of Mullaney's actions giving rise to HelpMeSee's claim, Debtor has significant claims against Mullaney, and potentially Debtor's Management and Debtor's Board of Directors, for breach of fiduciary duty, mismanagement, and indemnification, among others.  Debtor will not be in position to pursue those claims if Mullaney remains at the helm.  Accordingly, it is in best interests of creditors to appoint a chapter 11 trustee, an independent fiduciary, who can effectively evaluate the company's potential claims against Mullaney and other members of Debtors' senior management team and outside directors to determine whether and to what extent such claims should be pursued.

44.    A further analysis of the costs and benefits of appointing a trustee only provides additional support that a trustee is necessary.  A trustee's oversight would prevent Debtor's Management, including Mullaney, from abusing the litigation process – as it did when it refused to comply with the Arbitrator's discovery orders – and will instill confidence in the creditors who may be more willing to cooperate with Debtor, which will save the estate substantial legal costs.  *See In re Colorado-Ute Elec. Ass'n, Inc.*, 120 B.R. 164, 177 (Bankr. D. Colo. 1990) ("[I]f a party is appointed in whom the creditors have confidence, they may be less confrontational and litigious and more willing to work with [the debtor]"); *In re Microwave Prod. of Am., Inc.*, 102 B.R. 666, 676 (Bankr. W.D. Tenn. 1989) (considering the fact that if a chapter 11 trustee is not appointed, "[b]ecause of the erosion of confidence in the debtor, there is likely to be increased litigation which will result in escalating legal costs to the estate").  Indeed, Mullaney's tarnished

reputation alone renders an independent trustee – who has not been embroiled in a years-long dispute with Debtor's largest creditor and whose reputation is unsullied by decades-long charges of mismanagement and abuse – in the best interest of the creditors.  Finally, as this case is still in its infancy, a trustee promptly appointed will be able to quickly gain the requisite knowledge of the case, and, as such, will not be an unduly burdensome expense.

## CONCLUSION

WHEREFORE, HelpMeSee requests that the Court enters an order: (i) directing the appointment of a Chapter 11 Trustee; and (ii) granting it such other and further legal and equitable relief to which it may be entitled.

Dated: January 18, 2017
       New York, NY

Respectfully submitted,

/s/ Benjamin Mintz
Benjamin Mintz
Vincent Sama
Catherine Schumacher
Peta Gordon

ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, New York 10019-9710
Telephone:  (212) 836-8000
Fax:  (212) 836-8689
benjamin.mintz@apks.com
vincent.sama@apks.com
catherine.schumacher@apks.com
peta.gordon@apks.com