Pamela A. Mann
Judith M. Wallace
Aaron R. Cahn
Leonardo Trivigno
CARTER LEDYARD & MILBURN LLP
2 Wall Street
New York, New York 10005
Telephone:     (212) 738-3200
Facsimile:     (212) 738-3232
Email:     mann@clm.com
               cahn@clm.com
               trivigno@clm.com
               wallace@clm.com

*Counsel to the Debtor and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------- X
                                                   :
**In re**                                          :     **Chapter 11**
                                                   :
**WONDERWORK, INC.,**                              :     **Case No. 16-13607 (SMB)**
                                                   :
**Debtor.**                                        :     Re: Docket No. ____
                                                   :
                                                   :     Hearing Date: March 7, 2017 at 10:00 a.m.
                                                   :
                                                   :     Objection Deadline: February 24, 2017 at 4:00 p.m.
                                                   :
------------------------------------------------- X

## MEMORANDUM OF LAW OF WONDERWORK, INC.
## IN OPPOSITION TO HELPMESEE'S MOTION
## TO APPOINT A TRUSTEE

7912484.8

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ................................................................................................ iii

PRELIMINARY STATEMENT ........................................................................................1

STANDARD OF REVIEW ................................................................................................3

POINT I Appointment of a Trustee for Cause is Not Warranted Under 11 U.S.C. § 1104(a)(1) ...3

A. "Clear and Convincing Evidence" of Fraud or Similar Conduct Is Required to Rebut the Strong Presumption that the Debtor Should Remain in Possession ........4

B. An Arbitral Award Is Only Preclusive For Issues Shown "With Clarity and Certainty" To Be the Sole Basis for an Award ......................................................4

C. The Only "Essential" Findings Are Whether WonderWork's Founding Donors Were "Misled" and the Allocation of $200,000 in Net Contract Damages to HMS ..................................................................................................................6

D. Because HMS Argues that the Award Had Multiple Alternate Grounds for Ordering the Turnover of the $8.1 Million in WonderWork Donations, None of the Grounds on that Point Has Collateral Estoppel Effect ....................................7

E. The Award's Extensive and Unnecessary Discussion of Smile Train Contains Significant Factual and Legal Errors ..................................................................7

a. Cleft Palates ..........................................................................................8

b. Merger Proposal ..................................................................................10

c. Overall Reliability of the Award .........................................................13

F. The Arbitrator's Conclusions About Credibility Are Fundamentally Flawed and Do Not Constitute "Clear and Convincing Evidence" of Cause .........................14

a. The Arbitrator Failed to Acknowledge the Potential for Bias .......14

b. Mr. Wang's Credibility and Character Have Been Questioned Repeatedly ...........................................................................................16

G. The Award's Statements Concerning Mr. Wang and Smile Train Are Not Essential and Do Not Have Preclusive Effect ....................................................17

H. The Arbitrator Disregarded Evidence of Improper Threats Against Entities Receiving Grants from WonderWork ..................................................................20

I. Other Allegations in HMS's Motion Do Not Support Appointment of a Trustee ............................................................................................................20

a. Disclosures Regarding Restricted Funds .........................................20

7912484.8

          b.      Non-Prejudicial Errors In Bankruptcy Filings ............................... 24

          c.      Disclosure of Bankruptcy ............................................................ 24

          d.      Discovery Disputes in Arbitration ............................................... 24

POINT II Discretionary Appointment of a Trustee is Not Warranted Under 11 U.S.C. §
        1104(a)(2) ............................................................................................. 26

    A.      Consideration of the Best Interest of the Debtor and Its Charitable Mission ........ 26

    B.      The Best Interest of the Debtor and Its Charitable Mission is Served by Allowing
           WonderWork to Reorganize, Emerge from Bankruptcy, Comply With Gift
           Restrictions, and Pay Its Creditors ....................................................................... 27

    C.      Mr. Mullaney Is Properly Supervised by the Board, Has the Complete Confidence
           of the Board, and Has Unique Skills Critical to Successful Reorganization ......... 28

          a.      Mr. Mullaney's Unique and Essential Skill Set ............................ 28

          b.      Board Oversight and Support ........................................................ 32

          c.      Devastating Impact of the Appointment of a Trustee .................... 32

    D.      WonderWork's Other Creditors Oppose Appointment of a Trustee ..................... 34

    E.      HMS's Motion Reflects Bias and Animus and Is Contrary to the Interests of
           WonderWork's Other Creditors and the Reorganization of WonderWork .......... 35

    F.      HMS and Smile Train Have a Motive to Destroy an Economic Competitor ........ 37

    G.      Successful Reorganization of WonderWork Is In the Public Interest .................. 38

CONCLUSION ................................................................................................................. 38

ii

## TABLE OF AUTHORITIES

**Page(s)**

### FEDERAL CASES

*Adams v. Marwil (In re Bayou Group, LLC),*
 564 F.3d 541 (2d Cir. 2009)................................................................3

*In re Adelphia Commcations Corp.,*
 336 B.R. 610 (Bankr. S.D.N.Y. 2006), *aff'd*, 342 B.R. 122 (S.D.N.Y. 2006) ..........................3

*In re Ashley River Consulting, LLC,*
 No. 14-13406/07 (MG), 2015 WL 1540941 (Bankr. S.D.N.Y. Mar. 31, 2015)......................3

*BBS Norwalk One, Inc. v. Raccolta, Inc.,*
 117 F.3d 674 (2d Cir. 1997).................................................................5

*In re Bergeron,*
 No. 13-02912-8-SWH, 2013 WL 5874571 (Bankr. E.D.N.C. Oct. 31, 2013) ............22, 23, 25

*CA, Inc. v. Wang,*
 No. 04-CV-2697 (TCP), 2011 WL 5401324 (E.D.N.Y. Nov. 4, 2011)........................8, 16, 17

*In re Colorado-Ute Electric Association, Inc.,*
 120 B.R. 164 (Bankr. D. Colo. 1990) .....................................................36

*In re Computer Associates Class Action Securities Litigation,*
 Nos. 98-CV-4839, 02-CV-1226, 03-CV-4199 (TCP), 2007 WL 2713336 (E.D.N.Y.
 Sept. 12, 2007) ...........................................................................8, 16

*In re Crescent Beach Inn,*
 22 B.R. 155 (Bankr. D. Me. 1982)........................................................23

*In re Ionosphere Clubs, Inc.,*
 113 B.R. 164 (Bankr. S.D.N.Y. 1990) ....................................................3

*Martha Graham School and Dance Foundation, Inc. v. Martha Graham Center of
 Contemporary Dance,*
 224 F. Supp.2d 567 (S.D.N.Y. 2002), *aff'd in part, vacated in part on other grounds,*
 380 F.3d 624 (2d Cir. 2004)................................................................12

*In re Marvel Entertainment Group, Inc.,*
 140 F.3d 463 (3d Cir. 1998)................................................................26

*In re Microwave Products of America, Inc.,*
 102 B.R. 666 (Bankr. W.D. Tenn. 1989) .................................................36

*Postlewaite v. McGraw-Hill,*
   333 F.3d 42 (2d Cir. 2003) ...................................................................4, 5, 6, 7

*In re Ridgemour Meyer Properties, LLC,*
   413 B.R. 101 (Bankr. S.D.N.Y. 2008) ..........................................................3, 27

*SEC v. Computer Associates International, Inc.,*
   04-Civ-04088 (ILG) (E.D.N.Y.) .......................................................................16

*In re Sharon Steel Corp.,*
   871 F.2d 1217 (3d Cir. 1989) ...........................................................................24

*In re Shotwell Landfill, Inc.,*
   No. 13-02590-8-SWH, 2014 WL 4377721 (Bankr. E.D.N.C. Sept. 4, 2014) ........23

*In re Sletteland,*
   260 B.R. 657 (Bankr. S.D.N.Y. 2001) ................................................................4

*In re Smart World Technologies, LLC,*
   423 F.3d 166 (2d Cir. 2005) ..............................................................................3

*In re Sundale, Ltd.,*
   400 B.R. 890 (Bankr. S.D. Fla. 2009) ..............................................................23

*U.S. v. Computer Assocs. International Inc.,*
   Cr. No. 04-837 (E.D.N.Y. filed Sept. 22, 2004) ................................................16

*United States v. Kumar,*
   04-CR-846 (ILG) (E.D.N.Y. filed Nov. 2, 2006) ...............................................16

### STATE CASES

*Alco Gravure, Inc. v. Knapp Foundation,*
   64 N.Y.2d 458 (1985) .......................................................................................27

*Matter of Friends for Long Island's Heritage*
   80 A.D.3d 223 (2d Dep't 2010) ........................................................................21

### FEDERAL STATUTES

11 U.S.C. § 1104 .................................................................3, 4, 24, 26, 27, 38

11 U.S.C. § 1129 ...............................................................................................27

### OTHER STATUTES

Executive Law § 174-b(4) ..................................................................................21

iv

N-PCL § 720-a ...................................................................................................................36

N-PCL § 907 ..............................................................................................................12, 13

N-PCL § 907-a .................................................................................................................13

N-PCL § 907-b .................................................................................................................13

N-PCL § 513(b) ...........................................................................................................6, 21

N-PCL § 555 .......................................................................................................................6

## RULES

Bankruptcy Rule 2004 .......................................................................................................25

Federal Rule of Evidence 201 .............................................................................................8

## OTHER AUTHORITIES

Alex Berenson, *CA Says Its Founder Aided Fraud*, N.Y. TIMES (Apr. 14, 2007).......................17

Alex Berenson, *Chairman of Computer Associates Resigns*, N.Y. TIMES (Nov. 19, 2002)..........16

Dana Y. Elliott & Evan C. Hollander, *Navigating a Nonprofit Corporation Through
    Bankruptcy*, NONPROFIT QUARTERLY (Apr. 29, 2014),
    https://nonprofitquarterly.org/2014/04/29/navigating-a-nonprofit-corporation-
    through-bankruptcy/ ..............................................................................................26, 35

Elizabeth Simpson, *Operation Smile and Smile Train to Merge Charities*, THE
    VIRGINIAN-PILOT (Feb. 15, 2011), http://pilotonline.com/news/local/health/operation-
    smile-and-smile-train-to-merge-charities/article_3ebcafa8-263f-5f64-9d9f-
    a7085ff01e5a.html .........................................................................................................12

CA, Inc. Special Litigation Committee Report, WALL STREET JOURNAL,
    http://online.wsj.com/public/resources/documents/20070413_CA.pdf..................................17

*Operation Smile to Being [sic] Construction on New VA Headquarters*, WHSV (Sept. 24,
    2010), http://www.whsv.com/home/headlines/103716739.html. ..........................................11

U.S. Sec. & Exch. Comm'n, SEC Files Securities Fraud Charges Against Computer
    Associates International, Inc., Former CEO Sanjay Kumar, and Two other Former
    Company Executives, 2004-134 (2004), https://www.sec.gov/news/press/2004-
    134.htm ........................................................................................................................16

Smile Train, Inc., https://www.smiletrain.org. ........................................................................9

v

Smile Train, Inc., Stories: Satish Kalra 16 Years Smiles (June 29, 2016),
    https://www.smiletrain.org/stories/satish-kalra-16-years-smiles................................32

Smile Train, IRS Filing Form 990 (2015), https://www.smiletrain.org/about/financials..............10

Stephanie Strom, *2 Charities Set to End a Merger, Papers Say*, N.Y. TIMES (Mar. 6,
    2011) ........................................................................................................11, 13

Stephanie Strom, *Opposition Arises to Charities' Merger*, N.Y. TIMES
    (Feb. 23, 2011) ..........................................................................................11, 12, 15

7912484.8

WonderWork, Inc. ("***WonderWork***" or the "***Debtor***"), debtor and debtor in possession in the above-captioned case, submits this memorandum of law, and supporting declarations, in opposition to the motion by HelpMeSee, Inc. ("***HelpMeSee***" or "***HMS***") to appoint a trustee.

