Benjamin Mintz
Vincent Sama
Catherine Schumacher
Peta Gordon
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, New York 10019-9710
Telephone: (212) 836-8000
Fax: (212) 836-8689

*Counsel for Help Me See, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| WONDERWORK, INC., | Case No. 16-13607 (MKV) |
| Debtor. | Hearing: April 12, 2017 at 10:00 a.m. |

<u>**HELP ME SEE, INC.'S STATEMENT IN SUPPORT OF THE APPOINTMENT OF AN**</u>
<u>**EXAMINER AND IMPOSITION OF CAUTIONS AND CONTROLS**</u>

Pursuant to the Court's directive in the *Order to Show Cause,* issued on March 13, 2017 [Docket No. 80] (the "<u>Order to Show Cause</u>"), Help Me See, Inc. ("<u>HelpMeSee</u>") respectfully submits this statement in support of the entry of an order pursuant to section 1104(c) ordering the appointment of an examiner to conduct an investigation of WonderWork, Inc. ("<u>WonderWork</u>" or "<u>Debtor</u>") and the imposition of cautions and controls on Debtor, if this Court declines or reserves decision on HelpMeSee's pending *Motion for the Entry of an Order Directing the Appointment of a Chapter 11 Trustee Pursuant to Section 1104(a)(1) and (2) of the Bankruptcy Code* [Docket No. 16] (the "<u>Trustee Motion</u>"), and in support hereof states as follow.

## PRELIMINARY STATEMENT

1.      For the reasons set forth in the Trustee Motion and herein, HelpMeSee urges that the Court appoint a trustee.  Debtor is run by Brian Mullaney ("Mullaney"), who has engaged in a decades-long pattern of abusing charities.  HelpMeSee, which has an outstanding $16 million arbitration award (the "Award"), is not Mullaney's sole victim.  Rather, Mullaney has exploited and damaged a series of charities, including Smile Train, Operation Smile, Mercy Ships and — if the limited expense records produced to date are any guide — Debtor.  Mullaney's pattern of using charities' money and work to service his extravagant lifestyle has continued, including using Debtor's funds to buy first-class tickets for him and his family (*after* receiving the Award that purportedly bankrupted Debtor), to buy a multi-thousand dollar camera and other equipment, to rent cars that cost in excess of $300 per day (and in some cases also hire a chauffeur service), to stay at five-star hotels whenever Mullaney is in New York City, and to spend thousands of dollars on wine and flowers.  Although Mullaney has been effective at raising funds, those funds primarily inure to the benefit of Mullaney personally and are recycled to pay for Debtor's expensive direct-mail program.  These facts, many of which HelpMeSee proved in the arbitration and is prepared to prove again, demonstrate that Mullaney is a serial fraudster who has no business running a public charity, much less one that is in bankruptcy.

2.      Debtor's actions during its three months in bankruptcy further evidence the need for the appointment of a trustee and that even imposing Court-ordered cautions and controls has not been sufficient to protect Debtor's estate from Mullaney.  HelpMeSee has identified in Debtor's partial document production to date that numerous transfers in the form of extravagant expense reimbursements were made to or for the benefit of Mullaney (and certain other insiders) during the one-year period before the petition date.  Debtor has improperly failed to disclose

those transfers in its schedules and statements of financial affairs, even after Debtor amended those filings to address other material omissions. Debtor's continued, material non-disclosures reflect a lack of respect for the bankruptcy process and the fiduciary and disclosure obligations of a debtor-in-possession and further justify appointment of a trustee.

3. As detailed in HelpMeSee's *Objection to Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Continue Existing Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, and (C) Maintain Business Forms and Existing Bank Accounts; (II) Extending Time to Comply with 11 U.S.C. § 345(b) and (III) Granting Related Relief; and (B) Request For A Status Conference* [Docket No. 87] (the "Cash Management Objection"), Debtor has taken two significant actions during the bankruptcy case that violate Court orders and contradict specific representations and assurances made by Debtor to the Court. One, Debtor transferred $18 million of funds from a money-market investment fund to a stock investment fund in contravention of Court order and Debtor's assurance that it would not modify its investment practices without Court approval. Cash Management Objection ¶¶ 11-12. Two, Debtor invaded its purportedly donor-restricted funds and disbursed more than $1.1 million without seeking Court approval or consulting with the New York Attorney General in direct violation of Debtor's express representations and Mullaney's statements under oath. *Id*. ¶¶ 2, 13. These actions evidence management's dishonesty and fraud and further justify appointment of a trustee. Furthermore, these actions, cavalierly taken without regard to the orders of the Court and Debtor's own representations and affirmations, highlight why imposing cautions and controls on Debtor is an insufficient remedy to address concerns about Mullaney's fraud, dishonesty and mismanagement. To be sure, cautions and controls only

