# EXHIBIT 34

# CARTER LEDYARD & MILBURN LLP

*Counselors at Law*

Pamela A. Mann
Partner
•
Direct Dial: 212-238-8758
E-mail: mann@clm.com

2 Wall Street
New York, NY 10005-2072
•
Tel (212) 732-3200
Fax (212) 732-3232

570 Lexington Avenue
New York, NY 10022-6856
(212) 371-2720

September 19, 2017

**BY E-MAIL AND REGULAR MAIL**

Adam Cole
Michele Salituro
Ritesh Lall
BDO
100 Park Avenue
New York, NY  10017

Re:  *Audit for Fiscal Year Ending June 30, 2016*

Dear Messrs. Cole, Salituro and Lall:

As counsel to WonderWork, Inc. ("WonderWork"), we are writing to address numerous issues related to BDO's audit of WonderWork's financial statements for Fiscal Year Ending June 30, 2016 (the "Audit") identified by BDO in Exhibits A and B of your letter dated September 1, 2017 to John J. Coneys, Steven Rappaport, and Brian Mullaney (the "Letter").

In the materials that follow, we reference each issue identified by BDO in Exhibits A and B of its Letter, copying the text from your letter and adding our response in italicized font for your consideration. In some cases, we have enclosed supporting information which we have labeled to indicate the relevant Exhibit and item number of your Letter. If you have any questions about our responses or need additional information, please let us know as soon as possible and we will provide it to you. In a few cases, where it is not clear from your Letter what additional support or information you are seeking, we have indicated that in our responses and would appreciate your guidance on those matters.

Additionally, you state on page 4 of your Letter that "we have gathered substantial information to indicate an adjustment is required to the draft financial statements. However we have not received all requested information and, therefore, are unable to conclude on the final adjustment or likely adjustment to the draft financial statements." We believe the enclosed responses and supporting materials provide you with all such requested information, subject to the few requests for clarification we have included herein. If you have follow up questions in response to this letter, please send them to us as soon as possible. WonderWork's entire staff remains available to you to assist in any way possible. We note your statement on page 2 of that Letter that "we have determined that we may continue the audit subject to the requirements

detailed below." WonderWork will continue to promptly provide you with all information that you need to complete your audit of its financial statements for fiscal year 2016.

Very sincerely,

Pamela A. Mann

PAM:ewl
Enclosures

**Exhibit A - Issues Requiring Material Adjustments to the Financial Statements**

As noted in each matter, we have gathered substantial information to indicate an adjustment is required to the draft financial statements. However we have not received all requested information and, therefore, are unable to conclude on the final adjustment or likely adjustment to the draft financial statements.

**a) Compensation for Chief Executive Officer Issue:**

On August 15, 2017, it was noted that from fiscal year ended June 30, 2011 through June 30, 2016, the Chief Executive Officer's ("CEO") bonus was not being recorded in the general ledger system. On August 23, 2017, we received a schedule indicating that his approved compensation was $3,700,000 ($2,750,000 in salary and $950,000 in bonuses) through June 30, 2016. It appears that, cumulatively, $2,650,000 was reported on the CEO's form W-2 for calendar years December 31, 2011 - December 31, 2016. The remaining $1,050,000 in compensation to the CEO was not recorded in WonderWork's general ledger system but was maintained on an Excel spreadsheet outside of the general ledger system. Of the $1,050,000 amount, $250,000 relates to fiscal year 2016 and represents the 2016 bonus declared and approved by WonderWork's Board of Directors but unpaid. The remaining amounts relate to prior years. We received the CEO's Form W-2 on August 29, 2017.

In addition, the Chief Financial Officer ("CFO") indicated to us that the CEO would arbitrarily determine that certain travel expenses he had incurred on behalf of WonderWork for business purposes and certain business-related expenses that were paid by WonderWork be randomly deducted from the CEO's bonus amount. This calculation was maintained by management in the Excel spreadsheet outside of the general ledger system.

Furthermore, the CEO filed a pre-petition liability claim for unpaid bonuses amounting to $641,320 as set forth on the Amended Schedule of Liabilities E/F [Bankruptcy Dck # 212], filed on July 28, 2017.

Deferring a payment for compensation that is not covered by a Deferred Compensation Plan qualified in accordance with rules of the Internal Revenue Code can expose WonderWork and the individual to significant penalties and interest. We are requesting that WonderWork evaluate this matter and analyze the resulting financial exposure and related impact on the draft financial statements and disclosures therein.

Impact:
Current year - The impact for fiscal year 2016 is the unrecorded bonus in the general ledger for $250,000 plus the applicable taxes. Additionally, there may be penalties and interest associated with the deferred compensation that must be evaluated, accounted for and disclosed.

Prior year(s) - For fiscal years 2011 - 2015, expenses were under-reported by $800,000 and the beginning net assets deficit would require an adjustment. Additionally, incremental payroll taxes, penalties, and interest on the unrecorded compensation may need to be accrued that must be evaluated, accounted for and disclosed.

Sufficient competent information needs to be provided for us to be able to objectively determine that the CEO-reimbursed travel expenses have been appropriately recorded as an expense of WonderWork.

*WonderWork Response:*
*Per the above, BDO has made a determination that the $250,000 bonus awarded to the CEO in FY 2016 but not actually received by him constitutes compensation to him. This is not an audit finding, but, rather, a legal conclusion at odds with the applicable law with respect to "constructive receipt" and with WonderWork's practice in all previous fiscal years, approved in prior unqualified audits of its financial statements. BDO's determination also appears to be premised on various factual errors, noted below.*

*Constructive receipt is defined in the regulations to the tax code as income that "although not actually reduced to a taxpayer's possession is constructively received by him in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given. However, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions." 26 C.F.R. § 1.451–2.*

*It is well established that the doctrine of constructive receipt is to be used sparingly. <u>Johnson v. Commissioner</u>, 25 T.C. 499, 502 (1955). "The doctrine is only to be invoked when the taxpayer has an unrestricted right to receive payment of money that is available to him." <u>Lehmuth v. Commissioner</u>, No. 12325-00S, 2001 WL 1922711, at \*4 (T.C. Dec. 28, 2001).The Tax Court, in <u>Dial v. Comm'r of Internal Revenue</u>, 24 T.C. 117 (1955), has rejected a finding of "constructive receipt" in a case that is factually similar to the situation here. In <u>Dial</u>, the founders of a nonprofit health clinic were entitled to income that they opted to not receive, based on their determination that it would be in the best interests of the clinic, on whose board they served, to not withdraw their salaries. The Court found that, under those circumstances, the founders had not constructively received their salaries:*

> *It is apparent to us, from the record here, that the amounts credited to both Dwight's and Robert's salary accounts were not available to them during any of the years in issue.... Admittedly, the fact that Dwight, Robert and Elizabeth were the trustees of the Clinic, and <u>had complete control over the disposition of its money</u>, places Dwight in the suspect position that he could have paid himself at least the amount due him for services in 1944 if he had wished. We are satisfied, however, from the whole record here, that <u>the three trustees acted in good faith and on what they believed was sound business judgment ... when the Clinic's financial condition was, at that time, somewhat improved.</u> It may well be that in every year in which amounts were credited to Robert and Dwight, but not paid to them, they, as the trustees and controllers of the Clinic's money, could have paid ˌ themselves first and other obligations of the Clinic later. <u>They did not do that but acted in what they felt was the best interest of the Clinic, and adversely to their own personal interests, by not withdrawing the sums to which they were entitled. We cannot uphold [the Service's] determination that the amount credited to Dwight's account in 1944</u>*

2

*constituted income constructively received by him in that year.* [emphasis added and citations omitted]

In general, whether constructive receipt of compensation exists rests on a factual determination of whether the employee's failure to receive salary was related to the financial condition of the employer. *See, e.g. Rhombar Co. v. C. I. R.,* 47 T.C. 75, 85–86 (1966), aff'd sub nom. *Rhombar Co. v. C. I. R.,* 386 F.2d 510 (2d Cir. 1967); ("We think that the nonpayment of the notes was based upon a valid business reason from the standpoint of both the obligor and the obligee.") Where the financial condition of the employer is in doubt, it is more than likely the taxpayer did not have control or the ability to possess the funds. Moreover, in light of the presumption against a finding of constructive receipt, a determination that receipt of the funds would have negatively impacted the employer company has been found sufficient to negate a finding of constructive receipt. *See, e.g., Huber v. Commissioner* 12 B.T.A. 1, 2–3 (1928).

Here, the CEO did not take his bonus based on his judgment that it was prudent to conserve WonderWork's financial assets in the face of an ongoing arbitration which ultimately resulted in a $16 million award against WonderWork and its filing for Chapter 11 protection in bankruptcy court. His decision to forego his bonus and to allow his compensation to be reduced by business expenses for which he was entitled to be reimbursed under the terms of his employment contract or other WonderWork expenses was, the contrary statement in your letter notwithstanding, not "arbitrary" or "random," but, rather was based on his good faith business judgment that these deductions would benefit WonderWork, in light of its doubtful financial health. In light of BDO's insistence that it would be necessary to include in its audit letter its opinion that there was "substantial doubt" that WonderWork will continue as a going concern, it can hardly be heard to assert now that the CEO's actions with respect to his bonus were not based upon a valid business concern for the financial health of WonderWork.

## b) Recording of All Liabilities

Issue:

As a result of the CEO filing a pre-petition liability claim for unpaid bonuses as noted in (a) above, and WonderWork not recording all compensation liabilities, BDO performed additional procedures to determine that all material liabilities were recorded in the general ledger. We requested a detailed listing of the pre-petition liability claims filed by WonderWork with the Bankruptcy Court. On August 29, 2017 we received the Amended Schedule of Liabilities E/F [Bankruptcy Dck # 212], filed on July 28, 2017. We are currently evaluating the listing of the pre-petition liability claims and comparing it to the general ledger as it relates to June 30, 2016.

Impact:

Current year - Unable to determine at this time.

Prior year(s) - Unable to determine at this time.

*WonderWork Response:*

*Based on the issue statement above, it is our understanding that we have provided all requested information. We understand you are currently reviewing this information. Please advise us if this is not correct or if you have any further questions.*

## c) Documentation to Determine if Contributions are Temporarily Restricted or Unrestricted

<u>Issue:</u>

During our audit, we noted that management could not provide adequate support (such as the donor letter) to determine if a contribution was temporarily restricted or unrestricted. We attempted to expand our audit procedures to confirm the donor intent and purpose of the contribution directly with the donor in writing.

On August 15, 2017, management provided a court order to us and notified us that as part of WonderWork's bankruptcy proceedings, WonderWork "shall not take any action to modify its documentation with respect to the restricted funds, including requesting donors to designate such funds as restricted other than in a manner consistent with the Debtor's ordinary business practices." We were informed by management not to confirm directly with the donor if their contribution was temporarily restricted or unrestricted due to the court order.

<u>Impact:</u>

Current year - Given the lack of appropriate support for donor intent and management's restriction on our ability to confirm directly with donors (a common audit procedure performed under these circumstances), we are unable to determine if certain contributions are correctly recorded as unrestricted contributions or temporarily restricted contributions through BDO's independent confirmation process. This represents a restriction made by management on the scope of our audit. If we are able to complete this procedure, this matter would result in a modification of our audit report.

Prior year(s) - Not applicable.

<u>*WonderWork Response:*</u>

*We do not agree that "management could not provide adequate support (such as the donor letter) to determine if a contribution was temporarily restricted or unrestricted."*

*First of all, New York law is clear that the operative document(s) for determining whether a donation is restricted or unrestricted is the "gift instrument." Section 551(c) of the New York Not-for-Profit Corporation Law, applicable to WonderWork as a foreign corporation that conducts fundraising activity in New York, defines the "gift instrument" as "a record or records, including an institutional solicitation, under which property is granted to, transferred to, or held by an institution as an institutional fund." We have provided you with the complete gift*

4

*instrument for every donation you have requested. This is all of the support you need to audit these determinations.*

*We have reviewed the most recent list of contributions for which BDO has requested further materials, sent by Natalie Walston on August 30, 2017 in a spreadsheet. Per our responses inserted into that spreadsheet and supporting backup materials, both of which are enclosed, we have now provided you with the gift instrument for each of those contributions. We note that some of these contributions are unrestricted because the gift instrument did not specify how the contribution was to be used, i.e., the donor did not impose any restrictions on the use of his or her donation. In these cases, we have provided you with the complete gift instrument (e.g., copies of checks or wire transfer confirmations and solicitations); no further documentary support exists or is needed to prove the absence of a donor instruction.*

*Second of all, it is untrue that management has restricted BDO from contacting donors. In my email to Mr. Salituro on August 25, 2017, I provided a copy of the court order which imposes a series of controls on WonderWork during the period of time during which the Examiner is conducting his examination. That work is not yet completed. As I mentioned in my email, and in follow up phone conversations with you, these controls include, at the bottom page 7 of the order, a prohibition against "tak[ing]any action to modify its documentation with respect to the restricted funds, including requesting donors to designate such funds as restricted other than in a manner consistent with the Debtor's ordinary business practices." On page 8, the Court retains "jurisdiction with respect to all matters arising from or related to the implementation of this Order <u>including to impose sanctions on Debtor's principals and/or professionals</u> to the extent Debtor fails to abide by the cautions and controls set forth in this Order." <u>(emphasis added)</u>.*

*We understand your desire to perform certain evaluations in order to audit WonderWork's financial statements, but we believe that BDO's contacting WonderWork's donors while BDO is acting as WonderWork's auditors presents a risk of violating the enclosed court order. In prior communication with us, you indicated you did not agree that the court order prohibited you from contacting donors, and we have done nothing to prevent this. However, you do so at your own risk. If BDO chooses to contact donors, we would recommend that BDO limit its communication to providing the donor with copies of the "gift instrument" that WonderWork has provided to BDO, and requesting that the donor confirm there are no further materials within the meaning of that term as defined above.*

**d)    Incorrectly Recording Temporarily Restricted Contributions as Unrestricted Contributions in Fiscal Year 2016**

<u>Issue:</u>

During our audit we noted that management did not properly classify and record contributions as unrestricted or temporarily restricted during fiscal year 2016. Based on a process at year end that was performed by management in conjunction with Carter Ledyard a Milburn LLP ("CLM") prior to the commencement of the 2016 audit, $1,877,860 of contributions were incorrectly

5

reported as unrestricted contributions. This amount should have been recorded as temporarily restricted contributions.

Impact:

Current year - This caused an overstatement of unrestricted contributions and unrestricted net assets available for use and the understatement of temporarily restricted contributions and temporarily restricted net assets during the year. Contributions were not properly classified and recorded in the general ledger which could result in the funds not being used as the donor intended and could have reputational and other ramifications to WonderWork. This amount has been corrected in WonderWork's general ledger and will result in an adjustment to the draft financial statements.

Prior year(s) - Not applicable.

*WonderWork Response:*

*Both your factual statements and your legal conclusions are incorrect. As a preliminary clarification, your statement suggests you are referring to all of WonderWork's restricted fund accounting. In fact, the issue statement above relates only to donations made out to WonderWork. All donations made out to the DBA's are and have always been properly recorded as restricted.*

*WonderWork did not "improperly report" these donations made out to WonderWork in FY16; they will be reported for the first time, correctly, in the FY16 audited financial statements. In connection with the FY16 audit, WonderWork and its counsel have analyzed the gift instrument for each of these donations and properly classified them as restricted or unrestricted. As in prior years, WonderWork conducts this fund reconciliation process in connection with its annual audit. Upon completion of the audit, WonderWork adjusts the account balances accordingly and those balances serve as the opening balances for the next fiscal year.*

*BDO seems to be implying that WonderWork is legally required to perform this analysis so that it can report on its assets at any instant throughout the year. However, this is not required by law or accounting principles. In any event, in practice, there was no risk that restricted funds would be used for unrestricted purposes because WonderWork's unrestricted fund balances have always far exceeded its program expenses.*

*Nevertheless, moving forward, WonderWork will conduct this reconciliation more frequently, at least once per month.*

e)     **Unrestricted Net Assets and Temporarily Restricted Net Assets**

Issue:

We noted that management used separate general ledger accounts to track unrestricted contributions and temporarily restricted contributions. General ledger account #4000 was used to

record all unrestricted contributions and general ledger accounts #4005, 4010, 4020 and 4030 were used for temporarily restricted contributions. During our audit procedures, we noted that certain contributions that were explicitly restricted by donors were incorrectly recorded as unrestricted net assets.

As a result of this finding, BDO performed additional procedures on the opening balances for unrestricted and temporarily restricted net assets. BDO selected a sample of 67 contributions that were reported as unrestricted contributions in 2015 and noted 6 instances where contributions received from donors were restricted and incorrectly recorded and reported in the prior year financial statements as unrestricted. Additionally, management, in conjunction with CLM, counsel to WonderWork, performed a review of the 2015 contributions to determine if they were appropriately classified as temporarily restricted or unrestricted contributions.

Impact:

Current year - As noted in item (c) above, we are unable to determine if certain contributions are correctly recorded as unrestricted contributions or temporarily restricted contributions through BDO's independent confirmation process. This represents a restriction made by management on the scope of our audit. If we are able to complete this procedure, this matter would result in a modification of our audit report.

Prior year(s) - As a result of this process, an adjustment for $1,046,214 was recorded to reduce the unrestricted net assets and increase the temporarily restricted net assets balance as of June 30, 2015. This is a restatement of the net assets balances for the year ended June 30, 2015.

*WonderWork Response:*

*As a preliminary note, some clarification is needed regarding the timeline described above. After BDO selected this sample and noted these instances, BDO insisted upon auditing the FY15 closing balances of restricted funds, which were audited by KPMG (and which also served as the FY16 opening balances). To accommodate this request, WonderWork and its counsel reviewed all donations made out to WonderWork in FY15, and CLM provided BDO with its legal conclusions as to whether these donations were restricted or not. These conclusions led to the prior year adjustment you describe above. However, as was previously communicated by WonderWork's CFO to Natalie Walston, your figure above, $1,046,214, needs to be updated to $945,214 to reflect WonderWork program expenses for FY15.*

*Regarding the impact on current year described above in this item (e), please refer to our response to item (c) above.*

**f)    Incorrectly Using Temporarily Restricted Contributions and Temporarily Restricted Net Assets to Fund Direct Mailing Expenses**

Issue:
During our audit, we noted that management uses temporarily restricted contributions to fund direct mailing expenses. For direct mailing expenses incurred, management releases an amount

7

from temporarily restricted contributions and temporarily restricted net assets to pay for these expenses. Based on our review of the available donor agreements, it does not appear that the temporarily restricted contributions can be used for direct mailing expenses.

Impact:

Current year - WonderWork incorrectly released temporarily restricted net assets. This caused WonderWork's temporarily restricted net assets to be understated by approximately $1,300,000 for fiscal year 2016. This will result in an adjustment to the draft financial statements.

Prior year(s) - We are still in the process of gathering information on the prior years to determine the understatement of prior year temporarily restricted net assets.

*WonderWork Response:*

*As described in detail in our August 28, 2017 memorandum to BDO, the portion of WonderWork's direct mail expenses associated with public education – and only that portion – is allocated to programs pursuant to AICPA Statement of Position 98-2. As part of its annual financial reporting process, WonderWork reconciles its program-restricted fund balances to reflect these expenses. This is reflected in WonderWork's prior year financial statements, upon which KPMG delivered unqualified audit opinions.*

*The Notes to WonderWork's financial statements, which track the applicable FASB guidance, provide that "The classification of a not-for-profit organization's net assets and its support, revenue and expenses is based on the existence or absence of donor-imposed restrictions. It requires that the amounts for each of the classes of net assets, permanently restricted, temporarily restricted and unrestricted, be displayed in a statement of financial position and that the amounts of change in each of those classes of net assets be displayed in a statement of activities." WonderWork displays this information in its financial statements. An analysis of whether the gift instrument requires that program-restricted funds be used for one programmatic purpose (e.g. surgeries) and not another (e.g., the program portion of direct mail expenses) is a legal question that is beyond the scope of the accounting rules and this audit.*

*We note that Section 513(b) of the New York Not-for Profit Corporation Law (Administration of assets received for specific purposes), applicable to foreign corporations conducting fundraising activity in New York such as WonderWork, provides that "...the governing board shall apply all assets thus received to the purposes specified in the gift instrument as defined in section 551 (Definitions) <u>and to the payment of the reasonable and proper expenses of administration of such assets." (emphasis added)</u>. WonderWork's mission and activities, as reflected in its certificate of incorporation, are blindness, clubfoot, and burns programs, including promoting awareness and education about these diseases and corresponding treatments. The joint costs relating to public education that are allocated to programs are reasonable and proper expenses of administration of program-restricted assets.*

**g)    In-Kind Contributions**

8

Issue:

Based on the revised memo provided to BDO on July 24, 2017 by management and final responses to BDO questions on August 18, 2017, it was determined that, in accordance with Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 958-605 (In-Kind Contribution), WonderWork was incorrectly recording in-kind contributions for the surgeries being performed by its partners (such as hospitals). This is a grant that WonderWork makes to the partner for a fixed amount and includes guidelines on the type of surgery the grant funds may be used for and the patient demographic. WonderWork does not specifically identify which patient receives the surgery, and does not provide any diagnosis, treatment, additional care or have any obligation for the cost of the surgery above the grant amount. The doctors and nurses that perform these services are employed by the hospital. Based on a review of the grant agreement, doctors' and nurses' time, supplies, or hospital usage time for these services provided would not be in-kind contributions for WonderWork.

