**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re** | Chapter 11 |
| **WONDERWORK, INC.,** | Case No. 16-13607 (MKV) |
| Debtor. | |

**FINAL REPORT OF JASON R. LILIEN, EXAMINER**

**LOEB & LOEB LLP**

Walter H. Curchack, Esq.
Bethany D. Simmons, Esq.
Talia G. Metson, Esq.
345 Park Avenue
New York, New York 10154
Telephone: 212-407-4000
Facsimile: 212-407-4990
Email: wcurchack@loeb.com

*Counsel to Examiner*

**TABLE OF CONTENTS**

Page

I.  INTRODUCTION AND SUMMARY CONCLUSION ...............................................1

II. PROCEDURAL BACKGROUND.........................................................................7

    A.  Commencement of Chapter 11 Case.................................................................7
    B.  Examiner Appointment ....................................................................................8
    C.  Retention of Professionals ..............................................................................10

III. INVESTIGATION AND PREPARATION OF REPORT .........................................11

    A.  Examiner's Work Plan ....................................................................................11
    B.  Establishment of Rule 2004 Subpoena Authority.............................................16
    C.  Discovery Conducted in Furtherance of Investigation ......................................17

        1.  Initial Meetings with the Debtor and Interested Parties ...........................17
        2.  Document Collection and Review............................................................17
        3.  Witness Interview Process ......................................................................19
        4.  Additional Meetings with Interested Parties............................................22
        5.  Confidentiality and Privilege Issues........................................................23

    D.  Legal Research Conducted to Form Conclusions..............................................23
    E.  Forensic Analyses ..........................................................................................24

IV. STATEMENT OF BACKGROUND FACTS..............................................................27

    A.  Corporate History and Organization.................................................................27
    B.  The Debtor's Purpose......................................................................................28

        1.  Blindness................................................................................................29
        2.  Burns.....................................................................................................29
        3.  Clubfoot.................................................................................................30
        4.  Hydrocephalus.......................................................................................30
        5.  Cardiac Surgery.....................................................................................30

    C.  The Debtor's Mission......................................................................................31
    D.  Initial Fundraising Efforts ..............................................................................31

        1.  The Debtor's Relationship With HelpMeSee .........................................32

            a.  Mullaney, Thazhathu and Ueltschi Begin Exploring
                 Opportunities for Collaboration...................................................32
            b.  Mullaney Departs from SmileTrain and the Services
                 Agreement is Negotiated...........................................................33

|  |  | c. | The Services Agreement | 35 |
|  |  | d. | The Debtor Launches HelpMeSee's Direct Mail Program and the Relationship Deteriorates | 38 |
|  |  | e. | Termination of Services Agreement | 39 |
|  | 2. | The Debtor's Initial Fundraising Efforts | | 41 |
|  |  | a. | Major Donors | 41 |
|  |  | b. | Launch of Direct Mail | 42 |
|  |  | c. | SmileTrain Book Distribution | 43 |

**V. LEGAL ISSUES PLAGUE THE DEBTOR** ........................................................ **44**

| A. | HelpMeSee Arbitration | 44 |
|  | 1. Arbitration Proceedings | 44 |
|  | 2. Arbitration Award | 45 |
| B. | SmileTrain Related Litigations | 46 |
|  | 1. SmileTrain SDNY Litigation | 46 |
|  | 2. SmileTrain UK Litigation | 47 |
| C. | Shaheen Lawsuit | 48 |
| D. | Fuchs Lawsuit | 49 |
| E. | SmileTrain Interference With Vendors | 50 |

**VI. KEY PLAYERS** .......................................................................................... **51**

| A. | Board of Directors | 51 |
|  | 1. Board Composition | 51 |
|  | 2. Bylaws | 56 |
| B. | Officers and Management Team | 58 |
|  | 1. Introduction | 58 |
|  | 2. Mullaney | 60 |
|  | 3. Fuchs | 61 |
|  | 4. Greenwood | 62 |
|  | 5. Lazarus | 63 |
|  | 6. Huang | 64 |
| C. | Medical Advisory Board | 64 |
| D. | Advisory Board | 65 |
| E. | Celebrity "Supporters" | 65 |
| F. | Fundraising Service Providers and Other Professionals | 66 |

**VII. BOARD APPROVED POLICIES AND PROCEDURES** ............................................ 68

    A.    Investment Policy and Management of Assets .................................... 69
    B.    Travel Policy ........................................................................................ 71
    C.    Conflicts and Ethics Policies .............................................................. 72
    D.    Gifts and Donations Policies ............................................................. 72

**VIII. PREPETITION FINANCIAL POSITION** .............................................................. 73

    A.    Bank and Investment Accounts ........................................................... 73

        1.    HSBC Accounts .......................................................................... 73
        2.    PayPal Accounts ......................................................................... 74
        3.    Vanguard Account ....................................................................... 74

    B.    Insurance Assets .................................................................................. 75

        1.    Mullaney Term Life Insurance Policy ........................................ 75
        2.    Key Man Term Life Insurance Policies ...................................... 76
        3.    D&O Policies ............................................................................. 77
        4.    Commercial Liability Policy ....................................................... 77

    C.    Impact Loans ........................................................................................ 78

        1.    What is an impact investment? .................................................... 78
        2.    Impact Loan Pitches .................................................................... 79
        3.    Loan Terms .................................................................................. 82

            a.    Basic Loan Terms ................................................................. 82
            b.    Loan Forgiveness .................................................................. 82
            c.    Purpose of Loan and Use of Proceeds ................................. 83
            d.    Representations and Warranties ........................................... 84

                i.    Asset Levels ................................................................. 84
                ii.    No Litigation ............................................................... 85
                iii.    Other Indebtedness ...................................................... 86

            e.    Reporting Requirements ....................................................... 86
            f.    Closing Conditions ............................................................... 88

        4.    ████████ Loan Insurance Requirement .................................... 88
        5.    Mullaney "Loan" ......................................................................... 88
        6.    Impact Loan Forgiveness and Repayment Plan .......................... 89

IX.      FUNDRAISING .................................................................................................... 91

X.       DONATION PROCESSING ................................................................................ 137

         A.       Overview ................................................................................................ 137
         B.       DMI ........................................................................................................ 139
         C.       Coding Restricted Funds in DMI ......................................................... 142

XI.      RESTRICTED FUNDS ANALYSIS ................................................................. 145

         A.       Introduction ........................................................................................... 145
         B.       Analysis of Restricted Fund Balances ................................................. 153
         C.       WonderWork's Historic Practices with Respect to its Restricted Fund
                  Balances.................................................................................................. 156
         D.       Examiner's Calculation of Restricted Fund Balances......................... 166
         E.       The Examiner's attempt to determine the nature of the funds in the
                  Investment Account ............................................................................... 183

XII.     SURGERY PROGRAMS..................................................................................... 184

         A.       Partner Selection Process ...................................................................... 184
         B.       Grant Provisions .................................................................................... 185
         C.       Monitoring Grant Usage........................................................................ 186

                  1.       Grantee Visits............................................................................. 187
                  2.       Grant Usage Reports................................................................... 187
                  3.       Quality Assurance Reviews ....................................................... 188
                  4.       Audits.......................................................................................... 189

         D.       Connecting Solicitation Materials to Program Model Reality ........... 189

                  1.       Extent of Partners Supported and Countries Where Services Are
                           Provided ..................................................................................... 189
                  2.       Visual Acuity of Cataract Patients ........................................... 191
                  3.       Contribution Towards Surgeries ............................................... 192
                  4.       Number of Surgeries Performed on Children ......................... 193
                  5.       Nonprofit Status of Grantees..................................................... 194

XIII.    MULLANEY COMPENSATION AND EXPENDITURES .................................. 195

         A.       Mullaney Salary and Bonus................................................................... 195
         B.       Mullaney's Employment Agreement .................................................... 203
         C.       Mullaney "Payroll Ledger" ................................................................... 205

                  1.       Total Compensation Owed ......................................................... 206
                  2.       Compensation Outstanding........................................................ 208
                  3.       Expense Deductions ................................................................... 210

|  |  | a. | Personal Expenses | 211 |
|  |  | b. | Excessive Expenses | 212 |
|  |  | c. | Unsubstantiated Expenses | 214 |
|  |  | d. | Potentially Legitimate Business Expenses | 215 |

|  | 4. | Use of Payroll Ledger Led to a Failure of Disclosure and Corporate Governance Oversight | 217 |

| D. | Other Mullaney Expenses | 221 |
| E. | Examiner's Observations | 225 |

|  | 1. | The Examiner Believes the Bonus Constitutes Current Income | 226 |
|  | 2. | Payment of Personal Expenses | 229 |
|  | 3. | Improper Reporting, Withholding and Tax Payments | 229 |

**XIV. POTENTIAL CAUSES OF ACTION** ... **232**

| A. | Procedural Considerations | 232 |

|  | 1. | Choice of Law Analysis | 232 |

|  |  | a. | Potential Claims Involving Torts | 233 |
|  |  | b. | Potential Claims Involving Internal Affairs | 233 |

|  | 2. | Statutes of Limitations | 234 |

|  |  | a. | New York | 234 |
|  |  | b. | Delaware | 234 |
|  |  | c. | Effect of 11 U.S.C. § 108(a) | 235 |

| B. | Preference Claims | 235 |
| C. | Claims Against Mullaney for Excessive Compensation and Bonuses | 242 |

|  | 1. | Unjust Enrichment | 242 |
|  | 2. | The Bonus and Excessive Compensation Paid to Mullaney Under His Employment Agreement May Also be Recoverable and Any Severance or Benefit Obligation Avoidable Under Section 548 of the Bankruptcy Code | 245 |
|  | 3. | Certain Payments May Be Recovered from Mullaney As Excess Benefits | 249 |

| D. | Claims Related to Debtor's Reclassification of Funds as Restricted | 250 |

|  | 1. | Pre-petition: Fraudulent Transfer | 252 |

|  |  | a. | Actual Fraudulent Transfer | 252 |
|  |  | b. | Constructive Fraudulent Transfer | 254 |

2. Post-petition:  Violation of Section 549 ................................................. 255
3. New York Charity Law is Relevant to the Analysis ............................. 255

E. Claims Against Directors ................................................................. 256

1. Breach of Duty of Care ........................................................... 256
2. Potential Defenses .................................................................. 259

F. Claims Against Officers ................................................................... 259
G. Claims Against SmileTrain and HelpMeSee ..................................... 264

1. Improper Interference by SmileTrain ................................... 266
2. Wrongful Conduct By HelpMeSee ....................................... 267
3. Other Claims ........................................................................... 269

**XV. EXAMINER'S RECOMMENDATIONS REGARDING CONTINUING THE DEBTOR'S BUSINESS................................................................. 270**

A. Attorney General Referral ............................................................... 271
B. Appointment of a Trustee................................................................. 272

# I.    INTRODUCTION AND SUMMARY CONCLUSION

WonderWork is not a sham charity, at least in the traditional sense.  Over the years, it has funded numerous medical procedures in developing countries and seemingly operated within a traditional organizational structure.  However, this Examination has revealed that WonderWork abused the public's trust from its inception.  Through fundraising campaigns designed to mislead donors as to how their contributions would be spent, and an accounting system which failed to properly record and track those contributions, WonderWork raised, and then misapplied and misused, millions of charitable dollars.

WonderWork presents a case study on how a dominant CEO, left unchecked by a passive and overly deferential Board of Directors, can damage a charity beyond repair.  The Examiner's five-month review revealed that WonderWork is a poorly governed, costly and highly inefficient operation in which only a small fraction of donations are used to help people in need.  While laudable in concept, WonderWork failed in execution.  Under Brian Mullaney's charge, WonderWork has operated in disregard of key legal requirements and industry standards regarding charitable solicitation, restricted gift practices, financial reporting, and compensation standards.

The Court is familiar with the history of this case, and the Examiner will not belabor the past.  However a little background is instructive.

Brian Mullaney, CEO and "co-founder" of WonderWork was a successful advertising executive before he turned to fundraising for charity.  As the co-founder, with Charles Wang, of SmileTrain, he helped build a huge direct-mail based charity, raising hundreds of millions of dollars over the span of nearly a decade.  Towards the end of that period, Mullaney had a disagreement with Wang over which track SmileTrain should take.  That disagreement grew into

a feud, and that feud is what ultimately led WonderWork to Chapter 11. WonderWork's early days were plagued by litigation between Mullaney and SmileTrain, though with the support of his loyal donors, Mullaney managed to keep his new venture on course.

WonderWork then faced one last hurdle which it could not overcome. A dispute with HelpMeSee over who had breached a service contract between them grew into a multi-year, multi-million dollar, hotly-contested arbitration proceeding, encouraged, if not funded, by Wang. When the New York Supreme Court confirmed the arbitrator's initial $8 million plus judgment, WonderWork filed for Chapter 11, in a last ditch effort to stay in business.

The correctness of the arbitrator's award is not before this Court, and the Examiner felt bound to accept the state court judgment as final, unless and until it is reversed on appeal. But this background is important because it was HelpMeSee's motion seeking to appoint a trustee that led to the appointment of the Examiner.

WonderWork hoped to protect its "restricted" fund balances from HelpMeSee's adverse judgment (which, including interest and, if affirmed by the New York state court, attorney's fees, may exceed $16 million). In order to do that, both pre- and post-petition, WonderWork began to look back and see if it could reclassify some of its purportedly unrestricted funds as restricted. Those actions were among the reasons cited by HelpMeSee in its motion seeking a trustee.

Faced with the drastic choice of appointing a trustee and likely jeopardizing the Debtor's very existence, and with major donors indicating their support for Mullaney, the Court prudently chose to appoint an Examiner, tasked with two major jobs: first to determine, in accordance with New York State charity law, the Debtor's actual restricted fund balance, and second, to report to the Court on potential causes of action the estate might have, including traditional Chapter 5

14592424.11
228676-10002

avoidance actions, as well as potential claims arising from mismanagement or wrongful conduct by the principals of the Debtor.

New York charity law makes very clear that contributions donated to a charity for a particular purpose must be separately accounted for and spent only for that purpose. Accounting rules related to functional cost analysis may lead to a different presentation on an entity's financial statements, but the law on this subject is not ambiguous. Bankruptcy law and New York State law are both equally clear that restricted purpose donations cannot be used to satisfy creditors' claims.

As the Examiner initially approached his tasks, they appeared relatively limited in scope. The Debtor appeared to be trying to shelter its assets from a creditor by "restating" certain contributions it had been treating as unrestricted to restricted. What the Examination revealed however, was far more serious and far-reaching. In fact, the Debtor had been operating in violation of New York state charity law almost from inception. To a degree, the Debtor's actions could be attributed to a mistaken reliance on those accounting rules, but the Examiner believes that reliance was not innocent, and indeed was based on a deliberate attempt to take advantage of the rules. And in other respects, the Examiner believes the Debtor's actions, particularly in connection with its fundraising practices, now appear outright fraudulent.

And so an attempt to bring the Debtor's "restricted" accounts into balance, turned into an exercise in reconstructing, almost from scratch, the Debtor's entire fundraising history, all in the absence of the Debtor's most recent audit. This encompassing over 600 separate solicitations, hundreds of thousands of donations, and millions of dollars of misapplied and mishandled funds.

The Examiner did not anticipate that the issues regarding fundraising and record keeping would be so substantial. However, given the severity of issues uncovered, the Examination

14592424.11
228676-10002

necessitated a much more thorough and comprehensive review of the Debtor's systems. While many of the problems with Debtor's solicitation practice quickly became apparent to the Examiner, the magnitude of the issues and, most importantly, the economic consequence could not be accurately quantified until the Examiner was far into the process. Indeed additional solicitation materials were being produced and analyzed as recently as over the last few weeks. And as further discussed below, there were good reasons for the Examiner not to reach – or announce – his conclusions prematurely.

Wonderwork claims to raise money to fund surgeries that would not otherwise be available in underdeveloped countries around the world. Skilled at both in-person donor cultivation as well as drafting compelling mass marketing appeals, Mullaney's fundraising approach for the Debtor focused principally on maintaining donor relationships he formed while at SmileTrain, while sourcing new donors through an extensive direct mail campaign.

In total, since its inception in 2011, the Debtor has raised approximately $54.4 million in charitable contributions under the WonderWork name and the names of the individual DBAs. However, the bulk of the money spent by the charity over the years has gone to feed the enormous fundraising machine itself, including both its own highly compensated employees, and third party direct mail service providers. And although it has tried, the Debtor cannot excuse these expenditures on the grounds that it is still a relatively new charity.

The Examiner has concluded, based on his thorough review of the Debtor's fundraising practices and solicitation materials that almost $5 million of contributions originally reported as unrestricted should be classified as restricted. He has also determined that Debtor failed to properly account for the "roll-forward" of its restricted fund balances over the years. In fact, contrary to their publicly reported position, the great majority of the Debtor's current funds

should be deemed to be restricted.  As detailed throughout this Report, the Examiner found that the Debtor:

- used false and misleading solicitation materials, in violation of applicable law.

- failed in its reporting obligations, making clearly false and misleading statements in its public filings;

- failed to apply their restricted assets in accordance with their intended purpose;

- failed to spend money raised for specific purposes in accordance with the solicitation materials;

- failed to honor and account for matching donations;

- failed to keep accurate accounts of its restricted funds; and

- lacked appropriate governance protocols and its Board failed in its duty to monitor and control management's misfeasance.

Management of the Debtor further abused the public's trust for their own benefit through excessive compensation and benefits and under reported income.

The result of the Examiner's review, and as explained at length in this Report, is that of the approximately $20.2 million dollars held by the Debtor as of the Petition Date, the Examiner believes $16.25 million should be treated as "restricted" funds and can be spent, in accordance with donors' wishes, only on the "surgeries" which WonderWork funds and, as permitted by New York law, on costs related to the administration of such funds.

As detailed in his Report, the Examiner's conclusion that most of the money remaining in the Debtor's possession should be deemed restricted raises difficult questions with respect to the application of unrestricted funds to replenish restricted dollars wrongly spent in the past.  The Examiner has also struggled with the impact of his recommendation on creditors of the

organization, who may find themselves disadvantaged as a result of the misfeasance and malfeasance of the Debtor's management. Debtor's principal creditors are (i) the so-called "impact loan" lenders, all of whom entrusted large sums of money to the Debtor to "jump start" what they thought would be a successful fundraising machine and did not place any restrictions on their money, and (ii) HelpMeSee, whose arbitration award, currently under appeal in the New York State courts, is what brought the Debtor to this Court in the first place, and who will also have to deal with the consequences of having sought third party intervention. The Examiner is aware that his conclusions regarding the Debtor's purported reliance on accounting rules related to cost allocation may also prove unpopular in the non-profit world. However, he is comfortable with his determination that such accounting rules cannot be used to supersede a legal determination on the use of restricted gifts.

The Examiner believes that his investigation has revealed that sufficient grounds exist to appoint a Trustee under the Bankruptcy Code, given the evidence of mismanagement and improper fundraising and reporting practices. While the Examiner is mindful of the extraordinary expense already incurred and does not wish to add to the administrative expenses in this case, nevertheless the Examiner recommends that the Court consider such an appointment. Alternatively, given the Examiner's conclusions regarding the Debtor's restricted and unrestricted fund balances, the Court could consider providing for payment of administrative expenses from the Debtor's remaining unrestricted funds and then dismissing the case and referring the matter to the New York State Attorney General's Office in order to determine whether or not WonderWork can properly continue as a participant in the non-profit sector and what causes of action might be brought outside of the bankruptcy process. In the interim, the

Examiner recommends that the Court continue the current suspension of the Debtor's operations pending decisions on the Trustee appointment and the Attorney General's review.

## II.     PROCEDURAL BACKGROUND

### A.     Commencement of Chapter 11 Case

On December 29, 2016 (the "Petition Date"), the Debtor commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").[1] The Debtor continues to operate its business and manage its properties as a debtor in possession under section 1107 of the Bankruptcy Code.

In the *Declaration of Brian Mullaney Co-Founder and CEO of WonderWork, Inc. in Support of Chapter 11 Petition and First Day Pleadings* (the "Mullaney Declaration"), the Debtor disclosed that it filed for bankruptcy after an adverse arbitration award in the amount of $13,198,431.85, exclusive of interest but inclusive of attorneys' fees and arbitration costs, was entered against it in favor of another charity, HelpMeSee, Inc. ("HelpMeSee").[2] The Mullaney Declaration disclosed that if HelpMeSee were to enforce the Arbitration Award, the Debtor did not have enough unrestricted cash flow to pay the HelpMeSee arbitration award and continue to operate.[3] In its initial *Schedules of Assets and Liabilities*, the Debtor listed assets totaling $21,770,674 and claims totaling $25,882,442.[4]

---

[1] *See Chapter 11 Voluntary Petition for Non-Individual*, Docket No. 1. The case was originally assigned to Judge Bernstein, but was reassigned to Judge Vyskocil on March 3, 2017. *See Notice of Reassignment,* Docket No. 68.

[2] *See* Mullaney Declaration ¶¶ 19-20, Docket No. 2.

[3] *Id.* ¶ 22.

[4] *Schedule of Assets and Liabilities* (the "Initial Schedules"), Docket No. 12. The Debtor subsequently filed Amended Schedules E/F (the "Final Amended Schedules"), Docket No. 212, listing unsecured claims in the total amount of $26,567,042.28. HMS's claim in the Final Amended Schedules is listed as $16,059,833.50. *Id.* at 4.

### B. Examiner Appointment

On January 18, 2017, HelpMeSee filed a motion for the appointment of a chapter 11 trustee (the "Trustee Motion").[5]  As support for the Trustee Motion, HelpMeSee argued, among other things, that the Debtor's CEO, Brian Mullaney ("Mullaney")  had a long history of fraudulent conduct, financial impropriety and dishonesty, and that his and his staff's misconduct made them unfit to run the Debtor during the pendency of its bankruptcy case.[6]  HelpMeSee cited to the findings of fact contained in the Arbitration Award entered in its favor as support for its arguments.  On February 24, 2017, the Debtor filed its opposition to the Trustee Motion arguing that neither the mandatory nor discretionary grounds for the appointment of a trustee set forth in section 1104 of the Bankruptcy Code were met.[7]  In further opposition to the Trustee Motion, thirteen declarations were filed by members of the Debtor's Board of Directors (the "Board"), unsecured creditors, and other supporters of the Debtor.[8]  HelpMeSee then filed a reply in support of the Trustee Motion on March 3, 2017.[9]

On March 10, 2017, the Bankruptcy Court heard oral argument on whether the Trustee Motion could be granted as a matter of law based on the purported preclusive effect of the Arbitration Award and took the Trustee Motion under submission.  On March 13, 2017, the Bankruptcy Court entered an *Order to Show Cause* explaining why an examiner should not be

---

[5]*See Help Me See, Inc.'s Motion for the Entry of an Order Directing the Appointment of a Chapter 11 Trustee*, Docket No. 16.

[6]*Id* at ¶ 3.

[7]*Memorandum of Law of WonderWork, Inc. in Opposition to HelpMeSee's Motion to Appoint a Trustee*, Docket No. 62.

[8]*See* Docket Nos. 49 – 60, 63.

[9]*Help Me See, Inc.'s Reply Brief in Further Support of its Motion for the Entry of an Order Directing the Appointment of a Chapter 11 Trustee*, Docket No. 70.

appointed.[10]  On April 5, 2017, HelpMeSee filed a statement in response to the Order to Show Cause wherein it continued to urge the appointment of a trustee, but also indicated its support for the appointment of an examiner.[11]  That same day, the Debtor also filed a statement indicating that it did not object to the appointment of an examiner since an examiner could act as "a check against HelpMeSee's unbridled enthusiasm for conflict."[12]  On April 12, 2017, the Bankruptcy Court held a hearing denying the Trustee Motion without prejudice but indicating that it would enter an order appointing an examiner.[13]

On April 21, 2017, the Bankruptcy Court entered the *Order Directing the Appointment of an Examiner and Establishing Temporary Budgetary Controls* (the "Examiner Order").[14]  On May 5, 2017, the United States Trustee (the "U.S. Trustee") filed an application requesting that the Bankruptcy Court appoint Jason R. Lilien as the Examiner.[15]  On May 10, 2017, the Bankruptcy Court entered an order approving the appointment of the Examiner.[16]

---

[10] *See Order to Show Cause*, Docket No. 80.

[11] *Help Me See, Inc.'s Statement in Support of the Appointment of an Examiner and Imposition of Cautions and Controls*, Docket No. 92.

[12] *WonderWork's Response to Order to Show Cause to Appoint Examiner* ¶ 19, Docket No. 93.

[13] *See Hearing Tr.*, Docket No. 117.  Upon a request made by the Debtor, the Examiner Order was subsequently amended to provide clarification on the budgetary controls imposed on the Debtor.  *See Motion of Wonderwork, Inc. for Reconsideration and Clarification of Order Directing the Appointment of an Examiner and Establishing Temporary Budgetary Controls,* Docket No. 126, and *Amended Order Directing the Appointment of an Examiner and Establishing Temporary Budgetary Controls,* Docket No. 185.  However, the scope of the examination was not altered.

[14] Examiner Order, Docket No. 110.

[15] *See Notice of Appointment of Examiner,* Docket No. 129 and *Application for Order Approving Appointment of Examiner,* Docket No. 130.

[16] *See Order Approving Appointment of Chapter 11 Examiner*, Docket No. 136.

## C.     Retention of Professionals

On June 5, 2017, the Examiner sought the retention of Loeb & Loeb LLP ("Loeb") as his counsel, *nunc pro tunc* to May 10, 2017.[17]  On June 28, 2017, Loeb's retention was approved without objection by the Court.[18]

On June 26, 2017, the Examiner sought the retention of Goldin Associates, LLC ("Goldin Associates") as his financial advisor, *nunc pro tunc* to June 6, 2017.[19]  On July 20, 2017, Goldin Associates' retention was approved without objection by the Court.[20]

---

[17]*See Application of Examiner for Order Authorizing the Retention and Employment of Loeb & Loeb LLP as Counsel to the Examiner Nunc Pro Tunc to May 10, 2017*, Docket No. 165.

[18]*See Order Authorizing the Employment and Retention of Loeb & Loeb LLP as Counsel to the Examiner Nunc Pro Tunc to May 10, 2017*, Docket No. 198.

[19]*See Application of the Examiner for Order Authorizing the Retention and Employment of Goldin Associates, LLC as Financial Advisor to the Examiner Nunc Pro Tunc to June 6, 2017*, Docket No. 195.

[20]*See Order Authorizing the Retention and Employment of Goldin Associates, LLC as Financial Advisor to the Examiner Nunc Pro Tunc to June 6, 2017*, Docket No. 207.

14592424.11
228676-10002

### III.     INVESTIGATION AND PREPARATION OF REPORT

#### A.     Examiner's Work Plan

Within ten days after his appointment, the Examiner Order required the Examiner to file a proposed work plan.[21] The Examiner timely filed his Preliminary Work Plan on May 22, 2017.[22]

The Examiner Order required the Examiner to investigate:

1.     The Debtor's collection, use, allocation, and transfers of restricted and unrestricted funds, including:

(a)     the Debtor's system for collecting, tracking and using restricted-purpose funds;

(b)     whether and to what extent Debtor's funds are properly subject to donor restrictions and/or other restrictions under New York charity law and the characterization and nature of any such restriction;

(c)     how expenses and expenditures including overhead and grants are allocated across various causes, including the transfer of funds among the Debtor's bank accounts; and

(d)     whether Debtor has taken actions in violation of the automatic stay by attempting to impose restrictions on funds that were otherwise unrestricted as of the petition date;

2.     Whether grants made by the Debtor were to organizations that provide services that are consistent with the restricted purpose of the funds used to make such grants, and the method by which the Debtor monitors the use of the grants;

3.     Any potential claims and causes of action of the Debtor, including without limitation preferential and fraudulent transfers, including to insiders, claims for breach of fiduciary duty and corporate waste, other claims against insiders and claims relating to expense reimbursement;

---

[21]Examiner Order at 5, Docket No. 110.

[22]*See Preliminary Work Plan of Jason R. Lilien, Examiner,* Docket No. 142.

4.      All payments made to or amounts due to Brian Mullaney ("Mr. Mullaney") including expense reimbursements from the Debtor to Mr. Mullaney; and

5.      The Debtor's corporate governance structures and practices, including oversight Mr. Mullaney by the Debtor's board of directors…[23]

The Examiner Order further required the Examiner to perform the other duties set forth in section 1106(a)(3) and (4) of the Bankruptcy Code. Section 1106(a)(3) requires the Examiner to "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan." 11 U.S.C. § 1106(a)(3). Section 1106(a)(4) further requires the Examiner's Report to include "any fact ascertain pertaining to fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor, or a cause of action available to the estate." 11 U.S.C. § 1106(a)(4).

To address the required scope of the Report, the Preliminary Work Plan set forth the Examiner's intention to divide his investigation into two principal categories: (a) the classification of Debtor's funds as restricted or unrestricted, including the solicitation, receipt and classification of donations and the use, tracking and accounting of Debtor's restricted funds; and (b) issues related to the operation and management of the Debtor and potential claims arising therefrom, including (i) the propriety of the Debtor's expenditures of funds by or for the benefit of insiders; (ii) potential avoidance actions of the Debtor; (iii) other potential causes of action of

---

[23]Examiner Order at 2-3, Docket No. 110.

the Debtor, including breaches of fiduciary duty and waste of charitable assets; and (iv) issues raised by the Debtor's corporate governance structure and practices.[24]

From the outset of the investigation, the Examiner sought to balance the breadth of the Examiner Order with the desire to limit the costs and timeframe of the investigation. While parties in interest were generally cooperative throughout the pendency of the investigation, as will be further discussed in more detail throughout this report, certain circumstances hindered the ability of the Examiner to assimilate and analyze the information produced as quickly and efficiently as originally anticipated.

To minimize costs and expedite his review, the Examiner sought information, data, and reports from the Debtor that could be more easily produced by the Debtor than by Examiner. Where appropriate, the Examiner intended to build upon work already done by the Debtor in lieu of starting from scratch. However, it took the Debtor substantial time to produce a number of the requested reports, and certain other reports were never received. For example, from the outset of his investigation, the Examiner sought from the Debtor a report matching each solicitation to its transaction code[25] and stating whether the Debtor treated the solicitation and resulting donations as restricted. While the Debtor performed this analysis for the Examiner with respect to many of the solicitations conducted under the WonderWork brand and the funds raised for blindness treatment ("20/20/20"), the Debtor failed to perform a similar analysis for funds raised for treatment of clubfoot ("FirstStep"), and burn treatment ("BurnRescue," and together with 20/20/20 and FirstStep, the "DBAs"). As a result of the delay in provided the 20/20/20 analysis and refusing to provide the FirstStep and BurnRescue analyses, the Examiner was forced to

---

[24]Preliminary Work Plan ¶ 14, Docket No. 142.

[25]A transaction code is an 18 digit code used by the Debtor to identify various aspects of a donation. For more information about such codes and their use by the Debtor, *see* Donation Processing, Section X.

delay and curtail his analysis of the extent to which the Debtor's funds were properly subject to donor restrictions. Relatedly, the Debtor's audit, which was supposed to be completed in May, has still not been completed. As a result, the Examiner has been unable to compare his findings with positions taken by the Debtor with respect to the restricted fund analysis.

Moreover, certain third parties subpoenaed by the Examiner were unable to complete their productions on an expedited basis, delaying the Examiner's ability to move forward with key aspects of his fund usage analysis.

Other unexpected circumstances also impeded the Examiner's ability to expediently and efficiently complete his investigation. As set forth more fully below, the sheer volume of electronic records produced to the Examiner substantially exceeded the Examiner's expectations at the outset of the investigation by hundreds of thousands of documents. Many documents were not produced in a searchable format, making the Examiner's task that much more difficult.

Finally, the Debtor changed certain of its practices in the later part of 2016 and continuing after the Petition Date, complicating the issues and necessitating further investigation. As a result of these hurdles, among others, on July 27, 2017, the Examiner submitted his Status Report and Revised Work Plan to the Bankruptcy Court, requesting an extension of time to file his report beyond the ninety days granted by the Examiner Order and disclosing that the budget for completing the investigation would be significantly higher than originally anticipated.[26] On July 28, 2017, the Bankruptcy Court granted the Examiner's request for an extension and set

---

[26]The Examiner did not file the Status Report and Revised Work Plan on the docket in the first instance in deference to the provision of the Examiner Order prohibiting the Examiner from disclosing any preliminary results of his investigation absent an order from the Bankruptcy Court. *See* Examiner Order at 5, Docket No. 110.

14592424.11
228676-10002

September 29, 2017 as the deadline to file the Report.[27]  With the Bankruptcy Court's consent, the Examiner filed his Status Report and Revised Work Plan on the docket on July 31, 2017.[28]

On September 20, 2017, the Examiner filed a second letter request with the Bankruptcy Court seeking an extension of time to file his report.[29]  In the second letter request, the Examiner explained that, because the long awaited audit had not been completed, the Examiner had determined to proceed with his report without the audit.  The Examiner also apprised the Bankruptcy Court of the fact that certain necessary reports had not yet been produced by the Debtor.  On September 21, 2017,  the Bankruptcy Court extended the Examiner's deadline to file his report until October 20, 2017 and directed the Debtor to produce all outstanding documentation by September 27, 2017.[30]

On September 25, 2017, the court issued an order to show cause why the Debtors should not be held in contempt for failing to have its 2016 audit completed (the "Order to Show Cause").[31]  The Debtor filed an extensive response (the "Response")[32] accompanied by declarations from Pamela Mann of Carter Ledyard & Milburn LLP ("Carter Ledyard") and Hana Fuchs, each with numerous exhibits.[33]  In addition, BDO USA, LLP ("BDO") and HelpMeSee filed statements in response to the Debtor's filings.[34]

---

[27] *See Endorsed Order,* Docket No. 211.

[28] *See Status Report and Revised Work Plan*, Docket No. 213.

[29] *See Examiner's Second Letter Request*, Docket No. 246.

[30] *See Endorsed Order*, Docket No. 248.

[31] *See Order to Show Cause*, Docket No. 249.

[32] *See Debtor's Response to Order to Show Cause Dated September 25, 2017*, Docket No. 250.

[33] *See Declaration of Pamela A. Mann in Support of Debtor's Response to Order to Show Cause dated September 25, 2017*, Docket No. 251, and *Declaration of Hana Fuchs in Support of Debtor's Response to Order to Show Cause date September 25, 2017*, Docket No. 252.

[34] *Statement of BDO USA, LLP Regarding Debtor's Response to Order to Show Cause dated September 25, 2017*, Docket Nos. 256, *Help Me See, Inc.'s Response to Debtor's Response to Order to Show Cause Dated September 25,*

A hearing on the Order to Show Cause, was held on October 12th, and on October 16th, the Court issued an Order adjourning the hearing on the Order to show Cause pending the filing of the Examiner's Report.[35]  At that hearing the Court directed the Examiner to file his report by October 20th or file a statement as to why he could not complete his report by that date, and also instructed BDO to file a status report with respect to its audit as of that date.  On October 19, the Examiner sent a letter to the Court a letter indicating that his Report would be filed on or before October 25th, which the Court endorsed on October 19th.[36]  BDO subsequently filed its status report indicating that it could not give a definitive date for the completion of the audit.[37]

At the hearing on October 12th, it was also disclosed to the Court that the Debtor had hired two "temporary employees" to assist it in working with BDO towards the completion of the audit.  Several parties at the hearing questioned whether these two persons should be considered ordinary course temporary employees or retained professionals.  Following discussions with the U.S. Trustee, Debtor agreed to file retention applications.

### B.      Establishment of Rule 2004 Subpoena Authority

Shortly after his appointment, the Examiner sought an order from the Bankruptcy Court authorizing him to issue subpoenas without the need to file a separate application under Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for each respondent having documents and information relevant to the investigation.[38]  The Examiner sought such relief in recognition of the cost and time efficiencies that could be gained by not

---

*2017*, Docket No. 58, and *Declaration of Peta Gordon in Support of Help Me See, Inc.'s Response to Debtor's Response to Order to Show Cause Dated September 25, 2017*, Docket No. 259.

[35] *See Order Adjourning Hearing on Order to Show Cause*, Docket No. 267.

[36] *See Endorsed Order*, Docket No. 270.

[37] *See Status Report of BDO USA, LLP Regard Audit of Debtor's 2016 Financial Statements*, Docket  No. 272.

[38]*See Motion of the Examiner for Entry of an Order (I) Granting Authority to Issue Subpoenas for the Production of Documents and Authorizing the Examination of Persons and Entities, and (II) Establishing Confidentiality*, Docket No. 180.

needing to request authority to issue each discrete subpoena. The Examiner's request was granted by the Bankruptcy Court without objection on June 21, 2017.[39]

### C. Discovery Conducted in Furtherance of Investigation

#### 1. Initial Meetings with the Debtor and Interested Parties

Following his appointment, the Examiner and his counsel held separate in-person meetings with the Debtor and HelpMeSee, in order to become familiar with the facts and circumstances leading up to the filing of the case. The Examiner also had telephone discussions with the U.S. Trustee and the Charities Bureau of the New York State Attorney General (the "NYAG") to begin a dialogue and facilitate open lines of communication with respect to the investigation. The Examiner's initial discussions with the U.S. Trustee and the NYAG were followed by several additional follow-up calls as well as an in-person meeting with the NYAG.

#### 2. Document Collection and Review

In addition to a number of informal requests for documents and information, the Examiner's counsel served formal document and information demands upon the Debtor as a tool to ensure that the Debtor and its counsel, on the one hand, and the Examiner and his counsel, on the other hand, were in agreement regarding the information needed by the Examiner to conduct his investigation. The Debtor electronically produced over 700,000 email records and over 12,000 other documents. These documents included, among other things, email correspondence, non-email correspondence, board minutes and presentations, financial documents, corporate organizational documents, policy and procedural manuals, donor solicitation materials, grant making materials, grant monitoring materials, payroll reports, expense reports, and the arbitration record.

---

[39] *See Order (I) Granting Examiner Authority to Issue Subpoenas for the Production of Documents and Authorizing the Examination of Persons and Entities, and (II) Establishing Confidentiality* (the "Rule 2004 Order"), Docket No. 189.

In lieu of undertaking the exercise of agreeing on a set of search terms with the Debtor's counsel and wary of the discovery abuse findings of fact contained in the Arbitration Award, the Examiner determined that it would be more appropriate and efficient to obtain all email records from each of the Debtor's employees from inception through June 2017 and to then independently cull the collection. While the result was an enormous number of email records for such a small organization in existence for such a relatively short period of time, the decision proved to be prudent. The Debtor's original production of emails omitted emails sent and received by Janet Huang, the Debtor's Marketing Director, during the three months prior to the Petition Date, and included only a portion of the emails sent and received by Mullaney during August and September 2013, when the Debtor was negotiating several of its loans.[40] If the Examiner had not requested all emails from all employees, emails sent and received during critical time periods may not have been part of the Examiner's investigation.

While all of the email records were searchable, most of the other documents were produced by the Debtor in a non-searchable format. This required the Examiner's professionals to expend substantial time, independently and in coordination with the Debtor's counsel, organizing the Debtor's documents to facilitate their review. Moreover, during the course of the review, the Examiner's professionals found references to additional responsive documents that had not yet been produced, necessitating specific follow up requests to the Debtor for documents, conferences with the Debtor's counsel relating to such follow up requests, and further review of documents.

Pursuant to the Rule 2004 Order, the Examiner issued subpoenas for the production of documents upon (1) Direct Mail Processors, Inc., (2) HSBC Bank USA, N.A., (3) American

---

[40]Debtor's counsel promptly addressed the gap in production once it was raised by the Examiner.

Express Company, (4) PayPal Holdings, Inc., (5) ProTravel International, LLC, (6) Vanguard Marketing Corporation, (7) ADP, LLC, (8) BBB Wise Giving Alliance, and (9) Pearl Meyer & Partners, LLC. These parties collectively produced nearly 23,000 additional records, including numerous voluminous native spreadsheets. These documents included, among other things, correspondence, credit card statements, bank statements, investment account statements, payroll reports, caging reports, and donation detail reports. The Examiner also obtained a copy of the report prepared by Grant Thornton at the request of the SmileTrain Board of Directors in connection with that board's investigation of certain compensation and expense issues concerning Brian Mullaney's conduct as chief executive of that charity.

Given the magnitude of documents produced by the Debtor and other third party subpoena recipients, the Examiner and his professionals were forced to triage and prioritize the review of email records and documents. Therefore, to ensure adequate depth and breadth of review, the Examiner determined to run targeted searches for email records containing narrow key search terms and to conduct a sampling review of the remaining email records. Nevertheless, it was still necessary to review over 25,000 email records and documents, comprising tens of thousands of unique pages.

### 3. Witness Interview Process

The interview process began with informal interviews conducted by the Examiner's financial advisor with the Debtor's employees. These informal interviews provided the Examiner with necessary background knowledge on the Debtor's operations, policies, and procedures on a variety of topics, but particularly with respect to fundraising and the Debtor's treatment of restricted and unrestricted donations.

Once the Examiner believed he had gained a solid knowledge base of the Debtor's operations through the informal interview process and extensive document review, he

determined that it was necessary to conduct formal interviews of key employees of the Debtor and certain members of the Debtor's Board of Directors. Because of the short amount of time permitted for conducting the investigation, the Examiner limited the list of interviewees to those persons associated with the Debtor that the Examiner believed could meaningfully clarify the factual record developed through a review of produced documents.

The Examiner and his advisors conducted eight formal interviews, and the Examiner participated in each one. Unlike in a deposition, in which one party typically asks questions at a given time, the Examiner and his counsel both posed questions. Participating in each of the interviews allowed the Examiner to personally evaluate witness demeanor and credibility and to actively participate in questioning.

Six of the interviews were conducted in-person or by video conference and were transcribed. Although the Examiner did not request that interviewees take an oath, witnesses were admonished at the outset that all of their answers be given as though the interviewee were under oath. While the Examiner believed that there was benefit in terms of witnesses being forthcoming if their interviews were not conducted like sworn depositions with the inevitable objections that accompany deposition testimony, he concluded that transcripts were necessary to avoid disputes as to what was said by particular witnesses. Having transcripts also provided the Examiner with a more usable format from which to draw his conclusions for his report.

The remaining three interviews were conducted by phone and an attorney for the Examiner took copious notes to adequately memorialize the information gleaned from those interviews. Counsel for the Debtor was present at each of the interviews of an individual associated with the Debtor, with the exception of Dysart.

The following are the people formally interviewed, the dates of the interviews, and the form of the interview:[41]

| Interviewee | Title | Date of Interview | Interview Form |
|---|---|---|---|
| Karen Lazarus | Director of Strategic Projects | 8/8/17 | in-person |
| Ujjal Bhattacharya | Program Officer, India | 8/9/17 | video conference |
| Janet Huang | Marketing Director | 8/9/17 | in-person |
| Hana Fuchs | Chief Financial Officer | 8/14/17 and 8/15/17 | in-person |
| Brian Mullaney | Chief Executive Officer | 8/16/17 and 8/17/17 | in-person |
| John J. Coneys | Lead Independent Director | 8/22/17 | telephone |
| DeLois Greenwood | Chief Program Officer | 8/23/17 | in-person |
| Ravi Kant | Former Director | 9/15/17 | telephone |
| Theodore Dysart | Former Director | 10/5/17 | telephone |
| Maria Ferrari | Photoshop Instructor | 10/18/17 | telephone |

On balance, the Examiner believes that the interviews were helpful in assisting the Examiner in understanding the Debtor's business operations, policies, and procedures and in giving the principals of the Debtor a forum to provide further insight to the Examiner on facts and circumstances not readily discernable on the face of the documents reviewed by the Examiner and his advisors. Nevertheless, the Examiner had the impression that several of the interviewees were less than candid. For example, one interviewee did not recall the details of transactions that occurred only a few months ago, and the Debtor's employees all deferred to Mullaney to provide answers to topics that should have been within their own purview and knowledge. Accordingly, the Examiner was forced to make judgments about each of the interviewees to assess their credibility based on inconsistencies in their answers and between their answers and the printed record, and to consequentially expend additional time reviewing email records and documents to verify the veracity of certain responses he received during the interviews.

---

[41]All in-person formal interviews were conducted at the New York offices of Loeb & Loeb LLP.

### 4. Additional Meetings with Interested Parties

In addition to the formal and informal interviews conducted of the Debtor's employees and certain members of the Debtor's Board of Directors, the Examiner and his financial advisors also participated in a conference call with BDO, the Debtor's fiscal year 2016 auditor. The Examiner's financial advisors facilitated the call to better understand the status of the Debtor's audit and the issues impeding the completion of the audit.

Throughout the Investigation, the Examiner and his professionals had regular contact with Debtor's bankruptcy counsel, Carter Ledyard. While Carter Ledyard ultimately produced what the Examiner requested, the Examiner was frequently required to make multiple demands before certain materials were produced. Often the delay was blamed on limited resources and staff, and given the volume of material produced there is some merit to that argument. In hindsight, having counsel filter the production certainly led to some delays. However, to its credit, counsel did not refuse to produce any documents based on assertions of privilege or attorney work product. Carter Ledyard's assistance was crucial, though slow, in the difficult task of matching bates-stamped solicitations to receipts in the Debtor's DMI donor management system.

As noted above, after his initial communications, the Examiner met with and had a number of telephone calls with the NYAG. The Examiner also obtained information from the NYAG by filing FOIL requests.

Finally, at the request of counsel to HelpMeSee, the Examiner and his counsel met in person on two occasions. Also, counsel for the Examiner had several telephonic conversations with counsel for HelpMeSee. During these contacts, HelpMeSee had the opportunity to provide its views and insights on further areas for investigation.

### 5. Confidentiality and Privilege Issues

The Examiner Order contemplated that the report would contain confidential and otherwise privileged information that should not be disclosed or that discovery respondents would not want disclosed. It provided that "to the extent that the Report contains the identities of any of the Debtor's donors or grantees or the identities of any patients of any of the Debtor's grantees such information shall be redacted prior to filing and an un-redacted courtesy copy of the Report shall be delivered to the Court . . ."[42] The Examiner Order further provided that "all privileges, protections, confidentiality, and immunities shall remain in full force and effect as to any information provided to the Examiner . . ."[43]

Consistent with these provisions, the report is initially being filed under seal. The Examiner will deliver un-redacted copies to the Court and the U.S. Trustee. The Examiner will also deliver a redacted copy, deleting the items specifically referenced in the Examiner Order, such as donor and grantee names, to Debtor's counsel. The Examiner would hope to reach quick agreement with the Debtor's counsel in an attempt to agree on any further redactions of or allegedly privileged or confidential information so that the balance of the report may be unsealed. Absent agreement, the Examiner will submit any disputes to the Bankruptcy Court for resolution.

### D. Legal Research Conducted to Form Conclusions

To reach the conclusions and make the recommendations set forth in this Report, it was necessary for the Examiner and his counsel to conduct legal research on a number of areas of the law beyond traditional bankruptcy law principles, including New York non-for-profit law, Delaware corporate law, and tax law, and to attempt to reconcile the competing policy priorities

---

[42]Examiner Order at 3, Docket No. 110.

[43]*Id.* at 4.

of each. Because there is limited reported case law on nonprofits in bankruptcy, the Examiner's

counsel also conducted a review of the dockets of certain nonprofit cases in an attempt to obtain

additional guidance that was otherwise unpublished. In the end, the Examiner concluded that the

fact pattern of this case presents what appear to be a number of issues of first impression.

Accordingly, reaching the conclusions and making the recommendations set forth in this Report

required utilizing the Examiner's extensive knowledge of New York not-for-profit law and

available case law guidance.

### E.  Forensic Analyses

The Examiner's professionals did not set out to audit the Debtor. However, as a result of

the inadequate, inconsistent, and in some cases, questionable recordkeeping, the Examiner was

faced with a much larger task than originally contemplated.

Many of the issues addressed throughout this report are informed by the various analyses

performed by Goldin Associates, in cooperation with the Debtor's counsel. In the course of its

work, Goldin Associates uncovered and commented on all of the material issues that the

Examiner has since learned are preventing the completion of BDO's audit of the Debtor's 2016

fiscal year. Certain of the conclusions expressed in the Report are therefore caveated by the fact

that in many respects, the Examiner was dealing with unaudited numbers. However, for reasons

described and discussed throughout this Report, the Examiner believes the analysis he was able

to conduct is sufficient to reach the conclusions expressed.

Among the issues noted, and addressed various ways throughout the Report, were the

following:

- Issues related to the compensation and expense reimbursement of the Debtor's CEO,
  including as to the amount, treatment, and reporting thereof;

- Issues surrounding the Debtor's practices with respect to its treatment of restricted and unrestricted funds, including both recording, tracking, reporting and spending;

- Although generally beyond the scope of this Report, issues related to accounting practices, such as the treatment of "in-kind" contributions and joint cost allocation; and

- General concerns about certain of Debtor's business practices.

To address these concerns, among other things, the Examiner and his professionals reviewed:

- Debtor's general ledger, including performing a sources and uses analysis since inception through December 28, 2016, including:

  o Review of journal detail and preparation of schedules and analyses from the general ledger data;

  o Preparation of various analyses from the general ledger financial data; and

  o Testing the general ledger, including reconciling amounts/balances to the audited financial statements, Form 990 and the DMI System.

- Official and unofficial records regarding Brian Mullaney's compensation, including deferred compensation and payments to and from Mullaney, and an analysis of the Mullaney "payroll ledger" discussed later in this Report.

- Credit card account statements, particularly those related to Mullaney, including travel, commuting charges and likely personal charges.

- Bank and investment accounts, including transfers made into the Vanguard investment account.

The Examiner also investigated and prepared analyses of the Debtor's allocations between its restricted and unrestricted fund balances, including preparation and review of analyses to determine what the restricted balance should be at December 28, 2016.

Goldin Associates conducted a review of, and performed testing on, the Debtor's DMI donor management system, including a review of donations, recording, reporting and classification of donations and donors, and extracting data for various analyses prepared at the request of the Examiner and his counsel.

Separate analyses were conducted with respect to matching gifts, grants, and impact loans as well as specific fundraising practices, such as "check the box" response solicitations.

The Examiner's professionals also reviewed Debtor's monthly operating reports for certain post-petition activities, specifically donations received and reviewed financial document productions by the Debtor and third parties, including those relating to functional expense allocation, and reviewed Debtor's historical financial statements and Form 990s.

14592424.11
228676-10002

## IV.  STATEMENT OF BACKGROUND FACTS[44]

### A.  Corporate History and Organization

The Debtor was established by Mullaney as a Delaware non-profit corporation under the name Surgery for the Poor, Inc. on March 7, 2011.[45]  Corporate resolutions appointing Mullaney, Theodore Dysart ("Dysart"), and Ravi Kant ("Kant") as initial directors of the Debtor were passed on March 8, 2011.  The resolutions also appointed Mullaney as president of the Debtor, Dysart as the Treasurer/Secretary, and adopted the Debtor's initial Bylaws.

The Debtor's tax exempt status under section 501(c)(3) of the Internal Revenue Code ("IRC") was approved by the Internal Revenue Service (the "IRS") on September 1, 2011.[46]  As of September 9, 2011, the Debtor was authorized to do business in New York under the name Defeat Childhood Maladies.[47]  On April 13, 2012, the Debtor filed a Certificate of Amendment changing its name from Surgery for the Poor, Inc. to WonderWork, Inc.[48]  However, the Debtor did not file any similar amendment to its name in New York, and as of the Petition Date, was still listed as operating under the name Surgery for the Poor.

In August 2012, the Debtor registered the names FirstStep and BurnRescue as DBAs with the state of Delaware.[49]  The Debtor registered the name 20/20/20 as a DBA in January 2013[50][51]

---

[44] The appendix of documents supporting the conclusions set forth herein is divded into two categories.  The first category includes the transcripts of all interviews conducted by the Examiner and the exhibits thereto.  References to this appendix refer to the interviewee and the page and line of the transcript or to an exhibit introduced during the interiew.  The second category includes other supporting documentation that the Examiner relied upon in forming his conclusions.  References to this appendix are to Doc. Ex. __.

[45] While Mullaney is listed as the Debtor's co-founder, there are in fact no other founders of the Debtor.  *See* Mullaney Tr. 8/16/17, 113:13 – 23.

[46] Doc. Ex. 1 (WON-EX 000060).

[47] Doc. Ex. 2 (WON-EX 013282).

[48] Doc. Ex. 3 (WON-EX 000014).

[49] Doc. Ex. 4 (WON-EX 13287 and WON-EX 13290).

[50] Doc. Ex. 5 (WON-EX 013284).

However, the Examiner discovered no evidence to indicate that the Debtor ever registered any of the DBAs or the name WonderWork under New York law, either in county records or with the NYAG.

## B.    The Debtor's Purpose

Upon incorporation, the Debtor listed its purpose as to:

> provide treatment, surgery, and related assistance to children in developing countries suffering from disease, illness, or malady, including but not necessarily limited to blindness, cleft palate, club food, hydrocephalus, and burns; and to further support and educate doctors and the public on potential treatments and surgical techniques, as well as creating general awareness of these maladies and available treatments.

In its Form 1023 application for tax exemption, which the Debtor filed with the IRS on May 26, 2011, the Debtor represented that it would not be fundraising for other organizations.[52] The Debtor never subsequently informed the IRS that it would be fundraising for any other organization. The Debtor also never registered with the state of New York as an entity that would fundraise for any other organization. By the Certificate of Amendment the Debtor filed in April 2012, the Debtor changed its stated purpose by removing cleft palate as a cause, and restated its purpose as to provide "to provide "assistance to children and adults everywhere, including those in developing countries, suffering from disease, illness, or disability, including but not necessarily limited to *blindness, clubfoot, hydrocephalus, pediatric cardiac surgery, and burns*" (emphasis added). The Debtor also added that its purpose was "to further support medical institutions and other charitable organizations engaged in the provision of" the services

---

[51]Doc. Ex. 6 (WON-EX 010278).

[52]Doc. Ex. 7 (WON-EX 000035).

supported by the Debtor.[53]  As explained in the Debtor's solicitation materials, the need in the developing world for donations towards these causes is significant.

### 1. Blindness

According to the Debtor's solicitation materials, there are 20 million needlessly blind children and adults in the world,[54]  half of whom could "see tomorrow thanks to a miracle surgery that costs only $300."[55] The Debtor has identified a number of doctors and/or hospitals which provide 15 minute "miracle" surgeries for blind children and adults in the world's poorest countries.

### 2. Burns

In its solicitation materials, the Debtor states that "[b]urns are the biggest global health problem you have never heard of."[56]  The Debtor then outlines how more than one billion people worldwide still cook over open fires and cheap stoves or use kerosene lamps, thereby subjecting themselves to the possibility of severe burn accidents.  According to the Debtor, many burn victims do not survive their injuries due to their inability to pay for treatment, and those that do survive, are often horribly scarred and disfigured.  Inhibited in their range of movement and function, burned children can often no longer attend school and burned adults can often no longer work or care for their families.  The Debtor states in its solicitations materials that it has identified partner surgeons and hospitals which provide reconstructive burn surgery for as little as $300.

---

[53]*Id.*

[54] Doc. Ex. 8 (WON-EX 041353).

[55] Doc. Ex. 9 (WON0317).

[56] Doc. Ex. 10 (WON04093).

### 3. Clubfoot

Clubfoot is a debilitating birth defect which leaves babies born with feet that twist inward preventing them from standing, walking or functioning normally. People born with clubfoot are often treated as social outcasts suffering emotional harm in addition to the already painful physical realities of their condition. As the Debtor describes in its solicitation materials, clubfoot can be cured through a series of casting, known as the Ponseti method.[57] This noninvasive treatment manipulates the foot through a series of casts to straighten out the twisted limb and has a success rate of 95%.[58] The Debtor states in its solicitation materials that it has partner doctors and hospitals which treat clubfoot for $250.

### 4. Hydrocephalus

Hydrocephalus, also known as "water on the brain," is a build-up of fluids in the brain which in babies can cause the head to grow disproportionately large. In older children and adults, symptoms often present themselves as problems with vision, balance, slower development, impaired bladder function and many others. The treatment for hydrocephalus involves inserting a shunt system into the brain in order to drain excess fluid from the brain.[59] The Debtor only briefly raised funds for this cause.

### 5. Cardiac Surgery

Referring to a number of different birth defects affecting babies and small children, "Hole in the Heart", if not treated, impacts blood flow within the heart muscle. The Debtor explains in its solicitation materials, that the vast majority of these issues can be fixed by a simple cardiac

---

[57] Doc. Ex. 11 (WON02440).

[58] *Id.*

[59] Doc. Ex. 12 (WON-EX 041380).

surgery to patch the hole, costing $2,000.[60]  Like hydrocephalus, the Debtor only briefly raised funds for this cause.

### C.      The Debtor's Mission

In brochures and other materials, the Debtor touts its mission to provide "free, life-changing surgeries for children and adults who are blind, severely burned or crippled with clubfoot.  Instead of sending American doctors on missions, WonderWork empowers local doctors through free training, equipment and financial aid."[61]  However, as detailed in this Report, while the Debtor's mission is admirable and its business model appears sound on the surface, the reality of the Debtor's operations departs substantially from this stated purpose.  In practice, not only does the Debtor not provide training or equipment, the Debtor provides very few grants for surgeries as a percentage of the total funds it raises.  The Debtor raised approximately $46.4 million and only paid approximately $8.0 million in grants from Fiscal Year ("FY") 13[62] to the Petition Date.  In fact, the Debtor has historically spent only 17% of the amount raised in donations on grants, and more than three times that amount on fundraising materials and supposed public education campaigns, sent with its fundraising materials to prospective and current donors.[63]

### D.      Initial Fundraising Efforts

The Debtor operated in what appears to be two parallel realities for the first year and a half of its existence.  On one path, the Debtor negotiated a Services Agreement with HelpMeSee,

---

[60] Doc. Ex. 13 (WON-EX 041381).

[61] Doc. Ex. 14 (WW_EMAILS0070023) (February 12, 2016 email from Lazarus to Mullaney with draft application for BBB accreditation stating the Debtor's standard mission statement).

[62] WonderWork's fiscal year runs from July 1st through the following June 30th, therefore its fiscal year end is June 30th.

[63] The total expenses reported on printing, publication and postage exceeds $25 million.  This issue is discussed in greater detail *infra* in connection with the Debtor's joint cost allocation practices.

executed the agreement, and performed management tasks for HelpMeSee thereunder. On the other path, the Debtor acted for its own benefit by cultivating major donors, raising substantial start-up capital donations, and then launching its own direct mail marketing program to seek donations for its own causes. These major donors believed the Debtor was acting for itself. In reality, the Debtor was representing to HelpMeSee that it was courting these donors for HelpMeSee without success. When the truth came out and the paths collided, it resulted in the termination of the Services Agreement by HelpMeSee, and, ultimately, the Arbitration Award.

### 1. The Debtor's Relationship With HelpMeSee[64]

#### a. Mullaney, Thazhathu and Ueltschi Begin Exploring Opportunities for Collaboration

At the end of 2009 and in early 2010, while he was still at SmileTrain, Mullaney began speaking with James Ueltschi ("Ueltschi") and Mohan Thazhathu ("Thazhathu"),[65] who were both still working with Orbis International ("Orbis"). Orbis is a nonprofit that fights avoidable blindness using their Flying Eye Hospital, which is an airplane that has been adapted into a state-of-the-art teaching facility, including an operating room, classroom and recovery room.[66] In January 2010, Mullaney met with Thazhathu and Ueltschi to discuss a potential partnership between SmileTrain and Orbis in the event SmileTrain expanded its mission to include blindness as a cause. Over the next several months, Ueltschi and Mullaney continued to communicate and met on a few occasions. Ueltschi wanted to expand Orbis's mission to using an eye surgery simulator to train professionals to perform cataract surgeries (the "Cataract Initiative").

---

[64] As these issues were the subject of the Arbitration between the Debtor and HelpMeSee, this summary is meant only to provide context for the remainder of the Report and is in no way meant to be a substitute for the substantial arbitration record developed in connection with the Arbitration Proceedings.

[65] Doc. Ex. 15 (Respondent 1); Doc. Ex. 16 (Claimant 6).

[66] Orbis International is a non-profit that fights avoidable blindness. *See* http://www.orbis.org/ (last visited Oct. 18, 2017).

Mullaney agreed to share some of his marketing knowledge with Ueltschi and helped Ueltschi and Thazhathu make a presentation to the Orbis board pitching the Cataract Initiative.

In April 2010, Orbis determined not to pursue the Cataract Initiative directly, but offered to reassign Thazhathu to the project where he would report to the Orbis board and Ueltschi.[67] Instead of continuing to work with Orbis, Ueltschi decided it would be better to form a completely separate 501(c)(3) nonprofit focused exclusively on cataract blindness, and asked Mullaney to be a co-founder of the charity.[68] Mullaney had his own plans. By that time, Mullaney's future at SmileTrain was unclear, but he knew he wanted to focus on curing more surgical diseases than just clefts and cataract blindness.[69] By June 2010, when the SmileTrain board rejected Mullaney's plan to expand SmileTrain's mission to other causes, Mullaney began exploring the possibility of becoming a consultant for two or three charities and offered his services to Ueltschi.[70] Ueltschi was interested in the idea. Ueltschi and his father launched HelpMeSee in August 2010, after Mullaney donated intellectual property, including the name for the charity and the logo.[71]

### b. Mullaney Departs from SmileTrain and the Services Agreement is Negotiated

In September 2010, Mullaney was terminated from SmileTrain. SmileTrain has alleged that Mullaney's termination was the result of an internal investigation conducted by its audit committee into Mullaney's activities in attempting to expand the mission beyond cleft repair.[72]

---

[67] Doc. Ex. 17 (Claimant 11).

[68] Doc. Ex.18 (Claimant 12).

[69] Doc. Ex. 19 (Claimant 13).

[70] Doc. Ex. 20 (Claimant 16 ).

[71] Doc. Ex. 21 (Claimant 20).

[72] *SmileTrain, Inc. v. Mullaney*, No. 12-cv-9102 (JGK) (S.D.N.Y. 2013) at Docket No. 4 ¶ 12.

SmileTrain and Mullaney entered into a separation agreement in October 2010.[73] SmileTrain then conducted an investigation lead by Grant Thornton into Mullaney's expense and compensation practices,[74] resulting in Mullaney's W-2s for 2006 to 2010 being restated.[75] After the Separation Agreement was negotiated, SmileTrain apparently learned of a book deal that Mullaney had entered into with Hyperion books and decided to withhold certain payments owed to Mullaney under the Separation Agreement. In March 2011, Mullaney played a role in halting SmileTrain's proposed merger with another charity, Operation Smile. HelpMeSee has alleged that Mullaney did not inform Ueltschi and Thazhatzu about the circumstances of his separation from SmileTrain, the internal investigations, or his role in the failed Operation Smile merger.

Instead, over the next ten months, Mullaney informed Ueltschi and Thazhatzu about his work to incorporate the Debtor under Delaware law, and to meet with potential major donors that might support his new charity.[76] He also continued to negotiate with Ueltschi and Thazhatzu about how to structure Mullaney's relationship with HelpMeSee, including exploring the possibility of his serving as HelpMeSee's marketing manager,[77] having HelpMeSee be a division of the Debtor,[78] or for the Debtor to act as a consultant to HelpMeSee. They ultimately agreed that the Debtor would act as a manager for HelpMeSee, including managing and monitoring HelpMeSee's fundraising and marketing programs and providing strategic advice and services related to HelpMeSee's programs.

---

[73] Doc. Ex. 22 (Claimant 5.

[74] Doc. Ex. 23 (Grant Thornton Report).

[75] Doc. Ex. 24 (Respondent 1076).

[76] *See,.e.g.*, Doc. Ex. 25 (Claimant 28).

[77] Doc. Ex. 26 (Claimant 23).

[78] Doc. Ex. 27 (Claimant 27).

### c.     The Services Agreement

The Agreement by and between HelpMeSee and the Debtor, dated August 31, 2011 (the "Services Agreement") sets forth the terms and conditions of the Debtor's management responsibilities to HelpMeSee.[79]   The term of the Services Agreement was supposed to run from September 1, 2011 through September 1, 2016, but HelpMeSee had the right to terminate the agreement (1) upon thirty day's written notice to the Debtor of a material breach without cure, or (2) at any time after the first year upon six months' written notice to the Debtor.[80]   HelpMeSee also had the right to terminate the Services Agreement if events arose surrounding Charles Wang or SmileTrain that would impair the Debtor's or its personnel's ability to devote their full time and attention to performing under the Services Agreement, which included the publication of potentially adverse publicity involving the Debtor or its personnel or the commencement of any proceeding or action.[81]

The Debtor agreed to perform a variety of Services (as defined in the Services Agreement) for HelpMeSee.[82]   As set forth on the Services Schedule attached to the agreement, the Debtor agreed to provide all "back office" support for HelpMeSee's direct mail marketing campaign including, for example, providing strategy advice, identifying donor lists, supervising all contractors needed to design, print and mail the campaigns, and operating a call center to respond to donor inquiries.  The Debtor was also responsible for overseeing the caging company that would receive donations to HelpMeSee and for ensuring that all donor information was properly maintained in HelpMeSee's donor database.  The Debtor was responsible for designing

---

[79] A copy of the Services Agreement can be found at Doc. Ex. 28 (Claimant 4).

[80] *Id.* at Services Agreement § 5.

[81] *Id.* at Services Agreement § 5.3(a)(ii).

[82] *See id.* at Annex C (setting forth all of the Services that the Debtor was required to perform for HelpMeSee under the Services Agreement).

and coordinating with contractors to create marketing materials and a website for HelpMeSee, for identifying marketing opportunities for HelpMeSee, and for hiring and managing HelpMeSee's relationship with a public relations firm.

The Debtor was also responsible for maintaining HelpMeSee's books and records, including paying contractors, maintaining the general ledger, and selecting necessary financial software programs. HelpMeSee was entitled to audit the books and records relating to the Services at any time during normal business hours.[83]

Finally, the Debtor was responsible for creating a "grant application program" substantially similar to the program Mullaney designed for SmileTrain, meant to provide mailings, grant reports, and grant renewal applications to corporations and foundations. This included actively soliciting former SmileTrain donors.[84]

The Debtor agreed that HelpMeSee would be its only client for the first six months of the term,[85] but that the Debtor would not provide, even after the first six months, any similar services to another entity whose corporate or charitable purpose related to vision or blindness without HelpMeSee's consent during the term of the agreement.[86] The Debtor was allowed, however, to raise money for non-blindness programs. HelpMeSee and the Debtor set forth projected income for HelpMeSee over the first year, including approximately $6 million in direct mail marketing revenue in the first year and $1.1 million in Ancillary Income in the first year.[87] "Ancillary

---

[83] Services Agreement § 3.3(b).

[84] *Id*. at Services Agreement § 7.3(b).

[85] *Id*. at Services Agreement § 2.8.

[86] *Id*. at Services Agreement § 2.7.

[87] *Id*. at Services Agreement, Annex A.

Income" was defined as "gross revenues (calculated in accordance with GAAP) generated by the Company in fundraising efforts unrelated to the DMM Campaign."[88]

In return for providing the Services to HelpMeSee, the Debtor was supposed to receive a fee of $2 million per year, payable in monthly installments of $166,666.67 per month.[89] However, the Debtor and HelpMeSee also agreed that, in any given month during the first thirteen months, the management fee owed to the Debtor and the Costs (as defined in the Services Agreement) incurred by HelpMeSee relating the direct mail marketing campaign could not exceed $2.1 million (the "Cap"). If the Debtor exceeded the Cap, even with HelpMeSee's approval, HelpMeSee was entitled to reduce the Debtor's management fee to cover the amount in excess of the Cap. [90]

Finally, the Debtor and HelpMeSee agreed that the Debtor would provide periodic grants and a one-time donation to HelpMeSee. During each year of the term of the Services Agreement, the Debtor was required to provide a grant to HelpMeSee equal to the highest aggregate amount donated by the Debtor to any other one nonprofit during the applicable twelve month period.[91] The Debtor was also required to make a $2 million donation to HelpMeSee before the end of the term of the Services Agreement (the "One-Time Donation").[92] If the Services Agreement was terminated before the end of the term, the One-Time Donation would be prorated based on the period of the term that had passed before the Services Agreement was terminated.

---

[88] *Id.* at § 1.1.

[89] *Id.* at Services Agreement § 3.1(b).

[90] *Id.* at Services Agreement § 7.5.

[91] *Id.* at Services Agreement § 7.6(a).

[92] *Id.* at Services Agreement § 7.6(c).

d.   **The Debtor Launches HelpMeSee's Direct Mail Program and the Relationship Deteriorates**

The contractual relationship between the Debtor and HelpMeSee began to deteriorate shortly after it got started on September 1, 2011.  The Debtor spent the first couple of months of the contract term coordinating with vendors and finalizing contracts with them on behalf of HelpMeSee.  By January 2012, HelpMeSee was disappointed with the direct mail results achieved by the Debtor, prompting the Debtor to provide HelpMeSee with a "donation" of $239,550.00 that the Debtor said it had raised from "friends and supporters" and was to be used for surgeries.[93]  HelpMeSee viewed the funds as Ancillary Income owed under the Services Agreement.

By February 2012, SmileTrain had sent HelpMeSee a letter arguing that HelpMeSee's mailings were remarkably similar to SmileTrain's copyrighted mailings, which was causing donor confusion.[94]  The Debtor and HelpMeSee were also evaluating whether the direct mail marketing revenue target for the first year of the Services Agreement could be met.  Mullaney viewed SmileTrain's letter as harassment but revised at least a portion of HelpMeSee's mailing moving forward as a result of the letter.[95]

Dealing with the shortfall in direct mail marketing revenue was more complicated. Mullaney argued that the first year of the contract for purposes of the targets should start after the testing period for the direct mail pieces was complete, but Thazhatzu disagreed.[96]  Mullaney then proposed a more aggressive direct mail marketing campaign that could meet the target, but needed permission to exceed the Cap to do so and did not want the Debtor's management fee

---

[93] Doc. Ex. 29 (Claimant 65).

[94] Doc. Ex. 30 (Claimant 68).

[95] Doc. Ex. 31 (Claimant 185).

[96] Doc. Ex. 32 (Claimant 179).

reduced by the amount the Cap was exceeded as would otherwise be required by the terms of the Services Agreement.[97] HelpMeSee declined to grant permission for the Debtor to exceed the Cap until May 2012 after the Debtor agreed to provide HelpMeSee with a $150,000 payment.[98] HelpMeSee termed the $150,000 payment a fee reduction while the Debtor termed the payment a grant.[99]

In April 2012, Mullaney also had a disagreement with HelpMeSee and another charity, Mercy Ships. The Debtor had made arrangements to view, photograph, and video surgeries sponsored by HelpMeSee occurring aboard Mercy Ship's hospital ship in Togo, but wanted to be able to use the photographs and video for its own fundraising purposes as well as for HelpMeSee. The Debtor offered Mercy Ships a $10,000 grant in exchange for permission to use the photos for its own purposes. Mercy Ships declined the grant and required the Debtor to sign a memorandum of understanding providing that the photos would be used solely for HelpMeSee's fundraising purposes.[100] The Debtor resisted, but ultimately signed the agreement with Mercy Ships (the "Mercy Ships MOU").[101]

### e. Termination of Services Agreement

In June 2012, the Debtor informed HelpMeSee that it was changing its name to WonderWork. The Debtor also notified HelpMeSee that it would begin testing direct mail for its other causes, and would be making a $400,000 grant to HelpMeSee restricted to surgeries and payable in three installments.[102] The Debtor's letter to its "Founding Donors" sent in June 2012

---

[97] Doc. Ex. 33 (Claimant 75).

[98] Doc. Ex. 34 (Claimant 99).

[99] Doc. Ex. 35 (Claimant 196).

[100] Doc. Ex. 36 (Respondent 293).

[101] Doc. Ex. 37 (Respondent 299).

[102] Doc. Ex. 38 (Claimant 107).

was a different message. The letter stated that the Debtor "was already providing free surgeries for thousands of poor children and adults. Working with our partner, HelpMeSee, 3,000 of these surgeries have already taken place." The letter then went on to tell the story of a young girl that had received surgery and attached photos taken aboard Mercy Ship's hospital in violation of the Mercy Ships MOU.[103]

When HelpMeSee learned of the letter sent to "Founding Donors" of the Debtor touting the Debtor's blindness work to date, it demanded to see the list of recipients. Mullaney refused to divulge the list on the basis that the letters were personal correspondence with major donors that HelpMeSee was not entitled to receive.[104] HelpMeSee informed Mercy Ships that the photos had been used in the letter.[105] The Debtor offered Mercy Ships a $25,000 grant for the use of the photos.[106] Mercy Ships declined and sent the Debtor a cease and desist letter.[107] On July 18, 2011, HelpMeSee informed the Debtor that it believed the Debtor was in material breach of the Services Agreement.[108] HelpMeSee then elected to pursue its audit rights under the Services Agreement.[109] Dissatisfied with the Debtor's compliance with the audit and its course of action over the prior months, HelpMeSee terminated the Services Agreement on August 8, 2012, arguing that it had cause for the termination.[110]

---

[103] Doc. Ex. 39 (Respondent 354).

[104] Doc. Ex. 40 (Respondent 400).

[105] Doc. Ex. 41 (Respondent 366).

[106] Doc. Ex. 42 (Respondent 386).

[107] Doc. Ex. 43 (Respondent 408).

[108] Doc. Ex. 44 (Respondent 413).

[109] Doc. Ex. 45 (Respondent 422).

[110] Doc. Ex. 46 (Respondent 431)

### 2. The Debtor's Initial Fundraising Efforts

#### a. Major Donors

Unbeknownst to HelpMeSee when it terminated the Services Agreement, Mullaney had actually raised several million dollars from former SmileTrain donors, despite representing to HelpMeSee that the Debtor anticipated coming far short of the Ancillary Income target set forth in the Services Agreement.[111] While Mullaney met with a number of potential donors to the Debtor prior to entering into the Services Agreement, no donations on account of those meetings were actually received until after the Services Agreement was signed. For example, Mullaney informed HelpMeSee in February 2011 that he thought ███████████████ may donate $5 million.[112] By November 2011, Mullaney told HelpMeSee that he was finalizing the deal with a donor in Washington D.C., referring to ██████.[113] The Debtor, not HelpMeSee, ultimately received a $1 million donation from the ████████████████████████ for which ██████ is trustee, in May 2012.[114]

In November 2011, Mullaney told HelpMeSee that he was visiting Switzerland to pitch a major SmileTrain donor.[115] Again, the Debtor, not HelpMeSee, received a $5 million donation from the ████████████████, payable in January 2012.[116] In December 2011, the Debtor received a commitment from ████████████[117] and ████████ for a $1 million donation, payable over five years.[118] When ██████ asked Mullaney about the relationship with

---

[111] Doc. Ex. 47 (Respondent 335).

[112] Doc. Ex. 48 (Claimant 39).

[113] Doc. Ex. 49 (Respondent 126 ).

[114] Doc. Ex. 50 (WW_EMAILS0179578).

[115] Doc. Ex. 51 (Respondent 126).

[116] Doc. Ex. 52 (WW_EMAILS0012660).

[117] ████████████████████████

[118] Doc. Ex. 53 (WW_EMAILS023691).

HelpMeSee, Mullaney said that the Debtor had "a services agreement with them and although we represent them, none of their donations or surgeries run through us."[119] From November 1, 2011 through May 2, 2012, the Debtor received approximately fifty-eight donations from "Founding Donors" totaling over $8 million.[120]

From these funds, the Debtor made the $239,550 "grant" to HelpMeSee in April 2012. At the time, Mullaney explained to Ueltschi and Thazhathu that "[f]ormer donors, friends and supporters" of the Debtor's management team are always solicited for the Debtor and not HelpMeSee but that HelpMeSee major donors would always be solicited only for HelpMeSee.[121] Mullaney said that the Debtor had raised the grant funds through its major donors to give to HelpMeSee as its blindness partner and said that he expected the Debtor to be able to raise much more "just as our contract calls for."

### b.    Launch of Direct Mail

The Services Agreement prevented the Debtor from engaging in any direct mail activities on its own behalf until March 1, 2012 but, by agreement with HelpMeSee, the Debtor agreed to expand the date until June 2012. When the Debtor began its own direct mail campaigns that month, it sent out test mailers under the WonderWork brand directed at identifying the first two causes that it would focus on beyond blindness.[122] Burns and clubfoot received the best response rates. Accordingly, the Debtor created names, logos and websites to raise funds for clubfoot (FirstStep) and burns (BurnRescue) and registered the DBAs with the state of Delaware. By the end of December 2012, the Debtor was representing that it had raised $454,000 for FirstStep, had acquired 10,850 donors, and that its partners and programs were helping children in 23

---

[119] *Id.*

[120] Doc. Ex. 54.(Claimant 308).

[121] Doc. Ex. 55 (Claimant 84).

[122] Lazarus Ex. 6.

countries.[123]  The Debtor was also representing that it had raised $590,000 for BurnRescue, had acquired over 14,150 donors, and that its partners and programs were helping children in 24 countries.[124]

In January 2013, because HelpMeSee had terminated the Services Agreement and the Debtor was no longer precluded from raising money for blindness, the Debtor registered the name 20/20/20 as a DBA with the state of Delaware.  The Debtor launched 20/20/20 as a brand in February 2013, with a plan to mail 1.5 million pieces of mail during the months of February and March 2013.[125]

### c.    SmileTrain Book Distribution

In Fall 2012, Mullaney distributed over a thousand copies of his book, "One Smile at a Time" (the "SmileTrain Book") to SmileTrain donors, and included his contact information at the Debtor.[126]  Mullaney said that distribution of the book resulted in thousands of dollars of donations to SmileTrain, and also to the Debtor.  The book also lead to receipt of ███████ █████, discussed in more detail below.  However, SmileTrain owned the copyright to the book, and had decided not to publish it, which lead SmileTrain to sue Mullaney in December 2012, as discussed in more detail below.

---

[123] Doc. Ex. 56. (WON-EX 009627).

[124] *Id.* at WON-EX 009631.

[125] Doc. Ex. 57 (WON-EX 001383).

[126] Mullaney Tr. 8/17/17,  403:14 – 405:10.

## V.  LEGAL ISSUES PLAGUE THE DEBTOR

The genesis of the Debtor's legal problems was Mullaney's falling out with Wang and his termination from SmileTrain.  Since nearly its inception, the Debtor has been plagued by lawsuits involving it and its officers.  As a result, the Debtor and its small staff have been forced to expend an exorbitant amount of time and resources defending lawsuits instead of advancing the Debtor's missions.  In the end, the myriad of lawsuits have influenced the Debtor's mission, have stymied the Debtor's growth, and have ultimately resulted in the Debtor's bankruptcy.

### A.  HelpMeSee Arbitration

#### 1.  Arbitration Proceedings

Shortly after HelpMeSee sent its notice of termination, the Debtor requested mediation, as set forth in section 9.13 of the Services Agreement.  Mediation failed and arbitration ensued beginning on March 21, 2013.  The Debtor asserted a claim for unpaid management fees owed under the Services Contract in the amount of $1,333,333.28.  HelpMeSee ultimately filed numerous counterclaims against the Debtor, including for breach of fiduciary duty, failure to pay the One-Time Donation, failure to pay the $400,000 grant pledge in June 2012, conversion, fraudulent concealment, and breach of contract.  Among the contract claims HelpMeSee alleged as breach of the Services Agreement audit provision, breach of the duty to disclose actions relating to SmileTrain and Wang, and failure to adhere to the requirement that the Debtor perform services relating to blindness only to HelpMeSee.

The Arbitration Proceedings did not end until Fall 2016, after forty-nine days of testimony from fourteen witnesses.  Among those witnesses were various individuals from SmileTrain.  Kaye Scholer represented HelpMeSee in the arbitration but also represents SmileTrain in various other litigations, resulting in Kaye Scholer attorneys eliciting testimony

from principals of their own client. HelpMeSee was represented by a full team of attorneys that ultimately billed fees of nearly $6 million. The Debtor was represented solely by Joe Vogel, and spent approximately $1.1 million in fees relating to the arbitration.

## 2. Arbitration Award

Ultimately, the arbitrator awarded HelpMeSee $8,128,348.00 in damages, less the $239,550, paid to HelpMeSee by the Debtor in January 2012, to equal the amount raised by the Debtor from "Founding Donors" during the term of the Services Agreement. The arbitrator also awarded HelpMeSee the $400,000.00 donation that the Debtor had pledged to make to it in June 2012, and another $386,849.00, which represented the prorated amount of the One-Time Donation as required by the section 7.6(c) of the Services Agreement. The arbitrator found the Debtor was entitled only to fees of $333,333.32 for the months of July 2012 and August 2012, and denied the Debtor all other relief.

The arbitrator also awarded HelpMeSee attorneys' fees and costs in the amount of $4.7 million, in part as a sanction for the Debtor's failure to comply with its discovery obligations in connection with the arbitration proceedings. The partial final Arbitration Award was issued on October 13, 2016, and directed HelpMeSee to file an affidavit setting forth the attorneys' fees it incurred in connection with the arbitration. The final Arbitration Award was issued on December 21, 2016.[127]

It is outside the scope of the Examiner's mandate to question the appropriateness of the Arbitration Award or the underlying fact determinations made by the arbitrator in reaching his conclusions. However, it is within the mandate of the Examiner Order to consider whether the Board exercised proper oversight of the Debtor in connection with the Arbitration. Given the

---

[127] Doc. Ex. 58 (Final Arbitration Award).

extensive discovery abuses and shortfalls found by the Arbitrator and the resulting award of nearly $5 million in attorneys' fees, there are at least colorable claims against Mullaney and the Board for failure to provide adequate direction during the course of the Arbitration.

### B. SmileTrain Related Litigations

#### 1. SmileTrain SDNY Litigation

In January 2013, SmileTrain brought a lawsuit against Mullaney alleging that Mullaney had infringed SmileTrain's copyrighted material and misappropriated SmileTrain's trade secrets, including its donor list (the "SDNY Action").[128] The SDNY Action alleged that Mullaney improperly distributed the SmileTrain Book to various donors, despite Mullaney's knowledge that SmileTrain owned the copyright to the book and that the SmileTrain board had determined not to publish the book.

Although the SDNY Action was brought against Mullaney directly and did not name the Debtor as a defendant, the Debtor's Board resolved to indemnify Mullaney up to $150,000 for the legal expenses he incurred in defending the action[129] since the Debtor was the beneficiary of certain donations obtained from donors that had received a copy of the book from Mullaney.[130] While the Debtor initially sought to submit a claim under its D&O policy, the insurer denied the claim since the underlying suit alleged actual wrongdoing.[131]

The SDNY Action was settled in July 2013. Ultimately, the Debtor spent $245,357.45 in legal fees defending Mullaney in the action,[132] even though no subsequent resolution was passed

---

[128]*SmileTrain, Inc. v. Mullaney*, No. 12-cv-9102 (JGK) (S.D.N.Y. 2013).

[129]Doc. Ex. 59 (Board resolution to indemnify Mullaney up to $150,000) (WON-EX 001257).

[130]Mullaney said that the ███████████████ came about because Mullaney had sent a copy of the SmileTrain Book to ███████.

[131]Doc. Ex. 60 (February 2013 email from Mullaney to Board explaining that Philadelphia Indemnity denied the claim) (WW_EMAILS0230163).

[132]Doc. Ex. 61 (Jones Day was paid $245,357.45).

authorizing the Debtor to indemnify Mullaney for any amount higher than $150,000.  Pursuant to the terms of the settlement agreement, the Debtor paid SmileTrain a $500,000 grant.  The Board approved the settlement agreement and Coneys signed on behalf of the Debtor.  The terms of the settlement agreement also required the Debtor to expunge all SmileTrain donors from its records.  However, with the apparent knowledge of counsel, the Debtor expunged the donors, later researched many of them, estimated the amount of donations they had given to the Debtor, and added the donors back into the donor data management system.[133]

## 2. SmileTrain UK Litigation

In 2013, Mullaney was sued by SmileTrain UK, the branch of SmileTrain formed to perform fundraising activities for SmileTrain in the United Kingdom, for the return of remuneration paid to Mullaney in violation the United Kingdom Charities Act of 1993 (the "UK Charities Act").[134]  SmileTrain UK had no office or employees and all of its work was performed in New York by employees of SmileTrain.  SmileTrain UK donated all funds that it raised to SmileTrain, less any expenses it incurred in the United Kingdom relating to fundraising activities.  Mullaney served as a director of SmileTrain UK, but also received compensation from SmileTrain UK between 2007 and 2011 totaling £633,509.  Under the UK Charities Act, Mullaney could not serve as a director and also receive compensation from SmileTrain UK absent a formal vote by the board of SmileTrain UK.  No formal vote was ever taken and Mullaney was ultimately ordered to repay £754,414 to SmileTrain UK.[135]

---

[133]Doc. Ex. 62 (WW_EMAILS0094513).

[134]Doc. Ex. 63 (Order entered in SmileTrain UK Litigation).

[135]██████ ultimately loaned Mullaney the money to pay the judgment entered against him in the SmileTrain UK action.  *See* Doc. Ex. 64 (email from ██████ to Mullaney informing him that   the wire was on its way for payment of the judgment) (WW_EMAILS0226534).

Mullaney took trips to London to defend himself at hearings in the SmileTrain UK action on October 18, 2013 and on November 4, 2013. The Debtor paid for Mullaney's flights and accommodations for both trips totaling over $14,000, even though the SmileTrain UK action was filed against Mullaney in his personal capacity and had nothing to do with the Debtor. Mullaney justified the Debtor's payment of the expenses because he purportedly met with potential donors during the trips as well. Mullaney also enlisted help from Fuchs and Lazarus during work hours in assisting him in preparing a defense to the SmileTrain UK lawsuit, even though it had no effect on the Debtor.

### C.     Shaheen Lawsuit

In January 2012, SmileTrain brought a lawsuit against Gregory Shaheen and his company, Ferris Consulting, Inc. (the "Shaheen Lawsuit").[136]  Shaheen provided information and technology outsourcing services to SmileTrain from May 2004 through July 2011.[137]  The complaint alleged that Shaheen had assisted Mullaney in obtaining confidential and proprietary information from SmileTrain during the time period that Mullaney was in a "transition period" under his Separation Agreement with SmileTrain.

To support its claims, SmileTrain subpoenaed Mullaney, demanding that he produce documents and appear for a deposition in July 2013. Mullaney sought to quash the subpoena via order to show cause supported by a fully briefed memorandum of law and affidavit in support. The state court granted Mullaney's motion to quash the subpoena in September 2013 after oral argument. Mullaney later appeared for a short deposition in the matter in February 2015.

---

[136]*SmileTrain, Inc. v. Ferris Consulting and Gregory Shaheen*, No. 653381/2011 (Sup. Ct. N.Y. Cty. 2011).

[137]Incidentally, Shaheen and Ferris Consulting provided similar services to the Debtor until 2016.

Per Fuchs' notes, the Debtor paid legal invoices totaling at least $58,539.38 for Mullaney's personal defense in the Shaheen Lawsuit.[138] Vogel, counsel for the Debtor in the Arbitration, represented Mullaney, and Vogel's invoices relating to the Arbitration and Shaheen Lawsuit were intermingled. The Debtor's Board was informed of the Shaheen Lawsuit in June 2013.[139] While the Board did not pass any resolution agreeing to have the Debtor pay Mullaney's legal expenses in quashing the subpoena, Coneys was tasked with reviewing and approving the legal fees paid by the Debtor and apparently did so. SmileTrain was represented by Kaye Scholer in the Shaheen Lawsuit, the same attorneys representing HelpMeSee in the arbitration. Since the allegations in the complaint in the Shaheen Lawsuit touched upon the allegations about the Debtor's donor list raised in the SDNY Action, there was some basis for the Debtor to pay Mullaney's legal expenses in quashing the subpoena. However, that no Board resolution was passed approving the Debtor's payment of the fees is further evidence of the Debtor's careless attitude towards corporate governance.

### D. Fuchs Lawsuit

In April 2011, Fuchs commenced a lawsuit against SmileTrain seeking to recover over $1 million in amounts she was allegedly owed under a five-year employment agreement entered into with SmileTrain in June 2010 (the "Fuchs Lawsuit").[140] SmileTrain answered stating that no employment agreement existed and counterclaimed for breach of fiduciary duty, citing Fuchs' and Mullaney's practices of causing SmileTrain to pay for Mullaney's personal expenses without Mullaney reimbursing the charity.

---

[138]Doc. Ex. 65 (Fuchs spreadsheet noting that she went through all Vogel invoices to-date for legal fees relating to the Ferris consulting matter) (WW_EMAILS0011552).

[139]Doc. Ex. 66 (June 13, 2013 Board meeting minutes) (WON-EX 001264).

[140]*Fuchs v. SmileTrain, Inc.*, No. 651009/2011 (Sup. Ct. N.Y. Cty. 2011).

As a result of the Fuchs Lawsuit and another lawsuit between Mullaney and Wang, ███████ reduced the grant pledge from his trust from $5 million to $1 million and only agreed to donate the $1 million if both lawsuits were resolved.[141]  Wang obtained summary judgment against Mullaney in November 2011 on the first lawsuit.[142]  To accommodate ███████ regarding the Fuchs Lawsuit, Mullaney, who was still on the SmileTrain board at the time, facilitated a resolution whereby both SmileTrain and Fuchs would withdraw their claims with prejudice.  The resolution enabled SmileTrain to avoid any negative media attention.  For her part, Fuchs agreed to drop her claims against SmileTrain on the condition that the Debtor enter into an employment contract with her that provided her with a $120,000 payment upon execution and guaranteed her employment for three years, until December 31, 2014, at a base salary of $200,000.[143]  While the Debtor's Board was certainly aware of the Fuchs Lawsuit, the Examiner did not uncover any evidence that the Board knew of the $120,000 payment to Fuchs or of her employment agreement.

### E.    SmileTrain Interference With Vendors

In addition to the numerous lawsuits brought by SmileTrain against Mullaney that interfered with the Debtor's ability to operate, SmileTrain took actions to ensure that certain fundraising professionals would not work with the Debtor.  For example, in July 2014, SmileTrain entered into a contract with TargetMarketTeam ("TMT"), the Debtor's direct mail fundraising consultant at the time, directly prohibiting TMT from working with the Debtor or Mullaney if TMT was also working with SmileTrain.  Mullaney had worked with TMT while he was at SmileTrain and had sought to replicate the direct mail successes he had with TMT for the

---

[141]Fuchs Ex. 1, Mullaney Ex. 2 and Lazarus Ex. 1.

[142] Doc. Ex. 67 (Respondent 946).

[143]Doc. Ex.  68 (Fuchs Employment Agreement) (WW_EMAILS0012386).

Debtor.  Mullaney also told the board that the Debtor's list broker and website provider resigned

when SmileTrain conditioned further work with them on ceasing work with the Debtor.

SmileTrain allegedly placed similar pressures on InfoGroup, the Debtor's list broker,

causing it to also resign.

## VI.      KEY PLAYERS

### A.      Board of Directors

#### 1.      Board Composition

The Debtor's first board meeting was held on April 11, 2012, just over a year after it was

incorporated.[144]  The initial directors were Mullaney and Ted Dysart, who had been a member of

the Board of Advisors at SmileTrain.  Mullaney and Dysart in turn recruited Ravi Kant, who had

also served on the SmileTrain Board of Advisors, and Dysart recruited John J. Coneys

("Coneys"), whom he knew personally when both lived in Greenwich, Connecticut.  The first

meeting attended by Coneys was held on December 28, 2012.[145]  According to the minutes, the

Board formed audit, nominating and compensation committees at the February 14, 2013

meeting.  At the meeting it was also determined that Coneys would chair the audit committee

and Dysart would chair the nominating and compensation committees.[146]  However, there is no

record that any of these committees ever held any formal meetings and no minutes of any such

meetings were produced, nor according to the directors interviewed, were such minutes prepared.

Dysart, in his interview, referred several times to the "informal" nature of the Board's

functioning because it was a "small" group and they "knew each other."

---

[144]Mullaney Ex. 39 (April 11, 2012 Board meeting minutes).

[145]Doc. Ex. 69(December 28, 2012 Board meeting minutes) (WON-EX 001257).

[146]Doc. Ex. 70 (February 14, 2013 Board meeting minutes) (WON-EX 001261).

Since nearly the first meeting, the Debtor's Board had discussions about expanding the Board by recruiting additional members.[147] The issue of expansion was discussed at nearly every meeting thereafter. Board members proposed and met with a number of board prospects, but numerous leads did not result in new board members. For example, Ann Ziff, attended a Board meeting and participated in a phone call of the independent directors. Emails and documents show that the Board voted to make her a member, but she apparently never officially joined. In fact, even despite the Board's continued discussions about expansion and active attempts to recruit new members, the composition of the Board remained the same until November 2015 when Dysart resigned as a result of his frustration over constant disagreements with Mullaney on the direction and operation of the Debtor, in general, and Mullaney's compensation in particular.[148]

While the Examiner inquired about the failed attempts to attract new members during several of the interviews, none of the interviewees were able to provide a reasoned explanation for why the Board remained so small for so long. However, Mr. Dysart did note that a number of the candidates proposed by Mullaney were not, in Dysart's opinion, sufficiently "independent," while a number of the more qualified candidates they solicited apparently were unwilling to serve. It would also appear that Mullaney's concept of a board was different than that of the Board members with more corporate governance experience.

In fact, as early as January of 2014, Mullaney was complaining of being excluded from executive sessions of the Board. He wrote in an e-mail to a potential Board member:

---

[147]Doc. Ex. 71 (June 22, 2012 Board meeting minutes) (WON-EX 001253).

[148]Doc. Ex. 72 (November 30, 2015 email from Mullaney to Coneys and Kant regarding new slate of Board members and Dysart's resignation over the employment agreement issue) (WW_EMAILS0251267); Doc. Ex. 73 (November 30, 2015 email from Mullaney to Greenwood, Fuchs, and Lazarus stating that he thinks Dysart resigned over term limits, new board members, and not being able to go on the Cranston trip) (WW_EMAILS0011242).

Over the past year, I have received more and more calls from Ted Dysart telling me that he has discussed this or that with "other board members' and he is calling to tell me what to do. If I disagree with anything he shuts me off and he responds as if I am a direct report. He is acting as if he has been appointed as the lead director and spokesperson for the board in charge of dealing with "management." I suspect this has come from Ted and not at the request of the board but I do not know. Ted comes from a very corporate environment and seems to want to impose a lot of that structure and protocol on our tiny charity. There is a great saying that when all you own is a hammer, everything looks like a nail.

Personally, I want to hear what our board members think from them directly – not Ted. And no, I do not want to run WonderWork like a large corporation nor do I want Ted to be the lead director or spokesperson for the board.

I want a small board that I trust and can count on for support and help. I want to be treated like a fellow board member and co-founder first – and then as an employee."[149]

Though he claims he was never elected, for all intents and purposes, Mullaney was the Chair of the Board. Mullaney ran the Board meetings. He prepared the agendas, took notes and then had his notes typed up by Lazarus into the formal minutes, which would then be approved by the Board at its next meeting. As discussed in further detail below, Mullaney revisited his role as "chair" only in 2015, when, in connection with its application for accreditation by the Better Business Bureau (the "BBB") he was informed that under the BBB's standards, a CEO could not serve as chairman. However, prior to its bankruptcy filing, there had been no other "chair" of the Board.

One of the three independent directors, Ravi Kunt, lived in India, and generally participated only by phone. When interviewed by the Examiner he noted that this made it difficult to always follow the discussion. And on financial issues, the Board seemed unduly differential to director Coneys, because of his professional accounting background.

---

[149] Doc. Ex. 74 (January 2014 email from Mullaney to Ziff with complaints about Dysart).

Upon Dysart's departure, the remaining board members – Mullaney, Kant, and Coneys – approved a new slate of members in December 2015.[150] They added Steven Levitt ("Levitt"), Clark Kokich ("Kokich"), Steven Rappaport ("Rappaport"), Richard Price ("Price"), Mark Atkinson ("Atkinson"), and Richard Steele ("Steele"). However, none of these new board members attended a meeting until March 2016.[151] At the June 2016 meeting, the Board reconstituted the audit committee and the nominating and compensation committee, and formed a new finance and investment committee. The new committees consisted of: (1) a nominating and compensation committee of Coneys, Kant, Kokich, and Levitt, (2) an audit committee of Coneys and Rappaport, and (3) a finance and investment committee of Steele, Coneys, and Mullaney.[152] In October 2016, James Poehling and Sabrina Clark were also added to the Board.[153]

The Debtor's progress in expanding its board was short lived. Its legal troubles and subsequent bankruptcy filing prompted several resignations. Kant, Steele, and Clark all resigned in December 2016.[154] Coneys also indicated his intent to resign from the board in December 2016, but withdrew his resignation upon Mullaney's urging.[155] Poehling resigned in June

---

[150]Doc. Ex. 75 (December 23, 2015 Board meeting minutes) (WON-EX 001289).

[151]Doc. Ex. 76 (March 8, 2016 Board meeting minutes) (WON-EX 001292). The Debtor expanded its Board, in part, to meet the BBB's requirements for becoming an accredited charity, which, among other things, required the Debtor to have at least five independent voting directors.

[152] Doc. Ex. 77 (June 13, 2016 Board meeting minutes) (WON-EX 001296).

[153] Doc. Ex. 78 (October 11, 2016 Board meeting minutes) (WON-EX 001300).

[154]Doc. Ex. 79 (December 8, 2016 email from Steele to Mullaney explaining that he is resigning because of concern over exposure) (WW_EMAILS0186040).

[155]Doc. Ex. 80 (December 21, 2016 emails between Coneys and Mullaney with Coneys submitting his board resignation and Mullaney urging him to reconsider given the other recent resignations).

2017.[156]  The Debtor's current board members are Mullaney, Coneys, Kokich, Levitt, Rappaport, Price, and Atkinson.

The following chart identifies each of the Debtor's Board members since inception, the approximate dates each served on the Board, and a brief description of their background, qualifications and/or experience to serve on the Board:

| Board Members | Dates of Service | Background |
|---|---|---|
| Brian Mullaney | March 2011 – present | President and CEO, WonderWork. |
| Theodore Dysart | March 2011 – November 2015 | Vice Chairman, Heidrick & Struggles.  Dysart was on the Board of Advisors of SmileTrain and agreed to join the Debtor's Board when Mullaney separated from SmileTrain and formed the Debtor. |
| Ravi Kant | March 2011 – December 2016 | Former Vice Chair, Tata Motors.  Like Dysart, Kant was also on the Board of Advisors when Mullaney separated from SmileTrain and agreed to join the Debtor's Board. |
| John J.  Coneys | December 2012 – present | Former Regional Vice Chair, PricewaterhouseCoopers.  Coneys joined the Debtor's Board upon the recommendation of Dysart, with whom he had known professionally, after the two discussed Coneys desire to pursue board service after Coneys' retirement from PricewaterhouseCoopers. |
| Steven Levitt | December 2015 – present | Professor of Economics at University of Chicago and author of the book *Freakonomics*.  His firm, The Greatest Good, provided donor analytics for both SmileTrain and the Debtor. |
| Clark Kokich | December 2015 – present | Executive Chairman, Marchex.  Kokich was a major SmileTrain donor. ███████████ ███████████████████████████████ ███████████████████████████████████ |

[156]Doc. Ex. 81 (June 2017 email from Poehling to Mullaney resigning and explaining that circumstances should be discussed via phone) (WW_EMAILS0244572); Doc. Ex. 82 (June 2017 email regarding Poehling resignation and Mullaney stating that ███████████ made Poehling resign) (WW_EMAILS0237368).

| Board Members | Dates of Service | Background |
|---|---|---|
| Steven Rappaport | December 2015 – present | Partner, RZ Capital, LLC. Before Rappaport joined the Board, Mullaney had known him for over 20 years. |
| Richard Price | December 2015 – present | CEO, CBRE Global Investors' Asia Pacific Investment. Price helped Mullaney launch SmileTrain. |
| Mark Atkinson | December 2015 – present | Partner & Creative Director, Otto Design + Marketing. Atkinson is a former member of the SmileTrain Board of Directors. He is also a longtime friend of Mullaney and has gone on several program trips for the Debtor to photograph and video surgeries. |
| Richard Steele | December 2015 – December 2016 | Principal, SY Partners. Mullaney met Steele when Steele was with The Bridgespan Group, which had performed some consulting services for SmileTrain. Mullaney rented the Debtor's first office space from The Bridgespan Group as a result of his relationship with Steele. |
| Sabrina Clark | October 2016 – December 2016 | Managing Director of Business Operations, SY Partners. Clark is a business associate of Steele and joined the Debtor's Board at Steele's recommendation. |
| James Poehling | October 2016 – June 2017 | Assistant Vice-Chancellor for Health Sciences at University of Missouri Healthcare. Poehling is the former director of the Thompson Center for Autism and Neurodevelopmental Disorders at the University of Missouri and also serves on the Board of the Thompson Foundation for Autism. He joined the Debtor's Board at the request of ███████████ ████████████████████████████████ ██████████ |

2. **Bylaws**

The Debtor's original Bylaws were adopted on March 8, 2011 when the Debtor was

incorporated in Delaware, although they are inexplicably dated January 31, 2011.[157] The Bylaws

---

[157]Doc. Ex. 83 (March 8, 2011 resolution adopting bylaws) (WON-EX 001791); Doc. Ex. 84 (Bylaws) (WON-EX 000026). Article IV, Section 10 of the Bylaws provides that the Debtor was organized under the Missouri Nonprofit

required the Debtor to have a minimum of three directors and provided for each of the directors to serve one year terms, but placed no limit on the number of terms that a director could serve. The Bylaws required the Debtor's board to have a minimum of two meetings a year with a quorum constituting a majority. As further indication of the Debtor's haphazard corporate governance, the original bylaws spoke of a "Missouri" corporation (Debtor's nonprofit law firm was based in that state) and referred to the "members" of the corporation, even though the entity never had any "members" nor was it supposed to.

The Bylaws required the Debtor's board to elect a chair, a president, and a secretary and treasurer, but provided that a vice president was optional. While the first corporate resolution passed by the board selected Mullaney as President and Dysart as Secretary and Treasurer,[158] the board did not select a chair as required by the Bylaws. Nevertheless, as stated above, Mullaney has presided over each of the board meetings and served as the chair of the board for all practical purposes. Draft minutes from a January 2016 board meeting even show that Mullaney was selected as chair of the board.[159] However, once the Debtor was informed that the BBB required the chair of an accredited charity's board to be different from the charity's CEO, the Debtor reversed course and represented to the BBB that there was no chair of the Debtor's board but that Coneys served as the Lead Independent Director. In practice, Coneys' role as Lead Independent Director was short-lived, lasting only a period of a few months, and his responsibilities were limited to finalizing Mullaney's employment agreement on behalf of the Board. Nor did Coneys believe he had any additional duties as a result of holding that title.

---

Corporation Act. Since the Debtor was actually organized under the laws of the state of Delaware, the Examiner has assumed that this was a drafting error.

[158]While several documents refer to Dysart, and later to Kant or Coneys, as the secretary of the Debtor's board, in practice, Karen Lazarus ("Lazarus") prepares minutes of the Board meetings at Mullaney's direction.

[159]Mullaney Ex. 4 (rough draft of January, 2016 Board meeting minutes from Mullaney to Lazarus indicating that Mullaney will serve as chairman and CEO).

Finally, the Bylaws stated that the Debtor has the members noted in the minutes of the first board meeting and that each member would hold his position for life. This provision later created some confusion within the Debtor's board as the minutes of the first meeting did not actually state that there were any "members" of the corporation.[160]

The Debtor's board finally began the process of amending the Bylaws in October 2015, but the Amended and Restated Bylaws (the "Amended Bylaws") were not passed until March 8, 2016.[161] The Amended and Restated Bylaws eliminated the issue about members of the corporation, provided that each director would have a three year term and be limited to two consecutive terms, except no limits were placed on Mullaney's ability to continue to serve on the Board. The Amended Bylaws maintained the same required officers, but also placed a term limit of two consecutive terms of service on officers.

## B. Officers and Management Team

### 1. Introduction

As of the Petition Date, the Debtor's management and reporting structure was organized as follows:

---

[160]Doc. Ex. 85 (█████████████████████████████████████████████████████████████████ ████████████████████████████████████████(WW_EMAILS0188495).

[161]Doc. Ex. 86 (Amended and Restated Bylaws) (WON07221).



Most of the management team at the Debtor has worked together for over 15 years, initially at SmileTrain and now at the Debtor. The Examiner's interviews demonstrated that the senior managers are all incredibly loyal and dedicated to Mullaney, who founded the Debtor and serves as its Chief Executive Officer.

For example, Fuchs, Greenwood, and Lazarus were each offered substantial severance packages when they were terminated from SmileTrain. As a condition to receiving the severance package, each of them were prohibited from working or even volunteering for an organization involving Mullaney for a period of five years. As a result, each refused their severance package and, instead, joined the Debtor.

Mullaney promised each of them a $15,000 bonus from the Debtor to help defray their legal costs relating to their termination from SmileTrain.[162] Each of Fuchs, Greenwood, and Lazarus denied receiving any such bonus. However, Fuchs received a $120,000 signing bonus

---

[162]Fuchs Ex. 1, Mullaney Ex. 2, and Lazarus Ex. 1.

upon the execution of an employment agreement she entered into with the Debtor as of December 29, 2011, and a further guaranteed salary of $200,000 per year through December 31, 2014.[163] Greenwood's first check as an employee of the Debtor was approximately $15,000 higher than her standard monthly compensation.[164] And Lazarus received compensation totaling $169,000 in 2011 despite only working for part of the year, but her salary was reduced to $121,500 in 2012.[165]

### 2.    Mullaney

Mullaney began his career as an advertising executive but became involved in the nonprofit sector in the early 1990s. Mullaney then began serving on the board of a nonprofit called Operation Smile in 1994. Operation Smile's mission is to provide cleft lip and palate repairs to children around the world through missions involving volunteer medical professionals traveling to communities to provide surgeries. Mullaney remained on the board of Operation Smile until 1999 when he left to form SmileTrain with co-founder Charles Wang ("Wang"). SmileTrain's business model was different. Instead of sending medical professionals on surgical missions, SmileTrain's model is to provide financial assistance to local surgeons so that they can perform cleft lip and palate repair surgeries themselves.

Mullaney became CEO of SmileTrain in 2001. During the time Mullaney served as CEO of SmileTrain, it grew into the world's largest cleft charity, raising $120 million a year at its peak and helping to provide 120,000 surgeries a year. By October 2009, Mullaney suggested to the SmileTrain Board that it should consider expanding its mission beyond clefts to include other

---

[163]Doc. Ex. 87 (Fuchs employment agreement). The details and circumstances of Fuchs' employment agreement are discussed further *infra*.

[164]The first paycheck to Greenwood was for $29,166.67 but the following paychecks were for $14,583.00. Doc. Ex. 88.

[165]For 2011, Lazarus received a Form 1099 for $80,000 and also a W2 for $89,000. Her W-2 for 2012 was $121,500.

causes, including, for example, blindness.[166] Mullaney cited the growing surplus of donations being held by SmileTrain and the decline in cleft surgeries as reasons for expanding the mission. In February 2010, Mullaney presented the results of some testing he had conducted on donor response to blindness ads to the SmileTrain board.[167] Wang and other members of the SmileTrain board did not want the charity to expand its mission, prompting a power struggle between Mullaney and Wang that Mullaney lost. Beginning in March 2010, an investigation into Mullaney's spending practices was conducted by members of the SmileTrain board. As a result of the investigation and the SmileTrain board's decision not to expand SmileTrain's mission to other causes, Mullaney was asked to resign as CEO of SmileTrain in September 2010. He signed a separation agreement with SmileTrain in October 2010,[168] but remained on the SmileTrain board through June 2012. Mullaney's separation from SmileTrain kicked off a series of legal battles between himself, SmileTrain, and Wang that have had a marked effect on the Debtor.

Mullaney formed the Debtor in March 2011 to support the causes that the SmileTrain board declined to support. Mullaney has served as the Debtor's CEO and a member of its board of directors since inception. Although the Debtor's offices are located in New York, Mullaney has lived near Boston since 2013.

### 3.    Fuchs

Hana Fuchs is the Chief Financial Officer of the Debtor. Fuchs has no professional training in finance or accounting. Rather, she learned her accounting skills on the job. She spent twenty five years at Avon. Over time, her positions changed and by the time she left, she was

---

[166]Doc. Ex. 89 (Claimant Ex. 274).

[167]Doc. Ex. 90 (Claimant Ex. 278).

[168]Doc. Ex. 91 (Claimant Ex. 5).

Director of International Audits, conducting financial and operational audits of the company's facilitates around the world. Fuchs then spent two years as the Controller at Sesame Workshop before joining SmileTrain as the Vice President of Finance and Administration. It is worth noting that when Ms. Fuchs was recruited to SmileTrain, she organized the accounting, financing and human resources departments at SmileTrain, and continued to serve in that capacity for ten years. After Mullaney's departure from SmileTrain, Fuchs was also asked to leave in February 2011. She joined the Debtor almost immediately as the Debtor's Chief Financial Officer, where she set up the Debtor's accounting and financing system. Fuchs' hours were reduced to a part time schedule for a short period in 2016 when the Debtor made the decision to shift away from direct mail and to reduce costs.[169] She has since resumed a fulltime position with the Debtor. The Examiner found Fuchs to be evasive and inconsistent throughout the interview, and when confronted with e-mails or with documents, forgetful, particularly with respect to Mullaney's "limbo pay," as discussed forth below.

### 4. Greenwood

DeLois Greenwood served as the Chief Program Officer of the Debtor from inception until September 2017 when she resigned. At the time she was interviewed by the Examiner, prior to her resignation, she had two direct reports, Tiffany Carson and Ujjal Bhattacharya. Her responsibilities included overseeing all aspects of the Debtor's provision of surgeries, including the identification of entities to receive grants, budgeting for grants to be made to hospitals, and monitoring compliance with the terms of the grants made by the Debtor. Greenwood also served as the Debtor's unofficial Chief Operating Officer, fulfilling certain human resource functions,

---

[169] Doc. Ex. 92 (May 2, 2016 email from Mullaney to Fuchs regarding restructuring WonderWork and reducing Fuchs' hours) (WW_EMAILS0038133).

organizing staff meetings, and otherwise managing many of the day to day operations of the Debtor.

Like Fuchs, Greenwood is an alumni of SmileTrain. At SmileTrain, Greenwood formerly oversaw all surgery programs at SmileTrain, and, prior to SmileTrain, performed similar functions at Operation Smile, where she first met Mullaney. Also like Fuchs, Greenwood was asked to leave SmileTrain in February 2011. Greenwood began as a consultant for the Debtor through a company she set up for that purpose, Help for the Cause, LLC. She told the Examiner that she established an entity because she had originally intended to provide consulting services to other organizations as well, but no other opportunities presented themselves and she became a fulltime employee of the Debtor in April 2013. Greenwood lives near Atlanta, Georgia and throughout her employment, she periodically commuted to the Debtor's offices in New York. The Debtor paid the cost for a plane ticket each month for Greenwood to commute to New York.[170]

It would appear that Greenwood acted as a "de facto" replacement for Mullaney, running staff meetings when he was not in town, and supervising various projects beyond program activities from time to time. Mullaney referred to her as his "COO," but she disclaimed the title, and added "I really don't have that authority."[171]

### 5. Lazarus

Karen Lazarus holds the title of Director of Strategic Projects for the Debtor. However her job is really to act as an executive assistant to Mullaney. Lazarus has worked with and for Mullaney for 20 years, beginning as an assistant to Mullaney at his advertising agency, then at SmileTrain, and now at the Debtor. Lazarus was also asked to leave SmileTrain in February

---

[170]Fuchs 8/15/17 Tr. 366:9-25.

[171] Greenwood Tr. 22:5-6.

2011 at the same time Greenwood and Fuchs departed.  Her responsibilities at the Debtor include, among other things, communicating with major donors to the Debtor, setting up meetings for Mullaney, researching prospective donors, preparing Board meeting minutes and presentations, arranging travel for Mullaney, and preparing expense reports.  Despite her impressive title, which she admits she chose herself, Mullaney refers to her as "his secretary."

### 6. Huang

Janet Huang is the Marketing Director for the Debtor.  Unlike the rest of the management team at the Debtor, Huang did not previously work for SmileTrain.  Huang joined the Debtor in May 2013 as the Senior Marketing Manager, but did not become Marketing Director until January 2015.  Huang is the fourth individual to serve as the Debtor's Marketing Director since it was formed.  While Huang oversees the mechanics of the Debtor's direct mail program, she has very little independent authority and all major decisions, creative or otherwise, are made by Mullaney.

### C. Medical Advisory Board

In addition to its board of directors, the Debtor also has a Medical Advisory Board (the "MAB") that was formed in June 2014 .  The MAB's primary purpose is to provide input in, and oversight of, the quality assurance reviews conducted of hospitals that receive substantial grants from the Debtor.  The MAB has provided the Debtor with guidance on the patient data repository system being developed for the Debtor.  The MAB also occasionally provides best practice literature to the Debtor's partner hospitals.  Finally, members of the MAB have occasionally recommended potential partner hospitals to the Debtor.  The MAB meets twice a year.

Its current members as of August 2017 are (1) Joseph McCarthy, Lawrence D.  Bell Professor of Plastic Surgery at NYU Langone Medical Center, (2) Norman Meadow, Professor of Pediatric Ophthalmology at Albert Einstein College of Medicine, (3) Adrian Gelb,

Distinguished Professor at the Department of Anesthesia and Perioperative Care at University of California, San Francisco, (4) Nicole Gibran, Director and Attending Physician at University of Washington Burn Center, (5) Alice Chu, Director of Ponseti Clubfoot Center at NYU Langone Medical Center, and (6) Anjali Sastry, Senior Lecturer in System Dynamics at the MIT Sloan School of Management.

### D. Advisory Board

The Debtor states that it maintains an Advisory Board. According to the Debtor, the current members of the Debtor's Advisory Board purportedly include (1) Ann Ziff, chairman of the Metropolitan Opera, (2) Kenneth French, professor at the Tuck School of Business at Dartmouth College, (3) Atul Gawande, surgeon and professor at Harvard Medical School and associate professor in the Department of Health Policy and Management at the Harvard School of Public Health, (4) Joseph McCarthy, Lawrence D. Bell Professor of Plastic Surgery at NYU Langone Medical Center, (5) Garrett Moran, Senior Advisor at Blackstone, and (6) Anjali Sastry, Senior Lecturer in System Dynamics at the MIT Sloan School of Management. However, the Advisory Board does not meet, and prospects were told that membership included only a few optional dinner meetings a year. The Advisory Board has no formal oversight responsibilities over the Debtor.

### E. Celebrity "Supporters"

The Debtor also maintains a slate of celebrity "supporters" that it says do not necessarily support it financially, but that support its mission. Like the Advisory Board, the celebrity supporters do not have any formal role with the Debtor. Instead, each of the celebrity supporters granted the Debtor permission to use their name and an approved quote about the Debtor on the Debtor's marketing and other promotional materials. The names of these individuals appear on the Debtor's 20/20/20 website, on the letterhead for WonderWork and each of the DBAs, and in

various other promotional materials. It is unclear whether the celebrity supporters placed any limits on the Debtor's use of their respective names.

The celebrity supporters have included (1) Candice Bergen, actor, (2) Sir Ben Kingsley, actor, (3) Chris Meloni, actor, (4) Christie Brinkley, actor, (5) Drew Ordon, The Doctors television show, (6) Bryan Cranston, actor, (7) Alex Trebek, host of Jeopardy!, (8) Howie Mandel, comedian and game show host, (9) Jane Kaczmarek, actor, (10) Mariska Hargitay, actor, (11) Hannah Storm, co-anchor on ESPN, and (12) Bette Midler, entertainer. The Debtor also lists a quote about it by Warren Buffett, the Chief Executive Officer and Chairman of Berkshire Hathaway on its letterhead. The Examiner notes that the use of celebrity "endorsements" is in fundraising charities like the Debtor. The Examiner found no evidence to suggest that any of the celebrity supporters were, or had any reason to be, aware of any of the issues discussed in this report. In fact, it appears that at least one raised a question about the amount of compensation paid to Mullaney.

F. **Fundraising Service Providers and Other Professionals**

Over the years, Debtor has employed a plethora of fundraising consultants, database managers, list brokers and other service providers. The Debtor also engaged a remarkable number of law firms, largely because of the numerous litigations it has faced, and which are described, when relevant, throughout this Report.

The following tables[172] list (a) professional and consulting vendors, and (b) printing publication and postage related professionals. Except where referenced in the body of this Report, the Examiner's only observation with respect to these tables is that the overall cost of these providers is troubling given the size of the organization. There is likely a certain amount of

---

[172] Prepared by Goldin Associates.

duplication of cost as a result of the many changes the Debtor made. However, in some cases the changes were due to the potentially actionable conduct of third parties (such as SmileTrain and HelpMeSee, each of whom appear to have attempted to interfere with the Debtor's business relationships) and in other cases, based on the interviews, simply reflect business decisions to seek better results or better pricing from vendors.

**Professional & Consulting Vendors**

| Professional & Consulting | FY 2011 | FY 2012 | FY 2013 | FY 2014 | FY 2015 | FY 2016 | FY 2017[1] | Total |
|---|---|---|---|---|---|---|---|---|
| **6330 Consulting - Legal** | **$7,421** | **$21,989** | **$351,943** | **$639,924** | **$361,906** | **$256,246** | **$307,044** | **$1,946,472** |
| Kaplan Kravet & Vogel P.C. | - | - | $71,614 | $510,783 | $283,378 | $238,243 | $49,589 | $1,153,607 |
| Carter Ledyard & Milburn LLP | - | - | - | - | - | - | $254,454 | $254,454 |
| Jones Day | - | - | $144,535 | $18,768 | - | - | - | $163,304 |
| American Arbitration Association | - | - | $8,628 | $37,000 | $68,175 | - | - | $113,803 |
| Legal (TBD)[2] | - | - | $102,474 | $1,131 | $280 | - | - | $103,885 |
| Copilevitz & Canter, LLC | $7,421 | $20,909 | $19,181 | $25,205 | $7,548 | $14,374 | $3,000 | $97,638 |
| HMS (Arbitration) | - | - | - | $46,800 | - | - | - | $46,800 |
| Simpson Thacher & Bartlett LLP | - | - | $3,088 | $236 | - | - | - | $3,324 |
| VedderPrice PC | - | - | - | - | - | $2,578 | - | $2,578 |
| JAMS | - | - | - | - | $2,525 | - | - | $2,525 |
| Kaplan & Levenson P.C. | - | - | $2,425 | - | - | - | - | $2,425 |
| Thomas & White | - | $1,080 | - | - | - | - | - | $1,080 |
| Kenneth Thomas | - | - | - | - | - | $1,050 | - | $1,050 |
| **6340 Consulting - Marketing** | **$11,035** | **$75,986** | **$204,038** | **$376,994** | **$281,500** | **$303,700** | **$102,250** | **$1,355,502** |
| CDR Fundraising Group | - | - | - | - | $227,500 | $292,500 | $81,250 | $601,250 |
| Target MarkeTeam | - | $10,000 | - | $180,913 | - | - | - | $190,913 |
| Onix Partners LLC | - | - | - | $142,880 | $40,000 | - | - | $182,880 |
| NNE Marketing | - | - | $160,000 | $16,000 | - | - | - | $176,000 |
| Koala Design | $10,000 | $22,100 | $31,350 | $34,700 | $14,000 | $9,500 | $8,500 | $130,150 |
| All other[3] | $1,035 | $43,886 | $12,688 | $2,500 | - | $1,700 | $12,500 | $74,308 |
| **6300 Consulting** | **$80,000** | **$90,125** | **$115,598** | **$19,720** | **$27,000** | **$33,709** | **$18,975** | **$384,715** |
| Help for the Cause, LLC | - | $90,125 | $88,431 | - | - | - | - | $178,556 |
| Ujjal Bhattacharya | - | - | $4,500 | $19,500 | $25,000 | $31,500 | $17,500 | $98,000 |
| Karen Lazarus | $80,000 | - | - | - | - | - | - | $80,000 |
| Pearl Meyer & Partners, LLC | - | - | $18,137 | - | - | - | - | $18,137 |
| All other[4] | - | - | $4,530 | $220 | $2,000 | $2,200 | $1,075 | $10,025 |
| **6310 Consulting - Accounting & Audit** | **-** | **$2,160** | **$46,570** | **$50,100** | **$56,075** | **$71,700** | **-** | **$226,605** |
| KPMG LLP | - | - | $42,500 | $50,100 | $56,075 | $71,700 | - | $220,375 |
| All other[5] | - | $2,160 | $4,070 | - | - | - | - | $6,230 |
| Other Consulting[6] | - | $8,122 | $4,669 | $3,494 | $3,357 | $18,519 | $20,000 | $58,160 |
| **Grand Total** | **$98,456** | **$198,381** | **$722,818** | **$1,090,232** | **$729,838** | **$683,865** | **$447,869** | **$3,971,457** |

Source: General Ledger
[1] FY 2017 data from July 1, 2016 through December 28 ,2016
[2] As described in the GL
[3] Includes 7 additional vendors paid for marketing purposes
[4] Includes 4 additional vendors paid for consulting purposes
[5] Includes 2 additional vendors paid for accounting and audit purposes
[6] Other Consulting includes the following General Ledger Accounts: 6320 Consulting-IT (4 vendors), 6350 Consulting-Search Firms (3 vendors)
These accounts have been consolidated for the purpose of this analysis



| Printing, Publications, Postage | FY 2012 | FY 2013 | FY 2014 | FY 2015 | FY 2016 | FY 2017¹ | Total |
|---|---|---|---|---|---|---|---|
| **7100 Direct Mail** | **$150,821** | **$7,748,946** | **$7,578,197** | **$6,895,837** | **$2,228,359** | **$401,766** | **$25,003,725** |
| Target MarkeTeam | - | - | $6,155,062 | $155 | - | - | $6,155,217 |
| Production Solutions | $105,583 | $5,766,761 | $39,982 | - | - | - | $5,912,325 |
| Mail America Communications | - | - | - | $5,415,165 | - | - | $5,415,165 |
| Paradysz Matera Co. Inc. | $41,328 | $1,622,892 | $712,659 | - | - | - | $2,376,879 |
| Infogroup | - | - | $406,451 | $630,046 | $20,178 | - | $1,056,675 |
| Direct Mail Solutions | - | - | - | $168,532 | $745,521 | - | $914,053 |
| IDMI | - | $161,258 | $190,253 | $132,217 | $123,435 | $27,943 | $635,107 |
| Color Tree Group | - | - | - | $124,420 | $332,510 | $45,825 | $502,755 |
| Southwest Publishing & Mailing Corporation | - | - | $2,180 | $139,203 | $196,878 | $718 | $338,980 |
| American List Counsel, Inc. | - | - | $9,280 | $20,669 | $199,201 | $89 | $229,239 |
| Direct Mail Processors, Inc. | $2,750 | $47,133 | $57,472 | $58,313 | $35,882 | $18,939 | $220,489 |
| Action Mailers | - | - | - | $34,236 | $76,279 | $104,248 | $214,763 |
| (Unknown)² | - | $141,991 | - | -$3,813 | $21,857 | - | $159,835 |
| National Graphics | - | - | - | $14,720 | $139,946 | $3,510 | $158,177 |
| National Fundraising Lists | - | - | - | $48,082 | $65,776 | - | $113,858 |
| Log-On | - | - | - | - | - | $79,693 | $79,693 |
| Communications Corporation of America | - | - | - | $37,230 | $29,243 | $6,306 | $72,779 |
| Print Mail Communications | - | - | - | - | $59,561 | - | $59,561 |
| L&E Meridian | - | - | - | - | $32,842 | $25,560 | $58,402 |
| Resource One | - | - | - | $38,032 | - | $5,228 | $43,260 |
| RST Associates, Inc. | - | - | - | - | $41,258 | - | $41,258 |
| CENVEO | - | - | - | $8,320 | $6,759 | $9,295 | $24,374 |
| New Channel Direct | - | - | - | - | $22,208 | - | $22,208 |
| All other³ | $980 | $8,911 | $4,858 | $30,308 | $78,225 | $74,411 | $198,674 |
| **6550 Public Relations** | **-** | **$21,200** | **$5,872** | **$93,950** | **-** | **$25,000** | **$146,022** |
| Blue Chalk Media | - | - | - | $77,950 | - | - | $77,950 |
| Sard Verbinnen & Co. LLC | - | - | - | - | - | $25,000 | $25,000 |
| Group Gordon | - | $21,200 | - | - | - | - | $21,200 |
| All other⁴ | - | - | - | - | - | - | $21,872 |
| **Other⁵** | **$12,835** | **$94,291** | **$73,141** | **$9,710** | **$3,175** | **$1,270** | **$194,421** |
| **Grand Total** | **$163,456** | **$7,864,436** | **$7,657,210** | **$6,999,497** | **$2,231,534** | **$428,036** | **$25,344,168** |

Source: General Ledger

¹ FY 2017 data from July 1, 2016 through December 28 ,2016

² As described in the GL

³ Includes 27 additional vendors paid for direct mail purposes

⁴ Includes 5 additional vendors paid for public relations

⁵ Other includes the following General Ledger Accounts: 6500 WEB Development (9 vendors), 7000 Marketing (8 vendors), 7200 Advertising (3 vendors), 7300 Events (6 vendors). These accounts have been consolidated for the purpose of this analysis


**GoldinAssociates**˙ᶜ

# VII.   BOARD APPROVED POLICIES AND PROCEDURES

The Board approved a Board of Directors Policy Manual (the "Policy Manual")[173] on
October 11, 2012, which would appear to remain in effect.[174]  The Policy Manual requires that
two-thirds of the Debtor's directors be independent and establishes a number of committees
including (1) an optional executive committee, (2) an optional investment committee, (3) an
audit committee, (4) a finance committee, (5) a nominating committee, and (6) a compensation

---

[173]Doc. Ex. 93 (Policy Manual) (WON-EX 010666).

[174]Doc. Ex. 94 (October 11, 2012 Board meeting minutes) (WON-EX 001255).

committee.  However as noted throughout this report, the Examiner found little evidence that the Policy Manual was followed or referred to in the course of the day to day operation of the Debtor.

### A.    Investment Policy and Management of Assets

The Policy Manual provides for the investment of donated funds based on three categories of funds.  The first category of funds are temporarily restricted funds, which are funds restricted to programs.  By the Policy Manual, the Board authorized the Debtor to invest temporarily restricted funds and to spend principal and interest to meet grant requirements and the operational needs of the Debtor.  The second category of funds are unrestricted short-term operating funds, which are not restricted in their use.  The Board authorized the Debtor to invest these funds and to spend both principal and interest to meet the operational needs of the Debtor.  The third category of funds are Board-designated reserves, which are funds designated to be held in reserve to support future years' operations, provide a resource for unexpected downturns, and provide a source for investment in the business.  The Board authorized the Debtor to invest the principal of these funds while maximizing investment income.  In reality, as described in more detail below, the Debtor's cash management system was not set up in accordance with such policies, or applicable law.  The Debtor appeared to treat all funds as fungible.

Only when it came time for the year-end audit required to be filed with its Form 990, Debtor would make any attempt to reconcile its restricted fund balances.

The Policy Manual also sets standards for management of the Debtor's financials and assets.  It requires the Debtor to maintain assets that are no less than 100% of liabilities, to maintain commercial general liability insurance, to seek competitive bids for any purchases over $25,000, and to obtain co-approval of the officers for any purchases over $100,000.  Expenditures, including for travel must be approved in advance.  Pursuant to the financial and

asset management provisions of the Policy Manual, the Debtor is supposed to maintain short term investments in checking and savings accounts, money market accounts, certificates of deposit, treasury bills, A1/P1 commercial paper and U.S. government bonds with less than 36 month maturity. The Debtor is permitted to make long term investments in any of the short term investment vehicles or in fixed income securities, equities, or other cash equivalents. The Debtor is not permitted to make any loans to officers or directors. Again, the Examiner's review discovered that these policies were generally honored in the breach. For example, with respect to major contracts, while on some occasions Debtor would apparently solicit bids, in many cases no such process took place.

In addition, with respect to the actual choice of investment vehicles, Debtor's investment "strategy" appears to have been based on a limited number of discussions with a certain, significant donor. In an email from 2014,[175] Mullaney sought advice from that donor, ██████ ██████, regarding whether to change the Vanguard International Index Fund that Debtor's cash had been held in. Interestingly, Mullaney refers to this as the investment of the impact loan "funds." However, as is explained elsewhere in this Report, it is impossible to state with any certainty exactly what is the source of most of the funds on deposit in the Vanguard account. In any event, in this correspondence, Mullaney acknowledged past reliance on ██████ for investment advice: "[w]e took your advice and invested our impact loan funds in an International Index Fund at Vanguard." After listing some pros and cons, ██████ suggested "consider[ing] continuing with your global index strategy or increasing your US allocation by either (i) selling some of the global and investing the money in a broad US index or (ii) spending out of the global and investing in a broad US index until you like the allocation." However, he also noted "You

---

[175] Doc. Ex. 95 (December 2014 emails between Mullaney and Fuchs regarding the Debtor's investment in the Vanguard global index fund) (WW_EMAILS0212137).

know your situation better than I, so I will defer to you." In fact, it appears that the Debtor never shifted its money from Vanguard until later in 2016, following the arbitration award against the Debtor.

## B. Travel Policy

The travel policy provides that the Debtor (1) will not reimburse for expenses personal in nature, (2) will only provide reimbursement based on actual and reasonable expenses incurred, (3) will not provide reimbursement for spouse travel without a business purpose and any such benefits shall be reported as compensation as required by federal law, and (4) will only reimburse expenses substantiated by supporting documentation and amounts not substantiated must be reported as actual income. The travel policy also provides that travel expenses must be approved by a supervisor or the chief financial officer, as applicable.

In practice, employees of the Debtor would develop a budget for expenses in advance of overseas trips.[176] However, the Debtor would also pay for non-program related expenses of employees, including, for example, to visit the Taj Mahal or go on a safari, if the expenses are incurred when a major donor is also traveling with the group.[177] As discussed in more detail below, the Debtor also pays for Mullaney to fly business or first class as a general practice and for Mullaney's spouse to travel with him on certain trips. The Examiner was told that Mullaney had final approval on all expense reimbursements, and that Fuchs was supposed to review and approve this. In her interview, Fuchs even acknowledged that the travel policy did not apply to Mullaney. In fact, the Examiner believes that the Debtor's policies with respect to its travel and expense reimbursements raise serious questions which are addressed elsewhere in this Report.

---

[176]Doc. Ex. 96 (June 2013 trip budget submitted for approval by Bhattacharya) (WW_EMAILS0001721).

[177]Greenwood Tr. 54:3; Lazarus Tr. 215:5.

### C. Conflicts and Ethics Policies

Other policies set forth in the Policy Manual include a conflicts policy, a whistleblower policy, a document retention policy, and a code of ethics. The conflicts policy requires the Debtor to obtain yearly conflicts disclosures from members of the board and staff. While the Debtor did not obtain conflict disclosures from the Board in 2012, 2013, or 2015, the disclosures the Debtor did obtain in 2014, 2016, and 2017 revealed no conflicts.

The Debtor also requires employees to acknowledge the Debtor's conflict of interest policy. The Debtor did not obtain such acknowledgements from its staff until June 2017. No actual or potential conflicts were disclosed to the Debtor at that time. However, while the Examiner found no evidence that the conflict of interest policy was violated facially, it must be noted that Debtor's management team failed to evidence the kind of independence in exercising their respective authority that would be expected in a qualified non-profit organization. For example, until the still incomplete FY2016 audit was undertaken, the Examiner could find no evidence to support that any independent approvals were obtained with respect to much if not all of Mullaney's extensive travel.

### D. Gifts and Donations Policies

Finally, the Policy Manual sets forth a number of standards for the Debtor's receipt of gifts and donations. For example, the Policy Manual requires solicitation and fundraising materials to identify how funds will be used and for personal information obtained to be kept confidential and used only for purposes of the donation. Per the Policy Manual, outside fundraisers must be governed by a contract. The Policy Manual further requires that donations that cannot be used consistent with a donor's intent should be returned or permission obtained to use the donation for another purpose. Among other standards, the Policy Manual also provides that the Debtor may assess a general administrative charge of not more than 15% on all grant

funding requests that total $500,000 or less unless the granting organization allows a higher percentage, with an additional charge of 5% being assessed on grant funding requests over $500,000. The Policy Manual provides that the purpose for assessing all administrative charges is to cover the costs of the Debtor's overhead.

## VIII. PREPETITION FINANCIAL POSITION

As of the Petition Date, the Debtor reported having just over $20.5 million in cash and financial assets at its disposal.[178] It also had unsecured loan liabilities totaling $9,627,166.66.[179]

### A. Bank and Investment Accounts

The Debtor maintains bank accounts at HSBC Bank USA, N.A. ("HSBC"), PayPal accounts, and an investment account with Vanguard. Currently and historically only Mullaney and Fuchs are the authorized signatories for the bank and investment accounts.

### 1. HSBC Accounts

While the Debtor initially had bank accounts at Chase Bank,[180] it has historically maintained its operational bank accounts at HSBC. The Debtor has four active HSBC accounts, one for the WonderWork brand and one for each of the DBAs. As funds accumulate in the DBA accounts, they are periodically transferred to the WonderWork main operating account. All expenses are paid from the WonderWork account. When significant cash accumulates in the WonderWork account, usually as a result of a large donation, the accumulated cash is transferred to the Vanguard investment account.

---

[178] *See* Initial Schedules at 8, Docket No. 12.

[179] *Id.*

[180] These accounts were closed in 2012.

## 2. PayPal Accounts

The Debtor maintains four active PayPal accounts for donations made by credit card from direct mailings, which are processed and deposited by the Debtor's cager, Direct Mail Processors. The PayPal accounts are also used for donations through the Debtor's websites. There is a separate PayPal account for WonderWork, 20/20/20, FirstStep and BurnRescue campaigns. Funds accumulated in each of the four PayPal accounts are transferred periodically to the four respective HSBC accounts. Fuchs transfers funds when a PayPal account accrues a significant balance, but there is no set balance or timeframe upon which funds are transferred from a PayPal account to an HSBC account.

## 3. Vanguard Account

Prior to the Petition Date, the Debtor's Vanguard investment account had a balance of over $18 million. The Debtor invested in the Vanguard funds at the recommendation of ███ ███████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████. The Board was aware that Mullaney sought ████████ investment advice and was using the advice to make determinations about how to invest the Debtor's surplus restricted and unrestricted funds.[181]

The first transfer into the Vanguard account occurred in February 2012 in the amount of $4.8 million. The Debtor made seven subsequent transfers into the Vanguard account, for a total investment of $15.3 million. The remaining funds in the Vanguard account accrued from donations of stock to the Debtor and from net investment gains and interest. The Debtor lost $112,676 in FY12, gained $881,997 in FY13, gained $1,878,168 in FY14, and lost $153,782 in FY15 as a result of its investments. In FY13, the Debtor took a loan of $1,159,203 against its

---

[181]Doc. Ex. 97 (October 11, 2012 Board meeting minutes) (WON-EX 001255); Doc. Ex. 98 (February 14, 2013 Board meeting minutes) (WON-EX 001261).

investments in the Vanguard fund in lieu of spending assets in the account because it was less expensive to borrow money based on the interest rate being obtained on the investments.[182]

In October 2016, the Board, which by that time included a number of new members, determined that the Debtor should take a more conservative investment strategy by investing in bonds instead of stocks.[183]  Days after the Board determined to pursue a more conservative investment strategy, the Arbitration Award was entered and Mullaney had the amounts invested in the Vanguard account switched to a money market account out of a concern that any downward fluctuation in the stock market would result in HelpMeSee suing the Board for its investment decisions.[184]  However, the funds were subsequently reinvested prior to the Petition Date.  Post-petition, the invested funds were moved to an account with Signature Bank.

### B.     Insurance Assets

While the Debtor did not list any insurance policies on its Schedules, it maintains several policies including (1) a term life insurance policy on Mullaney, (2) two key man life insurance policies on Mullaney, (3) two directors and officers liability policies, and (4) a commercial liability policy.

### 1.     Mullaney Term Life Insurance Policy

The Debtor maintains a $4 million term life insurance policy on Mullaney through Lincoln Financial Group.  The most recent policy was issued in March 2016.  Yearly premiums on the policy are $9,602.00.  The Debtor pays the premiums on the policy, but Mullaney's wife is the beneficiary.  While payment of the premiums was included in Mullaney's employment agreement executed in December 2015, the Debtor nevertheless paid the premiums on other life

---

[182]Fuchs 8/15/17 Tr. 74:24 – 76:7.

[183]Doc. Ex. 99 (October 11, 2016 Board meeting minutes) (WON-EX 001300).

[184]Doc. Ex. 100 (October 21, 2016 email from Mullaney to Board stating that he liquidated the Vanguard account to preserve capital) (WW_EMAILS0020703), and Mullaney 8/17/17 Tr. 494:6 – 495:2.

insurance policies for Mullaney's benefit in prior years as well.[185]  For example, in calendar year

2013, the Debtor paid nearly $17,000 in premiums for two life insurance policies maintained on

Mullaney totaling $7.66 million. [186]  No board resolution was passed prior to December 2015

authorizing the Debtor to pay these premiums.  Mullaney stated that payment of the premiums

was included in his employment agreement because of the dangers associated with certain trips

he takes.[187]  Of course, Mullaney didn't actually have an employment agreement until December

2015.  The Debtor only maintains small insurance policies on its remaining employees,[188]

although several of them also travel extensively.

### 2.    Key Man Term Life Insurance Policies

The Debtor maintains two key man life insurance policies on Mullaney for the benefit of

the ███████████████████████████ as initially required by the terms of the

Debtor's Loan Agreement with ████████.  The first policy is a $6 million yearly renewable

term life policy through First MetLife Investors Insurance Company, which was effective

November 4, 2011 and is renewable yearly provided that the $9,669 annual premium is timely

paid.  This policy was originally issued at the insistence of HelpMeSee pursuant to its consulting

agreement with the Debtor.  However, when that requirement ceased upon the termination of the

consulting agreement, the beneficiary was changed to ████████.  The second policy is a $1.5

million yearly renewable term life policy and is also through First MetLife Investors Insurance

Company.  The second policy was effective July 1, 2013 and is renewable yearly provided that

the $2,949 annual premium is timely paid.  While the requirement that the Debtor maintain a key

---

[185]Doc. Ex. 101 (October 2014 emails between Fuchs and Mullaney discussing review and costs of insurance and noting that WonderWork is paying these costs) (WW_EMAILS0011606).

[186]Doc. Ex. 102 (May 1, 2015 email from Mullaney to Fuchs questioning costs of life insurance policies) (WW_EMAILS0011568).

[187]Mullaney 8/17/17 Tr. 414:14-22.

[188]Fuchs 8/15/17 Tr. 364:21-24.

man life insurance policy and a long term disability policy on Mullaney for the benefit of ███████ was amended out of the ███████ Loan Agreement in December 2013, the Debtor has nevertheless maintained the key man life insurance policies.

### 3. D&O Policies

The Debtor maintains a $2 million directors and officers liability policy (the "D&O Policy") through Great American Insurance Companies, with the costs of defense being in addition to the liability limit.[189]  The most recent policy was issued in October 2016, but the D&O Policy was initially issued in October 2013.  The policy premium is $14,140.  The D&O Policy does not cover any civil or criminal proceedings initiated against any insured prior to October 3, 2016 and does not cover any "Wrongful Act(s)", which are defined to include "any actual or alleged error, misstatement, misleading statement, act or omission, neglect or breach of duty."

In addition to the D&O Policy, the Debtor maintains a $2 million excess directors and officers policy with Westchester Fire Insurance Company (the "D&O Excess Policy").[190]  The D&O Excess Policy is also a claims made policy.

### 4. Commercial Liability Policy

The Debtor maintains a commercial umbrella liability policy with Philadelphia Indemnity Insurance Company (the "Commercial Liability Policy") that provides coverage relating to, for example, (1) general liability in the amount of $2 million per occurrence and $2 million in the aggregate, (2) personal and advertising liability in the amount of $1 million, (3) auto liability coverage of $1 million per accident, and (4) employee benefits liability of $1 million per claim

---

[189]Doc. Ex. 103 (D&O Policy) (WON-EX 043056).

[190]Doc. Ex. 104 (D&O Excess Policy) (WON-EX043020).

and $1 million in the aggregate.[191]  The policy premium is $1,425 and has a term from October 3, 2016 to October 3, 2017.

### C.   Impact Loans

The Debtor is a party to a number of unsecured loan agreements totaling over $9 million. The Debtor calls these loans "impact loans," a type of impact investment.

### 1.   What is an impact investment?

According to the Global Impact Investing Network ("GIIN"), a nonprofit whose mission is to increase the scale and effectiveness of impact investing globally, impact investments are "investments made into companies, organizations, and funds with the intention to generate measurable social and environmental impact alongside a financial return."[192]  The G8's Social Impact Investment Taskforce has stated that "the defining characteristic of impact investment is that the goal of generating financial returns is unequivocally pursued within the context of setting impact objectives and measuring their achievement."[193]

Regardless of the accepted definition, impact investments are supposed to allow investors to achieve a return on their capital while also creating a positive social impact.[194]  Financial gains for the investor can be at market or below market, depending upon the goal of the investor.[195] Moreover, impact investments can take a variety of forms, including debt and guarantees for

---

[191] Doc. Ex. 105 (Commercial Liability Policy) (WON-EX 043153).

[192] *See* https://thegiin.org/impact-investing/ (last accessed Sept. 26, 2017). GIIN's definition of impact investment has been adopted in law review articles and journals on the topic of impact investment.  *See, e.g.*, *Deborah Burand, New Directions in Community Lawyering, Social Entrepreneurship, and Dispute Resolution: Resolving Impact Investment Disputes: When Doing Good Goes Bad*, 48 Wash. U. J.L. & Pol'y 55, 58;  Ranajoy Basu, *Social Impact Investing: The Growing Trend of Financing for Good*, 8 J. Int'l Banking & Fin. L 483A.

[193] Social Impact Investment Taskforce, Impact Investment: The Invisible Heart of Markets 1 (2014), available at http://www.socialimpactinvestment.org/ (last accessed Sept. 26, 2017).

[194] Doc. Ex. 106 (What is Impact Investing and How Does it Work?) (WON-EX 017336).

[195] Grantmakers in Health, Guide to Impact Investing 7-8 (2011), available at http://www.gih.org/files/usrdoc/GIH_Guide_to_Impact_Investing_FINAL_May_2011.pdf (last accessed Sept. 27, 2017).  WW_EMAILS0227860

nonprofit entities or equity, deposits, and real assets for social purpose for-profit entities. In addition to measuring financial gains, impact investors also measure and report on the social performance and progress made as a result of their investments.[196] While the use of impact investments is rising, the focus of such investments is generally on privately-owned social purpose companies and nonprofit revenue generating organizations that can ultimately produce funds to repay the impact investment rather than on traditional nonprofits that make grants and provide services free of charge, such as the Debtor.[197]

## 2. Impact Loan Pitches

The Debtor pitched each of the impact loans as a mechanism for it to raise start-up capital to fund its direct mail program and scale its capacity to provide more surgeries faster.[198] The Debtor explained to potential lenders that, while in the long run direct mail is the most cost-efficient way for it to raise money, direct mail is also expensive for all charities in the beginning because charities lose money on every new donor for the first year or so. Therefore, the Debtor explained that it needed financial reserves to invest in donor acquisition so that it could reap the benefits of having so many donors in later years. Using its experience at SmileTrain as a model, the Debtor estimated that it needed $15 million to help it acquire over 250,000 donors, who would then donate a projected $75 - $100 million over a five year period. The Debtor told potential lenders that the impact loans would be real five year loans paying 2% interest annually. Moreover, the Debtor told potential lenders that the IRS would treat the impact loan as a

---

[196]GIIN Core Characteristics of Impact Investing, https://thegiin.org/impact-investing/need-to-know/#s2 (last accessed Sept. 27, 2017).

[197]*See, e.g.*, Sharon Schneider & Page Snow, Foundation Source, Program-Related Investments: An Overview 3 (2012). The Debtor considered providing Foundation Source information to a potential lender. Erin Worsham, The Fuqua School of Business at Duke University, What is Impact Investing and How Does it Work?, available at https://centers.fuqua.duke.edu/case/2013/01/08/what-is-impact-investing-and-how-does-it-work/ (last accessed Sept. 27, 2017). The Debtor provided this article with its impact loan pitch materials. *See* Doc. Ex. 107 (WON-EX 017336).

[198]Doc. Ex. 108 (sample form pitch letter ███████) (WON-EX 017317).

donation, allowing for a 100% tax deduction up front regardless of whether the loan was paid back and also that foundation lenders could treat the impact loan as a distribution.

The Debtor chose to pursue Impact Loans from various individuals in lieu of traditional donations because of the potential close relationship that could be cultivated as a result of the loan. Mullaney thought parties would likely give more money to the Debtor in the form of a loan than a donation and that the five-year term of the loans would give the Debtor an audition period to prove that it deserved the funds and had earned them. He hoped from the beginning that the loans would be forgiven.

Mullaney started by pitching ████████ for a $10 million loan in or around January 2013. ████████ agreed to loan the Debtor $7.5 million to be exclusively used for direct mail costs. ████████ also agreed that the loan could be used as a "challenge grant" to obtain additional loans. The Board approved of the Debtor obtaining the ████████ loan and seeking other matching loans. After some negotiation, the ████████ loan closed in May 2013. At or around the same time, the Debtor began pitching others to provide the Debtor an impact loan. Among others, the Debtor sent pitch materials to donors that had given it over $15,000, high net-worth donors, and foundation donors with assets of at least $100,000.

The number of parties that were going to lend to the Debtor was a moving target for a period of time, with certain parties apparently initially expressing interest in providing a loan but ultimately electing not to participate and others deciding to make a donation in lieu of a loan. For example, ████████ initially expressed interest in providing a $4 million loan to fund the Debtor's direct mail costs, but ultimately made a $1 million donation through her foundation that was supposed to be restricted for surgeries.

As a result of the impact loan pitches, the Debtor ultimately received thirteen donations totaling over $1.6 million in lieu of loans and entered into loan agreements (collectively, the "Loan Agreements") for loans totaling $9.7 million with the following parties (the "Lenders"): (1) ███████; (2) ████████████████████████████; (3) J████████████████ ████████; (4) ████████████████████████████; (5) ████████ ████████████████████; (6) ████████████████████████████ ████████████; and (7) ████████████████████████████. The Loan Agreements were executed beginning in May 2013 with the ████████ Loan and ending in May 2014 with the ██ Loan.  A summary of the loans, dates of agreements, and amounts is as follows:



| Lender | Loan Amount | Scheduled Claim Amount[199] | Loan Date | Note Maturity Date | Exhibit Number |
|---|---|---|---|---|---|
| ███████ | $7,500,000.00 | $7,979,166.67 | 5/15/13 | 5/15/18 | Doc. Ex. 109 (WON07151) |
| ████ | $100,000.00 | $106,833.33 | 7/31/13 | 7/31/18 | Doc. Ex. 110 (WON01249; WON01257; WON01693) |
| ███████ | $250,000.00 | $110,750.00 | 8/8/13 | 8/8/18 | Doc. Ex. 111 (WON01259; WON01694) |
| ████ | $250,000.00 | $60,083.33 | 8/26/13 | 8/26/18 | Doc. Ex. 112 (WON01267; WON01275) |
| ███████ | $500,000.00 | $524,833.33 | 12/2/13 | 1/1/19 ($300,000)  1/1/20 ($200,000) | Doc. Ex. 113 (WON01276) |

---

[199]Based on the Initial Schedules.

| Lender | Loan Amount | Scheduled Claim Amount[199] | Loan Date | Note Maturity Date | Exhibit Number |
|---|---|---|---|---|---|
| ███████ | $100,000.00 | $0.00 | 12/19/13 | 12/19/18 | Doc. Ex. 114 (WON01286; WON01294) |
| ███ | $1,000,000.00 | $845,500.00 | 5/1/14 | 5/1/19 | Doc. Ex. 115 (WON01666; WON01677) |
| **Total:** | **$9,700,000.00** | **$9,627,166.66** | | | |

### 3. Loan Terms

The Loan Agreements generally contain the same terms, with some notable exceptions outlined below.

### a. Basic Loan Terms

Each of the Loan Agreements sets forth the loan amount and provides that the loan will be evidenced by an unsecured promissory note that will accrue interest at the rate of 2% per annum. Per the Loan Agreements, the principal and all accrued interest on each of the Loans is payable in five years from the closing date.

### b. Loan Forgiveness

With the exception of the ███ Loan, each of the Loan Agreements provides that "[u]pon maturity of the Note, Lender may forgive some or all of the unpaid principal and accrued interest still owing from Borrower at Lender's sole discretion." The ███ Loan Agreement does not contemplate the potential forgiveness of the ███ Loan upon maturity of the Note. Nevertheless, as set forth herein, $200,000 of the ███ Loan has been forgiven.

## c.      Purpose of Loan and Use of Proceeds

With the exception of the ███ Loan Agreement, each of the Loan Agreements provides that "Funds loaned by the Lender shall be used to generate additional funding for WonderWork programs and facilitate the more effective and efficient delivery of surgeries for the poor and needy served by WonderWork."  The ███ Loan Agreement provides that the "purpose of the Loan is to further Borrower's charitable mission of providing free surgery and related medical treatment to poor children in developing countries."

Again, with the exception of the ███ Loan Agreement, the Loan Agreements require WonderWork to "use the proceeds of the Loan exclusively for the purposes" set forth in the agreement and subject to the limitations in the agreement and further require WonderWork to "repay any portion of the Loan not used for such purposes, unless otherwise agreed to by the Lender and Borrower in writing."  Conversely, the ███ Loan Agreement specifically provides that:

> (i) at least 80% of the proceeds of the Loan shall be used to cover direct costs, as enumerated in the Proposal dated February 11, 2014 submitted to Lender by Borrower, of facilitating the more effective and efficient delivery of surgeries for the poor in developing countries, and (ii) the remaining proceeds may be used for the general operating support of the Borrower.

The February 11, 2014 proposal provides that the ███ Loan proceeds would be used specifically to fund surgeries as opposed to fund the Debtor's direct mail costs like the other impact loans.[200] However, despite this requirement, ███ submitted an affidavit to the Bankruptcy Court indicating that the purpose of the ███ Loan was "to generate additional funding for WonderWork's programs and thereby facilitate the charity's mission of sponsoring free

---

[200]Mullaney Ex. 32.

surgeries . . ." Like with the other Loan Agreements, the Debtor is required to repay any

portion of the ███Loan not used for the purposes set forth in the ███Loan Agreement.[201]

### d.  Representations and Warranties

The Debtor made certain representations and warranties in each of the Loan Agreements.

Notable representations and/or warranties include the following:

### i.  Asset Levels

The ███████ Loan Agreement originally required the Debtor to maintain net assets

levels greater than $5 million and to maintain annualized expenditures of more than 75% of all

public donations on program service activities.  The ███Loan Agreement originally required the

Debtor to maintain annualized expenditures of more than 80% of all public donations on

program service activities.  However, as a result of amendments thereto, the ███████Loan

Agreement and the ███Loan Agreement now both require the Debtor to maintain net assets of

$1.5 million and to maintain annualized expenditures of more than 50% of all public donations

on program service activities.  Mullaney justified these revisions to the Loan Agreements by

projecting that the Debtor would gradually increase its program spending over time to 75%.  As

of September 2013, the Debtor represented that its program spending was at 55%, which

Mullaney said was not abnormal for a start-up nonprofit.  (Of course, Mullaney was including in

that percentage a portion of the direct mail expenses in his definition of "program" expenses.)  In

support of amending the Loan Agreement, the Debtor represented to ███████ that the Better

---

[201]*Declaration in Opposition to HelpMeSee's Motion to Appoint a Trustee*, Docket No. 59.

Business Bureau recommends a 65% program spending ratio and that the American Institute of Philanthropy recommends a 60% minimum.[202]

The ▉▉▉ Loan Agreement also requires the Debtor to maintain net assets of $1.5 million but does not contain an annualized expenditures requirement.[203] The ▉▉▉ Loan Agreement requires the Debtor to maintain net assets levels greater than $5 million and to maintain annualized expenditures of more than 75% of all public donations on program service activities. Unlike with the ▉▉▉▉ Loan Agreement and ▉▉▉ Loan Agreement, the ▉▉▉▉ Loan Agreement was not amended to revise the net asset level requirement, despite a request for an amendment being made.

The ▉▉▉▉▉▉▉▉▉▉ Agreements do not require the Debtor to maintain a net asset level. However, irrespective of the requirements of the Loan Agreement, the Board Policy Manual required the Debtor to maintain assets of no less than 100% of liabilities.

### ii. No Litigation

Each of the Loan Agreements contains a representation that:

> There is no action, suit, or proceeding pending or threatened before any court or governmental or administrative body or agency, nor is there any basis for any such action, that may reasonably be expected to result in a material adverse change in the activities, operations, assets, properties, or condition, financial or otherwise, of [WonderWork], or to impair the ability of [WonderWork] to perform its obligations under the Loan Documents.

However, each of the Loan Agreements was executed after HelpMeSee filed its counterclaims in the arbitration. In addition, the ▉▉▉▉ Loan Agreement was executed before a settlement

---

[202] Doc. Ex. 116 (September 2013 email from Mullaney to ▉▉▉ regarding program spending and providing a 10 year forecast) (WON07611).

[203] The ▉▉▉ Loan Agreement also originally required the Debtor to maintain net assets levels greater than $1 million, but the requirement was revised by the First Amendment to Loan Agreement, dated March 31, 2015.

was reached in the action filed by SmileTrain SDNY Action alleging copyright infringement, commercial disparagement, and misappropriation of trade secrets by Mullaney.[204]  Accordingly, the accuracy of the no litigation representation is questionable.  It is also unclear whether the HelpMeSee Arbitration or SDNY Action were disclosed to the Lenders.

### iii.    Other Indebtedness

Several of the Loan Agreements, including the ███████ Loan Agreement, the ██ ██████Loan Agreement, the ██████ Loan Agreement, and the █████Loan Agreement, prohibit the Debtor from issuing any debt that ranks senior to the given Loan or that ranks pari passu with the given Loan without the Lender's consent.  In lieu of the pari passu language contained in the other Loan Agreements, the █████Loan Agreement, ████████ Loan Agreement, and ███████Loan Agreement all prohibit the Debtor from incurring indebtedness other than similar impact loans, except in the ordinary course of business.

### e.    Reporting Requirements

Both the ████████ Loan Agreement and the █████Loan Agreement contain reporting requirements.  The ████████Loan Agreement requires reporting every four months while the ████Loan Agreement requires yearly reporting.  The following must be reported:

i.    An accounting of all expenditures of proceeds of the Loan expended during [the reporting period], and cumulatively, by category and amount of expenditure, as well as the amount of any unexpended loan proceeds held by [WonderWork];

ii.    A report of additional funds raised to date by [WonderWork];

iii.    The number and nature of surgeries performed by [WonderWork] in the period covered by the report,

---

[204]The ███████ Loan Agreement was executed on May 13, 2013, but the SDNY Action was not settled until July 9, 2013.

including the number and nature of surgeries funded by proceeds of the Loan, and the names of the health care providers (*e.g.* hospital or clinic) where the surgeries were performed;

iv. The financial position of [WonderWork] (including the provision to the Lender of [WonderWork's] audited financial statement on an annual basis; and

v. Any other material information demonstrating [WonderWork's] progress in accomplishing its mission and its ability to repay the Note at maturity.

The ████████ Loan Agreement requires two face to face meetings with Mullaney per year during the term of the Loan. The documentary reporting required by the ██████ Loan Agreement occurred as required and, at minimum, several face to face meetings between Mullaney and the ████████ occurred. While certain reports required by the ██ Loan Agreement were produced, it is unclear whether the reports occurred yearly as required. The Debtor also provided periodic updates to the other Lenders with the information that had also been presented to the ████████.[205]

████████████████████████, or their designee are also permitted by the terms of the ████████ Loan Agreement to attend the non-executive session of the annual June Board of Directors meeting. To date, the ████████ have not attended a Board meeting. However, Poehling was added to the Debtor's Board at the ████████ urging and recommendation. Poehling also resigned from the Board in June 2017 at the ████████ direction.

Finally, the ████████ Loan Agreement required the Debtor to arrange a visit, at the Debtor's expense, by ████████████████████████, or their designee to one of the Debtor's partner hospital to review the work enabled through the Loan. Such a trip occurred, but ████████ waived this requirement and paid for the trip directly. The ██ Loan Agreement

---

[205] Mullaney Ex. 31 (February 2015 ████████ Loan update that was distributed to all lenders).

permits a similar program service review, but does not require the review to be at the Debtor's expense.

### f. Closing Conditions

As a condition to closing, among other requirements, each of the Loan Agreements requires the Debtor to deliver certified corporate resolutions evidencing approval of the form, terms and conditions of the Loan Documents by the Debtor's governing body and authorizations of the Debtor's officers to sign and deliver the Loan Documents and Note. No such corporate resolutions were produced and it does not appear that any were ever issued.

### 4. ████████ Loan Insurance Requirement

The ████████ Loan Agreement initially required the Debtor to obtain a key-man life insurance policy and a long term disability policy for Mullaney, with the proceeds payable to ████████. The Debtor obtained the key-man life insurance policy, but ████████ agreed to waive the long term disability policy as it was prohibitively expensive with a projected premium of $40,000 per year. However, the requirement for both policies was amended out via the First Amendment to Loan Agreement, dated December 1, 2013 (the "████████ Loan Amendment").

### 5. Mullaney "Loan"

Mullaney made numerous representations, including to the Board, ████████, and other Lenders, that he had also made a $250,000.00 impact loan to the Debtor. Mullaney apparently represented to the Board that he would be re-investing his FY13 performance bonus of $250,000 into the Debtor as an impact loan.[206] However, Fuchs declined to place Mullaney's purported loan on the Debtor's books because Mullaney had directed her not to actually pay out his FY13

---

[206]Mullaney Ex. 36 and Mullaney Ex. 35 (September 2013 emails discussing the treatment of Mullaney's bonus as an impact loan).

performance bonus, so no money had actually been received back into the Debtor.[207]  While

Fuchs did initially apparently account for the loan from Mullaney on the separate payroll ledger

she maintained on his behalf,[208] Mullaney subsequently directed her to deduct certain expenses

totaling $22,000 from his purported loan balance in any event.[209]  Mullaney conceded that he

never actually made such a loan to the Debtor and no loan agreement or promissory note was

ever signed to evidence a loan by Mullaney.[210]  Accordingly,  the Debtor does not owe any

impact loan principal or interest to Mullaney.

### 6.    Impact Loan Forgiveness and Repayment Plan

Unlike most recipients of an impact investment, the Debtor is not a privately-owned

company with a social purpose or a revenue generating nonprofit organization.  Accordingly, the

Debtor had limited avenues for actually repaying the Impact Loans when the loans were made.

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████[211]  Even in the 10-year marketing summary projections presented to the

Board in October 2013, the Debtor did not project repaying the loans in their entirety until

October 2021, despite maturity beginning in 2018, and even then only at a rate of 66%.[212]

In lieu of repaying the Impact Loans in their entirety, the Debtor hoped that substantial

portions of the Impact Loans would be forgiven, and appeared to have a basis for taking such a

---

[207]Fuchs Ex. 33 and Mullaney Ex. 29 (emails stating that Mullaney loan is not on the books are records).

[208]Mullaney's payroll ledger is discuss in detail *infra*.

[209]Fuchs Ex. 34 (March 9, 2015 email from Fuchs to Mullaney confirming that she deducted $22,000 from Mullaney's impact loan balance).

[210]Mullaney 8/17/17 Tr. 433:17 – 435:7; Fuchs 8/15/17 Tr. 308:19 – 310:7.

[211]Doc. Ex. 121 ██████████████████████████████████████████

[212]Mullaney Ex. 27 (10 year marketing summary showing plan to repay impact loans).  Although the 10-year marketing summary contemplated that the Debtor would obtain $15 million from impact loans instead of the $9.7 million it ultimately raised, the Debtor's spending on direct mail and ability to obtain donors presumably would have also decreased.

position.  Several of the Lenders have already forgiven portions of the Impact Loans prior to

maturity,[213] including the following:

| Lender | Amount Forgiven | Dec. 2016 Loan Balance (without interest) | Exhibit Number |
|---|---|---|---|
| ███████ | $50,000.00 (12/20/13) $50,000.00 (12/21/15) | $150,000.00 | Doc. Ex. 117 (WON07785 WON07780) |
| ██ | $100,000.00 (10/7/14) $100,000.00 (2/5/16) | $800,000.00 | Doc. Ex. 118 (WON07783 WON07779) |
| ████ | $50,000.00 (5/7/14) $50,000.00 (11/10/14) $50,000.00 (8/26/15) $50,000.00 (12/22/16) | $50,000.00 | Doc. Ex. 119 (WON07777) |
| █████ | $100,000.00 (3/31/15) | $0.00 | Doc. Ex. 120 (WON07781) |

Mullaney told others that ██████ was also considering forgiving $2.5 million of his Impact

Loan upon its maturity if the Debtor did not have a large surplus of funds.[214]  Dysart told the

Examiner that his understanding was that Mullaney expected the ██████ Loan, and perhaps

the others as well, to be forgiven by the Lenders when the time came.  However, Dysart also

indicated that he believed one of the reasons for the maintenance of the Debtor's large balance in

the investment account was to insure a source for repayment of the Impact Loans.

The Debtor intended to repay any portions of the Impact Loans not forgiven through

interest gained on invested assets and through unrestricted donations obtained from other major

---

[213] 

[214]*See, e.g.*, Doc. Ex. 123 (September 11, 2013 email from Mullaney to ██████ with impact loan pitch) (WON07608).

14592424.11
228676-10002

donors prior to the maturity of the respective Impact Loans.[215]  While repaying the Impact Loans

through donations from others is counter to the way in which traditional impact investments are

generally repaid, the Examiner did not uncover any evidence to suggest that the Impact Loans

were not "real" loans that could not or would not be ultimately repaid according to their terms.

Therefore, the Examiner does not recommend that the Impact Loans be re-characterized as

donations.


## IX.    FUNDRAISING

### A.    Introduction

From its inception, the Debtor has been a fundraising vehicle in search of a mission.

Opportunistic rather than strategic, the Debtor's mission has shifted based on the productivity of

its fundraising campaigns.  Initially fundraising for five causes: "blindness, cleft palate, clubfoot,

hydrocephalus, and burns,"[216] the Debtor replaced cleft palate with pediatric cardiac surgery in

2012.[217]  After initial fundraising results for hydrocephalus and pediatric cardiac surgery were

poor, the Debtor stopped fundraising for those causes, and focused instead on blindness, clubfoot

and burns.

In 2012, with the HelpMeSee arrangement heading towards litigation and disputes with

SmileTrain continuing, Mullaney turned his attention to aggressively raising money for the

Debtor, both in WonderWork's name and through the names of the three new DBAs – 20/20/20,

FirstStep and BurnRescue.[218]  Fundraising in WonderWork's name, Mullaney concentrated on a

---

[215]Mullaney 8/17/17 Tr. 336:16-25; Fuchs 8/15/17 Tr. 305:22 – 307:11.

[216] Doc. Ex. 124 (Certificate of Incorporation) (WON-EX 0019).

[217] Doc. Ex. 125 (WON-EX 000014).

[218] The Debtor established the "FirstStep" and "BurnRescue" DBAs on August 23, 2012 and the "20/20/20" DBA on January 23, 2013.  As Mullaney explains:

high touch, personalized strategy with major donors.  For the DBAs, he focused almost

exclusively on mass-marketing campaigns and invested heavily in acquisition mailings to

develop a large donor base.

By 2014, however, FirstStep and BurnRescue were not generating sufficient revenue, so

the Debtor again shifted its approach and decided to focus principally on blindness, which was

by far the its most successful program.  As Lazarus explained:

> Blindness became our most important program . . . it seemed to
> resonate very well with the donors.  And was a program that we
> could really scale.[219]

Mullaney further explained:

> We are doing primarily blindness, because it is the cheapest and
> donors like it the best and you can help ten times the patients as
> per burns or per clubfoot.[220]

Yet, even with a focus on blindness, it soon became clear that the fundraising program

wasn't working as expected.  Hobbled by his legal disputes with HelpMeSee and SmileTrain and

by the high costs of the DBA campaigns, Mullaney recognized that his plan of replicating the

SmileTrain model would not likely succeed: "It's not working as well as we hoped. It's not

---

Our direct mail, we started out spending huge amounts on acquisition and it did
not work as well as when we were at SmileTrain, so we had to kind of pivot and
reduce – the original plan was five causes, and I was trying to raise $5 million
for each cause and actually was very close to it.

And then the whole Charles Wang thing with SmileTrain blew up and I lost a lot
of donations….So that killed us.  So we trenched from that and we said, well,
we have enough capital to do three causes:  Burns, clubfoot and blindness.

Mullaney Tr. 8/16/17, 136:15-137:7.

[219] Lazarus Tr. 8/8/17, 112:23-113:9.

[220] Mullaney Tr. 8/16/17, 137:16-20.

working like SmileTrain," Mullaney said.[221]  For Mullaney, who measured success by the "cost

to raise a dollar,"[222] his plan was simply costing too much.

As a result, in 2016, Mullaney changed course again, decided to reduce the expensive

donor "acquisition mailings," and shift to smaller, targeted mailings, particularly to high net

worth donors.  Mullaney, in discussing his decision to move away from very large mailings,

admits: "It was a lot of waste. The net was very small."[223]

### B.      Overview of Fundraising

Informed by his years as an advertising executive and his success at SmileTrain where he

claims to have raised $700 million,[224] Mullaney developed an aggressive fundraising model for

the Debtor.  Skilled at both in-person donor cultivation as well as drafting compelling mass

marketing appeals, Mullaney's fundraising approach for the Debtor, focused principally on

maintaining donor relationships he formed while at SmileTrain, and sourcing new donors

through an extensive direct mail campaign.

The Debtor's mail campaigns fell into three broad categories: "acquisitions," "renewals"

and "acknowledgments."  Acquisition pieces, sent to prospective donors sourced from rented

donor lists, were designed to introduce WonderWork and the DBAs to the public.  Renewals, on

the other hand, were sent principally to the Debtor's house list of existing donors seeking

additional donations.  Acknowledgments were thank you letters which often included a direct ask

for additional funding.

---

[221] Mullaney Tr. 8/16/17, 193:24-194:2.

[222] Mullaney Tr. 8/16/17, 161:18.

[223] Mullaney Tr. 8/16/17, 198: 18-19.
[224] Mullaney, Tr. 8/16/17, 163:20-21

In total, since its inception in 2011, the Debtor has raised approximately $54.4 million in charitable contributions under the WonderWork name and the names of the individual DBAs.[225] As pictured below, slightly more than half of the total amount raised by the Debtor has been in Wonderwork's name with the balance in the names of individual DBAs. For the DBAs, 20/20/20 has been its most successful cause, raising almost twice as much money as the other causes combined.



[226]

1.     **Fundraising for WonderWork**

Unlike the DBAs, which have approximately 200,000 unique donors,[227] WonderWork's direct mailing list is relatively small, and is primarily focused on approximately 200[228] "major

---

[225] Doc. Ex. 126 (WON-EX040271).

[226] Doc. Ex. 127 (WON-EX040271).

[227] Huang Tr. 8/9/17, 26:18-19.

[228] Lazarus Tr. 8/8/17, 33:24.

donors" (currently, contributors above $250),[229] many of whom Mullaney brought over from SmileTrain. Most of the money raised by WonderWork directly (as compared with the DBAs) resulted from direct personalized appeals by Mullaney to individuals and family foundations. Lesser amounts, though still significant, were raised through acquisition mailings targeted to recruit new foundations and donors.[230]

### WonderWork Summary Donations by Category

| | FY 2012 | FY 2013 | FY 2014 | FY 2015 | FY 2016 | FY 2017[1] | Total | % |
|---|---|---|---|---|---|---|---|---|
| Solicitations | $14,200 | $1,259,643 | $3,307,814 | $1,593,853 | $1,668,275 | $1,041,376 | $8,885,161 | 31.8% |
| Personal Appeals (XX)[2] | $7,107,977 | $2,649,395 | $2,430,499 | $2,389,213 | $3,086,051 | $612,200 | $18,275,335 | 65.5% |
| Other[3] | $15,530 | $54,527 | $116,351 | $200,095 | $135,268 | $218,144 | $739,916 | 2.7% |
| Total | $7,137,707 | $3,963,565 | $5,854,664 | $4,183,161 | $4,889,594 | $1,871,720 | $27,900,411 | 100.0% |

Source: DMI System

[1] FY 2017 data from July 1, 2016 through December 28, 2016

[2] Personal appeals / donations made by larger donors, endowments or foundations not associated with a specific solicitation. XX is used as a placeholder in position 9-10 of the Transaction Code in the DMI System

[3] Other category includes WM, UN, SF in position 9-10 of the Transaction Code in the DMI System. WM and UN are used as placeholders in this instance for donations that are received through WonderWork's website, white mail, or otherwise cannot be matched to a specific solicitation material. SF is used as a placeholder to represent donations made through special fundraisers not associated with specific solicitation material.

Slightly more than $18 million of the approximately $28 million raised by WonderWork directly – or 65% of its total donations – was derived from Mullaney's personal appeals. The largest of this group by far is $13 million contributed by the ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, led by ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. The ▓▓▓▓▓▓▓▓▓▓ gifts included a $5 million seed grant provided to Wonderwork in 2011 and successive $2 million annual operating grants made between 2012 and 2015.

▓▓▓▓▓, like many other donors, came to the Debtor, through his prior relationship with Mullaney. As Lazarus puts it, "these were people from SmileTrain that wanted to help Brian in

---

[229] The threshold for a "major donor" had initially been $500, but decreased over time to $250.

[230] The chart below was prepared by Goldin Associates.

his new venture."[231]  Mullaney carefully cultivated relationships with the major donors through frequent contact and updates.  For example, Mullaney would fly to Switzerland each year and report to the ████████████████ board on the Debtor's success and request additional funding for the upcoming year.  Additionally, Mullaney and his wife would take annual summer vacations with ████████████████.  Mullaney also made multiple trips to Texas visit major donors like ████████████████, and frequently socialized with other major donors such as ████████████████.

Mullaney also kept in frequent touch with major donors through "Reports from the Field," lengthy first-person accounts of Mullaney's trips to medical centers and treatment camps in developing countries.  Illustrative of such mailings, which typically included envelopes for making donations, is a March 2015 report regarding a Mullaney trip to India.  The cover letter outlines Mullaney's experience, stating that "I just got back from an eye-opening, 18,000-mile trip to the poorest areas of India, and I wanted you to see for yourself the impact of your generous support." He then describes visiting blindness camps where thousands "showed up on one day in the hopes of getting their eyesight restored" or a burn camp where over 800 "severely burned children and adults come from all over India in the hopes of getting free reconstructive surgery."[232]

Typical of these reports, Mullaney details the travel challenges in reaching these remote locations, stating that "it took 36 hours to travel from the U.S. to this tiny village in Bihar, India."  Mullaney describes the poverty around him and the number of people desperate for WonderWork's miracle surgeries.  As Mullaney writes, "more than 20 million children and adults in developing countries are 'needlessly blind'" and "to be blind in a developing country is

---

[231] Lazarus Tr. 8/8/17, 45:24-46:2.

[232] Doc. Ex. 128 (WON-EX 3911).

14592424.11
228676-10002

a matter of life and death." Mullaney further explains that "having a blind child is worse than being blind yourself."[233] Mullaney then describes the unbelievable experience of watching adults who haven't seen in years have their eyesight restored, "once they realize that they can see – they react and you can see what a life-changing moment this is."[234]

Apart from its major donors, the Debtor has developed a modest mailing list which was used to send mailings to existing donors. These mailings were prepared in-house by the Debtor's staff up until the summer of 2016, when the process was largely outsourced to a third party vendor, Log On. Regardless of whether prepared in-house or by a third-party vendor, at all times, Mullaney maintained complete control of the process.

Highly protective of his cultivated relationships, Mullaney carefully crafted the mailings and personalized them for donors, often adding his own handwritten notes to the materials. He prepared the text, selected photos and approved the overall content and design before printing. As Lazarus – who oversees the mailings to the Debtor's major donors – confirmed in response to a question from the Examiner:

> MR. LILIEN: Does he [Mullaney] confirm with you want you send out before you send it?
>
> THE WITNESS: Brian always confirms what we send out.[235]

Using heart wrenching photos, the mailings describe the plight of children in developing countries who suffer from causes supported by WonderWork. For example, an oft-repeated story is that of a nine-year old girl name Priya, and how for six years her father "took Priya from

---

[233] Doc. Ex. 129 (WON-EX 3901).

[234] Doc. Ex. 130 (WON-EX 3903).

[235] Lazarus Tr. 8/8/17, 24: 20-23

hospital to hospital, begging them to help her.  They said no.  But one day, he saw an ad from one of our partner hospitals offering free eye surgery for the poor."[236]

Other mailings describe how WonderWork provides "modern-day, medical miracles that give crippled children the chance to walk and run.  That re-build the faces of children who've been deformed by burns.  And that give blind children and adults the chance to see again."[237] The materials describe how the surgeries provided by the Debtor enable "a child or adult who was blind [to] open their eyes and see.  A child who was crippled with clubfoot walk for the first time.  Or a severely burned child see themselves in the mirror for the first time after their bandages come off."[238]

Using rented donor lists, the Debtor would also send form letters to grantmaking foundations asking if a grant proposal could be sent to the foundation.  According to Lazarus:

> "The only type of mass mailing that we've done [for WonderWork] is the foundation acquisition mailing, which is seeking prospective foundations, whether family foundations or corporate foundations, through a rented list and mailing out a letter that asks them could we send you a proposal.  Many people would respond with a check; it didn't even get to the proposal part."[239]

When a foundation would express interest, the Debtor would provide a grant proposal specifying the number and cost of surgeries to be performed and what type (blindness, burns or clubfoot).  Virtually all of the Debtor's grant proposals to foundations included the promise that 100% of the donation would be used to fund surgeries, stating overhead and administrative costs are covered by a founding donor.  Upon completion of the grant, WonderWork would send the

---

[236] Mullaney Ex. 46.

[237] Mullaney Ex. 10.

[238] Doc. Ex. 131 (WON-EX 010973).

[239] Lazarus Tr. 45:8-17.

foundation a final grant report detailing where and how the donation was spent. This information would be derived from grantee reports to the Debtor.

In addition to the personal outreach and mailings to major donors, the Debtor also maintains an active website, www.wonderwork.org, through which prospective donors can make contributions to the Debtor. Over $300,000 donations have been made in this manner since 2011.[240]

## 2. Fundraising for DBAs

As noted above, unlike donations made in WonderWork's name, substantially all of the contributions to the DBAs were raised through mass market direct mail campaigns. The Debtor's marketing department, which has been led by Janet Huang since February 2015, is responsible for managing these campaigns. Huang, like her predecessors, Barbra Schulman, Amee Kandar and Elaine Patafio, were Marketing Directors (or the equivalent) in title alone – Mullaney ran the Debtor's marketing department and made all major marketing decisions.[241] Like WonderWork, ultimate approval remained with Mullaney. As Huang describes:

> Mr. LILIEN: If you have to approve something for printing, would you forward the materials to Brian and DeLois and have them both sign off on the copy before it gets printed, or just one of them?
>
> MS. HUANG: He would see the PDF from the agency. He would write back the comments and we would make the changes. And then if it came back close to what was intended, we would approve it.
>
> Q: And DeLois?
>
> A: She sat in on meetings, but this was really Brian's thing.[242]

---

[240] Doc. Ex. 132 (WON-EX 040271).

[241] The Debtor's organizational chart lists Mullaney as Chief Marketing Officer, but it is not clear if he was ever appointed as such.

[242] Huang Tr. 8/9/17, 42:19-43:7

Over its short lifetime, the Debtor has hired and replaced multiple third-party marketing consultants and internal marketing staff responsible for its mass-mailing campaigns. The direct mail consultants have included Massachusetts-based NNE Marketing, LLC, Georgia-based Target Market Team and Maryland-based Creative Direct Response, Inc. d/b/a CDR Fundraising Group. These consultants were largely responsible for preparing initial drafts of the mailings, including the text, images and overall design of the mailings. The direct mail consultants also were responsible for finding print and mail-houses to process the mailings. In addition, the Debtor contracted with a series of "list brokers" for the purpose of acquiring targeted donor lists, and with various other third party consultants to perform donor analytics.[243]

Often unsatisfied with the work prepared by direct mail vendors, Mullaney would rewrite much of the text of the DBA mailings himself. According to Mullaney:

> Usually our direct mail vendor has been doing it. I have been really unhappy with their writing because it's usually some 22-year-old who has never been in a burn ward in Dehli, and it sounds like it.[244]

### a. DBA Fundraising Process

Like WonderWork mailings, DBA mailings fall into three broad categories: "acquisitions," "renewals" and "acknowledgments." Acquisition pieces are sent to prospective donors, typically sourced from rented donor lists, which introduce the recipient to the DBAs. Renewals, on the other hand, are sent principally to the Debtor's DBA "house list" of existing donors. The Debtor has about 100,000 active unique donors on its DBA house list; with non-active donors, the Debtor's list is doubled to about 200,000 unique donors.[245] Acknowledgments are principally thank you letters to existing donors, which also often inform donors how their

---

[243] These consultants included Greatest Good, Julie Shafer, and Boston Consulting Group.

[244] Mullaney Tr. 8/16/17, 162: 7-12

[245] Active means a donor who has made a donation within the last 24 months.

money is being spent. A typical direct mail package for acquisitions and renewals would include an outer envelope, a letter, a reply device and a return envelope; the acknowledgments sent varied in form.[246]

The number of such direct mailing that were sent under the DBA campaigns is enormous. Taking 20/20/20 as an example, the Debtor has sent over 54.6 million pieces of mail in just four years of existence. In 2013, after the 20/20/20 DBA was established, the Debtor sent out over 30 distinct 20/20/20 mailings, including 19 acquisition mailings and 11 renewal mailings, with some donors receiving multiple mailings a month. Around July 2013, a decision was made to lessen the number of DBA mailings. According to Huang, "we were over mailing . . . we just realized the results were not where they were, that we needed to put a stop to it and just rethink the mail program."[247] At that point, the Debtor's strategy changed "we stopped mailing all three DBAs to outside lists. The focus was to mail 20/20/20 as the lead cause, and BurnRescue and FirstStep were reserved more for the house list rather than for a renting list and mailing outside lists."[248] However, the mailings continued to be substantial. In 2016, despite suspending acquisition mailings in May of that year, the Debtor sent almost 30 mailings for 20/20/20 in addition to a series of email campaigns, and also sent mailings for BurnRescue and FirstStep about 12 to 14 times a year.[249]

---

[246] *See* Huang Tr. 8/9/17, 16:16-17:3

[247] Huang Tr. 8/9/17, 22:2-6

[248] Huang Tr. 8/9/17, 23:2-7

[249] *See* Huang Tr. 8/9/17, 62:21-63:2

Similar to the WonderWork mailings, the DBA materials are drafted to pull at a potential

donor's heart strings.  Mullaney's strategy is to place the reader in the shoes of an inflicted

individual and their family.  As Mullaney explains:

> The strategy – my goal is to write a letter so that the reader feels
> they are with me in Bangladesh or Afghanistan or Somalia or
> wherever I am.
> That's my goal and to be very intimate and honest with them and
> tell it like it is and not give a sanitized version, anything like that.
> So that's my strategy when I write a letter. [250]

Largely featuring deformed, sick or dying children, the reader is drawn into a story

through graphic pictures and pleas of desperation, often with "imagine if…" type of messages.

For example, the donor is asked, "Can you imagine watching your son or daughter remain blind

year after year, solely because you were too poor to help them?"[251] or "imagine watching your 5-

year-old daughter remain blind year after year because you couldn't afford a three hundred dollar

surgery that would restore her eyesight."[252]

Donors are told about children who "sit home alone, with no school, no friends, no

future"[253] or who will be "shunned" their whole lives because of twisted feet. [254]  As one

solicitation explains, "severely burned children don't attend school, get a job or marry.  They're

often kept hidden away at shame at home a burden to their families.  A child who has been

severely burned in a developing country has no hope, no future, no chance."[255]  The family is

---

[250] Mullaney Tr. 8/16/17, 160:17-161:3

[251] Doc. Ex. 133 (WON03769).

[252] Doc. Ex. 134 (WON06055).

[253] Doc. Ex. 135 (WON-EX 048513).

[254] Doc. Ex. 136 (WON04173).

[255] Doc. Ex. 137 (WON01804).

devastatingly poor and cannot afford the "miracle surgery" which can save their child from a lifetime of ridicule and misery.

The prospective donor is led to believe they are the child's last hope, using lines like "help a child no one else will;" or "your donation changed the lives of 1,680 children who no one else would help . . . many of them had been waiting years for the miracle cure that could save them;"[256] or "You and I [Mullaney] may literally be <u>the only hope</u> for children to be able to walk normally and get all they can out of their lives;"[257] or "Because of <u>you</u> a little girl cried tears of joy after taking her very first step. A mother was relieved of the burden of having to carry her everywhere. And a family was spared what would have been a lifelong struggle."[258]

DBA fundraising materials also regularly espouse statistics and facts to give weight to the urgent need for funding and often use different font techniques like bold, underline and italics to emphasize the point. For example, a 20/20/20 fundraising piece proclaims that "<u>blindness is a virtual death sentence</u>. **In fact, more than half of them will die before reaching their fifth birthday.**"[259] Another one states that "**20 million people are blind today solely because they are poor.**"[260] Pitches for FirstStep and BurnRescue follow similarly. A BurnRescue solicitation states that "15 million children in the developing world have life-altering burns . . . In fact, someone is burned <u>every five seconds</u>. *The pain is extreme and the scars are crippling.*"[261] A

---

[256] Doc. Ex. 138 (WON03048).

[257] Doc. Ex. 139 (WON04191).

[258] Doc. Ex. 140 (WON03061).

[259] Doc. Ex. 141 (WON-EX 2135).

[260] Doc. Ex. 142 (WON03184).

[261] Doc. Ex. 143 (WON04070).

FirstStep solicitation includes a heading in large front which read "**2 Million Children Suffering With Clubfoot Can be Saved Through a Miracle Cure**"[262]

As depicted by the examples below, the primary goal of these solicitation pieces is to create an immediate and visceral connection with the potential donor to spur contributions:



262 Doc. Ex. 144 (WON01958).
263 Doc. Ex.145 (WON-EX 046220).

14592424.11
228676-10002

104



P.O. Box 96055
Washington, DC 20090-6055
www.1stStep.org

Dear ███████████████████,

Time is running out for ████████.

Like most little boys, he is full of energy and eager to explore. But unlike every other kid you've probably met, he was born with clubfoot – one of the most common of all birth defects in the developing world.

His clubfoot can be cured... but only if we act right away.

You see, the free treatment that FirstStep provides uses a series of casts that gradually bring the bones in the feet into the proper position. This procedure is safe, non-invasive, does not require surgery, and is virtually 100% effective in small children. The results are remarkable. The only thing that prevents these children from receiving this miracle cure is poverty.

████████ is struggling to walk on his twisted and deformed feet. As he gets older, the bones in his feet are becoming less pliable. The tendons and muscles are more difficult to correct. And we may not be able to completely correct his clubfoot unless we act immediately.

We need to help ████████ now. In a developing country, not being able to walk means not being able to go to school. Without a basic education, he won't be able to learn a trade. Without employment or the ability to walk normally, he may never marry or have a family.

His future will be a world of suffering.

Please make a gift of $25 or $50 to take ████████ or another young child off our waiting list.

**████████ was born with clubfoot, and is on our waiting list for free treatment.**

**He just needs help from a friend like you!**

He is just one of more than 2 million children who are crippled by clubfoot. The sad thing is, almost all of them could be saved by a procedure that costs just $250.

The window of opportunity is quickly closing on many children like ████████. As they grow older, treatment is more difficult and they will remain disabled for life!

*(over, please)*

264

---

[264] Doc. Ex. 146 (WON01921).



**_____ tiny hand traces over her mother's face. But she cannot see.**

**A 15-minute miracle surgery could restore her sight. But even the small cost is far more than _____ family can afford. Please help ...**

Dear Sample A. Sample,

Your mother's face is probably the first face you ever saw.

*It is the face that taught you how to smile, to laugh, to love.*

**But little _____ has never seen her mother's face.**

She lives in a world of darkness and mystery and fear. Because she is blind and poor, she will never go to school. And when she grows up, she may have few options other than begging with a tin cup on a dirty street corner.

**But it doesn't have to be this way.** My name is Brian Mullaney and I have stood side by side with poor families and held their hands as the bandages were slowly unwrapped ...

I have seen children blink their eyes, squint in the light and smile as they see their parents' faces ... often for the first time.



*Help _____ see her mother's face for the first time!*

**They went from blindness to vision in only 15 minutes. I call that a miracle!**

And perhaps the biggest miracle of all is this surgery costs only $300. Yet even this small amount is far more than many poor families in the world's developing countries can ever afford.

*They carry their blind children on their backs over rutted roads and rocky trails for 30 or 40 miles or more. They come desperately hoping for a miracle that will open their children's eyes and transform their lives.*

**That is why I am writing to you today. I am asking you — begging you really — to help me make a miracle come true. To permanently cure blindness for a poor child or adult.**

If you have $300 today to pay for a surgery, that would be a wonderful and generous gift. But even if you don't have that much to give, you can still help. You can join with other caring Americans by giving $150, $75, $50 or even $25 today. **Any amount will help!**

By adding generous gifts together, we can give a blind child the surgery that can help her see

*(over, please)*

20 | 20 | 20 | P.O. Box 96669, Washington, DC 20090-6669 | www.20x20x20.org

265

---

[265] Doc. Ex. 147 (WON03485).

Acquisition and renewal mailings for the DBAs also regularly included a reply device, which came in two main variations. Most frequently, a "gift array" remittance slip is included which allows a donor to select the size of their contribution and how their money should be used.[266] These reply devices lead donors to believe their donations will cover the cost of a surgery, or a portion of it, depending on the box they select.



The second variation of the gift array is included with matching campaign mailings. Here, donors are told that their donation will be matched by "one of our most generous donors,"[268] whose match will double, or in other cases triple, their gift.



[266] Mullaney Tr. 8/9/17, 178:2

[267] Doc. Ex. 148 (WON03110).

[268] Doc. Ex. 149 (WON04001).

Along with the letters and the reply devices, the envelopes included with the DBA mailings have also played an important marketing function. The envelopes are often plastered with large images of desperate-looking children in need and statements like "Inside: A Miracle Waiting to Happen"[269] or "Your support can transform a child's life forever!"[270]



There's a 15-minute surgery that can restore the eyesight of children who are completely blind.

C1603TTT
20/20/20 March ACQ Tanzania Baby
Quantity: 312,311
Mail Date: 3/10/16

[271]

In addition to the mass mailings, the Debtor also maintains an active websites for each of the DBAs – www.20x20x20.org, www.1ststep.org and www.burnrescue.org. The websites have cumulatively raised approximately $2.6 million in donations to the Debtor.

C.      Relevant Fundraising Law

The Debtor is registered to solicit charitable contributions with the NYAG under Article 7-A of the Executive Law. As an Article 7-A registrant, the Debtor must comply with New York State registration and solicitation laws that are designed to promote transparency and protect donors from fundraising abuses. The Article 7-A registration laws require that soliciting charities like the Debtor file an annual financial report. The report consists of the New York

---

[269] Doc. Ex. 150 (WON01819).

[270] Doc. Ex. 151 (WON03088).

[271] Doc. Ex. 152 (WON03543).

State CHAR500 disclosure form, which includes the Internal Revenue Service (the "IRS") Form 990 and the organization's audited financial statements as attachments.

Two officers of the charity are required to certify under penalties of perjury that the information contained in these forms are true, correct and complete. This attestation includes information contained in the IRS Form 990 and the audited financial statements. For the Debtor, Mullaney and Fuchs made this certification in each year that a CHAR500 was filed with the NYAG (fiscal years 2012 through 2015).

In addition to the registration requirements of Article 7-A, a charity must also comply with the solicitation rules in Article 7-A. These rules require that charities accurately disclose to donors how their charitable contributions will be used and that the charity will in fact use the contributions for those stated purposes. In particular, section 172-d of the Executive Law prohibits charities from:

- §172-d(1) Making any untrue statements in financial reports, including Form 990s

- §172-d(2) Engaging in fraudulent solicitations by means of false representation or promise

- §172-d(3) Using or intending to use any materially false advertising or promotional materials in connection with solicitations

- §172-d(4) Failing to apply contributions substantially consistent with the solicitations

Failure to comply with these rules, as well as the registration requirements, will subject a charity to enforcement by the NYAG. Significantly, in establishing fraud, the Attorney General does not have to demonstrate that there was an intent to defraud or that an injury occurred.[272]

---

[272] Executive Law §172-d(2)

### D. Analysis of Fundraising Materials

For every cynical donor who questions whether their donations are being used as promised, the Debtor has confirmed their very fears. The Examination has identified rampant misrepresentations and systemic problems in the Debtors fundraising materials.

#### 1. Overview of Misrepresentations

The Examiner performed an exhaustive review of the Debtor's solicitation materials. This included a review of every form of solicitation sent on behalf of WonderWork or the DBAs to donors between 2011 and 2017 to assess their accuracy. The Examiner also reviewed the Debtor's emails related to solicitations and questioned the Debtor's staff about the solicitation materials through the interview process.

The Examiner's review revealed that the Debtor's fundraising materials are replete with misleading statements and that the Debtor engaged in a deliberate attempt to present an charitable profile which is inaccurate. The Debtor is not the highly-efficient charity, that is run like a business with virtual no overhead as its solicitation materials claim it to be. Nor is it the transformative charity that is directly saving lives through its own surgical programs that donors are led to believe. In reality, the Debtor is simply an inefficient fundraising operation, often for other charities and NGOs, with millions of dollars spent on fundraising and only a small percentage of funds going to actually help people in need.

The misrepresentations in Debtor's fundraising materials are not isolated instances, but have appeared throughout its solicitations since its inception. These misrepresentations include:

- That donations would be used to pay for surgeries and surgery programs when donations were instead used to pay for direct mail expenses for the fundraising campaigns;

- That donations would be matched – resulting in double or triple the number of surgeries – when in fact the "matching funds" were not used for surgeries but used instead to pay for other expenses;

- That donations would be used to cure blind individuals when in fact the substantial majority of these patients were not blind under international standards;

- That donations would be used to primarily cure blind children when nearly all of the patients were in fact adults suffering from age-related cataracts;

- That a $300 donation would be used to pay for the full cost of a blindness surgery when instead the Debtor only paid $25 to hospitals for such surgeries and kept the rest for fundraising and other expenses;

- That surgeries are free for the patients when that was not always the case;

- That the Debtor was performing the surgeries directly in developing countries when the Debtor was in fact making donations to other charitable organizations, including those based in the United States or Europe;

- That the Debtor represents that it is involved in many more countries then in fact they are;

- That the Debtor incurs virtually no overhead when in fact, donations were used for overhead expenses;

- That the Debtor has not received gifts from large foundations when it has received numerous millions of dollars from foundations, including $13 million from one foundation alone;

### 2. Misrepresentations Regarding the Use of Donations and Recipients of Surgeries

The following excerpt from a WonderWork solicitation brochure from November 2014 exemplifies the misleading nature of many of the Debtor's solicitations regarding the use of donations and recipients of surgeries.

## Example 1







WonderWork is the world's first major charity to tackle the problem of the lack of access to surgery in the developing world. WonderWork provides free, life-changing surgeries for children and adults who are blind, severely burned or crippled with clubfoot. Instead of sending American doctors on missions, WonderWork empowers local doctors through free training, free equipment and financial aid.
WonderWork has 61 programs and partners in 58 countries worldwide. Yet, more than 40 million children and adults are still waiting for these surgeries and the vast majority of them will never receive them unless someone helps them.

273

The description in the Example 1 text box, which appears under a heading "About WonderWork," provides the reader with a false and misleading narrative regarding the organization's profile and activities. Introducing itself as the "world's first major charity to tackle the problem of the lack of access to surgery in the developing world," the Debtor ignores

---

[273] Doc. Ex. 153 (WON-EX 3829).

the entire field of international charities providing surgeries in developing countries.  This includes the Debtor's own predecessor organization, SmileTrain, which as Mullaney knows was providing surgeries in developing countries more than a decade before the Debtor.  Also well-known to Mullaney is ███████████, a global charity which began providing surgeries in the 1990s.  The Debtor has provided ███████████ with over $680,000 in grants over the years to perform surgeries in developing countries.  On its website, ███████████ describes its purposes, which closely resemble the Debtor's purposes over the years:

> The children we serve have conditions like clubfoot, bowed legs, cleft lips, untreated burns, and hydrocephalus. Without treatment, they will have little hope for a future. Many will die from their condition.
>
> That's why ██████ exists. We're a non-profit organization that operates charitable hospitals and programs in **29 countries worldwide** where patients experience the life-changing message of God's love for them, receiving surgical treatment regardless of gender, religion, or ethnicity.
>
> Since our founding in 1996, ███████████ have performed more than **175,000 procedures**, more than **102,000 children have been treated at** ███████████, and surgeons trained by ██████ have performed more than **8,000 procedures to treat hydrocephalus and spina bifida**.[274]

A cursory search on the internet easily shows the prevalence of many charities providing surgeries internationally.  One such search identified a 2016 research paper entitled, "Financial Contributions to Global Surgery; An Analysis of 160 International Charitable Organizations."  The paper's title itself makes clear there are many charities that preceded the Debtor.  As the report states:

> One hundred sixty organizations representing 15 specialties were identified. Adjusting for inflation, in 2014 U.S. dollars (US$), total aggregated revenue over the years 2008–2013 was $3·4 billion and total

---

[274] ██████████

aggregated expenses were $3·1 billion. Twenty-eight ophthalmology organizations accounted for 45 % of revenue and 49 % of expenses. Fifteen cleft lip/palate organizations totaled 26 % of both revenue and expenses. The remaining 117 organizations, representing a variety of specialties, accounted for 29 % of revenue and 25 % of expenses. In comparison, from 2008 to 2013, charitable organizations provided nearly $27 billion for global health, meaning an estimated 11.5 % went towards surgery.[275]

### a. Debtor Does Not Provide Surgeries; Nor Are They Free

The second sentence of the text box in Example 1 states: "WonderWork provides free, life-changing surgeries for children and adults who are blind, severely burned or crippled with clubfoot." Since its inception, statements like this have permeated the Debtor's solicitation materials and have undoubtedly motivated countless donors to contribute. Yet, they are misleading in multiple respects. First, the Debtor does not provide any surgeries itself. It operates through other organizations. In some cases the funding is directly to a hospital, while in other cases, the Debtor provides grants to another charity, which then in turns helps fund the surgery. In no event has the Debtor itself provided any surgeries.

Second, not all patients receiving surgeries from Debtor's grants receive them for free. The Debtor does not underwrite the entire cost of a surgery, but pays a portion of it, generally $25 towards an eye surgery. For adults, eye correction surgery can cost between $35 to $50 and children up to $300. Generally, the balance of the surgery cost has to come from another source; either another charity, the government, the hospital, or the patient him or herself.

A grant report for the ███████████████████████ makes clear that surgeries are not free. The report states that "costs of the cataract surgery is approximately $35, of which some

---

[275] Financial Contributions to Global Surgery; An Analysis of 160 International Charitable Organizations; L. Gutnik, G. Yamey, A. Dare, R. Riviello, J. Meara, M. Shrime, *Springer Plus* (2016), found at https://link.springer.com/article/10.1186/s40064-016-3046-z.

portion of the funds [is] shared by the patient."[276] A second report relating to a grant to the ███████ ██████████████████████ states that "per surgery costs is $35 and free patients pay partial-cost."[277]

Bhattacharya, the Debtor's program officer in India, confirmed that the Bangladesh surgeries performed by the ██████████████ floating hospital and the ███████████ ████████ are not free:

> Q: Am I correct in reading that that facility, the floating hospital itself, in fact charges the patient some amount in connection with the surgery?
>
> A: That's correct. They have told us, yes.
>
> Q: Let's now go to the ████████████████, which starts near the top of page 10 … The last line of the Finance section here says "Surgery cost is $35 and free patients pay partial cost"?
>
> A: That's correct. This is again a hospital, sir, we partner with them, but there are some cost issues, because $35 is not sufficient to them, so they partially charge the patient ten dollars or so, I believe they charge to the patient.[278]

Delois Greenwood, Chief Programing Officer and *de facto* Chief Operating Officer, acknowledges that surgeries may not be free:

> Q: Where do you think the hospitals to whom you made your grants were getting the balance of their funds?
>
> A: Well, we would make a contribution and a hospital may have operating capital already in, you know, other charitable, they're raising money locally, they might have other NGOs supporting things. So it was really not our – we didn't financially track where they were getting their money. It was up to them to come up with it.

---

[276] Mullaney Ex. 15.

[277] *Id.*

[278] Bhattacharya Tr. 8/9/17, 100:21 -101:16

Q: Do you know whether any of them actually charged a patient a portion of the fee?

A: We did not – we did not dictate that they, you know, our purpose is so that they help the poor. Some of our partners may in fact charge a patient for transportation or food, but we're not – we're not in the middle of that financial piece of it. But do you – and when we did the financial audits, and we've only done three, but when they did the financial audits and they interviewed patients, they were all free.

Q: DeLois, I believe my question, beyond the food and transportation, but in terms of the procedure itself, are you aware if any of your partners charged the patients a portion of the cost of the procedure?

A: I am not aware of that, but – you know, I'm not aware. But I can't say it has never happened, but I'm not aware of it. The intended purpose of the grants are to help them to provide free or its highly subjective, like I said. And sometimes in poor countries there's been a lot of debate about letting the patient pay $5. Its not a bad thing. So again, we leave that to our partners.[279]

Counsel for the Debtor acknowledged that surgeries were not always free, but asserts that patients only had to pay for services in 6% of the surgeries.[280] The Debtor does not ask for, nor do they receive, data on how much the surgeries actually cost and how much a patient is paying towards it, and therefore cannot confirm how many of its surgeries are free. Since the Debtor cannot confirm prior to a solicitation being made that surgeries will be free, the Examiner does not see a basis on which the Debtor can make this representation in its solicitation materials.

### b. Most Patients are Not Blind

Like many of the Debtor's solicitation materials, Example 1 states that WonderWork provides "life-changing surgeries for children and adults who are blind." Indeed, every 20/20/20 mailing and many of the WonderWork materials reviewed by the Examiner explicitly tell donors

---

[279] Greenwood Tr. 8/23/17, 99:9-110:22

[280] Doc. Ex. 154 (CLM Letter dated October 13, 2017).

that their donations will help those suffering from blindness.  Evan the mission of 20/20/20, as printed throughout its fundraising materials, is "restoring 20/20 vision to 20 million children and adults."[281]

Although the Debtor distributed over 54 million pieces of mail asking donors to help cure "blindness," the Examination found that most surgeries funded by the Debtor were not performed on individuals who were blind under international standards at the time of the operation.  Instead, the Examination found that the Debtor's funds were used predominantly to remove age-related cataracts for senior citizens.

The international standard for defining blindness is set by the World Health Organization ("WHO") in its International Statistical Classification of Diseases and Related Health Problems (ICD 10th Revision 1st and 2nd edition).[282]  The WHO standards provide the following categorizations for blindness:

---

[281] Doc. Ex. 155 (WON-EX003113).

[282] http://www.who.int/blindness/Change%20the%20Definition%20of%20Blindness.pdfICD is the foundation which develops international standards  "for reporting diseases and health conditions. It is the diagnostic classification standard for all clinical and research purposes. ICD defines the universe of diseases, disorders, injuries and other related health conditions, listed in a comprehensive, hierarchical fashion . . ."

| Presenting distance visual acuity | | |
|---|---|---|
| Category | Worse than: | Equal to or better than: |
| Mild or no visual impairment 0 | | 6/18 3/10 (0.3) 20/70 |
| Moderate visual impairment 1 | 6/18 3/10 (0.3) 20/70 | 6/60 1/10 (0.1) 20/200 |
| Severe visual impairment 2 | 6/60 1/10 (0.1) 20/200 | 3/60 1/20 (0.05) 20/400 |
| Blindness 3 | 3/60 1/20 (0.05) 20/400 | 1/60* 1/50 (0.02) 5/300 (20/1200) |
| Blindness 4 | 1/60* 1/50 (0.02) 5/300 (20/1200) | Light perception |
| Blindness 5 | No light perception | |
| 9 | Undetermined or unspecified | |

\* Or counts fingers (CF) at 1 metre.

**Note:** The term visual impairment in category **H54** comprises category 0 for mild or no visual impairment, category 1 for moderate visual impairment, category 2 for severe visual impairment, categories 3, 4 and 5 for blindness and category 9 for unqualified visual impairment. The term "low vision" included in the previous revision has been replaced by categories 1 and 2 to avoid confusion with those requiring low vision care.

WHO therefore defines blindness as anyone who has no light perception or vision which is worse than 3/60 in both eyes. If an individual is visually impaired in one eye, no matter the severity, but can see out of the other, they are not considered blind under international standards. As Bhattacharya acknowledged:

> MR. LILIEN: On WHO standard, if you meet the blindness standard in one eye but not in the other eye, in your view, would you be considered blind under the WHO standards?
>
> THE WITNESS: No that's not considered blind. Blind is both eyes.[283]

---

[283] Bhattacharya Tr. 8/9/17, 87:22-88:4.

The Examiner reviewed a random sampling of reports submitted by grantee organizations to verify whether the patients who received surgeries as a result of the Debtor's funding met the WHO blindness standards. The reports sampled were submitted to the Debtor by ██████ ██████████████████████████████████████████████████ ████████████████████████

In conducting his review, the Examiner reviewed the visual acuity reported for 7,498 individuals included in the grantee reports. In particular, the Examiner analyzed whether the visual acuity reported pre-operation for both eyes fell within the WHO's classification for blindness. Of the 7,498 individuals reviewed, only 28.65% of patients actually met the definition of blindness under the WHO standards.



While many of the individuals operated on may have had vision impairments, the Debtor did not raise money with the specific intent and purpose of helping them and nor did the Debtor tell donors that their donations would be used to cure cataracts.

The Examination found that, in fact, the Debtor was significantly lax in how it protected the charitable dollars it raised. Interviews with the Debtor confirmed a lack of awareness and concern about the need to establish a blindness standard. In granting out millions of dollars to grantees, the Debtor never required that grantees use their money only in accordance with specific blindness standards. As a result, there was no way for the Debtor to ensure that their funds would be used only on surgeries for blind individuals. Instead they left it up to the grantee hospital to determine on its own, without any parameters, how the Debtor's grant funds for blindness should be spent.

The Debtor only received patient summary reports after the fact, meaning that the Debtor had no mechanism for screening patients beforehand or for clawing back funds used improperly after the fact. The Debtor never held grantees accountable upon receiving grantee reports showing the patients pre-operative eyesight. Nor did the Debtor change future grant making practices once it became aware that many patients were not in fact blind. For example, the Debtor continued to makes grants to ███████████ in Fiscal Years 2016 and 2017 although in Fiscal Year 2015, the Debtor received a report showing that only a small percentage – 26% – of the patients were blind under the WHO guidelines before receiving surgery.

When asked, Bhattacharya offered a confusing and contradictory explanation of how the Debtor interprets blindness:

Q: How would you define "blindness"?

A: International guidelines for the blindness is 3 by 60, people that have that vision is counted as blind. International guidelines is less than 3 by 60.

MR. LILIEN: For blindness or for visual impairment?

THE WITNESS: For visual impairment.

MR. LILIEN: Can you tell us what standards you use to determine blindness?

THE WITNESS: Here in India we have the LOG metrics, L-O-G.

MR. LILIEN: I thought a moment ago you said you use the WHO standards for blindness.

THE WITNESS: Yes. The previous, in India, that is the cataract blindness, person having less than 3 by 60 are considered to be blind.

Q: In India?

A: Right.

Q: So, for whatever reason , if your visual acuity is less than 3 by 60, under India standard you're considered blind; is that correct?

A: Correct.

Q: Do you know what the WHO standards are?

A: WHO is also the same, it talks about the same.

MR. LILIEN: Just to be clear, the standard you're referring to, 3 by 60, as formulated by WHO, under your definition that would define blindness and not visual impairment?

THE WITNESS: Absolutely.[284]

Bhattacharya separately confirmed that nonetheless, the majority of the hospitals use the WHO

standard:

---

[284] Bhattacharya Tr. 8/9/17, 82:9-83:19.

> MR. LILIEN: When you identify a partner in India . . . do you, as part of the agreement with them, require them to follow the WHO standards or any other set of parameters?
>
> THE WITNESS: Yes. By and large, most of the partners follow the WHO parameters in terms of this thing, the surgical outcomes and the programs. Because every hospital, they do have that internal marketing, the internal process, so they do follow that.[285]

Greenwood, whose interview followed two weeks after Bhattacharya's interview, attempted to correct and reframe Bhattacharya's statements. In so doing, Greenwood expressly contradicted Bhattacharya:

> Q: So the question is: what standards does WonderWork use to determine what blindness is? And we've been told WonderWork uses WHO standards to determine blindness. Are you suggesting that WonderWork is not using WHO standards?
>
> A: I guess what I'm suggesting is our partners are not told that you only treat a patient who meets the WHO standard for blindness.
>
> Q: Does WonderWork have a standard for blindness?
>
> A: It's a guideline, in India, 2200 is considered blind, until this year when they adopted the WHO standards of 2400.[286]

Greenwood's response that the Debtor maintains blindness standards based on Indian criteria lacks credibility. Not only was the Indian system inconsistent with international practices and subsequently changed to match WHO, the Examiner questions how an international charity which claims to be operating in 60 countries would think it appropriate to select only one of those countries as its global standard in lieu of the actual WHO global standard.

Greenwood later acknowledges that WHO sets the global standard for blindness, when she states: "But I would like to make one point and that is, WHO sets the definition of blindness.

---

[285] Bhattacharya Tr. 8/9/17, 89:20- 90:8.

[286] Greenwood Tr. 8/23/17, at 79:25-80:14.

Got it."[287]  Similarly lacking credibility is Greenwood's argument that it's not the definition of blindness that matters, but whether "cataracts are impeding your vision," making it difficult to function and work.[288]  Again, while such concerns are laudable, they are not what Debtor has represented in its solicitation materials to donors.

Nevertheless, giving Greenwood the benefit of the doubt, the Examiner applied the former Indian vision standard to determine the percentage of patients who would be considered blind under that standard.  Here, the Examiner used the same sample of 7,498 individuals who were included in the WHO analysis above.  Even using the Indian standard (e.g., 6/60 or less), however, only half of the patients operated on would be considered blind, demonstrating that the Debtor is misusing a substantial amount of publicly raised funds, regardless of the standard is used.

Also striking is that Huang, the person responsible for overseeing all marketing materials sent to donors, had no basic understanding of the international standards for defining blindness, WHO, Indian or otherwise.   In other words, the person making representations to donors about blindness did not know if the representations were true, exemplified by the following exchange:

> MR. LILIEN: Do you have any understanding or knowledge whether someone with a unilateral cataract would be considered completely blind?
>
> MS. HUANG: If they're unilaterally with cataracts, I would think see out of the other eye.
>
> MR. LILIEN: Would you consider that person to be blind?
>
> MS. HUANG: In one eye, yes?
>
> MR. LILIEN: Would you consider that person to be blind under the standard definition of blindness?

---

[287] Greenwood Tr. 8/23/17, 85:1-3

[288] Greenwood Tr. 8/23/17, 85:7-8.

MS. HUANG: I don't know.

MR. LILIEN: Have you ever participated in a training what it means to be blind?

MS. HUANG: No.

MR. LILIEN: Have you ever asked anyone what it means to be blind?

MS. HUANG: No[289]

The examination also revealed that the Debtor purposefully obfuscated the fact that virtually all of the "blindness" surgeries performed were not performed on blind individuals but rather to remove an age-related cataract because, according to Lazarus, "Brian did not like to use 'cataracts' in the marketing materials."[290] When asked why, Lazarus responded:

> Because when one thinks of cataracts, especially when you're marketing to Americans, they say, Oh, my grandfather, he had cataract surgery, and people don't think of it as seriously, I think. And I think he decided to use "blindness" in general to talk about the cataract procedures that we do, but he used "blindness."[291]

Bhattacharya, the Debtor's program officer in India, confirmed that many patients funded by the Debtor are not in fact blind but are suffering from age-related cataracts.

> Q: I believe that cataract surgery is often conducted on people who don't necessarily meet that standard but rather might have what one would call "severe visual impairment"; is that correct?
>
> A: That's correct.[292]

### 3.    Misrepresenting Cost of Surgeries and Age of Patients

The following solicitation, Example 2, contains a multitude of tactics that individually and collectively mislead donors as to how their donations will be used.

---

[289] Huang Tr. 8/9/17, 61:2-22

[290] Lazarus Tr. 8/8/17, 189:10-11

[291] Lazarus Tr. 8/8/17, 189:10-21

[292] Bhattacharya Tr. 8/9/17, 83:20-25

<u>Example 2</u>

We can restore the eyesight of a child who was born completely blind through a 15-minute surgery that costs just $300.

But we can't do it without your help.

So please send us a donation and we'll use 100% of it to restore the eyesight of a blind baby, child or adult.

Every donation of $50 or more gets you an autographed photo of our baddest supporter, Bryan Cranston.

And even better, every donor will receive a photo of a child who was once blind — and now can see.

**I will help restore the eyesight of a blind child or adult...**
☐ $300 pays for an entire eyesight restoring surgery.
☐ $75 pays for anesthesia.
☐ _____ any amount is gratefully accepted.

Name _____ Zip _____
Address _____ City _____ State _____
Telephone _____ eMail _____
Credit Card # _____ Expires _____
☐ Visa ☐ MasterCard ☐ AMEX ☐ Discover Signature _____
☐ My check is enclosed. XP1309XX01XXXNYT01

**WonderWork, P.O. Box 96074, Washington, DC 20090-6074**

Donate now at
WonderWok.org
or call
212-729-1855

Miracle surgeries for children.
**wonder work**

WonderWork is a 501c3 nonprofit approved by the IRS. All donations are tax deductible in accordance with IRS regulations. © 2013 WonderWork.



293

### a.    Majority of Surgeries were Performed on Adults

Across all four campaigns, and throughout all of the fiscal years, the Debtor's solicitation materials are replete with pictures of children featured prominently.  As mentioned previously, Mullaney deliberately uses photos of desperate-looking children, coupled with emotionally charged stories about their plight to bring in donations.  The solicitation materials also regularly

[293] Doc. Ex. 156 (WON-EX 011303).

ask donors to "restore the eyesight of children who are completely blind"[294] and are accompanied by pictures of frightened or crying children, with blank stares. Mullaney even confirmed that the Debtor photoshopped eyes to "enhance the cataract" and make the effect more dramatic:[295]



Looking at these images and reading these stories, a donor would reasonably conclude that their contributions would be used to provide surgeries for blind children. Yet, the percentage of blind children receiving surgery is almost negligible. The Examiner conducted a review of patient information provided by grantee organizations to establish the percentage of surgeries performed on children versus adults. The average age of the patient is 60. Out of the 7,498 patients sampled, only 116 children – or 1.55% – were blind pre-operation according to the WHO blindness standards. Mullaney, always driven by returns, understands that featuring children prominently in the Debtor's solicitation materials will generate more donations through potential donors connecting to a story about a suffering child. This is clearly evident from the following exchange:

Q: Are the most of the blind patients, children or adults?

A: No, 90 per cent adults.

Q: Why do you emphasize children in the campaigns?

---

[294] Doc. Ex. 157 (WON-EX 048516).

[295] Mullaney Tr. 8/17/17, 589:2-4

A: Because we emphasize with photos, but when I write all the copy and I always children and adults, children and adults. We do have some adults in the brochure. But people have much more empathy for children than adults. That's why we use kids.[296]

Marketing Director Huang confirms Mullaney's strategy of featuring children, not adults:

> MR. LILIEN: Going back to the question on the photos, what type of photo received a better response? You say a large photo.
>
> MS. HUANG: Large photo
>
> MR. LILIEN: On what type of patient?
>
> MS. HUANG: We never tested different demographics of the photo, but its usually a child.
>
> MR. LILIEN: In your test, did you include any photos of aging cataracts?
>
> MS. HUANG: No. Because Brian had his experience, and his experience was children are more empathetic. Why would you test something that you know was not going to work?
>
> Q: Do you know the percentage of surgeries WonderWork funds for cataract removal that are performed on adults as opposed to children?
>
> A: Yes
>
> Q: What's your understanding of that ratio?
>
> A: Upwards of 90 percent are adults.[297]

Both Lazarus and Greenwood stated in their respective interviews that they understood that only about 2% of all surgeries were performed by grantees funded by the Debtor.[298] Yet neither they, nor Mullaney saw an issue with focusing their solicitation materials almost exclusively on children.

---

[296] Mullaney Tr. 8/16/17, 138:14-139:2.

[297] Huang Tr. 8/9/17, 65:20-66:17.

[298] Lazarus Tr. 8/8/17, 120:20-21; Greenwood Tr. 8/23/17, 90:25.

### b. Debtor Mislead the Donor Regarding the Cost of Surgery

Compounding the situation, Example 2 also mispresents the cost of surgery. Using a check-the-box form, a donor is able to elect to pay certain amounts that relate to cost of surgical functions. In the case of Example 2, $300 covers the entire cost of "an eyesight restoring surgery and $75 pays for anesthesia." This tactic, which permeates virtually all of the Debtor's solicitation materials, is designed to create a connection between donor and patient, where the donor believes they are saving the life of a specific individual.

As another example, the 20/20/20 reply device below provides even more options for a donor to sponsor a surgery.



<sup>299</sup>

Like Example 2, here the donor has option of paying $300 for the full cost of a surgery. A donor checking the box for $300 would have every reason to believe (1) that a surgery actually costs $300, and (2) their donation of $300 would be used to cover that cost. However, a review of the grant award letters to grantees shows that the Debtor never paid $300 for a surgery, and nothing close to it. Instead, in virtually all cases, the Debtor paid only $25 towards a surgery, allowing the rest to be used for other expenses. The Debtor also never made any grants for the purpose of providing anesthesia or surgical supplies, despite instructions from the donors to the contrary.

---

[299] Doc. Ex. 158 (WON03204).

The below letter to a hospital in Bihar, India is representative of the Debtor's standard grant award letter sent to grantee institutions. Typical of this form, the Debtor makes clear it is contribution of $25 per surgery, not the $300 the donor is told.



February 17, 2015



Dear ▮▮▮▮▮

On behalf of WonderWork and our dedicated blindness program, 20/20/20, I am pleased to inform you that we have approved a program partner grant in the amount of $100,000 USD.

We greatly admire the vital work being done by ▮▮▮▮▮▮ and your commitment to providing quality eye care for the rural poor. WonderWork's mission and yours align in our desire to deliver life-changing cataract surgery in the most underserved areas. Your community mobilization is impressive, as is your emphasis on quality of care. We encourage your ongoing efforts to assure that safe and quality treatment is a principal priority.

This WonderWork partner grant for cataract surgical treatment represents a contribution per surgery of $25.00 USD to help 4,000 patients. We ask that your center strive to allocate 5 to 10% of the funds for pediatric cataract treatment.

If you agree to the terms of this grant, complete the attached fund transfer documentation, and we will facilitate the grant right away! As is standard practice, please be prepared to submit patient information and a final grant report, as well as financial and clinical audit upon request. Should you have any questions, do not hesitate to contact me directly at delois@wonderwork.org or Program Officer, Tiffany Carson, at tiffany@wonderwork.org.

WonderWork is committed to reducing the burden of surgical disease and joining the fight against cataract blindness through our blindness program, 20/20/20. It is our hope that our partnership will have a lasting impact that changes lives.

Sincerely,

DeLois Greenwood
Chief Program Officer

cc:     Brian Mullaney, Co-Founder/CEO, WonderWork

TIME magazine named WonderWork one of "10 Ideas That Can Change The World."
420 Fifth Avenue, New York, NY 10018  Tel: 212.729.1955  WonderWork.org

WON-EX 4623

[300]

---

[300] Doc. Ex. 159 (WON-EX 4623).

As part of the Examiner's comprehensive review of the Debtor's solicitation materials, an analysis was performed of the Debtor's 20/20/20 solicitations that contained a check-the-box reply device.[301] A significant portion of the mass mailings sent out for the three DBAs allow donors to check a box on a gift array reply device to indicate how their donations would be used. For example, a $300 donation would provide the cost of a full surgery; $150 would pay half-the cost of the surgery; and $75 for the cost of anesthesia. Both the overall amounts raised through these devices as well as the amounts raised under their specific giving levels were tallied. The Examiner determined that of the total $16.9 million raised under the 20/20/20 DBA from its inception through December 31, 2016, $9.5 million raised or 56.3% of donations, should have been spent on surgeries, anesthesia or surgical supplies.[302]

### 20/20/20 Check the Box Solicitations

| | Total[1] | | | |
|---|---|---|---|---|
| | Donations | % | Value | % |
| $25 | 34,497 | 19.0% | $862,425 | 9.0% |
| $50 | 17,929 | 9.9% | $896,450 | 9.4% |
| $75 | 4,716 | 2.6% | $353,700 | 3.7% |
| $150 | 3,527 | 1.9% | $529,050 | 5.5% |
| $300 | 11,413 | 6.3% | $3,423,900 | 35.9% |
| $600 | 332 | 0.2% | $199,200 | 2.1% |
| $900 | 113 | 0.1% | $101,700 | 1.1% |
| $1,200 | 46 | 0.0% | $55,200 | 0.6% |
| Other[2] | 108,669 | 60.0% | $3,125,843 | 32.7% |
| **Total** | **181,242** | **100.0%** | **$9,547,468** | **100.0%** |

Source: DMI System
[1] Donations include data from July 1, 2012 to December 28, 2016
[2] Other category includes solicitation amounts different than the ones selected

---

[301] The Examiner was not able to review FirstStep and BurnRescue check the box solicitations, as the Debtor was unable or unwilling to provide the Examiner with a correlation between Bate Stamps and Transaction Codes which would have enabled the Examiner to match solicitations to dollar amounts.

[302] This chart was prepared by Goldin Associates.

Not surprisingly the amounts listed on the reply devices of $300 for a full surgery, $150 for half a surgery, $75 for anesthesia and $50 and $25 for surgical supplies, together accounted for over 67% of the donations which came in under theres campaigns.

Aside from misleading donors about the cost of a surgery and how their donations would be used, the Debtor did not track, record or monitor amounts donated for specific purposes. While the Debtor treated donations raised through the DBAs as restricted generally, it did not recognize the specific donations imposed by the donor as a result of checking the box. Nor did the Donor have any intention to do so when soliciting the donors. The device was simply a tool to manipulate donors into giving higher sums of money. As Mullaney explained:

> We test it and we go a hundred, 50, 75. You go 75 up – you go up and down. You test it for things. What helped us a lot to do an amount for the whole surgery. The average donor gives you 50 bucks.

> But you would say if you could give us $250, you would be paying for an entire surgery for clubfoot and you become a founding member. People like that. We would see a bump in those.[303]

Importantly, the $6,421,625 out of the $9,547,468, which specifically came in through a donor's use restriction indicated on a check the box reply device, was not accounted for, tracked, or spent out appropriately.

### 4. Debtor Mislead Donors Through Grant Proposals

In the 2014 Fiscal Year, the Debtor received four grants totaling $1,840,000 from ████

████████████████████████████████████████████████████████████████

████████████████████████████. Each of the final grant reports states that the funds were distributed immediately or within the fiscal year for surgeries.[304]

---

[303] Mullaney Tr. 8/16/17, 178:4-15.

[304] Mullaney Exhibit 16; Lazarus Exhibit 28.

- █████████████: The Debtor received $300,000 in multiple grants in the 2014 Fiscal Year. In a Final Grant Report dated October 15, 2014, the Debtor reported to the ██████████ that "each of these grants was distributed immediately."[305]

- ████████████████████ The Debtor received a $40,000 grant in February 2014. In a Final Grant Report dated September 4, 2014, the Debtor reported to the Fund that "We distributed this grant to our partner, ████████████, who was able to put this money to use immediately."

- ███████████████████: The Debtor received a $500,000 grant on December 31, 2013. The Final Grant Report to the Foundation stated that the grants made by Debtor as a result of the gift were distributed between January 17, 2014 and June 30, 2014, all within the 2014 Fiscal Year.

- ████████████████████: The Debtor received a $1,000,0000 grant in November 2013. The Final Grant Report to the Foundation, dated September 29, 2014, stated that "we distributed this grant immediately."

Collectively, in these reports, the Debtor represented to the respective donors that it made $1,840,000 in grants during the 2014 Fiscal Year. Yet, the Debtor's own audited financial statements show that the grants made during the 2014 Fiscal Year were only $1,543,055, resulting in a gap of approximately $300,000. Either the Debtor made misrepresentations to these four Donors about how their funds were used, which appears to be the case, or the Debtor's financial statements are simply wrong.

---

[305] Following the Fuchs and Mullaney interviews in which these grant reports were discussed, the Debtor's counsel sent an email to counsel for the Examiner, dated September 3, 2017. The email disputes the timing of the grants received by ████████ as well as the timing of grants made by the Debtor using such funds. The Debtor's counsel's explanation is inconsistent with the Debtor's own financial records.

If the Debtor's reporting is taken at face value, these four donors alone covered the entirety of the Debtor's grant-making for the 2014 Fiscal Year. Yet millions of dollars were raised from donors during the same time period based upon representations that their donations would be used for surgeries. The Examination showed that during the 2014 Fiscal Year, the Debtor raised approximately $6.5 million for its DBA surgery programs, which included $2.4 million from donors who checked a box directing that their donations be used for surgeries and surgical procedures. In addition, WonderWork raised in its own name $1.8 million, representing in its solicitation materials that:

> *"We will spend 100% of whatever you send us on surgeries, right away"* or

> *"I can promise you 100% of what you send us will go towards surgeries – and we will it to good use very quickly."*[306]

The total amount raised in the 2014 Fiscal Year for surgeries was $8.6 million including additional money raised under the WonderWork brand. Yet, only $1.5 million was granted for surgeries. As described in section below while a reasonable amount can be allocated towards the administration of these grants, it is clear that the bulk of the difference was not in fact spent on surgeries in that year. Contrary to what a reasonable donor would have expectated, based on the solicitation materials, the Debtor failed to use millions of donors in accordance with their charitable purposes.

### 5. Donors are Misled Through Matching Gift Campaigns

As described above, a frequent marketing tool of the Debtor was to notify donors of matching campaigns which were being run for a specific time period and where their contribution would be "doubled" or "tripled" by the matching funds of a "generous donor."

---

[306] Doc. Ex. 161 (WON-EX 003859); Doc. Ex. 162 (WON-EX 3839).

These matching donations in turn would be used to help save children by funding their surgeries.

As shown below a common representation is as follows:

In addition, our largest donor has agreed to match – and double - all the donations that come in from this letter. If just half the people who receive this letter help us, we have an excellent chance of reaching our budget goal of providing 100,000 surgeries.[307]



Often there is an urgency attached with these matching campaigns. The solicitation materials include artificial deadlines that move with each solicitation such as: "Last chance to have your support DOUBLED!"[308] or a description of how supports want to help children before school starts. The solicitations often set an arbitrary manufactured deadline date to incentivize donors to give.[309]

---

[307] Doc. Ex. 163 (WON06068).

[308] Doc. Ex. 164 (WON-EX 003556).

[309] Chart prepared by Goldin Associates.

## Matching Donation Summary

### Donations received from the public for matching campaigns

| | Total[3] | % |
|---|---|---|
| [1] WonderWork | $360,693 | 12.1% |
| [1] 20/20/20 | $1,381,437 | 46.5% |
| [2] BurnRescue | $620,876 | 20.9% |
| [2] FirstStep | $607,217 | 20.4% |
| **Total** | **$2,970,223** | **100.0%** |

### Total donations after (2-3x) matches are applied

| | Total[3] | % |
|---|---|---|
| WonderWork | $721,386 | 11.2% |
| 20/20/20 | $2,915,635 | 45.2% |
| BurnRescue | $1,508,434 | 23.4% |
| FirstStep | $1,304,050 | 20.2% |
| **Total** | **$6,449,505** | **100.0%** |

[1] Source: DMI System
[2] Source: Huang Exhibit 17 (WW_EMAILS0095674)
[3] Donations include data from July 1, 2012 to December 28, 2016

In total $2.97 million was received from the public through matching gift solicitations. These amounts should resulted in an additional $3.48 million based on the Debtor's representations that they donations would be "double" or "triple" matched. Yet, despite the representation to donors that the matching funds of $3.48 million would be used to help fund surgeries, the Examination revealed that the entirety of the matching gifts were used to pay for other, nonprogrammatic operating expenses.

### 6.     Debtor Mislead Donors Regarding their Global Reach

The Debtor markets itself as an international charity whose global presence has spanned 65 countries.   The following chart from 2015, states that WonderWork has presence in 60 countries through "partners, programs and partner hospitals."

**Partners:** WonderWork has 74 partners, programs and partner hospitals in 60 of the world's poorest countries.

| | | | | |
|---|---|---|---|---|
| Afghanistan | China | Honduras | Myanmar | South Sudan |
| Antigua | Colombia | India | Nepal | Sri Lanka |
| Banladesh | Congo | Indonesia | Nicaragua | St. Lucia |
| Belize | Domin. Rep. | Iraq | Niger | Sudan |
| Benin | Ecuador | Kenya | Nigeria | Tanzania |
| Bhutan | Ethiopia | Laos | Pakistan | Thailand |
| Bolivia | Gambia | Liberia | Peru | Togo |
| Botswana | Ghana | Madagascar | Philippines | Uganda |
| Burundi | Guatemala | Malawi | Rwanda | Ukraine |
| Cambodia | Guinea | Mali | Senegal | Vietnam |
| Cameroon | Guyana | Mauritius | Sierra Leone | Zambia |
| Chad | Haiti | Mozambique | Somalia | Zimbabwe |

[310]

The Examination revealed that this list is a gross overstatement of the Debtor's global reach.  The Debtor has no "partners" in the traditional sense; entities in a portion of these countries have received grants from the Debtor.  As such, it is not a partner relationship, but a grantor/grantee relationship and in fact, the Debtor has only made grants in 22 countries, not the 60 listed above.[311]   Nor does the Debtor conduct any actual "programs" in these countries; again Debtor is simply a United States based fundraising organization that makes grants overseas.  Additionally, the vast majority of the countries are present only because the Debtor makes grants to intermediary charities who conduct activities in these countries.  The Debtor is effectively taking credit for the global work of these other entities.  For example, ████████████, a

---

[310] Doc. Ex. 165 (WON-EX3932).

[311] Doc. Ex. 166 (WON-EX 005575 through WON-EX 005580).

religious based organization which has charitable surgical programs in 29 countries, has received approximately $680,000 from the Debtor.[312]

As noted above, the Debtor reevaluated this strategy after receiving complaints in 2016, reducing the number from 60 to 42 countries. However the Examiner has not uncovered any evidence to justify this figure.

## X.    DONATION PROCESSING

### A.    Overview

Donations are received by WonderWork in various forms, including by check, electronic funds transfer, credit card and stock.[313] There are also multiple methods by which the Debtor recieves donations, including by mail, electronic funds transfer, through the WonderWork and DBA websites, over the phone, or stock donated directly into the WonderWork Vanguard account.

To gain an understanding of the Debtor's fundraising and donation processes, including the processing and recording of donations, the Examiner and his professionals (a) met with WonderWork staff via in-person meetings and calls with Fuchs and Huang and other WonderWork staff; (b) took formal interviews of Fuchs and Huang; and (c) read and reviewed the September 2013 Customer Service Manual, the September 2014 DMP Manual and a Donation Process Overview document prepared post-petition by Huang and Fuchs with counsel. It was apparent that by the time the Examiner was appointed in 2017 the Debtor had implemented revised processes to improve its procedural profile.

---

[312] Doc. Ex. 167 (WON-EX 005575).

[313] There are an extremely small amount of times actual cash is received from donors.

From inception through September 2016, all checks received in the New York office, which were mostly for WonderWork campaigns, were deposited by Fuchs in a New York HSBC branch, either through an ATM or at the teller. Checks received at the office either for the WonderWork campaign or, according to donor instructions, the DBA campaigns, were also entered into the general ledger. The Debtor's marketing staff then recorded the donations into its third-party donor management provider's system (International Data Management, Inc. ("IMDI"), or Data Management Inc. ("DMI"))[314] with the appropriate fund code.

The September 2013 Customer Service Manual outlines the process and procedures for receipt of donations via check, credit card, electronic wire transfer and recurring monthly donation. Absent from the manual is a procedure with respect to stock donations, although the Examiner noted there were stock donations entered into the general ledger and deposited directly into the Vanguard account. Huang and Fuchs did not indicated to the Examiner's professionals that any material changes to the current process and procedure for the receipt of donations has

From September 2016 through present all checks received by the Debtor in the New York office are batched and sent to the Debtor's cager Direct Mail Processors, Inc. ("DMP") via a lockbox in Washington, D.C., to be deposited in the respective HSBC account and recorded into the DMI system by the cager.[315] Processing by DMP entails the deposit of checks and/or credit card processing followed by the input of donor information into the DMI database. WonderWork retains a tracking sheet with the number of mail pieces in each shipment to DMP.

---

[314] In October 2016, WonderWork switched its donation system from IDMI to DMI.

[315] The Examiner did observe from the review of bank statements that checks received throughout the first half of FY 2017 continued to be deposited in the HSBC operating account in the New York HSBC branch. In November and December 2016 it appears that there was only one deposit for each month made into the HSBC operating account locally at the New York HSBC branch.

For a small number of WonderWork donors, donations are sent directly to a post office box in Washington, D.C. for processing by DMP.

For the DBA campaigns, donors mail contributions to a post office box in Washington, D.C. for processing by DMP. For any donation greater than or equal to $500, DMP forwards a scanned image of the donation and remittance to the Debtor for review to ensure it has been properly entered into DMI. This process is also followed when the donation includes a donor comment or special request so that the Debtor can determine whether further action is required. The comments could be either gratuitous or require action such as the restriction of the donation to a particular cause.

PayPal processes donations to the Debtor's website – www.wonderwork.org, www.20x20x20.org, www.1ststep.org and www.burnrescue.org. PayPal then remits those donations to the Debtor, net of fees, on a daily basis. Fuchs periodically downloads data regarding web donations and emails that information on a spreadsheet to DMI. DMI uploads this information into the DMI database which is quality checked by a the Debtor's marketing department to ensure all donations are uploaded properly.

For phone donations, a staff member fills out the appropriate WonderWork internal donation form, whether for 20/20/20, FirstStep, BurnRescue or WonderWork, and charges the donor's credit card to the appropriate PayPal account. Subsequently, a WonderWork employee keyed the donation information into DMI.

### B. DMI

Both pre and post-petition, DMI was WonderWork's system for tracking donations to facilitate its fundraising efforts, i.e. donor database. The donations and direct costs of each

fundraising campaign were tracked. Prior to October 2016, the Debtor utilized IDMI for largely the same functionality and has migrated most of its historical data into DMI.[316]

DMI is used to track every donation made to the Debor. There are numerous information fields in the donor database. The transaction code,[317] an 18 character field with information about the campaign (e.g. cause, date and type of donor), is used for a multitude of marketing purposes and to determine the Fund Code, described below, which identifies the campaign (either WonderWork or one of the DBAs) credited for the donation. The transaction code positions are as follows:

| Position | Position Type | Position Type Example |
|---|---|---|
| 1 | Charity | WW, 20/20/20, First Step, BurnRescue |
| 2 | Channel | Acquisition, Renewal, Whitemail |
| 3-8 | Date | YYMMDD, YYMMXX |
| 9-10 | Package Code | WM, UN |
| 11-12 | Future Use | not applicable |
| 13-18 | Marketing Purposes | (a) |

(a) Positions 13-18 are used to capture donor habits (e.g. size of gift, frequency of gift) for marketing purposes

WonderWork includes a "reply device" with each appeal to a donor. The reply device includes the donor's name, address and suggested amounts which the donor may choose from. A unique transaction code is assigned to each appeal and printed on the reply device. For existing donors, this transaction code is also uploaded to their record. When a donor returns the reply device with his/her donation to the Debtor's lockbox in Washington, D.C., DMP keys or scans it for upload into DMI. Using the transaction code, WonderWork's donor database matches the

---

[316] The general ledger, not DMI, is used for recording donation revenues and related expenses into the books and records of the Debtor. DMI is also not used for tracking restricted versus unrestricted funds; that is tracked and prepared annually on excel spreadsheets during the year-end audit process for disclosure in the notes of the audited financial statements.

[317] WonderWork also refers to this as the key code or source code.

donation to the relevant appeal. For DBA appeals, this process has been in place since inception. For WonderWork appeals, this practice began in FY 2017. Prior to that, as noted above, WonderWork donations made by mail were remitted to the WonderWork office and deposited at a HSBC New York branch either at a teller or ATM machine.

In the case of donations received by mail without a reply device, DMP assigns a "white mail" code as a placeholder. In order to match donations with "white mail" codes to appeals, WonderWork has set up its database to use an automated "matchback" process based on donor name and address. If the name and address of the "white mail" donor matches an existing donor or a donor to whom WonderWork recently sent an appeal, the "white mail" transaction code is replaced with the transaction code of the most recent appeal on that donor's record. If no match is found, the donation retains the "white mail" transaction code.

The automated matchback process will only "matchback" a donation to a cause and an appeal for to a specific cause. This also means that donors to 20/20/20, FirstStep or BurnRescue who make a donation to WonderWork through their own donor advised fund or foundation (because they prefer to make their check out to the name of the legal entity with 501(c)(3) status) will not be picked up by the automated matchback process; they will be coded as "white mail" but should later be assigned by WonderWork staff a fund code restriction to the appropriate DBA.

In some cases, if it is clear to a staff member that a donor was responding to an appeal other than the most recent appeal on that donor's record in the database (for example, if a donor includes the cover page of a different appeal in the envelope with his or her donation), the staff member will "override" the automated matchback process and enter the transaction code for the appropriate appeal.

Online donations are all initially assigned a web "white mail" transaction code as a placeholder in the donor database which may be reassigned in the same manner described above for direct mail without reply devices.

In the case of donations made by phone, a staff member keys the donation into the donor database, determines from the database the most recent mailing the donor received and assigns the donation to that mailing; if there is no record of sending the donor any mail, the staff member assigns the donation a "white mail" code as a placeholder. These donations, which are usually from large donors, are assigned a transaction code to indicate that WonderWork made personalized appeals, presentations, or formal or informal pitches to this donor (the donor may have also received marketing materials).

**C.    Coding Restricted Funds in DMI**

Donations are restricted to the program(s) indicated in the first position of the donation's transaction code as follows:

"N" means restricted to blindness programs

"C" means restricted to clubfoot programs

"B" means restricted to burns programs

"X" means restricted to WonderWork

Donations are further designated with a "Fund Code" (which is not part of the transaction code) in DMI. A list of possible Fund Codes (N, C, B, W, X or U) and how they are associated with the first position of the 18 digit transaction code are as follows:

| Charity | 1st Digit of Key Code | Fund Code | Surgery Program |
|---------|----------------------|-----------|-----------------|
| 20/20/20 | N | N | Blindness |
| FirstStep | C | C | Clubfoot |
| BurnRescue | B | B | Burns |
| Wonderwork | X | W | Surgery Programs |
| Wonderwork | X | N | Blindness |
| Wonderwork | X | B | Burns |
| Wonderwork | X | C | Clubfoot |
| Wonderwork | X | X | system default |
| Wonderwork | X | U | Unrestricted |

Fund codes are automatically assigned to all new donations added into the database. For donations to WonderWork (X in first digit of transaction code), the database default is to assign an "X" fund code.

   If a donation is determined to be restricted, a WonderWork employee will then reassign the fund code as N, B, C or W, as appropriate. WonderWork began using the W fund code to signify donations that were restricted to surgery programs (as opposed to specific types of surgeries) around December 2016. Prior to that, starting around the end of 2013, WonderWork utilized "RS" in the transaction code for donations received in response to solicitations which represented to the public that the donations would be restricted to surgeries. WonderWork would communicate to its database vendor that all donors receiving a particular appeal should get "RS" in their transaction code. The last appeal utilizing the RS characters in the transaction code was sent around November of 2016.

   If the donation is unrestricted, in it would retain the "X" fund code; WonderWork has created but not yet implemented a new "U" fund code for staff to assign to these donations.

The Examiner's advisors met with Huang to discuss the marketing group's function including DMI and the donation process. Her description of the donation process was consistent as described above.

The Examiner conducted a test of the data in the DMI system as a basis for relying upon the information contained therein. To satisfy the Examiner that a significant portion of the donations were recorded into either the Debtor or the proper DBA and deposited into the appropriate bank account, all donations over $100,000 and nine donations of $100,000 were tested, altogether accounting for approximately $19.5 million of the donations from inception, or roughly 36%.[318]

In addition, the Examiner sampled a random group of donations in DMI to test to ensure they were recorded in the proper donation revenue account in the general ledger and posted to the appropriate bank statement. From FY2013 to December 28, 2016, ten donations were selected under $500 and ten were selected over $500. All of the documentation associated with donations over $500 received by the cager are sent to Wonderwork's marketing group for further review to ensure they were properly coded so they are captured as restricted or not restricted.

Altogether, between the testing of donations at and above $100,000 and the random sampling, 50 donations were tested. No exceptions were noted.

---

[318] Calculated by dividing approximately $19..5 million by the $54 million of revenues reported in the financial statements in FY11 to FY15 and the general ledger from 7/1/2015 to 12/28/2016.

# XI.    RESTRICTED FUNDS ANALYSIS

## A.    Introduction

The Examiner Order directed the Examiner to report on:

> "1.    The Debtor's collection, use, allocation, and transfers of restricted and unrestricted funds, including:
>
> > (a)    the Debtor's system for collecting, tracking and using restricted-purpose funds;
> >
> > (b)    whether and to what extent Debtor's funds are properly subject to donor restrictions and/or other restrictions under New York charity law and the characterization and nature of any such restriction;
> >
> > (c)    how expenses and expenditures including overhead and grants are allocated across various causes, including the transfer of funds among the Debtor's bank accounts; and
> >
> > (d)    whether Debtor has taken actions in violation of the automatic stay by attempting to impose restrictions on funds that were otherwise unrestricted as I of the petition date;"

As of the Petition Date, the Debtor's books and records reflected the following cash in the accounts indicated:[319]

---

[319]This chart reflects numbers taken from the Debtor's general ledger as of December 28, 2016, the day before the filing, and are comparable to those in the first day filings.  When Debtor first filed its schedules, on January 12, 2017, Docket No. 12, the first schedule reflected, among other changes, donations received between December 28, 2016 and January 11, 2017.

## WonderWork Cash and Investment Balances as of December 28, 2016

| Acct. No. | Description | Last 4 Digits of Acct. No. | Balance |
|---|---|---|---|
| 1040 | HSBC WW (checking) | 9896 | $538,096 |
| 1041 | HSBC 20/20/20 | 4089 | $500,708 |
| 1042 | HSBC BurnRescue | 4521 | $269,479 |
| 1044 | HSBC FirstStep | 4679 | $299,086 |
| | | | |
| 1060 | PayPal WW | | $26,364 |
| 1061 | PayPal 20/20/20 | | $156,784 |
| 1062 | PayPal BurnRescue | | $39,598 |
| 1064 | PayPal FIrstStep | | $49,467 |
| | | | |
| 1100 | Vanguard | | $18,272,994 |
| | **Total** | | **$20,152,576** |

Source: General Ledger

For purposes of the analyses contained in this section of the Examiner's report, unless otherwise noted, the Examiner started with the amounts on deposit in the Debtor's various deposit accounts. Importantly, however, approximately 90% of the Debtor's cash on hand rests in a single account, its so called "investment account," maintained as of the Petition Date at Vanguard, and since moved to Signature Bank. The Examiner's attempt to determine the source of the funds currently on deposit in that account are detailed below.

It should also be noted that while the amounts on deposit in the Debtor's various accounts can be confirmed by reference to the bank account statements produced by Debtor, there have been a series of inconsistent reports from the Debtor, reflected in amendments to their schedules as well as various correspondence between the Debtor and the Examiner as well as other

interested parties in the case.[320]  Some of these changes and discrepancies may be attributable to

timing differences, as well as the fact that more than eighteen months of activity (since June 30,

2015) remains unaudited.  However, the Examiner believes that the analyses which follow, based

on audited numbers where available, and the general ledger where they are not, are sufficiently

reliable in substance to provide appropriate guidance to the Court.  More importantly the

Examiner believes that by describing his methodology, rather than just presenting a conclusion,

the numbers can be reconciled if and when an audit of the Debtor's 2016 and 2017 fiscal years

may be completed, as well as to account for the donations which have come in since the Petition

Date.[321]

     Among the Examiner's charges is determining "whether and to what extent Debtor's

funds are properly subject to donor restrictions and/or other restrictions under New York law."

The basic tenet underlying New York law is that a donor's intent must be honored absent

modification by the donor or a court.  New York courts have reinforced this point in a variety of

contexts.  *See, e.g.*, *Smithers v. St. Luke's-Roosevelt Hosp. Ctr.*, 281 A.D.2d 127, 139 (N.Y. App.

Div. 1st Dep't 2001) ("…the well-settled principle that a donor's expressed intent is entitled to

protection . . .") ; *Matter of Hummel*, 30 A.D.3d 802, 805 (N.Y. App. Div. 3d Dep't 2006)

("Public policy will not permit parties to circumvent the donor's intent . . ."); *Matter of Friends*

---

[320]Debtor originally filed its schedules on January 12, 2017, and subsequently amended them on March 10, June 20, and July 28, 2017 Docket #s 12, 76, 187 and 212.

[321] According to Debtor's Monthly Operating Reports through July 31, 2017, Debtor has taken in and aggregate of $2,376,936 in donations this year including $638,100 in donations to WonderWork, $1,327,690 to 20/20/20 $235,655 to FirstStep, and $175,490 to BurnRescue since the Petition Date.  The amounts are not included in the analysis at this time.

*for Long Island's Heritage*, 80 A.D.3d 223, 235 (N.Y. App. Div. 2d Dep't 2010) ("…New York's long-standing policy honoring donors' restrictions on the use of the property…").[322]

Reflecting such principles, §513(b) of the Not-for-Profit Corporation Law mandates that the charity's governing board (*i.e.*, the Board of Directors) "apply assets thus received to the purposes specified in the gift instrument as defined in Section 551 and to the payment of reasonable and proper expenses of administration of such assets." Section 551(c) of the Not-for-Corporation Law, in turn, defines a gift instrument to include both a written instruction from the donor as well an "institutional solicitation." The statute does not define "institutional solicitation" nor is there any relevant case law on point. However, under its plain meaning, an "institutional solicitation" is a solicitation sent by a charitable institution to donors, which includes fundraising mailings and grant proposals.

In other words, in a case where a donor imposes a use restriction in writing, that writing governs the nature and scope of the restriction.[323] Where there is no writing by a donor, the language of a solicitation from the charity governs. Any donations received by a charity for a particular purpose – whether through a donor's written instructions or through solicitation materials that state a use – must be restricted and used for that purpose alone, subject to the payment of reasonable and proper expenses of administering the gift.

Relatedly, while New York law is silent, the Examiner believes the same principle would apply to interest earned or appreciation on a gift that is subject to a use restriction. If by way of

---

[322] Courts in other jurisdictions have similarly held that "In distributing funds raised by solicitation, the intent of the donor giving money in response to the solicitation must be honored. *Richard Blumenthal v. Sharon Hospital Inc. et. al.*, No. CV0200885375S, 2003 Conn. Super. LEXIS 1657 (Conn. Super. Ct. June 3, 2003). While New York is silent on this point, cases from other jurisdictions affirm that donations raised in public appeals must be used for the purposes cited in the appeals in the absence of donor instruction.

[323] Gift restrictions fall into two general categories. Restrictions on the use of the gift, which is relevant here, and restriction on the amount of spending permitted (for example, with respect to permanent endowment funds), which is not relevant here.

example, a donor instructs in writing that interest or appreciation on a gift be applied to the same gift use, then the charity must honor the instruction. Where a gift instrument (including a charitable solicitation) is silent, however, the interest or appreciation would not be subject to the use restriction. This result is consistent with the rational underlying use restrictions. Unlike endowment funds, which are by their very nature permanent, gifts subject to a use restriction alone are generally not intended for investment, absent donor instruction. In the instant case, there was no instruction by any donor, nor was any suggestion in any solicitation materials that interest income or appreciation on gifts be restricted. Therefore, the Examiner has determined to treat all investment income as unrestricted.

In applying these principles to the Examination, a key issue is whether the millions of dollars raised by the Debtor through its print and online campaigns should be treated as restricted funds and therefore outside the reach of creditors. The closest New York case on point, is *Friends of Long Island Heritage*, a 2010 New York State Appellate Division decision that found creditors could not access the assets of a museum collection that was subject to a use restriction. However, that case interpreted restrictions imposed under a written gift agreement not as a result of public solicitations – New York law is silent on that point.

In the absence of relevant case law, the Examiner believes the correct approach to interpreting N-PCL §513(b) in the context of public solicitations is to evaluate each fundraising solicitation to determine whether a reasonable person would believe that their donation would be used for a particular purpose based on the overall content of the solicitation. Towards that end, the Examiner conducted an exhaustive review of the Debtor's solicitation materials – which included fundraising mailings, personalized letters, emails, website narratives and foundation

grant proposals – to determine whether a use restriction on the donations could be reasonably established.

Until the summer of 2016, when the Debtor began restricting all of the donations received in WonderWork's name to surgeries, the Debtor took the position that all funds raised under the WonderWork name were unrestricted and all funds raised under the DBAs were restricted. The Examiner believes this approach is overly simplistic and inconsistent with legal standards, and resulted in millions of dollars being improperly classified and ultimately misused.

The Examiner determined that the Debtor's practices resulted in the Debtor under-restricting approximately $4.8 million in funds raised in WonderWork's name that should have clearly been restricted.

For the DBAs, the Examiner agrees with the Debtor's position that all donations should be restricted for the particular DBA program to which the donation was made, because donors intended for the gift to be used for that program. However, while such DBA funds are restricted in general, the Debtor failed to properly track and account for specific restrictions created by the solicitation materials. For example, 20/20/20 raised $9.5 million from donors who checked a box directing that their donations would be used for a "full surgery" or a "half a surgery," or "provide anesthesia for the surgery" or "surgical supplies for one surgery" or "surgical supplies for two surgeries." Yet, the Debtor did not restrict donations for those specific purposes; all donations were lumped together under a general "restricted" category, so there was no way for the Debtor to ensure compliance with such restrictions. This practice conflicts with the requirement in N-PCL §513(b) that "the governing board [*i.e.*, board of directors] shall cause accurate accounts to be kept of such assets separate and apart from the accounts of other assets of

the corporation."[324]   As noted above, the Debtor never accounted for these funds separately and as a result, failed to adhere to such restrictions.

What the Debtor should have done was to maintain a system to  track, monitor and account for specific use restrictions in one or more of the following situations:

- When the solicitation expressly states that 100% of the donation will be used for a particular purpose;

- When a donor affirmatively checks a box on a reply device directing how they would like their donation to be used;

- When the language of the solicitation otherwise makes it clear that the donation will be used for a particular purpose;

- When a donor indicates how they would like their donation to be used through an indication on the donation check itself or with a contemporaneous note;

- When a grant proposal states that the donation will be used for specific purposes.

The Debtor failed to do the above properly, if at all.  The Examiner therefore had to begin by trying to reconstruct what has been done.

In the Mullaney Declaration, Mullaney represented that the Debtor would not withdraw or use any "Restricted Funds" "without further order of this Court in consultation with and on notice to the New York State Attorney General."[325]  However other than identifying the relatively small balances in the respective DBA bank accounts, Mullaney did not quantify the amount of those funds, other than to say some were included in the Debtor's investment account at Vanguard.  Attached as Exhibit D to the Mullaney Declaration was the Debtor's audited

---

[324] Additionally, under N-PCL §513(b) the charity's treasurer must also make an annual report to the Board regarding the restricted assets.

[325]Docket No. 2 at 5.

financial statement for Fiscal Year 2015, which showed a temporarily restricted net asset balance as of June 30, 2015 of $4,497,054.

At the first day hearing, the U.S. Trustee asked for clarification of the restricted balance, and Debtor's counsel promised an answer "within the next week." That was also the first public indication that the Debtor had created or was in the process of creating a new category of "restricted" funds within WonderWork.[326] Debtor's counsel further represented to the Court that a "European Donor", a family foundation gives [to WonderWork] money specifically for the organization to pay its operating costs.[327]

There followed literally months of correspondence and motion practice, which need not be revisited here, but by April 12, at the continued hearing on the Debtor's cash management system, the Debtor has still not confirmed a definitive number for its restricted funds.

At that hearing on April 12, Debtor's counsel told the Court that Debtor had indicated in court papers filed in connection with the Arbitration that it had roughly $13 million in restricted funds. The Court appropriately asked "why do you need an audit to know how much you have in restricted funds? If something comes in and it's restricted, it should be going into accounts that are clearly for restricted funds, and you ought to know the minute it comes in the door what those amounts are.[328]

The response by Debtor's counsel illustrates exactly what this part of the Examination has been about:

> "Ms. Mann: That is true, Your Honor. And we do know, when they came in the door. But the funds are expended. And putting those two together is what requires the audit. It's not difficult to figure out how much comes in. What is more difficult is to figure

---

[326]Docket No. 10, Tr. at 5.

[327]*Id.* at 27.

[328]Docket No. 126-2 at 13.

out what's on hand at any particular time that should be classified as restricted or unrestricted."[329]

As already noted, except as specifically indicated, in recommending the adjustments hereafter described in this Report, based on testing by Goldin Associates, the Examiner generally assumes the accuracy of the actual cash numbers contained in the Debtor's audited Balance Sheets and Statements of Activities, and for periods subsequent to July 1, 2015, the Debtor's general ledger. And, as also discussed throughout this Report, the Examiner disagrees with the Debtor's characterization of certain contributions as unrestricted and the Examiner further disagrees with the conclusions reflected in the Statements of Functional Expenses contained in Debtors' audits, and the Debtor's use of the Statement of Functional Expense in order to calculate restricted fund balances.

### B.  Analysis of Restricted Fund Balances

Two key components must be considered in determining the calculation of a restricted fund balance. The first task is to make a proper determination as to whether funds received by the charity, whether from donations or any other source, are properly characterized as restricted and, if they are, what is the character of the restriction, e.g., is the donation required to be spent within a specific time period or for a particular use. (See, for example, the discussion of 20/20/20 "Check the Box" donations above.)

The second task is to determine which of the charity's disbursements and expenses are properly chargeable against and payable from the respective restricted fund balances.

Only by properly classifying funds when received, segregating and accounting for the funds appropriately, and carefully ensuring the use of the restricted funds only in a manner

---

[329] *Id.* at 14.

consistent with the respective donors' intentions, can the charity comply with its legal obligations under New York law.[330]

The Examiner's investigation discovered that WonderWork neither classified, accounted for, or expended its restricted funds consistent with applicable law. It did not segregate its restricted funds, it did not keep track of such funds currently, and it did not have in place adequate controls over the spending of such funds, consistent with proper practices.

Because of the deficiencies in the Debtor's records and practices, the Examiner was forced to undertake the monumental task of reconstructing the Debtor's restricted account balances essentially from scratch. This included: first, analyzing (i) all solicitations and ascribing the correct classification to the funds received with respect to each such solicitation as unrestricted, generally restricted as to "cause", or specifically restricted to a given purpose (in other words, how those funds should have been permitted to be used); and (ii) reviewing, where available, documentation related to all donations received under the WonderWork name (as opposed to the DBAs) to determine, if possible, the donor's intentions with respect to any restriction on the use of such donation. Then, based on the Debtor's general ledger and other information, the Examiner attempted to calculate the amounts it would have been appropriate to charge against the respective restricted fund balances. Only by performing this analysis could the Examiner be in a position to accurately report to the Court with respect to the remaining balance of each category of restricted funds.

Two final introductory points must be reiterated. First, the Examiner's analysis is a <u>legal</u> one, based on the Examiner's views as to the appropriate classification and use of restricted funds in accordance with New York law. It was <u>not</u> an examination to determine whether the

---

[330]The Examiner notes that there is no formal accounting requirement that the funds be segregated, though best practices would suggest doing so.

Debtor's audited financial statements conformed with Generally Accepted Accounting Principles ("GAAP"). Neither the Examiner nor his professionals performed an audit. The Examiner does not believe that certain of the accounting principles the Debtor (and for that matter, other charities) purport to follow, such as the application of functional cost analysis, supersedes state law governing the proper use of restricted funds. As discussed throughout this report, the Examiner believes Debtor abused those rules in any case. But the Examiner's analysis is not, in any case, an attempt to re-examine the Debtor's financial statements. Rather, it reflects the Examiner's effort to account for the actual spending of the real dollars intended by donors to be spent for specific purposes.

Second, the Examiner and his professionals had to work with original source documents to perform this analysis. While some comfort could be had with respect to certain accounts based on prior audits, the Debtor's last audited financials were for the Fiscal Year ended June 30, 2015, over a year and a half ago, during which time the Debtor collected , according to its own unaudited books and records (verified, to the extent possible by reference to bank and investment statements and other third party sources) in excess of $14,337,271.00 of donations, and spent at least $9,291,406.00. The Examiner therefore anticipates that further adjustments may well be necessary when the BDO or any other audit is completed. However, based on the testing performed by his professionals, the Examiner believes his conclusions are sufficiently accurate and important enough to warrant the issuance of the report.[331]

---

[331] The Debtor's core accounting systems are QuickBooks, the general ledger and DMI, the donor database. The Examiner's professionals held numerous meetings and telephone calls with Fuchs, Debtor's CFO, to get an understanding of the general ledger, the Debtor's cash management system, how the Debtor generates financial information, including management reports and interim, quarterly and annual financial statements. The Examiner's professionals also met and spoke on numerous occasions with Huang, Debtor's Marketing Director, who is in charge of the DMI System. During these meetings and calls the Examiner's professionals were able to get an understanding how the system was and is used, its functionality and the process of recording, reporting and analyzing donations. For each of these systems, Hana Fuchs or Huang provided documentation and information in order for the

### C. WonderWork's Historic Practices with Respect to its Restricted Fund Balances

When it was initially established, all funds received by WonderWork were treated as unrestricted. Commencing with the creation of the three "DBA"s in 2012, WonderWork began to classify all funds contributed to any of the DBAs as "restricted" and, with a few exceptions, any funds contributed directly to WonderWork as "unrestricted.

As Mullaney told the Examiner: "All the DBA's were 100 percent restricted. It was all going to surgeries."[332] "[T]he custom was to restrict all the DBA's and the WonderWork stuff was unrestricted."[333] Huang and Fuchs confirmed that to the Examiner. The exceptions related to so called "white mail" the treatment of which has been discussed above in the description of the Debtor's fundraising program.

However, simply classifying the contributions by DBA failed to reflect any limitation to a specific purpose, notwithstanding the fact that, as noted above, many of the cause related solicitations in fact were very specific that the funds raised would be used for a specific purpose, e.g. "surgeries" or, "surgery programs" or, "anesthesia" or, "surgical supplies" or in some cases even as to specific aspects of a surgery. (See discussion of "Check the Box" solicitations, above.)[334]

The Examiner's investigation in fact revealed that many more of the donations attributed to WonderWork also should have been classified as "restricted", based on either specific donor expressions of wishes accompanying the contribution, or the text of the specific solicitation

---

Examiner's professionals to supplement their understanding of how the systems worked, including the integration of them into the Debtor's day-to-day operations..

[332] Mullaney Tr. 179:5-7.

[333] Mullaney Tr. 218-20.

[334] Another exception was a specific $400,000 donation to fund the creation of an electronic medical database. These funds were recorded in the Debtor's general ledger WonderWork revenue account, and therefore remained "unrestricted" from an accounting perspective. However, it would appear that these funds should be "restricted" to the specific purpose for which they were donated.

which elicited the contribution. The somewhat cavalier attitude taken by Debtor with respect to the consequences of the content of its solicitation materials is illustrated by the following exchange with Mullaney:

> "Q. When you prepare the mailings, do you consider whether the funds are going to come in restricted, unrestricted?"
>
> A. "Not really…usually it's me trying to write the most emotional thing I can." [335]

Commencing in or around June of 2016, the Debtor undertook an effort to reclassify some of the contributions received by WonderWork as restricted.[336] In part this change was based on the fact that the Debtor had begun to shift its business model from mass mailings to more targeted "larger donors," and in connection with that shift, to reduce its marketing expenses. This resulted in the Debtor starting to include on all WonderWork branded mailings statements more or less to the effect that "100% " of all donations would go towards "surgeries" or "surgery programs," because a "generous" or "founding" donor (or donors) had contributed sufficient funds to cover "all" "administrative" or "overhead" and/or "fundraising" costs. The change may well also be attributed to the anticipation of an adverse ruling in the HelpMeSee Arbitration, and an attempt by the Debtor to "restrict" its funds to avoid making them subject to any potential adverse judgment.

Following the receipt of the adverse HelpMeSee Arbitration ruling, and Debtor's decision to retain counsel in contemplation of a bankruptcy filing, this effort increased, ███████

███████████████████████████████████████████████████

███████████████████████████████ With respect at least to all donations

---

[335] Mullaney Tr. 197:12-23.

[336] In fact, starting in 2013, WonderWork started to state in certain WonderWork branded solicitations, that the donations would be used solely "for surgeries" and using a code to designate receipts from such solicitations. However, such funds were not reflected by WonderWork as restricted in its general ledger or financial reporting.

received in fiscal years 2015 and 2016, WonderWork 

Mullaney addressed this as follows:

> Q. Why did you tell your accountant that you think you have been doing your restrictions wrong?
>
> A. Well, because I was confused and I was in a panic. We had just got this judgment and these are things that I saw at the end of the year and just signed and not really was involved with restricting, unrestricting, so I was trying to understand it.
>
> In the – the custom was to restrict all the DBAs and the WonderWork stuff was unrestricted. After I looked into it and learned more about restricted in the last three months than I ever knew, and with the legal definition of restricted, we said some of the WonderWork stuff should be restricted, especially after we put that [the 100% language] on the stationery.

> Q. When you started to put the hundred percent on –
>
> A. Yeah.
>
> Q. – was the purpose to encourage donations, or was the purpose to create a restriction on the funds?

[337]Debtor has provided the Examiner with schedules suggesting that the WonderWork funds "restricted to surgeries" amount to $1,002,264 in Fiscal Year 2015, $1,179,066 in Fiscal Year 2016, and $1,943,177 for the first 6 months of Fiscal Year 2017, for a total of $4,124,507.

A. Oh, raise donations.  I never cared what was restricted or not before this.  To tell you the truth, whatever the number was at the end of the year, I didn't care.  It was never an issue.  It was to help us raise more money, get a better response.

Mr. Lilien: What was never an issue?

The Witness: Restricted, unrestricted.  We never ran out of money.  We never had a thing.

If you ask me what the split was, I never really knew.  Hana did it with Kimberly and JJ and --.[338]

While the Examiner's analysis of the Debtor's solicitation materials and other records may, in fact, lead to some of same "reclassifications" performed by the Debtor ███████, the circumstances and timing of Debtor's attempts to make these changes raise serious questions as to its motivation, and with respect to actions taken before December 28, 2016, potential fraudulent conveyances, and with respect to actions taken after December 28, 2016,  potential violations of section 549 of the Bankruptcy Code.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████

As previously noted, contrary to the requirements of New York law, the Debtor did not segregate nor maintain a regular accounting of its restricted fund balances.

The Debtor's cash accounts include four held at HSBC (one for each DBA and another for WonderWork) and four held at PayPal (one for each DBA and another at WW).  Each of the DBA accounts were funded by donations related to that cause.  The remaining accounts (i.e. HSBC WonderWork Operating and Signature Bank) have a mix of restricted and unrestricted

---

[338] Mullaney Tr. 219:9 -221:11.

14592424.11
228676-10002

funds. The HSBC Operating Account is the charity's main operating account and is funded with (and disburses) both restricted and unrestricted funds.

Only at the end of each fiscal year, and in connection with the audit of its financial statements, the CFO would prepare a "roll forward" schedule to show the change in restricted fund balances over the course of the year. As a result of this practice, and since the audit does not occur until after the end of the fiscal year, it would have been impossible for the Debtor (or any other person) to know the exact balance of restricted funds at any point during the year.

> MR. LILIEN: If you don't determine what is restricted or unrestricted until the end of the year until the audit process, during the course of the year how would you know which funds can be spent for restricted purpose?
>
> MS. FUCHS: The funds during the course of the year are commingled in the bank. I pay everything out of the WonderWork bank account, so the only time I know how much is remaining is when I do the exercise at the end of the year when there is a particular restricted account that is set up, like the medical records database that I know specifically what it's been used for. But other than that, it's the end of the year.[339]

Moreover, Debtor's practice made it impossible to state with any certainty that restricted funds were NOT being used to pay inappropriate expenses during the course of the year.

Debtor's CFO, Fuchs, calculated annually the restricted fund balances for each DBA on a spreadsheet. Each fiscal year, and for each of the DBAs, the calculation would start with the restricted fund balance from the end of the preceding fiscal year. The CFO next added the donations that had been taken in by the respective DBA, based on deposits to the DBA's deposit account at HSBC, PayPal account and with respect to stock donations, the Vanguard account, and reflected in the general ledger. She would then subtract two items: (i) grants made with

---

[339] Fuchs Tr. 179:7-180:4.

respect to the appropriate cause, as reflected in the general ledger, and (ii) a portion of the printing, publication and postage charges spent on mailing by the respective DBA during the fiscal year.[340]

In applying this methodology to calculate the net restricted account balances, Fuchs improperly used joint cost accounting principles, which guide financial reporting, rather than legal principles, to determine how restricted funds could be spent. The Examiner disagrees with this practice.

Joint cost accounting is explained in FASB ASC 958-720 Not-for-Profit Entities ("ASC 958"). ASC 958 is intended to provide guidance to non-profits with respect to how they can allocate certain costs related to their fundraising activities among programs, management and general, and fundraising, if certain criteria related to purpose, content and audience are met. This allocation affects the charity's program /expense ratio, an important measure to assess financial effectiveness and one which is frequently referred to by regulators and donors.

Seeking to take advantage of the joint cost allocation accounting rules, Debtor aggressively charged a significant amount of the overall printing, publication, and postage charges related to its direct mail to "program" in its financial statements. It justified the allocation based on its claim that the materials included in its mailings were intended to raise public awareness and issue a "call for action" in support of the non-profit's mission. However, again, not only was the Debtor applying accounting rather than legal principles to determine how restricted funds can be spent, it was also increasing the amount it charged based on wordy, and inapposite brochures included with the solicitations.

---

[340]In addition, one donor made a $1 million donation that was charged off over a five year period in accordance with the Donor's direction.

The Examiner does recognize that an argument can be made that to a limited extent, some program related educational material may be included in some of the mailings.  However, the amount must be reasonable in relation to the purpose of the mailing, the nature of the information included and the intended benefit to be received by the recipient of the information provided.

A full explication of ASC 958 is beyond the scope of this Report.  However, because WonderWork spent over $25 million in printing, publication and postage expenses related to its direct mail campaigns, WonderWork's inappropriate reliance on ASC 958 to allocate an excessive portion of those expenses against its restricted fund balances cannot be ignored.

For FY2013 and FY2014, the joint cost analysis was performed by Target MarkeTeam (who had also performed this type of analysis for SmileTrain).  Target MarkeTeam used a word count in the information it reviewed to make its allocation between programming and fundraising costs.  In doing its analysis, Target MarkeTeam only considered a health brochure inserted into the solicitation package, not the entire mailing. When the Debtor switched vendors in 2015, the calculation was done by Gary Ellis, a third party "expert" retained by the debtor.  According to Fuchs, this "expert" was paid $100 per solicitation to perform an analysis of the text in the mailings, from which he extrapolated a percentage supposedly attributable to the "program" served by the mailing.  Ellis used a "line" count in to make his allocation between programming and fundraising costs.  Ellis also considered all the documents mailed to potential donors (i.e.  giving letter, health brochure, response device, color brochure, and envelope).

The following table shows the percentage of the Debtor's direct mail expenses which it charged against its restricted fund balances, based on the allocations performed by TargetMarkeTeam and Ellis:

| WonderWork Direct Mailing Cost Expense Allocation Methodology | | | | | |
|---|---|---|---|---|---|
| | FY 2013[1] | FY 2014[1] | FY 2015[2] | FY 2016[2] | |
| **Printing, Publication, Postage** | | | | | |
| WonderWork | 55.5% | 52.0% | 34.0% | 43.3% | |
| 20/20/20 | 19.0% | 40.5% | 61.1% | 53.9% | |
| BurnRescue | 10.5% | 2.1% | 2.4% | 1.4% | |
| FirstStep | 14.9% | 5.4% | 2.5% | 1.4% | |
| **Total** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | |
| | FY 2013 | FY 2014 | FY 2015 | FY 2016 | Total[3] |
| **Printing, Publication, Postage** | | | | | |
| WonderWork | $4,366,335 | $3,981,749 | $2,379,829 | $966,254 | $11,694,167 |
| 20/20/20 | $1,494,589 | $3,101,445 | $4,277,813 | $1,202,016 | $10,075,862 |
| BurnRescue | $828,904 | $159,966 | $166,308 | $31,632 | $1,186,810 |
| FirstStep | $1,174,608 | $414,050 | $175,547 | $31,632 | $1,795,838 |
| **Total** | **$7,864,436** | **$7,657,210** | **$6,999,497** | **$2,231,534** | **$24,752,677** |

[1] Cost allocation provided by Target MarkeTeam
[2] Cost allocation provided by Gary G. Ellis Consulting
[3] FY 2011, 2012, 2017 is not displayed for purpose of this analysis, but accounts for an additional $591,491 of direct mailing costs

The Examiner believes the "public awareness" materials incorporated by the Debtor into their DBA mailings raise serious questions as to whether the Debtor included these materials for any reason other than to allow it to release restricted funds, in other words, to allow restricted funds to be used for part of the Debtor's direct mail expenses. Mullaney told the Examiner: "none of the money in those accounts, the DBAs, was ever used for overhead or fundraising or

14592424.11
228676-10002

anything else."[341]  "[A]ll expenses came out of WonderWork money."[342]  But based on the Debtor's use of joint cost accounting, that was clearly not the case.

It is also interesting to note that, in performing this "roll forward" analysis of its restricted fund balances, the Debtor never included any other costs or expenses, such as a portion of salaries or overhead, that could legitimately be considered program related expenses.

The following charts[343] show the Debtor's calculations of their "roll forward" restricted net asset balances calculated using the Debtor's methodology,  and, based on the numbers shown in their audited financial statements, for years 2012-2015, and based on the unaudited general ledger financial data for more recent periods.

---

[341] Mullaney Tr. 319-20-22.

[342] Mullaney Tr. 361:18-19.

[343] These charts were prepared by Goldin Associates.

**WonderWork Restricted Net Asset Roll Forward**

| | WonderWork Restricted Calculation |
|---|---|
| **FY 2012** | |
| Beginning balance | - |
| Plus: Donations | - |
| Less: Grants | - |
| Less: Cost Allocation - Printing, Publication, Postage | - |
| Less: Other Adjustments | - |
| **FY 2012 balance (audited)** | |
| | |
| **FY 2013** | |
| Beginning balance | - |
| Plus: Donations | $3,669,157 |
| Less: Grants | ($877,500) |
| Less: Cost Allocation - Printing, Publication, Postage | ($1,506,807) |
| Less: Time | ($199,531) |
| Less: Other Adjustments | $772,950 |
| **FY 2013 balance (audited)** | **$1,858,269** |
| | |
| **FY 2014** | |
| Beginning balance | $1,858,269 |
| Plus: Donations | $6,596,814 |
| Less: Grants | ($3,651,735) |
| Less: Cost Allocation - Printing, Publication, Postage | ($3,717,856) |
| Less: Time | ($200,040) |
| Less: Other Adjustments | $1,500,173 |
| **FY 2014 balance (audited)** | **$2,385,626** |
| | |
| **FY 2015** | |
| Beginning balance | $2,385,626 |
| Plus: Donations | $8,437,315 |
| Less: Grants | ($1,891,500) |
| Less: Cost Allocation - Printing, Publication, Postage | ($4,230,548) |
| Less: Time | ($200,575) |
| Less: Other Adjustments | - |
| **FY 2015 balance (audited)** | **$4,500,317** |
| | |
| **FY 2016** | |
| Beginning balance | $4,500,317 |
| Plus: Donations[1] | $7,785,496 |
| Less: Grants | ($2,094,600) |
| Less: Cost Allocation - Printing, Publication, Postage | ($1,264,026) |
| Less: Time | ($169,541) |
| Less: Other Adjustments | - |
| **FY 2016 balance (unaudited)** | **$8,757,646** |
| | |
| **FY 2017** | |
| Beginning balance | $8,757,646 |
| Plus: Donations[2] | $3,624,776 |
| Less: Grants | ($1,035,000) |
| Less: Cost Allocation - Printing, Publication, Postage | ($175,364) |
| Less: Time | - |
| Less: Other Adjustments | - |
| **FY 2017 balance December 28, 2016 (unaudited)** | **$11,172,058** |

Source: WonderWork Net Assets Released Schedule

[1] FY 2016 donation in WonderWork roll forward schedule contains $1,921,196 donation that was not included in the General Ledger

[2] FY 2017 donation in WonderWork roll forward schedule contains $1,178,725 donation that was not included in the General Ledger

14592424.11
228676-10002

### D. Examiner's Calculation of Restricted Fund Balances

The Examiner believes that the manner in which the Debtor calculation of its restricted fund balances is irreparably flawed because of errors in determining the which funds were restricted, the systems maintained by the Debtor for tracking and accounting for restricted funds, and the methodology applied in making the calculations.

As a result the Examiner is disregarding the "roll forward" prepared by the Debtor and is creating his own based on appropriate inflows and outflows, including the appropriate amount of restricted funds and the reasonable amount of expenses that can be charged against them.

The Examiner confronted a number of hurdles that had to be overcome in order to come to his own determination of the current restricted fund balances. First, the lack of audited financial statements significantly increased the amount of work required to be done by the Examiner and his professionals. Second, both the Examiner's own investigation, as well as the still uncompleted 2016 audit, have revealed serious problems with the accounting records and management controls of the Debtor. Despite these challenges however, the Examiner believes his calculations nevertheless provide a reasonably reliable way to reach a number that should enable the Court to evaluate the amount of restricted funds and the Debtor's assets available to it for its creditors.

As a preliminary step, the Examiner evaluated a series of approaches in order to establish the net restricted fund balance. The Examiner ultimately determined that the most reliable method, consistent with preserving the status of restricted funds under New York law, is to reconstruct the net restricted fund balance based on the actual cash contributed to and spent by the Debtor starting from day one.

To determine the source of the Debtor's cash as of December 28, 2016, the Examiner used Debtor's audited financials for FY 2011 through FY 2015 and the general ledger was used

for FY 2016 and FY 2017 through December 28, 2016. The Examiner used the Statement of Activities and Statement of Cash Flows in the Debtor's audited financial statements to identify the sources and uses of cash for FY 2011 through FY 2015. Because the 2016 audit has not been completed, the Examiner also used the general ledger to derive data that would have otherwise been available in the audited Statement of Activities and Statement of Cash Flows to identify the sources and uses of cash for the period July 1, 2015 through December 28, 2016. The following chart shows the sources and uses of Debtor's cash from inception through December 28, 2016:

## WonderWork Sources and Uses, Cash/Investment Inflows (+) and Outflows (-) Analysis

| | Source[1] | Audited Financial Statements | | | | | General Ledger | | Total |
|---|---|---|---|---|---|---|---|---|---|
| | | FY 2011 | FY 2012 | FY 2013 | FY 2014 | FY 2015 | FY 2016[2] | FY 2017[2] | |
| **Cash/Investment Inflows** | | | | | | | | | |
| Contributions - Restricted | SofA | $0 | $769,687 | $3,669,157 | $6,596,814 | $8,437,315 | $5,864,301 | $2,446,051 | $27,783,325 |
| Contributions - Unrestricted | SofA | 50,767 | 7,109,303 | 3,777,015 | 5,582,853 | 3,958,954 | 4,596,583 | 1,432,336 | 26,507,811 |
| Contributions - In-kind | SofA | - | - | - | 1,882,441 | 1,522,112 | 2,466,663 | - | 5,871,216 |
| Contributions Receivables | CF | - | (769,451) | 199,295 | 200,040 | 168,240 | - | - | (201,876) |
| Loans Payable | CF | - | - | 3,659,203 | 5,840,797 | 200,000 | - | - | 9,700,000 |
| Loans Payable (officer) | CF | 126,000 | (126,000) | - | - | - | - | - | - |
| Debt Forgiveness | CF | - | - | - | (100,000) | (300,000) | - | - | (400,000) |
| Investment | CF | 6 | (112,676) | 881,997 | 1,878,168 | (153,782) | 348,263 | 528,229 | 3,370,206 |
| Service fees (rec'd from HMS) | SofA | - | 1,333,667 | - | - | - | - | - | 1,333,667 |
| Other | | - | - | - | 26,130 | 2,059 | 34,446 | (15,114) | 47,520 |
| **Total Cash Inflows:** | | $176,773 | $8,204,530 | $12,186,667 | $21,907,243 | $13,834,898 | $13,310,256 | $4,391,502 | $74,011,869 |
| | | | | | | | | | |
| **Cash/Investment Outflows** | | | | | | | | | |
| Grants | | $0 | ($56,800) | ($877,500) | ($1,993,055) | ($1,992,500) | ($2,083,600) | ($1,021,000) | ($8,024,455) |
| In-kind Services | SofA | - | - | - | (1,882,441) | (1,522,112) | (2,466,663) | - | (5,871,216) |
| Salaries and Related Expenses | SofA/SofFE | (61,272) | (1,240,919) | (1,369,968) | (1,721,683) | (1,617,554) | (1,430,338) | (1,103,399) | (8,545,133) |
| Professional and Consulting | SofA/SofFE | (98,456) | (198,380) | (722,818) | (1,090,232) | (729,838) | (683,865) | (447,869) | (3,971,457) |
| Occupancy | SofA/SofFE | (12,100) | (128,267) | (182,500) | (187,025) | (195,988) | (174,649) | (46,995) | (927,524) |
| Office Supplies and Services | SofA/SofFE | (3,818) | (78,322) | (172,952) | (186,141) | (215,951) | (222,215) | (99,470) | (978,869) |
| Printing, Publications, Postage | SofA/SofFE | (210) | (163,456) | (7,864,436) | (7,657,209) | (6,999,495) | (2,231,534) | (428,036) | (25,344,375) |
| Travel and Other Miscellaneous[3] | SofA/SofFE | (6,201) | (130,815) | (182,411) | (356,719) | (500,240) | (362,502) | (136,754) | (1,675,642) |
| Interest Payable | SofA/SofFE | - | - | - | 118,750 | 183,667 | - | - | 302,417 |
| AP and Accruals | CF | 6,705 | 17,730 | 716,599 | 381,256 | (934,223) | 489,783 | 727,256 | 1,405,106 |
| Purchases of Property and Equipment | CF | - | (16,904) | (130,645) | (1,822) | (11,197) | (29,285) | (6,934) | (196,788) |
| **Total Cash Outflows:** | | ($175,352) | ($1,996,133) | ($10,786,631) | ($14,576,321) | ($14,535,431) | ($8,194,868) | ($2,563,201) | ($53,827,937) |
| | | | | | | | | | |
| **Change in Cash/Investments** | | $1,421 | $6,208,397 | $1,400,036 | $7,330,922 | ($700,533) | $4,115,388 | $1,828,301 | $20,183,932 [4] |

[1] Statement of Activities (SofA), Statement of Functional Expenses (SofFE), Statement of Cash Flows (CF) and Balance Sheet (BS)

[2] Figures are estimates based upon a review of the General Ledger. FY 2016 audit yet to be finalized and issued. Unaudited financial information for FY 2017 as of 12/28/2016, the day before the petition date, still outstanding

[3] Miscellaneous items in this category include roughly $534,000 of interest for impact loans for FY 2014 - FY 2017

[4] Ending cash/investment balance does not equal cash/investment balance per the general ledger. The difference is $31,357 greater than the general ledger.

In order to prepare his model, the Examiner next had to evaluate the information in the foregoing chart. First, based on his analysis of the Debtor's fundraising materials, the Examiner determined that a material portion of the WonderWork funds originally characterized as "unrestricted" in fact should have been treated as restricted. This determination was based on the donor's expressed intention either through direct communication or as a result of the contents of the solicitation which elicited the donation. Certain of these restrictions require that the funds contributed to WonderWork (as opposed to the DBAs) be spent only on surgeries. This required the creation of an entirely new category of "WonderWork restricted funds."[344] The following chart reflects WonderWork donations that the Examiner has determined should be considered "restricted."[345]

---

[344] For similar reasons, certain of the WonderWork donations can also be attributed to the respective DBA's and simply incorporated into the respective DBA restricted fund balance.

[345] The Examiner also determined that approximately $275,000 of restricted donations lacked support for restrictions so these donations were reclassified as unrestricted.

## WonderWork Restricted Donation Detail

| | FY 2012 | | FY 2013 | | FY 2014 | | FY 2015 | |
|---|---|---|---|---|---|---|---|---|
| | Donations | Value | Donations | Value | Donations | Value | Donations | Value |
| Restricted[2] | 0 | $0 | 0 | $0 | 1 | $100,000 | 1 | $1,250 |
| Restricted Database[3] | 0 | $0 | 0 | $0 | 0 | $0 | 0 | $0 |
| Unrestricted[4] | 2 | $10,000 | 0 | $0 | 155 | $1,994,204 | 109 | $506,539 |
| **Total** | **2** | **$10,000** | **0** | **$0** | **156** | **$2,094,204** | **110** | **$507,789** |

| | FY 2016 | | FY 2017[1] | | Total | | | |
|---|---|---|---|---|---|---|---|---|
| | Donations | Value | Donations | Value | Donations | % | Value | % |
| Restricted[2] | 1 | $1,432 | 1 | $600 | 4 | 0.6% | $103,282 | 1.9% |
| Restricted Database[3] | 1 | $400,000 | 0 | $0 | 4 | 0.2% | $400,000 | 7.5% |
| Unrestricted[4] | 160 | $977,875 | 191 | $1,323,645 | 617 | 99.2% | $4,812,264 | 90.5% |
| **Total** | **162** | **$1,379,307** | **192** | **$1,324,245** | **622** | **100.0%** | **$5,315,546** | **100.0%** |

Source: General Ledger
[1] FY 2017 data from July 1, 2016 through December 28, 2016
[2] Restricted donations in the General Ledger are booked to the program accounts
[3] General Ledger properly restricted the $400,000 donation specified for the Electronic Medical Database
[4] Unrestricted donations in the General Ledger are booked to the WonderWork 4000 account

The Examiner also notes that an argument could be made that when an unrestricted donation, such as ▮▮▮▮▮▮, is used to "match" a public donation, as Debtor asserts was the case with the foregoing solicitations, those previously unrestricted funds should be treated as restricted. Because the funds came in as unrestricted initially and ▮▮▮▮▮ did not subsequently restrict them, the matched portion would remain unrestricted under New York law. As a result, while the Examiner believes the matching solicitations are misleading and not applied for their stated use, he has determined not to reclassify the funds used to "match" the public donations.

On the "expense" side of the ledger, the Examiner generally agrees that grants to hospitals (the primary mission of the organization) are properly considered program expenses and can be paid from restricted funds. In addition, because the Examiner thinks it was a misleading and improper entry, he has ignored the "in-kind" numbers both on the income and expense side. Since they cancel each other out, those numbers never served any purpose except to inflate revenue, program, and other "statistics" for reporting purposes, which would appear to

be a not uncommon practice among certain charities. Though beyond the scope of the Examination, the in-kind contribution practice followed by the Debtor appears to conflict with basic accounting principles. The Debtor has historically treated as an in-kind contribution amounts that another organization contributed for a surgery at a grantee hospital. For example, if a hospital in India were to subsidize a blindness surgery or contribute professional services for surgeries, the Debtor may take credit for the value of such contributed services or amounts. While the Examiner is not in a position to opine on accounting rules and recommends that the Debtor's outside auditors consider this issue, the Debtor's use of in-kind contributions appears to be inappropriate. As a result, the Examiner has removed in-kind contributions from his model.

As previously discussed, the Examiner has serious doubts as to Debtor's allocation of printing, publication and postage expenses to be charged to its restricted funds. However, consistent with industry practice, an argument can be made that some nominal amount of such expenses could be allowed against the restricted balances. Therefore, for purposes of this analysis, the Examiner determined to allow 10% of the Debtor's printing, publication and postage expense to program.

In addition, as noted above, New York law does permit restricted funds to pay the reasonable and proper expenses of the administration of such assets. In the context of WonderWork, the Examiner believes this would mean the costs properly attributable to, for example, making and administering grants, monitoring the performance of grant recipients, and building and maintaining the MasTec electronic medical database, including reasonable payroll costs for the personnel involved in providing the program services and related overhead. Debtor did include an allocation of these personnel and overhead costs in its statement of activity statement, but inexplicably failed to include them in its calculation of its restricted fund balances.

However, it must be noted that the Examiner also disagrees with the allocation of certain payroll costs made by the Debtor.[346]

The following table[347] shows the Debtor's historic allocation of its personnel costs among program, management and general, and fundraising as prepared by Fuchs with input from Mullaney.

---

[346]For purposes of this analysis the Examiner utilized the Debtor's reported compensation numbers. This should not be taken to suggest that the Examiner agrees with the appropriateness of such salaries.

[347] The table was prepared by Goldin Associates.

| Name | Title | FY 2012 | | | FY 2013 | | | FY 2014 | | | FY 2015 | | | FY 2016 (unaudited) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Program | Mgt/Gen | Fundraise | Program | Mgt/Gen | Fundraise | Program | Mgt/Gen | Fundraise | Program | Mgt/Gen | Fundraise | Program | Mgt/Gen | Fundraise |
| Brooke Bohling | | 100% | 0% | 0% | | | | | | | | | | | | |
| DeLois Greenwood | Chief Program Officer | | | | 100% | 0% | 0% | 100% | 0% | 0% | 100% | 0% | 0% | 100% | 0% | 0% |
| Suji Strain-Kokich | Intern | | | | 100% | 0% | 0% | 100% | 0% | 0% | | | | | | |
| Tiffany Carson | Program Officer | | | | | | | 100% | 0% | 0% | 100% | 0% | 0% | 100% | 0% | 0% |
| Karen Lazarus | Director Strategic Projects | 95% | 2% | 3% | 80% | 2% | 18% | 80% | 2% | 18% | 80% | 2% | 18% | 75% | 5% | 20% |
| Nicole Macagna | Development Associate | | | | 80% | 2% | 18% | 80% | 2% | 18% | 80% | 2% | 18% | | | |
| Hana Fuchs | CFO | 80% | 20% | 0% | 80% | 20% | 0% | 80% | 20% | 0% | 75% | 25% | 0% | 80% | 20% | 0% |
| Brian Mullaney | CEO & Founder | 95% | 2% | 3% | 80% | 2% | 18% | 80% | 2% | 18% | 75% | 2% | 23% | 75% | 5% | 20% |
| Janet Huang | Marketing Director | | | | 50% | 0% | 50% | 50% | 0% | 50% | 64% | 4% | 32% | 57% | 3% | 41% |
| Elaine Patafio | Director Marketing | | | | 50% | 0% | 50% | 50% | 0% | 50% | 64% | 4% | 32% | | | |
| Barbra Schulman | Director Marketing | 0% | 15% | 85% | 50% | 0% | 50% | 50% | 0% | 50% | 64% | 4% | 32% | | | |
| Vera Eastman | Marketing & Develop Manager | | | | | | | 50% | 25% | 25% | 50% | 25% | 25% | 57% | 3% | 41% |
| Mollie Toomey | Marketing Associate | 0% | 15% | 85% | 50% | 0% | 50% | 50% | 0% | 50% | | | | | | |
| Jenna Minchuk | Digital Marketing Manager | | | | | | | | | | 0% | 0% | 100% | | | |
| Angelissa Paulino | Donor Relations Associate | | | | | | | | | | 0% | 0% | 100% | 0% | 0% | 100% |
| Kathleen Trainor | Donor Relations Associate | | | | | | | | | | 0% | 0% | 100% | 0% | 0% | 100% |
| Michele Sinesky | Director Donor Relations | 0% | 0% | 100% | 0% | 0% | 100% | 0% | 0% | 100% | 0% | 0% | 100% | 0% | 0% | 100% |
| Angela Lee | Intern | | | | | | | 0% | 100% | 0% | 0% | 100% | 0% | | | |
| Alexandra Kaliff | Intern | | | | 0% | 100% | 0% | 0% | 100% | 0% | | | | | | |

Source: The Debtor supporting schedules for each annual functional expense allocation

It is clear to the Examiner, that Debtor intended to overweight these expenses towards programming in a manner that the Examination revealed to be inappropriate. For just a few examples:

Janet Huang is the Debtor's marketing manager. Marketing for WonderWork meant only one thing – fundraising. In her interview, Huang stated: "I don't handle programs at all at WonderWork."[348] Responding to a question about her knowledge of the hospitals to whom the charity was making grants, she said "If it was something that involved hospitals, we would ask the Program team, Delois (Greenwood) and the program associate at the time, if it was true." (Huang at 29:9-12). This was confirmed by Mullaney: "We have two fundraising people, Janet [Huang] and Vera. They do nothing with programs." (Mullaney at 200:9-11). Yet in 2015, Huang's salary was allocated 64% to Programming and only 32% to Fundraising.

Hana Fuchs is the Debtor's CFO. When asked about how she allocated her time for the cost analysis she said "I would put part of it in programs depending on how much I worked with the program group in paying the grants and reviewing the documentation on the grants." Fuchs 184:22-24. Yet on the schedule her payroll costs have been allocated 80% to program and only 2% to management and overhead.

Brian Mullaney is the CEO of WonderWork. The organizational chart he provided to Pearl Mayer to justify his salary, as well as the organizational chart filed as part of his affidavit in connection with the first day motions show him wearing a multitude of hats, including, significantly, "Chief Development Officer" and "Chief Marketing Officer." In his interview, discussing how his time was spent, he said "I am kind of split [between programs and fundraising."] Mullaney at 200:12-17. Mullaney also stated that he wrote "most of it not all" of

---

[348] Huang Tr. 8/9/2017, 53:13-14

the contents for WonderWork's mailings. Yet his salary also has been allocated 80% to program and only 2% to management and general.[349]

Conversely, Greenwood, whom Mullaney had described as his "COO" (though she denied having the title and the responsibilities) said 10% of her time was allocated beyond program even though "Brian is always pulling me trying to get me beyond my role." Greenwood, at 20:17-21. The Debtor allocated her time 100% to programs.

As a result the Examiner has been forced to make certain judgments as to appropriate allocations of payroll costs. He then applied the same percentages to other "administrative" expenses (office rent, overhead, etc.) in an effort to come up with a fair allocation to charge against the restricted funds.

The Examiner believes there are certain other categories of expense that it is appropriate to deem reasonable costs of administering the "cause" and "surgery" restricted funds. The first of these include certain expenses included in the line item for Debtor's professional and consulting fees, and represent payments to Ujjal Bhattacharya, Debtor's Indian-based liason with grant recipients, the amounts paid by Debtor is Greenwood's consulting firm, Help for the Cause, LLC, before she officially joined WonderWork's staff, and payments to an Indian doctor who performed on-site visits to assist Debtor with its review of grant recipients.

Second, it must be noted that Debtor's legitimate programs require extensive overseas travel, and there are travel expenses incurred in connection with finding appropriate grantees, as well as monitoring their performance. (Because of the inadequate records maintained by the Debtor, it is difficult to separate these travel costs from other expenses which might more appropriately charged in part to fundraising.) In addition, the Examiner has been advised that no

---

[349] For purposes of this analysis the Examiner has not included as an expense any portion of Mullaney's so-called limbo pay", which was reflected on an off the books ledger maintained by Fuchs with respect to Mullaney's alleged "deferred bonus".

formal travel and entertainment reports were kept.  For example Mr.  Mullaney's annual visit to Switzerland to make a presentation to the ███████████████, the organization's single largest donor, would appear to be a fundraising trip.  And, on a number of other trips, often accompanied by donors, WonderWork paid for, among other things, a safari and a trip to the Taj Majal.  (The Examiner notes that donors apparently reimbursed the Debtor for their share of these expenses, and in at least one case, Greenwood made a "donation" to the charity to cover some portion of her expenses on the safari.)  Mullaney also purported to charge some of these expenses against his "limbo" pay, which is discussed later in this report.

Based on the information available to him, the Examiner characterized international trips taken between 2012 and 2016 and as to those which could be deemed primarily program related, allowed 100% of the expenses to be charged against restricted funds.

The results of these calculations are reflected in the following charts.  The first chart shows the Examiner recommended payroll allocation, which, based on his review, the Examiner believes more accurately reflects the actual duties of each employee.

14592424.11
228676-10002

## Examiner's Recommended Payroll Allocation

| Name | Title | Examiner's Recommendation | | |
|------|-------|---------|---------|-----------|
| | | Program | Mgt/Gen | Fundraise |
| Brooke Bohling | | 100% | 0% | 0% |
| DeLois Greenwood | Chief Program Officer | 90% | 10% | 0% |
| Suji Strain-Kokich | Intern | 100% | 0% | 0% |
| Tiffany Carson | Program Officer | 100% | 0% | 0% |
| Karen Lazarus | Director Strategic Projects | 40% | 20% | 40% |
| Nicole Macagna | Development Associate | 0% | 0% | 100% |
| Hana Fuchs | CFO | 30% | 40% | 30% |
| Brian Mullaney | CEO & Founder | 40% | 20% | 40% |
| Janet Huang | Marketing Director | 0% | 15% | 85% |
| Elaine Patafio | Director Marketing | 0% | 15% | 85% |
| Barbra Schulman | Director Marketing | 0% | 15% | 85% |
| Vera Eastman | Marketing & Develop Manager | 0% | 15% | 85% |
| Mollie Toomey | Marketing Associate | 0% | 15% | 85% |
| Jenna Minchuk | Digital Marketing Manager | 0% | 0% | 100% |
| Angelissa Paulino | Donor Relations Associate | 0% | 0% | 100% |
| Kathleen Trainor | Donor Relations Associate | 0% | 0% | 100% |
| Michele Sinesky | Director Donor Relations | 0% | 0% | 100% |
| Angela Lee | Intern | 0% | 100% | 0% |
| Alexandra Kaliff | Intern | 0% | 100% | 0% |

The following summarizes from a financial perspective how the Examiner performed his calculations to allocate the $20.2 million in cash and investments as of December 28, 2016 between unrestricted and restricted fund balances. For WonderWork and the campaigns raising restricted funds (i.e. 20/20/20, FirstStep, BurnRescue, "restricted to surgeries" and the electronic medical database), an account balance was calculated each day based upon the cash inflows (including investment income) less the cash outflows determined to be appropriate as discussed above, and rolled forward for each day from inception through the December 28, 2016. Inflows and outflows attributable to WonderWork were classified as unrestricted; inflows attributable to the DBA balances, the restricted for surgeries balance and the electronic medical database were

classified as restricted.[350]  Outflows only were allocated (on a prorated basis) to the DBA balances and restricted for surgeries balance, but not to the electronic medical database balance. The table below identifies the inflows and outflows which the Examiner attributed to either WonderWork or the DBAs, restricted for surgeries or the electronic medical database.

| | Unrestricted - WonderWork | Restricted - DBA and Restricted for Surgeries |
|---|---|---|
| **Inflows** | Donations - WonderWork (a)<br>Impact loans<br>Investment income<br>Service revenues (from HelpMeSee)<br>Other income (e) | Donations - DBAs and Restricted for Surgeries<br>and Electronic Medical Database (a) |
| **Outflows** | Overhead - allocation (b)<br>Professional and consulting - all except select vendors (c)<br>Travel and other expenses - all except select trips (d)<br>Printing, publications and postage - allocation (f)<br>Interest expense<br>Property and equipment | Overhead - allocation (b)<br>Professional and consulting - select vendors (c)<br>Travel and other expenses - select trips (d)<br>Printing, publications and postage - allocation (f)<br>Grants |

(a)  The Examiner determined that approximately $4.8 million in WonderWork donations should have been restricted.  Those donations were reclassified from WonderWork to either restricted for surgeries or 20/20/20 as of the day the donations were made.  The Examiner also determined that approximately $275,000 of restricted donations lacked support for restrictions, so these donations were reclassified to unrestricted.

(b)  Overhead-salaries and related expenses, occupancy and office supplies were allocated between unrestricted and restricted funds based on a compensation allocation determined by the Examiner.  The compensation allocation was based upon the percentage of time each employee devoted to program services (which is restricted) and management or general (which is unrestricted), or fundraising (which is unrestricted)

(c)  Select vendors include Help for the Cause, LLC, Ujjal Bhattacharya and ███████████

(d)  There were eleven trips for approximately $411,000.

---

[350] In addition, one donor pledged $1 million in FY 2012 to be released for unrestricted purposes over 5 years (time release).

(e)  Other income is approximately $100,000 and is mostly comprised of rental income from American List Counsel

(f)  The allocation is 90% to unrestricted and 10% to restricted.

The source of the inflows and outflows for this analysis was the general ledger. WonderWork, the DBAs and the electronic medical database each have a dedicated general ledger account for revenues.  However, inflows that are restricted for surgeries are not tracked in the general ledger.  They are included in the general ledger account for WonderWork and are also separately tracked in DMI.

The outflows were captured from general ledger accounts and recorded as unrestricted except as noted.[351]

This analysis yields $3.908 million in WonderWork unrestricted funds and $16.251 million in restricted funds (including $7.870 million for 20/20/20, $1.628 million for BurnRescue, $2.407 million for FirstStep, $3.945 million for Restricted for Surgeries and $400,000 for the Electronic Medical Database, calculated as follows:

---

[351] The Examiner did not deem interest expense and printing, publication and postage fees to be chargeable to restricted funds.

| | Unrestricted | Restricted | Total |
|---|---|---|---|
| Inflows | $ 41,459,856 | $ 27,900,726 | $ 69,360,582 |
| Outflows | $ (40,124,016) | $ (9,076,225) | $ (49,200,241) |
| **Total** | **$ 1,335,840** | **$ 18,824,502** | **$ 20,160,342** |
| | | | |
| **Examiner Adjustments:** | | | |
| **Inflows** | | | |
| Donation Reclassification to Restricted | $ (4,812,264) | $ 4,812,264 | |
| Donation Reclassification to Unrestricted | $ 275,929 | $ (275,929) | |
| **Outflows**[6] | | | |
| Salaries & Related Expenses[2] | $ 3,179,514 | $ (3,179,514) | |
| Professional & Consulting Expenses[3] | $ 277,206 | $ (277,206) | |
| Occupancy Expenses[2] | $ 340,664 | $ (340,664) | |
| Office Supplies & Services Expenses[2] | $ 366,959 | $ (366,959) | |
| Printing, Publications, Postage[4] | $ 2,534,417 | $ (2,534,417) | |
| Travel and Other Expenses[5] | $ 410,564 | $ (410,564) | |
| **Total** **Adjusted Ending Balance** | **$ 3,908,830** | **$ 16,251,512** | **$ 20,160,342** |

Source: Audited financial statements from FY 2011 through FY 2015 and General Ledger since inception through December 28, 2016

[1] FY 2017 data from July 1, 2016 through December 28, 2016
[2] Expense allocations for programs according to Examiner's determination of salary cost allocations
[3] Expense adjustments includes consulting expenses paid to: Help for the Cause, LLC, Tejas Eye Hospital and Ujjal Bhattacharya
[4] Direct mailing costs for Printing, Publication, Postage assumed to be 10% per year allocated to programs
[5] Expense adjustments include specific trips / allocations as determined by Examiner's review of Debtor's American Express statement, itineraries, and other records
[6] Expenses are redistributed across the four restricted accounts (20/20/20, BurnRescue, FirstStep, Surgeries) based on incoming donation percentages of restricted donations

The charts on the following two pages summarize the Examiner's calculation of a more appropriate "roll-forward" analysis with respect to the application of Debtor's restricted funds including a comparison to the Debtor's "roll-forward", which shows the restricted balance of $16.3 million.

## WonderWork Net Restricted Roll Forward With Examiner Adjustments

| | WonderWork Restricted Calculation | Examiner Adjustments | Revised Restricted Roll Forward After Examiner Adjustments |
|---|---|---|---|
| **FY 2012** | | | |
| Beginning balance | - | - | - |
| Plus: Donations | - | $1,000,165 | $1,000,165 |
| Plus: Reclassification to Restricted | - | $5,000 | $5,000 |
| Less: Reclassification to Unrestricted | - | ($205) | ($205) |
| Less: Grants | - | ($389,550) | ($389,550) |
| Less: Cost Allocation - Printing, Publication, Postage | - | ($16,346) | ($16,346) |
| Less: Cost Allocation - Overhead | - | ($596,753) | ($596,753) |
| Less: Time | - | ($202,954) | ($202,954) |
| Less: Other Adjustments | - | ($27,359) | ($27,359) |
| **FY 2012 balance (audited)** | **-** | **($228,001)** | **($228,001)** |
| | | | |
| **FY 2013** | | | |
| Beginning balance | | | ($228,001) |
| Plus: Donations | $3,669,157 | ($76,385) | $3,592,773 |
| Plus: Reclassification to Restricted | - | - | - |
| Less: Reclassification to Unrestricted | - | ($75,111) | ($75,111) |
| Less: Grants | ($877,500) | $40,016 | ($837,484) |
| Less: Cost Allocation - Printing, Publication, Postage | ($1,506,807) | $720,364 | ($786,444) |
| Less: Cost Allocation - Overhead | - | ($743,670) | ($743,670) |
| Less: Time | ($199,531) | - | ($199,531) |
| Less: Other Adjustments | $772,950 | ($772,950) | - |
| **FY 2013 balance (audited)** | **$1,858,269** | **($907,736)** | **$722,532** |
| | | | |
| **FY 2014** | | | |
| Beginning balance | $1,858,269 | | $722,532 |
| Plus: Donations | $6,596,814 | $26,163 | $6,622,977 |
| Plus: Reclassification to Restricted | - | $1,998,704 | $1,998,704 |
| Less: Reclassification to Unrestricted | - | ($30,137) | ($30,137) |
| Less: Grants | ($3,651,735) | $1,533,387 | ($2,118,348) |
| Less: Cost Allocation - Printing, Publication, Postage | ($3,717,856) | $2,952,135 | ($765,721) |
| Less: Cost Allocation - Overhead | - | ($949,968) | ($949,968) |
| Less: Time | ($200,040) | - | ($200,040) |
| Less: Other Adjustments | $1,500,173 | ($1,500,173) | - |
| **FY 2014 balance (audited)** | **$2,385,626** | **$4,030,111** | **$5,279,999** |

| | WonderWork Restricted Calculation | Examiner Adjustments | Revised Restricted Roll Forward After Examiner Adjustments |
|---|---|---|---|
| **FY 2015** | | | |
| Beginning balance | $2,385,626 | | $5,279,999 |
| Plus: Donations | $8,437,315 | ($6,977) | $8,430,338 |
| Plus: Reclassification to Restricted | - | $497,476 | $497,476 |
| Less: Reclassification to Unrestricted | | ($63,315) | ($63,315) |
| Less: Grants | ($1,891,500) | ($126,868) | ($2,018,368) |
| Less: Cost Allocation - Printing, Publication, Postage | ($4,230,548) | $3,530,599 | ($699,950) |
| Less: Cost Allocation - Overhead | | ($925,446) | ($925,446) |
| Less: Time | ($200,575) | - | ($200,575) |
| Less: Other Adjustments | | | |
| **FY 2015 balance (audited)** | **$4,500,317** | **$2,905,469** | **$10,300,160** |
| | | | |
| **FY 2016** | | | |
| Beginning balance | $4,500,317 | | $10,300,160 |
| Plus: Donations[1] | $7,785,496 | ($1,945,753) | $5,839,743 |
| Plus: Reclassification to Restricted | - | $976,385 | $976,385 |
| Less: Reclassification to Unrestricted | - | ($83,891) | ($83,891) |
| Less: Grants | ($2,094,600) | $494,534 | ($1,600,066) |
| Less: Cost Allocation - Printing, Publication, Postage | ($1,264,026) | $1,040,873 | ($223,153) |
| Less: Cost Allocation - Overhead | | ($785,698) | ($785,698) |
| Less: Time | ($169,541) | - | ($169,541) |
| Less: Other Adjustments | | - | |
| **FY 2016 balance (unaudited)** | **$8,757,646** | **($303,549)** | **$14,253,940** |
| | | | |
| **FY 2017** | | | |
| Beginning balance | $8,757,646 | | $14,253,940 |
| Plus: Donations[2] | $3,624,776 | ($1,210,045) | $2,414,731 |
| Plus: Reclassification to Restricted | - | $1,334,699 | $1,334,699 |
| Less: Reclassification to Unrestricted | | ($23,270) | ($23,270) |
| Less: Grants | ($1,035,000) | ($77,410) | ($1,112,410) |
| Less: Cost Allocation - Printing, Publication, Postage | ($175,364) | $132,560 | ($42,804) |
| Less: Cost Allocation - Overhead | | ($573,374) | ($573,374) |
| Less: Time | | - | |
| Less: Other Adjustments | | - | |
| **FY 2017 balance 12/28/16 (unaudited)** | **$11,172,058** | **($416,840)** | **$16,251,512** |

[1] FY 2016 donation in WonderWork roll forward schedule contains $1,921,196 donation that was not included in the General Ledger
[2] FY 2017 donation in WonderWork roll forward schedule contains $1,178,725 donation that was not included in the General Ledger

### E. The Examiner's attempt to determine the nature of the funds in the Investment Account

As has previously been noted, the bulk of the Debtor's cash on hand today consists of funds held in the single, pooled investment account that the Debtor has maintained since 2012. Because there were relatively few transfers into that account (only 8) the Examiner attempted to see if there was any pattern that could lead to a conclusion as to whether any portion of the funds in the account should be deemed restricted or not.

Of the approximately $18.2 million balance in the Vanguard Account as of the Petition Date approximately $15.3 million was funded from the eight deposits (from February 2012 through June 2016) from the HSBC Operating Account[352], and the balance consists of net investment income of approximately $3.37 million.

Based on his analysis of the general ledger and the balances and fund transfers into the HSBC operating account during the period ending up to each deposit, the Examiner was unable to identify with any certainty whether the funds deposited into the Vanguard fund were restricted or unrestricted.

---

[352]The 2012 transfers were from a different HSBC operating account which was the predecessor the current HSBC Operating Account.

## XII.   SURGERY PROGRAMS

Since its founding, the Debtor has made approximately $10 million in grants, which it says represents more than 270,000 surgeries[353] for cataract blindness, burns, and clubfoot in more than 30 countries.  While the amount of grants made by the Debtor is small in terms of the total amount raised, the Examiner has determined that the recipients of the Debtor's grants are generally sound organizations performing surgeries in their respective countries.

### A.   Partner Selection Process

The Debtor makes grants to other organizations that perform surgeries or provide treatment in the areas of cataract blindness, clubfoot deformity, and burn reconstruction.  The Debtor has also made minimal grants to improve education and training and to purchase equipment.  It performs no surgeries itself and has no medical personnel on staff.  As Mullaney has described the Debtor's model:  "[W]e do not have a single surgeon, doctor or nurse on staff. We provide no service directly to patients.  Instead, we work through partner hospitals and NGOs who do provide miracle surgeries and other care."[354]

When the Debtor began its operations, Greenwood was tasked with identifying potential partners to be grant recipients.  She informed the Examiner that she considered over 800 prospects doing work to support the same causes as the Debtor, which she then narrowed after conducting considerable research and visiting several of the hospitals.  Qualified grantees are supposed to have (1) the appropriate level of experience, such as hospitals with the requisite ability and infrastructure to provide the surgical treatments supported by the Debtor, (2) an outreach system with healthcare workers to find and refer patients, (3) an education and training

---

[353] Doc. Ex.  167 (WON-EX 001782).

[354] Doc. Ex. 168 (April 2016 email from Mullaney to a donor explaining Debtor's business model) (WW_EMAILS0156093).

program aimed at ensuring best practices, and (4) a follow-up care protocol for measuring surgical outcomes.[355]

The Debtor eventually invited approximately 70 hospitals and NGOs to apply for a grant from the Debtor.[356]  From there, grant recipients were selected through a two phase process.[357] First, the potential recipient had to submit the application and undergo an interview with the Debtor's staff via Skype or phone call.  If the Debtor determined after the interview that the potential grant recipient was a good candidate for a grant, the potential recipient was invited to submit a full grant proposal (1) describing the treatment program, the location of the hospital, and the CVs of the program director and operating surgeons, (2) providing a description of quality assurance protocols, and (3) providing confirmation of non-profit status.  The potential grant recipient was also required to confirm that the funding could be used to support an incremental increase in surgeries in lieu of displacing other funds.  Finally, the potential grant recipient had to provide its most recent audited financials.  The Debtor's Chief Program Officer, Manager of Global Programs, and Chief Financial Officer then reviewed the application prior to final approval.

### B.    Grant Provisions

The terms of the Debtor's grants to hospitals have evolved over time.  Initially, the Debtor made "seed grants" to new grantees for smaller amounts of approximately $10,000. These seed grants were used by the Debtor to evaluate whether the hospital would provide a proper report about the use of the funds.[358]  Rather than setting forth structured requirements for the use of funds, the seed grant letters asked, for example, that the funds "be used to support the

---

[355] Greenwood Ex. 6 and Bhattacharya Ex. 2.

[356] Greenwood Tr. 8/23/17, 40:21 – 42:6.

[357] Greenwood Ex. 5.

[358] Bhattacharya Tr.8/9/17, 25:10-24.

delivery of cataract surgery for children and adults in regions of greatest need" and requested that the recipient "provide a written report" on how the funds were used.[359]  Notably, despite the lax provisions in the seed grant letters, the Debtor still represents that it supported over 12,000 surgeries through those funds.[360]  Of the initial recipients of seed grants, Greenwood estimated that the Debtor did not make follow up grants to approximately 20-30%.[361]

The Debtor now has a reliable network of grantee hospitals that it can provide repeated grants.[362]  It has also placed more restrictions on the way grant funds can be used and on the reporting that is required to evidence proper usage of the funds.  Beginning in FY14, the Debtor began requiring grantee hospitals to provide surgeries to a specific number of people, based on a specified contribution amount per surgery.  For example, the Debtor would provide a $20,000 grant, requiring the partner to complete 800 cataract surgeries using the grant funds and applying $25 to each surgery while "striving] to allocate 5 to 10% of the funds for pediatric cataract treatment."[363]  Beginning in FY17, the Debtor began providing $150 for a specified number of pediatric cataract surgeries and $25 for a specified number of adult cataract surgeries to incentivize partners to locate and treat more pediatric cataract patients.[364]

### C.    Monitoring Grant Usage

The Debtor has four mechanisms for monitoring whether the grants it provides to grantees have been used in accordance with the terms of grant letters accompanying grant funds, including (1) site visits, (2) grant reports received back from grantees after grant funds have been

---

[359] *See, e.g.*, Doc. Ex. 169 (WON-EX 004104).

[360] Fuchs Ex 2.

[361] Greenwood Tr. 8/23/17, 64:8-20.

[362] *Id.* at 64:22-65:4.

[363] DG Tab 19 (WON-EX 004661).

[364] Greenwood Tr. 8/23/17, 95:24 – 96:5.

used, (3) a limited number of quality assurance reviews of grantees that have received a significant amount of grants from the Debtor, and (4) a limited number of grantees of partners that have received a certain number of grants from the Debtor.

### 1. Grantee Visits

As part of its continued effort to monitor and maintain relationships with grantees, the Debtor regularly visits the organizations. Since many of the Debtor's grantees are located in India, the Debtor has an India Program Officer, Ujjal Bhattacharya. Bhattacharya regularly visits hospitals in India that receive funds from the Debtor, and provides the Debtor with on-the-ground support. In addition, Greenwood estimated that she has personally visited 60% of the Debtor's grantee hospitals.

### 2. Grant Usage Reports

The Debtor also monitors grant usage through the grant reports it receives. While the Debtor originally only required grantees to submit a narrative detailing how grant funds were used, its process became stricter in 2014. At that time, the Debtor started requiring grantees to submit patient data with their grant reports.[365] Working with Boston Consulting Group, the Debtor developed a template for collecting this patient data, including name, age, demographics, diagnosis, preoperative and postoperative visual acuity, and date of diagnosis, among other data.[366] However, because of the large amount of data included in the spreadsheets, the Debtor's ability to fully analyze it has been limited.[367]

In April 2016, the Debtor received a $400,000 grant from the ███████████████ ████████ to develop an electronic medical records database that would allow the Debtor to

---

[365] *Id.* at. 29:8 – 13.

[366] *Id.* at 30:1 -15.

[367] *Id.* at 31:24 – 32:10.

fully analyze the data being received from partners.[368]  The Debtor initially selected thirteen

organizations to pilot the electronic medical records database program which was being

developed by a company called Mastek.[369]  In Spring 2017, the Debtor was still in the process of

testing the database for broader use, and hospitals were having difficulty uploading the necessary

data.[370]  The Examiner understands that continued development of the database is currently on

hold in light of the Debtor's bankruptcy and issues raised in this Report.  Nevertheless, the

Debtor anticipated that the database would significantly enhance the Debtor's ability to monitor

the proper usage of grant funds.

### 3.  Quality Assurance Reviews

In 2015, the Debtor implemented a quality assurance review process of certain grantees

that had received significant funding from the Debtor.  The Debtor developed the process using

input from a consultant from Columbia University and the Medical Advisory Board.[371]  The

quality assurance review evaluates standards and implementation of care in eight different

categories.[372]  The quality assurance review process is not meant to be punitive, but rather to

encourage recipients of the Debtor's grant funds to improve the quality and safety of the

surgeries and treatments that they perform.[373]  Once the quality assurance review is complete, the

Debtor and the partner develop a quality improvement plan to address any deficiencies identified

through the process.[374]

---

[368] Doc. Ex. 170 (WW_EMAILS0062071).

[369] Greenwood Tr. 8//23/17, 168:9-18.

[370] Doc. Ex. 171 (WW_EMAILS0009107).

[371] Greenwood Tr. 8/23/17, 10:11-23.

[372] Doc. Ex. 172 (WON-EX 021669).

[373] *See, e.g.*, Doc. Ex. 173 (WON-EX 003628).

[374] *See, e.g.*, Doc. Ex. 174 (WON-EX 021672).

14592424.11
228676-10002

Quality assurance reviews have been conducted on behalf of the Debtor by Dr. Uday Gajiwala, whom the Debtor says is a national expert that also performs similar audits on behalf of other charities, including Sight Savers.[375]  Dr. Gajiwala's hospital is also a partner of the Debtor.[376]  Five quality assurance reviews have been conducted to date, and while other quality assurance reviews were planned by the Debtor, those are on hold pending resolution of the Debtor's bankruptcy.

### 4.　　　Audits

Using the services of KPMG, the Debtor audited four hospitals in India that have received significant funding.[377]  The audits included financial and programmatic verification components.[378]

### D.　　　Connecting Solicitation Materials to Program Model Reality

While the Debtor's surgery programs have resulted in improvements in the lives of thousands of individuals, there is, in several ways, a disconnect between the Debtor's model for providing support for surgeries and the way in which the Debtor's surgery programs are actually presented to the public in solicitation materials.

### 1.　　　Extent of Partners Supported and Countries Where Services Are Provided

Currently, the Debtor states that it has 59 active partners[379] in about 30 countries.[380]  The Examiner does not have evidence to substantiate that fact and indeed, it appears from the Debtors own grant records that they have only made grants in 22 countries.  The Debtor considers an

---

[375] Greenwood Tr. 8/23/17, 17:7-18:5.

[376] Bhattacharya Tr. 8/9/17, 73:9 – 25.

[377] Fuchs Tr. 8/15/17,　259:20-25.

[378] *See, e.g.*, Doc. Ex. 175 (WON-EX 011581).

[379] Greenwood Tr. 8/23/17, 24:13 – 25:6.

[380] *Id.* at 26:13 – 16.

organization it has a grantor/grantee relationship with to be a partner organization, even though they are not partners in the traditional sense. Prior to April 2016, the Debtor represented that it was working within a country if one of its partners that had ever received a grant was also working in that country, irrespective of whether the work being conducted by that partner in that country related to one of the causes supported by the Debtor.[381] Some of the Debtor's partners operate in numerous countries all over the world. Under the Debtor's prior system, the Debtor would, by extension, also represent that it had a partner in each one of those numerous countries as well.

However, the Debtor reevaluated this strategy in March 2016 after receiving a complaint from a donor explaining that Guatemala was on the list of countries where the Debtor operated in a mailing he had received, but upon the donor's visit there, no one had heard of the Debtor.[382] Upon review, the Debtor determined that Guatemala was on the list of countries because (1) one of its partners, ███████ provided cleft repair surgery there in partnership with a different charity, and (2) ████████████, which had received one grant from the Debtor for cataract surgeries in Cambodia, worked with another charity in Guatemala to develop junior high school programs.[383] Moving forward, the Debtor determined that it would only list countries where it had current partners, defined as having received a grant within the prior three years, and only if the partner had a program for blindness, clubfoot, or burns, in a given country.[384] The Debtor's system was not revised to ensure that its specific funds were actually being used in every country on its list.

---

[381] Doc. Ex. 175 (March 2016 email exchange between Greenwood and Carson identifying the reasons Guatemala appeared on the Debtor's list of active countries) (WW_EMAILS0155753).

[382] Doc. Ex. 176 (March 3, 2016 letter from a donor to Mullaney) (WW_EMAILS0062266).

[383] Doc. Ex. 177 (WW_EMAILS0155753).

[384] Doc. Ex. 178 (WW_EMAILS0156093).

As a result of the Debtor's system for representing the number of countries in which it operates, the scale of its work is exaggerated. In reality, twenty-nine of the Debtor's partners are located in India[385] and $6 million of the Debtor's approximately $10 million in grants have been made to partners in India. Moreover, several of the partners with a "global reach" are headquartered in the United States and the United Kingdom. While the work conducted by these organizations is laudable, an extra layer of administration is required when the Debtor raises funds for a particular cause, and those funds are then donated to another entity that raises funds for that cause before the funds finally make it to a hospital that can actually provide treatment or surgery.

### 2. Visual Acuity of Cataract Patients

The Debtor represents that it provides support for surgeries that cure blindness in children and adults. However, the Debtor does not have specific standards in place to ensure that the funds it provides to partners will be used to treat blind individuals, using any generally acceptable standard for blindness. For example, the Debtor's partners are not told that they can only treat patients that meet the WHO standard for blindness using the Debtor's grant.[386] The Debtor also does not require that cataract surgery recipients be visually impaired in both eyes.[387] Instead, the Debtor allows the doctors performing the surgeries to determine which patients should receive treatment. The fact that the Debtor has no measurable standard in place represents a potential for use of funds contrary to donor intent.

---

[385] Bhattacharya Tr. 13:4-11.

[386] Greenwood Tr. 79:25 – 80:14.

[387] Greeenwood Tr. 85:21 – 86:1.

### 3.    Contribution Towards Surgeries

The Debtor makes a "contribution" toward surgery in lieu of paying the entire cost. For blindness surgeries prior to 2016, the Debtor provided $25 per surgery and directed grant recipients to strive to allocate 5-10% on pediatric surgeries.[388] However, pediatric cataract surgeries are substantially more expensive than adult cataract surgeries because the lenses used on children cost more than the lenses used on adults and children must also be put under general anesthesia for the procedure. While the Debtor was aware of this fact, prior to 2016, it provided the same contribution per surgery for adults and children and directed grant partners to "use funds from other sources to match with our funds or cover any additional costs."[389]

The Debtor's contribution towards clubfoot treatment is $150 per treatment and it acknowledges to grant recipients that the grant may not cover the total cost of the treatment.[390] The actual cost to treat clubfoot is as high as $500, with one of the Debtor's main clubfoot treatment partners stating that the cost is approximately $250.[391] The Debtor contributes $300 towards burn reconstruction surgeries, although it acknowledges that the actual cost of procedures can vary widely, depending on the severity of the burn.[392]

Because the Debtor is aware that the funding it provides is only a contribution towards the real cost of the surgery, the Debtor requests that its partners complete an annual survey detailing their actual costs in completing a surgery.[393] The Debtor then reports the difference as an "in-kind" contribution on its financial statements. The Debtor also books a corresponding

---

[388] *See, e.g.*, Doc. Ex. 179 (WON-EX 004660) and Doc. Ex. 180 (WON-EX 005171).

[389] Doc. Ex. 180 (March 2015 email from Carson to partner regarding contribution for surgery) (WW_EMAILS0003739).

[390] Doc. Ex. 181 (June 2014 grant to ███ for $150,000 to be used to help 1,000 patients) (WON-EX 004271).

[391] Greenwood Tr. 107:5 – 22.

[392] Greenwood Tr.108:13 – 109:10.

[393] Greenwood Tr. 187:1 and Greenwood Ex. 16.

grant cancelling out any net effect on its financial statements. However, this practice allows the Debtor to inflate the amount of "donations" it has actually received, as well as the amount of "grants" it has actually made by an aggregate of more than $5 million through the Petition Date. The Examiner considers this position misleading.

In addition, because the Debtor does not provide the full cost of the surgeries completed through its grants, patients are, in some instances required to pay a portion of the cost. For example, the Debtor has provided $85,000 in grants to ████████████████████. The cost of surgeries performed by ████████████████ is $35, and a portion of the cost is funded by the patients.[394] The Debtor has also provided grants to ████████████████ totaling $111,250, which also charges "free patients" the "partial cost" of surgery.[395] Moreover, Debtor also did not specifically require partners to provide the surgeries or treatments for free, although all patients interviewed for the financial audits that were conducted by the Debtor did receive free surgery.[396] This is problematic because the Debtor touts itself as providing "free" surgeries for the world's poorest populations.

### 4.    Number of Surgeries Performed on Children

The Debtor touts itself as a charity that provides "miracle surgeries for children." However, the reality is that 98% of the surgeries it funds are performed on adults with cataracts. While many of the grants for cataract surgeries direct partners to strive to expend 5-10% of the grant on pediatric surgeries, the instance of pediatric cataracts is only 2% of all individuals with cataracts. Therefore, the Debtor also aims for 2% of all cataract surgeries that it supports be for

---

[394] Doc. Ex. 182 (WW_EMAILS0009471).

[395] Doc Ex. 183 (WW_EMAILS0009471).

[396] Greenwood Tr. 99:17-101:7.

pediatric cataract surgeries despite language to the contrary in certain of its grant letters.[397]  In at least one instance, a partner that had reserved 5% of the grant it received from the Debtor was unable to identify enough pediatric cataract patients to satisfy the terms of the grant and was forced to request permission to use the grant to treat other pediatric eye diseases or to use the remaining portion of the grant to provide surgery to adult cataract surgery patients.[398]

###### 5.      Nonprofit Status of Grantees

While the Debtor has stated that only tax-exempt nonprofit organizations can serve as the sponsoring organization of a grant from the Debtor, at least one of the Debtor's grantees is a for profit hospital.  The Debtor has made three grants totaling $50,000 to S█████████ ███████████████████████████.[399]  Before the Debtor made the first grant to ██████ ████████, it was instructed not to label the grant as a donation since ███████████ "would be raising [a] bill against each patient" for audit purposes at the end of the financial year.[400] ████████ ████████ also instructed the Debtor to call the grant a "program partner fee" instead of a gift, but did represent to the Debtor that the surgeries provided through the grant would be free of charge to the patient.[401]

---

[397] Greenwood Tr. 90:23 – 91:23.

[398] Doc. Ex. 185 (WW_EMAILS0060562).

[399] Greenwood Ex. 14.

[400] Greenwood Ex. 7.

[401] Greenwood Ex. 14.

## XIII. MULLANEY COMPENSATION AND EXPENDITURES

### A. Mullaney Salary and Bonus

Mullaney receives an annual salary of $475,000 per year. He is also eligible to receive a discretionary bonus of up to $250,000 per year, which the Board awarded him in its entirety in 2013, 2014, and 2016, and in the amount of $200,000 in 2015. This is the same compensation package Mullaney had at SmileTrain, even though SmileTrain raised over $102 million in Mullaney's final full year with the organization,[402] and the Debtor only raised around $12 million in its best year since inception.[403] This $90 million a year difference in revenue generation is even more striking when considering the fact that the Board approved Mullaney's salary at $475,000 per year beginning in calendar year 2012. During that same timeframe, the Debtor received contributions and grants of about $7.88 million (including ███████ $5 million) and made grants of only $389,800, all of which went to resolve a dispute with HelpMeSee under its Service Agreement with the Debtor.[404]

Even though the Debtor was a start-up charity, Mullaney justified the magnitude of his salary amount and his eligibility for a bonus of that size on the grounds that he brought to the Debtor a proven track record and a decade of experience at SmileTrain.[405] Although the Board approved Mullaney's yearly compensation of $475,000 at the June 2012 Board meeting, at the recommendation of Board member Dysart, it subsequently determined to seek a compensation

---

[402]*See* SmileTrain, Inc. Form 990 for the time period between July 1, 2009 and June 30, 2010, available at http://990.erieri.com/EINS/133661416/133661416_2009_073D7D47.PDF (last accessed Sept. 29, 2017).

[403]*See* WonderWork, Inc. Form 990 for the time period between July 1, 2013 and June 30, 2014, available at http://wonderwork.org/wp-content/uploads/2012/05/fy2014.pdf (last accessed Sept. 29, 2017) (showing that the Debtor received contributions and grants of $12,912,667) and WonderWork, Inc. Form 990 for the time period between July 1, 2014 and June 30, 2015, available at http://wonderwork.org/wp-content/uploads/2012/05/fy2015.pdf (last accessed Sept. 29, 2017) (showing that the Debtor received contributions and grants of $12,396,269).

[404]WonderWork, Inc. Form 990 for the time period between July 1, 2011 and June 30, 2012 (showing contributions and grants to the Debtor of $7,878,990).

[405]Doc. Ex. 186 (June 2013 email from Mullaney to Dysart regarding request for SmileTrain compensation package) (WW_EMAILS9211672).

analysis from Pearl Meyer & Partners ("Pearl Meyer"). Mullaney resisted the Board's retention of Pearl Meyer, allegedly out of concern for the cost. Instead, Mullaney urged the Board to rely on the compensation analysis that had been conducted by a different firm while he was at SmileTrain. The Board resisted Mullaney's request and retained Pearl Meyer in May of 2013, at a cost of $18,137.00.[406]

Pearl Meyer caveated its report by reference to section 4958 of the IRC, commonly referred to as the "Intermediate Sanctions" rule.[407] In order to establish a rebuttable presumption of reasonableness and thus provide assurance that compensation is reasonable, section 4958 and the accompanying regulations require, among other things, that the Board comply with three critical requirements in determining the appropriate level of compensation for high-level personnel, so-called "disinterested persons," such as the CEO, in this case, Mullaney. None of the three requirements were fully met by the Debtor in the context of the Pearl Meyer report and Mullaney's compensation.

The first condition is that any decision on the pay of the disinterested person must be made solely by "independent" Board Members. The record here shows that the final decision was made by the three independent board members in a meeting at which Mullaney was not present. However, it appears that Mullaney did have a significant amount of input into the deliberative process, both as a result of numerous communications with Pearl Meyer, and through his involvement creating the list of "peers" against which his compensation was to be

---

[406]A copy of the Engagement letter with Pearl Meyer is contained in the Document Appendix as Exhibit 187 and a copy of the Final Report presented to the Board, and dated June 7, 2013, is Mullaney Ex. 43.

[407]Organizations exempt from federal income tax under section 501(c)(3) that provide excessive compensation to directors and certain high-leveled employees (collectively known as "disqualified persons") jeopardize their tax-exempt status on the grounds of inurement and expose the disqualified person who received the excessive compensation to an excise tax calculated at 25% of the amount by which the compensation paid exceeds reasonable compensation for the services provided. The disqualified person is also required to reimburse the organization for the full amount of the excess.

benchmarked.  In addition, while Dysart drafted minutes of an independent directors meeting discussing the retention of Pearl Meyer, Debtor provided no contemporaneous written record of the Board formally adopting the report.

Second, the basis for defining the disinterested person's compensation should include a comparability analysis that includes comparisons to similar positions in like organizations.  Here, for a number of reasons described below, the report went far beyond an appropriate "peer group" analysis."  Rather than allowing himself to be compared to CEO's of comparably sized non-profits, Mullaney insisted on a different peer group analysis.

Third, the Board should use the information available to it to document its decision and rationale.  Throughout the Debtor's history, there has been strikingly little "documentation" kept with respect to compensation decisions, other than emails confirming that a decision has been made.  In fact, the Examiner's investigation found NO contemporaneous minutes of any executive session of the Board other than the email referred to above confirming the decision to retain Pearl Meyer.  Directors indicated in interviews with the Examiner, and emails confirm, that there was discussion of Mullaney's bonus, but the only "formal" documentation consists of emails from a Board member to Fuchs announcing the decision.[408]  This is significant in that the Pearl Meyer report specifically commented that the Board should "quantify" Mullaney's other contractual requests in determining the amount of any annual bonus payments.  (These requests included such consideration as a spousal travel allowance, payment of travel costs and hotel stays to facilitate Mullaney's decision to move to Boston, and a large personal life insurance policy.  It is also worth noting that both the Board and Pearl Meyer were apparently aware of the "unorthodox" way in which Mullaney was reimbursed for certain of his expenses.  This was even

---

[408]*See* Fuchs Ex. 37.

alluded to in the minutes of the May 16, 2013 executive session of the Board retaining Pearl Meyer: "Dysart asked about the treatment of some expenses and if they needed to be treated as income."[409]

Jim Hudner and Peter Lupo of Pearl Meyer conducted the analysis. Prior to preparing their analysis, Lupo warned Dysart that Pearl Meyer might not be able to conclude that Mullaney's salary was reasonable in the context of Intermediate Sanctions, which could impose personal liability on the Board for approving the arrangement if the IRS determined that the Board approved benefits for Mullaney were excessive. (In fact, Pearl Meyer's engagement letter stated that Pearl Meyer's fee would be increased by $5,000 "if we can state pay is reasonable after Intermediate Sanctions." No such statement was contained in the final report.)

There was an extensive discussion of the appropriate comparison peer group. In the end, Pearl Meyer came up with five separate groups to compare:

1. **Traditional Non-Profit** – Entities that have comparable missions to WonderWork and are comparable in size.

2. **High Growth Non-Profit** – Entities that have comparable missions to WonderWork and have a demonstrated track record of aggressively growing revenues. The size of these entities is closer to WonderWork's estimated revenues [for] 2020. This could be referred to as an "aspirational" peer group.
   - This excludes entities receiving a substantial portion of revenue from government grants or program services.

3. **High Growth For-Profit** – This consists of publicly-traded companies that have experienced rapid growth. This group provides an additional frame of reference and are not necessarily a directly comparable peer group.

4. **Foundation Peer Group** – A group of large foundations that might represent viable alternative employment choices for Mr. Mullaney.

---

[409] Doc. Ex. 187.

5. **University Development Officers** – Given the focus on fundraising, a fifth group that can provide another point of reference consists of several of the country's elite, large research institutions.[410]

Contrary to generally accepted practices, Mullaney provided input into the analysis conducted by Pearl Meyer and met directly with Hudner in an attempt to impress upon Hudner the reasons why a traditional compensation review would not be appropriate, and to make recommendations about the appropriate comparison peer group that should be utilized by Pearl Meyer.[411] Mullaney did so, with the knowledge of Dysart, the head of the Compensation Committee at the time, apparently because Dysart was unable to take part in all meetings necessary for Pearl Meyer to complete their analysis. As support for his requested compensation package, Mullaney represented to Pearl Meyer that he held the title of not only CEO, but also Chief Marketing Officer and Chief Development Office as set forth in the following organizational chart:

---

[410]Mullaney Ex. 43 at 7.

[411]Mullaney Ex. 44 (May 2013 email from Mullaney to Hudner at Pearl Meyer asking that he revise his approach to the compensation review based on Mullaney's and his team's experience).



After what Dysart described as an emotionally exhausting process resulting from Mullaney's approach to the compensation analysis, Hudner and Lupo presented their analysis (the "Pearl Meyer Report")[412] to the Board at the Board meeting held on June 13, 2013.[413] Pearl Meyer concluded that using traditional non-profits of comparable size to the Debtor as a benchmark for determining an appropriate peer group to analyze Mullaney's compensation would fail to account for Mullaney's significant experience. Therefore, in lieu of recommending that Mullaney's compensation be benchmarked solely against traditional non-profits of comparable size, Pearl Meyer considered whether Mullaney's base compensation would be

---

[412]Mullaney Ex. 43. WON-EX 010764 – (Pearl Meyer Report).

[413]Doc. Ex. 187 (June 13, 2013 Board meeting minutes) (WON-EX 001264).

competitive if Mullaney was working for a considerably larger high growth non-profit, as a senior executive of a large foundation, or as a top development officer at a large university. However, even in those instances, Pearl Meyer concluded that Mullaney's *base* salary of $475,000 was at the high end of competitive for the peer groups considered. In the end, Pearl Meyer did not express an opinion on whether the compensation paid to Mullaney was reasonable or not. As a result, neither the Debtor's board nor Mullaney can rely on a rebuttable presumption of reasonableness with regard to his compensation.

As disclosed in the Pearl Meyer Report, Mullaney's base compensation, without including any bonus, appears disproportionately high when compared to a traditional non-profit of comparable size. In fact, further review of the report reveals that even the "peer group" of organizations comprising traditional non-profits of "comparable size" to the Debtor was generated based not on reality, but rather on an estimate of where the Debtor projected itself to be in the year 2015. The median income for CEO's in this peer group was approximately $310,000, and that was for entities with median revenue of $35.8 million and median expenses of $36.8, substantially higher than those of the Debtor in any year it has operated. Even when compared to the separate peer group comprised of "high-growth non-profits" with median revenues of $110.8 million and median expenditures of $95.1 million, Mullaney' s base compensation appears high. (The median CEO pay for this group was approximately $363,000.) In fact, Mullaney's compensation would rank at the 75th percentile in comparison to senior executives managing foundations with average assets of over $7 billion.[414]

With respect to Mullaney's proposed bonus eligibility, Pearl Meyer noted that the maximum award of $250,000 was about 53% of his base salary, a very high amount in a non-

---

[414]Treas. Reg. § 53.4958-6(2) provides that "in the case of compensation, relevant includes, but is not limited to, compensation levels paid by similarly situated organizations, both taxable and tax-exempt, for functionally comparable positions."

profit environment. The Pearl Meyer Report also concluded that it would only be reasonable to consider such an "unorthodox approach" to a bonus structure if Mullaney were actually able to repeat his results at SmileTrain.

Pearl Meyer recommended to the Board that if it accepted that Mullaney's compensation could be evaluated using high growth non-profits, large foundations, and university development officers at large universities as peer groups, that the Board keep Mullaney's salary at $475,000 and offer him an annual bonus within the range of $50,000 to $200,000 only if Mullaney's performance warranted it. Pearl Meyer also recommended periodically reviewing Mullaney's compensation package to ensure it continued to be supported by market practices. Finally, Pearl Meyer cautioned the Board that it must be cognizant of the optics and perception of whether the compensation package proposed for Mullaney was "reasonable – in the eyes of interested parties (e.g. media) and government regulators – represented by the IRC Section 4958, which provides regulatory oversight on executive compensation in 501(c)(3) organizations."[415]

Despite the caveats and cautions imbedded in the Pearl Meyer Report and being advised of the consequences of Intermediate Sanctions if Mullaney was over-compensated, the Board approved Mullaney's compensation at $475,000 per year and determined that he would be eligible for a discretionary bonus up to $250,000 each year.[416]

Mullaney was awarded the full amount of the discretionary bonus every year except for 2015 when the Board awarded him a bonus of $200,000. Even in 2015 when the Board awarded Mullaney less than the full discretionary bonus, Mullaney strenuously argued with the Board that his bonus should have been the full $250,000, and offered to "give back" $100,000 of the bonus

---

[415]Mullaney Ex. 43 at 5. Pearl Meyer Report, at 5.

[416]*See, e.g.* Mullaney Exs. 36 and 35. (September 2013 emails where Dysart confirms Mullaney's bonus); (September 2014 email from Mullaney instructing Fuchs to confirm his bonus with Coneys).

to the Debtor for a net bonus of only $150,000.[417]  The Board considered this approach illogical and proceeded to award Mullaney a $200,000 bonus.

### B.     Mullaney's Employment Agreement

Mullaney first requested that the Board approve an employment agreement with him in October 2012.[418]  The Board reviewed a draft of a proposed agreement in February 2013.[419]  In relevant part, the draft employment agreement proposed a term of two years and provided that Mullaney would (1) be subject to annual reviews, (2) receive a 10% match for any funds placed in his company retirement account, (3) be entitled to one year severance plus the cost of his health insurance if he were terminated without cause or with cause under certain circumstances, and (4) be entitled to reimbursement for spouse travel expenses if there was a bona fide purpose for his spouse's participation in the trip.

The Board did not approve an employment agreement with Mullaney at that time based on some concerns that it apparently had about the terms and Mullaney's overall compensation. There was strong disagreement between the Board and Mullaney about how the Board would evaluate Mullaney's performance and the mix of qualitative and quantitative metrics that should be used for the evaluation.[420]  The process of negotiating and finalizing Mullaney's employment agreement took a considerable amount of the Board's time over the next three years.

The Board eventually agreed to evaluate Mullaney's performance on a high level basis and to proceed with the employment agreement in 2015.  ███████████████████████

███████████████████████████████████████  However, Dysart wanted Mullaney's

---

[417]Doc. Ex. 189 (October 2015 emails between Mullaney and the Board regarding why his bonus should not be reduced to $200,000 with back and forth disagreement) (WW_EMAILS0204094).

[418]Doc. Ex. 190 (October 11, 2015 Board meeting minutes) (WON-EX 001255).

[419]Doc. Ex. 191 (February 14, 2013 Board meeting minutes) (WON-EX 001261).

[420]Doc. Ex. 192 (January 2014 email between Ziff and Mullaney regarding call of independent directors to discuss performance metrics) (WW_EMAILS0209245).

personal lawyer and employment counsel hired by the Debtor, Vedder Price, to negotiate Mullaney's employment contract.[421]  Mullaney believed that the cost to him of involving his personal lawyer and the cost to the Debtor of paying Vedder Price was unnecessary.  The dispute was one of the principal causes of Dysart's resignation in November 2015.  Coneys then took the lead in finalizing Mullaney's employment agreement on behalf of the Board without the assistance of outside counsel.  Mullaney's employment agreement was not finalized until December 2015.[422]

Mullaney's employment agreement with the Debtor (the "Employment Agreement")[423] is for a five year term commencing on January 1, 2016.  The Employment Agreement entitles Mullaney to yearly compensation of $475,000 and a discretionary bonus of up to $250,000 per year.  Mullaney is also entitled upon termination of employment to eighteen months salary as severance along with payment of his insurance premiums through COBRA, provided that he is not terminated by the Debtor for cause, including, for example, a determination by the Board that Mullaney committed fraud, a determination by the Board that Mullaney's violation of a law was materially detrimental to the Debtor, or if Mullaney is convicted of a felony or any crime involving moral turpitude.  Mullaney is entitled to the severance payments under most other circumstances, provided that he enters into a confidentiality and release agreement with the Debtor.

Under the Employment Agreement, Mullaney is also entitled to a number of benefits and perquisites.  In particular, the Debtor is obligated to pay the premiums on approved life insurance

---

[421]Mullaney Ex. 40 (November 2015 email from Mullaney to Dysart regarding the fact that he has been waiting three years for an employment contract and wants the current draft approved without involving his personal lawyer).

[422]Doc. Ex. 193 (December 2015 email between Mullaney and Fuchs discussing finalization of employment contract) (WW_EMAILS0012807).

[423]Mullaney Ex. 41 and Fuchs Ex. 35.

policies on Mullaney to which he has designated his wife as beneficiary as well as pay for "such other perquisites approved by the Board" as set forth in a Board resolution. Mullaney is also permitted to bring his wife to major donor events, visits, and program trips overseas at the Debtor's expense.

## C. Mullaney "Payroll Ledger"

The issues arising from Mullaney's pay and expenditures are numerous and further complicated by the Debtor's unorthodox practices. Rather than pay Mullaney his base compensation monthly and his bonus compensation when awarded, Mullaney instructed Fuchs to maintain a separate "payroll ledger" in a spreadsheet that tracks Mullaney's base pay and bonus, separate from the Debtor's general ledger, reflecting what is referred to as Mullaney's "limbo" pay.[424]

As Fuch's explained during her interview:

> "I maintained a spreadsheet of Brian's salary that was owed to him from when he decided he wanted not to take all his salary until now. And alongside that was the amounts that he deducted from his salary based on the things that you have here on [Exhibit] Number 34."[425]

(This appears to be the continuation of a practice that they started at SmileTrain, but which Grant Thornton, in a report to the SmileTrain Board, later concluded was inappropriate, requiring Mullaney's W-2s for certain years to be restated).

When asked about the payroll ledger, Fuchs stated:

> A. This is a running list of all the requests to deduct monies form Brian's salary.

---

[424]Mullaney Ex. 54, Fuchs Ex. 37 and Lazarus Ex 36 ; Fuchs Ex. 37. *See* Mullaney Tr. 8/17/17, 579:20; Fuchs Tr. 318-350.

[425] Fuchs Tr. 318: 11-17

> MR. LILIEN: So when they were deducted from Brian's salary, did you recorded that as income to Brian.
>
> MS. FUCHS: No, I did not."[426]

The payroll ledger books tracks three aspects of Mullaney's compensation. It is included in the transcripts appendix at Mullaney Ex. 54.

### 1.    Total Compensation Owed

The payroll ledger appears to tracks the amount of compensation purportedly owed at a given time to Mullaney by the Debtor in total, including base pay and bonus. With respect to base pay, Mullaney was paid $275,000 in December 2011 as his compensation for the year. Then, in January 2012, Mullaney apparently instructed Fuchs to increase his annual pay to $295,000 per year. In June 2012, the Board increased Mullaney's annual pay to $475,000 per year. However, instead of Mullaney's pay being increased to $475,000 annually beginning at that point, Mullaney instructed Fuchs to pay him at the $475,000 rate retroactively to January 2012 in June 2012, so that his pay for the entire calendar year 2012 would be $475,000. [427] No contemporaneous record exists detailing the Board's decision.

While the Board meeting minutes reflect that the Board approved the Debtor's FY13 budget at the June 2012 meeting, there is nothing in the Board meeting minutes or the presentation to the Board indicating that the Board knowingly approved Mullaney's increased salary at the meeting retroactively (i.e. for fiscal year 2012), so that he would receive total compensation of $475,000 for calendar year 2012. In fact, in an email to the Board in advance of the June 2012 Board meeting, Mullaney represented that his current base compensation was

---

[426] Fuchs transcript 327: 5-12

[427] Doc. Ex. 194 (June 22, 2012 email from Mullaney to Fuchs regarding board approval of salary) (WW_EMAILS0012615).

already $475,000.[428]  And as noted above, the email relied on by Fuchs to pay the increase

retroactively came from Mullaney rather than a Board Member.  Moreover, Fuchs actually paid

Mullaney $190,000 in June 2012 instead of the $90,000 that would have been necessary to bring

Mullaney's pay to $475,000 for 2012.  The extra $100,000 payment to Mullaney in 2012 is

unexplained.  In any event, Mullaney's annual base compensation has been $475,000 per year

since 2012.

The payroll ledger states that Fuchs was informed of Mullaney's bonus awards by email

from a member of the Board each year after the June fiscal year-end meeting, although the FY15

bonus email was not communicated to Fuchs until December 2015.  However, although the

Board has approved a bonus for Mullaney every year since 2013, Mullaney has never paid taxes

on any bonus, no bonus has ever appeared on the Debtor's Form 990, no bonus was ever

reported on any W-2 form, no FICA taxes were paid with respect to any bonus and no bonus to

Mullaney has ever appeared on the Debtor's general ledger or in its audited or unaudited

financial statements.[429]  Moreover, Fuchs treated Mullaney's "salary and bonus" as

indistinguishable in the ledger.

> MR. LILIEN: When you say he deducted expenses from his salary,
> again, are you referring to the 475 base salary or the additional
> amount, the bonus amount that he was awarded from which he was
> deducting his expenses?

---

[428] Doc. Ex. 195 (June 21, 2012 email from Mullaney to Kant and Dysart attaching budget detail and payroll information) (WW_EMAILS02333196).

[429] Treas. Reg. § 53.4945-4(c)(1) provides that, in general, "an economic benefit is not treated as compensation for the performance of services unless the organization providing the benefit clearly indicates its intent to treat the benefit as compensation when the benefit is paid."  Treas. Reg. § 53.4958-4(c)(3) provides that an organization's intent to treat an economic benefit as compensation includes reporting the benefit on Form W-2, Form 1099, Form 990 or Form 1040.  Under Treas. Reg. § 53.4958-4(a)(1) only economic benefits treated as "reasonable compensation" are not deemed "excess benefits" for purposes of IRC 4958.  The IRS Internal Revenue Manual provides that  if an economic benefit is not treated as compensation for services or compensation for something other than the provision of services, the entire amount of  the economic benefit is treated as an excess benefit subject to excise tax.  IRM 7.27.30.6.3.1.6.

MS. FUCHS: Well, to me it was a combination because I kept them in a running total. So I would give him whatever was remaining from the last place first and continue to run the totals.[430]

## 2. Compensation Outstanding

The payroll ledger also tracks the amount of compensation Mullaney has actually received via the Debtor's ADP administered payroll and the date he received it as well as the amount of compensation that Mullaney has been awarded but not yet received. This is necessary because (1) payments to Mullaney are erratic, and (2) Mullaney has instructed Fuchs to maintain his reported compensation at $475,000 per calendar year, even though his base pay plus bonus has generally amounted to $725,000.[431]

For example, while Mullaney's annual base compensation would be $39,583.33 per month if he were paid it on a monthly basis, Mullaney often instructs Fuchs to issue him checks for large sums at once. Mullaney received a check in the amount of $190,000 in June 2012, then received regular paychecks of $39,583.33 in July, August, and September 2012, a paycheck for $18,750 in October 2012 and then no paycheck in November or December 2012. Even though Mullaney had been paid the full $475,000 for calendar year 2012 by October, Fuchs made a notation on the payroll ledger suggesting that pay totaling $20,833.30 for October, and $39,583.33 for each of November and December was deferred by Mullaney. Mullaney then received checks totaling $136,083.29 in January 2013, which represented a sum equal to (1) his January 2013 paycheck, (2) the remainder of his October 2012 paycheck that he was not owed, and (3) his paycheck for November and December 2012. This resulted in Mullaney's "deferred" compensation being increased by about $100,000.

---

[430] Fuchs Tr. 320:6-18.

[431] Doc. Ex. 196 (August 2012 email from Mullaney to Fuchs regarding not exceeding $475K approved salary for the year) (WW_EMAILS0012498).

Mullaney then received regular paychecks of $39,583.33 from February to September 2013, a check for $22,250.77 in October 2013 and then no paycheck in November or December 2013. Calendar year 2014 was no different. Mullaney received checks totaling $136,083.25 in January 2014, regular paychecks of $39,583.33 in February and March 2014, a check for $189,583.33 in April 2014,[432] a regular paycheck of $39,583.33 in May 2014, a check for $30,583.43 in June 2014 and then no paychecks for the remainder of 2014. Mullaney then received a check for $50,000 in January 2015 and checks totaling $425,000 in February 2015, but then received no other paychecks for the remainder of the year. Mullaney's only paycheck in 2016 was issued in June (the last month of the fiscal year) for $475,000. While Mullaney instructed Fuchs to pay his entire pay for 2017 in his January paycheck,[433] Mullaney had not yet received a paycheck for calendar year 2017 as of June 2017. Mullaney's W-2s for each of 2012 through 2016 reflect compensation of only $475,000.[434] Moreover, the Debtor's 990s for the same time periods also consistently represent to the public that Mullaney's pay is only $475,000 and contain no indication that he is entitled to any bonus, actual, unpaid or deferred or any other deferred compensation.

The following table illustrates the timing of Mullaney's base salary payments based on Fuchs' payroll ledger:

---

[432]This amount included $150,000 of the bonus awarded to Mullaney that he had purportedly loaned to the Debtor as an impact loan.

[433]Doc. Ex. 197 (December 2016 email from Mullaney to Fuchs requesting that all accrued pay be paid in January payroll to show that he receives his pay in lump sums) (WW_EMAILS0020378).

[434]Mullaney Ex. 55.

**Brian Mullaney Compensation**

| Salary | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|
| January | | $24,583 | $136,083 | $136,083 | $50,000 | | $346,750 |
| February | | $24,583 | $39,583 | $39,583 | $425,000 | | $528,750 |
| March | | $24,583 | $39,583 | $39,583 | | | $103,750 |
| April | | $24,583 | $39,583 | $189,583 | | | $253,750 |
| May | | $24,583 | $39,583 | $39,583 | | | $103,750 |
| June | | $214,583 | $39,583 | $30,583 | | $475,000 | $759,750 |
| July | | $39,583 | $39,583 | | | | $79,167 |
| August | | $39,583 | $39,583 | | | | $79,167 |
| September | | $39,583 | $39,583 | | | | $79,167 |
| October | | $18,750 | $22,250 | | | | $41,000 |
| November | | | | | | | $0 |
| December | $275,000 | | | | | | $275,000 |
| | $275,000 | $475,000 | $475,000 | $474,999 | $475,000 | $475,000 | $2,649,999 |
| Bonus - Paid in July | $0 | $0 | $250,000 | $250,000 | $200,000 | $250,000 | $950,000 |
| Total Compensation | $275,000 | $475,000 | $725,000 | $724,999 | $675,000 | $725,000 | $3,599,999 |

Source: ADP Records

### 3.    Expense Deductions

Finally, the payroll ledger tracks numerous expenditures that the Debtor paid, and which appear as expenses on the general ledger generally as payments to American Express, but which Mullaney requested be deducted from his "limbo pay." The Board was aware of Mullaney's practice of charging expenses against this secret ledger but apparently viewed the expenses as legitimate business expenses tracked via the payroll ledger to appease Mullaney's desire to "give back" his bonus to the Debtor. However, the Examiner believes this assessment is untenable. Many of the expenses should not be treated as legitimate business expenses, are excessive or appear to lack contemporaneous substantiation (or a combination thereof). The total amount exceeds $400,000 since 2012.[435]

---

[435] The Examiner's professionals reviewed charges against Mullaneys's corporate American Express card, and, when available, related backup information. The amounts set forth in the Report are intended to serve as examples and, are in some cases, conservatively expressed approximations.

### a. Personal Expenses

A number of the expenses Mullaney instructed Fuchs to deduct from his deferred compensation are purely personal. A January 2014 deduction for $22,000 is even marked as a "personal reimbursement" and included charges for Mullaney's trip with ████████ in 2013, a dinner with friends, a limousine for his wife's birthday, and a hotel stay for a trip his daughter took, among other charges. In 2015, Mullaney instructed Fuchs to deduct over $12,000 from his deferred compensation to pay for the cost of a writer to travel with Mullaney to India and assist him in writing another book,[436] a project the Board had expressed strong reservations about pursuing. In October 2015, he also instructed Fuchs to deduct $2,057 to pay for his dues at the Harvard Club. In October 2016, Mullaney instructed Fuchs to deduct $25,000 from his deferred compensation to defray the costs of a trip to Bangladesh taken by Mullaney, his wife and daughter that was paid for by the Debtor.[437] The trip was apparently at least in part, program related, justifying the Debtor paying some of Mullaney's expenses. However, even if Mullaney's employment agreement (only signed in late 2015) does provide that the charity will pay for Mullaney's spouse to accompany him on certain trips, such amounts should be treated as compensation, and appropriately reported and taxed. In an email to Kant and Dysart on September 29, 2012, Mullaney stated with respect to his requested spousal travel allowance "I will deposit from my pay 100% of the airplane ticket and any other expenses related to her."

---

[436]Fuchs Ex. 43.

[437]Doc. Ex. 198 (October 2016 email from Mullaney to Fuchs requesting that costs for wife and daughter to Bangladesh be deducted from pay) (WW_EMAILS0020718).

Other expenses include chauffeured cars, commuting expenses between Boston and New York, hotel stays while in New York, and invitations to a party for ▌▌▌▌▌. Mullaney also purports to make donations to the Debtor through deductions from his "limbo pay."[438]

Post-petition, Mullaney seems to have acknowledged that these types of personal expenses are not appropriately deducted from his pay.[439] He has since instructed Fuchs and Lazarus to ensure that all personal expenses are paid for 100% in cash by him rather than by pay deduction.

### b. Excessive Expenses

In other instances, Mullaney directed Fuchs to deduct amounts to defray the costs of expensive dinners and drinks with potential donors. In October 2014, Mullaney instructed Fuchs to deduct $1,000 from his pay to pay for the cost of an expensive dinner and drinks at the Langham Hotel. Mullaney has also instructed Fuchs to deduct expenses for dinners at the Four Seasons, totaling over $20,000. This includes a staff holiday dinner costing almost $2,300 for no more than nine people.[440] In another instance, Mullaney admitted to staying in an upgraded room at an already expensive hotel in London and asked Fuchs to deduct the cost from his pay.[441]

Other expenses, which are both excessive and personal, include yearly trips taken every summer by Mullaney and his wife and ▌▌▌▌▌▌▌▌▌▌▌▌▌▌ foundation is the

---

[438]Fuchs Ex. 36. (email from Mullaney to Fuchs requesting spreadsheet of pay so that he can make a donation to WonderWork). The Examiner found no evidence to indicate such a "donation", other than the apparent reduction in the "limbo pay" balance.

[439]Doc. Ex. 199 (June 8, 2017 email from Mullaney noting to Lazarus and Fuchs that personal expenses cannot just be deduct from his pay moving forward. "Legitimate business expenses can be deducted from pay but personal expenses accidentally charged to wrong credit card need to be paid for 100% in cash by me – not by pay deduction.") (WW_EMAILS0010400).

[440]This amount is in addition to $15,000 spent at the Four Seasons that was deducted from Mullaney's pay in January 2014 as a "personal reimbursement".

[441]Doc. Ex. 200 (November 2012 email from Mullaney to Fuchs saying to deduct larger room from pay and also to figure out per diem for trip to London) (WW_EMAILS0230933).

largest donor to the Debtor, and it appears that ███████ and the Mullaneys are close, personal friends.

In 2013, ████████ and the Mullaneys travelled to Maine for a three night trip that cost the Debtor over $6,000. Mullaney instructed Fuchs to tally the total cost of the trip so that he could deduct it from his "pay."[442] While Mullaney represented to ██████ that he and his wife had paid for the trip directly and that no Debtor funds were used,[443] Mullaney's "payment" was actually represented only by a notation on the payroll ledger and the Debtor in fact cut the check from its own funds.

In 2014, the Mullaneys and ████████ traveled to Martha's Vineyard. The total cost of the trip was over $7,000, and included luxury accommodations at the Hob Knob boutique hotel, several expensive meals, and a boat ride. Mullaney represented to ██████ that he had again deducted the cost of the trip from his pay, and instructed ████████ to wire the amount of his cost for the trip directly to the Debtor,[444] which ██████ did.[445] Mullaney instructed Fuchs to deduct $10,000 from his "pay" for his costs on the trip, which deduction was actually just a debit to the secret ledger account.[446]

In 2015, the Mullaneys and ████████ traveled to Newport, Rhode Island. The total cost of the trip was over $11,400, including luxury accommodations at the Castle Hill Inn, a sailing cruise and several expensive meals.[447] ████████ wired funds to the Debtor for his share of the

---

[442] Doc. Ex. 201 (July 2013 email from BM to HF instructing her to add up all bills from ████ visit as he is planning to deduct 100% of it from his pay) (WW_EMAILS0210904).

[443] Doc. Ex. 202 (WW_EMAILS0265922).

[444] Doc. Ex. 203 (WW_EMAILS0206272).

[445] Doc. Ex. 204 (August 2014 HSBC statement showing wire transfer from ████) (WON-EX 006264).

[446] Fuchs Ex. 41. WON07293.

[447] Doc. Ex. 205 (spreadsheet detailing expenses from July 2015 trip) (WW_EMAILS0196210).

costs associated with the trip.[448]  Mullaney, on the other hand, represented to ████ that the Mullaneys' share of the trip would be deducted from his pay.[449]  It was not.  In fact, there is no notation on the payroll ledger showing any deduction for the trip, even though the Debtor paid the entire bill.

In 2016, the Mullaneys and ████ traveled to Nantucket.  The total cost of the trip was over $12,400, and included luxury accommodations at the Cliffside Beach Club, a rental car for $1,600, and a $1,200 sailing cruise.  Mullaney instructed Fuchs to deduct the entire amount from his pay, which she did by making a notation on the payroll ledger.[450]  ████ reimbursed the Debtor for $6,000 of the costs of the trip,[451] which reflected the ████ share of the expenses.[452]

### c.    Unsubstantiated Expenses

Other expenses on the payroll ledger are completely unsubstantiated.  For example, the payroll ledger tracks requested deductions from Mullaney's deferred compensation beginning with a camera costing $3,500 that was purchased by the Debtor for Mullaney in October 2012.  Rather than submitting a receipt for the expense, Mullaney told Fuchs that the camera cost "around $3,500."[453]  She then proceeded to pay the current American Express bill and deduct that amount from Mullaney's "limbo pay."  Other unsubstantiated costs include, for example, $30,000 to cover "about half" of Mullaney's commuting costs in FY14 and FY15, $3,000 for Photoshop lessons in April 2015, $3,750 for more Photoshop lessons in August 2016, and $5,000

---

[448]Doc. Ex. 206 (August 2015 HSBC statement showing wire transfer from ████) (WON-EX 006619).

[449]Mullaney Ex. 23 (August 2015 email from Mullaney to ████ regarding trip expenses) . (WW_EMAILS0196209).

[450]Doc. Ex. 207 (WON07320).

[451]Doc. Ex. 208 (September 2016 HSBC bank statement showing wire transfer from ████) (WON-EX 006866).

[452]Doc. Ex. 209 (WW_EMAILS0251482).

[453]Fuchs Ex. 39.

for a computer in October 2016.  Even if a portion of these expenses could be considered legitimate business expenses, none of them are supported.[454]

### d. Potentially Legitimate Business Expenses

In other instances, Mullaney directed Fuchs to deduct expenses that actually could be considered legitimate business expenses.  These costs include, for example, the cost of holiday dinners for the staff,[455] year-end staff bonuses, a dinner once a year when the Debtor's Medical Advisory Board and Board of Directors hold a joint meeting, the cost of Mullaney's health insurance in 2016, and at least a reasonable portion of the cost for Mullaney to go on certain program-related trips.  However, these categories of expenses appear to represent only a small percentage of the overall deductions made by Fuchs over the years. And in any case the concept that Mullaney was actually "paying" them was bogus.

> "Q.    So when Mr. Mullaney said that he was paying the staff bonuses out of his funds, in fact they were paid out of his account that you were maintaining on this separate ledger. Is that correct?
>
> A.    The funds he had not received yet. That's correct.
>
> Q.    So he had never actually received those funds?
>
> A.    That is correct.
>
> Q.    And he had never reported those Funds as income to himself?
>
> A.    Well, he did not receive a W-2. I don't know what he does for his taxes.
>
> MR. LILIEN: Did you believe he had an entitlement to these funds?
>
> MS. FUCHS:  Yes. These were owed to him for salaries he didn't take at that point.
>
> Q.    But they were not reflected on the books and records of WonderWork as a deferred compensation liability?

---

[454] Thus, for example, the payroll ledger reflects deductions of $10,000 for "annual Haefer visits" and $30,000 for "about 50% weekly travel FY 14. FY 15."

[455] That being said, Mullaney charged over $2,700 for a staff dinner at the Four Seasons.

A.    Correct."[456]

A significant component of the amount "charged" against Mullaney's "limbo pay" is the cost of his travel between Boston, where he moved in 2013, and New York. The issue of whether these expenses qualify as "business expenses" or "commuting costs" is beyond the scope of this Report. However the Examiner makes the following observations:

First, Mullaney moved to Boston for personal reasons. In an email to the Board dated April 8, 2013, he wrote:

> Gentlemen,
>
> I have a personal issue I had wanted to discuss at our June Board meeting but it can't wait till then.
>
> One of the biggest challenges that I have faced with WonderWork is my personal schedule and travel obligations. As you know, I have been traveling quite frequently both domestically and internationally with 3 trips to India over the past 14 months, 1 trip to Africa, 3 trips to Europe and a dozen of trips around the U.S.
>
> Combine this with a very lengthy commute from my Connecticut home to our New York office of 3.5 hours every day, 17.5 hours a week, and the fact that we are small, understaffed start-up and you can understand why there is little time left for my family and kids. My kids are still young, 9, 11 and 12 years old so it is important to me to spend much more time with them than I have over the past two years.
>
> I have been trying to figure out how to sole this situation for the past six months as it is unsustainable. I have accepted the fact that the travel part of my job is too important to try and change. To build our programs and our fundraising revenues, I simply have to take these long trips every couple of months. So instead I have been focusing on how to change my commute. 3.5 hours a day, 100+ miles a day, is a 'mega-commute." It not only cuts into my work hours, it is an exhausting energy and emotional drain too.
>
> My proposal is to trade my 17.5 hour a week daily commute for an 8-hour a week commute by moving to Boston

---

[456] Fuchs Tr. 339:15-340:14.

> My plan is to take the Acela train down to Penn Station New York once a week (4 hours), which is 3 blocks from our offices, work 2, 3 or 4 long days in the office, stay in a fairly inexpensive room at the Harvard Club, and then commute back to Boston  Any days I am not in New York, I will work in my home office."[457]

Similarly, in his communications with Pearl Meyer, he mentioned that as a benefit, he expected a "Housing Allowance - commuting expenses from boston [sic] once a week by train, overnight stay 1-3 night..."[458]

Second, the Board appears to have approved the move, in the sense of allowing Mullaney to make the move.  However the Examiner saw no documentation to support an argument that the Board authorized the payment of these travel expenses as "business expenses" which the Debtor would pay.  In fact, Mullaney told the Board that he would cover the expenses out of "my pay."

Third, the Examiner believes that such expenses should in any event be taken into account in determining whether Mullaney's overall compensation should be deemed excessive.

### 4. Use of Payroll Ledger Led to a Failure of Disclosure and Corporate Governance Oversight

By having the Debtor keep track of Mullaney's "limbo pay" only on the payroll ledger maintained by Fuchs and then debiting personal, excessive or unsubstantiated "expenses" from the deferred compensation, Mullaney avoided paying income tax on these expenses.  Likewise the Debtor avoided paying its share of FICA taxes.  The payroll ledger also allowed the Debtor to account for Mullaney's "bonus" while avoiding reporting excessive or questionable expenses in its financial statements or other public reports.  The existence of the payroll ledger seems to also have led to a laissez-faire attitude on the part of Mullaney about expenses that can be

---

[457] Doc. Ex. 210.

[458] Doc. Ex. 211 (Sample Employment Agreement Term sheet, provided by Pearl Meyer in response to Examiner's Subpoena).

charged to the account. In one instance, he offered to pay for a member of the advisory board to stay in a five star suite at the Langham Hotel and buy him a dinner at the Four Seasons if he helped land a donor.[459]

As noted, it appears that at least by late 2015, the Board was aware of the Debtor's practice of maintaining the payroll ledger. Dysart reported being uncomfortable by the existence of the payroll ledger, but stated that he was repeatedly told by Coneys, the chair of the Audit Committee, that usage of the payroll ledger was appropriate and approved by the auditors. An email from Coneys to Kent, dated October 15, 2015, written in the context of the Board's dispute with Mullaney over his Fiscal Year 2015 bonus is instructive:

> "He has proposed to have his bonus reduced to $100,000 which I am in favor of doing. If he wants to continue the fiction of being awarded a $250,000 bonus with a 'give back' of $150,000 I think we should accept that. But we should be clear in the communications with him that he has agreed to this arrangement and that WW has no obligation to pay him the $150,000. It has been his practice at both SmileTrain and WW to earmark selected ST and WW spending for donor dinners, travel and other expenses as coming out of his bonus, which is the mechanism for his 'give back'. This is certainly an un-orthodox approach but all of the earmarked expenses are proper business expenses of WW (and reported as such) and he is, in fact, foregoing receipt of what he would otherwise be entitled to receive as a cash bonus. Hana maintains a spreadsheet keeping track of expenses earmarked against his bonus. As of mid-summer the balance of his remaining unpaid bonus was approximately $130,000. It may be below $100,000 by now but the new bonus award 'give back' amount of $150,000 will bring the balance back up. This unusual arrangement provides Brian with a form of psychic income which is clearly very important to him and the satisfaction of making a deemed contribution back to the organization. To my accounting mind this is a fiction with hypothetical income offset by a hypothetical donation back. He is not gaining a tax advantage and

---

[459]Doc. Ex. 212 (May 2015 email from Mullaney to Levitt offering to put him up in a five star suite in the Langham Hotel (a WonderWork sponsor) and take him to the Four Seasons if he helps land a donor).

WW is properly reporting all expenses, including his compensation (which is actual cash paid)."[460]

In reality, the Examiner believes Coneys was, at a minimum, not informed or misled about the types and amounts of expenses being charged on the payroll ledger. In fact, no one from the Board reviewed any of Mullaney's American Express payments until May 2017 when Coneys reviewed Mullaney's FY16 American Express invoices in connection with the BDO audit. Prior to the FY16 audit, however, it appears that no member of the Board ever reviewed Mullaney's American Express invoices or other expenditures and Fuchs confirmed that Travel Policy did not apply to Mr. Mullaney.[461] While Fuchs asserted in her interview that the Board was aware of the ledger, a fact which seems confirmed by the foregoing email, she would not state that any Board member had actually seen the ledger.

"Q.     So you believed the board of directors knew at some point in time that you were maintaining this separate account?

A.     Oh, yes.

Q.     At what point in time do you thing they were aware of that?

A.     Oh, from the beginning.

         H. Fuchs

Q.     That would apply to all of the directors?

A.     I don't know about all the directors. I know some of them.

Q. Which ones?

A.     Particularly J.J. knew that. And I think, before that, Ted Dysart, but I'm not sure….

MS. FUCHS:  They might have or might not. I am not exactly sure if I actually gave them a physical copy of if they looked at what I had, but they definitely knew about it.

_____

[460] Doc. Ex. 213.

[461] Fuchs Tr. 56:17.

> MR. LILIEN: When you say looked at what you had, what do you mean?
>
> MS. FUCHS: Looked on the computer
>
> MR. LILIEN: Did any board member receive this versions or any prior version of this spreadsheet?
>
> MS. FUCHS: I don't remember sending that to any of the board members."[462]

Coneys told the Examiner that he understood Mullaney's arrangement to use the payroll ledger as a form of "psychic" income that would allow Mullaney to deduct numerous "legitimate" business expenses from his pay and allow Mullaney to "give back" to the Debtor in that way, but that Mullaney elected to forego the entire amount of his bonus upon it being awarded. He seemed genuinely surprised to learn that Mullaney was asserting a claim against the Debtor of over $600,000 for unpaid prepetition wages. Coneys also acknowledged that the Debtor and Mullaney would face disclosure issues relating to the Debtor's payment of Mullaney's commuting expenses between Boston and New York. In fact, Debtor's amended schedules show an amount due to Mullaney for deferred compensation equal to $641,320.07, while the balance reflected in the payroll ledger on the petition date was $624,800.12.

The extent of the Debtor's auditors' actual knowledge of the payroll ledger is also unknown. Members of the Board, Mullaney, and Fuchs all claimed that KPMG was fully aware of the payroll ledger system and of Mullaney's practice of deferring any compensation over $475,000 a year. However Fuchs would not say that she had ever shown the payroll ledger to the accountants.

Moreover, the Debtor's staff appears to have been instructed to avoid directly disclosing even Mullaney's base pay, much less his substantial annual bonus. Numerous emails show

---

[462] Fuchs Tr. 343:18 – 346:15.

members of the Debtor's team directing all questions from donors about Mullaney's pay to Fuchs, who then forwarded the Debtor's Form 990 with a cover note not providing a direct answer to the question.[463]  One celebrity supporter, Alex Trebek, was also clearly troubled by Mullaney's base pay upon learning of it, but Mullaney appeared to explain away and justify the amount.  The Debtor also avoided disclosing its financial statements and Form 990 on its websites for several years.  In fact, the Debtor did not provide a link to its Form 990 and financial statements until the BBB made accreditation contingent upon disclosure.

### D.     Other Mullaney Expenses

Even beyond the expenses Mullaney directed Fuchs to deduct from his deferred compensation, there are other expenses that the Examiner believes should have been charged to Mullaney as being personal or excessive.

The following chart is a summary of charges made to Mullaney's corporate American Express card between 2012 and 2016.  It informs the discussion which follows.

---

[463] *See, e.g.*, Doc. Ex. 214 (WW_EMAILS0038620).

| | Commuting | | | | | Travel | | | | Likely personal | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Transportation[1] | Hotel Langham | # of Nights | Meals/Other[2] | | Airfare[3] | Lodging | Meals | | Subscription[5] | Other[6] |
| Jan-12 | - | - | - | - | | - | - | - | | - | - |
| Feb-12 | - | - | - | - | | - | - | - | | - | - |
| Mar-12 | - | - | - | - | | - | - | - | | - | - |
| Apr-12 | - | - | - | - | | - | - | - | | - | - |
| May-12 | - | - | - | - | | - | - | - | | - | - |
| Jun-12 | $350 | - | - | $655 | | $5,291 | - | $44 | | $81 | $67 |
| Jul-12 | $54 | - | - | - | | - | $528 | $76 | | $31 | $1,094 |
| Aug-12 | - | - | - | $415 | | $1,464 | - | - | | $406 | $20 |
| Sep-12 | - | - | - | $128 | | - | $338 | $672 | | $201 | $256 |
| Oct-12 | $107 | - | - | - | | $16,073 | $4,623 | $271 | | $221 | $1,723 |
| Nov-12 | $65 | - | - | $90 | | $10,408 | $3,940 | - | | $223 | $1,388 |
| Dec-12 | $16 | - | - | - | | $456 | $2,982 | $1,441 | | $87 | $1,605 |
| **2012** | $592 | - | - | $1,288 | | $33,691 | $12,412 | $2,504 | | $1,248 | $6,153 |
| Jan-13 | $45 | - | - | $189 | | $6,611 | $1,256 | $188 | | $294 | $3,327 |
| Feb-13 | $43 | - | - | $133 | | $5,835 | - | - | | $758 | $42 |
| Mar-13 | - | - | - | $821 | | $8,781 | $5,129 | - | | $457 | $4,194 |
| Apr-13 | $427 | - | - | $311 | | $5,972 | $1,011 | $56 | | $87 | $563 |
| May-13 | $48 | - | - | $633 | | $5,589 | $1,565 | $25 | | $265 | $757 |
| Jun-13 | - | - | - | $448 | | - | - | - | | $62 | $22 |
| Jul-13 | $415 | $1,106 | 2 | $1,143 | | - | $4,529 | $1,009 | | $228 | $1,196 |
| Aug-13 | $864 | $2,633 | 3 | $281 | | $9,986 | - | - | | $265 | $1,059 |
| Sep-13 | $1,160 | $1,372 | 2 | $339 | | $4,102 | $1,847 | $171 | | $239 | $721 |
| Oct-13 | $1,209 | $3,076 | 4 | $1,261 | | $7,954 | $1,260 | $52 | | $254 | $76 |
| Nov-13 | $1,988 | $3,098 | 4 | $486 | | $24,822 | - | - | | $82 | $484 |
| Dec-13 | $967 | $2,301 | 2 | - | | $12,111 | $333 | $138 | | $283 | $292 |
| **2013** | $7,166 | $13,586 | 17 | $6,045 | | $91,764 | $16,930 | $1,640 | | $3,274 | $12,730 |
| Jan-14 | $1,390 | $1,370 | 4 | $839 | | $335 | $879 | $363 | | $340 | - |
| Feb-14 | $1,230 | $1,366 | 3 | $119 | | $3,296 | $3,475 | $409 | | $945 | - |
| Mar-14 | $993 | $1,691 | 2 | $465 | | $2,463 | $1,029 | $511 | | $703 | - |
| Apr-14 | $1,953 | $3,718 | 6 | - | | - | - | $1,409 | | $354 | - |
| May-14 | $1,195 | $1,907 | 3 | - | | $4,186 | $4,973 | $1,423 | | $742 | - |
| Jun-14 | $703 | $3,824 | 3 | - | | - | - | $1,178 | | $290 | - |
| Jul-14 | $562 | $1,221 | 4 | - | | - | - | $1,977 | | $452 | - |
| Aug-14 | $1,487 | $1,244 | 1 | - | | $1,971 | - | $1,003 | | $265 | - |
| Sep-14 | $1,082 | $4,062 | 4 | - | | $5,055 | $1,836 | $487 | | $316 | - |
| Oct-14 | $1,286 | $4,683 | 5 | - | | $8,453 | $452 | $638 | | $345 | $5,890 |
| Nov-14 | $1,333 | $3,788 | 4 | $144 | | $9,579 | - | $1,318 | | $297 | $362 |
| Dec-14 | $724 | $2,261 | 3 | $216 | | $3,862 | $3,113 | $175 | | $302 | $1,093 |
| **2014** | $13,938 | $31,135 | 42 | $1,783 | | $39,200 | $15,758 | $10,890 | | $5,351 | $7,345 |

**Mullaney 2012-2016 American Express Summary**

| | Commuting | | | | Travel | | | Likely personal | |
|---|---|---|---|---|---|---|---|---|---|
| | Transportation¹ | Hotel Langham | # of Nights | Meals/Other² | Airfare³ | Lodging | Meals | Subscription⁵ | Other⁶ |
| Jan-15 | $1,042 | $1,952 | 6 | $1,053 | $11,108 | $406 | - | $356 | $3,237 |
| Feb-15 | $881 | $2,018 | 3 | $1,503 | $17,067 | $6,331 | - | $826 | $300 |
| Mar-15 | $1,049 | $1,215 | 4 | - | ($60) | $496 | $30 | $249 | - |
| Apr-15 | $2,023 | $3,038 | 8 | $591 | - | $8,916 | - | $405 | - |
| May-15 | $1,095 | $2,148 | 5 | $453 | $2,088 | $405 | $533 | $203 | $2,999 |
| Jun-15 | - | $610 | 2 | - | $839 | $655 | $488 | $233 | - |
| Jul-15 | $749 | $952 | 3 | $664 | - | $821 | $910 | $372 | $132 |
| Aug-15 | $1,047 | $1,775 | 5 | - | - | - | - | $932 | $1,326 |
| Sep-15 | $1,389 | $1,314 | 4 | $641 | - | $277 | - | $238 | $1,000 |
| Oct-15 | $1,188 | $3,305 | 9 | $1,052 | $7,769 | - | - | $328 | - |
| Nov-15 | $1,131 | $1,357 | 3 | - | - | $1,305 | - | $155 | - |
| Dec-15 | $1,126 | $2,964 | 6 | $2,022 | $8,485 | - | - | $250 | $195 |
| **2015** | **$12,720** | **$22,649** | **58** | **$7,978** | **$47,296** | **$19,611** | **$1,961** | **$4,548** | **$9,189** |
| | | | | | | | | | |
| Jan-16 | $1,282 | $1,517 | 4 | - | $45 | $8,593 | $20 | $239 | $33 |
| Feb-16 | $1,579 | $2,485 | 5 | $1,330 | $2,032 | - | - | $925 | $903 |
| Mar-16 | $839 | $3,431 | 9 | $41 | $11,521 | - | - | $253 | $151 |
| Apr-16 | $1,175 | $2,104 | 5 | $54 | $355 | $903 | $374 | $23 | $2,024 |
| May-16 | $87 | $1,270 | 3 | $270 | $5,573 | $3,274 | $111 | $291 | $49 |
| Jun-16 | $685 | $2,031 | 6 | $128 | $253 | - | $302 | $219 | $84 |
| Jul-16 | $1,618 | $1,538 | 4 | $432 | $961 | $162 | $1,863 | $299 | $1,200 |
| Aug-16 | $137 | $684 | 2 | $478 | - | - | $286 | $241 | - |
| Sep-16 | $855 | $1,394 | 4 | $983 | $839 | - | - | $223 | - |
| Oct-16 | $1,269 | $2,879 | 6 | - | $14,568 | - | - | $220 | $3,614 |
| Nov-16 | $875 | $1,606 | 4 | $1,074 | $1,200 | $1,111 | - | $249 | $5,739 |
| Dec-16 | $1,149 | $1,155 | 3 | $357 | $48 | $1,344 | - | $234 | $677 |
| **2016** | **$11,550** | **$22,094** | **55** | **$5,146** | **$37,395** | **$15,387** | **$2,956** | **$3,416** | **$14,474** |
| | | | | | | | | | |
| **5 Year Total** | **$45,965** | **$89,464** | **172** | **$22,241** | **$249,345** | **$80,098** | **$19,951** | **$17,836** | **$49,891** |

Source: American Express statements

¹ Commuting - Transportation category includes Amtrak tickets, parking costs and several flights from NYC to Boston

² Commuting - Meals/Other category includes dinners, meals, and misc. items purchased while in NYC

³ Airfare is typically purchased from two days to two months prior to departure date. The most frequent timing of airfare purchases was about 2-4 weeks ahead of time

⁴ Travel - Local Transportation category includes taxis and rental cars while traveling

⁵ Likely personal - Subscription category includes Boston Globe, WSJ, AT&T bills, LinkedIn membership. All except the LinkedIn membership are recurring monthly expenses

⁶ Likely personal - Other category includes misc. items that may be purchased for non-business purposes (i.e. dinners in Boston, tickets to shows, charity donations, sightseeing trips etc.)

Items reflected as commuting expenses include: (i) transportation costs between Mullaney's home near Boston, MA and the Debtor's office in New York, NY, (ii) hotel stays at the Hotel Langham in New York, NY and (iii) meals and miscellaneous charges while in New York, NY. During 2015 and 2016, Mr. Mullaney incurred over $82,000 in commuting expenses including more than $43,000 in 2015. In 2015 and 2016, Mullaney spent over 100 nights at the Langham Hotel in New York, NY and incurred over $44,000 in hotel charges. Over $24,000 in transportation charges were incurred including Amtrak train tickets and flights for commuting

between New York, NY and Boston, MA, and also parking charges in Boston.  It was noted that during the summer months, many Amtrak tickets originated in Providence, Rhode Island instead of Boston.

Travel expenses include: (i) airfare, (ii) lodging and (iii) meals.  Mullaney typically purchased airfare from 2 days to 2 months prior to travel.  During 2015 and 2016 Mullaney incurred almost $85,000 in airfare charges.  Most tickets were purchased through Pro Travel International, but flights to London on British Airways were purchased directly through the airline.  His most frequent destinations were London and Dubai.  There were also several flights booked on Cape Air from Massachusetts to Nantucket over the summer of 2016.

During 2015 and 2016 Mr. Mullaney incurred almost $35,000 in lodging charges.  In the summer months, there were multiple and significant charges at the Castle Inn in Newport, Rhode Island and Cliffside Beach Resort in Nantucket, Massachusetts.

There were multiple recurring subscriptions that likely should be considered personal. These included subscriptions for the Boston Globe, Wall Street Journal, Dropbox, LinkedIn, Microsoft Office and AT&T that total almost $8,000.  The Examiner also notes other likely personal expenses, including a sight sailing charge in Nantucket and Newport Mansion tickets.

A significant portion of Mullaney's expenses of commuting between Boston and New York were not debited to the "payroll ledger."  For example, the Debtor has spent nearly $90,000 in hotel stays for Mullaney while he is in New York, only some of which appear to have been deducted from Mullaney's pay via the payroll ledger.

In June of 2017, having been asked to review all of Mullaney's expenses in connection with the BDO audit, Coneys wrote to Mullaney: "hotel charges add up to quite a lot over the course of a year…" Mullaney's response: "Yes, the hotel – even though I reimburse

WonderWork for 100% of these expenses – does add up" (WW 0020221). These expenses include local taxis taken by Mullaney while in New York as well as the costs of Amtrak tickets and parking fees at the train station in Boston.

Similarly, Mullaney often travels by business or first class. Over the course of five years, nearly $250,000 has been charged to Mullaney's corporate American Express to cover travel expenses. For example, the Debtor spent $9,887.16 in January 2016 on a flight to Zimbabwe, $2,767.20 in February 2016 on a flight to Los Angeles, $7,990 in March 2016 on a flight to Lisbon, and $3,878 in May 2016 on flight to Portland and Seattle. While it is arguably reasonable to pay for business or first class travel on long overseas trips, Form 990 expressly asks whether the organization pays for any first class travel, or any spousal travel. In every year, WonderWork checked "no" as the answer to these questions.

### E.     Examiner's Observations

Mullaney's expense practices suggest a troubling disregard for the need to expend charitable funds appropriately, irrespective of whether those funds are restricted or unrestricted as to use.

The foregoing compensation and reimbursement and expense policies also raise a number of legal issues for Debtor, for its officers and possibly its directors.

The Examiner believes it is appropriate to address some of the concerns raised by the foregoing discussion of Mullaney's compensation, though arguably beyond the initial scope of his examination.

14592424.11
228676-10002

### 1.	The Examiner Believes the Bonus Constitutes Current Income

A cash basis taxpayer, such as Mullaney, must include income in the taxable year in which it is actually or constructively received.[464]   Income is constructively received in the taxable year in which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time (or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given).  However, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions.[465]

In the instant case, there were no limitations or restrictions on Mullaney's ability to withdraw the amounts.  The Debtor appears to have had sufficient cash on hand to make the payment, and it would have been completely inappropriate in the first place for the bonuses to be awarded if that was not the case.  The bonus was reflected in the payroll ledger, and as described above, such amounts were used to pay Mullaney's expenses as and when directed by him.  As with the timing of the payments of his base compensation, Mullaney had total control over the timing of the payment of his bonus.  Any deferment of the bonus was due to the exercise of Mullaney's choice, rather than any substantial limitation or restriction of his right to control the date of the receipt of the bonus.  In fact, Mullaney had check writing authority and could have written checks to himself had he chosen.  There is no evidence that he ever did that, but nor is there any evidence that Fuchs ever refused to pay any expense identified by Mullaney.  In such case, Mullaney constructively received the bonus.[466]

---

[464]Regs. §1.451-1(a).

[465]Regs. §1.451-2(a).

[466]See, e.g., *Haack v. Comr,* T.C. Memo 1981-13.

Moreover, income cannot be deferred because of a substantial risk of forfeiture. For this purpose, a substantial risk of forfeiture exists only if the taxpayer's right to the bonus is conditioned, directly or indirectly, upon the future performance (or refraining from performance) of substantial services by any person, or upon the future occurrence of a condition relating to a purpose of the bonus if the possibility of forfeiture is substantial. A risk that the value of the right may decline is not a substantial risk of forfeiture.[467] A bonus was awarded to Mullaney each year for services rendered during such year. As stated above, Mullaney's right to receive the bonus was not contingent on any future services (or refraining therefrom) or any other condition.

Even if the bonus is not considered constructively received in the taxable year it was awarded, it may still be taxable in such year. With certain exceptions not relevant here, purported deferrals of income that do not meet the requirements of Section 409A of the Internal Revenue Code are subject to income tax in the first taxable year in which the right to payment is not subject to a substantial risk of forfeiture.[468] For this purpose, a taxpayer's right to compensation is subject to a substantial risk of forfeiture if this right is conditioned on the performance of substantial services by any individual.[469] The regulations under Section 409A interpret this language to follow the same standard articulated above, such that a substantial risk of forfeiture exists only if the taxpayer's right to the bonus is conditioned, directly or indirectly, upon the future performance (or refraining from performance) of substantial services by any person, or the future occurrence of a condition relating to the purpose of the bonus if the

---

[467] Reg. §1.83-3(c)(1).

[468] IRC §409A(a)(1)(A).

[469] IRC §409A(d)(4).

14592424.11
228676-10002

possibility of forfeiture is substantial.[470]   In addition to immediate inclusion of income, the

taxpayer is subject to an additional income tax equal to 20% of the compensation which is

required to be included in gross income.[471]

Under Section 409A, any deferral of compensation must be in writing and must specify a

permissible distribution date or event, which is limited to (a) a specified date or vesting event, (b)

the date of the taxpayer's separation from service, death or disability, (c) a change in control of

the employer, or (d) the occurrence of an unforeseeable emergency.[472]   Neither the employer nor

the taxpayer may accelerate the timing of the deferred compensation.[473]   In addition, there are

other required elections, rules and regulations.[474]   A fundamental principle of Section 409A is

that the service provider not have the ability to manipulate the timing of when the compensation

is taken into income.

The Examiner does not believe that Mullaney's deferral of the bonus payments meets the

requirements of Section 409A.  As described above, the payment was merely deferred until

Mullaney wanted it, allowing him to manipulate the timing of the inclusion of the income,

contrary to the express intent of Section 409A.  Moreover, the other requirements of Section

409A were not met.  Since the right to payment was not conditioned on the future performance

of any services or other condition, such amount is income in the taxable year the bonus was

awarded and is also subject to the additional 20% income tax penalty.

---

[470]Regs. §1.409A-1(d)(1).

[471]IRC §409A(a)(1)(B)(i).

[472]IRC §409A(a)(2)(A).

[473]IRC §409A(a)(3).

[474]IRC §409A(a)(4).

## 2. Payment of Personal Expenses

Even if for some reason the bonus was not to be deemed taxable income to Mullaney in the year it was awarded, it should be included in income to the extent it was used to pay Mullaney's personal expenses. Compensation includes all payments made by the employer for the employee's services.[475] Here, the Debtor only paid Mullaney's personal expenses because he provided services to the Debtor. And certain items, such as the premium for non-group term, life insurance, as specifically addressed in IRS regulations as includable as income.[476]

In addition, even if the bonus could be deferred for federal income tax purposes, it must be taken into account for federal employment tax purposes (FICA and FUTA) as of the later of (a) when the services are performed, or (b) when there is not substantial risk of forfeiture of the right to such amounts.[477] As described above, the bonus was awarded to Mullaney each year for services rendered during the year, and Mullaney's right to payment was not conditioned, directly or indirectly, upon the performance (or refraining from the performance of services) by any person, or upon the occurrence of any other condition. Since the right to payment was not subject to forfeiture, FICA and FUTA were required to be paid (and withheld) in the year the bonus was awarded.

## 3. Improper Reporting, Withholding and Tax Payments

As described above, the Debtor failed to treat certain amounts in excess of Mullaney's base salary as wages to him. A few excerpts from Fuchs interview are instructive

> MR. LILIEN: What I am asking is, did his W-2's, which report income, at any point include amounts that were paid by

---

[475]See, e.g., IRC §61(a)(1); *Old Colony Trust Co. v. Comr.*, 279 U.S. 716 (1929).

[476] Regs. §61-2(A)(2)(i).

[477]IRC §§3121(v)(2), 3306(r)(2). For this purpose, a substantial risk of forfeiture is defined under Regs. §1.83-3(c). Regs. §31.3121(v)(2)-1(e)(3).

WonderWorks from his bonus account for expenses, reimbursement of expenses or payment of expenses?

MS. FUCHS: W-2's? They did not. They were just salary numbers.[478]

MR. LILIEN: Was it Mr. Mullaney's desire to maintain his reportable compensation at $475,000 each year?

MS. FUCHS: You'd have to ask him that, please. I would always follow what he asked me at that point as what he wanted. But…[479]

As a result, the Debtor failed to properly report such amounts on its tax filings, including its Form 990 (Return of Organization Exempt from Income Tax), Form 941 (Employer's Quarterly Federal Tax Return), and Form 940 (Employer's Annual Federal Unemployment (FUTA) Tax Return), as well as the Form W-2 (Wage and Tax Statement) relating to Mullaney, failed to properly withhold income and employment taxes with respect to Mullaney, and failed to properly pay the employer's portion of employment taxes with respect to Mullaney. The Debtor could be liable for the taxes it failed to pay and may be liable for the taxes it failed to withhold, together with interest on such amounts. In addition, each of the foregoing failures could subject the Debtor to penalties.[480] [481]

In fact Mullaney acknowledged that his payroll ledger was designed to avoid tax reporting. When asked in his interview about an email Fuchs had sent to the Board relating to the impact loan Mullaney told some donors he was making, but in fact never did, the following colloquy transpired.

"Q. And do you recall sending this e-mail"

---

[478] Fuchs Tr. 331: 3-11.

[479] Fuchs Tr. 332: 16-23.

[480] See, e.g., IRC §6651(a)(failure to file), §6656 (failure to deposit), §6662 (negligence), §6663 (fraud), §6672 (failure to withhold), §6721 (failure to file information returns).

[481] Mullaney could also face substantial New York tax consequences if he were found not to satisfy the requirements for out-of-state resident treatment of New York source income.

A.     Yes.

Q.     And this appears to be a response to the same e-mail that we read earlier where Hana wrote, "Thanks, Ted. Just to clarify."

Is that correct?

A.     Yes

Q.     And could you read this e-mail into the record, please?

A.     "Hana, I wish you hadn't sent this e-mail. Please do not ever again send the board and e-mail without  running it by me first. WE can discuss on Monday."

Q.     Why did you send this e-mail to Hana?

A.     Because I was upset that she hadn't discussed it with me before she sent it, because I didn't want to be paid out. I wanted the charity to keep the money and—

Q.     But if you were making an impact loan, the charity would have received the money, wouldn't they have?

A.     No, they wouldn't. Half of the money would have gone to taxes.

Q.     Could you elaborate on what you mean by that?

A.     This bonus is to be paid out on July 13th, so she gives me $250,000, and the government – I pay taxes on it, and WonderWork pays workman's comp and all that on it and it cuts the money in half. So it's much better for the charity to keep $250,000 of my pay, not pay taxes on it, and it ends better for me.

You know, for me to take money out of a charity and then give it back to it is really not very useful because I am paying taxes on monies that are just going to do a roundtrip to the charity."[482]

The Examiner believes that the so-called "deferred" pay was available to Mullaney for the asking.  Assuming therefore it should have been considered constructively "received", then it should have been reported on Mullaney's W-2 forms, and payroll taxes paid and deducted.

Second, the failure to report this income clearly constituted misstatements in the organization's IRS Forms 990.

---

[482] Mullaney Tr. 461: 12- 463:10.

It would further appear that at least some of this compensation and or the expenses to the extent they were not for a valid business purpose, were excessive, or lack adequate contemporaneous substantiation would constitute "excess benefits" which must be returned to the organization.

## XIV.   POTENTIAL CAUSES OF ACTION

The Examiner Order directed the Examiner to investigate "[a]ny potential claims and causes of action of the Debtor, including without limitation preferential and fraudulent transfers, including to insiders, claims for breach of fiduciary duty and corporate waste, other claims against insiders and claims relating to expense reimbursement."[483]  The Examiner has determined that a number of potential causes of action may be available to the estate.

### A.        Procedural Considerations

#### 1.        Choice of Law Analysis

Claims on behalf of the estate may be brought in this Court under 28 U.S.C. § 1334(b), which provides that "[n]otwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."  28 U.S.C.  § 1334(b).  "Such jurisdiction extends not only to questions of federal law, but also to many state law disputes."  *Statek Corp. v. Dev. Specialists, Inc.  (In re Coudert Bros.  LLP)*, 673 F.3d 180, 187 (2d Cir.  2012) (explaining the reach of 11 U.S.C.  § 1334(b)).

"Federal principles should guide [the Court's] consideration of which jurisdiction's substantive law applies in cases arising out of federal law . . .  especially [ ] when a case

---

[483]Examiner Order at 3.

involves controversies implicating important federal bankruptcy policy." *In re Koreag, Controle et Revision S.A.*, 961 F.2d 341, 350 (2d Cir. 1992). However, to the extent claims are based upon state law, this Court would apply the choice of law rules of the state of New York since this Court is located in New York. *See Bianco v. Erkins (In re Gaston & Snow)*, 243 F.3d 599, 601-02 (2d Cir. 2001) ("Because federal choice of law rules are a type of federal common law, which federal courts have only a narrow power to create, we decide that bankruptcy courts confronting state law claims that do not implicate federal policy concerns should apply the choice of law rules of the forum state.")."New York's choice of law rules provide different choice of law doctrines depending on the nature of the claim – i.e. torts or contracts." *In re BP P.L.C. Derivative Litig.*, 507 F. Supp. 2d 302, 307 (S.D.N.Y. 2007).

### a. Potential Claims Involving Torts

"Under New York choice of law principles, this court must apply the substantive tort law of the state having the most significant relationship with the occurrence and with the parties." *Golden Distribs., Ltd. v. Auburn Merch. Distributorship, Inc.*, 134 B.R. 750, 755 (Bankr. S.D.N.Y. 1991) (citing *Babcock v. Jackson*, 12 N.Y.2d 473, 482 (1963); *American Protein Corp. v. AB Volvo*, 844 F.2d 56, 62-63 (2d Cir. 1988). Here, the Debtor's principal place of business is in New York and all of its primary contacts are in New York. A New York choice of law analysis is likely to conclude that New York law applies to any tort claims the Debtor may be able to assert.

### b. Potential Claims Involving Internal Affairs

"New York law requires that claims related to corporate affairs – i.e., issues involving the rights and liabilities of a corporation – are governed by the internal affairs doctrine." *In re BP P.L.C. Derivative Litig.*, 507 F. Supp. 2d at 307. The internal affairs doctrine provides that "[q]uestions relating to the internal affairs of corporations – for profit or not-for-profit – are

generally decided in accordance with the law of the place of incorporation." *United States v. Funds Held ex rel. Wetterer*, 210 F.3d 96, 106 (2d Cir. 2000).

Here, since the Debtor is incorporated under the laws of the state of Delaware, claims by the estate relating to, for example, breaches of fiduciary duty will likely be governed by Delaware law. *See Official Comm. of Unsecured Creditors Hydrogen, L.L.C. v. Blomen (In re Hydrogen, L.L.C.)*, 431 B.R. 337, 346 (Bankr. S.D.N.Y. 2010) ("A claim for breach of fiduciary duty brought against a corporate officer or director raises issues relating to the internal affairs of a corporation and therefore should be governed by the law of the state of incorporation of the relevant corporation.").

However, the NYAG may assert that it has jurisdiction in its own right to bring a fiduciary duty claim against the officers and directors of the Debtor. The NYAG would likely assert that the Debtor's presence in New York, its activities in the state, and its registration with the NYAG subjects the Debtor to the Attorney General's jurisdiction.

### 2. Statutes of Limitations

#### a. New York

The statute of limitations for any tort claims the Debtor's estate may have under New York law is three years. *See* N.Y. C.P.L.R. § 214(5).

#### b. Delaware

Under Delaware law, claims for a breach of fiduciary duty have a three year statute of limitations. *Pfeiffer v. Toll*, 989 A.2d 683, 690 (Del. Ch. Mar. 3, 2010) (10 Del. C. § 8106(a)). The statute of limitations for each discrete wrongful transaction begins to run upon the occurrence of each transaction, and a plaintiff can only challenge those transactions, or other wrongful acts, that occurred within the limitations period. *Desimone v. Barrows*, 924 A.2d 908,

924 (Del. Ch. June 7, 2007); *see also Price v. Wilmington Trust Co.*, No. 12476, 1995 Del. Ch. LEXIS 65, at *2 (Del. Ch. May 19, 1995) (holding, in a case involving multiple breaches of fiduciary duty by a trustee, that the continuing wrong doctrine does not apply where there are alleged to be numerous repeated wrongs of similar, if not the same, character over an extended period).

### c. Effect of 11 U.S.C. § 108(a)

Section 108(a) of the Bankruptcy Code provides that that the statute of limitations on claims held by the Debtor will not run until the later of "(1) the end of such period . . .; or (2) two years after the order for relief." 11 U.S.C. § 108(a). For purposes of section 108(a), filing a voluntary petition for bankruptcy protection operates as an order for relief. *Bousa Inc. v. United States (In re Bousa Inc.)*, No. 93 Civ. 4494 (PKL) (JCF), 2005 U.S. Dist. LEXIS 9422, at *10-11 (S.D.N.Y. May 17, 2005) (noting that order for relief is entered on the date the voluntary petition is filed). Therefore, claims for which the statute of limitations had not run by December 28, 2016, the Petition Date, will not be time-barred until, at a minimum, December 28, 2018.

### B. Preference Claims

In the ninety days prior to the Petition Date, the Debtor made over $618,000 in transfers to apparently unrelated creditors.[484] The Debtor also made transfers of a minimum of $484,212 to Mullaney and $168,000 to Fuchs, both statutory insiders under the Bankruptcy Code, in the year prior to the Petition Date.[485] As a result, each of these transfers is subject to potential avoidance as a preference under section 547 of the Bankruptcy Code. *See* 11 U.S.C. § 547. To be avoidable as a preferential transfer, a payment must satisfy each of the requirements of section

---

[484] *See* Amended Schedules at 17.

[485] *Id.* at 19.

547(b) of the Bankruptcy Code.  The Debtor's estate bears the burden of proving such transfers

were:

> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the debtor
> before such transfer was made;
> (3) made while the debtor was insolvent;
> (4) made –
>
>> (A) on or within 90 days before the date of filing
>> of the petition; or
>> (B) between ninety days and one year before the filing of
>> the petition, if such creditor at the time of the transfer was
>> an insider; and
>
> (5) that enables such creditor to receive more than such creditor
> would have received [had the case been a chapter 7 liquidation and
> the creditor not received the transfer.]

11 U.S.C. § 547(b);  *Pereira v. UPS* (*In re Waterford Wedgwood USA, Inc.*), 508 B.R. 821, 826

(Bankr. S.D.N.Y. 2014).  In general, the transfer may not be avoided if the defendant transferee

can prove that it is entitled to rely on one of the exceptions listed in section 547(c), including (1)

contemporaneous exchanges for new value; (2) payments in the ordinary course of business (3)

payments for purchase-money security interests, (4) transfers for subsequent new value, (5)

security interests granted in inventory or receivables, (5) valid statutory liens; or (6) transfers

aggregating less than $6,425 in cases involving non-consumer debts.  *See* 11 U.S.C. § 547(c).

For example, the ordinary course of business defense generally protects "recurring,

customary credit transactions that are incurred and paid in the ordinary course of business of the

debtor and the debtor's transferee." *Official Comm. of Unsecured Creditors of Enron Corp. v.*

*Martin (In re Enron Creditors Recovery Corp.)*, 376 B.R. 442, 459 (Bankr. S.D.N.Y. 2007)

(quoting *Sender v. Heggland Family Trust (In re Hedged-Investments Assocs.)*, 48 F.3d 470, 475

(10th Cir. 1995)).  The policy behind the defense is to "leave undisturbed normal financial

relations, because it does not detract from the general policy of the preference section to

discourage unusual action by either the debtor or [its] creditors during the debtor's slide into bankruptcy." *Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.)*, 78 F.3d 30, 41 (2d Cir. 1996) (quoting H. Rep. No. 95-595 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6329).

Particularly, relevant to the analysis here is that, but for the Arbitration award, the Debtor did not appear to be in any financial distress that would have led to change in its customary (albeit in some cases, unorthodox) business practices.

The ordinary course of business exception applies if the transfer was (1) "made in the ordinary course of business or financial affairs of the debtor and the transferee" or (2) "made according to ordinary business terms." 11 U.S.C. § 547(c)(2). On this basis, a transferee can avoid preference liability if it can show either that the "transfer was ordinary between the parties to the transfer" or was made in accordance with "relevant industry practices." *Davis v. R.A. Brooks Trucking, Co. (In re Quebecor World (USA), Inc.)*, 491 B.R. 379, 386 (Bankr. S.D.N.Y. 2013). When determining whether a transfer was ordinary between the two parties, courts consider a number of factors, including "(i) the prior course of dealing between the parties, (ii) the amount of the payment, (iii) the timing of the payment, (iv) the circumstances of the payment, (v) the presence of unusual debt collection practices, and (vi) changes in the means of payment." *Id.* When determining whether payments were in accordance with industry practices, a transferee needs to present admissible evidence "related to industry credit, payment, and general business terms in order to support its position." *Burch v. Revchem Composites, Inc. (In re Sierra Concrete Design, Inc.)*, Nos. 08-12029 (CSS), 2015 Bankr. LEXIS 2344, at *33 (U.S. Bankr. D. Del. July 16, 2015).

The following parties received payments from the Debtor within 90 days of the Petition Date:

| Transferee | Amount | Preference Analysis |
|---|---|---|
| Action Mailers | $39,913.10 | The Debtor paid fourteen invoices issued by Action Mailers in the ninety days prior to the Petition Date. Many of the invoices were paid within several days of their issuance, but at least five were paid approximately two months later. Given the varying timeframes of payment, the Debtor likely has preference claims for certain of the payments made to Action Mailers, although other payments are likely subject to the ordinary course of business defense. |
| Adams & Reese Real Estate, LLC ("A&R") | $25,547.37 | The Debtor paid three invoices to A&R for rent for October, November, and December 2016, each in the amount of $8,585.79. These payments appear to have been made in the ordinary course of business, so the Debtor's estate does not likely have a strong preference claim for these payments. |
| American Express ("AmEx") | $58,863.43 | The Debtor paid five invoices to AmEX in the ninety days prior to the Petition Date. The Debtor paid Mullaney's September, October, and November 2016 statements. The other two payments were for the October and November 2016 statements for the shared card utilized by Fuchs, Lazarus and Greenwood. All payments were made a few days in advance of the due date. It is likely that AmEx could assert an ordinary course of business defense relating to each of the payments as the Debtor regularly timely paid AmEx invoices. (However, the Examiner notes that as discussed elsewhere in this report, other basis exist to seek to recover some of these funds from Mullaney,) |
| Carter Ledyard & Milburn LLP ("CLM") | $254,454.38 | In the ninety days prior to the Petition Date, the Debtor paid CLM a retainer of $25,000. The Debtor exhausted the retainer in November 2016 and CLM issued an invoice for $41,352.86 on November 22, 2016 and another invoice for $188,101.50 on December 2, 2016. Both invoices were paid in full by a single check dated December 5, 2016. The Debtor has a colorable preference claim against CLM, although CLM may be able to assert an affirmative defense to the claim based on, among other things, the ordinary course of business. |

| Transferee | Amount | Preference Analysis |
|---|---|---|
| CDR Fundraising Group ("CDR") | $16,250.00 | CDR received one payment on November 8 as payment for an invoice dated September 30 and due October 30. The Debtor made the same monthly payment in most months prior to the preference period, so CDR likely has an ordinary course of business defense. |
| Color Tree Group ("CTG") | $14,921.20 | On October 26, the Debtor paid nine invoices owed to CTG dated September 12 and September 15. On October 27, the Debtor paid another nine invoices, dated from September 20 – September 26. The regularly paid these types of invoices, so an ordinary course of business defense could be asserted. |
| IDMI | $18,966.11 | The Debtor issued three checks to IDMI during the preference period. The Debtor paid invoices for both August and September at the end of October and then paid the October invoice at the beginning of November. The payment terms on each invoice were net 45 days, so the August invoice was paid late and the September and October invoices were paid early. Thus, a colorable preference challenge exists. |
| Kaplan Kravet & Vogel P.C. ("KK&V") | $49,210.63 | KK&V received a check from the Debtor on December 5 in payment of the October invoice and another check on December 6 as payment for the November invoice. |
| L&E Meridian ("L&E") | $16,397.02 | L&E received four payments from the Debtor during the preference period. Three of the payments were made within a week of receiving the invoice, while one payment was made approximately three weeks after the date of the invoice. |
| Log-On | $29,153.03 | The Debtor made a number of separate payments to Log-On during the preference period. Several of the payments were made the same day as the invoice date or the following day while other payments were made more than two weeks after the invoice date. |
| Marsh & McLennan Agency LLP ("M&M") | $24,140.00 | M&M received two payments from the Debtor during the preference period as payment for the Debtor's D&O Policies. These payments were made within the terms of the invoices. |

14592424.11
228676-10002

| Transferee | Amount | Preference Analysis |
|---|---|---|
| Mastek Limited ("Mastek") | $15,000.00 | The Debtor received a restricted grant to fund the development of a patient data warehouse, and the Examiner understands that Mastek was paid using these funds. Since the payment was made using restricted funds that are not property of the estate, the Debtor's estate does not have a preference claim against Mastek. |
| Oxford Health Plans ("Oxford") | $22,425.31 | The Debtor made three payments to Oxford during the preference period. However, the payments were not on account of antecedent because they were made on the first day of each month in payment for health coverage during that month. There is no preference claim. |
| Sard Verbinnen & Co, LLC ("SVC") | $25,000.00 | SVC received a $25,000 retainer on November 15, 2016 to work for the Debtor as a crisis communication consultant. Pursuant to its Engagement Letter with the Debtor, SVC agreed to accumulate time charges against the retainer and did so until the retainer was exhausted in February 2017. Therefore, SVC did not received payment on account of an antecedent debt. *See Charys Liquidating Tr. v. Hades Advisors, LLC (In re Charys Holding Co.)*, No. 08-10289 (BLS), 2010 Bankr. LEXIS 2072, at *15 n.3 (Bankr. D. Del. July 14, 2010) ("By definition, a retainer is a pre-paid fee to secure later services and not a payment on account of an antecedent debt.") (citing Black's Law Dictionary, 1341 (8th ed. 2004)). |
| Vanguard Group, Inc. ("Vanguard") | $25,176.00 | While total payments to Vanguard from the Debtor were over $25,000, approximately $20,000 of the payments were employee contributions to their 401(K), and the remaining $5,000 related to the Debtor's 401(K) match program. The Debtor's estate has no preference claim for these funds based on a number of theories. |
| Workwell Partners ("Workwell") | $6,434.00 | Workwell received one payment in October for work that appears to have been completed in May. While the payment appears to meet the elements of a preference, it is very near the *de minimus* exception of 11 U.S.C. § 547(c)(9). |

14592424.11
228676-10002

As the CEO and CFO of the Debtor, Mullaney and Fuchs, respectively, are statutory insiders of the Debtor. *See* 11 U.S.C. § 101(31)(B) (defining insiders of a corporate debtor to include officers of the debtor). Greenwood, as the Chief Program Officer of the Debtor, can also be viewed as an insider of the Debtor pursuant to section 101(31)(B) of the Bankruptcy Code. As her title suggests, she is an officer of the Debtor. She is also an individual that was "in control of the Debtor." *See* 11 U.S.C. § 101(31)(B) (defining insider to also include a "person in control of the Debtor"). Mullaney often referred to Greenwood as his "number two" in command. She was also referred to as the *de facto* chief operating officer of the Debtor and, to that end, performed a number of human resources functions. Accordingly, payments made to each of them within one year of the Petition Date are also subject to avoidance as potential preferences.

Fuchs received approximately $168,000 and Greenwood received approximately $162,500 in payments from the Debtor in the year prior to the Petition Date. Each of the payments made to Fuchs and Greenwood during the preference period, with the exception of a bonus payment paid in December 2016 in the amount of $6,000 to Fuchs and $10,000 to Greenwood, are payments in the ordinary course of the Debtor's business as each regularly received a paycheck on the fifteenth day of every month. While the bonus payments might be subject to a constructive fraudulent transfer claim, they were not payments made on account of an antecedent debt, so are not preferences.

The payments to Mullaney present an entirely different analysis. From March 2015 to May 2016, Mullaney did not receive a paycheck through payroll. Then, in June 2016, Mullaney received a check for $475,000. Accordingly, the payment was (1) made to a creditor (Mullaney), (2) on account of antecedent debt (back pay), (3) while the Debtor was insolvent (a presumption

of insolvency exists, (4) within a year before the Petition Date (here June 2016), and (5) that enable the creditor to obtain more than he would if the Debtor were liquidated. The remaining payments of $9,211.96 in personal expenses purportedly taken as a deduction from Mullaney's "limbo pay" are also preferential for all of the same reasons that the June 2016 payment is preferential.

While Mullaney often received payroll payments in large lump sums, he had not previously gone so many months without a paycheck and had never been paid such a large amount at once. Mullaney's deduction of personal expenses from his pay was also erratic. Therefore, the ordinary course of business defense does not apply, nor do any of the other defenses appear to apply.

### C. Claims Against Mullaney for Excessive Compensation and Bonuses

In addition to claims for preferences, the Examiner believes that the Debtor's estate may be able to bring causes of action against Mullaney to recover certain excessive compensation and bonuses paid or awarded to Mullaney based upon a number of theories, including under a theory of unjust enrichment, under section 548 of the Bankruptcy Code, or as an excess benefit transaction.

#### 1. Unjust Enrichment

Both New York and Delaware law recognize the doctrine of unjust enrichment. "Under New York law, a claim for unjust enrichment consists of the following three elements: that (1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Official Comm. of Unsecured Creditors Hydrogen, L.L.C. v. Blomen (In re Hydrogen, L.L.C.)*, 431 B.R. 337, 359 (Bankr. S.D.N.Y. 2010) (quotations omitted). Under Delaware law, unjust enrichment is recognized as "the unjust retention of a benefit to the loss of another, or the retention of money

or property of another against the fundamental principles of justice or equity and good conscience." *MCG Capital Corp. v. Maginn*, No. 4521-CC, 2010 Del. Ch. LEXIS 87, at *92 (Del. Ch. Ct. May 5, 2010) (quotations omitted). "The elements of an unjust enrichment claim [under Delaware law] are (i) an enrichment, (ii) an impoverishment, (iii) a relation between the enrichment and impoverishment, (iv) the absence of justification, and (v) the absence of a remedy provided by law." *Id.*

New York law likely applies to any claim for unjust enrichment that could be asserted against Mullaney since the relevant decisions relating to his compensation were made in New York. *Official Comm. of Unsecured Creditors Hydrogen, L.L.C. v. Blomen (In re Hydrogen, L.L.C.)*, 431 B.R. 337, 359 (Bankr. S.D.N.Y. 2010) ("New York law - the law of the place where the allegedly actions giving rise to the unjust enrichment claim occurred - should also govern the unjust enrichment claim. Such is the case given that relevant compensation decisions were most likely made in New York, the Debtor's principal place of business."). Nevertheless, even if the Court were to determine that Delaware law applies, the analysis would be substantially similar.

Relying upon unjust enrichment principles, courts have held that bonuses paid based upon wrongful assumptions about the performance of a company can support an unjust enrichment claim. For example, in *MCG Capital Corp. v. Maginn*, the court held that a claim for unjust enrichment was adequately pled where the CEO was paid a bonus of $750,000 and the complaint also adequately pled a breach of his duty of loyalty to the company in obtaining approval of the bonus. *MCG Capital Corp. v. Maginn*, No. 4521-CC, 2010 Del. Ch. LEXIS 87, at *92 (Del. Ch. Ct. May 5, 2010). In *Scrushy v. Tucker*, the court required a CEO to repay $47.8 million in bonuses he received when it became clear that the company had not reached the

profit thresholds upon which those bonuses were contingent. *Scrushy v. Tucker*, 955 So. 2d 988, 1012 (Ala. 2006). The CEO's bonuses were based on the company's earnings, which the company later discovered were massively overstated due to accounting errors. *Id.* Repayment was ordered even on the assumption that the CEO had no actual knowledge of and did not participate in any of the activities that resulted in the falsification of the company's financials. *Id.*

Conversely, in *Hampshire Grp., Ltd. v. Kuttner*, the court denied a claim for unjust enrichment seeking to clawback incentive bonuses paid to the company's CFO and another executive based on the need to restate the company's financial statements. *Hampshire Grp., Ltd. v. Kuttner*, No. 3607-VCS, 2010 Del. Ch. LEXIS 144, at *136 (Ch. July 12, 2010). The court specifically distinguished *In re Healthsouth Shareholders Litigation*,[486] where a CEO had repaid a loan made to the corporation using corporate stock with an inflated value, due in part to financial improprieties and misrepresentations contained in the corporation's financial statements, and held that misstatements of financial statements alone is not enough to require repayment of a bonus based on a theory of unjust enrichment, especially when other theories of damages may exist. *Id.* (citing *In re HealthSouth Corp. S'holders Litig.*, 845 A.2d 1096, 1099 (Del. Ch. 2003)).

In Mullaney's case, the estate can assert a claim for unjust enrichment relating to Mullaney's bonuses awarded in 2013, 2014, 2015, and 2016. Each of the bonuses was awarded based on the complete discretion of the Board. At Mullaney's own insistence, no specific metrics were used to determine his bonus eligibility. However, as made clear by the Examiner's investigation, the Board did not have a complete picture of the way Mullaney had operated the

---

[486]Incidentally, the CEO referred to in *In re Healthsouth Shareholders Litigation* and in *Scrushy v. Tucker* is the same individual.

Debtor and steered the Debtor through the arbitration. As demonstrated by the myriad of issues raised by BDO in connection with the FY16 audit, Mullaney, at a minimum, also failed to properly oversee the maintenance of the Debtor's books and records. Similar to the CEO in *MCG Capital Corp. v. Maginn*, the Debtor's estate has an argument that Mullaney failed to give the board a complete picture of the his entitlement to a bonus. *MCG Capital Corp. v. Maginn*, 2010 Del. Ch. LEXIS 87, at *92 (holding that claim against CEO for unjust enrichment in connection with bonus payment was adequately pled where breach of duty of loyalty claim relating to the bonus was also adequately pled). In addition, even if misstatements of a company's financial statements alone may not be enough to warrant a claim of unjust enrichment based on a bonus payment, *see, e.g., Hampshire Grp., Ltd. v. Kuttner*, 2010 Del. Ch. LEXIS 144, at *136 (Ch. July 12, 2010), Mullaney's actions amounted to more. Accordingly, the Debtor's can assert a claim to seek avoidance of any bonus payments Mullaney received, including in the form of a deduction from his pay for payment of personal expenses, and to deny Mullaney's claim for unpaid bonuses, all based on a theory of unjust enrichment. The same logic will apply to payment of Mullaney's expenses incurred in defending the SmileTrain UK litigation.

> **2.  The Bonus and Excessive Compensation Paid to Mullaney Under His Employment Agreement May Also be Recoverable and Any Severance or Benefit Obligation Avoidable Under Section 548 of the Bankruptcy Code**

The excessive compensation and bonus paid to Mullaney beginning in December 2015 when his Employment Contract was signed may be recoverable under section 548(a)(1)(B)(ii)(IV) of the Bankruptcy Code. "To recover under this section, a trustee must establish that the debtor made a transfer but received 'less than a reasonably equivalent value in exchange'" and "made the transfer to or for the benefit of an insider under an employment

contract and not in the ordinary course of business." *Jacobs v. D'Alessandro (In re Dewey & Leboeuf LLP)*, No. 12-12321 (MG), 2014 Bankr. LEXIS 4051, at \*30-31 (Bankr. S.D.N.Y. Sept. 23, 2014) (citing 11 U.S.C. §§ 548(a)(1)(B)(ii) – (iv)). It is not necessary for the debtor to be insolvent at the time the obligation was incurred or the transfer was made. *Jahn v. Char (In re Incentium, LLC)*, 473 B.R. 264, 268 (Bankr. E.D. Tenn. May 10, 2012).

"The question of reasonably equivalent value is based on the facts and circumstances of each case and requires the court to compare what was given with what was received. Courts consider the good faith of the parties, whether it was an arm's length transaction, and what the debtor actually received." *Jacobs v. D'Alessandro (In re Dewey & Leboeuf LLP)*, 2014 Bankr. LEXIS 4051, at \*30-31. In addition, to be an ordinary course transfer, the transfer must satisfy *both* a subjective and an objective test. "The subjective element requires an examination of whether the transfer was ordinary between the parties to the transfer. . . . By contrast, the objective test looks not to the specifics of the transaction between the debtor and the particular creditor, but rather focuses on the general practices in the industry, in particular the industry of the creditor." *Id.* at \*27-28 (citations and quotations omitted).

In *Jacobs v. D'Alessandro (In re Dewey & Leboeuf LLP)*, the debtor's former chief operating officer received significant payments under an employment contract, which the trustee sought to avoid and recover as constructive fraudulent transfers. The trustee alleged the debtor had not received reasonably equivalent value for the payments under the contract because the payments were so exorbitant that they could not be justified by the services actually performed. *Id.* at \*31. The trustee further alleged that the employment contract was not entered into in the ordinary course of business because it was not negotiated at arm's length or consistent with industry practices given the benefits provided to the chief operating officer under the agreement.

*Id.* The benefits included out-sized compensation, termination only upon a fraud or crime against the firm, and a "poison pill" provision requiring the debtor to deposit all amounts payable under the contract into the chief operating officer's trust if the chairman of the firm was removed. *Id.* at*6-7. Based on the facts alleged, the court held that the trustee had pled facts sufficient to survive a motion to dismiss. *Id.* at *31.

The Debtor's estate has an argument that it did not receive reasonably equivalent value from Mullaney in entering into the Employment Contract and granting benefits and perquisites to him thereunder. Mullaney was granted numerous lucrative benefits under the Employment Contract in addition to the benefits granted to all employees of the Debtor including, for example: (1) base compensation of $475,000 for a term of five years, (2) a yearly discretionary bonus of $250,000, (3) payments of his life insurance policy, (4) a spousal travel allowance permitting Mullaney's wife to attend all major donor events, visits and program trips overseas, (5) "such other perquisites as approved by the Board of Directors from time to time as designated by resolution of the Board," and (6) a severance package equal to eighteen months pay and payment of all COBRA benefits if he is terminated at any time by mutual agreement of the parties without cause.

In contrast, the Pearl Meyer Report cautioned that Mullaney's base compensation of $475,000 per year was "on the higher end of the competitive range." Pearl Meyer further recommended that the Board approve a bonus for Mullaney of between $50,000 - $200,000, only if Mullaney had performed at or above 75th percentile levels of those in the reviewed peer groups. Pearl Meyer also urged the Board to quantify the value of any other contract requests made by Mullaney and to take the value into account when evaluating the amount of annual inventive to grant Mullaney.

Despite these clear recommendations and cautions, Mullaney's Employment Contract nevertheless made him eligible for a full $250,000 bonus and granted him valuable benefits in the form of payment of life insurance premiums, a spousal travel allowance and other perquisites that might be approved by the Board, all other benefits afforded to the Debtor's employees, and a generous pre-agreed severance package. The Examiner found no evidence that the Board attempted to quantify the additional benefits granted to Mullaney as urged by Pearl Meyer. Given the fact that the benefits granted to Mullaney in the Employment Contract are substantially over and above what Pearl Meyer recommended would be reasonable, the Debtor's estate has an argument that it did not receive reasonably equivalent value in entering into the agreement.

As further support for the estate's argument that it did not receive reasonably equivalent value in entering into the Employment Agreement, the agreement was not entered into after a true arm's length transaction. Dysart attempted to retain separate employment counsel for the Debtor and to require Mullaney to do the same, but Mullaney resisted and the struggle over the issue lead to Dysart's resignation. In the end, the Debtor's attorney, Greg Lam, drafted the Employment Contract and the terms were discussed and agreed to between Mullaney and Coneys without the input of counsel.

The estate also has an argument that the benefits afforded to Mullaney under the Employment Contract were also not granted by the Debtor in the ordinary course when evaluated using objective criteria. The Pearl Meyer report makes clear that the base compensation sought by Mullaney was on the higher end of competitive. It also noted that Mullaney's requested discretionary bonus was "very high in a non-profit environment" and urged the Board to "be cognizant of the optics / perceptions on whether the compensation is reasonable" in both the eyes

of interested parties and the IRS. Despite these caveats and cautions, the Employment Contract granted Mullaney significant benefits and perquisites over and above what was already high compensation. Given these facts, the estate has an argument that the benefits and perquisites afforded to Mullaney under the Employment Contract were not standard in the nonprofit industry in which the Debtor operates, and are therefore not in the ordinary course of business from an objective viewpoint.

Since the estate would only need to show that the entry into the Employment Contract was outside the ordinary course of the Debtor's business from an objective viewpoint in order to make a claim, it would not be necessary for the estate to argue that the Employment Agreement was subjectively part of the ordinary course of the Debtor's business. This argument would be somewhat more difficult for the Debtor's estate to make since Mullaney received compensation and benefits similar to what he was provided in his Employment Contract in years before the Employment Contract was officially executed. Therefore, the Debtor did have a course of dealings with Mullaney on similar terms as those set forth in the Employment Contract. While Fuchs had an employment contract beginning in 2012 that was entered into without the knowledge of the Board, no other employee of the Debtor had an Employment Contract with such generous terms. On balance, the subjective test is closer and the result of the analysis thereunder is less clear. If the Debtor's estate focuses on the objective test, it is still likely to prevail on a claim that the benefits granted to Mullaney under the Employment Contract were outside the ordinary course of business.

### 3. Certain Payments May Be Recovered from Mullaney As Excess Benefits

Mullaney may have received excess benefits in the form of base compensation and bonuses or in the form of expense reimbursements that were personal, unsubstantiated, or

excessive.  Any compensation Mullaney received in excess of the "reasonable" compensation for services rendered must be repaid to the Debtor.  If demand for payment by the Debtor's estate is not successful, the Examiner recommends a referral to the IRS for resolution.  Additionally, the Examiner recommends that a referral be made to the NYAG for potential action.

### D.  Claims Related to Debtor's Reclassification of Funds as Restricted

As set forth above, prior to the Petition Date, the Debtor began classifying certain donations to WonderWork as restricted, in a departure from its prior business practices over the course of five years.  Prior to the Petition Date and continuing after the Petition Date, the Debtor also contacted donors to confirm whether they wanted their donations to be restricted.

The classification of donations as restricted or unrestricted is important because property of the Debtor's estate consists only of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a).  Courts considering the issue have nearly uniformly held that donations made to a nonprofit debtor that are restricted as to use are not property of the debtor's estate pursuant to section 541(c) of the Bankruptcy Code.  *See, e.g.*, *In re Save Our Springs (S.O.S.) Alliance, Inc.*, 388 B.R. 202, 247 (Bankr. W.D. Tex. Apr. 11, 2008) (finding that restricted funds held by a nonprofit debtor were not property of the estate); *Hunter v. St. Vincent Med. Ctr. (In re Parkview Hosp.)*, 211 B.R. 619 (Bankr. N.D. Ohio 1997) (finding that restricted funds were not property of the debtor's estate); *In re Forum Health*, 444 B.R. 848, 853 n.6 (Bankr. N.D. Ohio 2011) (finding no dispute that restricted funds cannot be used to pay creditors); *Tort Claimants Comm. v. Roman Catholic Archbishop (In re Roman Catholic Archbishop)*, 345 B.R. 686 (Bankr. D. Or. 2006) (finding that restricted church endowment containing $ 36 million was held in charitable trust and thus excluded from debtor's bankruptcy estate).

For example, in *In re Save our Springs (S.O.S.) Alliance, Inc.*, the debtor ("<u>SOS</u>") was a nonprofit that relied on donations from donors sharing its same vision for water preservation and conservation in south Texas. *In re Save Our Springs (S.O.S.) Alliance, Inc.*, 388 B.R. 202, 209 (Bankr. W.D. Tex. 2008). SOS filed for bankrtupcy after a judgment was entered against it ordering it to pay nearly $300,000 in attorneys' fees. *See id.* at 210. SOS proposed a plan, and the judgment creditor objected, arguing that the plan was not confirmable on a number of grounds, including that SOS's failure to allocate restricted funders for the payment of creditors exhibited a lack of good faith in ensuring that creditors were paid to the maximum extent possible. *Id.* at 246-47.

In the course of SOS's business, it had maintained its restricted funds and unrestricted funds in the same bank account. *Id.* at 218. An expert testifying on behalf of the judgment creditor concluded that, on a number of occasions prior to the bankruptcy, the balance of the SOS's bank account had dipped below the amount its own books and records showed were restricted funds by approximately $30,000. *Id.* at 220. Six days prior to the petition date, SOS received an unrestricted donation, which is purportedly used to replenish the restricted funds that had been spent without authorization. It then moved an amount equal to what should have been its restricted fund balance to a segregated account. *Id.* at 248. The court held that the unrestricted donation could not be used to replenish SOS's restricted fund balance and that the value was instead part of the SOS's estate and should be made available to satisfy unsecured claims. *Id.* at 249. However, the court further held that SOS's unauthorized use of some if its restricted funds "should not override the express intent of donors, and should therefore not destroy the overall character of the [remaining] funds as restricted." *Id.*

The Examiner believes that the Debtor's estate has causes of action based on theories of fraudulent transfer under section 548 and 549 of the Bankruptcy to justify the re-classification of certain donations as unrestricted and part of the Debtor's estate.

1.      **Pre-petition:  Fraudulent Transfer**

a.      **Actual Fraudulent Transfer**

Under the Bankruptcy Code, "the trustee may avoid any transfer . . . of an interest of the debtor in property . . .  made or incurred on or within 2 years before the date of the filing of the petition, if the debtor . . .  made such transfer . . .  with actual intent to hinder, delay or defraud." *Picard v. Estate of Chais (In re Bernard L.  Madoff Inv. Sec.  LLC)*, 445 B.R.  206, 219 (Bankr.  S.D.N.Y.  2011) (quoting 11 U.S.C.  § 548(a)(1)(A)).To do this, the complaint must allege (1) the property subject to the transfer, (2) the timing and, if applicable, frequency of the transfer and (3) the consideration paid with respect thereto." *Id.*  (quotation omitted).  The trustee must also allege the intent of the debtor-transferor to hinder, delay or defraud consistent with the heightened pleading standards set forth in Rule 9(b) of the Federal Rules of Civil Procedure.  *Id.*

"Due to the difficulty of proving actual intent, a plaintiff may plead 'badges of fraud' that give rise to an inference of intent.  *Geltzer v. Barish (In re Geltzer)*, 502 B.R.  760, 769 (Bankr.  S.D.N.Y.  2013) (citing *Sharp Int'l Corp.  v. State St.  Bank & Tr.  Co.  (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56 (2d Cir.  2005)).  Common badges of fraud include:

> (1) lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; (6) the general chronology of the events and transactions under inquiry; (7) a

questionable transfer not in the usual course of business; and (8) the secrecy, haste, or unusualness of the transaction.

*Silverman v. Actrade Capital, Inc.  (In re Actrade Fin.  Techs., Ltd.)*, 337 B.R.  791, 809 (Bankr.

S.D.N.Y.  2005).  "The presence or absence of one badge of fraud is not conclusive."  *In re*

Geltzer, 502 B.R.  at 760 (citation omitted).

Here, each of the elements required by section 548(a)(1)(A) can be pled by the Debtor's

estate:  (1) the Debtor sought to reclassify unrestricted funds as restricted donations, (2) the

Debtor undertook these activities following the issuance of the Arbitration Award in October

2016, and (3) the Debtor received no consideration for classifying the donations as restricted as

opposed to unrestricted.  Numerous badges of fraud also support the inference that the transfers

to the restricted fund account were made with an actual intent to hinder, delay, or defraud the

Debtor's creditors.  For example, the Debtor received nothing in exchange for reclassifying the

funds as restricted, the Debtor did so only after the Arbitration Award was issued and admitted in

email exchanges that it was doing so to ensure that funds were not available to satisfy the

judgment, and the Debtor's reclassification of the donations was out of the ordinary course of

business.  Indeed, prior to the issuance of the Arbitration Award, the Debtor sought to treat as

many donations as unrestricted as possible.

Under the circumstances, the Debtor's estate has a clear claim to have any donations that

were reclassified treated as unrestricted.  However, as discussed throughout this report, the

Examiner proposed significant adjustments to the "Restricted Fund" balances.  Thus, this claim

would only be relevant to any reclassification inconsistent with the Examiner's proposed

adjustments.  Since the Debtor's purported changes have not been effectuated by any actual

transfer of funds, it is impossible to quantify the amount of this claim at this time.  However, it

does demonstrate the Examiner's view that the Court should not be bound by Debtor's statements as to its restricted fund balances.

### b.    Constructive Fraudulent Transfer

As an alternative to the a claim for actual fraudulent transfer in connection with the re-classification of donations as restricted, the Debtor's estate also has a claim for constructive fraudulent transfer. To assert a claim of constructive fraudulent transfer under section 548(a)(1)(B) of the Bankruptcy Code, the trustee must demonstrate that within two years of the petition date:

> (1) the debtor transferred an interest in property;
>
> (2) the debtor was
>
>> (a)    insolvent at the time of the transfer or became insolvent as a result of the transfer,
>>
>> (b)    was engaged in business or was about to engage in business for which the debtor's remaining property was an unreasonably small capital, or
>>
>> (c)    intended to incur or believed that it would incur debts beyond its ability to pay as they matured, and
>
> (3) the debtor received less than a reasonably equivalent value in exchange for such transfer.

*Official Comm. of Unsecured Creditors v. JP Morgan Chase Bank, Nat'l Ass'n (In re M. Fabrikant & Sons, Inc.)*, 394 B.R. 721, 735 (Bankr. S.D.N.Y. 2008) (citing 11 U.S.C. § 548(a)(1)(B)). No allegation of intent on the part of the Debtor is necessary. *Id.*

Where the Debtor re-classified donations as restricted that were not previously classified as restricted in the course of the Debtor's business prior to entry of the Arbitration Award, the Debtor effectively transferred an interest that it had in property. Moreover, once the Arbitration Award was issued in October 2016, the Debtor was unquestionably insolvent. Finally, the Debtor received nothing in exchange for re-classifying the donations as restricted. Accordingly,

subject to the same caveats discussed with respect to § 548(a), the Debtor's estate has a claim that the re-classification of funds as restricted that had not previously been classified as restricted in the course of the Debtor's business resulted in a constructive fraudulent transfer.

### 2.    Post-petition:  Violation of Section 549

A more viable claim exists under Section 549 of the Bankruptcy Code which permits a trustee to avoid a transfer of property of the estate that occurs after the commencement of the case that is not authorized by the Bankruptcy Code or by the court.  11 U.S.C.  § 549.  The Debtor's communications with donors <u>after</u> the Petition Date requesting that they confirm whether their donation should be restricted resulted in the unauthorized transfer of approximately $350,000 by the Debtor out of the Debtor's estate.  Since the Debtor's actions were out of its ordinary course of business, and not otherwise authorized by the Bankruptcy Code or this Court, the Examiner believes the Debtor's estate should be entitled to treat the donations that were only classified as restricted after the donor received a post-Petition Date confirmation letter as unrestricted.

### 3.    New York Charity Law is Relevant to the Analysis

State law governs the determination of what property is part of the Debtor's estate. *Butner v. United States*, 440 U.S. 48, 55 (U.S. Feb. 21, 1979).  Here, New York law provides that restricted funds cannot be used to satisfy the claims of creditors.  *Matter of Friends for Long Island's Heritage*, 80 A.D.3d 223, 235 (N.Y.  App.  Div. 2010) ("We find that New York's long-standing policy honoring donors' restrictions on the use of the property they donate has greater weight than the claims of creditors."); *In re Estate of Kraetzer*, 119 Misc. 2d 436, 439 (N.Y. Sur. Ct. June 2, 1983) (holding that an unpaid bequest to a non-operating nonprofit hospital in bankruptcy should be made to another entity under the cy pres power because the hospital's charitable purposes were to provide patient care services rather than satisfying the claims of

creditors).  Accordingly, consistent with the Examiner's conclusions throughout this Report, donations that should have been characterized as restricted should not be available to pay the claims of creditors, but donations that the Debtor attempted to restrict after receiving the donation should be made available for creditors.

### E.      Claims Against Directors

The governance processes in place at WonderWork have been addressed throughout this report.  For purposes of his report on potential of the Debtor claims against its directors, the Examiner distinguishes between Mullaney, who was also the Debtor's CEO, and the other directors, all of whom could qualify as "independent."  It is also important to note that for most of the Debtor's existence, there were only at first two, and then three such independent directors, Dysart and Kant, who were joined at the very end of 2012 by Coneys.

Other board members did not begin to attend Board meetings until at least March of 2016, and by the end of 2016, most had resigned.

The Examiner believes that the Debtor's estate may assert claims for breach of fiduciary duty against certain of the Debtor's directors, though the likelihood of prevailing on such claims is uncertain.

### 1.      Breach of Duty of Care

A claim for breach of fiduciary duty requires proof of two elements: (1) that a fiduciary duty existed and (2) that the defendant breached that duty.  *See KDW Restructuring & Liquidation Servs. LLC v. Greenfield*, 874 F.  Supp.  2d 213, 221 (S.D.N.Y.  2012) (*Estate of Eller v. Bartron*, 31 A.3d 895, 897 (Del.  2011)).

Among the fiduciary duties owed by directors of a corporation is the duty of care.  *Id.* "To prove a breach of the duty of care, a plaintiff must demonstrate gross negligence."  *Id.* (citing *In re Lear Corp.  S'holder Litig.*, 967 A.2d 640, 651 (Del.  Ch.  2008)).  "Gross

negligence has a 'stringent meaning' in Delaware corporate law, involving 'indifference amounting to recklessness.'" *Id.* (quoting *Zimmerman v. Crothall*, No. 6001-VCP, 2012 Del. Ch. LEXIS 64, at *6 (Del. Ch. Mar. 5, 2012)).

Directors of nonprofit corporations owe a duty of care to the beneficiaries of the corporation. *Gassis v. Corkery*, No. 8868-VCG, 2014 Del. Ch. LEXIS 86, *54 (Del. Ch. May 28, 2014) ("A nonprofit charitable corporation's board owes fiduciary duties to its beneficiaries, not to its members or directors."). In *Oberly v. Kirby*, the Delaware Supreme Court confirmed a "court cannot second-guess the wisdom of facially valid decisions made by charitable fiduciaries, any more than it can question the business judgment of the directors of a for-profit corporation," but stated that when a corporation is "created for a limited charitable purpose rather than a generalized business purpose, those who control it have a special duty to advance its charitable goals and protect its assets." *Oberly v. Kirby*, 592 A.2d 445, 462 (Del. 1991).

A director of a Delaware corporation can also be liable for breaching its duty of care for failing to appropriately monitor the corporation. In *In re Caremark International Inc. Derivative* Litigation, the court held that "a director's obligation includes a duty to attempt in good faith to assure that a corporate information and reporting system, which the board concludes is adequate, exists, and that failure to do so under some circumstances may, in theory at least, render a director liable for losses caused by non-compliance with applicable legal standards." *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 970 (Del. Ch. 1996).

The Delaware Supreme Court affirmed the *Caremark* holding in *Stone ex rel. AmSouth Bancorporation v. Ritter* stating that *Caremark* articulates the necessary conditions predicate for director oversight liability: (a) the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls,

consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention. *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006). In either case, imposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligations. *Id.* The court also stated that a failure to act in the face of a known duty to act "thereby demonstrating a conscious disregard for their responsibilities," will make directors liable for breach of their duty of loyalty to the corporation and its stockholders "by failing to discharge their fiduciary obligations in good faith." *Id.*

Here, the Examiner believes that Debtor's independent directors failed to adequately oversee the Debtor's business operations in a number of ways. As more completely discussed throughout this Report, the Debtor's independent directors approved an inappropriate compensation package for Mullaney along with excessive discretionary bonuses. They were also aware of Mullaney's and Fuchs' practice of maintaining the payroll ledger, but permitted it anyway.

The independent directors were also aware that the arbitration between HelpMeSee and the Debtor had spanned the course of several years, but each admitted to discussing the status of the arbitration only briefly during Board meetings. None of the independent directors interviewed by the Examiner had an understanding of the contract terms at issue between HelpMeSee and the Debtor, let alone a strong understanding of the issues raised in the arbitration or the substantial added time and expense that resulted from the Debtor's approach to the discovery process related to the arbitration. Similarly, the Examiner questions the Board's authorizing the Debtor to pay the expenses related to Mullaney travelling to London in connection with the SmileTrain UK litigation.

Finally, it appears to the Examiner that the Board abrogated its responsibility to oversee the Debtor's fundraising practices both with respect to content and practices, its record keeping with respect to restricted funds, and with its accounting practices in general, placing undue reliance on Debtor's management.

## 2. Potential Defenses

Despite these shortcomings, however, the independent members of the Debtor's Board likely have a number of defenses to any breach of fiduciary duty claims the Debtor's estate might assert. As noted, under Delaware law "gross negligence" must be found.

Turning to a few of the more significant allegations, first with respect to Mullaney's compensation, the Board obtained the Pearl Meyer Report, which they maintain showed that the compensation package was reasonable under a totality of the circumstances. While their reliance may have been questionable, difficult issues of fact would arise with regard to whether the "gross negligence" standard would be satisfied.

Regarding the Arbitration, the Board can assert that it had the right reasonably to rely on the Debtor's management to apprise the Board of any issues relating to the arbitrations. Board minutes reflect discussions of the case, and Coneys was given legal fee invoices to review on a regular basis, and the record suggests that he did review and approve payment of each invoice.

Finally with respect to the Debtor's books and records, WonderWork did obtain regular audits from a "Big 4" firm, at least through fiscal year 2015, and there is evidence of communication between the director serving as the "audit committee" and the auditors.

## F. Claims Against Officers

The Examiner believes that the Debtor's estate has much stronger claims against Mullaney for breaching his fiduciary duties in his role as a director, and against both Mullaney and Fuchs as officers for, among other things, their practices in connection with Mullaney's expenditures, their

failures to appropriately ensure that the Debtor's financial statements did not include material misrepresentations and their shared responsibility for excessing and inappropriate spending of the Charity's funds. Under Delaware law, officers and key employees of a company owe certain fiduciary duties to the company that are similar to those of corporate directors. *Hampshire Group, Ltd. v. Kuttner*, No. 3607-VCS, 2010 Del. Ch. LEXIS 144, at *34-35 (Del. Ch. July 12, 2010). As a result, officers and key employees are "expected to pursue the best interests of the company in good faith (*i.e.,* to fulfill their duty of loyalty) and to use the amount of care that a reasonably prudent person would use in similar circumstances (*i.e.,* to fulfill their duty of care)." *Id.* at *35. Liability on a due of care claim against an officer or key employee requires proof that the individual acted with gross negligence. *Id.* at *36. When an officer is accused of facilitating the wrongful action by another, the court should "examine the officers' state of mind to determine whether they acted in bad faith for a purpose other than advancing the best interests of the corporation." *Id.* at *37. Finally, "[u]nlike directors, corporate officers cannot be shielded from personal liability by 8 Del. C. § 102(b)(7), which permits a corporation to offer such protection to directors in a corporate charter." *Id.* at *43.[487]

In *Hampshire Group, Ltd. v. Kuttner*, claims were brought against the company's chief financial officer, among other things, (1) approving additional compensation for the personal expenses of certain executives, and (2) improperly certifying the company's financial statements. *Id.* at *33-34. As part of agreements the company reached when acquiring a subsidiary, the executives in questions each had a $140,000 business expense allowance, which the company understood would be used for more lavish business expenses than the company would normally

---

[487]The Delaware General Corporation Law applies to nonprofit nonstock Delaware corporations as a result of section 114. *See* 8 Del. C. § 114; *Hockessin Cmty. Ctr., Inc. v. Swift*, 59 A.3d 437, 455-456 (Del. Ch. Oct. 5, 2012) (describing 8 Del. C. § 114 as a translator provision setting forth which provisions of the DGCL apply to all nonstock corporations and which of those provisions apply specifically to nonprofit nonstock corporations.).

reimburse. *Id.* at *82. Nevertheless, the expenses needed to be actual business expenses in order to be reimbursed. *Id.* In reality, the CFO permitted the executives to charge numerous personal expenses against the allowance. *Id.* at *83. To accomplish the scheme, the expenses on the executives' credit card statements would be put into the company ledger to make the charges appear all business-related. *Id.* The executives would then mark the credit card statement to denote expenses as business or personal. Personal expenses would then be recorded on separate handwritten expense logs, which did not facially reveal the personal nature of the expenses, but instead included a vague reference to the purpose such as "AMEX" and the amount of the expense. *Id.* at *84. The expense logs would be used to determine how much of the $140,000 allotment the executive had spent.

The Delaware Chancery Court found that the CFO had breached his fiduciary duty of loyalty to the company by allowing the executives to book personal expenses as business expenses because, in doing so, he consciously caused the company to violate the law. *Id.* at *89. When he became aware that the executives were not complying with the law, but failed to stop the practice, the CFO breached his duty of loyalty. *Id.* Moreover, as a result of the improper payment of personal expenses, the CFO consciously misstated the company's books and records and breached his duty of loyalty by certifying the company's financial statements without disclosing to the audit committee of the board what he knew. *Id.* at *124. The Delaware Chancery Court held:

> [W]hen a corporate officer is aware of financial misreporting that involves high-level management and that has evaded the corporation's auditors, and nonetheless certifies that he is not aware of any material weakness in the company's internal controls, he is making a false statement and failing to bring material information to the board, in breach of his duty of loyalty.

*Id.* at *124.

Similarly, in *Dweck v. Nasser*, a company's CEO caused the company to reimburse her over $172,000 in personal expenses and over $170,000 in unsubstantiated expenses which she claimed she thought was part of her compensation. *Dweck v. Nasser*, No. 1353-VCL , 2012 Del. Ch. LEXIS 7, at *55 (Del. Ch. Jan. 18, 2012). The CEO was jointly and severally liable to the company for repayment of the expenses along with the CFO, who had co-signed the reimbursement of the CEO's expenses without reviewing any of them. The Delaware Chancery Court held that, since it was the CFO's job to review the expenses and he consciously failed to do so, he had breached his duty of loyalty to the company. *Id.*

Here, Mullaney's and Fuchs' practice in maintaining the off the books, private ledger of Mullaney's "limbo pay" remarkably similar to the facts in *Hampshire Group, Ltd. v. Kuttner* and evidence their breaches of fiduciary duty of care and of loyalty to the Debtor. Mullaney and Fuchs both knowingly maintained the payroll ledger as a mechanism for making Mullaney's compensation appear less on the Debtor's Form 990s and Financial Statements than Mullaney actually received to the extent of over $700,000 on the Form 990s filed in connection with FY12 through FY15. This course of action has exposed the Debtor to potential claims by state and federal taxing authorities for intentionally misstating Mullaney's employment tax liability and the Debtor's financials.

The misstatements in the Debtor's Form 990s and Financial Statements relating to Mullaney's compensation also effectuated a fraud on donors, who often review a charity's Form 990s and financial statements in deciding whether to donate to a particular organization. Both Mullaney and Fuchs knew this fact. Fuchs carefully responded to email communications inquiring about Mullaney's compensation, and directed the staff to refer all such inquiries to her. Mullaney consciously decided not to make the Debtor's Form 990 and financial statements

available on the Debtor's website in an effort, in part, to conceal the extent of his compensation, which would have appeared to be only $475, 000 per year in any event.

In ensuring that the full extent of Mullaney's compensation would be concealed, Mullaney engaged in self-dealing for his own benefit in breach of his duty of loyalty to the Debtor. By facilitating Mullaney's concealment of his salary from the state and federal taxing authorities and the public, Fuchs exhibited her loyalty to Mullaney, which was fostered over a course of a fifteen year working relationship, over her loyalty to the Debtor. These actions are also indicative of a breach of duty of care by Mullaney and Fuchs as a reasonably prudent person simply would not knowingly expose another to potential tax claims and other damage to goodwill.

Likewise, a claim could also be made against Mullaney and Fuchs for their roles in allowing the spending of the entity's funds in appropriate expenditures. For example, Fuchs was paid a $20,000 signing bonus at the end of 2011 to induce her to drop her lawsuit against SmileTrain.

Similarly, while the statute of limitations may present a bar to any attempt by WonderWork to recapture some of the payments, other defenses that might be available to independent board members do not necessarily apply in the case of Mullaney or Fuchs. They can hardly assert reliance on "management" as a defense since they were management. And while reliance on outside auditors might provide some degree of comfort in some circumstances, as discussed above, it is far from clear that the auditors ever knew the full extent of the actions being taken, and in any case, they were entitled to rely on representation letters signed by Mullaney and Fuchs, which may in fact have been misleading, if not completely inaccurate.

### G. Claims Against SmileTrain and HelpMeSee

The Debtor may be able to assert colorable claims against SmileTrain and HelpMeSee based on tortious interference with business relations. To establish a claim for tortious interference with business relations under New York law, a plaintiff must prove: "(1) there was a business relationship with a third party; (2) defendants knew of that relationship and intentionally interfered with it; (3) defendants either acted 'solely out of malice' or used 'wrongful means;' and, (4) defendants' interference caused injury to the relationship with the third-party." *Freedom Calls Found. v. Bukstel*, No. 05 CV 5460 (SJ) (VVP), 2006 U.S. Dist. LEXIS 19685, at *64 (E.D.N.Y. Mar. 3, 2006) (citing *Carvel Corp. v. Noonan*, 350 F.3d 6, 17 (2d Cir. 2003)). "The pleading standard for a claim of interference with a prospective economic advantage has been described as 'extremely high.'" *Am. Nat'l Theatre & Acad. v. Am. Nat'l Theatre Inc.*, No. 05 Civ. 4535 (JGK), 2006 U.S. Dist. LEXIS 69420, at *5 (S.D.N.Y. Sept. 27, 2006) (citing *Astor Holdings, Inc. v. Roski*, No. 01 Civ. 1905, 2002 U.S. Dist. LEXIS 758, at *19 (S.D.N.Y. Jan. 17, 2002)).

For the third factor, the level of interference necessary to state a claim depends on whether the interfering party is a competitor or a non-competitor. *See Carvel Corp. v. Noonan*, 350 F.3d at 18. "If the plaintiff claims that a non-competitor interfered with its prospective economic relations, then the defendant should be liable where its interference was merely 'improper.'" *Freedom Calls Found. v. Bukstel*, 2006 U.S. Dist. LEXIS 19685, at *65 (quoting *Carvel Corp. v. Noonan*, 350 F.3d at 18). Factors evidencing improper interference include the "nature of the defendant's conduct, the defendant's motive, the interests of both parties, the social interests in competition and the sanctity of contract, the degree to which the defendant's conduct caused the interference, and the relationship between the parties." *Id.* at *65-66. Moreover, a defendant's conduct may be improper when "it is in 'violation of recognized ethical

codes for a particular area of business activity or of established customs or practices regarding disapproved actions or methods.'" *Id.* at *66 (quoting Restatement (Second) of Torts § 767). Conversely, if the plaintiff claims that a competitor has interfered with its prospective economic relations, liability will only result when the defendant employed "wrongful means", including "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not, however, include persuasion alone although it is knowingly directed at interference with the contract." *Id.* (citation omitted).

Like for-profit entities, nonprofit entities can also assert claims for tortious interference with prospective economic advantage. *See, e.g.*, *American Baptist Churches v. Galloway*, 271 A.D.2d 92, 97 (N.Y. App. Div. 1st Dep't May 9, 2000) (holding that a nonprofit can assert a claim for tortious interference with contractual relationships and prospective contractual relationships); *Freedom Calls Found. v. Bukstel*, 2006 U.S. Dist. LEXIS 19685, at *64 (same). The opinion in *Freedom Calls Found. v. Bukstel* is instructive in this regard. In that case, the plaintiff was a nonprofit that provided videoconferencing services to members of the armed forces and the defendant was a former employee and board member of the plaintiff that created a similar website to plaintiff's and purported to provide similar services as plaintiff. *Id.* at *3-6. After defendant was terminated, he contacted supporters and clients of plaintiff, stating that plaintiff had cancelled or threatened to cancel various videoconferences and that plaintiff's executive director had mistreated troops and their families and had embezzled money from plaintiff. *Id.* at *11-12. The court found these actions to be tortious under both the "improper conduct" and the less stringent "wrongful means" standard. *Id.* at *67. In particular, the court found that defendant had violated the ethical codes applicable to non-profit organizations.

## 1.    Improper Interference by SmileTrain

The Debtor has alleged that SmileTrain has interfered with the Debtor's business

relationships with several fundraising consultants and vendors, including Infogroup, a list broker,

Target MarkeTeam, a direct mail agency, and Direct Mail Processors, a caging company.  As a

result of this interference, the Debtor has alleged that these vendors will no longer work with the

Debtor.  The Debtor also produced a contract between SmileTrain and Target MarkeTeam,

which prohibits Target MarkeTeam from working with the Debtor while it provides services to

SmileTrain.  In relevant part, the contract provides in a section headed "Non-Compete":

> During the term of this Agreement and for a 12-month period
> immediately following the date of termination, TMT will not,
> directly or indirectly, on its own behalf . . .  become employed by,
> be engaged in, consult and provide services for, volunteer for, or
> provide any advice or services to the WonderWork organization or
> any other organization or entity controlled by or affiliated in any
> way with Brian Mullaney.

Target MarketTeam worked with the Debtor during FY13, but, according to Mullaney, resigned

unexpectedly in 2014, leaving the Debtor with no direct mail agency until January 2015 when

the Debtor hired CDR Fundraising Group ("CDR").  The Debtor has also alleged that SmileTrain

unsuccessfully attempted to interfere with its business relationship with CDR.  In addition to the

contract between SmileTrain and Target MarkeTeam, the Examiner did review certain emails,

Board meeting minutes and other correspondence suggesting that the Debtor has some basis for

alleging SmileTrain's interference with its various business relationships.

Substantial additional third party discovery and investigation would be necessary to

determine the nature and extent of SmileTrain's interference with the Debtor's business

relationships.  However, based on the preliminary discovery available to the Examiner, it appears

that the Debtor has a reasonable basis to assert a claim against SmileTrain for tortious interference with business relations based on improper conduct by a non-competitor.

Although it is also a nonprofit, SmileTrain is not a direct competitor to the Debtor. In general, SmileTrain's stated mission is to eradicate clefts while WonderWork's stated mission is to eradicate blindness and provide treatment for burns and clubfoot. Though a non-competitor to the Debtor, SmileTrain can nevertheless be liable for interfering with the Debtor's business relations if its actions were improper. In considering whether SmileTrain's actions were improper, the Court would evaluate the nature of SmileTrains's conduct, its motive, the interests of SmileTrain and the Debtor, the degree of interference, and the relationship between the parties. *See Freedom Calls Found. v. Bukstel*, 2006 U.S. Dist. LEXIS 19685, at *65 (quoting *Carvel Corp. v. Noonan*, 350 F.3d at 18). Applying the factors, it is clear that the relationship between SmileTrain, on the one hand, and the Debtor and Mullaney, on the other hand, is acrimonious, making SmileTrain's motives appear distasteful. If the Debtor's allegations are true, SmileTrain has exhibited a pattern of attempting to influence the Debtor's business relationships. Moreover, given that both SmileTrain and the Debtor are nonprofits, SmileTrain's actions, if true, are not economically motivated. Based on facts known to the Examiner and the allegations raised by the Debtor, the Debtor's estate may have a colorable claim against SmileTrain for its pattern of interfering with the Debtor's business relations.

### 2. Wrongful Conduct By HelpMeSee

The Debtor has also alleged that, in October 2014, HelpMeSee interfered with its relationships with various partners in India including (1) ███████████, (2) ███████████████, (3) ███████████████████, (4) ███████████████ (5) ███████████, (6) ████████████, (7) ██████████████, and (8) ███████████. The Debtor has alleged that HelpMeSee informed these partner hospitals that it

would not provide funding to them if they were also receiving funding from the Debtor, and the Examiner has reviewed certain emails to this effect. The Debtor also produced an affidavit from ██████████████████, the Project Head and Trustee of ██████████████ ██████, which ██████ details meetings and correspondence between himself and HelpMeSee representatives urging ████████████████ to form an exclusive partnership with HelpMeSee and to stop accepting funding from the Debtor. ██████████stated that HelpMeSee offered ██████ over $350,000 to form an exclusive partnership with it. ██████████ further stated that HelpMeSee informed him, in October 2014, that the Debtor was in poor financial shape, its donors were abandoning it, and that HelpMeSee would be obtaining a legal decision against the Debtor in five or six months that would require all hospitals that had received funding from the Debtor to pay the money back.

HelpMeSee and the Debtor are both charities that seek to eradicate cataract blindness, which makes them competitors to the extent that they both seek donations from a limited pool of donor funds for that purpose. Therefore, whether HelpMeSee's activities amount to tortious interference with the Debtor business relations depends on whether HelpMeSee's actions amount to "wrongful conduct." *See Freedom Calls Found. v. Bukstel*, 2006 U.S. Dist. LEXIS 19685, at \*65 (quoting *Carvel Corp. v. Noonan*, 350 F.3d at 18). The standard for wrongful conduct is higher than the improper conduct standard applied to noncompetitors. A court considering whether HelpMeSee engaged in wrongful conduct would consider whether HelpMeSee engaged in physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, or applied significant economic pressure. *See id.* at \*66.

Like with the allegations against SmileTrain, the Examiner's ability to fully investigate a potential claim of tortious interference with business relations against HelpMeSee was limited.

Significant additional third party discovery would be necessary to prove the claim. Nevertheless, based on the Examiner's review of available documentation, the Examiner has concluded that the Debtor has a colorable claim against HelpMeSee for tortious interference with business relations. The fact that both HelpMeSee and the Debtor are nonprofits is an important consideration in evaluating HelpMeSee's conduct and its purported threat to various partners of the Debtor not to provide funding if that partner also accepted funding from the Debtor. In large part, these partners rely on outside funding from charities to conduct their operations, so the attempt to exercise such economic pressure is particularly harmful. As the court in *Freedom Calls Found. v. Bukstel* observed, there are ethical codes applicable to non-profit organizations, which disapprove of the purported actions taken by HelpMeSee in pressuring hospitals that are in desperate need of funding to not accept grants from the Debtor. *See id.* at *67.

### 3. Other Claims

The Examiner considered whether a number of other potential claims against SmileTrain, HelpMeSee, and their common counsel would be viable, including for abuse of process and prima facie tort, based on their collective efforts in bringing numerous lawsuits aimed at undermining the Debtor's work, whether against the Debtor or Mullaney. HelpMeSee's expenditure of nearly $5.9 million in fees in the Arbitration to obtain an award of $8.3 million in damages suggests that it was motivated by something more than just obtaining damages. Similarly, SmileTrain's assistance in ensuring that HelpMeSee prevailed in the Arbitration, including the expenditure of substantial attorney's fees of its own suggests that it, too, had motives other than seeing a just resolution to the Arbitration. SmileTrain has also sued Mullaney on numerous occasions, leading to several costly settlements between the parties. Both HelpMeSee and SmileTrain issued cease and desist letters to the Debtor and Mullaney in connection with the Debtor's and Mullaney's purported use of their intellectual property. Once

the Debtor and Mullaney provided a response, both HelpMeSee and SmileTrain, again represented by the same counsel, seem to have dropped their arguments.  These actions exhibit a pattern aimed at undermining the Debtor's operations at substantial cost to all three charities.  To say that there is substantial hostility between the charities is understatement.  However, despite the collective effort on the part of those charities to undermine the Debtor the Examiner has concluded that any claim the Debtor might assert for abuse of process or prima facie tort against HelpMeSee, SmileTrain, and their common counsel would more likely than not be unsuccessful, and therefore an inappropriate drain on the Debtor's resources.

## XV.     EXAMINER'S RECOMMENDATIONS REGARDING CONTINUING THE DEBTOR'S BUSINESS

The Examiner Order also directed the Examiner to "otherwise perform [the] duties of [an] examiner set forth in 11 U.S.C.  § 1106(a)(3) and (4) of the Bankruptcy Code."  Examiner Order.  Dkt #105 at 3.

Section 1106(a)(3), in turn, requires a trustee (or examiner) to "investigate the acts, conduct, assets, liabilities and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business." (Emphasis Added)

The Examiner has tried to balance his findings regarding the operations of the Debtor against concerns related to damaging any good will associated with the Debtor's charitable work, and the most effective way to assure the Debtor's donor restricted assets are put to their proper and intended use.

The results of that balancing are (i) the Examiner's recommendation that the matter be referred to the New York State Attorney General for further action consistent with applicable New York laws and (ii) the Debtor's recommendation that the U.S.  Trustee exercise its

prerogative under 11 U.S.C. 1104(e) to move for the appointment of a Chapter 11 Trustee to administer the estate pending the determination of the Attorney General as to how to proceed.

### A.    Attorney General Referral

The Examination revealed serious concerns about the Debtor's fundraising, governance and financial practices that the Examiner believes warrant review by the New York State Attorney General.  The Examination showed that the Debtor, an Executive Law Article 7-A registrant, likely has (i) filed financial reports containing material inaccuracies with the New York State Attorney General (Exec. Law §172-d(1)), (ii) raised money from New Yorkers through false representations (Exec. Law §172-d(2)); (iii) solicited the public based on false or misleading fundraising materials (Exec. Law §172-d(3)); and (iv) failed to apply contributions in a manner substantially consistent with solicitations (Exec. Law §172-d(4)).

Though the Debtor is a Delaware Corporation, the New York State Attorney General may seek to assert jurisdiction over the Debtor based on the Debtor's activities in New York State, the fact that its corporate offices are in New York State and that it is registered with the Attorney General.  In such event, Mullaney and Fuchs, and potentially the Board of Directors, may be subject to claims by the Attorney General for breach of fiduciary duty under §717 and §720 of the Not-for-Profit Corporation Law for failing to maintain proper financial records, failing to comply with the terms of restricted gifts, failing to account for and track restricted donations, and for engaging in improper fundraising practices.  In addition Mullaney and Fuchs may be subject to additional duty of loyalty claims for structuring and perpetuating improper compensation and expense arrangements for personal benefit.  Should the Attorney General become involved, the Examiner believes it would have viable causes of action to pursue.

## B.     Appointment of a Trustee

Section 1104(e) of the Bankruptcy Code requires the U.S. Trustee to move for the appointment of a trustee "if there are reasonable grounds to suspect that current members of the governing body of the debtor, the debtor's chief executive or chief financial officer . . . participated in actual fraud, dishonesty, or criminal conduct in the management of the debtor or the debtor's public financial reporting." 11 U.S.C. § 1104(e). Section 1104(e) was added to the Bankruptcy Code in 2005, so there is sparse case law applying the requirement in practice. However, two decisions are instructive, and both were cases where a reasonable investigation of alleged actual fraud, dishonesty, or criminal conduct in the management of the debtor or the debtor's public financial reporting had not yet been conducted.[488]

In *In re Michigan BioDiesel, LLC*, the court entered an order to show cause regarding the appointment of a trustee or an examiner because the debtor was claiming eligibility for various alternative fuel tax credits, but the basis for seeking the tax credits appeared fraudulent to the court. *See In re Mich. BioDiesel, LLC*, 466 B.R. 413, 415 (Bankr. W.D. Mich. Oct. 31, 2011). While the U.S. Trustee said that it had a number of questions about the debtor's pursuit of the tax credits, it did not yet have enough information to believe that criminal conduct was at play warranting the appointment of a trustee pursuant to section 1104(e). *See id.* at 420. Accordingly, in lieu of a trustee, the court ordered the appointment of an examiner with relevant expertise on the tax credits at issue to investigate whether a trustee was necessary under 1104(a).

---

[488] The fact pattern for the remaining cases citing section 1104(e) involved a change in management shortly after or before bankruptcy, which raised questions about independence of the new management, but no trustee was ultimately appointed in those cases. *See, e.g.*, *In re 1031 Tax Group, LLC*, 374 B.R. 78 (Bankr. S.D.N.Y. 2007); *In re West End Fin. Advisors, LLC*, No. 11-11152 (SMB), 2012 Bankr. LEXIS 3045 (Bankr. S.D.N.Y. July 2, 2012); *In re Platinum Props. of Cent. Fla., Inc.*, No. 6:07-bk-04441-ABB, 2007 Bankr. LEXIS 4480 (Bankr. M.D. Fla. Nov. 16, 2007).

*See id.* at 421. Pending the examiner's report, the court left current management in place because the business was otherwise performing well under the circumstances. *Id.*

*In re American Natural Resources, LLC* is the only case located by the Examiner that considered the appointment of a trustee pursuant to section 1104(e) of the Bankruptcy Code based on the apparent fraud, dishonesty and criminal conduct of the debtor's current management as a result of a motion made by the U.S. Trustee. *In re Am. Natural Res., LLC*, No. 15-80355- TRC, 2015 Bankr. LEXIS 2403 (Bankr. E.D. Okla. July 21, 2015). In that case, a prepetition arbitration award found improprieties in the operation of the debtor's business in connection with a breach of contract claim, but did not go as far as finding tort or statutory liability. *Id.* at *14-15. Instead, the arbitration panel concluded that "the absence of good faith . . . does not, in every instance constitute fraud" and found that there was no "no occasion to find tort or statutory liability" on the facts. *Id.* The U.S. Trustee had not conducted its own investigation of the debtor, but relied on the arbitration award to make its motion for a trustee. *Id.* at *14. Since the debtor was working with a competent accountant and the debtor's management had demonstrated an intimate knowledge of the debtor's financial state and operations at the trial on the motion to appoint a trustee, the court concluded that no trustee should be appointed at that time. *Id.* at *17.

Here, unlike in *In re Michigan BioDiesel, LLC* and *In re American Natural Resources, LLC*, a fulsome investigation of the Debtor has been conducted by the Examiner. This investigation has revealed reasonable grounds for suspecting that the Debtor's current management, Mullaney and Fuchs, "participated in actual fraud, dishonesty, or criminal conduct in the management of the [D]ebtor or the [D]ebtor's public financial reporting." 11 U.S.C. § 1104(e). Mullaney and Fuchs knowingly under-reported Mullaney's tax liability, potentially

exposing the Debtor to claims by the IRS. Mullaney and Fuchs failed to properly account for and expend charitable donations as required by New York Non-for-Profit Law. In fact, a large portion of the Debtor's operations were conducted to pay for the substantial compensation packages paid to the Debtor's senior management. Under these circumstances, and because the Examiner is also recommending that the New York Attorney General conduct an investigation of the Debtor, the Examiner believes that there is enough information available to support a motion seeking the appointment of a trustee.

Submitted this 25th day of October, 2017.

_____
Jason R. Lilien, Court Appointed Examiner

14592424.11
228676-10002