# EXHIBIT 28

EXHIBIT

C-4

ALL-STATE LEGAL®



AGREEMENT

by and between

HELP ME SEE, INC.

and

SURGERY FOR THE POOR, INC.

August 31, 2011

WW 0006869

# TABLE OF CONTENTS

Page

## ARTICLE I

### DEFINITIONS

Section 1.1    Definitions ................................................................................................................. 1
Section 1.2    Other Terms ............................................................................................................. 5
Section 1.3    Interpretation ........................................................................................................... 5

## ARTICLE II

### APPOINTMENT OF MANAGER; SERVICES

Section 2.1    Appointment of Manager .......................................................................................... 5
Section 2.2    Services; Additional Services. ................................................................................... 5
Section 2.3    Standard ................................................................................................................... 6
Section 2.4    Change in Services ................................................................................................... 6
Section 2.5    Personnel ................................................................................................................. 6
Section 2.6    Limitations on Manager's Authority ......................................................................... 6
Section 2.7    Activities of the Manager ......................................................................................... 6
Section 2.8    Notice of Additional Activities ................................................................................. 6
Section 2.9    DMM Campaign Operations ..................................................................................... 7

## ARTICLE III

### PAYMENT FOR SERVICES

Section 3.1    Remuneration of Manager; Costs ............................................................................. 7
Section 3.2    Currency and Mode of Payment ............................................................................... 8
Section 3.3    Books and Records; Audit. ....................................................................................... 8

## ARTICLE IV

### CONFIDENTIALITY

Section 4.1    Disclosure and Use Restrictions ............................................................................... 8
Section 4.2    Authorized Uses ....................................................................................................... 8
Section 4.3    Authorized Disclosure .............................................................................................. 8

## ARTICLE V

### TERM AND TERMINATION

Section 5.1    Term ......................................................................................................................... 8
Section 5.2    Termination Generally ............................................................................................... 9
Section 5.3    Termination of the Manager ..................................................................................... 9
Section 5.4    Action Upon Termination ......................................................................................... 9

WW 0006870

## ARTICLE VI

### CUSTODY OF PROPERTY; INTELLECTUAL PROPERTY

Section 6.1   Custody of Money or Other Property ................................................. 10
Section 6.2   Intellectual Property Ownership .................................................... 10

## ARTICLE VII

### REPRESENTATIONS AND WARRANTIES; COVENANTS

Section 7.1   Party Representations and Warranties ............................................. 11
Section 7.2   Manager Representations and Warranties .......................................... 11
Section 7.3   Compliance with Laws; Best Efforts ............................................... 11
Section 7.4   Terms and Conditions .............................................................. 12
Section 7.5   Company Out-of-Pocket Expenses; Cap ............................................. 12
Section 7.6   Periodic Grants; One-Time Donation ............................................... 12
Section 7.7   Disclaimer ........................................................................ 13

## ARTICLE VIII

### INDEMNIFICATION

Section 8.1   Indemnification by Manager ....................................................... 13
Section 8.2   Indemnification Procedures ....................................................... 13
Section 8.3   Limitations on Liability ......................................................... 14
Section 8.4   No Duplication .................................................................... 14
Section 8.5   Company's Right of Offset ........................................................ 14
Section 8.6   Insurance ......................................................................... 15

## ARTICLE IX

### MISCELLANEOUS

Section 9.1    Notices. .......................................................................... 15
Section 9.2    Relationship; No Joint Venture ................................................... 15
Section 9.3    Binding Nature of Agreement; Successors and Assigns .............................. 15
Section 9.4    Entire Agreement ................................................................. 16
Section 9.5    Amendments ....................................................................... 16
Section 9.6    Governing Law .................................................................... 16
Section 9.7    Survival of Representations and Warranties ....................................... 16
Section 9.8    Waiver ........................................................................... 16
Section 9.9    Costs and Expenses pertaining to Agreement ...................................... 16
Section 9.10   Section Headings ................................................................. 16
Section 9.11   Counterparts ..................................................................... 16
Section 9.12   Severability ..................................................................... 16
Section 9.13   Dispute Resolution; Arbitration .................................................. 16
Section 9.14   Force Majeure .................................................................... 17
Section 9.15   Construction ..................................................................... 17

WW 0006871

# INDEX OF DEFINED TERMS

Page

AAA .................................................................................................................................... 17
Affiliate ................................................................................................................................. 1
Agreement ............................................................................................................................. 1
Ancillary Income .................................................................................................................. 2
Applicable Charity Bureau .................................................................................................. 2
Benchmark ............................................................................................................................ 2
Board .................................................................................................................................... 2
Business Day ......................................................................................................................... 2
Cap ........................................................................................................................................ 2
Code ...................................................................................................................................... 1
Company ............................................................................................................................... 1
Confidential Information ...................................................................................................... 2
Contractors ........................................................................................................................... 2
Copyrights ............................................................................................................................ 3
Costs ..................................................................................................................................... 2
Dispute .................................................................................................................................. 17
DMM Campaign ................................................................................................................... 3
DMM Campaign Contribution Income ................................................................................ 3
Effective Date ....................................................................................................................... 12
Estimated Costs .................................................................................................................... 7
Force Majeure Event ....................................................................................................... 3, 17
GAAP .................................................................................................................................... 3
Governmental Authority ....................................................................................................... 3
Indemnified Parties .............................................................................................................. 13
Indemnifying Party ............................................................................................................... 13
Intellectual Property ............................................................................................................ 3
Invoices ............................................................................................................................. 3, 8
Know-How ............................................................................................................................ 3
Law ....................................................................................................................................... 3
Losses ................................................................................................................................... 13
Management Fee ................................................................................................................... 4
Management Fee Installment ............................................................................................ 4, 7
Manager ................................................................................................................................ 1
Manager Personnel .............................................................................................................. 3
Mediation Rules ................................................................................................................... 17
Meet and Confer Period ....................................................................................................... 17
Meet and Confer Request ..................................................................................................... 17
Parties ............................................................................................................................... 1, 4
Party .................................................................................................................................. 1, 4
Patent .................................................................................................................................... 4
Patents .................................................................................................................................. 3
Performance Target .............................................................................................................. 4
Person ................................................................................................................................... 4
Representatives ..................................................................................................................... 4
Rules ..................................................................................................................................... 17
Senior Managers ................................................................................................................... 17
Separation Agreement .......................................................................................................... 4
Service .................................................................................................................................. 4
Services Schedule ................................................................................................................. 4

WW 0006872

Smile Train ............................................................................................................................................ 4
Software .......................................................................................................................................... 3, 4
Statements ........................................................................................................................................... 7
Target MarkeTeam ................................................................................................................................. 4
Term ................................................................................................................................................... 4
Third Party ........................................................................................................................................... 4
Third Party Claim ................................................................................................................................ 13
Three-Year Plan .................................................................................................................................... 5
TMT Agreement ..................................................................................................................................... 5
Trademarks ...................................................................................................................................... 3, 5
Work Product ....................................................................................................................................... 5

WW 0006873

This AGREEMENT (this "Agreement"), dated as of August 31, 2011, is entered into by and between HELP ME SEE, INC., a Delaware not for profit corporation (the "Company"), and SURGERY FOR THE POOR, INC., a Delaware not for profit corporation (the "Manager") (each, a "Party" and collectively, the "Parties").

## WITNESSETH:

WHEREAS, the Company is a not for profit charitable organization formed to eliminate global cataract blindness and is exempt from federal income tax under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code");

WHEREAS, the Manager is a not for profit charitable organization formed to provide surgery for indigent children and adults in developing countries and has applied for an exemption from federal income tax under Section 501(c)(3) of the Code according to the copy of the Internal Revenue Service 1023 application provided by the Manager;

WHEREAS, Brian Mullaney is the co-founder and former chief executive officer of Smile Train, and founder of the Manager;

WHEREAS, the Company desires to retain the Manager (together with certain key members of his former Smile Train personnel) to create, manage and monitor various fundraising and marketing programs as well as to provide strategic advice and services related to the Company's charitable programs in accordance with the terms and subject to the conditions set forth herein. The Manager will also manage various Contractors (as defined below) engaged in connection therewith, and perform certain ancillary services for the Company, subject to the direction and oversight of the Board (as defined below) in accordance with the terms and subject to the conditions set forth herein; and

WHEREAS, the Manager desires to create, manage and monitor various fundraising and marketing programs as well as to provide strategic advice and services related to the Company's charitable programs in accordance with the terms and subject to the conditions set forth herein. The Manager will also manage various Contractors (as defined below) engaged in connection therewith, and perform certain ancillary services for the Company, subject to the direction and oversight of the Board (as defined below) in accordance with the terms and subject to the conditions set forth herein; and

WHEREAS, the Manager is confident its engagement with the Company will enable the Company to accelerate the implementation and efficiency of the DMM Campaign.

NOW THEREFORE, in consideration of the premises and agreements hereinafter set forth, the parties hereto hereby agree as follows:

## ARTICLE 1

## DEFINITIONS

Section 1.1    Definitions.  As used in this Agreement, the following terms shall have the meanings set forth below.

"AAA" has the meaning set forth in Section 9.13(b).

"Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, that Person.

"Agreement" has the meaning set forth in the preamble.

WW 0006874

"Ancillary Income" means gross revenues (calculated in accordance with GAAP) generated by the Company in fundraising efforts unrelated to the DMM Campaign.

"Applicable Charity Bureau" means any bureau, commission, department or division of the state government, which has authority over the Services conducted by the Manager pursuant to this Agreement.

"Benchmark" has the meaning set forth in Section 7.6(a).

"Board" means the Board of Directors of the Company.

"Business Day" means any day except a Saturday, a Sunday or a day on which banking institutions in New York, New York are not required to be open.

"Cap" has the meaning set forth in Section 7.5.

"Code" has the meaning set forth in the recitals.

"Company" has the meaning set forth in the preamble.

"Confidential Information" means all confidential information and proprietary information provided to the Manager, its Affiliates or any of its or their Representatives, by or on behalf of the Company or a Third Party, or to which the Manager, its Affiliates or any of its or their Representatives, is provided with access. in connection with the Manager's obligations hereunder, including confidential and proprietary information relating to the Company, its charitable purposes, or the DMM Campaign, including customer information, actual and prospective donor lists and information included in any related databases, business plans, whether in oral, written, electronic or any other form, regardless of the manner in which it is furnished. For clarity, Confidential Information includes all analyses, compilations or other materials that include any Confidential Information prepared by the Manager, its Affiliates or any of its or their Representatives, whether or not prepared in connection with the DMM Campaign or any of the Services provided or proposed to be provided hereunder. Confidential Information shall not include information that the Manager can demonstrate, by written records or other competent proof, (i) is or hereinafter becomes generally available to the public, other than as a result of disclosure by the Manager, its Affiliates or Representatives or (ii) is or becomes available to the Manager, its Affiliates or Representatives on a non-confidential basis from a source (other than the Company, its Affiliates or Representatives) that is, to the knowledge of the Manager, not prohibited from disclosing such information to the Manager.

"Contractors" means, collectively, the Third Parties set forth in Annex B and any other Third Parties approved by the Board following the date hereof, that provide services to the Company on the Manager's behalf, in each case, in accordance with the terms hereof.

"Copyrights" has the meaning set forth in the definition of "Intellectual Property".

"Costs" means, collectively, and to the extent previously approved in writing by the Company, the out-of-pocket costs and expenses incurred by the Manager with respect to the Contractors engaged by the Manager in connection with providing the Services, including costs associated with the DMM Campaign mailings, certain of which are set forth in Annex B. For clarity, the Manager shall be fully responsible for any costs and expenses incurred by it, other than the Costs.

"Dispute" has the meaning set forth in Section 9.13(a).

"DMM Campaign" means the direct mail marketing campaign of the Company, including the list of Persons solicited or considered for solicitation (whether in person, by phone. by mail or otherwise) for the benefit of the Company.

2

WW 0006875

"DMM Campaign Contribution Income" means gross revenues (computed in accordance with GAAP), generated by or directly related to the DMM Campaign. For clarity, DMM Campaign Contribution Income excludes any donations or loans made directly to the Company and Ancillary Income.

"Effective Date" has the meaning set forth in Section 7.4.

"Estimated Costs" has the meaning set forth in Section 3.1(d).

"Force Majeure Event" has the meaning set forth in Section 9.14.

"GAAP" means generally accepted accounting principles in effect in the United States on the date such principles are applied, consistently applied.

"Governmental Authority" means any national, state, local or foreign government, any provincial, state, regional, local or other political subdivision thereof, any supranational organization of sovereign states and any department, commission, bureau, agency, authority, board or court, arbitrator, tribunal, arbitration panel, body or bureau or other instrumentality of the foregoing.

"Indemnified Parties" has the meaning set forth in Section 8.1.

"Indemnifying Party" has the meaning set forth in Section 8.2(a).

"Intellectual Property" means all intellectual property rights throughout the world, including all (i) patents, patent applications, invention disclosures, and all related continuations, continuations-in-part, divisionals, reissues, re-examinations, substitutions, and extensions thereof ("Patents"); (ii) trademarks, service marks, names, corporate names, trade names, domain names, logos, slogans, trade dress, design rights, and other similar designations of source or origin, together with the goodwill symbolized by any of the foregoing ("Trademarks"); (iii) copyrights and copyrightable subject matter ("Copyrights"); (iv) rights in computer programs (whether in source code, object code, or other form), algorithms, databases and technology supporting the foregoing ("Software"); (v) trade secrets and all other Confidential Information, ideas, know-how, inventions, processes, formulae, models, and methodologies ("Know-How"); (vi) rights of publicity, privacy, and rights to personal information; (vii) moral rights and rights of attribution and integrity; (viii) all applications and registrations for the foregoing and (ix) all rights and remedies against past, present, and future infringement, misappropriation, or other violation thereof.

"Invoices" has the meaning set forth in Section 3.1(e).

"Know-How" has the meaning set forth in the definition of "Intellectual Property".

"Law" means any law, statute, regulation, ordinance, rule, order, decree, judgment, consent decree or governmental requirement enacted, promulgated, entered into or imposed by any Governmental Authority.

"Losses" has the meaning set forth in Section 8.1.

"Manager" has the meaning set forth in the preamble.

"Manager Personnel" has the meaning set forth in Section 2.5.

"Management Fee" means the management fee in an aggregate amount equal to two (2) million dollars ($2,000,000).

"Management Fee Installment" has the meaning set forth in Section 3.1(b).

3

WW 0006876

"Mediation Rules" has the meaning set forth in Section 9.13(b).

"Meet and Confer Period" has the meaning set forth in Section 9.13(b).

"Meet and Confer Request" has the meaning set forth in Section 9.13(a).

"Party" or "Parties" has the meaning set forth in the preamble.

"Patents" has the meaning set forth in the definition of "Intellectual Property".

"Performance Target" means each of the performance targets established in connection with the Three-Year Plan set forth in Annex A.

"Person" means any natural person, corporation, partnership, association, limited liability company or any other legal entity.

"Representatives" means with respect to a Person, its directors, officers, managers, representatives, employees, independent contractors, agents, consultants or advisors (which includes financial advisers, accountants and legal counsel). For the purposes of this Agreement, the Contractors are Representatives of the Manager.

"Rules" has the meaning set forth in Section 9.13(c).

"Senior Managers" has the meaning set forth in Section 9.13(a).

"Separation Agreement" means the separation agreement by and between Smile Train, Inc. and Brian Mullaney dated as of October 14, 2010.

"Service" means each service the Manager is required to provide or cause the Contractor to provide to the Company hereunder.

"Services Schedule" means the schedule of Services set forth in Annex C.

"Smile Train" means collectively, (i) Smile Train, Inc., a well-known, direct mail-based not for profit charitable organization formed in New York and (ii) its Affiliates.

"Software" has the meaning set forth in the definition of "Intellectual Property".

"Statements" has the meaning set forth in Section 3.1(c).

"Target MarkeTeam" means Target MarkeTeam, Inc., the counterparty to the agreement (the "TMT Agreement") entered into by and between Target MarkeTeam and the Company, pursuant to which Target MarkeTeam will provide professional fundraising services in connection with the DMM Campaign.

"Term" has the meaning set forth in Section 5.1.

"Third Party" means any Person other than the Parties or their respective Affiliates.

"Third Party Claim" has the meaning set forth in Section 8.2(a).

"Three-Year Plan" means the three-year plan with respect to DMM Campaign mailings set forth in Annex A.

"Trademarks" has the meaning set forth in the definition of "Intellectual Property".

4

WW 0006877

"TMT Agreement" has the meaning set forth in the definition of "Target MarkeTeam".

"Work Product" has the meaning set forth in Section 6.2.

Section 1.2    Other Terms.  Other terms may be defined elsewhere in the text of this Agreement and, unless otherwise specifically indicated, shall have such meaning indicated in this Agreement.

Section 1.3    Interpretation.

(a)    The words "hereof", "herein", "hereto", "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement or Articles, Sections, Annexes, Exhibits and Schedules of the Agreement unless otherwise expressly specified.

(b)    The terms defined in the singular shall have a comparable meaning when used in the plural, and vice versa.  When a term is defined herein, each of its grammatical forms shall have a corresponding meaning.

(c)    The word "including" means "including but not limited to" or "including without limitation".

(d)    Reference to any Article, Section, Annex, Schedule or Exhibit are to those contained in, or appended to, this Agreement, and the expression "this Article" or "this Section" shall, unless followed by reference to a specific provision, be deemed to refer to the whole Article or Section, as the case may be, (not merely the sub-section, paragraph or other provision) in which the expression occurs.

(e)    With respect to the determination of any period of time, "from" means "from and including," "to" means "to but excluding" and "through" means "through and including".

(f)    The titles to Articles and headings of Sections contained in this Agreement have been inserted for convenience of reference only and shall not be deemed to be a part of or to affect the meaning or interpretation of this Agreement.

(g)    A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and permitted assigns.

(h)    A reference to any agreement includes any relevant part thereof.

## ARTICLE II

## APPOINTMENT OF MANAGER; SERVICES

Section 2.1    Appointment of Manager.  The Company hereby appoints the Manager to provide or cause the Contractors to provide the Services pursuant to the terms and subject to the conditions set forth in this Agreement and the Manager shall perform or cause the Contractors to perform all of the Services pursuant to the terms and subject to the conditions set forth (i) herein, (ii) in the applicable agreements between the Manager and the Contractors, each of which agreements shall be subject to the approval of the Company (which will not be unreasonably withheld or delayed) and (iii) in the TMT Agreement.

Section 2.2    Services; Additional Services.

(a)    The Manager shall provide or cause the Contractors to provide each Service to the Company in accordance with the Services Schedule and consistent with the Performance Targets set forth in the Three-Year Plan and the other terms of this Agreement.  The Manager shall not delegate any of its rights and responsibilities to any Third Parties other than the Contractors without the prior written consent of the Company.  The Manager shall provide the Company with

WW 0006878

regular updates of the progress of the Services and shall provide Representatives of the Company full access to inspect the results of any Services that are capable of being inspected.

(b)     The Manager shall not take any actions that are inconsistent with the description of the Services on the Services Schedule or send or authorize any other Person to send, any DMM Campaign mailing without the prior written consent of the Company. If, at any time during the Term, the Manager determines that any service not encompassed within the Services listed on the Services Schedule is necessary to improve the Services, the Manager may reasonably request in writing that the Company authorize the Manager to provide such service in accordance with the terms hereof. Following the Company's receipt of such a written request, the Parties shall negotiate in good faith the scope and Costs of such service and, if the Parties reach agreement with respect thereto, the Parties shall amend the Services Schedule, and, if necessary, this Agreement, to include such additional service as a Service.

Section 2.3     Standard. The Manager shall ensure that the Services are provided at a level, and at standards of quality, diligence and care, consistent with the level and standards that were customary during Brian Mullaney's tenure as chief executive officer of Smile Train during 2010; provided that such level and standards are sufficient to achieve or surpass the Performance Targets.

Section 2.4     Change in Services. The Manager shall continually evaluate and monitor the impact of market conditions on the Costs and efficacy of providing the Services and shall propose modifications, alterations or substitutions to the Services including, as appropriate, new communication and social networking technologies, to make the operation of the DMM Campaign more successful and more cost-efficient.

Section 2.5     Personnel. The Company shall have the right to approve the Persons designated, employed or assigned by the Manager to perform the Services; provided, however, that the Company shall be deemed to have approved Brian Mullaney, Delois Greenwood, Hana Fuchs, Karen Lazarus, and Mike Schell (together with all other Manager personnel, the "Manager Personnel") for the responsibilities set forth in Annex D.

Section 2.6     Limitations on Manager's Authority. The Manager will at all times be subject to the supervision and direction of the Board and will have only such functions and authority as the Company may delegate to it. The Manager shall not engage in any action (i) that violates the Company's conflict of interest policy (attached hereto as Annex E) or (ii) with its Affiliates or its or their officers, directors or employees unless the terms of the transaction are on an arm's length basis and on terms which are no less favorable to the Company than would have been obtained in a transaction with a Third Party (irrespective of whether such transaction would not violate the Company's conflict of interest policy).

Section 2.7     Activities of the Manager. The Manager shall not (and shall cause its Affiliates and its and their officers, directors or employees not to) provide advisory, direct mail marketing-related or any other services to any other Person whose corporate or charitable purpose, as applicable, relates to vision or eyesight, without the prior written consent of the Company. Without prejudice to Section 2.3, the Manager hereby agrees that the Company shall have the benefit of the Manager's best judgment and effort in rendering the Services or causing the Services to be rendered. The Manager shall not (and shall cause its Affiliates and its and their officers, directors or employees not to) undertake activities or enter into any arrangements, including any direct mail marketing-related or other fundraising initiatives, that, in the Manager's good faith judgment, could adversely affect the performance of its (and that of its Affiliates) respective obligations under this Agreement.

Section 2.8     Notice of Additional Activities. As of the effective date of this Agreement and for the six (6) month period thereafter, the Company shall be the Manager's only client. If, during the Term, the Manager is engaged by another Person to render direct mail marketing-related services or other services similar to the Services, the Manager shall promptly notify the Company. In such

WW 0006879

event, the Company shall have the right, in its sole discretion, to change any Service, including the content and/or any proposed date of any DMM Campaign mailing.

Section 2.9    DMM Campaign Operations. The Manager shall ensure that all solicitations in furtherance of the DMM Campaign specify that all correspondence and donations are for the exclusive benefit of the Company and that all contribution checks and/or credit card donations are addressed explicitly and exclusively to the Company. The Manager shall coordinate with and oversee the applicable Contractors responsible for caging operations. Such Contractors shall, among the other responsibilities set forth in Annex C under "DMM Campaign Caging and Cashiering", log donor information into a secure Company database. Within five (5) days of receipt, all gross revenue from donations received by the Manager and any such Contractors relating to the DMM Campaign shall be deposited by the Manager or the Contractors, as applicable, into a specified DMM Campaign account. Such account shall be under the Company's exclusive control. Under the Company's supervision, the Manager shall have access to the DMM Campaign account statements to permit the Manager to review and evaluate the performance of the DMM Campaign. In no event shall the Manager or any Contractor have the authority to withdraw funds from such DMM Campaign account.

## ARTICLE III

## PAYMENT FOR SERVICES

Section 3.1    Remuneration of Manager; Costs.

(a)    Subject to Sections 5.3, 5.4 and 7.5, during each year of the Term, the Company shall pay to the Manager the Management Fee, and reimburse the Manager for the Costs.

(b)    The Management Fee shall be payable in twelve (12), equal monthly installments of $166,666.66 (each, a "Management Fee Installment") on the first Business Day of every month, commencing on September 1, 2011. The Parties acknowledge that the Management Fee is intended to compensate the Manager for all of the costs and expenses of its Manager Personnel and any related overhead incurred in providing to the Company the Services rendered under this Agreement. For clarity, the Manager shall be solely responsible for all of its own customary, day-to-day operating expenses and routine expenses, which operating expenses shall be deemed to include travel within the United States.

(c)    The Manager shall submit statements (the "Statements") to the Company on a monthly basis setting forth the aggregate amount of DMM Campaign Contribution Income with respect to the preceding month. Each Statement shall include all documentation required under Section 3.3(a).

(d)    The Manager shall submit estimates with respect to projected Costs associated with the Services. The Company shall only be responsible for reimbursement of (i) estimated Costs (the "Estimated Costs") and (ii) Costs related to international travel that, in the case of clauses (i) and (ii), the Company shall have previously approved in writing. Subject to the limitations set forth in Section 7.5, the Company shall pre-pay those Estimated Costs in excess of $10,000 that the Company shall have previously approved in writing. Costs related to international travel shall be reimbursed in accordance with the terms and subject to the conditions set forth in Section 3.1(e).

(e)    The Manager shall submit invoices (the "Invoices") to the Company for the Services on a monthly basis setting forth the amount of Costs incurred by the Manager with respect to the preceding month. Each Invoice shall include a reasonably detailed summary of the Services rendered and the applicable Costs incurred as well as the documentation required under Section 3.3(a). During the Term, the Company shall pay the amount specified in each Invoice within forty five (45) days of receipt; provided that the Manager shall have provided the documentation required under Section 3.3(a) and that the Company does not dispute any of the amounts set forth therein.

WW 0006880

Section 3.2    Currency and Mode of Payment. The Company shall make all payments to the Manager required under this Agreement by electronic transfer of immediately available U.S. dollars to a bank account designated from time to time in writing by the Manager.

Section 3.3    Books and Records; Audit.

(a)    The Manager shall maintain complete, accurate and appropriate books, records and accounts relating to the performance of the Services contemplated hereunder. Such books, records and accounts shall fairly reflect the calculation of the DMM Campaign Contribution Income in each Statement delivered by the Manager to the Company under Section 3.1(c) and the Costs specified in each Invoice delivered by the Manager to the Company under Section 3.1(c) and shall be sufficiently detailed to permit the Company to verify such amounts.

(b)    Such books, records and accounts shall be maintained at the Manager's offices in New York, New York and shall be accessible for inspection and copy by the Company, its Affiliates and any of its or their Representatives at any time during normal business hours. The Manager shall retain the books of account and records until at least the seventh (7th) anniversary of the Term or such longer period as may be required by applicable Law.

## ARTICLE IV

## CONFIDENTIALITY

Section 4.1    Disclosure and Use Restrictions. Except as expressly provided herein, the Manager agrees that, for the Term and thereafter, it shall, and shall cause its Affiliates and its or their Representatives to, keep confidential and shall not publish or otherwise disclose and shall not use for any purpose any Confidential Information.

Section 4.2    Authorized Uses. The Manager shall not disclose any Confidential Information, in whole or in part, to any Person other than to its Affiliates and its or their Representatives who need to know such Confidential Information for the purpose of rendering the Services hereunder or with the prior written consent of the Company; provided, that such Persons shall be subject to confidentiality and non-use provisions at least equivalent in scope to those set forth in this Article IV and the Manager shall be liable for any failure by any such Persons to comply with the terms hereof.

Section 4.3    Authorized Disclosure. Nothing herein shall prohibit the Manager from disclosing Confidential Information pursuant to an order of a court or other Governmental Authority or as required by applicable Law; provided, however, that the Manager provides the Company with reasonable, advance written notice thereof so that the Company may seek an appropriate protective order and/or waive the Manager's compliance with the provisions of this Agreement. If, failing the entry of a protective order or the receipt of a waiver hereunder, the Manager is, in the opinion of counsel, required to disclose Confidential Information, the Manager may disclose only that portion of such Confidential Information that its counsel advises the Manager is legally required to furnish; provided, further, however, that the Manager agrees to exercise its best efforts to obtain reliable assurance that confidential treatment will be accorded such information.

## ARTICLE V

## TERM AND TERMINATION

Section 5.1    Term. This Agreement shall become effective on September 1, 2011. This Agreement shall continue in operation until September 1, 2016 (the "Term"), unless this Agreement is terminated in accordance with Sections 5.2 or 5.3, or the Term is extended pursuant to an agreement of the Parties.

