# EXHIBIT 59

**MEETING MINUTES OF**
**WONDERWORK, INC. ("WONDERWORK")**
**BOARD OF DIRECTORS**

**December 28, 2012**

A meeting of the Board of Directors of WONDERWORK, a corporation incorporated under the laws of the State of Delaware, was held by telephone conference call on December 28, 2012, commencing at 8:00 am, EST, pursuant to timely notice given to all members of the Board.

The following persons were present:

Present:      Ravi Kant
              Theodore Dysart
              John J. Coneys
              Brian Mullaney (limited participation)

## I.    CALL TO ORDER

Board members all acknowledged receipt of proper notice of the meeting and receipt of the agenda for the meeting. At the Board's direction, WonderWork's counsel was designated to prepare the minutes of the meeting and provide same to the Secretary of the corporation. A quorum being present, the meeting commenced.

## II.   United States District Court for the Southern District of New York, Case No. 12 CV 9102, captioned *Smile Train, Inc., v. Brian F. Mullaney*

Counsel for WonderWork and Brian Mullaney opened the meeting with general background information and historical perspective leading up to the filing of the captioned litigation against Brian. Board members had been provided with copies of the formal District Court complaint. This discussion included Brian's prior roles with Smile Train, his relationship with certain of its Board members and important factual information surrounding the issues that purportedly lead to the filing of the lawsuit.

At this point, Brian presented his oral request for indemnification. Counsel for

Brian then left the meeting. Counsel spoke to

1

**WON-EX 1257**

JJ Coneys suggested that the Board consider its current financial situation and place a ceiling or cap on the amount it would presently agree to indemnify. The other Board members were in agreement and it was resolved to cap current indemnity at $150,000.00. All legal bills would be reviewed by JJ and the audit committee. The Board could consider adjustments to these limits at a later date depending upon future circumstances and WonderWork's financial condition. Counsel for WonderWork was instructed to report approximately every thirty (30) days on the status of both the case and the costs associated with same.

The Board unanimously agreed to indemnify Brian Mullaney in connection with the suit filed against him by Smile Train up to a current limit of $150,000.00, subject to further review or potential future requests to increase the limit. Brian Mullaney was not part of the discussion on this matter and was not in attendance during this portion of the meeting. Upon motion duly made and seconded, it was so agreed and counsel was instructed to draft a formal resolution for adoption by the Board and insertion into the corporate records of WonderWork.

## III.    MEETING ADJOURNED

There being no further business, the meeting was duly adjourned.

Secretary

2

WON-EX 1258

## RESOLUTION
## OF
## THE BOARD OF DIRECTORS OF
WonderWork, Inc.

The Board of Directors of WonderWork, Inc., (WonderWork), having been presented with a request by Board member Brian Mullaney for indemnification from WonderWork in connection with the defense of a case filed in the United States District Court for the Southern District of New York, Case No. 12 CV 9102, captioned *Smile Train, Inc., v. Brian F. Mullaney*, does hereby make and adopt the following Resolution, approving indemnification for and against the costs and expenses incurred in connection with the defense of or participation in the above-captioned case under the terms and conditions contained in this Resolution.

The Board of Directors, with the exclusion of Brian Mullaney, join in this Resolution. In a meeting of the Board of Directors, the Board recognized the joint benefits to Brian Mullaney and WonderWork through his leadership and experience, and his authorship and speaking activities, including, but not necessarily limited to, name recognition and significant financial contributions for WonderWork programs that WonderWork would likely not receive otherwise. The Board views Brian's current participation in the *Smile Train* lawsuit a function and result of his service to WonderWork and as a member of its Board of Directors and further views successful results and outcomes from the matters as beneficial to WonderWork, as well.

The Bylaws of the Corporation, as well as Delaware law, the law of the State in which WonderWork is incorporated, authorize indemnification of directors, officers, and employees of WonderWork who are parties to, or threatened to be parties to, any pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, against expenses (including attorneys fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with such action if he acted in good faith and in a manner he reasonably believed to be in, or not opposed to the best interests of WonderWork.

Therefore, the Board of Directors, without participation by Brian Mullaney, hereby unanimously adopts the following Resolution, agreeing to indemnify Brian Mullaney in connection with his participation in the *Smile Train* lawsuit, in accordance with its Bylaws and Delaware law as follows:

> RESOLVED: That the Board of Directors of WonderWork, by vote of all of the Directors except Brian Mullaney, hereby agrees to indemnify Brian Mullaney in connection with his costs and expenses (including attorney fees, professional, expert, and consultant fees, investigative costs, and costs of appeal) incurred by reason of, or resulting from, or relating to his participation in the defense of claims, demands, and causes of action asserted against him in the instant *Smile Train* lawsuit, in accordance with its Bylaws and Delaware law. The Board of Directors further resolves to seek

1

WON-EX 1259

reimbursement for those costs and expenses through its Directors and Officers Liability Insurance Policy currently held with Philadelphia Indemnity Insurance Companies. The Board of Directors is presently limiting the amount of any losses, fees and costs it will provide through this agreement to indemnify at $150,000.00. The Board may revise or reassess these limits should circumstances change.

I FURTHER CERTIFY that all of the members of the Board of Directors have voted to adopt the foregoing Resolution, and the same shall be included in the official corporation minute book and/or other corporation records maintained by the Corporation. Brian Mullaney did not participate in the discussion or vote on this Resolution.

IN WITNESS WHEREOF, I have hereunto subscribed my name this 28th day of December, 2012.

_____
Secretary

Theodore L. Dysart
Print Name

2

WON-EX 1260

EXHIBIT 60

**From:** Brian Mullaney [brian@wonderwork.org]
**Sent:** Wednesday, February 13, 2013 10:24 AM
**To:** Ted Dysart; jjconeys@gmail.com; Ravi Kant
**Subject:** FW: Denial of Coverage notice from Marshall Conway & Bradley
**Attachments:** !2013_02_14_BOD_meeting_2013_02_13.pdf; Mullaney draft employment ver 1[1].doc

Hi,

I wanted you to see this email from Greg Lam regarding getting our insurance company to pay for legal  expenses. They denied coverage which it seems it their standard response but  Greg seems optimistic we have a good case to get at least some reimbursement.

I have attached the board presentation for tomorrow as well. I had intended to get this to you Monday but we had some internal issues getting all the numbers correct – I apologize for that.

I have al;so attached a DRFAT employment agreement for me. I recommend that we discuss tomorrow and a process to get this finalized by our year-end June meeting along with an independent review of my comp and that of our top 4 people.

Looking forward to our meeting tomorrow as we have a lot to discuss. Please try and go through the presentation before we meet if we can so we can move quickly. Of course if you have any questions or information requests before we meet do not hesitate.

Thanks,


Brian


**Brian Mullaney**
Co-Founder/CEO
WonderWork    *(formerly Surgery For The Poor)*
420 Fifth Avenue, 27th Floor
New York, NY  10018
tel: 212.729.1855
cell: 917.902.7550
email: brian@wonderwork.org
www.WonderWork.org


Miracle surgeries for children.
wonder work

**TIME magazine named WonderWork "One of 10 Ideas That Can Change The World."**

---

**From:** "greglam@cckc-law.com" <greglam@cckc-law.com>
**Date:** Tuesday, February 12, 2013 12:32 PM



WW_EMAILS0230163-2

**TIME magazine named WonderWork "One of 10 Ideas That Can Change The World."**

# EXHIBIT 61

9595 ☐ VOID ☐ CORRECTED

| PAYER'S name, street address, city or town, province or state, country, ZIP or foreign postal code, and telephone no. | | 1 Rents $ | OMB No. 1545-0115 |
|---|---|---|---|
| WonderWork, Inc.<br>420 5TH AVE<br>27th floor<br>NEW YORK, NY 10018<br>(212)729-1855x103 | | 2 Royalties $ | **2013**<br>Form **1099-MISC** |

**Miscellaneous Income**

| | | 3 Other income $ | 4 Federal income tax withheld $ |
|---|---|---|---|

**Copy A**

**For Internal Revenue Service Center**

| PAYER'S federal identification number | RECIPIENT'S identification number | 5 Fishing boat proceeds $ | 6 Medical and health care payments $ |
|---|---|---|---|
| 27-4159217 | ████████ | | |

**File with Form 1096.**

| RECIPIENT'S name | 7 Nonemployee compensation | 8 Substitute payments in lieu of dividends or interest $ |
|---|---|---|
| Jones Day | $ 245357.45 | |

**For Privacy Act and Paperwork Reduction Act Notice, see the 2013 General Instructions for Certain Information Returns.**

| Street address (including apt. no.) | 9 Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ▶ ☐ | 10 Crop insurance proceeds $ |
|---|---|---|
| 222 East 41st Street | | |

| City or town, province or state, and ZIP or foreign postal code | 11 Foreign tax paid | 12 Foreign country or U.S. possession |
|---|---|---|
| NY, NY 10017-6702 | | |

| Account number (see instructions) | 2nd TIN not. ☐ | 13 Excess golden parachute payments $ | 14 Gross proceeds paid to an attorney $ |
|---|---|---|---|

| 15a Section 409A deferrals $ | 15b Section 409A income $ | 16 State tax withheld $ $ | 17 State/Payer's state no. | 18 State income $ $ |
|---|---|---|---|---|

Form **1099-MISC**  Department of the Treasury - Internal Revenue Service  38-2099803

**Do Not Cut or Separate Forms on This Page -- Do Not Cut or Separate Forms on This Page**

9595 ☐ VOID ☐ CORRECTED

| PAYER'S name, street address, city or town, province or state, country, ZIP or foreign postal code, and telephone no. | | 1 Rents $ | OMB No. 1545-0115 |
|---|---|---|---|
| WonderWork, Inc.<br>420 5TH AVE<br>27th floor<br>NEW YORK, NY 10018<br>(212)729-1855x103 | | 2 Royalties $ | **2013**<br>Form **1099-MISC** |

**Miscellaneous Income**

| | | 3 Other income $ | 4 Federal income tax withheld $ |
|---|---|---|---|

**Copy A**

**For Internal Revenue Service Center**

| PAYER'S federal identification number | RECIPIENT'S identification number | 5 Fishing boat proceeds $ | 6 Medical and health care payments $ |
|---|---|---|---|
| 27-4159217 | ████████ | | |

**File with Form 1096.**

| RECIPIENT'S name | 7 Nonemployee compensation | 8 Substitute payments in lieu of dividends or interest $ |
|---|---|---|
| Kaplan & Levenson P.C. | $ 2424.50 | |

**For Privacy Act and Paperwork Reduction Act Notice, see the 2013 General Instructions for Certain Information Returns.**

| Street address (including apt. no.) | 9 Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ▶ ☐ | 10 Crop insurance proceeds $ |
|---|---|---|
| 630 Third Avenue, 5th floor | | |

| City or town, province or state, country, and ZIP or foreign postal code | 11 Foreign tax paid | 12 Foreign country or U.S. possession |
|---|---|---|
| New York, NY 10017-6705 | | |

| Account number (see instructions) | 2nd TIN not. ☐ | 13 Excess golden parachute payments $ | 14 Gross proceeds paid to an attorney $ |
|---|---|---|---|

| 15a Section 409A deferrals $ | 15b Section 409A income $ | 16 State tax withheld $ $ | 17 State/Payer's state no. | 18 State income $ $ |
|---|---|---|---|---|

Form **1099-MISC**  Department of the Treasury - Internal Revenue Service  38-2099803

DETACH BEFORE MAILING

NTF 257737A   BMISFED

WON-EX 1942

# EXHIBIT 62

**From:** Brian Mullaney [brian@wonderwork.org]
**Sent:** Wednesday, September 14, 2016 9:50 PM
**To:** Karen Lazarus
**CC:** DeLois Greenwood
**Subject:** Re: Marketing/Development Meeting Notes - 9/7

Ok.
I read the clause.

We did expunge them. And the info.

Please enter the new info into the new database – not the olfd info. We got all their address info from the internet correct? And take a guess at their giving and we should be good.
b


**Brian Mullaney**
Co-Founder/CEO

WonderWork
411Fifth Avenue, Suite 702 **NEW ADDRESS!**
New York, NY  10016
tel: 212.729.1855
cell: 917.902.7550
email: brian@wonderwork.org
www.WonderWork.org

Watch two blind sisters see their mom for the first time!
More than 11,000,000 people have watched this heart-warming video so far. It was the #1 watched video on the National Geographic website for more than a year.



**TIME magazine named WonderWork "One of 10 Ideas That Can Change The World."**

---

**From:** Karen Lazarus <karen@wonderwork.org>
**Date:** Wednesday, September 14, 2016 at 7:07 PM
**To:** brian mullaney <brian@wonderwork.org>
**Cc:** DeLois Greenwood <delois@wonderwork.org>
**Subject:** FW: Marketing/Development Meeting Notes - 9/7

I spoke to Janet a bit more about the database and the "special" donors; she mentioned that you wanted me to look at the agreement to see if there was a specific mention of IDMI.  I just reviewed it, but I don't see any mention of IDMI or a database.  Should I be looking at something else?
Attached is a screen shot of the clause in the agreement in case you wanted to re-review it.  Thanks.

