# EXHIBIT 74

**From:** Brian Mullaney [brian@wonderwork.org]
**Sent:** Wednesday, January 08, 2014 8:01 AM
**To:** Ziff, Ann
**Subject:** Re: monthly update

Like it says on every jar of mayonnaise in the world...,

Keep cool... But do not freeze!

B

On Jan 8, 2014, at 12:58 PM, "Ziff, Ann" <AZiff@zbi.com> wrote:

> 😊😊😊 Truly no reason for you to get worked up about this. Nothing general board related was on the agenda. Keep cool! 😊😊😊

> **From:** Brian Mullaney [mailto:brian@wonderwork.org]
> **Sent:** Wednesday, January 08, 2014 7:56 AM
> **To:** Ziff, Ann
> **Subject:** Re: monthly update
>
> Ok
> I won't!
> ;)
> B

On Jan 8, 2014, at 12:51 PM, "Ziff, Ann" <AZiff@zbi.com> wrote:

> Good morning Brian,
>
> You are over-reacting to this. I worry about you because of what I am reading in your email. It was not a board meeting at all. It was to discuss metrics to judge performance. I think that is something that we all had promised to get back to you with and we were not able to schedule a call until yesterday. It was a normal thing to do in any size organization and the four of us discussed that solely. It would not have been appropriate to have you on the call. Tiny charity or large one, these things are discussed without the board member/officer included. It truly was NOT a board meeting, Brian. And there would also be no reason for us to have to inform the staff of the organization that we are talking about metrics and compensation issues? That is the board responsibility, not involving any of the staff.
>
> Don't let yourself get upset by this, Brian. It truly was standard operating procedure. But I think this general issue here is something that bothers you. Let's you and I get together and discuss this. You shouldn't have anything like this on your mind bothering you. And truly from my perspective I have no sense of division being "fomented" by Ted between you and the board. I think the other three feel close and connected and straightforward about everything with you.
>
> Let yourself calm down about this, Brian. I do sense an over-reaction that is unfounded. It was a straightforward, direct call...not a board meeting at all.
>
> Much luck for today, and especially tonight with  Are you attending his board meeting tomorrow in Zurich?
>
> Let me know when you are home and we'll get together for a vino and chat.
>
> Best,
>
> Ann

> **From:** Brian Mullaney [mailto:brian@wonderwork.org]
> **Sent:** Wednesday, January 08, 2014 1:18 AM
> **To:** Ziff, Ann
> **Subject:** Re: monthly update
>
> Hi Ann,
>
> Thanks for your email. I appreciate it.
>
> Yes, I know it is a regular practice for corporations, companies and large non-profits like Lincoln Center but we are a tiny charity and I am not just a "business officer" but also the co-founder and a board member.
>
> I cannot tell you how upsetting it was for me and my staff to find out about a board meeting that was scheduled without our knowledge. We were all in shock when we found out about it.

I completely understand why I need to excuse myself when the board discusses my performance and/or compensation at year-end but other than that, I do not understand why I should be excluded from anything. Was there a good reason to exclude me from this meeting? Ted told me the purpose was to "go over the budget" - whatever that means. In all the years at Smile Train, another very successful and small charity, there were never any secret board meetings until the disastrous end. Perhaps that is why this was so unnerving.

Over the past year, I have received more and more calls from Ted Dysart telling me that he has discussed this or that with "other board members" and he is calling to tell me what to do. If I disagree with anything he shuts me off and he responds as if I am a direct report. He is acting as if he has been appointed as the lead director and spokesperson for the board in charge of dealing with "management." I suspect this has come from Ted and not at the request of the board but I do not know. Ted comes from a very corporate environment and seems to want to impose a lot of that structure and protocol on our tiny charity. There is a great saying that when all you own is a hammer, everything looks like a nail.

Personally, I want to hear what our board members think from them directly - not Ted. And no, I do not want to run WonderWork like a large corporation nor do I want Ted to be the lead director or spokesperson for the board.

I want a small board that I trust and can count on for support and help. I want to be treated like a fellow board member and co-founder first - and then as an employee.

I am very uncomfortable with the division between me and the board which Ted seems to be fomenting.

Anyhow, don't fret about it. We can discuss at our next board meeting in March and hear what the board thinks.

I am in London this morning for meetings with SightSavers and then off to Zurich this afternoon for dinner with ███ tonight and the big board meeting tomorrow.

Wish me luck!

Brian

**Brian Mullaney**
Co-Founder/CEO
WonderWork
420 Fifth Avenue, 27th Floor
New York, NY 10018
tel: 212.729.1855
cell: 917.902.7550
email: brian@wonderwork.org
www.WonderWork.org

**From:** <Ziff>, "aziff@zbi.com" <aziff@zbi.com>
**Date:** Tuesday, January 7, 2014 8:26 PM
**To:** brian mullaney <brian@wonderwork.org>
**Subject:** RE: monthly update

Yes, we talked this morning. We had scheduled the call weeks ago at a time when the four of us could be free. It's not unusual for board members to do that on a fairly regular basis among themselves without business officers of the charity involved.

All fingers crossed for a great meeting with  When I get to Zurich next, I should look him up.

Email me when you get home. Good luck.

Ann

**From:** Brian Mullaney [mailto:brian@wonderwork.org]
**Sent:** Tuesday, January 07, 2014 6:28 PM
**To:** Ziff, Ann
**Subject:** Re: monthly update

Thanks Ann.

We wil get you on a trip, no worries. Greetings from London.

I am sorry that Ted bothered you with a conference call - he did that without even telling me which really disappoints me. Did the call even happen? Last I heard, no one responded.

Anyhow, off to Zurich tomorrow for a great meeting with ██████ Yes of course he will remember you and I will send your regards too!

Hope to see you soon,


B.



**Brian Mullaney**
Co-Founder/CEO
WonderWork
420 Fifth Avenue, 27th Floor
New York, NY  10018
tel: 212.729.1855
cell: 917.902.7550
email: brian@wonderwork.org
www.WonderWork.org

---

**From:** <Ziff>, "aziff@zbi.com" <aziff@zbi.com>
**Date:** Tuesday, January 7, 2014 7:46 AM
**To:** "ravikant@tatamotors.com" <ravikant@tatamotors.com>, brian mullaney <brian@wonderwork.org>
**Cc:** Ted Dysart <tdysart@heidrick.com>, "jjconeys@gmail.com" <jjconeys@gmail.com>
**Subject:** RE: monthly update

Mid-March for the meeting is fine with me, Brian.  Thanks for the positive report.  Wish I could join you all for the end of January in India.  One of these days, I'll make the trip.


Best,

Ann

---

**From:** ravikant@tatamotors.com [mailto:ravikant@tatamotors.com]
**Sent:** Tuesday, January 07, 2014 1:52 AM
**To:** brian@wonderwork.org
**Cc:** tdysart@heidrick.com; jjconeys@gmail.com; Ziff, Ann
**Subject:** RE: monthly update

Dear Brian,

I am very pleased with the progress made with regard to the arrangement for funds.  Compliments to you and your team.

As far as the Board meeting is concerned, I will go by what the others decide, as I will join by phone.
Rgds,
Ravi

---

**From:** Brian Mullaney [mailto:brian@wonderwork.org]
**Sent:** Monday, January 06, 2014 10:07 PM
**To:** John Coneys; Ted Dysart; Ravi Kant [ Vice Chairman (Tata Motors)]; aziff@zbi.com
**Subject:** monthly update

Hello All,

Happy New Year!

The bad news is that the U.S. Postal service  was about 3 weeks late with both our November and December direct mail drops.

The good news is that our results are very, very good. Our October drop of about 1.3 million which is the only one which we have finished data for is showing a $55 average donation vs. our projected $40 and a cost to raise a dollar of less than a dollar. November is looking very strong also. December may be affected by the delay as our in-home delivery of Dec. 7th became December 29th and that ruins our plans to take advantage of year-end, tact deductible gifts.

On the major gift front we had a strong end of the year with the highlight being a $500,000 first grant from the ███████ in Houston, Texas that I have been telling you about. I went back down there a couple weeks ago and had several additional good meetings. To refresh your memory, ████████████ are two 38 year olds with a net worth of $3+ billion who are spending all their time now on philanthropy and their foundation. I believe this could be the beginning of many millions of dollars of grants.

We have now have 80,000+ donors close to $11,000,000 cash and investments in the bank and are due another $2,500,000 from ████████ this month pending another successful update. He asked that I give him the update in India instead of flying out to California.

I fly to Europe tomorrow for meetings in London and then a very big meeting with ████████ and the board of the ████████ ████████████ – our largest donor – for our annual progress report. We have a lot of good news and results to report for both ████████ and ████ so I anticipate both meetings will go well.

Our new director of direct response marketing, Elaine Patafio started in December and is off to a good start.

We have our major trip to India for ████████████ planned for the end of this month and I want to thank Ted and Ravi for being part of it and thank Ravi for all his help, suggestions, support he has given us in arranging this. Delois flew to India in december just to make sure everything would run smoothly – or as smoothly as these things can run!

We have our next board meeting scheduled for mid February but I recommend that we push it back to mid March so that we have more definitive results to share with you. Please let me know what you think.

The most important data point of all is that grants we have given our partners have helped provide more than 55,000 surgeries after our first two full years. At Smile Train we had only provided about 2,000 surgeries after our first two years so we are off to a very fast start in the most important category.

As always, thanks for the help.


Brian

**Brian Mullaney**
Co-Founder/CEO
WonderWork
420 Fifth Avenue, 27th Floor
New York, NY  10018
tel: 212.729.1855
cell: 917.902.7550
email: brian@wonderwork.org
www.WonderWork.org

***********************************************************************************************************
"This e-Mail may contain proprietary and confidential information and is sentfor the intended recipient(s) only.
If, by an addressing or transmission error,this mail has been misdirected to you, you are requested to delete this mailimmediately.
You are also hereby notified that any use, any form of reproduction, dissemination, copying, disclosure, modification, distribution
and/or publication of this e-mail message,contents or its attachment(s) other than by its intended recipient(s) is strictly prohibited.
Any opinions expressed in this email are those of the individual and not necessarily of the organization.
Before opening attachment(s), please scan for viruses."
***********************************************************************************************************

CONFIDENTIALITY NOTICE:
This email and any attachments thereto are intended solely for use by the recipients named above and may contain confidential information.  If you are not an intended recipient of this e-mail or if you otherwise received this email in error, you are hereby notified that any disclosure, copying, distribution or use of this e-mail or any attachment is strictly prohibited.  Please notify us immediately by returning it to the sender and permanently delete this message and any attachments from your system.  You should not retain this e-mail, nor should you disclose all or any part of the contents to any other person.  Thank you for your cooperation.

CONFIDENTIALITY NOTICE:
This email and any attachments thereto are intended solely for use by the recipients named above and may contain confidential information.  If you are not an intended recipient of this e-mail or if you otherwise received this email in error, you are hereby notified that any disclosure, copying, distribution or use of this e-mail or any attachment is strictly prohibited.  Please notify us immediately by returning it to the sender and permanently delete this message and any attachments from your system.  You should not retain this e-mail, nor should you disclose all or any part of the contents to any other person.  Thank you for your cooperation.

On the major gift front we had a strong end of the year with the highlight being a $500,000 first grant from the ███████ in Houston, Texas that I have been telling you about. I went back down there a couple weeks ago and had several additional good meetings. To refresh your memory, ████████████ are two 38 year olds with a net worth of $3+ billion who are spending all their time now on philanthropy and their foundation. I believe this could be the beginning of many millions of dollars of grants.

We have now have 80,000+ donors close to $11,000,000 cash and investments in the bank and are due another $2,500,000 from ████████ this month pending another successful update. He asked that I give him the update in India instead of flying out to California.

I fly to Europe tomorrow for meetings in London and then a very big meeting with ████████ and the board of the ████████ ████████████ – our largest donor – for our annual progress report. We have a lot of good news and results to report for both ████████ and ████ so I anticipate both meetings will go well.

Our new director of direct response marketing, Elaine Patafio started in December and is off to a good start.

We have our major trip to India for ████████████ planned for the end of this month and I want to thank Ted and Ravi for being part of it and thank Ravi for all his help, suggestions, support he has given us in arranging this. Delois flew to India in december just to make sure everything would run smoothly – or as smoothly as these things can run!

