# EXHIBIT 109

# LOAN AGREEMENT

This Loan Agreement (the "Agreement") is entered into as of the 15th day of May, 2013, by and between the ▮▮▮▮▮▮▮▮▮▮▮, a California private foundation (the "Lender") and WonderWork, Inc., a Delaware tax-exempt, not for profit corporation presently located in New York, New York (the "Borrower").

WHEREAS, the Borrower has applied to the Lender for an unsecured impact loan to serve as a program related investment for Lender in the amount of Seven Million Five Hundred Thousand Dollars ($7,500,000.00), with the proceeds thereof to be used by the Borrower for the purposes described in Section 5 of this Agreement, in furtherance of the exempt, charitable purposes of the Borrower; and

WHEREAS, the Lender is willing to make a loan to the Borrower upon the terms and conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the foregoing premises, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.     **LOAN AMOUNT.** The Lender agrees, subject to the terms and conditions hereinafter set forth, to offer a loan to the Borrower in the principal amount of Seven Million Five Hundred Thousand Dollars ($7,500,000.00) (hereinafter the "Loan"). The closing of the Loan (the "Closing") shall be held on or before May 15, 2013 (the "Closing Date") by full execution of this Agreement and the presentment of a fully executed unsecured promissory note by Borrower to Lender attached hereto as Exhibit A (the "Note"). Simple interest shall accrue on the outstanding principal balance of the Note at the rate of 2% per annum, based on a 365 day year.

2.     **REPAYMENT AND POSSIBLE FORGIVENESS OF LOAN.** Principal and all accrued interest on the Loan shall be first due and payable five (5) years from the Closing Date. The Note is pre-payable in whole or in part by Borrower without penalty. Upon maturity of the Note, Lender may forgive some or all of the unpaid principal and accrued interest still owing from Borrower at Lender's sole discretion.

3.     **DRAWDOWN.** Upon execution of this Agreement and the Note, Borrower shall be entitled to a drawdown of loaned funds in accordance with the following schedule:
   a. $2,500,000.00 on May 15, 2013 after full execution of this Agreement;
   b. $2,500,000.00 on the first business day of the month that is four months after the first payment date, namely September 15, 2013, conditional upon the Lender having timely received its first report, as required under Section 10, demonstrating accomplishments to date on the purposes for which the loan has been made.
   c. $2,500,000 on the first business day of the month that is four months after the second payment date, namely January 15, 2014, conditional upon the Lender having timely

1

WON 07151

received its second report, as required under Section 10, demonstrating accomplishments to date on the purposes for which the loan is made.

If for any legitimate reason the Lender is not satisfied with the accomplishments of Borrower in effectuating the purposes for which the loan has been provided, then the Lender may delay, withhold, or otherwise cancel any of the payments set forth in this Section 3.a.-c.

**4.     NOTE AND SECURITY.** The Loan shall be evidenced by the Note, duly executed on behalf of the Borrower by its authorized representatives and dated as of the Closing Date. The Note is unregistered, non-negotiable and not transferable. All other terms and conditions stated in the Note are hereby incorporated herein by this reference. This Loan shall otherwise be unsecured; provided, however, that Borrower shall secure a key-man life insurance policy on Brian Mullaney, its CEO, in the amount of $7,500,000.00, as well as a long-term disability policy for Brian Mullaney in the amount of $7,500,000.00, the beneficiary of which in both instances shall be Lender. In the event of the death or long term disability of Mullaney, the proceeds of said policies shall be used to repay the principal balance of the Note to Lender.

**5.     PURPOSE OF THE LOAN.** Borrower's charitable purpose is to provide free surgeries for children in the poorest countries in the world. Funds loaned by the Lender shall be used to generate additional funding for WonderWork programs and facilitate the more effective and efficient delivery of surgeries for the poor and needy served by WonderWork.

**6.     REPRESENTATIONS AND WARRANTIES.** Borrower makes the following representations and warranties:

    **a.  Program Related Investment.** Borrower shall meet all program-related investment requirements established by Lender, including, but not limited to, use of the Loan proceeds to advance the mission of Borrower.

    **b.  Net Assets.** Borrower will at all times during the term of this Loan Agreement maintain positive net assets, including maintaining net assets in excess of $5 million and maintaining annualized expenditures of 75% or more of all public donations on program service activities.

    **c.  Organization and Powers.** Borrower is a tax-exempt, public charitable, nonprofit corporation duly formed, validly existing, and in good standing under the laws of the States of Delaware and New York. Borrower has the power and authority to own its assets and properties and to carry on its activities as now conducted and as contemplated to be conducted. Borrower has the power and authority to execute, deliver and perform this Agreement, to execute and deliver the Note, and to borrow hereunder.

    **d.  Tax Status.** Borrower has received and maintains a current and unrevoked determination issued by the United States Internal Revenue Service recognizing Borrower as tax-exempt under Section 501(c)(3) of the Internal Revenue Code and further that it is a publicly supported organization and not a private foundation under Sections 509(a)(1) and 170(b)(1)(A)(vi) of the Internal Revenue Code.

    **e.  Authorization.** The execution, delivery and performance by the Borrower of this Agreement, the execution and delivery of the Note, and the borrowing hereunder,

2

WON 07152

have been duly authorized by all requisite corporate action. Upon execution and delivery of each of them by the Borrower, this Agreement and the Note (the "Loan Documents") will constitute the legal, valid and binding obligations of the Borrower, enforceable in accordance with their terms.

f. **Litigation.** There is no action, suit, or proceeding pending or threatened before any court or governmental or administrative body or agency, nor is there any basis for any such action, that may reasonably be expected to result in a material adverse change in the activities, operations, assets, properties, or condition, financial or otherwise, of the Borrower, or to impair the ability of the Borrower to perform its obligations under the Loan Documents. Borrower is not in violation of or alleged to be in violation of any judgment, writ, injunction, decree, rule, or regulation of any court or any governmental or administrative body or agency.

g. **No Conflicts.** The execution, delivery and performance by the Borrower of the Loan Documents and the use of the Loan proceeds contemplated hereby will not violate any provision of law, any order, rule, regulation, or judgment of any court or governmental or regulatory body, the Articles of Incorporation or Bylaws of the Borrower, or any indenture, agreement, instrument, or deed of trust to which the Borrower is a party or by which the Borrower or any of its assets or properties is bound or conflict with, result in a breach of, or constitute a default under any such indenture, agreement, instrument, or deed of trust, or result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of the assets or properties of Borrower, except as otherwise permitted, required, or contemplated by the Loan Documents. The Borrower is not a party to any indenture, agreement, or instrument, nor subject to any restriction, which adversely affects the ability of the Borrower to perform its obligations under the Loan documents. Borrower is not in default or alleged to be in default under any indenture, agreement, or instrument for borrowed money, or under any indenture, agreement, or instrument which, if in default, might reasonably be expected to result in an adverse change in the activities, operations, assets, properties, or condition, financial or otherwise, of the Borrower, or to impair the ability of the Borrower to perform its obligations under the Loan Documents.

h. **No Default.** Borrower is in compliance with all of the terms and provisions set forth in the Loan Documents on its part to be observed or performed, and no event of default (as defined in this Agreement), or any event that, with notice or lapse of time or both, would constitute any such event of default, has occurred.

i. **Financial Condition.** There has been no material adverse change in Borrower's financial condition since the dates of the Borrower's most recent annual financial statements.

j. **Taxes.** Borrower has filed all tax and information returns (or extensions thereof) required to be filed by Borrower in any jurisdiction, and has paid all taxes, assessments, fees or other governmental charges which have become due and payable.

k. **Disqualified Persons.** Neither the Borrower, nor any director, officer, or employee of Borrower, is a "disqualified person" with respect to the Lender within the meaning of Section 4946(a) of the Internal Revenue Code.

3

CONFIDENTIAL

WON 07153

l.  **Merger.** Borrower will not merge into, dissolve, or voluntarily declare itself insolvent.

m.  **Debt.** Borrower will not issue any debt that ranks senior to the Loan nor issue any debt that ranks pari passu with the loan without Lender's written consent.

7.  **CLOSING CONDITIONS.** The Loan Documents shall have been duly executed as appropriate and delivered to the Lender and shall be in full force and effect. On or before the Closing Date, Borrower shall have delivered to the Lender certified corporate resolutions of the Borrower evidencing approval of the form, terms, and conditions of the Loan Documents by the Borrower's governing body, and the authorization of the Borrower's officers to sign and deliver this Agreement and the Note and all such certificates of good standing and certified or other copies of corporate formation documents of the Borrower, and such other documents as may be reasonably requested by the Lender. On the Closing Date, all legal matters in connection with this Agreement and the transactions contemplated hereunder shall be satisfactory to counsel for both the Lender and the Borrower.

8.  **USE OF PROCEEDS.** Borrower shall use the proceeds of the Loan exclusively for the purposes set forth in Section 5 of this agreement and on the terms, in the manner, and subject to the limitations set forth in the Loan Documents, and shall repay any portion of the Loan not used for such purposes, unless otherwise agreed to by the Lender and Borrower in writing.

9.  **PAYMENT OF INDEBTEDNESS AND TAXES.** Borrower shall pay all of its indebtedness and obligations promptly and in accordance with the terms thereof, file or cause to be filed all Federal, state, and local tax or information returns required to be filed by it, and pay and discharge or cause to be paid and discharge or cause to be paid and discharged promptly any taxes, assessments, and governmental charges or levies imposed upon it or upon its income or profits, or upon any of its property or upon any part thereof, before the same shall become in default, as well as all lawful claims for labor, materials and supplies, or otherwise which, if unpaid, might become a lien or charge upon its property, or any part thereof; *provided, however,* that the Borrower shall not be required to pay and discharge or to cause to be paid and discharged any such indebtedness, obligation, tax, assessment, charge, levy, or claim so long as the validity thereof shall be contested in good faith by appropriate proceedings and the Borrower shall have set aside on its books adequate reserves therefor.

10.  **REPORTING REQUIREMENTS OF BORROWER.** Borrower shall furnish or cause to be furnished to the Lender a written report at the end of each four (4) months during the term of the Loan setting forth, at a minimum: (i) expenditure of Loan amounts by category and amount of expenditure, as well as the amount of any unexpended Loan proceeds held by Borrower ; (ii) an estimate of additional funds raised to date by Borrower; (iii) the number and nature of surgeries performed by Borrower in the period covered by the report tracing from this Loan; (iv) the financial position of the Borrower (including the provision to the Lender of Borrower's audited financial statement on an annual basis); and (v) any other material information demonstrating Borrower's progress with its mission and its ability to repay the Note at maturity. Borrower shall also facilitate, at Lender's request, face to face meetings with Brian Mullaney, CEO of Borrower, at a minimum of two (2) times per year during the term of this Agreement.

4

WON 07154

**11.     BOOKS AND RECORDS.** Borrower shall maintain books and records adequate to support the information supplied in Section 10 of this Agreement and shall retain such books and records for a period of three (3) years after repayment of the Loan and make such books and records available to Lender at reasonable times for inspection. KPMG presently serves as the independent auditor of Borrower and Borrower hereby agrees to notify Lender of any change in auditor.

**12.     NOTICE TO LENDER.** Borrower shall advise Lender of the occurrence of any of the following events:

   **a.** Any change in the positions or responsibilities held by the Borrower's key personnel, who shall be the officers elected by Borrower's governing body, serving in the capacity as Borrower's Chief Executive Officer and/or Chief Financial Officer.
   **b.** Any final order by a court or any governmental or administrative body or agency, which order could have a material adverse effect upon the operations, assets, or properties of the Borrower.
   **c.** Any denial of or challenge to the tax-exempt status, non-private foundation status, or nonprofit corporate status of the Borrower by any governmental authority.
   **d.** Any change in circumstances that would cause the Loan no longer to serve the purposes set forth in this Agreement.
   **e.** Any material adverse change in the condition, financial or otherwise, or operations of the Borrower.
   **f.** Any Event of Default or other event that, with notice or lapse of time or both, would constitute an Event of Default.

**13.     NO LEGISLATIVE OR POLITICAL USES.** Borrower shall not use any proceeds of the loan for any of the purposes described in Section 170(c)(2)(D) of the Internal Revenue Code, except as permitted by U.S. Treasury Regulations, as follows. Borrower shall not use any proceeds of the Loan to carry on propaganda or otherwise to attempt to influence legislation within the meaning of Section 4945(d)(1) of the Internal Revenue Code), or to influence the outcome of any specific public election, or to carry on, directly or indirectly, any voter registration drive (within the meaning of Section 4945(d)(2) of the Internal Revenue Code).

**14.     NO MATERIAL CHANGE.** Borrower shall not make any material change in the nature of its activities as presently conducted that would adversely affect the Borrower's ability to perform under the Loan Documents. Furthermore, Borrower shall not conduct its activities in a manner that materially departs from the representations made in the documents submitted by Borrower to Lender in connection with Borrower's request for this Loan.

**15.     ACQUISITION; MERGER; DISPOSAL OF ASSETS.** While any sums remain outstanding on the Loan, the Borrower shall notify Lender of its desire to (a) acquire all or substantially all of the assets or properties of any other entity, except by gift, bequest, or other donation, or pursuant to the enforcement of a loan or security interest; (b) sell, lease, transfer, or otherwise dispose of any substantial part of its assets or properties; or (c) dissolve, liquidate, merge, or consolidate with or into any other person firm, corporation, or other entity. Lender

CONFIDENTIAL                                                  WON 07155

shall have fourteen (14) days to object to such action or Borrower's acquisition, merger, or disposal shall be deemed approved by Lender.

**16.    GOVERNING DOCUMENTS AMENDMENTS.**  Borrower shall not amend its Articles of Incorporation or Bylaws in any manner that would cause the Borrower to be in violation of any provision of the Loan Documents or which would jeopardize the ability of the Borrower to perform its obligations under the Loan Documents.

**17.    FUTURE INDEBTEDNESS.**  Aside from additional, similar, impact loan arrangements, Borrower shall not incur, create, assume, or suffer to exist any debt or obligation for borrowed money other than the Loan and indebtedness incurred in the ordinary course of business that does not materially adversely affect the ability of the Borrower to perform any of its obligations under the Loan Documents; provided, however, in accordance with Section 6, above, Borrower will not issue any debt that ranks senior to, or pari passu with, the Note without the written consent of Lender.

**18.    EVENTS OF DEFAULT.**  Borrower shall be deemed to be in default under this Agreement upon the occurrence of any of the following events (each of which is herein sometimes called an "Event of Default"):

  a.  Borrower fails to make any payment of principal or interest that is due and payable hereunder, and such default continues unremedied for fifteen (15) days after notice to the Borrower.
  b.  Borrower uses any portion of the proceeds of the Loan for a purpose or in a manner other than specifically authorized by this Agreement, and in particular, Section 5 of this Agreement.
  c.  Any material representation or warranty made in the Loan Documents, or in any report, certificate, financial statement, or instrument furnished in connection with this Agreement or the Loan, shall prove to have been false or misleading when made, in any material respect.
  d.  Borrower violates or fails to observe or perform any other covenant contained herein, or any agreement on the part of the Borrower to be observed or performed pursuant to the Loan Documents, other than those referred to above in this Section 18, and such default shall continue unremedied for thirty (30) days after notice to the Borrower.
  e.  Borrower shall have an order for relief entered against it by a bankruptcy court; or admit in writing its inability to pay its debts as they mature; or make an assignment for the benefit of creditors; or apply for or consent to the appointment of any receiver, trustee, or similar officer for it or for all or any substantial part of its property; or suffer the appointment of such receiver, trustee, or similar officer, which appointment shall continue undischarged for a period of thirty (30) days; or institute any bankruptcy, insolvency, reorganization, arrangement, readjustment of debt, dissolution, liquidation, or similar proceeding relating to the borrower under the laws of any jurisdiction; or suffer the institution of any such proceeding against the Borrower, which proceeding shall remain pending or unstayed for a period of thirty (30) days; or by any act indicate its consent to, approval of, or acquiescense in such

6

CONFIDENTIAL

WON 07156

proceeding or the appointment of any receiver or trustee for the Borrower or any substantial part of its property.

f. Borrower shall pay upon demand Lender's attorneys' fees and litigation costs and expenses so owed to Lender if any costs or expenses are owed to Lender, of if any attorney is engaged by Lender because of any Event of Default hereunder or to enforce or, with respect to any third party claim, defend any provision of this Agreement or the Note.

**19.    REMEDIES ON DEFAULT.**  If an Event of Default occurs or is continuing, at the option of the Lender, the Lender may, by written notice to the Borrower, declare the Note and any and all other indebtedness of the Borrower to the Lender immediately due and payable, whether or not the Note or the other indebtedness shall be otherwise due and payable and whether or not the Lender shall have initiated any other action for the collection of the Note; whereupon the Note and such other indebtedness shall become due and payable, as to the principal, interest, and any other amounts payable, without presentment, demand, protest, or notice of any kind, all of which are hereby expressly waived by the Borrower. In addition, the Lender may pursue any and all remedies available to it at law or in equity for the collection of the Note and enforcement of the provisions hereof.

**20.    INDEMNIFICATION.**  Borrower hereby indemnifies and agrees to defend and hold harmless the Lender, its directors, officers, employees, agents, and affiliates, from and against any and all losses, liability damages, and expenses (including attorneys' fees and expenses) which any of them may incur or be obligated to pay in any action, claim, or proceeding against them or any of them, for or by reason of any acts, whether of omission or commission, that may be committed or omitted by the Borrower or any of its servants, agents, or employees, in connection with this Agreement. The provisions of this Article and the Borrowers' obligations hereunder shall survive any expiration, termination, or rescission of this Agreement. In the event that a judgment, levy, attachment, or other seizure is entered against the Lender arising from any claim within the scope of this indemnification, the Borrower shall promptly post any necessary bond to prevent execution against any property of the Lender.

**21.    PROGRAM SERVICE REVIEW.**  During the term of this Loan Agreement, Lender, through ▮▮▮▮▮▮▮▮▮▮▮▮▮ or a designated representative of either ▮▮▮▮▮▮▮▮ ▮▮▮▮▮ named in writing by either one or both of them, shall be allowed to attend the non-executive session of the annual meeting of the Board of Directors of Borrower held in June of each year in New York, New York, or such other location as determined by the Board of Directors of Borrower.  Borrower, at Borrower's expense, will arrange for ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮, or a designated representative of either ▮▮▮▮▮▮▮▮▮▮▮named in writing by either one or both of them, as representatives of Lender, to travel to a developing country to visit Borrower partner hospitals and observe the work of Borrower which has been enabled through their Loan to Borrower.



**22.    COMMUNICATIONS/CONFIDENTIALITY.**  Any communication, including, but not limited to, press releases, website communications, or other marketing communications, that refers to the Lender or this Loan must be reviewed and approved in advance by a designated

7

WON 07157

representative of Lender. It is intended that Lender's identity and the terms of the Note, including the status of any repayment, shall be confidential between the Lender and Borrower.

**23.   ENTIRE AGREEMENT.** This Agreement and the Exhibits attached hereto constitute the entire agreement between the parties with respect to the transactions contemplated hereby and supersede all prior agreements or understandings, written or oral, in respect hereof.

**24.   NOTICES.** Any notice or communication required or desired to be given hereunder by either of the parties to the other shall be in writing and delivered by hand, via facsimile transmission, or mailed by first class mail or by nationally-recognized overnight courier, postage prepaid, addressed to the party at its address appearing below:

> **If to Borrower:**   WonderWork, Inc.
> Attention: Brian Mullaney, CEO
> 420 Fifth Avenue, 27th Floor
> New York, NY 10018
> Ph (212) 729-1855
> Fax (212) 729-4541
>
> **If to Lender:**   

**25.   WAIVER; REMEDIES.** No waiver of any provision hereof shall be valid unless in writing signed by the party waiving its rights under the provision. No course of dealing or delay or failure on the part of either party in exercising any right, power, or privilege hereunder shall operate as a waiver thereof or otherwise prejudice such party's rights, powers, or remedies, nor shall any waiver in any particular instance of any right, power, or privilege hereunder on the part of either party operate as a waiver of such right or any other right, power, or privilege hereunder in any other instance.

**26.   ASSIGNMENT OR SALE.** The Lender may not assign or sell all or any portion of its rights or obligations under the Loan Documents without the express written agreement of Borrower. In the event of any such assignment or sale, the assignee or payor shall be accorded the full rights of the Lender by the Borrower with respect to such assignment or sale. The Borrower may not assign or sell all or any portion of its rights or obligations under the Loan Documents without the prior written consent of the Lender.

**27.   HEADINGS.** The headings in the Loan Documents are for convenience of reference only and shall not affect the meaning or interpretation of the Loan Documents.

8

CONFIDENTIAL

**28. COUNTERPARTS.** This Agreement may be executed in counterparts, each of which shall constitute an original, but all of which, when taken together, shall constitute only one agreement.

**29. GOVERNING LAW.** The Loan Documents shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be performed entirely within such State.

**30. SEVERABILITY.** If any provision of the Loan Documents shall for any reason be held to be illegal, invalid, or unenforceable, such illegality shall not affect any other provision of the Loan Documents, but the Loan Documents shall be construed as if such illegal, invalid, or unenforceable provision had never been contained herein.

**31. MODIFICATION; AMENDMENT.** No change, modification or amendment of any provision hereof shall be valid unless in writing signed by the party to be bound.

IN WITNESS WHEREOF, the parties' duly authorized representatives have signed this Agreement below.

| | WONDERWORK, INC. |
| --- | --- |
| | "BORROWER" |
| By: ▮ | By: |
| Name: ▮ | Name: Brian Mulaney |
| Title: Trustee | Title: Co-Founder/CEO |
| Date: 5/15/13 | Date: May 14, 2013 |

9

CONFIDENTIAL

WON 07159

# FIRST AMENDMENT TO LOAN AGREEMENT

_12/1_    This First Amendment to Loan Agreement (the "First Amendment") is entered into as of , 2013, by and between the ███████████████████████ , a California private foundation (the "Lender") and WonderWork, Inc., a Delaware tax-exempt, not for profit corporation (the "Borrower").

**WHEREAS**, the Lender and the Borrower (the "Parties") entered into that certain Loan Agreement dated May 15, 2013 (the "Loan Agreement");

**WHEREAS**, pursuant to Section 31 of the Loan Agreement, the Parties reserved the right to amend any provision of the Loan Agreement by writing signed by the party to be bound; and

**WHEREAS**, the Parties desire to amend the Loan Agreement;

**NOW, THEREFORE**, in consideration of the foregoing premises, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

1.    **SECTION 4.** Section 4 of the Loan Agreement shall be amended to read as follows:

    **4.    NOTE AND SECURITY.**  The Loan shall be evidenced by the Note, duly executed on behalf of the Borrower by its authorized representatives and dated as of the Closing Date.  The note is unregistered, non-negotiable and not transferable.  All other terms and conditions stated in the Note are hereby incorporated by this reference. This Loan shall otherwise be unsecured.

2.    **SECTION 6.**  Subparagraph b. of Section 6 of the Loan Agreement shall be amended to read as follows:

    **b.  Assets.** Borrower will at all times during the term of this Loan Agreement maintain positive assets, including maintaining assets in excess of $1.5 million and maintaining annualized expenditures of 50% or more of all public donations on program service activities. Borrower and Lender understand that "net assets" is not contemplated under the terms of this paragraph.

3.    **ENTIRE AGREEMENT.** This First Amendment together with the Loan Agreement constitute the entire agreement between the parties with respect to the transactions contemplated hereby and supersede all prior agreements or understandings, written or oral, in respect hereof.

4.    **COUNTERPARTS.** This First Amendment may be executed in counterparts, each of which shall constitute an original, but all of which, when taken together, shall constitute only one agreement.

663261.2

5.  **GOVERNING LAW**. This First Amendment shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be performed entirely within such State.

6.  **SEVERABILITY**. If any provision of this First Amendment shall for any reason be held to be illegal, invalid, or unenforceable, such illegality shall not affect any other provision of this First Amendment, but the First Amendment shall be construed as if such illegal, invalid, or unenforceable provision had never been contained herein.

7.  **MODIFICATION; AMENDMENT**. No change, modification or amendment of any provision hereof shall be valid unless in writing signed by the party to be bound.

IN WITNESS WHEREOF, the Parties' duly authorized representatives have signed this Agreement below.

|  |  |
|---|---|
| █████████████████ | WONDERWORK, INC. |
| ███████████████ | "BORROWER" |
| By: _____ | By: _____ |
| Name: █████ | Name: Brian Mullaney |
| Title: Co-Trustee | Title: Co-Founder/CEO |
| Date: | Date: |

663261.2

Exhibit A

Unsecured Promissory Note

$7,500,000.00          New York, New York
Two Percent (2%)          Maturity Date: May 15, 2018

      WonderWork, Inc., a Delaware tax-exempt, nonprofit corporation (the "Borrower"), for value received, hereby promises to pay to the order of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (the "Lender"), or holder, at its offices at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, or at such other place or places in the United States of America as the holder hereof may designate in writing from time to time, the Amounts outstanding from time to time under the terms of the Loan Agreement ("Agreement") between Borrower and Lender, of even date herewith, with interest thereon at the rate of two percent (2%) per annum on the Amounts and accrued interest thereon remaining unpaid from time to time, from the date hereof until such principal amount is fully repaid. The terms of interest payments shall be as set forth in the Agreement. The entire unpaid principal balance, together with all accrued but unpaid interest, shall be due and payable on the Maturity Date.

      The Borrower may, without notice, prepay the Loan in whole or in part, without premium or penalty, at any time or from time to time, with accrued interest to date of such prepayment, if any; provided, however, that each such prepayment shall be applied first to interest accrued but unpaid on the entire outstanding principal balance of the Note through the date of such prepayment, if any, and then to principal.

      This Note is the Note referred to in the Loan Agreement, and the holder hereof is entitled to the benefits of such Loan Agreement and may enforce the provisions thereof and exercise the remedies provided thereunder or otherwise available in respect thereof. Any defined term not defined herein shall have the meaning set forth in the Loan Agreement. To the extent that the terms of the Note are in conflict with the Loan Agreement, the terms of the Loan Agreement shall control.

      Payment of principal and interest, if any, shall be made in lawful money of the Untied States of America. Whenever any payment to be made hereunder would otherwise be due on a Saturday, Sunday, or public holiday under the laws of the State of New York, such payment shall be due on the next succeeding business day.

      This Note shall be payable without presentment, demand, protest, or notice of any kind, all of which are unconditionally waived by the Borrower. At maturity, Lender, at Lender's sole discretion, may forgive some or all of the remaining unpaid principal and accrued interest on the Loan secured by this Note.

      This Note shall be governed by and construed in accordance with the laws of the State of New York.

By: _____

Name/Title: _____ BRIAN MULLANEY CEO

By: _____

Name/Title: _____

# EXHIBIT 110

# LOAN AGREEMENT

This Loan Agreement (the "Agreement") is entered into as of the **31** day of July 2013, by and between the ███████████████████, a Florida private foundation (the "Lender") and WonderWork, Inc., a Delaware tax-exempt, not for profit corporation presently located in New York, New York (the "Borrower").

**WHEREAS**, the Borrower has applied to the Lender for an unsecured impact loan to serve as a program related investment for Lender in the amount of One Hundred Thousand Dollars ($100,000.00), with the proceeds thereof to be used by the Borrower for the purposes described in Section 5 of this Agreement, in furtherance of the exempt, charitable purposes of the Borrower; and

**WHEREAS**, the Lender is willing to make a loan to the Borrower upon the terms and conditions hereinafter set forth;

**NOW, THEREFORE**, in consideration of the foregoing premises, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      **LOAN AMOUNT.** The Lender agrees, subject to the terms and conditions hereinafter set forth, to offer a loan to the Borrower in the principal amount of One Hundred Thousand Dollars ($100,000.00) (hereinafter the "Loan"). The closing of the Loan (the "Closing") shall be held on or before **08/01**, 2013 (the "Closing Date") by full execution of this Agreement and the presentment of a fully executed unsecured promissory note by Borrower to Lender attached hereto as Exhibit A (the "Note"). Simple interest shall accrue on the outstanding principal balance of the Note at the rate of 2% per annum, based on a 365 day year.

2.      **REPAYMENT AND POSSIBLE FORGIVENESS OF LOAN.** Principal and all accrued interest on the Loan shall be first due and payable five (5) years from the Closing Date. The Note is pre-payable in whole or in part by Borrower without penalty. Upon maturity of the Note, Lender may forgive some or all of the unpaid principal and accrued interest still owing from Borrower at Lender's sole discretion.

3.      **DRAWDOWN.** Upon execution of this Agreement and the Note, Borrower shall be entitled to a drawdown of loaned funds in accordance with the following schedule: $100,000.00 on July 30, 2013, after full execution of this Agreement.

4.      **NOTE AND SECURITY.** The Loan shall be evidenced by the Note, duly executed on behalf of the Borrower by its authorized representatives and dated as of the Closing Date. The Note is unregistered, non-negotiable and not transferable. All other terms and conditions stated in the Note are hereby incorporated herein by this reference. This Loan shall otherwise be unsecured.

1

WON 01249

**5.     PURPOSE OF THE LOAN.** Borrower's charitable purpose is to provide free surgeries for children in the poorest countries in the world. Funds loaned by the Lender shall be used to generate additional funding for WonderWork programs and facilitate the more effective and efficient delivery of surgeries for the poor and needy served by WonderWork.

**6.     REPRESENTATIONS AND WARRANTIES.** Borrower makes the following representations and warranties:

   a. **Program Related Investment.** Borrower shall meet all program-related investment requirements established by Lender, including, but not limited to, use of the Loan proceeds to advance the mission of Borrower.
   b. **Net Assets.** Borrower will at all times during the term of this Loan Agreement maintain positive net assets, including maintaining net assets in excess of $1 million. If net assets should fall below $1 million, Borrower shall notify Lender immediately.
   c. **Organization and Powers.** Borrower is a tax-exempt, public charitable, nonprofit corporation duly formed, validly existing, and in good standing under the laws of the States of Delaware and New York. Borrower has the power and authority to own its assets and properties and to carry on its activities as now conducted and as contemplated to be conducted. Borrower has the power and authority to execute, deliver and perform this Agreement, to execute and deliver the Note, and to borrow hereunder.
   d. **Tax Status.** Borrower has received and maintains a current and unrevoked determination issued by the United States Internal Revenue Service recognizing Borrower as tax-exempt under Section 501(c)(3) of the Internal Revenue Code and further that it is a publicly supported organization and not a private foundation under Sections 509(a)(1) and 170(b)(1)(A)(vi) of the Internal Revenue Code.
   e. **Authorization.** The execution, delivery and performance by the Borrower of this Agreement, the execution and delivery of the Note, and the borrowing hereunder, have been duly authorized by all requisite corporate action. Upon execution and delivery of each of them by the Borrower, this Agreement and the Note (the "Loan Documents") will constitute the legal, valid and binding obligations of the Borrower, enforceable in accordance with their terms.
   f. **Litigation.** There is no action, suit, or proceeding pending or threatened before any court or governmental or administrative body or agency, nor is there any basis for any such action, that may reasonably be expected to result in a material adverse change in the activities, operations, assets, properties, or condition, financial or otherwise, of the Borrower, or to impair the ability of the Borrower to perform its obligations under the Loan Documents. Borrower is not in violation of or alleged to be in violation of any judgment, writ, injunction, decree, rule, or regulation of any court or any governmental or administrative body or agency.
   g. **No Conflicts.** The execution, delivery and performance by the Borrower of the Loan Documents and the use of the Loan proceeds contemplated hereby will not violate any provision of law, any order, rule, regulation, or judgment of any court or governmental or regulatory body, the Articles of Incorporation or Bylaws of the Borrower, or any indenture, agreement, instrument, or deed of trust to which the

2

WON 01250

Borrower is a party or by which the Borrower or any of its assets or properties is bound or conflict with, result in a breach of , or constitute a default under any such indenture, agreement, instrument, or deed of trust, or result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of the assets or properties of Borrower, except as otherwise permitted, required, or contemplated by the Loan Documents. The Borrower is not a party to any indenture, agreement, or instrument, nor subject to any restriction, which adversely affects the ability of the Borrower to perform its obligations under the Loan documents. Borrower is not in default or alleged to be in default under any indenture, agreement, or instrument for borrowed money, or under any indenture, agreement, or instrument which, if in default, might reasonably be expected to result in an adverse change in the activities, operations, assets, properties, or condition, financial or otherwise, of the Borrower, or to impair the ability of the Borrower to perform its obligations under the Loan Documents.

h. **No Default.** Borrower is in compliance with all of the terms and provisions set forth in the Loan Documents on its part to be observed or performed, and no event of default (as defined in this Agreement), or any event that, with notice or lapse of time or both, would constitute any such event of default, has occurred.

i. **Financial Condition.** There has been no material adverse change in Borrower's financial condition since the dates of the Borrower's most recent annual financial statements.

j. **Taxes.** Borrower has filed all tax and information returns (or extensions thereof) required to be filed by Borrower in any jurisdiction, and has paid all taxes, assessments, fees or other governmental charges which have become due and payable.

k. **Disqualified Persons.** Neither the Borrower, nor any director, officer, or employee of Borrower, is a "disqualified person" with respect to the Lender within the meaning of Section 4946(a) of the Internal Revenue Code.

l. **Merger.** Borrower will not merge into, dissolve, or voluntarily declare itself insolvent.

7. **CLOSING CONDITIONS.** The Loan Documents shall have been duly executed as appropriate and delivered to the Lender and shall be in full force and effect. On or before the Closing Date, Borrower shall have delivered to the Lender certified corporate resolutions of the Borrower evidencing approval of the form, terms, and conditions of the Loan Documents by the Borrower's governing body, and the authorization of the Borrower's officers to sign and deliver this Agreement and the Note and all such certificates of good standing and certified or other copies of corporate formation documents of the Borrower, and such other documents as may be reasonably requested by the Lender. On the Closing Date, all legal matters in connection with this Agreement and the transactions contemplated hereunder shall be satisfactory to counsel for both the Lender and the Borrower.

8. **USE OF PROCEEDS.** Borrower shall use the proceeds of the Loan exclusively for the purposes set forth in Section 5 of this agreement and on the terms, in the manner, and subject to the limitations set forth in the Loan Documents, and shall repay any portion of the Loan not used for such purposes, unless otherwise agreed to by the Lender and Borrower in writing.

3

WON 01251

**9.    PAYMENT OF INDEBETDNESS AND TAXES.** Borrower shall pay all of its indebtedness and obligations promptly and in accordance with the terms thereof, file or cause to be filed all Federal, state, and local tax or information returns required to be filed by it, and pay and discharge or cause to be paid and discharge or cause to be paid and discharged promptly any taxes, assessments, and governmental charges or levies imposed upon it or upon its income or profits, or upon any of its property or upon any part thereof, before the same shall become in default, as well as all lawful claims for labor, materials and supplies, or otherwise which, if unpaid, might become a lien or charge upon its property, or any part thereof; *provided, however,* that the Borrower shall not be required to pay and discharge or to cause to be paid and discharged any such indebtedness, obligation, tax, assessment, charge, levy, or claim so long as the validity thereof shall be contested in good faith by appropriate proceedings and the Borrower shall have set aside on its books adequate reserves therefor.

**10.    BOOKS AND RECORDS.** Borrower shall maintain books and records for a period of three (3) years after repayment of the Loan and make such books and records available to Lender at reasonable times for inspection. KPMG presently serves as the independent auditor of Borrower and Borrower hereby agrees to notify Lender of any change in auditor.

**11.    NOTICE TO LENDER.** Borrower shall advise Lender of the occurrence of any of the following events:

   **a.**  Any denial of or challenge to the tax-exempt status, non-private foundation status, or nonprofit corporate status of the Borrower by any governmental authority.
   **b.**  Any change in circumstances that would cause the Loan to no longer serve the purposes set forth in this Agreement.
   **c.**  Any material adverse change in the condition, financial or otherwise, or operations of the Borrower, including, but not limited to, net assets falling below $1 million.
   **d.**  Any Event of Default or other event that, with notice or lapse of time or both, would constitute an Event of Default.

