MULLANEY
EXHIBIT 28

| | |
|---|---|
| From: | Brian Mullaney <brian@wonderwork.org> |
| Sent: | Friday, September 06, 2013 4:39 PM |
| To: | ███████████████████████ |
| Cc: | |
| Subject: | first update meeting |
| Attachments: | X_Thompson_ImpactLoan_revisedfonts_2013_09_05.pptx |

███████

Thank you both for making time for me this morning.

I hope I did not overwhelm you with all the numbers. I really do want you to understand our business model so you can easily evaluate our progress as we execute this plan.

As I told you, these DM numbers are all coming from our direct mail partner Target MarkeTeam. They were by far our most important partner at Smile Train and we are all very excited to be working with them again. They are much more conservative than I am and so are these numbers. Additionally, they are primarily derived from our results over the past 12 months in which we mailed more than 23 million letters. Suffice it to say that we have a high degree of confident in hitting these numbers and we for any reason we fall short, we will know it sooner rather than later.

All of us are still in shock over the response to our Impact Loan Appeal. I was hoping to raise $2-$3 million and we ended up around $9 million. This is a real tribute to how much confidence and faith people have in us.

We will not let them down.

███████

I am glad you are considering coming to our November 5th event. Most of your fellow "Funding Investors" will be there and would be thrilled to meet you. I am sure your presence would help us get ███████████████ there too. I would like to give you your own table and have you fill it with prospects – that would help us a lot. If you can make it, the sooner you can tell me the better. I am sending out invites with letters next week – and I would want to mention that you will be there. I can Fedex you as many invites as you might want to send out.

As for publicity, we feel this is a tremendous opportunity to get PR for WonderWork and raise awareness about these causes. You would help us a lot if you would participate but if you are not comfortable with that that's okay too. We will not mention your name and keep your identity anonymous. I believe we will get a feature article in WSJ, The NY Times and or one of the big business mags such as Fortune or Forbes. Please let me know this as soon as you can as we will be pitching the media very soon.

The trip you have some time on! Please take a look at the proposed itinerary and give us some feedback. I promise we will make it a journey you will never forget.

That's it for now!

Thanks again for making time during such a hectic time and congrats again on your new grandson.

All the best,

**EXHIBIT -28**
Brian Mullaney
8/17/17
S. Arielle Santos, RPR, CSR
**TransPerfect Legal**

1

WON07589

Brian

P.S ██ —sorry to miss you today. I would love the opportunity to walk you through this presentation in person or over the phone whenever you have a free moment.

P.S.S. There is an excellent video that you might want to watch that addresses the issue of capital allocation in the non-profit world. It is around 13 minutes and I strongly recommend you take a look.

http://www.ted.com/talks/dan_pallotta_the_way_we_think_about_charity_is_dead_wrong.html

Brian Mullaney
Co-Founder/CEO
WonderWork
400 Fifth Avenue, 27th Floor
New York, NY 10018
tel: 212.729.1855
cell: 917.902.7550
email: brian@wonderwork.org
www.WonderWork.org

CONFIDENTIAL

WON07590

CONFIDENTIAL

# Impact Loan Progress Report
## for

████████████████████████████

September 6, 2013

Miracle surgeries for children.

wonder
work

WON07591

CONFIDENTIAL

WON07592

# 1st Impact: Enlist Other Major WW Donors



So you can take money in your foundation that's currently invested and invest it instead in a charity that is doing good work. And afterwards, if for any reason you change your mind, you can always call your loan, just like a bank, and get repaid early.

*You can see why impact loans are the hottest new trend in philanthropy.*

We've created a $15 Million *WonderWork Donor Acquisition Impact Loan Note* that will be a 5-year loan that pays 2% interest annually.

We need to find 15 *WonderWork Founding Investors* to finance a portion of the loan. We've already found a generous couple *who* has agreed to finance half of this loan.

### WonderWork Donor Acquisition Impact Loan
*$15 million, 5-year term, 2% interest per year*

| Portion Of Loan | Investors needed | Total | Status |
|---|---|---|---|
| $7,500,000 | 1 | $7,500,000 | 1 |
| $2,500,000 | 1 | $2,500,000 | 0 |
| $1,000,000 | 2 | $2,000,000 | 0 |
| $500,000 | 4 | $2,000,000 | 0 |
| $250,000 | 2 | $500,000 | 0 |
| $100,000 | 5 | $500,000 | 0 |
| | 15 | $15,000,000 | 1 |



**I am writing to ask you to be one of our WonderWork Founding Investors.**

This is a rare opportunity to be one of 15 people who will provide the crucial start-up capital for what will one day be one of the largest children's charities in the world.

*A charity that will change the lives of millions of children and adults.*

I write this with confidence because we've already done it once. At Smile Train, my team and I turned $27 million in start-up capital into the world's largest cleft charity that will soon raise its $1-billionth dollar and operate on its 1-millionth child.

WonderWork should be even bigger than Smile Train because, while 2 million children in the world need cleft surgery, there are 20 million children who are blind, burned or crippled with clubfoot waiting to be helped.

Virtually the entire senior management team that helped me create Smile Train is now helping me at WonderWork. The enclosed chart shows how far we have come and how far we hope to grow. As you can see, we'll have plenty of money to repay your loan in 5 years. My goal is to personally hand you your repayment check in 5 years and to thank you personally on behalf of the hundreds of thousands of children who you helped us save.

*When was the last time a charity sent you a check?*



# WonderWork Investors

WON07593

| Avg Annual Giving | Impact Loan Commitment |
|---|---|
| $20,000 | $25,000 Donation |
| $2,000 | $50,000 |
| $2,000 | $50,000 Donation |
| $0 | $55,000 |
| $100,000 | $100,000 |
| $10,000 | $100,000 |
| $10,000 | $100,000 |
| $30,000 | $100,000 |
| $6,500 | $100,000 |
| $4,500 | $100,000 |
| $50,000 | $100,000 |
| | |
| $25,000 | $250,000 |
| $50,000 | $250,000 |
| $50,000 | $250,000 |
| $100,000 | $400,000 |
| $25,000 | $1,000,000 |
| $100,000 | $1,000,000 |
| $20,000 | $4,500,000 |
| $0 | $7,500,000 |
| **$605,000** | **$16,030,000** |



# 2nd Impact: Generate Publicity

- Tremendous PR opportunity
  - One of the largest Impact Loans done so far.
  - Press release mid-September – █████████ to participate?
  - Will pitch large print/online publications, such as NYTimes, WSJ, Washington Post, LA Times, TIME, USA Today, Newsweek, Forbes and popular TV shows, such as The Today Show, Today, Good Morning America, CBS This Morning





CONFIDENTIAL

WON07595

# 3rd Impact: Crucial Funding for Direct Mail

- Finalizing all impact loan contracts in September.
- Begin acquisition spending in October.

**20|20|20**
RESTORING THE EYESIGHT OF
20 MILLION BLIND
CHILDREN AND ADULTS

One donation from you
can restore the eyesight
of a blind child or adult.
(And we'll never ask
for another.)

Dear Salutation,

Imagine if your daughter suddenly became blind at the age of :

You learn there's a surgery that can restore her eyesight, but yo
hospital to hospital begging for help. You try to borrow the mon
watch your daughter sit at home alone, with no school, no frien
only reason she remains blind is because you can't afford the s

I recently met such a man and his 9-year-old daughter in India.

After six years of trying, he was about to give up when he saw a
surgery for the blind. He and his daughter Priya traveled 100+ k
hospital where I met them. The surgery Priya waited six years fo
bandages came off, she opened her eyes and could see again. I

I've seen a lot of suffering over the past 20 years as I traveled to
countries such as Haiti, Afghanistan, India and Somalia. As the
Smile Train, I helped provide free cleft surgery for more than 700

But I have never experienced anything as powerful, as inspiring
someone who is blind, open their eyes and see.

It's about the closest thing to a miracle I've ever seen.

Just a simple 15-minute surgery, that costs just $300 and doesn't even require stitches. The
next morning the bandages come off, the eyes open and just like that, someone gets a second
chance at life that they never thought they'd get.

There's only one problem.

There's a 15-minute surgery that
can restore the eyesight of children
who are completely blind.





CONFIDENTIAL

# WonderWork Direct Mail Results To Date

- Acquisition
  - Letters Mailed · · · · · · · · · · · · · · · 23,388,247
  - Response Rate · · · · · · · · · · · · · · · .42%

  - Donations · · · · · · · · · · · · · · · 98,233
  - Donors · · · · · · · · · · · · · · · 72,500

  - Average Gift · · · · · · · · · · · · · · · $39.60
  - Total Expenses · · · · · · · · · · · · · · · $7,490,676
  - Total Revenue · · · · · · · · · · · · · · · $3,889,704
  - Cost-To-Raise 1$ · · · · · · · · · · · · · · · $1.93
  - Net · · · · · · · · · · · · · · · -$3,600,972

- Retention
  - Letters Mailed · · · · · · · · · · · · · · · 162,412
  - Response Rate · · · · · · · · · · · · · · · 4.25%
  - Gifts · · · · · · · · · · · · · · · 6,899
  - Average Gift · · · · · · · · · · · · · · · $35.09
  - Total Expenses · · · · · · · · · · · · · · · $105,456
  - Total Revenue · · · · · · · · · · · · · · · $242,114
  - Cost-To-Raise 1$ · · · · · · · · · · · · · · · $.44
  - Net · · · · · · · · · · · · · · · $136,658

CONFIDENTIAL

# WonderWork Acquisition Campaign:  Strategy

- New Direct Response Director - Amee Kamdar, formerly of Steve Levitt's Greatest Good
- New Direct Marketing Vendor - TMT, agency responsible for ST astronomic growth
- New Strategy - start with one cause and then add additional causes…
  - Begin with blindness - 20/20/20 generated highest average gift and response rate
  - Add burns and clubfoot as quickly as we can.

WON07597

# Acquisition and Renewal Year 1 – FY14

| | Oct-13 | Nov-13 | Dec-13 | Jan-14 | Feb-14 | Mar-14 | Apr-14 | May-14 | Jun-14 | Jul-14 | Aug-14 | Sep-14 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ACQUISITION** | | | | | | | | | | | | | |
| Spending | $500,000 | $750,000 | $1,000,000 | $750,000 | $750,000 | $750,000 | $750,000 | $750,000 | $750,000 | $750,000 | $750,000 | $1,000,000 | $9,250,000 |
| Cost per letter mailed | $0.33 | $0.33 | $0.33 | $0.33 | $0.33 | $0.33 | $0.33 | $0.33 | $0.33 | $0.33 | $0.33 | $0.33 | |
| Letters mailed | 1,515,152 | 2,272,727 | 3,030,303 | 2,307,692 | 2,307,692 | 2,307,692 | 2,307,692 | 2,307,692 | 2,307,692 | 2,307,692 | 2,307,692 | 3,076,923 | 28,356,643 |
| Response rate | 0.40% | 0.40% | 0.40% | 0.40% | 0.40% | 0.40% | 0.40% | 0.40% | 0.40% | 0.40% | 0.40% | 0.40% | |
| Donations | 6,061 | 9,091 | 12,121 | 9,231 | 9,231 | 9,231 | 9,231 | 9,231 | 9,231 | 9,231 | 9,231 | 12,308 | 113,427 |
| Average donation | $40.00 | $40.00 | $40.00 | $40.00 | $40.00 | $40.00 | $40.00 | $40.00 | $40.00 | $40.00 | $40.00 | $40.00 | |
| Revenue | $242,424 | $363,636 | $484,848 | $369,231 | $369,231 | $369,231 | $369,231 | $369,231 | $369,231 | $369,231 | $369,231 | $492,308 | $4,537,063 |
| New donors | 6,061 | 9,091 | 12,121 | 9,231 | 9,231 | 9,231 | 9,231 | 9,231 | 9,231 | 9,231 | 9,231 | 12,308 | 113,427 |
| Net | -$257,576 | -$386,364 | -$515,152 | -$380,769 | -$380,769 | -$380,769 | -$380,769 | -$380,769 | -$380,769 | -$380,769 | -$380,769 | -$507,692 | -$4,712,937 |
| Total donors | 72,000 | 81,091 | 93,212 | 102,443 | 111,674 | 120,904 | 130,135 | 139,366 | 148,597 | 157,828 | 167,058 | 179,366 | 179,366 |
| Cost per dollar raised | $ 2.06 | $ 2.06 | $ 2.06 | $ 2.03 | $ 2.03 | $ 2.03 | $ 2.03 | $ 2.03 | $ 2.03 | $ 2.03 | $ 2.03 | $ 2.03 | |
| | | | | | | | | | | | | | |
| **RENEWAL** | | | | | | | | | | | | | |
| Mailable donors | 47,952 | 54,007 | 62,079 | 68,227 | 74,375 | 80,522 | 86,670 | 92,818 | 98,965 | 105,113 | 111,261 | 119,458 | |
| Letters mailed (1.5 mailings per month) | 71,928 | 71,928 | 81,010 | 93,119 | 102,340 | 111,562 | 120,784 | 130,005 | 139,227 | 148,448 | 157,670 | 166,891 | 1,394,911 |
| Cost per letter mailed | $0.50 | $0.50 | $0.50 | $0.50 | $0.50 | $0.50 | $0.50 | $0.45 | $0.45 | $0.45 | $0.45 | $0.45 | |
| Spending | $35,964 | $35,964 | $40,505 | $46,559 | $51,170 | $55,781 | $60,392 | $58,502 | $62,652 | $66,802 | $70,951 | $75,101 | $660,344 |
| Response rate | 3.75% | 3.75% | 3.75% | 3.75% | 3.75% | 3.75% | 3.75% | 3.75% | 3.75% | 3.75% | 3.75% | 3.75% | |
| Donations | 2,697 | 2,697 | 3,038 | 3,492 | 3,838 | 4,184 | 4,529 | 4,875 | 5,221 | 5,567 | 5,913 | 6,258 | 52,309 |
| Average donation | $37.00 | $37.00 | $37.00 | $37.00 | $37.00 | $37.00 | $37.00 | $37.00 | $37.00 | $37.00 | $37.00 | $37.00 | |
| Revenue | $99,800 | $99,800 | $112,401 | $129,202 | $141,997 | $154,792 | $167,587 | $180,382 | $193,177 | $205,972 | $218,767 | $231,562 | $1,935,440 |
| Net | $63,836 | $63,836 | $71,896 | $82,643 | $90,827 | $99,011 | $107,195 | $121,880 | $130,525 | $139,170 | $147,815 | $156,461 | $1,275,096 |
| Cost per dollar raised | $ 0.36 | $ 0.36 | $ 0.36 | $ 0.36 | $ 0.36 | $ 0.36 | $ 0.36 | $ 0.32 | $ 0.32 | $ 0.32 | $ 0.32 | $ 0.32 | |
| | | | | | | | | | | | | | |
| TOTAL DM SPENDING | | | | | | | | | | | | | $9,910,344 |
| TOTAL DM REVENUE | | | | | | | | | | | | | $6,472,502 |
| COMBINED NET | -$193,740 | -$322,528 | -$443,255 | -$298,126 | -$289,942 | -$281,758 | -$273,574 | -$258,889 | -$250,244 | -$241,599 | -$232,954 | -$351,232 | -$3,437,841 |

# Acquisition and Renewal Year 2 – FY15

| | Oct-14 | Nov-14 | Dec-14 | Jan-15 | Feb-15 | Mar-15 | Apr-15 | May-15 | Jun-15 | Jul-15 | Aug-15 | Sep-15 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ACQUISITION** | | | | | | | | | | | | | |
| Spending | $1,500,000 | $1,500,000 | $1,500,000 | $1,000,000 | $1,000,000 | $1,000,000 | $1,000,000 | $1,000,000 | $1,000,000 | $1,000,000 | $1,000,000 | $1,000,000 | $13,500,000 |
| Cost per letter mailed | $0.33 | $0.33 | $0.33 | $0.33 | $0.33 | $0.33 | $0.33 | $0.33 | $0.33 | $0.33 | $0.33 | $0.33 | |
| Letters mailed | 4,615,385 | 4,615,385 | 4,615,385 | 3,076,923 | 3,076,923 | 3,076,923 | 3,076,923 | 3,076,923 | 3,076,923 | 3,076,923 | 3,076,923 | 3,076,923 | 41,538,462 |
| Response rate | 0.40% | 0.40% | 0.40% | 0.40% | 0.40% | 0.40% | 0.40% | 0.40% | 0.40% | 0.40% | 0.40% | 0.40% | |
| Donations | 18,462 | 18,462 | 18,462 | 12,308 | 12,308 | 12,308 | 12,308 | 12,308 | 12,308 | 12,308 | 12,308 | 12,308 | 166,154 |
| Average donation | $40.00 | $40.00 | $40.00 | $40.00 | $40.00 | $40.00 | $40.00 | $40.00 | $40.00 | $40.00 | $40.00 | $40.00 | |
| Revenue | $738,462 | $738,462 | $738,462 | $492,308 | $492,308 | $492,308 | $492,308 | $492,308 | $492,308 | $492,308 | $492,308 | $492,308 | $6,646,154 |
| New donors | 18,462 | 18,462 | 18,462 | 12,308 | 12,308 | 12,308 | 12,308 | 12,308 | 12,308 | 12,308 | 12,308 | 12,308 | 166,154 |
| Net | -$761,538 | -$761,538 | -$761,538 | -$507,692 | -$507,692 | -$507,692 | -$507,692 | -$507,692 | -$507,692 | -$507,692 | -$507,692 | -$507,692 | -$6,853,846 |
| Total donors | 197,828 | 216,289 | 234,751 | 247,058 | 259,366 | 271,674 | 283,981 | 296,289 | 308,597 | 320,904 | 333,212 | 345,520 | 345,520 |
| Cost per dollar raised | $ 2.03 | $ 2.03 | $ 2.03 | $ 2.03 | $ 2.03 | $ 2.03 | $ 2.03 | $ 2.03 | $ 2.03 | $ 2.03 | $ 2.03 | $ 2.03 | |
| | | | | | | | | | | | | | |
| **RENEWAL** | | | | | | | | | | | | | |
| Mailable donors | 115,929 | 126,226 | 135,858 | 142,026 | 148,194 | 154,362 | 160,530 | 166,699 | 172,867 | 179,035 | 185,203 | 190,695 | |
| Letters mailed (2.1 mailings per month) | 243,451 | 265,075 | 285,301 | 298,254 | 311,208 | 324,161 | 337,114 | 350,067 | 363,020 | 375,974 | 388,927 | 400,460 | 3,943,012 |
| Cost per letter mailed | $0.40 | $0.40 | $0.40 | $0.40 | $0.40 | $0.40 | $0.40 | $0.40 | $0.40 | $0.40 | $0.40 | $0.40 | |
| Spending | $97,380 | $106,030 | $114,120 | $119,302 | $124,483 | $129,664 | $134,846 | $140,027 | $145,208 | $150,389 | $155,571 | $160,184 | $1,577,205 |
| Response rate | 3.75% | 3.75% | 3.75% | 3.75% | 3.75% | 3.75% | 3.75% | 3.75% | 3.75% | 3.75% | 3.75% | 3.75% | |
| Donations | 9,129 | 9,940 | 10,699 | 11,185 | 11,670 | 12,156 | 12,642 | 13,128 | 13,613 | 14,099 | 14,585 | 15,017 | 147,863 |
| Average donation | $38.00 | $38.00 | $38.00 | $38.00 | $38.00 | $38.00 | $38.00 | $38.00 | $38.00 | $38.00 | $38.00 | $38.00 | |
| Revenue | $346,917 | $377,732 | $406,554 | $425,013 | $443,471 | $461,929 | $480,387 | $498,846 | $517,304 | $535,762 | $554,221 | $570,655 | $5,618,792 |
| Net | $249,537 | $271,702 | $292,434 | $305,711 | $318,988 | $332,265 | $345,542 | $358,819 | $372,096 | $385,373 | $398,650 | $410,471 | $4,041,587 |
| | | | | | | | | | | | | | |
| TOTAL DM SPENDING | | | | | | | | | | | | | $15,077,205 |
| TOTAL DM REVENUE | | | | | | | | | | | | | $12,264,946 |
| COMBINED NET | -$512,001 | -$489,836 | -$469,105 | -$201,982 | -$188,705 | -$175,427 | -$162,150 | -$148,873 | -$135,596 | -$122,319 | -$109,042 | -$97,221 | -$2,812,259 |

CONFIDENTIAL

# 10-Year Summary

| | Sep-13 | Oct-14 | Oct-15 | Oct-16 | Oct-17 | Oct-18 | Oct-19 | Oct-20 | Oct-21 | Oct-22 | Oct-23 | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DM spending | | $9,910,344 | $15,077,205 | $15,949,765 | $16,777,258 | $17,619,623 | $18,457,079 | $19,296,156 | $20,134,698 | $20,973,416 | $21,812,077 | $176,007,621 |
| DM revenue | | $6,472,502 | $12,264,946 | $15,373,443 | $18,321,384 | $21,322,309 | $24,305,749 | $27,294,959 | $30,282,265 | $33,270,200 | $36,257,927 | $225,165,686 |
| DM net | | -$3,437,841 | -$2,812,259 | -$576,322 | $1,544,127 | $3,702,687 | $5,846,670 | $7,998,803 | $10,147,567 | $12,296,783 | $14,445,850 | $49,158,065 |
| Donors | | 194,418 | 427,694 | 643,970 | 860,245 | 1,076,521 | 1,292,797 | 1,509,072 | 1,725,348 | 1,941,624 | 2,157,899 | 2,157,899 |
| President's Circle | | $500,000 | $1,400,000 | $2,200,000 | $3,000,000 | $3,800,000 | $4,500,000 | $5,162,000 | $5,900,000 | $6,656,000 | $7,400,000 | $40,518,000 |
| Major gifts | | $3,000,000 | $4,000,000 | $6,000,000 | $6,000,000 | $8,000,000 | $8,000,000 | $9,000,000 | $10,000,000 | $11,000,000 | $12,000,000 | $77,000,000 |
| Foundations | | $100,000 | $200,000 | $300,000 | $400,000 | $500,000 | $600,000 | $700,000 | $800,000 | $900,000 | $1,000,000 | $5,500,000 |
| Investment income | | $645,000 | $549,215 | $487,323 | $531,153 | $627,912 | $652,830 | $670,875 | $704,465 | $761,526 | $835,275 | $6,465,575 |
| Gross revenue | | $10,717,502 | $18,414,160 | $24,360,767 | $28,252,538 | $34,250,221 | $38,058,579 | $42,827,834 | $47,686,731 | $52,587,726 | $57,493,202 | $354,649,261 |
| Net revenue | | $807,159 | $3,336,956 | $8,411,001 | $11,475,280 | $16,630,599 | $19,601,500 | $23,531,678 | $27,552,033 | $31,614,310 | $35,681,126 | $178,641,640 |
| Program spending info | | $4,955,172 | $7,538,602 | $7,974,883 | $8,388,629 | $8,809,811 | $9,228,540 | $9,648,078 | $10,067,349 | $10,486,708 | $10,906,038 | $88,003,810 |
| Program spending intl | | $2,000,000 | $2,500,000 | $3,000,000 | $3,500,000 | $10,000,000 | $12,500,000 | $15,000,000 | $17,500,000 | $20,000,000 | $25,000,000 | $111,000,000 |
| Program spending total | | $6,955,172 | $10,038,602 | $10,974,883 | $11,888,629 | $18,809,811 | $21,728,540 | $24,648,078 | $27,567,349 | $30,486,708 | $35,906,038 | $199,003,810 |
| Surgeries | | 57,143 | 71,429 | 85,714 | 100,000 | 285,714 | 357,143 | 428,571 | 500,000 | 571,429 | 714,286 | 3,171,429 |
| Overhead and admin | | $1,500,000 | $1,500,000 | $1,750,000 | $1,750,000 | $2,000,000 | $2,000,000 | $2,250,000 | $2,250,000 | $2,500,000 | $2,500,000 | $20,000,000 |
| Yearly net surplus | | -$3,192,841 | -$2,063,044 | $1,461,001 | $3,225,280 | $830,599 | $601,500 | $1,119,678 | $1,902,033 | $2,458,310 | $781,126 | $7,123,640 |
| Total assets | $21,500,000 | $18,307,159 | $16,244,114 | $17,705,116 | $20,930,396 | $21,760,994 | $22,362,494 | $23,482,173 | $25,384,205 | $27,842,515 | $28,623,640 | |
| Total liabilities | $18,000,000 | $18,000,000 | $18,000,000 | $18,000,000 | $18,000,000 | $18,000,000 | $18,000,000 | $18,000,000 | $18,000,000 | $18,000,000 | $18,000,000 | |
| Net surplus | $3,500,000 | $307,159 | -$1,755,886 | -$294,884 | $2,930,396 | $3,760,994 | $4,362,494 | $5,482,173 | $7,384,205 | $9,842,515 | $10,623,640 | |



CONFIDENTIAL

# Multi-Cause Strategy Is Working

| Charity Program | Burn Rescue | First Step | 20/20/20 | Unique Donors | # Gifts | Revenue | Avg. Gift | # Mailable Donors |
|---|---|---|---|---|---|---|---|---|
| **BurnRescue** | Y | | | 25,531 | 28,712 | $1,135,287 | $39.54 | 17,445 |
| **BurnRescue** | Y | | Y | 1,943 | 2,398 | $78,207 | $32.61 | 1,179 |
| **BurnRescue** | Y | Y | | 5,520 | 7,537 | $254,435 | $33.76 | 3,498 |
| **BurnRescue** | Y | Y | Y | 2,085 | 4,898 | $111,795 | $22.82 | 1,343 |
| **FirstStep** | | Y | | 23,029 | 25,574 | $1,243,817 | $48.64 | 14,871 |
| **FirstStep** | | Y | Y | 2,092 | 2,626 | $99,150 | $37.76 | 1,203 |
| **FirstStep** | Y | Y | | 5,520 | 7,033 | $260,168 | $36.99 | 3,498 |
| **FirstStep** | Y | Y | Y | 2,085 | 4,641 | $108,016 | $23.27 | 1,343 |
| **20/20/20** | | | Y | 11,314 | 12,011 | $577,795 | $48.11 | 7,295 |
| **20/20/20** | | Y | Y | 2,092 | 2,404 | $91,487 | $38.06 | 1,203 |
| **20/20/20** | Y | | Y | 1,943 | 2,162 | $74,803 | $34.60 | 1,179 |
| **20/20/20** | Y | Y | Y | 2,085 | 3,463 | $78,681 | $22.72 | 1,343 |

<u>% of Donors that give to multiple causes:</u>
25% of BurnRescue donors
28% of FirstStep donors
33% of 20/20/20 donors



WON07601

CONFIDENTIAL

# Other WonderWork News

CONFIDENTIAL

# WonderWork Program Update

- 61 partners
- 58 countries
- 1,154 hospitals/clinics
- 1,091,898 total surgeries performed by partners
- $2,167,000 grants distributed to provide ~35,000 surgeries



WON07603

# WonderWork Risk Management

- Putting together structure and procedures to mitigate and manage risk
- Focusing on the following risk areas
    - Mission
    - Donor
    - Governance
    - Operational
    - Financial
    - Regulatory and Compliance
    - Social Media



# WonderWork Major Donor Event

- November 5th Event, Four Seasons Restaurant
- Way to thank our biggest donors and introduce WonderWork to prospective supporters
- Hosted and paid for by:
  - Brian Mullaney, and
  - ███████████████████████

- All star guest list:
  - Mayor Michael Bloomberg, Bette Midler, Katie Couric, Renee Fleming, Candice Bergen, Tom and Meredith Brokaw, Nick Kristof
- Special guest speaker - Brent Stirton
  - World-renowned photojournalist
  - Will share photos from his trip to Kolkhata where he will follow 2 of WonderWork's blind patients and document their life-changing surgery.



In 15 Minutes,
We Can Restore
The Eyesight Of A Child
Who Is Completely Blind.

On November 5th,
we're going to open your eyes too.



CONFIDENTIAL

# Wonderwork Balance Sheet

| FY14 Balance Sheet | |
| --- | --- |
| **As of August 31, 2013** | |
| **ASSETS** | |
| Cash and cash equivalents | $ 954,819 |
| Investments | 6,788,090 |
| Accounts Receivable | 570,156 |
| Impact loans receivable | 13,005,000 |
| Other Assets | 46,275 |
| Prepaid expenses and other assets | - |
| Furniture and equipment, net | 131,590 |
| Total assets | $ 21,495,930 |
| | |
| Value of 60,000 Donors over time ($125 each) | $ 7,500,000 |
| | |
| Total assets including donors | $ 28,995,930 |
| | |
| **LIABILITIES AND NET ASSETS** | |
| Liabilities | |
| Accounts Payable | $ 1,124,781 |
| Other Current Liabilities (Line of Credit) | 1,164,782 |
| Other Current Liabilities (Impact Loans) | 15,855,000 |
| Total Liabilities | $ 18,144,563 |
| | |
| Net Assets | |
| Net assets end of last year | $ 3,320,356 |
| Value of 60,000 Donors over time ($125 each) | 7,500,000 |
| Net income | 31,011 |
| Total net assets | $ 10,851,367 |
| | |
| **Total Liabilities and Net Assets** | $ 28,995,930 |



WON07606

CONFIDENTIAL

# Impact Loan Progress Report
## for

September 6, 2013

Miracle surgeries for children.

w n e
w r

WON07607

MULLANEY
EXHIBIT 29

**From:** Hana Fuchs
**Sent:** Monday, May 18, 2015 2:17 PM
**To:** Brian Mullaney
**Subject:** RE: Following up on our meeting

Also these numbers include your $250k loan which is not on the books.

**From:** Hana Fuchs
**Sent:** Monday, May 18, 2015 1:58 PM
**To:** Brian Mullaney
**Cc:** DeLois Greenwood
**Subject:** RE: Following up on our meeting

My numbers are purely the loans we received – Karen's numbers includes the donations as a result of the ask letter and a few others
I will get these numbers

**From:** Brian Mullaney
**Sent:** Monday, May 18, 2015 1:57 PM
**To:** Hana Fuchs
**Cc:** DeLois Greenwood
**Subject:** Re: Following up on our meeting

Ok.
Why are the Numbers are different than our board presentations?
Different than our presentations to █████████ ?
B.


Brian Mullaney
Co-Founder/CEO

WonderWork
420 Fifth Avenue, 27th Floor
New York, NY 10018
tel: 212.729.1855
cell: 917.902.7550
email: brian@wonderwork.org
www.WonderWork.org

Watch two blind sisters see their mom for the first time!
Almost 3,000,000 people have watched this heart-warming video over the past few months!



TIME magazine named WonderWork "One of 10 Ideas That Can Change The World."

**From:** Hana Fuchs
**Date:** Monday, May 18, 2015 at 1:55 PM
**To:** brian mullaney
**Cc:** DeLois Greenwood

EXHIBIT -29
Brian Mullaney
8/17/17
S. Anelle Santos, RPR, CSR
TransPerfect Legal

**Subject:** RE: Following up on our meeting

*Regarding the loans - this is how it was reported in the audited finaicials and I think that is what she was referring to in the question-*
*h*

**From:** Brian Mullaney
**Sent:** Monday, May 18, 2015 1:51 PM
**To:** Hana Fuchs
**Cc:** DeLois Greenwood
**Subject:** Re: Following up on our meeting

My comments below....

**Brian Mullaney**
Co-Founder/CEO

WonderWork
420 Fifth Avenue, 27th Floor
New York, NY 10018
tel: 212.729.1855
cell: 917.902.7550
email: brian@wonderwork.org
www.WonderWork.org

Watch two blind sisters see their mom for the first time!
Almost 3,000,000 people have watched this heart-warming video over the past few months!



TIME magazine named WonderWork "One of 10 Ideas That Can Change The World."

**From:** Hana Fuchs
**Date:** Monday, May 18, 2015 at 1:45 PM
**To:** brian mullaney
**Cc:** DeLois Greenwood
**Subject:** FW: Following up on our meeting

**Please see my responses before you/I reply to** ████████
**Let me know if you need any changes**.

**From:** ███████████████████████████
**Sent:** Monday, May 18, 2015 12:52 PM
**To:** Hana Fuchs; DeLois Greenwood; Brian Mullaney
**Subject:** Following up on our meeting

Dear Brian, DeLois, and Hana:

Thanks again for making the time to meet with me on Friday May 8th. I'm writing to let you know that I am scheduled to

WW_EMAILS0011581-2

speak with JJ Coneys tomorrow and also wondered if you could confirm a few of the notes that I took while I was with you two Fridays ago? I've addressed each question to the person whom I think is best positioned to answer, in the hope that this will reduce the amount of time needed for you to spend on my questions. I hope that is helpful.

### Brian and DeLois –

1. Both of you mentioned that the need for cleft palate surgery worldwide has decreased. Compared to the needs of club foot (3MM), burns (15MM), cataracts (10MM), what is the need of cleft palate today? The numbers above are based on my notes; please let me know if they are accurate!

2. I have in my notes that you have either 200K or 240K small donors. Could you please confirm how many small donors you have (and what threshold defines small), and how many major donors you have? Is it correct to assume that the major donors are covering Wonder Work's general operating costs?

3. Have you changed the by-laws to three terms maximum or are you planning on doing so in the near future? If not already, when do you plan on doing so? If at all possible, may I share the newest female addition to the board? What is her name?

### DeLois –

1. Thank you for walking me through Wonder Work's due diligence and vetting process of doctors and hospitals. Could you please confirm how many (or approximately how many) doctors/hospitals you review per year and what your target number is to grow the network annually?

