FUCHS

EXHIBIT 30



There's a 15-minute surgery that can restore the eyesight of children who are completely blind.

20I20I20 CFOE

Client/Job: WW_1305_20_AQNEW_CFOE
Size: 9.5"x 4.125" (#10)
Color: C■ M■ Y□ K■

Stock:
Window Specs: N/A

EXHIBIT 30
WIT: Fuchs
DATE: 8-15-17
DEBRA STEVENS, RPR, CRR

**20|20|20**

RESTORING THE EYESIGHT OF
20 MILLION BLIND
CHILDREN AND ADULTS

P.O. Box 96669
Washington, DC 20090-6669

Send us a donation and we'll never ask for another!

**NNE** Marketing

**Client/Job:** WW_1305_20_AQNEW_CFOE
**Size:** 9.5"x 4.125" (#10)
**Color:** C ▪ M ▪ Y ☐ K ▪

**Stock:**
**Window Specs:** N/A

WON-EX 9334

20/20/20 RE–DROP 1

Return Address

AlHedrew Buttell

NAIEOOOJRKXEEEXT

20/20/20
PO Box 96666
Washington, DC 20090-6669

20/20/20 is a WonderWork charity program. Your gift is very much appreciated and fully deductible as a charitable contribution. A copy of our latest financial report may be obtained by writing to Wonderwork, Inc., 420 Lexington Avenue, 27th Floor, New York, NY 10170, 212-986-7414. If you are a resident of one of these states, you may obtain financial information directly from the state agency. FLORIDA — A COPY OF THE OFFICIAL REGISTRATION AND FINANCIAL INFORMATION MAY BE OBTAINED FROM THE DIVISION OF CONSUMER SERVICES BY CALLING TOLL-FREE, 1-800-435-7352 WITHIN THE STATE. REGISTRATION DOES NOT IMPLY ENDORSEMENT, APPROVAL, OR RECOMMENDATION BY THE STATE. Florida Registration CH55519. GEORGIA — A full and fair description of our programs and our financial statement summary is available upon request at the office and phone number indicated above. MARYLAND — For the cost of copies and postage, office of the Secretary of State, State House, Annapolis, MD 21401 MISSISSIPPI — The official registration and financial information may be obtained from the Mississippi Secretary of State's office by calling 1-888-236-6167. Registration by the Secretary of State does not imply endorsement. NEW JERSEY — INFORMATION FILED WITH THE ATTORNEY GENERAL CONCERNING THIS CHARITABLE SOLICITATION AND THE PERCENTAGE OF CONTRIBUTIONS RECEIVED BY THE CHARITY DURING THE LAST REPORTING PERIOD THAT WERE DEDICATED TO THE CHARITABLE PURPOSE MAY BE OBTAINED FROM THE ATTORNEY GENERAL OF THE STATE OF NEW JERSEY BY CALLING (973) 504-6215 AND IS AVAILABLE ON THE INTERNET AT http://www.state.nj.us/lps/ca/charfrm.htm. REGISTRATION WITH THE ATTORNEY GENERAL DOES NOT IMPLY ENDORSEMENT. NEW YORK — Office of the Attorney General, Charities Bureau, 120 Broadway, New York, NY 10271. NORTH CAROLINA — FINANCIAL INFORMATION ABOUT THIS ORGANIZATION AND A COPY OF ITS LICENSE ARE AVAILABLE FROM THE STATE SOLICITATION LICENSING BRANCH AT 1-888-830-4989. THE LICENSE IS NOT AN ENDORSEMENT BY THE STATE. PENNSYLVANIA — The official registration and financial information of WonderWork may be obtained from the Pennsylvania Department of State by calling toll-free, within Pennsylvania, 1-800-732-0999. Registration does not imply endorsement. VIRGINIA — Virginia State Office of Consumer Affairs, Department of Agriculture and Consumer Services, PO Box 1163, Richmond, VA 23218. WASHINGTON — Charities Division, Office of the Secretary of State, State Capitol, Charleston, WV 25305. Registration with any of these state agencies does not imply endorsement, approval or recommendation by any state.

IONNE

Stock:
Special Instructions:

Client/Job: WW_1305_20_ACCTRL_RE
Size: 8.875" x 3.875" (#9)
Color: PMS329■

WON-EX 9335



One million blind children could have their eyesight restored through a $300 surgery.

**20|20|20**
RESTORING THE EYESIGHT OF
20 MILLION BLIND
CHILDREN AND ADULTS

---

Millions who are waiting for surgery to restore their eyesight will never receive it unless someone helps them.

*You* can be that someone.

**20|20|20**
RESTORING THE EYESIGHT OF
20 MILLION BLIND
CHILDREN AND ADULTS

P.O. Box 96669
Washington, DC 20090-6669
20x20x20.org

20/20/20 is a WonderWorks charity program. WonderWorks, Inc. is a 501 (C)(3) nonprofit, charitable organization recognized by the IRS. All donations are tax-deductible in accordance with IRS regulations. © 2013 20/2020

Stock:
Special Instructions:

---

In developing countries, blindness is 500% more prevalent than in the U.S.



Millions of children and adults become blind every year and it can happen at any age.

Babies are born completely blind in both eyes.

Children who have perfect eyesight suddenly go blind in one eye or both.

Teenagers suffer injuries that cause them to go completely blind.

Parents become blind and lose their jobs, their income and their families.

Grandparents lose their eyesight and become a huge burden to their families.

**All of them could have their eyesight restored — if someone helps them.**

NNE Consulting

Client/Job: WW_1305_20_AQNEW_TRI
Size: 8.5"x 11"
Color: C ▪ M ▪ Y ☐ K ▪

WON-EX 9336

## They've invented a surgery that can cure blindness in 15 minutes.

It sounds unbelievable but it's true.

Half of all the blind children and adults in the world — that's 20 million people — could have their eyesight restored through a miracle surgery that takes 15 minutes and costs $300.

It is a modern-day medical miracle.

The bad news is that even at $300, most blind children and adults in developing countries could never afford this surgery.

So millions of blind children and adults — who are often referred to as the "needlessly blind" — will remain blind.

Forever.

Unless someone helps them.

That's why we started 20/20/20.

To restore 20/20 vision to 20 million blind children and adults!

To give them back not just their eyesight — but their future too.

But we can't do it without your help.

Please help us restore the vision of a child or adult who is blind.

NNE

Client#/Job: WW_1305_20_AQNEW_TRI
Size: 8.5 x 11"
Color: C ■ M ■ Y□ K■

## 20/20/20 is different than other charity programs.

### We're focused on a single problem: helping the blind see.

Unlike most charities that try to solve many different problems, we're focused exclusively on just one. This helps us be more productive and cost-efficient. And it makes it easy for us to measure our progress and effectiveness. Our name says it all — our mission is to help restore 20/20 vision for 20 million blind children and adults.

### We deliver results you can see and benefits that last a lifetime.

Unlike charities that are searching for a cure or that do things that you can't really see or appreciate, what we do is crystal clear. We provide miracle surgeries that in a matter of minutes can restore the eyesight of children and adults who are blind. Permanently.

### We give donors the opportunity to save a child's life.

Literally. The World Health Organization reports that in developing countries, 60% of children die within 1-2 years of going blind.

Our miracle surgeries not only can give these children their eyesight back — but their future too.

### We give donors the maximum impact for every donation.

Every donor wants to know that their donation,

whatever amount, actually makes a difference. What could be more impactful than restoring the eyesight of a child who is completely blind? And saving them from a lifetime of suffering, pain and heartache?

### 20/20/20 is managed like a business.

20/20/20 has a very experienced management team that takes great pride in the fact that it is held accountable for achieving specific goals and very ambitious results. We measure and monitor everything we do. Every program, every direct mail campaign, every dollar that we spend.

### Extremely low overhead.
### Sky-high productivity.

Donors don't like charities that spend a lot on overhead and administration.

Neither do we.

We have a tiny staff working in a half-price sublet office that came with free furniture. All of our technology — email, servers, networks — is in the "cloud" which saves millions of dollars.

### 20/20/20 is a WonderWork charity program.

This means we share office space, personnel, computers, etc. with other charity programs in order to dramatically reduce our overhead, administration and fundraising costs.




Stock:
Special Instructions:

WON-EX 9337

# Information About

# Cloudy Lenses
# and Your Vision

## What is a cloudy lens?

A cloudy lens affects vision and can cause blindness. Most cloudy lens problems are related to aging and very common in older people. By age 80, more than half of all Americans either have experienced a cloudy lens or have had surgery to correct cloudy lens. A cloudy lens can occur in either one or both eyes. It cannot spread from one eye to the other. A congenital cloudy lens is present at birth. The lens of the eye is normally clear. It focuses light that comes into the eye onto the retina. In most patients, no cause can be found.