## PRELIMINARY STATEMENT

HelpMeSee, trumpeting deeply flawed "findings" from an arbitration award (the "*Award*")[1] entered against WonderWork as though they were uncontested facts that bind the parties and the Court, would have this Court believe that Brian Mullaney, the CEO of WonderWork, is a "serial fraudster" whose conduct poses a clear and present danger to the Debtor. In truth, the Debtor vigorously contests the arbitral findings, and they are, in almost every respect, patently inaccurate. More importantly for this motion, because the lion's share of the arbitral findings are unrelated to the contract dispute between HMS and Wonderwork and not essential to the relief granted by the arbitrator to HMS, they are not binding on this Court.

The Debtor is a charity built by Mr. Mullaney, who has demonstrated an outstanding ability to raise funds for worthy causes over two decades. Mr. Mullaney enjoys the confidence and support of an extremely experienced, distinguished, active and vigilant board of directors; other creditors; and WonderWork's donor base, many of whom join in opposition to this motion.

As set forth in these supporting declarations, Mr. Mullaney possesses a unique and essential skill set, including his longstanding relationships with major donors, oversight of the organization's robust and sophisticated direct mail campaigns, and partnerships with hospitals and NGOs in the developing world. There is no credible allegation of material misconduct in

---

[1] The Partial Final Award (the "Award"), dated October 13, 2016, which was confirmed by the Supreme Court on November 29, 2016 and from which WonderWork is appealing, is annexed as Exhibit A to the Declaration of Aaron R. Cahn ("Cahn Decl."). The Final Award, dated December 21, 2016, which includes a further award of attorneys' fees, and which has not been confirmed (the "Final Fee Award"), is annexed as Exhibit A to the Declaration of Benjamin Mintz, dated January 18, 2017 ("Mintz Decl.") [Dkt. No. 17]. WonderWork reserves all its rights and defenses with respect to the confirmation of that further award.

relation to the Debtor's own operations or dealings, which have been demonstrably aboveboard.

But for the Award (which is subject to reversal on appeal), WonderWork, a successful organization that has raised over $55 million dollars and provided support for more than 220,000 life-changing medical treatments in the developing world, would not be in Chapter 11. This Award arises from a contract dispute. HMS succeeded, at a cost of $6 million in legal fees, in convincing the arbitrator to enlarge the scope of the arbitration (about a services contract) into claims of third parties, resulting in numerous demonstrable errors of fact and law.[2] The Award's principal factual finding – that donors were "misled" into giving $8.1 million in donations to WonderWork that they intended for HMS – is unquestionably wrong, as demonstrated by affidavits and statements of donors reiterating their intent to donate to WonderWork.[3]

With its motion for a trustee and related maneuvers, HMS seeks to engineer the demise of WonderWork, plainly motivated by personal animus and a desire to eliminate an economic competitor. The motion ignores the interest of the Debtor or the creditors as a whole, and imperils the Debtor's continued existence as well as the people served by its charitable efforts.

Contrary to HMS's distorted narrative, WonderWork's management should be able to reorganize and, whether the appeal is successful or not, should be able pay its creditors and continue its important work supporting medical treatments in the developing world.

---

[2] HMS's statement that Debtor has not disputed the factual and legal findings in the Award is flatly incorrect (HelpMeSee, Inc.'s Motion for the Entry of an Order Directing the Appointment of a Chapter 11 Trustee, dated January 18, 2017 ("HMS Motion") [Dkt. No. 16], at ¶ 2). See WonderWork's Mem. of Law in Support of Cross-Motion to Vacate Arbitration Award, dated Nov. 11, 2016, submitted in *Help Me See, Inc. v. WonderWork, Inc.*, in New York Supreme Court, New York County, Index No. 655667/2016, Cahn Decl., Ex. B, p. 1, n.2 ("WonderWork submits that these findings are erroneous and not supported by the facts and evidence presented at the hearing ")

[3] See Affidavits of William E. Conway, Jr. (sworn to on Nov. 11, 2016), Clark Kokich (sworn to on Nov. 8, 2016), Joseph E. Mullaney (sworn to on Nov. 9, 2016), and letter from Martin Haefner, to Hon. Barry R. Ostrager, Justice of the Supreme Court of the State of New York, County of New York, dated Nov. 9, 2016, submitted in *Help Me See, Inc. v. WonderWork, Inc.*, N.Y. Sup. Ct., N.Y. County, Index No. 655667/2016, Mintz Decl., Ex. C.

2

## STANDARD OF REVIEW

Under Section 1104 of the Bankruptcy Code, the showing required for appointment of a trustee is "very high" and appropriate only in "extraordinary cases." *In re Smart World Techs., LLC*, 423 F.3d 166, 176 (2d Cir. 2005) (citing 7 COLLIER ON BANKRUPTCY ¶ 1104.02[2][a] (15th L. King. ed.)). A motion seeking a trustee must provide "clear and convincing evidence" that a trustee is appropriate. *Adams v. Marwil (In re Bayou Grp., LLC)*, 564 F.3d 541, 546 (2d Cir. 2009); *In re Ridgemour Meyer Props., LLC*, 413 B.R. 101, 108 (Bankr. S.D.N.Y. 2008).

The "appointment of a trustee should be the exception rather than the rule." *In re Ashley River Consulting, LLC*, No. 14-13406/07 (MG), 2015 WL 1540941, at *8 (Bankr. S.D.N.Y. Mar. 31, 2015) (quoting *In re Sharon Steel Corp.*, 871 F.2d 1217, 1225 (3d Cir. 1989)); *see also Ridgemour Meyer*, 413 B.R. at 108 (appointment of trustee is an "extraordinary remedy").

Chapter 11 is designed "to allow the debtor-in-possession to retain management and control of the debtor's business operations unless a party in interest can prove that the appointment of a trustee is warranted." *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 167 (Bankr. S.D.N.Y. 1990). Accordingly, "there is a *strong* presumption that the debtor should be permitted to remain in possession . . . ." *In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 655 (Bankr. S.D.N.Y. 2006), *aff'd*, 342 B.R. 122 (S.D.N.Y. 2006) (emphasis added).

## POINT I

## APPOINTMENT OF A TRUSTEE FOR CAUSE IS NOT WARRANTED UNDER 11 U.S.C. § 1104(a)(1)

HMS fails to make the very strong showing of "clear and convincing evidence" of wrongful conduct that is required to demonstrate that a trustee is warranted for cause under Section 1104(a). HMS cannot meet this very high standard by relying on statements in the

3

Award that are patently incorrect and do not have collateral estoppel effect in this Court –
including, most significantly, the unnecessary discussion of disputes with non-party Smile Train,
neither a party in the arbitration nor a party in this proceeding.

### A. "Clear and Convincing Evidence" of Fraud or Similar Conduct Is Required to Rebut the Strong Presumption that the Debtor Should Remain in Possession

Section 1104(a)(1) authorizes the bankruptcy court to grant a motion to appoint a trustee
for cause, defined as "fraud, dishonesty, incompetence, or gross mismanagement of the affairs of
the debtor by current management" or for "similar cause." While a court may consider past acts
by debtor's management, "the focus is on debtor's current activities, not past misconduct." *In re
Sletteland*, 260 B.R. 657, 672 (Bankr. S.D.N.Y. 2001) (citing 7 COLLIER ON BANKRUPTCY ¶
1104.02[3][c][i] (15th L. King. ed.)). HMS fails to make this showing because it relies almost
entirely on an Award that is demonstrably incorrect and should be disregarded by this Court.
Moreover, HMS's motion evidences bias and malice toward the Debtor and a desire to force the
Debtor out of business, which motives are inconsistent with the purpose of Section 1104.

### B. An Arbitral Award Is Only Preclusive For Issues Shown "With Clarity and Certainty" To Be the Sole Basis for an Award

Under federal law and New York State law, "in order for a judgment to be preclusive, the
issue in question must have been actually decided, and its determination must have been
essential to the judgment." *Postlewaite v. McGraw-Hill*, 333 F.3d 42, 48 (2d Cir. 2003) (citing
*Tucker v. Arthur Andersen & Co.*, 646 F.2d. 71, 728 (2d Cir. 1980)). "If an issue was not
actually decided in the prior proceeding, or if its resolution was not necessary to the judgment, its
litigation in a subsequent proceeding is not barred by collateral estoppel." *Id.*

In evaluating the preclusive effect of an arbitration award, the Second Circuit in
*Postlewaite* noted that "the party asserting preclusion bears the burden of showing *with clarity*

4

*and certainty* what was determined by the prior judgment, and issue preclusion will apply only if it is *quite clear* that this requirement has been met." *Postlewaite*, 333 F.3d at 49 (emphasis in original) (quotation marks omitted) (quoting *BBS Norwalk One, Inc. v. Raccolta, Inc.*, 117 F.3d 674, 677 (2d Cir. 1997)).

Under this demanding standard, to "obtain summary judgment on collateral estoppel grounds based on an arbitration award," a party "must make a showing so strong that no fair-minded jury could fail to find that" the result was for the reason that the party seeking collateral estoppel asserts." *Id.* (internal quotation marks omitted) (quoting *BBS Norwalk One*, 177 F.3d at 677). Where the award is unclear and the arbitration record "extensive" the Court in *BBS Norwalk* required the party seeking to rely on the award to "submit the entire arbitration record (testimony, exhibits, and the oral and written submissions of counsel) to the district court . . . ." *BBS Norwalk One*, 117 F.3d at 678.