work if Debtor remains compliant with them and it does not appear that Debtor here is prepared to abide by Court orders or its own representations.

4.      HelpMeSee therefore stands by the Trustee Motion and contends that the only truly adequate and appropriate remedy is to remove Mullaney and appoint an independent trustee.  Nonetheless, if the Court is reluctant to grant that relief at this time, there are more than ample grounds to warrant the appointment of an examiner to conduct an appropriate investigation of, among other things, (i) Debtor's potential claims and causes of action, including, without limitation, claims for avoidable preferences, fraudulent transfers, corporate waste, and breaches of fiduciary duty, against Mullaney, other insiders and other third parties, and (ii) Debtor's funds and to what extent its funds may be subject to donor restrictions and similar restrictions under applicable law.

5.      Moreover, because the appointment of an examiner would only be for the purposes of conducting an investigation, it is imperative that the Court order the imposition of robust safeguards, cautions, and controls to ensure that the estate is preserved during the pendency of this case and that management conducts itself appropriately and does not continue to take actions detrimental to creditors.  HelpMeSee has identified a series of minimally necessary cautions and controls that the Court should impose to protect and preserve Debtor's estate including reporting requirements, budgeting constraints, and limitations on grants and expense reimbursements, the details of which are set forth below.  The proposed reporting requirements and budgeting constraints are typical of the types of constraints that are imposed by secured lenders on debtors-in-possession through cash collateral or debtor-in-possession financing orders.  To insure compliance, and in light of Debtor's disregard of Court orders and

its own representations, the Court should be prepared to impose sanctions on Debtor's management if it fails to comply with the cautions and controls.

<h2 style="text-align:center">BACKGROUND</h2>

6.     The facts set forth in the Trustee Motion are incorporated herein by reference. The Court held an initial hearing on the Trustee Motion on March 10, 2017 (the "March 10 Hearing") to determine whether the Award had collateral estoppel effect, thus requiring the appointment of a trustee as a matter of law.  The Court has not yet ruled on the Trustee Motion.

7.     On March 13, 2017, the Court entered the Order to Show Cause directing parties, including HelpMeSee, to show cause why the Court should not order the appointment of an examiner pursuant to section 1104(c)(1) of the Bankruptcy Code and "what cautions or controls can be put in place to address the concerns raised both in the [Trustee] Motion and on the record at the [March 10] Hearing."  At the March 10 Hearing, Debtor indicated that it had no objection to the appointment of an examiner.  Transcript of Proceedings at 61:10-18 (Mar. 10, 2017).

8.     On March 24, 2017, HelpMeSee filed the Cash Management Objection.  As detailed in the Cash Management Objection, on February 14, 2017, Debtor, without Court approval or disclosure to the Court, shifted $18 million from a money-market fund to a fund investing in stocks, in violation of the Court's order and Debtor's own representations regarding the funds, including that it would not change its investment practices without Court approval.  As further detailed in the Cash Management Objection, in January and February 2017, Debtor violated its representations and Mullaney violated his sworn statement by diverting and using restricted funds without Court approval or consultation with the New York Attorney General.