Impact:

Current year - While there is no effect on net assets, this caused an overstatement of in-kind service revenue and program (direct) expenses that were recorded in the statement of activities. The amount for this error is approximately $2.5 million for fiscal year 2016. This will result in an adjustment to reduce the in-kind service revenue and the program (direct) expenses in the draft financial statements.

Prior year(s) - There is no effect on prior year net assets. However, the prior years in-kind service revenue and program (direct) expenses for WonderWork are overstated by an offsetting amount. Such amount is yet to be determined.

*WonderWork Response:*

*WonderWork believes it has satisfied the applicable auditing guidance, as WonderWork's prior auditor KPMG determined for the past several years. We have provided BDO with the audited financial statements of similar charities reflecting similar in-kind contributions. We refer to the memorandum provided to BDO on July 24, 2017 for further support, as well as the various emails between CLM, WonderWork and BDO on this subject during June, July and August 2017.*

*Nevertheless, in the interest of completing the audit, WonderWork agrees to the current year adjustments proposed by BDO above. However, it would be inappropriate to restate the audited financial statements from prior years.*

h)      **Allocation of Joint Costs**

Issue:

On August 28, 2017, BDO received a revised memo from CLM on behalf of management regarding the recording of joint activities costs in accordance with FASB ASC 958-720-55, "Accounting for Costs of Activities that Include Fundraising".

9

The criteria within FASB ASC 958-720-55, which include a purpose criteria, audience criteria and content criteria, must be met by WonderWork under the accounting standard to allocate costs as joint activities costs.

Additionally, all fundraising campaigns which apply this accounting standard, requires that all recipients that receive the campaign materials feel a call to action to carrying out the mission of WonderWork that doesn't require them to give money.

Impact:

Current year - BDO is currently evaluating the responses to the initial memo received on August 28, 2017 to determine if all criteria have been met to recognize joint activities costs.

Prior year(s) - If the criteria are not met, it could require an adjustment to prior years financials.

*WonderWork Response:*

*As described in the above-referenced memorandum, WonderWork believes it has satisfied the above-mentioned criteria. It is WonderWork's understanding that we have provided all requested information at this point and that you are currently reviewing this information. Please advise us if that is not correct or if you have any further questions.*

**i)      Grant Award Approval**

Issue:

During our audit, we noted that management does not have a Grant Committee to approve the grants awarded to other non-profit organizations/partners during fiscal 2016. Instead, the Manager of Global Programs determines and presents the grants to be issued to the CEO for approval. This could allow for funds to be awarded to organizations that are not aligned with WonderWork's or the donor's intent.

Impact:

Having a Grant Committee mitigates management override of controls over the selection and approval of grant awards and funds being sent to organizations that were not approved. BDO is in the process of selecting a sample of grant awards and confirming amounts received with the recipient. If no issues are noted based on the results of our procedures, this item will be re-categorized to Exhibit B.

*WonderWork Response:*

*WonderWork appreciates this recommendation by BDO and will strongly consider establishing a committee that will include members from its Medical Advisory Board and/or Board of*

10

*Directors. However, we note that WonderWork is not required by state or federal law to have a Grant Committee, and many public charities such as WonderWork have no such committee.*

*In FY16, WonderWork's Chief Program Officer, who has decades of relevant experience, and WonderWork's Manager of Global Programs, who has several years of relevant experience, reviewed grant applications against WonderWork's eligibility requirements. In addition, WonderWork's CFO and CEO reviewed and approved proposed grants before they were made. This represents four of WonderWork's seven staff members. WonderWork's Board is apprised of grants made at regularly scheduled board meetings, which generally occur three times per year.*

*For the reasons described above, we ask that you reclassify this matter as a Business Recommendation instead of a Material Weakness.*

## j) Procurement and Cash Disbursements

Issues:

During our testing of cash disbursements, we noted the following issues:

- Management could not provide documentation that transactions for services were properly procured in order to ensure that those individuals contracted with had the competencies and ability to provide the services and that the price that was paid was competitive.
- Management could not provide support for various consultant agreements or other support for payments made to temporary employees.
- There is a lack of segregation of duties related to reviewing invoices; approving invoices for payments to vendors, contractors and suppliers; checks signing, and recording invoices to the general ledger. All these functions were performed by the CFO.

Impact:

WonderWork should develop policies and procedures in relation to the procurement process.

All cash disbursements should be supported by an appropriate voucher package including invoices, contracts, where appropriate, and evidence of approval. Lack of a support and a timely review may allow unsupported or non-business expenses to be recorded within the general ledger. All expenses should be reviewed at least one level above the employee who incurred the expenses.

WonderWork was not able to supply the auditor with sufficient evidential audit support in connection with various payments to consultants and temporary employees. If such information is not provided, this matter would result in a modification of our audit report.

All expenses incurred for fiscal 2016 were subsequently approved by the Audit Committee Chairman.

8075834.3

_WonderWork Response:_

_Regarding your first bullet point, WonderWork's staff has decades of experience working with these and other vendors that provide similar services and, as a result, has a deep familiarity with its vendors' competencies. For example, WonderWork's staff has been working with its caging company Direct Mail Processors, for over 15 years (including the staff's time at SmileTrain). Similarly, WonderWork staff have worked with several direct mail vendors over the past 20+ years._

_Prior to hiring CDR to assist with direct mail, WonderWork conducted a request for proposal and received several responses; held in person meetings with those firms; compared experience, competencies, pricing and other terms; and selected CDR. We have enclosed some of these materials for your review._

_Regarding your second bullet point, we do not know what type of support you are requesting – please clarify. Material consulting contracts are documented: for example, in FY16, WonderWork entered into contracts with (1) President and Fellows of Harvard College, a Massachusetts nonprofit educational corporation that was paid approximately $11,000 to help develop software requirements and other project specifications which were later implemented by Mastek; and (2) Development Resources, inc., an executive search firm, for executive search services. Copies of these contracts are enclosed._

_In FY16, WonderWork made approximately $11,500 in payments to 10 temporary employees. In general, these were individuals who came to the office for a day or several days to perform clerical tasks such as stuffing envelopes or stamping letters, or interns who worked on research or marketing projects for several months. WonderWork has copies of these checks and can provide them to you if that would be helpful – please advise. WonderWork also collects various identifying information from "temps" and interns when they begin (e.g., copy of drivers license or ID card, social security number, health information, emergency contact info, etc.), and requires them to complete timesheets for approval by their WonderWork supervisors._

_Under the Impact heading above, you indicate needing "sufficient evidential audit support." If you need further support beyond what we have provided to you, please explain specifically what you need so that we can provide it._

_Regarding your third bullet point, WonderWork has implemented this recommendation. As you noted, WonderWork's Audit Committee Chairman has subsequently approved past expenses per BDO's request, and is reviewing and approving certain other current expenses as required by the Bankruptcy Court. WonderWork is currently reviewing other options for implementing this second level of review._

_For the reasons described above, we ask that you reclassify this matter as a Business Recommendation instead of a Material Weakness._

**Exhibit B - Material Weaknesses, Significant Deficiencies, Deficiencies in Internal Control and Business Recommendations**

The following is a description of the various deficiencies noted below:

| Category | Definition |
|---|---|
| Material Weakness | A deficiency or combination of deficiencies in internal control, such that there is a reasonable possibility that a material misstatement of the nonprofit's financial statements will not be prevented, or detected and corrected on a timely basis. |
| Significant Deficiency | A deficiency or combination of deficiencies in internal control that is less severe than a material weakness, yet important enough to merit attention by those charged with governance. |
| Deficiency in Internal Control | A deficiency in internal control exists when the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to prevent, or detect and correct misstatements on a timely basis. |
| Business Recommendations | We have identified best practice recommendations that are not material weaknesses or significant deficiencies |

Each of the matters noted in Exhibit A represent material weaknesses in internal controls. Additionally, the following matters have been identified during our audit procedures that also represent either material weaknesses, significant deficiencies, deficiencies in internal controls or business recommendations.

**Material Weaknesses**

**a) No Reconciliation Between the General Ledger and the Direct Mail Processors, Inc. ("DMP") Reports**

Issue:

During our audit we noted that management did not reconcile the DMP reports with the general ledger.

There was no reconciliation of the third-party contribution report from DMP to the general ledger. This is an important internal control process to determine if the revenue from donors was accurately and properly recorded. Failure to monitor that contributions are recorded correctly and collected could result in concealment of misappropriation of assets and failure to identify posting error-related contributions in the general ledger.

Impact:

This could create material misstatements to the financial statements for contributions received.

A reconciliation schedule will assist management in properly capturing all contributions and to ensure that payments are recorded timely.

Audit Impact:

BDO performed alternative procedures in relation to the reconciliations between the general ledger and the DMP reports.

*WonderWork Response:*

*This is not correct. WonderWork performs this reconciliation on a monthly basis. More specifically, the DMP daily cash log reports are e-mailed to the CFO on a daily basis (example attached) and sent to the CFO in hard copy on a weekly basis. Each report details the donations received each day batched by cause and bank. The CFO inputs this information into the general ledger as a journal entry. These reports are reconciled to the bank statements and PayPal accounts each month.*

**b)     Pledge Receivable Roll Forward Schedule**

Issue:

During our audit we noted that management does not maintain a pledge receivable roll forward schedule to track long-term pledges.

Impact:

A reconciliation schedule will assist management in properly capturing future payments on pledges to ensure that payments are recorded at the time of receipt and that appropriate collection efforts can be made.

Audit Impact:

BDO performed alternative procedures in relation to the pledge receivable roll forward schedule.

*WonderWork Response:*

*We note that in FY16, WonderWork received only four pledges. Given the foregoing, WonderWork did not think it was necessary to maintain a schedule in order to track long-term pledges. WonderWork will maintain such a schedule moving forward, but we continue to believe that the small number of pledges WonderWork receives makes this unnecessary. We ask that you reclassify this matter as a Business Recommendation instead of a Material Weakness.*

## c)     Investment Reconciliation Process

<u>Issue:</u>

During our audit we noted that management does not prepare an investment roll forward schedule and does not properly track classify differences between unrealized gains or losses, realized gains or losses and investment income for changes in WonderWork's investment values.

<u>Impact:</u>

Unrealized gains or losses are reported separately on the face of the financial statements. Management's failure to record unrealized gains or losses on changes in investment values could materiality affect the presentation of the financial statements. Investment balances should be evaluated and unrealized gains or losses recorded.

<u>Audit Impact:</u>

BDO performed alternative procedures in relation to the investment reconciliation process.

<u>*WonderWork Response:*</u>

*For the past several fiscal years, KPMG has provided this investment roll forward schedule. WonderWork explained this to BDO at the outset of its FY16 audit. WonderWork has provided this schedule to BDO for FY15 and would appreciate BDO's assistance preparing the same for FY16. The CFO keeps a running total of the change in investment account on the general ledger.*

## d)     Loan Forgiveness

<u>Issue:</u>

During our audit we noted that management could not provide any correspondence from lenders to support forgiveness of debt that was recorded. Management only maintains acknowledgement letters sent to the lenders. Acknowledgment of the loan forgiveness from the lender is necessary in order to be able to support and to record loan forgiveness and to appropriately verify that the debt has been forgiven.

BDO noted one instance of a lender being a related party to the CEO.

<u>Impact:</u>

Written communication from lenders to support the forgiveness of the loan's outstanding

15

debt by WonderWork should be obtained and the financial statements adjusted as necessary otherwise a loan forgiveness may occur without proper donor approval.

Audit Impact:

BDO performed alternative procedures in relation to forgiveness of loans that occurred during the 2016 fiscal year.

*WonderWork Response:*

*This is not correct. During FY16, $100,000 was forgiven by Bill and Ann Ziff Foundation. $50,000 was forgiven by Vinoly Foundation; and $50,000 was forgiven by Joseph Mullaney. WonderWork does not recall BDO requesting this correspondence. Email correspondence from the Bill and Ann Ziff Foundation and from the Vinoly Foundation is enclosed. Joseph Mullaney verbally instructed WonderWork regarding his forgiveness, and a memo to file in the form of an email from Brian Mullaney to Karen Lazarus documenting that instruction is enclosed.*

*We note further that under New York law, verbal agreements are generally binding and enforceable. Nevertheless, moving forward, as a matter of best practice, WonderWork will be sure to obtain written documentation from all lenders of their loan forgiveness.*

*Regarding the "one instance of a lender being a related party to the CEO" noted by BDO above, we do not understand why this instance is being noted. There is nothing wrong with this, and it is already disclosed in WonderWork's audited financial statements and its Form 990, which are publicly available.*

*For the reasons described above, we ask that you reclassify this matter as a Business Recommendation instead of a Material Weakness.*

**e)      Record-Retention Policy**

Issue:

During our audit we noted WonderWork does not have a formal record-retention policy. The availability of records can be critical to a business organization in the event of an audit by the Internal Revenue Service (or other federal or state agency), a lawsuit, an insurance claim, or a number of other circumstances. A clear, written record-retention policy can help ensure that the appropriate records are available when they are needed.

Impact:

A record-retention policy provides staff members with a single point of reference for guidelines and procedures related to record retention.

Audit Impact:

16

BDO elevated its testing procedures to respond to this material weakness in internal control.

*WonderWork Response:*

*This is not correct. WonderWork does have a record retention policy, which is enclosed.*

## f)     Journal Entry Posting Issue:

During our testing of journal entries, we noted that there was no segregation of duties over the posting, review and approval of manual journal entries. The posting, review and approval functions were performed by the CFO.

Impact:

This lack of segregation of duties can allow for management override of controls and posting of fictitious transactions that could go undetected. Additionally, journal entries should be properly supported and the underlying transactions appropriately recorded. This caused us to perform alternative procedures which included expanding our sample selections and performing additional audit procedures.

Audit Impact:

BDO elevated its testing procedures to respond to this material weakness in internal control.

*WonderWork Response:*

*As a preliminary note, all journal entries into Quickbooks are manual – someone at WonderWork has to enter it. If you are drawing a distinction between segregation and support with respect to certain types of journal entries but not others, please clarify. Regarding segregation of duties, WonderWork's practice with respect to its journal entries is typical for an organization of its size with only one employee with such duties.*

*In reference to your statement that "Additionally, journal entries should be properly supported and the underlying transactions appropriately recorded," WonderWork already does this. For all journal entries for which BDO requested support, WonderWork has provided you with that support. For example, journal entries for payroll are supported by payroll reports from ADP and are traced to bank statements (samples of which were already provided to BDO and are enclosed again here). Similarly, support for journal entries for loan forgiveness are also enclosed. Please identify any journal entries for which you would like further support.*

## g)     Those Charged With Governance

Issues:

We noted the CEO of WonderWork is a voting member of the Board of Directors.
The New York Non-Profit Revitalization Act requires certain functions to be carried out by a Board or Audit Committee comprised solely of independent directors. Such functions include overseeing the accounting and financial reporting process of WonderWork and the audit of WonderWork's financial statements.

In addition, under the New York Non-Profit Revitalization Act, any related party transactions between a nonprofit and its directors, officers, and key employees, including their relatives and other organizational affiliations, must be carefully addressed:

- An interested party must disclose the material facts of his or her relationship to the transaction to the Board and be absent from Board discussions and votes;

- A Board may only approve a financial transaction if it is fair, reasonable, and in the best interests of the nonprofit and consider alternative options;

- Office of the Attorney General has the power to bring action to enjoin or rescind any related party transactions which are not approved in accordance with required policies and procedures.

Impact:

WonderWork should develop and implement policies and procedures for compliance with the independent directors and related party transaction requirements under the New York Non-Profit Revitalization Act.

Audit Impact:

BDO elevated its testing procedures to respond to this material weakness in internal control.

*WonderWork Response:*

*BDO's conclusion is based on a series of erroneous legal opinions. WonderWork is a Delaware corporation. The related party transaction provisions of the New York Non-Profit Revitalization Act (NPRA) cited above are not applicable to foreign (e.g., Delaware) corporations such as WonderWork. Moreover, WonderWork voluntarily complies with the Internal Revenue Service rules related to excess benefit transactions, which generally parallel the New York related party transaction rules. WonderWork has a robust conflict of interest policy (copy enclosed) and its directors and officers complete an annual conflicts disclosure form (sample completed form enclosed).*

*The audit oversight provisions of the NPRA, which do apply to certain foreign corporations such as WonderWork, require that "The Board, or a designated audit committee of the board comprised solely of independent directors," (emphasis added) shall perform these functions. WonderWork's Audit Committee is comprised solely of independent directors, and they have satisfied all requirements in the law. WonderWork's CEO is not a member of*

18

*that committee.*

## h) Credit Card Transactions

<u>Issues:</u>

During our audit we noted the following:

- Certain credit card transactions did not include formal approval.
- There is no formal policy for review and approval of the CEO's credit card transactions.
- Management could not provide sufficient and appropriate evidence to support certain credit card transactions over $75.

<u>Impact:</u>

Lack of a formal policy or timely review may allow unsupported or non-business expenses to be recorded within the general ledger. All employee-reimbursed expenses should be reviewed at least one level above the employee who incurred the expenses.

<u>Audit Impact:</u>

The Audit Committee Chairman, subsequent to fiscal 2016, contemporaneously approved all transactions related to CEO credit card transactions

<u>*WonderWork Response:*</u>

*As a preliminary note, WonderWork no longer uses corporate credit cards.*

*Regarding your first bullet point, WonderWork has implemented procedures so that all transactions by staff other than the CEO must be approved by the CFO; any transactions by the CFO must be approved by the CEO.*

*Regarding your second bullet point, WonderWork has implemented procedures so that all transactions by the CEO must be reviewed by the audit committee.*

*Regarding your third bullet point, WonderWork has implemented procedures so that all personnel incurring business expenses for $75 or more will submit receipts for those expenses, and the CFO will retain copies of those receipts. In most cases, the staff is required to submit receipts for all business expenses, regardless of the amount, and the CFO will retain copies of those receipts.*

## i) Checks Paid to Employees

<u>Issue:</u>

8075834.3

During our audit we noted employees received payments from the accounts payable check register without verifiable evidence of proper approval.

Impact:

Lack of a timely review may allow unsupported or non-business expenses to be recorded within the general ledger. All expenses should be reviewed at least one level above the employee who incurred the expenses.

Audit Impact:

All expenses incurred for fiscal 2016 were subsequently approved by the Audit Committee Chairman.

*WonderWork Response:*

*Any employee payments from the accounts payable check register are generally reimbursed expenses for either travel, office supplies, stamps, etc. An expense report form is used and approved by the CFO. An example of a completed expense report form is enclosed.*

*Reimbursements for the CFO are now being approved by the CEO. Reimbursements for the CEO are now being approved by the Audit Committee.*

**Significant Deficiencies**

a)      **Grant Monitoring**

Issue:

BDO noted that WonderWork appears to lack the proper staffing to adequately monitor grantees to ensure whether performance requirements and other grant-related requirements are met.

Impact:

Not having a proper grant monitoring process in place may allow grant funds to be used for purposes other than intended by the donor, which may result in a liability to the donor.

Audit Impact:

BDO is in the process of selecting a sample of grant awards to confirm amounts received with the recipient.

*WonderWork Response:*

*BDO has not raised this issue prior to its September 1, 2017 letter, and we do not understand the basis for the note above that WonderWork "appears" to lack the proper*

*staffing in this regard. WonderWork generally requires all grantees to agree, as a condition to receiving funding, to provide narrative reports and patient data detailing how funds will be used, and, as a condition to receiving further installments of funding, to provide those reports and data. WonderWork's Chief Program Officer and WonderWork's Manager of Global Programs review these reports before future funding is awarded. Furthermore, in FY16, WonderWork began development of a patient data warehouse to automate and further strengthen the reporting and monitoring process.*

**b)      General Ledger Accounting System**

Issue:

We noted that WonderWork uses QuickBooks for its general ledger accounting system. We noted that the audit trail feature was not turned on. Therefore, there is no way to know if there have been changes made to a transaction from a prior period.

Impact:

The use of QuickBooks in this manner presents unique challenges for data integrity due to the lack of audit trail, no unique user log-in and passwords and the ability for periods to remain open after a month-end close.

Audit Impact:
BDO elevated its testing procedures to respond to this significant deficiency.

*WonderWork Response:*

*This is not correct. The audit trail feature is and has always been turned on. WonderWork's CFO explained this to Grace Lim at BDO, who was having technical issues downloading the complete audit trail due to the file size. Instead of seeking assistance from WonderWork or Quickbooks support, BDO simply reached this erroneous conclusion. BDO will be provided with "read-only" access to WonderWork's Quickbooks which will enable BDO to independently confirm this. Had BDO raised this question with WonderWork earlier, this access would have been provided promptly.*

**c)      Discounts and Bad Debt Allowance Policy**

Issue:

During our audit we noted that management does not perform an analysis as to the adequacy of the allowance for uncollectible analysis of pledges and does not discount longer-term pledge receivables.