8

WW 0006881

Section 5.2    Termination Generally. Without prejudice to other remedies which may be available to the Parties by Law or under this Agreement, this Agreement may be terminated at any time by the mutual written consent of the Parties.

Section 5.3    Termination of the Manager.

(a)    At the option of the Company, in its sole discretion, and at any time during the Term, this Agreement shall terminate upon thirty (30) days' written notice of termination from the Board to the Manager, without prejudice to any other rights or remedies which may be available to the Parties, if:

(i)    the Manager shall commit a material breach of any provision of this Agreement, which such material breach continues uncured for a period of thirty (30) days after written notice of such breach (or, with respect to breaches of a nature that cannot be cured within such thirty (30)-day period, if the Manager does not commence and diligently continue substantive actions to cure such breach during the thirty (30)-day period);

(ii)    any fact, circumstance or event arises that is related to or involves Mr. Charles Wang, Smile Train and/or his or their Representatives that impairs or that, in the Company's good faith discretion, could impair the ability of the Manager (or any of the Manager Personnel) from devoting its (or their) full time, attention and/or abilities to the performance of its (or their) obligations under this Agreement (including, publication of potentially adverse publicity involving the Manager and/or any Manager Personnel or the commencement of any proceeding or action); or

(iii)    the Manager shall commit any act of fraud, misappropriation of funds, or embezzlement or shall be grossly negligent in the performance of its duties under this Agreement.

(b)    If any of the events specified in Sections 5.3(a)(ii) or 5.3(a)(iii) shall occur, the Manager shall give prompt written notice thereof to the Board.

(c)    Without prejudice to Section 5.3(a), at the option of the Company and at any time after the initial twelve (12) months of the Term, this Agreement shall terminate upon six (6) months' written notice of termination from the Board to the Manager, without prejudice to any other rights or remedies which may be available to the Parties.

Notwithstanding anything to the contrary contained herein, at the option of the Company following the filing of this Agreement by the Manager with the Applicable Charity Bureau, this Agreement may be terminated within the time frame prescribed under applicable Law.

Section 5.4    Action Upon Termination.

(a)    From and after the date of termination of this Agreement pursuant to Sections 5.2 or 5.3, the Manager shall not be entitled to compensation for further Services or have any other rights under this Agreement or any claims against the Company arising out of this Agreement; provided, however, that in the event of termination under Sections 5.2 or 5.3, the Manager shall be entitled to payment of any accrued, but unpaid Management Fee Installments and Costs incurred up to the date of termination.

(b)    Upon termination of this Agreement under Sections 5.2 or 5.3, the Manager shall forthwith:

WW 0006882

     (i)      pay over to the Company all money, if any, collected and held for the account of the Company pursuant to this Agreement;

     (ii)     deliver to the Board a full accounting, including a statement showing all payments collected by it and a statement of all money held by it, covering the period following the date of the last accounting furnished to the Board with respect to the Company;

     (iii)    deliver to the Board, at the Manager's sole cost and expense, all property, records, documents and materials of the Company (whether or not such records, documents or materials were created by the Manager, its Affiliates and/or its and/or their Representatives in connection with the Services), including all Confidential Information and Work Product then in the custody of the Manager, its Affiliates and/or its and/or their Representatives; and

     (iv)     donate the amounts referred to in Section 7.6.

     (c)     The following provisions of this Agreement, together with all other provisions of this Agreement that expressly specify that they survive, shall survive the expiration or earlier termination of this Agreement: Article IV (Confidentiality), this Article V (Term and Termination), Article VI (Custody of Property; Intellectual Property), Sections 7.2 through 7.7 and Article IX (Miscellaneous).

## ARTICLE VI

### CUSTODY OF PROPERTY; INTELLECTUAL PROPERTY

     Section 6.1     Custody of Money or Other Property. The Manager agrees that all money or other property of the Company held by the Manager, its Affiliates and/or its and/or their Representatives shall be deemed held by the Manager as custodian for the Company, and the Manager's records shall be appropriately and clearly marked to reflect the ownership of such money or other property by the Company.

     Section 6.2     Intellectual Property Ownership. Any and all Intellectual Property developed or conceived by the Manager, its Affiliates or its or their Representatives in connection with, or during the performance of the Services, and tangible embodiments thereof, (collectively, the "Work Product") shall be owned solely by the Company and any copyrightable works included in such Intellectual Property shall be considered a "work made for hire" owned by the Company to the fullest extent permitted by Law. To the extent any such right, title or interest is assigned to the Manager, its Affiliates or its or their Representatives, the Manager hereby irrevocably and perpetually assigns, and shall cause its Affiliates and its and their Representatives, to irrevocably and perpetually assign, such right, title and interest to the Company. Without limiting the foregoing, the rights assigned to the Company in the Work Product pursuant to this Section 6.2 include the right to register the Intellectual Property included in such Work Product throughout the world in the Manager's name or otherwise and the right to publish, license, exploit, sell, create derivative works of and otherwise dispose of such all Work Product. The Manager hereby waives, and shall cause its Affiliates and its and their Representatives to waive, all rights of attribution and moral rights with respect to any Work Product. The Manager, without charge to the Company (other than reasonable out-of-pocket expenses), shall execute, acknowledge, and deliver to the Company all further papers, including applications for patents and copyrights, and shall take all further actions, as the Company may reasonably request to enable the Company to register, publish, record, protect, defend, or enforce or assert its rights in any Work Product worldwide and to vest title to such Work Product in the Company or its nominees, their

WW 0006883

successors or assigns. At the Company's reasonable request and expense, the Manager shall assist the Company in any proceeding or litigation involving the Work Product.

## ARTICLE VII

## REPRESENTATIONS AND WARRANTIES; COVENANTS

**Section 7.1** Party Representations and Warranties. Each Party represents and warrants that: (i) it has all requisite corporate power and authority to enter into and deliver, and consummate the transactions contemplated by, this Agreement, including the authority to execute and deliver any other documents and instruments to be executed and delivered by it in connection with this Agreement; (ii) the execution, delivery and performance of this Agreement by such Party and the consummation by such Party of the transactions contemplated by this Agreement, have been duly authorized by all necessary action on the part of such Party; and (iii) this Agreement constitutes a legal, valid and binding obligation of such Party, enforceable against such Party in accordance with its terms.

**Section 7.2** Manager Representations and Warranties. The Manager represents and warrants that it does not, and its officers, directors and employees do not, have any outstanding agreement or obligation, whether written or oral (including the Separation Agreement) that is in conflict with any of the provisions of this Agreement, or that would preclude the Manager, and its officers, directors and employees, from fully complying with the provisions hereof, and further certifies that the Manager, and its officers, directors and employees, will not enter into any such conflicting agreement during the Term. The Manager represents and warrants that it does not, and will not, in the performance of the Services and its obligations under this Agreement, employ any information-gathering methods that will use any confidential or proprietary information of any Third Party and that the performance of the Services and the Work Product (and all portions thereof) will not infringe or otherwise violate the Intellectual Property rights of any Third Party. The Manager further represents and warrants that it will not seek to learn, and that it will not disclose to the Company, any Third Party trade secrets or confidential or proprietary information in the performance of the Services and its obligations under this Agreement. The Manager shall take all physical and information security measures consistent in scope and quality with the manner in which such measures were taken during Brian Mullaney's tenure as chief executive officer of Smile Train in 2010, but in no event less than reasonable measures, and in accordance with the Company's policies, standards, and guidelines related to privacy, protection of personally identifiable information, and information and system security, which standards, policies and guidelines were provided to the Manager prior to the execution of this Agreement. The Manager acknowledges that the Company may make additions, changes and adjustments during the Term to such physical and information security measures in the ordinary course of its business and in order to comply with applicable Laws and regulatory guidelines.

**Section 7.3** Compliance with Laws; Best Efforts.

(a) The Manager shall maintain in full force and effect all necessary licenses, permits and other authorizations required by all applicable Laws to carry out its obligations under this Agreement. The Manager shall be in compliance with all Laws applicable to its activities under this Agreement, including compliance with all state charitable solicitation rules applicable to it and will not engage any Contractor that is not in compliance with the state charitable solicitation requirements, and shall keep all records and reports required to be kept by applicable Laws.

(b) The Manager agrees to devote its best efforts to the performance of its obligations under this Agreement. In furtherance of the foregoing, the Manager agrees to actively and diligently solicit donations, including by soliciting former Smile Train donors. The Manager further acknowledges and agrees that the Manager's voluntary or involuntary failure to comply with any of the covenants set forth in this Agreement shall constitute a material breach.

WW 0006884

(c)     For the purposes of Section 5.3(a), the Company shall have the right to terminate this Agreement upon thirty (30) days' written notice by the Company to the Manager, whether or not the Manager is able to or has commenced and diligently continued substantive actions to cure a breach of this Section 7.3.

Section 7.4    Terms and Conditions. The Manager agrees that it shall not render advisory, direct mail marketing or any other services similar to the Services to any other Person upon terms that are more favorable than the terms granted by the Manager to the Company under this Agreement. If the Manager enters into any subsequent agreement (the date of such subsequent agreement, the "Effective Date") with any other Person during the Term that provides for benefits or terms more favorable than those contained in this Agreement, then this Agreement shall be deemed automatically amended as of the Effective Date, without any further action of the Parties, to provide the Company with benefits and terms at least as favorable as those provided by the Manager to such other Person under such more favorable agreement and the terms provided therein. The Manager shall promptly give the Company written notice on the Effective Date of the existence of such more favorable agreement.

Section 7.5    Company Out-of-Pocket Expenses; Cap. The Manager acknowledges and agrees that during the first thirteen (13) months of the Term, the Company shall satisfy the payment to the Manager of the Management Fee Installments and the Costs by drawing the applicable amounts from a line of credit. The Company's satisfaction of one Management Fee Installment plus the Costs shall not exceed two million one hundred thousand dollars ($2,100,000) (the "Cap"). The Manager further acknowledges and agrees that the Company's written approval shall be required prior to incurring any obligations in excess of the Cap and that the Company shall be entitled to offset the payment of subsequent Management Fee Installments and/or reimbursement of Costs by the amounts incurred by the Manager in excess of the Cap (including amounts incurred following Company approval). Following the expiration of such thirteen (13) month period, the Parties agree to evaluate the capital requirements of the Company and to discuss in good faith any arrangements which may be necessary to provide the Manager with additional capital.

Section 7.6    Periodic Grants; One-Time Donation.

(a)     During each year of the Term, if the Manager makes a charitable grant of any portion of the Manager's unrestricted funds to a not for profit charitable organization other than the Company, the Manager shall also make a charitable grant to the Company. Within thirty (30) days following each such 12-month period, the Manager shall determine the aggregate amount of all charitable grants that the Manager shall have made to each not for profit charitable organization. The amount owed by the Manager to the Company shall be based on the highest aggregate amount donated by the Manager to any one not for profit charitable organization during the applicable twelve (12) month period (the "Benchmark").

(b)     Within thirty (30) days after the above thirty (30) day period, the Manager shall pay to the Company an amount equal to or greater than the Benchmark. The Manager shall pay such charitable grant to the Company by wire transfer of immediately available U.S. dollars to an account designated by the Company from time to time, which amounts so distributed to the Company will be used in furtherance of the Company's charitable purposes.

(c)     The Manager shall donate two million dollars ($2,000,000) to the Company on or before September 1, 2016. If the Manager is terminated under Section 5.3 or this Agreement is otherwise terminated prior to September 1, 2016, for any reason, the Manager shall only be responsible for a percentage of such donation, based on that period of the Term that shall have passed, calculated through the date of termination. For clarity, if, for example, this Agreement is terminated as of September 1, 2015, the Manager shall pay the Company four-fifths of the two million dollars, or one million six hundred thousand dollars ($1,600,000).

12

WW 0006885

Section 7.7   Disclaimer. EXCEPT AS EXPRESSLY PROVIDED IN THIS ARTICLE VII, NEITHER PARTY, ITS AFFILIATES NOR ANY OF ITS OR THEIR REPRESENTATIVES, MAKES OR HAS MADE ANY REPRESENTATION OR WARRANTY, AND HEREBY EXPRESSLY DISCLAIMS ALL OTHER REPRESENTATIONS AND WARRANTIES, EXPRESS OR IMPLIED, WRITTEN OR ORAL, AT LAW OR IN EQUITY, IN CONNECTION WITH THIS AGREEMENT, INCLUDING WITH RESPECT TO THE SERVICES.

## ARTICLE VIII

### INDEMNIFICATION

Section 8.1   Indemnification by Manager. Subject to the terms and conditions set forth herein, from and after the date hereof, the Manager hereby agrees to indemnify the Company, its Affiliates and their respective officers, directors, employees and agents, in each case, when acting in such capacity (collectively, the "Indemnified Parties") against, and agrees to hold them harmless from, any loss, liability, claim, damage or expense, excluding punitive, special, multiple-based, consequential or other similar damages (collectively, "Losses"), to the extent directly arising or resulting from, in respect of or involving: (i) any breach of any representation, warranty or covenant by the Manager, (ii) any of the Contractors and any of the services performed by any of the Contractors, (iii) any of the Manager Personnel (whether or not related to their respective roles at the Manager or their former roles and/or termination of employment with Smile Train (including, to the extent applicable, the Separation Agreement, and any other agreement, whether written or oral, between any of the Manager Personnel and Smile Train)), (iv) any Third Party Claim that the performance of the Services and/or any Work Product infringes, misappropriates or otherwise violates the Intellectual Property rights of any Third Party, and (v) gross negligence, willful misconduct or bad faith of the Manager in connection with any activities under or related to this Agreement, including, with respect to the Manager's obligations to indemnify the Indemnified Parties.

Section 8.2   Indemnification Procedures.

(a)   In order for an Indemnified Party to be entitled to any indemnification provided for under this Agreement directly arising or resulting from, in respect of or involving a claim made by any Person against the Indemnified Party (a "Third Party Claim"), such Indemnified Party must notify the Manager (the "Indemnifying Party") in writing (and in reasonable detail) of the Third Party Claim within thirty (30) Business Days after receipt by such Indemnified Party of notice of the Third Party Claim; provided, however, that failure to give such notification shall not affect the indemnification provided under this Agreement except to the extent the Indemnifying Party shall have been actually and materially prejudiced as a result of such failure. Thereafter, the Indemnified Party shall deliver to the Indemnifying Party promptly after the Indemnified Party's receipt thereof, copies of all notices and documents (including court papers) received by the Indemnified Party relating to the Third Party Claim.

(b)   If a Third Party Claim is made against an Indemnified Party, the Indemnifying Party shall be entitled to participate in the defense thereof as set forth in this Section 8.2(b). The Indemnifying Party shall have the right to elect (by notice to the Indemnified Party within fifteen (15) days after the date it receives notice of the Third Party Claim) to defend such Third Party Claim on behalf of the Indemnified Party, at the Indemnifying Party's sole cost and expense and with counsel reasonably satisfactory to the Indemnified Party. If the Indemnifying Party assumes such defense, the Indemnified Party shall have the right to participate in the defense thereof and to employ counsel, at its own cost and expense, separate from the counsel employed by the Indemnifying Party, it being understood that the Indemnifying Party shall control such defense. If the Indemnifying Party chooses to defend or prosecute a Third Party Claim, the applicable Indemnified Parties shall reasonably cooperate in the defense or prosecution thereof. Such cooperation shall include the retention and (upon the Indemnifying Party's request) the provision to the Indemnifying Party of records and information that are reasonably relevant to such Third Party Claim, and making

13

WW 0006886

Representatives reasonably available on a mutually convenient basis to provide additional information and explanation with respect to matters reasonably related to such Third Party Claim. If the Indemnifying Party assumes the defense of a Third Party Claim, the Indemnified Party shall be entitled to agree to any settlement, compromise or discharge of a Third Party Claim that the Indemnifying Party may recommend which by its terms (x) involves payment of monetary damages by the Indemnifying Party only and (y) releases the Indemnified Party completely.

(c)     If any Indemnified Party has or could have a claim against the Indemnifying Party under Section 8.1 that does not involve a Third Party Claim, the Indemnified Party shall deliver notice of such claim with reasonable promptness to the Indemnifying Party, but in any event not later than thirty (30) Business Days after the Indemnified Party determines that it has or could have a claim for indemnification under this Agreement, stating the amount of Loss, if known, and method of computation thereof, and containing a specific reference to the provisions of this Agreement in respect of which such right of indemnification is claimed or arises. The failure by any Indemnified Party to so notify the Indemnifying Party shall not relieve the Indemnifying Party from any indemnification obligation that it may have under Section 8.1, except to the extent that the Indemnifying Party is actually and materially prejudiced by such failure. If the Indemnifying Party disputes that it has an indemnification obligation with respect to such claim, the Indemnifying Party shall deliver notice of such dispute within ten (10) Business Days of receipt of notice of such claim from the Indemnified Party, and the failure to deliver notice of such dispute within the ten (10)-day period shall be deemed as an acceptance of such claim by the Indemnifying Party. The Indemnifying Party and the Indemnified Party shall proceed in good faith to negotiate a resolution of such dispute for a period of twenty (20) Business Days following the receipt by the Indemnified Party of such dispute notice. If the Indemnified Party and the Indemnifying Party have not resolved such dispute during such time period through good faith negotiations, such dispute shall be resolved in accordance with the provisions of Section 9.13.

(d)     The payment of any amount due by the Indemnifying Party to an Indemnified Party under this Section 8.2 shall be made by electronic transfer of immediately available U.S. dollars to a bank account designated by the Indemnified Party within thirty (30) days of the date when the amount of the Indemnifying Party's liability shall have been finally determined pursuant to either a settlement agreement, court decision or arbitral award in accordance with Section 9.13.

Section 8.3     Limitations on Liability.

(a)     Any liability for indemnification hereunder shall be determined without duplication of recovery by reason of the state of facts giving rise to such liability constituting a breach of more than one representation, warranty, covenant or agreement.

(b)     Any indemnification payments under this Agreement shall be net of any insurance proceeds or any indemnity, contribution or other similar payment received by the Indemnified Party or its Affiliates from any Third Party with respect thereto, net of any costs and expenses related to the recovery of such proceeds and the cost of any applicable insurance premiums. In the event that an insurance or other recovery is received by any Indemnified Party with respect to any indemnification payment for which any such Person has been indemnified under this Agreement, then a refund equal to the aggregate amount of the recovery with respect to such indemnification payment shall be made promptly to the Indemnifying Party.

Section 8.4     No Duplication.     Notwithstanding anything to the contrary herein, no Indemnified Party shall be entitled to make a claim for indemnification under both this Agreement and any other agreement with respect to the same Losses that are related to or arise, directly or indirectly, out of a particular event, circumstance or loss.

Section 8.5     Company's Right of Offset.     The Company shall have the option, in its sole discretion, to deduct any Losses incurred by the Company, from any and all amounts due from the Company to the Manager under this Agreement.

14

WW 0006887

Section 8.6    Insurance.  During the Term, the Manager shall maintain (i) a general liability insurance policy in such amount as is customary in the industry and (ii) a life insurance policy on the life of Brian Mullaney, which policy shall be in a face amount of at least six million dollars ($6,000,000) and name the Company as beneficiary.  Each of such policies shall be issued by a financially sound and reputable insurer, and the Manager shall timely pay all premiums and other amounts required to maintain such policies in full force and effect and such policies shall cover all claims made, if any, following the termination of this Agreement to the extent such claims relate to occurrences during the Term.

## ARTICLE IX

## MISCELLANEOUS

Section 9.1    Notices.

(a)    All notices, requests and demands to or upon the Parties to be effective shall be in writing (including by electronic mail), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered, or three (3) Business Days after being deposited in the mail, postage prepaid, or, in the case of notice by electronic mail, when received, addressed as follows (or to such other address as may be hereafter notified by the Parties):

The Company:

HELP ME SEE, INC.
1560 Broadway, Suite 406
New York, NY 10036
Attention:     Mohan Jacob Thazhathu
Fax:           (212) 221-7604
Email:         mjthazhathu@helpmesee.org

The Manager:

SURGERY FOR THE POOR, INC.
c/o Copilevitz and Canter, LLC
300 West 20th Street, Suite 300
Kansas City, Missouri 64108
Attention:     Doris Rieke
Fax:           (816) 472-5000
Email:         drieke@cckc-law.com
               brian@surgery4thepoor.org

Section 9.2    Relationship; No Joint Venture.  The Manager shall act as an independent contractor and not an employee or agent of the Company, nor are the Company and the Manager partners or joint venturers with each other and nothing herein shall be construed to make them such partners or joint venturers or impose any liability as such on either of them.  The Manager shall not have any authority to bind, obligate or represent the Company.

Section 9.3    Binding Nature of Agreement; Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns.  Except as otherwise expressly set forth herein, neither Party may sell, transfer, assign, license, sublicense, delegate, pledge or otherwise dispose of, whether voluntarily, involuntarily, by operation of Law or otherwise, this Agreement or any of its rights or obligations under this Agreement, in whole or in part, without the prior written consent of the other Party, which consent may not be unreasonably withheld or conditioned.

15

WW 0006888

Section 9.4   Entire Agreement.  This Agreement contains the entire agreement and understanding among the Parties with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements, understandings, inducements and conditions, express or implied, oral or written, of any nature whatsoever with respect to the subject matter hereof.

Section 9.5   Amendments.  This Agreement, may not be amended, supplemented or otherwise modified except by an instrument in writing executed by the Parties.

Section 9.6   Governing Law.   THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

Section 9.7   Survival of Representations and Warranties.   All representations and warranties made hereunder, and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement.

Section 9.8   Waiver.  The failure of any Party to enforce any condition or part of this Agreement at any time shall not be construed as a waiver of that condition or part, nor shall it forfeit any rights to future enforcement thereof.  Any term, covenant, representation, warranty or condition set forth herein may be waived only by written instrument executed by the Party waiving compliance.

Section 9.9   Costs and Expenses pertaining to Agreement.  Each Party shall bear its own costs and expenses (including the fees and disbursements of counsel and accountants) incurred in connection with the negotiations, preparation and execution of this Agreement, and all matters incident thereto.

Section 9.10   Section Headings.  The section and subsection headings in this Agreement are for convenience in reference only and shall not be deemed to alter or affect the interpretation of any provisions hereof.

Section 9.11   Counterparts.  This Agreement may be executed by the Parties in separate counterparts, each of which shall be considered one and the same agreement and shall become effective when a counterpart of this Agreement shall have been signed by both Parties.

Section 9.12   Severability.  If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions completed by this Agreement is not affected in any manner materially adverse to any Party.  Upon such determination, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner so that the transactions contemplated by this Agreement are consummated as originally contemplated to the fullest extent possible.

Section 9.13   Dispute Resolution; Arbitration.

(a)   In the event of any dispute arising out of or in connection with this Agreement, including, in respect of any alleged breach hereof, any disputed termination of this Agreement or any dispute as to the validity of any provision of this Agreement (any of the foregoing, a "Dispute"), senior management representatives of each Party (the "Senior Managers"), as soon as reasonably practicable and in any event no later than twenty (20) days after a written request ("Meet and Confer Request") from a Party, shall meet and endeavor to resolve such Dispute.

WW 0006889

(b)     In the event that any Dispute remains unresolved for any reason thirty (30) days after a Party's written request for a meeting pursuant to Section 9.13(a) (the "Meet and Confer Period"), the Parties agree to submit the Dispute to mediation under the Commercial Mediation Rules of the American Arbitration Association ("AAA") then in effect (the "Mediation Rules") before a single neutral mediator. The mediator shall be agreed upon by the Parties within ten (10) days of expiration of the Meet and Confer Period or appointed by the AAA in accordance with the Mediation Rules.

(c)     In the event that any Dispute remains unresolved for any reason sixty (60) days after expiration of the Meet and Confer Period, such Dispute shall be referred to and finally resolved by arbitration under the Commercial Arbitration Rules of Arbitration of the AAA (the "Rules"), which Rules are deemed to be incorporated by reference into this Section 9.13(c), and which arbitration shall be administered by the AAA. There shall be a single arbitrator, agreed to by the Parties within twenty (20) days of the service on respondent of the demand for arbitration, or in default thereof appointed by the AAA using the listing, ranking and striking method in the Rules. The arbitration shall be held and the award shall be issued in New York, NY, USA. The award shall be final and binding on the Parties, and judgment upon the award rendered by arbitrators may be entered and enforced in any court having competent jurisdiction.

Section 9.14     Force Majeure. Any delays in performance by any Party under this Agreement shall not be considered a breach of this Agreement if and to the extent caused by occurrences beyond the reasonable control of the Party affected, including acts of God, embargoes, restrictions of a Governmental Authority, fire, flood, earthquake, hurricanes, storms, tornadoes, explosion, riots, wars, acts of terrorism, civil disorder, failure of public utilities or common carriers, labor disturbances, rebellion or sabotage (each, a "Force Majeure Event"). The Party suffering the occurrence of a Force Majeure Event shall notify the other Party as soon as practicable of such Force Majeure Event and the period for which the delay in performance is expected to continue. In the event of a Force Majeure Event, the time for performance hereunder shall be extended by the actual time of delay caused by such Force Majeure Event; provided that the Party suffering such Force Majeure Event uses reasonable efforts to mitigate any such delay, including by using reasonable efforts to procure an alternative method by which its obligations under this Agreement might be performed. The Party giving such notice shall thereupon be excused from such of its obligations under this Agreement as it is thereby disabled from performing, and shall have no liability for such non-performance, for so long as it is so disabled and for thirty (30) days thereafter. Where a Force Majeure Event is reasonably foreseeable, the Party affected shall use reasonable efforts to mitigate or prevent the effects of such foreseeable Force Majeure Event in light of the nature of such Force Majeure Event and the amount of time reasonably available to it to prepare.

Section 9.15     Construction. The Parties acknowledge that each Party and its counsel have reviewed and revised this Agreement and that any rule of construction to the effect that any ambiguities are to be resolved against the drafting Party shall not be employed in the interpretation of this Agreement.

[remainder of page intentionally left blank]

WW 0006890

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

HELP ME SEE, INC.

By: _____

Name: JAMES T. UELTSCH.

Title: CHAIRMAN/TREASURER

SURGERY FOR THE POOR, INC.

By: _____

Name:

Title:

18

WW 0006891

THREE-YEAR PLAN

| | DMM MAILINGS | DMM DONORS | DMM CAMPAIGN CONTRIBUTION INCOME (IN $) | MANAGEMENT FEE (IN $) | DMM CAMPAIGN INCOME (IN $) | ANCILLARY REVENUE[2] (IN $) | TOTAL NET REVENUE (IN $) |
|---|---|---|---|---|---|---|---|
| 1 | 12,951,959 | 118,516 | $6,022,609 | $2,000,000 | ($1,834,363) | $1,110,000 | ($724,363) |
| 2 | 23,361,342 | 271,056 | $13,872,150 | $2,000,000 | $1,927,858 | $1,110,000 | $3,037,858 |
| 3 | 36,503,594 | 483,944 | $22,846,420 | $2,000,000 | $5,848,669 | $1,110,000 | $6,958,669 |

A-1

The projections set forth in this Annex A take into account the Costs associated with the DMM Campaign that will be incurred by the Company. Such DMM Campaign-related Costs are set forth in Annex B.

The Manager's Services shall include fundraising initiatives other than the DMM Campaign that the Manager projects will generate additional revenue.