---

**From:** Janet Huang <janet@wonderwork.org>
**Date:** Wednesday, September 7, 2016 5:43 PM
**To:** Brian Mullaney <brian@wonderwork.org>
**Cc:** Vera Eastman <vera@wonderwork.org>, DeLois Greenwood <delois@wonderwork.org>, Karen Lazarus <karen@wonderwork.org>

WW_EMAILS0094513_0001

**Subject:** Marketing/Development Meeting Notes - 9/7

Hi All,

Below are the notes:

## RENEWAL

- Review results. CTRADs for summer matching gift are currently $0.18. 20/20/20 Transformation isn't doing well and we should not repeat this package. Brian felt the Transformation OE headline wasn't strong. He will rewrite headlines on upcoming CDR creatives, if necessary.
- The Once and Done test results are promising. With 5 weeks of returns, the tests have a $0.30 CTRAD. Mailing Once and Done would enable us to mail 50K more donors. Once and Done donors will be flagged as 8x limited communication. We will start sending renewals to the Once and Done donors who gave another donation. We will ask for CDR's recommendations on the strategy for mailing Once and Done.
- Going forward when discussing creatives, we will have a file of the creative mailed for reference. We will refer to result history, sorted by CTRADs from best to worst. And just repeat the top 12 creatives.
- Cost per piece will increase as mail quantities shrink for the sub-causes and also when we cancel creative that was supposed to gang print with other jobs.
- Brian reviewed the stamp package along with the projections and approved the test.
- Standard renewal results will seem worse as we've pulled out half of the major donors for in-house mailings. We would need to look at results combined.
- Brian will review supporter card art next week when we're able to compare the options with the 2016 package.
- JCA: Brian approved adding copy inside of the reply envelopes

## MAJOR DONOR

- SEPT: As the Back to School letter is mailing 9/7, the Chitrakoot cultivation letter should mail 9/21 – two weeks later – not 9/26.
- OCT:

  - Last October's match gift letter did well with 8.9% and 6% response rates for WonderWork and 20/20/20, respectively. Brian will write a version of that letter for October, which will mail Oct. 5th.
  - Brian will write the October cultivation letter with content from Tiffany. He will have the October letters done by 9/16. It will mail Oct. 19th, which will give the printer a month.

- STATE REG: Legal said we should have state registration on the major donor mail. We will print and fold it inside of the envelope.
- PreSort Postage: Brian agreed to using presorted first class postage, which would save 5 cents per piece. To further save on costs, we will also look at the non-profit rate stamp next week as another option and BREs.
- Letters to $10K DONORS: Karen sent letters to 11 of the $10K cumulative donors. Brian to review the list again to see if there are more donors who we should send letters to.
- To decide on creative to mail, each month we will brainstorm, review previous creatives and results. This process will help decide what letter Brian needs to write.
- We will create a WW version of the supporter card for major donors
- When we mail the grant proposals again the photos will need to be updated with new ones.
- Grant Proposals: we'll break out the results by those who have given to the grants compared with donors who haven't
- P.S. In one of the letters asked donors to send in comments. Comments received will be collected in a folder for reference. Not necessary to put into a spreadsheet.
- DMP will handle any major donor checks/comments sent to WW office. First batch was FedEx'd to DMP on 9/6.

## DONOR RELATIONS

- Call log sheet will be revised. Improvements to be made include % for donors reached and total amount of gifts per day.

- To increase pool of donors to call, we will include donors who gave $50-$99.99

DATABASE

- Contract is in legal review. IDMI pulling data for offload.
- Special donors: Brian believes the document states about removal from "IDMI".

WEB

- 100% claim should be moved up higher in the donate page.  Perhaps next to the ask string.

Next Steps

- Brian to provide October major donor letter copy (9/16)
- Marketing to discuss Once and Done contact strategy with CDR and provide recommendations (9/13)
- Update 100% claim placement on the donate pages (9/19)
- Revise call log (9/13)

Attendees: DG, BM & JH

# EXHIBIT 63

IN THE HIGH COURT OF JUSTICE

CHANCERY DIVISION

WEDNESDAY 18 DECEMBER 2013

MASTER MARSH

Claim No. HC13F00538



EXHIBIT

C-254

ALL-STATE LEGAL®

B E T W E E N :

THE SMILE TRAIN UK
(a company limited by guarantee)

**Claimant**

- and -

(1) BRIAN MULLANEY
(2) HM ATTORNEY GENERAL

**Defendants**

---

### ORDER

---

**UPON** the Claimant's application by notice dated 25 July 2013 for an extension of time for service of the Claim Form pursuant to rule 7.6(1) of the Civil Procedure Rules 1998

**AND UPON** the Claimant's application by notice dated 13 August 2013 for summary judgment pursuant to Part 24 of the Civil Procedure Rules 1998

**AND UPON** the First Defendant's application by notice dated 18 October 2013 to strike out the claim pursuant to rule 3.4(2) of the Civil Procedure Rules 1998

**AND UPON** hearing Counsel for the Claimant and Counsel for the First Defendant, and the Second Defendant not appearing nor being represented

**AND UPON** reading the evidence

**AND UPON** the Master finding that the First Defendant has no real prospect of successfully defending the claim and that there is no other reason why the claim should be disposed of at trial

**AND UPON** the Claimant undertaking to the Court that, in the event that it is able recover from Her Majesty's Revenue and Customs more than 6.9% of the VAT due on the costs set out in the costs schedule dated 17 December 2013, it will promptly repay to the First Defendant any sums paid by him in respect of irrecoverable VAT which are in fact so recoverable

CONFIDENTIAL

**IT IS ADJUDGED AND ORDERED THAT**

(1) Time for service of the Claim Form and the Particulars of Claim be extended to 15 August 2013

(2) The application of the First Defendant be dismissed

(3) There be summary judgment for the Claimant on the claim

(4) The First Defendant do pay to the Claimant the sum of £701,959.21 by 4.00pm on 31 January 2014

(5) The Defendant do pay the Claimant's costs of the claim by 4.00pm on 31 January 2014. The said costs are summarily assessed in the sum of £52,455

(6) If the First Defendant wishes to apply to stay enforcement and/or for permission to serve proceedings on The Smile Train Inc, he must file and serve on the First Defendant an application notice and evidence in support on or before 23 January 2014. The hearing of any such application shall be at 10.00am on 29 January 2014 before Master Marsh with a time estimate of 1 hour.


CONFIDENTIAL

WW 00089401

**IN THE HIGH COURT OF JUSTICE**

**CHANCERY DIVISION**

**WEDNESDAY 18 DECEMBER 2013**

**MASTER MARSH**

B E T W E E N :

### THE SMILE TRAIN UK
(a company limited by guarantee)

**Claimant**

– and –

(1)  BRIAN MULLANEY
(2)  HM ATTORNEY GENERAL

**Defendants**

---

**ORDER**

---

Bates Wells & Braithwaite London LLP
2-6 Cannon Street
London
EC4M 6YH

Tel: 020 7551 7777
Fax: 020 7551 7700

DX 42609 Cheapside 1

Ref: MPR/MKJ

**Solicitors for the Claimant**

CONFIDENTIAL

# EXHIBIT 64

**From:** ████████████ [info@haefmar.ch]
**Sent:** Wednesday, February 05, 2014 2:22 AM
**To:** Brian Mullaney
**Subject:** Re: UK Nightmare and bank info

Wire is on its way!

████

Am 05.02.2014 um 08:07 schrieb "Brian Mullaney" <brian@wonderwork.org>:

Hi ████,

My lawyer tells me that I should pay them right away to stop them from incurring additional fees and also from beginning the seizure process. (I have included email below.)

The total amount I have to pay is 745,404 British pounds sterling.

My bank account info is:

Account name: Brian and Kristen Mullaney
Account Number: ████████████
**Routing Number: 021000021**
Bank Name: JP MORGAN CHASE, New York, New York  USA

Immediately after I receive your wire I will send the money to Smile Train UK's  lawyers.

I cannot thank you enough for helping me with this. It has been very difficult dealing with this over the past two years. After this is over I will sleep through the night for the first time in a long time.

I paid taxes on that money so I am going to ask the U.S. Government to refund to me the taxes I paid and whatever they give me I will of course send to you. And I will try and find a way to repay the remaining money as well.

Thank you for helping us.


Brian & Cricket

P.S. Cricket's heart is getting better – I think you deserve the credit – not the doctors.


**Brian Mullaney**
Co-Founder/CEO
WonderWork
420 Fifth Avenue, 27th Floor
New York, NY  10018
tel: 212.729.1855
cell: 917.902.7550
email: brian@wonderwork.org
www.WonderWork.org

---

**From:** Emma Read <eread@1ec.co.uk>
**Date:** Thursday, January 30, 2014 4:00 AM

**To:** brian mullaney <brian@wonderwork.org>
**Subject:** RE: Outcome of today's hearing.

Dear Brian,

Thanks for your email.

If I can be of any further assistance to you or your US lawyers in relation to writing to the board or the presentation of documents and evidence, etc. do let me know. It seems to me that there are a number of areas where you might be able to improve your presentation of the evidence. In particular, Smile Train UK complained that there was insufficient evidence in relation to payments being deducted from your US salary.

I will scan the orders to you tomorrow from work, but the details are as follows

You will need to pay the Claimant (or the Claimant's solicitors) the sum of £701,959.21 by 4.00pm on 31 January 2014 and a further £52,455 in costs also by 4.00pm on 31 January 2014.


Emma

---

**From:** Brian Mullaney [mailto:brian@wonderwork.org]
**Sent:** 29 January 2014 21:25
**To:** Emma Read
**Subject:** Re: Outcome of today's hearing.

Thanks Emma.

Very disappointed news but I know you did your best. Thanks for trying to help me.

Can you please tell me what the Court expects me to do next? Pay how much, when and to whom?

I think I may now write to the Smile Train Inc Board and get them involved.

They are my last and only hope.

Thanks,


Brian

**Brian Mullaney**
Co-Founder/CEO
WonderWork
420 Fifth Avenue, 27th Floor
New York, NY  10018
tel: 212.729.1855
cell: 917.902.7550
email: brian@wonderwork.org
www.WonderWork.org

---

**From:** Emma Read <eread@1ec.co.uk>
**Date:** Wednesday, January 29, 2014 2:49 PM

**To:** brian mullaney <brian@wonderwork.org>
**Subject:** Outcome of today's hearing.

Dear Brian,

It went well in Court, we had answers to most of the Master's questions, but ultimately we were unsuccessful.

The master refused permission to bring the counterclaim for two main reasons:

<!--[if !supportLists]-->1.    <!--[endif]-->His view was that you should have made an application for relief at a much earlier stage in the proceedings.  I explained that you had been acting in person for much of the time. His view was that you could and should have sought alternative solicitors/legal advice at an earlier stage and made this application sooner.

<!--[if !supportLists]-->2.    <!--[endif]-->BUT, even if you had, he decided not to allow you to bring the counterclaim because his view was it was legally hopeless.

The Claimant's barrister and I argued over the law on this point.  As I anticipated, they argued that s1157 should not apply to "unauthorised remuneration".  The leading case is *Guinness v Saunders*, which I have attached – you will see that on page 663 at d-g the House of Lords (the old name for the Supreme Court) Lord Templeman explains why s.727(now known as s.1157) did not apply to unauthorised remuneration. This is repeated by Lord Goff.

I made all the arguments I could about why your situation was different to that  of Mr Ward in the *Guinness* case (he was made to repay £5.2million that he had earned as an advisor which had been agreed by a sub-committee of the board but not the full board). Master Marsh disagreed and said that the case had very wide application and covered your situation.

I asked for permission to appeal but that too was refused.  I am extremely disappointed as I see the whole episode as one in which you have suffered manifest injustice. I do recommend reading the *Guinness* case (at least the first few pages) because it will help explain why the court has reached the decisions it has, although I had very much hoped I could persuade the Court to come to a different view.

The question is where do we go from here?  You decided not to try to sue the Smile Train Inc here in the UK (we discussed the potential costs of doing so and the difficulties with such a claim). It maybe that you are best placed seeking advice from your US lawyers about whether you should pursue Smile Train Inc for the money you now owe to Smile Train UK. There seem to be many arguments that could be advanced against your former employer, Smile Train Inc, but I am of course not well placed to advise you on those. You may also have a residual claim against BWB, but I will think on that some more over the next few days.

In the meantime, I hope you have a good trip to India and do please let me know if I can offer you or your US lawyers further assistance.