We have our next board meeting scheduled for mid February but I recommend that we push it back to mid March so that we have more definitive results to share with you. Please let me know what you think.

The most important data point of all is that grants we have given our partners have helped provide more than 55,000 surgeries after our first two full years. At Smile Train we had only provided about 2,000 surgeries after our first two years so we are off to a very fast start in the most important category.

As always, thanks for the help.


Brian

**Brian Mullaney**
Co-Founder/CEO
WonderWork
420 Fifth Avenue, 27th Floor
New York, NY  10018
tel: 212.729.1855
cell: 917.902.7550
email: brian@wonderwork.org
www.WonderWork.org

***********************************************************************************************************
"This e-Mail may contain proprietary and confidential information and is sentfor the intended recipient(s) only.
If, by an addressing or transmission error,this mail has been misdirected to you, you are requested to delete this mailimmediately.
You are also hereby notified that any use, any form of reproduction, dissemination, copying, disclosure, modification, distribution
and/or publication of this e-mail message,contents or its attachment(s) other than by its intended recipient(s) is strictly prohibited.
Any opinions expressed in this email are those of the individual and not necessarily of the organization.
Before opening attachment(s), please scan for viruses."
***********************************************************************************************************

CONFIDENTIALITY NOTICE:
This email and any attachments thereto are intended solely for use by the recipients named above and may contain confidential information.  If you are not an intended recipient of this e-mail or if you otherwise received this email in error, you are hereby notified that any disclosure, copying, distribution or use of this e-mail or any attachment is strictly prohibited.  Please notify us immediately by returning it to the sender and permanently delete this message and any attachments from your system.  You should not retain this e-mail, nor should you disclose all or any part of the contents to any other person.  Thank you for your cooperation.

CONFIDENTIALITY NOTICE:
This email and any attachments thereto are intended solely for use by the recipients named above and may contain confidential information.  If you are not an intended recipient of this e-mail or if you otherwise received this email in error, you are hereby notified that any disclosure, copying, distribution or use of this e-mail or any attachment is strictly prohibited.  Please notify us immediately by returning it to the sender and permanently delete this message and any attachments from your system.  You should not retain this e-mail, nor should you disclose all or any part of the contents to any other person.  Thank you for your cooperation.

CONFIDENTIALITY NOTICE:
This email and any attachments thereto are intended solely for use by the recipients named above and may contain confidential information. If you are not an intended recipient of this e-mail or if you otherwise received this email in error, you are hereby notified that any disclosure, copying, distribution or use of this e-mail or any attachment is strictly prohibited. Please notify us immediately by returning it to the sender and permanently delete this message and any attachments from your system. You should not retain this e-mail, nor should you disclose all or any part of the contents to any other person. Thank you for your cooperation.

CONFIDENTIALITY NOTICE:
This email and any attachments thereto are intended solely for use by the recipients named above and may contain confidential information. If you are not an intended recipient of this e-mail or if you otherwise received this email in error, you are hereby notified that any disclosure, copying, distribution or use of this e-mail or any attachment is strictly prohibited. Please notify us immediately by returning it to the sender and permanently delete this message and any attachments from your system. You should not retain this e-mail, nor should you disclose all or any part of the contents to any other person. Thank you for your cooperation.

# EXHIBIT 75



**Approved Minutes of the**
**Board of Directors Special Meeting**

| | |
|---|---|
| **Date:** | **December 23, 2015** |
| **Location:** | **Conference Call** |
| **Present:** | **Brian Mullaney, JJ Coneys, Ravi Kant** |

Meeting began at 8:00AM EST.

**Governance:**
Resignation
Mullaney, Coneys and Kant accepted resignation of Ted Dysart (resigned November 29, 2015).

New board members
Board discussed, nominated and unanimously approved the following 6 new board members: Mark Atkinson, Clark Kokich, Steven Levitt, Richard Price, Steven Rappaport, Dickie Steele.

The following staggered terms and classes were approved:
JJ Coneys, Brian Mullaney* - Class of 2016
Steve Levitt, Mark Atkinson - Class of 2017
Ravi Kant, Richard Price, Clark Kokich - Class of 2018
Richard Steele, Steve Rappaport - Class of 2019

*Mullaney exempt from term limits as long as he is CEO.

All agreed that we need to find 1 or more women to join board as soon as possible. Mullaney mentioned that he is meeting with Kelly Tullier next month in London. He is also meeting with Anne Black, Chief Operating Officer, Goldman Sachs Gives in NYC. Coneys stated that he is researching some of his former clients and colleagues.

Kant inquired if we should have a medical professional join board. Coneys and Mullaney both agreed it was a good idea. Mullaney offered an option in the meantime to have a member of the WonderWork Medical Advisory Board attend Board of Directors meetings. All agreed to pursue this idea.

**Future meetings:**
Board discussed and approved moving Tuesday, February 9, 2016 Board of Directors meeting to Tuesday, March 8, 2016. Meeting will take place from 10:00am-1:00pm.

Coneys requested a prep call in February 2016 to discuss latest Direct Mail results, as well as best way to welcome new board members and bring them up to speed on all programs.

Mullaney reminded everyone of year-end meeting on Monday, June 13, 2016 which will overlap with WonderWork MAB meeting. This will include a joint lunch with presentation by ▓▓▓▓▓▓▓▓ and a joint dinner for both boards. (Lunch/presentation will begin at 12:00pm; followed by Board of Directors meeting from 2:00pm-5:00pm; and then a joint dinner from 6:00pm-9:00pm)

Meeting ended at 8:35am.

# EXHIBIT 76



### DRAFT Minutes of the
### Board of Directors FY16 Q1/Q2 Meeting

**Date:** March 8, 2016

**Location:** WonderWork Headquarters

**Present:** Brian Mullaney, JJ Coneys, Clark Kokich, Mark Atkinson, Richard Steele, Steven Levitt (conference call) & guest, Burt LaFountain of BCG

**Not present:** Ravi Kant, Steven Rappaport, Richard Price

Meeting began at 2:00PM EST.

Welcomed everyone and opened meeting with FirstStep clubfoot video.

GOVERNANCE
Reviewed and approved future board meeting dates.

Reemphasized importance of year-end meeting on June 13th which will overlap with Medical Advisory Board meeting. Noted meeting will begin with a joint lunch presentation by surgeon, ████ at noon, followed by Board of Directors meeting from 2-5pm and a joint board dinner from 6-9pm.

Confirmed that the October 11, 2016 and February 14, 2017 meetings will be from 11am-1pm EST.

Approved revised by-laws and passed resolution.

Confirmed proposed board classes:
2016 – JJ Coneys, Brian Mullaney
2017 – Steve Levitt, Mark Atkinson
2018 – Ravi Kant, Richard Price, Clark Kokich
2019 – Richard Steele, Steve Rappaport

Reviewed WonderWork structure and how it has evolved over time. Noted that blindness (20/20/20) represents approx. 80% of revenue and 70% of donors for FY16 amongst 3 causes. Noted that blindness also represents 98% of all surgeries.

PROGRAMS
Reviewed WonderWork programs and its grant and oversight process. Noted that WonderWork currently has 74 partners in 60 countries and has provided more than 134,000 surgeries since its inception. Mr. Mullaney explained expansion into two new countries, Zimbabwe and Sri Lanka, are at request of major donors.

Discussed surgery growth over the past several years. It was noted for this current fiscal year, we have a lot of grants to get out the door to reach our target of 100,000+ surgeries . Mr. Mullaney explained low program spending due to financial uncertainty and a difficult fall.

Reviewed role of medical advisory board and the successful recent medical audit of one of partner hospitals in West Bengal, India. Noted that there are 3 additional partner audits under way.


Mr. Mullaney introduced new electronic medical data warehouse project that WonderWork is collaborating on with Harvard School of Public Health, as well as Boston Consulting Group. Explained that the data warehouse will enable WonderWork to detect fraud, measure quality of surgery, surgeons and hospitals, as well as analyze pre & post visual acuity data.

Mr. Mullaney turned floor over to special guest, Mr. Burt LaFountain, principal at BCG to explain the visual acuity slides and the findings from the data BCG collected among WonderWork's partners. The charts demonstrated how "blind" patients are and where the most "blind" are coming from. Charts also showed pre-and post-op visual acuity measurements to demonstrate improvement as well as poor surgical outcomes.

Mr. Mullaney provided overview on reconstructive surgery hospital and world class burn center to be built in Varanasi, India with the help of major donors. Noted that center will provide over 750,000 reconstructive surgeries over its 50-year lifetime. Discussed that ███████, world renowned architect, will help design hospital pro bono.

DEVELOPMENT
Reviewed development results for calendar year 2015, illustrating how direct mail and major gifts comprise the total "pie." Noted that 54% of revenue comes from direct mail and 46% from major gifts. Highlighted the average direct mail gift is $56, whereas the average major gift is $5,700+.

Discussed notable major gifts received during past second quarter, including the renewed $2,000,000 annual grant from ██████████████. Mr. Mullaney noted meetings with ½ dozen billionaire donors and prospects. Discussed efforts to expand major gift capabilities by searching for a Major Gift Officer.

Mr. Mullaney provided board with Direct Mail 101 overview to show the lifecycle of a direct mail donor.

Discussed some of the challenges we've had with direct mail results this past year, from key vendors resigning to our replacement agency, CDR, grossly underperforming. Explained how we took actions that have resulted in improvements, including hiring a new list agency, getting CDR to reduce their fees by 50% and taking more control over key decisions. Discussed our current strategy of scaling up our volume from mailing 6 million letters/year to 10 million/year to acquire 35-40k new donors/year.

Reviewed total direct mail revenue and costs for calendar year 2015. Noted that we acquired approximately 24,000 new donors over the past year and that our total net revenue amongst the 3 causes was close to $3,000,000.

Reviewed Acquisition summary for FY16 Q1 & Q2. Demonstrated how we were performing better than budget across all metrics: response rate up from budgeted .61% to .65%; average gift up from $33 to $38; cost to raise a dollar down from $1.92 to $1.31 and net revenue up from -$537k to -$208k. Noted that we are acquiring donors for $11 (vs $30 budget) which is very low. Mr. Levitt inquired about Cost to Raise $ (CTRAD) and if it was calculated with net or gross revenue. Mr. Mullaney explained "net."

Raised issue of whether we should or shouldn't abandon direct mail. Mr. Mullaney responded that we should not abandon it for now, as we need to cultivate all the donors we already have, but monitor closely how much we invest in acquiring new donors. Explained that we are using a $1.50 CTRAD ceiling, so breakeven is soon.

Reviewed test results for a new control which show that the best pieces are the ones conceived in-house including the 2 winning acquisition pieces.

2


Reviewed acquisition performance for last 18 months regarding mail volume, response rate, average gift, net revenue, CTRAD, and Cost to Acquire a donor. Noted the overall performance improvement over the last several months.

Reviewed retention numbers for FY16 Q1 & Q2. Noted retention performing under, yet close to, budget across all metrics. Discussed that we are mailing creatives that have proven track record and are limiting creative testing to lift results. Discussed overall retention results over the past 12 and 18 months as well as package performance within each cause. Mr. LaFountain suggested we examine top creative packages and de-average them to see which groups they work best against.

Regarding digital performance, it was noted that more than $500,000 was raised through the web since July 2015 and that the average gift of these donors is $184. Mr. Kokich inquired as to who does our website and proposed he might be able to help find a good vendor to help us improve it.

Discussed creating a WonderWork virtual reality video and letting donors experience what it's like to be at a blindness camp, witness a surgery and watch a child open their eyes for the first time – without having to travel.

PR was also inquired about. Mr. Mullaney explained that we are actually in talks with one firm at this time, and agreed that we need to spend more time on it as it has been neglected.

Board brainstormed on development ideas.

Mr. Steele proposed focusing on rich Indians in the US, finding their village, asking them to help solve blindness in their village, state, etc. He suggested we create a campaign – "End Blindness in India." Mr. Steele further inquired about public health policies, and raising awareness of the lack of awareness and funding for surgery programs.

Mr. Kokich proposed doing capital campaigns – be it for the reconstructive surgery hospital in Varanasi, and/or for other big projects.