**12.    NO LEGISLATIVE OR POLITICAL USES.** Borrower shall not use any proceeds of the loan for any of the purposes described in Section 170(c)(2)(D) of the Internal Revenue Code, except as permitted by U.S. Treasury Regulations, as follows. Borrower shall not use any proceeds of the Loan to carry on propaganda or otherwise to attempt to influence legislation within the meaning of Section 4945(d)(1) of the Internal Revenue Code), or to influence the outcome of any specific public election, or to carry on, directly or indirectly, any voter registration drive (within the meaning of Section 4945(d)(2) of the Internal Revenue Code).

**13.    NO MATERIAL CHANGE.** Borrower shall not make any material change in the nature of its activities as presently conducted that would adversely affect the Borrower's ability to perform under the Loan Documents. Furthermore, Borrower shall not conduct its activities in a manner that materially departs from the representations made in the documents submitted by Borrower to Lender in connection with Borrower's request for this Loan.

WON 01252

**14. ACQUISITION; MERGER; DISPOSAL OF ASSETS.** While any sums remain outstanding on the Loan, the Borrower shall notify Lender of its desire to (a) acquire all or substantially all of the assets or properties of any other entity, except by gift, bequest, or other donation, or pursuant to the enforcement of a loan or security interest; (b) sell, lease, transfer, or otherwise dispose of any substantial part of its assets or properties; or (c) dissolve, liquidate, merge, or consolidate with or into any other person firm, corporation, or other entity. Lender shall have fourteen (14) days to object to such action or Borrower's acquisition, merger, or disposal shall be deemed approved by Lender.

**15. GOVERNING DOCUMENTS AMENDMENTS.** Borrower shall not amend its Articles of Incorporation or Bylaws in any manner that would cause the Borrower to be in violation of any provision of the Loan Documents or which would jeopardize the ability of the Borrower to perform its obligations under the Loan Documents.

**16. FUTURE INDEBTEDNESS.** Aside from additional, similar, impact loan arrangements, Borrower shall not incur, create, assume, or suffer to exist any debt or obligation for borrowed money other than the Loan and indebtedness incurred in the ordinary course of business that does not materially adversely affect the ability of the Borrower to perform any of its obligations under the Loan Documents.

**17. EVENTS OF DEFAULT.** Borrower shall be deemed to be in default under this Agreement upon the occurrence of any of the following events (each of which is herein sometimes called an "Event of Default"):

    a. Borrower fails to make any payment of principal or interest that is due and payable hereunder, and such default continues unremedied for fifteen (15) days after notice to the Borrower.

    b. Borrower uses any portion of the proceeds of the Loan for a purpose or in a manner other than specifically authorized by this Agreement, and in particular, Section 5 of this Agreement.

    c. Any material representation or warranty made in the Loan Documents, or in any report, certificate, financial statement, or instrument furnished in connection with this Agreement or the Loan, shall prove to have been false or misleading when made, in any material respect.

    d. Borrower violates or fails to observe or perform any other covenant contained herein, or any agreement on the part of the Borrower to be observed or performed pursuant to the Loan Documents, other than those referred to above in this Section 17 and such default shall continue unremedied for thirty (30) days after notice to the Borrower.

    e. Borrower shall have an order for relief entered against it by a bankruptcy court; or admit in writing its inability to pay its debts as they mature; or make an assignment for the benefit of creditors; or apply for or consent to the appointment of any receiver, trustee, or similar officer for it or for all or any substantial part of its property; or suffer the appointment of such receiver, trustee, or similar officer, which appointment shall continue undischarged for a period of thirty (30) days; or institute any bankruptcy, insolvency, reorganization, arrangement, readjustment of debt, dissolution, liquidation, or similar proceeding relating to the borrower under the laws

5

WON 01253

of any jurisdiction; or suffer the institution of any such proceeding against the Borrower, which proceeding shall remain pending or unstayed for a period of thirty (30) days; or by any act indicate its consent to, approval of, or acquiescense in such proceeding or the appointment of any receiver or trustee for the Borrower or any substantial part of its property.

    f.  Borrower shall pay upon demand Lender's attorneys' fees and litigation costs and expenses so owed to Lender if any costs or expenses are owed to Lender, of if any attorney is engaged by Lender because of any Event of Default hereunder or to enforce or, with respect to any third party claim, defend any provision of this Agreement or the Note.

**18.    REMEDIES ON DEFAULT/ACCELERATION.** If an Event of Default occurs or is continuing, at the option of the Lender, the Lender may, by written notice to the Borrower, declare the Note and any and all other indebtedness of the Borrower to the Lender immediately due and payable, whether or not the Note or other indebtedness shall be otherwise due and payable and whether or not the Lender shall have initiated any other action for the collection of the Note; whereupon the Note and such other indebtedness shall become due and payable, as to the principal, interest, and any other amounts payable, without presentment, demand, protest, or notice of any kind, all of which are hereby expressly waived by the Borrower. In addition to the remedies on default, Lender may, by written notice to the Borrower, declare the entire principal sum then unpaid immediately due and payable within 90 days.

**19.    INDEMNIFICATION.** Borrower hereby indemnifies and agrees to defend and hold harmless the Lender, its directors, officers, employees, agents, and affiliates, from and against any and all losses, liability damages, and expenses (including attorneys' fees and expenses) which any of them may incur or be obligated to pay in any action, claim, or proceeding against them or any of them, for or by reason of any acts, whether of omission or commission, that may be committed or omitted by the Borrower or any of its servants, agents, or employees, in connection with this Agreement. The provisions of this Article and the Borrowers' obligations hereunder shall survive any expiration, termination, or rescission of this Agreement. In the event that a judgment, levy, attachment, or other seizure is entered against the Lender arising from any claim within the scope of this indemnification, the Borrower shall promptly post any necessary bond to prevent execution against any property of the Lender.

**20.    ENTIRE AGREEMENT.** This Agreement and the Exhibits attached hereto constitute the entire agreement between the parties with respect to the transactions contemplated hereby and supersede all prior agreements or understandings, written or oral, in respect hereof.

**21.    NOTICES.** Any notice or communication required or desired to be given hereunder by either of the parties to the other shall be in writing and delivered by hand, via facsimile transmission, or mailed by first class mail or by nationally-recognized overnight courier, postage prepaid, addressed to the party at its address appearing below:

       **If to Borrower:**      WonderWork, Inc.
                             Attention: Brian Mullaney, CEO
                             420 Fifth Avenue, 27th Floor

WON 01254

New York, NY 10018
Ph (212) 729-1855
Fax (212) 729-4541

**If to Lender:** 
Attention:

**22.     WAIVER; REMEDIES.**  No waiver of any provision hereof shall be valid unless in writing signed by the party waiving its rights under the provision.  No course of dealing or delay or failure on the part of either party in exercising any right, power, or privilege hereunder shall operate as a waiver thereof or otherwise prejudice such party's rights, powers, or remedies, nor shall any waiver in any particular instance of any right, power, or privilege hereunder on the part of either party operate as a waiver of such right or any other right, power, or privilege hereunder in any other instance.

**23.     ASSIGNMENT OR SALE.**  The Lender may not assign or sell all or any portion of its rights or obligations under the Loan Documents without the express written agreement of Borrower.  In the event of any such assignment or sale, the assignee or payor shall be accorded the full rights of the Lender by the Borrower with respect to such assignment or sale.  The Borrower may not assign or sell all or any portion of its rights or obligations under the Loan Documents without the prior written consent of the Lender.

**24.     HEADINGS.**  The headings in the Loan Documents are for convenience of reference only and shall not affect the meaning or interpretation of the Loan Documents.

**25.     COUNTERPARTS.**  This Agreement may be executed in counterparts, each of which shall constitute an original, but all of which, when taken together, shall constitute only one agreement.

**26.     GOVERNING LAW.**  The Loan Documents shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be performed entirely within such State.

**27.     SEVERABILITY.**  If any provision of the Loan Documents shall for any reason be held to be illegal, invalid, or unenforceable, such illegality shall not affect any other provision of the Loan Documents, but the Loan Documents shall be construed as if such illegal, invalid, or unenforceable provision had never been contained herein.

**28.     MODIFICATION; AMENDMENT.**  No change, modification or amendment of any provision hereof shall be valid unless in writing signed by the party to be bound.

7

IN WITNESS WHEREOF, the parties' duly authorized representatives have signed this Agreement below.

█████████████████████

"LENDER"

By: █████████████████

Name: ███████████████████

Title: *President*

Date: 07/31/2013

WONDERWORK, INC.
"BORROWER"

By: _____

Name: Brian Mullaney

Title: CEO/Co-Founder

Date: 8/5/13

8

WON 01256

# FIRST AMENDMENT TO LOAN AGREEMENT

This First Amendment to Loan Agreement (the "First Amendment") is entered into as of ____ __March 31, 2015__ by and between the ▮▮▮▮▮▮▮▮▮▮▮▮, a Florida private foundation (the "Lender") and WonderWork, Inc., a Delaware tax-exempt, not for profit corporation (the "Borrower").

**WHEREAS,** the Lender and the Borrower (the "Parties") entered into that certain Loan Agreement dated July 31, 2013 (the "Loan Agreement");

**WHEREAS,** pursuant to Section 28 of the Loan Agreement, the Parties reserved the right to amend any provision of the Loan Agreement by writing signed by the party to be bound; and

**WHEREAS,** the Parties desire to amend the Loan Agreement;

**NOW, THEREFORE,** in consideration of the foregoing premises, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

1.    **SECTION 6.** Subparagraph b. of Section 6 of the Loan Agreement shall be amended to read as follows:

      a.    **b. Assets.** Borrower will at all times during the term of this Loan Agreement maintain positive assets, including maintaining assets in excess of $1.5 million. Borrower and Lender understand that "net assets" is not contemplated under the terms of this paragraph.

2.    **ENTIRE AGREEMENT.** Except as otherwise modified herein, the Loan Agreement, together with this First Amendment constitute the entire agreement between the parties with respect to the transactions contemplated hereby and supersede all prior agreements or understandings, written or oral, in respect hereof.

3.    **COUNTERPARTS.** This First Amendment may be executed in counterparts, each of which shall constitute an original, but all of which, when taken together, shall constitute only one agreement.

4.    **GOVERNING LAW.** This First Amendment shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be performed entirely within such State.

5.    **SEVERABILITY.** If any provision of this First Amendment shall for any reason be held to be illegal, invalid, or unenforceable, such illegality shall not affect any other provision of this First Amendment, but the First Amendment shall be construed as if such illegal, invalid, or unenforceable provision had never been contained herein.

6.    **MODIFICATION; AMENDMENT.** No change, modification or amendment of any provision hereof shall be valid unless in writing signed by the party to be bound.

WON 01257

IN WITNESS WHEREOF, the Parties' duly authorized representatives have signed this Agreement below.

██████████

██████████

By: ████████████
Name: ████████████
Title:   President
Date:   03/07/2015

WONDERWORK, INC
("BORROWER")

By: _____
Name: Brian Mullaney
Title:   CEO
Date:   3-31-15

Exhibit A

Unsecured Promissory Note

$100,000.00                                New York, New York
Two Percent (2%)                           Maturity Date: July 31, 2018

, WonderWork, Inc., a Delaware tax-exempt, nonprofit corporation (the "Borrower"), for value received, hereby promises to pay to the order of ███████████████ (the "Lender"), or holder, at its offices at ███████████████████, or at such other place or places in the United States of America as the holder hereof may designate in writing from time to time, the Amounts outstanding from time to time under the terms of the Loan Agreement ("Agreement") between Borrower and Lender, of even date herewith, with interest thereon at the rate of two percent (2%) per annum on the Amounts and accrued interest thereon remaining unpaid from time to time, from the date hereof until such principal amount is fully repaid. The terms of interest payments shall be as set forth in the Agreement. The entire unpaid principal balance, together with all accrued but unpaid interest, shall be due and payable on the Maturity Date.

The Borrower may, without notice, prepay the Loan in whole or in part, without premium or penalty, at any time or from time to time, with accrued interest to date of such prepayment, if any; provided, however, that each such prepayment shall be applied first to interest accrued but unpaid on the entire outstanding principal balance of the Note through the date of such prepayment, if any, and then to principal.

This Note is the Note referred to in the Loan Agreement, and the holder hereof is entitled to the benefits of such Loan Agreement and may enforce the provisions thereof and exercise the remedies provided thereunder or otherwise available in respect thereof. Any defined term not defined herein shall have the meaning set forth in the Loan Agreement. To the extent that the terms of the Note are in conflict with the Loan Agreement, the terms of the Loan Agreement shall control.

Payment of principal and interest, if any, shall be made in lawful money of the Untied States of America. Whenever any payment to be made hereunder would otherwise be due on a Saturday, Sunday, or public holiday under the laws of the State of New York, such payment shall be due on the next succeeding business day.

This Note shall be payable without presentment, demand, protest, or notice of any kind, all of which are unconditionally waived by the Borrower. At maturity, Lender, at Lender's sole discretion, may forgive some or all of the remaining unpaid principal and accrued interest on the Loan secured by this Note.

This Note shall be governed by and construed in accordance with the laws of the State of New York.

By: _____

Name/Title: _____ Brian Mullaney CEO

By: ███████████████, Pres

Name/Title: ███████████████

EXHIBIT 111

# LOAN AGREEMENT

This Loan Agreement (the "Agreement") is entered into as of the 8ᵗʰ day of August 2013, by and between ███████████, an individual resident of the State of Massachusetts (the "Lender") and WonderWork, Inc., a Delaware tax-exempt, not for profit corporation presently located in New York, New York (the "Borrower").

WHEREAS, the Borrower has applied to the Lender for an unsecured impact loan to serve as a program related investment for Lender in the amount of Two Hundred Fifty Thousand Dollars ($250,000.00) with the proceeds thereof to be used by the Borrower for the purposes described in Section 5 of this Agreement, in furtherance of the exempt, charitable purposes of the Borrower; and

WHEREAS, the Lender is willing to make a loan to the Borrower upon the terms and conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the foregoing premises, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      **LOAN AMOUNT.** The Lender agrees, subject to the terms and conditions hereinafter set forth, to offer a loan to the Borrower in the principal amount of Two Hundred Fifty Thousand Dollars ($250,000.00) (hereinafter the "Loan"). The closing of the Loan (the "Closing") shall be held on or before Aug. 15, 2013 (the "Closing Date") by full execution of this Agreement and the presentment of a fully executed unsecured promissory note by Borrower to Lender attached hereto as Exhibit A (the "Note"). Simple interest shall accrue on the outstanding principal balance of the Note at the rate of 2% per annum, based on a 365 day year.

2.      **REPAYMENT AND POSSIBLE FORGIVENESS OF LOAN.** Principal and all accrued interest on the Loan shall be first due and payable five (5) years from the Closing Date. The Note is pre-payable in whole or in part by Borrower without penalty. Upon maturity of the Note, Lender may forgive some or all of the unpaid principal and accrued interest still owing from Borrower at Lender's sole discretion.

3.      **DRAWDOWN.** Upon execution of this Agreement and the Note, Borrower shall be entitled to a drawdown of loaned funds in accordance with the following schedule: $250,000.00 on August 15 2013, after full execution of this Agreement.

4.      **NOTE AND SECURITY.** The Loan shall be evidenced by the Note, duly executed on behalf of the Borrower by its authorized representatives and dated as of the Closing Date. The Note is unregistered, non-negotiable and not transferable. All other terms and conditions stated in the Note are hereby incorporated herein by this reference. This Loan shall otherwise be unsecured.

1

WON 01259

5.    **PURPOSE OF THE LOAN.** Borrower's charitable purpose is to provide free surgeries for children in the poorest countries in the world. Funds loaned by the Lender shall be used to generate additional funding for WonderWork programs and facilitate the more effective and efficient delivery of surgeries for the poor and needy served by WonderWork.

6.    **REPRESENTATIONS AND WARRANTIES.** Borrower makes the following representations and warranties:

   a. **Program Related Investment.** Borrower shall meet all program-related investment requirements established by Lender, including, but not limited to, use of the Loan proceeds to advance the mission of Borrower.
   b. **Organization and Powers.** Borrower is a tax-exempt, public charitable, nonprofit corporation duly formed, validly existing, and in good standing under the laws of the States of Delaware and New York. Borrower has the power and authority to own its assets and properties and to carry on its activities as now conducted and as contemplated to be conducted. Borrower has the power and authority to execute, deliver and perform this Agreement, to execute and deliver the Note, and to borrow hereunder.
   c. **Tax Status.** Borrower has received and maintains a current and unrevoked determination issued by the United States Internal Revenue Service recognizing Borrower as tax-exempt under Section 501(c)(3) of the Internal Revenue Code and further that it is a publicly supported organization and not a private foundation under Sections 509(a)(1) and 170(b)(1)(A)(vi) of the Internal Revenue Code.
   d. **Authorization.** The execution, delivery and performance by the Borrower of this Agreement, the execution and delivery of the Note, and the borrowing hereunder, have been duly authorized by all requisite corporate action. Upon execution and delivery of each of them by the Borrower, this Agreement and the Note (the "Loan Documents") will constitute the legal, valid and binding obligations of the Borrower, enforceable in accordance with their terms.
   e. **Litigation.** There is no action, suit, or proceeding pending or threatened before any court or governmental or administrative body or agency, nor is there any basis for any such action, that may reasonably be expected to result in a material adverse change in the activities, operations, assets, properties, or condition, financial or otherwise, of the Borrower, or to impair the ability of the Borrower to perform its obligations under the Loan Documents. Borrower is not in violation of or alleged to be in violation of any judgment, writ, injunction, decree, rule, or regulation of any court or any governmental or administrative body or agency.
   f. **No Conflicts.** The execution, delivery and performance by the Borrower of the Loan Documents and the use of the Loan proceeds contemplated hereby will not violate any provision of law, any order, rule, regulation, or judgment of any court or governmental or regulatory body, the Articles of Incorporation or Bylaws of the Borrower, or any indenture, agreement, instrument, or deed of trust to which the Borrower is a party or by which the Borrower or any of its assets or properties is bound or conflict with, result in a breach of , or constitute a default under any such indenture, agreement, instrument, or deed of trust, or result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of the assets or properties of Borrower, except as otherwise permitted, required, or

2

WON 01260

contemplated by the Loan Documents. The Borrower is not a party to any indenture, agreement, or instrument, nor subject to any restriction, which adversely affects the ability of the Borrower to perform its obligations under the Loan documents. Borrower is not in default or alleged to be in default under any indenture, agreement, or instrument for borrowed money, or under any indenture, agreement, or instrument which, if in default, might reasonably be expected to result in an adverse change in the activities, operations, assets, properties, or condition, financial or otherwise, of the Borrower, or to impair the ability of the Borrower to perform its obligations under the Loan Documents.

g. **No Default.** Borrower is in compliance with all of the terms and provisions set forth in the Loan Documents on its part to be observed or performed, and no event of default (as defined in this Agreement) or any event that, with notice or lapse of time or both, would constitute any such event of default, has occurred.

h. **Financial Condition.** There has been no material adverse change in Borrower's financial condition since the dates of the Borrower's most recent annual financial statements.

i. **Taxes.** Borrower has filed all tax and information returns (or extensions thereof) required to be filed by Borrower in any jurisdiction, and has paid all taxes, assessments, fees or other governmental charges which have become due and payable.

j. **Disqualified Persons.** Neither the Borrower, nor any director, officer, or employee of Borrower, is a "disqualified person" with respect to the Lender within the meaning of Section 4946(a) of the Internal Revenue Code.

k. **Merger.** Borrower will not merge into, dissolve, or voluntarily declare itself insolvent.

7. **CLOSING CONDITIONS.** The Loan Documents shall have been duly executed as appropriate and delivered to the Lender and shall be in full force and effect. On or before the Closing Date, Borrower shall have delivered to the Lender certified corporate resolutions of the Borrower evidencing approval of the form, terms, and conditions of the Loan Documents by the Borrower's governing body, and the authorization of the Borrower's officers to sign and deliver this Agreement and the Note and all such certificates of good standing and certified or other copies of corporate formation documents of the Borrower, and such other documents as may be reasonably requested by the Lender. On the Closing Date, all legal matters in connection with this Agreement and the transactions contemplated hereunder shall be satisfactory to counsel for both the Lender and the Borrower.

8. **USE OF PROCEEDS.** Borrower shall use the proceeds of the Loan exclusively for the purposes set forth in Section 5 of this agreement and on the terms, in the manner, and subject to the limitations set forth in the Loan Documents, and shall repay any portion of the Loan not used for such purposes, unless otherwise agreed to by the Lender and Borrower in writing.

9. **PAYMENT OF INDEBTEDNESS AND TAXES.** Borrower shall pay all of its indebtedness and obligations promptly and in accordance with the terms thereof, file or cause to be filed all Federal, state, and local tax or information returns required to be filed by it, and pay and discharge or cause to be paid and discharge or cause to be paid and discharged promptly any taxes, assessments, and governmental charges or levies imposed upon it or upon its income or profits, or upon any of its property or upon any part thereof, before the same shall become in default, as well as all lawful claims for labor, materials and supplies, or otherwise which, if

3

WON 01261

unpaid, might become a lien or charge upon its property, or any part thereof; *provided, however,* that the Borrower shall not be required to pay and discharge or to cause to be paid and discharged any such indebtedness, obligation, tax, assessment, charge, levy, or claim so long as the validity thereof shall be contested in good faith by appropriate proceedings and the Borrower shall have set aside on its books adequate reserves therefor.

**10.     BOOKS AND RECORDS.** Borrower shall maintain books and records for a period of three (3) years after repayment of the Loan and make such books and records available to Lender at reasonable times for inspection. KPMG presently serves as the independent auditor of Borrower and Borrower hereby agrees to notify Lender of any change in auditor.

**11.     NOTICE TO LENDER.** Borrower shall advise Lender of the occurrence of any of the following events:

    **a.** Any denial of or challenge to the tax-exempt status, non-private foundation status, or nonprofit corporate status of the Borrower by any governmental authority.

    **b.** Any change in circumstances that would cause the Loan to no longer serve the purposes set forth in this Agreement.

    **c.** Any material adverse change in the condition, financial or otherwise, or operations of the Borrower.

    **d.** Any Event of Default or other event that, with notice or lapse of time or both, would constitute an Event of Default.

**12.     NO LEGISLATIVE OR POLITICAL USES.** Borrower shall not use any proceeds of the loan for any of the purposes described in Section 170(c)(2)(D) of the Internal Revenue Code, except as permitted by U.S. Treasury Regulations, as follows. Borrower shall not use any proceeds of the Loan to carry on propaganda or otherwise to attempt to influence legislation within the meaning of Section 4945(d)(1) of the Internal Revenue Code), or to influence the outcome of any specific public election, or to carry on, directly or indirectly, any voter registration drive (within the meaning of Section 4945(d)(2) of the Internal Revenue Code).

**13.     NO MATERIAL CHANGE.** Borrower shall not make any material change in the nature of its activities as presently conducted that would adversely affect the Borrower's ability to perform under the Loan Documents. Furthermore, Borrower shall not conduct its activities in a manner that materially departs from the representations made in the documents submitted by Borrower to Lender in connection with Borrower's request for this Loan.

**14.     ACQUISITION; MERGER; DISPOSAL OF ASSETS.** While any sums remain outstanding on the Loan, the Borrower shall notify Lender of its desire to (a) acquire all or substantially all of the assets or properties of any other entity, except by gift, bequest, or other donation, or pursuant to the enforcement of a loan or security interest; (b) sell, lease, transfer, or otherwise dispose of any substantial part of its assets or properties; or (c) dissolve, liquidate, merge, or consolidate with or into any other person firm, corporation, or other entity. Lender shall have fourteen (14) days to object to such action or Borrower's acquisition, merger, or disposal shall be deemed approved by Lender.

4

WON 01262

**15. GOVERNING DOCUMENTS AMENDMENTS.** Borrower shall not amend its Articles of Incorporation or Bylaws in any manner that would cause the Borrower to be in violation of any provision of the Loan Documents or which would jeopardize the ability of the Borrower to perform its obligations under the Loan Documents.

**16. FUTURE INDEBTEDNESS.** Aside from additional, similar, impact loan arrangements, Borrower shall not incur, create, assume, or suffer to exist any debt or obligation for borrowed money other than the Loan and indebtedness incurred in the ordinary course of business that does not materially adversely affect the ability of the Borrower to perform any of its obligations under the Loan Documents.

**17. EVENTS OF DEFAULT.** Borrower shall be deemed to be in default under this Agreement upon the occurrence of any of the following events (each of which is herein sometimes called an "Event of Default"):

a. Borrower fails to make any payment of principal or interest that is due and payable hereunder, and such default continues unremedied for fifteen (15) days after notice to the Borrower.

b. Borrower uses any portion of the proceeds of the Loan for a purpose or in a manner other than specifically authorized by this Agreement, and in particular, Section 5 of this Agreement.

c. Any material representation or warranty made in the Loan Documents, or in any report, certificate, financial statement, or instrument furnished in connection with this Agreement or the Loan, shall prove to have been false or misleading when made, in any material respect.

d. Borrower violates or fails to observe or perform any other covenant contained herein, or any agreement on the part of the Borrower to be observed or performed pursuant to the Loan Documents, other than those referred to above in this Section 17, and such default shall continue unremedied for thirty (30) days after notice to the Borrower.

e. Borrower shall have an order for relief entered against it by a bankruptcy court; or admit in writing its inability to pay its debts as they mature; or make an assignment for the benefit of creditors; or apply for or consent to the appointment of any receiver, trustee, or similar officer for it or for all or any substantial part of its property; or suffer the appointment of such receiver, trustee, or similar officer, which appointment shall continue undischarged for a period of thirty (30) days; or institute any bankruptcy, insolvency, reorganization, arrangement, readjustment of debt, dissolution, liquidation, or similar proceeding relating to the borrower under the laws of any jurisdiction; or suffer the institution of any such proceeding against the Borrower, which proceeding shall remain pending or unstayed for a period of thirty (30) days; or by any act indicate its consent to, approval of, or acquiescence in such proceeding or the appointment of any receiver or trustee for the Borrower or any substantial part of its property.

f. Borrower shall pay upon demand Lender's attorneys' fees and litigation costs and expenses so owed to Lender if any costs or expenses are owed to Lender, of if any attorney is engaged by Lender because of any Event of Default hereunder or to enforce or, with respect to any third party claim, defend any provision of this Agreement or the Note.

5

WON 01263

**18. REMEDIES ON DEFAULT/ACCELERATION.** If an Event of Default occurs or is continuing, at the option of the Lender, the Lender may, by written notice to the Borrower, declare the Note and any and all other indebtedness of the Borrower to the Lender immediately due and payable, whether or not the Note or the other indebtedness shall be otherwise due and payable and whether or not the Lender shall have initiated any other action for the collection of the Note; whereupon the Note and such other indebtedness shall become due and payable, as to the principal, interest, and any other amounts payable, without presentment, demand, protest, or notice of any kind, all of which are hereby expressly waived by the Borrower. In addition to the remedies on default, Lender may, by written notice to the Borrower, declare the entire principal sum then unpaid immediately due and payable. In addition to an event of default, and the right to exercise acceleration of maturity upon such event, in the event Lender should die prior to maturity, then upon such death the Note and all other indebtedness of the Borrower to the Lender shall become due and payable to the Lender's estate within 90 days of notification of Lender's death.

**19. INDEMNIFICATION.** Borrower hereby indemnifies and agrees to defend and hold harmless the Lender, its directors, officers, employees, agents, and affiliates, from and against any and all losses, liability damages, and expenses (including attorneys' fees and expenses) which any of them may incur or be obligated to pay in any action, claim, or proceeding against them or any of them, for or by reason of any acts, whether of omission or commission, that may be committed or omitted by the Borrower or any of its servants, agents, or employees, in connection with this Agreement. The provisions of this Article and the Borrowers' obligations hereunder shall survive any expiration, termination, or rescission of this Agreement. In the event that a judgment, levy, attachment, or other seizure is entered against the Lender arising from any claim within the scope of this indemnification, the Borrower shall promptly post any necessary bond to prevent execution against any property of the Lender.

**20. ENTIRE AGREEMENT.** This Agreement and the Exhibits attached hereto constitute the entire agreement between the parties with respect to the transactions contemplated hereby and supersede all prior agreements or understandings, written or oral, in respect hereof.

**21. NOTICES.** Any notice or communication required or desired to be given hereunder by either of the parties to the other shall be in writing and delivered by hand, via facsimile transmission, or mailed by first class mail or by nationally-recognized overnight courier, postage prepaid, addressed to the party at its address appearing below:

      **If to Borrower:**      WonderWork, Inc.
                            Attention: Brian Mullaney, CEO
                            420 Fifth Avenue, 27th Floor
                            New York, NY 10018
                            Ph (212) 729-1855
                            Fax (212) 729-4541

      **If to Lender:**      ███████████████

                            ██████████

                            ███████████

WON 01264

22. **WAIVER; REMEDIES.** No waiver of any provision hereof shall be valid unless in writing signed by the party waiving its rights under the provision. No course of dealing or delay or failure on the part of either party in exercising any right, power, or privilege hereunder shall operate as a waiver thereof or otherwise prejudice such party's rights, powers, or remedies, nor shall any waiver in any particular instance of any right, power, or privilege hereunder on the part of either party operate as a waiver of such right or any other right, power, or privilege hereunder in any other instance.

23. **ASSIGNMENT OR SALE.** The Lender may not assign or sell all or any portion of its rights or obligations under the Loan Documents without the express written agreement of Borrower. In the event of any such assignment or sale, the assignee or payor shall be accorded the full rights of the Lender by the Borrower with respect to such assignment or sale. The Borrower may not assign or sell all or any portion of its rights or obligations under the Loan Documents without the prior written consent of the Lender.

24. **HEADINGS.** The headings in the Loan Documents are for convenience of reference only and shall not affect the meaning or interpretation of the Loan Documents.

25. **COUNTERPARTS.** This Agreement may be executed in counterparts, each of which shall constitute an original, but all of which, when taken together, shall constitute only one agreement.

26. **GOVERNING LAW.** The Loan Documents shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be performed entirely within such State.

27. **SEVERABILITY.** If any provision of the Loan Documents shall for any reason be held to be illegal, invalid, or unenforceable, such illegality shall not affect any other provision of the Loan Documents, but the Loan Documents shall be construed as if such illegal, invalid, or unenforceable provision had never been contained herein.

28. **MODIFICATION; AMENDMENT.** No change, modification or amendment of any provision hereof shall be valid unless in writing signed by the party to be bound.

WON 01265

IN WITNESS WHEREOF, the parties' duly authorized representatives have signed this Agreement below.

"LENDER"

By: _____

Name: _____ 8/8/13 _____

Date: _____

WONDERWORK, INC.

"BORROWER"

By: _____

Name: _____ Brian Mullaney

Title: ____ CEO _____

Date: ____ 8/13/13 _____

8

WON 01266

Exhibit A

Unsecured Promissory Note

$250,000                                                  New York, New York
Two Percent (2%)                                         Maturity Date: _8/15_, 2018

   WonderWork, Inc., a Delaware tax-exempt, nonprofit corporation (the "Borrower"), for value
received, hereby promises to pay to the order of ███████ (the "Lender"), or holder, at ███████
███████, or at such other place or places in the United States of America as the holder
hereof may designate in writing from time to time, the Amounts outstanding from time to time under the
terms of the Loan Agreement ("Agreement") between Borrower and Lender, of even date herewith, with
interest thereon at the rate of two percent (2%) per annum on the Amounts and accrued interest thereon
remaining unpaid from time to time, from the date hereof until such principal amount is fully repaid. The
terms of interest payments shall be as set forth in the Agreement. The entire unpaid principal balance,
together with all accrued but unpaid interest, shall be due and payable on the Maturity Date.

   The Borrower may, without notice, prepay the Loan in whole or in part, without premium or
penalty, at any time or from time to time, with accrued interest to date of such prepayment, if any;
provided, however, that each such prepayment shall be applied first to interest accrued but unpaid on the
entire outstanding principal balance of the Note through the date of such prepayment, if any, and then to
principal.

   This Note is the Note referred to in the Loan Agreement, and the holder hereof is entitled to the
benefits of such Loan Agreement and may enforce the provisions thereof and exercise the remedies
provided thereunder or otherwise available in respect thereof. Any defined term not defined herein shall
have the meaning set forth in the Loan Agreement. To the extent that the terms of the Note are in conflict
with the Loan Agreement, the terms of the Loan Agreement shall control.

   Payment of principal and interest, if any, shall be made in lawful money of the Untied States of
America. Whenever any payment to be made hereunder would otherwise be due on a Saturday, Sunday,
or public holiday under the laws of the State of New York, such payment shall be due on the next
succeeding business day.

   This Note is payable without presentment, demand, protest, or notice of any kind, all of
which are unconditionally waived by the Borrower. At maturity, Lender, at Lender's sole discretion, may
forgive some or all of the remaining unpaid principal and accrued interest on the Loan secured by this
Note.

   This Note shall be governed by and construed in accordance with the laws of the State of New
York.

                                    By: _____
                                    Name/Title: Brian Mullaney CEO  WONDERWORK

                                    By: ██████████████████████
                                    Name/Title: _____

EXHIBIT 112

# LOAN AGREEMENT

This Loan Agreement (the "Agreement") is entered into as of the 2( *August* (day of ~~June~~ 2013, by and between the ███████████████████████, a New York private foundation (the "Lender") and WonderWork, Inc., a Delaware tax-exempt, not for profit corporation presently located in New York, New York (the "Borrower").

WHEREAS, the Borrower has applied to the Lender for an unsecured impact loan to serve as a program related investment for Lender in the amount of Two Hundred Fifty Thousand Dollars ($250,000.00), with the proceeds thereof to be used by the Borrower for the purposes described in Section 5 of this Agreement, in furtherance of the exempt, charitable purposes of the Borrower; and

WHEREAS, the Lender is willing to make a loan to the Borrower upon the terms and conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the foregoing premises, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. **LOAN AMOUNT.** The Lender agrees, subject to the terms and conditions hereinafter set forth, to offer a loan to the Borrower in the principal amount of Two Hundred Fifty Thousand Dollars ($250,000.00) (hereinafter the "Loan"). The closing of the Loan (the "Closing") shall be held on or before _8/2(_, 2013 (the "Closing Date") by full execution of this Agreement and the presentment of a fully executed unsecured promissory note by Borrower to Lender attached hereto as Exhibit A (the "Note"). Simple interest shall accrue on the outstanding principal balance of the Note at the rate of 2% per annum, based on a 365 day year.

2. **REPAYMENT AND POSSIBLE FORGIVENESS OF LOAN.** Principal and all accrued interest on the Loan shall be first due and payable five (5) years from the Closing Date. The Note is pre-payable in whole or in part by Borrower without penalty. Upon maturity of the Note, Lender may forgive some or all of the unpaid principal and accrued interest still owing from Borrower at Lender's sole discretion.

3. **DRAWDOWN.** Upon execution of this Agreement and the Note, Borrower shall be entitled to a drawdown of loaned funds in accordance with the following schedule: $250,000.00 on July 15, 2003, after full execution of this Agreement.

4. **NOTE AND SECURITY.** The Loan shall be evidenced by the Note, duly executed on behalf of the Borrower by its authorized representatives and dated as of the Closing Date. The Note is unregistered, non-negotiable and not transferable. All other terms and conditions stated in the Note are hereby incorporated herein by this reference. This Loan shall otherwise be unsecured.

1

WON 01267

5. **PURPOSE OF THE LOAN.** Borrower's charitable purpose is to provide free surgeries for children in the poorest countries in the world. Funds loaned by the Lender shall be used to generate additional funding for WonderWork programs and facilitate the more effective and efficient delivery of surgeries for the poor and needy served by WonderWork.