### Hana –

2. Could you please provide the general loan terms for me so I can share them with Nathaniel? To confirm, you raised $10MM in loans and as a result, $2MM in private donations, correct? **Please see below-**

### General Terms of Loans

Payable in whole or in part upon maturity of 5 years.
Pre-payable by WonderWork at any time in whole or in part without penalty.
Foundation may consider forgiveness of some or all of the unpaid principal and accrued interest .
Simple interest shall accrue on the outstanding principal balance at the rate of 2% per annum.
Wonderwork shall maintain positive assets in excess of $1.5 million.
Maintain KPMG as auditors.

THESE NUMBERS DO NOT INCLUDE RELATED DONATIONS FROM IMPACT LOAN APPEAL. TOTAL LOAN WAS $9,950,000 WASN'T IT? IT WAS ALL FROM INDIVIDUALS – NOT FOUNDATIONS – THEY SIMPLY MADE THE KOANS THROUGH PERSONA FOUNDATIONS *this is how it was reported in the audit-I think that is what she was referring to in  he question-*

### How much was raised:

Total raised $9,700,000
Total raised from foundations $9,450,000
Total raised from individuals $250,000

3. Lastly, in the most recent 990, you stated that you have $7.755 MM in office expenses. In general terms, what did you categorize as programmatic expenses? **I GUESS THIS IS OKAY.**

According to the explanation of this line item in the 990 (by KPMG), this expense line includes all marketing printing, publications, and postage expenses in addition to office expenses. These expenses are split between public education (programmatic) and fundraising. According to the method used for this allocation, each marketing piece was reviewed to insure that it contained public education and public interaction. KPMG tested each piece and determined that we could allocate 48% of our marketing materials to programs/public education and 52% to fundraising.

WW_EMAILS0011581-3

Thanks so much for all of your help. Best,

██████



Learn how innovative funders are going
Beyond Grant Making to amplify their impact

WW_EMAILS0011581-4

MULLANEY
EXHIBIT 30

April 23, 2014

Dear ███████,

I am delighted to send you an update on the "██████████████"

So far, your loan has had a very LARGE impact on our organization.

1. It helped us raise an additional $2,500,000 in impact loans AND $1,600,000 in donations from donors who responded to our loan request with cash donations.
2. It has helped us invest much more in direct mail than we could have afforded to without it. This is helping up ramp up much faster.
3. It will help us acquire between 125,000–160,000 new donors which will have a lifetime value of between $12,500,000 and $16,000,000.

We began spending our "████████████████" in Oct. 2013. Here are our results to date....

| Mailing | Letters Mailed | Expense | Revenue | Projected New Donors | Actual New Donors | Difference |
|---|---|---|---|---|---|---|
| October | 1,498,291 | $452,573 | $496,938 | 5,993 | 8,411 | 2,418 |
| November | 1,945,752 | $654,624 | $606,970 | 7,783 | 11,634 | 3,851 |
| December | 1,842,924 | $601,085 | $447,239 | 7,372 | 8,543 | 1,171 |
| January | 2,019,406 | $604,826 | $451,519 | 8,078 | 9,514 | 1,436 |
| Totals | 7,306,373 | $2,293,108 | $2,002,666 | 29,225 | 38,102 | 8,877 |

As you can see, we acquired 38,102 new donors in our first 4 months. Our 38,102 "Thompson" donors now comprise 30% of all our total 120,000 donors. Starting now, we go to 4 million letters a month and should acquire 18,000 new donors per month.

The average donation was 31% higher and costs were 5% lower than projected. Cost to acquire a donor projected to be $42.50 came in around $8 per donor. So we're off to a great start. As expected, $2.3 million in expenses exceeded revenue of $2 million. But as I have told you, donor acquisition mailings lose money.

We are still focused on what matters the most: surgeries. We will help provide almost 30,000 free surgeries this year. That's twice what we did last year. It comes out to 82 miracle surgeries *every single day*.

I can't tell you how grateful we are that you both travelled half way around the world to see our work. As you know, I have been doing this work for more than 20 years now. But these trips are different. These problems are bigger. The suffering greater. And virtually no one else is helping these kids.

I hope you remember how small and skinny all the children we met looked. Virtually all of them were suffering from stunted growth due to malnutrition. 600 million in India suffer from malnutrition. It starts in the womb because the mom is malnourished. I remember a 10-year-old girl who weighs 45 pounds. My 10-year-old son, ████, weighs 93 pounds.

EXHIBIT -30
Brian Mullaney
8/17/17
S. Arielle Santos, RPR, CSR
TransPerfect Legal

CONFIDENTIAL

I am sure there were times on our trip where it got a little depressing. Sometimes you ask yourself, what is the use? Whenever I ask that, I always come back to the same answer...

*Because every child deserves a chance.*

No matter how poor they are. Or where they live. Or how bleak their prospects may be. We can never give up on these kids. *We started WonderWork to help kids no one else will.*

And we are. 82 surgeries a day right now. Next year we're shooting for 160 surgeries a day. We're also giving struggling hospitals crucially needed financial support. We're helping very poor, but proud communities, become self-sufficient. We're bringing hope to some of the world's most hopeless places. And we're giving desperate children a 2nd chance at life.

When I use the word "we" – I mean you and us. It is hard to believe that my first meeting with Bill in NYC was just over a year ago. But already you two have had an enormous impact on our young organization which will be completing its 3rd year this June 30th.

The "███████████████" has provided us with start-up capital in six months that would have taken us 3, 4 maybe 5 more years to raise. It has accelerated our fundraising tremendously. It has also freed up capital that we were then able to spend on surgeries which has significantly accelerated our program growth as well.

But as you know from the trip we took, the need is immense. So this month, we are asking both our Founding Donors and our Founding Investors who funded our Impact Loan, to consider sending us a special donation that will be used solely to fund surgeries.

*Would you please consider send us such a donation?*

You don't even need to send us any additional money. *Simply let me know how much you'd like to donate and we will deduct it from your impact loan.* And we'll send you a tax-deductible receipt. To do this, just email me or call me at 212-729-1855.

If you can't send us a donation at this time, no worries. We're still grateful for everything you've done for us. I'll continue to send you periodic Impact Loan updates like this one.

Until then, please know how much we appreciate – and need – your support.

I hope you know by now – we could do nothing without it.

All the best,


Brian

WonderWork Impact Loan # 2013001
Loan Owner:                              ████████████
Current Impact Loan Balance: $7,579,167
Date of Loan:                 May 15, 2013
Interest rate:                2%
Interest earned to date:      $79,167
Loan repayment date:          May 15, 2018

CONFIDENTIAL

WON07754

MULLANEY
EXHIBIT 31

February 18, 2015



Dear ███████████

Here's the latest ██████████████ update that went out to all
8 of our Impact Loan Donors – including you!

Getting a lot of good feedback.

Thank you for making this opportunity possible – we really don't
know where we would be today without your loan.

All the best,


Brian

EXHIBIT -31
Brian Mullaney
8/17/17
S. Anelle Santos, RPR, CSR
TransPerfect Legal

February 15, 2015



RE:    **UPDATE - WonderWork Impact Loan**

Dear ███████████,

I have some very good news.

First and foremost, we will soon be crossing our 100,000th surgery threshold!

If you want to know just how many patients that is, imagine every single seat filled with a smiling child or adult in the stadium where they just played the SuperBowl – and another 37,000 waiting outside!

That's a lot of burn victims who have received vital reconstructive surgery. Crippled children who can now walk and run for the first time. And tens of thousands of blind children and adults who can now see.

You played a major role in making these miracle surgeries possible.

It took us six years to provide 100,000 surgeries at Smile Train, so we're really proud to do it in just 3.5 years this time around.

On the donor front, we just passed an important milestone also – we now have more than 225,000 donors! Almost half of them have come on board thanks to the Impact Loan that you helped us with.

Here is a summary of all the good things that have happened as a result of this WonderWork Impact Loan (updated since the last progress report I gave you in January):

**WONDER WORK IMPACT LOAN UPDATE**

| | |
|---|---|
| Total Impact Loan Amount: | $9,950,000 |
| Direct mail fundraising appeals sent: | 34,445,180 |
| ████████ Impact Donors: | 110,572 |
| Total revenue raised from these new donors: | $10,436,483 |
| Total interest accrued: | $227,417 |

We are thrilled to be doing so well just 1.5 years into this 5-year loan. Of course, this is just the beginning. We will track every donation that comes in from these 110,572 Impact Loan donors that are now supporting us, and we expect that revenue to be significant.

We have had several of our Impact Loan supporters begin to forgive a portion of their loan, which has also been a huge help. If you are interested in doing that, please let us know. We will use the money you forgive to pay for surgeries right away, and will also send you a tax-deductible receipt for the donation. **To forgive any portion of your impact loan, just send me an email or call me, and we will take care of it.** Thank you for considering this.

(cont.)

WON-EX 8109

I have some other good news as well:

Our WonderWork blindness video has gone viral and more than 2,600,000 people have viewed it since September. It has been featured on many major websites and networks including: National Geographic, TIME, Huffington Post, ABC News, Reddit, and Upworthy. It was the #1 video in 2014 on the Nat Geo website. In addition, this viral video has generated more than $300,000 in donations from 74 different countries.

The highly respected, $4 billion consulting firm, The Boston Consulting Group, has adopted our organization as one of its key pro bono clients. They are providing us with invaluable consulting advice and help that pertains both to improving our fundraising and also improving our programs in the field. We started working with them in July, and it has been an extraordinary experience. They are helping us raise more money and provide more surgeries.

The *New York Times* recommended 7 charities to its readers Christmas week, and we were one of them. Not bad considering there are 1.5 million charities in America to choose from.

That's all for now. If you have any questions about your loan with us or anything else, please do not hesitate to call me directly at 646-558-3768 or email me at brian@wonderwork.org.

Please know how grateful we are for your very generous support. You are one of 8 people - out of 225,000 donors – who said yes when we asked for help with this Impact Loan.

Just as we thought, it is having a huge impact on our growth and ability to provide surgeries.

We would never be where we are today without your help.

Thank you,


Brian
Co-Founder
646-558-3768
brian@wonderwork.org


**WonderWork Impact Loan # 2013001**

| | |
|---|---|
| Loan Owner: | ███████████████ |
| Date of Loan: | May 15, 2013 |
| Original Loan Amount: | $7,500,000 |
| Loan Balance: | $7,691,666.67 |
| Interest rate: | 2% |
| Interest accrued: | $191,666.67 |
| Loan repayment date: | May 15, 2018 |

February 15, 2015



RE:    **UPDATE - WonderWork Impact Loan**

Dear ███,

I have some very good news.

First and foremost, we will soon be crossing our 100,000th surgery threshold!

If you want to know just how many patients that is, imagine every single seat filled with a smiling child or adult in the stadium where they just played the SuperBowl – and another 37,000 waiting outside!

That's a lot of burn victims who have received vital reconstructive surgery. Crippled children who can now walk and run for the first time. And tens of thousands of blind children and adults who can now see.

You played a major role in making these miracle surgeries possible.

It took us six years to provide 100,000 surgeries at Smile Train, so we're really proud to do it in just 3.5 years this time around.

On the donor front, we just passed an important milestone also – we now have more than 225,000 donors! Almost half of them have come on board thanks to the Impact Loan that you helped us with.

Here is a summary of all the good things that have happened as a result of this WonderWork Impact Loan:

**WONDER WORK IMPACT LOAN UPDATE**

| | |
|---|---|
| Total Impact Loan Amount: | $9,950,000 |
| Direct mail fundraising appeals sent: | 34,445,180 |
| New donors acquired as a result of these appeals: | 110,572 |
| Total revenue raised from these new donors: | $10,436,483 |
| Interest due to Impact Loan investors: | $227,417 |

We are thrilled to be doing so well just 1.5 years into this 5-year loan. Of course, this is just the beginning. We will track every donation that comes in from these 110,572 Impact Loan donors that are now supporting us, and we expect that revenue to be significant.

Several of our Impact Loan supporters – including yourself! – have forgiven portions of their loan which has really been a huge help. The $100,000 you've forgiven has already been restricted to our surgery programs. If you are interested in doing this again, just let me know. We will use the money you forgive to pay for surgeries right away, and will also send you a tax-deductible receipt for the donation. Thank you for considering this.

(cont.)

I have some other good news as well:

Our WonderWork blindness video has gone viral and more than 2,600,000 people have viewed it since September. It has been featured on many major websites and networks including: National Geographic, TIME, Huffington Post, ABC News, Reddit, and Upworthy. It was the #1 video in 2014 on the Nat Geo website. In addition, this viral video has generated more than $300,000 in donations from 74 different countries.

The highly respected, $4 billion consulting firm, The Boston Consulting Group, has adopted our organization as one of its key pro bono clients. They are providing us with invaluable consulting advice and help that pertains both to improving our fundraising and also improving our programs in the field. We started working with them in July, and it has been an extraordinary experience. They are helping us raise more money and provide more surgeries.

The *New York Times* recommended 7 charities to its readers Christmas week, and we were one of them. Not bad considering there are 1.5 million charities in America to choose from.

That's all for now. If you have any questions about your loan with us or anything else, please do not hesitate to call me directly at 646-558-3768 or email me at brian@wonderwork.org.

Please know how grateful we are for your very generous support. You are one of 8 people – out of 225,000 donors – who said yes when we asked for help with this Impact Loan.

Just as we thought, it is having a huge impact on our growth and ability to provide surgeries.

We would never be where we are today without your help.

Thank you,


Brian
Co-Founder
646-558-3768
brian@wonderwork.org

P.S. The donor who provided $7,500,000 for our impact loan amended his contract recently, and we are obliged to keep all of our other contracts in sync with his. To do so, we are requesting that you also amend your contract as he did. I have included the amendment so you can review it. If you don't have any questions, please sign it and return in the envelope we have provided. If you wish to discuss it, I am happy to do so at any time: 646-558-3768 or brian@wonderwork.org. For your convenience, I have included our latest balance sheet.

### WonderWork Impact Loan # 2014001

| | |
|---|---|
| Loan Owner: | ████████████ |
| Date of Loan: | May 1, 2014 |
| Original Loan Amount: | $1,000,000 |
| Loan Amount Forgiven: | $100,000 |
| Loan Balance: | $912,833 |
| Interest rate: | 2% |
| Interest accrued: | $12,833 |
| Loan repayment date: | May 1, 2019 |

WON-EX 8112

February 15, 2015



RE:    **UPDATE - WonderWork Impact Loan**

Dear █████████

I have some very good news.

First and foremost, we will soon be crossing our 100,000th surgery threshold!

If you want to know just how many patients that is, imagine every single seat filled with a smiling child or adult in the stadium where they just played the SuperBowl – and another 37,000 waiting outside!

That's a lot of burn victims who have received vital reconstructive surgery. Crippled children who can now walk and run for the first time. And tens of thousands of blind children and adults who can now see.

You played a major role in making these miracle surgeries possible.

It took us six years to provide 100,000 surgeries at Smile Train, so we're really proud to do it in just 3.5 years this time around.

On the donor front, we just passed an important milestone also – we now have more than 225,000 donors! Almost half of them have come on board thanks to the Impact Loan that you helped us with.

Here is a summary of all the good things that have happened as a result of this WonderWork Impact Loan:

**WONDER WORK IMPACT LOAN UPDATE**

| | |
|---|---|
| Total Impact Loan Amount: | $9,950,000 |
| Direct mail fundraising appeals sent: | 34,445,180 |
| New donors acquired as a result of these appeals: | 110,572 |
| Total revenue raised from these new donors: | $10,436,483 |
| Interest due to Impact Loan investors: | $227,417 |

We are thrilled to be doing so well just 1.5 years into this 5-year loan. Of course, this is just the beginning. We will track every donation that comes in from these 110,572 Impact Loan donors that are now supporting us, and we expect that revenue to be significant.

Several of our Impact Loan supporters – including you both! – have forgiven portions of their loan which has really been a huge help.  The $100,000 you've forgiven has already been restricted to our surgery programs.  If you are interested in doing this again, just let me know. We will use the money you forgive to pay for surgeries right away, and will also send you a tax-deductible receipt for the donation. Thank you for considering this.

(cont.)

WON-EX 8113

I have some other good news as well:

Our WonderWork blindness video has gone viral and more than 2,600,000 people have viewed it since September. It has been featured on many major websites and networks including:  National Geographic, TIME, Huffington Post, ABC News, Reddit, and Upworthy.  It was the #1 video in 2014 on the Nat Geo website. In addition, this viral video has generated more than $300,000 in donations from 74 different countries.

The highly respected, $4 billion consulting firm, The Boston Consulting Group, has adopted our organization as one of its key pro bono clients. They are providing us with invaluable consulting advice and help that pertains both to improving our fundraising and also improving our programs in the field. We started working with them in July, and it has been an extraordinary experience. They are helping us raise more money and provide more surgeries.

The *New York Times* recommended 7 charities to its readers Christmas week, and we were one of them. Not bad considering there are 1.5 million charities in America to choose from.

That's all for now. If you have any questions about your loan with us or anything else, please do not hesitate to call me directly at 646-558-3768 or email me at brian@wonderwork.org.

Please know how grateful we are for your very generous support. You are one of 8 people - out of 225,000 donors – who said yes when we asked for help with this Impact Loan.

Just as we thought, it is having a huge impact on our growth and ability to provide surgeries.

We would never be where we are today without your help.

Thank you,


Brian
Co-Founder
646-558-3768
brian@wonderwork.org

P.S. The donor who provided $7,500,000 for our impact loan amended his contract recently, and we are obliged to keep all of our other contracts in sync with his. To do so, we are requesting that you also amend your contract as he did. I have included the amendment so you can review it. If you don't have any questions, please sign it and return in the envelope we have provided. If you wish to discuss it, I am happy to do so at any time: 646-558-3768 or brian@wonderwork.org. For your convenience, I have included our latest balance sheet.

**WonderWork Impact Loan # 2013004**

| | |
|---|---|
| Loan Owner: | ██████████████ |
| Date of Loan: | August 26, 2013 |
| Original Loan Amount: | $250,000 |
| Loan Amount Forgiven: | $100,000 |
| Current Impact Loan Balance: | $155,666.67 |
| Interest rate: | 2% |
| Interest accrued: | $5,666.67 |
| Loan repayment date: | August 26, 2018 |

WON-EX 8114

February 15, 2015



**RE:    UPDATE - WonderWork Impact Loan**

Dear ▉,

I have some very good news.

First and foremost, we will soon be crossing our 100,000th surgery threshold!

If you want to know just how many patients that is, imagine every single seat filled with a smiling child or adult in the stadium where they just played the SuperBowl – and another 37,000 waiting outside!

That's a lot of burn victims who have received vital reconstructive surgery. Crippled children who can now walk and run for the first time. And tens of thousands of blind children and adults who can now see.

You played a major role in making these miracle surgeries possible.

It took us six years to provide 100,000 surgeries at Smile Train, so we're really proud to do it in just 3.5 years this time around.

On the donor front, we just passed an important milestone also – we now have more than 225,000 donors! Almost half of them have come on board thanks to the Impact Loan that you helped us with.

Here is a summary of all the good things that have happened as a result of this WonderWork Impact Loan:

**WONDER WORK IMPACT LOAN UPDATE**
| | |
|---|---|
| Total Impact Loan Amount: | $9,950,000 |
| Direct mail fundraising appeals sent: | 34,445,180 |
| New donors acquired as a result of these appeals: | 110,572 |
| Total revenue raised from these new donors: | $10,436,483 |
| Interest due to Impact Loan investors: | $227,417 |

We are thrilled to be doing so well just 1.5 years into this 5-year loan. Of course, this is just the beginning. We will track every donation that comes in from these 110,572 Impact Loan donors that are now supporting us, and we expect that revenue to be significant.

Several of our Impact Loan supporters – including yourself! – have forgiven portions of their loan which has really been a huge help. The $100,000 you've forgiven has already been restricted to our surgery programs. If you are interested in doing this again, just let me know. We will use the money you forgive to pay for surgeries right away, and will also send you a tax-deductible receipt for the donation. Thank you for considering this.

(cont.)

WON-EX 8115

I have some other good news as well:

Our WonderWork blindness video has gone viral and more than 2,600,000 people have viewed it since September. It has been featured on many major websites and networks including: National Geographic, TIME, Huffington Post, ABC News, Reddit, and Upworthy. It was the #1 video in 2014 on the Nat Geo website. In addition, this viral video has generated more than $300,000 in donations from 74 different countries.

The highly respected, $4 billion consulting firm, The Boston Consulting Group, has adopted our organization as one of its key pro bono clients. They are providing us with invaluable consulting advice and help that pertains both to improving our fundraising and also improving our programs in the field. We started working with them in July, and it has been an extraordinary experience. They are helping us raise more money and provide more surgeries.

The *New York Times* recommended 7 charities to its readers Christmas week, and we were one of them. Not bad considering there are 1.5 million charities in America to choose from.

That's all for now. If you have any questions about your loan with us or anything else, please do not hesitate to call me directly at 646-558-3768 or email me at brian@wonderwork.org.

Please know how grateful we are for your very generous support. You are one of 8 people - out of 225,000 donors – who said yes when we asked for help with this Impact Loan.

Just as we thought, it is having a huge impact on our growth and ability to provide surgeries.

We would never be where we are today without your help.

Thank you,


Brian
Co-Founder
646-558-3768
brian@wonderwork.org


**WonderWork Impact Loan # 2013003**

| Loan Owner: | |
|---|---|
| Date of Loan: | August 15, 2013 |
| Original Loan Amount: | $250,000 |
| Loan Amount Forgiven: | $100,000 |
| Loan Balance: | $156,083.33 |
| Interest rate: | 2% |
| Interest accrued: | $6,083.33 |
| Loan repayment date: | August 19, 2018 |

WON-EX 8116

February 15, 2015



RE: **UPDATE - WonderWork Impact Loan**

Dear ██████████,

First of all, thank you for your 2nd installment of your Impact Loan. The timing was perfect, as I wanted to deliver some very good news to you!

We are excited to announce that we will soon be crossing our 100,000th surgery threshold!

If you want to know just how many patients that is, imagine every single seat filled with a smiling child or adult in the stadium where they just played the SuperBowl – and another 37,000 waiting outside!

That's a lot of burn victims who have received vital reconstructive surgery. Crippled children who can now walk and run for the first time. And tens of thousands of blind children and adults who can now see.

You played a major role in making these miracle surgeries possible.

It took us six years to provide 100,000 surgeries at Smile Train, so we're really proud to do it in just 3.5 years this time around.

On the donor front, we just passed an important milestone also – we now have more than 225,000 donors! Almost half of them have come on board thanks to the Impact Loan that you helped us with.

Here is a summary of all the good things that have happened as a result of this WonderWork Impact Loan:

**WONDER WORK IMPACT LOAN UPDATE**

| | |
|---|---|
| Total Impact Loan Amount: | $9,950,000 |
| Direct mail fundraising appeals sent: | 34,445,180 |
| New donors acquired as a result of these appeals: | 110,572 |
| Total revenue raised from these new donors: | $10,436,483 |
| Interest due to Impact Loan investors: | $227,417 |

We are thrilled to be doing so well just 1.5 years into this 5-year loan. Of course, this is just the beginning. We will track every donation that comes in from these 110,572 Impact Loan donors that are now supporting us, and we expect that revenue to be significant.

We have had several of our Impact Loan supporters begin to forgive a portion of their loan, which has also been a huge help. If you are interested in doing that, please let us know. We will use the money you forgive to pay for surgeries right away, and will also send you a tax-deductible receipt for the donation. **To forgive any portion of your impact loan, just send me an email or call me, and we will take care of it.** Thank you for considering this.

(cont.)

WON-EX 8117

I have some other good news as well:

Our WonderWork blindness video has gone viral and more than 2,600,000 people have viewed it since September. It has been featured on many major websites and networks including: National Geographic, TIME, Huffington Post, ABC News, Reddit, and Upworthy. It was the #1 video in 2014 on the Nat Geo website. In addition, this viral video has generated more than $300,000 in donations from 74 different countries.

The highly respected, $4 billion consulting firm, The Boston Consulting Group, has adopted our organization as one of its key pro bono clients. They are providing us with invaluable consulting advice and help that pertains both to improving our fundraising and also improving our programs in the field. We started working with them in July, and it has been an extraordinary experience. They are helping us raise more money and provide more surgeries.

The *New York Times* recommended 7 charities to its readers Christmas week, and we were one of them. Not bad considering there are 1.5 million charities in America to choose from.

That's all for now. If you have any questions about your loan with us or anything else, please do not hesitate to call me directly at 646-558-3768 or email me at brian@wonderwork.org.

Please know how grateful we are for your very generous support. You are one of 8 people - out of 225,000 donors – who said yes when we asked for help with this Impact Loan.

Just as we thought, it is having a huge impact on our growth and ability to provide surgeries.

We would never be where we are today without your help.

Thank you,


Brian
Co-Founder
212-729-1855
brian@wonderwork.org


**WonderWork Impact Loan # 2013005**

| | |
|---|---|
| Loan Owner: | ███████████ |
| Date of Loan: | December 2, 2013 |
| Original Loan Amount: | $500,000 |
| Loan Balance: | $506,000 |
| Interest rate: | 2% |
| Interest accrued: | $6,000 (based on $300,000 loan only) |
| Loan repayment date: | Jan 1, 2019 ($300,000 loan); Jan 1, 2020 ($200,000 loan) |

WON-EX 8118

February 15, 2015



Dear ███████,

I have some very good news.

First and foremost, we will soon be crossing our 100,000th surgery threshold!

If you want to know just how many patients that is, imagine every single seat filled with a smiling child or adult in the stadium where they just played the SuperBowl – and another 37,000 waiting outside!

That's a lot of burn victims who have received vital reconstructive surgery. Crippled children who can now walk and run for the first time. And tens of thousands of blind children and adults who can now see.

You played a major role in making these miracle surgeries possible.

It took us six years to provide 100,000 surgeries at Smile Train, so we're really proud to do it in just 3.5 years this time around.

On the donor front, we just passed an important milestone also – we now have more than 225,000 donors! Almost half of them have come on board thanks to the Impact Loan that you helped us with.

Here is a summary of all the good things that have happened as a result of this WonderWork Impact Loan:

**WONDER WORK IMPACT LOAN UPDATE**

| | |
|---|---|
| Total Impact Loan Amount: | $9,950,000 |
| Direct mail fundraising appeals sent: | 34,445,180 |
| New donors acquired as a result of these appeals: | 110,572 |
| Total revenue raised from these new donors: | $10,436,483 |
| Interest due to Impact Loan investors: | $227,417 |

We are thrilled to be doing so well just 1.5 years into this 5-year loan. Of course, this is just the beginning. We will track every donation that comes in from these 110,572 Impact Loan donors that are now supporting us, and we expect that revenue to be significant.

We have had several of our Impact Loan supporters begin to forgive a portion of their loan, which has also been a huge help. If you are interested in doing that, please let us know. We will use the money you forgive to pay for surgeries right away, and will also send you a tax-deductible receipt for the donation. **To forgive any portion of your impact loan, just send me an email or call me, and we will take care of it.** Thank you for considering this.

(cont.)

I have some other good news as well:

Our WonderWork blindness video has gone viral and more than 2,600,000 people have viewed it since September. It has been featured on many major websites and networks including: National Geographic, TIME, Huffington Post, ABC News, Reddit, and Upworthy. It was the #1 video in 2014 on the Nat Geo website. In addition, this viral video has generated more than $300,000 in donations from 74 different countries.

The highly respected, $4 billion consulting firm, The Boston Consulting Group, has adopted our organization as one of its key pro bono clients. They are providing us with invaluable consulting advice and help that pertains both to improving our fundraising and also improving our programs in the field. We started working with them in July, and it has been an extraordinary experience. They are helping us raise more money and provide more surgeries.

The *New York Times* recommended 7 charities to its readers Christmas week, and we were one of them. Not bad considering there are 1.5 million charities in America to choose from.

That's all for now. If you have any questions about your loan with us or anything else, please do not hesitate to call me directly at 646-558-3768 or email me at brian@wonderwork.org.

Please know how grateful we are for your very generous support. You are one of 8 people – out of 225,000 donors – who said yes when we asked for help with this Impact Loan.

Just as we thought, it is having a huge impact on our growth and ability to provide surgeries.

We would never be where we are today without your help.

Thank you,


Brian
Co-Founder
646-558-3768
brian@wonderwork.org

P.S. The donor who provided $7,500,000 for our impact loan amended his contract recently, and we are obliged to keep all of our other contracts in sync with his. To do so, we are requesting that you also amend your contract as he did. I have included the amendment so you can review it. If you don't have any questions, please sign it and return in the envelope we have provided. If you wish to discuss it, I am happy to do so at any time: 646-558-3768 or brian@wonderwork.org. For your convenience, I have included our latest balance sheet.

**WonderWork Impact Loan # 2013002**

| | |
|---|---|
| Loan Owner: | ████████████ |
| Date of Loan: | August 1, 2013 |
| Original Loan Amount: | $100,000 |
| Loan Balance: | $103,000 |
| Interest rate: | 2% |
| Interest accrued: | $3,000 |
| Loan repayment date: | July 31, 2018 |

WON-EX 8120

February 15, 2015



RE:     **UPDATE - WonderWork Impact Loan**

Dear █,

I have some very good news.

First and foremost, we will soon be crossing our 100,000th surgery threshold!

If you want to know just how many patients that is, imagine every single seat filled with a smiling child or adult in the stadium where they just played the SuperBowl – and another 37,000 waiting outside!

That's a lot of burn victims who have received vital reconstructive surgery. Crippled children who can now walk and run for the first time. And tens of thousands of blind children and adults who can now see.

You played a major role in making these miracle surgeries possible.

It took us six years to provide 100,000 surgeries at Smile Train, so we're really proud to do it in just 3.5 years this time around.

On the donor front, we just passed an important milestone also – we now have more than 225,000 donors! Almost half of them have come on board thanks to the Impact Loan that you helped us with.

Here is a summary of all the good things that have happened as a result of this WonderWork Impact Loan:

**WONDER WORK IMPACT LOAN UPDATE**

| | |
|---|---|
| Total Impact Loan Amount: | $9,950,000 |
| Direct mail fundraising appeals sent: | 34,445,180 |
| New donors acquired as a result of these appeals: | 110,572 |
| Total revenue raised from these new donors: | $10,436,483 |
| Interest due to Impact Loan investors: | $227,417 |

We are thrilled to be doing so well just 1.5 years into this 5-year loan. Of course, this is just the beginning. We will track every donation that comes in from these 110,572 Impact Loan donors that are now supporting us, and we expect that revenue to be significant.

We have had several of our Impact Loan supporters begin to forgive a portion of their loan, which has also been a huge help. If you are interested in doing that, please let us know. We will use the money you forgive to pay for surgeries right away, and will also send you a tax-deductible receipt for the donation. **To forgive any portion of your impact loan, just send me an email or call me, and we will take care of it**. Thank you for considering this.

(cont.)

I have some other good news as well:

Our WonderWork blindness video has gone viral and more than 2,600,000 people have viewed it since September. It has been featured on many major websites and networks including: National Geographic, TIME, Huffington Post, ABC News, Reddit, and Upworthy. It was the #1 video in 2014 on the Nat Geo website. In addition, this viral video has generated more than $300,000 in donations from 74 different countries.

The highly respected, $4 billion consulting firm, The Boston Consulting Group, has adopted our organization as one of its key pro bono clients. They are providing us with invaluable consulting advice and help that pertains both to improving our fundraising and also improving our programs in the field. We started working with them in July, and it has been an extraordinary experience. They are helping us raise more money and provide more surgeries.

The *New York Times* recommended 7 charities to its readers Christmas week, and we were one of them. Not bad considering there are 1.5 million charities in America to choose from.

That's all for now. If you have any questions about your loan with us or anything else, please do not hesitate to call me directly at 646-558-3768 or email me at brian@wonderwork.org.

Please know how grateful we are for your very generous support. You are one of 8 people - out of 225,000 donors – who said yes when we asked for help with this Impact Loan.

Just as we thought, it is having a huge impact on our growth and ability to provide surgeries.

We would never be where we are today without your help.

Thank you,


Brian
Co-Founder
646-558-3768
brian@wonderwork.org


**WonderWork Impact Loan # 2013006**

| | |
|---|---|
| Loan Owner: | ███████████████ |
| Date of Loan: | December 19, 2013 |
| Original Loan Amount: | $100,000 |
| Loan Balance: | $102,166.67 |
| Interest rate: | 2% |
| Interest accrued: | $2,166.67 |
| Loan repayment date: | December 19, 2018 |

WON-EX 8122

MULLANEY
EXHIBIT 32

February 11, 2014


Miracle surgeries for children.
wonder
work

# PROPOSAL FOR USE OF PROCEEDS
## PURSUANT TO LOAN AGREEMENT BY AND BETWEEN
█████████████████████████ AND WONDERWORK

### Use of Proceeds
80% of Total Loan ($800,000) to be used
to help pay for surgeries and treatment during term of Loan.

### Proposed Breakout by Program:

| Program | Amount | | Surgeries |
|---------|--------|---|-----------|
| Blindness | $ | 600,000 | 17,143 |
| Burns | $ | 100,000 | 333 |
| Clubfoot | $ | 100,000 | 400 |
| Total | $ | 800,000 | 17,876 |

Progress reports to be provided every 12 months per Loan Agreement.