## What is the lens?

The lens is a clear part of the eye that helps to focus light, or an image, on the retina. The retina is the light-sensitive tissue at the back of the eye. In a normal eye, light passes through the transparent lens to the retina. Once it reaches the retina, light is changed into nerve signals that are sent to the brain. The lens must be clear for the retina to receive a sharp image. If the lens is cloudy from a cloudy lens, the image you see will be blurred.

## What types of cloudy lenses are there?

Although most cloudy lens problems are related to aging, there are other types: **Secondary** — A cloudy lens can form after surgery from other eye problems, such as glaucoma. A cloudy lens can also develop in people who have other health problems, such as diabetes. A cloudy lens can sometimes be linked to steroid use. **Traumatic** — A cloudy lens can develop after an eye injury, sometimes years later. **Congenital** — Some babies are born with a cloudy lens or develop

them in childhood, often in both eyes. These may not affect vision. If they do, the lenses may need to be removed. **Radiation** — A cloudy lens can develop after exposure to some types of radiation.

## What are the causes of a cloudy lens?

The lens of the eye is normally clear. It acts like the lens on a camera, focusing light as it passes to the back of the eye. Until a person is around age 45, the shape of the lens is able to change. This allows the lens to focus on an object, whether it is close or far away. As we age, proteins in the lens begin to break down and the lens becomes cloudy. What the eye sees may appear blurry. This condition is known as a cloudy lens. Factors that may speed up cloudy lens formation are: Diabetes; Smoking; Eye Inflammation; Eye injury; Family history of cloudy lens; Long-term use of corticosteroids (taken by mouth) or certain other medications; Radiation exposure; Surgery for another eye problem; Too much exposure to ultraviolet light (sunlight). In many cases, the cause of a cloudy lens is unknown.

## How can a cloudy lens affect my vision?

Age-related cloudy lens can affect your vision in two ways: Clumps of protein reduce the sharpness of the image reaching the retina. The lens consists mostly of water and protein. When the protein clumps up, it clouds the lens and reduces the light that reaches the retina. The clouding may become severe enough to cause blurred vision. Most age-related cloudy lenses develop from protein clumpings. When a cloudy lens is small, the cloudiness affects only a small part of the lens. You may not notice any changes in your vision. Cloudy lens tend to "grow" slowly, so vision gets worse gradually. Over time, the cloudy area in the lens may get larger, and the cloudy lens may increase in size. Seeing may become more difficult and your vision may get duller or blurrier. The clear lens slowly changes to a yellowish/brownish color, adding a brownish tint to vision. As the clear lens slowly colors with age, your vision gradually may acquire a brownish shade. At first, the amount of tinting may be small and may not cause a vision problem. Over time, increased tinting may make it more difficult to read and perform other routine activities. This gradual change in the amount of tinting does not affect the sharpness of the image transmitted to the retina. If you have advanced lens discoloration, you may not be able to identify blues and purples. You may be wearing what you believe to be a pair of black socks, only to find out from friends that you are wearing purple socks.

## When are you most likely to have a cloudy lens?

The term "age-related" is a little misleading. You do not have to be a senior citizen to get this type of cloudy lens. In fact, people can have an age-related cloudy lens in their 40s and 50s. But during middle age, most cloudy lens are small and do not affect vision. It is after age 60 that most cloudy lenses steal vision.

## What are the symptoms of a cloudy lens?

Blurry vision; Colors that seem faded; Glare; Headlights, lamps, or sunlight may appear too bright; A halo may appear around lights; double vision; not being able to see well at night; frequent prescription changes in your eye wear. These symptoms also can be a sign of other eye problems. If you have any of these symptoms, check with your eye care professional. Cloudy lens usually develops slowly. New glasses, brighter lighting, anti-glare sunglasses or magnifying lenses can help at first. Surgery is also an option. It involves removing the cloudy lens and replacing it with an artificial lens. Congenital cloudy lens usually looks different than other forms of cloudy lens. Symptoms include: Infant doesn't seem to be able to see (if cloudy lens are in both eyes); Gray or white cloudiness of the pupil (which is normally black); "Red eye" glow of the pupil is missing in photos, or is different between the two eyes; Unusual rapid eye movements (nystagmus).

## How is a cloudy lens detected?

A cloudy lens is detected through a comprehensive eye exam that includes: **Visual acuity test** — This eye chart test measures how well you see at various distances. **Dilated eye exam** — Drops are placed in your eyes to widen, or dilate, the pupils. Your eye care professional uses a special magnifying lens to examine your retina and optic nerve for signs of damage and other eye problems. After the exam, your close-up vision may remain blurred for several hours. **Tonometry** — An instrument measures the pressure inside the eye. Numbing drops may be applied to your eye for this test.

## How is a cloudy lens treated?

The symptoms of a cloudy lens may be improved with new eyeglasses, brighter lighting, anti-glare sunglasses, or magnifying lenses. If these measures do not help, surgery is the only effective treatment. Surgery involves removing the cloudy lens and replacing it

**IWCO Job No:** 2013032
**Component:** Information Insert

**Project:** WW 2020/20 February Acquisition
**Size:** 10.5x5.5    **Stock:** white

**Date:** 01/28/13    **Stage:** FINAL
**Ink:** 1/1; Black

WON-EX 9338

with an artificial lens. A cloudy lens needs to be removed only when vision loss interferes with your everyday activities, such as driving, reading, or watching TV. You and your eye care professional can make this decision together. Once you understand the benefits and risks of surgery, you can make an informed decision about whether cloudy lens surgery is right for you. In most cases, delaying cloudy lens surgery will not cause long-term damage to your eye or make the surgery more difficult. You do not have to rush into surgery. Sometimes a cloudy lens should be removed even if it does not cause problems with your vision. For example, a cloudy lens should be removed if it prevents examination or treatment of another eye problem, such as age-related macular degeneration or diabetic retinopathy. If your eye care professional finds a cloudy lens, you may not need cloudy lens surgery for several years. In fact, you might never need cloudy lens surgery. By having your vision tested regularly, you and your eye care professional can discuss if and when you might need treatment. If you choose surgery, your eye care professional may refer you to a specialist to remove the cloudy lens. If you have cloudy lens in both eyes that require surgery, the surgery will be performed on each eye at separate times, usually four to eight weeks apart. Many people who need cloudy lens surgery also have other eye conditions, such as age-related macular degeneration or glaucoma. If you have other eye conditions in addition to cloudy lens, talk with your doctor. Learn about the risks, benefits, alternatives, and expected results of cloudy lens surgery.

## How is a congenital cloudy lens treated?

If congenital cloudy lenses are mild and do not affect vision, they may not need to be treated, especially if they are in both eyes. Moderate to severe cloudy lenses that affect vision or a cloudy lens that is in only one eye, will need to be treated with cloudy lens removal surgery. In most (noncongenital) cloudy lens surgeries, an artificial intraocular lens (IOL) is inserted into the eye. The use of IOLs in infants is controversial. Without an IOL, the infant will need to wear a contact lens. Patching to force the child to use the weaker eye is often needed to prevent amblyopia.

## Is cloudy lens surgery effective?

Cloudy lens removal is one of the most common operations performed in the United States. It also is one of the safest and most effective types of surgery. In about 90 percent of cases, people who have cloudy lens surgery have better vision afterward.

## What are the risks of cloudy lens surgery?

Early diagnosis and treatment are key to preventing permanent vision problems. As with any surgery, cloudy lens surgery poses risks, such as infection and bleeding. Before cloudy lens surgery, your doctor may ask you to temporarily stop taking certain medications that increase the risk of bleeding during surgery. After surgery, you must keep your eye clean, wash your hands before touching your eye, and use the prescribed medications to help minimize the risk of infection. Serious infection can result in loss of vision. Cloudy lens surgery slightly increases your risk of retinal detachment. Other eye disorders, such as high myopia (nearsightedness), can further increase your risk of retinal detachment after cloudy lens surgery. One sign of a retinal detachment is a sudden increase in flashes or floaters. Floaters are little "cobwebs" or specks that seem to float about in your field of vision. If you notice a sudden increase in floaters or flashes, see an eye care professional immediately. A retinal detachment is a medical emergency. If necessary, go to an emergency service or hospital. Your eye must be examined by an eye surgeon as soon as possible. A retinal detachment causes no pain. Early treatment for retinal detachment often can prevent permanent loss of vision. The sooner you get treatment, the more likely you will regain good vision. Even if you are treated promptly, some vision may be lost. Talk to your eye care professional about these risks. Make sure cloudy lens surgery is right for you.

## When to contact a medical professional

Call for an appointment with your health care provider if you have: decreased night vision, problems with glare, or vision loss.