That demanding standard was not met in *Postlewaite* because the Second Circuit determined there were two potential legal theories that were colorable bases for the award – and thus neither had collateral estoppel effect. *See Postlewaite*, 333 F.3d at 48-51. *Postlewaite* concerned an arbitral decision, in a claim by authors against certain publishers. In a later dispute between the parties, regarding a software agreement for the same works, the district court held that the authors' new claims were barred by the doctrine of collateral estoppel. The Second Circuit reviewed the arbitral record and reversed, because "if the arbitrators made both findings, either of which would have been a colorable basis for the award, neither finding may properly be said to have been essential to the award." *Postlewaite*, 333 F.3d at 51 (citing RESTATEMENT (SECOND) OF JUDGMENTS § 27 cmt. i (1982)).

In this case, the voluminous Award contains extensive discussion of points on which the

5

arbitrator declines to rule and others which provide, at best, alternate bases for certain findings. None of these have preclusive effect under *Postlewaite.*

### C. The Only "Essential" Findings Are Whether WonderWork's Founding Donors Were "Misled" and the Allocation of $200,000 in Net Contract Damages to HMS

Relying on significant factual errors, the Arbitrator found in paragraph 123 of the Award that WonderWork "misled" donors into making gifts to WonderWork instead of HMS. On the basis of this improper and incorrect finding, the arbitrator ordered that all $8.1 million donated to WonderWork during the agreement term should be diverted to HMS.

In the Supreme Court, in its cross-motion to vacate the Award, WonderWork contested this finding as exceeding the arbitrator's authority and violating the strong and well-established public policy embodied in New York statutes and appellate decisional law.[4] New York's Not-for-Profit Corporation Law ("N-PCL") §§ 513 and 555, the Estate Powers and Trusts Law, and binding judicial authority hold that a charitable gift must be spent only for the purpose specified by the donor and may not be modified without the consent of the donor or, upon narrow grounds, if so approved by an order of the Supreme Court, and that such a court proceeding must provide the donor and Attorney General with notice and the opportunity to be heard.

Wonderwork's cross-motion to vacate the Award also demonstrated that the factual underpinnings of this Award were patently incorrect. WonderWork provided sworn declarations and letters from donors of more than $7 million of this $8.1 million, reconfirming that they intended their gifts to be to WonderWork and not HMS.[5] These include major donors that

---

[4] *See* WonderWork's Mem. of Law in Support of Cross-Motion to Vacate, Cahn Decl., Ex. B, at pp. 1-3.

[5] *See* Mintz Decl., Ex. C. WonderWork is appealing the confirmation of the Award on this ground, among others, including that the award of fees constitutes an impermissible award of punitive damages in arbitration. This Court recently entered an order lifting the automatic stay to allow the debtor to prosecute its appeal. Order Lifting Automatic Stay to Allow Debtor to Prosecute its Appeal, dated February 16, 2017 [Dkt. No. 48].

6

followed Mr. Mullaney from Smile Train, a member of WonderWork's board, and Mr.

Mullaney's father. These donors did not intend to support HMS. Much of the remaining balance

of the $8.1 million came from family and staff of WonderWork, including Mr. Mullaney.

The disputes between HMS and WonderWork deemed related to the services agreement

resulted in a further $200,000 to HMS (for a total of $8.3 million, before interest and fees).[6] The

extensive discussion of disputes between Smile Train and Mr. Mullaney was not essential.

## D. Because HMS Argues that the Award Had Multiple Alternate Grounds for Ordering the Turnover of the $8.1 Million in WonderWork Donations, None of the Grounds on that Point Has Collateral Estoppel Effect

HMS attempts to side-step the inconvenient fact that WonderWork's donors have clearly

expressed their intent to give to WonderWork and reiterated that they were not "misled" by

arguing that the Award set forth alternate grounds for diversion of $8.1 million in donations.[7]

If the Award states multiple grounds, none has collateral estoppel effect. *Postlewaite*,

333 F.3d at 51. Accordingly, it is appropriate for this Court to consider the sworn statements

from the donors as to whether they were actually "misled" and whether these donations made to

WonderWork were intended to support WonderWork or HMS.

## E. The Award's Extensive and Unnecessary Discussion of Smile Train Contains Significant Factual and Legal Errors

The first 40 paragraphs of an arbitration Award in a dispute between HMS and

WonderWork focus almost exclusively on Mr. Mullaney's relationship with Smile Train, which

he co-founded with Charles Wang in 1999 and of which he was President for over a decade. This

---

[6] The damages calculation is set forth in the Award (¶¶ 123-124) include contract fees due from HMS to WonderWork and grants the arbitrator deemed owed to HMS, and notes demands of HMS that were rejected.

[7] *See* HMS Motion, ¶ 19. However, both alternative grounds were based on the same incorrect finding that HMS was the owner of the $8.1 million in donations made to WonderWork, which could only be because the donors intended to support HMS, a finding that the arbitrator was not empowered to make as a matter of New York law.

7

was an improper expansion of the scope of the arbitration, was irrelevant to the parties' dispute, and did not result in any damages awarded to HMS.

In the arbitration, HMS's counsel was Vincent Sama, who previously defended Smile Train's founder, Charles Wang, in connection with the massive $3.3 billion accounting fraud at Computer Associates.[8] HMS then proceeded to spend $6 million in legal fees on the arbitration, three times the total contract amount, much of it on its litigating its own irrelevant and overly burdensome demands for discovery and testimony relating to Smile Train.

The Award contains hundreds of factual errors, large and small, concerning Smile Train. HMS now relies upon these statements in support of its motion for a trustee. None of these are binding on this Court, and this Court is free to make a contrary finding.[9] The below-listed errors are not an exhaustive list, but are indicative of the defects in the Award as a whole.

     *a.*    *Cleft Palates*

The arbitrator made numerous erroneous findings with respect to an internal debate at Smile Train in 2009-2010 over whether Smile Train's mission should be expanded. This occurred long before the HMS-WonderWork services agreement. Because HMS relies heavily on those statements in its motion, WonderWork will correct the record here.[10]

Smile Train provides financial support for cleft palate surgeries. In or around 2009, the number of cleft surgeries it funded flattened, and, as acknowledged in the Award, Smile Train

---

[8] *See, e.g., CA, Inc. v. Wang*, No. 04-CV-2697 (TCP), 2011 WL 5401324 (E.D.N.Y. Nov. 4, 2011) (noting scope of fraud and describing findings of Special Litigation Committee investigation concerning Mr. Wang; Mr. Sama, then at Winston & Strawn LLP, represented Mr. Wang); *In re Computer Assocs. Class Action Sec. Litig.*, Nos. 98-CV-4839, 02-CV-1226, 03-CV-4199 (TCP), 2007 WL 2713336 (E.D.N.Y. Sept. 12, 2007) (same). The existence of such filings is appropriate for judicial notice pursuant to Federal Rule of Evidence 201.

[9] The errors are too numerous to discuss in their entirety here.

[10] *See* HMS Motion, ¶ 11.

8

raised $91 million and had amassed substantial unspent funds.[11] Smile Train had enough cash on hand to fund hundreds of thousands of these surgeries, which cost Smile Train a few hundred dollars each.[12] As former Smile Train director Mark Atkinson states in his declaration, there was a debate as to whether the need for these surgeries would ultimately decline. Smile Train's management proposed expanding Smile Train's mission to include raising funds for other issues that could also be remedied by life-changing low-cost medical treatments.[13] The Award insinuates that this was an improper personal agenda to divert restricted purpose funds already on hand, rather than a legitimate debate about the future mission of the organization.

The Award incorrectly suggests that Mr. Mullaney bribed and conspired with Dr. Steven D. Levitt to provide false analysis to support an expansion of the organization's mission. Dr. Levitt is the William B. Ogden Distinguished Service Professor of Economics at the University of Chicago, and the author of books including *Freakonomics*.[14] His declaration demonstrates that Smile Train's accusation is untrue.

In 2009, Dr. Levitt co-founded The Greatest Good, formerly known as *Freakonomics*, a consulting firm that advises philanthropic organizations by using data to increase productivity, reduce costs and drive growth. The Greatest Good provided Smile Train with a range of consulting services, including analytics on its extensive and sophisticated direct mail campaigns. Paragraph 18 of the Award states that "to buy Freakonomics' cooperation" Mr. Mullaney

---

[11] Declaration of Mark Atkinson, executed on February 24, 2017 ("Atkinson Decl."), at ¶ 9.

[12] Smile Train, https://www.smiletrain.org. Smile Train's web site states that "$250 can cover the cost of surgery".

[13] Atkinson Decl., ¶ 9.

[14] In 2003, he received the John Bates Clark Medal from the American Economics Association. In 2006, he was named one of *Time* magazine's "100 People Who Shape Our World." He holds a B.A. in economics from Harvard University and a Ph.D. from the Massachusetts Institute of Technology. Declaration of Steven D. Levitt, executed on February 20, 2017 ("Levitt Decl."), at ¶ 2.

9

"unilaterally" doubled "Freakonomics' monthly retainer to $30,000." This is false. As stated in Dr. Levitt's declaration (¶ 10), The Greatest Good received an increase in its retainer after it helped Smile Train recoup millions of dollars of donations tied to TrustAid in the UK, and required this increase based on the time and resources it was devoting to Smile Train.

As acknowledged in the Award, the Smile Train board authorized a review of the question of whether to expand its mission, and a test solicitation confirmed that Smile Train donors would provide support for blindness surgery.[15] Mr. Wang strongly opposed any inquiries into this expansion. *Id.* ¶ 9-10. Eight months later, after Mr. Wang gained control of the Smile Train board, Mr. Wang engineered Mr. Mullaney's departure as President, unilaterally ordered investigations of Mr. Mullaney, and sued him in state, federal and foreign courts. *Id.* ¶ 13.

The Award (¶ 19) concludes that Mr. Mullaney's concerns were invalid because Smile Train support for surgeries increased. It fails acknowledge that Smile Train's surplus continued to outpace grants for these inexpensive surgeries, swelling to $250 million in 2015.[16]

  b. *Merger Proposal*

The accumulation of cash laid the groundwork for the second major dispute at Smile Train discussed in the Award – the abandoned merger with Operation Smile.

The Award contains a lengthy discussion of this proposed merger and suggests that impropriety by Mr. Mullaney led Smile Train to abandon it to the detriment of Smile Train.[17] This merger was proposed, and the proposal withdrawn, in early 2011, months before the HMS-WonderWork agreement. There was no valid reason for this merger to be the subject of extensive

---

[15] Atkinson Decl., ¶ 9.

[16] Smile Train, IRS Filing Form 990 (2015), https://www.smiletrain.org/about/financials.