9.     On March 30, 2017, Debtor filed its reply to the Cash Management Objection [Docket No. 90] (the "Cash Management Reply").  With regard to the transfer of $18 million of

the Vanguard funds into a stock fund, Debtor now agrees to transfer the funds to Signature Bank, effectively acknowledging that it should not have transferred the funds to a stock investment in the first place. Debtor's explanation that its historic investment practices included stock investments is unavailing and ignores the fact that transferring $18 million to a stock fund is outside the ordinary course of business and requires court approval for that reason alone. In addition, in the *Motion for Order Pursuant to 11 U.S.C. § 345(b) Authorizing and Approving Continued Use of Existing Bank Accounts* [Docket No. 30] (the "Bank Account Motion"), which was filed on January 31, 2017 to support an exemption from section 345(b), Debtor assured the Court that the funds were invested conservatively in a money-market fund:

> As of December 31, 2016, the funds in the Vanguard Account totaled approximately $18.2 million dollars. Over $17.9 million of this money is invested in the Vanguard Federal Money Market Fund (the "**FMMF**"). The FMMF invests in U.S. government securities, seeks to "preserve shareholders' principal investment" and "is one of the most conservative investment options offered by Vanguard." As such, the FMMF is a low-risk investment.

Bank Account Motion at ¶ 9. **Fourteen days later**, after touting the conservative nature of the Vanguard investment, Debtor moved all of the money market funds to the much riskier stock fund.

10.     With regard to the restricted funds, Debtor argues in the Cash Management Reply that its making of grants from restricted funds is an ordinary course action permitted by the Bankruptcy Code and that its representation regarding restricted funds (*i.e.*, that restricted funds would only be used with Court approval and after consultation with the New York Attorney General) was intended to refer to actions outside the ordinary course of business. This is a lame excuse. For one, neither Debtor's representation nor Mullaney's statement under oath was qualified in the manner Debtor now suggests — Debtor unequivocally and without any

qualification represented it would not use the restricted funds without Court approval and consultation with the New York Attorney General, to wit: "During its chapter 11 case, the Debtor will not withdraw or use any Restricted Funds without further order of this Court in consultation with and on notice to the New York Attorney General." *Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Continue Existing Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, and (C) Maintain Business Forms and Existing Bank Accounts; (II) Extending Time to Comply with 11 U.S.C. § 345(b) and (III) Granting Related Relief; and (B) Request For A Status Conference* [Docket No. 4] ("Cash Management Motion") at ¶ 12; *Declaration of Brian Mullaney Co-Founder and CEO of WonderWork, Inc. in Support of Chapter 11 Petition and First Day Pleadings* [Docket No. 2] ("Mullaney Declaration") at ¶ 16. Second, a debtor is, of course, always required to get Court approval for non-ordinary course actions, so Debtor's re-write of its representation to suggest that it meant it would get Court approval to use the restricted funds outside the ordinary course renders the statement meaningless.[1] Third, Debtor's grants of over $1.1 million during the first two months of its bankruptcy case are not within the ordinary course of business insofar as such amounts far, far exceed Debtor's historic grant-making activity. Debtor cites to its having granted $535,000 in December 2016, but a singular month is not representative of Debtor's historic grant practices. Moreover, Debtor's accounts were frozen from December 6 to December 31, 2016 and it represented in its December 14, 2016 Responses to Questionnaire in Connection With Information Subpoena that it had not paid or promised any grants in December

---

[1] Debtor's interpretation of the restrictive language in the Cash Management Motion and Mullaney Declaration to read in "outside the ordinary course" renders the language a complete nullity in a second respect. In Debtor's view, the only use of donor restricted funds that would be outside the ordinary course would be uses not consistent with donor intent, but any such uses would violate applicable law, meaning that there would not be any circumstance in which the language would apply.

2016, so it is not clear what figure Debtor is quoting. Notably, Debtor's grant-making markedly increased after the Award, both on the eve of bankruptcy and during the bankruptcy case.[2] The pace of grants in the bankruptcy case (*i.e.*, almost $6 million per year) exceeds by many multiples Debtor's historic practices, *e.g.*, in 2015, Debtor granted a total of $1.99 million and in 2014, it granted $1.1 million.[3] Thus, these transfers were outside the ordinary course of business. Furthermore, such transfers are highly inappropriate and problematic in view of Debtor's continued inability to provide a report to the Court and parties in interest regarding the restricted funds (or undertake the long-promised audit) and the continued uncertainty surrounding which funds may in fact be restricted.