Impact:

21

This could create material misstatements to the financial statements for pledges not presented at their appropriate net discounted amount or including pledges that may not be collectible. Additional testing should be performed to ensure that an appropriate allowance for doubtful accounts is recorded and that long-term pledges are recorded at the appropriate amount.

Audit Impact:

BDO performed alternative procedures in relation to discounts and bad debt allowances for WonderWork.

*WonderWork Response:*

*This is not correct. As a preliminary note, WonderWork receives very few pledges. In FY16, it received only four pledges.*

*WonderWork does analyze the adequacy of the "bad debt" allowance for pledges. For example, WonderWork received a pledge in FY16 in the amount of $85,000, half of which was paid in FY16. After discussion with BDO in connection with the FY16 audit (which led to sending a confirmation notice to this donor who did not respond), the remaining $42,500 was deemed uncollectible and has been reflected as such in the draft audited financial statements for FY16 (in the same fiscal year in which the pledge was made). WonderWork received another pledge in FY16 to be paid out over several years, but that donor rescinded his pledge in FY16, as discussed with BDO.*

*WonderWork also discounts any long-term pledges where appropriate. For example, WonderWork received one pledge in December 2011 in the amount of $1 million, to be paid over five years. KPMG calculated the discount, which is reflected in WonderWork's prior year financial statements. Once WonderWork had received the full amount pledged, this discount was reversed in the general ledger in FY16, as discussed with BDO, and will be reflected accordingly in the FY16 financial statements. No other long term pledges were outstanding in FY16. In FY16, there was only one other pledge made -- in April of 2016 -- for $500,000; WonderWork received $250,000 of that amount in April of 2016, and the balance in August of 2016.*

*WonderWork will continue to evaluate any pledges as part of its annual audit process to ensure that an appropriate allowance for doubtful accounts is recorded and that long-term pledges are recorded with the appropriate discount. If this is not sufficient "additional testing," WonderWork would appreciate further clarification from BDO about what further actions it recommends.*

**d)      Gap in Check Sequences**

Issue:

During our audit we performed a gap test related to the number sequence of checks cut and noted that management could not provide supporting documents for the 5 gaps (missing checks) that were identified. These gaps are typically voided checks and are kept for tracking purposes. BDO recommended management request stop-payments for each check missing within the gap testing.

Impact:

WonderWork should track gaps in checks issued as these missing checks could be used for unauthorized payments.

Audit Impact:

BDO performed alternative procedures in relation to the gap in check sequences.

*WonderWork Response:*

*These checks were voided due to errors on the checks in the payment amount, or spelling when reviewed against the invoices prior to signing and paying. All voided checks were shredded in the past and noted as voided in the General Ledger. WonderWork now saves voided checks per BDO's recommendation.*

**e)   Recording of Pledges**

Issue:

WonderWork does not have a formal written policy for recording pledges.

Impact:

WonderWork should develop a formal written policy for recording pledges to prevent contributions from donors that are not in line with WonderWork's mission and to ensure the proper review and approval of pledges received.

Audit Impact:

BDO elevated its testing procedures to respond to this significant deficiency.

*WonderWork Response:*

*As a preliminary note, WonderWork very rarely receives pledges: for example, in FY16, WonderWork received four pledges. WonderWork's recognizes a pledge as revenue when the donor makes a promise to give to WonderWork that is unconditional, as stated in the Notes to WonderWork's financial statements.*

*WonderWork does not accept pledges from donors that specify a purpose that is inconsistent*

23

*with WonderWork's mission. If any such pledge is offered, prior to accepting it, WonderWork's management reviews the proposed restriction to evaluate whether it is consistent with WonderWork's mission.*

*WonderWork will develop a formal written policy documenting the above on BDO's recommendation. If there are other matters that should be covered by this policy, please let us know.*

*For the reasons described above, we ask that you reclassify this matter as a Business Recommendation instead of a Material Weakness.*

**Business Recommendations**

**a)      Employee Handbook**

Issue:

During our audit, we noted that management did not finalize its employee handbook and distribute it to the employees. Employees were only provided a form listing certain compensation benefits and paid time off when hired.

Impact:

An employee handbook consolidates all organizational policies in one place and provides staff members with a single point of reference for guidelines and procedures. It encourages employees to create a culture of appropriate behavior.

*WonderWork Response:*

*WonderWork does have an employment handbook, which was circulated to employees in draft form. Counsel is reviewing the handbook for any updates that may be required by law. Upon completion, the updated handbook will be circulated to WonderWork employees.*

**b)      Finance Committee**

Issue:

During our audit we noted that WonderWork does not have a Finance Committee.

Impact:

A Finance Committee is important for establishing WonderWork's budgeting process and monitoring WonderWork's financial results in comparison to that process. The Finance Committee also plays a vital part in approving WonderWork's policies and procedures and providing appropriate financial governance in addressing risk of management override.

24

_WonderWork Response:_

_This is not correct. Although WonderWork is not required by law to have a Finance Committee, the Board established a Finance and Investment Committee during the Board meeting on October 11, 2016. BDO has been provided with meeting minutes documenting this. Given that all WonderWork investments are subject to the direction of the bankruptcy court (and have been moved to a court-approved money market account), this committee has not been active during the bankruptcy proceeding. Following emergence from bankruptcy, this committee will re-commence activities._

# EXHIBIT A.c

| ID NUMBER | FORMATTED FULL NAME | TRANS DATE | TRANS AMOUNT | Notes | CRM Response |
|---|---|---|---|---|---|
| | | 1/23/2015 | 2,000,000.00 | There was no donor letter received with donation. There is no documentation provided to support donation being recorded as unrestricted. The support provided does not address the donations to Wonder Work for fiscal year 2015 and 2016. | **CRM Response**<br>We have provided a copy of the wire transfer confirmation for this donation. Under "Payment details," (page 3) it says "Donation WonderWork." There is no solicitation. Therefore, this donation is unrestricted (you have the full gift instrument and it does not contain any restriction). By way of further background, we are providing you with the letter from the ▓▓▓▓▓▓ accompanying its original donation, which indicates the donation is "to get SurgePTY of The Poor started" and is sworn affidavit to The Supreme Court of the State of New York, signed by ▓▓▓▓▓▓ saying "The purpose of the one-time strategic contribution payment was to provide start-up, organizational, and technical support at the inception of WonderWork, including raising public awareness of incorporation and life-changing medical treatments, and developing a network of partners and funders, including development of a direct mail fundraising program." This should be further support (though not necessary) to demonstrate that this donor's practice was to make unrestricted contributions to WonderWork. |
| | | 9/5/2014 | 200,000.00 | No donation letter from donor was provided from Wonder Work. There was no support for the donation being unrestricted from the donor. | We have confirmed that there are no additional documents related to this donation that impose any restriction on the donation either through donor instructions or solicitation language. Therefore, the donation should be treated as unrestricted. |
| | | 1/26/2015 | 100,000.00 | No donation letter from donor was provided by WonderWork. The last appeal mailing is not sufficient to support the restriction on the donation. Please provide additional support for restriction. | Relevant appeal 2014_12_YearendDecemberAllcatHoliday2014_WW_ASK<br>Relevant restricting language: "For every child and adult we were able to help last week, there are many more who're still waiting, hoping and praying someone will come along and help them. Do you have any room left on your Christmas list?" |
| | | 12/24/2014 | 10000.00 | No donation letter from donor was provided by WonderWork. The last appeal mailing is not sufficient to support the restriction on the donation. Please provide additional support for restriction. | Relevant appeal: 2014_12_YearendDecemberAllcatHoliday2014_WW_LAPSEDASK<br>Relevant restricting language: "Because for every child and adult we were able to help last week, there are many more who're still waiting, hoping and praying someone will come along and help them. These folks really need our help - and we need yours. Do you have any room left on your Christmas list?" |

| ID NUMBER | FORMATTED FULL NAME | TRANS DATE | TRANS AMOUNT | Notes | CLM Response |
|---|---|---|---|---|---|
| | | 2/26/2016 | $2,000,000.00 | There was no donor letter received with donation. There is no documentation provided to support donation being recorded as unrestricted. The support provided does not address the donations to Wonder Work for fiscal year 2015 and 2016. | We have provided a copy of the wire transfer confirmation for this donation. Under "Payment details," [page 3] it says "Donation WonderWork". In addition, we have enclosed an email from the donor (which was already provided to BDO) indicating that the donor "agreed to renew its annual contribution." There is no solicitation. Therefore, this donation is unrestricted [you have the full gift instrument and it does not contain any restriction]. By way of further background, we are providing you with the letter from the █████ accompanying its original donation, which indicates the donation is "to get Surgeries for The Poor started" and a sworn affidavit to The Supreme Court of the State of New York, signed █████ saying "The purpose of the one-time strategic contribution payment was to provide start-up, organizational, and technical support at the inception of WonderWork, including raising public awareness of inexpensive and life-changing medical treatments, and developing a network of partners and funders, including development of a direct mail fundraising program." This should be no further support [though not necessary] to demonstrate that this donor's practice was to make unrestricted contributions to WonderWork. That is not correct. WonderWork treated this donation as unrestricted. Support enclosed showing donor did not indicate any restriction. Please advise if you have follow up questions about this donation. |
| | | 12/14/2015 | 10,682.88 | There was no support provided from donor regarding the restriction on the donation if any. WonderWork recorded the donation as restricted. Please provide additional support for restriction. | In addition to the confirmation letter, the last appeal sent [which also █████ agreed to] also supports WonderWork classifying this donation as restricted.<br>Relevant appeal: 2015_12_YearEndAsk<br>Relevant restricting language: "...help a severely burned little girl get the reconstructive surgery she desperately needs. Help a crippled little boy walk for the very first time. Or give a blind child or adult their eyesight back...A month or so afterwards, I'll send you a before and after photo of a child whose life has been changed forever – thanks to you." |
| | | 12/16/2015 | 10,000.00 | No donor letter provided. WonderWork provided acknowledgement letter sent by WonderWork dated 4/7/17 for donations of $10,000 each on 8/5/15 and 12/16/15 and donor checked box noting donation for any of the support programs. BDO can not accept this as support due to the fact the confirmations were not sent or received directly to BDO. | |
| | | 1/12/2016 | 8,120.00 | No donor letter provided. WonderWork received an acknowledgment sent by WonderWork from donor dated 2/24/17 noting donation of $8120 on 1/12/16 was for WonderWork surgery programs. BDO can not accept this as support due to the fact the confirmations were not sent or received directly by BDO. | |
| | | 10/23/2015 | 7,500.00 | Donor letter says pleased to continue my support for WonderWork, there was no correspondence from donor regarding the restriction if any on the donation. WonderWork recorded the donation as restricted. The last appeal mailing is not sufficient to support the restriction on the donation. Please provide additional support for restriction. | Relevant appeal: 2015_10_MatchGift<br>Relevant restricting language: "Twice as many children and adults are counting on us to help provide them with surgery..." "Whatever you send will make a big difference in the life of a child or adult...." |
| | | 1/7/2016 | 7,161.66 | No donor letter provided, there was a note from donor thanking Wonder Work for providing an update. There was no correspondence from the donor regarding the restriction if any on the donation. WonderWork recorded the donation as restricted. The last appeal mailing is not sufficient to support the restriction on the donation. Please provide additional support for restriction. | Relevant appeal: 2015_10_MatchGift<br>Relevant restricting language: "Twice as many children and adults are counting on us to help provide them with surgery..." "Whatever you send will make a big difference in the life of a child or adult...." |

# HSBC ⟨X⟩

Acc name: WONDERWORK INC
Account number: [redacted]
Bank name: HSBC Bank USA NA
Currency: USD
Location: US
BIC: MRMDUS33
IBAN:

**Details as at 27/01/2015 07:41**

## Transaction main details

| | |
|---|---|
| Customer ref : | |
| Bank reference : | |
| Related reference : | |
| Payment order date : | 23/01/2015 |
| Currency/Instructed amount : | USD          Not Available |
| Charges : | Not Available          0.00 |
| Instructed exch rate : | |

## Debit details

| | |
|---|---|
| Gross amount : | Not Available |
| Exchange rate : | Not Available |
| Net amount : | Not Available          Not Available |
| Value date : | 0799 |
| Account : | |
| Statement details : | |

## Credit details

| | |
|---|---|
| Gross amount : | USD          2,000,000.00 |
| Exchange rate : | 01.00000000 |
| Net amount : | USD          2,000,000.00 |
| Value date : | 23/01/2015 |
| Account : | |
| Statement details : | |

**Payment and value dates**

HSBC

Payment currency : USD
Amount : 2,000,000.00
Value date : 23/01/2015

Ordering customer :
　Name : ▮▮▮▮▮
　Address :

Ordering bank :
　Name : UBS AG
　Address : ZURICH

Sending bank :
　Name :
　Address :

Reimbursement bank :
　Name :
　Address :
SWIFT address :

Debit party :
　Name :
　Address :

Intermediary bank :
　Name : ▮▮▮
　Address :
SWIFT address :

Beneficiary bank :
　Name :
　Address :
SWIFT address :

Beneficiary details :
　Name : WONDERWORK INC
　Address : 420 5TH AVE FL 27

HSBC

**Account with Bank :** NEW YORK NY 10018-0271

SWIFT address :
Name : WONDERWORK INC
Address : 420 5TH AVE FL 27
NEW YORK NY 10018-0271
NEW YORK

Payment details

Bank to bank information

Sender's charges

Instruction code

Regulatory reporting



Mr Brian Mullaney
Surgery For The Poor
420 Fifth Avenue
New York, NY 10018

December 1, 2011

Dear Brian

First of all thank you for having come to Zurich. The Board of  was very impressed by your presentation of the emerging charity Surgery For The Poor.

As a result, we are very pleased to contribute the amount of $ 5.0 Million

By this donation that can be called in January 2012 we are confident that Surgery For The Poor has a solid base to continue initial fundraising. We are convinced that this one-time strategic payment will be more helpful to get Surgery For The Poor started than ongoing smaller contributions year by year.

We are looking forward having you in Zurich again in about a year to receive you first report.

Good luck to you and your team - best regards

Member of the
foundation board

Member of the
foundation board

WW00060958

November 9, 2016

Honorable Barry R. Ostrager

The Supreme Court of the State Of New York

Your Honor,

1.    I am a Member of the Board of the Walter Haefner Foundation ("the Foundation").

2.    On or around December 1, 2011, the Foundation informed Brian Mullaney, founder and CEO of Surgery For The Poor ("SFTP"), now known as WonderWork, Inc. ("WonderWork") by letter that the Foundation would contribute $5 million to WonderWork.

3.    The contribution would be available in January 2012.

4.    The purpose of the one-time strategic contribution payment was to provide start-up, organizational, and technical support at the inception of WonderWork, including raising public awareness of inexpensive and life-changing medical treatments, and developing a network of partners and funders, including development of a direct mail fundraising program.

5.    The Foundation understood at the time that WonderWork partners with charities, hospitals and non-governmental organizations in order to achieve its mission of providing free and reduced cost surgeries for children.

6. The Foundation understood at the time that it directed the contribution to WonderWork that one type of surgery for which WonderWork provides support is cataract surgery for blindness in children.

7. The Foundation did not intend for the contribution to be used solely for one type of children's surgery or to be donated in its entirety to any particular charity, hospital or non-governmental organization, rather, the donation was intended to be distributed as WonderWork determined was necessary and advisable in accomplishing its charitable mission of providing surgery to address a range of causes, including burns and club foot.

8. The Foundation directed the contribution to WonderWork based in large part on the longstanding relationships between WonderWork CEO and co-founder Brian Mullaney and the late Walter Haefner and Martin Haefner, and their knowledge of Mr. Mullaney's many years of success in fundraising for other charities that assisted in providing surgeries for children in need, and his experience in working with others around the world to ensure that life-changing surgeries are efficiently provided where they are needed the most. The Foundation's contribution was made in reliance on Brian Mullaney's leadership role in the organization receiving the grant.

9. The Foundation understands that an arbitration award has stated it was misled into donating directly to WonderWork rather than directly to HelpMeSee, one of WonderWork's former partners that provides cataract surgery.

10. The Foundation is aware that WonderWork works with and through partners that provide medical treatment, and it did not wish to give to any of those partners directly, but rather intended its grant to be directed to WonderWork.

11. The Foundation objects to its contribution being redirected to HelpMeSee without the Foundation's knowledge or consent.

If permitted, I would affirm this 9th day of November, 2016, that under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that I am physically located outside the geographic boundaries of the United States, Puerto Rico, the United States Virgin Islands, or any territory or insular possession subject to the jurisdiction of the United States, that the foregoing is true, and that I understand that this document may be filed in an action or proceeding in a court of law. But unfortunately, Swiss law will not allow me to sign an affirmation to a foreign court in Switzerland. I hope that this letter will suffice and I thank you for your understanding.

Sincerely,

Martin Haefner

February 16, 2017

VIA ECF

Honorable Stuart M. Bernstein
United States Bankruptcy Judge
Bankruptcy Court for the Southern District of New York
1 Bowling Green
New York, New York 10004

      Re:   *In re WonderWork, Inc.*, Case No. 16-13607
              Opposition to HelpMeSee's Motion to Appoint a Trustee

Dear Honorable Judge Bernstein:

      1.    The Walter Haefner Foundation ("the Foundation"), one of the founding donors of WonderWork, Inc. ("WonderWork"), formerly known as Surgery For The Poor ("S4TP") herewith respectfully writes to you to vigorously object to HelpMeSee's motion to appoint a trustee. For the reasons set forth below, the Foundation believes that retaining Brian Mullaney ("Brian") as Chief Executive Officer, and his current management team, is in the best interest of WonderWork.

### Start-Up Donation & Relationship With Brian Mullaney

      2.    Due in large part to Brian's demonstrated excellence in nonprofit management, fundraising and global partnerships, the Foundation has been an avid contributor of Brian's many charitable endeavors. More precisely, The Foundation is proud of having helped him to grow SmileTrain and to create WonderWorks that together have provided more than 1.2 million surgeries in 90 of the world's poorest countries.

3. When Brian was removed from being CEO of Smile Train and from being on the Board of Directors of SmileTrain, the Foundation decided to end any kind of relationship with SmileTrain and to enable Brian's plan of establishing a new charity

3.      Therefore, around December 1, 2011, the Foundation extended a considerable donation of $5 million as start-up capital for WonderWork. The Foundation expected that this gift would be used by Brian to grow the young charity, enabling the organization to help provide life-saving surgeries for children and adults no one else would help. At the same time, the Foundation also understood that its funds would be critical in establishing a comprehensive direct mail fundraising program that would earn the trust and support of thousands of other donors which it has. With its initial donation of $5 million, the Foundation hoped to encourage WonderWork's development as a charity.

4.      The Foundation has worked with Brian since he served as the President and Co-Founder of Smile Train, Inc. ("Smile Train"). The Foundation provided an initial donation of approximately $50 million to Smile Train which, together with another initial donation of roughly the same size by Mr. Charles Wang, enabled Brian to start Smile Train. He and his team built the organization into one of the largest charities in the world. That they did so in less than five years is nothing short of miraculous. To date, Smile Train has provided more than 1.4 million cleft surgeries and raised more than $1 billion dollars. However, the Foundation was very disappointed to learn about the removal of Brian from SmileTrain which in the perception of the Foundation has the potential to put SmileTrain's success story at high risk.

5.      Brian's excellent leadership at SmileTrain was the motivation for the Foundation to support him again at WonderWork. And so far, he and his team have not dis-

appointed. In less than six years, WonderWork has scaled up to more than 100,000 surgeries per year. This growth rate is even faster than what Brian and his team accomplished at Smile Train.

6.      Not only has the Foundation worked with Brian for an extended period, but it also remains involved with WonderWork today. Since WonderWork started, there have been regular meetings between Brian and the Foundation every January. Throughout the year, Brian has kept the Foundation informally updated on how the charity is doing.

### Opposition to the Arbitration Award

7.      It is our understanding that the Partial Final Arbitration Award, AAA Case No. 13-20-1300-0650, dated October 13, 2016, inexplicably attempts to redirect funds the Foundation donated to WonderWork, giving them instead to HelpMeSee. As we gather, the arbitrator somehow determined that the Foundation was misled into giving to Wonder-Work. This could not be further from the truth. Again: because of Brian's outstanding record as a nonprofit leader, and the impressive team he leads, the Foundation has chosen to support WonderWork. Without question, the Foundation objects to its contribution being redirected to HelpMeSee without the Foundation's knowledge or consent.

8.      As suggested above, the Foundation directed its contribution to Won-derWork based, in large part, on its longstanding relationship with Brian. Brian's many years of success in fundraising for other charities, and his experience working with health care providers around the world, convinced the Foundation to support WonderWork at its inception. The Foundation's contribution was made in absolute reliance on Brian's leadership role in the organization. To date, the Foundation has given WonderWork approximate-

ly *$13 million in donations* and intends to continue to do so as long as Brian remains WonderWork's leader.