WW 0006892

COSTS[3]

For clarity, the ultimate selection and engagement of the Contractors is subject to negotiations and approval by the Company.

| SERVICE PROVIDER | SERVICES PROVIDED | PROJECTED COSTS | | | | |
|---|---|---|---|---|---|---|
| | | YEAR 1 | YEAR 2 | YEAR 3 | YEAR 4 | YEAR 5 |
| Target MarkeTeam | DMM Campaign Vendor | | | | | |
| R.R. Donnelley & Sons Company | Printing | Included in direct mail costs. | Included in direct mail costs. | Included in direct mail costs. | | |
| Mediaspace Solutions | Advertising | $200,000 | $200,000 | $200,000 | | |
| InfoCision | Telemarketing | $60,000 | $60,000 | $60,000 | | |
| Direct Mail Processors, Inc. | Data input | | | | | |
| Public Interest Data, Inc. | Donor Database | | | | | |

---

[3] DMM Campaign costs are not currently set forth in this table. Aggregate DMM Campaign costs projected for the first three years are as follows: $5,856,972; $9,944,292 and $14,997,351, respectively.

WW 0006893

## SERVICES SCHEDULE

The Manager shall be responsible for the Services and any other services that become Services pursuant to the terms of this Agreement, including:

### DMM CAMPAIGN

(i) advise the Company with respect to DMM Campaign criteria and develop strategic guidelines for presentation to and approval by the Board;

(ii) advise the Company in connection with DMM Campaign-related decisions to be made by the Board;

(iii) provide its knowledge, experience and donor information to implement and operate nationwide, direct mail marketing campaigns for the DMM Campaign;

(iv) identify and analyze the most comprehensive and efficient direct mail donor lists that are available for rent in order to develop a proprietary targeted direct mail list model with significantly less overhead costs;

(v) test multiple direct mail marketing strategies to establish a "control" model that may be scaled to larger volumes, and restructure the DMM Campaign to protect against "control fatigue";

(vi) coordinate and supervise, on behalf of the Company (at the Company's expense), the applicable Contractors that will design, print and mail the direct mail marketing materials and such other related services as may be required to implement the DMM Campaign;

(vii) supervise Target MarkeTeam; and

(viii) provide and operate a call center to respond to donor requests, questions and complaints with respect to the Company and the DMM Campaign.

### DMM CAMPAIGN CAGING AND CASHIERING

(i) coordinate with the applicable Contractors to pickup and deliver the Company's DMM Campaign-related mail from the applicable post office to the Manager's office and thereafter, return the empty mail bags to the applicable post office daily;

(ii) immediately reconcile any discrepancies in the business reply mail counts with the applicable post office and obtain credits, on behalf of the Company, for such discrepancies;

(iii) record and coordinate with the applicable Contractors to record, in the Company's secure, "donor" database, all direct mail responses including the donor's name and address, as well as the amount of the donation received and whether it was sent by cash or check;

(iv) verify and audit the donor information recorded (including the amount of each donation received) daily;

WW 0006894

(v)    coordinate with the applicable Contractors to update the deposit logs and scan information with respect to direct mail responses and payments in the Company's secure "deposit log" database; and

(vi)    coordinate with the applicable Contractors to deposit the donations into the Company's designated DMM Campaign account.

## RELATIONSHIPS WITH CONTRACTORS

(i)    arrange periodic meetings between the Company and each Contractor to review each such Contractor's performance and associated fees and expenses, as well as plans and projected fees and expenses for future projects.

## INITIAL PRODUCTS AND MATERIALS

(i)    design and coordinate with the applicable Contractors to create state-of-the-art marketing materials (including direct mail materials, videos and PowerPoint presentations, as well as a documentary film and other media) upon the request of the Company;

(ii)    send a professional photographer or photojournalist to Company-approved developing countries to take high-impact photographs for use in all Company materials and/or solicitations; and

(iii)    design the Company's website and coordinate and supervise, on behalf of the Company (at the Company's expense), the applicable Contractors that will create, build and manage the website so that the Company can receive electronic donations and provide information to prospective donors, partners, advocates and others.

## MARKETING, ADVERTISING AND PUBLIC RELATIONS

(i)    investigate, analyze and select potential marketing opportunities for Board approval;

(ii)    create and produce a direct response advertising campaign for the Company;

(iii)    test and analyze the effect of various forms of advertising, including print, television and digital media, on the level of donations received;

(iv)    coordinate with the applicable Contractors to purchase discounted advertising to provide visibility for and build the Company's brand image; and

(v)    hire and manage the relationship with a reputable public relations firm that will handle the Company's relationship with the media, including journalists nationwide.

## CORPORATE AND FOUNDATION FUNDRAISING

(i)    create a grant application program substantially similar to that designed for Smile Train by Brian Mullaney during his tenure as chief executive officer of Smile Train, together with any improvements made to such grant application program, which program will provide mailings, grant reports and grant renewal applications to corporations and foundations.

## FINANCIAL ACCOUNTING, REPORTING AND SOFTWARE

WW 0006895

(i)     prepare consolidated billing statements and pay the Contractors on behalf of the Company (assuming the Company does not contest, in good faith, any amount billed), for work that was approved by the Company;

(ii)     implement general ledger procedures and policies substantially similar to those used by Smile Train during Brian Mullaney's tenure as chief executive officer of Smile Train, which procedures and policies will include maintaining a record of the Company's accounts and providing the Company with accurate financial statements and regular progress reports; and

(iii)     review and recommend financial software programs that will provide the Company with updated access to its financial data, and have reporting and auditing functions.

WW 0006896

RESPONSIBILITIES OF MANAGER PERSONNEL

| NAME OF MANAGER PERSONNEL | TITLE OF MANAGER PERSONNEL | RESPONSIBILITIES |
|---|---|---|
| Brian Mullaney | President and Chief Executive Officer | Providing leadership for the Company's DMM Campaign and overseeing the successful implementation of all Services. |
| Delois Greenwood | Chief Operating Officer | Assisting the Company with establishing treatment and training programs. |
| Hana Fuchs | Chief Financial Officer | Managing and maintaining the Company's finances and accounts. |
| Karen Lazarus | Senior Manager | Communicating between the Company and the Contractors regarding all of the Company's operations, including arranging meetings, getting approvals and ensuring that all Services are implemented on time and at the agreed upon costs. |
| Mike Schell | Creative Director | Creating and designing, with the assistance of the Contractors, the Company's brochures, videos, and any other of the Company's marketing materials. |
| TBD | Donor Relations Manager | Manage and maintaining HMS Donor Relations. |

WW 0006897

## COMPANY'S CONFLICT OF INTEREST POLICY

### ARTICLE I

#### PURPOSE

The purpose of the conflict of interest policy is to protect this tax-exempt organization's (the "Organization") interest when it is contemplating entering into a transaction or arrangement that might benefit the private interest of an officer or director of the Organization or might result in a possible excess benefit transaction. This policy is intended to supplement but not replace any applicable state and federal laws governing conflict of interest applicable to nonprofit and charitable organizations.

### ARTICLE II

#### DEFINITIONS

1.   Interested Person

Any director, principal officer, or member of a committee with governing board delegated powers, who has a direct or indirect financial interest, as defined below, is an interested person.

2.   Financial Interest

A person has a financial interest if the person has, directly or indirectly, through business, investment, or family:

a.   An ownership or investment interest in any entity with which the Organization has a transaction or arrangement,

b.   A compensation arrangement with the Organization or with any entity or individual with which the Organization has a transaction or arrangement, or

c.   A potential ownership or investment interest in, or compensation arrangement with, any entity or individual with which the Organization is negotiating a transaction or arrangement.

Compensation includes direct and indirect remuneration as well as gifts or favors that are not insubstantial.

A financial interest is not necessarily a conflict of interest. Under Article III, Section 2, a person who has a financial interest may have a conflict of interest only if the appropriate governing board or committee decides that a conflict of interest exists.

### ARTICLE III

#### PROCEDURES

1.   Duty to Disclose

In connection with any actual or possible conflict of interest, an interested person must disclose the existence of the financial interest and be given the opportunity to disclose all material facts to the directors and members of committees with governing board delegated powers considering the proposed transaction or arrangement.

2.   Determining Whether a Conflict of Interest Exists

After disclosure of the financial interest and all material facts, and after any discussion with the interested person, he/she shall leave the governing board or committee meeting while the determination of a conflict of interest is discussed and voted upon. The remaining board or committee members shall decide if a conflict of interest exists.

WW 0006898

3. Procedures for Addressing the Conflict of Interest

a. An interested person may make a presentation at the governing board or committee meeting, but after the presentation, he/she shall leave the meeting during the discussion of, and the vote on, the transaction or arrangement involving the possible conflict of interest.

b. The chairperson of the governing board or committee shall, if appropriate, appoint a disinterested person or committee to investigate alternatives to the proposed transaction or arrangement.

c. After exercising due diligence, the governing board or committee shall determine whether the Organization can obtain with reasonable efforts a more advantageous transaction or arrangement from a person or entity that would not give rise to a conflict of interest.

d. If a more advantageous transaction or arrangement is not reasonably possible under circumstances not producing a conflict of interest, the governing board or committee shall determine by a majority vote of the disinterested directors whether the transaction or arrangement is in the Organization's best interest, for its own benefit, and whether it is fair and reasonable. In conformity with the above determination it shall make its decision as to whether to enter into the transaction or arrangement.

4. Violations of the Conflicts of Interest Policy

a. If the governing board or committee has reasonable cause to believe a member has failed to disclose actual or possible conflicts of interest, it shall inform the member of the basis for such belief and afford the member an opportunity to explain the alleged failure to disclose.

b. If, after hearing the member's response and after making further investigation as warranted by the circumstances, the governing board or committee determines the member has failed to disclose an actual or possible conflict of interest, it shall take appropriate disciplinary and corrective action.

## ARTICLE IV

### RECORDS OF PROCEEDINGS

The minutes of the governing board and all committees with board delegated powers shall contain:

a. The names of the persons who disclosed or otherwise were found to have a financial interest in connection with an actual or possible conflict of interest, the nature of the financial interest, any action taken to determine whether a conflict of interest was present, and the governing board's or committee's decision as to whether a conflict of interest in fact existed.

b. The names of the persons who were present for discussions and votes relating to the transaction or arrangement, the content of the discussion, including any alternatives to the proposed transaction or arrangement, and a record of any votes taken in connection with the proceedings.

## ARTICLE V

### COMPENSATION

a. A voting member of the governing board who receives compensation, directly or indirectly, from the Organization for services is precluded from voting on matters pertaining to that member's compensation.

b. A voting member of any committee whose jurisdiction includes compensation matters and who receives compensation, directly or indirectly, from the Organization for services is precluded from voting on matters pertaining to that member's compensation.

253551

WW 0006899

c. No voting member of the governing board or any committee whose jurisdiction includes compensation matters and who receives compensation, directly or indirectly, from the Organization, either individually or collectively, is prohibited from providing information to any committee regarding compensation.

## ARTICLE VI

### ANNUAL STATEMENTS

Each director, principal officer and member of a committee with governing board delegated powers shall annually sign a statement which affirms such person:

a. Has received a copy of the conflicts of interest policy,

b. Has read and understands the policy,

c. Has agreed to comply with the policy, and

d. Understands the Organization is charitable and in order to maintain its federal tax exemption it must engage primarily in activities which accomplish one or more of its tax-exempt purposes.

## ARTICLE VII

### PERIODIC REVIEWS

To ensure the Organization operates in a manner consistent with charitable purposes and does not engage in activities that could jeopardize its tax-exempt status, periodic reviews shall be conducted. The periodic reviews shall, at a minimum, include the following subjects:

a. Whether compensation arrangements and benefits are reasonable, based on competent survey information, and the result of arm's length bargaining.

b. Whether partnerships, joint ventures, and arrangements with management organizations conform to the Organization's written policies, are properly recorded, reflect reasonable investment or payments for goods and services, further charitable purposes and do not result in inurement, impermissible private benefit or in an excess benefit transaction.

## ARTICLE VIII

### USE OF OUTSIDE EXPERTS

When conducting the periodic reviews as provided for in Article VII, the Organization may, but need not, use outside advisors. If outside experts are used, their use shall not relieve the governing board of its responsibility for ensuring periodic reviews are conducted.

253551

WW 0006900

# EXHIBIT 29



**SURGERY**
**FOR THE**
**POOR**



EXHIBIT
**C-65**

ALL-STATE LEGAL®

January 31, 2012

Messrs. Jim Ueltschi &
     Mohan Jacob Thazhathu
HelpMeSee
1560 Broadway
Suite 406
New York, NY 10036

Dear Jim and Mohan,

I am happy to present you with a donation of $239,550!

This money comes from donations we have received from friends and supporters who are eager to support our new venture, Surgery For The Poor, and our efforts to solve the problem of the needlessly blind.

Please use this money to pay for cataract surgeries.

Hopefully this is the first of many donations Surgery For The Poor will be able to make to support the good work of HelpMeSee.

All the best,

Brian
Co-Founder & CEO
212-729-1855

---

SURGERY FOR THE POOR INC
430 9TH AVE
NEW YORK, NY 10018-2700

1074

DATE 1/31/12

PAY TO THE ORDER OF _Help Me See_      $ 239,550.00

_Two hundred thirty nine thousand five hundred & fifty_ DOLLARS

HSBC ✕
The world's local bank

FOR _____

WW 0006926

# EXHIBIT 30

**Subject:** many thanks
**Date:** Friday, February 17, 2012 5:15:48 PM Eastern Standard Time
**From:** Brian Mullaney
**To:** James Ueltschi



Hi Jim,

Thank you so much for your very generous hospitality this week. You and Jean are great hosts, a lot of fun, and very kind to be so nice to us. We both really enjoyed spending time with you.

I must tell you I feel horrible that you are not feeling better about our results so far. I can tell you that we have done everything we can as quickly as we can and as well as we can. The contract should have explicitly stated a testing period but to be honest that contract took so long and has so many mistakes in it I stopped paying attention to it. It is very screwed up.

I don't need a contract to do a great job for you, I told you we would, and we are.

Over the next few months you will see.

I appreciate your help and advice in dealing with Mohan. He is a handful. I will do my best to get along with him and work together as productively as possible.

Thanks again for everything.

B.

Brian Mullaney
Co-Founder
Surgery For The Poor
420 Fifth Avenue, 27th Floor
New York, New York 10018
email brian@surgery4thepoor.org
tel 646-558-3768
cell 917-902-7550
www.surgery4thepoor.org



TIME magazine named Surgery For The Poor one of "10 Ideas That Can Change The World"

WW 0005667

# EXHIBIT 31



| From: | Mohan Jacob Thazhathu <mjthazhathu@helpmesee.org> |
|---|---|
| Sent: | Saturday, March 3, 2012 6:55 PM |
| To: | jim@helpmesee.org |
| Subject: | Brian's legal challenges |

Jim

I am glad that at least one isse is off the table between Brian and HMS. I am surprised about his legal challenges. I thought Greg was giving Brian legal advice. Looks like he still have unresolved legal issues with SmileTrain and Wang.

Mohan

HelpMeSee

Tel: +1 212 221 7633
Fax: +1 212 221 7604
www.helpmesee.org

HelpMeSee, Inc. is a nonstock, not for profit, public tax-exempt corporation, under US IRS 501 (c)(3).

**From:** Brian Mullaney [mailto:brian@surgery4thepoor.org]
**Sent:** Friday, March 02, 2012 4:23 PM
**To:** James Ueltschi
**Cc:** mjthazhathu@helpmesee.org
**Subject:** Re: you're doing well!

Hi Jim,

■ gave $600. This shows the importance of letters that are personal and not signed by more than one person – they really do make a difference and thank you Mohan for approving our new thank you letters. We re-designed the fridge photos we are sending to donors so they look nothing like Smile Train's "Child Of The Month." The email from Priscilla Ma was pure harassment in my opinion and our lawyers. That being said, I am tired of Wang making my life miserable to I am meeting with my personal lawyers Monday to see what if anything I can do to get him off our backs and our of our hair. He is very threatened that we will be successful and will keep doing whatever he can to try and undermine our efforts.

I emailed Tori first thing this morning actually asking if she is available sometime the next two weeks, I will keep you posted on that.

We received 315 envelopes today and yesterday which is a lot, our appeals are supposed to be slowing down so I am very optimistic about the numbers we will share with you next week. I believe all three letters that we remailed are performing quite well. I spoke with Ron yesterday and he says our revised scale up plane is very aggressive and quick but "doable." We will get Ron and Donna on the phone for our meeting on the 12th so they can give you their opinion themselves.

That;s it for now.

Have a good weekend. As always, if there is anything you wish to discuss do not hesitate.

B.

**From:** James Ueltschi <jim@helpmesee.org>
**Date:** Fri, 2 Mar 2012 10:42:01 -0500
**To:** Brian Mullaney <brian@helpmesee.org>
**Cc:** "mjthazhathu@helpmesee.org" <mjthazhathu@helpmesee.org>
**Subject:** Re: you're doing well!

Nice. How much did ■ give?

When are you and Tori going meet the other donor?

Jim

On Mar 2, 2012, at 8:30 AM, Brian Mullaney <brian@surgery4thepoor.org> wrote:

> Fyi....
>
> **From:** ███████████████████████
> **Date:** Thu, 1 Mar 2012 16:37:21 -0800
> **To:** Brian Mullaney <brian@helpmesee.org>
> **Subject:** you're doing well!
>
> Dear Brian,
> Your thank you letter came today, and I am impressed and pleased.
> A personal thank you means a lot to me, and makes me feel even
> more interested in the work you are doing. I give because God
> blesses me and makes it possible for me to share; knowing the gift
> helps others and is appreciated warms my heart.
> Thank you for the "personal touch". It goes a long way.
> I wish you great success helping the blind have the marvelous gift of
> sight!
> Blessings to you and your work,
>
> ███████████████

HMS0060639

# EXHIBIT 32



EXHIBIT

C-179

ALL-STATE LEGAL®

**From:** Mohan Thazhathu <mjthazhathu@helpmesee.org>
**Sent:** Tuesday, February 21, 2012 9:04 PM
**To:** 'DeVerter Harry' <HDeVerter@bairweller.com>
**Subject:** FW: clearing up any and all confusion - S4TP proposal to revise the HelpMeSee agreement

Harry
Please see Brian's e-mail and my recommendation to Jim. Can we please talk when you get a few minutes?
Mohan

Mohan Jacob Thazhathu
President and CEO
**HelpMeSee**

1560 Broadway| 46th Street
Suite 406 | New York
New York 10036-1537

Tel: +1 212 221 7633
Fax: +1 212 221 7604
www.helpmesee.org

HelpMeSee, Inc. is a nonstock, not for profit, tax exempt corporation under US IRS 501(c)(3).

**From:** Mohan Thazhathu [mailto:mjthazhathu@helpmesee.org]
**Sent:** Tuesday, February 21, 2012 3:33 PM
**To:** James Ueltschi
**Subject:** FW: clearing up any and all confusion - S4TP proposal to revise the HelpMeSee agreement

Jim

I believe, we need some hard thinking on this. Essentially Brian's claim is that the agreement is flawed and inoperable. We cannot acknowledge or accept his claim that the agreement is one sided as he claims it to be. Essentially S4TP proposes to revise the agreement without changes in prices or reduced fee payments regardless of:
   Substantially reduced level and quality of services.
   Performance level similar or equivalent to any DM service provider, such as TMT, extension of breakeven months to 22 and such.

If so, should we not go back to the drawing board and revise the agreement? I am more comfortable with revising the agreement with the Test phase added as separate and renegotiating the fee structure without the premium values that we expected from Brian.

Mohan
**HelpMeSee**

Tel: +1 212 221 7633
Fax: +1 212 221 7604
www.helpmesee.org

HelpMeSee, Inc. is a nonstock, not for profit, tax exempt corporation under US IRS 501(c)(3).

**From:** Brian Mullaney [mailto:brian@surgery4thepoor.org]
**Sent:** Tuesday, February 21, 2012 1:48 PM

To: James Uebtsch; Mohan Thazhathu
Cc: Brian Mullaney
Subject: clearing up any and all confusion

Hi,

This original chart below will explain the major discrepancies between the plans we presented last week and Mohan's complaints that we are way behind schedule.

As I explained to you both Friday, the schedule with direct mail targets and goals that is in our contract omitted a very important line in Ron Bell's projections called TEST.

This was not an oversight or omission as the number of donors, mail volume and revenues were intentionally added to Year 1. No SFTP fees were included during this Test period for some reason. Again, this was not a mistake but intentional. I do not know if Mohan or Sherri is responsible for the chart in the contract but it is clearly deeply flawed and it was not done by Ron Bell or Donna. The original was done by IMT and then someone who added our fees made other significant changes.

Please note that Assumption #9 explicitly states that a "short year" of test mailings would precede Year 1. It also states that it would take about 2,000,000 test letters to find a control. We have found your control in much less time and for much less money. We are counting our first four months as our TEST year and using calendar year 2012 as our TEST year and that Year 1 began September 1st. Going forward, we need to agree on what Year 1 is.

Add up the numbers in this chart below also and you will find many other mistakes. Whomever manipulated this Ron Bell chart was sloppy.

While the contract was being developed over 5 long months, I mentioned to Mohan on many occassions that much of the information that was being requested and/or included was inaccurate, inane or both. Virtually all of my comments were ignored. I could spend hours taking you through the rest of the issues but there is no point because of better or worse. You remember, that we asked for the opportunity to re-draft the contract and remove most of the nonsense but were told in August, after 5 months, take it or leave it. Against our lawyer's advice, we signed this contract because we believed in the cause and our ability to do a good job.

I must say that the spirit of the contract and intent, that we build you a direct mail program as good or better than what we built at Smile Train is what guides us and that we are right on target. We hired all the Smile Train employees and vendors that we promised and our control so far is markedly better than the Smile Train control. We are doing everything we promised we would do, as quickly as humanly possible. Add the TEST year to this schedule and you will see that we are not behind– we are ahead of schedule. We are not as good as Smile Train - so far we are better.

Since September 1st when we started work, we have worked as quickly and efficiently as possible. We are very proud of our results to date and excited about the scale up plan we presented last week. Our plan promises to deliver tens if millions of dollars in incremental revenue over the original plan in the contract.

I have asked Mohan to meet with us to go over all the numbers in or plan so we can all agree on the targets, timing, budget, etc. During this meeting we can re-hash this contract dispute as well although it is not a very productive use of our time as for better or worse, this is the contract we signed and must abide by.

As we discussed Friday, I asked Barbra if the deficit cap was in any way delaying our scale up plans at all and she said if you would grant us permission to exceed the cap one month earlier than when it expires, we would like to add a mailing of 1 million letters to August which would buy us a month. You can make this decision in May or June as to whether you wish to pursue this or not.

I hope that we can clear the air with all of this confusion and put this behind us so we can work together, as partners, and help the 20 million blind children and adults who are depending on us.

If is stupid to fight over this, especially when our test numbers came in so well. We are on target, on track and on schedule to create the world's largest blindness charity.

If you wish to discuss this I'd be happy to.

Brian

Help Me See Program Launch
Three Year Projection – Premium & Nonpremium Acquisition
Proposed to be Managed by Surgery For The Poor - March 2011

| Total Mailing | Total Donors | New Donors | Active Donors | # Gifts | Gifts/ Donor | Avg Gift | Revenue/ Donor | Total Revenue | DMM Operating Cost | SFTP Mgmt. Fees | Total Cost | Net DMM Income |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

CONFIDENTIAL

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TEST | 2,000,000 | 9,600 | 9,600 | 9,600 | 9,600 | 1.00 | $42.00 | $42.00 | $42.00 | $403,200 | $916,000 | $2,000,000 | $7,856,972 | ($1,834,362) |
| Year 1 | 10,951,959 | 108,916 | 86,116 | 89,476 | 126,587 | 1.16 | $44.39 | $62.80 | $5,619,409 | $4,940,972 | $2,000,000 | $11,944,292 | $1,927,858 |
| Year 2 | 23,361,342 | 271,056 | 162,140 | 194,897 | 290,875 | 1.49 | $47.69 | $71.18 | $13,872,150 | $9,944,292 | $2,000,000 | $16,997,751 | $5,848,669 |
| Year 3 | 36,503,594 | 433,944 | 212,888 | 297,081 | 454,934 | 1.53 | $50.22 | $76.90 | $22,846,420 | $14,997,751 | | | |
| Total | 72,816,895 | 873,516 | 470,744 | 297,081 | 881,997 | | | | $42,741,179 | $30,799,014 | $6,000,000 | $36,799,014 | $5,942,165 |

Assumptions:

1 Based on actual results for the top 3 million rental/exchange names used by Smile Train, mailing nationally

2 Mix of 30-35%% premium, balance nonpremium, based on the lists being used. Allows the donor file to grow faster without major degradation of gift.

3 Assumes no pledge program (similar to Smile Train results for limited appeal for pledge).

4 Major donor revenue from DM-sourced promotions assumed at 11% of renewal in year 1, 22% in year 2 and 33% onward. No revenue included from personal solicitations.

5 Grassroots fund raising efforts (schools, churches, and other personal events) assumed to be 5% of renewal revenues.

6 Assumes higher gift than initially projected, based on more recent client results. New donor gift very close to Smile Train current level.

7 White mail is included at 8% of total revenue, similar to Smile Train, but not allocated to a particular program (shown on totals tabs).

8 Acquisition 10MM units year one, 20MM units year two, 30MM units year three. Could possibly be increased if results warrant, but difficult to get to 75MM units in three years.

9 Note that the first year (FY10 Tab and called TEST above) is a very short year with only one mailing. Not sure when they will start and how it affects fiscal/calendar year.

10 The ROI need to achieve a minimum of 1/0% by year 5 for the program to be viable.

Brian Mulheren
Surgery For The Poor
Co-Founder
420 Fifth Avenue, 27th Floor
New York, New York 10018
email
brian@surgery4thepoor.org
tel
212-729-1855
cell
917-902-7550
www.surgery4thepoor.org

[Redacted] magazine named Surgery For The Poor one of "10 Ideas That Can Change The World"

CONFIDENTIAL

# EXHIBIT 33

**Subject:** new more aggressive roll out plan as requested
**Date:** Thursday, February 23, 2012 7:53:43 PM Eastern Standard Time
**From:** Brian Mullaney
**To:** James Ueltschi, Mohan Thazhathu
**BCC:** Brian Mullaney



Hi Jim and Mohan,

You both have said you are unhappy with the pace of our roll up plan so we are submitting for your consideration a more aggressive plan that moves faster.

It is attached. This plan is much more aggressive and riskier because it expands to new lists without a lot of testing.

But if you are eager to get bigger quicker, you will like it.

One rule this plan does break is the maximum deficit incurred in year one so if you do like this plan you will have to give us permission to do this and exemption from the penalty in our contract.

Please take a look and let me know what you think.

I will go over in detail tomorrow morning with Mohan.

Thanks,


Brian



Brian Mullaney
Co-Founder
Surgery For The Poor
420 Fifth Avenue, 27th Floor
New York, New York 10018
email brian@surgery4thepoor.org
tel 646-558-3768
cell 917-902-7550
www.surgery4thepoor.org



TIME magazine named Surgery For The Poor one of "10 Ideas That Can Change The World"

WW 0005725

# EXHIBIT 34

| From: | Brian Mullaney </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=6FDF07B78B3B41E7AB5FB3144A508115-BRIAN> |
|---|---|
| Sent: | Thursday, May 17, 2012 10:23 AM |
| To: | Mohan Thazhathu <mjthazhathu@helpmesee.org>; Brian@helpmesee.org |
| Cc: | 'Mullen, Jeff' <Jeff.Mullen@gs.com>; 'James Ueltschi' <jim@helpmesee.org> |
| Bcc: | Barbra Schulman <barbra@surgery4thepoor.org> |
| Subject: | Re: moving forward |



EXHIBIT

C-99

Thank you Mohan.

We will send you a check for $150,000 today as promised.

We will continue to do anything and everything we can to maximize your revenue and number of donors acquired and hit our targets by August 31.

Barbra will get back to you today with a new timeline, final creative approvals, etc. The original June estimate you approved for $550,000 has been reduced to $475,000 and Barbra has an idea that can save us a week in getting this out to minimize time lost. I do not need the language in the estimate now since you have sent me this email so we will proceed based on your original approval.

Are we staying with the winning control mailer, "They've Invented a Surgery..."? We recommend that as it is clearly the proven winner and it brings in the maximum revenue.