Kind regards,

WW_EMAILS0226534-3

Emma

Emma Read

*Barrister*
*One Essex Court*
*Chambers of the Rt Hon Sir Tony Baldry MP*
*1ˢᵗ Floor*
*One Essex Court*
*Temple*
*London*
*EC4Y 9AR*

*Tel: 020 7936 3030 / 020 7415 5200*
*Fax: 020 7583 1606*
*@1EssexCourt*

*All members of One Essex Court undertake work exclusively under the approved Standard Contractual Terms unless agreed otherwise in writing. Full details of our terms can be found here: www.1ec.co.uk*

# EXHIBIT 65

**Payroll / salary worksheet**

| Period | Amount 1 | Amount 2 | Amount 3 | Note |
|---|---|---|---|---|
| **Brian Mullaney** | **$475,000.00** | | | 2011- $275k |
| | | | | e-mail 1/4/12 $295k |
| | | | | board approved at $475k 6/22/12 per bm e-mail 6/22/12 |
| Dec.2011 | 275,000.00 | | | |
| **Calendar 2011** | **$275,000.00** | | | |
| Jan.12 | 24,583.33 | | | |
| Feb.12 | 24,583.33 | | | |
| Mar.12 | 24,583.33 | | | |
| Apr.12 | 24,583.33 | | | |
| May.12 | 24,583.33 | | | |
| June.12 | 24,583.33 | | | |
| June.12 | 190,000.00 | | | additional salary per 6/22/12 bod meeting |
| **FY12** | **$612,499.98** | | | |
| July.12 | 39,583.33 | | | |
| Aug.12 | 39,583.33 | | | |
| Sep.12 | 39,583.33 | | | |
| Oct.12 | 18,750.03 | 20,833.30 | | less $3500 for camera |
| Nov.12 | 0.00 | 39,583.33 | | |
| Dec.12 | 0.00 | 39,583.33 | | |
| **Calendar 2012** | **$475,000.00** | | | |
| Jan.13 | 56,916.63 | | | include holdover per BM e-mail 1/2/13 |
| Jan.13 additional | 79,166.66 | | | Nov.12 and Dec.12 catch up e-mail 1/2/13 |
| Feb.13 | 39,583.33 | | | |
| Mar.13 | 39,583.33 | | | |
| April.13 | 39,583.33 | | | hold at $475k per e-mail 4/4/13 |
| Mar.13 | 39,583.33 | | | |
| Jun.13 | 39,583.33 | | | |
| **FY13** | **$471,499.96** | | | |
| Jul.13 | 39,583.33 | | | |
| Aug.13 | 39,583.33 | | | |
| Sep.13 | 39,583.33 | | | |
| Oct.13 | 22,250.07 | 17,333.26 | | |
| Nov.13 | 0.00 | 39,583.33 | | |
| Dec.13 | 0.00 | 39,583.33 | 96,499.92 | paid in Jan 2014 |
| **Calendar 2013** | **$475,000.00** | | | |
| Bonus 7/1/13 | | 250,000.00 | 0.00 | |
| Jan.14 | 114,170.19 | -22,000.00 | 114,170.19 | |
| Jan.14 additional | 21,913.06 | | $136,083.25 | 136,083.25 |
| Feb.14 | 39,583.33 | | | |
| Mar.14 | 39,583.33 | -78,000.00 | | deducted per 4/5/14 |
| Apr.14 | 189,583.33 | | | includes $150k bonus per 4/5/14 e-mail |
| May.14 | 39,583.33 | | | |
| Jun.14 | 30,583.43 | 8,999.90 | | remaining |
| **FY14** | **$616,000.06** | | | |
| Jul.14 | 0.00 | 39,583.33 | | |
| Aug.14 | 0.00 | 39,583.33 | | |
| Sep.14 | 0.00 | 39,583.33 | | |

**BM Salary schedule**

| | | notes | | | | $237,500 |
|---|---|---|---|---|---|---|
| | | | | 137,500.00 | 295,000 | $475,000 |

| BM Salary | | fiscal year | calendar year | | increase | difference |
|---|---|---|---|---|---|---|
| | 12/15/2011 | 275,000.00 | | | | |
| | 1/15/2012 | 24,583.33 | | 24,583.33 | 39,583.33 | 15,000.00 |
| | 2/15/2012 | 24,583.33 | | 24,583.33 | 39,583.33 | 15,000.00 |
| | 3/15/2012 | 24,583.33 | | 24,583.33 | 39,583.33 | 15,000.00 |
| | 4/15/2012 | 24,583.33 | | 24,583.33 | 39,583.33 | 15,000.00 |
| | 5/15/2012 | 24,583.33 | | 24,583.33 | 39,583.33 | 15,000.00 |
| | 6/15/2012 | 24,583.33 | | 24,583.33 | 39,583.33 | 15,000.00 |
| Total for the fiscal year | | 422,499.98 | | | | |
| Calendar year | | | | 147,499.98 | | 90,000.00 |
| | | | | 137,500.00 | $237,500 | 90,000.00 |
| | | | | | | 190,000.00 |

**NOTES**

| Date | Description | Amount | Note |
|---|---|---|---|
| 7/1/2013 | Board bonus | 250,000.00 | e-mail TD |
| 7/1/2013 | impact loan | 250,000.00 | |
| 1/6/2014 | deduct the $22,000 from my impact loan to $228,000. | | |
| 1/6/2014 | | -22,000.00 | e-mail BM |
| | remaining | 228,000.00 | |
| 7/1/2013 | Board bonus | 250,000.00 | e-mail TD |
| 1/6/2014 | personal reimbursement | -22,000.00 | e-mail BM 1/6/14 |
| 1/6/2014 | remaining | 228,000.00 | |
| 4/5/2014 | 4/5/2014 | -30,000.00 | about 50% weekly travel FY14, FY15 |
| | | -10,000.00 | annual ▮ visits |
| | | -38,000.00 | additional contribution |
| | remaining bonus | 150,000.00 | paid 4/15/14 |
| | given back | -100,000.00 | |
| | BM | | |
| | Jun.14 | 8,999.90 | |
| | Jul.14 | 39,583.33 | |
| | bonus | 250,000.00 | see e-mail from JJ 10.21.14 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| bonus per 10/21/14 | | 250,000.00 | | | Aug.14 | 39,583.33 | | |
| per e-mail 10/1/14 | | -1,000.00 | | | Sep.14 | 39,583.33 | | |
| Oct.14 | 0.00 | 39,583.33 | | | Oct.14 | 38,583.33 | per e-mail 10/1/14 | -1,000.00 |
| per e-mail 10/21/14 | | -50,000.00 | | | 10/21/14email | -50,000.00 | 10/21/14email | |
| Nov.14 | 0.00 | 39,583.33 | | | Nov.14 | 39,583.33 | | |
| Dec. 14 | 0.00 | 39,583.33 | 445,499.88 | | Dec.14 | 39,583.33 | | |
| Calendar 2014 | $475,000.00 | | | | | 445,499.88 | | |
| | | | | | Jan. 15 | 39,583.33 | | |
| Jan.15 | $50,000.00 | -$10,416.67 | | | | 485,083.21 | | |
| 1/8/2015 | | -2,274.09 | | holiday dinner | Jan.15 | -50,000.00 | payroll | |
| 2/9/2015 | | -1,300.00 | | MAB dinner | | 435,083.21 | | |
| Feb.15 | | 39,583.33 | $431,509.12 | end of Jan 15 | 1/8/15 email | -2,274.09 | holiday dinner | |
| Feb.14 additional | 385,416.67 | to bring calendar year to $475k | | | 2/9/15 email | -1,300.00 | MAB dinner | |
| | | | $46,092.45 | balance as of Feb.15 | | 431,509.12 | | |
| Mar.15 | 0.00 | 39,583.33 | | | Feb. 14 | 39,583.33 | | |
| Apr.15 | 0.00 | 39,583.33 | -29,000.00 | april 2015 emails | | -39,583.33 | paid 2/13/15 | |
| May.15 | 0.00 | 39,583.33 | -5,000.00 | 5/6/15 e-mail | paid in Feb | 385,416.67 | to bring calendar 2015 to 475,000 | |
| Jun.15 | 0.00 | 39,583.33 | -2,652.17 | 6/3/15 e-mail | remaining | 46,092.45 | | |
| FY15 | $475,000.00 | $204,425.77 | $167,773.60 | balance as of 6/15/15 | | | as of the | |
| Jul.15 | 0.00 | 39,583.33 | $207,356.93 | | | | end of Feb.15 | |
| Aug.15 | 0.00 | 39,583.33 | $246,940.26 | | Mar.15 | 39,583.33 | | |
| Sep.15 | 0.00 | 39,583.33 | $285,173.59 | | Apr.15 | 39,583.33 | | |
| Oct.15 | 0.00 | | | | | 125,259.11 | | |
| Nov.15 | 0.00 | | | | | -6,000.00 | 4/20/15 per mb for writer | |
| Dec.15 | 0.00 | | | | | -3,000.00 | 4/20/15 per mb for Photoshop lessons | |
| Calendar 2015 | $475,000.00 | | | | | 116,259.11 | as of 4/20/15 | |
| | | | | | | -20,000.00 | e-mail 4/21/15 June ███ trip | |
| Jan.16 | | | | | May.15 | 39,583.33 | | |
| | | | | | | -5,000.00 | e mail 5/6/15 $-5,000 for camera equipment | |
| Feb.16 | | | | | | 130,842.44 | | |
| Mar.16 | | | | | | -2,652.17 | e-mail 6/3/15 skyline deductions | |
| Apr.16 | | | | | June.15 | 39,583.33 | | |
| May.16 | | | | | | 167,773.60 | June Board 2015 meeting reduction of $150k not included | |
| Jun.16 | | | | | July.15 | 39,583.33 | | |
| FY16 | $0.00 | | | | | 207,356.93 | | |
| | | | | | Aug.15 | 39,583.33 | | |
| | | | | | | 246,940.26 | | |
| Taken to date | | | | | Sep.15 | 39,583.33 | | |
| Calendar 2011 | $275,000.00 | | | | | -1,350.00 | e-mail 9/23/15 | |
| Calendar 2012 | $475,000.00 | | | | owed | 285,173.59 | Sep.15 | |
| Calendar 2013 | $475,000.00 | | | | Given back to date | -266,445.86 | | |
| Calendar 2014 | $475,000.00 | | | | | | | |
| Calendar 2015 | $475,000.00 | | | | | | | |
| | $2,175,000.00 | | | | | | | |
| | | | | | | | | |
| owed | 285,173.59 | | | | | | | |
| | | | | | | | | |
| Given back to date | -266,445.86 | | | | | | | |

running total for payroll

WW_EMAIL0011552

| Date | Amount | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 8/28/2012 | -3,500.00 | camera | | | | | | | |
| | | | | | | | | | |
| 1/6/2014 | -22,000.00 | deduct the $22,000 from my impact loan to $228,000. | | | | | | | |
| 4/5/2014 | -30,000.00 | about 50% weekly travel FY14, FY15 | | | | | | | |
| | -10,000.00 | annual ███████ visits | | | | | | | |
| | -38,000.00 | additional contribution | | | | | | | |
| | -100,000.00 | | | | | | | | |
| | | | | | | | | | |
| 10/1/2014 | -1,000.00 | per email 10/1/14 | | | | | | | |
| | | | | | | | | | |
| 10/21/2014 | -50,000.00 | 10/21/14 e-mail | | | | | | | |
| | | | | | | | | | |
| 1/8/15 email | -2,274.09 | holiday dinner | | | | | | | |
| | | | | | | | | | |
| 2/9/2015 | -1,300.00 | MAB dinner | | | | | | | |
| | | | | | | | | | |
| | | -5,750.00 | | | | | | | |
| | | | | | | | | | |
| | | -6,080.22 | **did not deduct expenses for writer on India trip** | | | | | | |
| | | | **awaiting confirmation and amount** | | | | | | |
| **2/23/2015** | | -58,539.38 | **did not deduct Greg S legal bills yet - awaiting discussion** | | | | | | |
| | -70,369.60 | | | | | | | | |
| 2/23/2015 | did not deduct Greg S legal bills yet - awaiting discussion | | | | | | | | |
| I was able to go through all of Joe Vogel's invoices to-date and came up with **$58,539.38** for invoices related to Ferris. | | | | | | | | | |
| We can go through all of the invoices in detail when you return | | | | | | | | | |
| | **-29,000.00** | april 2015 emails | | | | | | | |
| | **-5,000.00** | 5/6/15 e-mail | | | | | | | |
| | **0.00** | 6/3/15 e-mail | | | | | | | |
| | | Skyline | | | | | | | |
| 6/3/2015 | -2,652.17 | deduct entire amount from my pay and continue to do entire amount going forward. | | | | | | | |
| | | | | | | | | | |
| e-mail 9/23/1 | -1,350.00 | e-mail 9/23/15 | | | | | | | |
| total todate | **-266,445.86** | | | | | | | | |