Mr. Kokich also inquired about "millennial giving." Mr. Mullaney noted that our current donors are predominantly middle aged and older. Mr. Kokich suggested we try some wealth screening products.

It was suggested that WonderWork seek the support of a Bollywood actress, such as Aishwarya Rai, who currently serves as Smile Train's Goodwill Ambassador.

Mr. Kokich offered to host an event for WonderWork in Seattle, with ▮▮▮▮▮▮▮▮ as a special guest when he visits the US in June. Mr. Mullaney responded that we would provide Mr. Kokich with information on our Seattle-based based supporters.

<u>ADMINSTRATION & FINANCE</u>
Discussed move to new space at the end of the month. Noted that we will be saving more than $100k/year.

Mr. Mullaney brought everyone up to speed on the HelpMeSee arbitration which will be coming to a close after 3 years. Noted that WonderWork's legal fees and expenses since inception have amounted to more than $1.8 million.

Reviewed Vanguard portfolio position, noting that, as of Feb 29th, we had an unrealized loss of $811,110 (-6%).

Confirmed that WonderWork audited financials for FY15 will be completed by May.

3



Discussed FY16 partner hospital financial audits, noting that 2 audits have already been completed with 2 additional audits in process. Remarked that findings confirmed that funds are being spent in compliance with grant terms.

Reviewed FY16 Budget against FY16 Q1 &Q2 Actuals. Noted that overall we are close to budget.

Reviewed P&L and Balance Sheet. Noted that net assets were at $8.2 million.

Meeting concluded at 5pm.

WON-EX 1295

# EXHIBIT 77



## Minutes of the
## Board of Directors FY16 Year-End Meeting

Date:        **June 13, 2016**

Location:    **WonderWork Headquarters**

Present:     **Brian Mullaney, JJ Coneys (conference call), Ravi Kant, Clark Kokich, Steven Levitt, Steven Rappaport, Richard Steele**

Not present: **Mark Atkinson, Richard Price**

Meeting began at 2:00PM EST.

Welcomed everyone and opened meeting with The Boy Who Was Blind video.

REVENUE SUMMARY
Reviewed FY16 revenue summary against budget. Noted that total revenue was 169% over budget due to the major gifts received during the last couple of months of the fiscal year.

Mr. Levitt inquired about placing remnant ads which Mr. Mullaney agreed was a good idea to try again.

Several board members asked about using social media to raise revenue. Mr. Mullaney explained how difficult it is to acquire new donors via social media, citing that even WonderWork's viral video which has now been seen by 10+ million people, has only raised $200K+.

PROGRAMS
Mr. Mullaney reviewed our WonderWork programs structure and process. Noted that we currently have 60 active partner hospitals and NGOs in 42 countries and that we have contributed to more than 64,000 surgeries this past fiscal year. The details shared with the Board demonstrated that blindness continues overwhelmingly to be our main cause, comprising approximately 98% of the total surgeries.

Mr. Mullaney discussed that we will have a record program spending of $5.45 million next fiscal year and that we are increasing our pediatric surgeries performed to 2.5%.

Mr. Rappaport stressed the importance that WonderWork's funding to partners be used for incremental surgeries. Mr. Mullaney confirmed that this would be enforced through explicit agreements and grant proposals.

Mr. Mullaney provided an overview of the WonderWork burn hospital we are seeking to build in Varanasi, India, noting that ████████████████ was negotiating to acquire the land and that we are working on finalizing all outstanding agreements.

Mr. Mullaney also discussed the new electronic medical record data warehouse WonderWork is collaborating on with Harvard School of Public Health. Noted that this data warehouse will help us greatly improve our ability to detect fraud, measure quality of surgery, surgeons and hospitals, as well as analyze pre- & post visual acuity data. Mr. Mullaney explained that project is being bid on and estimates a delivery date by end of year.

DEVELOPMENT
Reviewed direct mail Acquisition and Retention results for past fiscal year.



Mr. Mullaney discussed the challenges of direct mail explaining that it costs too much to acquire a donor. As an example, based upon his past experiences at Smile Train, he explained how Smile Train was mailing 72 million pieces in a year and that the cost to raise a dollar was $1.35. Whereas for WonderWork, in just one month of mailing 6 million pieces, the cost to raise a dollar was almost double at $2.32. Mr. Mullaney also discussed that donors are lapsing much quicker than they used to, nor are they giving as often or as much, citing a comparison with Smile Train once again. He explained that we are spending close to $1 million in vendor and overhead costs just to maintain a mediocre direct mail program.

It was noted that WonderWork needs to transition from direct mail to major gifts as a primary fundraising source. During this past fiscal, major gifts represented 67% of total donor revenue, bringing in more than $10 million.

Mr. Levitt noted the pie chart on slide 23 which demonstrated the breakout of direct mail vs major gifts would be more effective if plotted with net revenue (vs gross revenue) to more accurately portray the stark difference in profitability.

There was unanimous consensus from the board that the transition to major gifts is the right move. Mr. Levitt explained the tremendous opportunity, noting that the cost of spending time on money-losing direct mail would now be spent raising major gifts.

Board also discussed the possibility of creating a very high-end direct mail program aimed to generate leads for major gifts.

They acknowledged that future results will be "lumpy" because of nature of major gifts and small volume. Mr. Kant advised that we add a column to our major gifts slide that shows cumulative gifts.

To help pursue more major gift donors, Mr. Kokich recommended we use wealth screening of our donor database to identify good prospects. Mr. Kokich also mentioned that he is on the board of a charity who hired a semi-retired executive to help with major gifts and that it has been a success. He said that hiring good development people is very hard, as many have proven to be ineffective.

Mr. Levitt suggested we send letters to high net worth folks inviting them to go on a trip. Discussion ensued as to who should pay for trip. Consensus was that prospects should pay their own way, otherwise it was determined that they would not be good prospects. Mr. Mullaney shared story with ███████████ and the issue with him and his family going, and then not going, to Africa last year.

With regards to major gift prospecting, Mr. Mullaney discussed the possibility of receiving a large 7-8 figure grant from ███████████ whom he has cultivated over the past year with the help of █████ ██████. Mr. Rappaport mentioned that we might want to research ███████████████ █████ who is very wealthy and philanthropic.

Mr. Levitt inquired about current efforts on public relations to which Mr. Mullaney agreed that we should do more. Noted that we had a mid-size PR firm promise us pro-bono work, but then submitted a proposal with fees around $100,000/year.

On the subject of direct mail, Mr. Kant asked if we might consider hiring a senior executive to run direct mail so that Mr. Mullaney would not be bogged down with it. Mr. Mullaney suggested that we first fix our retention results and then entertain this as a possibility. It was agreed that there was no interest in investing any more money in acquiring more donors until we can prove they will be profitable.

WON-EX 1297


## ADMINSTRATION & FINANCE

Mr. Mullaney provided board with legal update, noting that HelpMeSee arbitration is coming to a close after almost 4 years and more than $1.2 million in legal fees. Final ruling expected in August/September.

Discussed portfolio position with Vanguard, and that, as of June 3, 2016, we had an unrealized gain of $419,000 on our investment.

Confirmed that FY15 Audited Financials and FY15 990 were both submitted to the IRS this past May.

Noted that 4 partner hospital financial audits were conducted by KPMG this past fiscal year. Continuing to target hospitals for audit that receive $250k+ funding.

Reviewed FY16 budget vs actuals. Noted that major gift revenue was the main factor beating revenue budget by 169%.

Mr. Levitt mentioned that we are possibly being too cautious holding back on program spending because of legal issues and challenges.

Mr. Levitt and Mr. Steele both suggested we frame pitches to donors in creative ways, instead of just the monolithic "20 million need surgery" approach. They suggested that focus be on children and region or geographic area.

Mr. Kant recommended we approach ███████████████ and try to form a partnership with them to raise money from wealthy Indians in the US. He confirmed they know who and where they are. 100% of the money raised could be restricted to ██████

Mr. Rappaport recommended that we delineate capital gifts and capital spending, as it distorts operating income and expenses.

Next Mr. Mullaney presented the FY17 budget which board approved with following modifications:

> Increase major gifts target from $4 million to $5 million.
> Increase program spending from $5,455,000 to $6,455,000.

Several board members suggested we use large $2 million grant from one donor to pay for all non-program expenses, so we can use 100% of all donations to pay for surgeries, just as we did at Smile Train.

This generated a lively discussion of our capacity to increase surgeries: how easy will it be to scale up surgeries and will it require capital investment?

Mr. Levitt asked if we have prospective partners "in the wings" we can bring on if major gifts come in. Mr. Mullaney explained he believes we do and promised to circulate a spreadsheet that shows partners' current surgeries for us as well as their capacity.

Mr. Mullaney suggested we can go to 150,000-200,000 surgeries/year with our current partners.

Reviewed P&L and balance sheet. Noted that gross assets are at $24 million.

## GOVERNANCE

Reviewed future board meeting dates and discussed changing times if possible.

Mr. Rappaport said he can attend October and June meeting if time is changed from 11am-1pm to 10am-12pm. If not, Mr. Rappaport said he could attend a meeting on June 5th (instead of June 13th).

WON-EX 1298



Board approved formation of following committees with these members:

Nominating and Compensation Committees: JJ Coneys, Ravi Kant, Clark Kokich and Steve Levitt
Audit Committee: JJ Coneys, Steve Rappaport
Finance and Investment Committee: Dickie Steele, JJ Coneys, Brian Mullaney

Board nominated and approved JJ Coneys for new 3-year term, with understanding he will probably need to-resign after one more year due to work obligations.

Mr. Kokich asked if we should determine a give or get for board members.

Discussed new board prospects Jim Poehling and Sabrina Clark.

Mr. Poehling was favorably received. Agreed that next step would be to set up a call/meeting between Mr. Kokich and Mr. Poehling.

Sabrina Clark's nomination was also discussed, and Mr. Mullaney explained she would be attending board dinner where members would meet her. Mr. Mullaney seated her next to Mr. Kokich during the dinner.

It was agreed that after Mr. Kokich speak with Mr. Poehling, board would discuss both candidates on a conference call or via email. It was noted that it one or both are approved, they will be able to attend the next board meeting in October.

Noted that WonderWork has received the seal from the Better Business Bureau after having met all 20 standards for charity accountability.

As a side note, Mr. Levitt recommended we contact Peter Attia, a very talented surgeon and treats the richest people in New York.

At 4:10pm, the meeting was concluded.

WON-EX 1299

# EXHIBIT 78



**Minutes of the**
**Board of Directors Meeting**

**Date:**        **October 11, 2016**

**Location:**     **WonderWork Headquarters**

**Present:**      **Mark Atkinson, Sabrina Clark, Brian Mullaney, Jim Poehling, Steven Rappaport**

**Dialed in:**    **JJ Coneys, Ravi Kant, Clark Kokich, Steven Levitt, Richard Price, Richard Steele**

Meeting convened at 10am EST.

<u>GOVERNANCE</u>

Board voted on and approved new members: James Poehling (Former Assistant Vice Chancellor Health Sciences, University Missouri Healthcare) and Sabrina Clark (Managing Director, Business Operations & Program Management, SY Partners).

Minutes from June 13, 2016 year-end board meeting were approved per changes by board members.

It was suggested that future board meetings be moved back to allow for more comprehensive and accurate reporting. The following new dates were approved: Tuesday, March 7, 2017; Tuesday, June 27, 2017; and Thursday, November 16, 2017. (Mr. Kokich had a conflict with Tuesday, November 14th and board agreed to move meeting to Thursday). In order to ensure as full attendance as possible, it was requested that WonderWork send members a reminder one month prior to a meeting.

Discussed new member prospect: Tara Abrahams. It was noted that Ms. Abrahams has 15 years of experience in strategy consulting, philanthropy, program implementation and change management. Mr. Mullaney explained that she was originally referred by Mr. Steele who worked with her while she was a consultant at Bridgespan for approximately 2 years. Overall, board members considered her an excellent candidate with Mr. Kant and Mr. Rappaport verbally noting they were very impressed by her credentials. It was agreed that Mr. Kokich would schedule a phone call with Ms. Abrahams to formally discuss her joining WonderWork board. Upon her consent, a special board conference call will be scheduled to vote and approve her so that she may attend the March 7, 2017 meeting.