6. **REPRESENTATIONS AND WARRANTIES.** Borrower makes the following representations and warranties:

    a. **Program Related Investment.** Borrower shall meet all program-related investment requirements established by Lender, including, but not limited to, use of the Loan proceeds to advance the mission of Borrower.

    b. **Net Assets.** Borrower will at all times during the term of this Loan Agreement maintain positive net assets, including maintaining net assets in excess of $5 million and maintaining annualized expenditures of 75% or more of all public donations on program service activities.

    c. **Organization and Powers.** Borrower is a tax-exempt, public charitable, nonprofit corporation duly formed, validly existing, and in good standing under the laws of the States of Delaware and New York. Borrower has the power and authority to own its assets and properties and to carry on its activities as now conducted and as contemplated to be conducted. Borrower has the power and authority to execute, deliver and perform this Agreement, to execute and deliver the Note, and to borrow hereunder.

    d. **Tax Status.** Borrower has received and maintains a current and unrevoked determination issued by the United States Internal Revenue Service recognizing Borrower as tax-exempt under Section 501(c)(3) of the Internal Revenue Code and further that it is a publicly supported organization and not a private foundation under Sections 509(a)(1) and 170(b)(1)(A)(vi) of the Internal Revenue Code.

    e. **Authorization.** The execution, delivery and performance by the Borrower of this Agreement, the execution and delivery of the Note, and the borrowing hereunder, have been duly authorized by all requisite corporate action. Upon execution and delivery of each of them by the Borrower, this Agreement and the Note (the "Loan Documents") will constitute the legal, valid and binding obligations of the Borrower, enforceable in accordance with their terms.

    f. **Litigation.** There is no action, suit, or proceeding pending or threatened before any court or governmental or administrative body or agency, nor is there any basis for any such action, that may reasonably be expected to result in a material adverse change in the activities, operations, assets, properties, or condition, financial or otherwise, of the Borrower, or to impair the ability of the Borrower to perform its obligations under the Loan Documents. Borrower is not in violation of or alleged to be in violation of any judgment, writ, injunction, decree, rule, or regulation of any court or any governmental or administrative body or agency.

    g. **No Conflicts.** The execution, delivery and performance by the Borrower of the Loan Documents and the use of the Loan proceeds contemplated hereby will not violate any provision of law, any order, rule, regulation, or judgment of any court or governmental or regulatory body, the Articles of Incorporation or Bylaws of the

2

WON 01268

Borrower, or any indenture, agreement, instrument, or deed of trust to which the Borrower is a party or by which the Borrower or any of its assets or properties is bound or conflict with, result in a breach of , or constitute a default under any such indenture, agreement, instrument, or deed of trust, or result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of the assets or properties of Borrower, except as otherwise permitted, required, or contemplated by the Loan Documents. The Borrower is not a party to any indenture, agreement, or instrument, nor subject to any restriction, which adversely affects the ability of the Borrower to perform its obligations under the Loan documents. Borrower is not in default or alleged to be in default under any indenture, agreement, or instrument for borrowed money, or under any indenture, agreement, or instrument which, if in default, might reasonably be expected to result in an adverse change in the activities, operations, assets, properties, or condition, financial or otherwise, of the Borrower, or to impair the ability of the Borrower to perform its obligations under the Loan Documents.

h. **No Default.** Borrower is in compliance with all of the terms and provisions set forth in the Loan Documents on its part to be observed or performed, and no event of default (as defined in this Agreement), or any event that, with notice or lapse of time or both, would constitute any such event of default, has occurred.

i. **Financial Condition.** There has been no material adverse change in Borrower's financial condition since the dates of the Borrower's most recent annual financial statements.

j. **Taxes.** Borrower has filed all tax and information returns (or extensions thereof) required to be filed by Borrower in any jurisdiction, and has paid all taxes, assessments, fees or other governmental charges which have become due and payable.

k. **Disqualified Persons.** Neither the Borrower, nor any director, officer, or employee of Borrower, is a "disqualified person" with respect to the Lender within the meaning of Section 4946(a) of the Internal Revenue Code.

l. **Merger.** Borrower will not merge into, dissolve, or voluntarily declare itself insolvent.

m. **Debt.** Borrower will not issue any future debt that ranks senior to the Loan nor issue any future debt that ranks pari passu with the loan without Lender's written consent.

7.     **CLOSING CONDITIONS.** The Loan Documents shall have been duly executed as appropriate and delivered to the Lender and shall be in full force and effect. On or before the Closing Date, Borrower shall have delivered to the Lender certified corporate resolutions of the Borrower evidencing approval of the form, terms, and conditions of the Loan Documents by the Borrower's governing body, and the authorization of the Borrower's officers to sign and deliver this Agreement and the Note and all such certificates of good standing and certified or other copies of corporate formation documents of the Borrower, and such other documents as may be reasonably requested by the Lender. On the Closing Date, all legal matters in connection with this Agreement and the transactions contemplated hereunder shall be satisfactory to counsel for both the Lender and the Borrower.

3

WON 01269

**8.      USE OF PROCEEDS.** Borrower shall use the proceeds of the Loan exclusively for the purposes set forth in Section 5 of this agreement and on the terms, in the manner, and subject to the limitations set forth in the Loan Documents, and shall repay any portion of the Loan not used for such purposes, unless otherwise agreed to by the Lender and Borrower in writing.

**9.      PAYMENT OF INDEBETDNESS AND TAXES.** Borrower shall pay all of its indebtedness and obligations promptly and in accordance with the terms thereof, file or cause to be filed all Federal, state, and local tax or information returns required to be filed by it, and pay and discharge or cause to be paid and discharge or cause to be paid and discharged promptly any taxes, assessments, and governmental charges or levies imposed upon it or upon its income or profits, or upon any of its property or upon any part thereof, before the same shall become in default, as well as all lawful claims for labor, materials and supplies, or otherwise which, if unpaid, might become a lien or charge upon its property, or any part thereof; *provided, however,* that the Borrower shall not be required to pay and discharge or to cause to be paid and discharged any such indebtedness, obligation, tax, assessment, charge, levy, or claim so long as the validity thereof shall be contested in good faith by appropriate proceedings and the Borrower shall have set aside on its books adequate reserves therefor.

**10.      BOOKS AND RECORDS.** Borrower shall maintain books and records for a period of three (3) years after repayment of the Loan and make such books and records available to Lender at reasonable times for inspection. KPMG presently serves as the independent auditor of Borrower and Borrower hereby agrees to notify Lender of any change in auditor.

**11.      NOTICE TO LENDER.** Borrower shall advise Lender of the occurrence of any of the following events:

  a.  Any denial of or challenge to the tax-exempt status, non-private foundation status, or nonprofit corporate status of the Borrower by any governmental authority.
  b.  Any change in circumstances that would cause the Loan to no longer serve the purposes set forth in this Agreement.
  c.  Any material adverse change in the condition, financial or otherwise, or operations of the Borrower.
  d.  Any Event of Default or other event that, with notice or lapse of time or both, would constitute an Event of Default.

**12.      NO LEGISLATIVE OR POLITICAL USES.** Borrower shall not use any proceeds of the loan for any of the purposes described in Section 170(c)(2)(D) of the Internal Revenue Code, except as permitted by U.S. Treasury Regulations, as follows. Borrower shall not use any proceeds of the Loan to carry on propaganda or otherwise to attempt to influence legislation within the meaning of Section 4945(d)(1) of the Internal Revenue Code), or to influence the outcome of any specific public election, or to carry on, directly or indirectly, any voter registration drive (within the meaning of Section 4945(d)(2) of the Internal Revenue Code).

**13.      NO MATERIAL CHANGE.** Borrower shall not make any material change in the nature of its activities as presently conducted that would adversely affect the Borrower's ability to perform under the Loan Documents. Furthermore, Borrower shall not conduct its activities in

4

WON 01270

a manner that materially departs from the representations made in the documents submitted by
Borrower to Lender in connection with Borrower's request for this Loan.

**14.    ACQUISITION; MERGER; DISPOSAL OF ASSETS.** While any sums remain
outstanding on the Loan, the Borrower shall notify Lender of its desire to (a) acquire all or
substantially all of the assets or properties of any other entity, except by gift, bequest, or other
donation, or pursuant to the enforcement of a loan or security interest; (b) sell, lease, transfer, or
otherwise dispose of any substantial part of its assets or properties; or (c) dissolve, liquidate,
merge, or consolidate with or into any other person firm, corporation, or other entity. Lender
shall have fourteen (14) days to object to such action or Borrower's acquisition, merger, or
disposal shall be deemed approved by Lender.

**15.    GOVERNING DOCUMENTS AMENDMENTS.** Borrower shall not amend its
Articles of Incorporation or Bylaws in any manner that would cause the Borrower to be in
violation of any provision of the Loan Documents or which would jeopardize the ability of the
Borrower to perform its obligations under the Loan Documents.

**16.    FUTURE INDEBTEDNESS.** Aside from additional, similar, impact loan arrangements,
Borrower shall not incur, create, assume, or suffer to exist any debt or obligation for borrowed
money other than the Loan and indebtedness incurred in the ordinary course of business that
does not materially adversely affect the ability of the Borrower to perform any of its obligations
under the Loan Documents; provided, however, in accordance with Section 6, above, Borrower
will not issue any future debt that ranks senior to, or pari passu with, the Note without the written
consent of Lender.

**17.    EVENTS OF DEFAULT.** Borrower shall be deemed to be in default under this
Agreement upon the occurrence of any of the following events (each of which is herein
sometimes called an "Event of Default"):

   a. Borrower fails to make any payment of principal or interest that is due and payable
      hereunder, and such default continues unremedied for fifteen (15) days after notice to
      the Borrower.
   b. Borrower uses any portion of the proceeds of the Loan for a purpose or in a manner
      other than specifically authorized by this Agreement, and in particular, Section 5 of
      this Agreement.
   c. Any material representation or warranty made in the Loan Documents, or in any
      report, certificate, financial statement, or instrument furnished in connection with this
      Agreement or the Loan, shall prove to have been false or misleading when made, in
      any material respect.
   d. Borrower violates or fails to observe or perform any other covenant contained herein,
      or any agreement on the part of the Borrower to be observed or performed pursuant to
      the Loan Documents, other than those referred to above in this Section 17 and such
      default shall continue unremedied for thirty (30) days after notice to the Borrower.
   e. Borrower shall have an order for relief entered against it by a bankruptcy court; or
      admit in writing its inability to pay its debts as they mature; or make an assignment
      for the benefit of creditors; or apply for or consent to the appointment of any receiver,

5

WON 01271

trustee, or similar officer for it or for all or any substantial part of its property; or suffer the appointment of such receiver, trustee, or similar officer, which appointment shall continue undischarged for a period of thirty (30) days; or institute any bankruptcy, insolvency, reorganization, arrangement, readjustment of debt, dissolution, liquidation, or similar proceeding relating to the borrower under the laws of any jurisdiction; or suffer the institution of any such proceeding against the Borrower, which proceeding shall remain pending or unstayed for a period of thirty (30) days; or by any act indicate its consent to, approval of, or acquiescense in such proceeding or the appointment of any receiver or trustee for the Borrower or any substantial part of its property.

f.  Borrower shall pay upon demand Lender's attorneys' fees and litigation costs and expenses so owed to Lender if any costs or expenses are owed to Lender, of if any attorney is engaged by Lender because of any Event of Default hereunder or to enforce or, with respect to any third party claim, defend any provision of this Agreement or the Note.

**18.    REMEDIES ON DEFAULT.** If an Event of Default occurs or is continuing, at the option of the Lender, the Lender may, by written notice to the Borrower, declare the Note and any and all other indebtedness of the Borrower to the Lender immediately due and payable, whether or not the Note or the other indebtedness shall be otherwise due and payable and whether or not the Lender shall have initiated any other action for the collection of the Note; whereupon the Note and such other indebtedness shall become due and payable, as to the principal, interest, and any other amounts payable, without presentment, demand, protest, or notice of any kind, all of which are hereby expressly waived by the Borrower. In addition, the Lender may pursue any and all remedies available to it at law or in equity for the collection of the Note and enforcement of the provisions hereof.

**19.    INDEMNIFICATION.** Borrower hereby indemnifies and agrees to defend and hold harmless the Lender, its directors, officers, employees, agents, and affiliates, from and against any and all losses, liability damages, and expenses (including attorneys' fees and expenses) which any of them may incur or be obligated to pay in any action, claim, or proceeding against them or any of them, for or by reason of any acts, whether of omission or commission, that may be committed or omitted by the Borrower or any of its servants, agents, or employees, in connection with this Agreement. The provisions of this Article and the Borrowers' obligations hereunder shall survive any expiration, termination, or rescission of this Agreement. In the event that a judgment, levy, attachment, or other seizure is entered against the Lender arising from any claim within the scope of this indemnification, the Borrower shall promptly post any necessary bond to prevent execution against any property of the Lender.

**20.    ENTIRE AGREEMENT.** This Agreement and the Exhibits attached hereto constitute the entire agreement between the parties with respect to the transactions contemplated hereby and supersede all prior agreements or understandings, written or oral, in respect hereof.

**21.    NOTICES.** Any notice or communication required or desired to be given hereunder by either of the parties to the other shall be in writing and delivered by hand, via facsimile

6

WON 01272

transmission, or mailed by first class mail or by nationally-recognized overnight courier, postage prepaid, addressed to the party at its address appearing below:

    **If to Borrower:**    WonderWork, Inc.
                            Attention: Brian Mullaney, CEO
                            420 Fifth Avenue, 27th Floor
                            New York, NY 10018
                            Ph (212) 729-1855
                            Fax (212) 729-4541

    **If to Lender:**



**22.** **WAIVER; REMEDIES.** No waiver of any provision hereof shall be valid unless in writing signed by the party waiving its rights under the provision. No course of dealing or delay or failure on the part of either party in exercising any right, power, or privilege hereunder shall operate as a waiver thereof or otherwise prejudice such party's rights, powers, or remedies, nor shall any waiver in any particular instance of any right, power, or privilege hereunder on the part of either party operate as a waiver of such right or any other right, power, or privilege hereunder in any other instance.

**23.** **ASSIGNMENT OR SALE.** The Lender may not assign or sell all or any portion of its rights or obligations under the Loan Documents without the express written agreement of Borrower. In the event of any such assignment or sale, the assignee or payor shall be accorded the full rights of the Lender by the Borrower with respect to such assignment or sale. The Borrower may not assign or sell all or any portion of its rights or obligations under the Loan Documents without the prior written consent of the Lender.

**24.** **HEADINGS.** The headings in the Loan Documents are for convenience of reference only and shall not affect the meaning or interpretation of the Loan Documents.

**25.** **COUNTERPARTS.** This Agreement may be executed in counterparts, each of which shall constitute an original, but all of which, when taken together, shall constitute only one agreement.

**26.** **GOVERNING LAW.** The Loan Documents shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be performed entirely within such State.

**27.** **SEVERABILITY.** If any provision of the Loan Documents shall for any reason be held to be illegal, invalid, or unenforceable, such illegality shall not affect any other provision of the Loan Documents, but the Loan Documents shall be construed as if such illegal, invalid, or unenforceable provision had never been contained herein.

<div align="center">7</div>

WON 01273

28. **MODIFICATION; AMENDMENT.** No change, modification or amendment of any provision hereof shall be valid unless in writing signed by the party to be bound.

IN WITNESS WHEREOF, the parties' duly authorized representatives have signed this Agreement below.

WONDERWORK, INC.

By: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮      By: _____

Name: ▮▮▮▮▮▮▮▮▮▮▮      Name: _Brian Mullaney_

Title: _Secretary_  ▮▮▮▮▮▮      Title: _CEO_

Date: _8/26/13_  ▮▮▮▮      Date: _8/26/13_

8

WON 01274

Exhibit A

Unsecured Promissory Note

$250,000.00                                    New York, New York
Two Percent (2%)                               Maturity Date: 8/26/2018

     WonderWork, Inc., a Delaware tax-exempt, nonprofit corporation (the "Borrower"), for value received, hereby promises to pay to the order of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (the "Lender"), or holder, at its offices at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ or at such other place or places in the United States of America as the holder hereof may designate in writing from time to time, the Amounts outstanding from time to time under the terms of the Loan Agreement ("Agreement") between Borrower and Lender, of even date herewith, with interest thereon at the rate of two percent (2%) per annum on the Amounts and accrued interest thereon remaining unpaid from time to time, from the date hereof until such principal amount is fully repaid. The terms of interest payments shall be as set forth in the Agreement. The entire unpaid principal balance, together with all accrued but unpaid interest, shall be due and payable on the Maturity Date.

     The Borrower may, without notice, prepay the Loan in whole or in part, without premium or penalty, at any time or from time to time, with accrued interest to date of such prepayment, if any; provided, however, that each such prepayment shall be applied first to interest accrued but unpaid on the entire outstanding principal balance of the Note through the date of such prepayment, if any, and then to principal.

     This Note is the Note referred to in the Loan Agreement, and the holder hereof is entitled to the benefits of such Loan Agreement and may enforce the provisions thereof and exercise the remedies provided thereunder or otherwise available in respect thereof. Any defined term not defined herein shall have the meaning set forth in the Loan Agreement. To the extent that the terms of the Note are in conflict with the Loan Agreement, the terms of the Loan Agreement shall control.

     Payment of principal and interest, if any, shall be made in lawful money of the Untied States of America. Whenever any payment to be made hereunder would otherwise be due on a Saturday, Sunday, or public holiday under the laws of the State of New York, such payment shall be due on the next succeeding business day.

     This Note shall be payable without presentment, demand, protest, or notice of any kind, all of which are unconditionally waived by the Borrower. At maturity, Lender, at Lender's sole discretion, may forgive some or all of the remaining unpaid principal and accrued interest on the Loan secured by this Note.

     This Note shall be governed by and construed in accordance with the laws of the State of New York.

By: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Name/Title: ▮▮▮▮▮▮▮▮▮▮▮▮ Secretary ▮▮▮▮▮▮▮

By: _____

Name/Title: _____

WON 01275

# EXHIBIT 113

# LOAN AGREEMENT

This Loan Agreement (the "Agreement") is entered into as of the 2nd day of NOVEMBER DECEMBER 2013, by and between ▮▮▮▮▮▮▮▮ (the "Lender") and WonderWork, Inc., a Delaware tax-exempt, not for profit corporation presently located in New York, New York (the "Borrower").

**WHEREAS**, the Borrower has applied to the Lender for an unsecured impact loan to serve as a program related investment for Lender in the amount of FIVE HUNDRED THOUSAND Dollars ($500,000.00) with the proceeds thereof to be used by the Borrower for the purposes described in Section 5 of this Agreement, in furtherance of the exempt, charitable purposes of the Borrower; and

**WHEREAS**, the Lender is willing to make a loan to the Borrower upon the terms and conditions hereinafter set forth;

**NOW, THEREFORE**, in consideration of the foregoing premises, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.     **LOAN AMOUNT.**  The Lender agrees, subject to the terms and conditions hereinafter set forth, to offer a loan to the Borrower in the principal amount of FIVE HUNDRED THOUSAND Dollars ($500,000.00) (hereinafter the "Loan"), with the amounts borrowed by Borrower spread out over two years.  Lender shall provide to Borrower the principal amount of THREE HUNDRED THOUSAND DOLLARS ($300,000.00) on or about January 1, 2014, and an additional principal amount of TWO HUNDRED THOUSAND DOLLARS ($200,000.00) on or about January 1, 2015.  The closing of the Loan (the "Closing") shall be held on or before 12/2, 2013 (the "Closing Date") by full execution of this Agreement and the presentment of a fully executed unsecured promissory note or notes by Borrower to Lender attached hereto as Exhibits A and B (the "Notes").  Simple interest shall accrue on the outstanding principal balance of the Notes at the rate of 2% per annum, based on a 365 day year until paid in full.

2.     **REPAYMENT AND POSSIBLE FORGIVENESS OF LOAN.**  Principal and all accrued interest on the portion of the Loan in the amount of three hundred thousand dollars ($300,000.00) shall be first due and payable five (5) years from January 1, 2014.  Principal and all accrued interest on the remaining balance of the Loan in the amount of two hundred thousand dollars ($200,000.00) shall be first due and payable five (5) years from January 1, 2015.  Interest does not begin accruing until the date that the funds are first drawn.  The Notes are pre-payable in whole or in part by Borrower without penalty.  Upon maturity of the Notes, Lender may forgive some or all of the unpaid principal and accrued interest still owing from Borrower at Lender's sole discretion.

1

WON 01276

**3.    DRAWDOWN.** Upon execution of this Agreement and the Notes, Borrower shall be entitled to a drawdown of funds actually loaned to date.

**4.    NOTE AND SECURITY.** The Loan shall be evidenced by the Notes, duly executed on behalf of the Borrower by its authorized representatives and dated as of the Closing Date or the date the funds are provided by Lender to the Borrower. The Notes are unregistered, non-negotiable and not transferable. All other terms and conditions stated in the Notes are hereby incorporated herein by this reference. This Loan shall otherwise be unsecured.

**5.    PURPOSE OF THE LOAN.** Borrower's charitable purpose is to provide free surgeries for children in the poorest countries in the world. Funds loaned by the Lender shall be used to generate additional funding for WonderWork programs and facilitate the more effective and efficient delivery of surgeries for the poor and needy served by WonderWork.

**6.    REPRESENTATIONS AND WARRANTIES.** Borrower makes the following representations and warranties:

    a.  **Program Related Investment.** Borrower shall meet all program-related investment requirements established by Lender, including, but not limited to, use of the Loan proceeds to advance the mission of Borrower.

    b.  **Organization and Powers.** Borrower is a tax-exempt, public charitable, nonprofit corporation duly formed, validly existing, and in good standing under the laws of the States of Delaware and New York. Borrower has the power and authority to own its assets and properties and to carry on its activities as now conducted and as contemplated to be conducted. Borrower has the power and authority to execute, deliver and perform this Agreement, to execute and deliver the Notes, and to borrow hereunder.

    c.  **Tax Status.** Borrower has received and maintains a current and unrevoked determination issued by the United States Internal Revenue Service recognizing Borrower as tax-exempt under Section 501(c)(3) of the Internal Revenue Code and further that it is a publicly supported organization and not a private foundation under Sections 509(a)(1) and 170(b)(1)(A)(vi) of the Internal Revenue Code.

    d.  **Authorization.** The execution, delivery and performance by the Borrower of this Agreement, the execution and delivery of the Notes, and the borrowing hereunder, have been duly authorized by all requisite corporate action. Upon execution and delivery of each of them by the Borrower, this Agreement and the Notes (the "Loan Documents") will constitute the legal, valid and binding obligations of the Borrower, enforceable in accordance with their terms.

    e.  **Litigation.** There is no action, suit, or proceeding pending or threatened before any court or governmental or administrative body or agency, nor is there any basis for any such action, that may reasonably be expected to result in a material adverse change in the activities, operations, assets, properties, or condition, financial or otherwise, of the Borrower, or to impair the ability of the Borrower to perform its obligations under the Loan Documents. Borrower is not in violation of or alleged to be in violation of any judgment, writ, injunction, decree, rule, or regulation of any court or any governmental or administrative body or agency.

WON 01277

    **f.**  **No Conflicts.** The execution, delivery and performance by the Borrower of the Loan Documents and the use of the Loan proceeds contemplated hereby will not violate any provision of law, any order, rule, regulation, or judgment of any court or governmental or regulatory body, the Articles of Incorporation or Bylaws of the Borrower, or any indenture, agreement, instrument, or deed of trust to which the Borrower is a party or by which the Borrower or any of its assets or properties is bound or conflict with, result in a breach of , or constitute a default under any such indenture, agreement, instrument, or deed of trust, or result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of the assets or properties of Borrower, except as otherwise permitted, required, or contemplated by the Loan Documents. The Borrower is not a party to any indenture, agreement, or instrument, nor subject to any restriction, which adversely affects the ability of the Borrower to perform its obligations under the Loan documents. Borrower is not in default or alleged to be in default under any indenture, agreement, or instrument for borrowed money, or under any indenture, agreement, or instrument which, if in default, might reasonably be expected to result in an adverse change in the activities, operations, assets, properties, or condition, financial or otherwise, of the Borrower, or to impair the ability of the Borrower to perform its obligations under the Loan Documents.

    **g.**  **No Default.** Borrower is in compliance with all of the terms and provisions set forth in the Loan Documents on its part to be observed or performed, and no event of default (as defined in this Agreement), or any event that, with notice or lapse of time or both, would constitute any such event of default, has occurred.

    **h.**  **Financial Condition.** There has been no material adverse change in Borrower's financial condition since the dates of the Borrower's most recent annual financial statements.

    **i.**  **Taxes.** Borrower has filed all tax and information returns (or extensions thereof) required to be filed by Borrower in any jurisdiction, and has paid all taxes, assessments, fees or other governmental charges which have become due and payable.

    **j.**  **Disqualified Persons.** Neither the Borrower, nor any director, officer, or employee of Borrower, is a "disqualified person" with respect to the Lender within the meaning of Section 4946(a) of the Internal Revenue Code.

    **k.**  **Merger.** Borrower will not merge into, dissolve, or voluntarily declare itself insolvent.

7.    **CLOSING CONDITIONS.** The Loan Documents shall have been duly executed as appropriate and delivered to the Lender and shall be in full force and effect. On or before the Closing Date, Borrower shall have delivered to the Lender at Lender's request certified corporate resolutions of the Borrower evidencing approval of the form, terms, and conditions of the Loan Documents by the Borrower's governing body, and the authorization of the Borrower's officers to sign and deliver this Agreement and the Notes and all such certificates of good standing and certified or other copies of corporate formation documents of the Borrower, and such other documents as may be reasonably requested by the Lender. On the Closing Date, all legal matters in connection with this Agreement and the transactions contemplated hereunder shall be satisfactory to counsel for both the Lender and the Borrower.

WON 01278

**8.     USE OF PROCEEDS.** Borrower shall use the proceeds of the Loan exclusively for the purposes set forth in Section 5 of this agreement and on the terms, in the manner, and subject to the limitations set forth in the Loan Documents, and shall repay any portion of the Loan not used for such purposes, unless otherwise agreed to by the Lender and Borrower in writing.

**9.     PAYMENT OF INDEBTDNESS AND TAXES.** Borrower shall pay all of its indebtedness and obligations promptly and in accordance with the terms thereof, file or cause to be filed all Federal, state, and local tax or information returns required to be filed by it, and pay and discharge or cause to be paid and discharged promptly any taxes, assessments, and governmental charges or levies imposed upon it or upon its income or profits, or upon any of its property or upon any part thereof, before the same shall become in default, as well as all lawful claims for labor, materials and supplies, or otherwise which, if unpaid, might become a lien or charge upon its property, or any part thereof; *provided, however,* that the Borrower shall not be required to pay and discharge or to cause to be paid and discharged any such indebtedness, obligation, tax, assessment, charge, levy, or claim so long as the validity thereof shall be contested in good faith by appropriate proceedings and the Borrower shall have set aside on its books adequate reserves therefor.

**10.     BOOKS AND RECORDS.** Borrower shall maintain books and records for a period of three (3) years after repayment of the Loan and make such books and records available to Lender at reasonable times for inspection. KPMG presently serves as the independent auditor of Borrower and Borrower hereby agrees to notify Lender of any change in auditor.

**11.     NOTICE TO LENDER.** Borrower shall advise Lender of the occurrence of any of the following events:

   a.  Any denial of or challenge to the tax-exempt status, non-private foundation status, or nonprofit corporate status of the Borrower by any governmental authority.
   b.  Any change in circumstances that would cause the Loan to no longer serve the purposes set forth in this Agreement.
   c.  Any material adverse change in the condition, financial or otherwise, or operations of the Borrower.
   d.  Any Event of Default or other event that, with notice or lapse of time or both, would constitute an Event of Default.

**12.     NO LEGISLATIVE OR POLITICAL USES.** Borrower shall not use any proceeds of the loan for any of the purposes described in Section 170(c)(2)(D) of the Internal Revenue Code, except as permitted by U.S. Treasury Regulations, as follows. Borrower shall not use any proceeds of the Loan to carry on propaganda or otherwise to attempt to influence legislation within the meaning of Section 4945(d)(1) of the Internal Revenue Code), or to influence the outcome of any specific public election, or to carry on, directly or indirectly, any voter registration drive (within the meaning of Section 4945(d)(2) of the Internal Revenue Code).

**13.     NO MATERIAL CHANGE.** Borrower shall not make any material change in the nature of its activities as presently conducted that would adversely affect the Borrower's ability to perform under the Loan Documents. Furthermore, Borrower shall not conduct its activities in

4

WON 01279

a manner that materially departs from the representations made in the documents submitted by Borrower to Lender in connection with Borrower's request for this Loan.

**14.    ACQUISITION; MERGER; DISPOSAL OF ASSETS.**  While any sums remain outstanding on the Loan, the Borrower shall notify Lender of its desire to (a) acquire all or substantially all of the assets or properties of any other entity, except by gift, bequest, or other donation, or pursuant to the enforcement of a loan or security interest; (b) sell, lease, transfer, or otherwise dispose of any substantial part of its assets or properties; or (c) dissolve, liquidate, merge, or consolidate with or into any other person firm, corporation, or other entity.  Lender shall have fourteen (14) days to object to such action or Borrower's acquisition, merger, or disposal shall be deemed approved by Lender.

**15.    GOVERNING DOCUMENTS AMENDMENTS.**  Borrower shall not amend its Articles of Incorporation or Bylaws in any manner that would cause the Borrower to be in violation of any provision of the Loan Documents or which would jeopardize the ability of the Borrower to perform its obligations under the Loan Documents.

**16.    FUTURE INDEBTEDNESS.**  Aside from additional, similar, impact loan arrangements, Borrower shall not incur, create, assume, or suffer to exist any debt or obligation for borrowed money other than the Loan and indebtedness incurred in the ordinary course of business that does not materially adversely affect the ability of the Borrower to perform any of its obligations under the Loan Documents.

**17.    EVENTS OF DEFAULT.**  Borrower shall be deemed to be in default under this Agreement upon the occurrence of any of the following events (each of which is herein sometimes called an "Event of Default"):

  a.  Borrower fails to make any payment of principal or interest that is due and payable hereunder, and such default continues unremedied for fifteen (15) days after notice to the Borrower.
  b.  Borrower uses any portion of the proceeds of the Loan for a purpose or in a manner other than specifically authorized by this Agreement, and in particular, Section 5 of this Agreement.
  c.  Any material representation or warranty made in the Loan Documents, or in any report, certificate, financial statement, or instrument furnished in connection with this Agreement or the Loan, shall prove to have been false or misleading when made, in any material respect.
  d.  Borrower violates or fails to observe or perform any other covenant contained herein, or any agreement on the part of the Borrower to be observed or performed pursuant to the Loan Documents, other than those referred to above in this Section 17, and such default shall continue unremedied for thirty (30) days after notice to the Borrower.
  e.  Borrower shall have an order for relief entered against it by a bankruptcy court; or admit in writing its inability to pay its debts as they mature; or make an assignment for the benefit of creditors; or apply for or consent to the appointment of any receiver, trustee, or similar officer for it or for all or any substantial part of its property; or suffer the appointment of such receiver, trustee, or similar officer, which appointment

5

WON 01280

shall continue undischarged for a period of thirty (30) days; or institute any bankruptcy, insolvency, reorganization, arrangement, readjustment of debt, dissolution, liquidation, or similar proceeding relating to the borrower under the laws of any jurisdiction; or suffer the institution of any such proceeding against the Borrower, which proceeding shall remain pending or unstayed for a period of thirty (30) days; or by any act indicate its consent to, approval of, or acquiescence in such proceeding or the appointment of any receiver or trustee for the Borrower or any substantial part of its property.

f.   Borrower shall pay upon demand Lender's attorneys' fees and litigation costs and expenses so owed to Lender if any costs or expenses are owed to Lender, of if any attorney is engaged by Lender because of any Event of Default hereunder or to enforce or, with respect to any third party claim, defend any provision of this Agreement or the Note.

**18.**    **REMEDIES ON DEFAULT/ACCELERATION.** If an Event of Default occurs or is continuing, at the option of the Lender, the Lender may, by written notice to the Borrower, declare any effective Note and any and all other indebtedness of the Borrower to the Lender immediately due and payable, whether or not the Note(s) or the other indebtedness shall be otherwise due and payable and whether or not the Lender shall have initiated any other action for the collection of the Note(s); whereupon the Note(s) and such other indebtedness shall become due and payable, as to the principal, interest, and any other amounts payable, without presentment, demand, protest, or notice of any kind, all of which are hereby expressly waived by the Borrower. In addition to the remedies on default, Lender may, by written notice to the Borrower, declare the entire principal sum then unpaid immediately due and payable.

**19.**    **INDEMNIFICATION.** Borrower hereby indemnifies and agrees to defend and hold harmless the Lender, its directors, officers, employees, agents, and affiliates, from and against any and all losses, liability damages, and expenses (including attorneys' fees and expenses) which any of them may incur or be obligated to pay in any action, claim, or proceeding against them or any of them, for or by reason of any acts, whether of omission or commission, that may be committed or omitted by the Borrower or any of its servants, agents, or employees, in connection with this Agreement. The provisions of this Article and the Borrowers' obligations hereunder shall survive any expiration, termination, or rescission of this Agreement. In the event that a judgment, levy, attachment, or other seizure is entered against the Lender arising from any claim within the scope of this indemnification, the Borrower shall promptly post any necessary bond to prevent execution against any property of the Lender.

**20.**    **ENTIRE AGREEMENT.** This Agreement and the Exhibits attached hereto constitute the entire agreement between the parties with respect to the transactions contemplated hereby and supersede all prior agreements or understandings, written or oral, in respect hereof.

**21.**    **NOTICES.** Any notice or communication required or desired to be given hereunder by either of the parties to the other shall be in writing and delivered by hand, via facsimile transmission, or mailed by first class mail or by nationally-recognized overnight courier, postage prepaid, addressed to the party at its address appearing below:

6

WON 01281

**If to Borrower:**     WonderWork, Inc.
Attention: Brian Mullaney, CEO
420 Fifth Avenue, 27th Floor
New York, NY 10018
Ph (212) 729-1855
Fax (212) 729-4541

**If to Lender:**



**22.     WAIVER; REMEDIES.** No waiver of any provision hereof shall be valid unless in writing signed by the party waiving its rights under the provision. No course of dealing or delay or failure on the part of either party in exercising any right, power, or privilege hereunder shall operate as a waiver thereof or otherwise prejudice such party's rights, powers, or remedies, nor shall any waiver in any particular instance of any right, power, or privilege hereunder on the part of either party operate as a waiver of such right or any other right, power, or privilege hereunder in any other instance.

**23.     ASSIGNMENT OR SALE.** The Lender may not assign or sell all or any portion of its rights or obligations under the Loan Documents without the express written agreement of Borrower. In the event of any such assignment or sale, the assignee or payor shall be accorded the full rights of the Lender by the Borrower with respect to such assignment or sale. The Borrower may not assign or sell all or any portion of its rights or obligations under the Loan Documents without the prior written consent of the Lender.

**24.     HEADINGS.** The headings in the Loan Documents are for convenience of reference only and shall not affect the meaning or interpretation of the Loan Documents.

**25.     COUNTERPARTS.** This Agreement may be executed in counterparts, each of which shall constitute an original, but all of which, when taken together, shall constitute only one agreement.

**26.     GOVERNING LAW.** The Loan Documents shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be performed entirely within such State.

**27.     SEVERABILITY.** If any provision of the Loan Documents shall for any reason be held to be illegal, invalid, or unenforceable, such illegality shall not affect any other provision of the Loan Documents, but the Loan Documents shall be construed as if such illegal, invalid, or unenforceable provision had never been contained herein.

7

WON 01282

**28.    MODIFICATION; AMENDMENT.** No change, modification or amendment of any provision hereof shall be valid unless in writing signed by the party to be bound.

IN WITNESS WHEREOF, the parties' duly authorized representatives have signed this Agreement below.

<div style="display:flex;justify-content:space-between;">

████████████████

By: ████████████

Name: █████████████

Title: TRUSTEE

Date: 11/23/13

WONDERWORK, INC.
"BORROWER"

By: _____

Name: Brian Mullaney

Title: Co-founder / CEO

Date: 12/2/13

</div>

8

WON 01283

Exhibit A

Unsecured Promissory Note

$300,000.00                                        New York, New York
Two Percent (2%)                                   Maturity Date: JANUARY 1, 2019

     WonderWork, Inc., a Delaware tax-exempt, nonprofit corporation (the "Borrower"), for value received, hereby promises to pay to the order of ████████████████████ the "Lender"), or holder, at ████████████████, or at such other place or places in the United States of America as the holder hereof may designate in writing from time to time, the Amounts outstanding from time to time under the terms of the Loan Agreement ("Agreement") between Borrower and Lender, of even date herewith, with interest thereon at the rate of two percent (2%) per annum on the Amounts and accrued interest thereon remaining unpaid from time to time, from the date hereof until such principal amount is fully repaid. The terms of interest payments shall be as set forth in the Agreement. The entire unpaid principal balance, together with all accrued but unpaid interest, shall be due and payable on the Maturity Date.