Below are WonderWork's Partners and the countries in which they operate:

### Our Worldwide Partners



### Countries Where Our Partners Operate

| | | | |
|---|---|---|---|
| Afghanistan | Dominican Rep. | Madagascar | Sierra Leone |
| Antigua | Ecuador | Malawi | Somalia |
| Bangladesh | Ethiopia | Mali | South Sudan |
| Belize | Gambia | Mauritius | Sri Lanka |
| Benin | Ghana | Mozambique | St. Lucia |
| Bolivia | Guatemala | Myanmar | Sudan |
| Botswana | Guinea | Nepal | Tanzania |
| Burundi | Guyana | Nicaragua | Thailand |
| Cambodia | Haiti | Niger | Togo |
| Cameroon | Honduras | Nigeria | Uganda |
| Chad | India | Pakistan | Ukraine |
| China | Indonesia | Peru | Vietnam |
| Colombia | Kenya | Philippines | Zambia |
| Congo, Dem Rep | Laos | Rwanda | Zimbabwe |
| | Liberia | Senegal | |

EXHIBIT -32
Brian Mullaney
8/17/17
S. Arielle Santos, RPR, CSR
TransPerfect Legal

CONFIDENTIAL

WON 07840

MULLANEY
EXHIBIT 33

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------- X
                       :

In re                     :       Chapter 11

WONDERWORK, INC.,    :       Case No. 16-13607 (SMB)

          Debtor.     :

---------------------------------------------------------- X

## DECLARATION IN OPPOSITION
## TO HELPMESEE'S MOTION TO APPOINT A TRUSTEE

       I, Tamsen Ann Ziff, declare under penalty of perjury that the following is true and correct to the best of my knowledge, information and belief.

       1.    I am the President and Director of the Bill and Ann Ziff Foundation (the "Foundation") and am authorized to represent the Foundation. The Foundation is a named creditor of WonderWork, Inc. ("WonderWork"), the debtor in this proceeding.

       2.    The Foundation submits this declaration in opposition to HelpMeSee's motion to appoint a trustee.

### Position as a Creditor

       3.    The Foundation is a substantial creditor, holding unsecured claims against WonderWork totaling $845,500.00. The Foundation became a creditor as a result of an outstanding loan (the "Loan") extended to WonderWork on May 1, 2014.

       4.    The purpose of the Loan was to generate additional funding for WonderWork's programs and thereby facilitate the charity's mission of sponsoring free surgeries for individuals in developing countries who cannot afford medical treatment.  This loan is referred to as an "impact loan" because its aim was to generate a positive financial impact for the public good.

EXHIBIT -33
Brian Mullaney
8/17/17
S. Anelle Santos, RPR, CSR
TransPerfect Legal

**Opposition to Motion**

5.      I am aware of HelpMeSee's motion to appoint a trustee and it is, without question, contrary to the Foundation's interest as a creditor.  Although HelpMeSee alleges the appointment of a trustee is in the best interests of WonderWork's creditors and estate, the Foundation does not support HelpMeSee's motion.  In fact, the Foundation believes that preserving WonderWork's CEO and Co-Founder, Brian Mullaney, and the rest of the organization's management, is in our best interest and the best interest of the bankruptcy estate.

6.      The Foundation extended the Loan to WonderWork due, in large part, to Mr. Mullaney's extensive experience as a nonprofit leader, his valuable partnerships with health care providers in developing countries, and his impressive fundraising abilities.  The Foundation has been involved with Mr. Mullaney since he served as President and Co-Founder of Smile Train, Inc.  In this time Mr. Mullaney has demonstrated himself as an honest, trustworthy and effective officer.  Removal of Mr. Mullaney as CEO, or his talented management team, would certainly be against our interest in watching WonderWork flourish as a charity.

7.      The Foundation is confident that WonderWork's current management will offer a comprehensive plan for reorganization, one that will allow it to satisfy our claims and emerge from bankruptcy.  In order to do so, WonderWork desperately needs its leadership to guide the charity through this bankruptcy proceeding and beyond.  Mr. Mullaney and his team had the Foundation's vote of confidence when the Loan was extended and they have our vote of confidence now.

7916148.3

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct to the best of my knowledge, information and belief.

Dated: _2 - 24_____, 2017
     New York, New York

                                     Tamsen Ann Ziff

3

# MULLANEY
# EXHIBIT 34

# WALTER HAEFNER STIFTUNG

Postfach, 8022 Zürich
Telefon 044/ 269 53 53 • Telefax 044/ 269 53 63

February 16, 2017

<u>VIA ECF</u>

Honorable Stuart M. Bernstein
United States Bankruptcy Judge
Bankruptcy Court for the Southern District of New York
1 Bowling Green
New York, New York 10004

Re:   *In re WonderWork, Inc.*, Case No. 16-13607
<u>Opposition to HelpMeSee's Motion to Appoint a Trustee</u>

Dear Honorable Judge Bernstein:

1.      The Walter Haefner Foundation ("the Foundation"), one of the founding donors of WonderWork, Inc. ("WonderWork"), formerly known as Surgery For The Poor ("S4TP") herewith respectfully writes to you to vigorously object to HelpMeSee's motion to appoint a trustee. For the reasons set forth below, the Foundation believes that retaining Brian Mullaney ("Brian") as Chief Executive Officer, and his current management team, is in the best interest of WonderWork.

### <u>Start-Up Donation & Relationship With Brian Mullaney</u>

2.      Due in large part to Brian's demonstrated excellence in nonprofit management, fundraising and global partnerships, the Foundation has been an avid contributor of Brian's many charitable endeavors. More precisely, The Foundation is proud of having helped him to grow SmileTrain and to create WonderWorks that together have provided more than 1.2 million surgeries in 90 of the world's poorest countries.

EXHIBIT -34
Brian Mullaney
8/17/17
S. Anelle Santos, RPR, CSR
**TransPerfect Legal**

3. When Brian was removed from being CEO of Smile Train and from being on the Board of Directors of SmileTrain, the Foundation decided to end any kind of relationship with SmileTrain and to enable Brian's plan of establishing a new charity

3.     Therefore, around December 1, 2011, the Foundation extended a considerable donation of $5 million as start-up capital for WonderWork. The Foundation expected that this gift would be used by Brian to grow the young charity, enabling the organization to help provide life-saving surgeries for children and adults no one else would help. At the same time, the Foundation also understood that its funds would be critical in establishing a comprehensive direct mail fundraising program that would earn the trust and support of thousands of other donors which it has. With its initial donation of $5 million, the Foundation hoped to encourage WonderWork's development as a charity.

4.     The Foundation has worked with Brian since he served as the President and Co-Founder of Smile Train, Inc. ("Smile Train"). The Foundation provided an initial donation of approximately $50 million to Smile Train which, together with another initial donation of roughly the same size by Mr. Charles Wang, enabled Brian to start Smile Train. He and his team built the organization into one of the largest charities in the world. That they did so in less than five years is nothing short of miraculous. To date, Smile Train has provided more than 1.4 million cleft surgeries and raised more than $1 billion dollars. However, the Foundation was very disappointed to learn about the removal of Brian from SmileTrain which in the perception of the Foundation has the potential to put SmileTrain's success story at high risk.

5.     Brian's excellent leadership at SmileTrain was the motivation for the Foundation to support him again at WonderWork. And so far, he and his team have not dis-

appointed. In less than six years, WonderWork has scaled up to more than 100,000 surgeries per year. This growth rate is even faster than what Brian and his team accomplished at Smile Train.

6.    Not only has the Foundation worked with Brian for an extended period, but it also remains involved with WonderWork today. Since WonderWork started, there have been regular meetings between Brian and the Foundation every January. Throughout the year, Brian has kept the Foundation informally updated on how the charity is doing.

### Opposition to the Arbitration Award

7.    It is our understanding that the Partial Final Arbitration Award, AAA Case No. 13-20-1300-0650, dated October 13, 2016, inexplicably attempts to redirect funds the Foundation donated to WonderWork, giving them instead to HelpMeSee. As we gather, the arbitrator somehow determined that the Foundation was misled into giving to Wonder-Work. This could not be further from the truth. Again: because of Brian's outstanding record as a nonprofit leader, and the impressive team he leads, the Foundation has chosen to support WonderWork. Without question, the Foundation objects to its contribution being redirected to HelpMeSee without the Foundation's knowledge or consent.

8.    As suggested above, the Foundation directed its contribution to Won-derWork based, in large part, on its longstanding relationship with Brian. Brian's many years of success in fundraising for other charities, and his experience working with health care providers around the world, convinced the Foundation to support WonderWork at its inception. The Foundation's contribution was made in absolute reliance on Brian's leader-ship role in the organization. To date, the Foundation has given WonderWork approximate-

ly *$13 million in donations* and intends to continue to do so as long as Brian remains WonderWork's leader.

### Opposition to Motion

9.      The motion to appoint a trustee in this proceeding is troubling.  The Foundation strongly opposes the motion and it fears the appointment of a trustee would mean the end of this very important charity.  Like most major donors, the Foundation would stop supporting WonderWork if Brian or his team were removed.  The Foundation is convinced that there is no one who could take over all the responsibilities and duties that Brian or WonderWork's management handle.

10.      Among the barrage of litigation waged by HelpMeSee, in this and previous proceedings, it is all too easy to lose sight of the actual difference that WonderWork makes in the world.  The Foundation has been very pleased with WonderWork's achievements.  The Foundation's support has helped change the lives of more than 225,000 children and adults who have received surgery thanks to WonderWork.  The Foundation is very concerned that if Brian is removed WonderWork's critical support for surgeries will halt, and all of these life-saving medical procedures will end. No other charity will fill this void.

11.      Although HelpMeSee alleges the appointment of a trustee is in the best interest of WonderWork, the Foundation opposes HelpMeSee's motion.  The Foundation believes that preserving Brian as WonderWork's CEO and Co-Founder, along with the rest of the organization's management, is in our best interest and the best interest of the bankruptcy estate.

12.      The Foundation remains confident that WonderWork's current management will offer a comprehensive plan for reorganization, one that will allow it to satisfy

creditor claims and emerge from bankruptcy.  In order to do so, WonderWork desperately needs its leadership to guide the charity through this bankruptcy proceeding and beyond. Brian and his team had the Foundation's vote of confidence before this bankruptcy, and they have our vote of confidence now.

In light of the foregoing, the Foundation opposes this motion.

Respectfully submitted,

Walter Haefner Foundation
Martin Haefner
Vice-President

MULLANEY
EXHIBIT 35

**From:** Brian Mullaney [brian@wonderwork.org]
**Sent:** Thursday, September 12, 2013 2:06 PM
**To:** Hana Fuchs; Dysart, Ted
**CC:** jjconeys@gmail.com; Ravi Kant (ravikant@tatamotors.com)
**Subject:** Re: Bonus for Brian Mullaney

Hana,

We should discuss with the auditors whether it should be put on the books as a liability for 2013 or 2014.

It will not be "paid out" until I receive it which may be never if I decide to forgive part or all of the impact loan as I hope many of our other Impact Loan participants will.

Thank you,


Brian.



**Brian Mullaney**
Co-Founder/CEO
WonderWork
420 Fifth Avenue, 27th Floor
New York, NY 10018
tel: 212.729.1855
cell: 917.902.7550
email: brian@wonderwork.org
www.WonderWork.org

**From:** Hana Fuchs <hana@wonderwork.org>
**Date:** Thursday, September 12, 2013 1:03 PM
**To:** Ted Dysart <tdysart@heidrick.com>
**Cc:** brian mullaney <brian@wonderwork.org>, "jjconeys@gmail.com"
<jjconeys@gmail.com>, "ravikant@tatamotors.com" <ravikant@tatamotors.com>
**Subject:** RE: Bonus for Brian Mullaney

Thanks Ted.
Just to clarify, the bonus is to be "paid out" in July 2013 for FY14 and booked as an impact loan from Brian?
Regards, Hana


**From:** Dysart, Ted [mailto:tdysart@heidrick.com]
**Sent:** Wednesday, September 11, 2013 5:01 PM
**To:** Hana Fuchs
**Cc:** Brian Mullaney; jjconeys@gmail.com; Ravi Kant (ravikant@tatamotors.com)
**Subject:** Bonus for Brian Mullaney

EXHIBIT -35

Brian Mullaney
8/17/17
S. Arielle Santos, RPR, CSR
**TransPerfect Legal**

Hana,

I'm remiss in not having sent this note to you earlier. At the June board meeting, the independent directors approved a year end performance bonus of $250,000 for Brian. Brian shared with us that he is re-investing this in WonderWork as part of our impact loan program.

Please let me know if you have any questions or need any further information from us.

Ted.

**Theodore L. Dysart**
Vice Chairman

**Heidrick & Struggles**
233 S. Wacker Drive
Chicago, IL 60606
tel: +1 (312) 496-1860
mobile: +1 (312) 638-9243
asst: Jackie Cahill  +1 (312) 496-1751
**tdysart@heidrick.com**
follow me on twitter @tldysart or
Join me on LinkedIn
http://www.theodoredysart.com

MULLANEY
EXHIBIT 36

**From:** Brian Mullaney [brian@wonderwork.org]
**Sent:** Thursday, September 12, 2013 2:04 PM
**To:** Hana Fuchs
**Subject:** Re: Bonus for Brian Mullaney

Hana,

I wish you hadn't sent this email.

Please do not ever again send the board an email without running it by me first.

We can discuss this on Monday.

B.

**Brian Mullaney**
Co-Founder/CEO
WonderWork
420 Fifth Avenue, 27th Floor
New York, NY 10018
tel: 212.729.1855
cell: 917.902.7550
email: brian@wonderwork.org
www.WonderWork.org

**From:** Hana Fuchs <hana@wonderwork.org>
**Date:** Thursday, September 12, 2013 1:03 PM
**To:** Ted Dysart <tdysart@heidrick.com>
**Cc:** brian mullaney <brian@wonderwork.org>, "jjconeys@gmail.com"
<jjconeys@gmail.com>, "ravikant@tatamotors.com" <ravikant@tatamotors.com>
**Subject:** RE: Bonus for Brian Mullaney

Thanks Ted.
Just to clarify, the bonus is to be "paid out" in July 2013 for FY14 and booked as an impact loan from Brian?
Regards, Hana

**From:** Dysart, Ted [mailto:tdysart@heidrick.com]
**Sent:** Wednesday, September 11, 2013 5:01 PM
**To:** Hana Fuchs
**Cc:** Brian Mullaney; jjconeys@gmail.com; Ravi Kant (ravikant@tatamotors.com)
**Subject:** Bonus for Brian Mullaney

EXHIBIT -36
Brian Mullaney
8/17/17
S. Arielle Santos, RPR, CSR
**TransPerfect Legal**

Hana,

I'm remiss in not having sent this note to you earlier. At the June board meeting, the independent directors approved a year end performance bonus of $250,000 for Brian. Brian shared with us that he is re-investing this in WonderWork as part of our impact loan program.

Please let me know if you have any questions or need any further information from us.

Ted.

Theodore L. Dysart
Vice Chairman

Heidrick & Struggles
233 S. Wacker Drive
Chicago, IL 60606
tel: +1 (312) 496-1860
mobile: +1 (312) 638-9243
asst: Jackie Cahill +1 (312) 496-1751
tdysart@heidrick.com
follow me on twitter @tldysart or
Join me on LinkedIn
http://www.theodoredysart.com

WW_EMAILS0012053-2

MULLANEY
EXHIBIT 37

**From:** Greg Lam [GregLam@cckc-law.com]
**Sent:** Tuesday, June 25, 2013 12:51 PM
**To:** Karen Lazarus; Brian Mullaney; Hana Fuchs
**Subject:** ██████
**Attachments:** WW ████████████████doc; WonderWork ████ Note.doc; Note Terms
FINAL.docx

**Follow Up Flag:** Follow up
**Flag Status:** Flagged

████████████████████████████████████████

████████████████████████████████████████

3. **When Clients Want Their Own Foundations**

EXHIBIT -37
Brian Mullaney
8/17/17
S. Arielle Santos, RPR, CSR
**TransPerfect Legal**

June 24, 2013                     *Wall Street Journal*

Arden Dale

A lot of people like the idea of having a private charitable foundation of their own, but financial advisers caution they're not suitable for everyone.

When the time comes for clients to give, their advisers can help them decide if a foundation is better than using a donor-advised fund or charitable trust, or simply writing a personal check. How much money a client wants to give is a crucial determining factor, along with the right personality and the passion to make the foundation succeed.

Operating a foundation is akin to running a business, advisers say. It requires tax filings and other money-management tasks, establishing by-laws, holding meetings with a board of trustees and recording minutes, and much more.

What may seem like a great idea at the outset can turn into an administrative or financial nightmare for the wrong person. Without solid guidance, the over-eager may get burned. That's why some advisers consider them too much of a hassle, and steer their clients away.

"They're going to get annoyed, and if you're the adviser who got them into a tough spot, there's backlash," said David Diesslin, an adviser in Fort Worth, Texas.

But those clients who do choose a private foundation are often after certain things they can't get through donor-advised funds and other charitable vehicles.

They have more control over their investments and gifts. And they can run their own programs, make gifts directly to individuals, groups and families facing hardships, emergencies or medical distress, and grant scholarships. Someone who contributes to a donor-advised fund doesn't have such flexibility.

"It's great for people who want to go to the gala and hand the check right to the person," said Rich

Polt, a spokesman for Foundation Source, which works with advisers and their clients to establish and help run new foundations.

The number of foundations has grown each year since 2000 (except for 2010). In 2011, there were some 73,764 independent, private foundations, up 8.1% from the previous year, according to the Foundation Center, which provides data on foundations.

For Mr. Diesslin of advisory firm Diesslin & Associates, it's all about heart and vision. If the idea of establishing a foundation isn't "owned by your client," he said, it likely won't work out well. He also has a dollar amount--$3 million--that he considers a rough minimum to commit to a private foundation. Only a handful of his clients have foundations.

Recently, Mr. Diesslin has been talking to a married couple who wants to set up a faith-related foundation with their parents and children. Serious philanthropists, the couple seeded the effort with a few hundred thousand dollars, with an eye toward putting $10 million to $15 million into it eventually.

The problem right now, he noted, is getting everyone in the family together so they can sit down and focus on the foundation. Everybody loved the idea of creating it, but scheduling has already become a stumbling block.

Beth Gamel, an adviser with Pillar Financial Advisors in Waltham, Mass., likens running a foundation to operating a business. Her advice: Don't set one up without the help of an attorney or accountant with specific experience in the niche. Explain to clients that the tax rules are complicated. Then, encourage them to keep good records and let the professionals handle the details.

One of her clients with a $10 million foundation had a hard time meeting the Internal Revenue Service requirement to give away 5% of a foundation's asset each year. In one instance, he ended up giving $300,000 to a donor-advised fund, which chose charities on his behalf.

Greg B. Lam
Attorney
Copilevitz & Canter
(816) 472-9000

Privileged and confidential information intended only for the use of the addressee. Attorney-client privilege applies. If you are not the intended recipient or the employee or agent responsible for delivering it to the intended recipient, any dissemination or copying of this communication is strictly prohibited. If you have received it in error, please notify us by telephone.

IRS CIRCULAR 230 Disclosure:
Under U.S. Treasury regulations, we are required to inform you that any tax advice contained in this e-mail or any attachment hereto is not intended to be used, and cannot be used, to avoid penalties imposed under the Internal Revenue Code.

# MULLANEY
# EXHIBIT 38

Wonderwork board minutes oct. 2016
  Present
Mark Atkinson, Sabrina Clark, Jim Poehling, Steve Rappaport
Dialing in: Richard Price, Richard Steele, Ravi Kant, JJ Coneys, Steve Levitt, Clark Kokich

Approved new candidates

Approved minutes with changes.

Discussed moving board meetings back, approved.

Clark has conflict with nov. 14th meeting, could do 16th

So please change nov. 14th 2017 to nov. 16th.

They requested we check in one month before to make sure everyone can make it.

Discussed tara – Rappaport – very impressive, how did we find her? Ravi Kant, very impressive, Clark to have phone call and then hope to discuss and approve her so she can attend next meeting.

Clark is going to chair and organize nominating and compensation committee.

JJ will be chairman of audit committee

Dickie to chair finance committee.

Sabrina asked what is the responsibility of committee? Mullaney the commitees need to figure this out.


Reviewed overview chart with circles, different causes. Poehling asked what the need for surgery is for each cause.

Steve Levitt --- how do you know surgeries are incremental, mullaney expl;ained all the steps we take to confirm that....please list steps...

Cloud database --- Rappaport can we license to to other organizations? Non---profit and for profit....

Sabrian --- asked how does it work? How do they get their records into our database?

EXHIBIT -38
Brian Mullaney
8/17/17
S. Arielle Santos, RPR, CSR
TransPerfect Legal

Ravi – knows, the co founder of Mastek, said very niced things about them.

Steve levitt, offered to help pitch USAID folks....

Dickie recommended we review finance requirements, of government, onerous, block grants from government, accounting requirements are substantial

Development

Atkinson – have times changed, what happened to direct mail? mullaney explained demographics, aging donors, new donors are more digital, no one cuts out coupons any more,

Mullaney explained pivoting to higher end donors,

Atkinson asked can you rent high end lists? Mullaney yes, arch digest, town and country, frontgate

Dfiscussed how difficult to hire good major gifts folks... mull discussed challenges, little known charity with a little known cause.

Rapport – need strong admin people surround Mullaney to make him more productive

Poehling --- said they experienced same challenges at Thompson autism center, answer was a home grown person, a nurse from one of the centers.

Discussed viral videos, disappoint donations.

Clark – did you pay for the views? Social media cost is zero.

Dickie – connect us with AARAP shifting away from direct mail. need a war room to be connected with social media... AARP..... follow up with Dickie...

Dfiscussed investments. Rappaport – more conservative, bonds, look at this balance sheet --- impact loans shoudn't be 100% in stocks, more conservative, investment committee to discuss and decide.

Rappaport – remarked acquisition did consume a lot of money but not a disaster, raised awareness, helped establish the brands.

JJ – agrees need to relook at investment strategy, committee should handkle, nat geo article on blindness, how can we leverage? Send around to board members...

WON-EX 010615

Sabrina – get mailing list of nat geo...

Rappaport – use article to get people to watch our viral video....

Atkinson – leverage nat geo video, credibility.....

Richard price – cbre real estate – will help with hospital...

How can we try and partner with social media influencers.... – celebrities?

Rappaport – AARAP – foundation? Sould we ask them for moneY

Meeting ended at 11:20.

WON-EX 010616

MULLANEY
EXHIBIT 39



EXHIBIT -39
Brian Mullaney
8/17/17
S. Anelle Santos, RPR, CSR
TransPerfect Legal

### Approved Minutes of the Meeting of the
### Board of Directors
### of Surgery For The Poor

**Date:** April 11, 2012

**Location:** Skype Conference Call

**Present:** Brian Mullaney
Ravi Kant
Ted Dysart

Welcomed everyone to Surgery For The Poor's first board meeting.

Mr. Mullaney thanked Mr. Dysart and Mr. Kant for joining the board and helping us launch our new charity.

#### Governance

Discussed and approved resolution to change name from Surgery For The Poor to WonderWork and to expand mission allowing us to support and help other charities.

Discussed prospects for board – Bill Conway and Wyc Grousbeck. Mr. Dysart said he has a good prospect with strong accounting background, Tim Flynn, Chairman of KPMG International. Also, another prospect is Paul Weaver. Dysart will pursue and try and arrange meetings with other board members.

Discussed future meeting schedule and agreed to year-end meeting in June which is needed to approve new budget for fiscal year 2013 which begins July 1st.

Agreed to 3 meetings/year – June, October and February. Ms. Lazarus will coordinate dates for all meetings with everyone.

Mr. Mullaney suggested he will most likely be back in India before next board meeting and will try to make it to Mumbai to meet with Ravi.

#### Programs

Discussed early progress with programs and initial focus on cataract surgeries through partner, HelpMeSee. Mr. Kant noted he just underwent cataract surgery and it was quite an experience, remarkably quick with dramatic results.

Mr. Mullaney discussed recent trip to Chitrakoot and how impressive the surgeons are and the experience of watching hundreds of blind children and adults having their vision restored in 15 minutes or less.



Mr. Dysart expressed interest in going on a trip – needs 6 months notice.

Mr. Kant has a contact who runs an eye hospital in Bihar that does 60,000 surgeries for the poor a year – he will put Mr. Mullaney in touch with them.

### S4TP Fundraising and Development

Discussed fundraising and development. Off to a very good start. Mr. Kant explained it is premature to approach Tata for funding at this point, but may be a possibility in the future. He will try and think of other good prospects in India. Mr. Dysart will do the same in the U.S.

Mr. Mullaney explained how HelpMeSee is providing service fees which are covering most of our expenses. Relationship is a challenge, but results for direct mail are very, very good. Should help us get up and running and over time become self-sufficient.

### Causes

Reviewed our causes and results to date.

Initial direct mail results for HelpMeSee have been excellent. Mr. Dysart asked for a Dashboard that could show a brief summary of key figures for Surgery For The Poor. Mr. Mullaney promised to have it by June meeting to review.

### WonderWork Launch

Discussed WonderWork launch in June. Everyone likes the name. Launch in June of new name will include direct mail test for all other causes – club foot, hydrocephalus, hole-in-the-heart and burns to gauge donor support. New website will be launched in June and all supporters will be told of new name.

### Finance and Administration

Discussed staff · 9 employees so far. Most are veterans who created and built Smile Train.

Reviewed strategy to keep overhead low through cloud technology – all servers, phones, IT in the "cloud". Our IT closet is empty.

Discussed finances. Mr. Dysart requested real financial statements for June meeting and going forward.

Mr. Mullaney discussed possibility of a $3 million loan from NYC city repayable in 5 years. Mr. Kant liked this idea because revenue flow from donors comes years after initial expense.

Mr. Mullaney explained the goal is to hire a top, well-known and well-respected auditor and letters have been sent to all the top firms. Mr. Dysart offered to help with phone calls if we need it.

Meeting was adjourned at 10:45.

2

WON-EX 1252



## Minutes of the Annual Meeting of the
## Board of Directors
## of WonderWork

Date:       June 22, 2012

Location:   Oovoo Video Conference Call

Present:    Brian Mullaney
            Ravi Kant
            Ted Dysart

Meeting called to order at 9:00am EST.

### Governance

Board approved minutes from April 11, 2012 meeting.

Discussed draft board policy manual. Dysart commented that he was very impressed with the professionalism and thoroughness in the preparation of these documents and policies. However, both he and Kant still wish to share comments/suggestions off-line before approving.

Discussed new board members search. Dysart noted that Tim Flynn is reluctant to join and will continue to focus on Paul Weaver. In addition, Dysart mentioned he will reach out to Sherri Barratt, who recently retired as Vice Chairman from Northern Trust. Mullaney explained that Conway is still a prospect for board of directors. It was also noted that Dave McCormick, Co-CEO of Bridgewater cannot join board of directors, but remains a good prospect for advisory board. Kant stated that he knows McCormick and will reach out to him. Dysart will provide Kant contact info.

Reviewed future BOD schedule. It was discussed that actual dates be confirmed one month prior to meeting. Kant noted that he may be in NYC week before October 11 (the next scheduled meeting).

### 1st Year Accomplishments

Reviewed start-up capital fundraising results. Both Kant and Dysart acknowledged they were pleased with progress. Mullaney noted that he will be meeting with viable donor prospects, ███████ ████████████, in the coming months. In addition, Mullaney noted that efforts to continue acquiring Founding Donors are underway through both mail and email campaigns.

Discussed WonderWork team recruitment. Kant and Dysart remarked that small team has done a great job at getting the charity off the ground. Mullaney iterated that Advisory Board is still being put together and will continue to work on getting pending members, Corinne Grousbeck, Ken French and Joseph McCarthy, on board. Kant will reach out to Dave McCormick as a prospect for joining advisory board as well.



Discussed hiring a small PR firm in September to increase media coverage and help with celebrity recruitment.

Discussed HelpMeSee and current relationship. Mullaney explained challenges of working with them, but it was noted that the benefits far outweigh the disadvantages. Mullaney explained contract is up at end of August, but will do everything possible to continue working with HelpMeSee.

Reviewed WonderWork name launch. Both Dysart and Kant remarked that new name and logo look great. Dysart specifically commented that he was impressed with the 5 websites that were recently launched.

Reviewed WonderWork direct mail test. Dysart inquired how much the test and first year development costs will be. Dysart also suggested that a board conference call be arranged in August to review results of test.

Discussed status of WonderWork "clients." Stressed importance of continuing relationship with HelpMeSee. Noted that goal of working with ███████████ is to get ██████████ on board. Mullaney indicated that ███████████ can be turned over to TargetMarketTeam at any time. Remarked that ████████ and ██████████ are tentative.

### Finance

Reviewed finance update. Mullaney iterated that ██████████ is advising on investment strategy and had recommended investing in Vanguard's Global Index Fund.

Discussed ongoing search for auditors. Dysart offered assistance with PWC, KPMG and Deloitte and requested we send him all correspondence for each of those firms.

Reviewed P&L and Balance Sheet for FY2012.

Reviewed 5-Year Projections and FY2013 budget.

Board approved FY2013 budget.

Meeting was adjourned at 9:39am EST.

2

WON-EX 1254



**APPROVED Minutes of the**
**Board of Directors Meeting**

Date:      October 11, 2012

Location:   WonderWork Office

Present:    **Brian Mullaney**
            **Ravi Kant**
            **Ted Dysart (Skype)**

Meeting called to order at 12:00pm EST.

**GOVERNANCE**
Approved minutes from June 22, 2012 meeting.

Approved revised policy manual.

Discussed audit proposals from KPMG, BDO and EisnerAmper. Approved appointment of KPMG pending discussion with JJ Coneys Monday, October 15th.

Reviewed board member prospects.

Discussed update on HelpMeSee issue.

Approved future board meeting dates.

**PROGRAMS**

Discussed programs and partners update. Kant would like to see a spreadsheet that breaks out partners and their surgery/patient numbers, medical problems, etc.

Dysart inquired about the grants we recently distributed. Mullaney explained that they are small for the moment, $5,000-$25,000. The plan is to build a network of quality partners for whom funding can be increased as donations increase and be able to open it up like a spigot. Mullaney noted that after this Fall, we will decide on a proper "run rate" for grants, as it is somewhat ad hoc at the moment.

Board approved strategy of acting as a grant-making organization for first year to accelerate this process, as well as serve as a learning curve for us. It was agreed that by giving grants to a broad range of partners now, WonderWork can move faster, help more children sooner, as well as learn a great deal. After year one, it was discussed that we would revisit managing programs ourselves. Over time, we would identify high performing partners and move our grants away from low performers.

Discussed benefit of establishing a Medical Advisory Board with leaders from every field.

Noted importance of needs assessment trips similar to the ones DeLois took in Kenya and Ethiopia in October, as well as the one planned for India and Nepal in November.

WON-EX 1255



## DEVELOPMENT

Reviewed notable prospects in pipeline for Founding Donors, as well as fundraising opportunity in London with the ████████████████████████████

Discussed PR firms being considered for hire. Dysart inquired about cost and Mullaney noted that, depending on firm chosen, monthly costs would range between $5,000-$15,000.

## MARKETING

Reviewed results from June test and rollout mailings with FirstStep and BurnRescue this Fall.

Discussed boilerplate language to let donors know BurnRescue and FirstStep are "WonderWork charity programs." Will be able to explain to donors the many benefits of being a program of a larger charity, such as minimal overhead and admin costs, etc.

Noted that initial websites were great to get us started, but now that we have our charity brands launched, we need to spend more to improve and expand content.

## FINANCE

Reviewed Vanguard portfolio update. Explained that ████████████ is continuing to advise us on investments. At his suggestion, we are using Index funds to reduce costs and management time. Noted that the Global Index Fund he recommended is up 10% since June.

Reviewed FY13 budget and Q1 actuals. Kant asked for yearly budget to be broken up by quarter so we can see how we might make up for down quarters.

Mullaney explained that with large gifts coming, quarterly performance may vary considerably.

Reviewed balance sheet which Boards feels is strong.

## MISCELLANEOUS

Discussed Spousal Travel Allowance which would allow Mullaney to bring his wife on trips where she could add value. Mullaney will research a basic employment contract to address this and will discuss this at next board meeting in February.

Noted that WonderWork needs a policy about photos and videos taken on trips, as WonderWork needs to co-own all content. Mullaney will research how to implement policy.

Discussed a trip for advisory board members and directors, possibly for next Fall, to witness programs firsthand. Mullaney to research.

Discussed idea of licensing name to Smile Train Rome and Dr. Fabio Abenavoli. Mullaney to research.

With regards to additional prospects, Kant mentioned he has a contact at Credit Suisse, Sanjay Newatia, in London and may be able to get us meeting. Kant also mentioned that he may be able to get us an introduction with the COO of Unilever, based in Singapore, Harish Manwani. In addition, Kant may be able to arrange a meeting in Mumbai with Tata Trust during November trip to India. Mullaney to send dates as soon as possible.

Dysart inquired about year-end holiday party to thank and motivate employees. Dysart will make effort to attend.

2

WON-EX 1256

**MEETING MINUTES OF**
**WONDERWORK, INC. ("WONDERWORK")**
**BOARD OF DIRECTORS**

December 28, 2012

A meeting of the Board of Directors of WONDERWORK, a corporation incorporated under the laws of the State of Delaware, was held by telephone conference call on December 28, 2012, commencing at 8:00 am, EST, pursuant to timely notice given to all members of the Board.

The following persons were present:

Present:     Ravi Kant
             Theodore Dysart
             John J. Coneys
             Brian Mullaney (limited participation)

## I.     CALL TO ORDER

Board members all acknowledged receipt of proper notice of the meeting and receipt of the agenda for the meeting. At the Board's direction, WonderWork's counsel was designated to prepare the minutes of the meeting and provide same to the Secretary of the corporation. A quorum being present, the meeting commenced.