## How can I prevent cloudy lenses?

The best prevention involves controlling diseases that increase the risk of a cloudy lens, and avoiding exposure to factors known to promote cloudy lens formation. Wearing sunglasses and a hat with a brim when you are outside during the day can reduce the amount of ultraviolet (UV) light your eyes are exposed to. Some sunglasses do not filter out the harmful UV. An optician should be able to tell you which sunglasses filter out the most UV. For patients who smoke cigarettes, quitting will decrease the risk of cloudy lenses. Researchers also believe good nutrition can help reduce the risk of age-related cloudy lenses. They recommend eating green leafy vegetables, fruit, and other foods with antioxidants. If you are age 60 or older, you should have a comprehensive dilated eye exam at least once every two years. In addition to cloudy lens, your eye care professional can check for signs of age-related macular degeneration, glaucoma, and other vision disorders. Early treatment for many eye diseases may save your sight.

## Summary

A cloudy lens is a clouding of the eye's lens and is the leading cause of blindness worldwide, and the leading cause of vision loss in the United States. Cloudy lens can occur at any age due to a variety of causes, and can be present at birth. Although treatment for the removal of a cloudy lens is widely available, access barriers such as insurance coverage, treatment costs, patient choice, or lack of awareness prevent many people from receiving the proper treatment. An estimated 20.5 million (17.2%) Americans 40 years and older have a cloudy lens in one or both eyes, and 6.1 million (5.1%) have had their lens removed operatively. The total number of people who have cloudy lenses is estimated to increase to 30.1 million by 2020.

*Information was derived from the U.S. Government National Institutes of Health, the National Eye Institute and the Centers for Disease Control and Prevention.*



2020 20
RESTORING THE EYESIGHT OF
20 MILLION BLIND
CHILDREN AND ADULTS

**Yes,** I want to give the blind a chance to see...

- ○ $300 to provide a full surgery
- ○ $150 to provide half a surgery
- ○ $75 for anesthesia
- ○ $_____ Any amount will help

▰▰▰▰▰

- ○ If you prefer to charge your gift to a credit card, please check here and see other side.

*A $300 donation makes you a Founding Partner!*

- ○ Please send me updates about 20/20/20.
- ○ I'd like to receive limited communications.
- ○ Please do not ask me for another donation.

(Please allow 8 weeks to be removed from our mailing list. Thanks for your patience as we process your request.)

F177919732 NA13050812XXX01615



**20|20|20**
**RESTORING THE EYESIGHT OF**
**20 MILLION BLIND**
**CHILDREN AND ADULTS**

One donation from you
can restore the eyesight
of a blind child or adult.
(And we'll never ask
for another.)

Dear ▰▰▰▰

Just think if you were born into a poor family, living in a mud hut, in one of the poorest countries in the world.

And you are completely blind. In both eyes. Since birth.

I recently met a 5-year-old boy who had been born into this horrific situation.

We met at a small hospital in rural Ethiopia where we were helping hundreds of children who needed free cleft surgery. As the co-founder and former CEO of Smile Train, my team and I helped 700,000 children undergo surgery they would otherwise never have received.

But there was nothing I could do to help this 5-year-old boy.

That broke my heart.

I watched him being led around by his friend and his future was as bleak as the look on his face. When I returned to the U.S., the pictures that I took really haunted me. So I did some research and what I learned was shocking.

**There are 40 million blind children and adults in the world. Half of them could see tomorrow if they received a simple surgery that costs just $300.**

Yes, I know this sounds like it cannot possibly be true. But it is.

20 million children and adults are blind because they are too poor to afford a simple 15-minute surgery. So they remain blind. For life. They're called the "needlessly blind." What a wretched name.

My second reaction was, that's not a surgery — that is a miracle!

A 15-minute surgery that can restore the eyesight of someone who is completely blind is a modern-day, medical miracle.

**So why haven't all of these blind children and adults been helped already?**

This answer is also unbelievable. Today, in developing countries, 20 million children and adults remain blind *solely because they are too poor to afford the $300 miracle surgery that could restore their eyesight*.

So they will remain blind. Forever.

Unless someone helps them.

**You can be that someone.**

That's why we created 20/20/20.

To restore the eyesight of 20 million children and adults.

To give each one of them back not just their vision — but their future.

And a 2nd chance at life that they never thought they'd get. But we can't do it without your help.

WON-EX 9340

Visit our web site at 20x20x20.org to make a secure donation online.

Enclosed is my check payable to 20/20/20. If you prefer, we accept:

( ) MasterCard   ( ) VISA   ( ) American Express   ( ) Discover

Card # _____ CVV# _____ Exp. Date _____

Signature _____

20/20/20 sometimes allows other worthy organizations to mail to our donors. If you do not wish to receive these mailings, or if you would like to change the frequency of mailings from us, let us know. We are happy to respect your wishes. 20/20/20 is a WonderWork charity program. WonderWork is a 501 (c) (3) nonprofit charitable organization recognized by the IRS. All donations are tax deductible in accordance with the law.

**20|20|20**
RESTORING THE EYESIGHT OF
**20 MILLION BLIND CHILDREN AND ADULTS**

P.O. Box 96669
Washington, DC 20090-6669

*20x20x20.org*

---

We're a new charity program and we receive no money from the government or big foundations and corporations.

Every life-changing surgery we provide is paid for with donations from generous individuals like you.

**YOU can make a miracle happen for a blind child or a blind adult.**

**YOU can save someone from a lifetime of blindness.**

**Will you please help us?**

100% of your donation will go towards programs — 0% goes to overhead or fundraising.

The impact of even a modest donation can be enormous.

Imagine what you would pay to save your child from a lifetime of blindness.

Imagine what this surgery means to these children and their parents. It means the world — and it costs so little.

To thank you for helping us, I will send you a photo of a child you helped.

I promise those photos will open your eyes too.

Thanks for helping us help these kids.

Brian Mullaney
Co-Founder

P.S. Would you honor us by becoming a Founding Donor? All it takes is a $300 donation. I'll send you a certificate of appreciation and when we're helping millions of blind children and adults a year, you'll be proud you helped us get started.

P.P.S. 20/20/20 is a WonderWork charity program, which means we share our office space, personnel and computers with other charity programs to keep our overhead expenses very, very low.

WON-EX 9341

# FUCHS
# EXHIBIT 31

| | FY15 | FY16 | | FY17 July 1 - December 28, 2016 | December 29, 2016 - March 31, 2017 |
|---|---|---|---|---|---|
| | Jul 2014 - Jun 2015 | Jul 2015 - Jun 2016 | | | |
| | | 2,000,000.00 heather | | | |
| 4000 Donations-WonderWork | 3,958,954.50 | 2,596,583.38 | | 1,432,335.54 | 1,178,724.74 resticed | 362,025.66 |
| 4010 Blindness (N) | 6,342,598.27 | 4,231,132.32 | | 1,790,842.32 | 1,015,340.08 |
| 4020 Burns (B) | 911,989.44 | 536,014.64 | | 259,434.77 | 115,815.26 |
| 4030 Clubfoot (C) | 1,182,729.30 | 697,154.04 | | 395,774.09 | 140,627.50 |
| kolich | | | | | |
| database | | 400,000.00 | | | $ 1,633,808.50 |
| | $ 12,396,269.51 | $ 10,460,884.38 | $ - | $ 3,878,386.72 | $ 1,221,169.49 |