[17] Award, ¶¶ 36-41.

discovery and hearings in the arbitration. As discussed below, this merger proposal was objectively problematic, publicly criticized by independent directors and donors, and not confidential, as it would have required judicial approval on notice to the Attorney General.

Under the proposal, Operation Smile, a smaller, Virginia-based charity would acquire and absorb Smile Train, an inversion of the usual process. In another unusual feature, the proposal created a restricted fund within the surviving corporation (the "LF") to control Smile Train assets. The lesser of $50 million or 1/3 of Smile Train's assets would transfer to an unrestricted fund, the remainder would transfer to the LF. The surviving corporation also divided all net revenues raised between the surviving corporation and the LF. Had the merger succeeded, Mr. Wang would have had, through indirect control, influence and control over the expenditure and investment of approximately $185 million of charitable funds.[18] The LF would not have been subject to New York regulatory jurisdiction, or the independent directors of Smile Train. Also, news reports noted Operation Smile had an obligation of $20 million for new headquarters.[19]

The proposal was presented to the independent directors as a *fait accompli*, after Mr. Wang had installed sufficient directors who worked for his companies to create a majority on the board. *The New York Times* described the merger as "the equivalent of a putsch" approved with the votes of only those directors who were employed by Mr. Wang's businesses.[20] The former head of the Charities Bureau in the New York State Attorney General's office was quoted

---

[18] Stephanie Strom, *2 Charities Set to End a Merger, Papers Say*, N.Y. TIMES (Mar. 6, 2011), http://www.nytimes.com/2011/03/07/business/07charity.html (including links to proposed amended bylaws and merger agreement) (annexed to Cahn Decl., Ex. C); Atkinson Decl. ¶ 14.

[19] *See Operation Smile to Being [sic] Construction on New VA Headquarters*, WHSV (Sept. 24, 2010), http://www.whsv.com/home/headlines/103716739.html (annexed to Cahn Decl., Ex. D).

[20] Stephanie Strom, *Opposition Arises to Charities' Merger*, N.Y. TIMES (Feb. 23, 2011), http://www.nytimes.com/2011/02/24/business/24smile.htm l?_r=0 (annexed to Cahn Decl., Ex. E).

7912484.8

describing the fund to be controlled by Mr. Wang as "a fiefdom."[21]

The Award implies that the abandonment of the merger was caused by Mr. Mullaney's improper leaks of "confidential" information.[22]    But the merger was not a secret.    Smile Train announced the merger on February 14, 2011.[23]

What Mr. Wang objected to was dissent. The Award (¶ 40) states that the board was polled on March 7, 2011 about leaks to *The New York Times* reporter Stephanie Strom. Because all board members denied doing so at that meeting, except Mr. Mullaney, who refused to answer, the Award suggests that Mr. Mullaney must have been Ms. Strom's source. This is absurd. Ms. Strom's article quoted two other board members criticizing the merger proposal, noted that "many at Smile Train opposed the merger" (indicating she spoke to more than these two) but explicitly states that Mr. Mullaney "declined to comment."[24]    Moreover, disclosures were consistent with the fiduciary duty of directors, which was to the interests and mission of Smile Train, not the interest of Mr. Wang in securing control over its assets.[25]

Regulatory scrutiny was inevitable. Under the law in effect in 2011, the merger of a Type B organization (like Smile Train) with another charitable organization required an order of the Supreme Court on notice to the Attorney General.[26]    And judicial approval was far from

---

[21] *Id.*

[22] Award, ¶ 36-41.

[23] Elizabeth Simpson, *Operation Smile and Smile Train to Merge Charities*, THE VIRGINIAN-PILOT (Feb. 15, 2011), http://pilotonline.com/news/local/health/operation-smile-and-smile-train-to-merge-charities/article_3ebcafa8-263f-5f64-9d9f-a7085ff01e5a.html (annexed to Cahn Decl., Ex. F).

[24] Stephanie Strom, *Opposition Arises to Charities' Merger, supra* note 20 (Cahn Decl., Ex. E).

[25] It is a well-established principle of New York law that the directors and officers of not-for-profit corporations are required to act "with an eye single to the interests" of the entity to which they owe a fiduciary duty. *Martha Graham Sch. and Dance Found., Inc. v. Martha Graham Ctr. of Contemporary Dance*, 224 F. Supp.2d 567, 608 (S.D.N.Y. 2002), *aff'd in part, vacated in part on other grounds*, 380 F.3d 624 (2d Cir. 2004), *on remand*, 374 F. Supp.2d 355 (S.D.N.Y 2005), *aff'd*, 466 F.3d 97 (2d Cir. 2006) (describing procedural history).

[26] N-PCL § 907. Analogous provisions in the current law are set out at N-PCL §§ 907-a and 907-b.

12

guaranteed. A merger would only be approved if "the interests of the constituent corporations and the public interest will not be adversely affected." N-PCL § 907(e).[27]

The arbitrator concluded that Mr. Mullaney "concealed the extent of his involvement" in the merger from HMS.[28] But as reported in the New York Times, Mr. Wang and Mr. Mullaney had a falling out and Smile Train blamed Mr. Mullaney for the failure of the merger.[29] Mr. Mullaney should not have been required to say more to HMS, and WonderWork should not have been required to litigate this issue in a service contract dispute with HMS.

>    c.    *Overall Reliability of the Award*

Page one of the Award begins with the incorrect statement that Charles Wang was a co-founder of WonderWork.[30] This basic error is emblematic of the Award, and must be considered in evaluating the weight appropriate for over 30 of 90 paragraphs in the "facts" section of the Award that address Charles Wang or organizations with which he is affiliated.

The Award also dwells on an investigation of Mr. Mullaney by Smile Train. The independent directors of Smile Train viewed the investigation as vindictive and unfounded.[31] The Award suggests it should have been disclosed to HMS. If an investigation is sufficient to impugn credibility, in 2007, Mr. Wang was the subject of an independent shareholder investigation that reached highly critical conclusions about his conduct, as discussed below. And as a result of that investigation, Mr. Wang would certainly have understood the negative impact of an investigation and the importance of controlling its results.

---

[27] This citation is to the law in effect at the time of the proposed Smile Train merger.

[28] Award, ¶ 41.

[29] Stephanie Strom, *2 Charities Set to End a Merger*, *supra* note 18 (Cahn Decl. C).

[30] Award, ¶ 1.

[31] *See, e.g.*, Atkinson Decl., ¶ 16.

13

The Award similarly suggests that litigation concerning Smile Train UK and a Smile Train book had merit.[32]   As stated in Mr. Price's declaration, the independent directors concluded that the Smile Train UK litigation was vindictive and baseless, and a waste of the organization's resources.[33]

Space prohibits a listing of all factual errors and baseless insinuations in the Award.   In view of the errors listed above, the non-essential statements (the majority of this voluminous Award) should not be accepted, as none is binding on this Court, and most are false.

## F. The Arbitrator's Conclusions About Credibility Are Fundamentally Flawed and Do Not Constitute "Clear and Convincing Evidence" of Cause

### a.   The Arbitrator Failed to Acknowledge the Potential for Bias

Despite acknowledging that most of the $8.1 million in donations that WonderWork raised for itself were allegedly from Smile Train donors, the Arbitrator failed to consider the potential for bias in evaluating the accuracy of Smile Train's version of events.[34]

The departure of independent directors, board of governors members, donors and staff to continue to work with Mr. Mullaney provides compelling circumstantial evidence that Mr. Mullaney's conduct at Smile Train was appropriate.[35]   Their criticism of Smile Train, and public support for WonderWork, also helps to explain the personal animus that Mr. Wang and Smile Train would have toward WonderWork. Mr. Atkinson was a Smile Train director and Dr. Levitt

---

[32] Award, ¶ 106; ¶¶ 31-35, respectively.

[33] Declaration of Richard T.G. Price, executed on February 20, 2017 ("Price Decl."), at ¶¶ 8-14 (Smile Train UK litigation).

[34] Award, ¶ 123.

[35] *See* Atkinson Decl. (noting Mr. Atkinson's departure from Smile Train along with Smile Train's upper management that followed Brian to WonderWork); *see also* Declaration of John J. Coneys, Jr., executed on February 20, 2017 ("Coneys Decl.") (noting Brian's close relations with former Smile Train donors); Letter of Martin Haefner, dated February 16, 2017, Cahn Decl., Ex. G.

a member of the Smile Train board of governors. Both now serve on the WonderWork board. Richard Price, a Smile Train UK Trustee, also followed Mr. Mullaney to WonderWork.

William S. Conway, a partner at the Carlyle Group, and Trustee of the Bedford Falls Foundation Charitable Trust, resigned as a member of Smile Train's board of governors after the merger incident discussed above. *The New York Times* reported that he wrote to Smile Train that "[y]our new organization will be receiving no additional contributions from me and the Bedford Falls Foundation . . . . Frankly, I would like to get my past contributions returned, as I am afraid that the money will be wasted."[36]    Bedford Falls was one of the founding donors of WonderWork with a grant of $1 million.

Smile Train's initial chair of the board of directors was Ann Ziff, a pillar of the non-profit community who is also chair of the Metropolitan Opera, vice chair of Lincoln Center for the Performing Arts, and on the board of the American Museum of Natural History. She had firsthand knowledge of Smile Train and Mr. Mullaney.  Following Mr. Mullaney's departure from Smile Train, the Bill and Ann Ziff Foundation provided a $1 million loan to WonderWork.

Mr. Wang's former business associate Walter Haefner and his son Martin Haefner also followed Mr. Mullaney to WonderWork.[37]   The Walter Haefner Foundation made a $5 million grant to WonderWork in 2012 – the majority of the $8.1 million in donations at issue.  Mr. Wang would have had particularly strong reasons to attempt to frustrate, divert or waste the Haefner Foundation's gift to WonderWork. Mr. Haefner's father, Walter, was the largest shareholder in Computer Associates (now known as CA, Inc.), which, as discussed below, was suing Mr. Wang for his role in the accounting fraud at the time that WonderWork was established.

---

[36] *See* Stephanie Strom, *Opposition Arises to Charities' Merger*, *supra* note 20 (Cahn Decl., E).

[37] *See* Award, ¶ 8.

15

7912484.8

b.    *Mr. Wang's Credibility and Character Have Been Questioned Repeatedly*

Public information concerning Mr. Wang provides substantial support for the conclusion

that Mr. Wang, not Mr. Mullaney, was the "serial fraudster" who testified at HMS's arbitration.

At the time of the failed Smile Train merger and the founding of WonderWork, Mr.