11. Moreover, a review of Debtor's schedules and produced documents has only further confirmed what this this Court already observed — Debtor is in need of meaningful safeguards and controls and there is a need for an investigation into Debtor's financial affairs.[4] For example:

- Debtor's credit cards[5] include reimbursed expenses for first-class airfare for Mullaney (approximately $36,000 in 2016) and Delois Greenwood (approximately $16,150 in 2016 excluding economy flights between her residence in Atlanta and New York City); a three-night trip to Nantucket for Mullaney and his wife with expenses

---

[2] From a cynical view, the fact that the grant-making activity increased post-Award suggests that Mullaney is using charitable grants as a means of depriving HelpMeSee of recovery on the Award.

[3] HelpMeSee does not have access to Debtor's grant activity for 2016 in its entirety.

[4] Transcript of Proceedings at 44:3-15; 46:1-12 (Mar. 10, 2017) (". . . But I mean, look, the problem that I'm having is there's clearly a problem here. And to allow the case to just march on forward without anybody looking into what's going on, without anybody doing an investigation, without any kind of safeguards or controls being put in place, is problematic . . .").

[5] Debtor maintains two American Express credit cards: one in Mullaney's name and one in Hana Fuchs' ("Fuchs") name that includes charges by Fuchs, Delois Greenwood ("Greenwood"), and Karen Lazarus ("Lazarus") categorized by person.

totaling over $11,000 (including flights to/from Nantucket and a sailing trip);[6] a two-night trip to Los Angeles for Mullaney with expenses over $4,500 (including a $2,106 hotel stay, rental car and chauffeur, and excluding first-class airfare); a one-night trip to Newport, Rhode Island with expenses of over $1,950; and five-star hotel rooms for Mullaney when he stays in New York City totaling over $20,000 in 2016.  In addition, Mullaney spent $3,613.95 at a camera store and $5,277 at Apple in November and December 2016 on WonderWork's credit card, but those assets do not appear anywhere on Debtor's schedules.

- Debtor first represented at the January 5, 2017 hearing that Mullaney has not taken salary since October 2015, but then stated at the 341 meeting that he took a salary payment in June 2016 of his full 2015 salary.  Debtor thereafter produced evidence of a one-time payment of $230,793.20 to Mullaney in June 2016.  This is facially a preferential transfer and one which Debtor failed to disclose in its initially filed schedules and statement of financial affairs.

- Debtor's initial schedules stunningly did not include *any* insider payments in the one year prior to the bankruptcy filing. In Debtor's amended schedules, it disclosed $484,211.96 in payments to Mullaney and $168,000 to Fuchs.  Among other things, Debtor's amended schedules still fail to disclose payments for Mullaney's reimbursable expenses, health benefits to senior management, payments to Board members, and payments for first-class airline tickets and high-end hotels for Mullaney's wife and daughter.

- Debtor made an improper payment of a prepetition claim without Court approval.  Debtor paid a $15,098.74 invoice to its printer, E1 Digital Direct, allegedly to release a lien. Debtor did not disclose that the payment was for a prepetition claim when the payment was included in its January 2017 monthly operating report, but later acknowledged the payment was for a prepetition claim at the 341 meeting.  Debtor did not seek and has not sought Court approval of the payment even though it was required to do so.  In the Cash Management Reply, Debtor argues that no Court approval was required to effect the payment because it was to secure the release of a perfected lien.  That is absolutely not the law.  While the existence of a lien might justify a Court granting a debtor authority to make the payment under its equitable powers pursuant to 11 U.S.C. § 105 (*e.g.*, in the context of a typical first day motion

---

[6] Debtor's counsel contended at the March 10 Hearing that Mullaney deducted costs from this trip from his deferred salary. Transcript of Proceedings at 45:18-22 (Mar. 10, 2017).  No evidence of that has been provided to HelpMeSee.  Further, that statement is fundamentally at odds with Debtor's repeated representations that Mullaney did not receive any salary for 2016, as well as the inclusion of his full 2016 salary and other amounts as an unsecured claim reflected in the amended schedules. (The amended schedules' reflection of Mullaney's full 2016 salary as a claim against Debtor is also directly at odds with Mullaney's testimony at the 341 meeting that he paid his employees' bonuses (totaling $39,000) in December 2016 out of his "deferred" salary.)  Nor does such amount appear to be included in Mullaney's 2016 W-2.