### Opposition to Motion

9.      The motion to appoint a trustee in this proceeding is troubling. The Foundation strongly opposes the motion and it fears the appointment of a trustee would mean the end of this very important charity. Like most major donors, the Foundation would stop supporting WonderWork if Brian or his team were removed. The Foundation is convinced that there is no one who could take over all the responsibilities and duties that Brian or WonderWork's management handle.

10.     Among the barrage of litigation waged by HelpMeSee, in this and previous proceedings, it is all too easy to lose sight of the actual difference that WonderWork makes in the world. The Foundation has been very pleased with WonderWork's achievements. The Foundation's support has helped change the lives of more than 225,000 children and adults who have received surgery thanks to WonderWork. The Foundation is very concerned that if Brian is removed WonderWork's critical support for surgeries will halt, and all of these life-saving medical procedures will end. No other charity will fill this void.

11.     Although HelpMeSee alleges the appointment of a trustee is in the best interest of WonderWork, the Foundation opposes HelpMeSee's motion. The Foundation believes that preserving Brian as WonderWork's CEO and Co-Founder, along with the rest of the organization's management, is in our best interest and the best interest of the bankruptcy estate.

12.     The Foundation remains confident that WonderWork's current management will offer a comprehensive plan for reorganization, one that will allow it to satisfy

creditor claims and emerge from bankruptcy. In order to do so, WonderWork desperately

needs its leadership to guide the charity through this bankruptcy proceeding and beyond.

Brian and his team had the Foundation's vote of confidence before this bankruptcy, and they

have our vote of confidence now.

    In light of the foregoing, the Foundation opposes this motion.

                Respectfully submitted,

                Walter Haefner Foundation
                Martin Haefner
                Vice-President

8350

P.O. BOX 746
PECOS, TEXAS 79772

DATE  8-27-14          88-467-1123

PAY
TO THE
ORDER OF  WonderWork                                    $ 200,000.00

Two hundred thousand and no/100————————————— DOLLARS

|  | donation |  |  |  |
|---|---|---|---|---|
|  |  |  |  |  |

THIS CHECK IS DELIVERED FOR PAYMENT ON THE ACCOUNTS LISTED

*Robin Prewit*

West Texas National Bank  P.O. Box 2027  Pecos, Texas 79772

Deposited 9/3/14

June 30, 2014

«SALUTATION»«.
«ENTITY»
«AD1»
«AD2»
«CITY», «ST» «ZIP»

Dear «SPECIALTY_SALUTATION»,

Today is the last day of our fiscal year and the last item on my To Do list is to write and thank the people who helped make this year possible.

Without your generous start-up grant and continuous support and encouragement, WonderWork would not exist. Thank you for believing in us when all we had was a plan, passion and lots of determination.

We have come a long way since I first wrote to you asking for your help.

Today, as we finish our 3rd year, we have earned the trust and support of almost 200,000 donors.

We have formed partnerships and programs to solve clubfoot, burns and blindness in 60 of the world's poorest countries. We have some amazing partners who are committed to helping the poor under very difficult circumstances.

Most important, we have helped provide more than 58,000 life-changing surgeries for children and adults no one else would help. Most waited for surgery for many years before we came along. If we hadn't come along – they'd still be waiting.

I am including a photo of one of these 58,000 patients. I hope you put it somewhere special as a reminder that you helped start a charity that's making a difference. And that halfway around the world, tens of thousands of very poor children and adults and their families are very grateful you did.

As are we.

Thank you,


Brian


P.S. If you have any feedback for me – good or bad – I'd love to hear from you. You can reach me by email at brian@wonderwork.org or phone, 212-729-1855.

CASH ONLY IF ALL *CheckLock* ™ SECURITY FEATURES LISTED ON BACK INDICATE NO TAMPERING OR COPYING

FIRST NATIONAL BANK OF POWER

05-12-21

PAY TO THE
ORDER OF ___WONDER WORK_____  $ **100,000.00

One Hundred Thousand Only******                                                                    DOLLARS

WONDER WORK
120 FIFTH AVENUE
NEW YORK, NY 10011

CONTRIBUTION

December 11, 2014

«FULLNAME»
«company»
«AD1»
«AD2»
«CITY», «ST» «ZIP»

Dear «SALUTATION»,

I just returned from a very inspiring, exhausting, eye-opening trip to Ethiopia and Tanzania, where we met more than a thousand patients, dads and moms, surgeons, nurses, social workers and Good Samaritans.

The very first thing I did when I got home (after sleeping for 12 hours) was write you this letter. I'm writing to thank you again for helping us. And to let you know your donations really are making a difference.

Your generosity is helping children and adults no one else will help.

You're helping children crippled with clubfoot walk for the first time. You're helping severely burned children get reconstructive surgery they desperately need. And you're helping restore the eyesight of tens of thousands of blind children and adults. We watched babies who had been born completely blind open their eyes and see their moms for the very first time.

Most of these patients traveled many miles to reach our hospitals. And most have waited years to be helped. Without our programs - without your help - they would all still be waiting. I've included a few photos to show you what you missed.

You can see just how poor these people are.

Look at their faces, and you'll see how much these surgeries mean to them.

I am hesitant to ask you to help us yet again, but I must.

For every child and adult we were able to help last week, there are many more who're still waiting, hoping and praying someone will come along and help them.

Do you have any room left on your Christmas list?

I promise it will be the best present you give this year.


Brian

P.S. If you want to see more photos from our trip, please visit wonderwork.org/africa.

CITY NATIONAL BANK
NEW YORK OFFICE
NEW YORK, NY 10022

10125

50-1395/260

12/18/2014

PAY TO THE
ORDER OF     WONDERWORK

$ **10,000.00

Ten Thousand and 00/100********************************************************

DOLLARS

WONDERWORK
420 FIFTH AVENUE, FL 27
NEW YORK, NY 10018
Attn: Brian Mullaney

MEMO

AUTHORIZED SIGNATURE

12/18/2014          10125
10,000.00

City Nat'l. (Oper.) #66   From Candice Bergen

10,000.00

December 11, 2014

«FULLNAME»
«company»
«AD1»
«AD2»
«CITY», «ST» «ZIP»

Dear «SALUTATION»,

I just returned from a very inspiring, exhausting, eye-opening trip to Ethiopia and Tanzania, where we met more than a thousand patients, dads and moms, surgeons, nurses, social workers and Good Samaritans.

The very first thing I did when I got home (after sleeping for 12 hours) was write you this letter. I'm writing to thank you again for helping us. And to let you know your donations really are making a difference.

Your generosity is helping children and adults no one else will help.

You're helping children crippled with clubfoot walk for the first time. You're helping severely burned children get reconstructive surgery they desperately need. And you're helping restore the eyesight of tens of thousands of blind children and adults. We watched babies who had been born completely blind open their eyes and see their moms for the very first time.

Most of these patients traveled many miles to reach our hospitals. And most have waited years to be helped. Without our programs - without your help - they would all still be waiting. I've included a few photos to show you what you missed.

You can see just how poor these people are.

Look at their faces, and you'll see how much these surgeries mean to them.

I realize you haven't sent us a donation in awhile. You are one of our biggest donors, so to lose your support would be quite a blow.

If there was ever a good time to start supporting us again, now is the time.

Because for every child and adult we were able to help last week, there are many more who're still waiting, hoping and praying someone will come along and help them. These folks really need our help - and we need yours.

Do you have any room left on your Christmas list?

I promise it will be the best present you give this year.


Brian

P.S. If you want to see more photos from our trip, please visit wonderwork.org/africa.

# HSBC

Acc name: WONDERWORK INC
Account number: ▰▰▰▰
Bank name: HSBC Bank USA NA
Currency: USD
Location: US
BIC: MRMDUS33
IBAN:

## Details as at 26/02/2016 05:▰▰

### Transaction main details

| | | |
|---|---|---|
| Customer ref : | ▰▰ | |
| Bank reference : | ▰▰ | |
| Related reference : | ▰▰ | |
| Payment order date : | 26/02/2016 | |
| Currency/Instructed amount : | | |
| Charges : | USD | Not Available |
| Instructed exch rate : | Not Available | 0.00 |

### Debit details

| | | |
|---|---|---|
| Gross amount : | | Not Available |
| Exchange rate : | Not Available | |
| Net amount : | | Not Available |
| Value date : | | |
| Account : | 0799 | |
| Statement details : | | |

### Credit details

| | | |
|---|---|---|
| Gross amount : | USD | 2,000,000.00 |
| Exchange rate : | 01.00000000 | |
| Net amount : | USD | 2,000,000.00 |
| Value date : | 26/02/2016 | |
| Account : | | |
| Statement details : | | |

### Payment and value date

# HSBC

| | |
|---|---|
| **Ordering customer** | Payment currency : USD |
| | Amount : 2,000,000.00 |
| | Value date : 26/02/2016 |
| | Name : ████████ |
| | Address : ████████ |
| **Ordering bank** | Name : ████████ |
| | Address : ████████ |
| **Sending bank** | Name : |
| | Address : |
| **Reimbursement bank** | SWIFT address : |
| | Name : |
| | Address : |
| **Debit party** | Name : ████████ |
| | Address : |
| **Intermediary bank** | SWIFT address : |
| | Name : |
| | Address : |
| **Beneficiary bank** | SWIFT address : |
| | Name : |
| | Address : |
| **Beneficiary details** | Name : WONDERWORK INC |
| | Address : 420 5TH AVE FL 27 |

# HSBC

| Account with Bank | NEW YORK NY 10018-0271 |
| --- | --- |
| SWIFT address : | |
| Name : | WONDERWORK INC |
| Address : | 420 5TH AVE FL 27 |
| | NEW YORK NY 10018-0271 |
| | NEW YORK |

Payment details

Bank to bank information

Senders charges

Instruction code

Regulatory reporting

**Hana Fuchs**

| | |
|---|---|
| **From:** | Brian Mullaney |
| **Sent:** | Monday, July 31, 2017 1:04 PM |
| **To:** | Karen Lazarus; Hana Fuchs |
| **Subject:** | FW: follow up |
| **Attachments:** | 2F5A9E35-4EF5-4412-BCC3-947F8754FA19[19].png |

Email from Martin regarding 2016 donation....


b.

**Brian Mullaney**
Co-Founder/CEO
WonderWork


411 Fifth Avenue, Suite 702
New York, NY 10016
Tel: 212.729.1855
Cell: 917.902.7550


Email: brian@wonderwork.org
www.WonderWork.org

Watch two blind sisters see their mom for the first time!
More than 15,000,000 people
have watched this heart-warming video
so far. It was the #1 watched video
on the National Geographic website
for more than a year!  Viewers from more
than 90 countries have sent donations.




WonderWork Debtor In Possession  TIME magazine named WonderWork "One of 10 Ideas That Can Change
The World."


----------------------------------------
From: ▓▓▓▓▓▓▓ <▓▓▓▓▓▓▓
Date: Thursday, February 4, 2016 at 3:24 AM
To: Brian Mullaneyo <brian@wonderwork.org>
Cc: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
Subject: Re: follow up

Dear Brian,

no need to worry. The board was impressed by your report and agreed to renew its annual contribution of $2.0 million. You should receive a formal confirmation letter shortly.

Furthermore, the board is not completely negative to an increase of its donation. However, with respect of this it decided to stay on the sideline and may reconsider if your efforts to generate other seven digit donors are successful.

Best regards 

Von meinem iPad gesendet

**Subject:** Funds recieved in our WW bank today

**Date:** Monday, December 14, 2015 8:41:16 AM Eastern Standard Time

**From:** ¯ Hana Fuchs

**To:** Karen Lazarus, Vera Eastman

**Priority:** High

348320822
BOOK TRANSFER CREDIT                                    C3445061235755 40 Posted 14/12/2015 5 306.
348007547I320822NMID450W000192031BOOK TRANSFER CREDIT 1206 04 41B
OOK CREDIT WONDERWORK INC*ORG:TERRY SATER RALIA*BNR:WONDERWORK IN
C,NEW YORK*OBI:CHARITY▓▓▓▓▓▓▓▓▓▓▓▓▓▓ 021001088 ABA
021001088*STBOOK*TIME:1741*YR REF:C344505123575 MMB REF:348320822

348400219
FOREIGN REMITTANCE CREDIT                              6008348LEY370001559 Posted 14/12/2015 !
348069151Q400219000333 INTL RECEIPT (CHIPS) 3216 05 33RECD CHIP B
ANK OF AMERICA N.A.*ORG-1/C▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓                     ‖ 10,633
EW YORK*OBI:DONATION*STCHIPSEQ:019194*TIME:0412*YR REF:6008348LE
Y370001*MMB REF:348400219

Hana
Hana Fuchs
Chief Financial Officer
WonderWork

Watch two blind sisters see their mom for the first time!
More than 6.5 million people have watched this heart-warming video over the past few weeks!

420 Fifth Avenue, 27th Floor
New York, NY 10018
tel: 212.729.1855 ext. 103
email: hana@wonderwork.org
www.WonderWork.org



TIME magazine named WonderWork "One of 10 Ideas That Can Change The World."

12-1209
750
747768001

2126

DATE 12/12/15

PAY TO THE
ORDER OF __Wonderwork_____  $ 10,000.00

__Ten thousand and__ no/100 _____ DOLLARS

**CHASE**
JPMorgan Chase Bank, N.A.
Milwaukee, Wisconsin 53202
www.Chase.com

Beth Onosko

MEMO





Brian McKinney
co-founder, wonderwork

December 4, 2015

«FULLNAME»
«ENTITY»
«AD1»
«AD2»
«CITY», «ST» «ZIP»

Dear «SALUTATION»,

What is the last good deed you will do this year?

It's not too late to help a severely burned little girl get the reconstructive surgery she desperately needs.

Help a crippled little boy walk for the very first time.

Or give a blind child or adult their eyesight back.

We can help make your last donation of the year one of the most impactful donations you'll ever give.

A month or so afterwards, I'll send you a before and after photo of a child whose life has been changed forever – thanks to you.

There are only a few days left of this year.

Will you help us, one more time, please?

With gratitude,

Brian
Co-Founder
646-558-3768
brian@wonderwork.org

P.S. Our largest donor has generously agreed to match 100% of any donation you might send us. Big or small, your donation will help change someone's life forever.



Miracle surgeries for children.

"...one of 10 ideas that will change the world."
— TIME

**BOARD OF DIRECTORS & ADVISORY BOARD**

Brian Mullaney
Co-Founder & CEO, WonderWork

Steven D. Levitt
Author, *Freakonomics*

John (JJ) Coneys
Former Vice Chair, PwC

Clark Kokich
Former Exec. Chair, Marchex

Steven Rappaport
Partner, RZ Capital

James Poehling
Former Asst. Vice Chancellor
Health Services, Univ. MO

Richard Price
Chief Executive, Asia Pacific,
CBRE Global Investors

Mark Atkinson
Creative Director, Otto

Tamsen Ann Ziff
Chairman, Metropolitan Opera

Kenneth French
Tuck School at Dartmouth

Garrett Moran
President, Year Up

**SUPPORTERS**

Bryan Cranston
Actor

Christie Brinkley
Actor/Model

Howie Mandel
Comedian

Mariska Hargitay
Actor

Alex Trebek
Host of Jeopardy!

Bette Midler
Entertainer

Chris Meloni
Actor

Candice Bergen
Actor

Jane Kaczmarek
Actor

Sir Ben Kingsley
Actor

April 7, 2017



Dear

We want to make sure we use your very generous donations of $10,000 that we received on 08/05/2015 and $10,000 on 12/16/2015 in accordance with your wishes.

Could you please take just a moment and check a box below, sign underneath, and send this back to us in the enclosed, stamped, self-addressed envelope? If easier, you may email me a PDF copy at brian@wonderwork.org. *(Note: you need not check the same box for both donations. If you wish to check more than one box, please indicate which donation(s) goes with which box.)*

I would greatly appreciate it!

[X] Please use my donation for any of your surgery programs.

[ ] Please use my donation for blindness surgery programs.

[ ] Please use my donation for burn surgery programs.

[ ] Please use my donation for clubfoot surgery programs.

[ ] Please use my donation for general support.

Name: _____     Date: 4/14/17

Thank you so much for your help with this – and as always – for your very generous support.

WE COULD DO NOTHING WITHOUT IT!

With gratitude,

Brian
212-729-1686
brian@wonderwork.org

P.S. If you have any questions, email me at brian@wonderwork.org or call me on my cell: 917-902-7550. Thank you very much!


ACCREDITED CHARITY
give.org

JAN 12 2016

PAY TO THE ORDER OF **Wonderwork**

1645

DATE 1-6-16

eight thousand one hundred twenty 800/100     $8,120.—

DOLLARS

Seattle Bank
2627 Second Ave.
Seattle, WA 98121
(888) 500-BANK
www.seattlebank.com

FOR

SEATTLE
WA 980
07 JAN '16
PM 7 L

$0.4
US POST
FIRST-CL
062S000914
9

Wonderwork
Brian or Delois
420 5th Ave, 27th floor
NY, NY 10018

i0018027127



*be kind to your skin*™

Brian & Delois,

$8,120

+$5,605

_____

$13,725 to WIN for ▓▓▓▓▓▓

We are cooking with gas!

—LK

WHEELS UP, LLC · 1735 WESTLAKE AVE NORTH #500 · SEATTLE WASHINGTON · 98109   WWW.KARIGRAN.COM



Miracle surgeries for children.
# wonder work

*" ..one of 10 ideas that*
*will change the world."*
— TIME

**BOARD OF DIRECTORS & ADVISORY BOARD**

Brian Mullaney
Co-Founder & CEO,
WonderWork

Steven D. Levitt
Author, *Freakonomics*

John (JJ) Concys
Former Vice Chair, PwC

Clark Kokich
Former Exec. Chair, Marchex

Steven Rappaport
Partner, RZ Capital

James Poehling
Former Asst. Vice Chancellor
Health Services: Univ. MO

Richard Price
Chief Executive, Asia Pacific,
CBRE Global Investors

Mark Atkinson
Creative Director, Otto

Tamsen Ann Ziff
Chairman, Metropolitan Opera

Kenneth French
Tuck School at Dartmouth

Garrett Moran
President, Year Up

**SUPPORTERS**

Bryan Cranston
Actor

Christie Brinkley
Actor/Model

Howie Mandel
Comedian

Mariska Hargitay
Actor

Alex Trebek
Host of Jeopardy!

Bette Midler
Entertainer

Chris Meloni
Actor

Candice Bergen
Actor

Jane Kaczmarek
Actor

Sir Ben Kingsley
Actor

February 24, 2017



Dear

I am very sorry to bother you but could you please take less than a minute to check ONE box below and return this letter to us?

I would greatly appreciate it.

As we prepare for our annual audit, we want to be certain we have clear direction from you as to how you would like us to treat your donation of $8,120 of 01/12/16.

☒ I would like my donation to be used toward surgery programs.

☐ I would like my donation to be used toward blindness surgery programs.

☐ I would like my donation to be used toward burn surgery programs.

☐ I would like my donation to be used toward clubfoot surgery programs.

☐ I would like my donation to be unrestricted.

After you check a box, please stick this letter in the enclosed, self-addressed envelope and mail to us!

Thank you so much for your help with this – and as always – for your generous support.

WE COULD DO NOTHING WITHOUT IT!

With gratitude,

Brian
212-729-1855
brian@wonderwork.org


ACCREDITED CHARITY
give.org



6743

2-1/710

DATE 10/16/15 PHP

PAY TO THE
ORDER OF _Wonder Work._____ $ 7,500.⁰⁰

_Seven thousand five hundred dollars_____ DOLLARS ← Heat Reactive Ink

### J.P.Morgan
Founded 1799
JPMorgan Chase Bank, N.A.
Chicago, Illinois

MEMO _____

LOOK FOR FRAUD-DETERRING FEATURES INCLUDING THE SECURITY SQUARE AND HEAT-REACTIVE INK. DETAILS ON BACK.





Wonder Work
Anne Brion Vallieu
120th 5th Avenue
New York, NY 10011



October 19, 2015

WonderWork
420 Fifth Avenue
New York, NY 10018

Re:    2015 Contribution

I am pleased to continue my support for WonderWork. Terrific work for a wonderful cause. Enclosed is my check in the amount of $7,500.00.

My best for the holiday season.

Very truly yours,





From Mulhaney
<span>...</span>

**Personal and confidential**

October 7, 2015

‹FULLNAME›
‹ENTITY›
‹AD1›
‹AD2›
‹CITY›, ‹ST› ‹ZIP›

Dear ‹SALUTATION›,

I am writing to ask for your help.

Twice as many children and adults are counting on us to help provide them with surgery over the next few months. Most have been waiting for years to be helped.

Can you imagine watching your 5-year-old daughter remain blind year after year because you couldn't afford a $300 surgery that could restore her eyesight?

But while the number of children and adults who need our help keeps rising, our fundraising is struggling to keep up. (We had a WonderWork board meeting this morning.) The slow economic recovery in the U.S. and worst year for stocks since 2008 haven't helped.