Yes of course, we will renegotiate our contract in August and will accept a significantly reduced fee in the hopes of continuing our partnership. We value our partnership with HelpMeSee very much and these negotiations will reflect that.

We look forward to meeting with you and the rest of the team to make June, July and August as productive and cost-effective as possible.

I still do recommend that you meet with 3-4 other major direct mail vendors so you can get their perspective on our results and timeline.

Thank you for working with us to resolve this and giving us the opportunity to keep up the momentum we have built and finish this year strong.

Brian

Brian Mullaney
Surgery For The Poor
Co-Founder
420 Fifth Avenue, 27th Floor
New York, New York 10018
email brian@surgery4thepoor.org
tel  212-729-1855
cell  917-902-7550
www.surgery4thepoor.org



TIME magazine named Surgery For The Poor one of "10 Ideas That Can Change The World"

WW00062845

From: "mjthazhathu@helpmesee.org" <mjthazhathu@helpmesee.org>
Date: Thu, 17 May 2012 09:57:56 -0400
To: <Brian@helpmesee.org>
Cc: "'Mullen, Jeff'" <Jeff.Mullen@gs.com>, 'James Ueltschi' <jim@helpmesee.org>
Subject: RE: moving forward

Dear Brian,

Thank you for our meeting on 15 May 2012, and your proposal to reduce the S4TP fee by $150,000 for the 3 months of June, July and August 2012.

Jim, Jeff and I discussed your proposal as summarized below in regard to the S4TP contract with HelpMeSee dated 31 August 2011.

1. HelpMeSee accepts your offer to reduce the S4TP fee by a total of $150,000 for 3 months (June, July, and August 2012) which you will remit to HelpMeSee in advance. Based on the foregoing HelpMeSee approves exceeding the maximum out of pocket limit of $2.1 million as required under section 7.5 of the contract when it may occur. We are agreeing to exceed the cap and not exercising our rights under the contract to reduce the management fee in consideration of your agreement to lower the management fee by $150,000 through August 31st. This understanding will permit the "June" mailing to go out. HMS reserves the right to approve additional DM mailing expenses based upon donation results and projected costs.

2. There are no other changes to the provisions of the current S4TP contract with HelpMeSee. HelpMeSee acknowledges the offer of S4TP to re-negotiate the contract in August 2012, and accept a significantly reduced fee for the management of the HelpMeSee DMM program.

3. To manage effectively the available line of credit for HelpMeSee DMM, HelpMeSee will schedule a meeting as soon as possible, among TMT , Paradysz (list broker), and S4TP to plan the DMM mailing volumes, schedules and cost estimates for June, July and August 2012.

Thank you once again for your support to HelpMeSee.

Regards
Mohan

Mohan Jacob Thazhathu
President and CEO
**HelpMeSee**
1560 Broadway| 46th Street
Suite 406 | New York
New York 10036-1537

Tel: +1 212 221 7633
Fax: +1 212 221 7604
www.helpmesee.org

HelpMeSee, Inc. is a nonstock, not for profit, tax exempt corporation under US IRS 501 (c)(3).

From: Brian Mullaney [mailto:brian@surgery4thepoor.org]
Sent: Tuesday, May 15, 2012 9:33 AM
To: 'James Ueltschi'
Cc: 'Mullen, Jeff'; Mohan Thazhathu
Subject: moving forward

Hi,

Thanks for the meeting today.

WWV00062846

I wanted to summarize our position and put in writing an offer that I made to Jim that he said he seemed to like and said he would consider.

First of all, I am sorry that you are not happy with our results. I can tell you that we have done everything humanly possible and moved as quickly as possible to acquire as many donors and raise as much money as we can.

And we will continue to do so.

In my opinion, it would cause irreparable harm to both of our organizations to part ways at this point. I appreciate it Jim that you told me you are not going to fire us. That is a relief.

Let us keep working together through August 31st and if you are still unhappy then, you are free to fire us then.

If we decide to part ways at the end of August, we will work with you to make a smooth, amicable and seamless transition.

If you want to continue working with us on August 31st, we will gladly renegotiate our contract with you and reduce our monthly fee dramatically.

Either way, it will be your call.

Until then, as a token of good faith, we will give you a $150,000 grant that represents 100% of our net income from you for the next three months: June, July and August. As you know, our net income from you is about $45,000 a month.

In return, you agree not to fire us over the next three moths and to keep paying us our monthly fee.

I will send a check over today if you approve this plan.

In addition, please give us written permission to exceed the cap – you can modify the language Mohan if you wish – and we will get the June mailing back in production today. All of the lists are ordered and ready to go.

Please let me know what you think.

Thanks,

Brian

Brian Mullaney
Surgery For The Poor
Co-Founder
420 Fifth Avenue, 27th Floor
New York, New York 10018
email
brian@surgery4thepoor.org
tel
212-729-1855
cell
917-902-7550
www.surgery4thepoor.org



TIME magazine named Surgery For The Poor one of "10 Ideas That Can Change The World"

WW00062847

# EXHIBIT 35



| From: | Mohan Jacob Thazhathu <mjthazhathu@helpmesee.org> |
|---|---|
| Sent: | Friday, May 18, 2012 12:08 AM |
| To: | 'James Ueltschi' <jim@helpmesee.org> |
| Subject: | RE: S4TP - Offset Fee for $150,000.00 |

Jim

Yes, that is why it is being accounted as an offset of the fees paid. I did mention this to Harry, will confirm. Brain says it is a grant. May be that's is how he wants to account in his books as S4TP.

Mohan

**HelpMeSee**

Tel: +1 212 221 7633
Fax: +1 212 221 7604
www.helpmesee.org

HelpMeSee, Inc. is a nonstock, not for profit, tax exempt corporation under US IRS 501 (c)(3).

**From:** James Ueltschi [mailto:jim@helpmesee.org]
**Sent:** Thursday, May 17, 2012 8:05 PM
**To:** Mohan Jacob Thazhathu
**Subject:** Re: S4TP - Offset Fee for $150,000.00

We need to check with Harry. This is not a donation in my opinion. It is a reduction of the management fee.

Jim

On May 17, 2012, at 7:25 PM, "Mohan Jacob Thazhathu" <mjthazhathu@helpmesee.org> wrote:

> We received the check for $150,000 from S4TP. This is accounted this as offset against the S4TP Fees. Hence the funds deposited into HelpMeSee Ueltschi Funds Account with Merrill Lynch.
> Mohan
> **HelpMeSee**
>
> Tel: +1 212 221 7633
> Fax: +1 212 221 7604
> www.helpmesee.org
>
> HelpMeSee, Inc. is a nonstock, not for profit, tax exempt corporation under US IRS 501 (c)(3).
>
>
> <S4TP $150000 - Offset_17_May_2012.pdf>

# EXHIBIT 36

Dear Don and Kerry,

I am more than disappointed to receive this email.

Respectfully, I would like you both to please reconsider.

And if you will, consider the following.....

- We have been working in good faith with Glen Strauss (for more than 6 weeks) and your team (for more than 2 weeks) and there was never any mention of these restrictions. If we had been told this six weeks ago we would have never proceeded.
- We are an independent charity that has a contract with HelpMeSee that could be terminated by either party at any time. How can we spend all of our time and $25,000 on this trip - plus a $10,000 grant - and not have any rights to the photos and footage we are creating?
- We will lose $15,000 - $20,000 in non-refundable airfare if we are forced to cancel this trip tomorrow not to mention the week of work Mark Atkinson will lose which is worth $10,000 - $20,000.
- We will be forced to cancel a meeting we have planned with one of my classmates from Harvard who is running for President of Ghana – he is driving to Togo to meet us.
- You should consider the value of the photos and videos we are shooting for you at our expense. I know you have had many photographers/film crews visit your ship but with all due respect few have the experience or track records we do.
- You have agreed to give Mark Atkinson the rights to use content to promote his business – the only outstanding issue is allowing Surgery For The Poor to use the content. We are not asking for a lot. Why scuttle this project and our 10 year relationship over this?
- You should consider the future value of a relationship with Surgery For The Poor and the prospect of more million dollar grants.
- You have everything to lose - and nothing to gain by not figuring out a way to make this work. You lose all the footage, all the pictures, the $10,000 grant and a chance to build a relationship with a surgical charity that will raise ten times as much money as Smile Train.

Close to 10 years ago Don, you came to Smile Train asking for help.

We immediately responded by giving your organization a million dollar grant – a blank check really – to pay for every cleft surgery Mercy Ship ever does.

This time, it is us who are asking for your help.

Please do not let us down.


Brian

WW00062582

Brian Mullaney
Surgery For The Poor
Co-Founder
420 Fifth Avenue, 27th Floor
New York, New York 10018
email brian@surgery4thepoor.org
tel 212-729-1855
cell 917-902-7550
blog: www.brian-mullaney.com
www.surgery4thepoor.org



TIME magazine named Surgery For The Poor one of "10 Ideas That Can Change The World"

---

**From:** Kerry Peterson <kerry.peterson@mercyships.org>
**Date:** Thu, 26 Apr 2012 21:34:45 +0000
**To:** brian mullaney <brian@surgery4thepoor.org>
**Cc:** Don Stephens <don.stephens@mercyships.org>, Joanne Connors <joanne.connors@mercyships.org>, Peter Schulze <peter.schulze@mercyships.org>
**Subject:** RE: finally!

Brian;

I know that this is going to come as a disappointment to you but after much discussion between all parties and legal counsel, we will not be able to work your requested changes into the original agreement. It was our original understanding that your trip was funded by HelpMeSee to gather promotional materials for them only. I am sorry if your other purpose was not noticed in time for thorough discussions between us to the point we could have come to a mutually beneficial agreement. As it stands, we do not feel comfortable coming to quick agreement without being able to explore and consider the possible ramifications.

We would be happy to give Mark Adkinson the rights to use the materials for self-promotion. I also realized that regardless of our granting him this right, he also must be included in this agreement unless we were to create a separate "work-for-hire" agreement. If you still wish to proceed with this trip under the proposed original agreement, please let me know and I will have the modified agreement to you no later than 9am EST tomorrow morning.

Again, I apologize for the way this has worked out and would be more than happy to discuss future possibilities when time is not such a pressure.

Regards ... Kerry

---

**Kerry Peterson**
**Vice-President, Human Resources**

kerry.peterson@mercyships.org

WW00062583

+1 903.939.7000 (main) | +1 903.939.7134 (direct) | +1 903.316.8004 (cell) | Skype: kerry.peterson1



Mercy Ships
PO Box 2020, Lindale, TX 75771-2020, USA
**www.mercyships.org | Bringing hope and healing …**

This message and any attachment are confidential and may be privileged or otherwise protected from disclosure. Mercy Ships.

**From:** Brian Mullaney [mailto:brian@surgery4thepoor.org]
**Sent:** Thursday, April 26, 2012 10:51 AM
**To:** Don Stephens
**Cc:** Kerry Peterson
**Subject:** Re: finally!

HI,

Many thanks for taking the time for the call this morning.

I was quite surprised by most of what you told me. I hope that after this trip we can resolve whatever issues there are and collaborate.

Here are my thoughts for an MOU between Mercy Ships and Surgery For The Poor (S4TP). You have your own partnership with HMS so I thought it would be quicker and simpler to make this between our two organizations.

**SUMMARY:** Mercy Ships is giving access and permission to Surgery For The Poor to shoot video, take photographs on and around their ship in Togo the week of April 30th. Brian Mullaney, CEO of S4TP and Mark Atkinson, a supporter of S4TP will be taking all the photos and shooting all the video.

**MERCY SHIPS WILL…**

1. Receive copies of all photos and video courtesy of S4TP on a hard drive within 2 weeks after we return from the trip.
2. Be given unlimited rights to use all of these photos and videos for Mercy Ships purposes in perpetuity from Mark Atkinson and Brian Mullaney, who retain ownership of this content.
3. Will give permission to Mark Atkinson to use this content to promote his business but not to license to any other charity.
4. Will give permission to Brian Mullaney to use this content to help Surgery For The Poor only.
5. Receive attribution any and every time these photos or video are used by S4TP: ie: photo courtesy of Mercy Ships, video courtesy of Mercy Ships.
6. Receive a $10,000 grant tomorrow, from S4TP which is a token of good will, the first of what we hope will be many grants to Mercy Ships and enough to pay for the surgery for all 30 of the children we will be shoting. (We were told by HelpMeSee the cost was $300 per surgery.) So far this year, we have given HelpMeSee $239,000 in grants for cataract surgeries.

**SURGERY FOR THE POOR WILL….**

1. Retain the rights to to use these photos and video to promote itself and raise money but will not be allowed to license this content to anyone else except HelpMeSee.
2. Share all of these photos and videos with HelpMeSee who will also have unlimited rights to use this content to promote HelpMeSee.

Please give me a call to discuss if I forgot anything or if you want any changes. I understand if you need a lawyer to turn this into legalese but we need to move quickly please.

With your approval I would like to sign this today and Fedex you a signed copy with a check for $10,000 this afternoon.

WW00062584

I promise you that you will be quite pleased with the quality of the photos and video we will shoot. We have decades of experience with this work and the last movie we did, a documentary for Smile Train, won an Oscar.

Once we get back from the trip, I would like to have a conference call to discuss how we might get our direct mail project back on track.

Our enthusiasm for it has never waned and I am sorry for any miscommunication or misperceptions.

Look forward to hearing from you.


Brian

Brian Mullaney
Surgery For The Poor
Co-Founder
420 Fifth Avenue, 27th Floor
New York, New York 10018
email
brian@surgery4thepoor.org
tel
212-729-1855
cell
917-902-7550
www.surgery4thepoor.org

 SURGERY
FOR THE POOR

TIME magazine named Surgery For The Poor one of "10 Ideas That Can Change The World"

**From:** Don Stephens <don.stephens@mercyships.org>
**Date:** Wed, 25 Apr 2012 19:55:01 +0000
**To:** "Qqwts-/4//5... STzasZzSaZssaArzAzzsZsaeZszzsrZaa" <brian@surgery4thepoor.org>
**Cc:** Glenn Strauss <glennandkimstrauss@gmail.com>, John Paul Ketels <johnpaul.ketels@cliffordchance.com>, Kerry Peterson <kerry.peterson@mercyships.org>, Donovan Palmer <donovan.palmer@mercyships.org>, Diane Rickard <diane.rickard@mercyships.org>
**Subject:** RE: finally!

Brian,

Kerry Peterson will be sending you a media access agreement shortly.

Please note that we never have and cannot allow use of Mercy Ships program documentation for use in promotion of a third party, which in this case is surgery4forthepoor. I trust you will understand. Obviously we stand prepared to facilitate Help Me See in this matter, as they are our partner in our eye program.

WW00062585

I do understand there has been a bit of confusion in this matter, as the request for your visit onboard came through unusual channels and seemed to move along without opportunity to work out the details.

With all this said, I hope you have a wonderful time on the ship. It brings me great pleasure to know you will, at long last, be able to see the work of Mercy Ships.

Kind regards,
Don

**Don Stephens**
President / Founder

Executive Assistant: Joanne Connors
don.stephens@mercyships.org | joanne.connors@mercyships.org
+1 903.939.7000 (main) | +1 903.939.7013 (direct)



Mercy Ships
PO Box 2020, Lindale, TX 75771-2020, USA

**www.mercyships.org** | Bringing hope and healing ...

This message and any attachment are confidential and may be privileged or otherwise protected from disclosure. Mercy Ships.

**From:** Brian Mullaney [mailto:brian@surgery4thepoor.org]
**Sent:** Wednesday, April 25, 2012 2:21 PM
**To:** Don Stephens
**Cc:** Glenn Strauss; John Paul Ketels; Kerry Peterson; Donovan Palmer; Joanne Connors
**Subject:** Re: finally!

Hello All,

Haven't received any MOU yet – can someone please send ASAP?

Not knowing that this was a requirement we have been moving ahead for more than a month and have spent quite a deal of money.

We leave in 3 days.

Appreciate your help.

Brian

Brian Mullaney
Surgery For The Poor
Co-Founder
420 Fifth Avenue, 27th Floor
New York, New York 10018
email
brian@surgery4thepoor.org
tel
212-729-1855

WW00062586

cell
917-902-7550
www.surgery4thepoor.org



TIME magazine named Surgery For The Poor one of "10 Ideas That Can Change The World"

---

**From:** Don Stephens <don.stephens@mercyships.org>
**Date:** Tue, 24 Apr 2012 18:51:26 +0000
**To:** "Qqwts-/4//5... STzasZzSaZssaArzAzzsZsaeZszzsrZaa" <brian@surgery4thepoor.org>
**Cc:** Glenn Strauss <glennandkimstrauss@gmail.com>, John Paul Ketels <johnpaul.ketels@cliffordchance.com>,
Kerry Peterson <kerry.peterson@mercyships.org>, Donovan Palmer <donovan.palmer@mercyships.org>,
Joanne Connors <joanne.connors@mercyships.org>
**Subject:** RE: finally!

Hi Brian,

We do have a lot of synergy going right now, which I view as positive. Thank you for your part!

In and of themselves, the 30-40 blind children scheduled by Mercy Ships for screening and possible surgery during Dr. Glenn's time onboard our hospital ship *"AFRICA MERCY"* are quite a story. Of course, Mercy Ships will brand and copyright all video and still photos of each of these children. In the spirit of collaboration and to enhance the synergy now in place, we need to have a written MOU with 'surgery4thepoor' and 'helpmesee' outlining the conditions of use.

Kerry Peterson and our legal counsel are in the process of writing an MOU with helpmesee, and will contact you tomorrow with regards an MOU with surgery4thepoor. We do have this document in place with all our partner organizations.

Warm regards,
Don

---

**Don Stephens**
**President / Founder**

Executive Assistant: Joanne Connors
don.stephens@mercyships.org | joanne.connors@mercyships.org
+1 903.939.7000 (main) | +1 903.939.7013 (direct)

Mercy Ships
PO Box 2020, Lindale, TX 75771-2020, USA

www.mercyships.org | Bringing hope and healing ...

WW00062587



This message and any attachment are confidential and may be privileged or otherwise protected from disclosure. Mercy Ships.

**From:** Brian Mullaney [mailto:brian@surgery4thepoor.org]
**Sent:** Monday, April 23, 2012 11:35 AM
**To:** Don Stephens
**Subject:** finally!

Hi Don,

I leave for Togo, Africa Saturday and after all the years since we first met, I am finally going to visit your miracle ship!

I am really looking forward to it.

We are doing quite a bit of work in blindness right now and Glen Strauss who is working with us is operating on 30-40 children who were all born blind. It should be quite an interesting experience. I will send you a quick report upon return.

I don't know where we are with our direct mail joint venture, Jeff Kramer disappeared and it seems like there are other barriers. Anyhow, if you need our help, we are still ready, willing and able.

All the best,


Brian




Brian Mullaney
Surgery For The Poor
Co-Founder
420 Fifth Avenue, 27th Floor
New York, New York 10018
email
brian@surgery4thepoor.org
tel
212-729-1855
cell
917-902-7550
www.surgery4thepoor.org

WW00062588



TIME magazine named Surgery For The Poor one of "10 Ideas That Can Change The World"

This message and any attachments may be privileged or otherwise protected from disclosure - Mercy Ships.

WW00062589

# EXHIBIT 37

| | |
|---|---|
| **From:** | Karen Lazarus </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=50A194FACDFF4AC7AC4F8774D6B8AB91-KAREN> |
| **Sent:** | Friday, April 27, 2012 3:10 PM |
| **To:** | kerry.peterson@mercyships.org |
| **Cc:** | Mohan Jacob Thazhathu <mjthazhathu@helpmesee.org>; Brian Mullaney <brian@surgery4thepoor.org> |
| **Subject:** | Agreement... |
| **Attach:** | MS_SFP_agreement_2012_04_27.PDF |

Hi Kerry,

Attached is the initialed and signed agreement by Brian and Mark.

Thank you for confirming receipt of this.

All the best,
Karen

**Karen Lazarus**
Senior Manager
Surgery For The Poor
420 Fifth Avenue, 27th Floor
New York, NY 10018
t. 212.729.1855 ext. 101
c. 917.848.3508
e. karen@surgery4thepoor.org
www.surgery4thepoor.org



TIME magazine named Surgery For The Poor "One of 10 Ideas That Can Change The World."

**Respondent's Ex. 299**                    WW00069303

Date: 27 April 2012
Terms of agreement between Mercy Ships, Surgery for the Poor and Mark Atkinson.

1. **PURPOSE:**
   Mercy Ships will provide access on board the *Africa Mercy* to Surgery for the Poor for the sole purpose of documentation of the Mercy Ships Eye Program which is operated in part through partnership with the charity, Help Me See. Access shall include patients, related staff and personnel as well as related ship and off-ship facilities.

   Documentation may include photography and videography ("Documentation"), which may be used solely for the purpose of creating promotional materials for Help Me See. In no instance may any such Documentation be used for the purpose of promotion or fundraising by any other charity or any third party, or other purpose whatsoever (except as noted in item 9 below), without the express written consent by Mercy Ships, which may be granted or withheld in its sole discretion.

2. **LOCATION AND DURATION:**
   Surgery for the Poor's media visit will take place in Lome, Togo with the Mercy Ship *Africa Mercy* between 29 April and 3 May, 2012.

3. **MEDIA TEAM PARTICIPANTS:**
   The following individuals will comprise the Surgery for the Poor media team.

   DeLois Greenwood
   Surgery for the Poor
   420 5th Ave. Floor 27
   New York, NY 10018
   Tel. 212.729.1855
   Email: delois@surgery4thepoor.org

   Brian Mullaney
   Surgery for the Poor
   420 5th Ave. Floor 27
   New York, NY 10018
   Tel. 212.729.1855
   Email: brian@surgery4thepoor.org

   Mark Atkinson
   Otic Design & Marketing
   217 77th Street
   Virginia Beach, VA 23451
   Tel. 757.622.4050
   Email: markedwardatkinson@mac.com

4. **ACCESS:** Mercy Ships media liaison Lewis Swann (the "Media Liaison") will be Surgery for the Poor's host during it's visit and will facilitate its interactions with any crew/patient/projects both on and off ship. Any access to crew or patient interviews, photography or videography must be arranged through the Media Liaison.

   Additionally, Surgery for the Poor will be given access to the Mercy Ships photo archives ("Archives"). As these photographs are copyrighted intellectual property, any photo used must be notated © Mercy Ships / photographer (name) and may not be used for any commercial purpose except as noted in item 1 above.

5. **TRANSPORT:**
   Flight arrangements have been made by Surgery for the Poor and are confirmed as follows:



WVV00069304

Flight Arrival: Flight Number (TBC) 6:05 pm.
Flight Departure: Flight Number (TBC) 10:00 pm.

Required visas have been obtained directly by Surgery for the Poor for each of Surgery for the Poor's team participants, (each a "Team Participant").

Transportation to and from the airport will be arranged and covered by Mercy Ships.

6.   BUDGET:
While the Media Liaison will facilitate logistical arrangements on the ground, all costs are the responsibility of Surgery for the Poor; including costs of flights, accommodation, translators, in-country transportation (except as noted in item 5 above), and off-ship meals.

7.   SHIP PROTOCOL:
For the safety of the crew and the smooth running of the ships, the Captain and ship officers' orders must be followed both on and off the ship while each Team Participant is under Mercy Ships' visa invitation. This includes the immediate cessation of any activity – whether directly associated with the work of the ship or otherwise – should it seem to be in any way threatening the continued work of Mercy Ships. Additionally, no alcohol or smoking is allowed onboard the *Africa Mercy*.

8.   CULTURAL GUIDELINES:
While on the *Africa Mercy* as well as any Mercy Ships field location, each Team Participant may be given guidelines by the Media Liaison relating to cultural expectations. Team Participants sensitivity and compliance is appreciated.

9.   FINAL PRODUCT:
Surgery for the Poor is given permission to use Documentation as well as material obtained from the Archives (subject to the terms noted in item 4 above) for the purpose of producing promotional materials for Help Me See, and to use such promotional materials solely on behalf of Help Me See.

In the event that Surgery for the Poor is no longer contracted to promote Help Me See, all rights hereby given to Surgery for the Poor to use Documentation and materials obtained from the Archives shall be terminated immediately.

Mercy Ships will be given a copy of all Documentation no later than May 25, 2012 with unlimited rights to use any and all for Mercy Ships promotional purposes in perpetuity

Mark Atkinson is given permission to use any and all Documentation to promote his business, Otto Design in perpetuity. In no instance shall this permission extend to promotion of any other commercial interest.

10.   HEALTH AND LIABILITY:
It is highly recommended that each Team Participant obtain the proper evacuation and repatriation insurance that would provide coverage should a medical emergency occur. This insurance is readily available. Should any Team Participant not wish to obtain this coverage, Mercy Ships will not be held liable for the cost of such services as would have been otherwise covered.

11.   CONFLICT:
In the event that this agreement is in conflict with any other agreement between the parties or between any party and any other outside party, the terms of this agreement will supersede the terms of the agreement in conflict. Additionally, should any term in this agreement be held unenforceable, the remaining terms shall survive.

WW00069305

Please sign this agreement and scan to return by email or fax to:

Kerry Peterson
VP, HR & Legal Compliance
Mercy Ships
kerry.peterson@mercyships.org
Tel: (903) 939-7134
Fax: (903) 939-7114

AGREED AND ACCEPTED BY:

_____
Brian Mullaney
Surgery for the Poor

4/27/12
Date

_____
Mark Atkinson
Otic Design

4/27/12
Date

_____
Kerry Peterson
Mercy Ships

_____
Date

WW00069306

# EXHIBIT 38





EXHIBIT
C-107
ALL-STATE LEGAL®

June 14, 2012

Mohan Jacob Thazhathu
HelpMeSee
1560 Broadway
Suite 406
New York, NY 10036

Dear Mohan,

I am happy to report that Surgery For The Poor is making a $400,000 grant to HelpMeSee to be used for surgeries.

This is the third grant we have given HelpMeSee over the past six months - and it is not our last! As I have told you before, we would like to be one of your biggest donors.

To date, we have given HelpMeSee grants totaling $789,500 which should enable you to provide 20,000 life-changing surgeries for blind children and adults. We hope this grant will allow you to ramp up your surgeries even faster than your current rate.

This $400,000 grant will be payable as follows:

- $100,000 payable on August 15
- $100,000 payable on October, 15
- $200,000 payable on December 15.

I also want you to know that next week we are changing our name to WonderWork . It seems a lot of people didn't like Surgery For The Poor so we decided to change it.

Also next week, we begin testing direct mail for our other causes: club foot, burns, water on the brain and hole in the heart. Even though our contract allowed us to begin work on other causes last March, we waited until June to make sure HelpMeSee was on solid footing. Which it is!

If you have any questions or feedback please let me know. I will keep you all in the loop as we get the results of our direct mail back the first of August. Hopefully with revenue coming in from these new charities it will allow us to significantly reduce our fees to HMS. That's the plan anyhow!

All the best,

Brian Mullaney
Co-Founder & CEO
212-729-1855

cc:     Jim Ueltschi
        Jeff Mullen

TIME magazine named WonderWork one of "10 Ideas That Can Change The World."

# EXHIBIT 39

June 15, 2012

«Addressee»
«Title_»
«Company»
«Address_l»
«Street_Address»
«City», «State»   «Zipcode» «Postal_Code» «Country»

Dear «Salutation»,

I have a lot of good news to share with you.

### OUR NEW NAME

Although I liked it, and others did too, the name "Surgery For The Poor" turned off some folks. So, we decided to find a new name that was less literal, more positive, upbeat and unique. After a 5-month search, we narrowed it down from hundreds to six favorites and did a survey that yielded a landslide winner...**WonderWork**.