given back notes
3 OF 11
Copy of WW_EMAILS0011552.xlsx

| Owed to WW | | | |
|---|---|---|---|
| **Expense** | **Detail** | **Date** | **Notes** |
| $ 4,934.26 | Eve Claxton - BA flight; Jet Airways; Air India flight | 1/15/2015 | |
| $ 945.19 | Eve Claxton - Imperial Hotel - India Trip | 02/25/15 | |
| $ 200.77 | Eve Claxton - ITC Maurya Hotel - India Trip | 03/01/15 | |
| | | | |
| | | | |
| | | | |
| **$ 6,080.22** | | | |
| | | | |
| **Owed to BM** | | | |
| **Expense** | **Detail** | | **Notes** |
| $ 250.00 | India Trip - Miscellaneous Expenses | 2/25-3/1 | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| **$ 250.00** | | | |
| | | | |
| **Difference** | | | |
| **$ 5,830.22** | | | |

| Owed to WW | | | |
|---|---|---|---|
| Expense | Detail | Date | Notes |
| $ 92.39 | Four Seasons Dinner | 10/01/14 | personal friend |
| $ 653.27 | Four Seasons Dinner | 03/01/14 | John Mannix Dinner/Mtg. |
| $ 177.82 | Postage (certified letters) | 01/31/14 | ST UK Legal |
| $ 73.99 | Harvard Club Meeting | 01/14/14 | |
| $ 25.00 | Taxi | 01/02/14 | Taxi with Maura |
| $ 1,022.47 | | | |
| | | | |
| Owed to BM | | | |
| Expense | Detail | | Notes |
| $ 25.00 | Misc Taxis and Tips Pecos Trip | 12/17/15 | Dec 16-17 |
| $ 350.00 | Misc Taxis and Tips Africa Trip | 12/05/14 | Dec 1-6 |
| $ 25.00 | Misc Taxis and Tips Pecos Trip | 10/16/14 | Oct 15-16 |
| $ 100.00 | Misc Taxis and Tips Houston/California Trip | 09/18/14 | Sept 15-18 |
| $ 75.00 | Misc Taxis and Tips California Trip | 05/29/14 | May 27-29 |
| $ 50.00 | Misc Taxis and Tips Houston Trip | 02/18/14 | Feb 17-Feb 18 |
| $ 400.00 | Misc Taxis and Tips India Trip | 01/30/14 | Jan 30-Feb 5 |
| $ 100.00 | Misc Taxis and Tips Zurich Trip | 01/09/14 | Jan 7-Jan 9 |
| $ 1,125.00 | | | |
| | | | |
| Difference | | | |
| $ (102.53) | | | |

| Owed to WW | 2013 | | Date | Notes |
|---|---|---|---|---|
| $ 1,009.00 | Office holiday dinner | | 12/9/2013 | |
| $ 132.50 | Skyline - Michael Bianco - ride to Huntington | | 11/12/2013 | |
| $ 15,000.00 | 4 Seasons Donor Dinner | | 11/5/2013 | |
| $ 233.14 | PIER 77          CAPE PORPOISE     ME | | 07/24/13 | Haefner Trip |
| $ 172.66 | HURRICANE RESTAURANTKENNEBUNKPORT     ME | | 07/23/13 | Haefner Trip |
| $ 44.00 | TAJ BOSTON HOTEL 167BOSTON          MA | | 07/23/13 | Haefner Trip |
| $ 318.96 | TAJ BOSTON HOTEL 167BOSTON          MA | | 07/23/13 | Haefner Trip |
| $ 15.46 | HUDSON NEWS  BOSTON EAST BOSTON        MA | | 07/22/13 | Haefner Trip |
| $ 9.00 | PORT AUTHORITY      BOSTON          MA | | 07/22/13 | Haefner Trip |
| $ 378.86 | W BOSTON DINE W BOSTBOSTON        MA | | 07/22/13 | Haefner Trip |
| $ 150.76 | BOSTON DUCK TOURS   BOSTON          MA | | 07/18/13 | Haefner Trip |
| $ 495.15 | TICKETMASTER - Blue Man Group | | 07/15/13 | Haefner Trip |
| $ 866.70 | THE WHITE BARN INN  KENNEBUNK      ME | | 07/10/13 | Haefner Trip |
| $ 1,043.25 | THE WHITE BARN INN  KENNEBUNK      ME | | 07/10/13 | Haefner Trip |
| $ 69.49 | CROSS SOUND FERRY WENEW LONDON          CT | | 07/09/13 | Haefner Trip |
| $ 59.44 | Fedex - STUK - Attorney General | | 06/10/13 | |
| $ 71.44 | Fedex - STUK - Charity Commission | | 06/10/13 | |
| $ 56.95 | Fedex - STUK - Andrew Redpath | | 06/07/13 | |
| $ 20.97 | Fedex - STUK - Robert Smits | | 04/17/13 | |
| $ 20.97 | Fedex - STUK - Michael Dowling | | 04/17/13 | |
| $ 44.55 | Fedex - STUK - Elaine Bell Long | | 04/10/13 | |
| $ 130.76 | Fedex - STUK - Hillary Brown | | 04/10/13 | |
| $ 116.75 | Fedex - STUK - Eduardo Monopoli | | 04/10/13 | |
| $ 298.30 | Hotel in Newton, MA for ███████ Trip | | 02/01/13 | |
| $ 320.39 | Rudy's Donna Winston | | 01/01/13 | |
| $ 99.00 | Rudy's Cricket bday | | 01/01/13 | |
| $ 242.09 | Rudy's Cricket bday | | 01/01/13 | |
| $ 285.00 | Dinner portion with friends in Chicago Park Hyatt | | 01/01/13 | |
| $ 2,463.02 | Corinthia Hotel portion for London Trip | | 11/01/12 | 450pounds/night=$720x3 US |
| $ 24,168.56 | | | | |
| | | | | |
| Owed to BM | 2013 | | | |

| Expense | Detail | | Notes |
|---|---|---|---|
| $      92.00 | Taxi from Logan Airport to Needham (Houston Trip) | 12/18/2013 | |
| $     200.00 | Misc Taxis and Tips India Trip | 9/25/2013 | |
| $      40.00 | Misc Taxis DC Trip (███████████ Meeting) | 05/23/13 | |
| $     368.00 | Golf with JJ Coneys and Donor Prospect, ███████ | 04/26/13 | |
| $     200.00 | Misc Taxis and Tips India Trip | 03/01/13 | |
| $      50.00 | Misc Taxis and Tips Chicago Trip | 01/01/13 | |
| $      50.00 | Misc Taxis and Tips LA Trip | 01/01/13 | |
| $     150.00 | Misc Taxis and Tips Switzerland Trip | 12/01/12 | |
| $     100.00 | Misc Taxis and Tips LA Trip | 12/01/12 | |
| $     250.00 | Misc Taxis and Tips Nepal/India Trip | 10/01/12 | |
| $     200.00 | Misc Taxis in London | 10/01/12 | 125pounds |
| $     555.50 | Golf with ███████████ | 09/01/12 | |
| **$   2,255.50** | | | |
| | | | |
| **Difference** | | | |
| $  24,168.56 | **Owed to WW** | | |
| $   (2,255.50) | **Owed to BM** | | |
| **$   21,913.06** | **owed to WW for 2013** | | |
| | | | |
| **Owed to WW** | **2014** | | |
| **Expense** | **Detail** | **Date** | **Notes** |
| $     653.27 | Four Seasons Dinner | 03/01/14 | ███████ Dinner/Mtg. |
| $     177.82 | Postage (certified letters) | 01/31/14 | ST UK Legal |
| $      73.99 | Harvard Club Meeting | 01/14/14 | |
| $      25.00 | Taxi | 01/02/14 | Taxi with ███ |
| **$     930.08** | | | |
| | | | |
| **Owed to BM** | | | |
| **Expense** | **Detail** | | **Notes** |
| $      50.00 | Misc Taxis and Tips Houston Trip | 02/18/14 | Feb 17-Feb 18 |
| $     400.00 | Misc Taxis and Tips India Trip | 01/30/14 | Jan 30-Feb 5 |
| $     100.00 | Misc Taxis and Tips Zurich Trip | 01/09/14 | Jan 7-Jan 9 |
| **$     550.00** | | | |

| | | | |
|---|---|---|---|
| **Difference** | | | |
| $ 380.08 | **Owed to WW 2014** | | |
| | | | |
| $ 22,293.14 | **Owed to WW through 2013** | | |
| | | | |
| $ (22,000.00) | deducted from Impact Loan 1/6/14 | | |
| $ 228,000.00 | remaining Impact Loan | | |
| | | | |
| | | | |

| All transactions for Skyline Credit Ride Inc. | | | | | |
|---|---|---|---|---|---|
| Date | Type | No. | Payee | Category | Total | |
| 2015-04-10 | Bill | 771584 | Skyline Credit Ride Inc. | Transportation | 22.55 | |
| 2015-03-27 | Bill | 770077 | Skyline Credit Ride Inc. | Transportation | 31.78 | |
| 2015-03-20 | Bill | 769381 | Skyline Credit Ride Inc. | Transportation | 58.22 | |
| 2015-02-27 | Bill | 767090 | Skyline Credit Ride Inc. | Transportation | 148.94 | |
| 2015-02-20 | Bill | 766351 | Skyline Credit Ride Inc. | Transportation | 100.97 | |
| 2015-02-13 | Bill | 765604 | Skyline Credit Ride Inc. | Transportation | 23.58 | |
| 2015-02-06 | Bill | 764890 | Skyline Credit Ride Inc. | Transportation | 221.09 | |
| 2015-01-30 | Bill | 764094 | Skyline Credit Ride Inc. | Transportation | 134.28 | |
| 2015-01-23 | Bill | 73401 | Skyline Credit Ride Inc. | Transportation | 43.67 | |
| 2015-01-16 | Bill | 762674 | Skyline Credit Ride Inc. | Transportation | 57.91 | |
| 2015-01-09 | Bill | 762017 | Skyline Credit Ride Inc. | Transportation | 118.39 | |
| 2014-12-26 | Bill | 760605 | Skyline Credit Ride Inc. | Transportation | 155.80 | |
| 2014-12-19 | Bill | | Skyline Credit Ride Inc. | Transportation | 409.80 | |
| 2014-12-12 | Bill | 758972 | Skyline Credit Ride Inc. | Transportation | 90.71 | |
| 2014-11-28 | Bill | 757308 | Skyline Credit Ride Inc. | Transportation | 26.65 | |
| 2014-11-21 | Bill | 756528 | Skyline Credit Ride Inc. | Transportation | 69.39 | |
| 2014-11-14 | Bill | 755724 | Skyline Credit Ride Inc. | Transportation | 25.63 | |
| 2014-11-07 | Bill | 754930 | Skyline Credit Ride Inc. | Transportation | 42.03 | |
| 2014-10-31 | Bill | 754022 | Skyline Credit Ride Inc. | Transportation | 45.51 | |
| 2014-10-24 | Bill | 753214 | Skyline Credit Ride Inc. | Transportation | 57.91 | |
| 2014-10-17 | Bill | 752438 | Skyline Credit Ride Inc. | Transportation | 26.65 | |
| 2014-10-03 | Bill | 750863 | Skyline Credit Ride Inc. | Transportation | 100.76 | |
| 2014-09-19 | Bill | 749141 | Skyline Credit Ride Inc. | Transportation | 203.98 | |
| 2014-09-10 | Bill | 748405 | Skyline Credit Ride Inc. | Transportation | 179.69 | |
| 2014-08-15 | Bill | 745881 | Skyline Credit Ride Inc. | Transportation | 121.56 | **FY15** |
| 2014-07-15 | Bill | 743743 | Skyline Credit Ride Inc. | Transportation | 40.59 | 2,558.04 |
| | | | | | | |
| 2014-06-30 | Bill | 742535 | Skyline Credit Ride Inc. | Transportation | 29.73 | |
| 2014-06-15 | Bill | 741466 | Skyline Credit Ride Inc. | Transportation | 161.34 | |
| 2014-05-31 | Bill | 740251 | Skyline Credit Ride Inc. | Transportation | 299.10 | |
| 2014-05-15 | Bill | 739105 | Skyline Credit Ride Inc. | Transportation | 30.75 | |
| 2014-04-30 | Bill | 737925 | Skyline Credit Ride Inc. | Transportation | 46.95 | |
| 2014-04-15 | Bill | 736810 | Skyline Credit Ride Inc. | Transportation | 311.52 | |
| 2014-03-15 | Bill | 734484 | Skyline Credit Ride Inc. | Transportation | 147.81 | |
| 2014-02-28 | Bill | 733248 | Skyline Credit Ride Inc. | Transportation | 190.14 | |
| 2014-01-31 | Bill | 730933 | Skyline Credit Ride Inc. | Transportation | 127.93 | |
| 2014-01-15 | Bill | 729861 | Skyline Credit Ride Inc. | Transportation | 30.75 | |
| 2013-12-31 | Bill | 728510 | Skyline Credit Ride Inc. | Transportation | 88.46 | |
| 2013-12-15 | Bill | 727334 | Skyline Credit Ride Inc. | Transportation | 86.10 | |