With regards to the 3 newly created board committees, it was collectively decided that Mr. Kokich would chair and organize the Nominating and Compensation Committee, Mr. Coneys would chair the Audit Committee and Mr. Steele would chair the Finance and Investment Committee. Ms. Clark inquired about the responsibility of the committees with Mr. Mullaney responding that this would be determined by each committee.

Reviewed WonderWork overview chart which shows the program breakout under the WonderWork umbrella. It was noted that, amongst the causes, 20|20|20 comprises 80% of the revenue, 75% of the donors and 98% of the surgeries.

Mr. Poehling asked about the need for surgery for each cause. Mullaney explained the huge numbers who need help: 20,000,000 blind, 2,000,000 suffering with clubfoot, 11 million burned each year.



<u>PROGRAMS</u>

Mr. Mullaney provided an overview of the WonderWork programs structure and process, explaining everything from the vetting of partners to the grant approval process to the completion and reporting of surgeries.

Reviewed first quarter program results, noting that we have contributed to performing 17,244 total surgeries. Of the 16,894 cataract surgeries, Mr. Mullaney explained that 2% are pediatric. Noted that our 5-year projected surgery growth is 1,113%.

Mr. Levitt inquired as to how we know surgeries are incremental. Mr. Mullaney explained that several steps have been taken to ensure this. Explained that (1) award letters have been revised to indicate WW funding is to be used to support incremental surgeries and not displace other funds, (2) term sheets are also provided to partners which are then signed and returned to WW, (3) narrative reports required that partners complete, confirm that WW funding was used for incremental surgeries, (4) annual surveys are sent to partners to gauge capacity for expansion, measure growth over time and reconfirm that funds are used for incremental surgeries.

Mr. Mullaney discussed that we recently acquired a new, extremely viable, partner, ██████████ ██████ which is the highest surgical volume eye hospital in India, making this hospital extremely scalable for WonderWork.

Discussed Project Varanasi progress and land purchase options: Jansa Thana land and a government-owned land. Explained that ██████████ has moved forward with the purchase of Jansa Thana land which is 4-5 acres and has an excellent location. Mr. Mullaney noted that the low-cost, 14-acre government land is still under consideration, however, it is unlikely to come through due to the Indian bureaucratic government process. Mr. Price offered assistance from CBRE Real Estate should we need it.

Mr. Mullaney also updated the board on the data warehouse project. Noted that we retained IT company, Mastek, based in India, to build and deliver a cloud-based patient database by January 2017. Discussed that Mastek was chosen for its capability as well as its extremely reasonable cost ($40k vs competitive bids of $250k). Mr. Kant mentioned that he knows Mastek's co-founder and thinks highly of him and their company. Mr. Mullaney explained that Ariadne Labs at Harvard School of Public Health and BCG will continue to assist with the execution of the project as well.

Mr. Rappaport asked if data warehouse could be licensed to other non-profit and for-profit organizations.

Ms. Clark was curious as to how the database would work and how records would be loaded into the database. Mr. Mullaney explained that partners would upload patient data into an enterprise level, secure cloud-based server.

Mr. Mullaney went on to discuss an important funding opportunity with USAID that involves their Development Innovation Ventures program. He noted that USAID technology partners, CISCO and IBM, may be interested in our data warehouse. Also discussed the opportunity to pitch the 68 members of Congress whom we've identified with an interest in avoidable blindness. Mr. Levitt offered to help pitch the folks at USAID. Mr. Steele recommended we review government finance and accounting requirements, as they can be substantial and onerous.

WON-EX 1301



## DEVELOPMENT

Reviewed direct mail retention results for July and August campaigns. Noted that campaigns are performing better than budget.

Reviewed acquisition net income each year since FY13 to demonstrate the losses we incurred through these campaigns and why it was necessary to cease acquisition efforts.

Mr. Mullaney remarked that, since we are no longer conducting acquisition campaigns, we have stopped acquiring new donors and current donors are lapsing at a greater rate. Noted that as of September 30th, our donor file is comprised of 62% lapsed donors (haven't given a gift within past 24 months) vs 38% active donors.

Mr. Atkinson inquired as to what has happened to direct mail given that it was so successful for us for many years. Mr. Mullaney explained that demographics, aging donors, tendency of new donors to use digital means are contributing to the challenges the industry is seeing in traditional direct response mail.

Mr. Rappaport remarked that, while our acquisition program consumed a lot of money, it has not been a total disaster, as it raised awareness and helped establish the 3 brands.

Mr. Mullaney discussed a mailing opportunity with 45,000 of our "once and done" donors who have not been mailed for 2+ years that could contribute $1-$1.5MM in incremental revenue over the next 3-4 years. He explained that a recent test mailing to 30,000 of these donors did extremely well (exceeding response rate, average gift and showing lower cost to raise $1 against budget). It was noted that due to initial test success, it will be re-tested this fall.

Mr. Mullaney confirmed that overall direction is to continue pivoting from low-end to high-end direct mail, as major donors bring in 75% of revenue. He discussed that we are testing high-end, highly personalized retention mailings (both "ask" and "cultivation" pieces) to current $250+ level donors for 6 months.

Noting that we have stopped acquiring low-end direct mail donors, Mr. Mullaney mentioned that we would be exploring renting though our list broker more high-end, direct mail lists (e.g. Architectural Digest, Town and Country, Frontgate) which Mr. Atkinson also inquired about.

Provided update on major gift officer search, remarking that the first round of interviews were disappointing. Noted how difficult it is to find good major gift officers. Mr. Mullaney surmised that one challenge for us is that our charity is not well known, nor is our cause.

Mr. Poehling explained that the Thompson Autism Center experienced a similar challenge and their solution involved hiring a "home-grown person," a nurse from one of the centers.

Mr. Rappaport concluded that Mr. Mullaney needs strong administrative people around him to make him more productive.

Mr. Mullaney went on to discuss the current web stats, noting that online revenue was $85,000 for Q1 FY17 with 20|20|20 comprising 76% of revenue and gifts. He noted that, while videos have had tremendous numbers of views, the overall revenue raised from them has been disappointing.

Mr. Kokich asked if WonderWork paid for views; Mr. Mullaney confirmed we did not.

Mr. Steele mentioned that he would like to connect us with AARP given their success with social media and shift away from direct mail. Mr. Steele said that we "need a war room to be connected with social media." Mr. Rappaport suggested that we reach out to AARP Foundation and pitch them for funding.

WON-EX 1302



ADMINISTRATION & FINANCE

Discussed portfolio which shows that 100% of investment (including impact loans) rests in Vanguard Total Stock Market ETF. Noted that % gain was 4.34% as of Sept 30th. Mr. Rappaport suggested that money be invested in more conservative vehicles, such as bonds. Mr. Coneys concurred that investment strategy also be reviewed. Board discussed that Finance and Investment Committee would meet and discuss this.

MISCELLANEOUS

Mr. Mullaney presented article in *National Geographic* magazine on blindness and confirmed that a digital copy will be sent to all members. Mr. Coneys and Mr. Rappaport inquired as to how we can leverage the article to get people to watch our viral video. Mr. Atkinson also felt that we should leverage the Nat Geo video, as it lends tremendous credibility. Ms. Clark asked if we could get the mailing list of Nat Geo; Mr. Mullaney responded that we would look into this.

Discussed how we can try and partner with social media influencers and celebrities.


Meeting ended at 11:20am EST.

WON-EX 1303

# EXHIBIT 79

**From:** Brian Mullaney
**Sent:** Thursday, December 08, 2016 7:26 PM
**To:** Richard Steele; John Coneys
**CC:** Karen Lazarus
**Subject:** Re: Unanimous Written Consent - Re: Chapter 11

**SysUserProp:** 88334F2CCA0D8E51C8530404366F9B82

No problem Dickie.
I completely understand.


b.

**Brian Mullaney**
Co-Founder/CEO

**WonderWork**
411 Fifth Avenue, Suite 702 **NEW ADDRESS!**
New York, NY  10016
tel: 212.729.1855
cell: 917.902.7550
email: brian@wonderwork.org
www.WonderWork.org

Watch two blind sisters see their mom for the first time!
More than 15,000,000 people have watched this heart-warming video so far. It was the #1 watched video on the National Geographic website for more than a year.



**TIME magazine named WonderWork "One of 10 Ideas That Can Change The World."**

---

**From:** Richard Steele <rsteele@sypartners.com>
**Date:** Thursday, December 8, 2016 at 7:05 PM
**To:** Brian Mullaneyo <brian@wonderwork.org>, John Coneys <JJ.Coneys@nexteraenergy.com>
**Cc:** Karen Lazarus <karen@wonderwork.org>
**Subject:** Re: Unanimous Written Consent - Re: Chapter 11

Dear Brian and John

Brian, I help you're doing OK under the circumstances and that this e mail doesn't add to your troubles.

As I said when we spoke recently, I went through a very traumatic bankruptcy with Marakon. On the one hand, this gives me a perspective that I think can be valuable. On the other hand, I'm very aware how complicated this process may get for you and the board and your relationship with board members. I sense that things will get very complicated with HMS when we enter bankruptcy which I believe we should do now rather than appeal.

Indeed, I discussed the situation with my wife last night and she has encouraged me to resign from the board.

Most fundamentally I don't want to get into a situation where the board needs to make the kind of decisions that would put my relationship with you at risk. Already I feel that I'm not in a situation to be of service to the mission which I would like to be. I am concerned also about how HMS might pursue board members - in the Marakon case directors insurance was insufficient and I am scarred by that.

So, I am writing formally to resign from the board. I will remain a supporter and hope that when we are though these tough times I can help you in a less formal capacity,

I'm on the road at the moment but back on Sunday and can speak then if you like.

With great respect, much sadness and with apologies for e mailing but I know you need to move fast.


Dickie Steele




On Dec 8, 2016, at 5:33 PM, Karen Lazarus <karen@wonderwork.org> wrote:

Hi Dickie, I am following up on Brian's email from yesterday regarding the unanimous written consent regarding the Chapter 11 filings.

Thanks for sending us a PDF of your executed signature page.

We will then compile a fully executed PDF for everyone's records.

Thank you,
Karen
212-729-1855 ext.101

---

**From:** Karen Lazarus <brianmullaney@wonderwork.org>
**Date:** Wednesday, December 7, 2016 10:12 AM
**To:** Ravi Kant <rkant644@gmail.com>, John Coneys <JJ.Coneys@nexteraenergy.com>, Steven Levitt <slevitt@uchicago.edu>, Clark and Lisa Kokich <clark1@gmail.com>, Steve Rappaport <snr@rzcapital.com>, "sclark@sypartners.com" <sclark@sypartners.com>, Richard Price <rtgprice@me.com>, mark atkinson <meatkinson1611@gmail.com>, "Poehling, James C." <PoehlingJ@health.missouri.edu>, Richard Steele <rsteele@sypartners.com>
**Cc:** Ashley Mull <am@rzcapital.com>, "Abreu, Maria" <Maria.Abreu@fpl.com>, Jillian Davis <jdavis@sypartners.com>, Brian Mullaney <brian@wonderwork.org>
**Subject:** Unanimous Written Consent - Re: Chapter 11

Hi,

I am attaching the unanimous written consent regarding the Chapter 11 filings.

Each director should email me a PDF copy of his or her executed signature page as soon as possible, but no later than end of day, Wednesday.

I will then compile one fully executed PDF, date the first page and send it back to you for your records.

Thank you.

Brian

**Brian Mullaney**
Co-Founder/CEO
WonderWork
411 Fifth Avenue, Suite 702 **NEW ADDRESS!**
New York, NY 10016
tel: 212.729.1855
cell: 917.902.7550
email: brian@wonderwork.org
www.WonderWork.org

Watch two blind sisters see their mom for the first time!
Almost 10,000,000 people have watched this heart-warming video so far. It was the #1 watched video on the National Geographic website for more than a year.

<B3F902B3-DEAE-4C1F-90FF-C390E07C27BD.png>

**TIME magazine named WonderWork "One Of 10 Ideas That Can Change The World."**

<B3F902B3-DEAE-4C1F-90FF-C390E07C27BD.png><WW - Unanimous written consent re chapter 11_7887551_1[1].DOCX>

# EXHIBIT 80

Hi JJ,

First some good news.