     The Borrower may, with 30 days' written notice, prepay the Loan in whole or in part, without premium or penalty, at any time or from time to time, with accrued interest to date of such prepayment, if any; provided, however, that each such prepayment shall be applied first to interest accrued but unpaid on the entire outstanding principal balance of the Note through the date of such prepayment, if any, and then to principal.

     This Note is the Note referred to in the Loan Agreement, and the holder hereof is entitled to the benefits of such Loan Agreement and may enforce the provisions thereof and exercise the remedies provided thereunder or otherwise available in respect thereof. Any defined term not defined herein shall have the meaning set forth in the Loan Agreement. To the extent that the terms of the Note are in conflict with the Loan Agreement, the terms of the Loan Agreement shall control.

     Payment of principal and interest, if any, shall be made in lawful money of the Untied States of America. Whenever any payment to be made hereunder would otherwise be due on a Saturday, Sunday, or public holiday under the laws of the State of New York, such payment shall be due on the next succeeding business day.

     This Note shall be payable without presentment, demand, protest, or notice of any kind, all of which are unconditionally waived by the Borrower. At maturity, Lender, at Lender's sole discretion, may forgive some or all of the remaining unpaid principal and accrued interest on the Loan secured by this Note.

     This Note shall be governed by and construed in accordance with the laws of the State of New York.

By: _____████████████_____

Name/Title: ███████████████ — TRUSTEE

By: _____

Name/Title: Brian Mullaney - Cofounder / CEO

WON 01284

Exhibit B

Unsecured Promissory Note

$200,000.00                                    New York, New York
Two Percent (2%)                               Maturity Date: JANUARY 1, 2020


      WonderWork, Inc., a Delaware tax-exempt, nonprofit corporation (the "Borrower"), for value received, hereby promises to pay to the order of ███████████████ (the "Lender"), or holder, at ████████████████, or at such other place or places in the United States of America as the holder hereof may designate in writing from time to time, the Amounts outstanding from time to time under the terms of the Loan Agreement ("Agreement") between Borrower and Lender, of even date herewith, with interest thereon at the rate of two percent (2%) per annum on the Amounts and accrued interest thereon remaining unpaid from time to time, from the date hereof until such principal amount is fully repaid. The terms of interest payments shall be as set forth in the Agreement. The entire unpaid principal balance, together with all accrued but unpaid interest, shall be due and payable on the Maturity Date.

      The Borrower may, with 30 days' written notice, prepay the Loan in whole or in part, without premium or penalty, at any time or from time to time, with accrued interest to date of such prepayment, if any; provided, however, that each such prepayment shall be applied first to interest accrued but unpaid on the entire outstanding principal balance of the Note through the date of such prepayment, if any, and then to principal.

      This Note is the Note referred to in the Loan Agreement, and the holder hereof is entitled to the benefits of such Loan Agreement and may enforce the provisions thereof and exercise the remedies provided thereunder or otherwise available in respect thereof. Any defined term not defined herein shall have the meaning set forth in the Loan Agreement. To the extent that the terms of the Note are in conflict with the Loan Agreement, the terms of the Loan Agreement shall control.

      Payment of principal and interest, if any, shall be made in lawful money of the Untied States of America. Whenever any payment to be made hereunder would otherwise be due on a Saturday, Sunday, or public holiday under the laws of the State of New York, such payment shall be due on the next succeeding business day.

      This Note shall be payable without presentment, demand, protest, or notice of any kind, all of which are unconditionally waived by the Borrower. At maturity, Lender, at Lender's sole discretion, may forgive some or all of the remaining unpaid principal and accrued interest on the Loan secured by this Note.

      This Note shall be governed by and construed in accordance with the laws of the State of New York.

By: _____████████████_____

Name/Title: ████████████ TRUSTEE

By: _____

Name/Title: Brian Mullaney, Cofounder/CEO

WON 01285

# EXHIBIT 114

# LOAN AGREEMENT

This Loan Agreement (the "Agreement") is entered into as of the 19th day of December 2013, by and between ███████████████████████████████████ a New York nonprofit, tax-exempt private foundation (the "Lender") and WonderWork, Inc., a Delaware tax-exempt, not for profit corporation presently located in New York, New York (the "Borrower").

**WHEREAS,** the Borrower has applied to the Lender for an unsecured impact loan to serve as a program related investment for Lender in the amount of One Hundred Thousand Dollars ($100,000.00) with the proceeds thereof to be used by the Borrower for the purposes described in Section 5 of this Agreement, in furtherance of the exempt, charitable purposes of the Borrower; and

**WHEREAS,** the Lender is willing to make a loan to the Borrower upon the terms and conditions hereinafter set forth:

**NOW, THEREFORE,** in consideration of the foregoing premises, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.  **LOAN AMOUNT.** The Lender agrees, subject to the terms and conditions hereinafter set forth, to offer a loan to the Borrower in the principal amount of One Hundred Thousand Dollars ($100,000.00) (hereinafter the "Loan"). The closing of the Loan (the "Closing") shall be held on or before December 19, 2013 (the "Closing Date") by full execution of this Agreement and the presentment of a fully executed unsecured promissory note by Borrower to Lender attached hereto as Exhibit A (the "Note"). Simple interest shall accrue on the outstanding principal balance of the Note at the rate of 2% per annum, based on a 365 day year.

2.  **REPAYMENT AND POSSIBLE FORGIVENESS OF LOAN.** Principal and all accrued interest on the Loan shall be first due and payable five (5) years from the Closing Date. The Note is pre-payable in whole or in part by Borrower without penalty. Upon maturity of the Note, Lender may forgive some or all of the unpaid principal and accrued interest still owing from Borrower at Lender's sole discretion.

3.  **DRAWDOWN.** Upon execution of this Agreement and the Note, Borrower shall be entitled to a drawdown of loaned funds in accordance with the following schedule: $100,000.00 on December 19, 2013, after full execution of this Agreement.

4.  **NOTE AND SECURITY.** The Loan shall be evidenced by the Note, duly executed on behalf of the Borrower by its authorized representatives and dated as of the Closing Date. The Note is unregistered, non-negotiable and not transferable. All other terms and conditions stated in the Note are hereby incorporated herein by this reference. This Loan shall otherwise be unsecured.

1

WON 01286

5.     **PURPOSE OF THE LOAN.** Borrower's charitable purpose is to provide free surgeries for children in the poorest countries in the world. Funds loaned by the Lender shall be used to generate additional funding for WonderWork programs and facilitate the more effective and efficient delivery of surgeries for the poor and needy served by WonderWork.

6.     **REPRESENTATIONS AND WARRANTIES.** Borrower makes the following representations and warranties:

   a. **Program Related Investment.** Borrower shall meet all program-related investment requirements established by Lender, including, but not limited to, use of the Loan proceeds to advance the mission of Borrower.

   b. **Organization and Powers.** Borrower is a tax-exempt, public charitable, nonprofit corporation duly formed, validly existing, and in good standing under the laws of the States of Delaware and New York. Borrower has the power and authority to own its assets and properties and to carry on its activities as now conducted and as contemplated to be conducted. Borrower has the power and authority to execute, deliver and perform this Agreement, to execute and deliver the Note, and to borrow hereunder.

   c. **Tax Status.** Borrower has received and maintains a current and unrevoked determination issued by the United States Internal Revenue Service recognizing Borrower as tax-exempt under Section 501(c)(3) of the Internal Revenue Code and further that it is a publicly supported organization and not a private foundation under Sections 509(a)(1) and 170(b)(1)(A)(vi) of the Internal Revenue Code.

   d. **Authorization.** The execution, delivery and performance by the Borrower of this Agreement, the execution and delivery of the Note, and the borrowing hereunder, have been duly authorized by all requisite corporate action. Upon execution and delivery of each of them by the Borrower, this Agreement and the Note (the "Loan Documents") will constitute the legal, valid and binding obligations of the Borrower, enforceable in accordance with their terms.

   e. **Litigation.** There is no action, suit, or proceeding pending or threatened before any court or governmental or administrative body or agency, nor is there any basis for any such action, that may reasonably be expected to result in a material adverse change in the activities, operations, assets, properties, or condition, financial or otherwise, of the Borrower, or to impair the ability of the Borrower to perform its obligations under the Loan Documents. Borrower is not in violation of or alleged to be in violation of any judgment, writ, injunction, decree, rule, or regulation of any court or any governmental or administrative body or agency.

   f. **No Conflicts.** The execution, delivery and performance by the Borrower of the Loan Documents and the use of the Loan proceeds contemplated hereby will not violate any provision of law, any order, rule, regulation, or judgment of any court or governmental or regulatory body, the Articles of Incorporation or Bylaws of the Borrower, or any indenture, agreement, instrument, or deed of trust to which the Borrower is a party or by which the Borrower or any of its assets or properties is bound or conflict with, result in a breach of , or constitute a default under any such indenture, agreement, instrument, or deed of trust, or result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of

2

WON 01287

the assets or properties of Borrower, except as otherwise permitted, required, or contemplated by the Loan Documents. The Borrower is not a party to any indenture, agreement, or instrument, nor subject to any restriction, which adversely affects the ability of the Borrower to perform its obligations under the Loan documents. Borrower is not in default or alleged to be in default under any indenture, agreement, or instrument for borrowed money, or under any indenture, agreement, or instrument which, if in default, might reasonably be expected to result in an adverse change in the activities, operations, assets, properties, or condition, financial or otherwise, of the Borrower, or to impair the ability of the Borrower to perform its obligations under the Loan Documents.

g. **No Default.** Borrower is in compliance with all of the terms and provisions set forth in the Loan Documents on its part to be observed or performed, and no event of default (as defined in this Agreement), or any event that, with notice or lapse of time or both, would constitute any such event of default, has occurred.

h. **Financial Condition.** There has been no material adverse change in Borrower's financial condition since the dates of the Borrower's most recent annual financial statements.

i. **Taxes.** Borrower has filed all tax and information returns (or extensions thereof) required to be filed by Borrower in any jurisdiction, and has paid all taxes, assessments, fees or other governmental charges which have become due and payable.

j. **Disqualified Persons.** Neither the Borrower, nor any director, officer, or employee of Borrower, is a "disqualified person" with respect to the Lender within the meaning of Section 4946(a) of the Internal Revenue Code.

k. **Merger.** Borrower will not merge into, dissolve, or voluntarily declare itself insolvent.

7.    **CLOSING CONDITIONS.** The Loan Documents shall have been duly executed as appropriate and delivered to the Lender and shall be in full force and effect. On or before the Closing Date, Borrower shall have delivered to the Lender certified corporate resolutions of the Borrower evidencing approval of the form, terms, and conditions of the Loan Documents by the Borrower's governing body, and the authorization of the Borrower's officers to sign and deliver this Agreement and the Note and all such certificates of good standing and certified or other copies of corporate formation documents of the Borrower, and such other documents as may be reasonably requested by the Lender. On the Closing Date, all legal matters in connection with this Agreement and the transactions contemplated hereunder shall be satisfactory to counsel for both the Lender and the Borrower.

8.    **USE OF PROCEEDS.** Borrower shall use the proceeds of the Loan exclusively for the purposes set forth in Section 5 of this agreement and on the terms, in the manner, and subject to the limitations set forth in the Loan Documents, and shall repay any portion of the Loan not used for such purposes, unless otherwise agreed to by the Lender and Borrower in writing.

9.    **PAYMENT OF INDEBTEDNESS AND TAXES.** Borrower shall pay all of its indebtedness and obligations promptly and in accordance with the terms thereof, file or cause to be filed all Federal, state, and local tax or information returns required to be filed by it, and pay and discharge or cause to be paid and discharge or cause to be paid and discharged promptly any taxes, assessments, and governmental charges or levies imposed upon it or upon its income or

3

WON 01288

profits, or upon any of its property or upon any part thereof, before the same shall become in default, as well as all lawful claims for labor, materials and supplies, or otherwise which, if unpaid, might become a lien or charge upon its property, or any part thereof; *provided, however,* that the Borrower shall not be required to pay and discharge or to cause to be paid and discharged any such indebtedness, obligation, tax, assessment, charge, levy, or claim so long as the validity thereof shall be contested in good faith by appropriate proceedings and the Borrower shall have set aside on its books adequate reserves therefor.

**10.    BOOKS AND RECORDS.** Borrower shall maintain books and records for a period of three (3) years after repayment of the Loan and make such books and records available to Lender at reasonable times for inspection. KPMG presently serves as the independent auditor of Borrower and Borrower hereby agrees to notify Lender of any change in auditor.

**11.    NOTICE TO LENDER.** Borrower shall advise Lender of the occurrence of any of the following events:

  **a.**  Any denial of or challenge to the tax-exempt status, non-private foundation status, or nonprofit corporate status of the Borrower by any governmental authority.
  **b.**  Any change in circumstances that would cause the Loan to no longer serve the purposes set forth in this Agreement.
  **c.**  Any material adverse change in the condition, financial or otherwise, or operations of the Borrower.
  **d.**  Any Event of Default or other event that, with notice or lapse of time or both, would constitute an Event of Default.

**12.    NO LEGISLATIVE OR POLITICAL USES.** Borrower shall not use any proceeds of the loan for any of the purposes described in Section 170(c)(2)(D) of the Internal Revenue Code, except as permitted by U.S. Treasury Regulations, as follows. Borrower shall not use any proceeds of the Loan to carry on propaganda or otherwise to attempt to influence legislation within the meaning of Section 4945(d)(1) of the Internal Revenue Code, or to influence the outcome of any specific public election, or to carry on, directly or indirectly, any voter registration drive (within the meaning of Section 4945(d)(2) of the Internal Revenue Code).

**13.    NO MATERIAL CHANGE.** Borrower shall not make any material change in the nature of its activities as presently conducted that would adversely affect the Borrower's ability to perform under the Loan Documents. Furthermore, Borrower shall not conduct its activities in a manner that materially departs from the representations made in the documents submitted by Borrower to Lender in connection with Borrower's request for this Loan.

**14.    ACQUISITION; MERGER; DISPOSAL OF ASSETS.** While any sums remain outstanding on the Loan, the Borrower shall notify Lender of its desire to (a) acquire all or substantially all of the assets or properties of any other entity, except by gift, bequest, or other donation, or pursuant to the enforcement of a loan or security interest; (b) sell, lease, transfer, or otherwise dispose of any substantial part of its assets or properties; or (c) dissolve, liquidate, merge, or consolidate with or into any other person firm, corporation, or other entity. Lender

WON 01289

shall have fourteen (14) days to object to such action or Borrower's acquisition, merger, or disposal shall be deemed approved by Lender.

**15. GOVERNING DOCUMENTS AMENDMENTS.** Borrower shall not amend its Articles of Incorporation or Bylaws in any manner that would cause the Borrower to be in violation of any provision of the Loan Documents or which would jeopardize the ability of the Borrower to perform its obligations under the Loan Documents.

**16. FUTURE INDEBTEDNESS.** Aside from additional, similar, impact loan arrangements, Borrower shall not incur, create, assume, or suffer to exist any debt or obligation for borrowed money other than the Loan and indebtedness incurred in the ordinary course of business that does not materially adversely affect the ability of the Borrower to perform any of its obligations under the Loan Documents.

**17. EVENTS OF DEFAULT.** Borrower shall be deemed to be in default under this Agreement upon the occurrence of any of the following events (each of which is herein sometimes called an "Event of Default"):

    **a.** Borrower fails to make any payment of principal or interest that is due and payable hereunder, and such default continues unremedied for fifteen (15) days after notice to the Borrower.

    **b.** Borrower uses any portion of the proceeds of the Loan for a purpose or in a manner other than specifically authorized by this Agreement, and in particular, Section 5 of this Agreement.

    **c.** Any material representation or warranty made in the Loan Documents, or in any report, certificate, financial statement, or instrument furnished in connection with this Agreement or the Loan, shall prove to have been false or misleading when made, in any material respect.

    **d.** Borrower violates or fails to observe or perform any other covenant contained herein, or any agreement on the part of the Borrower to be observed or performed pursuant to the Loan Documents, other than those referred to above in this Section 17, and such default shall continue unremedied for thirty (30) days after notice to the Borrower.

    **e.** Borrower shall have an order for relief entered against it by a bankruptcy court; or admit in writing its inability to pay its debts as they mature; or make an assignment for the benefit of creditors; or apply for or consent to the appointment of any receiver, trustee, or similar officer for it or for all or any substantial part of its property; or suffer the appointment of such receiver, trustee, or similar officer, which appointment shall continue undischarged for a period of thirty (30) days; or institute any bankruptcy, insolvency, reorganization, arrangement, readjustment of debt, dissolution, liquidation, or similar proceeding relating to the borrower under the laws of any jurisdiction; or suffer the institution of any such proceeding against the Borrower, which proceeding shall remain pending or unstayed for a period of thirty (30) days; or by any act indicate its consent to, approval of, or acquiescence in such proceeding or the appointment of any receiver or trustee for the Borrower or any substantial part of its property.

5

WON 01290

    f.    Borrower shall pay upon demand Lender's attorneys' fees and litigation costs and expenses so owed to Lender if any costs or expenses are owed to Lender, of if any attorney is engaged by Lender because of any Event of Default hereunder or to enforce or, with respect to any third party claim, defend any provision of this Agreement or the Note.

**18.    REMEDIES ON DEFAULT/ACCELERATION.** If an Event of Default occurs or is continuing, at the option of the Lender, the Lender may, by written notice to the Borrower, declare the Note and any and all other indebtedness of the Borrower to the Lender immediately due and payable, whether or not the Note or the other indebtedness shall be otherwise due and payable and whether or not the Lender shall have initiated any other action for the collection of the Note; whereupon the Note and such other indebtedness shall become due and payable, as to the principal, interest, and any other amounts payable, without presentment, demand, protest, or notice of any kind, all of which are hereby expressly waived by the Borrower. In addition to the remedies on default, Lender may, by written notice to the Borrower, declare the entire principal sum then unpaid immediately due and payable.

**19.    INDEMNIFICATION.** Borrower hereby indemnifies and agrees to defend and hold harmless the Lender, its directors, officers, employees, agents, and affiliates, from and against any and all losses, liability damages, and expenses (including attorneys' fees and expenses) which any of them may incur or be obligated to pay in any action, claim, or proceeding against them or any of them, for or by reason of any acts, whether of omission or commission, that may be committed or omitted by the Borrower or any of its servants, agents, or employees, in connection with this Agreement. The provisions of this Article and the Borrowers' obligations hereunder shall survive any expiration, termination, or rescission of this Agreement. In the event that a judgment, levy, attachment, or other seizure is entered against the Lender arising from any claim within the scope of this indemnification, the Borrower shall promptly post any necessary bond to prevent execution against any property of the Lender.

**20.    ENTIRE AGREEMENT.** This Agreement and the Exhibits attached hereto constitute the entire agreement between the parties with respect to the transactions contemplated hereby and supersede all prior agreements or understandings, written or oral, in respect hereof.

**21.    NOTICES.** Any notice or communication required or desired to be given hereunder by either of the parties to the other shall be in writing and delivered by hand, via facsimile transmission, or mailed by first class mail or by nationally-recognized overnight courier, postage prepaid, addressed to the party at its address appearing below:

    **If to Borrower:**    WonderWork, Inc.
                            Attention: Brian Mullaney, CEO
                            420 Fifth Avenue, 27th Floor
                            New York, NY 10018
                            Ph (212) 729-1855
                            Fax (212) 729-4541

WON 01291

**If to Lender:** ██████████████████████████

**22. WAIVER; REMEDIES.** No waiver of any provision hereof shall be valid unless in writing signed by the party waiving its rights under the provision. No course of dealing or delay or failure on the part of either party in exercising any right, power, or privilege hereunder shall operate as a waiver thereof or otherwise prejudice such party's rights, powers, or remedies, nor shall any waiver in any particular instance of any right, power, or privilege hereunder on the part of either party operate as a waiver of such right or any other right, power, or privilege hereunder in any other instance.

**23. ASSIGNMENT OR SALE.** The Lender may not assign or sell all or any portion of its rights or obligations under the Loan Documents without the express written agreement of Borrower. In the event of any such assignment or sale, the assignee or payor shall be accorded the full rights of the Lender by the Borrower with respect to such assignment or sale. The Borrower may not assign or sell all or any portion of its rights or obligations under the Loan Documents without the prior written consent of the Lender.

**24. HEADINGS.** The headings in the Loan Documents are for convenience of reference only and shall not affect the meaning or interpretation of the Loan Documents.

**25. COUNTERPARTS.** This Agreement may be executed in counterparts, each of which shall constitute an original, but all of which, when taken together, shall constitute only one agreement.

**26. GOVERNING LAW.** The Loan Documents shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be performed entirely within such State.

**27. SEVERABILITY.** If any provision of the Loan Documents shall for any reason be held to be illegal, invalid, or unenforceable, such illegality shall not affect any other provision of the Loan Documents, but the Loan Documents shall be construed as if such illegal, invalid, or unenforceable provision had never been contained herein.

**28. MODIFICATION; AMENDMENT.** No change, modification or amendment of any provision hereof shall be valid unless in writing signed by the party to be bound.

WON 01292

IN WITNESS WHEREOF, the parties' duly authorized representatives have signed this Agreement below.

By:

Name:

Date: _12 - 19 - 13_

WONDERWORK, INC.
"BORROWER"

By: _____

Name: BRIAN MULLANEY

Title: CEO

Date: _12-31-13_

8

WON 01293

Exhibit A
Unsecured Promissory Note

$100,000.00                                          New York, New York
Two Percent (2%)                                     Maturity Date: December 19, 2018

WonderWork, Inc., a Delaware tax-exempt, nonprofit corporation (the "Borrower"), for value received, hereby promises to pay to the order of ███████████████████ ████████████████ a New York nonprofit, tax-exempt private foundation (the "Lender"), or holder, at ███, or at such other place or places in the United States of America as the holder hereof may designate in writing from time to time, the Amounts outstanding from time to time under the terms of the Loan Agreement ("Agreement") between Borrower and Lender, of even date herewith, with interest thereon at the rate of two percent (2%) per annum on the Amounts and accrued interest thereon remaining unpaid from time to time, from the date hereof until such principal amount is fully repaid. The terms of interest payments shall be as set forth in the Agreement. The entire unpaid principal balance, together with all accrued but unpaid interest, shall be due and payable on the Maturity Date.

The Borrower may, without notice, prepay the Loan in whole or in part, without premium or penalty, at any time or from time to time, with accrued interest to date of such prepayment, if any; provided, however, that each such prepayment shall be applied first to interest accrued but unpaid on the entire outstanding principal balance of the Note through the date of such prepayment, if any, and then to principal.

This Note is the Note referred to in the Loan Agreement, and the holder hereof is entitled to the benefits of such Loan Agreement and may enforce the provisions thereof and exercise the remedies provided thereunder or otherwise available in respect thereof. Any defined term not defined herein shall have the meaning set forth in the Loan Agreement. To the extent that the terms of the Note are in conflict with the Loan Agreement, the terms of the Loan Agreement shall control.

Payment of principal and interest, if any, shall be made in lawful money of the Untied States of America. Whenever any payment to be made hereunder would otherwise be due on a Saturday, Sunday, or public holiday under the laws of the State of New York, such payment shall be due on the next succeeding business day.

This Note shall be payable without presentment, demand, protest, or notice of any kind, all of which are unconditionally waived by the Borrower. At maturity, Lender, at Lender's sole discretion, may forgive some or all of the remaining unpaid principal and accrued interest on the Loan secured by this Note.

This Note shall be governed by and construed in accordance with the laws of the State of New York.

By: ███████████████████████

Name/T████████████████████

By: _____

Name/Title: Brian Mullaney, CEO, WonderWork

# EXHIBIT 115

# IMPACT LOAN AGREEMENT

This Loan Agreement (the "Agreement") is entered into as of the 1st day of May, 2014, by and between ▮▮▮▮▮▮▮▮▮ a private foundation (the "Lender") and WonderWork, Inc., a Delaware non-profit, non-stock corporation presently located in New York, New York, and doing business as Surgery For The Poor, Inc. (the "Borrower").

**WHEREAS**, Borrower's charitable purpose is to provide free surgery and related medical treatment for poor children in developing countries,

**WHEREAS**, the Borrower has applied to the Lender for an unsecured impact loan intended to qualify as a program related investment in the amount of One Million Dollars ($1,000,000), to be used in furtherance of the exempt, charitable purposes of the Borrower; and

**WHEREAS**, the Lender is willing to make a loan to the Borrower upon the terms and conditions hereinafter set forth;

**NOW, THEREFORE**, in consideration of the foregoing premises, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## THE LOAN

1. **LOAN AMOUNT.** The Lender agrees, subject to the terms and conditions hereinafter set forth, to make a loan to the Borrower in the principal amount of One Million Dollars ($1,000,000.00) (hereinafter the "Loan"). The closing of the Loan (the "Closing") shall be held on May 1, 2014 (the "Closing Date") by full execution of this Agreement and the presentment of a fully executed unsecured promissory note by Borrower to Lender attached hereto as Exhibit A (the "Note"). Simple interest shall accrue on the outstanding principal balance of the Note at the rate of 2% per annum, based on a 365 day year.

2. **REPAYMENT OF LOAN.** Principal and all accrued interest on the Loan shall be due and payable on May 1, 2019. The Note may be prepaid in whole or in part by Borrower without penalty.

3. **DRAWDOWN.** The Loan shall be made in one disbursement of $1,000,000.00 payable upon execution of this Agreement and the Note and satisfaction of the closing conditions set forth in Article 4 hereof.

4. **NOTE AND SECURITY.** The Loan shall be evidenced by the Note, duly executed on behalf of the Borrower by its authorized representatives and dated as of the Closing Date. The Note is unregistered, non-negotiable and not transferable. All other terms and conditions stated in the Note are hereby incorporated herein by this reference.

WON01666

## ARTICLE 2
## PURPOSE AND USE OF PROCEEDS

5. **PURPOSE OF THE LOAN.** The purpose of the Loan is to further Borrower's charitable mission of providing free surgery and related medical treatment to poor children in developing countries.

6. **USE OF PROCEEDS.** Borrower shall use the proceeds of the Loan exclusively for the purposes set forth in Section 5 of this agreement and on the terms, in the manner, and subject to the limitations set forth in this Agreement, and, in particular, (i) at least 80% of the proceeds of the Loan shall be used only to cover the direct costs, as enumerated in the Proposal dated February 11, 2014 submitted to Lender by Borrower, of facilitating the more effective and efficient delivery of surgeries for the poor in developing countries, and (ii) the remaining proceeds may be used for the general operating support of Borrower. Borrower shall immediately repay any portion of the Loan not used for these stated purposes.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES

7. Borrower makes the following representations and warranties:

   a. **Organization and Powers.** Borrower is a nonprofit corporation duly formed, validly existing, and in good standing under the laws of the State of Delaware. Borrower has the power and authority to own and operate its assets and properties and to carry on its activities as now conducted and as contemplated to be conducted. Borrower is duly qualified or licensed and in good standing as a foreign corporation authorized to conduct its activities in all jurisdictions, including the State of New York, in which the character of the assets and properties owned or the nature of the activities conducted makes such qualification or licensing necessary, except where the failure of which would not reasonably be expected to result in a material adverse change in the activities, operations, assets or properties or in the condition, financial or otherwise, of Borrower or impair the ability of Borrower to perform its obligations under this Agreement or the Note (collectively, the "Loan Documents") or prevent the use of the proceeds of the Loan as contemplated by the Loan Documents (collectively, a "Material Adverse Effect on Borrower").

   b. **Tax Status.** Borrower has received and maintains a current and unrevoked determination issued by the United States Internal Revenue Service recognizing Borrower as exempt from federal income taxation under Section 501(a) of the Internal Revenue Code of 1986, as amended (the "Code") as an organization described in Code Section 501(c)(3) and a publicly supported organization and not a private foundation under Code Sections 509(a)(1) and 170(b)(1)(A)(vi).

   c. **Authorization.** The execution, delivery and performance by Borrower of the Loan Documents, the borrowing hereunder and the use by Borrower of the proceeds of the Loan as contemplated by the Loan Documents are within Borrower's powers and have been duly authorized by all requisite corporate action. The Loan Documents

2

WON01667

have been duly executed and delivered on behalf of Borrower, and constitute the legal, valid and binding obligations of Borrower enforceable in accordance with their respective terms.

d. **Litigation.** There is no judgment, action, suit, claim, proceeding or investigation pending or threatened before any court or governmental or administrative body or agency, nor is there any basis for any such action, that may reasonably be expected to result in a Material Adverse Effect on Borrower. Borrower is not in violation of or alleged to be in violation of any judgment, writ, injunction, decree, rule, or regulation of any court or any governmental or administrative body or agency.

e. **No Conflicts.** The execution, delivery and performance by the Borrower of the Loan Documents and the use of the Loan proceeds contemplated hereby will not violate any provision of law, any order, rule, regulation, or judgment of any court or governmental or regulatory body, the Articles of Incorporation or Bylaws of the Borrower, or any indenture, agreement, instrument, or deed of trust to which the Borrower is a party or by which the Borrower or any of its assets or properties is bound or conflict with, result in a breach of, or constitute a default under any such indenture, agreement, instrument, or deed of trust, or result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of the assets or properties of Borrower, except as otherwise permitted, required, or contemplated by the Loan Documents. The Borrower is not a party to any indenture, agreement, or instrument, nor subject to any restriction, which adversely affects the ability of the Borrower to perform its obligations under the Loan documents. Borrower is not in default or alleged to be in default under any indenture, agreement, or instrument for borrowed money, or under any indenture, agreement, or instrument which, if in default, might reasonably be expected to result in an adverse change in the activities, operations, assets, properties, or condition, financial or otherwise, of the Borrower, or to impair the ability of the Borrower to perform its obligations under the Loan Documents.

f. **No Default.** Borrower is in compliance with all of the terms and provisions set forth in the Loan Documents on its part to be observed or performed, and no event of default (as defined in this Agreement), or any event that, with notice or lapse of time or both, would constitute any such event of default, has occurred.

g. **Financial Condition.** There has been no material adverse change in Borrower's financial condition since the dates of the Borrower's most recent annual financial statements.

h. **Taxes.** Borrower has filed all tax and information returns (or extensions thereof) required to be filed by Borrower in any jurisdiction, and has paid all taxes, assessments, fees or other governmental charges which have become due and payable.

i. **Merger.** Borrower will not merge into, dissolve, or voluntarily declare itself insolvent.

j. **Debt.** Borrower will not issue any debt that ranks senior to or pari passu with the Loan without Lender's written consent.

3

WON01668

## ARTICLE 4
## CLOSING CONDITIONS

8.     The Loan Documents shall have been duly executed as appropriate and delivered to the Lender and shall be in full force and effect. On or before the Closing Date, Borrower shall have delivered to the Lender certified corporate resolutions of the Borrower evidencing approval of the form, terms, and conditions of the Loan Documents by the Borrower's governing body, and the authorization of the Borrower's officers to sign and deliver this Agreement and the Note and all such certificates of good standing and certified or other copies of corporate formation documents of the Borrower, and such other documents as may be reasonably requested by the Lender. On the Closing Date, all legal matters in connection with this Agreement and the transactions contemplated hereunder shall be satisfactory to counsel for both the Lender and the Borrower.

## ARTICLE 5
## COVENANTS

9.     **PROGRAM RELATED INVESTMENT.** Borrower shall satisfy all program-related investment requirements established by Lender, including, but not limited to, use of the Loan proceeds to advance the mission of Borrower. Borrower and Lender acknowledge and agree that no significant purpose of the Loan is the production of income or the appreciation of property.

10.    **NO LEGISLATIVE OR POLITICAL USES.** Borrower shall not use any proceeds of the loan to accomplish any of the purposes described in Code Section 170(c)(2)(D). Borrower shall not use any proceeds of the Loan to carry on propaganda or otherwise to attempt to influence legislation within the meaning of Code Section 4945(d)(1), or to influence the outcome of any specific public election, or to carry on, directly or indirectly, any voter registration drive (within the meaning of Code Section 4945(d)(2)).

11.    **NET ASSETS.** Borrower will at all times during the term of this Loan Agreement maintain positive net assets, including maintaining net assets in excess of $1.5 million and maintaining annualized expenditures of 50% or more of all public donations on program service activities.

12.    **PAYMENT OF INDEBTEDNESS AND TAXES.** Borrower shall pay all of its indebtedness and obligations promptly and in accordance with the terms thereof, file or cause to be filed all Federal, state, and local tax or information returns required to be filed by it, and pay and discharge or cause to be paid and discharge or cause to be paid and discharged promptly any taxes, assessments, and governmental charges or levies imposed upon it or upon its income or profits, or upon any of its property or upon any part thereof, before the same shall become in default, as well as all lawful claims for labor, materials and supplies, or otherwise which, if unpaid, might become a lien or charge upon its property, or any part thereof; *provided, however,* that the Borrower shall not be required to pay and discharge or to cause to be paid and discharged any such indebtedness, obligation, tax, assessment, charge, levy, or claim so long as the validity thereof shall be contested in good faith by appropriate proceedings and the Borrower shall have set aside on its books adequate reserves therefor.

4

WON01669

**13. REPORTING REQUIREMENTS OF BORROWER.** Within 30 days of the end of each 12-month period (*i.e.*, each 12-month period ending on December 31) during the term of the Loan, Borrower shall furnish or cause to be furnished to the Lender a written report setting forth, at a minimum: (i) an accounting of all expenditures of proceeds of the Loan expended during that 12-month period, and cumulatively, by category and amount of expenditure, as well as the amount of any unexpended Loan proceeds held by Borrower; (ii) a report of additional funds raised to date by Borrower; (iii) the number and nature of surgeries performed by Borrower in the period covered by the report, including the number and nature of surgeries funded by proceeds of the Loan, and the names of the health care providers (*e.g.*, hospital or clinic) where the surgeries were performed; (iv) the financial position of the Borrower (including the provision to the Lender of Borrower's audited financial statement on an annual basis); and (v) any other material information demonstrating Borrower's progress in accomplishing its mission and its ability to repay the Note at maturity.

**14. BOOKS AND RECORDS.** Borrower shall maintain books and records adequate to verify the information supplied in Section 13 of this Agreement and shall retain such books and records for a period of four (4) years after repayment of the Loan and make such books and records available to Lender at reasonable times for inspection. KPMG presently serves as the independent auditor of Borrower and Borrower hereby agrees to notify Lender of any change in auditor.

**15. NOTICE TO LENDER.** Borrower shall advise Lender of the occurrence of any of the following events:

a. Any change in the positions or responsibilities held by the Borrower's key personnel, who shall be the officers elected by Borrower's governing body, serving in the capacity as Borrower's Chief Executive Officer and/or Chief Financial Officer.

b. The commencement or threatened commencement of an action, suit, claim, or proceeding against Borrower, its officers or directors in or before any federal, state or local court or arbitration tribunal or governmental or administrative body or agency (each, a "Governmental Entity"), or the taking of any adverse regulatory action by a Governmental Entity against Borrower, its officers or directors.

c. Any final judgment or order by a Governmental Entity that could have a Material Adverse Effect upon the operations, assets, or properties of the Borrower.

d. Any denial of or challenge to the status of the Borrower as an organization described in Code Sections 501(c)(3), 509(a)(1) and 170(b)(1)(A)(vi) by any governmental authority.

e. Any change in circumstances that would cause the Loan no longer to serve the purposes set forth in this Agreement.

f. Any material adverse change in the condition, financial or otherwise, or operations of the Borrower.

g. Any Event of Default or other event that, with notice or lapse of time or both, would constitute an Event of Default.

5

WON01670

**16. NO MATERIAL CHANGE.** Borrower shall not make any material change in the nature of its activities as presently conducted that would adversely affect the Borrower's ability to perform under the Loan Documents. Furthermore, Borrower shall not conduct its activities in a manner that materially departs from the representations made in the documents submitted by Borrower to Lender in connection with Borrower's request for this Loan.