## II.    United States District Court for the Southern District of New York, Case No. 12 CV 9102, captioned *Smile Train, Inc., v. Brian F. Mullaney*

Counsel for WonderWork and Brian Mullaney opened the meeting with general background information and historical perspective leading up to the filing of the captioned litigation against Brian. Board members had been provided with copies of the formal District Court complaint. This discussion included Brian's prior roles with Smile Train, his relationship with certain of its Board members and important factual information surrounding the issues that purportedly lead to the filing of the lawsuit.

At this point, Brian presented his oral request for indemnification. ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████

Brian then left the meeting. ████████████████████████████████

████████████████████████████████████████████████

1

WON-EX 1757

JJ Coneys suggested that the Board consider its current financial situation and place a ceiling or cap on the amount it would presently agree to indemnify. The other Board members were in agreement and it was resolved to cap current indemnity at $150,000.00. All legal bills would be reviewed by JJ and the audit committee. The Board could consider adjustments to these limits at a later date depending upon future circumstances and WonderWork's financial condition. Counsel for WonderWork was instructed to report approximately every thirty (30) days on the status of both the case and the costs associated with same.

The Board unanimously agreed to indemnify Brian Mullaney in connection with the suit filed against him by Smile Train up to a current limit of $150,000.00, subject to further review or potential future requests to increase the limit. Brian Mullaney was not part of the discussion on this matter and was not in attendance during this portion of the meeting. Upon motion duly made and seconded, it was so agreed and counsel was instructed to draft a formal resolution for adoption by the Board and insertion into the corporate records of WonderWork.

### III. MEETING ADJOURNED

There being no further business, the meeting was duly adjourned.

Secretary

RESOLUTION
OF
THE BOARD OF DIRECTORS OF
WonderWork, Inc.

The Board of Directors of WonderWork, Inc., (WonderWork), having been presented with a request by Board member Brian Mullaney for indemnification from WonderWork in connection with the defense of a case filed in the United States District Court for the Southern District of New York, Case No. 12 CV 9102, captioned *Smile Train, Inc., v. Brian F. Mullaney*, does . hereby make and adopt the following Resolution, approving indemnification for and against the costs and expenses incurred in connection with the defense of or participation in the above-captioned case under the terms and conditions contained in this Resolution.

The Board of Directors, with the exclusion of Brian Mullaney, join in this Resolution. In a meeting of the Board of Directors, the Board recognized the joint benefits to Brian Mullaney and WonderWork through his leadership and experience, and his authorship and speaking activities, including, but not necessarily limited to, name recognition and significant financial contributions for WonderWork programs that WonderWork would likely not receive otherwise. The Board views Brian's current participation in the *Smile Train* lawsuit a function and result of his service to WonderWork and as a member of its Board of Directors and further views successful results and outcomes from the matters as beneficial to WonderWork, as well.

The Bylaws of the Corporation, as well as Delaware law, the law of the State in which WonderWork is incorporated, authorize indemnification of directors, officers, and employees of WonderWork who are parties to, or threatened to be parties to, any pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, against expenses (including attorneys fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with such action if he acted in good faith and in a manner he reasonably believed to be in, or not opposed to the best interests of WonderWork.

Therefore, the Board of Directors, without participation by Brian Mullaney, hereby unanimously adopts the following Resolution, agreeing to indemnify Brian Mullaney in connection with his participation in the *Smile Train* lawsuit, in accordance with its Bylaws and Delaware law as follows:

> RESOLVED: That the Board of Directors of WonderWork, by vote of all of the Directors except Brian Mullaney, hereby agrees to indemnify Brian Mullaney in connection with his costs and expenses (including attorney fees, professional, expert, and consultant fees, investigative costs, and costs of appeal) incurred by reason of, or resulting from, or relating to his participation in the defense of claims, demands, and causes of action asserted against him in the instant *Smile Train* lawsuit, in accordance with its Bylaws and Delaware law. The Board of Directors further resolves to seek

1

reimbursement for those costs and expenses through its Directors and Officers Liability Insurance Policy currently held with Philadelphia Indemnity Insurance Companies. The Board of Directors is presently limiting the amount of any losses, fees and costs it will provide through this agreement to indemnify at $150,000.00. The Board may revise or reassess these limits should circumstances change.

I FURTHER CERTIFY that all of the members of the Board of Directors have voted to adopt the foregoing Resolution, and the same shall be included in the official corporation minute book and/or other corporation records maintained by the Corporation. Brian Mullaney did not participate in the discussion or vote on this Resolution.

IN WITNESS WHEREOF, I have hereunto subscribed my name this 28th day of December, 2012.

_____
Secretary

Theodore L. Dysart
Print Name

2



## Minutes of the
## Board of Directors Meeting

Date:        February 14, 2013

Location:    WonderWork Office

Present:     **Brian Mullaney**
             **JJ Coneys**
             **Ravi Kant (via conference call)**
             **Ted Dysart (via conference call)**

Meeting called to order at 10:15am EST.

### GOVERNANCE
Approved minutes from 10/11/2012 meeting and 12/28/2012 special meeting.

Reviewed CEO contract. Dysart noted that he will take lead on this and look to finalize contract for next board meeting. Dysart will also conduct review of salaries of top paid employees. Discussed using Reda and Associates to help with review.

Kant inquired about *Time Magazine* article and if it was about Smile Train. Mullaney noted that it was about Surgery For The Poor, which applies to WonderWork, as it specifically praises the "idea" which hasn't changed, though the name has. Suggested that article be circulated to all board members.

Reviewed photography copyright agreement.

Discussed legal updates. ███████████████████████████████████████████
███████████████████████████████████████████████████████████████
████████████████████████      ██████████████████████████████

Mullaney discussed Smile Train lawsuit and explained that lawyers on both sides have met and all agreed to try and settle outstanding issues. ████████████████████████████████
████████████████████████████████████████████████████████

Response from Smile Train is pending. Recommended that all legal bills be reviewed by Coneys and that a legal update be provided by Greg Lam for board on a monthly basis.

Discussed and established the following committees: Audit, Nominating and Compensation. Agreed that Coneys will head Audit Committee and Dysart will head Nominating and Compensation Committees.

Reviewed and approved future board meeting dates.

WON-EX 1261



## PROGRAMS

Reviewed partners and grants distributed. Discussed strategy of building network of partners through small initial grants which would increase as revenues increase.

Reviewed nucleus of and importance of a blue chip medical advisory board.

Discussed upcoming partner trip to India to visit additional burn, clubfoot and blindness clinics.

## DEVELOPMENT

Reviewed strong performance of WonderWork founding donors, as well as good repeat donation rate. Discussed probability of collecting large receivable from HelpMeSee.

Discussed new prospects: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Discussed concept of Impact Investing and agreed to provide board with pertinent articles on this subject. Noted that ▓▓▓▓▓▓▓ has offered WonderWork a significant $7.5M loan with requests for public disclosure, reporting, meeting WonderWork board members, attending a board meeting and going on a trip. ▓▓▓▓▓▓ also wants assurance that debt holders are protected in case of dissolution.

It was agreed that Mullaney will finalize agreement with ▓▓▓▓▓▓ and then present to board for final approval. Dysart asked for a simple term sheet when contract is presented.

Mullaney noted that this loan will be used as a "challenge grant" to try to raise additional money in impact loans.

Coneys recommended a template be developed that can be used for other impact loans. In addition, Coneys suggested that WonderWork find a law firm or ask Rockefeller Foundation to recommend one that has drafted these types of loan agreements. Coneys stressed importance of correctly handling these loans on WonderWork's books and getting the proper guidance from KPMG.

Discussed PR and termination of firm due to disappointing results.

## MARKETING

Reviewed Fundraising Summary.

Noted that volumes are all below projections due to cautious approach to list use, as well as capital setbacks during 1st half of fiscal year. Intend to hit projected volumes in 2nd half of fiscal year.

Kant recommended that a digital strategy be developed. Dysart agreed and also urged WonderWork to create a social media strategy. Mullaney confirmed that this will be presented at the June board meeting.

Explained that basic response rates and average gifts for acquisition and cultivation are in good shape and encouraging. In addition, it was noted that 9% of donors have already begun supporting a 2nd cause – also very promising.

Discussed launch of blindness charity-brand, 20/20/20.

Discussed new brochure. Dysart requested that mentions of Smile Train be minimized.



Discussed hiring new direct marketing agency, NNE; web developer, Jackson River; and Greatest Good with Steve Levitt.

Regarding celebrity prospects, Mullaney recounted face-to-face meeting with Morgan Freeman and his potential endorsement. Also noted that Robert David Hall of CSI has formally agreed to endorse WonderWork with a photo and quote. JR Martinez, Alan Alda and Clive Davis have recently been pitched as well.

## ADMINISTRATION & FINANCE

Discussed office renovation. Noted that architect is donating her time and is keeping the budget low by purchasing much of the furniture from Ikea.

Mullaney explained that since WonderWork staff is growing, space needs to be not only more attractive, but functional. Discussed recent hiring of Nicole Macagna as Development Associate.

Noted that audit review with KPMG is going well.

Remarked that investing in Vanguard Index Fund has been a smart move and that WonderWork should continue to take advantage of ▮▮▮▮▮▮ for free investment advice.

Reviewed budget and performance to date.

Meeting concluded at 11:41am EST.

3



## Minutes of the
## Board of Directors Meeting

**Date:**       June 13, 2013

**Location:**   WonderWork Office

**Present:**    **Brian Mullaney**
                **Ravi Kant (via conference call)**
                **Ted Dysart**
                **JJ Coneys**

---

Meeting called to order at approximately 9:00am. Dysart arrived shortly after meeting began.

Began with overview of year's results.

Kant inquired why the response rate was so much lower than projected. Mullaney explained that, one year ago, we had not mailed a single package and, thus, had no results from which to forecast. This accounted for projections being off.

Mullaney also acknowledged that one month after the FY2013 budget had been approved, we lost $6 million in anticipated revenues from the budget.

Development
Karen Lazarus entered the meeting to present development results and plans for FY2014.

Lazarus and Mullaney provided updates on current status of major donors. While development results are overall good, it was noted that Smile Train negative actions have impacted repeat giving resulting in significant loss of donations.

Discussed selected key major donors                                 Noted that it is not guaranteed that        will renew at $2MM this December, but that Mullaney will be seeing him in August in US to better gauge. Discussed        and issue with obtaining remaining $4MM originally promised to Mullaney. Dysart indicated that ST legal issues were obstacle for        per conversation with him. Discussed        loan and excitement about joining WonderWork. Noted that he and his wife,        , are looking forward to a trip to India in the late Fall/early Winter.

Highlighted major prospects in pipeline that Mullaney has been cultivating.

Also, discussed new ideas that will generate press and more awareness in the social sphere. Discussed hosting a donor dinner this Fall for the organization's major donors and prospects.

Discussed need for hiring a senior development individual to allow for increased soliciting of major gifts from donors and prospects.

With regards to Impact Loans, Mullaney explained how WonderWork intends to use 100% of the        for donor acquisition. This will be done through direct mail AND attracting other Impact Loans from current and prospective donors. Noted that we were getting a very good response from prospects and already have confirmations from 3 donors who wish to participate.

WON-EX 1264



Miracle surgeries for children
wonder
work

### Direct Marketing

Barbra Schulman joined meeting to present direct marketing results and plans for next year. Discussed extensive testing done to find control letters and best lists. Noted that 20% of our donors from the Fall are already supporting more than one cause and will begin to more strategically manage communications to these donors. Noted that renewal campaigns' average gift needs to be increased to ensure success of program.

Kant inquired as to who is doing our analytics. Schulman explained that analytics are being done by several firms, including Steve Levitt's, Greatest Good; our direct mail vendor, NNE; as well as our list broker, Paradysz.

Schulman explained that in addition to increasing direct mail acquisition volume and refining packages, we will be focusing on developing a strong digital presence starting with the launch of 4 new websites by early August. Schulman discussed that she was in process of hiring an online manager to oversee the development of targeted email and digital advertising campaigns as well as social media.

Mullaney discussed Fundraising and Revenue Targets for FY14. Board requested to see 5-year plan.

### Programs

Delois Greenwood joined meeting to explain Program results and FY14 plans.

Greenwood noted growth to 60 partners in 56 countries over 12 months. Discussed breakdown of $1,000,000 seed grants given in FY13. Encouraged by McCarthy's efforts to help recruit medical experts and build WonderWork Medical Advisory Board. Discussed challenges in helping patients in exceptionally poor regions where there is a shortage of hospitals, qualified medical staff and government support.

Greenwood discussed that program spending for next year is projected to be $2MM. Explained that search for new partnerships will continue and current high performing partners will be encouraged to scale. Noted meeting with Dimagi Group and benefits they can bring by developing cloud-based mobile monitoring tool for partners.

### Risk

Discussed Risk document drafted by KPMG.

### Legal Update

Greg Lam, WonderWork counsel, dialed in for legal segment.



### Compensation

Jim Hudner and Peter Lupo of Pearl Meyer dialed in to presentation of compensation review of CEO.

Lupo and Hudner presented their research, conclusions and recommendations. They stressed the difficulty of finding "peer" charities that are growing at the same speed of WonderWork. The board went into executive session and Mullaney exited the room.



Mullaney returned and the meeting continued.

<u>Governance and Finance</u>
Hana Fuchs entered the room to present FY13 financial results and plans for FY14.

Fuchs briefly discussed the FY13 financial results before the meeting concluded around 12:45pm.

There were still topics not yet reviewed or discussed at this point. These will be added to a telephonic meeting to be scheduled that will also include a review of the Smile Train settlement agreement.

Meeting concluded at 12:41am EST.



## Minutes of the
## Board of Directors Meeting

**Date:**      October 8, 2013

**Location:**  WonderWork Headquarters

**Present:**   Brian Mullaney
              Ravi Kant
              Ted Dysart
              JJ Coneys
              Ann Ziff

Meeting began at 9:00am EST.

### GOVERNANCE
Welcomed special guest, ███ ███. Noted that her nomination was delayed for 1-2 weeks.

Discussed board terms. Board approved 3-year terms that can be renewed after review and by a board vote for a maximum of 3 terms before a mandatory 1-year break. It was agreed that co-founder would be exempt from term limits. Board requested directors be staggered in different classes.

Board requested that Mullaney submit suggestions for Key Performance Indicators with regards to his performance. Dysart confirmed that he will coordinate with board to work on and finalize Mullaney employment agreement and KPIs by next board meeting.

Suggested that February board meeting date be changed from Thursday, February 13th to Tuesday, February 11th.

Discussed ████ trip to India in Jan/Feb 2014. Noted the extreme difficulties in getting accommodations in Varanasi due to peak tourist season. Kant offered help in securing reservations. It was discussed that if enough board members go to India in February, the next board meeting could be held there.

### DEVELOPMENT
Reviewed development results. Explained focus for the past several months has been on impact loans, which was a huge success, but focus is now returning back to major gifts. Confirmed goal of raising $3,000,000+ in major gift donations this fiscal year.

Reviewed list of 15 impact investors: loans received, loans committed and donations received in lieu of loans.

### MAJOR DONOR EVENT
Mullaney discussed event and its goals. ██ indicated that she invited ████ and was awaiting a response. Dysart mentioned that he also invited several very large prospects. Dysart specifically mentioned he knows ████████████████████, as well as ████████ former administrator of ████ and said he would drop them notes encouraging them to attend November 5th.

WON-EX 1269



Discussed PR goals of sending out 1-2 releases/month. Noted large press publication pick-ups regarding Stirton trip to India release. Discussed 5 additional releases in pipeline.

Kant inquired if WonderWork pays for eyeglasses as well as for surgery. Mullaney confirmed that WonderWork does not at this point. Kant mentioned that he has a contact that sells eyeglasses for $1 each and offered to put them in touch with WonderWork.

Dysart asked about Mullaney writing a blog and cited that Bloomberg has a great one.

Board requested that WonderWork pay more attention to social media and suggested hiring an online manager.

Mullaney presented animation video from BatteryPop and blindness film from MoFilm contest winner. Kant commented that the animation video, in particular, was excellent.

### DIRECT MARKETING UPDATE
Reviewed changes in personnel and vendors: hiring Amee Kamdar as Interim Direct Response Manager and TargetMarkeTeam as Direct Response Agency.

Reviewed new acquisition strategy of focusing on just two causes for the moment, blindness and clubfoot. Noted that third cause, burns, will be added back as soon as feasible. Discussed how packages would be made to look different from each other and test using different signers for different causes.

Discussed renewal strategy to improve response and performance. Noted that all three causes will continue to be mailed, but that mailings would be staggered, new creative would be implemented, and different signers would be used. Dysart inquired about the importance of different signers for different causes.

Kant acknowledged importance of "big data" and was pleased to see Kamdar as part of team.

### DIRECT MAIL RESULTS
Reviewed results of direct mail acquisition and renewal campaigns from inception to end of September. Kant requested that results be broken out by cause going forward.

### MULTI-CAUSE RESULTS
Reviewed multi-cause strategy results among 20/20/20, FirstStep and BurnRescue. Kant pointed out significant differences in donation sizes. Mullaney explained that low dollar donors tend to send in more donations to more causes and, while low dollar donors appear to be less valuable, Mullaney noted that three $23 donations is worth more than a single donation of $48.

It was discussed that additional work needs to be done to figure out best ways to leverage donors and determine how much more value and revenue multi-cause strategy can deliver.

### ACQUISITION AND RENEWAL FORECAST - *(Delois Greenwood, Karan Lazarus, Hana Fuchs and Amee Kamdar joined discussion at this point)*
Reviewed revised plan for direct mail.
Dysart inquired about discrepancy in cost-per-dollar raised in November 2013 and January 2014 from $2.06 to $2.03. (Noted that this was due to the cost-per-letter slightly decreasing from $.33 to $.325 per letter which was not clearly indicated on spreadsheet.)

WON-EX 1270


Discussed Once and Done package. Ziff asked if it was worth it due to the fact that 1/3 of donors cannot be mailed again. Mullaney explained that, despite this loss of renewable donors, the package generates more revenue than without this offer. Mullaney assured Board that we would be constantly monitoring these results.

Kant asked that the board be provided a monthly email update of direct mail results.

Discussed cost-per-dollar-raised metric and the goal of staying at around $2.

### 10-YEAR MARKETING SUMMARY
Reviewed projections for next 10 years. Mullaney emphasized importance of major gifts over next few years as direct mail is running major deficits. Kant commented on the President's Circle segment and recommended it be expanded to give VIP treatment to as many donors as possible. Kant suggested different levels be created, such as: silver, gold, platinum.

Board approved revised budget for FY 2014.

### WEBSITE
Discussed new website launch of 20/20/20. Board expressed need to do more on the online front and suggested we consider hiring an online manager.

### PROGRAM UPDATE
Reviewed Program Update, as well as new seed grants provided this quarter, in addition to recent grant to Smile Train. Also discussed development of new Medical Advisory Board.

Kant inquired about what defines a partner. Greenwood explained that partners are entities, including hospitals, clinics and NGOs that provide surgeries we support and/or training and education for safety and quality assurance. Coneys asked about the type of reporting we receive from partners. Greenwood explained that all partners must submit grant reports that show how our support is being used. She noted that, while all of our grants have been in support of surgical programs, we are not paying for surgeries on a case-by-case basis.

Noted program budget for FY14 is $1.5 million. Coneys inquired how funding for FY14 will be awarded and Greenwood explained our plan to re-grant support on anniversary date to keep partners active and engaged.

Kant commented that he thinks donors want to know and see where their money goes – perhaps geographically too – and that we should consider detailed reports for donors as to when and where their support was used.

### RISK DOCUMENT
Fuchs explained that Risk Document is being developed to enable us to identify risks, rate them in terms of likeliness and severity and then develop measures and practices that prevent, minimize and mitigate risk. Board asked that Smile Train, specifically, be added as a stand-alone category on our Risk Document.

A final version of this document will be presented at the next February board meeting.

### LEGAL UPDATE
Discussed status of HelpMeSee Arbitration. Explained that hearings have been moved from Nov 2013 to begin end of January/early February 2014. Noted that HMS counsel is same group representing Smile Train.

WON-EX 1271



FINANCE
Fuchs discussed audit and investment results.

REVISED BUDGET
Showed 1st quarter spending and results and confirmed that FY14 budget approved in June is being replaced with all revised budget numbers presented at this October 8, 2013 meeting.

P&L AND BALANCE SHEET
Reviewed P&L and balance sheet.

It is noted that Board went into Executive Session at the end of this meeting.

Meeting concluded at 12:15pm.

WON-EX 1272



## APPROVED Minutes of the
## Board of Directors Year-End Meeting

**Date:**       June 23, 2014

**Location:**   WonderWork Headquarters

**Present:**    Brian Mullaney, Ted Dysart, JJ Coneys, Ravi Kant

Meeting began at 10:30am EST.

### FY14 REVIEW

Reviewed year-end results for both revenue and expenses. Noted good, solid results across the board. Compared results to peer charities.

### PROGRAMS

Reviewed programs. Dysart inquired as to how we could be in so many countries. Mullaney explained that some of our partners, whom we work through, are providing care in many countries. Dysart further inquired about how we specify where our grants are used. Mullaney explained that we leave this up to the partners and do not specify which countries the grant must be used. It was noted that this broad approach serves us better.

Mullaney explained the role of the new Medical Advisory Board and the high caliber of members on this new board.

### DEVELOPMENT

Mullaney explained that it was a blockbuster year for development and we would be hard-pressed to match this performance again. Many major gifts were one-offs and a large number of gifts were related to the Impact Loan Appeal.

Reviewed "impact" of Impact Loan on WonderWork and all the benefits it has generated.

Reviewed FY15 development goals and challenge of soliciting major gifts.

### MARKETING

Reviewed direct mail results and efforts to drive costs down. Remarked positive performance of new list company and development of Prospect Database Model.

Discussed resignation of TargetMarkeTeam due to threats from Smile Train.

Presented artwork for retail impact loan.

Noted progress on digital side. Mullaney explained that we are still searching for a full-time senior digital manager, but have continued moving ahead with consultant to upgrade websites in meantime.

### GOVERNANCE

Approved Minutes from April 1 board meeting.

Approved 2-term limit for board members. Dysart, whose term was up, was nominated and approved for a 2nd term. Proposed classes were also approved for board members: Dysart (1st class), Kant (2nd class), Coneys (3rd class).

WON-FX 175



Discussed new board prospect, Marilyn Sonnie from Jones Day. Mullaney is also waiting for a recommendation from senior partner at Goodwin Procter.

Reviewed draft Risk Report prepared by KPMG. Mullaney asked for more feedback from board members after their in-depth review.

Approved new 401K Plan with 50% company match up to 6% of salary. Board asked that WonderWork implement a vesting policy for new employees regarding the company match portions. Dysart suggested 3-year vesting for new employees.

Reviewed and approved future board meeting dates.

### LEGAL
Discussed HMS Arbitration and frustration with runaway costs due to tactics of Smile Train lawyers representing HMS. Mullaney noted the tremendous time and stress caused by constant legal attacks and threats from Wang's lawyers.

### FINANCE
Explained financial moves regarding Smile Train grant and HMS grants which were removed from WonderWork books.

Discussed good portfolio performance. Dysart inquired about projected 2014 returns. Mullaney responded that he expects return to be around 5%.

Reviewed P&L and Balance Sheet. Remarked that WonderWork is in a much stronger financial position than it was one year ago.

### NEW IDEAS
Discussed new hospital project in India. Kant said Tata might consider helping us with this project.

Reviewed possible merger with ICD. Kant expressed concerns of stretching ourselves too thin. Kant stated that he is not against idea, but wants to make sure we understand its impact. Coneys liked the idea and remarked that we may get some quality board members/talent out of it. Dysart asked about structure and felt that we could make them a subsidiary. All members agreed this opportunity was worth exploring. Mullaney explained that it is just in the discussion phase at this point.

Discussed status of Sightsavers, Impact Loan and BCG projects.

### FY15 BUDGET
Reviewed and approved FY15 Budget. Coneys inquired as to when we "break even" and when we intend to be cash-positive with direct mail. Mullaney explained that this will take around 4-5 years. Dysart reviewed 10-year plan and asked that we insert our actual numbers for FY2014 to see growth comparison. Mullaney indicated that he will follow up on this request.

Kant requested that we prepare all financials in accordance with GAAP on a quarterly basis and share with board members. Mullaney indicated that he will follow up on this request as well.

Board went into Executive Session at 1:10pm with Mullaney exiting the room.

Mullaney rejoined the board and the meeting was adjourned at 1:45pm.



### Minutes
### Board of Directors Meeting

Date:       November 11, 2014

Location:   WonderWork Headquarters

Present:    Brian Mullaney, Ted Dysart, JJ Coneys

Absent:     Ravi Kant

Meeting began at 10:30am EST.

#### GOVERNANCE
Approved Minutes, including Minutes from Executive Session, from June 23, 2014 meeting.

Reviewed and approved future board meeting dates. Coneys and Dysart asked that reminders be sent in advance.

Discussed need for new board member. Mullaney explained that he met with Marilyn Sonnie of Jones Day, but was underwhelmed. Coneys mentioned a candidate from GE Plastics that he will explore. Mullaney mentioned that he would also do some research on a female attorney he knows that works for Pepsi.

#### DEVELOPMENT
Reviewed Founding Donor Revenue and noted it is just under budget. Acknowledged success of recent One-Time Special Grant mailer.

Discussed upcoming meeting with ▓▓▓▓▓▓▓ in January to pitch his board about renewing their $2,000,000 annual grant. Noted that ▓▓▓▓▓ who is considering renewing her $1,000,000 grant, will accompany Mullaney and Greenwood on an upcoming trip to India in early 2015. Mullaney discussed maintaining good relationship with ▓▓▓▓▓▓ and that she was impressed with our results and meeting ▓▓▓▓▓ this past September at her Houston office.

Mullaney pointed out that we continue to identify hi-net donors in our file. Most recently, we discovered, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓ are supporters. Discussed using Steve Levitt's book, *Think Like A Freak*, to help secure some hi-level, face to face meetings.

Coneys inquired about meeting with ▓▓▓▓▓▓▓, the billionaire philanthropist. Mullaney explained that attempts had been made to meet in the past but without success, and he agreed that it would be worth another try now.

Mullaney also pointed out that we have launched a foundation program where we have identified 240 foundation donors with assets totaling $7,000,000,000. Noted that we will be targeting them with special grant requests to increase their current giving.

WON-EX 1277



## DIRECT MARKETING

Discussed goal of hiring new direct mail agency before Thanksgiving. Two finalist agencies are: Worth Linen Associates and CDR Fundraising Group. Noted that the RFP process has been quite intense and that both candidates are very strong and competent. Mullaney explained that the loss of TMT and not having a vendor since June has hurt WonderWork's efforts and results.

Reviewed direct mail results. Noted that we mailed too aggressively in FY15Q1 and that the response rate is hovering at ~.25%, about 38% under budget. Though it was acknowledged that Acquisition is doing okay regarding overall revenue, as the average gift is 30% over budget, the donor shortfall is negatively impacting Retention efforts. Mullaney confirmed that the CTRAD (Cost to raise $1) is on target, however, we do not yet know the impact the lack of new donors to file will have over time. To mitigate the current loss, Mullaney explained that we ratcheted back acquisition quantities for November and December down to 500,000/month.

Mullaney explained that Cross-Sell results were originally included with Acquisition which artificially improved the overall results. It was discussed that Cross-Sell mailings would be reduced in November and December. The Board agreed that Acquisition, Retention and Cross-Sell be reviewed and analyzed separately.

## DIGITAL

Discussed recent digital efforts and viral video success with First Sight. Noted that it has been viewed 2,000,000 times and that donors from more than 65 countries have donated to 20/20/20 as a result. Mullaney remarked that several celeb supporters, such as Bryan Cranston, promoted us on their social media sites.

Reviewed the overall web traffic and noted revenue of $439,560 from 3,100+ donors from July – October. Acknowledged that average online donation is $140, almost 3 times that of direct mail.

Noted that 20/20/20 is now on Facebook and Twitter and that a new agency has been engaged to redo the 20/20/20 website.

Mullaney mentioned idea of crowdsourcing to raise funding for a new documentary film.

## PROGRAMS

Reviewed program update and noted that we currently have 72 partners in 61 countries. Mullaney acknowledged that the number of grants awarded this Fall was limited due to the net asset level we need to maintain pursuant to ▮▮▮▮▮▮ impact loan agreement.

Noted that the next Medical Advisory Board meeting will be held in February 2015.

Discussed upcoming trip to Ethiopia and Tanzania in early December to visit several new partners. Mentioned that Burt LaFountain, principal of BCG, will join trip.

## PROJECT VARANASI

Discussed new reconstructive surgery hospital in Varanasi that ▮▮▮▮▮▮ have proposed to fund. Noted that new hospital will be approximately 5 times the size of Subodh's current GS Memorial and that it would allow him to operate on close to 4 times as many patients/year. Mullaney discussed that cost to build and equip the center is estimated at $5.5MM.

Coneys requested that proposal has a full legal vetting so that it is very clear what WonderWork is responsible for. Dysart questioned WonderWork's possible seat on the board of the hospital and if it's really something we want.

2

WON-EX 1278



## BCG PARTNERSHIP

Reviewed pro-bono work done by BCG for both donors data analysis and partner/patient data analysis. Discussed the benefits of their in-depth analytics.

Coneys inquired about pitching BCG partners for donations. Mullaney agreed that he would explore opportunities. Discussed ongoing relationship with BCG and perhaps getting Tata Consulting to help with the geo-mapping project.

## LEGAL

Discussed HMS situation and how to best defend WonderWork from HMS attacks and slander. Everyone agreed that all legal options need to be explored. Coneys explained that we might be forced to file a lawsuit, as their actions are very serious and quite damaging.

Discussed latest threats and bullying from Smile Train regarding Steve Levitt's book and Greg Shaheen's case.

## FINANCE

Reviewed budget and actuals through end of October. Noted that total revenue is 34% over budget, however, acknowledged that $1,700,000 of in-kind donations is contributing to this. Coneys and Dysart asked to see more detail on the in-kind contributions. Mullaney agreed to circulate spreadsheet to board to explain how number was calculated. Noted that expenses are about 16% over budget.

Meeting was adjourned at noon.

3

WON-EX 1279



## Approved Minutes
## Board of Directors Meeting

Date:        February 10, 2015

Location:    Conference Call

Present:     Brian Mullaney, Ted Dysart, JJ Coneys, Ravi Kant

Meeting called to order at 10:30 sharp.

GOVERNANCE
Approved Minutes from 11/11/14 meeting.

Approved future dates for meetings: Tuesdays, June 9th; Oct 6; Feb 9, 2016.

Discussed final draft of Risk Assessment document. Coneys stated that it was good to have a formal document and important to keep risks on our radar. He inquired as to what else can be done to mitigate the biggest and most serious risks. Felt that we should review risks once a year. Mullaney suggested it be part of the annual year-end board meeting. Dysart agreed with Mullaney. Kant asked that we review every six months. Board questioned what we are currently doing to address the highest risks (upper right hand quadrant on page 4 of Risk Assessment). Mullaney to follow up.

Approved board resolution regarding joint allocation. Coneys mentioned that he had discussed this at length with Fuchs and stressed the importance of being in compliance. Mullaney to provide samples of marketing appeals to board. Mullaney explained that current auditors had calculated the allocation based on their own method which proved to be in line with Fuchs' calculation.

Discussed prospective board member, Kelly Tullier (EVP and General Counsel, VISA). Agreed that Mullaney would meet her in person and then arrange for follow up meetings in person, via phone or Skype with Coneys and Dysart. Board agreed that the goal would be to get her on board for year-end June meeting.

ADMINISTRATION & HR
Discussed marketing department re-org including departure of Analytics Consultant and recent termination of Direct Response Marketing Director. Noted recent promotions of Marketing Manager and Development Associate.

DEVELOPMENT
Noted Founding Donor FY15 revenue of $7.3MM+.

Discussed              willingness to fund our plans to build a hospital in India. Dysart inquired as to how this benefits WonderWork. Mullaney explained that it helps us in many ways: increases fundraising revenue, increases program spending, improves program spending ratios, strengthens relationship with            , creates a huge impact regarding surgical care (hospital will provide 15,000 surgeries a year for 50 years). Mullaney indicated that we need to determine how to allocate our share of the credit for this. Noted that it might be even more powerful than spending money on surgeries.

WON-EX 1280



Discussed upcoming February Major Donor trip to India with ███████ and June trip to Africa with ███████████████████

## IMPACT LOAN
Reviewed revenues and expenses associated with Impact Loan. Noted that more than 110,000 donors came on board as a direct result of the acquisition efforts it supported.

Dysart expressed concern about being able to pay back loan.

## DIRECT MARKETING
Noted hiring of new direct marketing agency, CDR, in November.

Reviewed Acquisition results for FY15 Q1&Q2. Noted very low response rates in Summer and Fall, as well as the poor performance of the Prospect Database Model. Discussed actions taken to mitigate weak results: dramatically decreased acquisition volumes, reassessing control package and developing new creatives with CDR.

Reviewed Retention results. Remarked that poor acquisition performance is negatively affecting retention mail volumes. Acknowledged that retention response rates were also lower than projected. Noted that CDR is helping to develop new creative packages as well as do deeper segmentation on brand donor data.

Coneys stated that we need to continue to test and feels that the more analytics we do, the better. Kant asked if we could benefit from additional help with analytics. Mullaney explained that we currently have analytics from both CDR and BCG and are learning a lot. Noted that we will provide board members with some analyses of direct mail results to review. Kant suggested we conduct some qualitative research as well; such as, focus groups, surveys, etc.

## DIGITAL
Reviewed web revenue and notable overall average gift of $127. Discussed viral video success: 2.6MM view to date, plus #1 most viewed video on National Geographic site in 2014. Noted great endorsement by *NYTimes'* Nick Kristof in his December 6th column "Gifts That Inspire."