WW restricted per CLM less database  $ 1,868,420.28  2,319,195.28  less 400k

2,319,195.28 WW restricted per CLM less database $ 49,775.00

including unclassified" $49,775   $ 1,921,195.28

less 12/29-31 $  $13,275
$ 1,207,894.49

$1,207,894.49, less $29,169.75 comprised of all donations (restricted or unrestricted) below $500 =   1,178,724.74

also including $2000 ████████ )

| | FY15 | FY16 | | | | | | FY17  07/01/16-12/28/16 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Restricted Net Assets at 6/30/15 | Donations FY16 | Total Restricted Addtions | Program Expenses | Direct Mail Allocation | Time Release | Total Expenses | Restricted Net Assets at 6/30/16 | Donations FY17 07/01/16/12/28/16 | Total Restricted Addtions | Program Expenses | Direct Mail Allocation | Total Expenses | Restricted Net Assets at 12/28/16 |
| 4000 Donations-WonderWork | 1,921,195 | 1,921,195 | 1,921,195 | 4,800 | 18,775 | | 23,375 | 1,897,820 | 1,178,725 | 3,076,545 | | 3,208 | 3,208 | 3,073,337 |
| 4010 Blindness (N) | 1,093,040 | 4,231,132 | 5,324,173 | 1,794,800 | 1,182,640 | | 2,977,440 | 2,346,733 | 1,790,842 | 4,137,575 | 960,000 | 138,821 | 1,098,821 | 3,038,754 |
| 4020 Burns (B) | 1,334,093 | 536,015 | 1,870,108 | 71,700 | 31,314 | | 103,014 | 1,767,094 | 259,435 | 2,026,529 | 30,000 | 16,744 | 46,744 | 1,979,785 |
| 4030 Clubfoot (C) | 1,900,380 | 697,154 | 2,597,534 | 212,500 | 31,296 | | 243,796 | 2,353,737 | 395,774 | 2,749,511 | 30,000 | 16,591 | 46,591 | 2,702,920 |
| Medical records database | 0 | 400,000 | 400,000 | 11,000 | 0 | | 11,000 | 389,000 | | 389,000 | 15,000 | | 15,000 | 374,000 |
| Time ████ gift over 5/10 years | 169,541 | | 169,541 | 0 | 0 | 169,541 | 169,541 | 0 | | 0 | | | 0 | 0 |
| Restricted donations remaining | 4,497,054 | 7,785,496 | 12,282,550 | 2,094,600 | 1,264,026 | 169,541 | 3,528,167 | 8,754,384 | 3,624,776 | 12,379,160 | 1,035,000 | 175,364 | 1,210,364 | 11,168,796 |

EXHIBIT 31
WIT: Fuchs
DATE: 8-15-17
DEBRA STEVENS, RPR, CRR

FUCHS

EXHIBIT 32

January XX, 2014



## PROPOSAL FOR USE OF PROCEEDS
### PURSUANT TO LOAN AGREEMENT BY AND BETWEEN
THE ████████████████████████ AND WONDERWORK

### Use of Proceeds
80% of Total Loan ($800,000) to be used
to help pay for surgeries and treatment during term of Loan.

### Proposed Breakout by Program:

| Program | Amount | Surgeries |
|---|---|---|
| Blindness | $ 600,000 | 17,143 |
| Burns | $ 100,000 | 333 |
| Clubfoot | $ 100,000 | 400 |
| **Total** | **$ 800,000** | **17,876** |

Progress reports to be provided every 12 months per Loan Agreement.

Below are WonderWork's Partners and the countries in which they operate:

#### Our Worldwide Partners



#### Countries Where Our Partners Operate

| | | | |
|---|---|---|---|
| Afghanistan | Dominican Rep. | Madagascar | Sierra Leone |
| Antigua | Ecuador | Malawi | Somalia |
| Bangladesh | Ethiopia | Mali | South Sudan |
| Belize | Gambia | Mauritius | Sri Lanka |
| Benin | Ghana | Mozambique | St. Lucia |
| Bolivia | Guatemala | Myanmar | Sudan |
| Botswana | Guinea | Nepal | Tanzania |
| Burundi | Guyana | Nicaragua | Thailand |
| Cambodia | Haiti | Niger | Togo |
| Cameroon | Honduras | Nigeria | Uganda |
| Chad | India | Pakistan | Ukraine |
| China | Indonesia | Peru | Vietnam |
| Colombia | Kenya | Philippines | Zambia |
| Congo, Dem Rep | Laos | Rwanda | Zimbabwe |
| | Liberia | Senegal | |



EXHIBIT 52
WIT: Fuchs
DATE: 8-15-17
DEBRA STEVENS, RPR, CRR

CONFIDENTIAL

FUCHS

EXHIBIT 33

**From:** "Hana Fuchs"
**Subject:** RE: Following up on our meeting
**Sent:** Mon, 18 May 2015 18:16:33 -0400
<u>image001.png</u>
<u>image002.png</u>

**From:** Hana Fuchs
**Sent:** Monday, May 18, 2015 2:17 PM
**To:** Brian Mullaney
**Subject:** RE: Following up on our meeting

Also these numbers include your $250k loan which is not on the books.

---

**From:** Hana Fuchs
**Sent:** Monday, May 18, 2015 1:58 PM
**To:** Brian Mullaney
**Cc:** DeLois Greenwood
**Subject:** RE: Following up on our meeting

My numbers are purely the loans we received – Karen's numbers includes the donations as a result of the ask letter and a few others
I will get these numbers

---

**From:** Brian Mullaney
**Sent:** Monday, May 18, 2015 1:57 PM
**To:** Hana Fuchs
**Cc:** DeLois Greenwood
**Subject:** Re: Following up on our meeting

Ok.
Why are the Numbers are different than our board presentations?
Different than our presentations to ████████?
B.


**Brian Mullaney**
Co-Founder/CEO

WonderWork
420 Fifth Avenue, 27th Floor
New York, NY 10018
tel: 212.729.1855
cell: 917.902.7550
email: <u>brian@wonderwork.org</u>
<u>www.WonderWork.org</u>


<u>Watch two blind sisters see their mom for the first time!</u>
Almost 3,000,000 people have watched this heart-warming video over the past few months!


Miracle surgeries for children
wonder work

EXHIBIT _33_
WIT: _____
DATE: _____
DEBRA STEVENS, RPR, CRR

**TIME** magazine named WonderWork "One of 10 Ideas That Can Change The World."

---

**From:** Hana Fuchs
**Date:** Monday, May 18, 2015 at 1:55 PM
**To:** brian mullaney
**Cc:** DeLois Greenwood

WW_EMAILS0011581

**Subject:** RE: Following up on our meeting

*Regarding the loans - this is how it was reported in the audited finaicials and I think that is what she was referring to in the question-h*

**From:** Brian Mullaney
**Sent:** Monday, May 18, 2015 1:51 PM
**To:** Hana Fuchs
**Cc:** DeLois Greenwood
**Subject:** Re: Following up on our meeting

My comments below....

**Brian Mullaney**
Co-Founder/CEO

WonderWork
420 Fifth Avenue, 27th Floor
New York, NY 10018
tel: 212.729.1855
cell: 917.902.7550
email: brian@wonderwork.org
www.WonderWork.org

Watch two blind sisters see their mom for the first time!
Almost 3,000,000 people have watched this heart-warming video over the past few months!



**TIME** magazine named WonderWork "One of 10 Ideas That Can Change The World."

**From:** Hana Fuchs
**Date:** Monday, May 18, 2015 at 1:45 PM
**To:** brian mullaney
**Cc:** DeLois Greenwood
**Subject:** FW: Following up on our meeting

Please see my responses before you/I reply to Anne-
Let me know if you need any changes.

**From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Monday, May 18, 2015 12:52 PM
**To:** Hana Fuchs; DeLois Greenwood; Brian Mullaney
**Subject:** Following up on our meeting

Dear Brian, DeLois, and Hana:

Thanks again for making the time to meet with me on Friday May 8th. I'm writing to let you know that I am scheduled to speak with JJ Coneys tomorrow and also wondered if you could confirm a few of the notes that I took while I was with you two Fridays ago? I've addressed each question to the person whom I think is best positioned to answer, in the hope that this will reduce the amount of time needed for you to spend on my questions. I hope that is helpful.

**Brian and DeLois –**
  1. Both of you mentioned that the need for cleft palate surgery worldwide has decreased. Compared to the needs of club

VW_EMAILS0011581

foot (3MM), burns (15MM), cataracts (10MM), what is the need of cleft palate today? The numbers above are based on my notes; please let me know if they are accurate!

2. I have in my notes that you have either 200K or 240K small donors. Could you please confirm how many small donors you have (and what threshold defines small), and how many major donors you have? Is it correct to assume that the major donors are covering Wonder Work's general operating costs?

3. Have you changed the by-laws to three terms maximum or are you planning on doing so in the near future? If not already, when do you plan on doing so? If at all possible, may I share the newest female addition to the board? What is her name?

### DeLois –
1. Thank you for walking me through Wonder Work's due diligence and vetting process of doctors and hospitals. Could you please confirm how many (or approximately how many) doctors/hospitals you review per year and what your target number is to grow the network annually?

### Hana –
2. Could you please provide the general loan terms for me so I can share them with ██████? To confirm, you raised $10MM in loans and as a result, $2MM in private donations, correct?**Please see below-**

### General Terms of Loans
Payable in whole or in part upon maturity of 5 years.
Pre-payable by WonderWork at any time in whole or in part without penalty.
Foundation may consider forgiveness of some or all of the unpaid principal and accrued interest .
Simple interest shall accrue on the outstanding principal balance at the rate of 2% per annum.
Wonderwork shall maintain positive assets in excess of $1.5 million.
Maintain KPMG as auditors.