Wang was still mired in the *$2 billion* "35-day-month" accounting fraud at Computer

Associates.[38]  That fraud resulted in civil actions by the Securities and Exchange Commission

against Computer Associates;[39] the entry of a consent judgment and deferred prosecution

agreement with the U.S. Attorney's Office in September 2004[40] and appointment of an

independent examiner;[41] criminal prosecutions of executives including Mr. Wang's protégé

Sanjay Kumar, who was sentenced to 12 years in prison and $8 million fine for securities fraud,

obstruction of justice and perjury in 2006; [42] a class action lawsuit,[43] and a six-year shareholder

derivative litigation against Computer Associates, Wang and others.[44]

In 2007, a 386-page report by the Special Litigation Committee of Computer Associates

and its counsel at Fried Frank, concluded (1) that Mr. Wang "knew of, and participated in" the

accounting fraud; (2) that the fraud "pervaded the entire Computer Associates organization at

---

[38] *See, e.g.*, *Wang*, 2011 WL 5401324.

[39] *See, e.g.*, *SEC v. Computer Associates Int'l, Inc.*, 04-Civ-04088 (ILG) (E.D.N.Y.); *see also* Alex Berenson, *Chairman of Computer Associates Resigns*, N.Y. TIMES (Nov. 19, 2002), http://www.nytimes.com/2002/11/19/busin ess/chairman-of-computer-associates-resigns.html.

[40] Deferred Prosecution Agreement, *U.S. v. Computer Assocs. Int'l Inc.*, Cr. No. 04-837 (E.D.N.Y. filed Sept. 22, 2004).

[41] *See id.* at ¶ 19.

[42] *See* Criminal Cause for Sentencing, *United States v. Kumar*, 04-CR-846 (ILG) (E.D.N.Y. filed Nov. 2, 2006); *see also* U.S. Sec. & Exch. Comm'n, SEC Files Securities Fraud Charges Against Computer Associates International, Inc., Former CEO Sanjay Kumar, and Two other Former Company Executives, 2004-134 (2004), https://www.sec.gov/news/press/2004-134.htm (annexed to Cahn Decl., Ex. I).

[43] *In re Computer Assocs. Class Action*, 2007 WL 2713336.

[44] *See Computer Assocs. Int'l., Inc., Derivative Litig.*, No. 04 Civ. 2697 (TCP) (E.D.N.Y.).

16

every level"; (3) that the fraud was perpetuated by a "culture of fear" in which "routine," "arbitrary," and "subjective" firings of staff were carried out was implemented "at the direct instruction of Mr. Wang"; (4) that he instructed subordinates to "stonewall" the government's investigation; and (5) that Mr. Wang's excuses "lacked credibility and moral force." The report recommended that the company pursue claims against Mr. Wang including breach of fiduciary duty, waste, fraud, and indemnity.[45] Mr. Wang avoided liability based on waiver and settlement defenses.[46] As noted above, Mr. Wang may blame Mr. Haefner, Computer Associates' largest shareholder, for the Computer Associates litigation.

Ironically, Smile Train accused Mr. Mullaney of accounting improprieties, and the arbitrator, bafflingly, found Mr. Wang 's version of these events credible.

## G. The Award's Statements Concerning Mr. Wang and Smile Train Are Not Essential and Do Not Have Preclusive Effect

Moreover, none of the extensive findings concerning Mr. Wang or Smile Train is entitled to collateral estoppel effect. Mr. Wang's personal counsel – in a new role as counsel to HMS[47] – convinced the arbitrator to explore Mr. Wang's disputes with Mr. Mullaney, in a proceeding in which Mr. Wang was not a party, evading a confidential settlement between Smile Train and WonderWork/Mr. Mullaney. At the same time, the arbitrator brushed aside WonderWork's objections to a "war of terror" waged by Smile Train.[48] This expansion of the arbitration was

---

[45] Special Litigation Committee Report, Cahn Decl., Ex. J, at pp. 11-13, filed in *Kaufman v. Kumar*, No. 2418-VCL (Del. Ch. 2006); *see also* Alex Berenson, *CA Says Its Founder Aided Fraud*, N.Y. TIMES (Apr. 14, 2007), http://www.nytimes.com/2007/04/14/technology/14compute.html (annexed to Cahn Decl., Ex. K). The SLC report is also available online at: http://online.wsj.com/public/resources/documents/20070413_CA.pdf.

[46] *See, e.g., Wang*, 2011 WL 5401324.

[47] Kaye Scholer, now Arnold & Porter Kaye Scholer, also represents Smile Train, and in that capacity continues to assert new and unfounded allegations against WonderWork.

[48] *See* Award, ¶ 106.

17

improper and not essential to the judgment.

One ostensible justification for this exploration of Smile Train's settled claims is that Section 5.3 of the Agreement allowed HMS to terminate the agreement if Mr. Wang or Smile Train interfered with WonderWork's performance.[49] HMS also claimed that these disputes bear on Mr. Mullaney's credibility in the arbitration. As noted above, when HMS and WonderWork entered into their agreement, it was public information that there was a rupture between Mr. Mullaney and Mr. Wang.  The Award acknowledges that HMS was aware of Mr. Wang's reputation, deep pockets, and the potential for his interference.[50]

The arbitrator allowed HMS to use these arguments as justification for extensive discovery – *more than 90,000 pages of documents* were produced by WonderWork.[51] WonderWork strenuously objected to the expansion of the arbitration, which is the basis, in part, for the discovery disputes.

The arbitrator's examination of the merits of these previously-settled disputes between Mr. Wang/Smile Train and Mr. Mullaney/WonderWork was also fundamentally flawed. The arbitrator stated that WonderWork should have informed HMS of these disputes, even though they occurred before the agreement between WonderWork and HMS commenced.

In any event, the arbitrator held that none of this entitled HMS to any damages, which is a required element of tort and contract claims.[52]  Accordingly, statements in the Award related to

---

[49] Agreement by and between HelpMeSee, Inc. and Surgery for the Poor, Inc., Mintz Decl., Ex. B, at § 5.3.

[50] *See* Award, ¶¶ 105-107 (noting Section 5.3 of the Agreement, but finding HMS did not sufficiently prove damages).

[51] Letter of Joseph A. Vogel to Vincent A. Sama, dated Apr. 2, 2015, Cahn Decl., Ex. L, at p. 2 (evidencing scope and nature of disputed discovery issues).

[52] Award, ¶ 107 ("HelpMeSee did not sufficiently prove damages resulting from the breaches and, hence, such damages are not included in this Award").

18

these subjects are not entitled to collateral estoppel effect.[53]

In addition, the arbitrator stated that HMS could terminate whether or not Smile Train's claims had merit and impacted WonderWork's ability to perform, and that it had "good faith discretion" for a determination that such issues "could impair" WonderWork's performance or result in potentially adverse publicity.[54]    Determinations of the merits of Smile Train's allegations were not essential. The arbitrator declined to rule at all on HMS's claim that it was fraudulently induced to enter into the Agreement.[55] The arbitrator's general assessment that Mr. Mullaney was not "credible" is not an essential element of any finding, and certainly not "clear and convincing" in view of the above.

## H. The Arbitrator Disregarded Evidence of Improper Threats Against Entities Receiving Grants from WonderWork

Documentary evidence was presented in the arbitration that HMS threatened WonderWork partners in India, told them that WonderWork would be going out of business, that hospitals that had accepted grants from WonderWork would need to return the money as a result of HMS's legal action against WonderWork, and promised substantial grants – but not to any partners that also accepted funds from WonderWork.[56]

There was no legitimate basis for HMS's demand that these underfunded Indian hospitals work exclusively with HMS. There are enough needy cataract patients. As Mr. Mritunjay Kumar Tiwari explained, his hospital performed 67,000 surgeries per year, and hoped to scale up to

---

[53] *Id.*

[54] *Id.*

[55] *See* Award, ¶ 114-116.

[56] *See* Arbitration Exhibit C-311, Cahn Decl, Ex. M, at p. 1. This Exhibit consists of the Statement of Mritunjay Kumar Tiwari, Project Head and Trustee of Akhand Jyoti Eye Hospitals, with an attached email from HMS to Indian hospital partners.

7912484.8

100,000 surgeries per year. HMS offered to provide him with funding for 10,000-12,000 surgeries per year, but only if it would stop accepting grants from WonderWork.[57]

HMS's demand was contrary to how normal charities work. Most seek to leverage their support to encourage grants from others. Rather than seeking exclusive relationships, most grantmaking organizations seek assurances that the recipient has other funding and is sustainable. Nor is there any legal basis for HMS's threat that these hospitals would be forced to repay HMS for grants accepted from WonderWork and expended on medical treatment.[58]

## I.    Other Allegations in HMS's Motion Do Not Support Appointment of a Trustee

In a fruitless attempt to bolster the case that Mr. Mullaney's actions with respect to management of WonderWork supports appointment of a trustee, HMS makes an assortment of feeble arguments, none of which satisfies the strong showing necessary.

### a.    *Disclosures Regarding Restricted Funds*

Whether in an attempt to obfuscate or out of ignorance, HMS (at ¶35) conflates (a) WonderWork's statements concerning the donative intent of the founding donors to WonderWork whose $8.1 million was diverted to HMS by the Award with (b) WonderWork's statements regarding the intent of donors of funds currently held by WonderWork.

WonderWork's cross-petition to vacate the Award made clear that the Award violates the strong public policy that modification of donor-imposed directions on gifts cannot occur in private arbitration. It may only take place in a Supreme Court proceeding where the donors and the Attorney General are given notice and an opportunity to be heard when it redirected

---

[57] *See id.* at 1.

[58] *See id.* at 1.

7912484.8

donations made to benefit WonderWork's general charitable purposes to HMS.

In addition, WonderWork discussed the impact of the Award on restricted purpose funds of WonderWork, which include grants received for specific projects, as well as donations for specific medical issues. These funds are completely different from the $8.1 million from founding donors. These were *separately* discussed in Supreme Court because they are implicated by the size of the awards, which consist of the total $8.3 million in the initial Award, a further $3 million in interest, and a further $5 million in HMS's legal fees. The size of the Award plus interest and HMS's attorneys' fees exceeds WonderWork's unrestricted assets.

HMS suggests that WonderWork's designation of certain funds as restricted is evidence of impropriety or mismanagement. In fact, WonderWork is legally required to segregate and track funds in this manner. New York Not-for-Profit Corporation Law ("N-PCL") § 513(b) provides that a not-for-profit "*shall* apply" charitable donations "to the purposes specified in the gift instrument" and for "reasonable and proper" costs for administering the gift, (emphasis supplied), and the laws governing charitable solicitation in New York require that charities use the funds raised from the public via a solicitation only for the purposes outlined in the solicitations. *See* Executive Law § 174-b(4). Restricted funds are not available to satisfy the claims of general creditors. *Matter of Friends for Long Island's Heritage*, 80 A.D.3d 223, 234-35 (2d Dep't 2010) ("We find that New York's long-standing policy honoring donors' restrictions on the use of the property they donate has greater weight than the claims of creditors. To hold otherwise would be to sanction a gap in the protection of the donors' expressed limitations."). A responsible charity will have a conservative view of restrictions and seek all appropriate approvals before lifting restrictions. HMS seems to regard this as culpable conduct.