approving payments to warehousemen), the existence of a lien does not entitle a debtor to make a unilateral payment of a prepetition claim.[7]

12.     Debtor has continually been unable to produce an audit of its restricted funds (despite initially promising the Court that it would provide a report of its restricted funds by January 12, 2017). As of the March 10 Hearing, Debtor had failed to even file a motion to retain an auditor. No retention motion has yet been filed and it is unclear what progress, if any, Debtor has made in undertaking that audit, notwithstanding the Court's admonishment that the audit should be completed without delay and quicker than the 30 additional days Debtor advised that it needed.[8]  The hearing on the Order to Show Cause will be on April 12, 2017, more than 30 days after the March 10 Hearing.

## ARGUMENT

13.     Should the Court decline to appoint a trustee at this juncture, for the reasons discussed at the March 10 Hearing and set forth herein and in the Trustee Motion, there is no question that the appointment of an examiner coupled with sufficient cautions and controls is warranted, necessary, and in the interest of creditors to ensure that the value of the estate is maximized and preserved during the pendency of this case, to ensure that Debtor does not continue to take actions in contravention of Court orders and its own representations, to protect

---

[7] *In re C.W. Mining Co.*, 749 F.3d 895, 899 (10th Cir. 2014), cited by Debtor, does not at all support Debtor's position — there, the court determined that there was no point in avoiding a secured creditor's unauthorized postpetition setoff because avoidance would revive the secured creditor's lien and the debtor suffered no damages from the setoff. Nothing in that decision supports the notion that a debtor need not obtain court approval for payments of prepetition secured claims.

[8] Transcript of Proceedings at 81:1-82:2 (Mar. 10, 2017) ("MS. MANN . . . It should be done in 30 days and we . . . THE COURT:  Thirty more days? MS. MANN:  Thirty more day [*sic*].  THE COURT:  That, that's just not acceptable . . . ).

Debtor from overreaching by Mullaney and to insure an appropriate and fair investigation is undertaken with regard to Debtor's assets.

14.     Section 1104(c) of the Bankruptcy Code provides:

> on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor, if— (1) such appointment is in the interests of creditors, any equity security holders, and other interests of the estate; or (2) the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000.

11 U.S.C. § 1104(c).   Detailed allegations of Mullaney's fraud, dishonesty, incompetence, misconduct, mismanagement, and irregularity in the management of the affairs of the debtor have been advanced by HelpMeSee in the Trustee Motion, the Cash Management Objection, other pleadings filed in the case, and the transcripts of the hearings in this case.  Those matters need to be investigated.

15.     Under the present circumstances, appointment of an examiner would clearly be in the interests of creditors (in the absence of the appointment of a trustee). *See In re JNL Funding Corp.*, No. 10-73724, 2010 WL 3448221, at *3 (Bankr. E.D.N.Y. 2010) (finding the appointment of an examiner in interests of the creditors and the estate as "such appointment allows for a thorough, independent, and expeditious examination to be made into serious allegations" regarding the prepetition financial activities of debtor); *In re Keene*, 164 B.R. 844, 856 (Bankr. S.D.N.Y. 1994) (appointing an examiner based on allegations of misappropriation and breach of fiduciary duties in other actions). This case requires an independent fiduciary who can properly investigate potential claims and causes of actions belonging to the estate.  No such fiduciary presently exists.  Significantly, no creditors committee has been appointed in the case and Debtor

has taken the shocking position that no causes of action against the insiders exist, despite facially evident preferences of hundreds of thousands of dollars.[9] *Memorandum of Law of WonderWork, Inc. in Opposition to HelpMeSee's Motion to Appoint A Trustee* [Docket No. 62], at 35-36 (asserting no claims against Mullaney exist). Under these circumstances, only an examiner (or a trustee) can effectively undertake that critically necessary independent investigation on behalf of the estate.

16.     So-called restricted funds are a central issue in the case and Debtor has provided inconsistent accounting of the restricted funds since the time of the arbitration. Disappointingly, and without a cogent explanation, Debtor has also been unable to timely conduct an audit of the so-called restricted funds or otherwise provide any formal reporting of any such restricted funds. Moreover, given Debtor's history, any internal audit under the supervision of Debtor cannot be trusted. Thus, an examiner is necessary to undertake the critical investigation of Debtor's so-called restricted and unrestricted funds, which stand as the sole source of available assets for distributions to creditors in this case.