I am sending this personal appeal to a very small group of our best donors (lucky you!) to ask if you could possibly send us another donation.

Of any amount.

One of our biggest donors has very generously offered to match 100% of all of the donations we receive from this letter. So whatever you send will be doubled.

Whatever you send will make a big difference in the life of a child or adult no one else will help.

Thank you for any support you can give us.

With gratitude,

Brian
Co-Founder

P.S. If you have any questions, good ideas or suggestions, please call me on my direct line 646-558-3768 or email me: brian@wonderwork.org.

**HSBC** ◆X◆

No. 341058

# FOREIGN BANK CHECK COLLECTION LETTER
## (DRAWN IN US DOLLAR OR FOREIGN CURRENCY)

| CUSTOMER | CUSTOMER ACCOUNT NUMBER |
|---|---|
| Wonderwork Inc. | ▓▓▓▓▓▓▓▓▓▓ |
| **CUSTOMER ADDRESS** 420 5th Ave. FL 27 New York, NY 10018 | **CUSTOMER TELEPHONE NUMBER** 212 769 1855 |

## PLEASE ENTER INFORMATION ON THE ATTACHED CHECK(S) FOR COLLECTION

| TYPE OF CURRENCY | AMOUNT |
|---|---|
| GBP | ▓▓▓▓▓ |

| BANK DRAWN ON-CITY & COUNTRY | CHECK NUMBER | CHECK DATE |
|---|---|---|
| ▓▓▓▓▓▓▓▓▓▓ | ▓▓▓▓▓ | 16-11-15 |
| **DRAWER OR MAKER** ▓▓▓▓▓▓▓▓▓▓ | | |

### SPECIAL INSTRUCTIONS:

▓▓▓▓▓▓▓▓▓▓▓▓▓▓

### CONDITIONS:

- You are authorized to supply our endorsement or to guarantee our endorsement on the within described item or any document pertaining hereto, where necessary.
- The handling of this collection is subject to uniform rules for the collection of commercial paper, International Chamber of Commerce Publication No. 522. All domestic and foreign bank charges for our account.

May take
6 weeks
to convert
to USD
from BBP

X _Vince Fuchs_     X _11/6/15_
CUSTOMER'S SIGNATURE          DATE

## FOR BRANCH USE ONLY

| BRANCH NAME: | Ave. | PREPARED BY: Jessica Y Jimenez |
|---|---|---|
| | | PRINT |

BRANCH PHONE NUMBER 212) 535-9072

BRANCH COST CENTER NUMBER IS 111610

_Glorias Ramirez_
AUTHORIZED BRANCH SIGNATURE

HSBC

IBD 20 NS (Rev. 6/06)
APS # 216994



**BARCLAYS**

WALLINGFORD BRANCH

Y D K Z K R T & H 8 B Q 4 >

20-01-09

40290807

Date 16.11.2015

Pay Wongawak,                    Only

Five thousand pounds          £ 5000 —00

27/04/2015    Y D K Z K R T & H 8 B Q 4 >
Cheque No.        Sort Code          Account No.



Telephone: 01869 [redacted]     e-mail: amandaruwar@yahoo.rm.uk

13·11·15

Dear Brian

     Thanks for the update. Herewith further contribution to your wonderful work

      Best wishes



BY AIR MAIL
par avion.   Royal Mail



Miracle surgeries for children.
# wonder
## work

Attn: Brian    420 Fifth Avenue
New York, NY 10018

U.S.A.



Brian McNulty
Co-Founder

**Personal and confidential**

October 7, 2015

»FULLNAME»
»ENTITY»
»AD1»
»AD2»
»CITY», »ST» »ZIP»

Dear »SALUTATION»,

I am writing to ask for your help.

Twice as many children and adults are counting on us to help provide them with surgery over the next few months. Most have been waiting for years to be helped.

Can you imagine watching your 5-year-old daughter remain blind year after year because you couldn't afford a $300 surgery that could restore her eyesight?

But while the number of children and adults who need our help keeps rising, our fundraising is struggling to keep up. (We had a WonderWork board meeting this morning.) The slow economic recovery in the U.S. and worst year for stocks since 2008 haven't helped.

I am sending this personal appeal to a very small group of our best donors (lucky you!) to ask if you could possibly send us another donation.

Of any amount.

One of our biggest donors has very generously offered to match 100% of all of the donations we receive from this letter. So whatever you send will be doubled.

Whatever you send will make a big difference in the life of a child or adult no one else will help.

Thank you for any support you can give us.

With gratitude,

Brian
Co-Founder

P.S. If you have any questions, good ideas or suggestions, please call me on my direct line 646-558-3768 or email me: brian@wonderwork.org.

# EXHIBIT A.j

| | Creative Direct Response | Worth Their Attention | TBD |
|---|---|---|---|
| Monthly Fee | $15,000 | $50,000 | $48,000 |
| | begin working with early adopter remediate open contract split; overall management of design campaigns Jan 2015 | begin working by side remediate open contract split; overall management of design begins Jan 2015 | |
| Scope of Services | | | Included |
| Creative Fees | approx $3000-$7500 | approx $7500-$10,000 | |
| Cost/Sell Strategy | NA | NA | NA |
| Production Mark-up | NA | 15% | |
| Production Scope of Services | | | Competitive bid process, will oversee lowest cost maximum value |
| Projected Production Costs | | | |
| Budget Goals | | | |
| Analyst Team | | | |
| Network Team | | | |
| Estimated Fee BB85 | | | |



Miracle surgeries for children.

# wonder work

# CDR Fundraising *Group*™

## Proposal for
## Direct Response Fundraising
### September 19, 2014



**202020** REGISTED SIGHT LOSS TO 20 MILLION BLIND CHILDREN AND ADULTS



BURN RESCUE



CDR Fundraising Group (CDR) is pleased to present WonderWork (WW) with our recommendations for your direct response program. The following proposal outlines many of the recommendations we discussed in our prior presentation and also includes our projected costs and revenue for your direct mail program for the upcoming year.

## Our Approach

We believe *one size cannot fit all*, and, therefore, the CDR team will focus on developing tailored solutions based on WW's specific needs and challenges. Our leadership team has extensive strategic and hands-on experience working with a large number of charities across multiple verticals. At the onset of any client relationship, we invest a significant amount of time getting to know your organization and team. Our strategies are based on a thorough analysis of your file, creative, and past results.

### Partnership
The best partnerships are just that, partnerships. WW's leadership and staff have extensive direct response experience with successful and complex programs. We would hope to build on each other's knowledge and, together, design strong fundraising programs. CDR views all of our client relationships as true partnerships. As a result, most of our clients have been with us for an extended period of time—as have our employees. We believe that continuity amongst our staff is an important ingredient in growing our clients' fundraising programs. Through CDR University, a formal in-house training program, as well as other internal and external training opportunities, our staff is able to grow into industry experts and develop innovative strategies to build successful direct response programs.

### Optimized Production
CDR has a skilled in-house production staff that would consistently and aggressively work to keep costs down for WW. We have relationships with over 100 printers and mail shops across the country, and are able to get rock-bottom pricing without sacrificing the quality of your program. Additionally, we manage over a dozen gang-run production jobs across clients throughout the year, allowing for even lower pricing. Gang runs are standardized direct mail formats that employ the combined quantity across several clients to enhance buying power and obtain the lowest-possible pricing. For example, we do gang runs for calendars, notepads, address labels, membership cards, greeting cards, wrapping paper, ornaments, and other packages. This allows smaller and growing clients to mail highly effective, proven techniques at a much lower cost than they could otherwise.

<u>All of our bids come straight from our vendors, and we do not mark up production</u>. This and our standard "3 bid rule" guarantee that you are being offered competitive pricing on your packages and that our advice to you is independent of any economic interests. In short, our transparent purchasing and billing policy ensures that we are focused only on the results we can produce for you.


## Creative Innovation

We recognize that while WW is in the early growth stage, your leadership and staff have brought a wealth of talent and experience to the direct response program and are utilizing best practices and proven mature techniques with established control packages and creative. Nevertheless, we recommend always testing new formats, messaging, offers, and signers to improve upon past results. Our creative team of designers and copywriters get to know your organization intimately and are sensitive to preserving your brand identity and voice. In addition, our creative is cohesive across channels—from direct mail to email to digital to television—to further ensure the integrity of your brand as well as consistency within your integrated campaigns.

## Multi-Channel

CDR believes that the *right offer* delivered at the *right time* within the *right channel* to the *right donor or prospect* is vital for our clients' success. Our campaigns are based on solid analytics, strategy, and creative, along with a thorough understanding of your brand. While WW is not requesting a fully integrated, multi-channel proposal, all of our campaigns can be fully integrated, utilizing direct mail, email, DRTV, mobile, online advertising, social media, print advertising, and telemarketing. We ensure that messaging, offers, and creative are consistent across channels, thereby providing a seamless experience for the prospect and donor.



CDR considers online acquisition to be a core competency and, amongst our staff, we have over 35 years of cumulative industry leading experience in building, growing, and supporting the digital media efforts of our clients. Across all channels, we adhere to a test-and-measure philosophy. We approach acquisition, donor engagement, and other key indicators of program success by looking at efforts from a campaign level all the way through annual reviews of the longer term value of a donor with an email address. In particular, our acquisition approach is multi-channel—we view it as a source to grow both an online and offline program, as well as add value to each channel.

## Data-Driven

In terms of direct response, data is king. CDR's most successful strategies are therefore extremely data driven. WW's direct response program is growing and is poised to continue to grow rapidly. This requires ongoing analysis and reporting in order to take immediate advantage of evolving learnings and data. We rely upon our reporting and analytics programs, utilizing our proprietary online reporting suite, *Agency Plus*, to drive recommendations and quickly provide our clients with relevant performance data. Through timely, accurate, and easily digestible diagnostic and predictive reporting and analysis, our clients are able to effectively track and react quickly to program-related performance challenges, opportunities, and expected outcomes. This data also drives our Testing Reports that show results of tests using confidence intervals to provide statistically valid results; we don't rely on "hunches" on which panel won, we rely on conclusive hard data. (A sample of this report is included as part of this proposal).

**CDR Fundraising** *Group*



*Agency Plus* is regularly updated based on client feedback. It handles all relevant performance data for tracking and reporting results including:

- Program reporting
- Campaign reporting
- Package results
- Segment level reporting
- Acquisition list results
- Geographic performance (Zip, SCF, etc. if requested)
- Daily/weekly/monthly cash flow
- Response curves and doubling day calculation
- Vendor cost summary (including the three bids on every component)
- Actual vs. budgeted results

CDR also provides additional analytic solutions, including dashboard level reporting and projection management against budget goals, comparison analyses against national benchmarking studies, portfolio/file health trending, statistically valid results reporting, and strategic review documents. Our reports are tailored to individual client needs, utilizing data from an organization's enterprise database or CRM Platform. Examples include:

- Testing results reporting showing which panel won by statistical confidence level
- Acquisition analysis by source of origin and package
- Digital analytics
- Investment analysis including lifetime value and net present value
- Custom ad hoc reports
- Segment selection utilizing lifecycle analysis



**CDR Fundraising** *Group*


## Our Process

Our philosophy in working with WW is to approach the process collaboratively, incorporating your mission knowledge and our combined expertise in fundraising. As previously mentioned, at the onset of any client relationship, we spend a significant amount of time getting to know your organization and team. This includes gaining a better understanding of your budgets, revenue expectations, style guidelines, copy tone and messaging and best practices. In addition to spending significant time with key stakeholders within the WW organization, we will also conduct a thorough analysis of your file, creative, and past results.

For each campaign we implement for WW, our management process consists of the following steps:

- *Situation Analysis* —We begin with an analysis of the current donor file and past results, as well as a creative analysis of all current donor touch points across channels.
- *Strategic Recommendations* —Following our analysis, we will make strategic and testing recommendations for discussion.
- *Campaign Execution* —The implementation stage includes budgeting, along with development of individual campaign plans.
- *Reporting* — We provide ongoing results and recommendations on next steps on a weekly basis, along with quarterly campaign level and yearly trends.



The above process thereby informs our overall strategy for your fundraising program. It will incorporate the following:

1) *Communication and Cultivation*
   Cultivation of your donors has a direct impact on your program's performance. By better utilizing donor information on file to tailor messaging and communication touch points (whether through direct mail and/or digital/email), we will not only provide the donor with a more customized relationship with WW, but we will also improve retention and potentially upgrade giving as well.

2) *Contact Management*
   As with cultivation, we will ensure that we strategically segment your file, choosing the right donors for the right solicitation to maximize net revenue across all of WW's programs, while also optimizing program and organizational long-term donor value. This approach will lead to better retention across all WW programs, especially as it relates to new and high-value names. Understanding these segments is critical to building the pipeline for planned gifts and major gifts. We will spend a significant amount of analysis to identify the best prospects for mid-level giving and sustainers.

**CDR Fundraising** *Group*.


3) *Cross-Channel Integration*
We acknowledge that WW is not immediately focused on integration of additional channels, but when it becomes appropriate, we will use multiple touches/channels to lift response and/or convert donors to an alternative (and possibly less expensive) channel. This allows the donor to choose to respond to your solicitations in the manner most comfortable for them. Integration goes beyond coordinating messages across touches; it means contacting donors through a combination of touches (and collecting the data needed to understand and manage these contacts).

4) *Mid and Major Donor Development*
We will identify current donors on file through the use of file overlays, which will allow us to develop a comprehensive cultivation program. Specifically, we will use this data in developing messaging, cadence and creative treatments to this audience to move them through the pipeline. This ultimately leads to more bequest and planned giving requests. Not all mid and major donors are qualified prospects for legacy gifts and finding out where donors are most comfortable and most profitable is crucial to maximizing their potential.



## Program Recommendations

Below are some initial thoughts on possible improvements to WW's programs. As we become more familiar with your past campaigns, creative, and results, we will provide more detailed and specific recommendations for implementation.

### *Acquisition /Reactivation*

Currently WW is focused on acquiring new outside donors solely through the 20/20/20 brand and the established control package. Donors who contribute to 20/20/20 are then cross sold in acquisition to the other brands: Burn Rescue and First Step. We would want to better understand WW's past testing strategy within acquisition as it established the 20/20/20 control package. One of the concerns we voiced in our previous discussion is that many of the mailings look similar across all of the brands and donors may be experiencing package fatigue. Our approach would be to institute ongoing and aggressive package, copy, signer, ask/offer, list and segmentation tests within the acquisition program to establish the most profitable best practices and communication flow. The ultimate goal should be to establish a portfolio of "control" packages that WW would have in its arsenal across all brands.

Some of our initial thoughts on testing include:

- **Ask/Offer amount**: Your average gift in acquisition is higher than many like-minded charitable organizations, but pushing donors to a higher level of giving initially may be depressing response. We would recommend testing a lower dollar ask string in acquisition and then moving donors up the pipeline after they come on the file. Of course, we would first like to perform an LTV analysis by inception amount to determine the threshhold at which donors will break even in a reasonable timeframe so that we do not solicit prospects at an amount so low that it will not pay back the investment. Ask string testing would also include packages with and without the "one & done" offer.

- **Premium vs. non-premium**: It does not appear that WW has tested "freemium" packages in acquisition (such as address labels, decals, or notecards). We'd also recommend further testing of backend premiums (previously only a tote bag has been tested). The co-op modelers can build models specifically skewed towards higher response on either premium or non-premium packages so that we can find the best prospects for each.

- **Celebrity signers**: If WW has high profile individuals who are associated with the organization, we recommend testing them as potential signers for the direct mail letters. As a relatively new organization, WW could benefit from the endorsement of a recognizable and well-liked celebrity. Their name should be featured prominently on the outer envelope in order to increase open rates.

- **Copy**: WW currently utilizes a two page letter with a very compelling story of one of the children the organization has been able to assist. The copy is very strong and emotionally engaging, however, we would recommend testing a longer form letter in order to share more

6


of the story and to further illustrate the impact and power of the donor's gift.

- **Brands/Lists**: As mentioned above, the current control is a 20/20/20 package. We would want to discuss with you further the possibility of testing the other brands to outside lists as well as potentially an "umbrella" package of all three brands. Additionally, there may be more targeted lists for each of the brand causes that would increase results.

Additionally, we recommend testing new package concepts in acquisition. Many of these could also be tested in your housefile program. Some initial ideas include:

- **Stamp Package**
  After extensive testing, the stamp package is one of the current controls for Wounded Warrior Project. It includes a stamp that is paper clipped to the reply document and shows through the second upper window on the outer envelope. Donors are encouraged to use the stamp when they send back their donation. This combination of sending something of universal value for "free" and including a bounceback or reason to take action is particularly effective in driving response. In addition to rapid file growth potential in acquisition, this technique can be very effective in donor mailings, lapsed donor reactivation and has proven to be an exponential control for new to file donors as part of a high response second gift strategy. We believe this package might also prove to be very cost effective in WW's conversion program between the brands, enhancing and prolonging the life of the existing conversion control package. At first glance we have also identified WW's "Waiting List" donor mailing as a possible initial donor program test for this technique.



While this is a much more expensive package than WW is used to mailing, the increased response in acquisition should offset the cost and put more quality donors on the file quickly. Subsequent to the initial response, we would track the short, mid and longer term value of these donors versus the existing controls. Below we have projected acquisition rollout metrics of the stamp package (based on various client results) against your current control.

|  | Mail Qty | RR | # Gifts | Ave Gift | Gross | CPP | Cost | Net | CTRD |
|---|---|---|---|---|---|---|---|---|---|
| WW Control | 1,000,000 | 0.40% | 4000 | $ 48.00 | $ 192,000.00 | $ 0.30 | $ 300,000.00 | $ (108,000.00) | $ 1.56 |
| Stamp | 1,000,000 | 1.80% | 18000 | $ 40.00 | $ 720,000.00 | $ 0.82 | $ 820,000.00 | $ (100,000.00) | $ 1.14 |




- **Matching Gift – Coupon Package**
  We understand that WonderWork employs a successful Matching Gift package in the donor housefile/renewal program. This package extends the reach of the Matching Gift campaign to



  the acquisition program and utilizes several "needs" coupons that focus on where specifically a donor's contribution can go. Each coupon includes ask amounts and a short "need description," along with an appropriate four-color image illustrating what the donor's gift can do.

  The coupon concept could be utilized for one brand, or tested to include all three brands under the WW umbrella. Matching Gift packages can be very effective in acquisition, whether they are true dollar for dollar matches, suggested matches of a "faux" check, or the coupon concept, in which a dollar amount correlates to a specific need. For example, in acquisition, it can also be tested with the acquisition current control "Make One Donation today…" offer, as a standalone package or tested with a premium.

  These package tweaks can also be tested in your appeal program.



- **Check Package**
  This package concept includes an actual live check made out to the prospect for a negligible amount. Ideally, the amount of the live check should tie to a mission centric "price point" such as, perhaps, the cost of an initial eye exam to see if a child is a candidate for a successful outcome following surgery, etc. Similar to the stamp package, by including a check and allowing it to show through the outer envelope, there is an increased likelihood of the package getting opened. Historically, 1-2% of the recipients will cash the check and this cost is factored into the package's immediate ROI and longer term value analysis.

8



- **Partner Card**
  This package includes a partner card that would show through the outer envelope window. Donors like the feeling of belonging to an organization, and the partner card provides that affinity in a tangible way. The copy would focus on the fact that the organization has already taken the liberty of printing them a partner card knowing that the prospect will want to be a part of WW and support their work. You employ this technique successfully in your donor program and it can be extended to acquisition.



- **Carrier Tests**
  The current WW packages include outer envelopes with images of children afflicted with the various ailments of the organizations' causes. We would recommend testing simple, blank outer carriers that either look more like a bill or don't immediately give away what is inside the mailing. This could increase open and response rates significantly. Additionally, given the international nature of the organization, outer envelopes that appear to come from overseas could also be tested.






## Projections

In the projections you will notice we are recommending mailing 33MM in acquisition for 20/20/20. We understand that your FY14 mail volume was 25MM and FY15 was to be 40MM. We believe this may be a little aggressive based on the rather precipitous drop in response rate realized in the second half of 2014, and from what we expect you will see from the expanded mail quantity along with a resulting rise in CTA and CTRD.

We are recommending varied mail quantities across months based on previous response rates. Additionally we believe in robust testing each month (except the summer) to identify new packages and make optimizations to existing controls. It will be important to identify multiple control packages when mailing at that volume to protect against package fatigue. We'll work together to quickly analyze results with confidence intervals to make rollout decisions.

We made acquisition projections by program as we feel there is room to test into outside lists with First Step and Burn Rescue. The First Step projections use a blended response from cross sells and outside lists. Burn Rescue primarily focuses on cross sells based on historical results. We did not project separate tests for FS/BR but that would be part of the plan as we move forward.