In the dictionary, you will find WonderWork means:

*A marvelous or miraculous act, work, or achievement; a marvel.*

What a great way to describe the surgeries we are providing:

- A 15-minute surgery that gives a blind girl her eyesight back.
- A $300 surgery that saves a boy dying from water on the brain.
- A miracle treatment that straightens clubfoot.
- A 2-hour surgery that transforms a severely burned child.
- A surgery that saves a teenager dying from hole in the heart.

### OUR FIRST CAUSE: BLINDNESS

For our first 10 months, we have focused exclusively on blindness and the miracle surgery that can give a blind child or adult their eyesight back in as little as 15 minutes and for as little as $300.

We are already providing free surgeries for thousands of poor children and adults. Working with our partner, HelpMeSee, 3,000 of these surgeries have already been performed. I am including a before and after photo of one of our very first patients, 4-year-old Elizabeth from West Africa.

Over the past few months, we've traveled to India and Africa to witness this miracle firsthand. I met two young girls, Catherine who is 5, and Elizabeth who is 4 (the girl in the before and after I have included.) Both girls were born blind and abandoned by their families. Watching them open their eyes and see for the very first time was something I'll never forget. I hope one day you can visit our hospitals and witness this miracle yourself.

## GOING BEYOND BLINDNESS.

This month, we've begun work on: burns, water on the brain, clubfoot, and hole in the heart. We're sending out direct mail test letters to see how donors respond. Personally, I hope all of them do well so we can move quickly. Most of the children who're suffering with these problems have been waiting for years for surgery. Time is of the essence.

## OUR TEAM.

Our staff of 9 is a true all-star team. We are lucky to have virtually the entire senior management team that built Smile Train: DeLois Greenwood, Hana Fuchs, Karen Lazarus, Michele Sinesky and Mike Schell. And we have found some new folks, too, who have substantial experience, energy and talent: Barbra Schulman, Brooke Bohling and Mollie Toomey.

## LOW OVERHEAD. HIGH GOALS.

We have a small staff and extremely low overhead. Our IT room is empty because all our file servers and email systems are up in the "cloud." Our phones are internet-based. This saves us hundreds of thousands of dollars every year. Our goal is to be the most productive, cost-efficient, fast-moving and innovative charity in the world.

## OUR FINANCIAL SITUATION.

We are now up to about 65 Founding Donors, but we still need more. If you can help us find other Founding Donors and/or, if you are in a position to send us additional start-up donations, we can use your help. If you need materials to send to your friends or colleagues, just ask. There is no minimum donation or commitment.

It's not easy starting a new charity from scratch. And we couldn't have picked a tougher time to raise start-up money. But with your support, we're off to a great start.

Please know how much we appreciate – and need – your help.

*We could do nothing without it.*

Thank you,


Brian Mullaney
Co-Founder & CEO

P.S. From time to time, I will send you Founding Donor updates. If you have any ideas, suggestions, comments or criticisms, please do not hesitate: brian@wonderwork.org or 212.729.1855.

# EXHIBIT 40

| From: | Brian Mullaney </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=6FDF07B78B3B41E7AB5FB3144A508115-BRIAN> |
|---|---|
| Sent: | Wednesday, July 11, 2012 11:25 AM |
| To: | James Ueltschi <jim@helpmesee.org> |
| Subject: | Re: WonderWork June List of Lists |

Hi Jim,

I have seen all of the mass mailings HMS has done and you have seen all the mass mailings we have done.

We have done nothing that is improper or not permitted by our contract. We were allowed to start working on our other charity brands in March but decided not to so we could spend more time on HelpMeSee. At the time, Mercy Ships pressured us to to start working for them doing exactly what we are doing for HelpMeSee and we said no, we wanted to make sure HMS was on solid footing before expanding. HMS is on very sound footing and the direct mail is working better than we ever dreamed.

As for WonderWork, we are doing exactly what I showed you our business plan was two years ago. There are many benefits to HMS of pattering with WonderWork, exchanging names, ganging up our printing volume to get discounts, managing the same vendors, etc. That is what we should be talking about.

I have not seen nor would I ever ask you for all of your personal correspondence between you and your major donors. I am not comfortable giving you my private letters as I am sure you would never give me your private letters. Imagine if I asked you to send me all your emails and letters to Bill Gates?

The name change letter is with the New York State folks and we are waiting for their reply. Legally this is a non issue as your lawyers can confirm. Our lawyers do not understand why you and Mohan are giving us such a hard time about our new name.

I have sent you the lists we mailed our WonderWork mass mailings to 3 times. It is attached to this email you just responded to. Click on the attachment and you will see our mail plan.

Can we please have a conversation instead of emails like this?

We have a lot to discuss and a lot of work to do – let's stop wasting time.

Standing by.

Brian

**Brian Mullaney**
Co-Founder/CEO
WonderWork    *(formerly Surgery For The Poor)*
420 Fifth Avenue, 27th Floor
New York, NY 10018
tel: 212.729.1855
cell: 917.902.7550



TIME magazine named WonderWork "One of 10 Ideas That Can Change The World."

---

**From:** James Ueltschi <jim@helpmesee.org>
**Date:** Wednesday, July 11, 2012 11:15 AM
**To:** brian mullaney <brian@wonderwork.org>
**Subject:** Re: WonderWork June List of Lists

Brian, I know you can read English.

I want copies of all the "Thank You" letters and the "Name Change" letters and the mailing lists for each. You have seen everything we have mailed. We are entitled to the same.

Jim

On Jul 11, 2012, at 10:49 AM, Brian Mullaney wrote:

> Hi Jim,
>
> For the third time, here is the list of the "lists" we used to mail our 400,000 WonderWork mailers. Paradsz did the plan for us.
>
> We are waiting on the letter from New York State but our lawyers tell us this is meaningless – we have legally changed our name and done everything we are required to. Once we get the New York State letter we will send it to you.
>
> The thank you letters I sent were personal letters and I do not feel comfortable sharing my personal correspondence between our donors and myself. If you have any questions or concerns about these letters just let me know and I will answer them. I have no idea what you are concerned about.
>
> Please let me know when we can have a discussion. You told me we could talk last Thursday and I have called you and Mohan several times and neither of you will take my call.
>
> I am ready and able to talk whenever you are available.
>
> Thanks,
>
> Brian

WW00063178

**Brian Mullaney**
Co-Founder/CEO
WonderWork    *(formerly Surgery For The Poor)*
420 Fifth Avenue, 27th Floor
New York, NY 10018
tel: 212.729.1855
cell: 917.902.7550
email: brian@wonderwork.org
www.WonderWork.org

<03018865-DB65-418E-A3D2-5362E9B9646E[37].png>

TIME magazine named WonderWork "One of 10 Ideas That Can Change The World."

---

**From:** brian mullaney <brian@wonderwork.org>
**Date:** Tuesday, July 10, 2012 8:58 PM
**To:** James Ueltschi <jim@helpmesee.org>
**Subject:** FW: WonderWork June List of Lists

HI Jim,

I sent you this yesterday afternoon – it is all the lists we used.

I am working on getting the change of name letter.

All my thank you letters were personal correspondence – not mass mailings – so I really don't feel comfortable sharing those with you. If you have any concerns just ask me what they are and I will tell you. The notion that we would use HMS donors for our WonderWork mailings – which is what I have been told you and Mohan suspect  - is he most ridiculous thing in the world! Are you serious?

Anyhow, can we please talk before this gets out of hand? I keep calling you and you refuse to take my call.

How about a conference call with Mohan and Jeff tomorrow morning?


B.


P.S. Our results for our WonderWork mailing have been FANTASTIC!  This means we will soon have hundreds of thousands of names we can share and exchange with you if you like – our success will BENEFIT HMS not compete with it.

P.S.S. The "scheme" to dump us and get TMT to do everything is going to backfire and harm HMS. Please think this through and let us discuss it. I can reduce our fee to a level where even you will like it!

WW00063179

Brian Mullaney
Co-Founder/CEO
WonderWork    *(formerly Surgery For The Poor)*
420 Fifth Avenue, 27th Floor
New York, NY 10018
tel: 212.729.1855
cell: 917.902.7550
email: brian@wonderwork.org
www.WonderWork.org

<03018865-DB65-418E-A3D2-5362E9B9646E[2].png>

TIME magazine named WonderWork "One of 10 Ideas That Can Change The World."

From: brian mullaney <brian@wonderwork.org>
Date: Monday, July 9, 2012 4:14 PM
To: James Ueltschi <jim@helpmesee.org>
Subject: FW: WonderWork June List of Lists

Hi Jim,

Here are the lists we mailed to for WonderWork.  Never did any mass mailings for Surgery For
The Poor.

I will get you the letters also if you like.

As I am sure you know, Mohan has taken away all of our access to virtually  everything,
vendors, database, donor phone calls etc. We were never informed about this, our vendors
told us.  Don't know why and I have been asking you and Mohan for more than a week what is
going on and have been told nothing, it is business as usual.

Just want you to know that despite this, we are still working hard on HMS business as best we
can.

Please let me know what is going on when you can.

Thanks,


Brian




Brian Mullaney
Surgery For The Poor
Co-Founder
420 Fifth Avenue, 27th Floor
New York, New York 10018
emailbrian@surgery4thepoor.org
tel 212-729-1855

WWV00063180

cell 917-902-7550
www.surgery4thepoor.org

<D9FA43C4-BFC3-4FBE-A5F9-128E1FFF2F15[1].png>

<78D8AA23-6CFB-41EB-9F1D-46328FBD6DC3[1].jpg> magazine named Surgery For The
Poor one of "10 Ideas That Can Change The World"

---

**From:** Barbra Schulman <barbra@wonderwork.org>
**Date:** Mon, 9 Jul 2012 15:08:16 -0400
**To:** Brian Mullaney <brian@wonderwork.org>
**Subject:** WonderWork June List of Lists

Brian,
Attached is the List of Lists for our June WonderWork mailing. Let me know if I can provide you with
anything else.
Thanks
Barbra

**Barbra Schulman**
Director of Marketing
WonderWork   *(formerly Surgery for the Poor)*
420 Fifth Avenue, 27th Floor
New York, NY 10018
tel: 212.729.1855 ext. 105
email: barbra@wonderwork.org
skype:barbra_wonderwork
www.WonderWork.org

<007C62C3-DD26-4FE4-8917-7F91BC8BD997[1].png>

**TIME** magazine named WonderWork "One of 10 Ideas That Can Change The World."
<007C62C3-DD26-4FE4-8917-7F91BC8BD997[1].png><WonderWork June Final list of lists
5.23.2012.xls><D9FA43C4-BFC3-4FBE-A5F9-128E1FFF2F15[1].png><78D8AA23-6CFB-41EB-9F1D-
46328FBD6DC3[1].jpg><03018865-DB65-418E-A3D2-5362E9B9646E[2].png>

WW00063181

# EXHIBIT 41

| From: | Mohan Jacob Thazhathu <mjthazhathu@helpmesee.org> |
|---|---|
| Sent: | Friday, June 29, 2012 12:29 AM |
| To: | Ueltschi Jim <jim@helpmesee.org> |
| Cc: | Mullen, Jeff <Jeff.Mullen@gs.com>; gracek@helpmesee.org |
| Subject: | FW: Brian Mullaney - Surgery for the Poor/ Wonder Work mailing |
| Attach: | WonderWork_Mailing_Announcement_15_June_2012.pdf; Mercy_Ships_S4TP_media_agreement_2012_04_27.pdf |

Jim

As we discussed, I sent the following to Kerry Peterson at Mercy Ships. I will keep you and Jeff updated.

Jeff, please let me know your convenient time for a quick update.

Regards

Mohan

Mohan Jacob Thazhathu
President and CEO
HelpMeSee
1560 Broadway | 46th Street | 7th Avenue
Suite 406 | New York
New York 10036-1537

Tel: +1 212 221 7633
Fax: +1 212 221 7604
www.helpmesee.org

HelpMeSee, Inc. is a nonstock, not for profit, tax exempt corporation under US IRS 501 (c)(3).

**From:** Mohan Jacob Thazhathu [mailto:mjthazhathu@helpmesee.org]
**Sent:** Thursday, June 28, 2012 8:23 PM
**To:** 'kerry.peterson@mercyships.org'
**Cc:** Gstrauss@helpmesee.org
**Subject:** Brian Mullaney - Surgery for the Poor/ Wonder Work mailing

Dear Kerry

Hope all is well.

The attached mailing by Surgery for the Poor/ WonderWork mailing was brought to our attention by several HelpMeSee supporters. Needless to say we were very surprised to see this. Specifically with respect to the Mercy Ships and HelpMeSee partnership interests:

1. WonderWork claim of supporting blindness surgeries is not true and disingenuous.

CONFIDENTIAL

HMS0006509

2. HelpMeSee is not a cause or a partner with Surgery for the Poor/ WonderWork. They are a contractor/supplier to manage the HelpMeSee DMM program.
3. Surgery for the Poor/ WonderWork is prohibited to use the images and story from Togo in their mailing, under the agreement signed by Brian with Mercy Ships for HelpMeSee. Please see the agreement executed by Brian with Mercy Ships.

I would like us to discuss as to how we may address this. Could we please discuss? Please let me know your convenient time.

Best regards

Mohan

Mohan Jacob Thazhathu
President and CEO
HelpMeSee
1560 Broadway| 46th Street
Suite 406 | New York
New York 10036-1537 | USA

Tel: +1 212 221 7633
Fax: +1 212 221 7604
www.helpmesee.org

HelpMeSee, Inc. is a nonstock, not for profit, tax exempt corporation under US IRS 501 (c)(3).

*****This e-mail and any attachments thereto, are intended for use by the addressee(s) named herein only. It may contain proprietary/ privileged/ confidential information pertaining to the sender and HelpMeSee Inc. Copying, forwarding or quoting from this e-mail to other parties needs sender's prior authorization. If you are not the intended recipient of this e-mail, please be notified that any dissemination, distribution or copying of this email, and any attachments thereto, is strictly prohibited. If you receive this email in error please immediately notify sender at (631) 974 -2627 and permanently delete the original, copies of e-mail and any printout thereof. Thank you. *****

From: Brian Mullaney [mailto:brian@surgery4thepoor.org]
Sent: Friday, April 27, 2012 2:23 PM
To: Kerry Peterson
Cc: Don Stephens; mjthazhathu@helpmesee.org; Joanne Connors
Subject: Re: finally!

Hi Kerry,

We are going to Togo!

I just signed the agreement and we are getting Mark's signature also and will email to you and Mohan today.

Look forward to seeing all the wonderful things your ship makes possible.

Thanks,

Brian

Brian Mullaney
Surgery For The Poor
Co-Founder
420 Fifth Avenue, 27th Floor
New York, New York 10018
email
brian@surgery4thepoor.org
tel
212-729-1855
cell
917-902-7550
www.surgery4thepoor.org



magazine named Surgery For The Poor one of "10 Ideas That Can Change The World"

-----------------------------------------------------------------------------------------------

**From:** Kerry Peterson <kerry.peterson@mercyships.org>
**Date:** Fri, 27 Apr 2012 13:15:25 +0000
**To:** "Qqwts-/4//5... STzasZzSaZssaArzAzzsZsaeZszzsrZaa" <brian@surgery4thepoor.org>
**Cc:** Don Stephens <don.stephens@mercyships.org>, "mjthazhathu@helpmesee.org" <mjthazhathu@helpmesee.org>, Joanne Connors <joanne.connors@mercyships.org>
**Subject:** RE: finally!

Brian;

I am sorry but we cannot reconsider this decision. It did not come easy and included legal advice which we cannot ignore.

If we had a relationship and partnership we would have more options, but the honest truth is that relationships and partnerships are developed over time, not by hastily putting something on paper.

At the direction of our attorneys I have removed Help Me See from this agreement and added Mark Adkinson. In order to proceed, I will need agreement from both you and Mark that this agreement will be signed. I would prefer having it in hand before you leave but if you agree to sign, you can sign it once you arrive in Togo.

As this may affect your arrangements with Help Me See, I am also copying them on this e-mail.

Again, I am truly sorry that we could not be more accommodating – In the future, should you wish we can talk more about what a true partnership might look like.

HMS0006511

**Kerry Peterson**
Vice-President, Human Resources

kerry.peterson@mercyships.org
+1 903.939.7000 (main) | +1 903.939.7134 (direct) | +1 903.316.8004 (cell) | Skype: kerry.peterson1



Mercy Ships
PO Box 2020, Lindale, TX 75771-2020, USA
www.mercyships.org | Bringing hope and healing ...

This message and any attachment are confidential, and may be privileged or otherwise protected from disclosure. Mercy Ships

**From:** Brian Mullaney [mailto:brian@surgery4thepoor.org]
**Sent:** Thursday, April 26, 2012 6:34 PM
**To:** Kerry Peterson
**Cc:** Don Stephens
**Subject:** Re: finally!

Dear Don and Kerry,

I am more than disappointed to receive this email.

Respectfully, I would like you both to please reconsider.

And if you will, consider the following.....

- We have been working in good faith with Glen Strauss (for more than 6 weeks) and your team (for more than 2 weeks) and there was never any mention of these restrictions. If we had been told this six weeks ago we would have never proceeded.
- We are an independent charity that has a contract with HelpMeSee that could be terminated by either party at any time. How can we spend all of our time and $25,000 on this trip - plus a $10,000 grant - and not have any rights to the photos and footage we are creating?
- We will lose $15,000 - $20,000 in non-refundable airfare if we are forced to cancel this trip tomorrow not to mention the week of work Mark Atkinson will lose which is worth $10,000 - $20,000.
- We will be forced to cancel a meeting we have planned with one of my classmates from Harvard who is running for President of Ghana — he is driving to Togo to meet us.
- You should consider the value of the photos and videos we are shooting for you at our expense. I know you have had many photographers/film crews visit your ship but with all due respect few have the experience or track records we do.
- You have agreed to give Mark Atkinson the rights to use content to promote his business — the only outstanding issue is allowing Surgery For The Poor to use the content. We are not asking for a lot. Why scuttle this project and our 10 year relationship over this?
- You should consider the future value of a relationship with Surgery For The Poor and the prospect of more million dollar grants.

- You have everything to lose - and nothing to gain by not figuring out a way to make this work. You lose all the footage, all the pictures, the $10,000 grant and a chance to build a relationship with a surgical charity that will raise ten times as much money as Smile Train.

Close to 10 years ago Don, you came to Smile Train asking for help.
We immediately responded by giving your organization a million dollar grant – a blank check really – to pay for every cleft surgery Mercy Ship ever does.
This time, it is us who are asking for your help.
Please do not let us down.

Brian

Brian Mullaney
Surgery For The Poor
Co-Founder
420 Fifth Avenue, 27th Floor
New York, New York 10018
email
brian@surgery4thepoor.org
tel
212-729-1855
cell
917-902-7550
blog: www.brian-mullaney.com
www.surgery4thepoor.org



magazine named Surgery For The Poor one of "10 Ideas That Can Change The World"

-------------------------------------------------------------------------------------------------------
---
**From:** Kerry Peterson <kerry.peterson@mercyships.org>
**Date:** Thu, 26 Apr 2012 21:34:45 +0000
**To:** brian mullaney <brian@surgery4thepoor.org>
**Cc:** Don Stephens <don.stephens@mercyships.org>, Joanne Connors <joanne.connors@mercyships.org>, Peter Schulze <peter.schulze@mercyships.org>
**Subject:** RE: finally!

Brian;

I know that this is going to come as a disappointment to you but after much discussion between all parties and legal counsel, we will not be able to work your requested changes into the original agreement. It was our original understanding that your trip was funded by HelpMeSee to gather promotional materials for them only. I am sorry if your other purpose was not noticed in time for thorough discussions between us to the point we could have come to a mutually beneficial agreement. As it stands, we do not feel comfortable coming to quick agreement without being able to explore and consider the possible ramifications.

CONFIDENTIAL

We would be happy to give Mark Adkinson the rights to use the materials for self-promotion. I also realized that regardless of our granting him this right, he also must be included in this agreement unless we were to create a separate "work-for-hire" agreement. If you still wish to proceed with this trip under the proposed original agreement, please let me know and I will have the modified agreement to you no later than 9am EST tomorrow morning.

Again, I apologize for the way this has worked out and would be more than happy to discuss future possibilities when time is not such a pressure.

Regards ... Kerry

**Kerry Peterson**
Vice-President, Human Resources

kerry.peterson@mercyships.org
+1 903.939.7000 (main) | +1 903.939.7134 (direct) | +1 903.316.8004 (cell) | Skype: kerry.peterson1

Mercy Ships
PO Box 2020, Lindale, TX 75771-2020, USA
www.mercyships.org | Bringing hope and healing ...

This message and any attachment are confidential and may be privileged or otherwise protected from disclosure. Mercy Ships.

This message and any attachments may be privileged or otherwise protected from disclosure. Mercy Ships

**From:** Mohan Thazhathu [mailto:mjthazhathu@helpmesee.org]
**Sent:** Friday, April 27, 2012 8:23 AM
**To:** 'Kerry Peterson'
**Cc:** James Ueltschi; Gstrauss@helpmesee.org
**Subject:** RE: finally!

Dear Kerry
Good morning. Thank you very much for dealing this issue with S4TP most appropriately. I was not aware or agree with Brian's representations to Mercy Ships about HelpMeSee. I am copying this email to Jim Ueltschi, Chairman and Treasurer of HelpMeSee for his information.

If Brian signs the original agreement, please let me know. I will turn it around quickly.

Thank you very much for your offer of support of Mercy Ships Media group incase Brian chooses not to participate. Glenn can make whatever decisions needed on the ground in Togo on behalf of HelpMeSee.

Best regards
Mohan

Mohan Jacob Thazhathu
President and CEO
HelpMeSee
1560 Broadway| 46th Street
Suite 406 | New York
New York 10036-1537

Tel: +1 212 221 7633
Fax: +1 212 221 7604
www.helpmesee.org

HelpMeSee, Inc. is a nonstock, not for profit, tax exempt corporation under US IRS 501 (c)(3).

**From:** Kerry Peterson [mailto:kerry.peterson@mercyships.org]
**Sent:** Thursday, April 26, 2012 5:35 PM
**To:** Brian Mullaney
**Cc:** Don Stephens; Joanne Connors; Peter Schulze
**Subject:** RE: finally!

Brian;

I know that this is going to come as a disappointment to you but after much discussion between all parties and legal counsel, we will not be able to work your requested changes into the original agreement. It was our original understanding that your trip was funded by HelpMeSee to gather promotional materials for them only. I am sorry if your other purpose was not noticed in time for thorough discussions between us to the point we could have come to a mutually beneficial agreement. As it stands, we do not feel comfortable coming to quick agreement without being able to explore and consider the possible ramifications.

We would be happy to give Mark Adkinson the rights to use the materials for self-promotion. I also realized that regardless of our granting him this right, he also must be included in this agreement unless we were to create a separate "work-for-hire" agreement. If you still wish to proceed with this trip under the proposed original agreement, please let me know and I will have the modified agreement to you no later than 9am EST tomorrow morning.

Again, I apologize for the way this has worked out and would be more than happy to discuss future possibilities when time is not such a pressure.

Regards ... Kerry

**Kerry Peterson**
Vice-President, Human Resources

kerry.peterson@mercyships.org
+1 903.939.7000 (main)  +1 903.939.7134 (direct)  +1 903.316.8004 (cell)  Skype: kerry.peterson1

CONFIDENTIAL



Mercy Ships
PO Box 2020, Lindale, TX 75771-2020, USA
www.mercyships.org | Bringing hope and healing ...

This message and any attachment are confidential and may be privileged or otherwise protected from disclosure. Mercy Ships.

**From:** Brian Mullaney [mailto:brian@surgery4thepoor.org]
**Sent:** Thursday, April 26, 2012 10:51 AM
**To:** Don Stephens
**Cc:** Kerry Peterson
**Subject:** Re: finally!

Hi,

Many thanks for taking the time for the call this morning.

I was quite surprised by most of what you told me. I hope that after this trip we can resolve whatever issues there are and collaborate.

Here are my thoughts for an MOU between Mercy Ships and Surgery For The Poor (S4TP). You have your own partnership with HMS so I thought it would be quicker and simpler to make this between our two organizations.

SUMMARY: Mercy Ships is giving access and permission to Surgery For The Poor to shoot video, take photographs on and around their ship in Togo the week of April 30th. Brian Mullaney, CEO of S4TP and Mark Atkinson, a supporter of S4TP will be taking all the photos and shooting all the video.

MERCY SHIPS WILL...

1. Receive copies of all photos and video courtesy of S4TP on a hard drive within 2 weeks after we return from the trip.
2. Be given unlimited rights to use all of these photos and videos for Mercy Ships purposes in perpetuity from Mark Atkinson and Brian Mullaney, who retain ownership of this content.
3. Will give permission to Mark Atkinson to use this content to promote his business but not to license to any other charity.
4. Will give permission to Brian Mullaney to use this content to help Surgery For The Poor only.
5. Receive attribution any and every time these photos or video are used by S4TP: ie: photo courtesy of Mercy Ships, video courtesy of Mercy Ships.
6. Receive a $10,000 grant tomorrow, from S4TP which is a token of good will, the first of what we hope will be many grants to Mercy Ships and enough to pay for the surgery for all 30 of the children we will be shoting. (We were told by HelpMeSee the cost was $300 per surgery.) So far this year, we have given HelpMeSee $239,000 in grants for cataract surgeries.

SURGERY FOR THE POOR WILL....

1. Retain the rights to to use these photos and video to promote itself and raise money but will not be allowed to license this content to anyone else except HelpMeSee.
2. Share all of these photos and videos with HelpMeSee who will also have unlimited rights to use this content to promote HelpMeSee.

Please give me a call to discuss if I forgot anything or if you want any changes. I understand if you need a lawyer to turn this into legalese but we need to move quickly please.

With your approval I would like to sign this today and Fedex you a signed copy with a check for $10,000 this afternoon.

I promise you that you will be quite pleased with the quality of the photos and video we will shoot. We have decades of experience with this work and the last movie we did, a documentary for Smile Train, won an Oscar.

Once we get back from the trip, I would like to have a conference call to discuss how we might get our direct mail project back on track.

Our enthusiasm for it has never waned and I am sorry for any miscommunication or misperceptions.

Look forward to hearing from you.

Brian

Brian Mullaney
Surgery For The Poor
Co-Founder
420 Fifth Avenue, 27th Floor
New York, New York 10018
email
brian@surgery4thepoor.org
tel
212-729-1855
cell
917-902-7550
www.surgery4thepoor.org

magazine named Surgery For The Poor one of "10 Ideas That Can Change The World"

From: Don Stephens <don.stephens@mercyships.org>
Date: Wed, 25 Apr 2012 19:55:01 +0000
To: "Qqwts-/4//5... STzasZzSaZssaArzAzzsZsaeZszzsrZaa" <brian@surgery4thepoor.org>
Cc: Glenn Strauss <glennandkimstrauss@gmail.com>, John Paul Ketels
<johnpaul.ketels@cliffordchance.com>, Kerry Peterson <kerry.peterson@mercyships.org>,
Donovan Palmer <donovan.palmer@mercyships.org>, Diane Rickard
<diane.rickard@mercyships.org>
Subject: RE: finally!

Brian,

Kerry Peterson will be sending you a media access agreement shortly.

Please note that we never have and cannot allow use of Mercy Ships program documentation for use in promotion of a third party, which in this case is surgery4forthepoor. I trust you will understand. Obviously we stand prepared to facilitate Help Me See in this matter, as they are our partner in our eye program.

I do understand there has been a bit of confusion in this matter, as the request for your visit onboard came through unusual channels and seemed to move along without opportunity to work out the details.

With all this said, I hope you have a wonderful time on the ship. It brings me great pleasure to know you will, at long last, be able to see the work of Mercy Ships.

Kind regards,
Don

**Don Stephens**
President / Founder

Executive Assistant: Joanne Connors
don.stephens@mercyships.org | joanne.connors@mercyships.org
+1 903.939.7000 (main) | +1 903.939.7013 (direct)



Mercy Ships
PO Box 2020, Lindale, TX 75771-2020, USA
www.mercyships.org | Bringing hope and healing ...