| Date | Type | No. | Payee | Category | Total | |
|------|------|-----|-------|----------|-------|---|
| **All transactions for Skyline Credit Ride Inc.** | | | | | | |
| 2013-11-30 | Bill | 726127 | Skyline Credit Ride Inc. | Transportation | 382.44 | |
| 2013-11-15 | Bill | 725001 | Skyline Credit Ride Inc. | Transportation | 111.11 | |
| 2013-10-15 | Bill | 722610 | Skyline Credit Ride Inc. | Transportation | 26.65 | |
| 2013-09-15 | Bill | 720285 | Skyline Credit Ride Inc. | Transportation | 30.75 | |
| 2013-08-31 | Bill | 719186 | Skyline Credit Ride Inc. | Transportation | 78.52 | **FY14** |
| 2013-07-31 | Bill | 716939 | Skyline Credit Ride Inc. | Transportation | 33.21 | 2,213.26 |
| | | | | | | |
| 2013-06-30 | Bill | 714621 | Skyline Credit Ride Inc. | Transportation | 53.30 | |
| 2013-05-31 | Bill | 712237 | Skyline Credit Ride Inc. | Transportation | 59.04 | |
| 2013-05-15 | Bill | 711095 | Skyline Credit Ride Inc. | Transportation | 104.55 | |
| 2013-04-15 | Bill | 708640 | Skyline Credit Ride Inc. | Transportation | 97.68 | |
| 2013-03-31 | Bill | 707368 | Skyline Credit Ride Inc. | Transportation | 115.82 | |
| 2013-03-15 | Bill | 706191 | Skyline Credit Ride Inc. | Transportation | 123.08 | |
| 2013-02-15 | Bill | 703778 | Skyline Credit Ride Inc. | Transportation | 26.52 | |
| 2013-01-31 | Bill | 702483 | Skyline Credit Ride Inc. | Transportation | 122.71 | |
| 2013-01-15 | Bill | 701322 | Skyline Credit Ride Inc. | Transportation | 27.54 | |
| 2012-12-15 | Bill | 698704 | Skyline Credit Ride Inc. | Transportation | 84.25 | |
| 2012-11-15 | Bill | 696163 | Skyline Credit Ride Inc. | Transportation | 23.46 | |
| 2012-10-31 | Bill | 69485 | Skyline Credit Ride Inc. | Transportation | 23.46 | |
| 2012-10-15 | Bill | 693577 | Skyline Credit Ride Inc. | Transportation | 108.63 | |
| 2012-09-30 | Bill | 692201 | Skyline Credit Ride Inc. | Transportation | 37.74 | |
| 2012-08-15 | Bill | 688702 | Skyline Credit Ride Inc. | Transportation | 22.44 | **FY13** |
| 2012-07-15 | Bill | 686171 | Skyline Credit Ride Inc. | Transportation | 22.44 | 1,052.66 |
| | | | | | | |
| 2012-06-15 | Bill | 683631 | Skyline Credit Ride Inc. | Transportation | 96.90 | |
| 2012-05-15 | Bill | 680941 | Skyline Credit Ride Inc. | Transportation | 200.18 | |
| 2012-05-14 | Bill | 679556 | Skyline Credit Ride Inc. | Transportation | 130.56 | |
| 2012-04-15 | Bill | 678335 | Skyline Credit Ride Inc. | Transportation | 26.52 | |
| 2012-02-15 | Bill | 673240 | Skyline Credit Ride Inc. | Transportation | 76.50 | |
| 2012-01-31 | Bill | 671854 | Skyline Credit Ride Inc. | Transportation | 72.93 | **FY12** |
| 2011-12-15 | Bill | 667975 | Skyline Credit Ride Inc. | Transportation | 24.39 | 627.98 |
| | | | | | | |
| 2011-06-30 | Bill | 653371 | Skyline Credit Ride Inc. | Transportation | 25.50 | |
| 2011-06-15 | Bill | 652129 | Skyline Credit Ride Inc. | Transportation | 196.24 | |
| 2011-05-31 | Bill | 650578 | Skyline Credit Ride Inc. | Transportation | 108.10 | |
| 2011-03-31 | Bill | 645320 | Skyline Credit Ride Inc. | Transportation | 104.78 | |
| 2011-02-28 | Bill | 642707 | Skyline Credit Ride Inc. | Transportation | 104.78 | **FY11** |
| 2011-02-15 | Bill | 641252 | Skyline Credit Ride Inc. | Transportation | 345.22 | 884.62 |
| | | | | | 7,336.56 | 7,336.56 |
| | | | | | | |

| All transactions for Skyline Credit Ride Inc. | | | | | | |
|---|---|---|---|---|---|---|
| Date | Type | No. | Payee | Category | Total | |
| | FY15 | 2,558.04 | to date | | | |
| | FY14 | 2,213.26 | | | | |
| | FY13 | 1,052.66 | | | | |
| | FY12 | 627.98 | | | | |
| | FY11 | 884.62 | | | | |
| | | 7,336.56 | | | | |
| | | | | | | |

Copy of WW_EMAILS0011552.xlsx

# EXHIBIT 66



<p style="text-align:center">**Minutes of the**<br>**Board of Directors Meeting**</p>

**Date:**       **June 13, 2013**

**Location:**   **WonderWork Office**

**Present:**    **Brian Mullaney**
             **Ravi Kant (via conference call)**
             **Ted Dysart**
             **JJ Coneys**

---

Meeting called to order at approximately 9:00am. Dysart arrived shortly after meeting began.

Began with overview of year's results.

Kant inquired why the response rate was so much lower than projected. Mullaney explained that, one year ago, we had not mailed a single package and, thus, had no results from which to forecast. This accounted for projections being off.

Mullaney also acknowledged that one month after the FY2013 budget had been approved, we lost $6 million in anticipated revenues from the budget.

Development
Karen Lazarus entered the meeting to present development results and plans for FY2014.

Lazarus and Mullaney provided updates on current status of major donors. While development results are overall good, it was noted that Smile Train negative actions have impacted repeat giving resulting in significant loss of donations.

Discussed selected key major donors: ███████████████████████. Noted that it is not guaranteed that ████████ will renew at $2MM this December, but that Mullaney will be seeing him in August in US to better gauge. Discussed ████████ and issue with obtaining remaining $4MM originally promised to Mullaney. Dysart indicated that ST legal issues were obstacle for ████████ per conversation with him. Discussed ██████████ loan and excitement about joining WonderWork. Noted that he and his wife, ████████ are looking forward to a trip to India in the late Fall/early Winter.

Highlighted major prospects in pipeline that Mullaney has been cultivating.

Also, discussed new ideas that will generate press and more awareness in the social sphere. Discussed hosting a donor dinner this Fall for the organization's major donors and prospects.

Discussed need for hiring a senior development individual to allow for increased soliciting of major gifts from donors and prospects.

With regards to Impact Loans, Mullaney explained how WonderWork intends to use 100% of the ████████████████ for donor acquisition. This will be done through direct mail AND attracting other Impact Loans from current and prospective donors. Noted that we were getting a very good response from prospects and already have confirmations from 3 donors who wish to participate.



### Direct Marketing

Barbra Schulman joined meeting to present direct marketing results and plans for next year. Discussed extensive testing done to find control letters and best lists. Noted that 20% of our donors from the Fall are already supporting more than one cause and will begin to more strategically manage communications to these donors. Noted that renewal campaigns' average gift needs to be increased to ensure success of program.

Kant inquired as to who is doing our analytics. Schulman explained that analytics are being done by several firms, including Steve Levitt's, Greatest Good; our direct mail vendor, NNE; as well as our list broker, Paradysz.

Schulman explained that in addition to increasing direct mail acquisition volume and refining packages, we will be focusing on developing a strong digital presence starting with the launch of 4 new websites by early August. Schulman discussed that she was in process of hiring an online manager to oversee the development of targeted email and digital advertising campaigns as well as social media.

Mullaney discussed Fundraising and Revenue Targets for FY14. Board requested to see 5-year plan.

### Programs

Delois Greenwood joined meeting to explain Program results and FY14 plans.

Greenwood noted growth to 60 partners in 56 countries over 12 months. Discussed breakdown of $1,000,000 seed grants given in FY13. Encouraged by McCarthy's efforts to help recruit medical experts and build WonderWork Medical Advisory Board. Discussed challenges in helping patients in exceptionally poor regions where there is a shortage of hospitals, qualified medical staff and government support.

Greenwood discussed that program spending for next year is projected to be $2MM. Explained that search for new partnerships will continue and current high performing partners will be encouraged to scale. Noted meeting with Dimagi Group and benefits they can bring by developing cloud-based mobile monitoring tool for partners.

### Risk

Discussed Risk document drafted by KPMG.

### Legal Update

Greg Lam, WonderWork counsel, dialed in for legal segment.



### Compensation

Jim Hudner and Peter Lupo of Pearl Meyer dialed in to presentation of compensation review of CEO.

Lupo and Hudner presented their research, conclusions and recommendations. They stressed the difficulty of finding "peer" charities that are growing at the same speed of WonderWork. The board went into executive session and Mullaney exited the room.

WON-EX 1265



Mullaney returned and the meeting continued.

<u>Governance and Finance</u>
Hana Fuchs entered the room to present FY13 financial results and plans for FY14.

Fuchs briefly discussed the FY13 financial results before the meeting concluded around 12:45pm.

There were still topics not yet reviewed or discussed at this point. These will be added to a telephonic meeting to be scheduled that will also include a review of the Smile Train settlement agreement.

Meeting concluded at 12:41am EST.

3

WON-EX 1266

# EXHIBIT 67

SUPREME COURT-STATE OF NEW YORK
SHORT FORM ORDER
Present:

    HON. TIMOTHY S. DRISCOLL
    Justice Supreme Court

-------------------------------------------------------------x   **TRIAL/IAS PART: 20**

CHARLES B. WANG,

                              **NASSAU COUNTY**

                   **Plaintiff,**

                              **Index No: 001429-11**
                              **Motion Seq. No: 1**

         -against-                      **Submission Date: 9/23/11**

BRIAN MULLANEY,

                  **Defendant.**

-------------------------------------------------------------x

The following papers have been read on this motion:

    Notice of Motion, Affidavit in Support, Affirmation in Support and Exhibits......x
    Memorandum of Law in Support..................................................................x
    Affidavits in Opposition and Exhibits.........................................................x
    Reply Memorandum of Law in Further Support.............................................x
    Correspondence dated September 26, 2011..................................................x

This matter is before the Court for decision on the motion filed by Plaintiff Charles B.
Wang ("Wang" or "Plaintiff") on July 18, 2011 and submitted on September 23, 2011. The
motion was the subject of oral argument before the Court on October 6, 2011. For the reasons
set forth below, the Court grants the motion.

    A. <u>Relief Sought</u>

    Plaintiff moves for an Order, pursuant to CPLR § 3212(a), awarding summary judgment
to Plaintiff on the Complaint.

    Defendant Brian Mullaney ("Mullaney" or "Defendant") opposes the motion.

1

Respondent's Ex. 946

B. The Parties' History

The Complaint (Ex. A to McEntee Aff. in Supp.) alleges as follow:

On or about February 4, 2005, Defendant executed and delivered to Plaintiff a demand promissory note ("Note") in the principal amount of $500,000 ("Principal Amount") (Ex. C to McEntee Aff. in Supp.). Plaintiff is, and at all times was, the holder and payee of the Note.

Pursuant to the Note, Defendant promised and agreed to pay Plaintiff interest at the annual rate of five (5%) percent on the Principal Amount during the period that the Note remains unpaid. The Note further provides that Defendant waived presentment, demand, protest, notice of protest and notice of dishonor of the Note.

Plaintiff alleges that Defendant has made no payments in reduction of the Principal Amount, and Defendant owes to Plaintiff the Principal Amount of the Note, with accrued interest. Plaintiff seeks a money judgment in the Principal Amount of $500,000, together with interest as provided in the Note.

In his Verified Answer ("Answer") (Ex. B to McEntee Aff. in Supp.), Defendant asserted ten (10) Affirmative Defenses. In the Tenth Affirmative Defense, which is the focus of Defendant's opposition to Plaintiff's motion, Defendant asserts that Plaintiff "agreed to not collect or enforce the subject Note and released Defendant from his payment obligations."