Our lawyers are meeting with HMS lawyers today or tomorrow to discuss a settlement. Their lawyers said they think it would make sense. (bear in mind this may be another game.)

We are offering to pay the entire award - $8.3 million – over four years in the form of grants for cataract surgeries. A settlement would save them millions in legal fees and eliminate the risk of us just closing down and leaving them with close to nothing. Stay tuned.

I understand exactly what you are saying and I greatly appreciate your staying on the board to help with the transition.

But could you please wait just a little bit? There could not be a worse time than right now.

At a time where we really need our board to stand with us, it looks like everyone is jumping ship. First Dickie Steele resigned. Then Ravi Kant resigned. We haven't heard a word from Sabrina, our only female member, and she works with Dickie so I am sure she is about to resign. If we add you to those three it would be almost half our board resigning which would really hurt our chances of convincing a bankruptcy judge that we are a viable organization worth saving.

After all, if you own board members don't believe in us why should anyone else?

Can you please postpone your resignation for a 2-3 months?

We should have a resolution by then, one way or another.

1.   We may be able to reach a settlement.
2.   If no settlement is possible, we can enter Chapter 11 and come back out. Since we have $19 million in the bank, are having a robust, fall fundraising season, and have the willingness and ability to pay 100% of the award, I am confident we will come up with a plan that will get approved.
3.   If for whatever reason, dissolving the organization makes more sense, we can do that too quickly. We are a very simple organization with little debt and 99% liquid.

One way or another, you can resign in 2-3 months.

I am very grateful for all of your help, support and wise advice over the past four years.

If you could just hang on while we get past this crisis it would help us a lot.

Please consider it and call me later when you have a moment to discuss.

Thanks

b

**Brian Mullaney**
Co-Founder/CEO

WonderWork
411 Fifth Avenue, Suite 702 **NEW ADDRESS!**
New York, NY 10016
tel: 212.729.1855
cell: 917.902.7550
email: brian@wonderwork.org
www.WonderWork.org

Watch two blind sisters see their mom for the first time!
More than 15,000,000 people have watched this heart-warming video so far. It was the #1 watched video on the National Geographic website for more than a year.



**TIME magazine named WonderWork "One of 10 Ideas That Can Change The World."**

---

**From:** "Coneys, JJ" <JJ.Coneys@nexteraenergy.com>
**Date:** Wednesday, December 21, 2016 at 8:56 AM
**To:** Brian Mullaneyo <brian@wonderwork.org>
**Subject:** RE: Board update

Brian,

Making the bankruptcy filing this week seems like the prudent course of action. While it's unfortunate that we were not able to secure the services of the bankruptcy law firm you were hoping to get, CLM should be able to handle this for us.

We need to speak about the board, in particular my continued involvement. As you know, when my board term ended this past June 30th, I was concerned about the constraints my full-time job in Florida has put on me in carrying out my responsibilities as a WonderWork board member. I indicated to you then that I was reluctant to agree to another term but I ultimately agreed to stay on for one more year to ease the transition to a new slate of board members, thinking that my time commitment would be relatively light. With the HMS crisis unfolding, more time, not less, is needed for all board members to help you and the company weather this difficult storm. I have not been able to make that time commitment and do not envision being able to make it in the coming months. It is comforting to see that several of the new board members have stepped up to provide counsel and assistance to you as this has unfolded. But as WonderWork enters this next phase, the transition to the new board has taken place and the time is now right for me to stand down. The new board members are well positioned to carry on without my involvement and have effectively been doing so for the past two months. Put simply, if I am unable to carry out my responsibilities as board member to the best of my abilities, I should not continue to serve on the board. Accordingly, I am resigning from the board with immediate effect.

I am proud of my association with WonderWork and have greatly enjoyed working with you and your team. I will remain a staunch supporter of the WonderWork mission. But I also believe that you and the full board will be better served with board members who are able to invest the time and energy needed at this critical time.

I will call you to discuss this.

Regards,

J. J.

**From:** Brian Mullaney [mailto:brian@wonderwork.org]
**Sent:** Tuesday, December 20, 2016 10:20 AM
**To:** Brian Mullaney; Coneys, JJ; Steve Levitt; Clark Kokich; Steve Rappaport; sclark@sypartners.com; Richard Price; Mark Atkinson; mark atkinson; Poehling, James C.
**Cc:** Ashley Mull; Abreu, Maria
**Subject:** Board update

CAUTION - EXTERNAL EMAIL

Hi,

Here is the latest.

It turns out our new bankruptcy law firm is unable to help us. With our bank accounts being frozen we were unable to come up with the retainer they required.

Thus, we have returned to our original firm., CLM,, which had been preparing to file our papers for Chapter 11 Bankruptcy Reorganization last week. They graciously took us back.

They will file on our behalf either tomorrow or Thursday at the latest. This should free up our bank accounts and let us continue to operate. It will also prevent HSM from doing anything to harm us.

Please know that there is a risk that HMS will reject any plan that we propose and pressure the judge to close us down.

We have four months to come up with a compelling, credible plan that will show how we can pay HMS most if not all of their award over 3-4 years in the form of grants for cataract surgeries while still supporting our partners, paying back 100% of our impact loans, etc.

I am confident we can do this.

CLM is reaching out to HMS once again to see if they will engage in any settlement talks.

We are revising our PR holding statement to reflect the Chapter 11 filing and I will circulate shortly.

Any questions or concerns please let me know.

I would recommend our next board call be in early January with our lawyers to discuss our reorganization plan and what issues and options there are.

Until then, thank you for your help and support during this difficult time.

Merry Christmas.


Brian


**Brian Mullaney**

Co-Founder/CEO

WonderWork
411Fifth Avenue, Suite 702 **NEW ADDRESS!**
New York, NY  10016
tel: 212.729.1855
cell: 917.902.7550
email: brian@wonderwork.org
www.WonderWork.org

Watch two blind sisters see their mom for the first time!
More than 15,000,000 people have watched this heart-warming video so far. It was the #1 watched video on the
National Geographic website for more than a year.



**TIME magazine named WonderWork "One of 10 Ideas That Can Change The World."**
**ne named WonderWork "One Of 10 Ideas That Can Change The World."**

# EXHIBIT 81

**From:** Jim Poehling [poehlingb@yahoo.com]
**Sent:** Monday, June 05, 2017 11:37 AM
**To:** Brian Mullaney
**Subject:** Resignation from Board

Brian,

I had hoped to talk with you in person about this but missed you this morning.

I sincerely regret that I must resign from the Wonder Work Board effective immediately.

It would probably be best if we discussed the circumstances by phone.

I regret any inconvenience this may cause. I wish you and your fine staff all the best as you work through these difficult times.

Best regards,

Jim

WW_EMAILS0244572-1

# EXHIBIT 82

**From:** Brian Mullaney [brian@wonderwork.org]
**Sent:** Monday, June 05, 2017 5:09 PM
**To:** Karen Lazarus
**Subject:** Re: Jim Poehling

Yes, I just spoke to him. Too bad. ███████ made him step down. b

**Brian Mullaney**
Co-Founder/CEO
WonderWork


411 Fifth Avenue, Suite 702
New York, NY  10016
Tel: 212.729.1855
Cell: 917.902.7550

Email: brian@wonderwork.org
www.WonderWork.org

Watch two blind sisters see their mom for the first time!
More than 15,000,000 people
have watched this heart-warming video
so far. It was the #1 watched video
on the National Geographic website
for more than a year!  Viewers from more
than 90 countries have sent donations.




WonderWork Debtor In Possession  TIME magazine named WonderWork "One of 10 Ideas That Can Change The World."

---

**From:** Karen Lazarus <karen@wonderwork.org>
**Date:** Monday, June 5, 2017 at 5:05 PM
**To:** Brian Mullaneyo <brian@wonderwork.org>
**Subject:** Jim Poehling

He emailed me to let me know he has resigned from the board.  Sad to see him go.  Said he might re-join later in the year...??  I guess we'll see.


**Karen Lazarus**
Director of Strategic Projects
WonderWork


411 Fifth Avenue, Suite 702

New York, NY  10016
tel: 212.729.1855 ext. 101
cell: 917.848.3508
skype: karen_wonderwork

email: karen@wonderwork.org
www.WonderWork.org

Watch two blind sisters see their mom for the first time!
Almost 15,000,000 people
have watched this heart-warming video
so far. It was the #1 watched video
on the National Geographic website
for more than a year. Viewers from more
than 90 countries have sent donations.



WonderWork Debtor In Possession   TIME magazine named WonderWork "One Of 10 Ideas That Will Change The World."

# EXHIBIT 83

## ACTION BY SOLE INCORPORATOR
## OF
## SURGERY FOR THE POOR, INC.

The undersigned, being the sole incorporator of Surgery for the Poor, Inc., a Delaware nonprofit corporation ("Corporation"), hereby acts as follows:

### Articles of Incorporation
### Corporate Name and Corporate Purpose

WHEREAS, the incorporator of this Corporation has adopted the Articles of Incorporation of Surgery for the Poor, Inc. ("Articles of Incorporation"), which Articles of Incorporation set forth the name and purpose of this Corporation and were filed with the Delaware Secretary of State on March 7, 2011; and

WHEREAS, it is in the best interests of the Corporation to authorize and ratify the adoption and filing of the Articles of Incorporation.

NOW, THEREFORE, IT IS RESOLVED, that the adoption and filing of the Articles of Incorporation, together with the corporate name and purpose which they embody, and each and every other provision set forth therein, hereby are ratified and authorized.

### Bylaws

WHEREAS, the incorporator of the Corporation has adopted the Bylaws of Surgery for the Poor, Inc. ("Bylaws") on March 7, 2011, a copy of which has been placed in the official corporate minute book for the Corporation, and

WHEREAS, it is in the best interests of the Corporation to authorize and ratify the adoption of the Bylaws.

NOW, THEREFORE, IT IS RESOLVED, that the adoption of the Bylaws, together with those Bylaws and each and every provision set forth therein, hereby is ratified and authorized.

### Appointment of First Directors

WHEREAS, the business and affairs of the Corporation must be managed by, and all corporate powers exercised by or under the ultimate direction of, a Board of Directors;

WHEREAS, it is in the best interests of the Corporation that the Corporation appoint a first Board of Directors to take effective immediately upon acceptance and filing of the Articles of Incorporation by the Delaware Secretary of State to serve until they are replaced or reelected in accordance with the Bylaws of the Corporation;

WHEREAS, the undersigned appoints the following persons as the first Directors of this Corporation and acknowledges that each has accepted said appointment:

WON-EX 1791

Brian Mullaney
Theodore Dysart
Ravi Kant

NOW, THEREFORE, IT IS RESOLVED, that the following persons are hereby appointed as the first Directors of this Corporation, which appointment shall be effective March 3, 2011:

Brian Mullaney
Theodore Dysart
Ravi Kant

FURTHER RESOLVED, that Brian Mullaney shall serve as the first President of the Corporation, and as such has the authority to sign any and all legal documents for and on behalf of the Corporation. Theodore Dysart shall serve as the initial Secretary/Treasurer, and shall have authority to sign or countersign legal documents on behalf of the Corporation, binding the Corporation to any obligations arising thereunder.

## Consent of Sole Incorporator

The incorporator of the Corporation, signing below and acting on her own behalf, hereby consents to the adoption of each of the recitals and resolutions set forth above.

Dated: March 8, 2011

Doris Rieke, Incorporator

## Resignation of Sole Incorporator

The incorporator of the Corporation, signing below and acting on her own behalf, has completed so much of the incorporation and organization of the Corporation as such person believes to be necessary. Such person resigns as the incorporator of this Corporation as of the date set forth below opposite such person's signature.

Dated: March 8, 2011

Doris Rieke, Incorporator

WON-EX 1792

# EXHIBIT 84

# BYLAWS

WON-EX 0026

# BYLAWS
## OF
## SURGERY FOR THE POOR, INC.

### (A Delaware Not-for-profit Corporation)

### ARTICLE I: Name

The name of this corporation is Surgery for the Poor, Inc. (hereinafter referred to as "the Corporation").