**17. ACQUISITION; MERGER; DISPOSAL OF ASSETS.** While any sums remain outstanding on the Loan, the Borrower shall not (a) acquire all or substantially all of the assets or properties of any other entity, except by gift, bequest, or other donation, or pursuant to the enforcement of a loan or security interest; (b) sell, lease, transfer, or otherwise dispose of any substantial part of its assets or properties; or (c) dissolve, liquidate, merge, or consolidate with or into any other person firm, corporation, or other entity without the prior consent of Lender.

**18. GOVERNING DOCUMENTS AMENDMENTS.** Borrower shall not amend its Articles of Incorporation or Bylaws in any manner that would cause the Borrower to be in violation of any provision of the Loan Documents or which would jeopardize the ability of the Borrower to perform its obligations under the Loan Documents.

**19. FUTURE INDEBTEDNESS.** Aside from additional, similar, impact loan arrangements, Borrower shall not incur, create, assume, or suffer to exist any debt or obligation for borrowed money other than the Loan and indebtedness incurred in the ordinary course of business that does not materially adversely affect the ability of the Borrower to perform any of its obligations under the Loan Documents; provided, however, in accordance with Section 6, above, Borrower shall not issue any debt that ranks senior to, or pari passu with, the Note without the written consent of Lender.

## ARTICLE 6
## EVENTS OF DEFAULT AND REMEDIES

**20. EVENTS OF DEFAULT.** Borrower shall be deemed to be in default under this Agreement upon the occurrence of any of the following events (each, an "Event of Default"):

   a. Borrower fails to make any payment of principal or interest that is due and payable hereunder, and such default continues unremedied for fifteen (15) days after notice to the Borrower.
   b. Borrower uses any portion of the proceeds of the Loan for a purpose or in a manner other than specifically authorized by this Agreement, and in particular, Section 6 of this Agreement.
   c. Any representation or warranty made in the Loan Documents, or in any report, certificate, financial statement, or instrument furnished in connection with this Agreement or the Loan, shall prove to have been false or misleading when made, in any material respect.
   d. Borrower violates or fails to observe or perform any other covenant contained herein, or any agreement on the part of the Borrower to be observed or performed pursuant to the Loan Documents, other than those referred to above in this Section 20, and such default shall continue unremedied for thirty (30) days after notice to the Borrower.

6

WON01671

e. Borrower shall have an order for relief entered against it by a bankruptcy court; or admit in writing its inability to pay its debts as they mature; or make an assignment for the benefit of creditors; or apply for or consent to the appointment of any receiver, trustee, or similar officer for it or for all or any substantial part of its property; or suffer the appointment of such receiver, trustee, or similar officer, which appointment shall continue undischarged for a period of thirty (30) days; or institute any bankruptcy, insolvency, reorganization, arrangement, readjustment of debt, dissolution, liquidation, or similar proceeding relating to the borrower under the laws of any jurisdiction; or suffer the institution of any such proceeding against the Borrower, which proceeding shall remain pending or unstayed for a period of thirty (30) days; or by any act indicate its consent to, approval of, or acquiescence in such proceeding or the appointment of any receiver or trustee for the Borrower or any substantial part of its property.

21. **REMEDIES ON DEFAULT.** If an Event of Default occurs or is continuing, at the option of the Lender, the Lender may, by written notice to the Borrower, declare the Note and any and all other indebtedness of the Borrower to the Lender immediately due and payable, whether or not the Note or the other indebtedness shall be otherwise due and payable and whether or not the Lender shall have initiated any other action for the collection of the Note; whereupon the Note and such other indebtedness shall become due and payable, as to the principal, interest, and any other amounts payable, without presentment, demand, protest, or notice of any kind, all of which are hereby expressly waived by the Borrower. In addition, the Lender may pursue any and all remedies available to it at law or in equity for the collection of the Note and enforcement of the provisions hereof.

22. **EXPENSES.** Borrower shall pay upon demand Lender's attorneys' fees and litigation costs and expenses incurred by Lender if any attorney is engaged by Lender because of any Event of Default hereunder or to enforce or, with respect to any third party claim, defend any provision of this Agreement or the Note.

## ARTICLE 7
## MISCELLANEOUS

23. **INDEMNIFICATION.** Borrower hereby indemnifies and agrees to defend and hold harmless the Lender, its members, directors, officers, employees, agents, and affiliates, from and against any and all losses, liability damages, and expenses (including attorneys' fees and expenses) which any of them may incur or be obligated to pay in any action, claim, or proceeding against them or any of them, for or by reason of any acts, whether of omission or commission, that may be committed or omitted by the Borrower or any of its servants, agents, or employees, in connection with this Agreement. The provisions of this Article and the Borrowers' obligations hereunder shall survive any expiration, termination, or rescission of this Agreement. In the event that a judgment, levy, attachment, or other seizure is entered against the Lender arising from any claim within the scope of this indemnification, the Borrower shall promptly post any necessary bond to prevent execution against any property of the Lender.

7

WON01672

**24.    PROGRAM SERVICE REVIEW.** During the term of this Loan Agreement, the Lender shall be allowed to visit Borrower partner hospitals and observe the work of Borrower which has been enabled through their Loan to Borrower.

**25.    COMMUNICATIONS/CONFIDENTIALITY.** Any communication, including, but not limited to, press releases, website communications, or other marketing communications, that refers to the Lender or this Loan must be reviewed and approved in advance in writing by a designated representative of Lender. It is intended that Lender's identity shall be confidential between the Lender and Borrower.

**26.    ENTIRE AGREEMENT.** This Agreement and the Exhibits attached hereto constitute the entire agreement between the parties with respect to the transactions contemplated hereby and supersede all prior agreements or understandings, written or oral, in respect hereof.

**27.    NOTICES.** Any notice or communication required or desired to be given hereunder by either of the parties to the other shall be in writing and delivered by hand, via facsimile transmission, or mailed by first class mail or by nationally-recognized overnight courier, postage prepaid, addressed to the party at its address appearing below:

**If to Borrower:**     WonderWork, Inc.
d/b/a Surgery For The Poor, Inc.
Attention: Brian Mullaney, CEO
420 Fifth Avenue, 27th Floor
New York, NY 10018
Ph (212) 729-1855
Fax (212) 729-4541

**If to Lender:**



**28.    WAIVER; REMEDIES.** No waiver of any provision hereof shall be valid unless in writing signed by the party waiving its rights under the provision. No course of dealing or delay or failure on the part of either party in exercising any right, power, or privilege hereunder shall operate as a waiver thereof or otherwise prejudice such party's rights, powers, or remedies, nor shall any waiver in any particular instance of any right, power, or privilege hereunder on the part of either party operate as a waiver of such right or any other right, power, or privilege hereunder in any other instance.

**29.    ASSIGNMENT OR SALE.** The Lender may not assign or sell all or any portion of its rights or obligations under the Loan Documents without the express written consent of Borrower, which consent shall not be unreasonably withheld, conditioned or delayed. In the event of any such assignment or sale, the assignee or payor shall be accorded the full rights of the Lender by the Borrower with respect to such assignment or sale. The Borrower may not assign or sell all or

8

WON01673

any portion of its rights or obligations under the Loan Documents without the prior written consent of the Lender.

**30.** **HEADINGS.** The headings in the Loan Documents are for convenience of reference only and shall not affect the meaning or interpretation of the Loan Documents.

**31.** **COUNTERPARTS.** This Agreement may be executed in counterparts, each of which shall constitute an original, but all of which, when taken together, shall constitute only one agreement.

**32.** **GOVERNING LAW.** The Loan Documents shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be performed entirely within such State.

**33.** **SEVERABILITY.** If any provision of the Loan Documents shall for any reason be held to be illegal, invalid, or unenforceable, such illegality shall not affect any other provision of the Loan Documents, but the Loan Documents shall be construed as if such illegal, invalid, or unenforceable provision had never been contained herein.

**34.** **MODIFICATION; AMENDMENT.** No change, modification or amendment of any provision hereof shall be valid unless in writing signed by the party to be bound.

9

WON01674

IN WITNESS WHEREOF, the parties' duly authorized representatives have signed this Agreement below.

By: ███████████

Name: ███████████

Title: President

Date: April 21, 2014

WONDERWORK, INC.
"BORROWER"

By: _Hana Fuchs_

Name: HANA FUCHS

Title: CEO

Date: 4/23/14

WON01675

Exhibit A
Unsecured Promissory Note

$1,000,000.00                                    New York, New York
Two Percent (2%)                                 Maturity Date: May 1, 2019

   WonderWork, Inc., a Delaware tax-exempt, nonprofit corporation (the "Borrower"), for value received, hereby promises to pay to the order of ▮▮▮▮▮▮▮▮▮▮ (the "Lender"), or holder, at ▮▮▮▮▮▮▮▮▮ or at such other place or places in the United States of America as the holder hereof may designate in writing from time to time, the principal sum of One Million Dollars, or so much thereof that is advanced from time to time, under the terms of the Loan Agreement ("Loan Agreement") between Borrower and Lender, of even date herewith, with interest accruing on the unpaid principal balance outstanding from time to time at the rate of two percent (2%) per annum, from the date of disbursement through and until the date on which such principal amount is fully repaid. The entire unpaid principal balance, together with all accrued but unpaid interest, shall be due and payable on May 1, 2019 (the "Maturity Date").

   The Borrower may, without notice, prepay the Loan in whole or in part, without premium or penalty, at any time or from time to time, with accrued interest to date of such prepayment, if any; provided, however, that each such prepayment shall be applied first to interest accrued but unpaid on the entire outstanding principal balance of the Note through the date of such prepayment, if any, and then to principal.

   This Note is the Note referred to in the Loan Agreement, and the holder hereof is entitled to the benefits of such Loan Agreement and may enforce the provisions thereof and exercise the remedies provided thereunder or otherwise available in respect thereof. Any capitalized term not defined herein shall have the meaning set forth in the Loan Agreement. To the extent that the terms of the Note are in conflict with the Loan Agreement, the terms of the Loan Agreement shall control.

   Principal and interest under this Note shall be paid as and when provided in the Loan Agreement, and the terms therefor provided therein are incorporated herein. Payment of principal and interest shall be made in lawful money of the United States of America. Whenever any payment to be made hereunder would otherwise be due on a Saturday, Sunday, or public holiday under the laws of the State of New York, such payment shall be due on the next succeeding business day.

   This Note shall be payable without presentment, demand, protest, or notice of any kind, all of which are unconditionally waived by the Borrower.

   Borrower agrees to perform and comply with each of the covenants, conditions, provisions and agreements of Borrower contained in the Loan Agreement. No waiver of any provision of this Note or the Loan Agreement, made by agreement of the holder hereof or any other person or party, shall constitute a waiver of any other term hereof or of the Loan Agreement, or otherwise release or discharge the liability of Borrower under this Note.

   This Note shall be governed by and construed in accordance with the laws of the State of New York.

By: ▮▮▮▮▮▮▮

Name/Title: ▮▮▮▮▮▮▮          President

By: _____

Name/Title: HANA FUCHS          CFO

# FIRST AMENDMENT TO LOAN AGREEMENT

This First Amendment to Loan Agreement (the "First Amendment") is entered into as of ____
__March 31, 2015__ by and between the [ ] a private foundation
(the "Lender") and WonderWork, Inc., a Delaware tax-exempt, not for profit corporation (the
"Borrower").

**WHEREAS,** the Lender and the Borrower (the "Parties") entered into that certain Loan
Agreement dated May 1, 2014 (the "Loan Agreement");

**WHEREAS,** pursuant to Section 34 of the Loan Agreement, the Parties reserved the right
to amend any provision of the Loan Agreement by writing signed by the party to be bound; and

**WHEREAS,** the Parties desire to amend the Loan Agreement;

**NOW, THEREFORE,** in consideration of the foregoing premises, and for other good
and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the
Parties hereto agree as follows:

1. **ARTICLE 5.** Section 11 of Article 5 of the Loan Agreement shall be amended to read as
follows:

   a. **11. ASSETS.** Borrower will at all times during the term of this Loan
   Agreement maintain positive assets, including maintaining assets in excess of
   $1.5 million and maintaining annualized expenditures of 50% or more of all
   public donations on program service activities. Borrower and Lender
   understand that "net assets" is not contemplated under the terms of this
   paragraph.

2. **ENTIRE AGREEMENT.** Except as otherwise modified herein, the Loan Agreement,
together with this First Amendment constitute the entire agreement between the parties with
respect to the transactions contemplated hereby and supersede all prior agreements or
understandings, written or oral, in respect hereof.

3. **COUNTERPARTS.** This First Amendment may be executed in counterparts, each of
which shall constitute an original, but all of which, when taken together, shall constitute only one
agreement.

4. **GOVERNING LAW.** This First Amendment shall be governed by and construed in
accordance with the laws of the State of New York applicable to agreements made and to be
performed entirely within such State.

5. **SEVERABILITY.** If any provision of this First Amendment shall for any reason be held
to be illegal, invalid, or unenforceable, such illegality shall not affect any other provision of this
First Amendment, but the First Amendment shall be construed as if such illegal, invalid, or
unenforceable provision had never been contained herein.

6. **MODIFICATION; AMENDMENT.** No change, modification or amendment of any
provision hereof shall be valid unless in writing signed by the party to be bound.

IN WITNESS WHEREOF, the Parties' duly authorized representatives have signed this
Agreement below.

WONDERWORK, INC
("BORROWER")

By: [redacted]
Name: [redacted]
Title: [redacted]
Date: 3-16-15

By: _____
Name: Brian Mullaney
Title: CEO / Co-Founder
Date: 3-31-15

# EXHIBIT 116

| | |
|---|---|
| **From:** | Brian Mullaney <brian@wonderwork.org> |
| **Sent:** | Wednesday, September 11, 2013 8:11 PM |
| **To:** | ████████████████ |
| **Subject:** | impact loan projections |
| **Attachments:** | WW 10 Year Forecast TMT.xlsx |

Gentlemen,

I wanted to make you aware of two issues regarding our loan agreement.

The first is that we are required to maintain minimum net assets of $5,000,000. Now, in the presentation I gave you we do meet this requirement BUT we do it by including our 70,000 donors as assets. I don't think you will have a problem with this but I wanted to make sure you are aware of this. I actually came up with this clause at the end of our agreement changes and to be honest, I should have given it more thought before I added it. Our unrestricted cash assets are around $3.5 million at the moment.

The other issue is another clause we added to our contract at the last minute without really deliberating on it: minimum spending on programs. As you can see from the attached spreadsheet – which is a working budget we are going to finalize for our October 8th board meeting – our program spending starts out at around 55% and rises slowly over time to 75%. Now it is very hard for a new charity, starting out, investing a lot of money into direct mail to meet a 75% program program spending ratio. The Better Business Bureau recommends a 65% ratio and the American Institute of Philanthropy recommends a 60% minimum so we are in that neighborhood. I do not think these numbers shown in the spreadsheet will in any way impede our progress or attractiveness to donors. Also, as I told you when we met, this is a super conservative projection and I anticipate we will exceed these numbers. But because we now have 16 Founding Investors, I want to make sure we under promise and over deliver. Especially if we attract a lot of media interest regarding our Impact Loan. These projections do not account for any of our Founding Donors forgiving any part of their impact loans – which we will expect many will do (they have told us this.) When this happens our major gifts will rise and our interest payments will drop.

What I would suggest – if it is okay with both of you – that we watch both of these numbers carefully as we grow. I will be giving you both regular progress reports and it will not take long to see if these are real issues or not.
And if it becomes a problem and you are unhappy with our performance and hitting these numbers we will make adjustments so we will. We could of course hit both numbers right away but it would significantly slow our growth.

Sorry for the long email. Please take a look and let me know your thoughts. If you want to discuss on the phone I am happy to do so.

I also look forward to any other comments you might have on my presentation too. We will be discussing and finalizing this budget October 8th and welcome your input and expertise.

Thank you both,


Brian


**Brian Mullaney**
Co-Founder/CEO
WonderWork
420 Fifth Avenue, 27th Floor
New York, NY 10018

CONFIDENTIAL WON07611

tel: 212.729.1855
cell: 917.902.7550
email: brian@wonderwork.org
www.WonderWork.org

CONFIDENTIAL

WON07612

| | Sep-13 | Oct-14 | Oct-15 | Oct-16 | Oct-17 | Oct-18 | Oct-19 | Oct-20 | Oct-21 | Oct-22 | Oct-23 | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DM spending | | $9,910,344 | $15,077,205 | $15,949,765 | $16,777,258 | $17,619,623 | $18,457,079 | $19,296,156 | $20,134,698 | $20,973,416 | $21,812,077 | $176,007,621 |
| DM revenue | | $6,472,502 | $12,264,946 | $15,373,443 | $18,321,384 | $21,322,309 | $24,305,749 | $27,294,959 | $30,282,265 | $33,270,200 | $36,257,927 | $225,165,686 |
| DM net | | -$3,437,841 | -$2,812,259 | -$576,322 | $1,544,127 | $3,702,687 | $5,848,670 | $7,998,803 | $10,147,567 | $12,296,783 | $14,445,850 | $49,158,065 |
| Donors | | 194,418 | 427,694 | 643,970 | 860,245 | 1,076,521 | 1,292,797 | 1,509,072 | 1,725,348 | 1,941,624 | 2,157,899 | 2,157,899 |
| President's Circle | | $500,000 | $1,400,000 | $2,200,000 | $3,000,000 | $3,800,000 | $4,500,000 | $5,162,000 | $5,900,000 | $6,656,000 | $7,400,000 | $40,518,000 |
| Major gifts | | $3,000,000 | $4,000,000 | $6,000,000 | $6,000,000 | $8,000,000 | $8,000,000 | $9,000,000 | $10,000,000 | $11,000,000 | $12,000,000 | $77,000,000 |
| Foundations | | $100,000 | $200,000 | $300,000 | $400,000 | $500,000 | $600,000 | $700,000 | $800,000 | $900,000 | $1,000,000 | $5,500,000 |
| Investment income | | $645,000 | $564,215 | $487,773 | $471,617 | $461,589 | $541,518 | $76,223 | $91,974 | $130,660 | $185,484 | $3,656,053 |
| Gross revenue | | $10,717,502 | $18,429,160 | $24,361,217 | $28,193,001 | $34,083,898 | $37,947,267 | $42,233,183 | $47,074,239 | $51,956,860 | $56,843,410 | $351,839,739 |
| Net revenue | | $807,159 | $3,351,956 | $8,411,451 | $11,415,744 | $16,464,276 | $19,490,187 | $22,937,027 | $26,939,541 | $30,983,444 | $35,031,334 | $175,832,118 |
| Program spending info | | $4,955,172 | $7,538,602 | $7,974,883 | $8,388,629 | $8,809,811 | $9,228,540 | $9,648,078 | $10,067,349 | $10,486,708 | $10,906,038 | $88,003,810 |
| Program spending intl | | $1,500,000 | $3,000,000 | $5,000,000 | $7,000,000 | $8,000,000 | $12,500,000 | $15,000,000 | $17,500,000 | $20,000,000 | $25,000,000 | $114,500,000 |
| Program spending ovr | | $750,000 | $750,000 | $875,000 | $875,000 | $1,000,000 | $1,000,000 | $1,125,000 | $1,125,000 | $1,250,000 | $1,250,000 | |
| Program spending total | | $7,205,172 | $11,288,602 | $13,849,883 | $16,263,629 | $17,809,811 | $22,728,540 | $25,773,078 | $28,692,349 | $31,736,708 | $37,156,038 | $212,503,810 |
| % spent on programs | | $4.46% | 56.73% | 60.17% | 62.92% | 63.74% | 68.95% | 70.52% | 71.94% | 73.00% | 75.35% | 65.78% |
| Total spending | | $13,230,344 | $19,897,205 | $23,019,765 | $25,847,258 | $27,939,623 | $32,957,079 | $36,546,156 | $39,884,698 | $43,473,416 | $49,312,077 | |
| Surgeries | | 42,857 | 85,714 | 142,857 | 200,000 | 228,571 | 357,143 | 428,571 | 500,000 | 571,429 | 714,286 | 3,271,429 |
| Overhead and admin | | $1,500,000 | $1,500,000 | $1,750,000 | $1,750,000 | $2,000,000 | $2,000,000 | $2,250,000 | $2,250,000 | $2,500,000 | $2,500,000 | $20,000,000 |
| Impact loan interest | | $320,000 | $320,000 | $320,000 | $320,000 | $320,000 | | | | | | |
| Yearly net surplus | | -$2,692,841 | -$2,548,044 | -$538,549 | -$334,256 | $2,664,276 | $490,187 | $525,027 | $1,289,541 | $1,827,444 | $131,334 | $814,118 |
| | | | | | | | $2,540,773 | | | | | |
| | | | | | | | $2,000,000 | | | | | |
| | | | | | | | $540,773 | | | | | |
| | | | | | | | Repay Impact Loans | | | | | |
| Total assets | $21,500,000 | $18,807,159 | $16,259,114 | $15,720,566 | $15,386,309 | $18,050,585 | $2,540,773 | | | $6,182,785 | $6,314,118 | |
| Total liabilities | $18,000,000 | $18,000,000 | $18,000,000 | $18,000,000 | $18,000,000 | $18,000,000 | $2,000,000 | | | $2,000,000 | $2,000,000 | |
| Net surplus | $3,500,000 | $807,159 | -$1,740,886 | -$2,279,434 | -$2,613,691 | $50,585 | $540,773 | | | $4,182,785 | $4,314,118 | |

WON07613

# EXHIBIT 117

**Subject:** FW: Contribution to WW
**Date:** Friday, December 20, 2013 3:02:07 PM Eastern Standard Time
**From:** Brian Mullaney
**To:** Karen Lazarus

Good news.

Can you please send this letter that they have requested to Roger?

And let Hana know to reduce his loan amount – and our liabilities  - by $50,000.

Thanks.


B.



**Brian Mullaney**
Co-Founder/CEO
WonderWork
420 Fifth Avenue, 27th Floor
New York, NY  10018
tel: 212.729.1855
cell: 917.902.7550
email: brian@wonderwork.org
www.WonderWork.org

**From:** ██████████████████████ >
**Date:** Friday, December 20, 2013 12:27 PM
**To:** brian mullaney <brian@wonderwork.org>
**Cc:** "rwade@gwwade.com" <rwade@gwwade.com>
**Subject:** Contribution to WW

Brian, As I mentioned I intend to remit $50,000 of my loan to WonderWork and make an additional contribution of $25,000. You may take this letter as my agreement as to the $50K and I will give you a check for the $25K when I see you next week. Roger would then like you to send me a plain vanilla letter on WW stationary acknowledging my contribution of $75K in 2013. Thanks ██

██████████

CONFIDENTIAL



Miracle surgeries for children.

Brian Mullaney
Co-Founder and CEO

December 21, 2015



Dear ▮

Thank you for the early and – very generous – Christmas present!

We acknowledge your recent donation of $50,000 on 12/21/15 and have forgiven this amount from your current $150,000 outstanding loan to WonderWork.

Your support couldn't have come at a better time. It will help us provide free surgery to more than 1,000 children and adults who are blind, severely burned and crippled with clubfoot. We're looking forward to putting it to good use as soon as possible.

On behalf of our 70 partners and their grateful patients and families, thank you for making the life-changing surgeries we provide possible.

All the best,

Brian
Co-Founder
212-729-1855
brian@wonderwork.org

P.S. Karen, Delois & Hana want to thank you too. They also want to wish you a happy and, most important, healthy 2016.

This is your tax receipt: WonderWork is a non-profit 501 (c)(3) organization. Since no goods or services were provided in exchange for your gift of $50,000 received on 12/21/15 it is tax-deductible to the full extent allowed by law.

TIME magazine named WonderWork one of "10 Ideas That Can Change The World."

420 Fifth Avenue, New York, NY 10018  Tel: 212.729.1855  WonderWork.org

CONFIDENTIAL

# EXHIBIT 118



Miracle surgeries for children.

Brian Mullaney
Co-Founder and CEO

October 7, 2014



Dear ███,

Thank you so much for being so generous – ONCE AGAIN! - and for helping us make such a tremendous impact on the lives of so many of our patients.

We acknowledge your recent donation of $100,000 from the ███████ ███████ on 10/7/14 and have forgiven this amount from your outstanding loan to WonderWork.

| | |
|---|---|
| Original Loan Amount (5/1/14): | $1,000,000.00 |
| Current Loan Balance with Interest: | $906,666.67 |
| Interest Accrued (2%) thru 9/30/14: | $6,666.67 |

Your support will help us provide free surgery to thousands of children and adults who are blind, severely burned and crippled with clubfoot.

On behalf of our 70 partners and their grateful patients and families, thank you for making the life-changing surgeries we provide possible.

All the best,

Brian
Co-Founder
212-729-1855
brian@wonderwork.org

TIME magazine named WonderWork one of "10 Ideas That Can Change The World."

420 Fifth Avenue, New York, NY 10018 Tel: 212.729.1855 WonderWork.org

CONFIDENTIAL

WON07783

February 5, 2016



Dear █

Thank you very much for forgiving another portion of your impact loan.

We acknowledge your recent donation of $100,000 from the ██████████ ██████████ on 2/5/16 and have forgiven this amount from your outstanding loan to WonderWork.

| | |
|---|---|
| Original Loan Amount (5/1/14): | $1,000,000.00 |
| Current Loan Balance with Interest: | $830,833.33 |
| Interest Accrued (2%) to date: | $30,833.33 |

Your support couldn't have come at a better time. It will help us provide free surgery to more than 2,000 children and adults who are blind, severely burned and crippled with clubfoot. We're looking forward to putting it to good use as soon as possible.

On behalf of our 75 partners and their grateful patients and families, thank you for making the life-changing surgeries we provide possible.

All the best,

Brian
Co-Founder
212-729-1855
brian@wonderwork.org

# EXHIBIT 119



*"A surgery that can change a child's life is one of the best investments anyone can make."* —Warren Buffett
WonderWork Supporter

Miracle surgeries for children.

*"...one of 10 ideas that will change the world."*
– TIME

**BOARD OF DIRECTORS & ADVISORY BOARD**

Brian Mullaney
Co-Founder & CEO,
WonderWork

Steven D. Levitt
Author, Freakonomics

John (JJ) Coneys
Former Vice Chair, PwC

Ravi Kant
Former Vice Chair, Tata Motors

Clark Kokich
Executive Chairman, Marchex

Steven Rappaport
Partner, RZ Capital

Richard Steele
Principal, SYPartners

Richard Price
Chief Executive, Asia Pacific,
CBRE Global Investors

Mark Atkinson
Creative Director, Otto

Tamsen Ann Ziff
Chairman, Metropolitan Opera

Kenneth French
Tuck School at Dartmouth

Garrett Moran
President, Year Up

**SUPPORTERS**

Bryan Cranston
Actor

Christie Brinkley
Actor/Model

Howie Mandel
Comedian

Mariska Hargitay
Actor

Alex Trebek
Host of Jeopardy!

Bette Midler
Entertainer

Chris Meloni
Actor

Candice Bergen
Actor

Jane Kaczmarek
Actor

Sir Ben Kingsley
Actor

December 22, 2016



Dear █████████,

Wow! Thank you both for the early Christmas gift!

We just received news from ████████████ that you wish to forgive another $50,000 from your impact loan. Thank you so much for your generosity and tremendous support.

This letter will serve to acknowedge your recent donation of $50,000 from the ███████████████████████ on 12/22/16 and that you have forgiven this amount from your outstanding loan to WonderWork.

| | |
|---|---|
| Original Loan Amount (08/26/13): | $250,000 |
| Forgiveness (05/7/14): | $50,000 |
| Forgiveness (11/10/14): | $50,000 |
| Forgiveness (08/26/15): | $50,000 |
| Forgiveness (12/22/16): | $50,000 |
| Current Loan Amount (12/22/16): | $50,000 |
| Current Loan Balance with Interest: | $60,083.33 |
| Interest Accrued (2%) to date: | $10,083.33 |

Thank you once again for your donation to support our free surgery programs!

100% of your donation will go towards our programs that help provide surgery for poor children and adults who are blind, crippled with clubfoot or severely burned.

Thank you again! I look forward to seeing you both in 2017.

All the best,

Brian
Co-Founder
212-729-1855
brian@wonderwork.org


BBB. ACCREDITED CHARITY
give.org

100% of all donations goes towards our free surgery programs.
A founding donor pays all admin and fundraising expenses.

411 Fifth Avenue, Suite 702, New York, NY 10016   T. 212.729.1855   WonderWork.org

CONFIDENTIAL

WON07777

# EXHIBIT 120

## LOAN AGREEMENT FORGIVENESS

This is to confirm that ███████████ has agreed to forgive the full amount of his loan, inclusive of interest, accrued through March 31, 2015 in the amount of $102,500, pursuant to the original Loan Agreement dated December 19, 2013 by and between the ███████ ████████████████████████, a private foundation (the "Lender") and WonderWork, Inc. a Delaware tax-exempt, not for profit corporation (the "Borrower").

IN WITNESS WHEREOF, the Parties' duly authorized representatives have signed this Agreement below.

████████████████████

████████████████████████

Name: ████████████
Title: ~~Title~~
Date: 4-10-15

WONDERWORK, INC.
("BORROWER")

Name: Brian Mullaney
Title: CEO/ Co-Founder
Date: 3-31-15

CONFIDENTIAL

# EXHIBIT 121

**From:** Greg Lam [GregLam@cckc-law.com]
**Sent:** Tuesday, June 25, 2013 12:51 PM
**To:** Karen Lazarus; Brian Mullaney; Hana Fuchs
**Subject:** ███████
**Attachments:** WW ███████████████████doc; WonderWork ██████Note.doc; Note Terms FINAL.docx

**Follow Up Flag:** Follow up
**Flag Status:** Flagged

██████████████████████████████████████████████
████████████████████████████████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

3. When Clients Want Their Own Foundations

June 24, 2013                          *Wall Street Journal*

Arden Dale

A lot of people like the idea of having a private charitable foundation of their own, but financial advisers caution they're not suitable for everyone.

When the time comes for clients to give, their advisers can help them decide if a foundation is better than using a donor-advised fund or charitable trust, or simply writing a personal check. How much money a client wants to give is a crucial determining factor, along with the right personality and the passion to make the foundation succeed.

Operating a foundation is akin to running a business, advisers say. It requires tax filings and other money-management tasks, establishing by-laws, holding meetings with a board of trustees and recording minutes, and much more.

What may seem like a great idea at the outset can turn into an administrative or financial nightmare for the wrong person. Without solid guidance, the over-eager may get burned. That's why some advisers consider them too much of a hassle, and steer their clients away.

"They're going to get annoyed, and if you're the adviser who got them into a tough spot, there's backlash," said David Diesslin, an adviser in Fort Worth, Texas.

But those clients who do choose a private foundation are often after certain things they can't get through donor-advised funds and other charitable vehicles.

They have more control over their investments and gifts. And they can run their own programs, make gifts directly to individuals, groups and families facing hardships, emergencies or medical distress, and grant scholarships. Someone who contributes to a donor-advised fund doesn't have such flexibility.

"It's great for people who want to go to the gala and hand the check right to the person," said Rich

Polt, a spokesman for Foundation Source, which works with advisers and their clients to establish and help run new foundations.

The number of foundations has grown each year since 2000 (except for 2010). In 2011, there were some 73,764 independent, private foundations, up 8.1% from the previous year, according to the Foundation Center, which provides data on foundations.

For Mr. Diesslin of advisory firm Diesslin & Associates, it's all about heart and vision. If the idea of establishing a foundation isn't "owned by your client," he said, it likely won't work out well. He also has a dollar amount--$3 million--that he considers a rough minimum to commit to a private foundation. Only a handful of his clients have foundations.

Recently, Mr. Diesslin has been talking to a married couple who wants to set up a faith-related foundation with their parents and children. Serious philanthropists, the couple seeded the effort with a few hundred thousand dollars, with an eye toward putting $10 million to $15 million into it eventually.

The problem right now, he noted, is getting everyone in the family together so they can sit down and focus on the foundation. Everybody loved the idea of creating it, but scheduling has already become a stumbling block.

Beth Gamel, an adviser with Pillar Financial Advisors in Waltham, Mass., likens running a foundation to operating a business. Her advice: Don't set one up without the help of an attorney or accountant with specific experience in the niche. Explain to clients that the tax rules are complicated. Then, encourage them to keep good records and let the professionals handle the details.

One of her clients with a $10 million foundation had a hard time meeting the Internal Revenue Service requirement to give away 5% of a foundation's asset each year. In one instance, he ended up giving $300,000 to a donor-advised fund, which chose charities on his behalf.

Greg B. Lam
Attorney
Copilevitz & Canter
(816) 472-9000

Privileged and confidential information intended only for the use of the addressee. Attorney-client privilege applies. If you are not the intended recipient or the employee or agent responsible for delivering it to the intended recipient, any dissemination or copying of this communication is strictly prohibited. If you have received it in error, please notify us by telephone.

IRS CIRCULAR 230 Disclosure:
Under U.S. Treasury regulations, we are required to inform you that any tax advice contained in this e-mail or any attachment hereto is not intended to be used, and cannot be used, to avoid penalties imposed under the Internal Revenue Code.

# EXHIBIT 122

**From:** Greg Lam [GregLam@cckc-law.com]
**Sent:** Friday, January 03, 2014 6:27 PM
**To:** Karen Lazarus; Brian Mullaney
**CC:** Hana Fuchs
**Subject:** Forgiveness



Greg B. Lam
Attorney
Copilevitz & Canter
(816) 472-9000

Privileged and confidential information intended only for the use of the addressee. Attorney-client privilege applies. If you are not the intended recipient or the employee or agent responsible for delivering it to the intended recipient, any dissemination or copying of this communication is strictly prohibited. If you have received it in error, please notify us by telephone.

IRS CIRCULAR 230 Disclosure:
Under U.S. Treasury regulations, we are required to inform you that any tax advice contained in this e-mail or any attachment hereto is not intended to be used, and cannot be used, to avoid penalties imposed under the Internal Revenue Code.

# EXHIBIT 123

## Borenstein, Bill

**From:** Brian Mullaney <brian@wonderwork.org>
**Sent:** Wednesday, September 11, 2013 1:59 PM
**To:** 
**Subject:** impact loan projections
**Attachments:** WW 10 Year Forecast TMT.xlsx

Hi ████,

The attached spreadsheet is an extremely conservative 10 year projection for WonderWork that shows how the Impact Loan will be used and repaid.

If you want to "look under the hood" go to the other worksheet which shows the monthly activity year by year with response rates, average gifts, volumes etc. We have a very high degree of confidence in these projections because they are based on results from more than 23 million letters we have mailed over the past year or so.

Altogether, total revenues are less than HALF of what we raised at Smile Train. We are being very, very conservative as we need to under promise and over deliver.

If you'd like to meet and go over these numbers in person I'd be happy to, or, talk on the phone. As you will see, direct mail requires a lot of upfront investment because 90+ % of the expenses are front loaded. But over time, it does become quite lucrative. In the early years, we are depending on Major Gifts to give us the money we need for surgeries until our Direct Mail program turns profitable.

Many of our Impact Donors have told us they are going to forgive a portion of their loan as the years go by but we have not included that in this forecast. And our biggest Founding Investor, has told us he intends to forgive $2,500,000 of his Impact Loan unless we have a large surplus by then. We have not included that either. So I see these results as the absolute minimum that we could deliver.

We do not really know yet what the mix will be between our three causes - burns, blindness and clubfoot. We can provide 10 times more surgeries per dollar for blindness so it makes it a difficult discussion. For this projection, we used all the money for blindness which generates an unbelievable number of surgeries – 3,300,000!   If we did adopt this approach we would be the largest blindness charity in the world in 5 years.

I am excited to get your feedback and see if you have any good ideas or suggestions for us! I certainly value your intellectual capital as well!

And we are very grateful you are considering participating in our Impact Loan Campaign.  We are trying to complete the paperwork on all the loans today and we will not ask for the capital until we need it.

We will not need your $1,000,000 – if you decide to go ahead – until mid to late 2014.

Look forward to hearing from you!