## PROGRAMS
Reviewed program update and noted crossing 100,000th patient milestone. Acknowledged that 79 grants were awarded in FY15 and that we currently have 77 partners in 60 countries. Noted that the Medical Advisory Board held its 2nd meeting on Feb 9th.

## PROJECT VARANASI
Mullaney acknowledged ███████████ approval of project and confirmed his grant of $4,000,000 to help build hospital. Noted that WonderWork hired top law firm in India, AZB, and that they have begun to advise us.

Dysart inquired about a seat on the board. Mullaney explained that idea of board seat for WonderWork and for ███████████ has been discussed, but it is still being determined. Mullaney said he would like to hear what AZB recommends.

Coneys asked what would happen in the event there are cost overruns or revenue shortfalls. Mullaney explained neither ███████████ nor WonderWork wants to be on the hook for this. Confident ███████████ can manage and be responsible for either. Mullaney confirmed board will review and approve contract with ███████ before signing.

2

WON-EX 1281



Kant indicated that he might be able to get India Prime Minister Modi to hospital opening in 2 years.

LEGAL
Noted ongoing arbitration with HelpMeSee. Kant noted he spoke with WonderWork partner in Bihar and is confident they will work things out.

Dysart inquired if we can lock up CDR so that we can't be fired. Mullaney confirmed he will explore.

FINANCE
Reviewed FY15 budget and actuals. Noted that Donor Revenue (July '14 – Jan '15) is slightly higher than budget and that Marketing Expenses are down from budget due to dramatic cut in volume mailed. Net income reflects marketing decrease.

Acknowledged that final draft of Audit by KPMG will be circulated upon completion.

Discussed portfolio update. Noted that assets were switched from Vanguard Total World Stock to Vanguard Total Stock Index in January 2015 to eliminate international exposure.

Reviewed P&L and Balance Sheet.

MISCELLANEOUS
Dysart shared article he came across from CharityWatch which gave WonderWork a poor score for its financial performance for FY13. Board discussed rating; Mullaney to look into further.

3

WON-EX 1282



**Approved Minutes of the**
**Board of Directors Year-End Meeting**

**Date:** June 09, 2015

**Location:** WonderWork Headquarters

**Present:** Brian Mullaney, Ted Dysart
JJ Coneys, Ravi Kant (dialed in)

Meeting began at 10:30am EST.

#### FY15 REVIEW
Reviewed year-end results for both revenue and expenses. Noted diminished direct mail results compared to budget due to under-performing response rates, as well as decreased mail volumes. Highlighted 262% increase over budget for Major Donor Revenue which has helped to balance out direct mail program. Noted that Expenses are 72% of budget due primarily to the cut in acquisition mail volumes.

Coneys noted the difference in results and margins between direct mail and major gifts and asked if we should be focusing more on major gifts and less on direct mail. Mullaney said that is certainly something to consider and let's see how this year unfolds and how the new direct mail company does. Dysart agreed.

#### PROGRAMS
Reviewed programs and noted that we have crossed the 100,000 surgery threshold with blindness comprising 95% of our surgeries. Mullaney also noted that more than 80% of surgeries are performed in India. Discussed that program spending in FY16 will increase to $3,000,000 and allow us to reach more than 100,000 patients in 1 single year. Noted how well we compare to Smile Train during their analogous years in business. With regards to QA, Mullaney discussed that medical audits will be conducted at 3 selected hospitals in India by a vetted and highly esteemed medical professional.

Dysart asked for breakout of grants by cause which was quickly reviewed in other part of presentation. Also wanted to know when Smile Train grant was paid – was paid in FY 2014.

When reviewing surgeries per employ Coneys questioned whether we have enough employees. Mullaney agreed with him that we do not and need to hire more employees but need to figure out the direct mail vs. major gifts question first.

#### PROJECT VARANASI
Mullaney acknowledged the search for new and better land for the hospital. Noted that renowned architect ▓▓▓▓▓▓▓ and one of WonderWork's major donors, has agreed to help with the design.

#### DEVELOPMENT
Mullaney reviewed the tremendous success of Major Donor performance in FY15. Acknowledged that while ▓▓▓▓▓▓▓' $4MM pledge towards the Varanasi hospital project is a major contributor to this overall revenue, the program was still well over budget without it. Mullaney discussed recent and near future meetings with hi-net major prospects. Noted that Development goal for FY16 is to raise $4,000,000 through continued pursuit of major donors and prospects as well as more frequent mailings to this base.

WON-EX 1283


Dysart asked whether major donor goal was high enough. Mullaney answered that since
gift was a one off and not a reflection of many gifts and many major donors, he felt a 33% increase was
plenty.

Dysart remarked that Steve Levitt works with a lot of extremely wealthy CitiGroup guys such as
Pandit, etc and asked if Steve could introduce us. Mullaney explained Levitt has been asked several
times to connect us to prospects and he doesn't seem to like doing that.

Coneys will follow up with Mullaney separately to discuss ideas he discussed with Anne LeBleu.

### DIRECT MARKETING
Reviewed challenges WonderWork faced with its direct mail program in FY15 starting with the
resignation of our direct mail agency last June. Mullaney explained the decline in acquisition was due
to the prospect database tanking after a solid initial performance. He also noted that the acquisition
"control" piece had fatigued and needed to be replaced. Mullaney presented some of the new
acquisition control packages mailed in March and April and the 2 winning packages. Mullaney further
discussed the under-performance of the retention program, due primarily to over-mailing. Noted that
since new agency, CDR, has come on board, initial results in acquisition and retention are encouraging.

Mullaney pointed out that, while we haven't been acquiring new donors as quickly as we anticipated,
we still have an impressive 259,000 donors in our database. It was noted that Smile Train in the same
year, had less than 7,000 donors.

Discussed FY16 Direct Marketing plan and noted its focus on 20/20/20. Noted that volume will be
kept at a modest 5.4MM pieces for acquisition. Goal is to acquire donors at a reasonable cost of $30 or
less, as well as at an improved response rate. It was discussed that a Founders Circle program with
20/20/20 will be launched as part of the retention efforts to increase revenue.

### DIGITAL
Noted the 200% increase in digital revenue since last year, but that it still accounts for just 10% of
total revenue in FY15. Discussed success with both viral videos and tremendous number of views,
however, noted that as good as this content is, it does not generate significant revenue.

### GOVERNANCE
Approved Minutes from February 10, 2015 board meeting.

Approved resolution regarding term limits. Will review restated Bylaws once a redline copy is
emailed to show changes from original Bylaws. Mullaney to circulate to board once Greg Lam has re-
submitted to us.

Kant, whose term was up, was nominated and approved for a 2nd term.

Dysart requested we create a to do list from the board meeting to review at next board meeting.

Discussed positive feedback from board prospect Kelly Tullier and Dysart requested we arrange
lunches or phone calls with her over the summer.

Coneys suggested we start thinking about an additional board member once we get Tullier on board in
the Fall.

Reviewed and approved future board meeting dates.



## ANNUALIZED SAVINGS FROM COST REDUCTIONS

Mullaney discussed cost savings measures taken, including the releasing of certain staff, as well as temporary pay cuts for senior management and reduction in travel and legal expenses for FY16.

Mullaney noted the savings are almost $1 million.

## LEGAL

Noted that HMS Arbitration should be coming to a close this summer. Decision from arbitrator expected by September. Mullaney acknowledged that Wang's attacks and harassment have not only cost WonderWork close to $2,000,000, they have cost WonderWork significant time and energy, and have harmed our relationships with key vendors.

Mullaney noted that Wang's personal lawyer admitted his federal affidavit he filed against WonderWork was not accurate.

Dysart asked if we should put clauses in our contracts that they cannot resign our account because of Smile train threats. Mullaney explained that would probably make it harder for us to attract good vendors.

## FINANCE

Noted overall flat performance of portfolio in FY15.

Reviewed FY15 Budget and Projected Actuals.

Reviewed P&L and Balance Sheet.

## NEW IDEAS

Discussed visit to Facebook with Oculus Rift and innovative idea of creating a virtual reality video for major donors and prospects.

Mullaney mentioned that a book proposal about WonderWork and Smile Train has been created and that several publishers are interested. Discussed that this is something WonderWork may want to participate in in 1-2 years when the book is published.

Coneys thinks the book will attract a lawsuit from Smile Train and Dysart agreed. Mullaney explained it would be a personal contract with publisher with no involvement of WonderWork. Kant requested opinion from WonderWork lawyer.

## FY16 BUDGET

Reviewed and approved FY16 Budget.

Meeting ended at 12:20Pm and Dysart requested a follow-up call to go into Executive Session.



## Approved Minutes of the
## Board of Directors FY16 Q1 Meeting

**Date:**       October 6, 2015

**Location:**   WonderWork Headquarters

**Present:**    Brian Mullaney, Ted Dysart, JJ Coneys, Ravi Kant

Meeting began at 9:00AM EST.

GOVERNANCE
Approved Minutes from June 9, 2015 Year-End Board Meeting.

Approved future board meeting dates. Dysart requested dates be sent to his assistant.

Approved Project Varanasi resolution. Noted detailed contracts between WonderWork and our partner in India, ▢▢▢▢▢▢▢▢▢▢▢▢▢▢▢▢▢ and any major donor that agrees to fund this project, will need to be approved by board as well.

Reviewed By-laws, but need clarification regarding "member" issue as to whether or not Dysart and Mullaney are the only members. If so, does that affect anything? In addition, it was discussed that the By-laws need to be revised to state that when/if Mullaney steps down as CEO, he would no longer be exempt from term limits.

Discussed need for new office space given that lease expires end of March 2016.

Discussed board prospects and the need to evolve to a board that can help WonderWork raise money. Noted that initial board was primarily a governance board. Kant agreed that new board members need to give and help raise money, but also said that they should spend time helping the charity. Coneys agreed that we have governance "covered" and that the next step is to recruit board members that can help raise significant money. Coneys also said we need a "robust process" to identify potential board members. Coneys offered to explore a contact with Kenneth Cole. Dysart noted that he liked Tullier, Kokich, Moran and Steele, but favored Steele and/or Moran. Mullaney and Coneys felt that we need to spread a wide net – explore all individuals in list – in order to net a good number of new board members. Dysart said he is good friends with Jason Pritzker and can solicit him if Penny Pritzker declines.

Coneys inquired about Mullaney's book project. Mullaney explained that after the previous meeting where board members expressed concerns about this project, he decided not to involve nor include WonderWork in any way. Coneys, Kant and Dysart still maintain concerns about possible reaction of Wang. Dysart asked if there was anything in the settlement agreement that prohibited Mullaney from writing a book. Kant said we need to obtain some sort of "legal fencing" to protect WonderWork. Mullaney offered to get a written opinion from a copyright lawyer as to any possible risks and ways to mitigate/reduce them.

It was approved that board meetings going forward would take place from 9am-12pm (3 hours).

PROGRAMS
Reviewed program results and noted that 47 grants have been awarded this fiscal year to date and that first medical audit is in process. Discussed the appointment of new eye specialist, Dr. Norman Medow, to Medical Advisory Board.

WON-EX 1286



Kant asked if board meetings could be coordinated with MAB meetings so that there could be more interaction with the BOD. Kant said he would be willing to come to a year-end meeting in June. Mullaney confirmed that he will explore this with MAB.

Discussed electronic data medical record data repository project with BCG and opportunity of major funding from 2 of WonderWork's major donors, Laura and John Arnold. Mullaney explained that an EMR data repository would allow us to detect fraud, measure quality of surgeries and surgeons as well as provide geocoded maps to show valuable information. Mullaney showcased the data/charts/maps that BCG pulled from our partner patient information as a sample of what could be learned with a robust system in place.

## PROJECT VARANASI
Mullaney confirmed █████████ commitment to project. Noted that land has not yet been selected or purchased and that search will continue until something suitable is found.

With regards to financing purchase of new land, Mullaney discussed option of WonderWork extending a 12-month loan to █████████ at 3% interest as an alternative to him financing the purchase through a high interest rate of 12% with an Indian bank. Dysart expressed his opposition to this idea. Mullaney assured board that idea had simply been raised, but no action has been taken at this point.

Discussed the next steps which include a signed board resolution to approve the project as well as entering into an official agreement with █████████

## DEVELOPMENT
Reviewed WonderWork major donor revenue for FY16. Discussed recent meetings with █████████ and the █████████ as well as the upcoming meeting with donor and philanthropist, █████████. Also discussed major billionaire prospects in the pipeline for obtaining meetings.

Kant mentioned that there are a lot of wealthy Indians in the U.S who may be motivated to give donations to support surgeries in their hometowns in India. Coneys said that he may be able to make an introduction to █████████.

Dysart mentioned that his Indian friends, █████████, donated $5,000 to WonderWork, but might give more if Mullaney met personally with them in Vancouver. Dysart also mentioned he has information, which he will pass on, regarding █████████ military history which apparently he is very proud of.

Coneys inquired as to the amount of time Mullaney spends on Development to which Mullaney responded: 60%.

## DIRECT MARKETING
Discussed marketing update. Noted recent hiring of new list broker, ALC.

Reviewed acquisition results. Noted that overall acquisition is beating budget based on Q1 results. Highlighted the 2 new control packages that have been found after testing over a dozen creatives. Noted that the "premium" (Check package) has a higher response rate than the "non premium" (Tanzania Brian's package), yet the average gift of the Tanzania package is almost 3 times higher than that of the Check package.

Noted that the overall retention program is underperforming. Reviewed the various brands package performance over the last 18th months ranked by CTRAD as well as chronological.

Discussed the recent and disappointing launch of the Founder's Circle.

2

WON-EX 1287



Reviewed the success of the Foundation acquisition program launched in June, noting that we acquired 12 new foundations and have invitations from 28 to submit proposals. Due to success of June mailing, confirmed rolling out to approximately 50,000 foundations in October using the same creative.

Kant inquired as to whether we need to hire someone in-house to run the direct mail program at a more senior level. Mullaney explained that he was overseeing the program now and, until we know its future, Mullaney recommended not spending any more money on salaries. Noted our fixed costs are close to $1 million.

## DIGITAL UPDATE
Reviewed web stats for Q1. Noted total web revenue of $133,000 of which 82% is from 20|20|20 for the quarter. Discussed launch of *First Step* video with National Geographic this October. Discussed the continued viral views of *Burned Girl* and *Blind Sisters*.

## FINANCE
Reviewed the FY16 Budget and Q1 Actuals. It was noted that stock market decline over these past several months negatively impacted the total revenue brought in during Q1 with a loss of ~$1million in our portfolio.

Dysart stated that he would like Mullaney's deferred pay to be included in accrued expenses.

## MISCELLANEOUS
Kant discussed his "Charity with Loyalty" idea which comes from a company of which he is an investor. Kant feels there is an opportunity to leverage technology to scale up donations. He mentioned that he would put Mullaney in touch with the company to explore this idea.

At 11:47 the board went into Executive Session.

WON-EX 1288



### Approved Minutes of the
### Board of Directors Special Meeting

**Date:**        December 23, 2015

**Location:**    Conference Call

**Present:**     Brian Mullaney, JJ Coneys, Ravi Kant

Meeting began at 8:00AM EST.

#### Governance:
Resignation
Mullaney, Coneys and Kant accepted resignation of Ted Dysart (resigned November 29, 2015).

New board members
Board discussed, nominated and unanimously approved the following 6 new board members: Mark Atkinson, Clark Kokich, Steven Levitt, Richard Price, Steven Rappaport, Dickie Steele.

The following staggered terms and classes were approved:
JJ Coneys, Brian Mullaney* - Class of 2016
Steve Levitt, Mark Atkinson - Class of 2017
Ravi Kant, Richard Price, Clark Kokich - Class of 2018
Richard Steele, Steve Rappaport - Class of 2019

*Mullaney exempt from term limits as long as he is CEO.

All agreed that we need to find 1 or more women to join board as soon as possible. Mullaney mentioned that he is meeting with Kelly Tullier next month in London. He is also meeting with Anne Black, Chief Operating Officer, Goldman Sachs Gives in NYC. Coneys stated that he is researching some of his former clients and colleagues.

Kant inquired if we should have a medical professional join board. Coneys and Mullaney both agreed it was a good idea. Mullaney offered an option in the meantime to have a member of the WonderWork Medical Advisory Board attend Board of Directors meetings. All agreed to pursue this idea.

#### Future meetings:
Board discussed and approved moving Tuesday, February 9, 2016 Board of Directors meeting to Tuesday, March 8, 2016. Meeting will take place from 10:00am-1:00pm.

Coneys requested a prep call in February 2016 to discuss latest Direct Mail results, as well as best way to welcome new board members and bring them up to speed on all programs.

Mullaney reminded everyone of year-end meeting on Monday, June 13, 2016 which will overlap with WonderWork MAB meeting. This will include a joint lunch with presentation by                and a joint dinner for both boards. (Lunch/presentation will begin at 12:00pm; followed by Board of Directors meeting from 2:00pm-5:00pm; and then a joint dinner from 6:00pm-9:00pm)

Meeting ended at 8:35am.

WON-EX 1289



## Minutes of the
## Board of Directors Special Meeting

**Date:** February 24, 2016

**Location:** Conference Call

**Present:** Brian Mullaney, JJ Coneys, Ravi Kant

Meeting began at 8:00AM EST.

### Direct Mail calendar year results
Reviewed acquisition and retention revenue and expenses for calendar year 2015. Agreed that results for last year were pretty decent. Discussed acquiring close to 24,000 new donors for $.53 a piece. Remarked that the net profit for direct mail was almost $3 million.

### Acquisition results year to date
Reviewed results for acquisition for FY16 Q1 & Q2 noting the very positive results. Demonstrated how we beat budget on virtually every metric: response rate up from budgeted .61% to .65%; average gift up from $33 to $38; cost to raise a dollar down from $1.92 to $1.31 and net revenue up from -$537k to -$20Bk. Noted that we are acquiring donors for $11 (vs $30 budget) which is very low.

### Cost to Acquire donors
Reviewed historical Cost to Acquire (CTA) donors going back 18 months. It was noted how it rose sharply in the spring (going up to $44) but now, with the new control, has dropped considerably, averaging $11 for the past 2 quarters.

### Retention results year to date
Reviewed retention numbers for FY16 Q1 & Q2. Noted retention performing under, yet close to, budget across all metrics. Discussed that we are mailing creatives that have proven track record and are limiting creative testing to lift results.

For March 8th board meeting, Ravi asked to see what worked and what didn't work for both acquisition and retention fundraising.

Mullaney expressed confidence in new control package which has a high gift and high margin, versus check control package, which collapsed at higher volumes with its average gift decreasing from $25 to $20 in addition to a drop in response rate.

With regards to upcoming March 8th board meeting, JJ noted that a "primer" on direct mail would be useful as well as a "primer" on programs: how we raise money and how we spend money.

It was recommended that presentation begin with more emotional material, including program update, if we think we will be doing a big dive into data further into meeting to discuss fundraising.

JJ also suggested we let new board members know different ways they can help.

JJ inquired about the future of direct mail. Mullaney responded that we should stick with it, although he maintained it will be a much more more modest program than originally thought when WonderWork was launched. It was discussed that WonderWork would mail approximately 8-10 million letters a year netting $5-$7 million.

WON-EX 1290



Mullaney stressed the need to focus equally on major gifts and explained that we have a good proposal from one firm we met with and will be obtaining a second proposal from another firm as well.

Discussed Steven Rappaport's help with reviewing the revised WonderWork by-laws draft.

Considered and discussed ███ ██████████ request to put a board member onto our board. It was noted that JJ and Mullaney like the idea, which will be discussed again at March 8th meeting.

Regarding HelpMeSee legal battle, Mullaney confirmed that the 3-year arbitration will be coming to an end in two weeks with its last witness.

Meeting concluded at 8:30AM EST.

2

WON-EX 1291



### DRAFT Minutes of the
### Board of Directors FY16 Q1/Q2 Meeting

Date:          March 8, 2016

Location:     WonderWork Headquarters

Present:      Brian Mullaney, JJ Coneys, Clark Kokich, Mark Atkinson, Richard Steele,
              Steven Levitt (conference call) & guest, Burt LaFountain of BCG

Not present:  Ravi Kant, Steven Rappaport, Richard Price

Meeting began at 2:00PM EST.

Welcomed everyone and opened meeting with FirstStep clubfoot video.

#### GOVERNANCE
Reviewed and approved future board meeting dates.

Reemphasized importance of year-end meeting on June 13th which will overlap with Medical Advisory
Board meeting. Noted meeting will begin with a joint lunch presentation by surgeon,
at noon, followed by Board of Directors meeting from 2-5pm and a joint board dinner from 6-9pm.

Confirmed that the October 11, 2016 and February 14, 2017 meetings will be from 11am-1pm EST.

Approved revised by-laws and passed resolution.

Confirmed proposed board classes:
2016 – JJ Coneys, Brian Mullaney
2017 – Steve Levitt, Mark Atkinson
2018 – Ravi Kant, Richard Price, Clark Kokich
2019 – Richard Steele, Steve Rappaport

Reviewed WonderWork structure and how it has evolved over time. Noted that blindness (20/20/20)
represents approx. 80% of revenue and 70% of donors for FY16 amongst 3 causes. Noted that
blindness also represents 98% of all surgeries.

#### PROGRAMS
Reviewed WonderWork programs and its grant and oversight process. Noted that WonderWork
currently has 74 partners in 60 countries and has provided more than 134,000 surgeries since its
inception. Mr. Mullaney explained expansion into two new countries, Zimbabwe and Sri Lanka, are at
request of major donors.

Discussed surgery growth over the past several years. It was noted for this current fiscal year, we have
a lot of grants to get out the door to reach our target of 100,000+ surgeries . Mr. Mullaney explained
low program spending due to financial uncertainty and a difficult fall.

Reviewed role of medical advisory board and the successful recent medical audit of one of partner
hospitals in West Bengal, India. Noted that there are 3 additional partner audits under way.

WON-EX 1292



Mr. Mullaney introduced new electronic medical data warehouse project that WonderWork is collaborating on with Harvard School of Public Health, as well as Boston Consulting Group. Explained that the data warehouse will enable WonderWork to detect fraud, measure quality of surgery, surgeons and hospitals, as well as analyze pre & post visual acuity data.

Mr. Mullaney turned floor over to special guest, Mr. Burt LaFountain, principal at BCG to explain the visual acuity slides and the findings from the data BCG collected among WonderWork's partners. The charts demonstrated how "blind" patients are and where the most "blind" are coming from. Charts also showed pre-and post-op visual acuity measurements to demonstrate improvement as well as poor surgical outcomes.

Mr. Mullaney provided overview on reconstructive surgery hospital and world class burn center to be built in Varanasi, India with the help of major donors. Noted that center will provide over 750,000 reconstructive surgeries over its 50-year lifetime. Discussed that ▇▇▇▇▇▇▇, world renowned architect, will help design hospital pro bono.

## DEVELOPMENT

Reviewed development results for calendar year 2015, illustrating how direct mail and major gifts comprise the total "pie." Noted that 54% of revenue comes from direct mail and 46% from major gifts. Highlighted the average direct mail gift is $56, whereas the average major gift is $5,700+.

Discussed notable major gifts received during past second quarter, including the renewed $2,000,000 annual grant from ▇▇▇▇▇▇▇▇▇▇▇. Mr. Mullaney noted meetings with ½ dozen billionaire donors and prospects. Discussed efforts to expand major gift capabilities by searching for a Major Gift Officer.

Mr. Mullaney provided board with Direct Mail 101 overview to show the lifecycle of a direct mail donor.

Discussed some of the challenges we've had with direct mail results this past year, from key vendors resigning to our replacement agency, CDR, grossly underperforming. Explained how we took actions that have resulted in improvements, including hiring a new list agency, getting CDR to reduce their fees by 50% and taking more control over key decisions. Discussed our current strategy of scaling up our volume from mailing 6 million letters/year to 10 million/year to acquire 35-40k new donors/year.

Reviewed total direct mail revenue and costs for calendar year 2015. Noted that we acquired approximately 24,000 new donors over the past year and that our total net revenue amongst the 3 causes was close to $3,000,000.

Reviewed Acquisition summary for FY16 Q1 & Q2. Demonstrated how we were performing better than budget across all metrics: response rate up from budgeted .61% to .65%; average gift up from $33 to $38; cost to raise a dollar down from $1.92 to $1.31 and net revenue up from -$537k to -$208k. Noted that we are acquiring donors for $11 (vs $30 budget) which is very low. Mr. Levitt inquired about Cost to Raise $ (CTRAD) and if it was calculated with net or gross revenue. Mr. Mullaney explained "net."

Raised issue of whether we should or shouldn't abandon direct mail. Mr. Mullaney responded that we should not abandon it for now, as we need to cultivate all the donors we already have, but monitor closely how much we invest in acquiring new donors. Explained that we are using a $1.50 CTRAD ceiling, so breakeven is soon.

Reviewed test results for a new control which show that the best pieces are the ones conceived in-house including the 2 winning acquisition pieces.

2

WON-EX 1293



Reviewed acquisition performance for last 18 months regarding mail volume, response rate, average gift, net revenue, CTRAD, and Cost to Acquire a donor. Noted the overall performance improvement over the last several months.

Reviewed retention numbers for FY16 Q1 & Q2. Noted retention performing under, yet close to, budget across all metrics. Discussed that we are mailing creatives that have proven track record and are limiting creative testing to lift results. Discussed overall retention results over the past 12 and 18 months as well as package performance within each cause. Mr. LaFountain suggested we examine top creative packages and de-average them to see which groups they work best against.

Regarding digital performance, it was noted that more than $500,000 was raised through the web since July 2015 and that the average gift of these donors is $184. Mr. Kokich inquired as to who does our website and proposed he might be able to help find a good vendor to help us improve it.

Discussed creating a WonderWork virtual reality video and letting donors experience what it's like to be at a blindness camp, witness a surgery and watch a child open their eyes for the first time – without having to travel.

PR was also inquired about. Mr. Mullaney explained that we are actually in talks with one firm at this time, and agreed that we need to spend more time on it as it has been neglected.

Board brainstormed on development ideas.

Mr. Steele proposed focusing on rich Indians in the US, finding their village, asking them to help solve blindness in their village, state, etc. He suggested we create a campaign – "End Blindness in India." Mr. Steele further inquired about public health policies, and raising awareness of the lack of awareness and funding for surgery programs.

Mr. Kokich proposed doing capital campaigns – be it for the reconstructive surgery hospital in Varanasi, and/or for other big projects.

Mr. Kokich also inquired about "millennial giving." Mr. Mullaney noted that our current donors are predominantly middle aged and older. Mr. Kokich suggested we try some wealth screening products.

It was suggested that WonderWork seek the support of a Bollywood actress, such as Aishwarya Rai, who currently serves as Smile Train's Goodwill Ambassador.

Mr. Kokich offered to host an event for WonderWork in Seattle, with                    as a special guest when he visits the US in June. Mr. Mullaney responded that we would provide Mr. Kokich with information on our Seattle-based based supporters.

## ADMINSTRATION & FINANCE
Discussed move to new space at the end of the month. Noted that we will be saving more than $100k/year.

Mr. Mullaney brought everyone up to speed on the HelpMeSee arbitration which will be coming to a close after 3 years. Noted that WonderWork's legal fees and expenses since inception have amounted to more than $1.8 million.

Reviewed Vanguard portfolio position, noting that, as of Feb 29th, we had an unrealized loss of $811,110 (-6%).

Confirmed that WonderWork audited financials for FY15 will be completed by May.

3

WON-EX 1294



Discussed FY16 partner hospital financial audits, noting that 2 audits have already been completed with 2 additional audits in process. Remarked that findings confirmed that funds are being spent in compliance with grant terms.

Reviewed FY16 Budget against FY16 Q1 &Q2 Actuals. Noted that overall we are close to budget.

Reviewed P&L and Balance Sheet. Noted that net assets were at $8.2 million.

Meeting concluded at 5pm.

WON-EX 1295



## Minutes of the
## Board of Directors FY16 Year-End Meeting

Date:        June 13, 2016

Location:    WonderWork Headquarters

Present:     Brian Mullaney, JJ Coneys (conference call), Ravi Kant, Clark Kokich, Steven
             Levitt, Steven Rappaport, Richard Steele

Not present: Mark Atkinson, Richard Price

Meeting began at 2:00PM EST.

Welcomed everyone and opened meeting with The Boy Who Was Blind video.

### REVENUE SUMMARY

Reviewed FY16 revenue summary against budget. Noted that total revenue was 169% over budget due to the major gifts received during the last couple of months of the fiscal year.

Mr. Levitt inquired about placing remnant ads which Mr. Mullaney agreed was a good idea to try again.

Several board members asked about using social media to raise revenue. Mr. Mullaney explained how difficult it is to acquire new donors via social media, citing that even WonderWork's viral video which has now been seen by 10+ million people, has only raised $200K+.

### PROGRAMS

Mr. Mullaney reviewed our WonderWork programs structure and process. Noted that we currently have 60 active partner hospitals and NGOs in 42 countries and that we have contributed to more than 64,000 surgeries this past fiscal year. The details shared with the Board demonstrated that blindness continues overwhelmingly to be our main cause, comprising approximately 98% of the total surgeries.

Mr. Mullaney discussed that we will have a record program spending of $5.45 million next fiscal year and that we are increasing our pediatric surgeries performed to 2.5%.

Mr. Rappaport stressed the importance that WonderWork's funding to partners be used for incremental surgeries. Mr. Mullaney confirmed that this would be enforced through explicit agreements and grant proposals.

Mr. Mullaney provided an overview of the WonderWork burn hospital we are seeking to build in Varanasi, India, noting that                          was negotiating to acquire the land and that we are working on finalizing all outstanding agreements.

Mr. Mullaney also discussed the new electronic medical record data warehouse WonderWork is collaborating on with Harvard School of Public Health. Noted that this data warehouse will help us greatly improve our ability to detect fraud, measure quality of surgery, surgeons and hospitals, as well as analyze pre- & post visual acuity data. Mr. Mullaney explained that project is being bid on and estimates a delivery date by end of year.

### DEVELOPMENT

Reviewed direct mail Acquisition and Retention results for past fiscal year.

WON-EX 1296



Mr. Mullaney discussed the challenges of direct mail explaining that it costs too much to acquire a donor. As an example, based upon his past experiences at Smile Train, he explained how Smile Train was mailing 72 million pieces in a year and that the cost to raise a dollar was $1.35. Whereas for WonderWork, in just one month of mailing 6 million pieces, the cost to raise a dollar was almost double at $2.32. Mr. Mullaney also discussed that donors are lapsing much quicker than they used to, nor are they giving as often or as much, citing a comparison with Smile Train once again. He explained that we are spending close to $1 million in vendor and overhead costs just to maintain a mediocre direct mail program.

It was noted that WonderWork needs to transition from direct mail to major gifts as a primary fundraising source. During this past fiscal, major gifts represented 67% of total donor revenue, bringing in more than $10 million.

Mr. Levitt noted the pie chart on slide 23 which demonstrated the breakout of direct mail vs major gifts would be more effective if plotted with net revenue (vs gross revenue) to more accurately portray the stark difference in profitability.

There was unanimous consensus from the board that the transition to major gifts is the right move. Mr. Levitt explained the tremendous opportunity, noting that the cost of spending time on money-losing direct mail would now be spent raising major gifts.

Board also discussed the possibility of creating a very high-end direct mail program aimed to generate leads for major gifts.

They acknowledged that future results will be "lumpy" because of nature of major gifts and small volume. Mr. Kant advised that we add a column to our major gifts slide that shows cumulative gifts.

To help pursue more major gift donors, Mr. Kokich recommended we use wealth screening of our donor database to identify good prospects. Mr. Kokich also mentioned that he is on the board of a charity who hired a semi-retired executive to help with major gifts and that it has been a success. He said that hiring good development people is very hard, as many have proven to be ineffective.

Mr. Levitt suggested we send letters to high net worth folks inviting them to go on a trip. Discussion ensued as to who should pay for trip. Consensus was that prospects should pay their own way, otherwise it was determined that they would not be good prospects. Mr. Mullaney shared story with and the issue with him and his family going, and then not going, to Africa last year.

With regards to major gift prospecting, Mr. Mullaney discussed the possibility of receiving a large 7-8 figure grant from whom he has cultivated over the past year with the help of Mr. Rappaport mentioned that we might want to research partner, who is very wealthy and philanthropic.

Mr. Levitt inquired about current efforts on public relations to which Mr. Mullaney agreed that we should do more. Noted that we had a mid-size PR firm promise us pro-bono work, but then submitted a proposal with fees around $100,000/year.

On the subject of direct mail, Mr. Kant asked if we might consider hiring a senior executive to run direct mail so that Mr. Mullaney would not be bogged down with it. Mr. Mullaney suggested that we first fix our retention results and then entertain this as a possibility. It was agreed that there was no interest in investing any more money in acquiring more donors until we can prove they will be profitable.

2

WON-EX 1297



## ADMINSTRATION & FINANCE

Mr. Mullaney provided board with legal update, noting that HelpMeSee arbitration is coming to a close after almost 4 years and more than $1.2 million in legal fees. Final ruling expected in August/September.

Discussed portfolio position with Vanguard, and that, as of June 3, 2016, we had an unrealized gain of $419,000 on our investment.

Confirmed that FY15 Audited Financials and FY15 990 were both submitted to the IRS this past May.

Noted that 4 partner hospital financial audits were conducted by KPMG this past fiscal year. Continuing to target hospitals for audit that receive $250k+ funding.

Reviewed FY16 budget vs actuals. Noted that major gift revenue was the main factor beating revenue budget by 169%.

Mr. Levitt mentioned that we are possibly being too cautious holding back on program spending because of legal issues and challenges.