THESE NUMBERS DO NOT INCLUDE RELATED DONATIONS FROM IMPACT LOAN APPEAL. TOTAL LOAN WAS $9,950,000 WASN'T IT? IT WAS ALL FROM INDIVIDUALS – NOT FOUNDATIONS – THEY SIMPLY MADE THE KOANS THROUGH PERSONA FOUNDATIONS *this is how it was reported in the audit-I think that is what she was referring to in  he question-*

### How much was raised:
Total raised $9,700,000
Total raised from foundations $9,450,000
Total raised from individuals $250,000

3. Lastly, in the most recent 990, you stated that you have $7.755 MM in office expenses. In general terms, what did you categorize as programmatic expenses? I GUESS THIS IS OKAY.

According to the explanation of this line item in the 990 (by KPMG), this expense line includes all marketing printing, publications, and postage expenses in addition to office expenses. These expenses are split between public education (programmatic) and fundraising. According to the method used for this allocation, each marketing piece was reviewed to insure that it contained public education and public interaction. KPMG tested each piece and determined that we could allocate 48% of our marketing materials to programs/public education and 52% to fundraising.

Thanks so much for all of your help. Best,
Anne





# FUCHS
# EXHIBIT 34

**From:** "Hana Fuchs"
**Subject:** RE: Brian Mullaney
**Sent:** Mon, 9 Mar 2015 21:40:41 -0400
image002.png
image003.png
image004.png

**From:** Hana Fuchs
**Sent:** Monday, March 09, 2015 5:41 PM
**To:** Brian Mullaney
**Subject:** RE: Brian Mullaney

Based on what I have deducted so far for WonderWork, you have given back- I can add more items before I respond.
H

| Date | Amount | |
|---|---|---|
| 8/28/2012 | -3,500.00 | camera |
| | | |
| 1/6/2014 | -22,000.00 | deduct the $22,000 from my impact loan to $228,000. |
| 4/5/2014 | -30,000.00 | about 50% weekly travel FY14, FY15 |
| | -10,000.00 | annual ████ visits |
| | -38,000.00 | additional contribution |
| | **-100,000.00** | |
| | | |
| 10/1/2014 | -1,000.00 | per email 10/1/14 |
| | | |
| 10/21/2014 | -50,000.00 | 10/21/14 e-mail |
| | | |
| 1/8/15 email | -2,274.09 | holiday dinner |
| | | |
| 2/9/2015 | -1,300.00 | MAB dinner |
| | | |
| | x | did not deduct photoshop lessons yet |
| | | |
| | x | did not deduct expenses for writer on India trip awaiting confirmation and amount |
| 2/23/2015 | x | did not deduct Greg S legal bills yet - awaiting discussion |
| | **-158,074.09** | |

**From:** Brian Mullaney
**Sent:** Monday, March 09, 2015 5:10 PM
**To:** Hana Fuchs
**Subject:** Re: Brian Mullaney

Yes, you can tell her about me giving back money.

It is more than $100,000 isn't it with all the small stuff, hotels, 4 seasons, xmas party, photohsop lessons. Etc.

B.

Ps. . I found the spreadsheet you gave me for Smile Train money I gave back and it was $400,000....

EXHIBIT __34__
WIT: _____
DATE: _____
DEBRA STEVENS, RPR, CRR

WW_EMAILS0011330

**Brian Mullaney**
Co-Founder/CEO

WonderWork
420 Fifth Avenue, 27th Floor
New York, NY 10018
tel: 212.729.1855
cell: 917.902.7550
email: brian@wonderwork.org
www.WonderWork.org

Watch two blind sisters see their mom for the first time!
More than 2,100,000 people have watched this heart-warming video over the past few weeks!



**TIME** magazine named WonderWork "One of 10 Ideas That Can Change The World."

---

**From:** Hana Fuchs
**Date:** Monday, March 9, 2015 at 2:57 PM
**To:** brian mullaney
**Subject:** FW: Brian Mullaney

Hi Brian,
I will respond that your base pay is $475k per year and for the past two years, at the end of our Fiscal Year, (June 30th ) our board has voted a bonus of $250k.
Let me know if you would like me to say anything else regarding giving back $100k.
Thanks Hana

---

**From:** Parnagian, Lisa [mailto:Lisa.Parnagian@bnymellon.com]
**Sent:** Monday, March 09, 2015 2:51 PM
**To:** Hana Fuchs
**Cc:** Brian Mullaney
**Subject:** Brian Mullaney

Dear Hana,

Thank you for your letter last month with respect to Brian Mullaney and back pay owed to him as of February 2015.

I am hoping you may be able to assist with information pertaining to Brian's current base pay and the cash bonus he's received for the last couple of years. From the recent paystub that Brian provided to me it appears that he salary is currently $600k (pay periods appear to be monthly and the amount is $50k per pay period).

When I submit Brian's paperwork to my underwriter, I am hoping I can provide clear information about whether the paystub is strictly base salary or perhaps bonus earnings are also included. To clarify the numbers for my underwriter, would it be possible for you to draft a letter that confirms Brian's current base salary and also confirms the amount of the cash portion of his bonus for 2013 and 2014? This would be the cash bonus that is paid out to Brian annually — as opposed to a deferred bonus.

Let me know if you can help me with this.

Best,
Lisa

WW_EMAILS0011330



**BNY Mellon**

**Lisa Parnagian**
VP – Mortgage Banking Officer
One Pershing Plaza, 5th Fl, Jersey City, NJ 07302
**Phone:** 201.413.2598 **Cell:** 201.978.1209 **Fax:** 724.540.3161
**Conf. Line:** 855.435.1784 **Passcode:** 572501
**Email:** lisa.parnagian@bnymellon.com
**AIM:** 07D-0509
**NMLS ID#** 42216

**Boston Based Mortgage Support Team:**
Nicholas Syme: nicholas.syme@bnymellon.com
Mollie Ring: mollie.ring@bnymellon.com
Heather Chisholm: heather.chisholm@bnymellon.com

The information contained in this e-mail, and any attachment, is confidential and is intended solely for the use of the intended recipient. Access, copying or re-use of the e-mail or any attachment, or any information contained therein, by any other person is not authorized. If you are not the intended recipient please return the e-mail to the sender and delete it from your computer. Although we attempt to sweep e-mail and attachments for viruses, we do not guarantee that either are virus-free and accept no liability for any damage sustained as a result of viruses.

Please refer to http://disclaimer.bnymellon.com/eu.htm for certain disclosures relating to European legal entities.

# FUCHS
# EXHIBIT 35

# EMPLOYMENT AGREEMENT
## BETWEEN
## WONDERWORK, INC.
## AND
## BRIAN MULLANEY

This Employment Agreement (this "Agreement") is entered into by and between the **WONDERWORK, INC.**, a Delaware non-profit corporation, with its principal place of business located in New York, NY ("WWI"), and **Brian Mullaney,** an individual resident of Belmont, MA ("Mullaney").

## RECITALS

The parties enter into this Agreement on the basis that WWI wishes to employ Mullaney as WWI's Chief Executive Officer, and Mullaney desires to be employed by WWI to serve as its Chief Executive Officer under the terms of this Agreement and at the pleasure of the Board of Directors of WWI.

NOW, THEREFORE, in consideration of these Recitals, which are incorporated in this Agreement by this reference, and the following mutual promises and intending to be legally bound hereby, and for other good and valuable consideration, the receipt and adequacy of which are acknowledged, the parties agree as follows.

## AGREEMENT

1.     **Employment.** As of January 1, 2016 WWI hereby employs Mullaney for a period of 5 years, through December 31, 2021, and Mullaney hereby accepts employment with WWI, upon the terms and conditions of this Agreement.

2.     **Duties, Responsibilities, and Authority.**

    **(a)**     <u>Duties</u>: Mullaney is hereby employed under the terms of this Agreement to perform the duties of Chief Executive Officer as further described herein and as may be required by the Board of Directors of WWI from time to time (the "Board"). The Chief Executive Officer shall report directly to the Board of Directors. The Chief Executive Officer job description is set forth in Attachment A to this Agreement. Mullaney's job description may be reasonably modified at the discretion of the Board of Directors of WWI, without the need to make a corresponding change to this Agreement. Mullaney agrees to devote his full time and best efforts to the performance of his duties to WWI.

    **(c)**     <u>Other Activities</u>: The foregoing shall not be construed to prohibit Mullaney from engaging in activities relating to serving on civic and charitable boards or committees, and managing his personal investments, provided that such activities do not significantly interfere or conflict with the performance by Mullaney of his duties, responsibilities, or authorities hereunder.