HMS mistakenly argues that "the only 'evidence' of these alleged restrictions that Debtor

21

has ever produced was affidavits . . . which actually state that the donations were unrestricted."

(HMS Motion, ¶ 35)  This is flatly incorrect, for the following reasons:

- First, WonderWork's solicitations allow donors to choose specific medical issues to support. Those are listed on WonderWork's web site and copies were provided with Hana Fuchs' affidavit in the motion to vacate the Award.[59]

- Second, the existence of restricted purpose funds is stated in WonderWork's annual audited financial statements, which are publicly available.[60]

- Third, in the motion to vacate the arbitral Award, and in its motion for a stay, WonderWork pointed out that the size of the Award, plus interest, plus fees, was so large that it would implicate funds that were subject to restrictions, either to a particular type of surgery, or to specific projects, which could not be invaded to pay a judgment to HMS.[61]

- Fourth, WonderWork reiterated in its motion to seek a stay pending its appeal that restricted purpose funds were not available to creditors.[62]

WonderWork anticipates that HMS will contest the existence and scope of restrictions during this bankruptcy proceeding, and this Court may be asked to make determinations in that regard.  Regardless, the fact that WonderWork maintains substantial funds subject to restrictions has been repeatedly disclosed and, far from being evidence of mismanagement, is evidence of careful stewardship of charitable assets.

Even when minor accounting issues exist – which WonderWork does not concede is the case here – they do not support appointment of a trustee.   To prove cause, extraordinary circumstances are required. *See In re Bergeron*, No. 13-02912-8-SWH, 2013 WL 5874571, at *7

---

[59] Affidavit of Hana Fuchs, sworn to on November 11, 2016, Cahn Decl., Ex. N.

[60] *See also* Declaration of Brian Mullaney in Support of Chapter 11 Petition and First Day Pleadings, executed on December 28, 2016 [Dkt. No. 2], Ex. D (audited financials for fiscal year ending June 30, 2015).

[61] Affidavit of Hana Fuchs, Cahn Decl., Ex. N, at ¶ 11.

[62] Memorandum of Law in Support of Motion for Stay of Judgment Pending Appeal, filed in the New York Supreme Court, Appellate Division, First Department, on December 8, 2016, Cahn Decl., Ex. O. WonderWork mistakenly interpreted a question on HMS's information subpoena to pertain to title, not use restrictions, but HMS was not prejudiced by this error, since it was well aware of the existence of restricted funds.

(Bankr. E.D.N.C. Oct. 31, 2013). "[A]llegations of prepetition fraud, dishonesty or mismanagement, by themselves, are not sufficient to warrant appointment of a trustee." *Id.* at *8. In *In re Sundale, Ltd.*, 400 B.R. 890 (Bankr. S.D. Fla. 2009), for example, this standard was not met even when the debtor, a hotel: failed to observe corporate formalities, failed to pay taxes, failed to file accurate schedules, failed to file accurate amended schedules, failed to install sprinklers, and failed to operate at a profit. Regardless of these failings, no trustee was appointed. *See id.* Here, there is no showing that any conduct by WonderWork managers harmed WonderWork or its donors.

Nor is a trustee warranted simply because debtors' "financial record keeping methodology was sloppy," and post-petition, "the repercussions from those earlier practices linger[ed]." *In re Shotwell Landfill, Inc.*, No. 13-02590-8-SWH, 2014 WL 4377721, at *7 (Bankr. E.D.N.C. Sept. 4, 2014). In *Shotwell*, the debtor did not observe corporate formalities and regularly commingled the debts and assets of his separate companies, failed to "recognize the significance of income and/or expenditures being attributable to one company instead of another," and only had "a generalized understanding of how funds move[d] within the affiliated companies, or who owe[d] what to whom." *Id.* at *7. Despite allegations of intentional fraud, incompetence as a fiduciary, lack of skill and attention to detail, the court was satisfied that there were "competing explanations" for the alleged misconduct, and denied the motion for appointment. *Id.* at *8. Even overdrawn checks, inadequate and "messy" bookkeeping, lapses in insurance coverage, and failure to file timely reports to the United States Trustee – none of which are present here -- "did not rise to the level of gross mismanagement" required under (a)(1). *See In re Crescent Beach Inn*, 22 B.R. 155, 159-60 (Bankr. D. Me. 1982). These failed to meet the required showing of *gross* mismanagement.

23

It is telling that HMS vociferously objects to Mr. Mullaney's delay in taking his own salary, which helped the charity, attempting to paint it as an accounting fraud (the conduct of which Mr. Wang was accused at Computer Associates).

### b.   Non-Prejudicial Errors In Bankruptcy Filings

HMS argues that WonderWork failed to disclose payments to counsel in all appropriate portions of the bankruptcy filings. However, the payment was prominently disclosed, and HMS was not prejudiced. WonderWork is in the process of amending its filings, as noted in its Motion in Opposition to Discovery.[63] A debtor's good faith mistakes in filing documents do not warrant appointment of a trustee under § 1104(a)(1). Chapter 11 does not impose upon the debtor a duty to operate perfectly. In fact, even managers lacking sophistication are permitted to keep running a debtor's operations. *See In re Sharon Steel Corp.*, 871 F.2d 1217, 1227-28 (3d Cir. 1989).

### c.   Disclosure of Bankruptcy

HMS implies in footnote 5 to its Motion that WonderWork disregarded an instruction from this Court's instruction to provide notice of the bankruptcy on its website. The transcript evidences that HMS's request was discussed and the Court asked counsel for WonderWork whether the Attorney General requires such disclosure, and, because such disclosures are not required, HMS's request was not granted.[64] HMS's exaggeration on this point should give this Court pause before accepting HMS's characterization of the Award and arbitration.

### d.   Discovery Disputes in Arbitration

HMS also claims that the arbitrator's statements regarding WonderWork's compliance

---

[63] Debtor's Opposition to Motion of Help Me See, Inc. for an Order Directing Production of Documents and Examination Pursuant to Bankruptcy Rule 2004 [Dkt. No. 36], at ¶ 17.

[64] *See* Transcript of Proceedings, Mintz Decl., Ex. F, at 19:2-20:24.

24

7912484.8

with discovery in the arbitration supports appointment of a trustee. Even in instances where a debtor has been found in civil contempt for willfully disobeying a temporary restraining order and preliminary injunction, no appointment of a trustee was necessary. *Bergeron*, 2013 WL 5874571, at *8–9. In *Bergeron*, the court noted that such deviations were likely responses to the "scorched earth" strategy utilized by opposing counsel in prior state court litigation, not unlike the hotly contested arbitration between Debtor and HMS.

The Award's statements regarding discovery (also filled with errors) were not essential to the Award and are therefore not entitled to preclusive effect. The arbitrator stated that it was authorized to award fees on two alternate grounds: that the parties put fees in issue and thus fees were within the arbitrator's discretion to award; that HMS was the substantially prevailing party, and due to the conduct pertaining to discovery.[65]

If this Court determines that it is necessary to decide the merits of these disputes in connection with this trustee motion, WonderWork will provide evidence to demonstrate that appropriate objections were asserted in the arbitration and/or full compliance was made in the arbitration with all orders.[66]   The discovery disputes principally reflect WonderWork's reasonable objections to HMS demands, the unauthorized expansion by HMS of the arbitration to encompass the history of Mr. Mullaney's dealings with Smile Train, and other issues that were not properly subject to the arbitration proceeding, with the result that HMS spent $6 million on its aggressive three-year "scorched earth" campaign.

The extensive discovery demands and the extended arbitration testimony concerning

---

[65] Award, ¶¶ 130-132.

[66] Whether these so-called discovery abuses actually took place and constitute a sufficient basis for the fee award will be an issue on confirmation of the second award, for approximately $5 million in fees. *See* Certified Final Arbitration Award, Mintz Decl., Ex. A.

Smile Train merely served as a pretext for Smile Train to evade commitments in the Smile Train-WonderWork/Mullaney confidential settlement agreement. Mr. Sama negotiated that settlement agreement on behalf of Smile Train, and, in the arbitration, sought discovery of communications from Smile Train to Mr. Mullaney.[67] WonderWork faced a Hobson's choice – acquiesce in a transparent campaign to trump up new Smile Train claims and harass blameless third parties, or oppose the effort and be accused of being uncooperative. Tellingly, there was no finding in the Award that any critical, identifiable documents relating were wrongfully concealed.

WonderWork is not aware of any reported decision in which discovery disputes in arbitration served as the basis for appointment of a trustee, and HMS has cited none.[68]

## POINT II

## DISCRETIONARY APPOINTMENT OF A TRUSTEE IS NOT WARRANTED UNDER 11 U.S.C. § 1104(a)(2)

### A. Consideration of the Best Interest of the Debtor and Its Charitable Mission

Section 1104(a)(2) "envisions a flexible standard" that provides the court discretion to appoint a trustee "when to do so would serve the parties' and estate's interests." *In re Marvel Entm't Grp., Inc.*, 140 F.3d 463, 474 (3d Cir. 1998) (citation omitted). Commentators have confirmed that when the Debtor is a charity, the organizational mission continues to take precedence over maximization of value for the benefit of creditors.[69]

---

[67] The settlement agreement between Smile Train and Mr. Mullaney and WonderWork is confidential but will be provided if requested by the Court.

[68] Further evidence of WonderWork's reasonable compliance is not submitted here, as the arbitration hearing and discovery record is subject to a protective order. If the Court would find such evidence helpful, WonderWork will, upon the lifting of the protective order, supply materials sufficient to show that the statements in the Award are inconsistent with the arbitration record.

[69] Dana Y. Elliott & Evan C. Hollander, *Navigating a Nonprofit Corporation Through Bankruptcy*, NONPROFIT QUARTERLY (Apr. 29, 2014), https://nonprofitquarterly.org/2014/04/29/navigating-a-nonprofit-corporation-through-bankruptcy/ (annexed to Cahn Decl., Ex. P).

A court may appoint a trustee, under Section 1104(a)(2), absent cause under (a)(1). Among the factors that guide courts are: "(i) the trustworthiness of the debtor; (ii) the debtor in possession's past and present performance and prospects for the debtor's rehabilitation; (iii) the confidence—or lack thereof—of the business community and of creditors in present management; and (iv) the benefits derived by the appointment of a trustee, balanced against the cost of the appointment." *Ridgemour*, 413 B.R. at 112 (quotations and citations omitted).