17.     Although the Order to Show Cause is framed under section 1104(c)(1), HelpMeSee submits that an examiner would also be required pursuant to section 1104(c)(2) because Debtor has fixed, liquidated unsecured debts (other than debts for goods, services and taxes) in excess of $5 million.

---

[9] At the 341 meeting on March 6, 2017, Debtor's counsel admitted that Mullaney's June 2016 salary payment sounded preferential.

18.     HelpMeSee submits that the scope of the examiner's investigation and report should include the following subjects:

(1)     Any potential claims and causes of action of Debtor, including, without limitation:

       i.     Preferential and fraudulent transfers including to insiders;

      ii.     Claims for breach of fiduciary duty and/or corporate waste;

     iii.     Other claims against insiders;

     iv.     Claims relating to excessive and extravagant expenses and expense reimbursements; and

      v.     Salary payments and whether such payments were made in accordance with Debtor's agreement and applicable tax law.

(2)     A forensic investigation of Debtor's funds including:

      i.     A determination whether and to what extent Debtor's funds are properly subject to donor restrictions or other restrictions under New York charity law and the characterization and nature of any such restriction;

      ii.     An analysis of how expenses are allocated across various causes, including when and how restricted funds are transferred between accounts, and whether they are handled in accordance with applicable law and restrictions; and

     iii.     An analysis of how grants are paid and apportioned across Debtor's various causes and whether Debtor maintains sufficient controls over its grantees to ensure that funds are spent in accordance with their restricted purpose.

19.     While the appointment of an examiner will allow for an independent investigation and analysis that will be highly beneficial to the Court and the estate and creditors, an examiner cannot provide any protection for creditors with regard to Debtor's continued operations. Debtor's suggestion that there is sufficient oversight from the Board of Directors and applicable reporting requirements falls far short of what is necessary under these circumstances to protect and preserve the estate for the benefit of creditors. *See* Transcript of Proceedings at 47:7-22

(Mar. 10, 2017).  Despite the supposed Board oversight and reporting requirements, Mullaney has consistently used Debtor's funds to finance lavish first-class travel for himself and his family[10] and, while under the jurisdiction of the Court, Debtor has already undertaken actions detrimental to the estate in violation of Court orders and its own representations, including diverting funds to a risky stock investment fund and diverting over a million dollars of restricted funds.

20.    Debtor's spending also exceeds its own budgeted representations during the bankruptcy.  At the 341 meeting, after detailed questioning, Mullaney represented that monthly expenses, excluding payroll, would be approximately $60,000 per month and January's disclosed expenses in excess of $150,000 were atypical.  Despite these representations, Debtor's February expenses were over $160,000, including $103,180 in "Marketing Fees" alone.  Moreover, Debtor's fiscal year 2017 budget only allocates $606,192 for "Marketing," yet Debtor has spent $210,807 in "Marketing Fees" in addition to $51,215 in "Consulting Fees" for its direct-mail program in the first two months of 2017.  Clearly, the Board is not equipped to control management in the manner that is appropriate and necessary here.

21.    Under the circumstances and in view of the serious allegations made by HelpMeSee about Debtor's management (as detailed in the Trustee Motion), Debtor should be subject to a robust set of cautions and controls.  HelpMeSee submits that the following cautions and controls are minimally necessary to protect and preserve the estate:

---

[10] Debtor spent $18,869.14 in reimbursable travel and entertainment expenses in February 2017. HelpMeSee does not know on what that was spent.