**CDR Fundraising** *Group*


### Housefile Appeals

### Targeting and Segmentation

In order to increase retention rates and further cultivate and engage donors, we believe WW could realize significant benefits from better targeting strategies. CDR's targeting and segmentation strategies are based on donor-driven behaviors and lifetime giving, and build upon both annual-based plans and trigger-based communication touches. Trigger-based communication uses certain donor behaviors or events as the basis for a communication. It can be as simple as a gift triggering a thank-you letter or an anniversary triggering an appeal, or as complex as a website visit triggering an online or offline appeal.

By performing an analysis on past giving behavior and trends on WW's donor file, CDR will develop campaigns that better segment and solicit donors. For example, we can conduct an analysis on when donors contribute to the organization, through what channels, or to which brand or type of appeal. Based on these donor trends our appeals can then be targeted accordingly.

As mentioned, we believe the right offer combined with the right ask to the right audience at the right time will be a key driver to increasing both retention rates and lifetime value of WW's donors. The number one reason donors say they give is because they were asked. By segmenting donors based on their donor lifecycle, how they came onto the file and which brands they contribute to most frequently, we can maximize revenue. We would also look for selects that aren't performing and cut those back to save you money.

### Testing and Creative

As mentioned in the above acquisition section, as donors are cross-sold the three brands, we recommend testing distinguishing the look and feel of packages between brands. This is particularly important for those donors who give across multiple brands and are receiving the bulk of the mailings.

We also recommend testing switching up the cadence and schedule between the brands. This will ensure that donors who give to more than one brand are not receiving similar types of packages for different brands at the same time or within weeks of each other. Where appropriate, same or similar packages can still be ordered or contracted together to realize volume discounts, but we recommend testing the schedule between the three brands for optimum response, retention and net income.



As with your acquisition program, we also recommend increasing the amount of testing within your housefile campaigns. This can include package tests similar to those recommended in acquisition, as well as more statement oriented packages for renewals so that making a subsequent gift becomes like "paying a bill." Additionally, longer form letters could be tested to tell more of the story of your work and patients as presumably your donors are already engaged and want to learn more.

## Mid Level Giving and Sustainers

Additionally, we recommend WW place an increased focus on moving donors up the pipeline as well as converting them to the sustainer program. We would want to better understand any current upgrade strategies, and would recommend that WW create mid-level giving clubs in order to steward donors. Mid-level donors (or "Middies") are higher-value donors than the average direct response donor, but, for most organizations with larger numbers of donors across all giving levels, they are not of a high enough value to be assigned to the Major Gifts Department or receive the full major donor treatment. For WW, the definition of Middies might be $100–$999, or $500–$4,999. Or perhaps they are donors who gave $75 three times in the past year or to multiple brands.

We suggest creating named giving levels for the Middies to establish a sense of belonging to a special group of donors. Essentially, a successful Middie strategy employs the best solicitation practices of all direct response program channels in conjunction with the more cost-effective cultivation practices of a major gifts program. These include more personalization, higher-dollar treatments (closed-face carriers, first-class postage, higher-quality stock, etc.) and some individualized attention via phone, email, or handwritten notes. You could also outline some special benefits for mid-level donors including: private conference calls, branded lapel pin or car decals, and a partners-only section of the website. This web page should be a donor portal that creates a unique experience for the donors who agree to support WW and its organizations at a higher level. The page should be password protected and provide insider information about special initiatives and programs the individual brands are developing.

In terms of the sustainer program, there is a push within the reply forms in acquisition and the housefile campaigns to become a monthly donor, however, there does not seem to be any further solicitations to donors beyond this passive ask. As with the Middies, WW should consider creating a named sustainer program for each of the organizations in order to further distinguish these donors. Asks for the sustainer program should be more targeted across all channels, particularly within digital efforts. The program should be further highlighted within your website to drive donations online. We can also test the positioning and various upgrade strategies at the point of transaction online. We have also seen success increasing sustainer conversion rates with premiums and incentives; this is especially effective with telemarketing where most sustainers are acquired. Additionally, once WW begins to grow the sustainer program, it should also implement a separate track of solicitations to this group, acknowledging that they are already highly committed to the organization.

## Projections

In building the donor projections we had to make some assumptions on the starting point of donors for 2015. We estimated 9MM in acquisition being mailed Oct-Dec of this year with a 0.4% response rate and 30% loss to "one & dones". This gave us a starting universe of 90,000 for 20/20/20. From there we kept your current 18 package mail cadence and included tests against the lowest performing packages. The Q1 packages are technique-heavy and have historically been strong performers. As we proceed with the onboarding process our plan is to get the mail out the door on time and then slate tests in later in the year. Many of the tests we are recommending are more premium based packages that should drive a higher response. Our gang run pricing makes these packages very affordable in test quantities to see if they resonate with your audience.

We made some similar assumptions on the initial quantities for First Step and Burn Rescue. Where we would like to suggest some changes are with crossover donors to make sure they are not receiving packages that are almost identical just a week apart. This most easily can be accomplished by changing up the look of the First Step and Burn Rescue packages so as not to put 20/20/20 revenue at risk.

As we gain further insight into your file we'll look at your New to File names and test against the Fridge Photo and Acknowledgement packages to ensure we're getting that second gift from as many donors as possible and as quickly as possible. Current projections are based off of historical results that we built from your transaction files. We did reduce response rate which will most likely happen with increased quantities.

**CDR Fundraising** *Group.*

*Integration of Other Channels*

We recognize that at this point, WW's key focus is on continuing to build the donor file through direct mail. However, we recommend that over the next year, WW also consider how to integrate other channels – specifically digital. Donors who give through two or more channels are worth more to an organization and online gifts tend to be higher dollar averages. At the very least, email campaigns and communications should begin to be integrated with the direct mail efforts. We would like to conduct a further assessment on any of WW's current e-communications, as well as better understand how online vs. offline donors perform. At minimum, WW should incorporate fundraising, engagement, and news updates into your email communication strategy to your current and past donors.

On average, we recommend that only one out of every three email messages include explicit fundraising asks. This is different from most offline solicitations where, due to costs, all communications should be fundraising appeals. Online audiences expect organizations to prove their value before they support you financially, and because of this, education, advocacy, mission and program communications will be a strong element of the overall online marketing and fundraising program.

Additionally, with a potential paid digital advertising campaign, WW can also build awareness for the brands as well as drive donations online. We also recommend that WW remain focused on the donor experience on its websites, ensuring that there is an ease of use as well as opportunities to give at different levels and make sustainer gifts.

Beyond digital integration, CDR has a core competency in developing DRTV programs. We believe that the mission and focus of WW would lend itself to this channel as well, however, we do not recommend undertaking a DRTV campaign until the donor and direct mail program is more established.

Telemarketing is another channel WW should consider especially if building a sustainer file is a focus. The high price point of a surgery at $300 lends itself to a sustainer program at $25 per month to pay for a surgery a year.



*Analytics*

As stated previously, we are focused on providing our clients with campaigns that are rooted in solid analytics, strategy, and an understanding of their position in the marketplace. One of our first steps when beginning a relationship with a new client is to conduct a comprehensive audit of their program. This includes a focus on past campaign results and overall trends on the housefile, as well as an in-depth look at creative, messaging, past testing history, and channel integration. Any audit of our clients' programs takes into account how they can best utilize their resources to cultivate and reach existing and new constituents.

We will review and assess your overall fundraising performance, your donors, direct mail performance (both acquisition and renewal), online performance, multi-channel performance (where applicable), and technology/data tools.

We have already provided you a preliminary Core Stats report, which includes a snapshot of the overall performance of the program, as well as benchmarking against other organizations. Our benchmarking capabilities include our comprehensive historical client database (with data going back 20 years for many national and international nonprofit organizations) as well as industry benchmarks through reports from organizations such as Target Analytics, the Association of Direct Response Fundraising Counsel (ADRFCO), and Guidestar.

The Core Stats report looks at trends over a period of time, typically the past five years, and can provide insight into the overall performance of the program, as well as performance by Lifecycle segment (New, 2nd-Year, Multi-Year, Lapsed, and Expired donors). It can also help identify areas to further focus on, such as acquisition, retention, giving rates, or upgrade/downgrades. The Core Stats report can be run on your overall program or broken out by direct mail and online programs. As mentioned in our meeting, we would want to ensure that we have a deeper understanding of your file as we continue to refine the Core Stats report. One aspect of your program that we'd like to dig deeper on is the trends for the "one and done" donors vs. donors who can be further solicited.

Another common report that we use paints a picture of what your donors look like. This includes a Demographic Profile that summarizes your donors on 30+ demographic characteristics, including standard demographics, such as age, education, and income, as well as their buying behavior and social media activity. The report includes a Market Penetration Index (MPI), showing how your donors compare to the U.S. population in the same ZIP code footprint.

Once we have an understanding of your overall performance and your donors, we can then dig deeper into your program with a more detailed review of your campaign results for acquisition and donor mailings. We will look at performance by list, segment, package, creative, seasonality, timing, offers, and targeting (i.e., geographic area). We will explore the impact of any multi-channel marketing efforts. All of our analyses look at metrics such as cost to acquire, net per donor, cost to raise a dollar, quantities mailed, response rates, average giving levels, open and click-through rates, potential universes/reach, and both LTV (with break-even timeframe analysis) and ROI.

**CDR Fundraising** *Group.*



Examples of campaign analyses include:

**Universe Optimization:** To maximize acquisition universe opportunities, we'll take an in-depth look at your results to see which markets work best for you and perform a survey of the marketplace and available lists to find opportunities for expansion into new lists and market types; this is informed by your current exchange balances, if provided.

**Package-to-List Strategy:** We will review the performance of both market types and individual lists to each control package to determine which combinations perform the best, as well as identifying those with room for testing.

**Ask String Analysis:** We know from the sample list plan you shared with us that you have been mailing different ask strings/arrays, and we'll assess results by ask, offer, list market, and list segment to see what's working, what's not, and where there are opportunities for testing. We will also take a close look at LTV by inception amount; we have seen with other clients that while it is tempting to improve response rate by bringing in more donors on a lower ask string, those lower dollar givers may not have adequate subsequent value to pay back the acquisition investment in a timely manner. We are always careful to leverage both response and value in the acquisition planning.

**Modeling Review:** We are pleased to see from the data you shared that you are a member of the six largest modeling co-ops; these vendors are our trusted partners in helping us optimize performance for our clients in both acquisition and donor campaigns (and across channels). The first thing we would like to do is review what models you are using, how they were built, and what can be refreshed and improved. We believe in having a continuing conversation with the modelers to constantly keep tabs on what is working, what isn't, and how to increase performance in the next campaign by using existing tools or trying something new.

Beyond using the co-ops as a source of prospecting names, we would also suggest using their merge optimization tools to identify prospects that are least likely to respond so that they can be removed from the mailings. Several other clients have used this tool to save on postage and production costs and lower their investment per donor. Another way we maximize clients' co-op membership is through modeling of existing donors; we can use the power of the co-op data to find the best candidates for reactivation efforts, sustainer invites, and for upgrading (with personalized ask strings). These tools are not only applicable to the mail, as co-ops have a variety of products to help us improve results across channels.

16



## Services and Fees

CDR will provide WW with program strategy and management, write copy and provide package graphics, supervise the production process and secure competitive bids for each component, including back-end, such as caging and fulfillment if necessary, and provide thorough analysis of results throughout the program. All these costs are covered in the fees detailed below.

We will work closely with WW to provide written analysis every two weeks and make recommendations and adjustments as needed to build on our successes and minimize loss. At no point will we go forward with mail plan without the approval of WW. We believe a high level of involvement from CDR staff will be needed to realize the vision outlined in this proposal. Because these types of services reach well beyond the scope of a "per package" arrangement, we propose an ongoing consulting relationship that will entail all the services outlined in this proposal.

As previously noted, to ensure the lowest cost, CDR will bid all production to a minimum of three vendors, providing WW with a written budget for your approval for each campaign. Through our network of vendors and our exceptional buying power, CDR has been able to save our clients considerably on all aspects of their direct mail program, thus increasing net profits and lowering the cost to acquire new donors.

CDR will charge WW a monthly retainer of $35,000 to handle all aspects of the direct mail program. The retainer is inclusive of all strategy, production management, and campaign analysis and would include consultation on other aspects of WW's program as it relates to our efforts. Art and copy fees will be charged at cost. There are additional fees to conduct some of the more in-depth analytics reporting, such as the Lifetime Value Analysis. Digital services can also be added on under a separate scope of work.

We hold weekly team conference calls to ensure regular communication regarding the ongoing strategies and review of results. These calls vary in length depending on the issues at hand during any given week, but setting a specific time each week helps with everyone's busy schedules. We typically handle smaller details via email.

**CDR Fundraising** *Group*



## About CDR

CDR Fundraising Group is an industry leading, full-service direct response fundraising agency headquartered in the Washington, DC, area. We are focused exclusively in the nonprofit industry, and recently celebrated our 30th year in business.

As the industry evolves, we continue to redefine and expand our offerings. While many of our clients' fundraising programs are driven by direct mail, we are focused on integrating multi-channel strategies, including email, digital advertising and social media efforts. Over the past decade, CDR has expanded our service offerings to include digital/online, cause marketing, speakers' bureaus, mid/major donor and planned giving cultivation, monthly sustainer programs, telemarketing, and direct response television (DRTV).

CDR is a part of the Moore Direct Marketing (MDM) family of companies. MDM is focused on providing comprehensive direct response fundraising expertise to the nonprofit market through a wide range of service and product offerings, including strategic consulting, production management, database services, analytical tools, caging, and product fulfillment.

The companies of MDM have been engaged in direct response fundraising for more than 80 years in various corporate forms. In addition to CDR, you have the following resources at your fingertips:


A full-service list brokerage and list management company.

First Degree is a leading cause marketing agency that negotiates and secures corporate sponsorships and other cause related tie-ins for nonprofits; specialties include public relations and social media fundraising. 

 A direct marketing company specializing in innovative package formats and boasting one of the largest mail production facilities in the country, as well as one of the largest fulfillment centers.

A full-service production agency supporting the fundraising community with unique strategic, analytic and creative offerings. 

2020'20 BURM
RESCUE
w n e
w r

 Bernard provides web-based member database
management software that offers a 360° view of the
member regardless of which channel they give through.
Bernard also provides merge/purge and other data services to support nonprofit fundraising.

Heartland Direct International specializing in printing and
product manufacturing around the globe.



**CDR Fundraising** *Group*


## Your CDR Team



**Angela Struebing, President.** As a direct marketing executive, Angela has successfully created, designed, and executed multi-channel fundraising programs for dozens of nonprofit and political clients. By leveraging predictive analytics, she drives results through data-driven decisions combined with creative strategies for member and donor acquisition and retention. As a consistent contributor to the thought leadership of the direct marketing industry, she has been invited to share her expertise as a writer and presenter at numerous conferences and publications.



**Robert Allen, Creative Director.** During his 35-year entrepreneurial career as an agency owner, industry thought leader, and strategic consultant, Robert has developed enduring, file-building and retention strategies and campaigns for over 150 nonprofits, including Wounded Warrior Project, Veterans of Foreign Wars, Toys for Tots, Christian Appalachian Project, Children's National Medical Center, National Easter Seal Society, Cystic Fibrosis, National Children's Cancer Society, National Wildlife Foundation, Mount Vernon, Wilderness Society, and many others.



**Tim Youngbar, Vice President.** Tim has been with the CDR since 1998. Over the years, Tim has directed fundraising strategies for a number of nonprofit accounts including Christian Appalachian Project, Disabled American Veterans, and American Parkinson Disease Association. His ability to develop successful integrated fundraising strategies has garnered numerous industry awards. Tim takes on a leadership role in the industry and currently serves as Board Chair for the Association of Direct Response Fundraising Counsel.



**Erica Tavarozzo, Account Executive.** Erica joined CDR Fundraising Group in 2011. She is currently responsible for managing the acquisition direct-mail program for Wounded Warrior Project. Prior to joining CDR, Erica worked in several customer service positions where she designed marketing campaigns to drive business, and increase cash flow while maintaining relationships with the clientele. Erica is passionate about helping nonprofits develop and implement strategies that will acquire and cultivate donors from acquisition to higher levels of giving.



**Peter Cline, Senior Production Strategist.** Pete brings over 14 years of direct marketing experience. His extensive production knowledge and project management skills have helped the continued growth of such well-known organizations as Marine Toys for Tots, Mothers Against Drunk Driving (MADD), Wounded Warrior Project and Veterans of Foreign Wars (VFW). Clients appreciate his fine attention to detail, his problem-solving skills and his ability to stay calm and deliver top-notch results under deadline pressures.

 
 **Janet Tonner, Director of Analytics.** With over 15 years of experience in the field, Janet works with clients to develop a better understanding of their customers and markets as well as improve campaign performance through data mining, profiling/modeling, analytics, testing, and program measurement. A recognized authority on research and analytics, Janet has both been cited in and written for top industry trade publications and served as a guest speaker at Direct Marketing Association events.

## CONSULTING AGREEMENT

This Consulting Agreement (the "Agreement") dated as of the 1st day of March, 2016 (the "Effective Date"), is by and between WonderWork with an address at 420 Fifth Avenue, 27th Floor, New York, NY 10018 and President and Fellows of Harvard College, a Massachusetts nonprofit educational corporation, acting through Ariadne Labs ("Consultant") with a principal place of business at 401 Park Drive, Boston, MA, 02215.

Ariadne Labs and WonderWork agree as follows:

### 1. Consultant's Services.

Consultant shall provide the following services and deliverables to WonderWork (the "Work"):

WonderWork would like to build a data warehouse and reporting system in order to automate data collection, data storage and reporting for WonderWork's cataract surgery initiative. Consultant proposes writing the requirements document (outlined below) for this enterprise to enable WonderWork to better illustrate the scope of work to potential bidders.

Develop software requirement specifications (SRS): The SRS will describe what the software should provide and which features would be included. It will define the:
- Business requirements: represent WonderWork's high-level objectives for the data warehouse system
- User requirements: describe the tasks that users must be able to accomplish with the help of the data warehouse system
- System requirements: represent the data warehouse system requirements on a very detailed level
  - Functional requirements: define the functionality that the development team must build into the data warehouse system to enable users to accomplish their tasks, thereby satisfying the business requirements
  - Informational requirements: describe the information and data, which the data warehouse should deliver or have access to

The Consultant's Business Analyst (BA) will be responsible for working with WonderWork to evaluate and document the requirements. The BA will also work with the Consultant's ETL Developer and Data Architect to better define and validate the technical requirements.

Any change to the Work must be approved in advance in writing by both parties.

Consultant shall perform the Work with reasonable care, consistent with applicable professional and industry standards and in compliance with all applicable laws, and substantially in accordance with the description set forth in this Agreement. Consultant represents that this Agreement and Consultant's performance of the Work will not breach any obligations of Consultant to any other party.

Consultant owns all the rights in the Work and related deliverables developed by and through the work of Consultant under this Agreement and Consultant agrees to transfer and assign all rights and title to the Work and related deliverables under this Agreement (see Rights in Work Product). Consultant represents that the work product created or delivered by Consultant will not infringe any patents, copyrights, trademarks, trade secrets or other rights of any third party.

## 2. Payment to Consultant.

As compensation in full for the Work and for all rights granted or assigned by Consultant to WonderWork under this Agreement, WonderWork shall pay fees to Consultant as follows:

$5,000 upon execution of agreement. Remainder to be paid upon completion of work.

Provided that the Work has been performed in accordance with this Agreement, WonderWork shall pay the final invoice within 60 days of receipt.

Additionally, WonderWork will be responsible for covering any reasonable travel costs incurred by Ariadne Labs and its employees while engaged in developing the Work.

## 3. Term and Termination.

The term of this Agreement shall begin March 14, 2016 and shall continue until completion of the Work, on or around April 11, 2016.

In addition to any other rights and remedies it may have, WonderWork may terminate this Agreement if Consultant fails to perform or breaches any of Consultant's obligations, warranties or representations in this Agreement and such failure or breach continues uncured for 5 days after written notice thereof is given by WonderWork to Consultant.

Within [7] days of any termination or expiration of this Agreement, (i) Consultant shall deliver to WonderWork all work product and materials related to Work completed or in progress as of the date of termination or expiration; and (ii) WonderWork shall pay Consultant undisputed amounts owing for Work performed in accordance with this Agreement. Consultant shall use reasonable efforts to promptly wind up Work and cancel expenses upon receiving notice of termination.

The provisions of this Agreement which by their explicit terms or their manifest intent are to survive, including without limitation those which relate to confidentiality, rights in

work product and use of Harvard and Ariadne Names shall survive expiration or termination of this Agreement.

## 4. Status and Authority of Consultant; Benefits and Taxes.

Consultant shall be an independent contractor, free from WonderWork's direction and control of the means and methods of performing the Work, and not an agent or employee of WonderWork. Consultant shall have no authority to incur any obligations or expenses on behalf of WonderWork or to act in any other manner on behalf of WonderWork or in its name. Consultant shall be solely responsible under all applicable laws for (i) taxes on Consultant's income, (ii) other tax and welfare and benefits payments and contributions required with respect to Consultant, and (iii) Consultant's professional and other licensing fees. Consultant shall not be entitled to receive any employee benefits from WonderWork.