This message and any attachment are confidential and may be privileged or otherwise protected from disclosure. Mercy Ships

**From:** Brian Mullaney [mailto:brian@surgery4thepoor.org]
**Sent:** Wednesday, April 25, 2012 2:21 PM
**To:** Don Stephens
**Cc:** Glenn Strauss; John Paul Ketels; Kerry Peterson; Donovan Palmer; Joanne Connors
**Subject:** Re: finally!

Hello All,

Haven't received any MOU yet -- can someone please send ASAP?

Not knowing that this was a requirement we have been moving ahead for more than a month and have spent quite a deal of money.

We leave in 3 days.

Appreciate your help.

HMS0006518

Brian

Brian Mullaney
Surgery For The Poor
Co-Founder
420 Fifth Avenue, 27th Floor
New York, New York 10018
email
brian@surgery4thepoor.org
tel
212-729-1855
cell
917-902-7550
www.surgery4thepoor.org

magazine named Surgery For The Poor one of "10 Ideas That Can Change The World"

**From:** Don Stephens <don.stephens@mercyships.org>
**Date:** Tue, 24 Apr 2012 18:51:26 +0000
**To:** "Qqwts-/4//5... STzasZzSaZssaArzAzzsZsaeZszzsrZaa" <brian@surgery4thepoor.org>
**Cc:** Glenn Strauss <glennandkimstrauss@gmail.com>, John Paul Ketels <johnpaul.ketels@cliffordchance.com>, Kerry Peterson <kerry.peterson@mercyships.org>, Donovan Palmer <donovan.palmer@mercyships.org>, Joanne Connors <joanne.connors@mercyships.org>
**Subject:** RE: finally!

Hi Brian,

We do have a lot of synergy going right now, which I view as positive. Thank you for your part!

In and of themselves, the 30-40 blind children scheduled by Mercy Ships for screening and possible surgery during Dr. Glenn's time onboard our hospital ship *"AFRICA MERCY"* are quite a story. Of course, Mercy Ships will brand and copyright all video and still photos of each of these children. In the spirit of collaboration and to enhance the synergy now in place, we need to have a written MOU with 'surgery4thepoor' and 'helpmesee' outlining the conditions of use.

Kerry Peterson and our legal counsel are in the process of writing an MOU with helpmesee, and will contact you tomorrow with regards an MOU with surgery4thepoor. We do have this document in place with all our partner organizations.

Warm regards,

HMS0006519

Don

---

**Don Stephens**
President / Founder

Executive Assistant: Joanne Connors·
don.stephens@mercyships.org | joanne.cornors@mercyships.org
+1 903.939.7000 (main) | +1 903.939.7013 (direct)

Mercy Ships
PO Box 2020, Lindale, TX 75771-2020, USA

www.mercyships.org | Bringing hope and healing ...

This message and any attachment are confidential and may be privileged or otherwise protected from disclosure. Mercy Ships.

---

**From:** Brian Mullaney [mailto:brian@surgery4thepoor.org]
**Sent:** Monday, April 23, 2012 11:35 AM
**To:** Don Stephens
**Subject:** finally!

Hi Don,

I leave for Togo, Africa Saturday and after all the years since we first met, I am finally going to visit your miracle ship!

I am really looking forward to it.

We are doing quite a bit of work in blindness right now and Glen Strauss who is working with us is operating on 30-40 children who were all born blind. It should be quite an interesting experience. I will send you a quick report upon return.

I don't know where we are with our direct mail joint venture, Jeff Kramer disappeared and it seems like there are other barriers. Anyhow, if you need our help, we are still ready, willing and able.

All the best,

Brian

Brian Mullaney
Surgery For The Poor
Co-Founder
420 Fifth Avenue, 27th Floor
New York, New York 10018
email
brian@surgery4thepoor.org
tel
212-729-1855

cell
917-902-7550
www.surgery4thepoor.org

The linked image cannot be displayed. The file may have been moved, renamed, or deleted. Verify that the link points to the correct file and location.

magazine named Surgery For The Poor one of "10 Ideas That Can Change The World"

This message and any attachments may be privileged or otherwise protected from disclosure - Mercy Ships.

CONFIDENTIAL

CONFIDENTIAL

Miracle surgeries for children

# WonderWork

June 15, 2012

Mr. Ron Bell
President
Target Market Team
1050 Crown Pointe Pkwy, 18th Floor
Atlanta, GA 30338

Dear Ron,

I have a lot of good news to share with you.

## OUR NEW NAME

Although I liked it, and others did too, the name "Surgery For The Poor" turned off some folks. So, we decided to find a new name that was less literal, more positive, upbeat and unique. After a 5-month search, we narrowed it down from hundreds to six favorites and did a survey that yielded a landslide winner...**WonderWork**.

In the dictionary, you will find WonderWork means:

*A marvelous or miraculous act, work, or achievement; a marvel.*

What a great way to describe the surgeries we are providing:

- A 15-minute surgery that gives a blind girl her eyesight back.
- A $300 surgery that saves a boy dying from water on the brain.
- A miracle treatment that straightens clubfoot.
- A 2-hour surgery that transforms a severely burned child.
- A surgery that saves a teenager dying from hole in the heart.

## OUR FIRST CAUSE: BLINDNESS

For our first 10 months, we have focused exclusively on blindness and the miracle surgery that can give a blind child or adult their eyesight back in as little as 15 minutes and for as little as $300.

We are already providing free surgeries for thousands of poor children and adults. Working with our partner, HelpMeSee, 3,000 of these surgeries have already been performed. I am including a before and after photo of one of our very first patients, 4-year-old Elizabeth from West Africa.

Over the past few months, we've traveled to India and Africa to witness this miracle firsthand. I met two young girls, Catherine who is 5, and Elizabeth who is 4 (the girl in the before and after I have included.) Both girls were born blind and abandoned by their families. Watching them open their eyes and see for the very first time was something I'll never forget. I hope one day *you* can our hospitals and witness this miracle yourself.

TIME magazine named WonderWork one of "10 Ideas That Can Change The World."

420 Fifth Avenue, New York, NY 10018  Tel: 212.729.1856  WonderWork.org

HWS0006522

CONFIDENTIAL


Miracle surgeries for children
wonder
work

### GOING BEYOND BLINDNESS.
This month, we've begun work on: burns, water on the brain, clubfoot, and hole in the heart. We're sending out direct mail test letters to see how donors respond. Personally, I hope all of them do well so we can move quickly. Most of the children who're suffering with these problems have been waiting for years for surgery. Time is of the essence.

### OUR TEAM.
Our staff of 9 is a true all-star team. We are lucky to have virtually the entire senior management team that built Smile Train: DeLois Greenwood, Hana Fuchs, Karen Lazarus, Michele Sinesky and Mike Schell. And we have found some new folks, too, who have substantial experience, energy and talent: Barbra Schulman, Brooke Bohling and Mollie Toomey.

### LOW OVERHEAD. HIGH GOALS.
We have a small staff and extremely low overhead. Our IT room is empty because all our file servers and email systems are up in the "cloud." Our phones are internet-based. This saves us hundreds of thousands of dollars *every* year. Our goal is to be the most productive, cost-efficient, fast-moving and innovative charity in the world.

It is not easy starting a new charity from scratch. And we couldn't have picked a tougher time to raise start-up money. But thanks to friends like you, we are off to a very good start.

Thanks for helping us,

Brian Mullaney
Co-Founder & CEO

P.S. If you have any questions, ideas, suggestions, comments or criticisms, please do not hesitate: brian@wonderwork.org or 212.729.1855. I hope to hear from you.

ISC006523

CONFIDENTIAL

## BEFORE



4-year-old Elizabeth was completely blind in both eyes. Her father is a day laborer and mother, a seamstress. They could never afford the surgery that could give her her eyesight back. Through our partner HelpMeSee, we provided free surgery for her that took 15 minutes per eye and cost $300.

## AFTER

The day after surgery, her bandages came off and Elizabeth opened her eyes to a new world and a new life. Her eyesight is 20-40. Her mom could not believe it and exclaimed, "this is the happiest moment of my entire life."



## HAPPILY... EVER AFTER

Elizabeth at home with her mom. She can now go to school, make friends, and look forward to a future that's been given back to her and a second chance at life she never thought she'd get.



Miracle surgeries for children.

# wonder work

## TOGO, WEST AFRICA

HMS0006524

If you could help a poor child get the surgery that will save her life, would you?



Miracle surgeries for children.
**wonder work**

Please help save a child no one else will help.

There's a miracle surgery that can save a child from a lifetime of pain and suffering.

But millions of children who are poor will never receive it unless someone helps them.

You could be that *someone*.



Miracle surgeries for children.
**wonder work**

P.O. Box 96053, Washington, DC 20090-6053
www.WonderWork.org

WonderWork is a 501 (c) (3) nonprofit recognized by the IRS, and all donations to WonderWork are tax-deductible in accord with IRS regulations. ©2012 WonderWork.



1 million blind children could have their vision restored.

2 million children suffering with club foot could have their feet straightened.

15 million children who've been burned are waiting for surgery.



3 million children need hole in the heart surgery or they will die.

3 million children dying from water on the brain can be saved.

CONFIDENTIAL

HMS0006525

# WonderWork is a high-impact, low-overhead non-profit.

## 20 million children are suffering from problems miracle surgeries could solve.



Like blindness which can be a death sentence for a child in a developing country. Half of the children that can ruin a child's life before turning 4. War, stroke or brain that causes seizures, brain damage and death. Clubfoot that twists and deforms feet so that walking and sometimes even standing up is impossible. And 2nd and 3rd degree burns that cripple and deform a child forever.

In a developing country, each one of these problems is usually a lifesentence of pain, suffering and often an early death.

The good news is that each one can be easily solved through a miracle surgery that takes very little time. And costs very little money.

A 15-minute surgery can restore the eyesight of a child who has been blind since birth in a couple of hours. A surgeon can close a hole in the heart it takes just 10 minutes for a surgeon to treat water on the brain. Even the most horrible burns scars and contractions can be greatly improved through plastic surgery and skin grafts. And even the most twisted and deformed clubfoot can be completely straightened.

Most every child in America and Europe who needs these surgeries automatically gets it. But most children in developing countries who need these surgeries never receive them solely because they are poor.

That's why we created WonderWork.

To help children no one else will help. To provide the surgeries for children who would otherwise never receive them.

To give these children their future back – and a second chance at life that they never thought they'd get.

## EMPOWERING LOCAL SURGEONS IN DEVELOPING COUNTRIES.



Instead of sending doctors on 2-week missions, WonderWork empowers local surgeons through free training, equipment and crucial financial support. This is the smartest way to deliver surgeries in developing countries.

## SETTING HIGH STANDARDS FOR SAFETY AND QUALITY.

The safety of our patients is our #1 priority. Our safety and quality protocols ensure our patients receive the best care possible. We audit results and provide free training for all of our partners.

## HELPING CHILDREN NO ONE ELSE WILL HELP.



We work in the poorest countries in the world. We tackle problems no one else will touch. We go to places other charities won't go. We help children who have been waiting for years for the miracle surgery that can save them.

## EXTREMELY LOW OVERHEAD AND ADMIN COSTS.



Our staff is less than 15 people. Our rent is half market rate. We will use digital patient charts for every surgery. Our phones, file servers and network are cloud-based. Our overhead and admin expenses are a fraction of what an average charity pays. That means there's more money for what matters: surgeries for children.

## WE'RE A NEW CHARITY THAT HAS 100+ YEARS OF EXPERIENCE.

Our principals have created and led some of the most well-known and successful surgical charities in the world. They have been helping provide free surgeries for children in developing countries since the 1980s.

Altogether we've already provided more than 1 million surgeries in 80 of the world's poorest countries. We're using all that we've learned to create the world's first children's charity that is focused on surgical disease. Helping children no one else will help. With miracle surgeries that can give them back their future – and a second chance at life that they never thought they'd get.

CONFIDENTIAL

HMS0006526

Date: 27 April 2012
Terms of agreement between Mercy Ships, Surgery for the Poor and Mark Atkinson.

1. **PURPOSE:**
   Mercy Ships will provide access on board the *Africa Mercy* to Surgery for the Poor for the sole purpose of documentation of the Mercy Ships Eye Program which is operated in part through partnership with the charity, Help Me See. Access shall include patients, related staff and personnel as well as related ship and off-ship facilities.

   Documentation may include photography and videography ("Documentation"), which may be used solely for the purpose of creating promotional materials for Help Me See. In no instance may any such Documentation be used for the purpose of promotion or fundraising by any other charity or any third party, or other purpose whatsoever (except as noted in item 9 below), without the express written consent by Mercy Ships, which may be granted or withheld in its sole discretion.

2. **LOCATION AND DURATION:**
   Surgery for the Poor's media visit will take place in Lome, Togo with the Mercy Ship *Africa Mercy* between 29 April and 3 May, 2012.

3. **MEDIA TEAM PARTICIPANTS:**
   The following individuals will comprise the Surgery for the Poor media team.

   DeLois Greenwood
   Surgery for the Poor
   420 5th Ave. Floor 27
   New York, NY 10018
   Tel. 212.729.1855
   Email: delois@surgery4thepoor.org

   Brian Mullaney
   Surgery for the Poor
   420 5th Ave. Floor 27
   New York, NY 10018
   Tel. 212.729.1855
   Email: brian@surgery4thepoor.org

   Mark Atkinson
   Otto Design & Marketing
   217 77th Street
   Virginia Beach, VA 23451
   Tel. 757.622.4050
   Email: markedwardatkinson@mac.com

4. **ACCESS:** Mercy Ships media liaison **Lewis Swann** (the "Media Liason") will be Surgery for the Poor's host during it's visit and will facilitate its interactions with any crew/patient/projects both on and off ship. Any access to crew or patient interviews, photography or videography must be arranged through the Media Liaison.

   Additionally, Surgery for the Poor will be given access to the Mercy Ships photo archives ("Archives"). As these photographs are copyrighted intellectual property, any photo used must be notated © Mercy Ships / photographer (name) and may not be used for any commercial purpose except as noted in item 1 above.

5. **TRANSPORT:**
   Flight arrangements have been made by Surgery for the Poor and are confirmed as follows:



HMS0006527

Flight Arrival: Flight Number (TBC) 6:05 pm.
Flight Departure: Flight Number (TBC) 10:00 pm.

Required visas have been obtained directly by Surgery for the Poor for each of Surgery for the Poor's team participants, (each a "Team Participant").

Transportation to and from the airport will be arranged and covered by Mercy Ships.

6. BUDGET:
While the Media Liaison will facilitate logistical arrangements on the ground, all costs are the responsibility of Surgery for the Poor; including costs of flights, accommodation, translators, in-country transportation (except as noted in item 5 above), and off-ship meals.

7. SHIP PROTOCOL:
For the safety of the crew and the smooth running of the ships, the Captain and ship officers' orders must be followed both on and off the ship while each Team Participant is under Mercy Ships' visa invitation. This includes the immediate cessation of any activity – whether directly associated with the work of the ship or otherwise – should it seem to be in any way threatening the continued work of Mercy Ships. Additionally, no alcohol or smoking is allowed onboard the *Africa Mercy*.

8. CULTURAL GUIDELINES:
While on the *Africa Mercy* as well as any Mercy Ships field location, each Team Participant may be given guidelines by the Media Liaison relating to cultural expectations. Team Participants sensitivity and compliance is appreciated.

9. FINAL PRODUCT:
Surgery for the Poor is given permission to use Documentation as well as material obtained from the Archives (subject to the terms noted in item 4 above) for the purpose of producing promotional materials for Help Me See, and to use such promotional materials solely on behalf of Help Me See.

In the event that Surgery for the Poor is no longer contracted to promote Help Me See, all rights hereby given to Surgery for the Poor to use Documentation and materials obtained from the Archives shall be terminated immediately.

Mercy Ships will be given a copy of all Documentation no later than May 25, 2012 with unlimited rights to use any and all for Mercy Ships promotional purposes in perpetuity.

Mark Atkinson is given permission to use any and all Documentation to promote his business, Otto Design in perpetuity. In no instance shall this permission extend to promotion of any other commercial interest.

10. HEALTH AND LIABILITY:
It is highly recommended that each Team Participant obtain the proper evacuation and repatriation insurance that would provide coverage should a medical emergency occur. This insurance is readily available. Should any Team Participant not wish to obtain this coverage, Mercy Ships will not be held liable for the cost of such services as would have been otherwise covered.

11. CONFLICT;
In the event that this agreement is in conflict with any other agreement between the parties or between any party and any other outside party, the terms of this agreement will supersede the terms of the agreement in conflict. Additionally, should any term in this agreement be held unenforceable, the remaining terms shall survive.

HMS0006528

Please sign this agreement and scan to return by email or fax to;

Kerry Peterson
VP, HR & Legal Compliance
Mercy Ships
kerry.peterson@mercyships.org
Tel: (903) 939-7134
Fax: (903) 939-7114

AGREED AND ACCEPTED BY:

_____        4/27/12
Brian Mullaney                          Date
Surgery for the Poor

_____        4/27/12
Mark Atkinson                           Date
Otto Design

_____        _____
Kerry Peterson                          Date
Mercy Ships

CONFIDENTIAL

HMS0006529

# EXHIBIT 42

Hi Kerry,

I just got off the phone with a very angry Jim Ueltschi who said a lot of things that were surprising to me.

He said that you called him and you were furious, he said that you were planning on taking or threatening to take legal action against us - specifically he said you were sending us a cease and desist letter from your law firm. I was surprised as I thought you and I had resolved this matter. Is this true?

He also said that you told him you would never accept a grant from us. Is this true?

He also said that you were complaining that HelpMeSee introduced MercyShips to us. I know this is not true as I met Don Stephens 10 years ago and we were talking to Jeff Kramer for more the a year about helping you with your direct mail.

Anyhow, I would like to set the record straight before we waste any more time on this.

1. We did not raise any money for WonderWork with these photos.
2. The flier you saw went to a small number of WonderWork donors to thank them for supporting us and in turn supporting the only program we have given grants to: HelpMeSee. We are NOT the largest donor to HelpMeSee, the Ueltschi Family is, so I misspoke when I told you that, but we have given HelpMeSee about $400,000 in cash and another grant for $400,000 payable over the next months AND we have another $400,000 grant we have agreed to pay them which is due in a few years. So at $1,200,000 we are their second largest donor. Their third largest donor has given HelpMeSee $25,000.
3. We mailed 400,000 letters last month and no Togo photos were used. I am attaching the brochures for those mailers so you can see.
4. We will not use these photos again for HelpMeSee or WonderWork unless you give us permission.

If you are around, I would like to call you today or Thursday to make sure you and I are on the same page.

Please let me know if you are available and this all seems reasonable.

Thanks,


Brian

**Respondent's Ex. 386**

WW00064212

Brian Mullaney
Co-Founder/CEO
WonderWork    *(formerly Surgery For The Poor)*
420 Fifth Avenue, 27th Floor
New York, NY 10018
tel: 212.729.1855
cell: 917.902.7550
email: brian@wonderwork.org
www.WonderWork.org



TIME magazine named WonderWork "One of 10 Ideas That Can Change The World."

From: Kerry Peterson <kerry.peterson@mercyships.org>
Date: Friday, June 29, 2012 10:09 PM
To: brian mullaney <brian@wonderwork.org>, Don Stephens <don.stephens@mercyships.org>
Cc: Joanne Connors <joanne.connors@mercyships.org>, "mjthazhathu@helpmesee.org"
<mjthazhathu@helpmesee.org>, "jim@helpmesee.org" <jim@helpmesee.org>
Subject: RE: grant for mercy ships

Brian;

Just to recap our discussion of earlier this morning. Any photographs or video product obtained during your trip
to the ship earlier this year remain the property of Mercy Ships with rights being granted to Help Me See. Per
our signed agreement, these photos are not to be used to promote any charity except Mercy Ships or Help Me
See.

While not allowed by our agreement, should Help Me See grant permission for WonderWorks to raise funds
indirectly for them under the WonderWorks name, we will grant limited permission for that use with the
stipulation that such permission be given in writing with specific limitation for each piece.

Kerry

From: Brian Mullaney [mailto:brian@wonderwork.org]
Sent: Friday, June 29, 2012 10:14 AM
To: Don Stephens; Brian Mullaney
Cc: Kerry Peterson; Joanne Connors
Subject: Re: grant for mercy ships

Okay thanks.

Just spoke with Kerry and explained everything. We are NOT just a vendor to HelpMeSee we are also their largest
donor.

We have passed along $400,000 in cash and another $400,000 grant last week to HelpMeSee from donations from
OUR donors.

WW00064213

I am sure I can work with Kerry to resolve whatever concerns there are,.

Thanks,

B.


Brian Mullaney
Surgery For The Poor
Co-Founder
420 Fifth Avenue, 27th Floor
New York, New York 10018
email
brian@surgery4thepoor.org
tel
212-729-1855
cell
917-902-7550
www.surgery4thepoor.org



TIME magazine named Surgery For The Poor one of "10 Ideas That Can Change The World"

**From:** Don Stephens <don.stephens@mercyships.org>
**Date:** Fri, 29 Jun 2012 15:08:55 +0000
**To:** Brian Mullaney <brian@wonderwork.org>
**Cc:** Kerry Peterson <kerry.peterson@mercyships.org>, Joanne Connors <joanne.connors@mercyships.org>
**Subject:** RE: grant for mercy ships

Dear Brian,

Im not in the office, but away in Colorado on a break.   Therefore, I defer to Kerry as to what our relationship would be going forward.

Warm personal regards,
Don


**Don Stephens**
President / Founder

Executive Assistant: Joanne Connors
don.stephens@mercyships.org | joanne.connors@mercyships.org
+1 903.939.7000 (main) | +1 903.939.7013 (direct)

WW00064214



Mercy Ships
PO Box 2020, Lindale, TX 75771-2020, USA
www.mercyships.org | Bringing hope and healing ...

This message and any attachment are confidential and may be privileged or otherwise protected from disclosure. Mercy Ships.

**From:** Brian Mullaney [mailto:brian@wonderwork.org]
**Sent:** Tuesday, June 26, 2012 3:42 PM
**To:** Kerry Peterson; Don Stephens
**Subject:** grant for mercy ships

Hi Guys,

We are nearing the end of our fiscal year and trying to get some grants out the door.

As I emailed you, we would like to send Mercy Ships a $25,000 grant but I never got any response.

Can you please let me know if you have any interest in working with us and becoming partners just as we were ay Smile Train?

Thanks very much,


Brian


Brian Mullaney
Co-Founder/CEO
WonderWork    *(formerly Surgery For The Poor)*
420 Fifth Avenue, 27th Floor
New York, NY 10018
tel: 212.729.1855
cell: 917.902.7550
email: brian@wonderwork.org
www.WonderWork.org



TIME magazine named WonderWork "One of 10 Ideas That Can Change The World."

This message and any attachments may be privileged or otherwise protected from disclosure - Mercy Ships.

WW00064215

# EXHIBIT 43

July, 16, 2012

CERTIFIED /RETURN RECEIPT

Mr. Brian Mullaney
Co-Founder / CEO
Wonderworks (formerly Surgery For The Poor)
420 Fifth Avenue, 27th Floor
New York, New York 10018

RE: Demand to Cease and Desist

Dear Brian,

As I have already expressed to you by telephone, Mercy Ships is deeply concerned that Wonderworks (formerly Surgery For The Poor) has violated the Terms of Agreement dated 27 April 2012, attached hereto (the "Agreement"), by using improperly, for its own fundraising or promotional purposes, pictures taken of patients of the Mercy Ships Eye Program (a partnership of Mercy Ships and the charity "Help Me See", the "Program"). Based on Mercy Ships' further investigation of this matter, including our review of the Program pictures contained in the attached Wonderworks fundraising mailer and our discussions with Help Me See executive management confirming Wonderwork's misuse of the Program pictures in non-compliance with the Agreement, Mercy Ships has determined that Wonderworks in fact has violated the Agreement resulting in material detriment and harm to Mercy Ships for which remedial actions are warranted and required. As such, Mercy Ships hereby demands that Wonderworks immediately cease and desist from any further violations of the Agreement, that it rescind the attached Wonderworks mailer (and any other such promotional or fundraising material containing any such Program pictures), and that it comply in full with its contractual obligations and the Agreement's restrictions. We also demand that all the Documentation (including copies, duplicates, images, or any other derivative materials thereof) in Wonderwork's custody, possession, or control not be used by Wonderworks at all hereafter and be returned to Mercy Ships. Other remedial actions, including compensation for the harm suffered and loss incurred by Mercy Ships, are fully warranted and now being considered.

As you know, under the Agreement, Wonderworks was permitted by Mercy Ships to take or record any such pictures or other images (i.e., "Documentation" as defined in the Agreement) solely for the purpose of documenting the Program and creating fundraising or promotional materials for Help Me See. Neither Wonderworks, Surgery For The Poor, nor any other party was intended to be a beneficiary of the Documentation without the express written consent of Mercy Ships. The Agreement specifically states: "In no instance may any such Documentation be used for the purpose of promotion or fundraising by any other charity or third party whatsoever without the express written consent of Mercy Ships." The attached Wonderworks mailer, containing the three pictures of Program patients

**Respondent's Ex. 408**

CONFIDENTIAL

HMS0009624

taken pursuant to the permission granted by Mercy Ships under the restrictions of the Agreement, clearly evidences a form of misuse by Wonderworks of those Program pictures in direct contradiction and violation of those restrictions. Help Me See agrees.

Accordingly, Mercy Ships hereby demands that Wonderworks immediately (i) cease and desist from any and all further violations of the Agreement, and (ii) confirm in writing that such actions have been taken and that Wonderworks commits that no further violations will occur. Please be further advised that Mercy Ships is considering all remedial actions available to it in this matter and has engaged legal counsel in pursuit of those actions. If Mercy Ships does not receive by July 23, 2012, a satisfactory written response from Wonderworks confirming its compliance with this Demand, Mercy Ships is prepared to take legal recourse against Wonderworks.

Thank you.

Kerry Peterson

Attachments:

CC: Mr. Mohan Jacob Thazhathu
President / CEO
Help Me See

CC: Mr. Mark Atkinson
Otto Design Marketing



Miracle surgeries for children

June 15, 2012

I have a lot of good news to share with you.

**OUR NEW NAME**
Although I liked it, and others did too, the name "Surgery For The Poor"
turned off some folks. So, we decided to find a new name that was less
literal, more positive, upbeat and unique. After a 5-month search, we
narrowed it down from hundreds to six favorites and did a survey that
yielded a landslide winner…**WonderWork.**

In the dictionary, you will find WonderWork means:

*A marvelous or miraculous act, work, or achievement; a marvel.*

What a great way to describe the surgeries we are providing:

* A 15-minute surgery that gives a blind girl her eyesight back.
* A $300 surgery that saves a boy dying from water on the brain.
* A miracle treatment that straightens clubfoot.
* A 2-hour surgery that transforms a severely burned child.
* A surgery that saves a teenager dying from hole in the heart.

**OUR FIRST CAUSE: BLINDNESS**
For our first 10 months, we have focused exclusively on blindness and the
miracle surgery that can give a blind child or adult their eyesight back
in as little as 15 minutes and for as little as $300.

We are already providing free surgeries for thousands of poor children and
adults. Working with our partner, HelpMeSee, 3,000 of these surgeries have
already been performed. I am including a before and after photo of one of
our very first patients, 4-year-old Elizabeth from West Africa.

Over the past few months, we've traveled to India and Africa to witness
this miracle firsthand. I met two young girls, Catherine who is 5, and
Elizabeth who is 4 (the girl in the before and after I have included.) Both
girls were born blind and abandoned by their families. Watching them open
their eyes and see for the very first time was something I'll never forget.
I hope one day *you* can our hospitals and witness this miracle yourself.

TIME magazine named WonderWork one of "10 Ideas That Can Change The World."