In his Affidavit in Support of the instant motion, Wang affirms that he has known Defendant professionally for more than 20 years. In or about early 2005, Wang agreed to make a loan ("Loan") to Defendant in the amount of $500,000, to be repaid on demand. In connection with the Loan, Plaintiff gave to Defendant the sum of $500,000 and, in exchange, Defendant executed and delivered the Note to Plaintiff. Plaintiff, at all times, has been the holder and payee of the Note, and the Note has not been assigned, forgiven or released.

The Note provides that Defendant is obligated to pay interest at the annual rate of 5 (5%) percent on the Principal Amount during the period the Note remains unpaid. There have been no payments of interest, and the entire Principal Amount remains unpaid. In the Note, Defendant waived presentment, demand, protest, notice of protest and notice of dishonor. The entire Principal Amount of the Note is now due, together with interest from February 4, 2005.

In opposition, Defendant affirms that, for 20 years, he provided marketing and related services for Wang and his entities ("Other Businesses") which include but are not limited to Computer Associates, the Charles B. Wang Foundation and real estate companies. Plaintiff

submits that he was "one of Wang's right-hand men, one of the most trusted and valued members of Wang's team" (Mullaney Aff. in Opp. at ¶ 2).

In February of 2005, Wang made the Loan to Defendant. At that time, Defendant's only salary was from his work with a non-profit entity founded by the parties, and Defendant affirms that his salary was "far less than what I had been accustomed to earning" (Mullaney Aff. in Opp. at ¶ 4). In addition to this employment, Mullaney continued to provide services to the Other Businesses, and he asked Wang for an equity interest in the Other Businesses. Mullaney affirms that Wang agreed to provide Mullaney, and other close advisors ("Advisors"), with equity interests that Wang described as "virtual stock" in the Other Businesses (id. at ¶ 6). Under this alleged agreement ("Offer"), Mullaney could select which entity(ies) he wished to have an interest in, and he was required to maintain that interest for a period of years before cashing out. Wang allegedly made the representation that each person's interest would be worth approximately $5 million within approximately five (5) years. Defendant affirms that Wang and his Advisors, including Mullaney, attended several meetings regarding this alleged Offer, at which time representatives of Wang made "sales pitches" designed to convince the Advisors to invest their "virtual stock" in the Other Businesses (id. at ¶ 7).

Defendant alleges, however, that in July of 2006, Wang "pulled an about-face" (Mullaney Aff. in Opp. at ¶ 8), and surmises that this occurred because Wang's relationship with one of the Advisors had soured and resulted in contentious litigation between the two. Wang told the Advisors that the Offer was no longer being extended, resulting in what Defendant describes as a "heated exchange" between Plaintiff and Defendant. Defendant provides an email exchange between Wang and Defendant in July of 2006 (Ex. D to Mullaney Aff. in Opp.). Wang's email makes no specific reference to the Offer; Defendant's email includes Defendant's statements that 1) he was "startled" by what Wang had said; 2) "deal or no deal, I want you to know that working with you for 19 years has been an honor and an experience I wouldn't trade for anything;" and 3) he feels lucky to run the non-profit entity for which he was working, and appreciated Wang's financial help "which makes it possible for me to do so."

Defendant submits that Wang "felt bad about reneging" on the Offer (Mullaney Aff. in Opp. at ¶ 9) and, as a result, agreed to forgive the Loan. Mullaney outlines comments allegedly made to him by Bob Bell ("Bell"), Wang's accountant, discussing the forgiveness of the Loan, and the planned documentation of that forgiveness. Mullaney does not provide an affidavit of

3

Bell, or provide facts that would permit the Court to conclude that these assertions are other than hearsay.

Mullaney suggests that the instant action is motivated by Wang's desire to take over the entity that employs Mullaney. Mullaney affirms that Wang announced his plans to close down Mullaney's employer, and direct its assets into a fund to be controlled by Wang. Due to negative reaction to that proposed move, Wang subsequently cancelled the proposed merger.

In her Affidavit in Opposition, Kristen Mullaney, Defendant's wife, affirms that Defendant recounted to her details of 1) the Offer, 2) Wang's reneging on the Offer, and 3) Defendant's conversations with Bell.

C. The Parties' Positions

Plaintiff submits that he has demonstrated his right to summary judgment by producing the Note and submitting evidence that Defendant failed to make payments in compliance with its terms. Plaintiff contends, further, that Defendant has failed to come forward with evidentiary proof of a factual issue requiring a trial of this matter. Thus, Plaintiff is entitled to judgment against Defendant in the Principal Amount, with interest, costs and disbursements.

Defendant opposes Plaintiff's motion, submitting that there are factual disputes making summary judgment inappropriate. Defendant argues, in the alternative, that he should be permitted to conduct discovery on issues including Plaintiff's alleged Offer, and his reneging on that Offer. Defendant cites *Park Associates v. Crescent Park Associates, Inc.*, 159 A.D.2d 460 (2d Dept. 1990) in support of his contention that there are conflicting statements that give rise to a question of fact, precluding summary judgment.

In reply, Plaintiff submits that Defendant has failed to raise a triable issue of fact in light of the fact that 1) pursuant to Uniform Commercial Code ("UCC") § 3-605, a promissory note may not be forgiven or cancelled orally; 2) assuming *arguendo* that Defendant contends that Plaintiff intended to make a gift to Defendant by forgiving the Note, Defendant has failed to come forward with evidence of a completed gift; 3) Defendant has failed to offer evidence that the Note was discharged for executed consideration, particularly in light of Defendant's contention that he never received any "virtual stock," which was allegedly the consideration for the discharge of the Note; and 4) Defendant has failed to offer competent evidence that the Note was forgiven in light of the fact that a) the statements by Bell are hearsay on which the Court may not rely in concluding that an issue of fact exists; b) the statements of Kristen Mullaney are

4

hearsay for which no recognized exception exists; and c) Defendant has provided no corroborating written evidence to support his "self-serving hearsay assertion" (Reply Mem. at p. 9) that Plaintiff orally forgave the Note.

<div align="center">RULING OF THE COURT</div>

A. Summary Judgment Standards

On a motion for summary judgment, it is the proponent's burden to make a *prima facie* showing of entitlement to judgment as a matter of law, by tendering sufficient evidence to demonstrate the absence of any material issues of fact. *JMD Holding Corp. v. Congress Financial Corp.*, 4 N.Y.3d 373, 384 (2005); *Andre v. Pomeroy*, 35 N.Y.2d 361 (1974). The Court must deny the motion if the proponent fails to make such a *prima facie* showing, regardless of the sufficiency of the opposing papers. *Liberty Taxi Mgt. Inc. v. Gincherman*, 32 A.D.3d 276 (1st Dept. 2006). If this showing is made, however, the burden shifts to the party opposing the summary judgment motion to produce evidentiary proof in admissible form sufficient to establish the existence of material issues of fact that require a trial. *Alvarez v. Prospect Hospital*, 68 N.Y.2d 320, 324 (1986). Mere conclusions or unsubstantiated allegations will not defeat the moving party's right to summary judgment. *Zuckerman v. City of New York*, 49 N.Y.2d 557, 562 (1980).

B. Promissory Note

To establish *prima facie* entitlement to judgment as a matter of law with respect to a promissory note, a plaintiff must show the existence of a promissory note, executed by the defendant, containing an unequivocal and unconditional obligation to repay, and the failure by the defendant to pay in accordance with the note's terms. *Larry Lawrence IRA v. Exeter Holding Ltd.*, 84 A.D.3d 1175, 1176 (2d Dept. 2011), quoting *Lugli v. Johnston*, 78 A.d.3d 1133, 1135 (2d Dept. 2010).

C. Forgiveness of Promissory Note

UCC § 3-605, titled "Cancellation and Renunciation," provides as follows:

(1) The holder of an instrument may even without consideration discharge any party

(a) in any manner apparent on the face of the instrument or the indorsement, as by intentionally cancelling the instrument or the party's signature by destruction or mutilation, or by striking out the party's signature; or

<div align="center">5</div>

(b) by renouncing his rights by a writing signed and delivered or by surrender of the instrument to the party to be discharged.

(2) Neither cancellation nor renunciation without surrender of the instrument affects the title thereto.

The Uniform Commercial Code does not permit oral cancellation of a promissory note. *Matter of Goggins*, 227 A.D.2d 481, 482 (2d Dept. 1996), citing UCC §§ 3-104 and 3-605. *Accord, Grant v. Marshall*, 307 A.D.2d 274 (2d Dept. 2003), citing *Matter of Goggins, supra* and UCC §§ 3-104 and 3-605. *See also Community National Bank and Trust Company v. Gold*, 45 A.D.2d 947 (1st Dept. 1967) (promissory note may not be effectively canceled by a "simple oral statement," citing UCC § 3-605). Moreover, while UCC § 3-601(2) does permit a party to be "discharged from his liability on an instrument to another party by any other act or agreement with such party which would discharge his simple contract for the payment of money," an oral agreement to discharge a debt must be based on an executed consideration. *Matter of Goggins, supra*, quoting *Conte Cadillac v. C.A.R.S. Purch. Serv.*, 126 A.D.2d 621, 623 (2d Dept. 1987).

C. Gift

The elements necessary for a valid *inter vivos* gift are 1) intent of the donor to make an irrevocable present transfer of ownership, 2) physical or constructive delivery, sufficient to divest the donor of dominion and control over the property, and 3) acceptance of the gift by the donee. *Chiaro v. Chiaro*, 213 A.D.2d 369, 370 (2d Dept. 1995), *app. den.*, 86 N.Y.2d 708 (1995), citing *Gruen* v. Gruen, 68 N.Y.2d 48 (1986). In *Matter of Goggins, supra*, the Second Department directed respondent to repay the amount of the promissory note pursuant to its terms in light of the fact that 1) it was uncontroverted that the decedent never executed any agreement to cancel respondent's obligation under the note; and 2) assuming *arguendo* that the decedent had the requisite donative intent to make a gift of cancellation to respondent, the record established that no delivery of the cancellation was ever effected by decedent. 227 A.D.2d at 482, citing *Gruen*.

D. Application of these Principles to the Instant Action

The Court grants Plaintiff's motion for summary judgment based on the Court's determination that Plaintiff has established its right to judgment on the Note by producing the Note, which contains Defendant's unequivocal and unconditional obligation to repay, and the failure by the Defendant to pay in accordance with the Note's terms. The Court concludes,

further, that Defendant has failed to raise an issue of fact that would defeat Plaintiff's right to judgment in light of the fact that 1) the law does not permit the oral cancellation of the Note, and Defendant has produced no writing supporting the purported cancellation; 2) assuming *arguendo* that Defendant has alleged an oral agreement to discharge the debt represented by the Note, he has not produced evidence of consideration supporting that agreement; and 3) Defendant has not established the elements of a gift, particularly in light of the absence of any evidence that Wang surrendered or delivered the Note to Defendant. In reaching these conclusions, the Court has disregarded the affirmations regarding statements allegedly made by Bell on the grounds that they are hearsay, and there does not appear to be a basis for their admissibility under any exception to the hearsay rule. In addition, the emails provided by Defendant provide no evidence of Plaintiff's intention to cancel the Note.

The Court concludes that the case of *Park Associates v. Crescent Park Associates, Inc.*, cited by Defendant, does not compel a different result. In *Park Associates,* plaintiff sought to establish that defendant's obligation to repay the debt was revived by a written acknowledgment of the debt, to defeat defendant's assertion of the statute of limitations as a bar to plaintiff's action on a promissory note. 159 A.D.2d at 461. In an effort to establish the applicability of that exception to the statute of limitations, plaintiff produced writings signed by the defendant as an officer of the corporation which "alternatively referred to the defendants' 'outstanding obligation,' proposed a method of satisfying the debt by allowing the plaintiff to participate in a mortgage held by the corporate defendant, *or requested that the plaintiff forgive the debt* [emphasis added]." *Id.* at 460-461. In opposition, defendants asserted that representatives of the plaintiff and defendant corporation had a meeting at which time the plaintiff agreed to forgive the debt in order to earn a greater profit on another transaction between the parties. *Id.* at 462. The Second Department concluded that the conflicting statements made by the parties in their affidavits gave rise to a question of fact that precluded summary judgment, specifically whether the plaintiff had forgiven the debt. *Id. Park Associates* is thus distinguishable because it involved a writing, proffered by the plaintiff seeking repayment on the promissory note, that included a request that the plaintiff forgive the debt. In the matter *sub judice*, on the other hand, Defendant has produced no writing, and has not suggested that discovery will uncover a writing, evidencing Plaintiff's intent to cancel the Note.

In light of the foregoing, the Court grants Plaintiff's motion and awards Plaintiff

judgment against the Defendant in the sum of $500,000, together with pre-judgment interest at the rate of 5% per annum from February 4, 2005, and costs and disbursements.

All matters not decided herein are hereby denied.