### ARTICLE II: Purposes and Limitations

The Corporation's purposes shall be as set forth in its Certificate of Incorporation.

### ARTICLE III: Registered Office

The address of the registered office of the Corporation is 3411 Silverside Road Rodney Building #104, City of Wilmington, County of New Castle, State of Delaware 19810. The name of the registered agent of the Corporation at that address is Corporate Creations Network, Inc. The Corporation may have other offices at such other places within or without the State as shall be determined by the Board of Directors.

### ARTICLE IV: Members

The Corporation shall have members. The members of the Corporation shall consist of the initial members set forth in the First Minutes of the First Meeting of the members and of such other persons as may be elected to membership from time to time by the other then-acting members, either by majority vote at any meeting in accordance with Section 5.10 of these Bylaws, or by unanimous written consent, in accordance with Section 5.12 of these Bylaws.

**Section 1.** **Term of Membership**. Unless a shorter term shall be specified by the other members at the time of his/her election, the term of any membership shall be life; provided, however, that any member may resign at any time upon written notice to the Secretary of the Corporation (any resignation to take effect as specified therein or, if not so specified, upon receipt by the Secretary), and any member may be removed at any time, with or without cause, by majority vote of the other members then in office.

**Section 2.** **Annual Meeting**. An annual meeting of the members shall be held for the election of directors and the transaction of other business as may properly come before the members.

**Section 3.** **Special Meetings**. Special meetings of the members may be called by a majority of all of the members for the review and transaction of any business required of the membership between annual meetings.

**Section 4.** **Place and Time of Meetings**. Meetings of members may be held at such place and at such hour as may be fixed in the notice of the meeting.

**Section 5.** **Notice of Annual and Special Meetings**. Written or printed notice stating the place, day and hour of the meeting, and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered not less than ten or more than fifty days before the date of the meeting, either personally or by mail or email, to each member entitled to vote at such meeting. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail, with postage thereon prepaid, addressed to the member at his/her address as it appears on the records of the Corporation.

**Section 6.** **Waivers of Notice**. Whenever any notice is required to be given to any member under any provision of law, the Articles of Incorporation or these Bylaws, a waiver thereof in writing signed by the member entitled to such notice, whether before or after the time stated therein, shall be the equivalent to the giving of such notice. The presence of any member at a meeting, in person or by proxy, without objection to the lack of notice of such meeting, shall also waive notice by such member.

**Section 7.** **Quorum**. A majority of members present at a meeting shall constitute a quorum at a meeting of members for the transaction of any business. The members present at a duly organized meeting may continue to do business until adjournment, notwithstanding the withdrawal of enough members to leave less than a quorum. If a meeting cannot be organized because a quorum has not attended, those present may adjourn the meeting from time to time until a quorum is present, when any business may be transacted that may have been transacted at the meeting as originally called.

**Section 8.** **Vote**. Each member shall have one vote. Whenever any corporate action is to be taken by vote of the members, it shall, except as otherwise required by law or by the Articles of Incorporation, be authorized by a majority of the votes cast at a meeting of members by the members entitled to vote thereon.

**Section 9.** **Presiding Officer**. At the first meeting of the members, a presiding officer shall be appointed to serve and preside over any and all member meetings. Said officer shall serve until his or her earlier death or resignation. If the presiding officer is not in attendance at any meeting of the members, an appointee of the person shall serve in his/her stead.

**Section 10.** **Informal Action by Members; Meetings by Conference Telephone**. Any action required by the Missouri Nonprofit Corporation Act to be taken at a meeting of the members of the Corporation, or any action which may be taken at a meeting of the members, may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by all of the members entitled to vote with respect to the subject matter thereof. Such consent shall have the same force and effect as a unanimous vote.

Except as otherwise required by law or restricted by the Articles of Incorporation or these Bylaws, the members may participate in a meeting of the members by means of conference

2

WON-EX 0028

telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other at the same time, and such participation shall constitute presence in person at the meeting.

## ARTICLE V: Board of Directors

**Section 1.**    **General Powers.** The affairs of the Corporation shall be managed by its Board of Directors. It shall be the Board of Directors' duty to carry out the objectives and purposes of the Corporation, and to this end, the Board of Directors may exercise all powers of the Corporation. The Board of Directors shall be subject to the restrictions and obligations set forth by law and in the Corporation's Articles of Incorporation and these Bylaws.

**Section 2. Legal Responsibilities of Board.** Directors shall meet certain standards of conduct and attention in carrying out their responsibilities to the Corporation. These standards include the duties of care, loyalty and obedience, as defined under Delaware law and the common law.

**Section 3. Composition, Election, Term, and Qualifications.** The number of Directors shall be not less than three (3), such number which shall be fixed from time to time by resolution adopted by a majority of the membership. The Directors shall be elected by the members as set forth in Article IV. Each Director shall hold office for a one (1)-year term; provided, however, that Directors shall serve until their successors have been duly elected and have qualified. There shall be no limit on the number of terms, consecutive or otherwise, that a Director may serve. The terms of Directors may be staggered, so as to not all expire at the same time, to the extent and as determined by the Board of Directors. To this end, the term(s) of one (1) or more Directors may be extended or abbreviated, to the extent and as determined by the membership. Directors shall be at least (21) years of age.

**Section 4.**    **Annual and Regular Meetings.** Not less than two regularly scheduled meetings of the Board of Directors shall be held each year at such time and place designated by the Board of Directors. No notice shall be required for regular meetings of the Board of Directors for which the time and place have been fixed. The Chairman of the Board will preside at all meetings for the Board of Directors. If there be no Chairman or in his or her absence, the President will preside, and if there be no President or in his or her absence, any other Director chosen by the Board of Directors shall preside.

**Section 5.**    **Special Meetings.** Special meetings of the Board of Directors may be called by or at the request of the President or any two (2) Directors then in office. The notice of the any special meeting shall specify the purpose of such meeting. The requirement for furnishing notice of a meeting may be waived by any director who signs a Waiver of Notice before or after the meeting or who attends the meeting without protesting the lack of notice to him.

**Section 6.**    **Quorum.** A majority of the Board of Directors in office shall constitute a

WON-EX 0029

quorum for the transaction of business at any meeting of the Board of Directors, provided, that if less than a majority of the Directors are present at said meeting, a majority of the Directors present may adjourn the meeting from time to time without further notice.

**Section 7.    Manner of Acting.** The act of a majority of the Directors present at a meeting at which a quorum is present shall be the act of the Board of Directors, except as otherwise provided by law, by the Corporation's Articles of Incorporation, or by these Bylaws. Each Director shall have one (1) vote on all matters submitted to a vote of the Board of Directors.

**Section 8.    Teleconferencing.** Any person participating in a meeting of the Board of Directors may participate by means of conference telephone or by any means of communication by which all persons participating in the meeting are able to hear one another and otherwise fully participate in the meeting. Such participation shall constitute presence in person at the meeting.

**Section 9.    Action by Unanimous Written Consent.** Any action required to be taken at a meeting of the Board of Directors or any action which may be taken at a meeting of the Board of Directors may be taken without a meeting if a consent in writing, setting forth the action so taken, is signed by all of the Directors entitled to vote with respect to the subject matter thereof.

**Section 10. Proxy Voting.** Any director may authorize another director to vote on the Director's behalf. Such authorization shall be signed by the respective director and returned without a written signature and submitted by other means of electronic transmission if it can be reasonably determined that the vote was authorized, such as by validating the director's birth date, or other unique identifier.

**Section 11.    Minutes and Parliamentary Procedure.** Full minutes of each meeting of the Board of Directors shall be recorded by the Secretary containing results of the deliberations of the Board of Directors. The minutes shall be submitted to the Board of Directors for approval at the subsequent meeting of the Board of Directors. All meetings of the Board of Directors shall be conducted in accordance with the latest edition of Robert's Rules of Order, to the extent that such parliamentary procedures are not inconsistent with these Bylaws, the Corporation's Articles of Incorporation, the N-PCL, or rules adopted by the Board of Directors for its own governance.

**Section 12.    Removal or Resignation of Directors.** (a) Any Director may be removed or suspended from office at any time by the affirmative vote of a majority of the Members, after giving notice to the Director and providing the Director an opportunity to respond in person or in writing. Such removal or suspension shall be for one or more material violation of the bylaws, rules, policies, or any applicable provisions of the N-PCL.

(b)    Any Director may resign at any time by giving written notice to an officer of the Board of Directors or to the Board of Directors or to the membership. Such resignation shall take effect at the time specified in such notice, or, if no time is specified, at the time such

4

WON-EX 0030

resignation is tendered.

**Section 13.** **Vacancies.** Any vacancy occurring in the Board of Directors or any Directorship to be filled by reason of an increase in the number of Directors may be filled at any time by the membership. A Director selected to fill a vacancy shall be elected for the unexpired term of his or her predecessor in office. Vacancies may be filled or new Directorships created and filled at any meeting of the membership. Such action shall be effected by the affirmative vote of a majority of the members present at a meeting at which a quorum is present in accordance with Article IV.

**Section 14.** **Committees.** Whenever the Board of Directors shall consist of more than three persons, the Board of Directors may designate from their number, an Executive Committee and other standing committees. Such committees shall have such authority as the Board of Directors may delegate, except to the extent prohibited by law.

## ARTICLE VI: Officers

**Section 1.** **Definition of Officers.** The Officers of the Corporation shall be a Chairman of the Board of Directors, a Vice-President (optional), a President, a Secretary and a Treasurer. The Board of Directors may elect such other Officers as it shall deem necessary and proper. All Officers shall be members of the Board of Directors by virtue of their office, unless otherwise determined by the Board of Directors. The offices of President and Treasurer shall not be held by the same person.

**Section 2.** **Election, Term and Qualifications.** The Officers of the Corporation shall be elected by the Board of Directors by the affirmative vote of a majority of the Board of Directors present at any meeting at which a quorum is present. Each Officer shall hold office for a one (1) year term provided, however, that Officers shall serve until their successors have been duly elected and have qualified. There shall be no limit on the number of terms, consecutive or otherwise, that an Officer may serve. The terms of Officers may be staggered, so as to not all expire at the same time, to the extent and as determined by the Board of Directors. To this end, the term(s) of one (1) or more Officers may be extended or abbreviated, to the extent and as determined by the Board of Directors.

**Section 3.** **Removal or Resignation of Officers.** (a) Any Officer may be removed from office at any time by the affirmative vote of a majority of the Members or by a vote of the majority of the Board of Directors present at a meeting at which a quorum is present, whenever in their judgment the best interests of the Corporation would be served thereby, after giving notice to the Director and providing the Director an opportunity to respond in person or in writing, as determined by the Members or the Board of Directors. Such removal or suspension shall be for one or more material violation of the bylaws, rules, policies, or any applicable provisions of the N-PCL.

5

WON-EX 0031

(b)    Any Officer may resign at any time by giving written notice to the President, Secretary-Treasurer, or to the Board of Directors.  Such resignation shall take effect at the time specified in such notice, or, if no time is specified, at the time such resignation is tendered.

**Section 4.    Vacancies.**  A vacancy in any office may be filled at any time by the Board of Directors for the unexpired portion of the term.

**Section 5.    Chairman of the Board**.  The Chairman of the Board of Directors shall preside at all meetings of the Board of Directors and shall have such powers and perform such duties as, from time to time, may be assigned to him or by her by the Board of Directors.

**Section 6.    President.**  The President shall be the principal executive officer of the Corporation and shall in general supervise and have charge of all of the affairs of the Corporation, pursuant to the direction and oversight of the Board of Directors.

**Section 7.    Vice-President.**  Should the corporation choose to elect one or more Vice-Presidents, each Vice-President, shall have such powers and shall perform such duties as shall be assigned the President. During the absence or disability of the President of the Corporation, the Vice-President shall perform such duties as may be prescribed by the Board of Directors from time to time.

**Section 8.    Treasurer.**  The Treasurer shall have charge and custody of and be responsible for all funds and securities of the Corporation, and in general perform all duties incident to the office of treasurer and such other duties as from time to time may be assigned to him or her by the President or the Board of Directors.  The Treasures shall, when duly authorized by the Board of Directors, sign and execute contracts in the name of the Corporation when countersigned by the President; he or she may also sign checks, drafts, notes and order for the payment of money, which shall have been duly authorized by the Board of Directors and counter-signed by the President.  Emergency expenditures over a threshold established by resolution of the Board must be approved by the President with the consent of one Officer in addition to the Treasurer.