All the best,


Brian

CONFIDENTIAL

WON07608

P.S. Hope you chat with ███████ goes well and that you get the opportunity to meet him. I think you two would really hit it off.

Brian Mullaney

Co-Founder/CEO
WonderWork
420 Fifth Avenue, 27th Floor
New York, NY 10018
tel: 212.729.1855
cell: 917.902.7550
email: brian@wonderwork.org
www.WonderWork.org

CONFIDENTIAL

| | Sep-13 | Oct-14 | Oct-15 | Oct-16 | Oct-17 | Oct-18 | Oct-19 | Oct-20 | Oct-21 | Oct-22 | Oct-23 | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DM spending | | $9,910,344 | $15,077,205 | $15,949,765 | $16,777,258 | $17,619,623 | $18,457,079 | $19,296,156 | $20,134,698 | $20,973,416 | $21,812,077 | $176,007,521 |
| DM revenue | | $6,472,502 | $12,264,946 | $15,373,443 | $18,321,384 | $21,322,309 | $24,305,749 | $27,294,959 | $30,282,265 | $33,270,200 | $36,257,927 | $225,165,686 |
| DM net | | -$3,437,841 | -$2,812,259 | -$576,322 | $1,544,127 | $3,702,687 | $5,848,670 | $7,998,803 | $10,147,567 | $12,296,783 | $14,445,850 | $49,158,065 |
| Donors | | 194,418 | 427,694 | 643,970 | 860,245 | 1,076,521 | 1,292,797 | 1,509,072 | 1,725,348 | 1,941,524 | 2,157,899 | 2,157,899 |
| President's Circle | | $500,000 | $1,400,000 | $2,200,000 | $3,000,000 | $3,800,000 | $4,500,000 | $5,162,000 | $5,900,000 | $6,656,000 | $7,400,000 | $40,518,000 |
| Major gifts | | $3,000,000 | $4,000,000 | $6,000,000 | $6,000,000 | $8,000,000 | $8,000,000 | $9,000,000 | $10,000,000 | $11,000,000 | $12,000,000 | $77,000,000 |
| Foundations | | $100,000 | $200,000 | $300,000 | $400,000 | $500,000 | $600,000 | $700,000 | $800,000 | $900,000 | $1,000,000 | $5,500,000 |
| Investment income | | $645,000 | $564,215 | $487,773 | $471,617 | $461,589 | $541,518 | $76,223 | $91,974 | $130,660 | $185,484 | $3,656,053 |
| Gross revenue | | $10,717,502 | $18,429,160 | $24,361,217 | $28,193,001 | $34,083,898 | $37,947,267 | $42,233,183 | $47,074,239 | $51,956,860 | $56,843,410 | $351,839,739 |
| Net revenue | | $807,159 | $3,351,956 | $8,411,451 | $11,415,744 | $16,464,276 | $19,490,187 | $22,937,027 | $26,939,541 | $30,983,444 | $35,031,334 | $175,832,118 |
| Program spending info | | $4,955,172 | $7,538,602 | $7,974,883 | $8,388,629 | $8,809,811 | $9,228,540 | $9,648,078 | $10,067,349 | $10,486,708 | $10,906,038 | $88,003,810 |
| Program spending intl | | $1,500,000 | $3,000,000 | $5,000,000 | $7,000,000 | $8,000,000 | $12,500,000 | $15,000,000 | $17,500,000 | $20,000,000 | $25,000,000 | $114,500,000 |
| Program spending ovr | | $750,000 | $750,000 | $875,000 | $875,000 | $1,000,000 | $1,000,000 | $1,125,000 | $1,125,000 | $1,250,000 | $1,250,000 | |
| Program spending total | | $7,205,172 | $11,288,602 | $13,849,883 | $16,263,629 | $17,809,811 | $22,728,540 | $25,773,078 | $28,692,349 | $31,736,708 | $37,156,038 | $212,503,810 |
| % spent on programs | | 54.46% | 56.73% | 60.17% | 62.92% | 63.74% | 68.96% | 70.52% | 71.94% | 73.00% | 75.33% | 65.78% |
| Total spending | | $13,230,344 | $19,897,205 | $23,019,765 | $25,847,258 | $27,939,623 | $32,957,079 | $36,546,156 | $39,884,698 | $43,473,416 | $49,312,077 | $49,312,077 |
| Surgeries | | 42,857 | 85,714 | 142,857 | 200,000 | 228,571 | 357,143 | 428,571 | 500,000 | 571,429 | 714,286 | 3,271,429 |
| Overhead and admin | | $1,500,000 | $1,500,000 | $1,750,000 | $1,750,000 | $2,000,000 | $2,000,000 | $2,250,000 | $2,250,000 | $2,500,000 | $2,500,000 | $20,000,000 |
| Impact loan interest | | $320,000 | $320,000 | $320,000 | $320,000 | $320,000 | | | | | | |
| Yearly net surplus | | -$2,692,841 | -$2,548,044 | -$538,549 | -$334,256 | $2,664,276 | $490,187 | $525,027 | $1,289,541 | $1,827,444 | $131,334 | $814,118 |
| | | | | | | | Repay Impact loans | | | | | |
| Total assets | $21,500,000 | $18,807,159 | $16,259,114 | $15,720,566 | $15,386,309 | $18,050,585 | **$2,540,773** | $3,065,799 | $4,355,341 | $6,182,785 | $6,314,118 | $6,314,118 |
| Total liabilities | $18,000,000 | $18,000,000 | $18,000,000 | $18,000,000 | $18,000,000 | $18,000,000 | **$2,000,000** | $2,000,000 | $2,000,000 | $2,000,000 | $2,000,000 | $2,000,000 |
| Net surplus | $3,500,000 | $807,159 | -$1,740,886 | -$2,279,434 | -$2,613,691 | $50,585 | **$540,773** | $1,065,799 | $2,355,341 | $4,182,785 | $4,314,118 | $4,314,118 |

CONFIDENTIAL

WON07610

# EXHIBIT 124

State of Delaware
Secretary of State
Division of Corporations
Delivered 10:00 AM 03/07/2011
FILED 10:00 AM 03/07/2011
SRV 110268316 – 4949958 FILE

STATE OF DELAWARE
CERTIFICATE OF INCORPORATION
OF
Surgery for the Poor, Inc.
A Non-Stock Corporation

The undersigned, for the purpose of forming a non-stock corporation pursuant to §101 of the General Corporation Law of the State of Delaware hereby certifies as follows:

FIRST: The name of the Corporation is Surgery for the Poor, Inc.

SECOND: The address of the registered office of the Corporation is 3411 Silverside Road, Rodney Building #104, County of New Castle, City of Wilmington, Delaware 19810. The name of the registered agent of the Corporation at that address is Corporate Creations Network, Inc.

THIRD: The Corporation shall be operated exclusively for charitable and educational purposes within the meaning of 501(c)(3) of the Internal Revenue Code of 1986, as now in effect or as may hereafter by amended ("the Code"). The purposes for which the Corporation is formed are to provide treatment, surgery, and related assistance to children in developing countries suffering from disease, illness, or malady, including but not necessarily limited to blindness, cleft palate, club foot, hydrocephalus, and burns; and to further support and educate doctors and the public on potential treatments and surgical techniques, as well as creating general awareness of these maladies and available treatments.

The Corporation shall be a nonprofit corporation and may engage in all lawful activities for which nonprofit corporations may be organized under the General Corporation Law of Delaware and shall further be authorized to engage in other charitable and educational activities consistent with an organization exempt from Federal Income Taxation under §501(c)(3) of the Internal Revenue Code, including provision of assistance and funds to other § 501(c)(3) organizations.

In furtherance thereof, the Corporation may receive property by gift, devise or bequest, invest or reinvest the same, and apply the income and principal thereof, as the Board of Directors may from time to time determine, either directly or through contributions to any charitable organization or organizations, exclusively for charitable and educations purposes, and engage in any lawful act or activity for which corporations may be organized under the Delaware General Corporation Law.

FOURTH: The Corporation shall not have authority to issue capital stock.

FIFTH: The Corporation shall not have members.

1

WON-EX 0019

ARTICLES OF INCORPORATION

WON-EX 0020

SIXTH:   The name and mailing address of the incorporator who is to serve as the initial director until the first annual meeting of the Board of Directors or until her successor is elected and qualifies is as follows:

Doris Rieke
300 W. 20th Street
Suite 300
Kansas City, Missouri 64108

SEVENTH:   No part of the net earnings of the Corporation shall inure to the benefit of, or be distributable to its members, trustees, officers, or other private persons, except that the Corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make payments and distributions in furtherance of the purposes set forth in Article THIRD hereof. No substantial part of the activities of the Corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation, and the corporation shall not participate in, or intervene in political campaigns on behalf of any candidate for public office. Notwithstanding any other provision of these articles, this Corporation shall not, except to an insubstantial degree, engage in any activities or exercise any powers that are not in furtherance of its exempt purposes or not permitted to be carried on by a corporation contribution to which are deductible under section 170 (c)(2) of the Internal Revenue Code.

EIGHTH   Upon dissolution of the Corporation, the Board of Directors shall, after paying or making provisions for payment of all of the liabilities of the Corporation, dispose of all of the assets of the Corporation by distributing those assets exclusively for public charitable use and purposes as shall at the time qualify as exempt from taxation under 501(c)(3) of the Internal Revenue Code and as other than a private foundation under Section 509 (a) of the Internal Revenue Code, as the Board of Directors shall determine. Any such assets not so disposed of shall be disposed of by a court of competent jurisdiction for the county in which the principal office of the Corporation is then located, exclusively for charitable and educational purposes or to such organization or organizations as said court shall determine which are organized and operated exclusively for charitable and educational purposes.

IN WITNESS WHEREOF, the undersigned incorporator has executed these Articles of Incorporation on this 4th day of March, 2011.

_____
Doris Rieke, Incorporator

2

# EXHIBIT 125

,State of Delaware
Secretary of State
Division of Corporations
Delivered 10:00 AM 04/18/2012
FILED 10:00 AM 04/18/2012
SRV 120448397 – 4949958 FILE

# STATE OF DELAWARE
# CERTIFICATE OF AMENDMENT
# (A CORPORATION WITHOUT CAPITAL STOCK)

The corporation, Surgery for the Poor, Inc. ,
organized and existing under the laws of the State of Delaware, hereby certifies as
follows:

(1) That at a meeting a vote of the members of the governing body was taken
for and against the amendment to the Certificate of Incorporation, said Amendment being
as follows: see attached amended Article First, amending the
name of the corporation; and Article Third amending
the purpose of the corporation.

(2) That said amendment was duly adopted in accordance with the provisions of
Section 242 of the General Corporation Law of the State of Delaware.

IN WITNESS WHEREOF, said corporation has caused this certificate to be
signed this __13__ day of __April__, A.D 20 12.

By: _____
Authorized Officer

Name:__BRIAN MULLANEY__
Print or Type

WON-EX 0014

Articles of Amendment
Articles of Incorporation
Surgery for the Poor, Inc.
p.2

Articles First and Third of the Articles of Incorporation are hereby amended as follows:

FIRST:    The name of the Corporation is WonderWork, Inc.

THIRD:   The Corporation shall be operated exclusively for charitable and educational purposes within the meaning of 501(c)(3) of the Internal Revenue Code of 1986, as now in effect or as may hereafter by amended ("the Code"). The purposes for which the Corporation is formed are to provide treatment, surgery, and related assistance to children and adults everywhere, including those in developing countries, suffering from disease, illness, or disability, including but not necessarily limited to blindness, club foot, hydrocephalus, pediatric cardiac surgery, and burns; and to further support medical institutions and other charitable organizations engaged in the provision of these services; as well as to educate doctors and the public on potential treatments and surgical techniques, and creating general awareness of these disabilities and available treatments.

     The Corporation shall be a nonprofit corporation and may engage in all lawful activities for which nonprofit corporations may be organized under the General Corporation Law of Delaware and shall further be authorized to engage in other charitable and educational activities consistent with an organization exempt from Federal Income Taxation under §501(c)(3) of the Internal Revenue Code, including provision of assistance and funds to other § 501(c)(3) organizations.

     In furtherance thereof, the Corporation may receive property by gift, devise or bequest, invest or reinvest the same, and apply the income and principal thereof, as the Board of Directors may from time to time determine, either directly or through contributions to any charitable organization or organizations, exclusively for charitable and educations purposes, and engage in any lawful act or activity for which corporations may be organized under the Delaware General Corporation Law.

WON-EX 0015

# State of Delaware

### SECRETARY OF STATE
### DIVISION OF CORPORATIONS
### P.O. BOX 898
### DOVER, DELAWARE 19903

*120448397*

*9241684*
*COPILEVITZ & CANTER, LLC.*
*310 W. 20TH STREET*
*STE 300*
*KANSAS CITY          MO    64108*
*ATTN: DIANE STINE*

*04-26-2012*

| DESCRIPTION | AMOUNT |
|---|---|
| *WONDERWORK, INC.* | |
| *4949958    0240   Amendment; Domestic* | |
| Receiving/Indexing | *115.00* |
| Data Entry Fee | *5.00* |
| Court Municipality Fee, Wilm. | *20.00* |
| Surcharge Assessment-New Castle | *6.00* |
| Page Assessment-New Castle Count | *27.00* |
| *FILING TOTAL* | *173.00* |
| *TOTAL PAYMENTS* | *253.00* |
| *CHARGED TO ACCOUNT* | *80.00CR* |

WON-EX 0016

# Delaware

## *The First State*

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF INCORPORATION OF "SURGERY FOR THE POOR, INC.", FILED IN THIS OFFICE ON THE SEVENTH DAY OF MARCH, A.D. 2011, AT 10 O'CLOCK A.M.

A FILED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE NEW CASTLE COUNTY RECORDER OF DEEDS.

Jeffrey W. Bullock, Secretary of State

**AUTHENTICATION:** *8605939*

**DATE:** *03-07-11*

*4949958 8100*

*110268316*

WON-EX 0017

# State of Delaware

SECRETARY OF STATE
DIVISION OF CORPORATIONS
P.O. BOX 898
DOVER, DELAWARE 19903

*110268316*

*9241684*                                                    *03-07-2011*
*COPILEVITZ & CANTER, LLC.*
*310 W. 20TH STREET*
*SUITE 300*
*KANSAS CITY                    MO    64108*
*ATTN: DIANE STINE*

| DESCRIPTION | AMOUNT |
|---|---|
| *SURGERY FOR THE POOR, INC.* | |
| *4949958    0102   Incorp Delaware Non-Stock* | |
| *Incorporation Fee* | *15.00* |
| *Receiving/Indexing* | *25.00* |
| *Certification Fee* | *50.00* |
| *Data Entry Fee* | *5.00* |
| *Court Municipality Fee, Wilm.* | *20.00* |
| *Surcharge Assessment-New Castle* | *6.00* |
| *Page Assessment-New Castle Count* | *27.00* |
| *Expedite Fee, 24 Hour* | *50.00* |
| *FILING TOTAL* | *198.00* |
| *TOTAL PAYMENTS* | *198.00* |
| *SERVICE REQUEST BALANCE* | *.00* |

WON-EX 0018

State of Delaware
Secretary of State
Division of Corporations
Delivered 10:00 AM 03/07/2011
FILED 10:00 AM 03/07/2011
SRV 110268316 – 4949958 FILE

STATE OF DELAWARE
CERTIFICATE OF INCORPORATION
OF
Surgery for the Poor, Inc.
A Non-Stock Corporation

The undersigned, for the purpose of forming a non-stock corporation pursuant to §101 of the General Corporation Law of the State of Delaware hereby certifies as follows:

FIRST:   The name of the Corporation is Surgery for the Poor, Inc.

SECOND:   The address of the registered office of the Corporation is 3411 Silverside Road, Rodney Building #104, County of New Castle, City of Wilmington, Delaware 19810. The name of the registered agent of the Corporation at that address is Corporate Creations Network, Inc.

THIRD:   The Corporation shall be operated exclusively for charitable and educational purposes within the meaning of 501(c)(3) of the Internal Revenue Code of 1986, as now in effect or as may hereafter by amended ("the Code"). The purposes for which the Corporation is formed are to provide treatment, surgery, and related assistance to children in developing countries suffering from disease, illness, or malady, including but not necessarily limited to blindness, cleft palate, club foot, hydrocephalus, and burns; and to further support and educate doctors and the public on potential treatments and surgical techniques, as well as creating general awareness of these maladies and available treatments.

The Corporation shall be a nonprofit corporation and may engage in all lawful activities for which nonprofit corporations may be organized under the General Corporation Law of Delaware and shall further be authorized to engage in other charitable and educational activities consistent with an organization exempt from Federal Income Taxation under §501(c)(3) of the Internal Revenue Code, including provision of assistance and funds to other § 501(c)(3) organizations.

In furtherance thereof, the Corporation may receive property by gift, devise or bequest, invest or reinvest the same, and apply the income and principal thereof, as the Board of Directors may from time to time determine, either directly or through contributions to any charitable organization or organizations, exclusively for charitable and educations purposes, and engage in any lawful act or activity for which corporations may be organized under the Delaware General Corporation Law.

FOURTH:   The Corporation shall not have authority to issue capital stock.

FIFTH:   The Corporation shall not have members.

1

WON-EX 0019

ARTICLES OF INCORPORATION

WON-EX 0020

SIXTH:   The name and mailing address of the incorporator who is to serve as the initial director until the first annual meeting of the Board of Directors or until her successor is elected and qualifies is as follows:

Doris Rieke
300 W. 20th Street
Suite 300
Kansas City, Missouri 64108

SEVENTH:   No part of the net earnings of the Corporation shall inure to the benefit of, or be distributable to its members, trustees, officers, or other private persons, except that the Corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make payments and distributions in furtherance of the purposes set forth in Article THIRD hereof. No substantial part of the activities of the Corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation, and the corporation shall not participate in, or intervene in political campaigns on behalf of any candidate for public office. Notwithstanding any other provision of these articles, this Corporation shall not, except to an insubstantial degree, engage in any activities or exercise any powers that are not in furtherance of its exempt purposes or not permitted to be carried on by a corporation contribution to which are deductible under section 170 (c)(2) of the Internal Revenue Code.

EIGHTH   Upon dissolution of the Corporation, the Board of Directors shall, after paying or making provisions for payment of all of the liabilities of the Corporation, dispose of all of the assets of the Corporation by distributing those assets exclusively for public charitable use and purposes as shall at the time qualify as exempt from taxation under 501(c)(3) of the Internal Revenue Code and as other than a private foundation under Section 509 (a) of the Internal Revenue Code, as the Board of Directors shall determine. Any such assets not so disposed of shall be disposed of by a court of competent jurisdiction for the county in which the principal office of the Corporation is then located, exclusively for charitable and educational purposes or to such organization or organizations as said court shall determine which are organized and operated exclusively for charitable and educational purposes.

IN WITNESS WHEREOF, the undersigned incorporator has executed these Articles of Incorporation on this 4th day of March, 2011.

_____
Doris Rieke, Incorporator

2

WON-EX 0021

# ACTION BY SOLE INCORPORATOR
## OF
## SURGERY FOR THE POOR, INC.

The undersigned, being the sole Incorporator of Surgery for the Poor, Inc., a Delaware nonprofit corporation ("Corporation"), hereby acts as follows:

### Articles of Incorporation
### Corporate Name and Corporate Purpose

WHEREAS, the incorporator of this Corporation has adopted the Articles of Incorporation of Surgery for the Poor, Inc. ("Articles of Incorporation"), which Articles of Incorporation set forth the name and purpose of this Corporation and were filed with the Delaware Secretary of State on March 7, 2011; and

WHEREAS, it is in the best interests of the Corporation to authorize and ratify the adoption and filing of the Articles of Incorporation.

NOW, THEREFORE, IT IS RESOLVED, that the adoption and filing of the Articles of Incorporation, together with the corporate name and purpose which they embody, and each and every other provision set forth therein, hereby are ratified and authorized.

### Bylaws

WHEREAS, the incorporator of the Corporation has adopted the Bylaws of Surgery for the Poor, Inc. ("Bylaws") on March 7, 2011, a copy of which has been placed in the official corporate minute book for the Corporation, and

WHEREAS, it is in the best interests of the Corporation to authorize and ratify the adoption of the Bylaws.

NOW, THEREFORE, IT IS RESOLVED, that the adoption of the Bylaws, together with those Bylaws and each and every provision set forth therein, hereby is ratified and authorized.

### Appointment of First Directors

WHEREAS, the business and affairs of the Corporation must be managed by, and all corporate powers exercised by or under the ultimate direction of, a Board of Directors;

WHEREAS, it is in the best interests of the Corporation that the Corporation appoint a first Board of Directors to take effective immediately upon acceptance and filing of the Articles of Incorporation by the Delaware Secretary of State to serve until they are replaced or reelected in accordance with the Bylaws of the Corporation;

WHEREAS, the undersigned appoints the following persons as the first Directors of this Corporation and acknowledges that each has accepted said appointment:

Brian Mullaney
Theodore Dysart
Ravi Kant

NOW, THEREFORE, IT IS RESOLVED, that the following persons are hereby appointed as the first Directors of this Corporation, which appointment shall be effective March 3, 2011:

Brian Mullaney
Theodore Dysart
Ravi Kant

FURTHER RESOLVED, that Brian Mullaney shall serve as the first President of the Corporation, and as such has the authority to sign any and all legal documents for and on behalf of the Corporation. Theodore Dysart shall serve as the initial Secretary/Treasurer, and shall have authority to sign or countersign legal documents on behalf of the Corporation, binding the Corporation to any obligations arising thereunder.

## Consent of Sole Incorporator

The incorporator of the Corporation, signing below and acting on her own behalf, hereby consents to the adoption of each of the recitals and resolutions set forth above.

Dated: March 8, 2011

Doris Rieke, Incorporator

## Resignation of Sole Incorporator

The incorporator of the Corporation, signing below and acting on her own behalf, has completed so much of the incorporation and organization of the Corporation as such person believes to be necessary. Such person resigns as the incorporator of this Corporation as of the date set forth below opposite such person's signature.

Dated: March 8, 2011

Doris Rieke, Incorporator

WON-EX 0023

**Surgery for the Poor, Inc.**
**Conflict of Interest Questionnaire**

Surgery for the Poor (the "Organization") requires each board member, officer and key employee annually (1) to review the Organization's Conflict of Interest Policy (the "Policy"); (2) to disclose any possible personal, familial, or business relationship that reasonably could give rise to a conflict of interest or the appearance of a conflict of interest; and (3) to acknowledge by his or her signature that he or she is acting in accordance with the letter and spirit of such Policy.

The information provided on this form shall be available for inspection by members of the Board and the Organization's legal counsel, but shall otherwise be held in confidence except when, after consultation with the applicable board member, officer or key employee, the Board determines that the Organization's best interest would be served by disclosure.

Please respond to the following questions to the best of your knowledge.

1.  Please list all corporations, partnerships, associations or other organizations of which you are an officer, director, trustee, partner or employee and describe your affiliation with such entity.[1]

2.  Please list all corporations, partnerships, or other entities in which you have a material financial interest as defined in the Policy.

3.  Please list all business dealings that you, your family members and/or entities listed in paragraphs 1-2 above have had with the Organization in the past year.

---

[1]     Use continuation sheets, if needed, to provide more detailed answers to any of the questions.

4

WON-EX 0024

4.  Please list any proposed business dealings between the Organization and you, your family members and/or entities listed in paragraphs 1-2 above. Describe each such relationship listed and the actual and potential financial benefits as you can best estimate them.

5.  Are you aware of any other relationships, arrangements, transactions or matters which could create a conflict of interest or the appearance of conflict? If so, please describe.

I have received and read the Policy. I am currently, and agree to remain, in compliance with the Policy.

_____
Signature

COPY OF WITHIN PAPER
RECEIVED

MAY 2 1 2012

NYS OFFICE OF THE ATTORNEY GENERAL
CHARITIES BUREAU

5

# EXHIBIT 126

**WW Donations by Medium**

| | WonderWork | | | | |
|---|---|---|---|---|---|
| | **FY11** | **FY12** | **FY13** | **FY14** | **FY15** |
| *Mail* | $50,767 | $7,134,372 | $1,699,189 | $3,332,036 | $1,422,753 |
| *Wire Transfer* | $0 | $0 | $2,033,543 | $2,192,785 | $2,097,434 |
| *Web* | $0 | $4,978 | $39,840 | $70,067 | $115,289 |
| *Phone* | $0 | $0 | $33,270 | $24,718 | $35,065 |
| *Stock* | $0 | $0 | $199,295 | $238,527 | $230,214 |
| *Loan Forgiveness* | $0 | $0 | | $50,000 | $302,500 |
| *Refunds* | $0 | $0 | -$6,043 | -$1,000 | -$18,520 |
| ***Total*** | **$50,767** | **$7,139,350** | **$3,999,093** | **$5,907,132** | **$4,184,736** |

| | 20/20/20 | | | | |
|---|---|---|---|---|---|
| | **FY11** | **FY12** | **FY13** | **FY14** | **FY15** |
| *Mail* | | | $614,303 | $3,760,004 | $5,381,270 |
| *Web* | | | $27,612 | $260,769 | $878,573 |
| *Phone* | | | $140 | $6,899 | $13,712 |
| *Wire Transfer* | | | $0 | $1,198 | $63,176 |
| *Stock* | | | $0 | $654 | $9,478 |
| *Refunds* | | | -$1,713 | -$23,447 | -$16,648 |
| **Total** | | | **$640,342** | **$4,006,077** | **$6,329,562** |

| | BurnRescue | | | | |
|---|---|---|---|---|---|
| | **FY11** | **FY12** | **FY13** | **FY14** | **FY15** |
| *Mail* | | $0 | $1,338,128 | $960,621 | $814,460 |
| *Web* | | $389 | $86,492 | $44,228 | $49,957 |
| *Phone* | | $0 | $11,585 | $6,121 | $1,325 |
| *Wire Transfer* | | *$0* | $36 | $974 | |
| *Stock* | | $0 | | | |
| *Refunds* | | $0 | -$4,366 | -$3,130 | -$1,300 |

| Total | | $389 | $1,431,876 | $1,008,814 | $864,441 |
|---|---|---|---|---|---|

| FirstStep | | | | | |
|---|---|---|---|---|---|
| | FY11 | FY12 | FY13 | FY14 | FY15 |
| *Mail* | | $0 | $1,457,351 | $1,364,437 | $1,125,202 |
| *Web* | | $59 | $74,782 | $83,354 | $60,367 |
| *Phone* | | $0 | $925 | $4,406 | $7,922 |
| *Wire Transfer* | | $0 | $0 | $197 | |
| *Stock* | | $0 | $0 | | $5,601 |
| *Refunds* | | $0 | -$6,108 | -$4,106 | -$4,265 |
| **Total** | | $59 | $1,526,950 | $1,448,287 | $1,194,826 |

| Hole in the Heart | | | | | |
|---|---|---|---|---|---|
| | FY11 | FY12 | FY13 | FY14 | FY15 |
| *Mail* | | $0 | $8,457 | $20 | |
| *Web* | | $18 | $0 | | |
| **Total** | | $18 | $8,457 | $20 | |

| Hydrocephalus | | | | | |
|---|---|---|---|---|---|
| | FY11 | FY12 | FY13 | FY14 | FY15 |
| *Mail* | | $0 | $10,189 | $46 | |
| *Web* | | $329 | $405 | | |
| **Total** | | $329 | $10,594 | $46 | |

| **GRAND TOTAL** | $50,767 | $7,140,144 | $7,617,313 | $12,370,376 | $12,573,565 |
|---|---|---|---|---|---|

Notes

*Source: Data is from the transaction reports provided to Goldin Associates through WW's Egnyte link on 6/23/17 and 6/27/17.*

Wire transfer includes four donations that were coded as cash in the database: $50,000 FY14 gift from ▮▮▮▮▮▮▮▮, FY15 gift of $10,000 f
FY16 gift of 10,682.88 from ▮▮▮▮▮▮▮▮▮▮.

WON-EX 040269

| FY16 | FY17 (to 12/29/16) | TOTAL |
|---|---|---|
| $1,947,549 | $1,008,367 | $16,595,032 |
| $2,401,405 | $360,406 | $9,085,573 |
| $66,037 | $22,542 | $318,753 |
| $43,585 | $15,555 | $152,193 |
| $233,183 | $414,850 | $1,316,069 |
| $200,000 | $50,000 | $602,500 |
| -$2,165 | | -$27,728 |
| **$4,889,594** | **$1,871,720** | **$28,042,392** |

| FY16 | FY17 (to 12/29/16) | TOTAL |
|---|---|---|
| $3,532,839 | $1,524,477 | $14,812,893 |
| $559,396 | $281,950 | $2,008,299 |
| $52,097 | $21,276 | $94,125 |
| $12,366 | $2,648 | $79,389 |
| $6,531 | $11,570 | $28,233 |
| -$20,044 | -$7,207 | -$69,059 |
| **$4,143,185** | **$1,834,714** | **$16,953,880** |

| FY16 | FY17 (to 12/29/16) | TOTAL |
|---|---|---|
| $483,819 | $212,917 | $3,809,945 |
| $44,129 | $21,807 | $247,002 |
| $4,272 | $3,625 | $26,928 |
| $250 | $0 | $1,260 |
| $0 | $0 | $0 |
| -$2,075 | -$270 | -$11,141 |

WON-EX 040269

|  |  |  |
|---|---|---|
| **$530,395** | **$238,079** | **$4,073,995** |

| FY16 | FY17 (to 12/29/16) | TOTAL |
|---|---|---|
| $645,099 | *$322,323* | $4,914,411 |
| $50,992 | *$30,480* | $300,034 |
| $2,715 | $2,836 | $18,804 |
| $10 | *$0* | $207 |
| $5,184 | $62,901 | $73,686 |
| -$4,701 | -$625 | -$19,805 |
| **$699,299** | **$417,915** | **$5,287,337** |

$54,200

| FY16 | FY17 (to 12/29/16) | TOTAL |
|---|---|---|
|  |  | $8,477 |
|  |  | $18 |
|  |  | **$8,494** |

| FY16 | FY17 (to 12/29/16) | TOTAL |
|---|---|---|
|  |  | $10,235 |
|  |  | $734 |
|  |  | **$10,969** |

**$10,262,474**          **$4,362,428**     **$54,377,067**

from ▮▮▮▮▮▮▮▮▮, FY gift of $1500 from ▮▮▮▮▮ and

4 of 4

WON-EX 040269

# EXHIBIT 127

**WW Donations by Medium**

| | WonderWork | | | | |
|---|---|---|---|---|---|
| | **FY11** | **FY12** | **FY13** | **FY14** | **FY15** |
| *Mail* | $50,767 | $7,134,372 | $1,699,189 | $3,332,036 | $1,422,753 |
| *Wire Transfer* | $0 | $0 | $2,033,543 | $2,192,785 | $2,097,434 |
| *Web* | $0 | $4,978 | $39,840 | $70,067 | $115,289 |
| *Phone* | $0 | $0 | $33,270 | $24,718 | $35,065 |
| *Stock* | $0 | $0 | $199,295 | $238,527 | $230,214 |
| *Loan Forgiveness* | $0 | $0 | | $50,000 | $302,500 |
| *Refunds* | $0 | $0 | -$6,043 | -$1,000 | -$18,520 |
| ***Total*** | **$50,767** | **$7,139,350** | **$3,999,093** | **$5,907,132** | **$4,184,736** |

| | 20/20/20 | | | | |
|---|---|---|---|---|---|
| | **FY11** | **FY12** | **FY13** | **FY14** | **FY15** |
| *Mail* | | | $614,303 | $3,760,004 | $5,381,270 |
| *Web* | | | $27,612 | $260,769 | $878,573 |
| *Phone* | | | $140 | $6,899 | $13,712 |
| *Wire Transfer* | | | $0 | $1,198 | $63,176 |
| *Stock* | | | $0 | $654 | $9,478 |
| *Refunds* | | | -$1,713 | -$23,447 | -$16,648 |
| **Total** | | | **$640,342** | **$4,006,077** | **$6,329,562** |

| | BurnRescue | | | | |
|---|---|---|---|---|---|
| | **FY11** | **FY12** | **FY13** | **FY14** | **FY15** |
| *Mail* | | $0 | $1,338,128 | $960,621 | $814,460 |
| *Web* | | $389 | $86,492 | $44,228 | $49,957 |
| *Phone* | | $0 | $11,585 | $6,121 | $1,325 |
| *Wire Transfer* | | $0 | $36 | $974 | |
| *Stock* | | $0 | | | |
| *Refunds* | | $0 | -$4,366 | -$3,130 | -$1,300 |

WON-EX 040269

| Total | | $389 | $1,431,876 | $1,008,814 | $864,441 |
|---|---|---|---|---|---|

| FirstStep | | | | | |
|---|---|---|---|---|---|
| | FY11 | FY12 | FY13 | FY14 | FY15 |
| *Mail* | | $0 | $1,457,351 | $1,364,437 | $1,125,202 |
| *Web* | | $59 | $74,782 | $83,354 | $60,367 |
| *Phone* | | $0 | $925 | $4,406 | $7,922 |
| *Wire Transfer* | | $0 | $0 | $197 | |
| *Stock* | | $0 | $0 | | $5,601 |
| *Refunds* | | $0 | -$6,108 | -$4,106 | -$4,265 |
| **Total** | | **$59** | **$1,526,950** | **$1,448,287** | **$1,194,826** |

| Hole in the Heart | | | | | |
|---|---|---|---|---|---|
| | FY11 | FY12 | FY13 | FY14 | FY15 |
| *Mail* | | $0 | $8,457 | $20 | |
| *Web* | | $18 | $0 | | |
| **Total** | | **$18** | **$8,457** | **$20** | |

| Hydrocephalus | | | | | |
|---|---|---|---|---|---|
| | FY11 | FY12 | FY13 | FY14 | FY15 |
| *Mail* | | $0 | $10,189 | $46 | |
| *Web* | | $329 | $405 | | |
| **Total** | | **$329** | **$10,594** | **$46** | |

| **GRAND TOTAL** | **$50,767** | **$7,140,144** | **$7,617,313** | **$12,370,376** | **$12,573,565** |
|---|---|---|---|---|---|

Notes

*Source: Data is from the transaction reports provided to Goldin Associates through WW's Egnyte link on 6/23/17 and 6/27/17.*

Wire transfer includes four donations that were coded as cash in the database:  $50,000 FY14 gift from ██████████, FY15 gift of $10,000 f
FY16 gift of 10,682.88  from ███████████████.

| FY16 | FY17 (to 12/29/16) | TOTAL |
|---|---|---|
| $1,947,549 | $1,008,367 | $16,595,032 |
| $2,401,405 | $360,406 | $9,085,573 |
| $66,037 | $22,542 | $318,753 |
| $43,585 | $15,555 | $152,193 |
| $233,183 | $414,850 | $1,316,069 |
| $200,000 | $50,000 | $602,500 |
| -$2,165 | | -$27,728 |
| $4,889,594 | $1,871,720 | $28,042,392 |

| FY16 | FY17 (to 12/29/16) | TOTAL |
|---|---|---|
| $3,532,839 | $1,524,477 | $14,812,893 |
| $559,396 | $281,950 | $2,008,299 |
| $52,097 | $21,276 | $94,125 |
| $12,366 | $2,648 | $79,389 |
| $6,531 | $11,570 | $28,233 |
| -$20,044 | -$7,207 | -$69,059 |
| $4,143,185 | $1,834,714 | $16,953,880 |

| FY16 | FY17 (to 12/29/16) | TOTAL |
|---|---|---|
| $483,819 | $212,917 | $3,809,945 |
| $44,129 | $21,807 | $247,002 |
| $4,272 | $3,625 | $26,928 |
| $250 | $0 | $1,260 |
| $0 | $0 | $0 |
| -$2,075 | -$270 | -$11,141 |

WON-EX 040269

|  | | |
|---:|---:|---:|
| **$530,395** | **$238,079** | **$4,073,995** |

| FY16 | FY17 (to 12/29/16) | TOTAL |
|---:|---:|---:|
| $645,099 | *$322,323* | $4,914,411 |
| $50,992 | *$30,480* | $300,034 |
| $2,715 | $2,836 | $18,804 |
| $10 | *$0* | $207 |
| $5,184 | $62,901 | $73,686 |
| -$4,701 | -$625 | -$19,805 |
| **$699,299** | **$417,915** | **$5,287,337** |

$54,200

| FY16 | FY17 (to 12/29/16) | TOTAL |
|---|---|---:|
|  |  | $8,477 |
|  |  | $18 |
|  |  | **$8,494** |

| FY16 | FY17 (to 12/29/16) | TOTAL |
|---|---|---:|
|  |  | $10,235 |
|  |  | $734 |
|  |  | **$10,969** |

| **$10,262,474** | **$4,362,428** | **$54,377,067** |
|---|---|---|

from ▮▮▮▮▮▮▮▮▮, FY gift of $1500 from ▮▮▮▮▮ and

WON-EX 040269

# EXHIBIT 128

March 18, 2015

«FULLNAME»
«ENTITY»
«AD1» «AD2»
«CITY», «ST» «ZIP»

Dear «SALUTATION»,

I just got back from an eye-opening, 18,000-mile trip to the poorest areas of India, and I wanted you to see for yourself the impact of your generous support.