Mr. Levitt and Mr. Steele both suggested we frame pitches to donors in creative ways, instead of just the monolithic "20 million need surgery" approach. They suggested that focus be on children and region or geographic area.

Mr. Kant recommended we approach ▮▮▮▮▮▮▮▮▮▮ and try to form a partnership with them to raise money from wealthy Indians in the US. He confirmed they know who and where they are. 100% of the money raised could be restricted to ▮▮▮▮

Mr. Rappaport recommended that we delineate capital gifts and capital spending, as it distorts operating income and expenses.

Next Mr. Mullaney presented the FY17 budget which board approved with following modifications:

Increase major gifts target from $4 million to $5 million.
Increase program spending from $5,455,000 to $6,455,000.

Several board members suggested we use large $2 million grant from one donor to pay for all non-program expenses, so we can use 100% of all donations to pay for surgeries, just as we did at Smile Train.

This generated a lively discussion of our capacity to increase surgeries: how easy will it be to scale up surgeries and will it require capital investment?

Mr. Levitt asked if we have prospective partners "in the wings" we can bring on if major gifts come in. Mr. Mullaney explained he believes we do and promised to circulate a spreadsheet that shows partners' current surgeries for us as well as their capacity.

Mr. Mullaney suggested we can go to 150,000-200,000 surgeries/year with our current partners.

Reviewed P&L and balance sheet. Noted that gross assets are at $24 million.

## GOVERNANCE
Reviewed future board meeting dates and discussed changing times if possible.

Mr. Rappaport said he can attend October and June meeting if time is changed from 11am-1pm to 10am-12pm. If not, Mr. Rappaport said he could attend a meeting on June 5th (instead of June 13th).

WON-EX 1298


Board approved formation of following committees with these members:

Nominating and Compensation Committees: JJ Coneys, Ravi Kant, Clark Kokich and Steve Levitt
Audit Committee: JJ Coneys, Steve Rappaport
Finance and Investment Committee: Dickie Steele, JJ Coneys, Brian Mullaney

Board nominated and approved JJ Coneys for new 3-year term, with understanding he will probably need to-resign after one more year due to work obligations.

Mr. Kokich asked if we should determine a give or get for board members.

Discussed new board prospects Jim Poehling and Sabrina Clark.

Mr. Poehling was favorably received. Agreed that next step would be to set up a call/meeting between Mr. Kokich and Mr. Poehling.

Sabrina Clark's nomination was also discussed, and Mr. Mullaney explained she would be attending board dinner where members would meet her. Mr. Mullaney seated her next to Mr. Kokich during the dinner.

It was agreed that after Mr. Kokich speak with Mr. Poehling, board would discuss both candidates on a conference call or via email. It was noted that it one or both are approved, they will be able to attend the next board meeting in October.

Noted that WonderWork has received the seal from the Better Business Bureau after having met all 20 standards for charity accountability.

As a side note, Mr. Levitt recommended we contact Peter Attia, a very talented surgeon and treats the richest people in New York.

At 4:10pm, the meeting was concluded.

4

WON-EX 1299



## Minutes of the
## Board of Directors Meeting

| Date: | October 11, 2016 |
|---|---|
| Location: | WonderWork Headquarters |
| Present: | Mark Atkinson, Sabrina Clark, Brian Mullaney, Jim Poehling, Steven Rappaport |
| Dialed in: | JJ Coneys, Ravi Kant, Clark Kokich, Steven Levitt, Richard Price, Richard Steele |

Meeting convened at 10am EST.

### GOVERNANCE

Board voted on and approved new members: James Poehling (Former Assistant Vice Chancellor Health Sciences, University Missouri Healthcare) and Sabrina Clark (Managing Director, Business Operations & Program Management, SY Partners).

Minutes from June 13, 2016 year-end board meeting were approved per changes by board members.

It was suggested that future board meetings be moved back to allow for more comprehensive and accurate reporting. The following new dates were approved: Tuesday, March 7, 2017; Tuesday, June 27, 2017; and Thursday, November 16, 2017. (Mr. Kokich had a conflict with Tuesday, November 14th and board agreed to move meeting to Thursday). In order to ensure as full attendance as possible, it was requested that WonderWork send members a reminder one month prior to a meeting.

Discussed new member prospect: Tara Abrahams. It was noted that Ms. Abrahams has 15 years of experience in strategy consulting, philanthropy, program implementation and change management. Mr. Mullaney explained that she was originally referred by Mr. Steele who worked with her while she was a consultant at Bridgespan for approximately 2 years. Overall, board members considered her an excellent candidate with Mr. Kant and Mr. Rappaport verbally noting they were very impressed by her credentials. It was agreed that Mr. Kokich would schedule a phone call with Ms. Abrahams to formally discuss her joining WonderWork board. Upon her consent, a special board conference call will be scheduled to vote and approve her so that she may attend the March 7, 2017 meeting.

With regards to the 3 newly created board committees, it was collectively decided that Mr. Kokich would chair and organize the Nominating and Compensation Committee, Mr. Coneys would chair the Audit Committee and Mr. Steele would chair the Finance and Investment Committee. Ms. Clark inquired about the responsibility of the committees with Mr. Mullaney responding that this would be determined by each committee.

Reviewed WonderWork overview chart which shows the program breakout under the WonderWork umbrella. It was noted that, amongst the causes, 20|20|20 comprises 80% of the revenue, 75% of the donors and 98% of the surgeries.

Mr. Poehling asked about the need for surgery for each cause. Mullaney explained the huge numbers who need help: 20,000,000 blind, 2,000,000 suffering with clubfoot, 11 million burned each year.

WON-EX 1300



<u>PROGRAMS</u>

Mr. Mullaney provided an overview of the WonderWork programs structure and process, explaining everything from the vetting of partners to the grant approval process to the completion and reporting of surgeries.

Reviewed first quarter program results, noting that we have contributed to performing 17,244 total surgeries. Of the 16,894 cataract surgeries, Mr. Mullaney explained that 2% are pediatric. Noted that our 5-year projected surgery growth is 1,113%.

Mr. Levitt inquired as to how we know surgeries are incremental. Mr. Mullaney explained that several steps have been taken to ensure this. Explained that (1) award letters have been revised to indicate WW funding is to be used to support incremental surgeries and not displace other funds, (2) term sheets are also provided to partners which are then signed and returned to WW, (3) narrative reports required that partners complete, confirm that WW funding was used for incremental surgeries, (4) annual surveys are sent to partners to gauge capacity for expansion, measure growth over time and reconfirm that funds are used for incremental surgeries.

Mr. Mullaney discussed that we recently acquired a new, extremely viable, partner, ▓▓▓▓▓▓▓ ▓▓▓▓▓, which is the highest surgical volume eye hospital in India, making this hospital extremely scalable for WonderWork.

Discussed Project Varanasi progress and land purchase options: Jansa Thana land and a government-owned land. Explained that ▓▓▓▓▓▓▓▓▓ has moved forward with the purchase of Jansa Thana land which is 4-5 acres and has an excellent location. Mr. Mullaney noted that the low-cost, 14-acre government land is still under consideration, however, it is unlikely to come through due to the Indian bureaucratic government process. Mr. Price offered assistance from CBRE Real Estate should we need it.

Mr. Mullaney also updated the board on the data warehouse project. Noted that we retained IT company, Mastek, based in India, to build and deliver a cloud-based patient database by January 2017. Discussed that Mastek was chosen for its capability as well as its extremely reasonable cost ($40k vs competitive bids of $250k). Mr. Kant mentioned that he knows Mastek's co-founder and thinks highly of him and their company. Mr. Mullaney explained that Ariadne Labs at Harvard School of Public Health and BCG will continue to assist with the execution of the project as well.

Mr. Rappaport asked if data warehouse could be licensed to other non-profit and for-profit organizations.

Ms. Clark was curious as to how the database would work and how records would be loaded into the database. Mr. Mullaney explained that partners would upload patient data into an enterprise level, secure cloud-based server.

Mr. Mullaney went on to discuss an important funding opportunity with USAID that involves their Development Innovation Ventures program. He noted that USAID technology partners, CISCO and IBM, may be interested in our data warehouse. Also discussed the opportunity to pitch the 68 members of Congress whom we've identified with an interest in avoidable blindness. Mr. Levitt offered to help pitch the folks at USAID. Mr. Steele recommended we review government finance and accounting requirements, as they can be substantial and onerous.

2

WON-EX 1301



## DEVELOPMENT

Reviewed direct mail retention results for July and August campaigns. Noted that campaigns are performing better than budget.

Reviewed acquisition net income each year since FY13 to demonstrate the losses we incurred through these campaigns and why it was necessary to cease acquisition efforts.

Mr. Mullaney remarked that, since we are no longer conducting acquisition campaigns, we have stopped acquiring new donors and current donors are lapsing at a greater rate. Noted that as of September 30th, our donor file is comprised of 62% lapsed donors (haven't given a gift within past 24 months) vs 38% active donors.

Mr. Atkinson inquired as to what has happened to direct mail given that it was so successful for us for many years. Mr. Mullaney explained that demographics, aging donors, tendency of new donors to use digital means are contributing to the challenges the industry is seeing in traditional direct response mail.

Mr. Rappaport remarked that, while our acquisition program consumed a lot of money, it has not been a total disaster, as it raised awareness and helped establish the 3 brands.

Mr. Mullaney discussed a mailing opportunity with 45,000 of our "once and done" donors who have not been mailed for 2+ years that could contribute $1-$1.5MM in incremental revenue over the next 3-4 years. He explained that a recent test mailing to 30,000 of these donors did extremely well (exceeding response rate, average gift and showing lower cost to raise $1 against budget). It was noted that due to initial test success, it will be re-tested this fall.

Mr. Mullaney confirmed that overall direction is to continue pivoting from low-end to high-end direct mail, as major donors bring in 75% of revenue. He discussed that we are testing high-end, highly personalized retention mailings (both "ask" and "cultivation" pieces) to current $250+ level donors for 6 months.

Noting that we have stopped acquiring low-end direct mail donors, Mr. Mullaney mentioned that we would be exploring renting though our list broker more high-end, direct mail lists (e.g. Architectural Digest, Town and Country, Frontgate) which Mr. Atkinson also inquired about.

Provided update on major gift officer search, remarking that the first round of interviews were disappointing. Noted how difficult it is to find good major gift officers. Mr. Mullaney surmised that one challenge for us is that our charity is not well known, nor is our cause.

Mr. Poehling explained that the Thompson Autism Center experienced a similar challenge and their solution involved hiring a "home-grown person," a nurse from one of the centers.

Mr. Rappaport concluded that Mr. Mullaney needs strong administrative people around him to make him more productive.

Mr. Mullaney went on to discuss the current web stats, noting that online revenue was $85,000 for Q1 FY17 with 20|20|20 comprising 76% of revenue and gifts. He noted that, while videos have had tremendous numbers of views, the overall revenue raised from them has been disappointing.

Mr. Kokich asked if WonderWork paid for views; Mr. Mullaney confirmed we did not.

Mr. Steele mentioned that he would like to connect us with AARP given their success with social media and shift away from direct mail. Mr. Steele said that we "need a war room to be connected with social media." Mr. Rappaport suggested that we reach out to AARP Foundation and pitch them for funding.

3

WON-EX 1302



### ADMINISTRATION & FINANCE

Discussed portfolio which shows that 100% of investment (including impact loans) rests in Vanguard Total Stock Market ETF. Noted that % gain was 4.34% as of Sept 30th. **Mr. Rappaport suggested that** money be invested in more conservative vehicles, such as bonds. Mr. Coneys concurred that investment strategy also be reviewed. Board discussed that Finance and Investment Committee would meet and discuss this.

### MISCELLANEOUS

Mr. Mullaney presented article in *National Geographic* magazine on blindness and confirmed that a digital copy will be sent to all members. Mr. Coneys and Mr. Rappaport inquired as to how we can leverage the article to get people to watch our viral video. Mr. Atkinson also felt that we should leverage the Nat Geo video, as it lends tremendous credibility. Ms. Clark asked if we could get the mailing list of Nat Geo; Mr. Mullaney responded that we would look into this.

Discussed how we can try and partner with social media influencers and celebrities.

Meeting ended at 11:20am EST.

WON-EX 1303



**Minutes of the**
**Board of Directors Special Meeting via Conference Call**

| | |
|---|---|
| **Date:** | December 6, 2016 |
| **Location:** | **WonderWork Headquarters** |
| **Present:** | **JJ Coneys, Clark Kokich, Steven Levitt, Brian Mullaney, James Poehling, Steven Rappaport** |
| **Additional:** | **Pamela Mann, Esq. and Aaron Cahn, Esq (Carter, Ledyard & Milburn); Joseph Vogel, Esq. (Kravet & Vogel); Stephanie Pillersdorf (Sard Verbinnen)** |
| **Not present:** | **Mark Atkinson, Sabrina Clark, Ravi Kant, Richard Price, Dickie Steele** |

Meeting began at 4:00pm EST.

A quorum was present.

Mullaney gave an overview of current situation.



Both resolutions regarding the "Filing of an Appeal for consideration at a Special Meeting Held on December 6, 2016" and the "Filing of a Chapter 11 Petition for consideration at a Special Meeting Held on December 6, 2016" were passed unanimously.

Meeting adjourned at 4:30pm EST.

WON-EX 1304

MULLANEY

EXHIBIT 40

**From:** Brian Mullaney [brian@wonderwork.org]
**Sent:** Wednesday, November 11, 2015 5:37 PM
**To:** Dysart, Ted
**Subject:** Re: Contract

Ted,

Three or four ago you said you would take care of developing an employment contract for me.

You never did.

After working for years without one, out of frustration, I asked our WW lawyer to draft a very simple, bare bones contract and circulated it to you and the board in September asking for comments so we could vote on it at our October board meeting.

It is not very complicated and I am not asking for anything that is not standard.

A few weeks later, you called and told me you were going to handle this and asked me if that was okay. I said sure.

Two months later, I have never heard another word from you about this topic until now.

My contract was not approved as I had hoped at our October board meeting and in fact, was never even discussed. No explanation was ever given.

Now you are asking me to get my personal lawyer involved.

Is this really necessary?

Can't you please get feedback, comments, suggestions to the very simple boilerplate contract I submitted and send me a revised draft that I can show them to my lawyer?

I can't imagine there are any significant issues because I am not asking for anything.

I know this is not the way you handle things with your clients and large corporations but we are a tiny charity with 9 employees.

I would rather not have my lawyer talk to anyone unless there is an issue.

If there are issues I am not aware of please let me know. If there is a valid reason why I need to spend money on a lawyer negotiating this please let me know.

I would like to just get this contract revised so both sides are happy and sign it.

Thank you,


Brian


**Brian Mullaney**
Co-Founder/CEO

WonderWork
420 Fifth Avenue, 27th Floor
New York, NY 10018
tel: 212.729.1855
cell: 917.902.7550

EXHIBIT -40
Brian Mullaney
8/17/17
S. Arielle Santos, RPR, CSR
**TransPerfect Legal**

email: brian@wonderwork.org
www.WonderWork.org

Watch two blind sisters see their mom for the first time!
More than 4,000,000 people have watched this heart-warming video over the past few months!



Miracle surgeries for children
wonder
work

**TIME** magazine named WonderWork "One of 10 Ideas That Can Change The World."

**From:** Ted Dysart
**Date:** Wednesday, November 11, 2015 at 4:40 PM
**To:** brian mullaney
**Subject:** Contract

Brian,

In an effort to get the contract issue settled, can you send me the contact info for your personal attorney? That way I can have the folks at Vedder get in touch directly?

Ted.

**Theodore L. Dysart**
Vice Chairman

**Heidrick & Struggles**
233 S. Wacker Dr. | Suite 4900 | Chicago, IL | 60606
T: +1 (312) 496-1860 | M: +1 (312) 638-9243 | E: tdysart@heidrick.com
Asst: Karen Kreiman | T: +1 (312) 496-1868 | E: kkreiman@heidrick.com

**HEIDRICK & STRUGGLES**

WE HELP OUR CLIENTS CHANGE THE WORLD,
ONE LEADERSHIP TEAM AT A TIME™

WW_EMAILS0193824-2

MULLANEY
EXHIBIT 41

<u>**EMPLOYMENT AGREEMENT**</u>
<u>**BETWEEN**</u>
<u>**WONDERWORK, INC.**</u>
<u>**AND**</u>
<u>**BRIAN MULLANEY**</u>

This Employment Agreement (this "Agreement") is entered into by and between the **WONDERWORK, INC.**, a Delaware non-profit corporation, with its principal place of business located in New York, NY ("WWI"), and **Brian Mullaney,** an individual resident of Belmont, MA ("Mullaney").

## RECITALS

The parties enter into this Agreement on the basis that WWI wishes to employ Mullaney as WWI's Chief Executive Officer, and Mullaney desires to be employed by WWI to serve as its Chief Executive Officer under the terms of this Agreement and at the pleasure of the Board of Directors of WWI.

NOW, THEREFORE, in consideration of these Recitals, which are incorporated in this Agreement by this reference, and the following mutual promises and intending to be legally bound hereby, and for other good and valuable consideration, the receipt and adequacy of which are acknowledged, the parties agree as follows.

## AGREEMENT

1.     <u>**Employment**</u>. As of January 1, 2016 WWI hereby employs Mullaney for a period of 5 years, through December 31, 2021, and Mullaney hereby accepts employment with WWI, upon the terms and conditions of this Agreement.

2.     <u>**Duties, Responsibilities, and Authority**</u>.

(a)     <u>Duties</u>: Mullaney is hereby employed under the terms of this Agreement to perform the duties of Chief Executive Officer as further described herein and as may be required by the Board of Directors of WWI from time to time (the "Board"). The Chief Executive Officer shall report directly to the Board of Directors. The Chief Executive Officer job description is set forth in Attachment A to this Agreement. Mullaney's job description may be reasonably modified at the discretion of the Board of Directors of WWI, without the need to make a corresponding change to this Agreement. Mullaney agrees to devote his full time and best efforts to the performance of his duties to WWI.

(c)     <u>Other Activities</u>: The foregoing shall not be construed to prohibit Mullaney from engaging in activities relating to serving on civic and charitable boards or committees, and managing his personal investments, provided that such activities do not significantly interfere or conflict with the performance by Mullaney of his duties, responsibilities, or authorities hereunder.

1

EXHIBIT -41
Brian Mullaney
8/17/17
S. Arielle Santos, RPR, CSR
**TransPerfect Legal**

3.    **Compensation**. In consideration of the services to be rendered by Mullaney for the benefit of WWI, Mullaney shall receive from WWI:

(a)    <u>Salary</u>: As compensation for the services provided by Mullaney hereunder, WWI shall pay Mullaney a gross annualized salary for the period of this Agreement of four hundred seventy-five thousand dollars and no cents ($475,000.00) payable in equal semi-monthly installments less deductions required by law or as otherwise agreed to by Mullaney. In addition thereto, Mullaney shall be entitled to additional compensation of an annual bonus of up to two hundred fifty thousand dollars and no cents ($250,000.00) per annum, at the discretion of the Board of Directors. Compensation shall be reviewed annually by the Board of Directors in connection with an annual review of Mullaney's performance and may be revised in the sole discretion of the Board of Directors.

(b)    <u>Vacation</u>. Mullaney shall receive no less than 4 weeks paid vacation each year.

(c)    <u>Tax Withholding</u>. All compensation payments will be made subject to applicable state, local, and federal withholding and payroll tax requirements.

(d)    <u>Salary Review</u>. In determining and approving Mullaney's salary, the Board of Directors reviewed appropriate, comparable data for persons serving tax-exempt, nonprofit organizations in the capacity of Executive Director. The Board of Directors shall commission or otherwise conduct further salary reviews should the terms of Mullaney's employment change, including any proposed, significant changes in his salary. Mullaney's salary may be confirmed or adjusted after such review, depending upon any changes in circumstances that may impact any previous determination by the Board of Directors that the salary stated herein, or any proposed changes in that salary, is reasonable.

4.    **Employee Benefits and Perquisites**. During the term of his employment, Mullaney shall be entitled to the benefits and perquisites set forth on Attachment B hereto, in addition to the standard benefits otherwise available to employees of WWI, set forth on Attachment C. Mullaney shall participate in WWI's Section 403(b) program with the same contributions and benefits available to other WWI employees pursuant to the terms of the Plan Document, as per Attachment B. WWI also agrees to pay for Mullaney's continuing education expenses and professional nonprofit association membership dues reasonably related to the performance of his duties and responsibilities.

5.    **Facilities.** WWI shall provide and maintain or cause to be provided and maintained, such facilities, equipment, supplies, and assistance as deemed necessary for Mullaney's performance of his duties under this agreement.

6.    **Termination.** Mullaney's employment hereunder shall commence on the Commencement Date and continue until the occurrence of any of the following:

(a)    <u>Death or Disability</u>: Mullaney's employment shall terminate upon his death or, subject to applicable law, at the option of WWI, in the event of Mullaney's disability, upon written notice from WWI. Mullaney will be deemed to be "disabled" when he (i) is unable to

2

WON 01238

engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which is expected to result in death or would be expected to last for a continuous period of not less than six (6) consecutive months or (ii) begins to receive income replacement benefits for a period of not less than three (3) months under any accident and health plan by reason of any medically determinable physical or mental impairment which is expected to result in death or would be expected to last for a continuous period of not less than six (6) consecutive months. Mullaney shall cooperate in submitting to a medical examination for the purpose of certifying disability under this Section 6(a) if requested by the Board of Directors or the Executive Committee of WWI.

(b) <u>For Cause - Immediate Termination</u>. WWI may terminate Mullaney's employment for "Cause" upon written notice by WWI to Mullaney. For purposes of this Agreement, "<u>Cause</u>" for immediate termination shall mean:

(i) the Board of Directors or the Executive Committee of WWI reasonably determines that Mullaney has committed any act of fraud, embezzlement, misappropriation, or theft in the course of Mullaney's employment with WWI;

(ii) Mullaney has violated any federal, state or local law, ordinance, rule or regulation (other than minor traffic violations or similar offenses) in the course of Mullaney's employment with WWI that the Board of Directors or the Executive Committee of WWI determines in good faith is materially detrimental to WWI's business, reputation, or goodwill;

(iii) Mullaney has been convicted by a court of competent jurisdiction of, or pleaded guilty or nolo contendere to, or has been indicted for any felony or any crime involving moral turpitude while employed by WWI; or

(iv) Mullaney has unlawfully used or been under the influence of alcohol or drugs or possession of illegal drugs while on the premises of WWI or while performing duties and responsibilities to WWI under this Agreement.

(c) <u>For Cause – Upon Notice and Mullaney's Failure to Cure</u>. WWI may terminate Mullaney's employment for "Cause" at any time upon thirty (30) days prior written notice to Mullaney, but only if the breach or condition giving rise to the existing "Cause" is not cured within thirty (30) days after Mullaney receives written notice of such breach or condition from WWI. For purposes of this provision, "<u>Cause</u>" for termination shall mean:

(i) Mullaney has failed to devote substantially all of his working time to WWI resulting in a material failure to perform his duties and responsibilities, as provided in this Agreement; or

(ii) Mullaney has (A) materially breached or failed to perform any material covenant in this Agreement, or (B) intentionally engaged in misconduct that is in violation of WWI's written policies as determined in the reasonable discretion of the Board of Directors or the Executive Committee of WWI.

WON 01239

**(d)** <u>Termination by Mullaney for Good Reason</u>. Mullaney may terminate his employment for "Good Reason" at any time upon thirty (30) days prior written notice to WWI, but only if the breach or condition giving rise to the existing "Good Reason" is not cured within thirty (30) days after WWI receives written notice of such breach or condition from Mullaney. For purposes of this Agreement, "<u>Good Reason</u>" shall mean any of the following:

(i) any failure by WWI to pay the salary or other material compensation or benefits owed to Mullaney under this Agreement; or

(ii) the assignment to Mullaney, without his consent, of a decrease in authority or responsibilities or a change in duties inconsistent with Mullaney's position as Chief Executive Officer, in each case so as to constitute a material diminution of his status with WWI.

**(e)** <u>Termination by Mullaney Without Good Reason</u>. Mullaney may terminate his employment at any time without Good Reason upon thirty (30) days prior written notice to WWI.

**(f)** <u>Rights and Remedies on Termination</u>.

(i) Upon the termination of Mullaney's employment pursuant to Section 6(b) (For Cause) or Section 6(e) (Termination by Mullaney without Good Reason) above, or due to Mullaney's death or disability pursuant to Section 6(a) (Death or Disability), Mullaney shall not be entitled to any severance pay and WWI shall be required to pay only for (A) any unpaid salary and benefits due for the period prior and through the date of termination, (B) Mullaney's accrued and unused vacation days through the date of termination and (C) following submission of proper expense reports by Mullaney, reimbursement for all expenses properly incurred in accordance with Section 8 hereof before the date of termination (the items set forth in the foregoing clauses (A), (B) and (C) collectively, the "<u>Accrued Benefits</u>"), and all obligations of WWI to pay salary and other payments to Mullaney hereunder shall terminate effective as of date of termination.

(ii) If Mullaney's employment hereunder is terminated at any time by mutual agreement of the parties without cause, then Mullaney shall be entitled to receive a severance payment of 18 months salary. In addition, he shall be entitled to reimbursement for any payments actually made by him for health insurance benefits during the period under which Mullaney is eligible for benefits under COBRA (as defined below) in a monthly amount not to exceed the amount that he would otherwise be required to pay under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("<u>COBRA</u>"), if he were to elect to obtain health insurance benefits under COBRA that are substantially equivalent to his health insurance for himself and his dependents (if applicable) in effect immediately prior to the date of onset of such disability (with the understanding that, during such period, Mullaney is free to purchase health insurance under COBRA, to the extent available, or otherwise, or not at all, but that he is entitled only to reimbursement for amounts actually paid by him for health insurance (the "<u>Health Severance</u>"), within the limits stated above, it being understood that if Mullaney enrolls in a subsequent employer's health plan, reimbursements under this Section 6(f)(ii) shall terminate for payment incurred after Mullaney enrolls in the subsequent employer's health plan), and (C) all

4

WON 01240

Accrued Benefits; provided, however, that WWI's obligations under this Section 6(f)(ii) shall terminate immediately upon Mullaney's violation of any provision of Section 6(g) of this Agreement.

(iii)   Obligation of Confidentiality.  If Mullaney receives severance payment(s) as stipulated above, then Mullaney and WWI shall both be obligated to keep all terms of the severance, and any associated separation agreement entered into by and between the parties, confidential.

(g)   Release.  Mullaney's right to receive any of the severance payments set forth in Section 6(f) is expressly conditioned upon Mullaney (or Mullaney's estate) executing and delivering to WWI, within thirty (30) days, a written release in such form as WWI shall reasonably determine, and the expiration of the revocation period described therein without such release having been revoked.  Mullaney shall not be entitled to any severance or other compensation after termination except as set forth above in this Section 6.

(h)   Section 409A.  The payments or distributions made under this Agreement are intended to be exempt from Section 409A of the Internal Revenue Code of 1986, as amended, and applicable guidance issued thereunder ("Section 409A") as such payments and distributions are structured to be distributed in the short-term deferral period, as defined under Treasury Regulation Section 1.409A-1(b)(4), or the separation pay exemption, as provided in Treasury Regulation Section 1.409A-1(b)(9).  For purposes of Section 6(f)(ii), the phrase "termination of employment," and correlative phrases, mean a "separation from service" as defined in Treasury Regulation Section 1.409A-1(h).  For purposes of this Agreement, each payment and installment payment made under this Agreement is hereby designated as a separate payment, and will not collectively be treated as a single payment, as provided in Treasury Regulation Section 1.409A-2(b)(2)(iii).  If, however, payments, distributions or reimbursements are determined to be subject to, and not exempt from, Section 409A, then:

(i)   For purposes of Section 6(f)(ii), if (A) Mullaney is a "specified employee," as defined in Section 409A, at the time of his separation from service, except due to death, and (B) some or any portion of the amounts payable to Mullaney, if any, when considered together with any other severance payments or separation benefits which may be considered deferred compensation under Section 409A (together, the "Deferred Compensation Separation Benefits") would result in the imposition of additional tax under Section 409A if paid to Mullaney on or within the six (6) month period following the separation from service, then to the extent such portion of the Deferred Compensation Separation Benefits resulting in the imposition of additional tax would otherwise have been payable on or within the first six (6) months following the separation from service, it will instead become payable on the first payroll date that occurs on or after the date six (6) months and one (1) day following the separation from service (or such longer period as is required to avoid the imposition of additional tax under Section 409A).  All subsequent Deferred Compensation Separation Benefits, if any, will be payable in accordance with the payment schedule applicable to each payment or benefit.

(ii)   Reimbursements shall not affect Mullaney's right to reimbursement of any other such expense in any other taxable year, and any such reimbursement shall be made, if at

WON 01241

all, not later than the end of the calendar year following the calendar year in which the expense was incurred, and shall not be subject to liquidation or exchange for any other benefit.

7.     **No Assignments or Delegations**. This Agreement is personal to each party hereto and no party may assign or transfer any of its rights or delegate any of his or its duties under this Agreement in whole or in part without first obtaining the written consent of the other party, which consent shall specifically reference this Agreement and the rights or duties that are the subject of such assignment, transfer, or delegation.

8.     **Binding Effect.** Subject to the provisions of this Agreement relating to transferability, this Agreement shall be binding on, and inure to the benefit of, the parties and their respective heirs, personal and legal representatives, executors, administrators, successors, and assigns.

9.     **Amendments and Modifications**. No amendment, modification, or supplement, including those by custom, usage of trade, or course of dealing, of any provisions of this Agreement shall be binding on either party unless it is in a subsequent writing and signed by both parties at the time of the amendment, modification, or supplement and which specifically references this Agreement and the provisions that are amended, modified, or supplemented. No oral order, objection, claim, or notice by either party to the other shall affect or modify any of the terms or obligations contained in this Agreement.

10.     **Severability of Provisions**. All of the provisions of this Agreement shall be severable. If any provision of this Agreement is found by a court of competent jurisdiction to be unconstitutional, unlawful, or unenforceable, the remaining provisions of this Agreement shall be valid unless the court finds the valid provisions of this Agreement are so essentially and inseparably connected with and so dependent upon the invalid provision(s) that it cannot be presumed that the parties to this Agreement could have included the valid provisions without the invalid provision(s) or unless the court finds that the valid provisions, standing alone, are incapable of being performed in accordance with the intentions of the parties or are contrary to or violate applicable state or federal law.

11.     **Survival.** All provisions of this Agreement which may reasonably be interpreted or construed as surviving the completion, expiration, termination, or cancellation of this Agreement, including without limitation this Section, shall survive the completion, expiration, termination, or cancellation of this Agreement.

12.     **Time of the Essence.** Time is of the essence in respect to all provisions of this Agreement in which a definite time for performance is specified; provided, however, that the foregoing shall not be construed to limit or deprive a party of the benefits of any notice, grace, or cure period provided for in this Agreement.

13.     **Applicable Law: Forum.** This Agreement shall be governed in all respects whether relative to validity, construction, capacity and performance, all claims sounding in tort, or otherwise by the laws of the State of New York excluding New York's conflicts-of-laws rule or principles.

WON 01242

14. **Notice.**

    (a)    _Notices Generally_. Except as provided in Section 14b., below, all notices, demands, and other communications required or contemplated to be given under this Agreement shall be in writing and shall be delivered either by (i) postage prepaid, return receipt requested, registered or certified mail; (ii) FedEx or other reputable, nationally known courier messenger service having a record of receipt; (iii) personal delivery; or (iv) facsimile addressed to the Party or Parties for whom intended at the addresses shown below or such other address as the intended recipient previously shall have designated by written notice from time to time (provided, however, notice of a change of address or facsimile number or e-mail shall be effective only upon receipt):

To Mullaney:

Brian Mullaney
1 Sumner Lane
Belmont, MA 02478

To WonderWork, Inc.

WonderWork
420 5th avenue
New York, New York 10018

Each party shall make an ordinary, good faith effort to ensure that such party will accept or receive notices that are given in accordance with this Section, and that any party to be given notice actually receives such notice. All such notices and other communications shall be deemed to have been rendered or given (i) if sent by postage prepaid, return receipt requested, registered or certified mail, on the date it is officially recorded as delivered to or refused by the intended recipient by return receipt or equivalent, and, in the absence of such record of delivery, the effective date shall be presumed to have been the seventh (7th) day after the date when it shall have been deposited in the mail; (ii) if sent by FedEx or other reputable, nationally known courier messenger service having a record of receipt, on the date it is officially recorded by the messenger service carrier as delivered to or refused by the intended recipient; (iii) if personally delivered, upon receipt; or (iv) if by facsimile, one (1) hour after its transmission, if such time is during the business hours in the place of its receipt or, if it is not, on the opening of business on the next succeeding day in the place of receipt, provided that receipt is electronically confirmed and verified by telephone. Notwithstanding the prescribed method of delivery set forth above, actual receipt of written notice by the natural person designated above shall constitute notice given in accordance with this Agreement on the date received, unless deemed earlier given pursuant to the foregoing paragraph.

_Electronic Communications_. Notices and other communications to a party may also be delivered or furnished by electronic communication by way of the foregoing e-mail addresses. Notices and other communications sent to an e-mail address shall be deemed received upon the sender's

WON 01243

receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail, or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient.

15.     **Section Headings.** Section headings used in this Agreement are included solely for convenience and shall not effect or be used in connection with the interpretation of this Agreement.