1

EXHIBIT _35_
WIT: _Fuchs_
DATE: _____
DEBRA STEVENS, RPR, CRR

WON 01237

**3.**     <u>Compensation</u>.  In consideration of the services to be rendered by Mullaney for the benefit of WWI, Mullaney shall receive from WWI:

    **(a)**     <u>Salary</u>: As compensation for the services provided by Mullaney hereunder, WWI shall pay Mullaney a gross annualized salary for the period of this Agreement of four hundred seventy-five thousand dollars and no cents ($475,000.00) payable in equal semi-monthly installments less deductions required by law or as otherwise agreed to by Mullaney.  In addition thereto, Mullaney shall be entitled to additional compensation of an annual bonus of up to two hundred fifty thousand dollars and no cents ($250,000.00) per annum, at the discretion of the Board of Directors. Compensation shall be reviewed annually by the Board of Directors in connection with an annual review of Mullaney's performance and may be revised in the sole discretion of the Board of Directors.

    **(b)**     <u>Vacation</u>.  Mullaney shall receive no less than 4 weeks paid vacation each year.

    **(c)**     <u>Tax Withholding</u>.  All compensation payments will be made subject to applicable state, local, and federal withholding and payroll tax requirements.

    **(d)**     <u>Salary Review</u>.  In determining and approving Mullaney's salary, the Board of Directors reviewed appropriate, comparable data for persons serving tax-exempt, nonprofit organizations in the capacity of Executive Director.  The Board of Directors shall commission or otherwise conduct further salary reviews should the terms of Mullaney's employment change, including any proposed, significant changes in his salary.  Mullaney's salary may be confirmed or adjusted after such review, depending upon any changes in circumstances that may impact any previous determination by the Board of Directors that the salary stated herein, or any proposed changes in that salary, is reasonable.

**4.**     <u>Employee Benefits and Perquisites</u>.  During the term of his employment, Mullaney shall be entitled to the benefits and perquisites set forth on Attachment B hereto, in addition to the standard benefits otherwise available to employees of WWI, set forth on Attachment C. Mullaney shall participate in WWI's Section 403(b) program with the same contributions and benefits available to other WWI employees pursuant to the terms of the Plan Document, as per Attachment B.  WWI also agrees to pay for Mullaney's continuing education expenses and professional nonprofit association membership dues reasonably related to the performance of his duties and responsibilities.

**5.**     <u>Facilities</u>.  WWI shall provide and maintain or cause to be provided and maintained, such facilities, equipment, supplies, and assistance as deemed necessary for Mullaney's performance of his duties under this agreement.

**6.**     <u>Termination</u>.  Mullaney's employment hereunder shall commence on the Commencement Date and continue until the occurrence of any of the following:

    **(a)**     <u>Death or Disability</u>: Mullaney's employment shall terminate upon his death or, subject to applicable law, at the option of WWI, in the event of Mullaney's disability, upon written notice from WWI.  Mullaney will be deemed to be "disabled" when he (i) is unable to

2

WON 01238

engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which is expected to result in death or would be expected to last for a continuous period of not less than six (6) consecutive months or (ii) begins to receive income replacement benefits for a period of not less than three (3) months under any accident and health plan by reason of any medically determinable physical or mental impairment which is expected to result in death or would be expected to last for a continuous period of not less than six (6) consecutive months. Mullaney shall cooperate in submitting to a medical examination for the purpose of certifying disability under this Section 6(a) if requested by the Board of Directors or the Executive Committee of WWI.

      **(b)**    For Cause - Immediate Termination. WWI may terminate Mullaney's employment for "Cause" upon written notice by WWI to Mullaney. For purposes of this Agreement, "Cause" for immediate termination shall mean:

          (i)    the Board of Directors or the Executive Committee of WWI reasonably determines that Mullaney has committed any act of fraud, embezzlement, misappropriation, or theft in the course of Mullaney's employment with WWI;

          (ii)    Mullaney has violated any federal, state or local law, ordinance, rule or regulation (other than minor traffic violations or similar offenses) in the course of Mullaney's employment with WWI that the Board of Directors or the Executive Committee of WWI determines in good faith is materially detrimental to WWI's business, reputation, or goodwill;

          (iii)    Mullaney has been convicted by a court of competent jurisdiction of, or pleaded guilty or nolo contendere to, or has been indicted for any felony or any crime involving moral turpitude while employed by WWI; or

          (iv)    Mullaney has unlawfully used or been under the influence of alcohol or drugs or possession of illegal drugs while on the premises of WWI or while performing duties and responsibilities to WWI under this Agreement.

      **(c)**    For Cause – Upon Notice and Mullaney's Failure to Cure. WWI may terminate Mullaney's employment for "Cause" at any time upon thirty (30) days prior written notice to Mullaney, but only if the breach or condition giving rise to the existing "Cause" is not cured within thirty (30) days after Mullaney receives written notice of such breach or condition from WWI. For purposes of this provision, "Cause" for termination shall mean:

          (i)    Mullaney has failed to devote substantially all of his working time to WWI resulting in a material failure to perform his duties and responsibilities, as provided in this Agreement; or

          (ii)    Mullaney has (A) materially breached or failed to perform any material covenant in this Agreement, or (B) intentionally engaged in misconduct that is in violation of WWI's written policies as determined in the reasonable discretion of the Board of Directors or the Executive Committee of WWI.

3

WON 01239

**(d)** <u>Termination by Mullaney for Good Reason</u>. Mullaney may terminate his employment for "Good Reason" at any time upon thirty (30) days prior written notice to WWI, but only if the breach or condition giving rise to the existing "Good Reason" is not cured within thirty (30) days after WWI receives written notice of such breach or condition from Mullaney. For purposes of this Agreement, "<u>Good Reason</u>" shall mean any of the following:

(i)     any failure by WWI to pay the salary or other material compensation or benefits owed to Mullaney under this Agreement; or

(ii)     the assignment to Mullaney, without his consent, of a decrease in authority or responsibilities or a change in duties inconsistent with Mullaney's position as Chief Executive Officer, in each case so as to constitute a material diminution of his status with WWI.

**(e)** <u>Termination by Mullaney Without Good Reason</u>. Mullaney may terminate his employment at any time without Good Reason upon thirty (30) days prior written notice to WWI.

**(f)** <u>Rights and Remedies on Termination</u>.

(i)     Upon the termination of Mullaney's employment pursuant to Section 6(b) (For Cause) or Section 6(e) (Termination by Mullaney without Good Reason) above, or due to Mullaney's death or disability pursuant to Section 6(a) (Death or Disability), Mullaney shall not be entitled to any severance pay and WWI shall be required to pay only for (A) any unpaid salary and benefits due for the period prior and through the date of termination, (B) Mullaney's accrued and unused vacation days through the date of termination and (C) following submission of proper expense reports by Mullaney, reimbursement for all expenses properly incurred in accordance with Section 8 hereof before the date of termination (the items set forth in the foregoing clauses (A), (B) and (C) collectively, the "<u>Accrued Benefits</u>"), and all obligations of WWI to pay salary and other payments to Mullaney hereunder shall terminate effective as of date of termination.

(ii)     If Mullaney's employment hereunder is terminated at any time by mutual agreement of the parties without cause, then Mullaney shall be entitled to receive a severance payment of 18 months salary. In addition, he shall be entitled to reimbursement for any payments actually made by him for health insurance benefits during the period under which Mullaney is eligible for benefits under COBRA (as defined below) in a monthly amount not to exceed the amount that he would otherwise be required to pay under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("<u>COBRA</u>"), if he were to elect to obtain health insurance benefits under COBRA that are substantially equivalent to his health insurance for himself and his dependents (if applicable) in effect immediately prior to the date of onset of such disability (with the understanding that, during such period, Mullaney is free to purchase health insurance under COBRA, to the extent available, or otherwise, or not at all, but that he is entitled only to reimbursement for amounts actually paid by him for health insurance (the "<u>Health Severance</u>"), within the limits stated above, it being understood that if Mullaney enrolls in a subsequent employer's health plan, reimbursements under this Section 6(f)(ii) shall terminate for payment incurred after Mullaney enrolls in the subsequent employer's health plan), and (C) all

4

WON 01240

Accrued Benefits; provided, however, that WWI's obligations under this Section 6(f)(ii) shall terminate immediately upon Mullaney's violation of any provision of Section 6(g) of this Agreement.

(iii) Obligation of Confidentiality. If Mullaney receives severance payment(s) as stipulated above, then Mullaney and WWI shall both be obligated to keep all terms of the severance, and any associated separation agreement entered into by and between the parties, confidential.

(g) Release. Mullaney's right to receive any of the severance payments set forth in Section 6(f) is expressly conditioned upon Mullaney (or Mullaney's estate) executing and delivering to WWI, within thirty (30) days, a written release in such form as WWI shall reasonably determine, and the expiration of the revocation period described therein without such release having been revoked. Mullaney shall not be entitled to any severance or other compensation after termination except as set forth above in this Section 6.