**B. The Best Interest of the Debtor and Its Charitable Mission is Served by Allowing WonderWork to Reorganize, Emerge from Bankruptcy, Comply With Gift Restrictions, and Pay Its Creditors**

WonderWork's board of directors, who are extremely reputable and experienced professionals, attest that they properly supervise Mr. Mullaney, have complete confidence in his work, and believe him to be critical to the organization's successful reorganization. Similarly, major donors and creditors who have supported WonderWork's charitable activities have demonstrated their confidence in Mr. Mullaney. This outweighs the overheated assertions of a single creditor, which appears to be motivated by malice and economic competition.

WonderWork's reorganization plan must comply with Section 1129(a)(16) of the Bankruptcy Code, which requires the plan to abide by state law restrictions on the use of funds. That is, WonderWork is required to adhere to state-law restrictions on the issue of restricted purpose funds. New York appellate decisional law has held that restricted purpose funds are not available to general creditors except in accordance with *cy pres* principles incorporated into the N-PCL. This principle is well-established,[70] but HMS treats it as a ruse. WonderWork has demonstrated appropriate respect for the rights of third parties and has indicated it will work

---

[70] *See Alco Gravure, Inc. v. Knapp Found.*, 64 N.Y.2d 458 (1985).

27

diligently to ensure that the rights of third parties are respected.

### C. Mr. Mullaney Is Properly Supervised by the Board, Has the Complete Confidence of the Board, and Has Unique Skills Critical to Successful Reorganization

Mr. Mullaney is supervised by a board of extremely well-qualified professionals who have complete confidence in his honesty, abilities, and ethics, and who all attest to the fact that he has a unique skill set that is essential to WonderWork's successful reorganization.

*a.      Mr. Mullaney's Unique and Essential Skill Set*

The chair of WonderWork's audit committee John J. Coneys, Jr., retired Vice Chairman of PricewaterhouseCoopers ("PwC"). Mr. Coneys spent 37 years with the firm, specializing in board governance, legislative and regulatory compliance, Sarbanes-Oxley oversight, innovation strategy leadership and business operations.[71]

As Mr. Coneys describes in his declaration (¶¶ 4-5), the principal programmatic goal of WonderWork is to help provide surgeries for poor children and adults in developing countries. Focusing on extremely low-cost surgeries, WonderWork empowers local hospitals and clinics by providing free equipment, training and financial aid. In addition, WonderWork promotes public awareness about the need for these surgeries and related issues.

WonderWork's fundraising efforts are as extensive as they are sophisticated. Funds are raised through a broad range of different vehicles and campaigns, including, but not limited to: face-to-face presentations with major donors, direct mailings to the general public and current donors, a donation hotline, tributes and memorial gifts, legacy gifts, monthly giving, and gifts of stocks and securities. Under Mr. Mullaney, WonderWork has been extremely successful.

---

[71] He has also served on the boards of The Salvation Army of Greater New York and the Villanova School of Business, as a Member of the Board of Trustees of Salve Regina University, and as Secretary of the United Way of Greenwich.Mr. Coneys' declaration includes a more extensive discussion of his experience. *See* Coneys Decl., ¶ 2.

7912484.8

Despite being a relatively young charity, formed in 2011, WonderWork has raised more than $55 million in contributions and grants to date.[72]  WonderWork's accomplishments are largely attributable to Mr. Mullaney, who is uniquely qualified to serve as the chief officer charged with overseeing all of WonderWork's program development, fundraising, direct mail programs and business operations and reporting to the Board. *See id.* ¶¶ 6-11.

The future success of WonderWork, however, depends greatly upon Mr. Mullaney's longstanding relationships with WonderWork's major donors, who have provided almost $40 million in gifts and impact loans.  Mr. Mullaney is the only WonderWork employee who works on acquiring and cultivating major donors.  He has a close relationship with all of WonderWork's biggest donors, including WonderWork's largest donor, Martin Haefner of the Walter Haefner Foundation, who meets with Mr. Mullaney every six months.[73]

In addition to major gifts, Mr. Mullaney manages WonderWork's robust direct mail program, which has mailed more than 75 million letters and acquired more than 268,000 new donors in the past few years.  Mr. Mullaney's fundraising acumen is also evident in the creative and compelling appeals WonderWork sends to donors via direct mail.  Along with managing these programs, he writes most of the letters WonderWork sends to donors.  These appeals are not merely solicitations, but immensely personal stories told in a way that inspires donors.  His substantial experience overseeing and managing these campaigns is unparalleled.  *Id.* ¶ 8.

---

[72] WonderWork did so with a small staff of just eight employees. These donations helped provide more than 220,000 life-changing surgeries for children and adults suffering with severe burns, clubfoot and blindness.  In 2016, WonderWork helped provide over 76,000 surgeries—its best year ever. WonderWork's revenues also far exceed its expenses and, but for the HMS arbitral Award, WonderWork is, and has always been, financially solvent.  In fact, fiscal year 2016 was WonderWork's strongest fundraising year, with revenues more than $14 million. *See* Coneys Decl., ¶¶ 6-8 for a detailed description of these fundraising activities.

[73] As WonderWork began its operations and programs, the Walter Haefner Foundation provided WonderWork with a $5 million start-up grant. Mr. Haefner has subsequently given WonderWork an additional $8 million.  Mr. Mullaney's relationship with the Haefners dates back to Mr. Mullaney's time as President and Co-Founder of Smile Train, a charity to which the Haefners gave $50 million. *Id.* ¶ 7.

Mr. Mullaney also maintains close and extensive partnerships with a network of hospitals, clinics and NGOs in 38 of the world's poorest countries. His ability to maintain these relationships, his knowledge of various public health programs, and understanding of geopolitical challenges in Asia, Africa and beyond are unique assets to the charity. Over the course of his career as a nonprofit leader, he has visited hundreds of hospitals and clinics in Asia, South Asia, Africa and South America, where he has helped provide training and support for thousands of surgeons, doctors, anesthesiologists, nurses, social workers and health care administrators. While leading WonderWork, he has partnered with over 60 hospitals and organizations, and more than 1,500 when he ran Smile Train. Mr. Mullaney's present and past charitable endeavors have received considerable media coverage. *Id.* ¶¶ 9-10.

It is difficult, if not impossible, to imagine a trustee that could perform any – much less all – of these tasks competently. Among other things, a trustee would have no personal relationships with major donors. A trustee would not have the same relationships with health care providers in the developing world nor would a trustee be able to cultivate and build WonderWork's network of partner hospitals and NGOs comparable to what Mr. Mullaney and his team has done for WonderWork. A trustee would not be able to manage WonderWork's direct mail program or write and produce its vital donor appeals. There is no one who could better manage the organization's charitable mission. No trustee would have the knowledge and skills necessary to maintain WonderWork's success and ability to reorganize. *Id.* ¶ 11.

The other members of WonderWork's board – all accomplished professionals

30

unanimously support this assessment and are described here.[74] Steven N. Rappaport is a Partner of RZ Capital, LLC, a New York private equity firm, and Chairman of the Open and Closed End Credit Suisse Mutual Fund Boards.[75] Dr. Levitt's and Mr. Atkinson's background is described above. Clark Kokich is the Executive Director of advertising analytics company Marchex and was the chairman of Razorfish, one of the largest digital marketing agencies in the world.[76] Richard Price is the Chief Executive Officer - Asia Pacific for CBRE Global Investors, and is also the chair of its Asia Pacific Regional Board and Investment Committee. Each board member has filed declarations of support, and explaining their background and basis for this assessment.

The Chairman of WonderWork's Medical Advisory Board, Dr. Joseph McCarthy, who is the Lawrence D. Bell Professor of Plastic Surgery Emeritus, Hansjorg Wyss Department of Plastic Surgery at NYU Medical Center, and the Director Emeritus of the Institute of Reconstructive Plastic Surgery at NYU Langone Medical Center, has also submitted a declaration expressing his confidence in Mr. Mullaney's character and integrity.[77]

Even the recently-retired Chief Programs Officer of Smile Train, Satish Kalra, submitted a letter in support of Mr. Mullaney for this Motion. Mr. Kalra states that he found Mr. Mullaney to be "honest, upright, ethical and principled," an "outstanding communicator who could as easily connect with parents of poor cleft afflicted kids as with high net worth donors" and notes that "his contribution to the growth and development of Smile Train was immense without which

---

[74] Declarations of Mark E. Atkinson, Steven D. Levitt, Richard T.G. Price, the Declaration of Steven N. Rappaport, executed on February 23, 2017 ("Rappaport Decl."), and the Declaration of Clark Kokich, executed on February 22, 2017 ("Kokich Decl.") (collectively, with Mr. Coneys' declaration, the "Board Declarations").

[75] Rappaport Decl., ¶ 2.

[76] Kokich Decl., ¶ 2.

[77] Declaration of Dr. Joseph G. McCarthy, executed February 23, 2017.

31

the organization would probably never have reached where it was today."[78]

### b.    Board Oversight and Support

Contrary to HMS's characterization of Mr. Mullaney as a "serial fraudster" running WonderWork alone and into the ground, Brian Mullaney is a respected executive under the supervision of a skilled and conscientious Board. Throughout WonderWork's existence, the Board has provided Mr. Mullaney with critical operational oversight and consultation, including issues related to HMS's protracted legal efforts to undermine Mr. Mullaney and the organization as a whole. Mr. Mullaney has an appropriate amount of authority for a chief executive officer, but at all times reports to, is supervised by, and serves at the pleasure of, the Board.

WonderWork's Board is very involved in the organization's decision-making. The Board holds three regular meetings per year – every four months – and special meetings as needed. Meetings typically involve active discussion between the Board and Mr. Mullaney on matters such as WonderWork's budget, investments, fundraising strategies, program capacity, and relationships with hospital partners, among other things.[79]

### c.    Devastating Impact of the Appointment of a Trustee

In addition, as confirmed by the Board Declarations, the suggestion in HMS's motion that WonderWork has potential, planned or pending claims against Mr. Mullaney is without any

---

[78] Letter of Mr. Satish Kalra, Former Smile Train Regional Director for South Asia, Cahn Decl., Ex. Q. Mr. Kalra's profile "Satish Kalra: 16 Years of Smiles" is still available at: https://www.smiletrain.org/stories/satish-kalra-16-years-smiles.

[79] See Coneys Decl. ¶¶ 12-16. Mr. Mullaney typically provides a detailed presentation at each meeting regarding governance, programs, administration, finance and development matters. The Board members, who themselves are quite accomplished and successful, are not just passive listeners during meetings; they ask questions and require explanation as appropriate. In between meetings, Mr. Mullaney has regular communication with the Board on operational and administrative matters, including any incidents, changes of circumstances, or other important matters that could materially impact WonderWork.