1.      <u>Additional Reporting Requirements</u>:  Debtor shall provide the following reporting to the examiner, the United States Trustee, HelpMeSee and the New York Attorney General:

a.      An unaudited schedule of so-called restricted and unrestricted funds (a "<u>Schedule of Funds</u>"), including a breakdown as to the nature of any alleged restrictions (and which shall be filed with the Court) on or before April 19, 2017.[11]

b.      A detailed 13-week budget for the period starting April 1, 2017, with specific detail of expenditures and grants, which shall be approved by Debtor's Board and shall be in a form and substance satisfactory to HelpMeSee and the New York Attorney General (if it chooses to exercise that right) and which shall be filed with the Court (the "<u>Initial Budget</u>"); *provided, however*, that if the parties do not agree on the Initial Budget, the Initial Budget will be subject to Court approval.  Debtor shall deliver the Initial Budget on or before April 19, 2017.  Pending approval of the Initial Budget, Debtor will not be permitted to expend any funds other than amounts for salary, rent and overhead subject to prior disclosure to HelpMeSee.

c.      No later than Friday of the fourth week covered by the then-existing Budget (including, but not limited to, the Initial Budget), Debtor shall deliver an updated 13-week budget (the "<u>Budget</u>"), which updated Budget shall be approved by Debtor's Board and shall be in a form and substance satisfactory to HelpMeSee and the New York Attorney General (if it chooses to exercise that right) and which shall be filed with the Court; *provided, however,* that if the parties do not agree on the Budget, the Budget will be subject to Court approval.

d.      Debtor will not be permitted to spend any amounts that are not set forth in an approved Budget (subject to reasonable timing adjustments and a 5% aggregate and line-item deviation) without prior Court approval.

e.      On or before April 19, 2017, Debtor's general ledger for January 1, 2017 to March 31, 2017.  No later than 20 days after the end of each calendar month, commencing with April 2017, a copy of Debtor's general ledger for that month.

f.      On every other Friday of each calendar week, commencing on Friday, April 28, 2017, a variance report (the "<u>Variance Report</u>") comparing, on a line-item basis, actual results for the previous individual week and cumulative weeks to the amounts set forth in the Budget for such previous weeks and since the last approved Budget.  Each material variance shall be accompanied by a qualitative explanation.  Each Variance Report shall include an accounting of the amount of restricted and unrestricted funds as of the end of the previous Variance Report.

---

[11] If an examiner is appointed and tasked with undertaking a forensic investigation of Debtor's restricted and unrestricted funds, HelpMeSee does not believe that Debtor separately retaining an auditor to conduct its own audit is necessary and would be a duplicative waste of resources.

2. <u>Grants</u>: Prior to the completion of the examiner's investigation and report into restricted funds, Debtor shall be prohibited from providing grants to any organization without prior Court approval. In no event shall any restricted blindness funds be used until the Award is satisfied. After delivery of the examiner report, the Court shall consider whether to modify the restriction.[12]

3. <u>Expense Reimbursements</u>: All expense reimbursements over $500 shall be subject to approval by Debtor's Board and the Court, unless expressly detailed and disclosed in the Budget.

4. <u>Investments</u>: As set forth in the Cash Management Reply, Debtor shall immediately transfer the Vanguard Funds to Signature Bank, and shall not move the funds without prior Court approval.

5. <u>Access to Records</u>: Debtor shall permit the following access to its books and records:

a. Debtor shall (i) permit the examiner to have access to and inspect Debtor's books and records; (ii) make its management and employees available to discuss Debtor's affairs, finances, and condition with the examiner; and (iii) otherwise cooperate with the examiner in order to facilitate the examiner's investigations.

b. HelpMeSee will have a right to review any documents received or reviewed by the examiner and shall be permitted to participate in any discovery conducted by the examiner.

---

[12] During the pendency of the bankruptcy case, Debtor should be restrained from making grants that dissipate its assets. Through February, Debtor had incurred a loss of over $450,000. Grants should not be made at the expense of the creditors.

## CONCLUSION

22.     For the foregoing reasons, HelpMeSee requests that, if the Court declines to issue an order appointing a trustee, the Court enter an order:  (1) directing an examiner to conduct an investigation of Debtor as described herein, (2) subjecting Debtor to the cautions and controls described herein; and (3) granting such other and further relief as the Court believes is just and equitable.

Dated: April 5, 2017
      New York, New York

                         Respectfully submitted,

                         /s/ Benjamin Mintz
                         Benjamin Mintz

                         ARNOLD & PORTER KAYE SCHOLER LLP
                         250 West 55th Street
                         New York, New York 10019-9710
                         Telephone:  (212) 836-8000
                         Fax:  (212) 836-8689
                         benjamin.mintz@apks.com

                         *Counsel for Help Me See, Inc.*