## 5. Confidentiality.

During the course of the Work, WonderWork may provide Consultant with or Consultant may obtain access to "Confidential Information," which shall mean any and all (a) non-public information about WonderWork, or about third parties, that is specifically identified as confidential or that Consultant knows or in the circumstances should know is regarded as confidential, and (b) personally identifiable information about current or former WonderWork employees ("Personal Data"). Consultant (i) will use reasonable care to protect the security of Confidential Information; (ii) will not use Confidential Information except as necessary for the performance of the Work; (iii) will not at any time during or after the term of this Agreement disclose Confidential Information to any person except with WonderWork's prior written consent (except as otherwise required by law in which case Consultant shall, unless prohibited by law, notify WonderWork prior to such disclosure); (iv) will comply with such additional protections as WonderWork shall reasonably require from time to time; and (v) will immediately notify WonderWork upon learning of any breach in the security of Confidential Information. All Confidential Information will remain the property of WonderWork. At any time on WonderWork's request and in any case upon termination or expiration of this Agreement, Consultant will unless otherwise instructed by WonderWork return all documents containing Confidential Information to WonderWork, delete all electronic files and records containing Confidential Information, and retain no copies of Confidential Information in any medium; provided, that Consultant shall be entitled to retain records containing Confidential Information if reasonably necessary solely for reference and archive purposes, on the condition that such records shall continue to be subject to the provisions of this Confidentiality Section and any Personal Data in such records shall be deleted or redacted.

## 6. Rights in Work Product.

WonderWork shall own and Consultant hereby assigns to WonderWork all right, title and interest in and to all Work and all work product created, prepared or developed by Consultant in the course of performing the Work and any patents, copyrights and other intellectual property embodied in the Work and work product, free of all liens, claims,

encumbrances and licenses; provided that all Work and work product subject to copyright shall be considered work made for hire by Consultant for WonderWork to the extent permitted by law.

Consultant shall execute and deliver to WonderWork all documentation that WonderWork reasonably requires to evidence WonderWork's rights in and to Work and work product and shall comply at WonderWork's expense with all reasonable requests for assistance in connection with (i) applications for registration of any patents, copyrights or other similar ownership rights in Work and work product and (ii) any action or proceeding with respect to WonderWork's protection or defense of its ownership rights.

### 7. Use of Harvard Names.

WonderWork shall not use the name "Harvard" (alone or as part of another name) or any logos, seals, insignia or other words, names, symbols or devices that identify Harvard or any Harvard school, unit, division or affiliate ("Harvard Names") for any purpose in connection with the Work or this Agreement except with the prior written approval of, and in accordance with restrictions required by, Harvard. WonderWork shall not seek to register any Harvard Name in any jurisdiction. Without limiting the foregoing, Consultant shall cease all use of Harvard Names authorized under this Agreement on the termination or expiration of this Agreement.

### 8. Waiver.

Any waiver by either party of a breach of any provision of this Agreement must be in writing and shall not be deemed a waiver of any subsequent breach. No delay or omission in the exercise or enforcement of any right or remedy provided in this Agreement or by law by either party shall be construed as a waiver of such right or remedy.

### 9. Severability.

In the event that any provision or section of this Agreement shall be held to be invalid by any court, such holding shall not affect in any respect whatsoever the validity of the remainder of the Agreement.

### 10. Assignment: Subcontracting.

This Agreement may not be assigned by either party, nor transferred by operation of law, without the prior written consent of the other. Any assignment or transfer without such consent shall be void. Consultant shall not engage any third party to perform any portion of the Work without WonderWork's prior written consent.

### 11. Governing Law.

This Agreement shall be governed by and interpreted in accordance with the laws of the Commonwealth of Massachusetts (excluding conflict of laws rules).

## 12. Entire Agreement; Amendment.

This Agreement contains and constitutes the entire agreement between the parties hereto with respect to the transactions, which are the subject of this Agreement and supersedes and cancels all previous negotiations, agreements, commitments, and writings relating to said transactions. It may be amended only by an agreement in writing, signed by each of the parties hereto.

The parties have executed this Agreement under seal as of the date first above written.

PRESIDENT AND FELLOWS
OF HARVARD COLLEGE acting through Ariadne Labs

By: _____ 3/11/16
    Name: Catherine Breen
    Title: Chief Operating Officer

WONDERWORK

By: _____ 3/7/16
    Name: Hana Fuchs
    Title: Chief Financial Officer



Miracle surgeries for children

**Letter of Agreement**

Vice President of Individual Giving

WonderWork

**Development Resources, *inc.***
1820 N. Fort Myer Drive
Suite 702
Arlington, VA 22209

703-294-6684

www.driconsulting.com



April 25, 2016

Brian Mullaney
Co-Founder and Chief Executive Officer
WonderWork
411 Fifth Avenue, Suite 702
New York, NY 10016
Via email: brian@wonderwork.org

Dear Brian:

On behalf of Development Resources, *inc.*, I am pleased to provide you with this Letter of Agreement for a comprehensive executive search for the position of Vice President of Individual Giving. We look forward to working with WonderWork on this search.

**Professional Arrangements**

As you know, DR*i* works on a retained search basis. We charge a set fee plus direct expenses.

*DRi's responsibilities include:*
- Continue to learn about and understand your current program and future needs.
- Prepare a position overview based on discussions with WonderWork about what is needed.
- Identify, screen and evaluate candidates through all relevant networks.
- Review all applicants and interview them as appropriate.
- Provide a slate of candidates qualified for the position.
- Prepare briefing materials on qualified candidates.
- Work with WonderWork to manage the search process.
- Coordinate the interview process, including the compilation of informational packets for candidates and the delivery of suggested interview questions.
- Conduct thorough reference checks on the final candidates.
- Facilitate the offer.
- Guarantee the candidate for one year.

*WonderWork's responsibilities include:*
- Select a point of contact to advocate for and to support the arrangement of meetings and travel for the candidates.
- Work to create appropriate briefing materials for candidates.
- Determine who will participate in the interview process.
- Pay direct expenses for the search for travel and advertising costs.
- Make the interview process a priority.
-

**Our Search Team**

Nancy Racette will lead this search for WonderWork. She will be your main point of contact at DR*i*, and will direct search strategy as well as candidate identification and evaluation. Nancy will be assisted by other members of our team, including Research, Communications, and Candidate Stewardship Associates.



**Fee**

The fee to conduct a comprehensive executive search for the position of Vice President of Individual Giving will be $30,000. Should you hire any of the candidates we introduce to you during the course of this assignment for another position, before and/or within twelve months after the assignment is completed, WonderWork agrees to pay DR*i* a placement fee of 50% ($15,000) of the original retained search fee.

DR*i* will bill WonderWork per the schedule below. It is our objective to complete the search within four months. Should we place the candidate sooner, all unpaid fees/expenses will be due at the time of placement.

| | |
|---|---|
| $ 10,000 | Upon signing this contract |
| $ 10,000 | Upon presentation of candidates |
| $ 10,000 | Upon offer acceptance of Vice President of Individual Giving |

**Expenses**

Expenses are billed separately as incurred at cost. Expenses include the costs of advertising, informational materials for candidates, and candidate travel. All expenses will be approved by WonderWork prior to being incurred.

**Timeline**

Although it is our objective to complete the assignment within four months, we shall continue our work for an additional five months if necessary, charging only for expenses. Our fee and project-related expenses, as described in this letter, shall be payable without regard to the ultimate resolution of the assignment. Kindly note that invoices are payable within thirty (30) days of receipt; non-payment of invoices in a timely manner shall result in suspension of our effort.

You agree that we have the right to represent you on this assignment until it is completed or suspended.

We will work closely with you to develop a comprehensive understanding of your needs and to determine the core competencies that you require in the ideal candidate. We will then identify the most qualified candidates for the position by utilizing our proprietary database, internal research capabilities, and our extensive network of contacts. In formulating a judgment as to a candidate's suitability for a position, we do rely upon information given to us by sources, candidates, references, and private contacts. Therefore, we cannot guarantee the information.

**Termination without Cause**

Either party shall have the right to terminate this Agreement by written notice ("Notice") to the other party. In such an event, this Agreement shall terminate on the thirtieth (30th) day after the receipt of the Notice (the "Termination Date"). If terminated by WonderWork, DR*i* shall be entitled to payment calculated as follows: total fee divided by six months times months served (partial month would count as a full month).

5/4/16



**Termination for Cause**

Either party shall have the right to terminate this Agreement upon fifteen (15) days written notice ("Notice") to the other party in the event of a breach or violation of any of the terms and conditions of this Agreement. (This fifteen (15) day period shall hereinafter be referred to as the "Notice Period.") The recipient of the Notice, which shall state with particularity the nature of the breach or violation, shall have the right to cure the breach or isolation during the Notice Period, and in the event that the recipient of the Notice cures the breach or violation during the Notice Period, the Notice of violation shall be null and void and the contract shall return to its prior status. In the event that the recipient of the Notice does not cure the breach or violation during the Notice Period, this Agreement shall terminate upon the expiration of the Notice Period ("Termination Date"). Any payments due prior to the Termination Date will still be owed to DR*i*, however no additional payments will be due after the Termination Date.

**Mutual Termination**

This Agreement may be terminated at any time by mutual agreement of the parties.

**Guarantee**

DR*i* will provide a one-year guarantee as follows: if, within one year from the date of hire, the candidate selected by you resigns or is terminated for reasons that DR*i* should have identified during the search process, DR*i* will conduct a search to find a replacement, charging for expenses only. The foregoing is the limit and extent of our liability to you relating to the termination of the recruited candidate, and you agree that we are not responsible for any damages that result as a consequence of, or otherwise related to, such a termination. We follow industry practice and guarantee our candidates, provided that the position for which they are hired has not changed.

**Non-Solicitation**

Throughout the search and for a period of one year after its conclusion, DR*i* agrees not to recruit any members of WonderWork's staff.

**Confidentiality**

Maintaining the confidentiality of client and candidate data is vital to the integrity of our work. The reports and information that you will receive about candidates are confidential and may also be protected by national data privacy legislation. Accordingly, they are exclusively for your own use and are to be used solely for the evaluation of the candidates for employment with your company. This information should be shared only with those inside your company who have a need to know such information and should never be disclosed to any third party outside of your organization.

DR*i* agrees that, unless prior written consent of WonderWork is obtained, DR*i* shall not—either during the term of this Agreement or at any time thereafter—divulge, use for the benefit of, or make accessible to any person either (1) materials produced under this Agreement or (2) information with respect to WonderWork which DR*i* may have obtained in the course of performing services or furnishing work product pursuant to this Agreement. WonderWork agrees to allow DR*i* to use photographs and other marketing materials in order to prepare public documents for candidates during and after the period of engagement for marketing purposes only.

4



## Diversity

In seeking candidates on your behalf, we will not discriminate on the basis of race, ethnicity, gender, religion, citizenship, age, sexual orientation, or any other characteristic protected by state, federal, or applicable local law.

## Conclusion

We sincerely appreciate your invitation to structure a contractual arrangement with WonderWork. If you find that the terms of this agreement meet with your approval, please sign where indicated on the addendum to this letter, then return a copy to me via email at racette@driconsulting.com. I look forward to working with you on this search.

Sincerely,

Nancy K. Racette

Nancy Racette, CFRE
Principal & COO
Development Resources, *inc.*



*WonderWork*
*AGREEMENT ADDENDUM*

AGREED: WonderWork agrees to engage Development Resources, *inc.* to provide search services according to the terms and conditions outlined in this letter, dated April 25, 2016.

**ACCEPTED BY:**

Signature: _____

HANA Fuchs, CFO
Brian Mullaney
Co-Founder and Chief Executive Officer
WonderWork

Date: _____

Signature: _____

Nancy Racette, CFRE
Principal and Chief Operating Officer
Development Resources, *inc.*

Date: _____ 4/25/2016 _____

PLEASE EMAIL TO:

Nancy Racette, CFRE
Principal and COO
Development Resources, *inc.*
racette@driconsulting.com
703-294-6684 (phone)

# EXHIBIT B.d

**Peters, Justin L.**

| | |
|---|---|
| **From:** | Karen Lazarus <karen@wonderwork.org> |
| **Sent:** | Thursday, September 07, 2017 6:09 PM |
| **To:** | Steckel, Jeremy S. |
| **Subject:** | FW: ▮▮▮▮ Impact Loan Forgiveness - $100k - Feb 4, 2016 |
| **Attachments:** | 2F5A9E35-4EF5-4412-BCC3-947F8754FA19[10].png |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

From: Karen Lazarus <karen@wonderwork.org>
Date: Friday, February 5, 2016 at 4:45 PM
To: Vera Eastman <vera@wonderwork.org>
Subject: ▮▮▮▮ Impact Loan Forgiveness -
00k - Feb 4, 2016

From: 
Date: Thursday, February 4, 2016 at 11:22 AM
To: brian mullaney
Subject: Re: impact loan

Hi Brian,

Nothing is settled with my situation...no surprise there of course.

I will forgive another $100,000 this year. I worry, however, that I will not be able to do that going forward. you never know but I doubt I can in future years.

But this year, absolutely...take another $100,000.

How are you? Everything OK?



On Feb 4, 2016, at 8:12 AM, Brian Mullaney <brian@wonderwork.org> wrote:

> Hey ▮▮▮▮
>
> If it is a bad time to ask, don't even think about it.
>
> But if there is any way you can forgive a portion of your impact loan like you did last year? We could really use the help.
>
> The last two years you forgave $100,000 a year.
>
> This stock market and shaky economy is making fundraising very difficult.
>
> If it is not a good time to consider this please forget I even asked! I know you have a lot on your plate.

1

We are grateful for all the help and support you have given us.


Brian


**Brian Mullaney**
Co-Founder/CEO

WonderWork
420 Fifth Avenue, 27th Floor
New York, NY 10018
tel: 212.729.1855
cell: 917.902.7550
email: brian@wonderwork.org
www.WonderWork.org

Watch two blind sisters see their mom for the first time!
More than 7,500,000 people have watched this heart-warming video so far. It was the #1 watched video on the National Geographic website for 2014.

<2F5A9E35-4EF5-4412-BCC3-947F8754FA19[10].png>

TIME magazine named WonderWork "One of 10 Ideas That Can Change The World."
CONFIDENTIALITY NOTICE: This email and any attachments thereto are intended solely for use by the recipients named above and may contain confidential information. If you are not an intended recipient of this e-mail or if you otherwise received this email in error, you are hereby notified that any disclosure, copying, distribution or use of this e-mail or any attachment is strictly prohibited. Please notify us immediately by returning it to the sender and permanently delete this message and any attachments from your system. You should not retain this e-mail, nor should you disclose all or any part of the contents to any other person. Thank you for your cooperation.
CONFIDENTIALITY NOTICE: This email and any attachments thereto are intended solely for use by the recipients named above and may contain confidential information. If you are not an intended recipient of this e-mail or if you otherwise received this email in error, you are hereby notified that any disclosure, copying, distribution or use of this e-mail or any attachment is strictly prohibited. Please notify us immediately by returning it to the sender and permanently delete this message and any attachments from your system. You should not retain this e-mail, nor should you disclose all or any part of the contents to any other person. Thank you for your cooperation.

| | |
|---|---|
| **From:** | Karen Lazarus <karen@wonderwork.org> |
| **Sent:** | Thursday, September 07, 2017 6:11 PM |
| **To:** | Steckel, Jeremy S. |
| **Subject:** | FW: Conversion of part of ████████ Loan |
| **Attachments:** | ████████50K_aug2015.pdf |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

**From:** Karen Lazarus <karen@wonderwork.org>
**Date:** Wednesday, August 26, 2015 at 3:40 PM
**To:** O'Donnell, Christine L" <christine.l.o'donnell@ustrust.com>
**Cc:** Brian Mullaney <brian@wonderwork.org>
**Subject:** Re: Conversion of part of ████████ Loan

Hi Christine, good speaking with you earlier this morning. Here is the letter we are sending to the ████ which will serve as confirmation for this $50k loan forgiveness as well as donation to WonderWork.

Any questions, please don't hesitate to call/email. All the best, Karen

**Karen Lazarus**
Director of Strategic Projects
WonderWork

Watch two blind sisters see their mom for the first time!
More than 4 million people have watched this heart-warming video!

420 Fifth Avenue, 27th Floor
New York, NY 10018
tel: 212.729.1855 ext. 101
cell: 917.848.3508
skype: karen_wonderwork
www.WonderWork.org



TIME magazine named WonderWork "One of 10 Ideas That Can Change The World."

**From:** ████████ <O'Donnell>, Christine L <christine.l.o'donnell@ustrust.com>
**Date:** Tuesday, August 25, 2015 2:28 PM
**To:** Karen Lazarus <karen@wonderwork.org>
**Cc:** Brian Mullaney <brian@wonderwork.org>
**Subject:** RE: Conversion of part of ████████ Loan

1

Dear Karen:

Diana would like to convert this year's repayment to a grant, as the foundation did last year. Can you send me paperwork confirming at your convenience? Thank you very much.

Christine O'Donnell
Senior Vice President, Senior Philanthropic Relationship Manager
U.S. Trust
114 West 47th Street, NY8-114-10-02, New York, NY 10036
T: (646) 855-1011 F: (646) 855-5463
christine.l.o'donnell@ustrust.com

Life's better when we're connected™



Bank of America Private Wealth Management

**From:** Karen Lazarus [mailto:karen@wonderwork.org]
**Sent:** Friday, May 16, 2014 11:30 AM
**To:** O'Donnell, Christine L
**Cc:** Brian Mullaney
**Subject:** Conversion of part of ▉▉▉ Loan

Good afternoon, Christine. Brian is traveling today, but asked me to get back to you regarding the documents pertaining to the conversion of $50,000 of the ▉▉▉ $250,000 loan to a grant.

I've attached the letter which we sent to ▉▉▉ to serve as confirmation of this transaction. We felt this letter receipt keeps the process simple and quick, as well as keeps the legal expenses down.

We are thrilled to be putting this donation to good use right away.

All the best,
Karen


Karen Lazarus
Director of Strategic Projects
WonderWork
420 Fifth Avenue, 27th Floor
New York, NY 10018
tel: 212.729.1855 ext. 101
cell: 917.848.3508
skype: karen_wonderwork
www.WonderWork.org



TIME magazine named WonderWork "One of 10 Ideas That Can Change The World."

This message, and any attachments, is for the intended recipient(s) only, may contain information that is privileged, confidential and/or proprietary and subject to important terms and conditions available at http://www.bankofamerica.com/emaildisclaimer. If you are not the intended recipient, please delete this message.

Peters, Justin L.

| | |
|---|---|
| **From:** | Karen Lazarus <karen@wonderwork.org> |
| **Sent:** | Thursday, September 07, 2017 6:15 PM |
| **To:** | Steckel, Jeremy S. |
| **Subject:** | FORGIVENESS OF ██████████ LOAN - $50K - 12/2015 |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

**From:** Karen Lazarus <karen@wonderwork.org>
**Date:** Monday, December 21, 2015 at 10:20 AM
**To:** Brian Mullaney <brian@wonderwork.org>
**Subject:** Re: subodh

Absolutely. To all 3 requests.

**From:** Brian Mullaney <brian@wonderwork.org>
**Date:** Monday, December 21, 2015 10:15 AM
**To:** Karen Lazarus <karen@wonderwork.org>
**Subject:** subodh

Can you please send ████ my report from the field for the visit to GS Memorial that we made with the ██████? I want her to see the photos too. I think I did a Day, Day 2, thing.

Can't remember.

Thanks.

Also, ████████said he would forgive $50,000 of his impact loan. Please prepare a nice thank you letter and tax receipt.

Thanks

B.

P.S. Let me know when $50,000 from the ██████ comes in. thx

**Brian Mullaney**
Co-Founder/CEO

WonderWork
420 Fifth Avenue, 27th Floor
New York, NY 10018
tel: 212.729.1855
cell: 917.902.7550
email: brian@wonderwork.org
www.WonderWork.org

1

<u>Watch two blind sisters see their mom for the first time!</u>
More than 6,500,000 people have watched this heart-warming video so far. It was the #1 watched video on the National Geographic website for 2014.



TIME magazine named WonderWork "One of 10 Ideas That Can Change The World."

# EXHIBIT B.e

# WONDERWORK, INC.
## Records Management Policy

*Document retention and destruction.*

### Purpose

This policy provides for the systematic review, retention, and destruction of documents received or created by WonderWork in connection with the transaction of organization business. This policy covers all records and documents, regardless of physical form, contains guidelines for how long certain documents should be kept, and how records should be destroyed (unless under a legal hold). The policy is designed to ensure compliance with federal and state laws and regulations, to eliminate accidental or innocent destruction of records, and to facilitate WonderWork's operations by promoting efficiency and freeing up valuable storage space.

### Document Retention

To the extent such documents exist, WonderWork follows the document retention procedures outlined below. Documents that are not listed, but are substantially similar to those listed in the schedule, will be retained for the appropriate length of time.