420 Fifth Avenue, New York, NY 10018 Tel: 212.729.1855 WonderWork.org

CONFIDENTIAL

HMS0009626



Miracle surgeries for children.

**wonder work**

## GOING BEYOND BLINDNESS.

This month, we've begun work on: burns, water on the brain, clubfoot, and hole in the heart. We're sending out direct mail test letters to see how donors respond. Personally, I hope all of them do well so we can move quickly. Most of the children who're suffering with these problems have been waiting for years for surgery. Time is of the essence.

## OUR TEAM.

Our staff of 9 is a true all-star team. We are lucky to have virtually the entire senior management team that built Smile Train: DeLois Greenwood, Hana Fuchs, Karen Lazarus, Michele Sinesky and Mike Schell. And we have found some new folks, too, who have substantial experience, energy and talent: Barbra Schulman, Brooke Bohling and Nollie Toomey.

## LOW OVERHEAD. HIGH GOALS.

We have a small staff and extremely low overhead. Our IT room is empty because all our file servers and email systems are up in the "cloud." Our phones are internet-based. This saves us hundreds of thousands of dollars *every* year. Our goal is to be the most productive, cost-efficient, fast-moving and innovative charity in the world.

It is not easy starting a new charity from scratch. And we couldn't have picked a tougher time to raise start-up money. But thanks to friends like you, we are off to a very good start.

Thanks for helping us,

Brian Mullaney
Co-Founder & CEO

P.S. If you have any questions, ideas, suggestions, comments or criticisms, please do not hesitate: brian@wonderwork.org or 212.729.1855. I hope to hear from you.

CONFIDENTIAL

HMS0009627

## BEFORE



4-year-old Elizabeth was completely blind in both eyes. Her father is a day laborer and mother, a seamstress. They could never afford the surgery that could give her her eyesight back. Through our partner HelpMeSee, we provided free surgery for her that took 15 minutes per eye and cost $300.

## AFTER

The day after surgery, her bandages came off and Elizabeth opened her eyes to a new world and a new life. Her eyesight is 20-40. Her mom could not believe it and exclaimed, "this is the happiest moment of my entire life."



## HAPPILY... EVER AFTER

Elizabeth at home with her mom. She can now go to school, make friends, and look forward to a future that's been given back to her and a second chance at life she never thought she'd get.

Miracle surgeries for children.

## wonder work

TOGO, WEST AFRICA

# EXHIBIT 44

| From: | Brian Mullaney </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=6FDF07B78B3B41E7AB5FB3144A508115-BRIAN> |
|---|---|
| Sent: | Wednesday, July 18, 2012 3:21 PM |
| To: | James Ueltschi <jim@helpmesee.org> |
| Cc: | Mullen Jeff <Jeff.Mullen@gs.com>; Thazhathu Mohan Jacob <mjthazhathu@helpmesee.org> |
| Subject: | Re: follow up |

Hi Jim,

We have responded as best we can to all of your information requests. Some of the documents you are requesting do not exist. Let me know what else you need and I will be happy to get it.

Our lawyers have read all of you emails and know everything about the Mercy Ship situation and they do not think we have breached anything. Please let me know how we are in breach and we will respond. To our knowledge we have done nothing to breach our contract and we continue work on behalf ;f of HMS in accordance with our contract.

In all due respect jim, it appears that you are just looking for an excuse not to honor the agreement you signed.

Not only that, just a month or so ago, you agreed to pay us through august if we gave you a $`150,000 grant which we did. Then we gave you another $400,000 grant AFTER we sent the WonderWork donor letters you are upset about. And you respond by not paying us for July? It appears that you are in breach = not us. You are not acting in good faith.

Please Jim, let's stop playing these games and let's try to handle this professionally and amicably. If you are going to terminate us on September 1st, as is your right, give us formal notice and we will begin the six month termination period September 1. Witholding our pay and trying to make Mercy Ships an issue when it isn't is beneath you.

I am ready to talk with you, Jeff and Mohan whenever you like. I keep calling you and you refuse to pick up the phone.

Thanks,


Brian


**Brian Mullaney**
Co-Founder/CEO
WonderWork    *(formerly Surgery For The Poor)*
420 Fifth Avenue, 27th Floor
New York, NY 10018
tel: 212.729.1855
cell: 917.902.7550
email: brian@wonderwork.org
www.WonderWork.org

**Respondent's Ex. 413**

WW00063963



**TIME magazine named WonderWork "One of 10 Ideas That Can Change The World."**

From: James Ueltschi <jim@helpmesee.org>
Date: Wednesday, July 18, 2012 11:45 AM
To: brian mullaney <brian@wonderwork.org>
Cc: Mullen Jeff <Jeff.Mullen@gs.com>, "mjthazhathu@helpmesee.org" <mjthazhathu@helpmesee.org>
Subject: Re: follow up

Just to confirm again, you will not release any further information we have requested?

On 6/29, we were informed by Mercy Ships of your unauthorized use of Mercy Ships' property which has affected our relationship with an important partner. It is not fine.

Your refusal to make your business records available for inspection makes it impossible to verify your compliance with our agreement which we determine to be a material breach. Under the circumstances, it is both in our interests to conclude our agreement as soon as possible. I sincerely hope that this transition can be accomplished smoothly.

Jim

On Jul 17, 2012, at 11:18 AM, Brian Mullaney wrote:

> Hi Jim,
>
> I have no idea what you are concerned about. Mercy Ships has no problem with us. Please stop trying to create an issue that isn't there. I have spoken to Kerry several times and everything is fine.
>
> We began raising start-up money for Surgery4ThePoor almost a year before we started working for HelpMeSee. When we began working for HelpMeSee we agreed not to launch any of our 4 other charity brands for at least six months, and then we delayed that 3 additional months to make sure HMS was in good shape.
> Every one of our Founding Donors has known us for years and long before we started working for HMS.
>
> <u>The only grants we have ever given has been to HMS: $400,000 in cash and $400,000 commitment.</u>
>
> We have done nothing wrong and I resent your accusations and implications. We have worked very hard for HelpMeSee for the past year and our results overall have been excellent. Any independent direct mail expert can confirm this. I am sorry about the confusion on the TEST period but your folks are responsible for that. It is very clear that someone who works for HMS manipulated the proposal we and TMT sent you. In the end, it shouldn't matter much because the six month delay you are complaining about will be irrelevant once you start generating millions of dollars of incremental donations as are now projected. Regardless of the timetable, the direct mail program we built for you is MUCH better in all aspects than what we promised you.
>
> Instead of worrying about our conduct and what we have or haven't done, you should worry about the fact that HMS is spending so little of the money it is raising for surgeries.
>
> As you know, you promised us and 20,000 HelpMeSee donors thatŠ

WWW00063964

- 100% of their donations would be doubled by the Ueltschi Family
- 100% of their donations would go towards surgeries.
- HELPMESEE would provide 120,000 surgeries this year.

For some reason, you are barely spending anything on surgeries. A few months ago, just a week after Mohan sat in our office and told us the surgery goal had been lowered from 120,000 this year to 60,000 for this year, you announced on a conference call that the new goal was 15,000 surgeries this year. We have asked many times why you keep lowering the goal and have never received a straight answer. That was one of the main reasons why we gave you grants out of our own pocket - so that you could increase your surgeries. Mohan kept telling us he was under sever financial pressure and had no money for surgeries. But even with our $400,000 in extra grants that we have given you, it had no impact .

With the Ueltschi Family match of 100%, you now have on hand about $2,000,000+ from HMS donors and $800,000 from Surgery4ThePoor. (Assuming the Uetlschi family doubles our cash grants of $400,000 too.) This does not count the $400,000 grant from us that you have not yet received. But for some unknown reason, you have spent only about $100,000 on surgeries. This makes no sense and looks like you are misleading donors. The facts are: you have the money for hundreds of thousands of surgeries and it is restricted, and you have the partners who could easily ramp up and perform these surgeries. And you told us *and* your donors you were going to do the surgeries. But for some reason you are not funding many surgeries. You have spent only about 3% of the monies you have raised. This is not right. I strongly encourage you to start spending the donations in accordance with what the donors' intent was and what you promised HMS donors. You are putting HMS at risk of a very bad news article and or attention from the State AGs.

Jim, life is short. I am sorry if you are mad at us and we fell short of your expectations. I can tell you we did our absolute best. And you have been angry since day one. I really don't think there is anything we can do to make you happy.

If you are firing us please let us know so we can move on and start working on a transition.

If you are not firing us, please let us know so I can submit a proposal for you to consider as you agreed just a month or so ago. There still are many benefits for us to maintain a relationship going forward. We could easily remain your largest donor.

Our WonderWork mass mailing is going GREAT. Your direct mail is going GREAT. There is so much work for both of our organizations to do, let's stop playing these games and get to work. There are so many children and adults who need help.

I keep calling you and you refuse to take the call. Can we please have a conference call with Jeff and Mohan and decide upon a professional, amicable way to proceed?

That is all I am asking for.

Thanks,


Brian

WW00063965

I think we need to have a conversation with Jeff and Mohan and figure out a responsible way to proceed. I keep calling you and you refuse to take the call.

Brian Mullaney
Co-Founder/CEO
WonderWork      *(formerly Surgery For The Poor)*
420 Fifth Avenue, 27th Floor
New York, NY 10018
tel: 212.729.1855
cell: 917.902.7550
email: brian@wonderwork.org
www.WonderWork.org

<03018865-DB65-418E-A3D2-5362E9B9646E[1].png>

**TIME magazine named WonderWork "One of 10 Ideas That Can Change The World."**

From: James Ueltschi <jim@helpmesee.org>
Date: Tuesday, July 17, 2012 9:57 AM
To: brian mullaney <brian@wonderwork.org>
Subject: Re: follow up

Hi Brian, I am glad that you and Jeff were able to talk.

I also agree with the 2 items listed.

In addition to the boilerplate letter you attached, I need the following information from you immediately:

1. Who are the WW founders, the amount donations, and when did they become S4TP/WW "founders"?

2. The "thank you" letters to S4TP/WW donors and the mailing list.

3. The "thank you" letters and mailing list to HMS donors and the enclosures.

4. List of all grant letters and checks by S4TP/WW, names, amounts, purpose.

As you know, this became necessary after the discovery of your use of photos you agreed in writing not

to use except with the written consent of Mercy Ships. We need to verify that S4TP/WW has acted in accordance with our agreement.

Jim

On Jul 13, 2012, at 1:20 PM, Brian Mullaney wrote:

Hi Jim,

I just had a very nice conversation with Jeff. I think we both agree on two things:

1. Nothing would be worse for both of our young charities than to have an ugly dispute.
2. Most of our problems are communication-related.

To that end, Jeff asked me about the three things you keep asking for. I have already sent you the lists that we mailed our 400,000 letters to. We are hounding the New York State folks for their return letter as you asked. And while I cannot send you a copy of my personal thank letters to donors I have included below the text that went in those letters and accompanied the photo of the blind girl we shot in Togo.

I hope that we can continue working together through the next 6 weeks which will bring us to the end of our first year. A lot is going to happen in these next weeks. We will get results back from the many changes that have been made to the HMS. I think you should review these results before making any major decisions. I also think you should at least consider my proposal to keep working together. You told me you would when we last met with your board.

One wild idea I did have when thinking about this was as follows. I think your heart is really into the simulator and training program and I know that's what Glenn Strauss wants.

Our hearts are in providing free surgeries. We don't know as much as you do about the simulator and your big training program. Maybe we find a way to divide and conquer. We could we takeover the free surgeries part of the plan and pay you back all the money you paid for direct mail and we take the donors and cultivate them. You continue on doing the simulator and developing the training program. We both do what we believe in and what we are good at. Let me know if you will even consider this.

Finally, if we do decide to part ways, we need to figure out a way to do it so it doesn't damage HMS or WonderWork. Both of us do everything we can to help not hurt the other side.

The end of summer will be here before we know it, that would be the best time to sit down where ever you want and discuss the future.

Please let me know what you think.

Thanks,


Brian

WW00063967

BELOW IS THE BOILERPLATE COPY THAT WENT WITH MY PERSONAL THANK YOU LETTERS TO OUR FOUNDING DONORSŠ

Dear _____,

I have a lot of good news to share with you.

## OUR NEW NAME.

Although I liked it, and others did too, the name ³Surgery For The Poor² turned off some folks. So, we decided to find a new name that was less literal, more positive, upbeat and unique. After a 5-month search, we narrowed it down from hundreds to six favorites and did a survey that yielded a landslide winnerŠWonderWork.

In the dictionary, you will find WonderWork means:

*A marvelous or miraculous act, work, or achievement; a marvel.*

What a great way to describe the surgeries we are providing:

- A 15-minute surgery that gives a blind girl her eyesight back.
- A $300 surgery that saves a boy dying from water on the brain.
- A miracle treatment that straightens clubfoot.
- A 2-hour surgery that transforms a severely burned child.
- A surgery that saves a teenager dying from hole in the heart.

## OUR FIRST CAUSE: BLINDNESS.

For our first 10 months, we have focused exclusively on blindness and the miracle surgery that can give a blind child or adult their eyesight back in as little as 15 minutes and for as little as $300.

We are already providing free surgeries for thousands of poor children and adults. Working with our partner, HelpMeSee, 3,000 of these surgeries have already been performed. I am including a before and after photo of one of our very first patients, 4-year-old Elizabeth from West Africa.

Over the past few months, we've traveled to India and Africa to witness this miracle firsthand. I met two young girls, Catherine who is 5, and Elizabeth who is 4 (the girl in the before and after I have included.) Both girls were born blind. Watching them open their eyes and see for the very first time was something I'll never forget. I hope one day you can visit our hospitals and witness this miracle yourself.

## GOING BEYOND BLINDNESS.

This month, we've begun work on: burns, water on the brain, clubfoot, and hole in the heart. We're sending out direct mail test letters to see how donors respond. Personally, I hope all of them do well so we can move quickly. Most of the children who're suffering with these problems have been waiting for years for surgery. Time is of the essence.

## OUR TEAM.

Our staff of 9 is a true all-star team. We are lucky to have virtually the entire senior

WWV00063968

management team that built Smile Train: DeLois Greenwood, Hana Fuchs, Karen Lazarus, Michele Sinesky and Mike Schell. And we have found some new folks, too, who have substantial experience, energy and talent: Barbra Schulman, Brooke Bohling and Mollie Toomey.

### LOW OVERHEAD. HIGH GOALS.

We have a small staff and extremely low overhead. Our IT room is empty because all our file servers and email systems are up in the [3]cloud.[2] Our phones are internet-based. This saves us hundreds of thousands of dollars every year. Our goal is to be the most productive, cost-efficient, fast-moving and innovative charity in the world.

### OUR FINANCIAL SITUATION.

We are now up to about 65 Founding Donors, but we still need more. If you can help us find other Founding Donors and/or, if you are in a position to send us additional start-up donations, we can use your help. If you need materials to send to your friends or colleagues, just ask. There is no minimum donation or commitment.

It's not easy starting a new charity from scratch. And we couldn't have picked a tougher time to raise start-up money. But with your support, we're off to a great start.

Please know how much we appreciate and need your help.

We could do nothing without it.

Thank you,

Brian

P.S. From time to time, I will send you Founding Donor updates. If you have any ideas, suggestions, comments or criticisms, please do not hesitate to email me or call me.

P.P.S. Please visit our new website atwww.WonderWork.org!

**Brian Mullaney**
Co-Founder/CEO
WonderWork     *(formerly Surgery For The Poor)*
420 Fifth Avenue, 27th Floor
New York, NY 10018
tel: 212.729.1855
cell: 917.902.7550
email: brian@wonderwork.org
www.WonderWork.org



TIME magazine named WonderWork "One of 10 Ideas That Can Change The World."

**Brian Mullaney**

WWO00063969

Co-Founder/CEO
WonderWork    *(formerly Surgery For The Poor)*
420 Fifth Avenue, 27th Floor
New York, NY  10018
tel: 212.729.1855
cell: 917.902.7550
email: brian@wonderwork.org
www.WonderWork.org

<03018865-DB65-418E-A3D2-5362E9B9646E.png>

TIME magazine named WonderWork "One of 10 Ideas That Can Change The World."

WWV00063970

# EXHIBIT 45

| From: | Brian Mullaney <brian@wonderwork.org> |
| --- | --- |
| Sent: | Friday, July 27, 2012 10:24 PM |
| To: | Harry B. DeVerter <hdeverter@taitweller.com> |
| Cc: | jim@helpmesee.org; mjthazhathu@helpmesee.org; Jeff.Mullen@gs.com |
| Subject: | Re: Review of financial and other records |

Hi Harry,

Sorry but I am out of the office this week too. Your request of yesterday was the first request to come into our offices and for documents.

Happy to see you any day after next week so I have a few days to compile everything. Again, please review your requests because you are asking for a lot of information that is not included in our agreement. If you might tell me what you exactly Jim is accusing us of that would make it a lot easier for us to provide the documents that will allay your fears. Jim has made several allegations and accusations but has not told us what exactly we have done wrong. We have no idea. We believe we are doing a very good job and have nothing to hide.

So again sorry it cannot be next week but please pick any day of the following week and you can stay as long as you like. We will have everything ready for you.

In regards to HMS records, you may be correct that the agreement does not provide for that but as HelpMeSee's largest donor (after the Ueltschi family) and as an organization who has given close to a million dollars, I think we have a right to see where are money has gone. We know it hasn't gone to surgeries. We do not want to be involved in any kind of controversy as Dr. Geoff Tabin tried to stir up in october when he and David Chang and others accused HelpMeSee of fraud and "bait and switch." The HMS website boasts about about transparency but when we ask Jim and Mohan where the money is going they refuse to provide any answers.

Anyhow, let me know what day and time works for you and again, I apologize that I was out of the office these two weeks.

Thanks and have a good weekend.


Brian


**Brian Mullaney**
Co-Founder/CEO
WonderWork    *(formerly Surgery For The Poor)*
420 Fifth Avenue, 27th Floor
New York, NY 10018
tel: 212.729.1855
cell: 917.902.7550
email: brian@wonderwork.org

**Respondent's Ex. 422**

www.WonderWork.org



TIME magazine named WonderWork "One of 10 Ideas That Can Change The World."

**From:** "Harry B. DeVerter" <hdeverter@taitweller.com>
**Date:** Friday, July 27, 2012 5:48 PM
**To:** brian mullaney <brian@wonderwork.org>
**Cc:** "jim@helpmesee.org" <jim@helpmesee.org>, "mjthazhathu@helpmesee.org"
<mjthazhathu@helpmesee.org>, "Jeff.Mullen@gs.com" <Jeff.Mullen@gs.com>
**Subject:** Re: Review of financial and other records

Brian
We tried to schedule our visit to your office at a convenient time by delaying the visit a week when you were out of the office and are a little disappointed in that the agreement provides for access to your records for inspection and copy during normal business hours. I would think that your financial records would be available for access. Likewise, the correspondence files do not have to be assembled, just available to access.

As to your request for me bringing HMS records for your review, I do not believe the agreement provides for that access. Certainly, as a donor you are entitled to the Form 990 and a copy of the audited financial statements. Both of these reports for 2011 are being finalized. When final, I know HMS will provide you with a copy. If you need anything else, you should contact HMS directly.

Harry

---

**Harry B. DeVerter**, CPA
Managing Partner

1818 Market Street, Suite 2400, Philadelphia, PA 19103
P 215.979.8802  C 215.356.9188  E hdeverter@taitweller.com



---

**From:** Brian Mullaney <brian@wonderwork.org>
**To:** Harry B. DeVerter
**Cc:** James Ueltschi <jim@helpmesee.org>; Mohan Thazhathu <mjthazhathu@helpmesee.org>; Mullen, Jeff <Jeff.Mullen@gs.com>
**Sent:** Fri Jul 27 13:34:28 2012
**Subject:** Re: Review of financial and other records

Hi Harry,

HMS0004896

Happy to have you come in Harry but we need at least a few days to collect everything. The time period covers almost a year and hundreds of documents. Can we please do it the following Monday or Tuesday?

Also, please read our agreement carefully. You are asking for many documents and records that are not required by our agreement. But rest assured that we will provide all of the documents that our agreement requires us too. Our lawyers are reviewing everything to make sure we are 100% in compliance with our agreement.

We would also like to request from HMS all the records of HMS program spending. We - and all HMS donors – were promised that 100% of all donations were to be doubled by the Ueltschi family and then 100% of that would be spent on surgeries. This amount adds up to something around $2,800,000. Yet only a tiny amount of $100,000 or has been spent on surgeries. We are very concerned that donors and we may have been misled. We are not aware of any valid reason for program spending to be such a tiny percentage of HMS revenues. Please bring all program spending records for HMS from September 1st, 2011 thru July, 2012 when you visit our offices for us to review.

Thanks a lot,


Brian

**Brian Mullaney**
Co-Founder/CEO
WonderWork    *(formerly Surgery For The Poor)*
420 Fifth Avenue, 27th Floor
New York, NY 10018
tel: 212.729.1855
cell: 917.902.7550
email: brian@wonderwork.org
www.WonderWork.org



TIME magazine named WonderWork "One of 10 Ideas That Can Change The World."

**From:** "Harry B. DeVerter" <hdeverter@taitweller.com>
**Date:** Friday, July 27, 2012 11:47 AM
**To:** brian mullaney <brian@wonderwork.org>
**Cc:** brian mullaney <brian@helpmesee.org>, Ueltschi Jim <jim@helpmesee.org>,
"mjthazhathu@helpmesee.org" <mjthazhathu@helpmesee.org>
**Subject:** Review of financial and other records

Tuesday is July 31st not August 1st - I am planning to be there Tuesday July 31st at 10:00am. Any questions, let me know. Thanks.

Harry

CONFIDENTIAL

Dear Brian

At the request of HelpMeSee, we would like to be provided with the following documents and materials:

1. All S4TP/WW financial records for the period September 1,2011 through June 30,2012 including general ledgers, donor systems, cash receipts and disbursements and bank statements. A copy of a trial balance at June 30,2012 with operating results for the period September 1, 2011 through June 30, 2012.
2. All correspondence and material that mentions HelpMeSee, HMS, Help me See or HelpMeSee,Inc. either electronic or physical involving donors (HMS,S4TP/WW), partners and vendors. This would include, but not limited to, requests for funding, correspondence, thank you letters, any enclosures etc.
3. List of all grants paid by S4TP/WW for the period September 1, 2011 through June 30, 2012 with the grant letters, names, amounts and purpose.
4. Listing of S4TP/WW founders with the amounts and dates of such contributions and all contributions received during the period September 1,2011 through June 30, 2012.

I am planning to commence my review on Tuesday August 1st. Let me know if you have any questions. Thanks.

Harry

---

**Harry B. DeVerter**, CPA
Managing Partner

1818 Market Street, Suite 2400, Philadelphia, PA 19103
**P** 215.979.8802 **C** 215.356.9188 Ehdeverter@taitweller.com



---

**Harry B. DeVerter**, CPA
Managing Partner

1818 Market Street, Suite 2400, Philadelphia, PA 19103
**P** 215.979.8802 **C** 215.356.9188 **E** hdeverter@taitweller.com

IRS Circular 230 Disclosure: Any tax advice in this communication (including attachments), unless expressly stated, is not intended by or written by Tait, Weller & Baker LLP, to be used, and cannot be used, by a client or any other person or entity for the purpose of avoiding penalties that may be imposed by the Internal Revenue Service.

This electronic mail message, and any attachments transmitted with it, contains privileged and confidential information, intended only for the named addressee(s). If you are not the intended recipient or the person responsible for delivering this e-mail to the intended recipient, you are hereby notified that any use, distribution, copying or disclosure of this communication is strictly prohibited. If you have received this e-mail in error, please immediately notify the sender by reply e-mail, and delete all copies of this communication from your computer and network.

# EXHIBIT 46



Helping the blind see™

1560 Broadway, 46th Street | Suite 406
New York, NY | 10036-1537
Tel: +1 212 221 7606 | Fax: +1 212 221 7604
www.helpmesee.org

**Date:** Wednesday, 8 August 2012

**Attendees:** Brian Mullaney, Founder, Surgery for the Poor (S4TP)/WonderWork (WW)
Mohan J Thazhathu, President & CEO, HelpMeSee (HMS)

**Sub:** Minutes – HMS & S4TP/WW Meeting – Wednesday, 8 August 2012 @ 10 AM EST

---

### HMS & S4TP/WW Meeting
### Wednesday, 8 August 2012 @ 10 AM EST
### Minutes

**Purpose of the meeting is to explore ways to complete the remediation of the material breach of the S4TP contract with HMS dated 31 August 2011 – Notices & Communications by HMS since 17 July 2012.**

I. The purpose of the meeting was to explore ways to remediate the material breach notice issues to S4TP as per the terms of the S4TP contract with HMS for violation of the agreement with Mercy Ships on the HMS partnership program, and in relation to access S4TP records related to the contract provisions.

II. S4TP is no longer required to provide any services to HMS since 29 June 2012.

III. Brian explained that the remediation as requested by HMS is unacceptable and:
   a. HMS continues to pay the monthly fee to S4TP/WW.
   b. S4TP/WW provides grants equal to 50% of the monthly fee back to HMS.

IV. Mohan requested Brian to outline the remedial steps to correct the material breach as per HMS communications. The S4TP work for HMS stands suspended since 29 June 2012, when Mercy Ships informed HMS of the S4TP violation of the agreement with Mercy Ships on the HMS joint program.

V. Brian does not believe that there is a common ground for S4TP to work with HMS and hence, would like to proceed for mediation.

VI. Mohan brought to Brian's attention the article that appeared in *Right Side News* titled, "Skimming Charities: From Brian Mullaney to Sean Hannity" and expressed Jim's and Mohan's concern on how it may impact the reputation of HMS. Brian dismissed this as an old issue and stated that this is yet another effort by Charles Wang and Smile Train to go after Brian personally.

VII. The meeting ended at approximately 10:45 AM EST.

**Attachment:**

Notices and Communications - S4TP / Brian Mullaney

---

CONFIDENTIAL                    **Respondent's Ex. 431**                    HMS0011383

# Notices and Communications - S4TP / Brian Mullaney

On Jul 17, 2012, at 9:57 AM Jim Ueltschi Wrote:

From: James Ueltschi <jim@helpmesee.org>
Date: Tuesday, July 17, 2012 9:57 AM
To: brian mullaney <brian@wonderwork.org>
Subject: Re: follow up

Hi Brian, I am glad that you and Jeff were able to talk.

I also agree with the 2 items listed.

In addition to the boilerplate letter you attached, I need the following information from you immediately:

1. Who are the WW founders, the amount donations, and when did they become S4TP/WW "founders"?

2. The "thank you" letters to S4TP/WW donors and the mailing list.

3. The "thank you" letters and mailing list to HMS donors and the enclosures.

4. List of all grant letters and checks by S4TP/WW, names, amounts, purpose.

As you know, this became necessary after the discovery of your use of photos you agreed in writing not to use except with the written consent of Mercy Ships. We need to verify that S4TP/WW has acted in accordance with our agreement.

Jim

On Jul 18, 2012, at 11:45 AM, Jim Ueltschi wrote:

From: James Ueltschi <jim@helpmesee.org>
Date: Wednesday, July 18, 2012 11:45 AM
To: brian mullaney <brian@wonderwork.org>
Cc: Mullen Jeff <Jeff.Mullen@gs.com>, "mjthazhathu@helpmesee.org"
<mjthazhathu@helpmesee.org>
Subject: Re: follow up

Just to confirm again, you will not release any further information we have requested?

On 6/29, we were informed by Mercy Ships of your unauthorized use of Mercy Ships' property which has affected our relationship with an important partner. It is not fine.

Your refusal to make your business records available for inspection makes it impossible to verify your compliance with our agreement which we determine to be a material breach. Under the circumstances, it is both in our interests to conclude our agreement as soon as possible. I sincerely hope that this transition can be accomplished smoothly.