This constitutes the decision and order of the Court.

Submit judgment on ten (10) days notice.

ENTER

DATED: Mineola, NY

     November 15, 2011

HON. TIMOTHY S. DRISCOLL

J.S.C.

ENTERED

NOV 22 2011

NASSAU COUNTY
COUNTY CLERK'S OFFICE

8

# EXHIBIT 68

# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT, dated as of December 29, 2011, is made between SURGERY FOR THE POOR ("Employer") and HANA FUCHS ("Employee").

WHEREAS, Employer desires to formalize the terms and conditions of employment between itself and Employee in a written employment agreement, and to assure itself of the exclusive availability of Employee's services, as defined herein, during the anticipated term of such employment; and

WHEREAS, Employee, who has been employed by Employer since October 1, 2011, desires to record her understanding of the terms and conditions of employment with Employer, including the anticipated term of such employment, in a written agreement;

NOW, THEREFORE, in consideration of the mutual promises and undertakings set forth herein, Employer and Employee hereby agree to the following terms and conditions:

1. **Duties.** Employer employs Employee in the position of Chief Financial Officer, reporting to its President and Founder, Brian Mullaney. Employee shall personally and diligently perform such services as are necessary and desirable in such position and any other additional services as Employer may reasonably require, including acting as *de facto* Chief Financial Officer for *Help Me See*, an organization with which Employer has contracted to provide certain administrative services. Employee shall observe all rules, regulations and policies adopted by Employer in connection with the operation of its business and carry out to the best of her ability all of Employer's instructions.

2. **Term.** The term of employment shall be considered to have commenced as of October 1, 2011, and shall expire on December 31, 2014 (the "Term of Employment").

3. **Compensation.** In full consideration for all rights and services provided by Employee hereunder, Employee shall receive from Employer the following:

a) As base compensation, **$200,000** per year, commencing January 1, 2012. Employee will be eligible for all step-increases in base compensation at Employer, as well as all merit increases, equity adjustments or promotion increases that may be awarded by Employer from time to time. In recognition of the work performed by Employee since October 1, 2011 at a lesser rate of pay, and in consideration of Employee's willingness to commit herself to exclusive employment by Employer, as defined herein, for the anticipated Term of Employment, Employee shall receive **$120,000** upon her execution of this Employment Agreement.

b) As incentive compensation, Employee will be eligible for all awards of incentive compensation that be awarded by Employer from time to time.

c) As benefits, all employee benefits that may be offered by Employer to its employees, now or in the future, including, but not limited to, health and medical insurance plans, retirement plans, life insurance and disability insurance.

WW_EMAILS0012386-1

All payments to Employee shall be made in accordance with Employer's then prevailing payment policy, except as otherwise specifically provided herein, and all compensation received by Employee shall be subject to all Federal, State, City and other taxes and withholding required by law.

4. **Non-compete.** During the Term of Employment Employee shall not compete in any manner, directly or indirectly, whether as a principal, employee, agent or owner, with Employer or any of its affiliates. In the event of earlier termination in accordance with paragraph 10 of this Employment Agreement, the term of employment, for purposes of this non-compete provision only, shall expire on the date of such earlier termination.

5. **Work-Made-For-Hire and Assignment.** To the extent permitted by law, all ideas, concepts, business plans, and other intellectual property that Employee creates or develops during the Term of Employment or resulting from her employment (the "Work Product") shall be work-made-for-hire under the United States copyright laws and owned by Employer. In the event any of the Work Product is not work-made-for-hire or is not copyrightable, Employee hereby assigns to Employer exclusively all of Employee's right, title and interest (including the copyright, throughout the world, and all extensions and renewals thereof) in and to such Work Product, for use in any and all media, now known or hereafter created, for any and all purposes. Employee agrees to execute all documents and to take all steps as Employer finds appropriate to evidence Employer's rights in the Work Product. This paragraph shall survive any termination of this Employment Agreement.

6. **Use of Employee's Name.** Employer shall the right, but not the obligation, to use Employee's name or likeness for any publicity or advertising purpose in connection with the Work Product or the services rendered under this agreement. Employer has no obligation to accord Employee public credit for any Work Product.

7. **Warranty of Rights.** Employee represents and warrants that she has the right to grant all of the rights granted herein without any limitation whatsoever and that no materials furnished by Employee, nor any use thereof as provided herein will infringe upon or violate any rights of any third party.

8. **Confidentiality.** Employee agrees and acknowledges that both the Work Product and certain information and materials which Employer provides to Employee for the purpose of Employee performing services may contain valuable proprietary and confidential information that belong solely to Employer. Employee agrees not to disclose to others, use for her own benefit, or otherwise appropriate or copy any such confidential information or trade secrets, including proprietary aspects of the Work Product, except as required in the performance of Employee's services during the Term of Employment. Employee further agrees not to disclose the financial terms of this Employment Agreement except in connection with obtaining legal or financial advice or fulfilling a tax reporting obligation with respect to her employment, or in enforcing the terms of this Employment Agreement, should that be necessary. Employee agrees that the

-2-

WW_EMAILS0012386-2

prohibited dissemination of such information without Employer's written approval will constitute a material breach of Employee's obligations hereunder and may result in immediate termination.

9. **Indemnification.** Employee shall defend, indemnify and hold harmless Employer, its officers, trustees, affiliates, employees, agents, assigns and representatives from and against any all claims, actions, damages, costs and expenses (including, but not limited to, reasonable attorneys' feess) arising out of or in connection with any breach by Employee of any of the representations or warranties contained in this Employment Agreement. This paragraph shall survive any termination of this Agreement.

10. **Termination.** Either party may terminate this Employment Agreement upon thirty (30) days written notice to the other party, provided, however, that if Employer should terminate this Employment Agreement without cause, it will pay Employee severance benefits for an additional sixty (60) days, in the amount of her then current compensation, in exchange for Employee's agreement to continue to abide for that period with the non-disclosure and non-compete obligations provided in paragraphs 4 and 8 above. For the purposes of this Employment Agreement, Employer shall have "cause" to terminate Employee upon Employee's (i) wilful misconduct or gross negligence, or (ii) misconduct that results in material and demonstrable damage to the business or reputation of Employer. The rights and remedies provided in this section are not exclusive and are in addition to any other rights and remedies provided by law or in this Employment Agreement.

11. **Assignment.** Employer shall have the right to assign this Employment Agreement or all or any part of its rights hereunder to any third party.

12. **Miscellaneous.** No waiver of any provision, or of any breach, of this Employment Agreement shall be considered a continuing waiver of that or of any other provision or breach of this Employment Agreement. This Employment Agreement supersedes all prior or contemporaneous agreements and statements, whether written or oral, concerning the terms of Employee's employment, and no amendment or modification of this Employment Agreement shall be binding against Employer unless set forth in a writing signed by Employer and delivered to Employee. The language of all parts of this Employment Agreement shall be construed as a whole, according to its fair meaning and not strictly for or against either party. This Employment Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to conflicts of laws rules. New York County shall be the exclusive forum for the resolution of disputes between the parties arising out of the interpretation or the performance or non-performance of this Employment Agreement.

AGREED TO AND SIGNED THIS        DAY OF DECEMBER, 2011,

_____        _____
HANA FUCHS, EMPLOYEE         BRIAN MULLANEY, FOUNDER AND
                                                      PRESIDENT, SURGERY FOR THE POOR

-3-

WW_EMAILS0012386-3

# EXHIBIT 69

## MEETING MINUTES OF
## WONDERWORK, INC. ("WONDERWORK")
## BOARD OF DIRECTORS

**December 28, 2012**

A meeting of the Board of Directors of WONDERWORK, a corporation incorporated under the laws of the State of Delaware, was held by telephone conference call on December 28, 2012, commencing at 8:00 am, EST, pursuant to timely notice given to all members of the Board.

The following persons were present:

Present:     Ravi Kant
             Theodore Dysart
             John J. Coneys
             Brian Mullaney (limited participation)

### I.     CALL TO ORDER

Board members all acknowledged receipt of proper notice of the meeting and receipt of the agenda for the meeting. At the Board's direction, WonderWork's counsel was designated to prepare the minutes of the meeting and provide same to the Secretary of the corporation. A quorum being present, the meeting commenced.

### II.    United States District Court for the Southern District of New York, Case No. 12 CV 9102, captioned *Smile Train, Inc., v. Brian F. Mullaney*

Counsel for WonderWork and Brian Mullaney opened the meeting with general background information and historical perspective leading up to the filing of the captioned litigation against Brian. Board members had been provided with copies of the formal District Court complaint. This discussion included Brian's prior roles with Smile Train, his relationship with certain of its Board members and important factual information surrounding the issues that purportedly lead to the filing of the lawsuit.

At this point, Brian presented his oral request for indemnification. Counsel for

Brian then left the meeting. Counsel spoke to

1

WON-EX 1257

JJ Coneys suggested that the Board consider its current financial situation and place a ceiling or cap on the amount it would presently agree to indemnify. The other Board members were in agreement and it was resolved to cap current indemnity at $150,000.00. All legal bills would be reviewed by JJ and the audit committee. The Board could consider adjustments to these limits at a later date depending upon future circumstances and WonderWork's financial condition. Counsel for WonderWork was instructed to report approximately every thirty (30) days on the status of both the case and the costs associated with same.

The Board unanimously agreed to indemnify Brian Mullaney in connection with the suit filed against him by Smile Train up to a current limit of $150,000.00, subject to further review or potential future requests to increase the limit. Brian Mullaney was not part of the discussion on this matter and was not in attendance during this portion of the meeting. Upon motion duly made and seconded, it was so agreed and counsel was instructed to draft a formal resolution for adoption by the Board and insertion into the corporate records of WonderWork.

## III. MEETING ADJOURNED

There being no further business, the meeting was duly adjourned.

Secretary

2

WON-EX 1258

## RESOLUTION
## OF
## THE BOARD OF DIRECTORS OF
WonderWork, Inc.

The Board of Directors of WonderWork, Inc., (WonderWork), having been presented with a request by Board member Brian Mullaney for indemnification from WonderWork in connection with the defense of a case filed in the United States District Court for the Southern District of New York, Case No. 12 CV 9102, captioned *Smile Train, Inc., v. Brian F. Mullaney*, does hereby make and adopt the following Resolution, approving indemnification for and against the costs and expenses incurred in connection with the defense of or participation in the above-captioned case under the terms and conditions contained in this Resolution.

The Board of Directors, with the exclusion of Brian Mullaney, join in this Resolution. In a meeting of the Board of Directors, the Board recognized the joint benefits to Brian Mullaney and WonderWork through his leadership and experience, and his authorship and speaking activities, including, but not necessarily limited to, name recognition and significant financial contributions for WonderWork programs that WonderWork would likely not receive otherwise. The Board views Brian's current participation in the *Smile Train* lawsuit a function and result of his service to WonderWork and as a member of its Board of Directors and further views successful results and outcomes from the matters as beneficial to WonderWork, as well.

The Bylaws of the Corporation, as well as Delaware law, the law of the State in which WonderWork is incorporated, authorize indemnification of directors, officers, and employees of WonderWork who are parties to, or threatened to be parties to, any pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, against expenses (including attorneys fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with such action if he acted in good faith and in a manner he reasonably believed to be in, or not opposed to the best interests of WonderWork.

Therefore, the Board of Directors, without participation by Brian Mullaney, hereby unanimously adopts the following Resolution, agreeing to indemnify Brian Mullaney in connection with his participation in the *Smile Train* lawsuit, in accordance with its Bylaws and Delaware law as follows:

RESOLVED: That the Board of Directors of WonderWork, by vote of all of the Directors except Brian Mullaney, hereby agrees to indemnify Brian Mullaney in connection with his costs and expenses (including attorney fees, professional, expert, and consultant fees, investigative costs, and costs of appeal) incurred by reason of, or resulting from, or relating to his participation in the defense of claims, demands, and causes of action asserted against him in the instant *Smile Train* lawsuit, in accordance with its Bylaws and Delaware law. The Board of Directors further resolves to seek

1

**WON-EX 1259**

reimbursement for those costs and expenses through its Directors and Officers Liability Insurance Policy currently held with Philadelphia Indemnity Insurance Companies. The Board of Directors is presently limiting the amount of any losses, fees and costs it will provide through this agreement to indemnify at $150,000.00. The Board may revise or reassess these limits should circumstances change.

I FURTHER CERTIFY that all of the members of the Board of Directors have voted to adopt the foregoing Resolution, and the same shall be included in the official corporation minute book and/or other corporation records maintained by the Corporation. Brian Mullaney did not participate in the discussion or vote on this Resolution.

IN WITNESS WHEREOF, I have hereunto subscribed my name this 28th day of December, 2012.