**Section 9.    Secretary.**  The Secretary shall record and keep the minutes of the meetings of the Board, see that all notices are duly given in accordance with the provisions of these Bylaws or as required by law, be the custodian of the corporate records, and in general perform all duties incident to the office of secretary and such other duties as from time to time may be assigned to her by the President or the Board of Directors.

### ARTICLE VII: Committees

**Section 1.    Committees of the Board of Directors.**  The Board of Directors, by resolution adopted by the majority of the entire board, shall from time to time, as appropriate, establish committees of the Board of Directors as the Directors determine may be necessary,

6

WON-EX 0032

including, but not limited to, an: (a) Executive Committee, (b) Nominating Committee, (c) Finance Committee, (d) Investment Committee and (e) Compensation Committee.

**Section 2. Election Term of Office, etc.,** Committees shall consist of three (3) or more Directors. Committee members shall be elected at the Annual Meeting of the Board of Directors or any meeting thereafter Committee members shall be elected in the same manner as Officers of the Corporation. The designation of any such committee and the delegation thereto shall not alone relieve any Director of the duties owed to the corporation as prescribed by law.

**Section 3. Procedure.** A majority of the members of each Committee shall constitute a quorum for the transaction of business. Minutes of the committee meeting shall be kept and forwarded to the Board of Directors within four (4) weeks of the meeting of the Committee.

**Section 4. Executive Committee.** The Board of Directors may create an Executive Committee, which shall have and exercise the authority of the Board in the management of the Corporation between meetings of the board of Directors as set forth in the N-PCL. The Executive Committee shall include the Officers of the Board of Directors.

**Section 5. Special Committeee and Task Forces.** The Chairman of the Board shall have the right to appoint Special Committees/Task forces, with the consent of the Board of Directors. Special committees of the Board shall have only the powers specifically delegated by the Board of Directors as set forth in the Resolution authorizing the Committee.

## ARTICLE VIII: Finances

**Section 1.    Fiscal Year.** The fiscal year of the Corporation shall be such period established by the Board of Directors.

**Section 2.    Contracts.** The Board of Directors may authorize any Officer or Officers, agent or agents of the Corporation, in addition to the Officers so authorized by these Bylaws, to enter into any contract or execute or deliver any instrument in the name of and on behalf of the Corporation. Such authority may be general or confined to specific instances.

**Section 3.    Checks and Drafts.** All checks, drafts or other orders for the payment of money, notes or other evidence of indebtedness issued in the name of the Corporation, shall be signed by such Officer or Officers, or agent or agents of the Corporation, and in such manner, as shall be determined by resolution of the Board of Directors.

**Section 4.    Deposits.** All funds of the Corporation shall be deposited to the credit of the Corporation in such banks, trust companies, or other depositories as the Board of Directors may select.

7

WON-EX 0033

## ARTICLE IX: Books and Records

The Corporation shall keep correct and complete books and records of account and shall also keep minutes of the proceedings of the Board of Directors and committees having any of the authority of the Board of Directors.

## ARTICLE X: Indemnification and Insurance

**Section 1. Indemnification**. The Corporation shall indemnify its Directors, Officers, committee members, and employees to the fullest extent permitted under New York law.

**Section 2. Insurance**. The Corporation shall purchase liability insurance for the indemnity specified above to the fullest extent as determined from time to time by the Board of Directors.

## ARTICLE XI: Amendments

The power to adopt, amend or repeal the Articles of Incorporation or these Bylaws shall rest with, and may be executed by, the membership only through a majority vote of the Members.

## ARTICLE XII: Governing Law

All questions with respect to the construction of these Bylaws shall be determined in accordance with the applicable provisions of the laws of the State of Delaware.

*Adopted by the Membership and the Board of Directors: January 31, 2011.*

_____
Attest, Secretary

WON-EX 0034

# EXHIBIT 85

REDACTED

# EXHIBIT 86

## AMENDED AND RESTATED BYLAWS
## OF
## WONDERWORK, INC.

### (F/K/A SURGERY FOR THE POOR, INC.)

### (A Delaware Not-for-profit Corporation)

### ARTICLE I: Name

The name of this corporation is WonderWork, Inc. (hereinafter referred to as "the Corporation") and it was originally formed and known as Surgery for the Poor, Inc. Its current legal name is and shall remain WonderWork, Inc., unless and until further amended.

### ARTICLE II: Purposes and Limitations

The Corporation's purposes shall be as set forth in its Certificate of Incorporation.

### ARTICLE III: Registered Office

The address of the registered office of the Corporation is 3411 Silverside Road Rodney Building #104, City of Wilmington, County of New Castle, State of Delaware 19810. The name of the registered agent of the Corporation at that address is Corporate Creations Network, Inc. The Corporation may have other offices at such other places within or without the State as shall be determined by the Board of Directors.

### ARTICLE IV: Members

As provided in the Articles of Incorporation of the Corporation, the Corporation shall not have members.

### ARTICLE V: Board of Directors

**Section 1.** **General Powers.** The affairs of the Corporation shall be managed by its Board of Directors. It shall be the Board of Directors' duty to carry out the objectives and purposes of the Corporation, and to this end, the Board of Directors may exercise all powers of the Corporation. The Board of Directors shall be subject to the restrictions and obligations set forth by law and in the Corporation's Articles of Incorporation and these Bylaws.

**Section 2. Legal Responsibilities of Board.** Directors shall meet certain standards of conduct and attention in carrying out their responsibilities to the Corporation. These standards include the duties of care, loyalty and obedience, as defined under Delaware law and the common law.

**Section 3. Composition, Election, Term, and Qualifications.** The number of Directors

ATTORNEY'S EYES ONLY

shall be not less than three (3). Directors shall be elected at the annual meeting by the then present Board of Directors from nominees solicited by the Board of Directors. Provided, however, that additional Board members may be appointed or elected at any time by vote of a majority of the members of the Board of Directors at a regular or special meeting at which a quorum is present. Each Director shall hold office for three (3) year, staggered terms. Directors, other than Co-Founder, Brian Mullaney, so long as he remains the President/Chief Executive Officer (CEO) of the Corporation, shall be limited to two consecutive terms of service as Directors, after which they must sit out for at least one (1) term (not less than three (3) years). There shall be no limit on the number of non-consecutive terms that any Director may serve. The terms of Directors may be staggered, so as to not all expire at the same time, to the extent and as determined by the Board of Directors. To this end, the term(s) of one (1) or more Directors may be extended or abbreviated, to the extent and as determined by the Board of Directors. Directors shall be at least (21) years of age.

**Section 4.    Annual and Regular Meetings.** Not less than two regularly scheduled meetings of the Board of Directors shall be held each year at such time and place designated by the Board of Directors. Notice of such meetings shall be provided at least thirty (30) days in advance of the annual or any other regular meeting of the Board of Directors. The Chairman of the Board will preside at all meetings for the Board of Directors. If there be no Chairman or in his or her absence, the President will preside, and if there be no President or in his or her absence, any other Director chosen by the Board of Directors shall preside.

**Section 5.    Special Meetings.** Special meetings of the Board of Directors may be called by or at the request of the President or any two (2) Directors then in office. Notice of any special meeting shall be required and said notice shall be provided no less than ten (10) days in advance of the date of the meeting and shall specify the purpose of such meeting. The requirement for furnishing notice of a meeting may be waived by any director who signs a Waiver of Notice before or after the meeting or who attends the meeting without protesting the lack of notice to him.

**Section 6.    Quorum.** A majority of the Board of Directors in office shall constitute a quorum for the transaction of business at any meeting of the Board of Directors, provided, that if less than a majority of the Directors are present at said meeting, a majority of the Directors present may adjourn the meeting from time to time without further notice.

**Section 7.    Manner of Acting.** The act of a majority of the Directors present at a meeting at which a quorum is present shall be the act of the Board of Directors, except as otherwise provided by law, by the Corporation's Articles of Incorporation, or by these Bylaws. Each Director shall have one (1) vote on all matters submitted to a vote of the Board of Directors.

**Section 8.    Teleconferencing.** Any person participating in a meeting of the Board of Directors may participate by means of conference telephone or by any means of communication by which all persons participating in the meeting are able to hear one another and otherwise fully participate in the meeting. Such participation shall constitute presence in person at the meeting.

2

ATTORNEY'S EYES ONLY

WON07222

**Section 9.    Action by Unanimous Written Consent.** Any action required to be taken at a meeting of the Board of Directors or any action which may be taken at a meeting of the Board of Directors may be taken without a meeting if a consent in writing, setting forth the action so taken, is signed by all of the Directors entitled to vote with respect to the subject matter thereof.

**Section 10. Proxy Voting.** Any Director may authorize another Director to vote on the Director's behalf. Such authorization shall be signed by the respective Director. Provided, however, such authorization may be returned without a written signature and submitted by other means of electronic transmission if it can be reasonably determined that the vote was authorized, such as by validating the Director's birth date, or other unique identifier.

**Section 11.    Minutes and Parliamentary Procedure.** Full minutes of each meeting of the Board of Directors shall be recorded by the Secretary containing results of the deliberations of the Board of Directors. The minutes shall be submitted to the Board of Directors for approval at the subsequent meeting of the Board of Directors. All meetings of the Board of Directors shall be conducted in accordance with the latest edition of <u>Robert's Rules of Order</u>, to the extent that such parliamentary procedures are not inconsistent with these Bylaws, the Corporation's Articles of Incorporation, the N-PCL, or rules adopted by the Board of Directors for its own governance.

**Section 12.    Removal or Resignation of Directors.** (a) Any Director may be removed or suspended from office at any time by the affirmative vote of a majority of the members of the Board of Directors. Such removal or suspension shall be at the sole discretion of a majority of the Board of Directors, subject to vote as set forth, herein.

(b)    Any Director may resign at any time by giving written notice to an Officer of the Corporation or to the Chairman. Such resignation shall take effect at the time specified in such notice, or, if no time is specified, at the time such resignation is tendered.

**Section 13.    Committees**. Whenever the Board of Directors shall consist of more than three persons, the Board of Directors may designate from their number, an Executive Committee and other standing committees. Such committees shall have such authority as the Board of Directors may delegate, except to the extent prohibited by law.

## ARTICLE VI: Officers

**Section 1.    Definition of Officers.** The Officers of the Corporation shall be a Chairman of the Board of Directors, a Vice-President (optional), a President, a Secretary and a Treasurer. The Board of Directors may elect such other Officers as it shall deem necessary and proper. All Officers shall be members of the Board of Directors by virtue of their office, unless otherwise determined by the Board of Directors. The offices of President and Secretary shall not be held by the same person.

3

ATTORNEY'S EYES ONLY                                                    WON07223

**Section 2.    Election, Term and Qualifications.** The Officers of the Corporation shall be elected by the Board of Directors by the affirmative vote of a majority of the Board of Directors present at any meeting at which a quorum is present. Each Officer shall hold office until such time as they resign or until such time as a majority of the Board determines to hold an election for such position during the annual meeting or at any regular or special meeting. Officers may serve no more than two (2) consecutive terms other than the President/CEO, who shall have no limit on the number of terms, consecutive or otherwise, that he/she may serve. The terms of Officers may be staggered, so as to not all expire at the same time, to the extent and as determined by the Board of Directors.

**Section 3.    Removal or Resignation of Officers.** (a)    Any Officer may be removed from office at any time by the affirmative vote of a majority of the members of the Board of Directors present at a meeting at which a quorum is present, whenever in their judgment the best interests of the Corporation would be served thereby.

(b)    Any Officer may resign at any time by giving written notice to the President, Secretary, Treasurer, or to the Board of Directors. Such resignation shall take effect at the time specified in such notice, or, if no time is specified, at the time such resignation is tendered.

**Section 4.    Vacancies.** A vacancy in any office may be filled at any time by the Board of Directors for the unexpired portion of the term.