Enclosed you'll find a few reports I wrote while I was there. (I tried to send you these via email, but don't know if they got through to you or not.)

The reports are about blindness camps where thousands of blind children and adults showed up on one day in the hopes of getting their eyesight restored.

And a one-day burn camp where 800+ severely burned children and adults had come from all over India in the hopes of getting free reconstructive surgery.

The vast majority of all these children and adults have been suffering for many years. Waiting, hoping and praying that someday, someone would help them get surgery.

*Without our programs – and support from folks like you – they'd all still be waiting.*

I am happy to report that no one was turned away from these camps. Our partners are helping everyone who showed up. Some of the blind children received surgery the same day they arrived, and the next day they opened their eyes and could see!

Please take 5 minutes to see all the good we're able to do with your help.

While some of these photos may make you cringe and some may make you cry, overall, I hope they will make you proud to be one of our most generous donors.

We feel very lucky to have you helping us.

Thank you!


Brian
Co-Founder
212-729-1855
brian@wonderwork.org

# EXHIBIT 129

# Report From The Field:
# Day 1 - Bihar, India

March 2015



I thought you might like to see how we're using your generous donations to change lives in the poorest places on our planet.

It took 36 hours to travel from the U.S. to this tiny village in Bihar, India. Bihar is one of the poorest places in all of India.

The average family is living on less than $1 a day. Day laborers make about 17 cents an hour. Literacy rates are 70% for men, 50% for women.



After 4 long plane rides, we found ourselves in an old van driving down dirt roads that took us back in time thousands of years.

Men wearing turbans were herding sheep and cattle. Women wearing saris were carrying water, pots, dung, wood, and wheat on their heads. We saw children and adults working in the fields, harvesting crops by hand.

When we arrive at the blindness camp, we find more than 1,000 children and adults who have come from all over India in the hope of curing their blindness.



They are all ages, from 9 months to 90 years old. In the U.S., blindness is rare and usually afflicts only senior citizens.

But in developing countries, blindness is a virtual epidemic that affects all ages. It is 500% more prevalent than in the U.S.

More than 20 million children and adults in developing countries are what they call "needlessly blind." That's the name they call blind folks who can't afford the $300, 15-minute surgery that cures blindness.



Imagine remaining blind for your entire life because you couldn't scrape together $300.



WON-EX 3899

Because they are poor, none of these children or adults will ever receive surgery unless someone helps them. That's why we're here. And we wouldn't be here without your help – thank you.



The loudspeaker calls the names as hundreds of people crowded around different registration tables. Dozens of volunteers guide the patients through various stations.

The test for blindness is pretty simple. They hand you the end of a 9-foot tape measure. On the other end, someone holds up their hand and asks how many fingers you can see.



If you can't count fingers correctly from 9 feet away you are blind. Simple as that.

To register, the women and men lined up in separate lines that went on and on. We slowly walked down the lines, taking photos, asking questions and listening to their stories.

If you look at my photos, you will see the years of desperation and suffering etched in their faces. Especially the women. When a man goes blind, the wife takes care of him. When the wife goes blind, the man takes a new wife.



To be blind in America is a tragedy. To be blind in a developing country is a matter of life or death. Here, they call a blind person a "mouth with no hands."

If you can't see, you can't work. If you can't work, you can't survive. 60% of children die within 1-2 years of going blind according to the WHO. There are no figures for adults.

In the back of the camp, we find all the blind children. Some were born completely blind. Some lost their vision at 3 years old, 10 years old, 15 years old. Some lost their vision through accidents.



We met a girl who lost her eyesight when a classmate hit her in the face with a stick.

The parents are worried their child won't be picked for surgery.


WON-EX 3900

When they get picked for surgery they worry it won't work. In a developing country, having a blind child is worse than being blind yourself.

This camp is run by one of our best partners in the world. In spite of all the poverty and suffering, their goal is to make Bihar, one of the poorest states in India, the first state to be free of curable blindness by the year 2020.

I admire their ambition, but it seems like an impossible goal. I look at the huge crowd and shake my head.

"This is overwhelming," I tell ███████, the man in charge. " I bet you could do one of these camps every single day."

He laughs and tells me, "We do 5 camps a day."

Then I remember who I am talking to – ██████ and his team of 12 surgeons and 32 optometrists at ████████████ provide 67,000 free surgeries a year and are trying to reach 100,000 free surgeries a year.

If anyone can make Bihar blindness free, these are the folks who can do it. And we are proud to be helping them.

All of the children and adults who can get their eyesight restored through surgery are put on buses with their families or attendants and sent off to the hospital for surgery.

All of the children and some of the adults will receive surgery right away.

We follow them in our van.

We're going to sleep at the hospital tonight so we are there early tomorrow morning when their bandages come off and they can see.

More later.

Brian
Co-Founder
212-729-1855
brian@wonderwork.org








WON-EX 3901

# Report From The Field:
# Day 2 – Bihar, India

March 2015



Today is a big day.

We're about to watch almost 300 children and adults who were blind yesterday - open their eyes and see!

Some will be seeing for the very first time. Some of the adults will be seeing for the first time in 10, 15, 20 years. Our youngest patient is 4 years old and our oldest is 94.



After breakfast we go outside and find hundreds of new people lined up to register for surgery – we're told buses arrived in the middle of the night. There's an endless supply of blind people in India where one third of all the blind in the world live. (12 million)

We begin in the pediatric ward where we watch the eye surgeon remove the bandages of all the children we met yesterday.



The children react differently than adults. Especially ones who have never seen before.

When adults get their eyesight back, they recognize everything. For babies and children that are seeing everything for the first time, it can be bewildering. Just as babies need time to teach their brain "how to see," children seeing for the first time also need to learn "how to see," depth perception, tracking, etc. It takes time.

The little girl you see in my photos has been blind since birth. She's never seen her mom. She's never seen anything. When the bandages come off, her eyes open so wide, you can tell right away she can see. She has "WOW" written all over her face.



When she hears her mom's voice, she turns to her instantly and then is obsessed with her mom's face. It is as if she's saying, "Is that really you? Are you my mom?"

The next 7-year-old boy is serious. We remember him because he walked in all by himself, with his patient chart, and climbed right up onto the O.R. table. It was only after he lied down that he started



WON-EX 3902

to tremble. Now his bandages are off, he can see and he is staring us right in the eyes.



Then there is my favorite. A little girl who just smiled and smiled! She was SOOOOOOO happy! In the photos she is smiling, jumping, dancing, beaming. And so is her mom. Imagine the weight lifted off of this mom's shoulders.

I sometimes hold out a finger to see if they can see my finger well enough to grab it. Every kid this morning grabbed it right away.

One of the best pictures is of the pediatric surgeon who made all these miracles happen. ▓▓▓▓▓ is a real hero. He is living out here, hundreds of miles from any big city, in one of the poorest villages in India, operating on the poorest of the poor. He could be making ten times his salary if he left.



Next, we go to a large outdoor building where hundreds of adults with bandages sitting on the ground in rows, are patiently waiting.

All of them underwent surgery yesterday. I get to stand right next to the head surgeon as he removes the bandages. There is total silence as everyone watches him remove the first bandage from a 50-year-old lady.



People are holding their breath. She squints, she blinks, she opens her eyes and – she can see! The crowd gasps. She cries. The line pushes forward...

With adults, after the bandage is removed, the eye stays shut for a moment or two. It's the moment of truth and many of these patients are desperately afraid the surgery didn't work.

Then the eye opens – sometimes with the help of the surgeon prying it open. Then another pause – did it work? Can I see? Once they realize that they can see – they react and you can see what a life-changing moment this is.

Everyone reacts differently. Some are in shock. Some shake their heads in disbelief. Others just smile. Many of them put their hands together as a Hindu thank you. Many of them cry. And some try to smile – but can't. You can see that after so many years of suffering, they haven't had anything to smile about in a long time.





WON-EX 3903

Watching hundreds of patients have their bandages removed was pretty emotional.



Afterwards, we asked the head of the hospital what brought him here and away from a high paying job in Calcutta and he had a great answer. He told us that helping the poor "nurtured his soul" in ways a big salary and comfortable life in the city did not.

Before we knew it, it was time to go.

Next on the schedule is a huge burn camp where we expect 800+ severely burned children and adults to show up. That camp is in Varanasi, which is a high holy Hindu city and the oldest continuously, inhabited city in the world. (3,000 years.)



It's an 8-hour drive and we are already running late. So we say our goodbyes and hit the road.

The good thing about our drive was that it gave us a close-up look at rural India and extreme poverty. In my photos, you will see many things you have never seen before. Giant piles of cow dung, young children working in fields, brickyards that look like labor camps, people carrying every imaginable thing on their heads: water, dirt, bricks, dung, wheat, wood, and water.



The "homes" are hard to look at. Broken down hovels made out of crumbling brick, shanties made out of dung, dirty tents in fields of garbage, lean-tos made out of straw. The dirt, the garbage, the smells, the noise, the heat were all overwhelming.

But no one was sitting around feeling sorry for themselves. Everyone was busy working, farming, cutting wood, fixing tires, selling chickens, fruit, fish, coal, and dresses.



The roads were packed with people carrying goods: carts laden with wheat, people herding cows and goats, men pushing carts overloaded with steel rebar, horses carrying bags filled with bricks. We saw many children working in the field, which was heartbreaking, but we also saw many more in school uniforms.



WON-EX 3904

The bad thing about the drive was that Indian roads are among the most dangerous in the world. Every single day, 543 people die in traffic accidents in India. That comes out to about 23 deaths an hour.

The roads are too narrow, and have no traffic lines – or rules.



There is way too much "traffic" including overloaded trucks, tilting buses with dozens of people sitting on the roof, weaving motorcycles with 3,4 and 5 passengers, tractors, and pushcarts.

Add hundreds of goats, donkeys, dogs, monkeys, horses and cows and the thousands of people who are walking, standing, sleeping on or right next to the roads and you can understand why India leads the world in road deaths.



It is absolute chaos.

The worst part is passing. These are not highways but single lane roads, so to pass you have to go in the oncoming lane. There is always someone coming the other way that is also passing.

This is terrifying because you see two lanes of traffic coming right at you at a high speed. The horns are blaring as both passing cars or trucks or buses swerve at the last minute, just missing each other by inches.



We called this "Indian Roulette" and it was the worst driving experience I have ever had in my life.

Somehow, we arrived safely at Varanasi around 7:30 that night. It had been a long day, to say the least, and we have a 5:00am wake up call, so we had a quick dinner and hit the hay.

800 severely burned children and adults will be waiting for us tomorrow.



I will let you know how it goes.

Brian
Co-Founder
212-729-1855
brian@wonderwork.org



WON-EX 3905

# Report From The Field:
# Day 3 – Varanasi, India

March 2015



The alarm clock rang at 4:30am. 20 minutes later
we're floating down the Ganges River as the sun
slowly rises. Thousands of Hindus, Sikhs, Buddhists,
pilgrims, holy men, spiritual gurus, swamis, priests,
nuns and monks gather on the riverbanks to pray,
bathe, chant, meditate, sing, play music, etc.

People are washing clothes on rocks like they've
done for thousands of years. It's like stepping into a
*National Geographic* magazine.



The Ganges is one of the longest, best-known, most
holy rivers in the world. Born in the Himalayas, it
winds its way through India and Bangladesh and
500 miles later, empties into the Bay of Bengal.

We float past crematoriums that are burning bodies
24 hours a day, 7 days a week. According to the
Hindu religion, if you die and/or are cremated in
Varanasi, you are liberated from the cycle of
reincarnation. Tens of thousands of people come
here during their last days to die in Varanasi.



It's one of the most spiritual, beautiful, special places
on our planet and a great place to start the day.
Especially this day, as we're expecting 800+
severely burned children to show up at our camp
and each one desperately needs a 2nd chance at life.

When we arrive at our partner hospital, there are
already hundreds of patients who are waiting. We
wade through the crowd slowly with one of the best
burn surgeons in all of India leading the way.



One by one, we hear their stories. Everyone gets a
birth defect the same way – they're born with it.
Burns are different – they're caused by accidents,
attacks, mistakes, fights, explosions, bad judgment
and freak occurrences. Every burn, every patient
has their own story and most are heartbreaking.

We meet a young mother who was 8 months
pregnant when her sari caught fire while she
was cooking.

A pair of sisters who were sleeping in the same bed
when their hut caught on fire.



WON-EX 3906

A little 3-year-old boy, left alone at home because both his parents have to work in the fields. His hut caught on fire and there was no one there to save him. His parents rushed him to a major hospital but they had no money to pay for treatment so they were turned away.



A young woman who had an epileptic seizure while she was cooking and fell face first, unconscious into a pot of boiling water.

A beautiful, 11-year old girl who went to the local kiosk to buy some fruit as her mom asked. The kiosk owner asked her to hold a candle while he switched gas tanks. There was a leak. An explosion. And in a flash her future went up in flames.



A young man who was working in a factory when someone mixed the wrong ingredients creating a big explosion.

And we met many, many kids who were caught in fires caused by a kerosene or oil lamp that was tipped over by mistake.

A little girl whose friend set her on fire. Her mother cried when she told us her family spent all the money they had to get treatment for their daughter, but none of it helped. Then they borrowed money for surgeries and they are paying 10% interest.



As we listened to heart-wrenching stories and met so many severely disfigured children, we had a hard time not crying or looking horrified.

But our partner surgeon was solid as a rock.

He would put his hand on their shoulder, gently explain to each child and parent, things are never as bad as they look. Then he would patiently explain what he could do. He is not just a surgeon – he is a magician.



He can build eyelids, noses, ears, mouths, etc.

He can separate a chin fused to a chest, a hand with all the fingers melted together, eyelids that are melted shut.

No matter how grim the prognosis, he was always confident and optimistic that he and his team could deliver a good result for each of these patients.



WON-EX 3907

He gave them a hug. And then he gave them hope.



It was remarkable to be there and see how he handled each and every patient. He treated each one with love and respect.

We asked each one, "How far did you come?"

Their answers shocked us. 100 kilometers, 300 kilometers, 500 kilometers. Their answers showed how desperate they were and that no one else would help them. None of these families owned a car or motorcycle. Some had to sell their rickshaws to raise money to travel to this burn camp.

We asked, "How long ago did you get burned?"



Many of them told us, 5, 10, 15 years ago. This was hard to hear. It also showed that they needed help for a long time – and no one would help them. A 1-hour, $300 surgery many years ago could have saved a lot of these children and their families an awful lot of pain and heartache.

Most had waited a very long time for this day.

They'd still be waiting if our program wasn't sponsoring these free surgeries. And none of this would be happening without your support.



I hope that you get the chance to look at my photos, as they tell the story far better than I can. I know it will make you proud you are one of our most generous donors.

I was very proud of our organization this week.

We're empowering selfless surgeons, nurses and medical teams that make miracles happen in the poorest places on earth.

We're helping desperate parents that have no place else to turn.



And we're helping children no one else will help.

Who can ask for more than that?

Brian
Co-Founder
212-729-1855
brian@wonderwork.org



WON-EX 3908

# EXHIBIT 130

# Report From The Field:
# Day 1 - Bihar, India

March 2015



I thought you might like to see how we're using your generous donations to change lives in the poorest places on our planet.

It took 36 hours to travel from the U.S. to this tiny village in Bihar, India. Bihar is one of the poorest places in all of India.

The average family is living on less than $1 a day. Day laborers make about 17 cents an hour. Literacy rates are 70% for men, 50% for women.



After 4 long plane rides, we found ourselves in an old van driving down dirt roads that took us back in time thousands of years.

Men wearing turbans were herding sheep and cattle. Women wearing saris were carrying water, pots, dung, wood, and wheat on their heads. We saw children and adults working in the fields, harvesting crops by hand.

When we arrive at the blindness camp, we find more than 1,000 children and adults who have come from all over India in the hope of curing their blindness.



They are all ages, from 9 months to 90 years old. In the U.S., blindness is rare and usually afflicts only senior citizens.

But in developing countries, blindness is a virtual epidemic that affects all ages. It is 500% more prevalent than in the U.S.

More than 20 million children and adults in developing countries are what they call "needlessly blind." That's the name they call blind folks who can't afford the $300, 15-minute surgery that cures blindness.



Imagine remaining blind for your entire life because you couldn't scrape together $300.



WON-EX 3899

Because they are poor, none of these children or adults will ever receive surgery unless someone helps them. That's why we're here. And we wouldn't be here without your help – thank you.



The loudspeaker calls the names as hundreds of people crowded around different registration tables. Dozens of volunteers guide the patients through various stations.

The test for blindness is pretty simple. They hand you the end of a 9-foot tape measure. On the other end, someone holds up their hand and asks how many fingers you can see.



If you can't count fingers correctly from 9 feet away you are blind. Simple as that.

To register, the women and men lined up in separate lines that went on and on. We slowly walked down the lines, taking photos, asking questions and listening to their stories.

If you look at my photos, you will see the years of desperation and suffering etched in their faces. Especially the women. When a man goes blind, the wife takes care of him. When the wife goes blind, the man takes a new wife.



To be blind in America is a tragedy. To be blind in a developing country is a matter of life or death. Here, they call a blind person a "mouth with no hands."

If you can't see, you can't work. If you can't work, you can't survive. 60% of children die within 1-2 years of going blind according to the WHO. There are no figures for adults.

In the back of the camp, we find all the blind children. Some were born completely blind. Some lost their vision at 3 years old, 10 years old, 15 years old. Some lost their vision through accidents.



We met a girl who lost her eyesight when a classmate hit her in the face with a stick.

The parents are worried their child won't be picked for surgery.



420 Fifth Avenue, 27th fl, New York, NY 10018  212.729.1855  WonderWork.org

2

WON-EX 3900

When they get picked for surgery they worry it won't work. In a developing country, having a blind child is worse than being blind yourself.

This camp is run by one of our best partners in the world. In spite of all the poverty and suffering, their goal is to make Bihar, one of the poorest states in India, the first state to be free of curable blindness by the year 2020.

I admire their ambition, but it seems like an impossible goal. I look at the huge crowd and shake my head.

"This is overwhelming," I tell ▮▮▮▮▮, the man in charge. " I bet you could do one of these camps every single day."

He laughs and tells me, "We do 5 camps a day."

Then I remember who I am talking to – ▮▮▮ and his team of 12 surgeons and 32 optometrists at ▮▮▮▮▮▮▮▮▮ provide 67,000 free surgeries a year and are trying to reach 100,000 free surgeries a year.

If anyone can make Bihar blindness free, these are the folks who can do it. And we are proud to be helping them.

All of the children and adults who can get their eyesight restored through surgery are put on buses with their families or attendants and sent off to the hospital for surgery.

All of the children and some of the adults will receive surgery right away.

We follow them in our van.

We're going to sleep at the hospital tonight so we are there early tomorrow morning when their bandages come off and they can see.

More later.

Brian
Co-Founder
212-729-1855
brian@wonderwork.org












WON-EX 3901

# Report From The Field:
# Day 2 – Bihar, India

March 2015



Today is a big day.

We're about to watch almost 300 children and adults who were blind yesterday - open their eyes and see!

Some will be seeing for the very first time. Some of the adults will be seeing for the first time in 10, 15, 20 years. Our youngest patient is 4 years old and our oldest is 94.



After breakfast we go outside and find hundreds of new people lined up to register for surgery – we're told buses arrived in the middle of the night. There's an endless supply of blind people in India where one third of all the blind in the world live. (12 million)

We begin in the pediatric ward where we watch the eye surgeon remove the bandages of all the children we met yesterday.

The children react differently than adults. Especially ones who have never seen before.



When adults get their eyesight back, they recognize everything. For babies and children that are seeing everything for the first time, it can be bewildering. Just as babies need time to teach their brain "how to see," children seeing for the first time also need to learn "how to see," depth perception, tracking, etc. It takes time.

The little girl you see in my photos has been blind since birth. She's never seen her mom. She's never seen anything. When the bandages come off, her eyes open so wide, you can tell right away she can see. She has "WOW" written all over her face.



When she hears her mom's voice, she turns to her instantly and then is obsessed with her mom's face. It is as if she's saying, "Is that really you? Are you my mom?"

The next 7-year-old boy is serious. We remember him because he walked in all by himself, with his patient chart, and climbed right up onto the O.R. table. It was only after he lied down that he started



WON-EX 3902

to tremble. Now his bandages are off, he can see and he is staring us right in the eyes.



Then there is my favorite. A little girl who just smiled and smiled! She was SOOOOOOO happy! In the photos she is smiling, jumping, dancing, beaming. And so is her mom. Imagine the weight lifted off of this mom's shoulders.

I sometimes hold out a finger to see if they can see my finger well enough to grab it. Every kid this morning grabbed it right away.

One of the best pictures is of the pediatric surgeon who made all these miracles happen. ████████ is a real hero. He is living out here, hundreds of miles from any big city, in one of the poorest villages in India, operating on the poorest of the poor. He could be making ten times his salary if he left.



Next, we go to a large outdoor building where hundreds of adults with bandages sitting on the ground in rows, are patiently waiting.

All of them underwent surgery yesterday. I get to stand right next to the head surgeon as he removes the bandages. There is total silence as everyone watches him remove the first bandage from a 50-year-old lady.

People are holding their breath. She squints, she blinks, she opens her eyes and – she can see! The crowd gasps. She cries. The line pushes forward...



With adults, after the bandage is removed, the eye stays shut for a moment or two. It's the moment of truth and many of these patients are desperately afraid the surgery didn't work.

Then the eye opens – sometimes with the help of the surgeon prying it open. Then another pause – did it work? Can I see? Once they realize that they can see – they react and you can see what a life-changing moment this is.

Everyone reacts differently. Some are in shock. Some shake their heads in disbelief. Others just smile. Many of them put their hands together as a Hindu thank you. Many of them cry. And some try to smile – but can't. You can see that after so many years of suffering, they haven't had anything to smile about in a long time.




WON-EX 3903

Watching hundreds of patients have their bandages removed was pretty emotional.



Afterwards, we asked the head of the hospital what brought him here and away from a high paying job in Calcutta and he had a great answer. He told us that helping the poor "nurtured his soul" in ways a big salary and comfortable life in the city did not.

Before we knew it, it was time to go.

Next on the schedule is a huge burn camp where we expect 800+ severely burned children and adults to show up. That camp is in Varanasi, which is a high holy Hindu city and the oldest continuously, inhabited city in the world. (3,000 years.)



It's an 8-hour drive and we are already running late. So we say our goodbyes and hit the road.

The good thing about our drive was that it gave us a close-up look at rural India and extreme poverty. In my photos, you will see many things you have never seen before. Giant piles of cow dung, young children working in fields, brickyards that look like labor camps, people carrying every imaginable thing on their heads: water, dirt, bricks, dung, wheat, wood, and water.

The "homes" are hard to look at. Broken down hovels made out of crumbling brick, shanties made out of dung, dirty tents in fields of garbage, lean-tos made out of straw. The dirt, the garbage, the smells, the noise, the heat were all overwhelming.



But no one was sitting around feeling sorry for themselves. Everyone was busy working, farming, cutting wood, fixing tires, selling chickens, fruit, fish, coal, and dresses.

The roads were packed with people carrying goods: carts laden with wheat, people herding cows and goats, men pushing carts overloaded with steel rebar, horses carrying bags filled with bricks. We saw many children working in the field, which was heartbreaking, but we also saw many more in school uniforms.




WON-EX 3904

The bad thing about the drive was that Indian roads are among the most dangerous in the world. Every single day, 543 people die in traffic accidents in India. That comes out to about 23 deaths an hour.

The roads are too narrow, and have no traffic lines – or rules.



There is way too much "traffic" including overloaded trucks, tilting buses with dozens of people sitting on the roof, weaving motorcycles with 3, 4 and 5 passengers, tractors, and pushcarts.

Add hundreds of goats, donkeys, dogs, monkeys, horses and cows and the thousands of people who are walking, standing, sleeping on or right next to the roads and you can understand why India leads the world in road deaths.

It is absolute chaos.



The worst part is passing. These are not highways but single lane roads, so to pass you have to go in the oncoming lane. There is always someone coming the other way that is also passing.

This is terrifying because you see two lanes of traffic coming right at you at a high speed. The horns are blaring as both passing cars or trucks or buses swerve at the last minute, just missing each other by inches.



We called this "Indian Roulette" and it was the worst driving experience I have ever had in my life.

Somehow, we arrived safely at Varanasi around 7:30 that night. It had been a long day, to say the least, and we have a 5:00am wake up call, so we had a quick dinner and hit the hay.

800 severely burned children and adults will be waiting for us tomorrow.



I will let you know how it goes.

Brian
Co-Founder
212-729-1855
brian@wonderwork.org



WON-EX 3905

# Report From The Field:
# Day 3 – Varanasi, India

March 2015



The alarm clock rang at 4:30am. 20 minutes later
we're floating down the Ganges River as the sun
slowly rises. Thousands of Hindus, Sikhs, Buddhists,
pilgrims, holy men, spiritual gurus, swamis, priests,
nuns and monks gather on the riverbanks to pray,
bathe, chant, meditate, sing, play music, etc.

People are washing clothes on rocks like they've
done for thousands of years. It's like stepping into a
*National Geographic* magazine.

The Ganges is one of the longest, best-known, most
holy rivers in the world. Born in the Himalayas, it
winds its way through India and Bangladesh and
500 miles later, empties into the Bay of Bengal.



We float past crematoriums that are burning bodies
24 hours a day, 7 days a week. According to the
Hindu religion, if you die and/or are cremated in
Varanasi, you are liberated from the cycle of
reincarnation. Tens of thousands of people come
here during their last days to die in Varanasi.

It's one of the most spiritual, beautiful, special places
on our planet and a great place to start the day.
Especially this day, as we're expecting 800+
severely burned children to show up at our camp
and each one desperately needs a 2nd chance at life.



When we arrive at our partner hospital, there are
already hundreds of patients who are waiting. We
wade through the crowd slowly with one of the best
burn surgeons in all of India leading the way.

One by one, we hear their stories. Everyone gets a
birth defect the same way – they're born with it.
Burns are different – they're caused by accidents,
attacks, mistakes, fights, explosions, bad judgment
and freak occurrences. Every burn, every patient
has their own story and most are heartbreaking.



We meet a young mother who was 8 months
pregnant when her sari caught fire while she
was cooking.

A pair of sisters who were sleeping in the same bed
when their hut caught on fire.



WON-EX 3906

A little 3-year-old boy, left alone at home because both his parents have to work in the fields. His hut caught on fire and there was no one there to save him. His parents rushed him to a major hospital but they had no money to pay for treatment so they were turned away.



A young woman who had an epileptic seizure while she was cooking and fell face first, unconscious into a pot of boiling water.

A beautiful, 11-year old girl who went to the local kiosk to buy some fruit as her mom asked. The kiosk owner asked her to hold a candle while he switched gas tanks. There was a leak. An explosion. And in a flash her future went up in flames.



A young man who was working in a factory when someone mixed the wrong ingredients creating a big explosion.

And we met many, many kids who were caught in fires caused by a kerosene or oil lamp that was tipped over by mistake.

A little girl whose friend set her on fire. Her mother cried when she told us her family spent all the money they had to get treatment for their daughter, but none of it helped. Then they borrowed money for surgeries and they are paying 10% interest.



As we listened to heart-wrenching stories and met so many severely disfigured children, we had a hard time not crying or looking horrified.

But our partner surgeon was solid as a rock.

He would put his hand on their shoulder, gently explain to each child and parent, things are never as bad as they look. Then he would patiently explain what he could do. He is not just a surgeon – he is a magician.

He can build eyelids, noses, ears, mouths, etc.



He can separate a chin fused to a chest, a hand with all the fingers melted together, eyelids that are melted shut.

No matter how grim the prognosis, he was always confident and optimistic that he and his team could deliver a good result for each of these patients.



2

WON-EX 3907

He gave them a hug. And then he gave them hope.

It was remarkable to be there and see how he handled each and every patient. He treated each one with love and respect.

We asked each one, "How far did you come?"

Their answers shocked us. 100 kilometers, 300 kilometers, 500 kilometers. Their answers showed how desperate they were and that no one else would help them. None of these families owned a car or motorcycle. Some had to sell their rickshaws to raise money to travel to this burn camp.

We asked, "How long ago did you get burned?"

Many of them told us, 5, 10, 15 years ago. This was hard to hear. It also showed that they needed help for a long time – and no one would help them. A 1-hour, $300 surgery many years ago could have saved a lot of these children and their families an awful lot of pain and heartache.

Most had waited a very long time for this day.

They'd still be waiting if our program wasn't sponsoring these free surgeries. And none of this would be happening without your support.

I hope that you get the chance to look at my photos, as they tell the story far better than I can. I know it will make you proud you are one of our most generous donors.

I was very proud of our organization this week.

We're empowering selfless surgeons, nurses and medical teams that make miracles happen in the poorest places on earth.

We're helping desperate parents that have no place else to turn.

And we're helping children no one else will help.

Who can ask for more than that?

Brian
Co-Founder
212-729-1855
brian@wonderwork.org








WON-EX 3908

# EXHIBIT 131

December 16, 2014



Dear ███████████,

I want you to know just how much I appreciate your recent donation and for your continued support of WonderWork.

Your gift will soon be on its way to our partner hospitals so it can be used for the life-saving and life-changing surgeries we help provide.

I just returned from a long trip to visit many of our clubfoot, burn and blindness partners in some of the poorest areas of Tanzania and Ethiopia. It was really incredible to get out in the field and meet our patients and doctors and see the impact of our efforts.

On this trip, I witnessed a lot of suffering; I also saw a lot of miracles. But I must tell you, nothing compares to watching a child or adult who was blind open their eyes and see. A child who was crippled with clubfoot walk for the first time. Or a severely burned child see themselves in the mirror for the first time after their bandages come off. Nothing even comes close.

It's your support that allows us to deliver these miracle surgeries and makes them possible.

I will send you photos and stories from my trip to show you how your support is helping children and adults no one else will help.

Best wishes for a happy and healthy holiday season.


Brian
Co-Founder
212-729-1855
brian@wonderwork.org

This is your tax receipt: WonderWork is a non-profit 501 (c)(3) organization. Since no goods or services were provided in exchange for your gift of $500 received on 12/15/14, it is tax-deductible to the full extent allowed by law.

WON-EX 010973

December 16, 2014



Dear ███████████,

I want you to know just how much I appreciate your recent donation and for your continued support of WonderWork.

Your gift will soon be on its way to our partner hospitals so it can be used for the life-saving and life-changing surgeries we help provide.

I just returned from a long trip to visit many of our clubfoot, burn and blindness partners in some of the poorest areas of Tanzania and Ethiopia. It was really incredible to get out in the field and meet our patients and doctors and see the impact of our efforts.

On this trip, I witnessed a lot of suffering; I also saw a lot of miracles. But I must tell you, nothing compares to watching a child or adult who was blind open their eyes and see. A child who was crippled with clubfoot walk for the first time. Or a severely burned child see themselves in the mirror for the first time after their bandages come off. Nothing even comes close.

It's your support that allows us to deliver these miracle surgeries and makes them possible.

I will send you photos and stories from my trip to show you how your support is helping children and adults no one else will help.

Best wishes for a happy and healthy holiday season.


Brian
Co-Founder
212-729-1855
brian@wonderwork.org

This is your tax receipt: WonderWork is a non-profit 501 (c)(3) organization. Since no goods or services were provided in exchange for your gift of $600 received on 12/15/14, it is tax-deductible to the full extent allowed by law.

WON-EX 010974

December 16, 2014



Dear ███,

I want you to know just how much I appreciate your recent donation and for your continued support of WonderWork.

Your gift will soon be on its way to our partner hospitals so it can be used for the life-saving and life-changing surgeries we help provide.

I just returned from a long trip to visit many of our clubfoot, burn and blindness partners in some of the poorest areas of Tanzania and Ethiopia. It was really incredible to get out in the field and meet our patients and doctors and see the impact of our efforts.

On this trip, I witnessed a lot of suffering; I also saw a lot of miracles. But I must tell you, nothing compares to watching a child or adult who was blind open their eyes and see. A child who was crippled with clubfoot walk for the first time. Or a severely burned child see themselves in the mirror for the first time after their bandages come off. Nothing even comes close.

It's your support that allows us to deliver these miracle surgeries and makes them possible.

I will send you photos and stories from my trip to show you how your support is helping children and adults no one else will help.

Best wishes for a happy and healthy holiday season.


Brian
Co-Founder
212-729-1855
brian@wonderwork.org

This is your tax receipt: WonderWork is a non-profit 501 (c)(3) organization. Since no goods or services were provided in exchange for your gift of $300 received on 12/6/14, it is tax-deductible to the full extent allowed by law.