16.     **Entire Agreement.** The terms of this Agreement (including Attachments A and B hereto, all of which are incorporated in full into this Agreement by this reference) are intended by the parties as a final expression of their agreement with respect to such terms as are included in this Agreement and may not be contradicted by evidence of any prior or contemporaneous agreement. The parties further intend that this Agreement constitutes the complete and exclusive statement of its terms and no extrinsic evidence whatsoever may be introduced in any judicial proceeding, if any, involving this Agreement. The language in all parts of this Agreement will in all cases be construed as a whole and in accordance with its fair meaning and not construed for or against either party.

17.     **Independent Counsel.** The parties represent and agree that: (a) they have read and reviewed (or had the opportunity to read and review) this Agreement; (b) they fully understand their right to discuss this Agreement with an attorney of their own choosing, and that to the extent the parties so desired, they have availed themselves of this opportunity; (c) they are voluntarily entering into this Agreement upon the advice of counsel with full understanding of its legal consequences; and (d) they agree that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not apply to the interpretation of this Agreement.

        IN WITNESS WHEREOF, the parties have executed this Agreement effective as of the Commencement Date of this Agreement.

WonderWork, Inc.                                    Brian Mullaney

By: _____            By: _____
    JJ Coneys, Lead Director                              Brian Mullaney

WON 01244

ATTACHMENT A
to
EMPLOYMENT AGREEMENT
By and Between WonderWork, Inc.
and Brian Mullaney
Executive Director Duties
as of the Commencement Date
and
WonderWork, Inc.
Position Description
Chief Executive Officer

## OVERALL FUNCTIONS

The Chief Executive Officer of WonderWork, Inc. (WWI) is expected to provide leadership and strategic vision with the goal of maximizing WWI's impact on its fundamental mission of providing free surgeries for indigent children and adults living in developing countries and raising awareness about the need to help these patients. Integral components include outreach to those individuals and groups whose understanding of WWI will result in their participation and contribution to our success, and management of WWI's headquarters, including management and oversight of all WWI employees and personnel and fundraising.

## NATURE AND SCOPE OF JOB

**Status:** Full Time, exempt, executive employment level
**Reports to:** Board of Directors
**Position Updated:** January, 2016

## PRINCIPAL DUTIES AND FUNCTIONS

1. RESPONSIBILITIES

   Personnel Management:

   - Ensure the office is in compliance with WWI's mission, values, and standards.
   - Oversees CFO in terms of budgeting and the financial management of projects, travel, and expenses.
   - Recruit, train, oversee, and manage all employees and personnel.
   - Determines compensation and bonuses for staff.
   - Perform annual appraisals/evaluations of Operations Director, Communications Director, Program Director and other staff. Assist and ensure employees have set appropriate goals in conjunction with the mission of WWI.

9

WON 01245

- Reviews and approves all revisions of the personnel policy manual and job descriptions prior to Board of Director's approval.
- Promote a team building and inter-office cooperative atmosphere to ensure a positive work environment.
- Demote, terminate or assist in terminating staff not performing and meeting office requirements.

Administrative Management:

- Assures that questions and requests from donors, including letters, emails, and phone calls, are answered in a timely manner.
- Prepare Board Meeting agendas with the Board Chairperson.
- Maintain regular communications with the Board of Directors including at least weekly contact with the Board Chair.
- Coordinate or assist in coordinating legal issues with WWI's attorney.

Financial Management:

- Oversees and assists the CFO and Operations Director with the development of WWI's annual operation and capital budgets.
- Provide recommendations for adjustments to the budget to the Board of Directors.
- Reviews monthly financial statements for accuracy and completeness and transits or coordinates the transmittal of same to the Board of Directors or Finance Committee.
- Works with the Finance Committee or Investment Committee to develop and maintain investment policies for WWI.

Public Relations Management/Development:

- Oversees all public relations for WWI.
- Acts as primary spokesperson for media outlets.
- Responsible for traveling to attend fundraising and speaking events, providing education and fundraising activities related to WWI.
- Oversees all advertising for WWI, including all advertisements in newspapers and magazines; all interviews for television and radio stations; and all printed materials for outreach publications.
- Oversees the maintenance and development of donor/patron relations.
- Oversees and approves the Website development.
- Maintenance and development of donor/patron relations, including collaboration with other charitable or non-governmental organizations engaging in activities similar to, or consistent with, the activities of WWI.

Serve as member of WWI Board of Directors:      .
- Serve at the pleasure of the Board of Directors and work with the Board of Directors in developing budgets and strategic planning.

10

WON 01246

- Attend all meetings of the Board of Directors.
- Attend Committee meetings at the request of any Committee.
- Responsible for proper communication with Board of Directors on operational and administrative matters, including any incidents, changes of circumstances, or other important matters that should be presented to the Board of Directors.

\*  \*  \*  \*

WON 01247

**ATTACHMENT B**
to
**EMPLOYMENT AGREEMENT**
**By and Between WonderWork, Inc.**
**and Brian Mullaney**

**Benefits and Perquisites of Employment**

1. Use of WWI owned cell phone and electronic data service pursuant to WWI policy.

2. Sick leave, jury duty leave, bereavement leave and paid holidays to be provided to equal those provided to other WWI employees pursuant to the Personnel Policy Manual.

3. Standard employee medical, dental, vision, and long-term disability insurance commensurate with benefits provided to other WWI employees.

4. Participation in WWI's Section 403(b) program with those contributions and benefits available to other WWI employees pursuant to the terms of the Plan Document.

5. Payment of premiums on approved life insurance policies, and such other perquisites as approved by the Board of Directors from time to time as designated by resolution of the Board.

6. Spousal travel allowance. Mullaney is allowed to bring his wife to major donor events, visits and on program trips overseas.

\*    \*    \*

WON 01248

MULLANEY
EXHIBIT 42

# EMPLOYMENT AGREEMENT
# BETWEEN
# WONDERWORK, INC.
# AND
# BRIAN MULLANEY

This Employment Agreement (this "Agreement") is entered into by and between **WonderWork, Inc.**, a Delaware non-profit corporation, with its principal place of business located in New York, NY ("WONDERWORK"), and **Brian Mullaney**, an individual, ("Mullaney").

## RECITALS

The parties enter into this Agreement on the basis that WONDERWORK wishes to employ Mullaney as WONDERWORK's Chief Executive Officer, and Mullaney desires to be employed by WONDERWORK to serve as its Chief Executive Officer under the terms of this Agreement and at the pleasure of the Board of Directors of WONDERWORK.

NOW, THEREFORE, in consideration of these Recitals, which are incorporated in this Agreement by this reference, and the following mutual promises and intending to be legally bound hereby, and for other good and valuable consideration, the receipt and adequacy of which are acknowledged, the parties agree as follows.

## AGREEMENT

1.     **Employment.** As of _____, 2013 ("Commencement Date"), WONDERWORK hereby employs Mullaney for a period of two (2) years, through February 28, 2015, and Mullaney hereby accepts employment with WONDERWORK, upon the terms and conditions of this Agreement. Notwithstanding any provision of this Agreement, Mullaney's employment may be terminated early as described in Section 6 below.

2.     **Duties, Responsibilities, and Authority.**

    **(a)**     <u>Duties</u>: Mullaney is hereby employed under the terms of this Agreement to perform the duties of Chief Executive Officer as further described herein and as may be required by the Board of Directors of WONDERWORK from time to time (the "Board"). The Chief Executive Officer shall report directly to the Board of Directors. The Chief Executive Officer job description is set forth in Attachment A to this Agreement. Mullaney's job description may be reasonably modified at the discretion of the Board of Directors of WONDERWORK, without the need to make a corresponding change to this Agreement. Mullaney agrees to devote his full time and best efforts to the performance of his duties to WONDERWORK.

    **(c)**     <u>Other Activities</u>: The foregoing shall not be construed to prohibit Mullaney from engaging in activities relating to serving on civic and charitable boards or committees, and managing his personal investments, provided that such activities do not significantly interfere or

EXHIBIT -42

Brian Mullaney

8/17/17

S. Arielle Santos, RPR, CSR
**TransPerfect Legal**

WON-EX 010748

conflict with the performance by Mullaney of his duties, responsibilities, or authorities hereunder.

**3.   Compensation.**  In consideration of the services to be rendered by Mullaney for the benefit of WONDERWORK, Mullaney shall receive from WONDERWORK:

    **(a)**    Salary:  As compensation for the services provided by Mullaney hereunder, WONDERWORK shall pay Mullaney a gross annualized salary for the period of this Agreement of _____ Dollars (\$_____) payable in equal semi-monthly installments less deductions required by law or as otherwise agreed to by Mullaney.  Compensation shall be reviewed annually thereafter by the Board of Directors in connection with an annual review of Mullaney' performance and may be revised in the sole discretion of the Board of Directors.

    **(b)**    Vacation.  Mullaney shall receive no less than 4 weeks paid vacation each year.

    **(c)**    Tax Withholding.  All compensation payments will be made subject to applicable state, local, and federal withholding and payroll tax requirements.

    **(d)**    Salary Review.  In determining and approving Mullaney' salary, the Board of Directors reviewed appropriate, comparable data for persons serving tax-exempt, nonprofit organizations in the capacity of Chief Executive Officer.  The Board of Directors shall commission or otherwise conduct further salary reviews should the terms of Mullaney' employment change, including any proposed, significant changes in his salary.  Mullaney' salary may be confirmed or adjusted after such review, depending upon any changes in circumstances that may impact any previous determination by the Board of Directors that the salary stated herein, or any proposed changes in that salary, is reasonable.

**4.   Employee Benefits and Perquisites.**  During the term of his employment, Mullaney shall be entitled to the benefits and perquisites set forth on Attachment B hereto, in addition to the standard benefits otherwise available to employees of WONDERWORK. In addition to participation in WONDERWORK's Section 403(b) program with those contributions and benefits available to other WONDERWORK employees pursuant to the terms of the Plan Document, as per Attachment B, WONDERWORK further agrees to contribute an additional matching payment to Mullaney' contributions to the Section 403(b) program, but not to exceed 10%. WONDERWORK also agrees to pay for Mullaney' continuing education expenses reasonably related to the performance of his duties and responsibilities.

**5.   Facilities.**  WONDERWORK shall provide and maintain or cause to be provided and maintained, such facilities, equipment, supplies, and assistance as deemed necessary for Mullaney' performance of his duties under this agreement.

**6.   Termination.**  Mullaney' employment hereunder shall commence on the Commencement Date and continue until the occurrence of any of the following:

    **(a)**    Death or Disability:  Mullaney's employment shall terminate upon his death or, subject to applicable law, at the option of WONDERWORK, in the event of Mullaney'

WON-EX 010749

disability, upon written notice from WONDERWORK. Mullaney will be deemed to be "disabled" when he (i) is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which is expected to result in death or would be expected to last for a continuous period of not less than six (6) consecutive months or (ii) begins to receive income replacement benefits for a period of not less than three (3) months under any accident and health plan by reason of any medically determinable physical or mental impairment which is expected to result in death or would be expected to last for a continuous period of not less than six (6) consecutive months. Mullaney shall cooperate in submitting to a medical examination for the purpose of certifying disability under this Section 6(a) if requested by the Board of Directors or the Executive Committee of WONDERWORK.

**(b)** For Cause - Immediate Termination. WONDERWORK may terminate Mullaney's employment for "Cause" immediately upon written notice by WONDERWORK to Mullaney. For purposes of this Agreement, "Cause" for immediate termination shall mean:

(i) the Board of Directors or the Executive Committee of WONDERWORK reasonably determines that Mullaney has committed any act of fraud, embezzlement, misappropriation, or theft in the course of Mullaney' employment with WONDERWORK;

(ii) Mullaney has violated any federal, state or local law, ordinance, rule or regulation (other than minor traffic violations or similar offenses) in the course of Mullaney's employment with WONDERWORK that the Board of Directors or the Executive Committee of WONDERWORK determines in good faith is materially detrimental to WONDERWORK's business, reputation, or goodwill; or

(iii) Mullaney has been convicted by a court of competent jurisdiction of, or pleaded guilty or nolo contendere to, or has been indicted for any felony or any crime involving moral turpitude while employed by WONDERWORK.

(c) For Cause – Upon Notice and Mullaney's Failure to Cure. WONDERWORK may terminate Mullaney' employment for "Cause" at any time upon thirty (30) days prior written notice to Mullaney, but only if the breach or condition giving rise to the existing "Cause" is not cured within thirty (30) days after Mullaney receives written notice of such breach or condition from WONDERWORK. For purposes of this provision, "Cause" for termination shall mean:

(i) Mullaney has failed to devote substantially all of his working time to WONDERWORK resulting in a material failure to perform his duties and responsibilities, as provided in this Agreement; or

(ii) Mullaney has (A) been insubordinate or has continually and intentionally refused to perform his job duties and responsibilities under this Agreement, (B) been grossly negligent in the performance of his job duties and responsibilities under this Agreement, (C) materially breached or failed to perform any material covenant in this Agreement, or (D) intentionally engaged in misconduct that is in violation of WONDERWORK's written policies as determined in the reasonable discretion of the Board of Directors or the Executive Committee of WONDERWORK.

WON-EX 010750

**(c)**    Termination by Mullaney for Good Reason.  Mullaney may terminate his employment for "Good Reason" at any time upon thirty (30) days prior written notice to WONDERWORK, but only if the breach or condition giving rise to the existing "Good Reason" is not cured within thirty (30) days after WONDERWORK receives written notice of such breach or condition from Mullaney. For purposes of this Agreement, "Good Reason" shall mean any of the following:

(i)    any failure by WONDERWORK to pay the salary or other material compensation or benefits owed to Mullaney under this Agreement; or

(ii)    the assignment to Mullaney, without his consent, of a decrease in authority or responsibilities or a change in duties inconsistent with Mullaney's position as Chief Executive Officer, in each case so as to constitute a material diminution of his status with WONDERWORK.

**(d)**    Termination by Mullaney Without Good Reason.  Mullaney may terminate his employment at any time without Good Reason upon thirty (30) days prior written notice to WONDERWORK.

**(e)**    Rights and Remedies on Termination.

(i)    Upon the termination of Mullaney's employment pursuant to Section 6(b) (For Cause) or Section 6(d) (Termination by Mullaney without Good Reason) above, or due to Mullaney's death or disability pursuant to Section 6(a) (Death or Disability), Mullaney shall not be entitled to any severance pay and WONDERWORK shall be required to pay only for (A) any unpaid salary and benefits due for the period prior and through the date of termination, (B) Mullaney's accrued and unused vacation days through the date of termination and (C) following submission of proper expense reports by Mullaney, reimbursement for all expenses properly incurred in accordance with Section 8 hereof before the date of termination (the items set forth in the foregoing clauses (A), (B) and (C) collectively, the "Accrued Benefits"), and all obligations of WONDERWORK to pay salary and other payments to Mullaney hereunder shall terminate effective as of date of termination.

(ii)    If Mullaney's employment hereunder is terminated at any time by mutual agreement of the parties without cause, then Mullaney shall be entitled to receive:  (A) as a severance payment, an amount equal to one year of his annualized gross salary in effect at the time of such termination; (B) as a severance payment, reimbursement for any payments actually made by him for health insurance benefits during the period under which Mullaney is eligible for benefits under COBRA (as defined below)) in a monthly amount not to exceed the amount that he would otherwise be required to pay under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA"), if he were to elect to obtain health insurance benefits under COBRA that are substantially equivalent to his health insurance for himself and his dependents (if applicable) in effect immediately prior to the date of onset of such disability (with the understanding that, during such period, Mullaney is free to purchase health insurance under

WON-EX 010751

COBRA, to the extent available, or otherwise, or not at all, but that he is entitled only to reimbursement for amounts actually paid by him for health insurance (the "Health Severance"), within the limits stated above, it being understood that if Mullaney enrolls in a subsequent employer's health plan, reimbursements under this Section 6(e)(ii) shall terminate for payment incurred after Mullaney enrolls in the subsequent employer's health plan), and (C) all Accrued Benefits; provided, however, that WONDERWORK's obligations under this Section 6(e)(ii) shall terminate immediately upon Mullaney's violation of any provision of Section 6(f) of this Agreement.

(iii)     If Mullaney's employment hereunder is terminated by WONDERWORK at any time without cause and without mutual agreement, or if Mullaney's employment hereunder is terminated at any time by Mullaney pursuant to Section 6(c) (Termination by Mullaney for Good Reason) hereof, then Mullaney shall be entitled to receive:  (A) as a severance payment, an amount equal to one year of his annualized gross salary in effect at the time of such termination; and (B) as a severance payment, reimbursement for any payments actually made by him for health insurance benefits during the period under which Mullaney is eligible for benefits under COBRA (as defined below) in a monthly amount not to exceed the amount that he would otherwise be required to pay under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA"), if he were to elect to obtain health insurance benefits under COBRA that are substantially equivalent to his health insurance for himself and his dependents (if applicable) in effect immediately prior to the date of onset of such disability (with the understanding that, during such period, Mullaney is free to purchase health insurance under COBRA, to the extent available, or otherwise, or not at all, but that he is entitled only to reimbursement for amounts actually paid by him for health insurance (the "Health Severance"), within the limits stated above, it being understood that if Mullaney enrolls in a subsequent employer's health plan, reimbursements under this Section 6(e)(ii) shall terminate for payment incurred after Mullaney enrolls in the subsequent employer's health plan), and (C) all Accrued Benefits; provided, however, that WONDERWORK's obligations under this Section 6(e)(ii) shall terminate immediately upon Mullaney's violation of any provision of Section 6(f) of this Agreement.

(f)     Release.  Mullaney' right to receive any of the severance payments set forth in Section 6(e) is expressly conditioned upon Mullaney (or Mullaney' estate) executing and delivering to WONDERWORK, within thirty (30) days, a written release in such form as WONDERWORK shall reasonably determine, and the expiration of the revocation period described therein without such release having been revoked.  Mullaney shall not be entitled to any severance or other compensation after termination except as set forth above in this Section 6.

(g)     Section 409A.  The payments or distributions made under this Agreement are intended to be exempt from Section 409A of the Internal Revenue Code of 1986, as amended, and applicable guidance issued thereunder ("Section 409A") as such payments and distributions are structured to be distributed in the short-term deferral period, as defined under Treasury Regulation Section 1.409A-1(b)(4), or the separation pay exemption, as provided in Treasury Regulation Section 1.409A-1(b)(9).  For purposes of Section 6(e)(ii), the phrase "termination of employment," and correlative phrases, mean a "separation from service" as defined in Treasury

WON-EX 010752

Regulation Section 1.409A-1(h). For purposes of this Agreement, each payment and installment payment made under this Agreement is hereby designated as a separate payment, and will not collectively be treated as a single payment, as provided in Treasury Regulation Section 1.409A-2(b)(2)(iii). If, however, payments, distributions or reimbursements are determined to be subject to, and not exempt from, Section 409A, then:

      (i)      For purposes of Section 6(e)(ii), if (A) Mullaney is a "specified employee," as defined in Section 409A, at the time of his separation from service, except due to death, and (B) some or any portion of the amounts payable to Mullaney, if any, when considered together with any other severance payments or separation benefits which may be considered deferred compensation under Section 409A (together, the "Deferred Compensation Separation Benefits") would result in the imposition of additional tax under Section 409A if paid to Mullaney on or within the six (6) month period following the separation from service, then to the extent such portion of the Deferred Compensation Separation Benefits resulting in the imposition of additional tax would otherwise have been payable on or within the first six (6) months following the separation from service, it will instead become payable on the first payroll date that occurs on or after the date six (6) months and one (1) day following the separation from service (or such longer period as is required to avoid the imposition of additional tax under Section 409A). All subsequent Deferred Compensation Separation Benefits, if any, will be payable in accordance with the payment schedule applicable to each payment or benefit.

      (ii)      Reimbursements shall not affect Mullaney's right to reimbursement of any other such expense in any other taxable year, and any such reimbursement shall be made, if at all, not later than the end of the calendar year following the calendar year in which the expense was incurred, and shall not be subject to liquidation or exchange for any other benefit.

7.      **Expense Account.** WONDERWORK shall reimburse Mullaney for all reasonable travel expenses authorized by WONDERWORK and reasonably and necessarily incurred by Mullaney in the performance of his duties, responsibilities, and authorities. To the extent that Mullaney establishes a bona fide business purpose for his spouse's participation in WONDERWORK activities, Mullaney shall also be entitled to reimbursement for spousal travel. Mullaney shall comply with such budget limitations and approval and reporting requirements with respect to expenses as the Board of Directors or the Executive Committee of WONDERWORK may establish from time to time.

8.      **No Assignments or Delegations**. This Agreement is personal to each party hereto and no party may assign or transfer any of its rights or delegate any of his or its duties under this Agreement in whole or in part without first obtaining the written consent of the other party, which consent shall specifically reference this Agreement and the rights or duties that are the subject of such assignment, transfer, or delegation.

9.      **Binding Effect.** Subject to the provisions of this Agreement relating to transferability, this Agreement shall be binding on, and inure to the benefit of, the parties and their respective heirs, personal and legal representatives, executors, administrators, successors, and assigns.

WON-EX 010753

**10.** **Amendments and Modifications.** No amendment, modification, or supplement, including those by custom, usage of trade, or course of dealing, of any provisions of this Agreement shall be binding on either party unless it is in a subsequent writing and signed by both parties at the time of the amendment, modification, or supplement and which specifically references this Agreement and the provisions that are amended, modified, or supplemented. No oral order, objection, claim, or notice by either party to the other shall affect or modify any of the terms or obligations contained in this Agreement.

**10.** **Severability of Provisions.** All of the provisions of this Agreement shall be severable. If any provision of this Agreement is found by a court of competent jurisdiction to be unconstitutional, unlawful, or unenforceable, the remaining provisions of this Agreement shall be valid unless the court finds the valid provisions of this Agreement are so essentially and inseparably connected with and so dependent upon the invalid provision(s) that it cannot be presumed that the parties to this Agreement could have included the valid provisions without the invalid provision(s) or unless the court finds that the valid provisions, standing alone, are incapable of being performed in accordance with the intentions of the parties or are contrary to or violate applicable state or federal law.

**12.** **Survival.** All provisions of this Agreement which may reasonably be interpreted or construed as surviving the completion, expiration, termination, or cancellation of this Agreement, including without limitation this Section, shall survive the completion, expiration, termination, or cancellation of this Agreement.

**13.** **Time of the Essence.** Time is of the essence in respect to all provisions of this Agreement in which a definite time for performance is specified; provided, however, that the foregoing shall not be construed to limit or deprive a party of the benefits of any notice, grace, or cure period provided for in this Agreement.

**14.** **Applicable Law: Forum.** This Agreement shall be governed in all respects whether relative to validity, construction, capacity and performance, all claims sounding in tort, or otherwise by the laws of the State of New York excluding New York's conflicts-of-laws rule or principles.

**15.** **Notice.**

    **(a)** Notices Generally. Except as provided in Section 15b., below, all notices, demands, and other communications required or contemplated to be given under this Agreement shall be in writing and shall be delivered either by (i) postage prepaid, return receipt requested, registered or certified mail; (ii) FedEx or other reputable, nationally known courier messenger service having a record of receipt; (iii) personal delivery; or (iv) facsimile addressed to the Party or Parties for whom intended at the addresses shown below or such other address as the intended recipient previously shall have designated by written notice from time to time (provided, however, notice of a change of address or facsimile number or e-mail shall be effective only upon receipt):

WON-EX 010754

To Mullaney:

Brian Mullaney
(insert address. email and phone)

To WONDERWORK:

WonderWork, Inc.
(Insert contact name, address, phone, and email)

Each party shall make an ordinary, good faith effort to ensure that such party will accept or receive notices that are given in accordance with this Section, and that any party to be given notice actually receives such notice. All such notices and other communications shall be deemed to have been rendered or given (i) if sent by postage prepaid, return receipt requested, registered or certified mail, on the date it is officially recorded as delivered to or refused by the intended recipient by return receipt or equivalent, and, in the absence of such record of delivery, the effective date shall be presumed to have been the seventh (7th) day after the date when it shall have been deposited in the mail; (ii) if sent by FedEx or other reputable, nationally known courier messenger service having a record of receipt, on the date it is officially recorded by the messenger service carrier as delivered to or refused by the intended recipient; (iii) if personally delivered, upon receipt; or (iv) if by facsimile, one (1) hour after its transmission, if such time is during the business hours in the place of its receipt or, if it is not, on the opening of business on the next succeeding day in the place of receipt, provided that receipt is electronically confirmed and verified by telephone. Notwithstanding the prescribed method of delivery set forth above, actual receipt of written notice by the natural person designated above shall constitute notice given in accordance with this Agreement on the date received, unless deemed earlier given pursuant to the foregoing paragraph.

Electronic Communications. Notices and other communications to a party may also be delivered or furnished by electronic communication by way of the foregoing e-mail addresses. Notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail, or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient.

16.     **Section Headings.** Section headings used in this Agreement are included solely for convenience and shall not effect or be used in connection with the interpretation of this Agreement.

17.     **Entire Agreement.** The terms of this Agreement (including Attachments A and B hereto, all of which are incorporated in full into this Agreement by this reference) are intended by the parties as a final expression of their agreement with respect to such terms as are included in this Agreement and may not be contradicted by evidence of any prior or contemporaneous agreement. The parties further intend that this Agreement constitutes the complete and exclusive

WON-EX 010755

statement of its terms and no extrinsic evidence whatsoever may be introduced in any judicial proceeding, if any, involving this Agreement. The language in all parts of this Agreement will in all cases be construed as a whole and in accordance with its fair meaning and not construed for or against either party.

18.     **Independent Counsel.**  The  parties represent and agree that: (a) they have read and reviewed (or had the opportunity to read and review) this Agreement; (b) they fully understand their right to discuss this Agreement with an attorney of their own choosing, and that to the extent the parties so desired, they have availed themselves of this opportunity; (c) they are voluntarily entering into this Agreement upon the advice of counsel with full understanding of its legal consequences; and (d) they agree that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not apply to the interpretation of this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement effective as of the Commencement Date of this Agreement.

**WonderWork, Inc.**                              **Brian Mullaney**


By     _____        _____
          Board Chairman                               Brian Mullaney

WON-EX 010756

ATTACHMENT A
to
EMPLOYMENT AGREEMENT
By and Between WonderWork, Inc.
and Brian Mullaney, dated as of _____, 2013

**Chief Executive Officer Duties**
as of the Commencement Date
and
**WonderWork**
Position Description

## OVERALL FUNCTIONS

The Chief Executive Officer of WonderWork, Inc. (WONDERWORK) is expected to provide leadership and strategic vision with the goal of maximizing WONDERWORK's impact on its fundamental mission of enhancing the human resources of foreign countries through the provision of much needed medical assistance and surgeries, especially for young children. Integral components include outreach to those individuals and groups whose understanding of WONDERWORK will result in their participation and contribution to our success, and management of WONDERWORK's headquarters, including management and oversight of all WONDERWORK employees and personnel.

## NATURE AND SCOPE OF JOB

**Status:**  Full Time, exempt, executive employment level
**Reports to:**  Board of Directors
**Position Updated:**  January 1, 2013

## PRINCIPAL DUTIES AND FUNCTIONS

1. RESPONSIBILITIES

   Personnel Management:

   - Ensure the office is in compliance with WONDERWORK's mission, values, and standards.
   - Oversees the Operations Director in terms of reviewing monthly financial status, co-signing all checks over $10,000, and approving any expense not budgeted.
   - Recruit, train, oversee, and manage all employees and personnel

WON-EX 010757

- Determines compensation and bonuses for staff, and communicates recommendations to Board of Directors.
- Perform and/or coordinate annual appraisals/evaluations of staff. Assist and ensure employees have set appropriate goals in conjunction with the mission of WONDERWORK.
- Reviews and approves all revisions of the personnel policy manual and job descriptions prior to Board of Director's approval.
- Promote a team building and inter-office cooperative atmosphere to ensure a positive work environment.
- Demote, terminate or assist in terminating staff not performing and meeting office requirements.

Administrative Management:

- Assures that a daily and weekly schedule indicating whereabouts of all staff is posted and followed.
- Assures that questions and requests from donors, including letters, emails, and phone calls, are answered in a timely manner.
- Prepare Board Meeting agendas with the Board Chairperson.
- Maintain regular communications with the Board of Directors including at least weekly contact with the Board Chair.
- Coordinate or assist in coordinating legal issues with WONDERWORK's attorney.

Financial Management:

- Oversees and assists the Operations Director with the development of WONDERWORK's annual operation and capital budgets.
- Provide recommendations for adjustments to the budget to the Board of Directors.
- Reviews monthly financial statements for accuracy and completeness and transits or coordinates the transmittal of same to the Board of Directors or Finance Committee.
- Approve major purchases necessary to assure quality and efficiency for the office.
- Approve all international wire transfers.
- Works with the Finance Committee or Investment Committee to develop and maintain investment policies for WONDERWORK.

Public Relations Management/Development:

- Oversees all public relations for WONDERWORK.
- Acts as primary spokesperson for media outlets.
- Responsible for traveling nationally and international to attend fundraising and speaking events, providing education and fundraising activities related to WONDERWORK.

WON-EX 010758

**ATTACHMENT B**
to
**EMPLOYMENT AGREEMENT**
**By and Between WonderWork, Inc.**
**and Brian Mullaney, dated as of _____, 2013**

**Benefits and Perquisites of Employment**

1.  Use of WONDERWORK owned cell phone and electronic data service pursuant to WONDERWORK policy.

2.  Sick leave, jury duty leave, bereavement leave and paid holidays to be provided equal to those provided to other WONDERWORK employees pursuant to the Personnel Policy Manual.

3.  Standard employee medical, dental, vision, and long-term disability insurance commensurate with benefits provided to other WONDERWORK employees.

4.  Participation in WONDERWORK's Section 403(b) program with those contributions and benefits available to other WONDERWORK employees pursuant to the terms of the Plan Document.

5.  Such other perquisites as approved by the Board of Directors from time to time as designated by resolution of the Board.

\*　　\*　　\*

WON-EX 010760

MULLANEY
EXHIBIT 43



Pearl Meyer & Partners
*Comprehensive Compensation*™

Miracle surgeries for children.

wonder

# CEO Compensation Analysis & Recommendations
## Competitive Frames of Reference

Confidential
June 7, 2013



©2013 Pearl Meyer & Partners

Pearl Meyer & Partners
*Comprehensive Compensation*

EXHIBIT -43
Brian Mullaney
8/17/17
S. Anelle Santos, RPR, CSR
TransPerfect Legal

WON-EX 010764

# Introduction

The Compensation Committee of WonderWork engaged Pearl Meyer & Partners (PM&P) to provide competitive compensation data and analysis for its Chief Executive Officer (CEO) including a recommendation on a CEO compensation program going forward.

PM&P, working with the Committee and with input from its CEO, developed five peer groups of organizations that are used as competitive frames of reference in this report.

Traditional Non-Profit

High Growth Non-Profit

High Growth For-Profit

Large Foundations

University Development Officers

PM&P analyzed Form 990 and other public filings for the above organizations to determine CEO pay levels at each respective organization.

This report summarizes CEO and other relevant executive pay levels for each of the peer groups and includes our initial recommendations.

PM Pearl Meyer & Partners
Compensation Consultants

# Executive Summary

Study Findings

The results of our analysis suggests that in comparisons to all peer groups, the CEO's current base salary is very competitive – and on the higher end of the competitive range (generally around the range of 75th percentile to over the 90th percentile).

Given that the CEO is not covered by an incentive program, Mr. Mullaney's total pay is somewhat less competitive when taking into account the amount of incentives paid to CEOs of other organizations. This is mostly true when compared to for-profit organizations.

## Peer Group Analysis

Given Mr. Mullaney's significant track record, a traditional approach to constructing a peer group would not give the Committee all of the information needed to understand the competitiveness of Mr. Mullaney's current pay package. Given this, we developed five peer groups for consideration. While we believe all of this data will help the Committee better understand the pay landscape, we believe the Committee should focus on three of the five peer groups. The chart on the next page summarizes our views of the importance of each peer group.

Pearl Meyer & Partners
Compensation Consultants

WON-EX 010766

# Executive Summary (cont'd)

Peer Group Relevance

**Traditional Non-Profit** – Entities that have comparable missions to WonderWork and are comparable in size.

Low

While the traditional approach is the most common way to assess CEO pay, we do not believe this data set takes into account Mr. Mullaney's significant experience and performance with other organizations.

**High Growth Non-Profit** – Entities that have comparable missions to WonderWork and have a demonstrated track record of aggressively growing revenues. The size of these entities is closer to WonderWork's estimated revenues 2020. This could be referred to as an "aspirational" peer group.

High

Although any organizations can be criticized for benchmarking pay against larger organizations, we believe this data set gives the Committee a better understanding of pay levels for high performing organizations.

**High Growth For-Profit** – This consists of publicly-traded companies that have experienced rapid growth. This group provides an additional frame of reference and are not necessarily a directly comparable peer group.

Low

This data set might be viewed as the very upper bound in pay. Given that Mr. Mullaney does not have experience running a public company as a CEO, we believe this data set should not have any meaningful impact in understanding market pay levels.

**Foundation Peer Group** – A group of large foundations that might represent viable alternative employment choices for Mr. Mullaney.

High

It is reasonable to believe Mr. Mullaney has the skills and experience necessary to be considered in a senior executive role among large, reputable foundations.

**University Development Officers** – Given the focus on fundraising, a fifth group that can provide another point of reference consists of several of the country's elite, large research institutions.

High

Similar to the Foundation Peer Group, we believe Mr. Mullaney has the skills and experience to be considered as the top development officer in a large university.