(h) Section 409A. The payments or distributions made under this Agreement are intended to be exempt from Section 409A of the Internal Revenue Code of 1986, as amended, and applicable guidance issued thereunder ("Section 409A") as such payments and distributions are structured to be distributed in the short-term deferral period, as defined under Treasury Regulation Section 1.409A-1(b)(4), or the separation pay exemption, as provided in Treasury Regulation Section 1.409A-1(b)(9). For purposes of Section 6(f)(ii), the phrase "termination of employment," and correlative phrases, mean a "separation from service" as defined in Treasury Regulation Section 1.409A-1(h). For purposes of this Agreement, each payment and installment payment made under this Agreement is hereby designated as a separate payment, and will not collectively be treated as a single payment, as provided in Treasury Regulation Section 1.409A-2(b)(2)(iii). If, however, payments, distributions or reimbursements are determined to be subject to, and not exempt from, Section 409A, then:

(i) For purposes of Section 6(f)(ii), if (A) Mullaney is a "specified employee," as defined in Section 409A, at the time of his separation from service, except due to death, and (B) some or any portion of the amounts payable to Mullaney, if any, when considered together with any other severance payments or separation benefits which may be considered deferred compensation under Section 409A (together, the "Deferred Compensation Separation Benefits") would result in the imposition of additional tax under Section 409A if paid to Mullaney on or within the six (6) month period following the separation from service, then to the extent such portion of the Deferred Compensation Separation Benefits resulting in the imposition of additional tax would otherwise have been payable on or within the first six (6) months following the separation from service, it will instead become payable on the first payroll date that occurs on or after the date six (6) months and one (1) day following the separation from service (or such longer period as is required to avoid the imposition of additional tax under Section 409A). All subsequent Deferred Compensation Separation Benefits, if any, will be payable in accordance with the payment schedule applicable to each payment or benefit.

(ii) Reimbursements shall not affect Mullaney's right to reimbursement of any other such expense in any other taxable year, and any such reimbursement shall be made, if at

5

WON 01241

all, not later than the end of the calendar year following the calendar year in which the expense was incurred, and shall not be subject to liquidation or exchange for any other benefit.

7.    **No Assignments or Delegations**. This Agreement is personal to each party hereto and no party may assign or transfer any of its rights or delegate any of his or its duties under this Agreement in whole or in part without first obtaining the written consent of the other party, which consent shall specifically reference this Agreement and the rights or duties that are the subject of such assignment, transfer, or delegation.

8.    **Binding Effect.** Subject to the provisions of this Agreement relating to transferability, this Agreement shall be binding on, and inure to the benefit of, the parties and their respective heirs, personal and legal representatives, executors, administrators, successors, and assigns.

9.    **Amendments and Modifications**. No amendment, modification, or supplement, including those by custom, usage of trade, or course of dealing, of any provisions of this Agreement shall be binding on either party unless it is in a subsequent writing and signed by both parties at the time of the amendment, modification, or supplement and which specifically references this Agreement and the provisions that are amended, modified, or supplemented. No oral order, objection, claim, or notice by either party to the other shall affect or modify any of the terms or obligations contained in this Agreement.

10.   **Severability of Provisions**. All of the provisions of this Agreement shall be severable. If any provision of this Agreement is found by a court of competent jurisdiction to be unconstitutional, unlawful, or unenforceable, the remaining provisions of this Agreement shall be valid unless the court finds the valid provisions of this Agreement are so essentially and inseparably connected with and so dependent upon the invalid provision(s) that it cannot be presumed that the parties to this Agreement could have included the valid provisions without the invalid provision(s) or unless the court finds that the valid provisions, standing alone, are incapable of being performed in accordance with the intentions of the parties or are contrary to or violate applicable state or federal law.

11.   **Survival**. All provisions of this Agreement which may reasonably be interpreted or construed as surviving the completion, expiration, termination, or cancellation of this Agreement, including without limitation this Section, shall survive the completion, expiration, termination, or cancellation of this Agreement.

12.   **Time of the Essence**. Time is of the essence in respect to all provisions of this Agreement in which a definite time for performance is specified; provided, however, that the foregoing shall not be construed to limit or deprive a party of the benefits of any notice, grace, or cure period provided for in this Agreement.

13.   **Applicable Law: Forum**. This Agreement shall be governed in all respects whether relative to validity, construction, capacity and performance, all claims sounding in tort, or otherwise by the laws of the State of New York excluding New York's conflicts-of-laws rule or principles.

6

WON 01242

## 14. Notice.

**(a)** <u>Notices Generally</u>. Except as provided in Section 14b., below, all notices, demands, and other communications required or contemplated to be given under this Agreement shall be in writing and shall be delivered either by (i) postage prepaid, return receipt requested, registered or certified mail; (ii) FedEx or other reputable, nationally known courier messenger service having a record of receipt; (iii) personal delivery; or (iv) facsimile addressed to the Party or Parties for whom intended at the addresses shown below or such other address as the intended recipient previously shall have designated by written notice from time to time (provided, however, notice of a change of address or facsimile number or e-mail shall be effective only upon receipt):

To Mullaney:

Brian Mullaney
1 Sumner Lane
Belmont, MA 02478

To WonderWork, Inc.

WonderWork
420 5th avenue
New York, New York 10018

Each party shall make an ordinary, good faith effort to ensure that such party will accept or receive notices that are given in accordance with this Section, and that any party to be given notice actually receives such notice. All such notices and other communications shall be deemed to have been rendered or given (i) if sent by postage prepaid, return receipt requested, registered or certified mail, on the date it is officially recorded as delivered to or refused by the intended recipient by return receipt or equivalent, and, in the absence of such record of delivery, the effective date shall be presumed to have been the seventh (7th) day after the date when it shall have been deposited in the mail; (ii) if sent by FedEx or other reputable, nationally known courier messenger service having a record of receipt, on the date it is officially recorded by the messenger service carrier as delivered to or refused by the intended recipient; (iii) if personally delivered, upon receipt; or (iv) if by facsimile, one (1) hour after its transmission, if such time is during the business hours in the place of its receipt or, if it is not, on the opening of business on the next succeeding day in the place of receipt, provided that receipt is electronically confirmed and verified by telephone. Notwithstanding the prescribed method of delivery set forth above, actual receipt of written notice by the natural person designated above shall constitute notice given in accordance with this Agreement on the date received, unless deemed earlier given pursuant to the foregoing paragraph.

<u>Electronic Communications</u>. Notices and other communications to a party may also be delivered or furnished by electronic communication by way of the foregoing e-mail addresses. Notices and other communications sent to an e-mail address shall be deemed received upon the sender's

7

WON 01243

receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail, or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient.

**15.** **Section Headings.** Section headings used in this Agreement are included solely for convenience and shall not effect or be used in connection with the interpretation of this Agreement.

**16.** **Entire Agreement.** The terms of this Agreement (including Attachments A and B hereto, all of which are incorporated in full into this Agreement by this reference) are intended by the parties as a final expression of their agreement with respect to such terms as are included in this Agreement and may not be contradicted by evidence of any prior or contemporaneous agreement. The parties further intend that this Agreement constitutes the complete and exclusive statement of its terms and no extrinsic evidence whatsoever may be introduced in any judicial proceeding, if any, involving this Agreement. The language in all parts of this Agreement will in all cases be construed as a whole and in accordance with its fair meaning and not construed for or against either party.

**17.** **Independent Counsel.** The parties represent and agree that: (a) they have read and reviewed (or had the opportunity to read and review) this Agreement; (b) they fully understand their right to discuss this Agreement with an attorney of their own choosing, and that to the extent the parties so desired, they have availed themselves of this opportunity; (c) they are voluntarily entering into this Agreement upon the advice of counsel with full understanding of its legal consequences; and (d) they agree that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not apply to the interpretation of this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement effective as of the Commencement Date of this Agreement.

**WonderWork, Inc.**                                      **Brian Mullaney**

By: _____          By: _____
    JJ Coneys, Lead Director                              Brian Mullaney

8

WON 01244

```
┌─────────────────────────────────────────────┐
│                ATTACHMENT A                   │
│                     to                        │
│           EMPLOYMENT AGREEMENT                │
│      By and Between WonderWork, Inc.          │
│             and Brian Mullaney                │
│           Executive Director Duties           │
│         as of the Commencement Date           │
│                    and                        │
│             WonderWork, Inc.                  │
│            Position Description               │
│           Chief Executive Officer             │
└─────────────────────────────────────────────┘
```

## OVERALL FUNCTIONS

The Chief Executive Officer of WonderWork, Inc. (WWI) is expected to provide leadership and strategic vision with the goal of maximizing WWI's impact on its fundamental mission of providing free surgeries for indigent children and adults living in developing countries and raising awareness about the need to help these patients. Integral components include outreach to those individuals and groups whose understanding of WWI will result in their participation and contribution to our success, and management of WWI's headquarters, including management and oversight of all WWI employees and personnel and fundraising.