7912484.8

foundation. In fact, Mr. Mullaney has the full and unwavering support of the Board.[80] Any attempt to oust Mr. Mullaney from managing WonderWork would be counterproductive to the organization's plans for reorganization, detrimental to the bankruptcy estate, and against the interests of creditors. Given WonderWork's dependence on Mr. Mullaney's expertise, the appointment of a trustee would put the organization at serious risk, limiting recovery for creditors and impeding charitable goals. Mr. Mullaney's removal would undeniably jeopardize the support of WonderWork's major donors and endanger WonderWork's relationships with the hospitals and clinics it supports around the world.[81] Not only that, but the strength of WonderWork's direct mail program would also be at risk. These are extremely significant threats to WonderWork's charitable mission.

HMS relies on *ad hominem* attacks and, to a great extent, unsubstantiated facts. These are not the hallmarks of a creditor that has the best interests of the debtor's estate in mind. Instead, they reflect HMS's desire to force WonderWork's demise. HMS would clearly prefer that WonderWork close its doors—a view that is not only contrary to other creditors, but antithetical to HMS's own charitable mission. HMS's interests are not aligned with other creditors nor WonderWork's plans for reorganization and its intent to continue operating.

The narrative presented by HMS is completely inaccurate. Mr. Mullaney is competent, trustworthy and effective in delivering outstanding results in terms of medical treatments in the developing world. Mr. Mullaney has spent the last two decades working to raise funds and facilitate live-changing surgeries to children and adults in the developing world.[82]

---

[80] *See* Board Declarations.

[81] *See* Haefner Letter, Cahn Decl., Ex. G, ¶ 9; Kokich Decl., ¶ 8 (stating that they would not provide further donations).

[82] *See generally* Declaration of Brian Mullaney, executed on February 23, 2017 (Mullaney Decl.").

33

The removal and replacement of Mr. Mullaney would likely create an enormous financial strain on the bankruptcy estate, prompt a mass defection of donors and staff, and lead to a shutdown of the organization's charitable mission. WonderWork filed for bankruptcy was so it could continue to carry out its important work of providing free surgeries to the economically needy. Appointment of a trustee will not only substantially reduce the funds available to creditors, but it would mean far fewer funds for life-changing surgeries.

What this motion seeks is not the success of the debtor under Chapter 11, but the end of WonderWork as a charity. If HMS's motion is granted, it will effectively eliminate the prospect of reorganization under Chapter 11 and will force the liquidation of WonderWork.

### D. WonderWork's Other Creditors Oppose Appointment of a Trustee

After HMS, whose claim may not survive the appeal, WonderWork's largest creditors are foundations and one individual who have collectively made impact loans to WonderWork. Several impact lender-creditors have submitted declarations attesting to their confidence in Mr. Mullaney's management and their view that he is essential to the organization.

WonderWork's impact lender-creditors include: the Bill & Ann Ziff Foundation, which has an outstanding loan balance of $845,500, the Meadowlark Foundation, which has an outstanding loan balance of $524,833.33, the Detter Family Foundation, which has an outstanding loan balance of $106,833.33, and Joseph Mullaney, who holds an outstanding loan balance of $110,750. These lenders have gone on the record to reiterate their support for Mr. Mullaney in the face of a campaign that appears intent on embarrassing, threatening and asserting unfounded accusations of corruption against anyone associated with Mr. Mullaney, and

34

is a testament to their confidence and commitment to WonderWork's success.[83]

Support from the business community for current management weighs against the appointment of a trustee. The continued confidence of these lenders will be critical during reorganization, which may require renegotiation of loan terms and deadlines. The prospects of a successful reorganization will be substantially increased if lenders continue to believe their loan funds will be well spent.

### E. HMS's Motion Reflects Bias and Animus and Is Contrary to the Interests of WonderWork's Other Creditors and the Reorganization of WonderWork

HMS's motion reflects bias and animus and is contrary to the interests of other creditors. It is in the interests of other creditors for WonderWork to survive, for its creditors to be paid, and for the donations and loans it has received to be used to support its charitable purposes.

As discussed above, the overblown invective in HMS's motion significantly misstates the record in this proceeding and the Award.[84]  HMS's motion even attempts to depict grantmaking to WonderWork's overseas partners to fund medical treatments – its core activity – as a wrongful effort to evade creditors, accusing WonderWork of "secreting" assets abroad prior to the bankruptcy filing by making transfers "for no consideration."[85]

HMS's motion claims that WonderWork "has significant claims" against Mr. Mullaney.[86]

---

[83] *See* the Declaration of Iris Detter (Detter Family Foundation), executed on February 22, 2017; Declaration of Garrett Moran (Meadowlark Foundation), executed on February 15, 2017; the Declaration of Joseph Mullaney, executed on February 14, 2017; the Declaration of Tamsen Ann Ziff (Bill and Ann Ziff Foundation), executed on February 24, 2017 (collectively, the "Impact Lender Declarations").

[84] *See supra* Point I(E)-(G).

[85] HMS Motion, ¶ 37. *See* Elliott & Hollander, *supra note 69* (nothing prevents the charity-debtor from operating in the ordinary course).

[86] Award, ¶ 43.

As stated in the Board Declarations, no such claims exist.[87]

HMS's motion includes personal attacks against WonderWork staff, by name, for representations concerning the business operations of WonderWork and threatens litigation against them.[88]  As noted in the arbitration Award and above, many of these staff members previously worked at Smile Train.  These attacks indicate that if a trustee is appointed, HMS will agitate to oust staff as well, further diminishing WonderWork's chances of reorganization.

HMS even threatens that WonderWork potentially has "significant claims" against the Board of Directors as well "for breach of fiduciary duty, mismanagement, and indemnification, among others."[89] N-PCL § 720-a provides unpaid directors of a tax-exempt organization with immunity from liability unless the director's conduct constitutes gross mismanagement or intentional harm.  HMS argues that a trustee will be more willing to evaluate claims against these outside directors.  HMS has no basis for this threat, yet accuses WonderWork of being "confrontational and litigious" and "abusing the litigation process."[90]

HMS seems to plan to abuse the Chapter 11 to gratuitously harass directors, and to prolong and complicate this proceeding with unfounded adversary proceedings.

HMS cites *Colorado-Ute* and *In re Microwave* for the proposition that confrontational litigation with creditors may justify a trustee. *See In re Colorado-Ute Elec. Ass'n, Inc.*, 120 B.R. 164, 177 (Bankr. D. Colo. 1990); *In re Microwave Prod. of Am., Inc.*, 102 B.R. 666, 676 (Bankr. W.D. Tenn. 1989). Both cases are inapplicable. WonderWork's defense against unfounded

---

[87] HMS asserts that a trustee might be less "confrontational and litigious." HMS Motion, ¶ 44. The 990 IRS Filings for HMS and Smile Train over their last four reported years reveal spending on legal fees in excess of $5 million.

[88] HMS Motion, ¶¶ 4, 43.

[89] Award, ¶ 43.

[90] Award, ¶ 44.

36

claims is appropriate. Moreover, in those cases, the court determined that the trustee could familiarize himself or herself with the operations of the debtor, instill confidence in the creditors, and effectively run the business. A trustee would not be able to effectively manage WonderWork nor would a trustee be able to solicit the donations WonderWork relies on for its survival. Appointment of a trustee will result in increased litigation, not less.

HMS cites WonderWork's appeal of the Award as evidence of litigiousness. As discussed above, WonderWork's appeal has a strong basis in New York statute and decisional law. With $16 million at stake, adapting briefs for the appeal and preparing the record is a modest expense. The pursuit of this appeal is not improper and does not warrant appointment of a trustee. HMS should not be heard to complain on this issue: HMS spent $6 million in legal fees in the arbitration, compared to $1 million by WonderWork.

Smile Train and HMS appear to continue to work hand in glove toward the goal of destroying Brian Mullaney and WonderWork. Smile Train, still represented by the same team of attorneys as represent HMS, recently opened another front in the assault on WonderWork by serving information demands on Brian Mullaney, purportedly in his individual capacity, and threatening litigation for alleged (but unspecified) use of Smile Train information and donors if extensive categories of documents are not produced.[91]

### F. HMS and Smile Train Have a Motive to Destroy an Economic Competitor

If HMS's principal goal were to obtain payment of $16 million in potential judgments, it would have an interest in allowing WonderWork to operate and reorganize. However, HMS may stand to gain more by driving out of business a charity that successfully creates compelling public appeals for donations, raises substantial funds and demonstrates success in providing

---

[91] Demand Letter from Catherine B. Schumacher to Brian F. Mullaney, dated February 1, 2017, Cahn Decl., Ex. R.

37

funding for low-cost life-changing surgeries in developing countries.

This is an improper basis for HMS to seek a trustee. The Section 1104(a)(2) balancing test asks whether the trustee is in the best interest of the debtor and its creditors, not whether one creditor would be better off if the debtor did not exist at all.

### G. Successful Reorganization of WonderWork Is In the Public Interest

It is vital that WonderWork continue its important work during and after reorganization. This goal is best served by maintaining its current charitable operations. While many reorganizations are only focused on saving jobs, WonderWork's reorganization is also focused on improving the lives of desperately poor and disabled people in the developing world. Although WonderWork only has eight employees, its impact is vast. WonderWork helps provide tens of thousands of surgeries every year, rebuilding the faces and bodies of severely burned children, allowing disabled children to walk, stand and run for the first time, or giving sight to the blind. If WonderWork is forced to close, these medical miracles may go unrealized.

### CONCLUSION

Mr. Mullaney provides the best hope for the successful reorganization of WonderWork. He has an unparalleled ability to create compelling appeals, and to ensure that funds are effectively used by reliable hospital partners to deliver medical treatments. Mr. Mullaney would also be the person best positioned to seek modification of gift restrictions, delays for loan repayment, or additional support from key donors, all of which will be more likely to be granted by donors and lenders if WonderWork continues to carry out its charitable mission. He has the support of WonderWork's board, donors, and other creditors.

7912484.8

HMS's motion must be denied so that WonderWork can emerge from bankruptcy and pursue its critically important work. For each of the reasons set forth above, the motion to appoint a chapter 11 trustee should be denied in its entirety.

Dated: February 24, 2017
      New York, New York

/s/ Aaron R. Cahn
_____
Pamela A. Mann
Judith M. Wallace
Aaron R. Cahn
Leonardo Trivigno
CARTER LEDYARD & MILBURN LLP
2 Wall Street
New York, New York 10005
Telephone:    (212) 738-3200
Facsimile:    (212) 738-3232
Email:    mann@clm.com
        cahn@clm.com
        trivigno@clm.com
        wallace@clm.com
*Proposed Counsel to the Debtor*
*and Debtor in Possession*

39