*Corporate Records*

| | |
|---|---|
| Annual Reports to Secretary of State/Attorney General | Permanent |
| Articles of Incorporation | Permanent |
| Board Meeting and Board Committee Minutes | Permanent |
| Board Policies/Resolutions | Permanent |
| Bylaws | Permanent |
| Construction Documents | Permanent |
| Fixed Asset Records | Permanent |
| IRS Application for Tax-Exempt Status (Form 1023) | Permanent |
| IRS Determination Letter | Permanent |
| State Sales Tax Exemption Letter | Permanent |
| Contracts (after expiration) | 7 years |
| Correspondence (general) | 3 years |

*Accounting and Corporate Tax Records*

| | |
|---|---|
| Annual Audits and Financial Statements | Permanent |
| Depreciation Schedules | Permanent |
| IRS Form 990 Tax Returns | Permanent |
| General Ledgers | [7 years/Permanent] |
| Business Expense Records | 7 years |
| IRS Forms 1099 | 7 years |
| Journal Entries | 7 years |
| Invoices | 7 years |
| Sales Records (box office, concessions, gift shop) | 5 years |
| Petty Cash Vouchers | 3 years |
| Cash Receipts | 3 years |

Credit Card Receipts                                        3 years

*Bank Records*
Check Registers                                             [7 years/Permanent]
Bank Deposit Slips                                          7 years
Bank Statements and Reconciliation                         7 years
Electronic Fund Transfer Documents                         7 years

*Payroll and Employment Tax Records*
Payroll Registers                                          Permanent
State Unemployment Tax Records                             Permanent
Earnings Records                                           7 years
Garnishment Records                                        7 years
Payroll Tax Returns                                        7 years
W-2 Statements                                             7 years

*Employee Records*
Employment and Termination Agreements                      Permanent
Retirement and Pension Plan Documents                      Permanent
Records Relating to Promotion, Demotion, or Discharge      7 years after termination
Accident Reports and Worker's Compensation Records         5 years
Salary Schedules                                           5 years
Employment Applications                                    3 years
I-9 Forms                                                  3 years after termination
Time Cards                                                 2 years

*Donor and Grant Records*
Donor Records and Acknowledgment Letters                   7 years
Grant Applications and Contracts                           7 years after completion

*Legal, Insurance, and Safety Records*
Appraisals                                                 Permanent
Copyright Registrations                                    Permanent
Environmental Studies                                      Permanent
Insurance Policies                                         Permanent
Real Estate Documents                                      Permanent
Stock and Bond Records                                     Permanent
Trademark Registrations                                    Permanent
Leases                                                     6 years after expiration
OSHA Documents                                             5 years
General Contracts                                          3 years after termination

**Electronic Documents and Records**
Electronic documents will be retained as if they were paper documents. Therefore, any electronic files, including records of donations made online, that fall into one of the document types on the above schedule will be maintained for the appropriate amount of

time. If a user has sufficient reason to keep an e-mail message, the message should be printed in hard copy and kept in the appropriate file or moved to an "archive" computer file folder. Backup and recovery methods will be tested on a regular basis.

**Emergency Planning**
WonderWork's records will be stored in a safe, secure, and accessible manner. Documents and financial files that are essential to keeping WonderWork operating in an emergency will be duplicated or backed up at least every week and maintained off-site.

**Document Destruction**
WonderWork's Board will assign responsibility for compliance with this policy to the appropriate person, from time to time, who shall then be responsible for the ongoing process of identifying its records, which have met the required retention period, and overseeing their destruction. Destruction of financial and personnel-related documents will be accomplished by shredding.

Document destruction will be suspended immediately, upon any indication of an official investigation or when a lawsuit is filed or appears imminent. Destruction will be reinstated upon conclusion of the investigation.

**Compliance**
Failure on the part of employees to follow this policy can result in possible civil and criminal sanctions against WonderWork and its employees and possible disciplinary action against responsible individuals. The chief financial officer and finance committee chair will periodically review these procedures with legal counsel or the organization's certified public accountant to ensure that they are in compliance with new or revised regulations.

# EXHIBIT B.f



**Journal date**

05/12/2016

**Journal no.**

Payroll.may.16.1

| # | ACCOUNT | DEBITS | CREDITS | NAME | LOCATION | CLASS |
|---|---------|--------|---------|------|----------|-------|
| 1 | 6001 Payroll Expenses:Taxes | | 20,611.57 | | | |
| 2 | 6035 Payroll Expenses:ER-FICA | 3,505.58 | | | | |
| 3 | 6040 Payroll Expenses:ER-Med | 819.85 | | | | |
| 4 | 6050 Payroll Expenses:ER-Fed | 0.00 | | | | |
| 5 | 6055 Payroll Expenses:ER-Stat | 0.00 | | | | |
| 6 | 6000 Salaries-Regular | 16,286.14 | | | | |
| 7 | | | | | | |
| 8 | | | | | | |
| | **Total** | 20,611.57 | 20,611.57 | | | |

Add lines    Clear all lines

**Memo**

**Attachments**   Maximum size: 25MB

Payroll Liability05.15.16.pdf (13.4 kb)

*Drag/Drop files here or click the icon*

Show existing

Privacy

**Journal date**

05/12/2016

**Journal no.**

Payroll.may.16.2

| # | ACCOUNT | DEBITS | CREDITS | NAME | LOCATION | CLASS |
|---|---------|--------|---------|------|----------|-------|
| 1 | 6000 Salaries-Regular | 18.20 | | | | |
| 2 | 6070 Fringe Benefits:Disability | | 18.20 | | | |
| 3 | | | | | | |
| 4 | | | | | | |
| 5 | | | | | | |
| 6 | | | | | | |
| 7 | | | | | | |
| 8 | | | | | | |
| | Total | 18.20 | 18.20 | | | |

Add lines     Clear all lines

**Memo**

**Attachments**  Maximum size: 25MB

*Drag/Drop files here or click the icon*

Show existing

Privacy

## Payroll Liability

**Total Cash Required**

| | | |
|---|---|---|
| | | $53,809.76 |
| Debit for FSDD (Full Service Direct Deposit) | HSBC Bank USA, Routing/Transit no. (ABA) 021001088, Bank account no. XXXXX9896 | $32,994.84 |
| Debit for Taxes | HSBC Bank USA, Routing/Transit no. (ABA) 021001088, Bank account no. XXXXX9896 | $20,611.57 |
| Debit for Pay-by-Pay | HSBC Bank USA, Routing/Transit no. (ABA) 021001088, Bank account no. XXXXX9896 | $203.35 |
| Total cash required for HSBC Bank USA, Routing/Transit no. (ABA) 021001088, Bank account no. XXXXX9896 | | $53,809.76 |

**Important Note**

Your cash required total does not include your fees for service. The invoice with the details of your fees will be sent the Monday after you process your payroll with the debit from your account occurring 3 banking days later.

Company: Wonderwork Inc
Check date: 5/13/2016 - Payroll 1
Pay Period: 05/01/2016 to: 05/31/2016

Date Printed: 05/09/2016 10:42
20395811 - RF/Q3J

**PAYFREQUENCY:  Monthly**

**Net Pay**

| Checks | | |
|---|---|---|
| Subtotal Net Pay | 0.00 | 0.00 |

**Taxes**

| Agency | Rate | Deposit Responsibility Client | | Deposit Responsibility ADP | | |
|---|---|---|---|---|---|---|
| | | EE withheid | ER contrib | EE withheid | ER contrib | |
| **Federal** | | | | | | |
| Federal Income Tax | | 8,019.80 | | 8,019.80 | | 8,019.80 |
| Social Security | | 3,505.59 | 3,505.59 | 819.85 | 3,505.59 | 7,011.17 |
| Medicare | | 819.85 | 819.85 | | 819.85 | 1,639.70 |
| Subtotal-Federal | | 12,345.24 | 4,325.43 | 12,345.24 | 4,325.43 | 16,670.67 |
| **State** | | | | | | |
| NY State Income Tax | | 2,692.71 | | 2,692.71 | | |
| Subtotal-NY | | 2,692.71 | | 2,692.71 | | 2,692.71 |
| **Local** | | | | | | |
| New York City Resident LIT | | 1,248.19 | | 1,248.19 | | |
| Subtotal-New York City Resident LIT | | 1,248.19 | | 1,248.19 | | 1,248.19 |
| Total Taxes | | 16,286.14 | 4,325.43 | 16,286.14 | 4,325.43 | 20,611.57 |

**Other Transfers**  Full Service Direct Deposit (FSDD)   32,994.84   7 Employee Transactions

Pay-by-Pay Insurance   203.35   Transactions

**Total/Monthly Pay Frequency**

| Total Direct Deposit (FSDD) | $32,994.84 |
|---|---|
| Total Pay-by-Pay Insurance | $203.35 |
| Total Taxes | $20,611.57 |
| Total Amount ADP Debited from your Account(s) | $53,809.76 |

**Total For 42503**

| Total Direct Deposit (FSDD) | $32,994.84 |
|---|---|
| Total Pay-by-Pay Insurance | $203.35 |
| Total Taxes | $20,611.57 |
| Total Amount ADP Debited from your Account(s) | $53,809.76 |

Company: Wonderwork Inc
Check date: 5/13/2016 - Payroll 1
Pay Period: 05/01/2016 to: 05/31/2016

2  of  2

Date Printed: 05/09/2016 10:42
20395811 - RF/Q3J

# EXHIBIT B.g

# WONDERWORK, INC.
## Financial Disclosure and Conflict of Interest Policy

### ARTICLE I
### PURPOSE

The purpose of the conflict of interest policy is to protect WonderWork, Inc. (WonderWork) when it is contemplating entering into a transaction or arrangement that might benefit the private interest of an officer or director of the Corporation or might result in a possible excess benefit transaction. This policy is intended to supplement but not replace any applicable state and federal laws governing conflict of interest applicable to nonprofit and charitable organizations.

### ARTICLE II
### DEFINITIONS

**Interested Person:**  Any director, principal officer, or member of a committee with governing Board delegated powers, who has a direct or indirect financial interest, as defined herein, is an interested person.

**Financial Interest:**  A person has a financial interest if the person has, directly or indirectly, through business, investment, or family:

    a.  An ownership or investment interest in any entity with which WonderWork has a transaction or arrangement.

    b.  A compensation arrangement with WonderWork or with any entity or individual with which WonderWork has a transaction or arrangement.

    c.  A potential ownership or investment interest in, or compensation arrangement with, any entity or individual with which WonderWork is negotiating a transaction or arrangement.

Compensation includes direct and indirect remuneration as well as gifts or favors that are not insubstantial. A financial interest is not necessarily a conflict of interest. Under Article III, a person who has a financial interest may have a conflict of interest only if the appropriate governing Board or committee decides that a conflict of interest exists.

### ARTICLE III
### CONFLICTS PROCEDURES

1.    Duty to Disclose

      In connection with any actual or possible conflicts of interest, an Interested Person must disclose the existence and nature of his or her financial interest to the Board of Directors ("Board") [or special committees with Board delegated powers (e.g.

conflicts or compensation committees)] considering the proposed transaction or arrangement.

2.      Determining Whether a Conflict of Interest Exists

After disclosure of the financial interest, the Interested Person shall leave the Board or committee meeting while the financial interest is discussed and voted upon. The remaining Board or committee members shall decide if a conflict of interest exists.

3.      Procedures for Addressing the Conflict of Interest

a.      The chairperson of the Board or committee shall, if appropriate, appoint a disinterested person or committee to investigate alternatives to the proposed transaction or arrangement.

b.      After exercising due diligence, the Board or committee shall determine whether the Corporation can obtain a more advantageous transaction or arrangement with reasonable efforts from a person or entity that would not give rise to a conflict of interest.

c.      If a more advantageous transaction or arrangement is not reasonably attainable under circumstances that would not give rise to a conflict of interest, the Board or committee shall determine by a majority vote of the disinterested directors whether the transaction or arrangement is in the Corporation's best interest and for its own benefit and whether the transaction is fair and reasonable to the Corporation and shall make its decision as to whether to enter into the transaction or arrangement in conformity with such determination.

4.      Violations of the Conflicts of Interest Policy

a.      If the Board or committee has reasonable cause to believe that a member has failed to disclose actual or possible conflicts of interest, it shall inform the member of the basis for such belief and afford the member an opportunity to explain the alleged failure to disclose.

b.      If, after hearing the response of the member and making such further investigation as may be warranted in the circumstances, the Board or committee determines that the member is an Interested Person and has failed to disclose an actual or possible conflict of interest, it shall take appropriate disciplinary and corrective action.

**ARTICLE IV**
**RECORDS OF PROCEEDINGS**

The minutes of the Board and all committee with Board-delegated powers shall contain:

a.    the names of the persons who disclosed or otherwise were found to have a financial interest in connection with an actual or possible conflict of interest, the nature of the financial interest, any action taken to determine whether a conflict of interest was present, and the Board's or committee's decision as to whether a conflict of interest in fact existed;

b.    the names of the persons who were present for discussions and votes relating to the transaction or arrangement, the content of the discussion, including any alternatives to the proposed transaction or arrangement, and a record of any votes taken in connection therewith.

## ARTICLE V
## COMPENSATION PROCEDURES

a.    No Interested Person shall vote on any matter relating to his or her compensation, irrespective of whether said compensation is received directly or indirectly, from the Corporation.

b.    The Corporation shall endeavor to ensure that all compensation arrangements affecting Interested Persons are objectively reasonable, based on the relevant market for persons of comparable skills, training, education and experience and performing similar duties for comparable organizations under similar conditions and circumstances. The Corporation shall consider and give due weight to studies published by third parties regarding rates of compensation whenever and, to the extent that, such studies are reliable and available.

## ARTICLE VI
## STATEMENTS and DISCLOSURE

1. Statements.

Each director, officer and executive level employee shall sign a statement which affirms that such person:

a.    has received a copy of the conflicts of interest policy;

b.    has read and understands the policy;

c.    has agreed to comply with the policy; and

d.    understands that the Corporation is a charitable organization and that in order to maintain its federal tax exemption it must engage primarily in activities which accomplish one or more of its tax-exempt purposes.

2. Disclosure.

Initially upon taking office or upon being hired and periodically thereafter, members of the Board of Directors, officers and executive level employees shall be required to complete and provide a financial disclosure and conflict of interest statement in the form attached to this Policy.

## ARTICLE VII
## PERIODIC REVIEWS

To ensure that the Corporation operates in a manner consistent with its charitable purposes and that it does not engage in activities that could jeopardize its status as an organization exempt from federal income tax, periodic reviews shall be conducted. The periodic reviews shall, at a minimum, include the following subjects:

a. whether compensation arrangements are objectively reasonable;

b. whether sales or acquisitions by the Corporation result in inurement or impermissible private benefit;

c. whether transactions and arrangements with third parties conform to written policies, are properly recorded, reflect reasonably payments for goods and services, further the Corporation's charitable purposes, and do not result in inurement or impermissible private benefit; and

e. whether the Corporation's expense reimbursement procedures are adequate in terms of required documentation, whether persons seeking reimbursement are complying with these procedures, and whether such expenses relate to furthering the Corporation's charitable purposes and do not result in inurement or impermissible private benefit.

## ARTICLE VIII
## USE OF OUTSIDE EXPERTS

In conducting the periodic reviews provided for herein, the Corporation may, but need not, use outside advisors and consultants. If outside experts are used, their use shall not relieve the Board of its responsibility for ensuring that periodic reviews are conducted.

I hereby certify that this is the current Conflict of Interest Policy of WonderWork, Inc. and is effective as of the date and year set forth below.

_signature_                     Dated: May 10, 2016

Title: Director

# WONDERWORK, INC.
## Board of Directors
### Individual Conflict of Interest Disclosure Statement

Name: _John J. Coneys_

Title: _Board Member_

Address: _813 Marbury Lane_
_Longboat Key, FL 34228_

Phone: _203 550-6420_

Fax: _____

E-mail: _jjconeys@gmail.com_

Please review the WonderWork Conflict of Interest Policy and complete this form. Include any situation, transaction or relationship in which you have been or may be involved that could constitute a potential conflict of interest or the appearance of one between yourself and WonderWork, or between any company or entity in which you may own and interest and WonderWork. Even if you are uncertain about whether you should report a situation, transaction or relationship, please include it. Specific areas of disclosure follow:

Financial Interests: Yes____ No_X_
Please explain Yes answer by disclosing all positions or material financial interests which you or members of your immediate family (e.g., spouse, children, parents, siblings) hold in any outside for-profit or nonprofit concern from which WonderWork secures or might secure goods or services.

Outside Work: Yes____ No_X_
Please explain Yes answer by disclosing all outside positions held by you or members of your immediate family as an officer, trustee, director or employee of a for-profit or nonprofit concern or whereby managerial or consultative service is rendered to any for-profit or nonprofit concern.

Other:    Yes___    No $\times$

Please explain Yes answer by disclosing any other interest, relationship or affiliation of you or any member of your immediate family, which may be within the spirit (if not the letter) of the foregoing, keeping in mind the purpose of this questionnaire is to protect you and WonderWork from a charge of a real or an apparent conflict of interest. Our goal is to avoid both impropriety and the appearance of impropriety.

### Certification

I certify that the information set forth on this Annual Board of Director Individual Disclosure Statement is complete and accurate to the best of my knowledge and I acknowledge my obligation to promptly inform WonderWork of any material changes, to answer any questions the Board may have, to withdraw from the meeting so long as the matter shall continue under discussion, and to refrain from voting on the matter.

_____          7 | 20 | 16
Board Member (Signature)                                Date

_____
Board Member (Name)

# EXHIBIT B.i



Miracle surgeries for children.

**Name:** Janet Huang

**Date:** 11-Dec-15

# Reimbursement Form

**Purpose**

1) Dec '15 Major Donor Maling
2) Holiday Party

**Date**

| | Explanation of Expense | Amount |
|---|---|---|
| Other Expenses | 4,000 first class stamps | $1,960.0 |
| Other Expenses | took taxi after holiday party | $61.3 |
| Other Expenses | | $0.0 |
| Other Expenses | | $0.0 |
| | **TOTAL** | $2,021 |

**Purpose:** Please write purpose of travel, including country or countries visited.
**Note:** Please attach only original receipts. Copies will not be reimbursed.
Please submit expenses in a timely manner so reimbursement can be done in a timely manner.
If you need additional pages, please use.



```
----- ============================= ===
         MIDTOWN STA
        223 W 38TH ST
          NEW YORK
             NY
           100189998
          3596480046
12/08/2015  (800)275-8777   12:31 PM
===== ============================= ===
Product                Sale      Final
Description            Qty       Price

Summon                  1
Supervisor
Vintage Rose          2000     $980.00
    (Unit Price:$0.49)
CI/100                  20      $980.00
Spangled
    (Unit Price:$49.00)

Total                          $1,960.00

Credit Card Remitd             $1,960.00
   (Card Name:MasterCard)
   (Account #:XXXXXXXXXXXX9960)
   (Approval #:50378Y)
   (Transaction #:897)

In a hurry? Self-service kiosks offer
quick and easy check-out. Any Retail
Associate can show you how.

Order stamps at usps.com/shop or call
1-800-Stamp24. Go to
usps.com/clicknship to print shipping
labels with postage. For other
information call 1-800-ASK-USPS
```

```
        I ♥ NEW YORK

HACK #:              05373063
MEDALLION              6N37
12/09/2015 23:05 - 00:01
TRIP# 3805 RATE#       1
STAND. CITY RATE
MILES R1             15.65
FARE R1        $     55.00
SURCHARGE      $      0.50
TOTAL $             55.50
STATE SRCHG$  $61.30  0.50
IMPRV SRCHG$         0.30
GRAND TOTAL $       56.30
                   +$5 Tip
Contact TLC Dial 3-1-1
```

**WONDERWORK INC**
420 5TH AVE 27TH FL
NEW YORK, NEW YORK 10018
www.wonderwork.org

**HSBC** ◇

1-108/210

12/15/2015

PAY TO THE
ORDER OF    Janet Huang

$ **2,021.30

Two thousand twenty-one and 30/100************************************************************************    DOLLARS

Janet Huang

MEMO

AUTHORIZED SIGNATURE

---

WONDERWORK INC

2764

12/15/2015    Janet Huang

| Date | Type | Reference | Original Amount | Balance Due | Payment |
|------|------|-----------|-----------------|-------------|---------|
| 12/11/2015 | Bill | ER.Dec.15 | 2,021.30 | 2,021.30 | 2,021.30 |
| | | | Check Amount | | 2,021.30 |

1040 Banks:HSBC W                                          2,021.30

WONDERWORK INC

2764

12/15/2015    Janet Huang

| Date | Type | Reference | Original Amount | Balance Due | Payment |
|------|------|-----------|-----------------|-------------|---------|
| 12/11/2015 | Bill | ER.Dec.15 | 2,021.30 | 2,021.30 | 2,021.30 |
| | | | Check Amount | | 2,021.30 |

1040 Banks:HSBC W                                          2,021.30

PRODUCT SSLT104    USE WITH 91663 ENVELOPE    Deluxe Corporation 1-800-328-0304 or www.deluxe.com/shop

247  E7246E  STXRX1  07/23/2015 01:42