Jim

CONFIDENTIAL                    HMS0011384

**On Jul 19, 2012, at 1:0 PM, Jim Ueltschi wrote:**

**From:** James Ueltschi <jim@helpmesee.org>
**Date:** Thursday, July 19, 2012 1:00 PM
**To:** brian mullaney <brian@wonderwork.org>
**Cc:** "mjthazhathu@helpmesee.org" <mjthazhathu@helpmesee.org>, Mullen Jeff
<Jeff.Mullen@gs.com>, DeVerter Harry <HDeVerter@taitweller.com>
**Subject:** Re: follow up

We will someone over to your office after you confirm that the following records will be readily
available:

1. All your financial records including bank statements.

2. All correspondence and material that mentions HMS, HelpMeSee, and Help Me See either electronic
or physical.

Jim

**On Jul 27, 2012, at 11:48 AM, Harry DeVerter wrote:**

**From:** Harry B. DeVerter [mailto:hdeverter@taitweller.com]
**Sent:** Friday, July 27, 2012 11:48 AM
**To:** brian@wonderwork.org
**Cc:** brian@helpmesee.org; Ueltschi Jim; mjthazhathu@helpmesee.org
**Subject:** Review of financial and other records

Tuesday is July 31st not August 1st - I am planning to be there Tuesday July 31st at 10:00am. Any
questions, let me know. Thanks. Harry

Dear Brian

At the request of HelpMeSee, we would like to be provided with the following documents and
materials:

1. All S4TP/WW financial records for the period September 1,2011 through June 30,2012 including
   general ledgers, donor systems, cash receipts and disbursements and bank statements. A copy
   of a trial balance at June 30,2012 with operating results for the period September 1, 2011
   through June 30, 2012.
2. All correspondence and material that mentions HelpMeSee, HMS, Help me See or HelpMeSee,
   Inc. either electronic or physical involving donors (HMS,S4TP/WW), partners and vendors. This
   would include, but not limited to, requests for funding, correspondence, thank you letters, any
   enclosures etc.
3. List of all grants paid by S4TP/WW for the period September 1, 2011 through June 30, 2012
   with the grant letters, names, amounts and purpose.

CONFIDENTIAL

4. Listing of S4TP/WW founders with the amounts and dates of such contributions and all contributions received during the period September 1, 2011 through June 30, 2012.

I am planning to commence my review on Tuesday August 1st. Let me know if you have any questions. Thanks.

Harry

---

Harry B. DeVerter, CPA
Managing Partner
1818 Market Street, Suite 2400, Philadelphia, PA 19103
P 215.979.8802  C 215.356.9188  E hdeverter@taitweller.com



---

On Jul 27, 2012, at 5:48 AM, Harry DeVerter wrote:

From: Harry B. DeVerter [mailto:hdeverter@taitweller.com]
Sent: Friday, July 27, 2012 5:48 PM
To: brian@wonderwork.org
Cc: jim@helpmesee.org; mjthazhathu@helpmesee.org; Jeff.Mullen@gs.com
Subject: Re: Review of financial and other records

Brian

We tried to schedule our visit to your office at a convenient time by delaying the visit a week when you were out of the office and are a little disappointed in that the agreement provides for access to your records for inspection and copy during normal business hours. I would think that your financial records would be available for access. Likewise, the correspondence files do not have to be assembled, just available to access.

As to your request for me bringing HMS records for your review, I do not believe the agreement provides for that access. Certainly, as a donor you are entitled to the Form 990 and a copy of the audited financial statements. Both of these reports for 2011 are being finalized. When final, I know HMS will provide you with a copy. If you need anything else, you should contact HMS directly.

Harry

On Jul 30, 2012, at 1:17 PM, Harry DeVerter wrote:

From: "Harry B. DeVerter" <hdeverter@taitweller.com<mailto:hdeverter@taitweller.com>>
Date: Mon, 30 Jul 2012 13:17:56 -0400
To: "brian@surgery4thepoor.org<mailto:brian@surgery4thepoor.org>"
Cc: <jim@helpmesee.org<mailto:jim@helpmesee.org>>,
"mjthazhathu@helpmesee.org<mailto:mjthazhathu@helpmesee.org>",
<Jeff.Mullen@gs.com<mailto:Jeff.Mullen@gs.com>>

HelpMeSee, Inc. | A nonstock, not for profit, 501(c)(3) tax exempt US corporation                    4

Subject: Re: Review of financial and other records

Brian - I would still like to come over tomorrow to at least look at the financial records. You can give us access to your quickbooks system, bank statements and donor system and we will be able to review the information without any assembly on your part. Thanks.

Harry

Harry B. DeVerter, CPA
Managing Partner

1818 Market Street, Suite 2400, Philadelphia, PA 19103
P 215.979.8802 C 215.356.9188 E hdeverter@taitweller.com<mailto:hdeverter@taitweller.com>


On Jul 30, 2012, at 2:14 PM, James Ueltschi wrote:

Brian, Harry will be at your office tomorrow at 9:30a to review books, records and accounts.

Jim

On Jul 30, 2012, at 6:08 PM, Harry DeVerter wrote:

**From:** Harry B. DeVerter [mailto:hdeverter@taitweller.com]
**Sent:** Monday, July 30, 2012 6:08 PM
**To:** Brian Mullaney; James Ueltschi
**Cc:** Thazhathu Mohan Jacob; Jeff Mullen
**Subject:** RE: Review of financial and other records

We also will need access to your financial records as we discussed – quickbooks, bank statements etc.

Harry

**Harry B. DeVerter**, CPA
Managing Partner

1818 Market Street, Suite 2400, Philadelphia, PA 19103
P 215.979.8802 C 215.356.9188 E hdeverter@taitweller.com

On August 2, 2012, at 12:08 PM, Jim Ueltschi wrote:
**From:** James Ueltschi <jim@helpmesee.org>
**Subject: Review of financial and other records**
**Date:** August 2, 2012 12:08:56 PM EDT
**To:** Brian Mullaney <brian@wonderwork.org>
**Cc:** drieke@cckc-law.com

CONFIDENTIAL                                                          HMS0011387

Brian, Harry reports that he was not given access to S4TP/WW financial records including general ledger, bank statements and other records in spite of your 7/20 email assurances. You were advised through my email to you of 7/19/12 that we consider the withholding of such records is a major breach of our agreement.

Jim

On August 6, 2012, at 8:14 PM, Mohan Thazhathu wrote:

**From:** Mohan Jacob Thazhathu [mailto:mjthazhathu@helpmesee.org]
**Sent:** Monday, August 06, 2012 8:14 PM
**To:** brian@helpmesee.org
**Cc:** 'James Ueltschi'
**Subject:** RE: website, meeting

Dear Brian

I am perfectly fine to meet with you on Wednesday, 8th August or Friday, 10 August. You choose the time. We can meet either in HelpMeSee or at your offices. I am open to discuss issues again, for mutually acceptable solutions.

Please let me know.

Regards

Mohan

**Mohan Jacob Thazhathu**
President and CEO
HelpMeSee
1560 Broadway | 46th Street | 7th Avenue
Suite 406 | New York
New York 10036-1537

Tel: +1 212 221 7633
Fax: +1 212 221 7604
www.helpmesee.org

HelpMeSee, Inc. is a nonstock, not for profit, tax exempt corporation under US IRS 501 (c)(3).

CONFIDENTIAL

# EXHIBIT 47

| **From:** | Brian Mullaney </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=6FDF07B78B3B41E7AB5FB3144A508115-BRIAN> |
|---|---|
| **Sent:** | Tuesday, May 15, 2012 1:20 PM |
| **To:** | RBell@tmtinc.com |
| **Subject:** | <no subject> |
| **Attach:** | HMS Review_May 2012.pptx |

here is what I presented.

Mohan was especially thuggish today.

He informed me that "his vendors" will do as he says.

B.

Brian Mullaney
Surgery For The Poor
Co-Founder
420 Fifth Avenue, 27th Floor
New York, New York 10018
email brian@surgery4thepoor.org
tel 212-729-1855
cell 917-902-7550
www.surgery4thepoor.org



magazine named Surgery For The Poor one of "10 Ideas That Can Change The World"

HMS and S4TP
Partnership Review





WW00062809

Are we delivering what we promised?

WW00062810

# What we've accomplished.

- Created HMS direct mail program:
  - ACQUISITION: Successfully tested 6 concepts and found a winning acquisition control. Found control quickly, saved HMS $450,000 and one month of testing.
  - The winning S4TP control delivers $1+ million/yr more revenue than TMT control.
  - Acquired 10,000 donors to date: lifetime value = $1,500,000.
- Created HMS advertising campaign.
- Created HMS banner advertising campaign.
- Created a HMS foundation solicitation program.
  - $55,000 in revenue to date, 16 grant proposals outstanding.
- Created a HMS website.
  - Has record 6–7% conversion.
- Identified the best donor database for HMS and negotiated contract.
- Created a rich, content database of thousands of patient photos and dozens of hours of video footage.
- Donated $240,000 to HelpMeSee to pay for almost 7,000+ surgeries

WW00062811

# Evaluation of Performance

- HMS hired S4TP primarily to create a large, direct mail program similar to or better than the one we created for Smile Train. We have done that.

| | Agreement | Projected (Aug.) | |
|---|---|---|---|
| Acquisition cost to raise a dollar | $1.36 | $1.34 | Smile Train today is at $2. |
| Cultivation cost to raise a dollar | $.26 | $.21 | 20% better. |

Ron Bell says that the HelpMeSee direct mail program has the best results for both acquisition and cultivation of any of his large clients.

Surgery For The Poor is thrilled with results so far.

HelpMeSee is unhappy with our results so far. HMS's primary complaint is not about performance BUT rather timing. HelpMeSee had expected us to have many more donors and much more revenue by now.

# HelpMeSee Performance Targets and Schedule

The ORIGINAL plan created by Ron Bell and Brian Mullaney and then sent to Mohan who added S4TP fees.

The REVISED plan that ended up in contract 5 months later.

| Year | Performance Target | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | CMM Mailings | CMM Donors | CMM Complain Contribution Revenue | CMM Cost | Management Fee | CMM Total Cost | CMM Campaign Revenue | Ancillary Revenue | Total Net Revenue |
| 1 | 12,051,959 | 118,568 | $6,022,609 | $5,953,972 | $2,000,000 | $7,953,972 | ($1,554,363) | $1,210,000 | -$724,363 |
| 2 | 23,061,342 | 271,256 | $13,872,150 | $9,944,292 | $2,000,000 | $11,944,292 | $1,927,858 | $1,110,000 | $3,037,858 |
| 3 | 36,507,594 | 433,944 | $22,846,420 | $14,397,751 | $2,000,000 | $16,397,751 | $5,948,669 | $1,110,000 | $6,958,669 |

- TEST time period should have been around six months.
- Revised plan includes revenue and donors from test but no management fees from test.
- Revised plan promises 118,516 new donors in first year versus 86,116 in original plan. (32,000+)
- Revised plan promises $6,022,609 in first year vs. $5,619,409 in original plan. ($400,00+)

WW00062813

5

# No need to argue over TEST period...

- Even though S4TP may not hit the "Plan" numbers by August 31st...
  - S4TP will hit the numbers WITHIN 1-2 MONTHS AFTER AUGUST 31, 2012.
  - S4TP will SIGNIFICANTLY EXCEED ALL NUMBERS by December 31, 2012.
  - HMS will have $1,364,000 in excess cash that was not spent by Aug. 31, 2012.
  - The year-end results will more than make up for being late.

- We should be celebrating - not arguing - over our results.

WW00062814

# Results & Projections

| SURGERY FOR THE POOR REPORT CARD | AGREEMENT Year 1 | PROJECTED August 31, 2012 | difference | % diff | PROJECTED - October 31, 2012 | difference | % diff | PROJECTED December 31, 2012 | difference | % diff |
|---|---|---|---|---|---|---|---|---|---|---|
| **TESTING TO FIND CONTROL** | | | | | | | | | | |
| Number of test letters | 2,000,000 | 996,326 | 1,003,674 | 50% | | | | | | |
| Cost of testing | $916,000 | $417,297 | $428,703 | 50% | | | | | | |
| **DIRECT MAIL PROGRAM PERFORMANCE** | | | | | | | | | | |
| acquisition mail quantity | 12,000,000 | 11,110,500 | (889,500) | 8% | 17,710,500 | 5,690,500 | 47% | $25,410,500 | 13,390,500 | 113% |
| acquisition cost to raise a dollar | $1.36 | $1.34 | $0.02 | 1% | $1.33 | $0.03 | 2% | $1.32 | $0.04 | 3% |
| total donors acquired | 118,316 | 74,654 | (43,662) | 37% | 118,271 | (45) | 0% | 149,336 | 30,687 | 33% |
| total revenue raised | $4,023,072 | $3,286,058 | $734,014 | 18% | $5,248,823 | $1,228,751 | 31% | $7,538,716 | $3,515,644 | 88% |
| cultivation cost to raise a dollar | $0.26 | $0.21 | $0.05 | 19% | $0.18 | $0.08 | 37% | $0.26 | $0.00 | 38% |
| total revenue raised | $1,453,607 | $413,470 | $1,040,137 | 72% | $1,264,604 | $189,003 | 13% | $2,569,156 | $1,105,549 | 76% |
| Total Direct Mail Revenue | $5,479,679 | $3,699,528 | $1,780,151 | 32% | $6,513,427 | $1,033,748 | 19% | $10,103,872 | $4,624,193 | 84% |
| Total Direct Mail Spending | $5,842,199 | $4,478,149 | $1,364,050 | 23% | $7,183,326 | $1,341,127 | 23% | $10,376,105 | $4,533,906 | 78% |
| Total Direct Mail Net | -$362,520 | -$778,671 | $416,101 | 115% | $669,799 | $669,797 | 185% | $272,233 | $92,187 | 25% |
| **ANCILLARY NET REVENUE** | $1,113,000 | $448,297 | $661,703 | 60% | $599,968 | $511,032 | 46% | $772,297 | $336,703 | 30% |
| **REVENUE SUMMARY** | | | | | | | | | | |
| Total revenue | $6,589,679 | $4,147,825 | $2,441,854 | 37% | $7,112,395 | | | $10,872,168 | | |
| Total spending | $5,842,199 | $4,478,149 | $1,364,050 | 23% | $7,183,326 | | | $10,376,105 | | |
| Total Net | $747,480 | -$330,324 | $1,077,804 | 144% | -$70,831 | | | $500,063 | | |

WW00062815

7

Are the fees HMS is paying S4TP reasonable?

# How much does S4TP really cost HMS?

|  | AGREEMENT | PROJECTED |
|---|---|---|
|  | Year 1 | August 31, 2012 |
| Monthly fees paid to S4TP | $2,000,000 | $2,000,000 |

A significant portion of the fees S4TP receives are supposed to be returned to HMS....

| | | |
|---|---|---|
| Ancillary Income generated by S4TP | $1.110,000 | $1,110,000 |
| Portion of 5-year grant S4TP owes HMS | $400,000 | $400,000 |
| Net cost of S4TP to HMS | $490,000 | $490,000 |

In addition....

S4TP saved HMS $450,000 in cash during the TEST period.

The S4TP acquisition mailer will generate $1,300,000 MORE revenue than the TMT mailer over 3 years.

WW00062817

# The S4TP Team That Is Working Hard For HMS

- Brian Mullaney
- DeLois Greenwood
  - Program development and oversight
- Barbra Schulman
  - Strategy and analytics for all direct marketing programs
  - Database development including needs assessment, vendor qualification and data migration and setup
  - New program development
- Hana Fuchs
  - Financial accounting expertise
- Karen Lazarus
  - Project management including Foundation program and Web development
  - Hi-touch donor communication and cultivation
- Mike Schell
  - Creative director
- Michele Sinesky
  - Grassroots fundraising guru
- Brooke Bohling
  - Donor Relations interface and program assistant
- Mollie Toomey
  - Marketing analyst
- Greatest Good - Steve Levitt, Amee Kamdar, Andrew Hogue
  - Analytic architecture requirements
  - Cutting-edge data analysis

WW00062818

Should we continue to work together?

WW00062819

## It is in the interests of both HMS and S4TP to stick together through "Year 1."

- By contract, HMS is allowed to terminate the contract on August 31, 2012.
- Parting ways now would cause irreparable harm to S4TP.
    - S4TP incurred millions of dollars in debt, expense and obligations to service HMS.
    - S4TP has until August 31st to deliver on financial targets.
    - S4TP has worked very hard and in good faith and have outstanding results. Although you can argue that we are two months late, we have built a high-performance direct mail program for HMS that is much better than even the Smile Train program.
- Parting ways now would also harm HMS.
    - HMS would lose much more than it would gain.
    - HMS would lose its winning control mail piece and Mullaney name.
    - It would take many months and cost HMS much more money than it currently pays (net) to replace the S4TP team whose experience cannot be replaced.
    - HMS would risk losing TMT.
- If HMS wants to continue working with S4TP on August 31st, S4TP will gladly renegotiate its contract with HMS.
- If HMS wants to part ways on August 1st, we will work hard to ensure it is a smooth and successful transition and wish HMS well.

WW00062820

# EXHIBIT 48



Dear Jim and Mohan,

I wanted to update both of you on everything.

The Smile Train debacle is painful to watch but I want you to know that this will have no impact on our plans for Surgery For The Poor. (Although it may have some benefits.)

The law firm Jones Day is representing the two independent directors, not me, and I am not a part of their action unless I am invited to meet with the State AG. As you saw in the New York Times article, I had no comment. There are plenty of very upset donors, employees, partners and celebrities who will carry the fight in this matter. I do not want to be distracted from launching Surgery For The Poor, the world's largest charity dedicated to surgical disease.

Here are the 3 most likely scenarios regarding Smile Train and possible impact on our work.

1. The merger is approved and it happens. (Some donors may file lawsuits to stop it.) This actually helps us because it frees up talent we want to hire without any non-solicit issues.It will also send most of Smile Train's disgruntled major donors and tens of millions of dollars our way. I have already received dozens of calls from major donors asking what I am working on and how can they be involved.
2. The merger is not approved and Wang is left in control of Smile Train. Highly unlikely because he has gutted the management and there is no one there who can run it. Also, the AG would have a hard time rejecting the merger and not acting against the people who engineered it. The whole thing stinks to high heaven.
3. The merger is not approved and Wang and his employees are removed from the Smile Train board. I of course remain on the board and we add independent directors, elect a new chairman and find a new ceo to run smile train.
4. The merger is not approved and Wang and his employees are removed from the Smile Train board and they ask me to come back in a management role as CEO. I will tell them I will only come back if Surgery For The Poor can be part of Smile Train as a division. I would bring with it all of our funding supporters for Surgery For The Poor and we would enjoy the benefits of Smile Train's 2 million donors, 1,500 hospitals and $165,000,000 in cash. This would save us 5-10 years of fundraising. Don't know how likely this is but I want you to know I am not going to walk away from Surgery For The Poor under any circumstances.

WW00077776

Most importantly for me, I do not want to waste time on the Smile Train circus. I want to be working on Surgery For The Poor 80 hours a week - as I have been for the past 4 months – and I do not want to lose our momentum and the great opportunities that are facing us at the moment.

Here's what we need to do as I see it:

- I need commitments and some cash advances from our founding donors. While I do not have the 501c3 status yet, we have all agreed to incorporate in Delaware and I have the structure for that to review this week from Greg Lam. While I cannot take donations yet, I do have a Surgery For The Poor bank account and could use some cash advances so I can hire people, buy equipment, pay rent, etc.
- I want to hire 3 people this week: Karen Lazarus, my assistant of 13 years and a key part of my success and the success of Smile Train. Hana Fuchs, 12 year CFO of Smile Train. Delois Greenwood, 12 year Smile Train exec, Executive Director. All three were fired by Smile Train last week and have decided not to accept their severance packages so they are available to work with us right away. If I do not move fast I will lose them.
- The 4th person that I want to hire is the CMO, Priscilla Ma but unfortunately she was not fired and I cannot solicit her. She is desperately unhappy at Smile Train and I have heard she is close to accepting a job with our direct mail vendor Ron Bell who you all know. If she does, she will work exclusively on our account which is just as good. I will keep you posted on this as it develops.
- I know that you want to have confirmation on non–solicit aspects of my separation agreement with Smile Train and I have asked my lawyer who handled the matter to speak to you and answer al of your questions. Let me know who she should speak with.

There is plenty of work to do....

We need to develop additional direct mail creative for HelpMeSee, website, collateral, PR plans, foundation and corporation plans, etc.

We need to to submit a proposal to the Gates Foundation ASAP – they are eagerly awaiting it.

We need to follow up with major donor meetings and commitments:, ███████████ ████████████████. All three are very interested in what we are doing and I think at least 2 of the 3 will become founding donors at $5 million each. ████ may sign on at $10 million.

I propose that we have a conference call at the end of today or tomorrow morning, discuss and resolve any outstanding issues and get to work!

Thank you for you help and support,

Brian

Brian Mullaney

Co-Founder/CEO



112 West 34th street, #1510

New York, New York 10120

Tel: 917-902-7550

<u>brian@surgery4thepoor.org</u>

WW00077778

# EXHIBIT 49

Hi all, these are the minutes from Saturday's call. There may be some new activity regarding the Tabin issue, but this is as of Saturday evening. Please let me know if there are any questions. Best, Karen

- Geoff Tabin Issue
    - o Discussed his 2 calls to Glenn Strauss.
        - ■ Appears that he feels threatened by HMS and is against HMS business model.
        - ■ Tabin apparently wants Strauss out so that HMS is without a Medical Director.
        - ■ Has stated he doesn't want $$ from HMS. (Has 1MM surplus from last year).
        - ■ Tabin has threatened to turn Glenn over to David Chang (Chairman of the ASCRS) and the Ethics Committee of the AAO.
        - ■ Jim, Mohan and Brian agreed that Tabin is not being reasonable and the only way to deal with him right now is to thank him for his comments and be as polite and gracious as can be. HMS must keep charging ahead.
            - ■ Brian mentioned that Glenn may use him if he needs to put blame on anyone, as he is in an uncomfortable situation.
        - ■ Discussed that Orbis mailer should not be sent to Tabin yet.
- Marketing Results
    - o Direct Mail
        - ■ Jim hasn't received anything to date, Grace has received everything, Mohan has received some pieces, Brian only has received Foundation Mailer.
        - ■ Too early to really report on anything tonight. Will provide more data next week.
        - ■ Reiterated that we won't have results from TMT mailers until first week of December.
        - ■ Discussed Ron Bell's continued involvement
            - ■ Brian feels strongly that he will offer to review results from October mailing. Not sure about any continued marketing efforts with TMT at this point.
    - o Banner Ads
        - ■ Hold put on them for now. Did not discuss when they would resume.
    - o Print Ads
        - ■ 6 papers to date; will continue to monitor over next several weeks.
    - o Google Analytics
        - ■ Per Brian, traffic up by 500% compared to same time last month.
        - ■ Will continue to monitor daily.
    - o DMP – Caging
        - ■ Discussed online, real-time access and why DMP cannot provide to HMS.
        - ■ Mohan suggested putting an Access interface database on front end to perhaps solve this issue.
            - ■ **Karen to reach out to DMP Monday to see if this is possible.**
        - ■ In the meantime, S4TP will provide results as often as HMS wishes to see.
- Major Donor/Celebrity Initiatives
    - o Celebrities
        - ■ Chris Meloni – confirmed, need a headshot and quote

**Respondent's Ex. 126**

- Alex Trebek, Drew Ordon, Jane Kaczmarek (meeting in California week of 11/14)
    - **Will ask for headshots and quotes**
- Candice Bergen - 80% on board
- Captain Scully
    - Jim suggested reaching out to pilot who landed plane in Hudson
        - **Karen/Brian to research him and write letter.**
- Review of Houston Trip – 11/9-11/10 – Brian and Delois
    - Met 6 couples, former ST major donors, impressed with presentation and appear to all be on board.
    - Waiting for Christmas to see if donations will come thru.
- DC Donor
    - Brian still working on finalizing deal.
- Lincoln Center - end of October Event
    - Met lots of celebs (I.e. Oprah, Seth Myers)...wrote to them, will follow up to gauge interest.
- California Trip – 11/15-11/18 – Brian and Delois
    - Meeting wealthy ST donors, plus celebs
- Switzerland – 11/21-11/23
    - Brian to meet ███████████████ (given $50+MM to ST).
- Additional Major Donors to reach out to
    - ███████████████████████
        - Discussed that Jim not needed to "close deals" with these donors.  Will bring Jim in for the large 5-10MM gift prospects.
    - ███████████ – Jim to reach out to.
    - ████████████████████████████████████
    - ██████████████████████████ – recommended by Jim
        - **Karen to research and send letter from Brian or Jim or both (TBD)**
        - Ways to get thru to ███████████
            - ████████████
            - ███████████████ (send a "galley proof") and ask him for his thoughts on it.  (Study to be sent by Peter Glick shortly to Mohan).
            - Flight Safety connection - ███████████████ flies around all over the place and must have a pilot who most likely was trained by Flight Safety.
    - Brian meeting with Julie Shafer Monday 11/14 to discuss list of 100+ people to target.
- Presentation for Major Donor Meetings
    - Jim keen on this being finished.  Brian in process.
    - Discussed that Rand Study, while impressive, should not be used in Presentation.
        - will not be as useful to getting a donor choked up.
        - Brian cited meeting with ST anonymous donor and how he wrote a check for $10MM after seeing Cronkite video.
- Foundation Mailer from Al Ueltschi
    - **Will research addresses week of 11/14**
    - **Mohan/Jim to review and add additional names to be cc'd and/or addressed to.**
- Website
    - Brian discussed his overall disappointment with job done by Digital Pulp.
    - Like design, but not impressed with functionality and performance.
        - Parallax not working on mobile devices.
        - Collage still inconsistent, sometimes photos are there and sometimes they're not and/or they don't move.
        - Suggested auto scroll being able to begin if site is dormant for say, 10 seconds.
        - Discussed that parallax may simply have to be dropped if it poses more problems than it is worth.
        - Jim brought up tagline on image with kid reading braille – does not feel comfortable saying that we can give him his "eyesight back."

WW00068217

- o **Mohan, Grace and Jim to come up with list of questions, comments, complaints by Monday 11/14 that Karen and Brian can address with Digital Pulp during a face to face/conf call week of 11/14.**
- Upcoming Trip to visit partners
  - o January 22-28, 2012
    - Visit Chitrakoot center, north of Delhi for a couple days with photographer/videographer to begin building photo and video archive and see surgery first-hand.
      - Per Mohan, Chitrakoot does 20-50 pediatric cataracts/month.
      - Will photograph children, as well as 20, 30 and 40 year-olds.
      - Goal is to create a short, emotional and impactful video that can go viral.
    - Will visit villages as well as medical center.
    - Will leave photographer/videographer on site to continue while Delois and Brian go to Mumbai to visit the following:
      - Tata
        - trying to get meetings with Ravi Kant (Vice Chairman, Tata and S4TP board member) and possibly Ratan Tata.
        - will also try to get meeting with Tata Consultancy to inquire about patient database help.
      - Aishwarya Rai – celebrity prospect
    - Photographer/Videographer
      - Mark Atkinson (ST board member and has been photographing children with clefts for 30 years)
        - can do both still and video
      - Geoff Oliver Bugbee
        - Mentioned by Jim since he is a well-known journalistic photographer and has been photographing blind children for many years now for Orbis.
        - Recently sent Jim and email stating he can license some of his existing images and is also looking forward to going on a trip to help out as well.
          - **Karen to reach out to Bugbee about licensing images.**

**Karen Lazarus**
Senior Manager
Surgery For The Poor
420 Fifth Avenue, 27th Floor
New York, NY 10018
t. 646.558.3766 ext. 101
c. 917.848.3508
e. karen@surgery4thepoor.org
**www.surgery4thepoor.org**



TIME magazine named Surgery For The Poor "One of 10 Ideas That Can Change The World."