Secretary

Theodore L. Dysart

Print Name

2

WON-EX 1260

# EXHIBIT 70



# Minutes of the
# Board of Directors Meeting

**Date:**      **February 14, 2013**

**Location:**      **WonderWork Office**

**Present:**      **Brian Mullaney**
**JJ Coneys**
**Ravi Kant (via conference call)**
**Ted Dysart (via conference call)**

Meeting called to order at 10:15am EST.

### GOVERNANCE

Approved minutes from 10/11/2012 meeting and 12/28/2012 special meeting.

Reviewed CEO contract. Dysart noted that he will take lead on this and look to finalize contract for next board meeting. Dysart will also conduct review of salaries of top paid employees. Discussed using Reda and Associates to help with review.

Kant inquired about *Time Magazine* article and if it was about Smile Train. Mullaney noted that it was about Surgery For The Poor, which applies to WonderWork, as it specifically praises the "idea" which hasn't changed, though the name has. Suggested that article be circulated to all board members.

Reviewed photography copyright agreement.

Discussed legal updates. ████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

Mullaney discussed Smile Train lawsuit and explained that lawyers on both sides have met and all agreed to try and settle outstanding issues. █████████████████████████████████

Response from Smile Train is pending. Recommended that all legal bills be reviewed by Coneys and that a legal update be provided by Greg Lam for board on a monthly basis.

Discussed and established the following committees: Audit, Nominating and Compensation. Agreed that Coneys will head Audit Committee and Dysart will head Nominating and Compensation Committees.

Reviewed and approved future board meeting dates.


## PROGRAMS

Reviewed partners and grants distributed. Discussed strategy of building network of partners through small initial grants which would increase as revenues increase.

Reviewed nucleus of and importance of a blue chip medical advisory board.

Discussed upcoming partner trip to India to visit additional burn, clubfoot and blindness clinics.

## DEVELOPMENT

Reviewed strong performance of WonderWork founding donors, as well as good repeat donation rate. Discussed probability of collecting large receivable from HelpMeSee.

Discussed new prospects: █████████████████████████████████████████
███████████████████████████████

Discussed concept of Impact Investing and agreed to provide board with pertinent articles on this subject. Noted that ████████████ has offered WonderWork a significant $7.5M loan with requests for public disclosure, reporting, meeting WonderWork board members, attending a board meeting and going on a trip. ████████ also wants assurance that debt holders are protected in case of dissolution.

It was agreed that Mullaney will finalize agreement with ████████ and then present to board for final approval. Dysart asked for a simple term sheet when contract is presented.

Mullaney noted that this loan will be used as a "challenge grant" to try to raise additional money in impact loans.

Coneys recommended a template be developed that can be used for other impact loans. In addition, Coneys suggested that WonderWork find a law firm or ask Rockefeller Foundation to recommend one that has drafted these types of loan agreements. Coneys stressed importance of correctly handling these loans on WonderWork's books and getting the proper guidance from KPMG.

Discussed PR and termination of firm due to disappointing results.

## MARKETING

Reviewed Fundraising Summary.

Noted that volumes are all below projections due to cautious approach to list use, as well as capital setbacks during 1st half of fiscal year. Intend to hit projected volumes in 2nd half of fiscal year.

Kant recommended that a digital strategy be developed. Dysart agreed and also urged WonderWork to create a social media strategy. Mullaney confirmed that this will be presented at the June board meeting.

Explained that basic response rates and average gifts for acquisition and cultivation are in good shape and encouraging. In addition, it was noted that 9% of donors have already begun supporting a 2nd cause – also very promising.

Discussed launch of blindness charity-brand, 20/20/20.

Discussed new brochure. Dysart requested that mentions of Smile Train be minimized.

WON-EX 1262



Discussed hiring new direct marketing agency, NNE; web developer, Jackson River; and Greatest Good with Steve Levitt.

Regarding celebrity prospects, Mullaney recounted face-to-face meeting with Morgan Freeman and his potential endorsement. Also noted that Robert David Hall of CSI has formally agreed to endorse WonderWork with a photo and quote. JR Martinez, Alan Alda and Clive Davis have recently been pitched as well.

## ADMINISTRATION & FINANCE

Discussed office renovation. Noted that architect is donating her time and is keeping the budget low by purchasing much of the furniture from Ikea.

Mullaney explained that since WonderWork staff is growing, space needs to be not only more attractive, but functional. Discussed recent hiring of Nicole Macagna as Development Associate.

Noted that audit review with KPMG is going well.

Remarked that investing in Vanguard Index Fund has been a smart move and that WonderWork should continue to take advantage of ▮▮▮▮▮▮ for free investment advice.

Reviewed budget and performance to date.

Meeting concluded at 11:41am EST.

WON-EX 1263

# EXHIBIT 71



### Minutes of the Annual Meeting of the
### Board of Directors
### of WonderWork

Date:        **June 22, 2012**

Location:    **Oovoo Video Conference Call**

Present:     **Brian Mullaney**
             **Ravi Kant**
             **Ted Dysart**

Meeting called to order at 9:00am EST.

<u>**Governance**</u>

Board approved minutes from April 11, 2012 meeting.

Discussed draft board policy manual. Dysart commented that he was very impressed with the professionalism and thoroughness in the preparation of these documents and policies. However, both he and Kant still wish to share comments/suggestions off-line before approving.

Discussed new board members search. Dysart noted that Tim Flynn is reluctant to join and will continue to focus on Paul Weaver. In addition, Dysart mentioned he will reach out to Sherri Barratt, who recently retired as Vice Chairman from Northern Trust. Mullaney explained that Conway is still a prospect for board of directors. It was also noted that Dave McCormick, Co-CEO of Bridgewater cannot join board of directors, but remains a good prospect for advisory board. Kant stated that he knows McCormick and will reach out to him. Dysart will provide Kant contact info.

Reviewed future BOD schedule. It was discussed that actual dates be confirmed one month prior to meeting. Kant noted that he may be in NYC week before October 11 (the next scheduled meeting).

<u>**1st Year Accomplishments**</u>

Reviewed start-up capital fundraising results. Both Kant and Dysart acknowledged they were pleased with progress. Mullaney noted that he will be meeting with viable donor prospects, ███████ ████████████████████████, in the coming months. In addition, Mullaney noted that efforts to continue acquiring Founding Donors are underway through both mail and email campaigns.

Discussed WonderWork team recruitment. Kant and Dysart remarked that small team has done a great job at getting the charity off the ground. Mullaney iterated that Advisory Board is still being put together and will continue to work on getting pending members, Corinne Grousbeck, Ken French and Joseph McCarthy, on board. Kant will reach out to Dave McCormick as a prospect for joining advisory board as well.



Discussed hiring a small PR firm in September to increase media coverage and help with celebrity recruitment.

Discussed HelpMeSee and current relationship. Mullaney explained challenges of working with them, but it was noted that the benefits far outweigh the disadvantages. Mullaney explained contract is up at end of August, but will do everything possible to continue working with HelpMeSee.

Reviewed WonderWork name launch. Both Dysart and Kant remarked that new name and logo look great. Dysart specifically commented that he was impressed with the 5 websites that were recently launched.

Reviewed WonderWork direct mail test. Dysart inquired how much the test and first year development costs will be. Dysart also suggested that a board conference call be arranged in August to review results of test.

Discussed status of WonderWork "clients." Stressed importance of continuing relationship with HelpMeSee. Noted that goal of working with ▮▮▮▮▮▮▮ is to get ▮▮▮▮▮▮ on board. Mullaney indicated that ▮▮▮▮▮▮▮▮▮ can be turned over to TargetMarketTeam at any time. Remarked that ▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮ are tentative.

**Finance**

Reviewed finance update. Mullaney iterated that ▮▮▮▮▮ is advising on investment strategy and had recommended investing in Vanguard's Global Index Fund.

Discussed ongoing search for auditors. Dysart offered assistance with PWC, KPMG and Deloitte and requested we send him all correspondence for each of those firms.

Reviewed P&L and Balance Sheet for FY2012.

Reviewed 5-Year Projections and FY2013 budget.

Board approved FY2013 budget.


Meeting was adjourned at 9:39am EST.

WON-EX 1254

# EXHIBIT 72

**From:** Brian Mullaney [brian@wonderwork.org]
**Sent:** Monday, November 30, 2015 10:31 AM
**To:** Ravi Kant
**CC:** jjconeys@gmail.com
**Subject:** Re: Matters arising

Thanks Ravi.

Ted never told me that all of you discussed and agreed upon this course of action. I wish he had.

For the most part, Ted kept me in the dark on how he was handling this matter. I was really surprised to hear that he was hiring or had hired these labor lawyers in Chicago and very concerned about the cost and the optics. I wanted to make sure that you and JJ were on board with this because I was not. When I asked Ted he told me he assumed you were. Maybe you had agreed to hiring outside counsel but had not know who he planned to hire and how much they would charge.

Anyhow, if you and JJ feel that we should use outside counsel to handle this matter than that is what we will do. I am sure we can find some lawyers in New York that can handle this for a reasonable price.
I do recommend that we postpone this until we have some new board members. I have gone 4 years without an agreement, I can wait another few months. Our focus right now should be on strengthening our board.

I was disappointed to receive Ted's resignation letter and regret that he resigned and especially the way he did it. Over the past 20 years, I have worked with more than 30 members of the Smile Train and WonderWork Boards of directors, Board of Governors, Advisory Boards and Medical Advisory Boards. Ted is the first and only director I have ever had problems working with.

From the very beginning, Ted and I had very different views on just about every subject. I will send him a letter thanking him for all of his contributions and wish him well.

As we all agreed at our last meeting, I have approached and been in discussions with the new board prospects that were presented to the board. Overall, I have been getting a lot of very positive interest and enthusiasm about joining our board. By year's end, I would like to send you a short list of 5-6 candidates for our board that we can discuss and vote on at our February meeting.

This will allow 2 months - Jan - Feb - for you and JJ to do any due diligence you would like including meeting with and or speaking with any of these prospects. I know all of these candidates for many years and am very excited about their joining our board.

After they are nominated and voted on in February, these new directors can then attend our year-end June meeting. They will receive staggered terms so some will receive 1, 2 and 3 year terms.

Please let me know if you and JJ are okay with this plan.

If you want to have a phone call to discuss any of this please let me know and I'd be happy to arrange it.

Thank you for your help and support.


Brian


Brian Mullaney
Co-Founder/CEO

WonderWork
420 Fifth Avenue, 27th Floor
New York, NY 10018
tel: 212.729.1855
cell: 917.902.7550
email: brian@wonderwork.org
www.WonderWork.org

Watch two blind sisters see their mom for the first time! <https://www.wonderwork.org/>
More than 6,500,000 people have watched this heart-warming video so far. It was the #1 watched video on the
National Geographic website for 2014.

TIME magazine named WonderWork "One of 10 Ideas That Can Change The World."

On 11/30/15, 1:24 AM, "Ravi Kant" <rkant644@gmail.com> wrote:

>Dear Brian,
>I regret to be responding late to your various mails as I have been travelling extensively overseas and in India.
>First I wish to tell you that the decision to refer to an outside counsel was a collective one of the independent
directors. This was in the interest of the individual and organisation following good practice of corporate
governance . We had hoped that you will take this in the right spirit.
>You have also referred to my comments in the board meeting. My view was that your personal time was
required more urgently and extensively for raising funds from high net worth individuals . Therefore you
needed to have a strong person to take care of direct mail which has been going downhill for sometime .
>With regards,
>Ravi
>
>Sent from my iPad

WW_EMAILS0251267-2

# EXHIBIT 73

**From:** Brian Mullaney [brian@wonderwork.org]
**Sent:** Monday, November 30, 2015 1:21 PM
**To:** DeLois Greenwood; Hana Fuchs; Karen Lazarus
**Subject:** ted dysart

Hi,

Yesterday I received quite a snarky resignation letter from Ted Dysart. He was unhappy because I strenuously objected to the fact that he went ahead and hired a Chicago law firm with two lawyers making $980 and $675 an hour to handle my employment contract. He had a call with Ravi and JJ which I guess gave him authority to do that although he never told me until after the fact.

I think he was also unhappy about 1. We put in place by-laws which make him leave the board in a year or two and 2. He couldn't come on the trip wit Bryan Cranston 3. I was proposing all these new board members.

Anyhow, I have five new board members that will be proposed and hopefully voted upon at our next board meeting in February. They are all very excited about joining our board and helping us.


B.


**Brian**
**Mullaney**
Co-Founder/CEO

WonderWork
420 Fifth Avenue, 27th Floor
New York, NY 10018
tel: 212.729.1855
cell: 917.902.7550
email: brian@wonderwork.org
www.WonderWork.org

Watch two blind sisters see their mom for the first time!
More than 6,500,000 people have watched this heart-warming video so far. It was the #1 watched video on the National Geographic website for 2014.



**TIME magazine named WonderWork "One of 10 Ideas That Can Change The World."**