**Section 5.    Chairman of the Board.** The Chairman of the Board of Directors shall preside at all meetings of the Board of Directors and shall have such powers and perform such duties as, from time to time, may be assigned to him or by her by the Board of Directors.

**Section 6.    President.** The President shall be the Chief Executive Officer of the Corporation and shall in general supervise and have charge of all of the affairs of the Corporation, pursuant to the direction and oversight of the Board of Directors.

**Section 7.    Vice-President.** Should the corporation choose to elect one or more Vice-Presidents, each Vice-President, shall have such powers and shall perform such duties as shall be assigned by the President after discussion with the Board of Directors. During the absence or disability of the President of the Corporation, the Vice-President shall perform such duties as may be prescribed by the Board of Directors from time to time.

**Section 8.    Treasurer.** The Treasurer shall have charge and custody of and be responsible for all funds and securities of the Corporation, and in general perform all duties incident to the office of treasurer and such other duties as from time to time may be assigned to him or her by the President or the Board of Directors. The Treasurer shall, when duly authorized by the Board of Directors, sign and execute contracts in the name of the Corporation when countersigned by the President; he or she may also sign checks, drafts, notes and order for the payment of money, which shall have been duly authorized by the Board of Directors and, where required, counter-signed by the President. Emergency expenditures over a threshold established by resolution of the Board must be approved by the President with the consent of one Officer in addition to the Treasurer.

4

ATTORNEY'S EYES ONLY

WON07224

**Section 9.     Secretary.** The Secretary shall record and keep the minutes of the meetings of the Board, see that all notices are duly given in accordance with the provisions of these Bylaws or as required by law, be the custodian of the corporate records, and in general perform all duties incident to the office of secretary and such other duties as from time to time may be assigned to him/her by the President or the Board of Directors.

## ARTICLE VII:  Committees

**Section 1.     Committees of the Board of Directors.** The Board of Directors, by resolution adopted by the majority of the entire board, shall from time to time, as appropriate, establish committees of the Board of Directors as the Directors determine may be necessary, including, but not limited to, an: (a) Executive Committee, (b) Nominating Committee, (c) Finance Committee, (d) Investment Committee,(e) Compensation Committee, and (f) Audit Committee.

**Section 2. Election Term of Office, etc.** Committees shall consist of members of the Board of Directors. Committee members shall be elected at the Annual Meeting of the Board of Directors or any meeting thereafter. Committee members shall be elected in the same manner as Officers of the Corporation. The designation of any such committee and the delegation thereto shall not alone relieve any Director of the duties owed to the corporation as prescribed by law.

**Section 3.  Procedure.** A majority of the members of each Committee shall constitute a quorum for the transaction of business. Minutes of the committee meeting shall be kept and circulated to the full Board of Directors prior to the next meeting of the Board of Directors.

**Section 4. Executive Committee.** The Board of Directors may create an Executive Committee, which shall have and exercise the authority of the Board in the management of the Corporation between meetings of the board of Directors as set forth in the N-PCL. The Executive Committee shall include the Officers of the Corporation.

**Section 5. Special Committee and Task Forces.** The Chairman of the Board shall have the right to appoint Special Committees/Task forces, with the consent of the Board of Directors. Special committees of the Board shall have only the powers specifically delegated by the Board of Directors as set forth in the Resolution authorizing the Committee.

## ARTICLE VIII: Finances

**Section 1.     Fiscal Year.** The fiscal year of the Corporation shall be such period established by the Board of Directors.

**Section 2.     Contracts.** The Board of Directors may authorize any Officer or Officers, agent or agents of the Corporation, in addition to the Officers so authorized by these Bylaws, to enter into any contract or execute or deliver any instrument in the name of and on behalf of the Corporation. Such authority may be general or confined to specific instances.

5

ATTORNEY'S EYES ONLY

WON07225

**Section 3. Checks and Drafts.** All checks, drafts or other orders for the payment of money, notes or other evidence of indebtedness issued in the name of the Corporation, shall be signed by such Officer or Officers, or agent or agents of the Corporation, and in such manner, as shall be determined by resolution of the Board of Directors.

**Section 4. Deposits.** All funds of the Corporation shall be deposited to the credit of the Corporation in such banks, trust companies, or other depositories as the Board of Directors may select.

## ARTICLE IX: Books and Records

The Corporation shall keep correct and complete books and records of account and shall also keep minutes of the proceedings of the Board of Directors and committees having any of the authority of the Board of Directors.

## ARTICLE X: Indemnification and Insurance

**Section 1. Indemnification.** The Corporation shall indemnify its Directors, Officers, committee members, and employees to the fullest extent permitted under Delaware and/or New York law.

**Section 2. Insurance.** The Corporation shall purchase liability insurance for the indemnity specified above to the fullest extent as determined from time to time by the Board of Directors.

## ARTICLE XI: Amendments

The power to adopt, amend or repeal the Articles of Incorporation or these Bylaws shall rest with, and may be executed by, the Board of Directors only through a majority vote of all of the members of the Board of Directors.

## ARTICLE XII: Governing Law

All questions with respect to the construction of these Bylaws shall be determined in accordance with the applicable provisions of the laws of the State of Delaware.

*These are the current Restated and Amended Bylaws of WonderWork, Inc., adopted by the Board of Directors on the following date:* __March 8, 2016__.

Attest, Secretary

6

WON07226

# EXHIBIT 87

# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT, dated as of December 29, 2011, is made between SURGERY FOR THE POOR ("Employer") and HANA FUCHS ("Employee").

WHEREAS, Employer desires to formalize the terms and conditions of employment between itself and Employee in a written employment agreement, and to assure itself of the exclusive availability of Employee's services, as defined herein, during the anticipated term of such employment; and

WHEREAS, Employee, who has been employed by Employer since October 1, 2011, desires to record her understanding of the terms and conditions of employment with Employer, including the anticipated term of such employment, in a written agreement;

NOW, THEREFORE, in consideration of the mutual promises and undertakings set forth herein, Employer and Employee hereby agree to the following terms and conditions:

1. **Duties.** Employer employs Employee in the position of Chief Financial Officer, reporting to its President and Founder, Brian Mullaney. Employee shall personally and diligently perform such services as are necessary and desirable in such position and any other additional services as Employer may reasonably require, including acting as *de facto* Chief Financial Officer for *Help Me See*, an organization with which Employer has contracted to provide certain administrative services. Employee shall observe all rules, regulations and policies adopted by Employer in connection with the operation of its business and carry out to the best of her ability all of Employer's instructions.

2. **Term.** The term of employment shall be considered to have commenced as of October 1, 2011, and shall expire on December 31, 2014 (the "Term of Employment").

3. **Compensation.** In full consideration for all rights and services provided by Employee hereunder, Employee shall receive from Employer the following:

a) As base compensation, **$200,000** per year, commencing January 1, 2012. Employee will be eligible for all step-increases in base compensation at Employer, as well as all merit increases, equity adjustments or promotion increases that may be awarded by Employer from time to time. In recognition of the work performed by Employee since October 1, 2011 at a lesser rate of pay, and in consideration of Employee's willingness to commit herself to exclusive employment by Employer, as defined herein, for the anticipated Term of Employment, Employee shall receive **$120,000** upon her execution of this Employment Agreement.

b) As incentive compensation, Employee will be eligible for all awards of incentive compensation that be awarded by Employer from time to time.

c) As benefits, all employee benefits that may be offered by Employer to its employees, now or in the future, including, but not limited to, health and medical insurance plans, retirement plans, life insurance and disability insurance.

All payments to Employee shall be made in accordance with Employer's then prevailing payment policy, except as otherwise specifically provided herein, and all compensation received by Employee shall be subject to all Federal, State, City and other taxes and withholding required by law.

4. **Non-compete.** During the Term of Employment Employee shall not compete in any manner, directly or indirectly, whether as a principal, employee, agent or owner, with Employer or any of its affiliates. In the event of earlier termination in accordance with paragraph 10 of this Employment Agreement, the term of employment, for purposes of this non-compete provision only, shall expire on the date of such earlier termination.

5. **Work-Made-For-Hire and Assignment.** To the extent permitted by law, all ideas, concepts, business plans, and other intellectual property that Employee creates or develops during the Term of Employment or resulting from her employment (the "Work Product") shall be work-made-for-hire under the United States copyright laws and owned by Employer. In the event any of the Work Product is not work-made-for-hire or is not copyrightable, Employee hereby assigns to Employer exclusively all of Employee's right, title and interest (including the copyright, throughout the world, and all extensions and renewals thereof) in and to such Work Product, for use in any and all media, now known or hereafter created, for any and all purposes. Employee agrees to execute all documents and to take all steps as Employer finds appropriate to evidence Employer's rights in the Work Product. This paragraph shall survive any termination of this Employment Agreement.

6. **Use of Employee's Name.** Employer shall the right, but not the obligation, to use Employee's name or likeness for any publicity or advertising purpose in connection with the Work Product or the services rendered under this agreement. Employer has no obligation to accord Employee public credit for any Work Product.

7. **Warranty of Rights.** Employee represents and warrants that she has the right to grant all of the rights granted herein without any limitation whatsoever and that no materials furnished by Employee, nor any use thereof as provided herein will infringe upon or violate any rights of any third party.

8. **Confidentiality.** Employee agrees and acknowledges that both the Work Product and certain information and materials which Employer provides to Employee for the purpose of Employee performing services may contain valuable proprietary and confidential information that belong solely to Employer. Employee agrees not to disclose to others, use for her own benefit, or otherwise appropriate or copy any such confidential information or trade secrets, including proprietary aspects of the Work Product, except as required in the performance of Employee's services during the Term of Employment. Employee further agrees not to disclose the financial terms of this Employment Agreement except in connection with obtaining legal or financial advice or fulfilling a tax reporting obligation with respect to her employment, or in enforcing the terms of this Employment Agreement, should that be necessary. Employee agrees that the

-2-

WW_EMAILS0012386-2

prohibited dissemination of such information without Employer's written approval will constitute a material breach of Employee's obligations hereunder and may result in immediate termination.

9. **Indemnification.** Employee shall defend, indemnify and hold harmless Employer, its officers, trustees, affiliates, employees, agents, assigns and representatives from and against any all claims, actions, damages, costs and expenses (including, but not limited to, reasonable attorneys' feess) arising out of or in connection with any breach by Employee of any of the representations or warranties contained in this Employment Agreement. This paragraph shall survive any termination of this Agreement.

10. **Termination.** Either party may terminate this Employment Agreement upon thirty (30) days written notice to the other party, provided, however, that if Employer should terminate this Employment Agreement without cause, it will pay Employee severance benefits for an additional sixty (60) days, in the amount of her then current compensation, in exchange for Employee's agreement to continue to abide for that period with the non-disclosure and non-compete obligations provided in paragraphs 4 and 8 above. For the purposes of this Employment Agreement, Employer shall have "cause" to terminate Employee upon Employee's (i) wilful misconduct or gross negligence, or (ii) misconduct that results in material and demonstrable damage to the business or reputation of Employer. The rights and remedies provided in this section are not exclusive and are in addition to any other rights and remedies provided by law or in this Employment Agreement.

11. **Assignment.** Employer shall have the right to assign this Employment Agreement or all or any part of its rights hereunder to any third party.

12. **Miscellaneous.** No waiver of any provision, or of any breach, of this Employment Agreement shall be considered a continuing waiver of that or of any other provision or breach of this Employment Agreement. This Employment Agreement supersedes all prior or contemporaneous agreements and statements, whether written or oral, concerning the terms of Employee's employment, and no amendment or modification of this Employment Agreement shall be binding against Employer unless set forth in a writing signed by Employer and delivered to Employee. The language of all parts of this Employment Agreement shall be construed as a whole, according to its fair meaning and not strictly for or against either party. This Employment Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to conflicts of laws rules. New York County shall be the exclusive forum for the resolution of disputes between the parties arising out of the interpretation or the performance or non-performance of this Employment Agreement.

AGREED TO AND SIGNED THIS _____ DAY OF DECEMBER, 2011,

_____
HANA FUCHS, EMPLOYEE

_____
BRIAN MULLANEY, FOUNDER AND
PRESIDENT, SURGERY FOR THE POOR

-3-

WW_EMAILS0012386-3

# EXHIBIT 88

REDACTED