# EXHIBIT 132

**WW Donations by Medium**

| | WonderWork | | | | |
|---|---|---|---|---|---|
| | **FY11** | **FY12** | **FY13** | **FY14** | **FY15** |
| *Mail* | $50,767 | $7,134,372 | $1,699,189 | $3,332,036 | $1,422,753 |
| *Wire Transfer* | $0 | $0 | $2,033,543 | $2,192,785 | $2,097,434 |
| *Web* | $0 | $4,978 | $39,840 | $70,067 | $115,289 |
| *Phone* | $0 | $0 | $33,270 | $24,718 | $35,065 |
| *Stock* | $0 | $0 | $199,295 | $238,527 | $230,214 |
| *Loan Forgiveness* | $0 | $0 | | $50,000 | $302,500 |
| *Refunds* | $0 | $0 | -$6,043 | -$1,000 | -$18,520 |
| ***Total*** | **$50,767** | **$7,139,350** | **$3,999,093** | **$5,907,132** | **$4,184,736** |

| | 20/20/20 | | | | |
|---|---|---|---|---|---|
| | **FY11** | **FY12** | **FY13** | **FY14** | **FY15** |
| *Mail* | | | $614,303 | $3,760,004 | $5,381,270 |
| *Web* | | | $27,612 | $260,769 | $878,573 |
| *Phone* | | | $140 | $6,899 | $13,712 |
| *Wire Transfer* | | | $0 | $1,198 | $63,176 |
| *Stock* | | | $0 | $654 | $9,478 |
| *Refunds* | | | -$1,713 | -$23,447 | -$16,648 |
| **Total** | | | **$640,342** | **$4,006,077** | **$6,329,562** |

| | BurnRescue | | | | |
|---|---|---|---|---|---|
| | **FY11** | **FY12** | **FY13** | **FY14** | **FY15** |
| *Mail* | | $0 | $1,338,128 | $960,621 | $814,460 |
| *Web* | | $389 | $86,492 | $44,228 | $49,957 |
| *Phone* | | $0 | $11,585 | $6,121 | $1,325 |
| *Wire Transfer* | | *$0* | $36 | $974 | |
| *Stock* | | $0 | | | |
| *Refunds* | | $0 | -$4,366 | -$3,130 | -$1,300 |

WON-EX 040269

| Total | | $389 | $1,431,876 | $1,008,814 | $864,441 |

| FirstStep | | | | | |
| --- | --- | --- | --- | --- | --- |
| | FY11 | FY12 | FY13 | FY14 | FY15 |
| Mail | | $0 | $1,457,351 | $1,364,437 | $1,125,202 |
| Web | | $59 | $74,782 | $83,354 | $60,367 |
| Phone | | $0 | $925 | $4,406 | $7,922 |
| Wire Transfer | | $0 | $0 | $197 | |
| Stock | | $0 | $0 | | $5,601 |
| Refunds | | $0 | -$6,108 | -$4,106 | -$4,265 |
| Total | | $59 | $1,526,950 | $1,448,287 | $1,194,826 |

| Hole in the Heart | | | | | |
| --- | --- | --- | --- | --- | --- |
| | FY11 | FY12 | FY13 | FY14 | FY15 |
| Mail | | $0 | $8,457 | $20 | |
| Web | | $18 | $0 | | |
| Total | | $18 | $8,457 | $20 | |

| Hydrocephalus | | | | | |
| --- | --- | --- | --- | --- | --- |
| | FY11 | FY12 | FY13 | FY14 | FY15 |
| Mail | | $0 | $10,189 | $46 | |
| Web | | $329 | $405 | | |
| Total | | $329 | $10,594 | $46 | |

| GRAND TOTAL | $50,767 | $7,140,144 | $7,617,313 | $12,370,376 | $12,573,565 |

Notes

*Source: Data is from the transaction reports provided to Goldin Associates through WW's Egnyte link on 6/23/17 and 6/27/17.*

Wire transfer includes four donations that were coded as cash in the database: $50,000 FY14 gift from ███████████, FY15 gift of $10,000 f
FY16 gift of 10,682.88 from ███████████.

| FY16 | FY17 (to 12/29/16) | TOTAL |
|---|---|---|
| $1,947,549 | $1,008,367 | $16,595,032 |
| $2,401,405 | $360,406 | $9,085,573 |
| $66,037 | $22,542 | $318,753 |
| $43,585 | $15,555 | $152,193 |
| $233,183 | $414,850 | $1,316,069 |
| $200,000 | $50,000 | $602,500 |
| -$2,165 | | -$27,728 |
| $4,889,594 | $1,871,720 | $28,042,392 |

| FY16 | FY17 (to 12/29/16) | TOTAL |
|---|---|---|
| $3,532,839 | $1,524,477 | $14,812,893 |
| $559,396 | $281,950 | $2,008,299 |
| $52,097 | $21,276 | $94,125 |
| $12,366 | $2,648 | $79,389 |
| $6,531 | $11,570 | $28,233 |
| -$20,044 | -$7,207 | -$69,059 |
| $4,143,185 | $1,834,714 | $16,953,880 |

| FY16 | FY17 (to 12/29/16) | TOTAL |
|---|---|---|
| $483,819 | $212,917 | $3,809,945 |
| $44,129 | $21,807 | $247,002 |
| $4,272 | $3,625 | $26,928 |
| $250 | $0 | $1,260 |
| $0 | $0 | $0 |
| -$2,075 | -$270 | -$11,141 |

WON-EX 040269

| | | |
|---:|---:|---:|
| **$530,395** | **$238,079** | **$4,073,995** |

| FY16 | FY17 (to 12/29/16) | TOTAL |
|---:|---:|---:|
| $645,099 | *$322,323* | $4,914,411 |
| $50,992 | *$30,480* | $300,034 |
| $2,715 | $2,836 | $18,804 |
| $10 | *$0* | $207 |
| $5,184 | $62,901 | $73,686 |
| -$4,701 | -$625 | -$19,805 |
| **$699,299** | **$417,915** | **$5,287,337** |

$54,200

| FY16 | FY17 (to 12/29/16) | TOTAL |
|---|---|---:|
| | | $8,477 |
| | | $18 |
| | | **$8,494** |

| FY16 | FY17 (to 12/29/16) | TOTAL |
|---|---|---:|
| | | $10,235 |
| | | $734 |
| | | **$10,969** |

| | | |
|---:|---:|---:|
| **$10,262,474** | **$4,362,428** | **$54,377,067** |

from ███████████, FY gift of $1500 from ██████ and

WON-EX 040269

# EXHIBIT 133

**20|20|20 | FOUNDER'S CIRCLE**
MEETING THE 20|20|20 VISION
TO 20 MILLION BLIND
CHILDREN AND ADULTS

Last chance to have your gift **DOUBLED** and help twice as many children!

D1509HH
20/20/20 Founder's Circle Year End Matching Gift FU
Quantity: 3,734
Mail Date: 12/8/15

**DEADLINE:**
**DECEMBER 31**

Attorneys' Eyes Only

WON03768

20 | 20 | 20 | 420 Fifth Avenue, 27th Floor, New York, NY 10018 | www.20x20x20.org

Your gift will be matched if received by December 31st.
Please hurry! Time is running out.

Attorneys' Eyes Only

**YEAR-END MATCHING GIFT REPLY FORM**

☐ **Yes, Brian!** I want to help provide more life-changing surgeries that can restore a child's or adult's eyesight. Please double my tax-deductible gift to 20|20|20 in the amount of:

 ☐ $200    ☐ $300    ☐ $400   ☐ Other $_____

Every gift
DOUBLES!

$400      $600      $800

D1509HI
20/20/20 Founder's Circle Year End Matching Gift FU
Quantity: 3,734
Mail Date: 12/8/15

☐ Please send me updates about 20/20/20. My email address is:
_____

**DEADLINE:**
DECEMBER 31

To donate online, please visit
www.2020for20.org

Please mail this reply form with your
check payable to 20|20|20 in the
envelope provided. Thank you!
To make a gift with a credit card,
please see other side.

0020077665   NR1512070bN1113AFC

Last chance to have your gift **DOUBLED!**
Please respond by December 31.

202020 | FOUNDER'S CIRCLE
RESTORING 20/20 VISION TO #1 MILLION BLIND CHILDREN AND ADULTS

Dear Sample A. Sample,

I hope I am not bothering you but I wanted to follow up on the letter I sent to you a couple of weeks ago about a 100% matching grant opportunity.

If you have already sent us a donation, please accept my sincere gratitude!

If you haven't, PLEASE read this short letter.

One of our most generous donors has offered to MATCH 100% of every donation we get in response to this appeal. So any gift you're able to send us will DOUBLE in value!



BEFORE: even

AFTER: restored vision

This is a huge **Year-End Matching Gift** opportunity for us, and I hope you can help us take advantage of it by sending a donation. We could really use your help.

Over the past few months, the number of children and adults coming to our partner hospitals has been increasing.

> Sample A. Sample, just think: Your gift of $200 will double to $400 – helping twice as many children who have few, if any, options to ever be able to see.

> A donation of $300 will double to $600 to help more children who will live their lives in darkness because their families cannot afford the simple, 15-minute procedure.

> And a most generous gift of $400 will be worth $800, reaching even more children and adults who are blind because they are poor.

Every day it seems we get a frantic request from one of our partner hospitals, asking for more support. Our tiny staff of 10 people is working as hard as we can but it's not enough. The patient backlogs and waiting lists grow by the day.

Many of these blind children and adults have been waiting for YEARS, hoping and praying for a miracle that will allow them to see.

*Can you imagine watching your son or daughter remain blind year after year, solely because you were too poor to help them?*

Recently, I met Priya, a 9-year-old girl in India who lost her eyesight when she was three. Her dad makes less than a dollar a day. So he spent years going from hospital to hospital,

*(over, please)*

Attorneys' Eyes Only

WON03769

### Other Ways to Support Life-Changing and Lifesaving Eyesight Restoration

At 20/20/20, we rely on donations from generous individuals like you to help us provide surgery for blind children and adults who would otherwise never receive it. You have a choice in how to support your charitable endeavors, and we hope to assist you in any way that is easiest and most convenient for you.

**Donations by mail** Please mail your check or money order to:
20/20/20 | PO Box 96669 | Washington, DC 20090-6669

**Donations by phone** To speak to one of our staff members, please call 212-390-1544.

**Tributes and Memorials** If you'd like to make a tribute in honor or in memory of a loved one, please call us at 212-390-1544, and one of our staff members will help you.

**Legacy Gifts** To name 20/20/20 in your will, or set up another legacy gift, please contact us at 212-390-1544, and one of our staff members will help you.

**Matching Gifts** Many employers will match any charitable contributions made by their employees, doubling or sometimes tripling your gift. Simply include your matching gift form, and we'll process it on your behalf. Please send your employer's matching gift form to:
20/20/20 | PO Box 96669 | Washington, DC 20090-6669

**Monthly Giving** To become a monthly supporter and provide a steady stream of gifts that help blind children and adults, please call us at 212-390-1544, and one of our staff members will help you.

**Stocks and Securities** To donate appreciated securities, please call us at 212-390-1544, and one of our staff members will help you.

#### CREDIT CARD PAYMENT

Please charge my gift to: ☐ ☐ ☐

Card # _____ CCV # _____

One-time gift of $ _____ Monthly gift of $ _____

Signature _____ Exp. Date ___/___

**20|20|20**
RESTORING 20/20 VISION
TO 20 MILLION BLIND
CHILDREN AND ADULTS

www.20x20x20.org
P.O. Box 96669,
Washington, DC 20090-6669

begging doctors to help his daughter. Nobody would.

But one day, they heard about our free surgery program for the poor and traveled almost 100 miles to get there.

The surgery Priya waited six years for took just 15 minutes. And it only cost $300.

I was there when they took her bandages off. I wish you could have seen the joyful moment when Priya opened her eyes and could see! You helped make this miracle happen.

I also want you to know that I was the co-founder and former president of Smile Train, the world's largest cleft charity. I've been helping to provide all types of free surgeries for poor children for more than 20 years.

But I've never seen anything as wonderful as watching a blind child open their eyes and see.

It is a true, modern-day miracle that is only made possible because of generous folks like you. And I can't thank you enough for helping us make these miracles happen year-round.

As the parent of a 15-year-old daughter and two sons who are 14 and 11, the thought of even one child being turned away this holiday season makes me cringe.

If you feel the same way, will you please help us?

If you can send us a donation of any amount, we will use it to help a blind child or adult get their eyesight back.

And 100% of your gift will be MATCHED by our biggest donor. But you need to act quickly as the match only lasts until December 31st.

How many blind children and adults we will be able to help this holiday season depends on how many people respond to this letter.

I really hope you do. Because none of these blind children and adults will receive surgery unless someone helps them. This matching gift opportunity is your chance to be that someone. Again.

Thank you very much for your consideration and for your very generous past support. Your gifts can truly transform people's lives.

Happy Holidays,

Brian Mullaney
Co-Founder & CEO

P.S.  Please send your best gift a quickly as you can. The match deadline is December 31st!

P.P.S. If you have any ideas or feedback, please contact me directly by calling 212.390.1544 or email me at brian@20x20x20.org. I would love to hear from you.

Attorneys' Eyes Only

WON03770

WON03771

NO POSTAGE
NECESSARY
IF MAILED
IN THE
UNITED STATES

# BUSINESS REPLY MAIL
FIRST-CLASS MAIL    PERMIT NO. 6126    NEW YORK, NY

POSTAGE WILL BE PAID BY ADDRESSEE

20|20|20
420 FIFTH AVENUE
27TH FLOOR
NEW YORK NY 10138-1128



NRISI2XXUMXXXUUUFC

Attorneys' Eyes Only

Attorneys' Eyes Only

# EXHIBIT 134



Brian Mullaney
Co-Founder and CEO

**Personal and confidential**

October 7, 2015

«FULLNAME»
«ENTITY»
«AD1»
«AD2»
«CITY», «ST» «ZIP»

Dear «SALUTATION»,

I am writing to ask for your help.

Twice as many children and adults are counting on us to help provide them with surgery over the next few months. Most have been waiting for years to be helped.

Can you imagine watching your 5-year-old daughter remain blind year after year because you couldn't afford a $300 surgery that could restore her eyesight?

But while the number of children and adults who need our help keeps rising, our fundraising is struggling to keep up. (We had a WonderWork board meeting this morning.) The slow economic recovery in the U.S. and worst year for stocks since 2008 haven't helped.

I am sending this personal appeal to a very small group of our best donors (lucky you!) to ask if you could possibly send us another donation.

Of any amount.

One of our biggest donors has very generously offered to match 100% of all of the donations we receive from this letter. So whatever you send will be doubled.

Whatever you send will make a big difference in the life of a child or adult no one else will help.

Thank you for any support you can give us.

With gratitude,

Brian
Co-Founder

P.S. If you have any questions, good ideas or suggestions, please call me on my direct line 646-558-3768 or email me: brian@wonderwork.org.

TIME magazine named WonderWork one of "10 Ideas That Can Change The World!"

625 Fifth Avenue, New York, NY 10152 Tel 212.713.1695 WonderWork.org

Attorney's Eyes Only

WON06055

EXHIBIT 135

TTT 1124, 1136

 4 color Process ◆ Non-Printing

www.2020x2020.org
P.O. Box 96669
Washington, DC 20090-6669

**2020**
RESTORING 20/20 VISION
TO 20 MILLION BLIND
CHILDREN AND ADULTS



**There's a 15-minute surgery that can restore the eyesight of children who are completely blind.**

**Send us a donation and we'll never ask for another!**

One of "10 ideas that will change the world." — *Time Magazine*

WON-EX 048507

33149_OE_Reg_1124_1136_110939.indd 1

4/18/14 8:29 AM



There's a 15-minute surgery that can restore the eyesight of children who are completely blind.

WON-EX 048508

● Cyan ● Magenta ● Yellow ● Black ● Non-Printing

**In developing countries, blindness is 500% more prevalent than in the U.S.**



**Millions who are waiting for surgery to restore their eyesight will never receive it unless someone helps them.**

*You* can be that someone.



Millions of children and adults become blind every year and it can happen at any age.

Babies are born completely blind in both eyes.

Children who have perfect eyesight suddenly go blind in one eye or both.

Teenagers suffer injuries that cause them to go completely blind.

Parents become blind and lose their jobs, their income and their families.

Grandparents lose their eyesight and become a huge burden to their families.

**All of them could have their eyesight restored — if someone helps them.**

**20|20|20**
RESTORING 20/20 VISION
TO 20 MILLION BLIND
CHILDREN AND ADULTS

P.O. Box 96669
Washington, DC 20090-6669
20x20x20.org

**One million blind children could have their eyesight restored through a $300 surgery.**

**20|20|20**
RESTORING 20/20 VISION
TO 20 MILLION BLIND
CHILDREN AND ADULTS

20|20|20 is a WonderWork charity program. WonderWork, Inc. is a 501(c)(3) nonprofit, charitable organization recognized by the IRS.
All donations are tax deductible in accordance with IRS regulations. © 2014 20|20|20

● Cyan  ● Magenta  ● Yellow  ● Black  ● Non-Printing

# 15 minutes + $300 = a cure for blindness

It sounds unbelievable but it's true.

Half of all the blind children and adults in the world — that's 20 million people — could have their eyesight restored through a miracle surgery that takes 15 minutes and costs $300.

It is a modern-day medical miracle.

The bad news is that even at $300, most blind children and adults in developing countries could never afford this surgery.

So millions of blind children and adults — who are often referred to as the "needlessly blind" — will remain blind.

Forever.

Unless someone helps them.

That's why we started 20|20|20.

To restore 20/20 vision to 20 million blind children and adults!

To give them back not just their eyesight — but their future too.

But we can't do it without your help.

Please help us restore the vision of a child or adult who is blind.

## 20|20|20 is different than other charity programs.

### We do one thing: help blind people see.

Unlike most charities that try to solve many different problems, we're focused exclusively on just one. This helps us be more productive and cost-efficient. And it makes it easy for us to measure our progress and effectiveness. Our name says it all — our mission is to help restore 20/20 vision for 20 million blind children and adults.

### We deliver results you can see and benefits that last a lifetime.

Unlike charities that are searching for a cure or that do things that you can't really see or appreciate, what we do is crystal clear. We provide miracle surgeries that in a matter of minutes can restore the eyesight of children and adults who are blind. Permanently.

### We give donors the opportunity to save a child's life.

Literally. The World Health Organization reports that in developing countries, 60% of children die within 1-2 years of going blind.

Our miracle surgeries not only can give these children their eyesight back — but their future too.

### We give donors the maximum impact for every donation.

Every donor wants to know that their donation, whatever amount, actually makes a difference.

What could be more impactful than restoring the eyesight of a child who is completely blind? And saving them from a lifetime of suffering, pain and heartache?

### 20|20|20 is managed like a business.

20|20|20 has a very experienced management team that takes great pride in the fact that it is held accountable for achieving specific goals and very ambitious results. We measure and monitor everything we do. Every program, every direct mail campaign, every dollar that we spend.

### Extremely low overhead. Sky-high productivity.

Donors don't like charities that spend a lot on overhead and administration.

Neither do we.

We have a tiny staff working in a half-price sublet office that came with free furniture. All of our technology — email, servers, networks — is in the "cloud" which saves millions of dollars.

### 20|20|20 is a WonderWork charity program.

This means we share office space, personnel, computers, etc. with other charity programs in order to dramatically reduce our overhead, administration and fundraising costs.





WON-EX 048510

● **Black**  ● Non-Printing 

# 20|20|20
RESTORING 20/20 VISION
TO 20 MILLION BLIND
CHILDREN AND ADULTS

# Information About Blindness

Providing valuable public information is one of our most important programs and an important part of our mission.

## Vision Impairment and Blindness

Vision impairment, or low vision, means that even with eyeglasses, contact lenses, medicine or surgery, you don't see well. Vision impairment can range from mild to severe. The leading causes of vision impairment and blindness in the United States are age-related eye diseases: macular degeneration, cataract and glaucoma. Other eye disorders, eye injuries, and birth defects can also cause vision loss. A loss of vision means that you may have to reorganize your life and learn new ways of doing things. If you have some vision, visual aids such as special glasses and large print books can make life easier. There are also devices to help those with no vision, like text-reading software and braille books. Sometimes, vision loss is preventable. Regular comprehensive eye exams and prompt treatment are critical.

## Some Causes of Blindness

### Macular Degeneration

Macular degeneration, or age-related macular degeneration (AMD), is a leading cause of vision loss in Americans 60 and older. It is a disease that destroys your sharp, central vision. You need central vision to see objects clearly and to do tasks such as reading and driving. AMD affects the macula, the part of the eye that allows you to see fine detail. It does not hurt, but it causes cells in the macula to die. There are two

types: wet and dry. Wet AMD happens when abnormal blood vessels grow under the macula. These new blood vessels often leak blood and fluid. Wet AMD damages the macula quickly. Blurred vision is a common early symptom. Dry AMD happens when the light-sensitive cells in the macula slowly break down. You gradually lose your central vision. A common early symptom is that straight lines appear crooked. Regular comprehensive eye exams can detect macular degeneration before the disease causes vision loss. Treatment can slow vision loss. It does not restore vision.

### Glaucoma

Glaucoma is a group of diseases that can damage the eye's optic nerve. It is a leading cause of blindness in the United States. It usually happens when the fluid pressure inside the eyes slowly rises, damaging the optic nerve. Often there are no symptoms at first. Without treatment, people with glaucoma will slowly lose their peripheral, or side vision. They seem to be looking through a tunnel. Over time, straight-ahead vision may decrease until no vision remains. A comprehensive eye exam can tell you if you have glaucoma. People at risk should get eye exams at least every two years. They include: African Americans over age 40; people over age 60, especially Mexican Americans; people with a family history of glaucoma. There is no cure, but glaucoma can usually be controlled. Early treatment can help protect your eyes against vision loss. Treatments usually include prescription eyedrops and/or surgery.

### Cataracts

Cataract is a clouding of the eye's lens and is the leading cause of blindness worldwide, and the leading cause of vision loss in the United States. Cataracts can occur at any age due to a variety of causes, and can be present at birth. Although treatment for the removal of cataract is widely available, access barriers such as insurance coverage, treatment costs, patient choice, or lack of awareness prevent many people from receiving the proper treatment. An estimated 20.5 million (17.2%) Americans 40 years and older have cataract in one or both eyes, and 6.1 million (5.1%) have had their lens removed operatively. The total number of people who have cataracts is estimated to increase to 30.1 million by 2020. Common symptoms are: blurry vision, colors that seem faded, glare, not being able to see well at night, double vision, frequent prescription changes in your eye wear. Cataracts usually develop slowly. New glasses, brighter lighting, anti-glare sunglasses or magnifying lenses can help at first. Surgery is also an option. It involves removing the cloudy lens and

replacing it with an artificial lens. Wearing sunglasses and a hat with a brim to block ultraviolet sunlight may help to delay cataracts.

### Congenital Cataracts

A congenital cataract is a clouding of the lens of the eye that is present at birth. The lens of the eye is normally clear. It focuses light that comes into the eye onto the retina.

Unlike most cataracts, which occur with age, congenital cataracts are present at birth. In most patients, no cause can be found. Congenital cataracts usually look different than other forms of cataract. Symptoms include: gray or white cloudiness of the pupil (which is normally black); infant doesn't seem to be able to see (if cataracts are in both eyes); "red eye" glow of the pupil is missing in photos, or is different between the two eyes; unusual rapid eye movements (nystagmus). To diagnose congenital cataract, the infant should have a complete eye examination by an ophthalmologist. The infant may also need to be examined by a pediatrician who is experienced in treating inherited disorders. Blood tests or x-rays may also be needed. If congenital cataracts are mild and do not affect vision, they may not need to be treated, especially if they are in both eyes.

Moderate to severe cataracts that affect vision, or a cataract that is in only one eye, will need to be treated with cataract removal surgery. Removing a congenital cataract is usually a safe, effective procedure. Call for an urgent appointment with your baby's health care provider if you notice that the pupil of one or both eyes appears white or cloudy, or if the child seems to have trouble seeing.

### Amblyopia

Amblyopia, or "lazy eye," is the loss of one eye's ability to see details. It is the most common cause of vision problems in children. Amblyopia occurs when the nerve pathway from one eye to the brain does not develop during childhood. This occurs because the abnormal eye sends a blurred image or the wrong image to the brain. This confuses the brain, and the brain may learn to ignore the image from the weaker eye. Strabismus is the most common cause of amblyopia. There is often a family history of this condition. The term "lazy eye" refers to amblyopia, which often occurs along with strabismus. However, amblyopia can occur without strabismus and people can have strabismus without amblyopia. Amblyopia is usually easily diagnosed with a complete



WON-EX 048511

examination of the eyes. Special tests are usually not needed. Children who get treated before age 5 will usually recover almost completely normal vision, although they may continue to have problems with depth perception. Delaying treatment can result in permanent vision problems. After age 10, only a partial recovery of vision can be expected.

### *Eye Injury*

According to the American Academy of Ophthalmology, an estimated 90 percent of eye injuries are preventable with the use of proper safety eyewear. Even a minor injury to the cornea — like that from a small particle of dust or debris — can be painful and become a life-long issue, so take the extra precaution and always protect the eyes. If the eye is injured, seek emergency medical help immediately.

## Dangers at Home

When we think of eye protection, we tend to think of people wearing hardhats and lab coats. We often forget that even at home, we might find ourselves dealing with similar threats to our eyes. Dangerous chemicals that could burn or splash the eyes aren't restricted to chemical laboratories. They're also in our garages and under our kitchen sinks. Debris and other air-borne irritants are present at home, too, whether one is doing a home construction project or working in the yard. The debris from a lawnmower or "weed wacker," for example, can be moving at high speeds and provide no time to react. Some sports also put the eyes at risk of injury from foreign objects moving at high speeds.

## Effective Eyewear

The best ways to prevent injury to the eye is to always wear the appropriate eye protection. The Bureau of Labor Statistics reports that approximately three out of every five workers injured were either not wearing eye protection at the time of the accident or wearing the wrong kind of eye protection for the job. To be effective, eyewear must fit properly and be effectively designed to protect the eyes based on the activity being performed. The Occupational Safety Health Administration (OSHA) has standards that require employers to provide their workers with the appropriate eye protection.

## When to Wear Protective Eyewear

According to these standards, you (or anyone who is watching you work) should always wear properly fitted eye protective gear, such as safety glasses with side protection/shields, when: Doing work that may produce particles, slivers, or dust from materials like wood, metal, plastic, cement, and drywall; hammering, sanding, grinding, or doing masonry work; working with power tools, working with chemicals, including common household chemicals like ammonia, oven cleaners, and bleach; using a lawnmower, riding mower, or other motorized gardening devices like string trimmers; working with wet or powdered cement; welding (which requires extra protection like a welding mask or helmet from sparks and UV radiation); "jumping" the battery of a motor vehicle; being a bystander to any of the above.

## Sports

It's also recommended that you protect your eyes from injury when participating in certain sports, including: indoor racket sports, paintball, baseball, basketball, hockey, cycling, riding or being a passenger on a motorcycle.

## Eye Health Tips

### *Simple Tips for Healthy Eyes*

Your eyes are an important part of your health. There are many things you can do to keep them healthy and make sure you are seeing your best. Follow these simple steps for maintaining healthy eyes well into your golden years.

**Have a comprehensive dilated eye exam.** You might think your vision is fine or that your eyes are healthy, but visiting your eye care professional for a comprehensive dilated eye exam is the only way to really be sure. When it comes to common vision problems, some people don't realize they could see better with glasses or contact lenses. In addition, many common eye diseases such as glaucoma, diabetic eye disease and age-related macular degeneration often have no warning signs. A dilated eye exam is the only way to detect these diseases in their early stages. During a comprehensive dilated eye exam, your eye care professional places drops in your eyes to dilate, or widen, the pupil to allow more light to enter the eye the same way an open door lets more light into a dark room. This enables your eye care professional to get a good look at the back of the eyes and examine them for any signs of damage or disease. Your eye care professional is the only one who can determine if your eyes are healthy and if you're seeing your best.

**Know your family's eye health history.** Talk to your family members about their eye health history. It's important to know if anyone has been diagnosed with a disease or condition since many are hereditary. This will help to determine if you are at higher risk for developing an eye disease or condition.

**Eat right to protect your sight.** You've heard carrots are good for your eyes. But eating a diet rich in fruits and vegetables, particularly dark leafy greens such as spinach, kale, or collard greens is important for keeping your eyes healthy, too. Research has also shown there are eye health benefits from eating fish high in omega-3 fatty acids, such as salmon, tuna, and halibut.

**Maintain a healthy weight.** Being overweight or obese increases your risk of developing diabetes and other systemic conditions, which can lead to vision loss, such as diabetic eye disease or glaucoma. If you are having trouble maintaining a healthy weight, talk to your doctor.

**Wear protective eyewear.** Wear protective eyewear when playing sports or doing activities around the home. Protective eyewear includes safety glasses and goggles, safety shields, and eye guards specially designed to provide the correct protection for a certain activity. Most protective eyewear lenses are made of polycarbonate, which is 10 times stronger than other plastics. Many eye care providers sell protective eyewear, as do some sporting goods stores.

**Quit smoking or never start.** Smoking is as bad for your eyes as it is for the rest of your body. Research has linked smoking to an increased risk of developing age-related macular degeneration, cataract, and optic nerve damage, all of which can lead to blindness.

**Be cool and wear your shades.** Sunglasses are a great fashion accessory, but their most important job is to protect your eyes from the sun's ultraviolet rays. When purchasing sunglasses, look for ones that block out 99 to 100 percent of both UV-A and UV-B radiation.

**Give your eyes a rest.** If you spend a lot of time at the computer or focusing on any one thing, you sometimes forget to blink and your eyes can get fatigued. Try the 20-20-20 rule: Every 20 minutes, look away about 20 feet in front of you for 20 seconds. This can help reduce eyestrain.

**Practice workplace eye safety.** Employers are required to provide a safe work environment. When protective eyewear is required as a part of your job, make a habit of wearing the appropriate type at all times and encourage your coworkers to do the same.

*Information was derived from the U.S. Government National Institutes of Health, the National Eye Institute and the Centers for Disease Control and Prevention.*

WON-EX 048512

WON-EX 048513

**Yes!** I want to restore the eyesight of a blind child or adult...

To donate offer, please visit
**www.2020x20.org**

**Make it Monthly!**
See details on reverse.

# 2020/20
RESTORING 20/20 VISION
TO 20 MILLION BLIND
CHILDREN AND ADULTS

☐ $300 that can provide a full surgery
☐ $150 that can provide half a surgery
☐ $75 that can provide anesthesia
☐ $_____ any amount will help

*To watch two sisters see for the very first time, visit www.2020x20.org*

Please mail this reply form with your check payable to 2020/20 in the envelope provided. Thank you! To make a gift with a credit card, please see other side.

☐ Please send me updates about 2020/20.
☐ I'd like to receive limited communications.
☐ Please do not ask me for another donation.
Thanks for your patience as we process your request

My email address is _____

(Please allow 8 weeks to be removed from our mailing list and to process your request.)

F41036.5061  NA14051507XX105500

C020277

At $300 donation
MAKES YOU A
FOUNDING DONOR!

# 2020/20
RESTORING 20/20 VISION
TO 20 MILLION BLIND
CHILDREN AND ADULTS

**One donation from you
can restore the eyesight of a
blind child or adult.
(And we'll never ask for another)**

Dear _____

Imagine if your daughter suddenly became blind at the age of three.

I recently met such a man and his 9-year-old daughter in India.

You learn there's a surgery that can restore her eyesight, but you can't afford it. You go from hospital to hospital begging for help. You try to borrow the money but can't. Years go by as you watch your daughter sit at home alone, with no school, no friends and no future. You know the only reason she remains blind is because you can't afford the surgery that can save her

After six years of trying, he was about to give up when he saw a small newspaper ad offering free surgery for the blind. He and his daughter Priya traveled 100+ kilometers to reach our partner hospital where I met them. The surgery Priya waited six years for took just 15 minutes. When her bandages came off, she opened her eyes and could see again. Her father cried. So did we.

I've seen a lot of suffering over the past 20 years as I traveled to many of the world's poorest countries such as Haiti, Afghanistan, India and Somalia. As the co-founder and former CEO of Smile Train, I helped provide free cleft surgery for more than 700,000 children.

But I have never experienced anything as powerful, as inspiring or as wonderful as watching someone who is blind, open their eyes and see.

**It's about the closest thing to a miracle I've ever seen.**



Just a simple 15-minute surgery, that costs just $300 and doesn't even require stitches. The next morning the bandages come off, the eyes open and just like that, someone gets a second chance at life that they never thought they'd get.

**20 million blind children and adults are waiting for this surgery – and most of them will never receive it.**

There's only one problem.

You see, even though this simple surgery costs just $300, very few people in developing countries can afford it. When you're living on less than a dollar a day, $300 might as well be $3 million.

As a result, millions of children and adults will remain blind for the rest of their lives solely because they are poor. They're called the "needlessly blind." And they suffer in more ways than you can imagine.

*(over, please)*

WON-EX 048514

## Prevent a Lifetime of Suffering with a Small Monthly Gift

Half of all the blind children and adults in the world could see tomorrow thanks to a miracle surgery that costs only $300. But because they are so poor, 99% of them will never receive surgery unless someone helps them. YOU could be that someone.

20/20/20 champions a simple, safe and virtually 100% effective surgery that takes as little as 15 minutes and permanently restores the eyesight of a blind child or adult. By making a monthly gift of just $25 (around 80¢ per day), you can help provide the funding for at least one of these miracle surgeries to prevent a lifetime of suffering.

Your monthly commitment will be automatically charged to your debit or credit card, and you'll never have to mail a check, find an envelope, or buy a stamp to help a blind child or adult. Simply fill in the credit card information on the left and become a monthly supporter today!

### Credit Card Donations
**If you prefer, we accept:**

Card #

CVV:

Exp. Date

One-time gift of $ ___   Monthly gift $ ___

Signature



20/20/20
RESTORING 20/20 VISION
TO 20 MILLION BLIND
CHILDREN AND ADULTS
www.2020.org
P.O. Box 96464
Washington, DC 20090-6464

When you go blind in a developing country, your vision is but the first thing you lose. When a 42-year-old farmer goes blind, his family starves. When a 28-year-old mother goes blind, she loses her children. When a 7-year-old child goes blind, well, they pretty much lose everything. The chance to go to school, to have friends, to even marry and raise a family.

The saddest part is that 100% of all of this suffering and heartache is completely unnecessary.

Each and every one of these 20 million blind children and adults could see tomorrow ....

If someone would help them.

**I am writing to ask you to be that someone.**

**I am asking you to help us provide surgery for a blind child or adult who could never afford it.**

And as a small token of our thanks, in a month or so, I will send you a photo of a child who was blind and now can see – thanks to donors like you.

I promise these photos may change the way you look at the world too.

Thank you for helping us,

Brian Mullaney
Co-Founder

P.S. Millions of children and adults around the world are hoping and praying to have their eyesight restored, just like Priya. Please send a gift today and see the difference you can make. Thanks again!

*A $300 DONATION INVOKES YOU A FOUNDING DONOR.)*

*THANKS FOR HELPING US!*

15 MINUTES + $300 = A CURE FOR BLINDNESS

PLACE STAMP HERE

RESTORING 20/20 VISION
TO 20 MILLION BLIND
CHILDREN AND ADULTS

**20|20|20**
PO Box 96669
Washington, DC 20090-6669

Attention: Brian

NA1405XXUNXXXBBB3T

2020|20 is a WonderWork charity program. Your gift is very much appreciated and fully deductible as a charitable contribution. A copy of our latest financial report may be obtained by writing to WonderWork, Inc. 420 Fifth Avenue, 27th Floor, New York, New York, NY 10018, 212-390-1544. If you are a resident of one of these states, you may obtain financial information directly from the state agency: FLORIDA – A COPY OF THE OFFICIAL REGISTRATION AND FINANCIAL INFORMATION MAY BE OBTAINED FROM THE DIVISION OF CONSUMER SERVICES BY CALLING TOLL-FREE, 1-800-435-7352 (800-HELP-FLA) WITHIN THE STATE. REGISTRATION DOES NOT IMPLY ENDORSEMENT, APPROVAL, OR RECOMMENDATION BY THE STATE. Florida Registration #CH26050. GEORGIA – A full and fair description of our programs and our financial statement summary is available upon request at the office and phone number indicated above. MARYLAND – For the cost of copies and postage, Office of the Secretary of State, State House, Annapolis, MD 21401 MISSISSIPPI – The official registration and financial information may be obtained from the Mississippi Secretary of State's office by calling 1-888-236-6167. Registration by the Secretary of State does not imply endorsement. NEW JERSEY – INFORMATION FILED WITH THE ATTORNEY GENERAL CONCERNING THIS CHARITABLE SOLICITATION AND THE PERCENTAGE OF CONTRIBUTIONS RECEIVED BY THE CHARITY DURING THE LAST REPORTING PERIOD THAT WERE DEDICATED TO THE CHARITABLE PURPOSE MAY BE OBTAINED FROM THE ATTORNEY GENERAL OF THE STATE OF NEW JERSEY BY CALLING (973) 504-6215 AND IS AVAILABLE ON THE INTERNET AT http://www.state.nj.us/lps/ca/charfrm.htm. REGISTRATION WITH THE ATTORNEY GENERAL DOES NOT IMPLY ENDORSEMENT. NEW YORK – Office of the Attorney General, Department of Law, Charities Bureau, 120 Broadway, New York, NY 10271. NORTH CAROLINA – FINANCIAL INFORMATION ABOUT THIS ORGANIZATION AND A COPY OF ITS LICENSE ARE AVAILABLE FROM THE STATE SOLICITATION LICENSING BRANCH AT 1-888-830-4989. THE LICENSE IS NOT AN ENDORSEMENT BY THE STATE. PENNSYLVANIA – The official registration and financial information of WonderWork may be obtained from the Pennsylvania Department of State by calling toll-free, within Pennsylvania, 1-800-732-0999 – Charities Division, Office of the Secretary of State, State of Washington, Olympia, WA 98504-0422, 1-800-332-4483. WEST VIRGINIA – Residents may obtain a summary of the registration and financial documents from the Secretary of State, State Capitol, Charleston, WV 25305. Registration with any of these state agencies does not imply endorsement, approval or recommendation by any state. Registration does not imply endorsement. VIRGINIA – Virginia State Office of Consumer Affairs, Department of Agricultural and Consumer Services, PO Box 1163, Richmond, VA 23218. WASHINGTON

WON-EX 048515

TTT 1124 #9 RE.indd 1

4/14/14  4:39 PM

#9  3.875 x 8.875
1.5 Flap ss