Pearl Meyer & Partners
Compensation Consultants

WON-EX 010767

# Executive Summary (cont'd)

**Mr. Mullaney's Request**

PM&P understands Mr. Mullaney would like to be considered for an annual incentive structured as follows:

| | |
|---|---|
| For an A+ performance | $250,000 |
| For an A performance | $150,000 |
| For an A- performance | $ 75,000 |
| Anything below an A | No bonus |

We have two key observations on this request:

We believe the proposed evaluation scale is too compressed to allow the Committee to differentiate performance and establish an award on this basis. For example, it may be impossible to clearly articulate what differentiates A+ from A performance

The maximum award is 53% of salary. This is not unreasonable as a general comment, but it is very high in a non-profit environment. Of course, if Mr. Mullaney is able to repeat his results at Smile Train (his prior employer), it would be reasonable for the Committee to consider an unorthodox approach to establishing a bonus structure.

WON-EX 010768

# Executive Summary (cont'd)

## PM&P's Recommendations

Our analysis of the CEO total pay levels of the three most relevant peer groups shows the following:

High Growth Non-Profit                    $495,000

Foundations                               $559,000

University Development Officers           $630,000

Based on the above, we believe the Committee could consider the following approach:

A salary remaining at $475,000.

An annual incentive within a range of $50,000 to $200,000 covering 2012 performance. Over the next few years, this range of incentive should provide the Committee with the opportunity to recognize performance and provide very competitive compensation.

> This assumes Mr. Mullaney has performed at or above 75th percentile levels. We realize the Committee may need to assess performance on a discretionary basis.

A periodic review of Mr. Mullaney's award opportunity to ensure it provides appropriate rewards for high levels of performance and is supported by market practice.

PM&P understands Mr. Mullaney has made other contract requests. PM&P recommends the Committee quantify the value of these requests. Any requests of significant value should take into account the amount of annual incentive that may be granted.

Finally, it is very important in determining the appropriate level of compensation that the Committee be cognizant of the optics / perceptions on whether the compensation is reasonable – in the eyes of interested parties (e.g., media) and government regulators – represented by the IRS's Section 4958, which provides regulatory oversight on executive compensation in 501 (c)3 and 501 (c)4 organizations.

5

WON-EX 010769

# Executive Summary (cont'd)

Peer Group Construction & Intermediate Sanctions

The process of assessing executive compensation levels is rarely straightforward, as there are many factors to be considered (e.g., industry, size, complexity, strategy, performance, growth, etc.). WonderWork's somewhat unique "business" model does create challenges in defining with great certainty appropriate compensation parameters.

While our work is guided by considerable experience and professional practice, in this case it is also guided by the Internal Revenue Code Section 4958, commonly referred to as Intermediate Sanctions.

This covers 501(c)3 and 501(c)4 organizations and provides regulations that guide organizations in how to set and manage the compensation of "disqualified" individuals, which would include an organizations' CEO.

There are three critical points in the regulations:

Independent Board members are making pay decisions relative to disqualified individuals.

A basis for defining compensation parameters is a comparability analysis that includes comparisons to like positions in like organizations.

The Board uses this information and any other relevant information to make pay decisions and documents its decisions and its rationale.

Given WonderWork's unique model, which results in extraordinary growth in a very short period of time, there really isn't a "clean" peer group; however, the different peer groups included in this report provide a reasonable frame of reference is assessing the CEO's compensation.

We recognize that each peer group alone is clearly not a mirror image of WonderWorks, but when taken as a whole, the peer groups capture *some* of the characteristics of WonderWork (e.g., comparable missions, non-profits, rapid growth rates).

We believe that the results provided in this report can help to define parameters in managing the CEO's compensation in the near-term; however, as Wonderworks develops and the marketplace changes, it is advisable to monitor the CEO's compensation to ensure there is a reasonable balance between WonderWork performance and market practice.

WON-EX 010770

# Approach and Methodology

## Peer Groups

Based on our discussions with the Compensation Committee and CEO Brian Mullaney, and our subsequent understanding of WonderWork's mission and its plans for growth, we have developed five different peer groups to provide a broader perspective on competitive levels of compensation. Given that WonderWork is unique and is in its infancy stages of development, there is not a single peer group that will be a great fit. Therefore, we have taken the approach of developing several peer groups that can provide an array of perspectives in assessing CEO compensation. The peer groups include:

**Traditional Non-Profit** – Entities that have comparable missions to WonderWork and are comparable in size.

**High Growth Non-Profit** – Entities that have comparable missions to WonderWork and have a demonstrated track record of aggressively growing revenues. The size of these entities is closer to WonderWork's estimated revenues 2020. This could be referred to as an "aspirational" peer group.

This excludes entities receiving a substantial portion of its revenue from government grants or program services.

**High Growth For-Profit** – This consists of publicly-traded companies that have experienced rapid growth. This group provides an additional frame of reference and are not necessarily a directly comparable peer group.

**Foundation Peer Group** – A group of large foundations that might represent viable alternative employment choices for Mr. Mullaney.

**University Development Officers** – Given the focus on fundraising, a fifth group that can provide another point of reference consists of several of the country's elite, large research institutions.

## Competitive Pay Data

PM&P accessed Form 990 other public filings, and survey data to establish the references for CEO pay levels.

Pay was aged at an annual rate of 3% to July 1, 2013 to ensure consistency across all data points.

Pearl Meyer & Partners
Member of the Group

WON-EX 010771

# Competitive Reference Summary
## Peer Group 1: Traditional Non-Profit Organization CEOs

The following provides market results for the 15 organizations included in this peer group.

As indicated, this peer group approximates the estimated size of Wonderwork at around the year 2015. It does not necessarily consist of organizations that have a demonstrated record of growth.

As the results indicate, the current compensation level of the CEO is around the 90th percentile.

The peer group organizations and detailed results are provided in our Supporting Detail.

| Annual Pay Element | WonderWork CEO | Peer Group 1 CEOs (Traditional NFPs) | | | WonderWork CEO Percentile Position |
|---|---|---|---|---|---|
| | | 25th Percentile | Median | 75th Percentile | |
| Base Salary | $475 | $204 | $285 | $316 | 95th Percentile |
| Total Cash base + bonus payments | $475 | $241 | $285 | $316 | 90th Percentile |
| Total Direct total cash + benefits + retirement | $500 | $256 | $310 | $386 | 85th Percentile |

Data in thousands of dollars unless noted

Peer Group 1 Income Statement Statistics

| | Revenue ($M) | Expenses ($M) |
|---|---|---|
| 25th Percentile | $10.5 | $10.9 |
| Median | $35.8 | $36.8 |
| 75th Percentile | $49.7 | $46.0 |

Pearl Meyer & Partners
Comprehensive Compensation

© 2016 Pearl Meyer & Partners

8

WON-EX 010772

# Competitive Reference Summary
## Peer Group 2: High Growth Non-Profit Organization CEOs

The following provides market results for the 14 organizations included in this peer group.

As indicated, this peer group approximates the estimated size of Wonderwork at around the year 2020 ($100 million). The median average annual growth in revenue for these organizations was 23%. Among organizations with a comparable mission – these organizations represented those with the highest growth in revenues.

As the results indicate, the current compensation level of the CEO is at higher percentiles.

The peer group organizations and detailed results are provided in our Supporting Detail.

| Annual Pay Element | WonderWork CEO |
|---|---|
| Base Salary | $475 |
| Total Cash base + bonus payments | $475 |
| Total Direct total cash + benefits + retirement | $500 |

| | Peer Group 2 CEOs (High Growth NFPs) | | | WonderWork CEO Percentile Position |
|---|---|---|---|---|
| Annual Pay Element | 25th Percentile | Median | 75th Percentile | |
| Base Salary | $238 | $313 | $395 | Highest |
| Total Cash | $253 | $325 | $433 | 88th Percentile |
| Total Direct | $272 | $363 | $495 | 77th Percentile |

Data in thousands of dollars unless noted

Peer Group 2 Income Statement Statistics

| | Revenue ($M) | Expenses ($M) |
|---|---|---|
| 25th Percentile | $64.0 | $57.6 |
| Median | $110.8 | $95.1 |
| 75th Percentile | $146.7 | $139.2 |

WON-EX 010773

# Competitive Reference Summary
## Peer Group 3: High Growth For-Profit Company CEOs

The following provides market results for the 20 organizations included in this peer group.

As indicated, this peer group approximates the estimated size of Wonderwork at around the year 2020 ($100 million). The median compounded annual growth in revenue for these organizations was 38% over the last five years. While this may not be a directly relevant comparator group, it does provide a perspective on compensation levels in rapid growth companies with revenues comparable to Wonderwork's 2020 estimate.

As the results indicate, the CEO's salary is very competitive, but as expected, total cash and total direct are less competitive, particularly when long-term incentives are included in the mix.

The peer group organizations and detailed results are provided in our Supporting Detail.

| Annual Pay Element | WonderWork CEO | Peer Group 3 CEOs (High Growth For-Profits) | | | WonderWork CEO Percentile Position |
| --- | --- | --- | --- | --- | --- |
| | | 25th Percentile | Median | 75th Percentile | |
| Base Salary | $475 | $330 | $421 | $467 | 76th Percentile |
| Total Cash base + bonus payments | $475 | $446 | $563 | $775 | 38th Percentile |
| Total Direct total cash + benefits + retirement + long-term incentives[2] | $500 | $959 | $1,569 | $2,872 | 16th Percentile |

Data in thousands of dollars unless noted
[2] For-profit companies generally dedicate a significant portion of annual pay to stock-based Long-Term Incentives (LTI)

Peer Group 3 Income Statement Statistics

| | Revenue ($M) | Expenses ($M) |
| --- | --- | --- |
| 25th Percentile | $42.2 | $49.3 |
| Median | $104.3 | $135.3 |
| 75th Percentile | $202.4 | $170.3 |

Pearl Meyer & Partners
Management Consultants

# Competitive Reference Summary
## Peer Group 4: Foundation 3rd Highest Paid Executives

The fourth peer group is focused on leadership positions among some of the top foundations in the U.S. that could represent a potential destination for WonderWork's CEO.

In order to provide a comparison, we used the 3rd highest paid executive in each of the foundations as the point of comparison. In many cases, the top two positions included the CEO and the Chief Investment Officer.

The summary statistics below for the 3rd highest paid executives at these foundations indicates that WonderWork's CEO is above the 50th percentile for total cash compensation and total direct compensation.

| Annual Pay Element | WonderWork CEO |
|---|---|
| Base Salary | $475 |
| Total Cash base + bonus payments | $475 |
| Total Direct total cash + benefits + retirement | $500 |

| | Peer Group 4 Executives (Foundations) Reflects 3rd Highest Paid Executives | | | WonderWork CEO Percentile Position |
|---|---|---|---|---|
| | 25th Percentile | Median | 75th Percentile | |
| | Not reported | | | N/A |
| | $321 | $389 | $478 | 74th Percentile |
| | $477 | $473 | $559 | 58th Percentile |

Data in thousands of dollars unless noted

Peer Group 4 Income Statement Statistics

| | Revenue ($M) | Expenses ($M) |
|---|---|---|
| 25th Percentile | $176.5 | $127.5 |
| Median | $573.5 | $234.9 |
| 75th Percentile | $3,747.0 | $358.0 |

Pearl Meyer & Partners

WON-EX 010775

# Competitive Reference Summary
## Peer Group 5: University Development Officers

As a final frame of reference, given the emphasis on fundraising, we have provided competitive market data for the Top Development position at large, research universities.

While we recognize that the university model for fundraising (e.g., strong alumni base) is different than that of WonderWorks', it does provide yet another point of reference.

WonderWork's CEO is positioned at approximately the 25th percentile for all elements of pay.

| Annual Pay Element | WonderWork CEO | Peer Group 5 CEOs (Univ. Development Officers) | | | WonderWork CEO Percentile Position |
| --- | --- | --- | --- | --- | --- |
| | | 25th Percentile | Median | 75th Percentile | |
| Base Salary | $475 | $470 | $510 | $550 | @ 25th Percentile |
| Total Cash base + bonus payments | $475 | $470 | $515 | $590 | @ 25th Percentile |
| Total Direct total cash + benefits + retirement | $500 | $540 | $575 | $630 | @ 25th Percentile |

Data in thousands of dollars unless noted

12

Pearl Meyer & Partners
Compensation Consultants

Supporting Detail

# Supporting Detail
## Peer Group 1: Traditional Peer Group

The following provides a list of institutions that have somewhat comparable missions as WonderWork and are of a comparable size, based on WonderWork's projected 2015 revenues and expenses.

| Organization | State | Income Statement | | Balance Sheet | |
|---|---|---|---|---|---|
| | | Revenues | Expenses | Assets | Liabilities |
| American Foundation for the Blind | NY | $10,243,973 | $11,889,170 | $46,549,430 | $2,271,489 |
| American Liver Foundation | NY | $8,582,746 | $8,216,744 | $5,096,471 | $3,717,491 |
| American Lung Association | NY | $48,565,057 | $48,563,482 | $29,342,436 | $19,026,863 |
| Christian Relief Services | VA | $39,058,647 | $38,798,006 | $68,745,584 | $56,354,413 |
| Crohn's & Colitis Foundation of America | NY | $50,915,534 | $49,604,872 | $23,007,692 | $16,795,118 |
| Cystic Fibrosis Foundation Headquarters | MD | $237,000,942 | $176,209,849 | $244,454,529 | $69,005,614 |
| Head Injury Association | NY | $10,902,863 | $11,295,862 | $21,409,035 | $9,771,270 |
| Kids in Distressed Situations | NY | $82,207,086 | $82,012,346 | $2,328,561 | $230,786 |
| Lupus Foundation of America | DC | $10,705,131 | $10,232,403 | $6,701,026 | $3,091,767 |
| National Parkinson Foundation | FL | $9,259,675 | $10,474,594 | $19,608,254 | $1,415,110 |
| National Society to Prevent Blindness | VA | $540,153 | $664,225 | $951,027 | $89,013 |
| Operation Smile | VA | $47,958,670 | $43,346,873 | $30,674,043 | $5,774,825 |
| Oxfam-America | MA | $35,769,359 | $37,844,433 | $102,090,256 | $14,652,849 |
| World Hope International | VA | $11,659,913 | $13,518,634 | $8,352,046 | $5,395,759 |
| World Lung Foundation | NY | $57,889,653 | $36,847,763 | $31,532,689 | $2,424,360 |
| | | | | | |
| 25th Percentile | | $10,474,552 | $10,885,228 | $7,526,536 | $2,347,925 |
| Median | | $35,769,359 | $36,847,763 | $23,007,692 | $5,395,759 |
| 75th Percentile | | $49,735,296 | $45,955,178 | $39,041,060 | $15,723,884 |

We understand that WonderWork's projected revenue for 2015 is about $29 million, with expenses of $29 million. 2020 projections are $93 million and $92 million, respectively.

14

Perl Meyer & Partners



# Supporting Detail
## Peer Group 1: Traditional Peer Group CEO Pay

| Organization | Executive | Base Salary | Bonus | Total Cash base + bonus | Other Comp | Deferred Comp | Benefits | Total Compensation total cash + other + deferred + benefits |
|---|---|---|---|---|---|---|---|---|
| American Foundation For The Blind | Carl Augusto | $279,234 | $0 | $279,234 | $0 | $24,507 | $13,557 | $317,298 |
| American Liver Foundation | Rex Smith Jr. | $260,866 | $0 | $260,866 | $132 | $0 | $2,765 | $263,763 |
| American Lung Association | Charles Connor | $319,133 | $0 | $319,133 | $0 | $54,457 | $12,906 | $386,496 |
| Christian Relief Services | Bryan Krizek | $154,233 | $0 | $154,233 | $0 | $6,029 | $7,729 | $167,991 |
| Crohn's & Colitis Foundation of America | Richard Geswell | $461,748 | $60,000 | $521,748 | $0 | $29,034 | $21,613 | $572,395 |
| Cystic Fibrosis Foundation Headquarters | Robert Beall | $502,429 | $175,750 | $678,179 | $33,374 | $342,858 | $19,314 | $1,073,725 |
| Head Injury Association | Liz Giordano | $302,656 | $0 | $302,656 | $70,549 | $0 | $9,647 | $382,852 |
| Kids in Distressed Situations | Janice Weinman | $190,006 | $50,000 | $240,006 | $0 | $7,200 | $6,419 | $253,625 |
| Lupus Foundation of America | Sandra Raymond | $230,640 | $12,000 | $242,640 | $0 | $20,700 | $5,830 | $269,170 |
| National Parkinson Foundation | Joyce Oberdorf | $290,000 | $0 | $290,000 | $0 | $7,350 | $6,177 | $303,527 |
| National Society to Prevent Blindness | Timothy Gresham | $109,777 | $0 | $109,777 | $0 | $0 | $16,510 | $126,287 |
| Operation Smile | William Magee Jr | $306,250 | $0 | $306,250 | $0 | $21,375 | $870 | $328,495 |
| Oxfam-America | Raymond Offenheiser | $340,307 | $16,300 | $356,607 | $465 | $111,880 | $23,629 | $492,581 |
| World Hope International | --CEO data not available-- | | | | | | | |
| World Lung Foundation | Peter Baldini | $195,000 | $20,000 | $215,000 | $0 | $7,800 | $22,580 | $245,380 |

| | 25th Percentile | $203,910 | | $240,665 | | | | $256,160 |
| | Median | $284,617 | | $284,617 | | | | $310,413 |
| | 75th Percentile | $315,912 | | $315,912 | | | | $385,585 |

15

Pearl Meyer & Partners
Compensation Consultants



WON-EX 010779

# Supporting Detail
## Peer Group 2: High Growth / Aspirational Non-Profit Peer Group

The following provides a list of institutions that have had a track record of growing revenues over the last several years. The size of these organizations is actually more comparable to the expected size of WonderWork in 2020.

| Organization | State | Income Statement | | Balance Sheet | |
|---|---|---|---|---|---|
| | | Revenues | Expenses | Assets | Liabilities |
| AIDS Healthcare Foundation | CA | $141,877,552 | $101,738,621 | $135,273,683 | $39,580,945 |
| American Lung Association | NY | $48,565,057 | $48,563,482 | $29,342,436 | $19,016,663 |
| Am. Soc. for Prevention of Cruelty to Animals (ASPCA) | NY | $148,247,629 | $145,507,016 | $213,706,112 | $30,794,533 |
| Children International | MO | $156,422,279 | $155,129,314 | $60,109,127 | $15,282,877 |
| Citihope International | NY | $125,329,513 | $120,173,075 | $9,560,340 | $688,867 |
| Crohn's & Colitis Foundation of America | NY | $50,905,534 | $49,604,872 | $23,007,692 | $16,795,118 |
| Environmental Defense Fund | NY | $96,358,261 | $88,540,355 | $153,964,992 | $16,930,820 |
| Heifer Project International | AR | $127,596,169 | $117,606,508 | $180,139,760 | $23,496,352 |
| Kids in Distressed Situations | NY | $82,207,086 | $82,012,346 | $2,328,561 | $230,786 |
| Operation Blessing Int'l Relief & Development | VA | $263,908,319 | $262,877,722 | $17,170,468 | $7,823,346 |
| Operation Smile | VA | $47,958,670 | $43,346,873 | $30,674,043 | $5,774,825 |
| Project Orbis International | NY | $86,928,876 | $81,479,054 | $46,708,977 | $1,492,608 |
| The Elizabeth Glaser Pediatric AIDS Foundation | DC | $161,703,471 | $164,151,044 | $33,317,641 | $21,734,395 |
| World Lung Foundation | NY | $57,889,653 | $36,847,763 | $31,532,689 | $2,424,360 |

| | Revenues | Expenses | Assets | Liabilities |
|---|---|---|---|---|
| 25th Percentile | $63,969,011 | $57,573,418 | $24,591,378 | $3,261,976 |
| Median | $110,843,887 | $95,139,488 | $32,425,565 | $16,038,998 |
| 75th Percentile | $146,655,110 | $139,173,531 | $116,482,544 | $21,057,512 |

We understand that WonderWork's projected revenue in 2017 is about $20 million, with expenses of $19 million. 2020 projections are $99 million and $93 million, respectively.

16

Pennfield & Partners

## Supporting Detail
### Peer Group 2: High Growth / Aspirational Non-Profit Peer Group CEO Pay

| Organization | Executive | Base Salary | Bonus | Total Cash base + bonus | Other Comp | Deferred Comp | Benefits | Total Compensation total cash + other + deferred + benefits |
|---|---|---|---|---|---|---|---|---|
| Aids Healthcare Foundation | Michael Weinstein | $262,650 | $92,550 | $355,200 | $0 | $23,458 | $1,850 | $380,508 |
| American Lung Association | Charles Connor | $319,133 | $0 | $319,133 | $0 | $54,457 | $12,906 | $386,496 |
| Am. Soc. for Prevention of Cruelty to Animals (ASPCA) | Edwin Sayres | $437,500 | $125,000 | $562,500 | $3,564 | $31,772 | $16,749 | $614,585 |
| Children International | James Cook | $433,829 | $0 | $433,829 | $22,750 | $21,752 | $18,663 | $496,994 |
| Citihope International | Rev. Paul S Moore Sr | $106,978 | $0 | $106,978 | $0 | $0 | $30,980 | $137,958 |
| Crohn's & Colitis Foundation of America | Richard Geswell | $461,748 | $60,000 | $521,748 | $0 | $29,034 | $21,613 | $572,395 |
| Environmental Defense Fund | Frederic Krupp | $407,510 | $26,000 | $433,510 | $0 | $35,904 | $17,670 | $487,084 |
| Heifer Project International | Pierre Ferrari | $290,625 | $0 | $290,625 | $0 | $0 | $36,044 | $326,669 |
| Kids in Distressed Situations | Janice Weinman | $190,006 | $50,000 | $240,006 | $0 | $7,200 | $6,419 | $253,625 |
| Operation Blessing International Relief & Development | Bill Horan | $331,623 | $147 | $331,770 | $1,663 | $0 | $11,889 | $345,322 |
| Operation Smile | William Magee Jr | $306,250 | $0 | $306,250 | $0 | $21,375 | $870 | $328,495 |
| Project Orbis International | Barbara Debuono | $230,433 | $0 | $230,433 | $0 | $0 | $19,240 | $249,673 |
| The Elizabeth Glaser Pediatric AIDS Foundation | Charles Lyons II | $358,284 | $72,500 | $430,784 | $23,032 | $87,150 | $19,831 | $560,797 |
| World Lung Foundation | Peter Baldini | $195,000 | $20,000 | $215,000 | $0 | $7,800 | $22,580 | $245,380 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 25th Percentile | | $238,487 | | $252,661 | | | | $271,886 |
| Median | | $312,692 | | $325,452 | | | | $362,915 |
| 75th Percentile | | $395,204 | | $432,829 | | | | $494,517 |

17

Pearl Meyer & Partners
Compensation Consultants

# Supporting Detail
## Peer Group 3: High Growth For-Profit Company Peer Group

The following provides a list of publicly-traded institutions that have had a strong track record of growing revenues over the last several years. They are in range of industry sectors, but the common bond is rapid growth. The size of these organizations is also more comparable to the expected size of WonderWork in 2020.

| Organization | State | Income Statement | | Balance Sheet | | Sales Growth (CAGR) | | Market Cap |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Revenues | Expenses | Assets | Liabilities | 5 Year | 10 Year | |
| Biolife Solutions | WA | $5,663,000 | $7,323,000 | $3,170,000 | $15,656,000 | 42% | 21% | $25,212,999 |
| Cavium | CA | $235,479,996 | $348,112,000 | $331,503,998 | $88,442,001 | 34% | N/A | $1,681,832,886 |
| Constant Contact | MA | $252,154,007 | $239,398,007 | $257,261,993 | $53,680,000 | 38% | N/A | $458,193,207 |
| Dexcom | CA | $99,900,002 | $154,400,002 | $106,000,000 | $29,000,000 | 85% | N/A | $1,472,660,156 |
| Document Security Sys | NY | $17,115,000 | $21,396,000 | $14,250,000 | $5,527,000 | 23% | 38% | $63,824,501 |
| Ebix | GA | $199,369,995 | $128,800,995 | $16,945,984 | $149,791,000 | 36% | 32% | $737,452,820 |
| Endologix | CA | $105,945,999 | $141,719,997 | $165,102,997 | $70,628,998 | 31% | 30% | $844,018,616 |
| Fab Universal | PA | $27,459,000 | $31,463,000 | $167,794,998 | $33,865,002 | 40% | 55% | $72,126,503 |
| Insulet | MA | $211,369,003 | $263,236,004 | $198,059,006 | $153,882,996 | 74% | N/A | $1,595,539,185 |
| Liveperson | NY | $157,408,997 | $151,053,997 | $208,576,004 | $38,333,000 | 25% | 34% | $508,920,685 |
| Logmein | MA | $138,837,006 | $135,771,006 | $279,537,994 | $94,901,001 | 39% | N/A | $618,765,930 |
| Mako Surgical | FL | $102,719,002 | $135,270,000 | $166,901,993 | $26,065,001 | 166% | N/A | $587,215,515 |
| Meetme | PA | $46,657,001 | $56,965,001 | $104,434,998 | $18,913,000 | 192% | 117% | $57,192,001 |
| Merge Healthcare | IL | $250,959,000 | $279,761,000 | $36,852,997 | $359,391,998 | 33% | 28% | $308,437,805 |
| Opentible | CA | $161,632,004 | $137,660,004 | $237,246,994 | $69,382,001 | 31% | N/A | $1,519,626,099 |
| Procera Networks | CA | $59,626,999 | $54,295,999 | $167,037,994 | $20,233,000 | 55% | N/A | $303,288,513 |
| Sourcefire | MD | $223,089,996 | $218,062,996 | $361,674,011 | $119,547,997 | 32% | N/A | $1,743,098,022 |
| Star Scientific | VA | $6,188,000 | $29,041,001 | $31,924,000 | $6,940,000 | 68% | -25% | $248,073,105 |
| Universal Display | NJ | $83,244,003 | $73,584,003 | $385,523,987 | $35,289,001 | 49% | 42% | $1,374,518,188 |
| USA Technologies | PA | $29,017,000 | $34,228,000 | $33,220,001 | $11,565,000 | 26% | 33% | $60,499,802 |

| | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 25th Percentile | | $42,247,001 | $49,278,999 | $105,608,749 | $19,903,000 | 32% | N/A | $204,086,454 |
| Median | | $104,332,500 | $135,270,503 | $182,927,002 | $36,811,001 | 38% | N/A | $544,568,100 |
| 75th Percentile | | $202,369,747 | $170,315,750 | $292,529,495 | $90,056,751 | 58% | N/A | $1,399,053,680 |

We understand that WonderWork's projected revenue for 2025 is about $20 million, with expenses of $20 million. 2020 projections are $93 million and $95 million, respectively.

Paul Meyer & Partners
Comprehensive Compensation

WON-EX 010782

# Supporting Detail
## Peer Group 3: High Growth For-Profit Company CEO Pay

| Company | Executive | Base Salary | Bonus | Total Cash base + bonus | Other Comp | Long-term Incentives (LTI) | Total Compensation total cash + other + LTI |
|---|---|---|---|---|---|---|---|
| Biolife Solutions | Michael Rice | $285,002 | $150,000 | $435,002 | $24,143 | $0 | $459,145 |
| Cavium | Syed B. Ali | $350,000 | $0 | $350,000 | $2,715 | $3,760,133 | $4,112,848 |
| Constant Contact | Gail F. Goodman | $450,000 | $300,797 | $750,797 | $11,030 | $476,831 | $1,238,658 |
| Dexcom | Terrance H. Gregg | $420,000 | $466,200 | $886,200 | $12,284 | $1,891,932 | $2,790,416 |
| Document Security Sys | Patrick White | $198,450 | $12,000 | $210,450 | $14,688 | $0 | $225,138 |
| Ebix | Robin Raina | $800,000 | $1,600,000 | $2,400,000 | $9,675 | $525,000 | $2,934,675 |
| Endologix | John McDermott | $431,200 | $229,614 | $660,814 | $0 | $1,369,750 | $2,030,564 |
| Fab Universal | Christopher Spencer | $241,322 | $100,000 | $341,322 | $0 | $0 | $341,322 |
| Insulet | Duane DeSisto | $422,981 | $245,758 | $668,739 | $7,500 | $2,175,051 | $2,851,290 |
| Liveperson | Robert P. LoCascio | $500,189 | $268,200 | $768,389 | $6,907 | $855,030 | $1,630,326 |
| Logmein | Michael K. Simon | $371,000 | $208,688 | $579,688 | $13,352 | $3,961,200 | $4,154,240 |
| Mako Surgical | Maurice R. Ferré M.D. | $455,821 | $0 | $455,821 | $3,750 | $1,048,128 | $1,507,699 |
| Meetme | John Abbott | $250,000 | $216,000 | $466,000 | $0 | $0 | $466,000 |
| Merge Healthcare | Jeffery A. Surges | $450,000 | $0 | $450,000 | $18,427 | $549,720 | $1,018,147 |
| Opentable | Matthew Roberts | $500,000 | $0 | $500,000 | $500 | $8,037,487 | $8,537,987 |
| Procera Networks | James F. Brear | $345,000 | $450,708 | $795,708 | $0 | $1,753,271 | $2,548,979 |
| Sourcefire | Martin F. Roesch | $324,250 | $223,003 | $547,253 | $0 | $711,285 | $1,258,538 |
| Star Scientific | Jonnie R. Williams Sr. | $1,000,000 | $0 | $1,000,000 | $117,641 | $12,263,635 | $13,381,276 |
| Universal Display | Steven V. Abramson | $561,400 | $438,750 | $1,000,150 | $31,110 | $438,708 | $1,469,968 |
| USA Technologies | Stephen P. Herbert | $332,246 | $40,000 | $372,246 | $18,748 | $391,300 | $782,294 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 25th Percentile | | $330,247 | | $446,251 | | | $959,184 |
| Median | | $421,491 | | $568,471 | | | $1,569,013 |
| 75th Percentile | | $466,866 | | $775,219 | | | $2,872,136 |

19

PM Pearl Meyer & Partners
Compensation Consultants



# Supporting Detail
## Peer Group 4: Foundation Peer Group

The following provides a list of large foundations, some of which have strong reputations for innovative approaches and an ability to raise funds. These institutions could represent a viable employment alternative for Mr. Mullaney as a member of the senior management group. Note that a large group of foundations was originally developed, and only those that compensate executives are included below.

| Organization | State | Income Statement | | Balance Sheet | |
|---|---|---|---|---|---|
| | | Revenues | Expenses | Assets | Liabilities |
| Bill & Melinda Gates Foundation | WA | $3,959,278,622 | $4,957,299,731 | $34,640,122,664 | $5,804,382,745 |
| Conrad N Hilton Foundation | NV | $46,510,572 | $99,365,775 | $2,125,048,563 | $93,851,179 |
| David and Lucile Packard Foundation | CA | $3,110,079,563 | $284,318,325 | $6,100,637,478 | $157,961,977 |
| Ford Foundation | NY | $6,027,284,758 | $564,371,235 | $10,498,982,621 | $301,352,951 |
| Harry & Jeanette Weinberg Foundation | MD | $601,857,609 | $107,247,858 | $2,072,697,349 | $14,285,661 |
| John S. and James L. Knight Foundation | FL | $4,030,420,323 | $111,632,757 | $2,137,010,922 | $163,103,878 |
| Kresge Foundation | MI | $4,490,222 | $174,924,549 | $3,025,786,097 | $111,645,769 |
| Rockefeller Foundation | NY | $545,183,231 | $192,945,348 | $3,507,144,871 | $109,400,443 |
| W K Kellogg Foundation | MI | $482,307,276 | $382,532,302 | $465,120,046 | $316,213,886 |
| William & Flora Hewlett Foundation | CA | $74,618,958 | $276,837,531 | $7,377,220,546 | $492,687,791 |

| | | | | | |
|---|---|---|---|---|---|
| 25th Percentile | | $176,541,038 | $127,455,705 | $2,128,039,153 | $109,961,775 |
| Median | | $573,520,420 | $234,891,440 | $3,266,465,484 | $160,532,928 |
| 75th Percentile | | $3,746,978,857 | $357,978,808 | $7,058,074,779 | $312,498,652 |

©2015 Pearl Meyer & Partners

Pearl Meyer & Partners

## Supporting Detail
### Peer Group 4: Foundation Peer Group 3rd Highest Paid Executive Pay

Note: foundations are only required to report aggregate compensation values.

| Organization | Executive | Title | Total Cash base + bonus | Total Compensation total cash + other + deferred + benefits |
|---|---|---|---|---|
| Bill & Melinda Gates Foundation | Allan Golston | President, US Program | $581,957 | $652,363 |
| Conrad N Hilton Foundation | Jaeloon Kang | Director of Investments | $371,195 | $418,464 |
| David and Lucile Packard Foundation | George Vera | VP & CFO | $531,490 | $579,331 |
| Ford Foundation | Nicholas Gabriel | VP, CFO & Treasurer | $416,437 | $551,103 |
| Harry & Jeanette Weinberg Foundation | Rachel Monroe | President | $406,208 | $463,818 |
| John S. and James L. Knight Foundation | Paula Ellis | VP, Strategic Initiatives | $298,791 | $349,854 |
| Kresge Foundation | Amy Coleman | VP, Finance | $251,304 | $332,114 |
| Rockefeller Foundation | Peter Madonia | Chief Operating Officer | $498,589 | $561,539 |
| W K Kellogg Foundation | Lajune Tabron | EVP for Operations & Treasurer | $317,161 | $482,977 |
| William & Flora Hewlett Foundation | Susan Bell | Vice President | $333,694 | $452,751 |

| | | | | |
|---|---|---|---|---|
| | | 25th Percentile | $321,294 | $427,036 |
| | | Median | $388,702 | $473,398 |
| | | 75th Percentile | $478,051 | $558,930 |

PM Paul Meyer & Partners
Consultants, Compensation
©2013 Paul Meyer & Partners

WON-EX 010785