## NATURE AND SCOPE OF JOB

**Status:**       Full Time, exempt, executive employment level
**Reports to:**   Board of Directors
**Position Updated:**   January, 2016

## PRINCIPAL DUTIES AND FUNCTIONS

1. RESPONSIBILITIES

   Personnel Management:

   - Ensure the office is in compliance with WWI's mission, values, and standards.
   - Oversees CFO in terms of budgeting and the financial management of projects, travel, and expenses.
   - Recruit, train, oversee, and manage all employees and personnel.
   - Determines compensation and bonuses for staff.
   - Perform annual appraisals/evaluations of Operations Director, Communications Director, Program Director and other staff. Assist and ensure employees have set appropriate goals in conjunction with the mission of WWI.

9

WON 01245

- Reviews and approves all revisions of the personnel policy manual and job descriptions prior to Board of Director's approval.
- Promote a team building and inter-office cooperative atmosphere to ensure a positive work environment.
- Demote, terminate or assist in terminating staff not performing and meeting office requirements.

Administrative Management:

- Assures that questions and requests from donors, including letters, emails, and phone calls, are answered in a timely manner.
- Prepare Board Meeting agendas with the Board Chairperson.
- Maintain regular communications with the Board of Directors including at least weekly contact with the Board Chair.
- Coordinate or assist in coordinating legal issues with WWI's attorney.

Financial Management:

- Oversees and assists the CFO and Operations Director with the development of WWI's annual operation and capital budgets.
- Provide recommendations for adjustments to the budget to the Board of Directors.
- Reviews monthly financial statements for accuracy and completeness and transits or coordinates the transmittal of same to the Board of Directors or Finance Committee.
- Works with the Finance Committee or Investment Committee to develop and maintain investment policies for WWI.

Public Relations Management/Development:

- Oversees all public relations for WWI.
- Acts as primary spokesperson for media outlets.
- Responsible for traveling to attend fundraising and speaking events, providing education and fundraising activities related to WWI.
- Oversees all advertising for WWI, including all advertisements in newspapers and magazines; all interviews for television and radio stations; and all printed materials for outreach publications.
- Oversees the maintenance and development of donor/patron relations.
- Oversees and approves the Website development.
- Maintenance and development of donor/patron relations, including collaboration with other charitable or non-governmental organizations engaging in activities similar to, or consistent with, the activities of WWI.

Serve as member of WWI Board of Directors:
- Serve at the pleasure of the Board of Directors and work with the Board of Directors in developing budgets and strategic planning.

10

WON 01246

- Attend all meetings of the Board of Directors.
- Attend Committee meetings at the request of any Committee.
- Responsible for proper communication with Board of Directors on operational and administrative matters, including any incidents, changes of circumstances, or other important matters that should be presented to the Board of Directors.

*        *        *

WON 01247

**ATTACHMENT B**
**to**
**EMPLOYMENT AGREEMENT**
**By and Between WonderWork, Inc.**
**and Brian Mullaney**

**Benefits and Perquisites of Employment**

1.  Use of WWI owned cell phone and electronic data service pursuant to WWI policy.

2.  Sick leave, jury duty leave, bereavement leave and paid holidays to be provided to equal those provided to other WWI employees pursuant to the Personnel Policy Manual.

3.  Standard employee medical, dental, vision, and long-term disability insurance commensurate with benefits provided to other WWI employees.

4.  Participation in WWI's Section 403(b) program with those contributions and benefits available to other WWI employees pursuant to the terms of the Plan Document.

5.  Payment of premiums on approved life insurance policies, and such other perquisites as approved by the Board of Directors from time to time as designated by resolution of the Board.

6.  Spousal travel allowance. Mullaney is allowed to bring his wife to major donor events, visits and on program trips overseas.

*       *       *

12

WON 01248

FUCHS

EXHIBIT 36

**From:** "Brian Mullaney"
**Subject:** Re: Weekly Financial Summary August 02, 2016
**Sent:** Wed, 3 Aug 2016 13:51:17 -0400

image001.png
image002.png
image003.png

**From:** Brian Mullaney [brian@wonderwork.org]
**Sent:** Wednesday, August 03, 2016 9:51 AM
**To:** Hana Fuchs
**Subject:** Re: Weekly Financial Summary August 02, 2016

Thanks.
How much do we pay Angie and what are the total costs including healthcare, etc. for her?
I am worried we have nothing for her to do and the plan t have her raise money through phone calls is not working.

I want to make a donation of my salary to WonderWork. Please send me latest spreadsheet with my taking a large chunk and also being given a bonus so I can decide how much.

Finally, want to conform that you bumbed Delois up to $180,000 a year

Thanks
B


p.s. How do you like working 2.5 days a week? Is it working out okay?


**Brian Mullaney**
Co-Founder/CEO

WonderWork
411Fifth Avenue, Suite 702 **NEW ADDRESS!**
New York, NY  10016
tel: 212.729.1855
cell: 917.902.7550
email: brian@wonderwork.org
www.WonderWork.org

Watch two blind sisters see their mom for the first time!
More than 11,000,000 people have watched this heart-warming video so far. It was the #1 watched video on the National Geographic website for more than a year.


Miracle surgeries for children
wonder work

EXHIBIT ___36___
WIT: _____
DATE: _____
DEBRA STEVENS, RPR, CRR

**TIME** magazine named WonderWork "One of 10 Ideas That Can Change The World."

**From:** Hana Fuchs <hana@wonderwork.org>
**Date:** Tuesday, August 2, 2016 at 5:23 PM
**To:** brian mullaney <brian@wonderwork.org>
**Cc:** DeLois Greenwood <delois@wonderwork.org>
**Subject:** Weekly Financial Summary August 02, 2016

Hi Brian,
Please find the weekly financial summary for FY17 as of today.

WW_EMAILS0038117

Let me know if you have any questions.
Awaiting receipt of ████████ $250k (they requested confirmation of banking info).
Glad ████████ visit was so successful – sorry about your fever.
Regards, Hana

## FY17 Expenses Unallocated

### FY17 Profit & Loss
### July 01, 2016 - August 02, 2016

### FY17 Balance Sheet
### As of August 02, 2016

| SUPPORT AND REVENUE | | | ASSETS | | |
|---|---|---|---|---|---|
| Major Gifts | $ | 80,213 | Cash and cash equivalents | $ | |
| 20/20/20 | | 243,114 | Investment of impact loans | | 9 |
| Burn Rescue | | 31,110 | Other investments | | 8 |
| 1st Step | | 36,332 | Accounts receivable | | 5 |
| Total mass marketing revenue | $ | 310,556 | Other assets | | |
| Total donor revenue | $ | 390,770 | Prepaid expenses and other assets | | |
| In-kind contributions | | - | Furniture and equipment, net | | |
| Investment & misc. income | | 512,042 | **TOTAL ASSETS** | $ | 24 |
| Total revenue | $ | 902,811 | | | |

| EXPENSES | | | LIABILITIES AND NET ASSETS | | |
|---|---|---|---|---|---|
| Program | $ | - | Liabilities | | |
| In-kind program contributions | | - | Accounts payable and accrued expenses | $ | |
| Total program expenses | $ | - | Other current liabilities (impact loans) | | 9 |
| Salaries and benefits | | 90,537 | Total liabilities | $ | 10 |
| Professional fees | | 18,750 | | | |
| Rent | | 15,803 | Net assets | | |
| Office expenses | | 9,907 | Net assets end of last year | $ | 13 |
| Marketing | | 68,497 | Net income | | |
| Depreciation expense | | - | Total net assets | $ | 14 |
| Impact loan interest expense | | - | | | |
| Travel, other | | 6,079 | | | |
| Total expenses | $ | 209,574 | **TOTAL LIABILITIES AND NET ASSETS** | $ | 24 |

| **NET INCOME** | **$** | **693,238** |
|---|---|---|

**Hana Fuchs**
Chief Financial Officer
WonderWork

<u>Watch two blind sisters see their mom for the first time!</u>
More than 10,000,000 people have watched this heart-warming video so far. It was the #1 watched video on the National Geographic

website for more than a year.

411 Fifth Avenue, Suite 702 **NEW ADDRESS!**
New York, NY  10016
tel: 212.729.1855 ext. 103
email: <u>hana@wonderwork.org</u>
<u>www.WonderWork.org</u>



**TIME magazine named WonderWork "One of 10 Ideas That Can Change The World."**

VW_EMAILS0038117