TOGUT, SEGAL & SEGAL LLP
One Penn Plaza
Suite 3335
New York, New York 10119
(212) 594-5000
Albert Togut
Scott E. Ratner

*Counsel to Stephen S. Gray,*
*not individually, but solely in*
*his capacity as Chapter 11 Trustee*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

```
--------------------------------------------------------x
                                    :  Chapter 11
In re:                              :
                                    :
     WONDERWORK, INC.               :  Case No.: 16-13607 (MKV)
                                    :
                    Debtor.         :
                                    :
--------------------------------------------------------x
```

## AMENDED DISCLOSURE STATEMENT RELATING
## TO THE AMENDED CHAPTER 11 PLAN OF LIQUIDATION
## FOR THE BANKRUPTCY ESTATE OF WONDERWORK, INC. AS
## PROPOSED BY THE CHAPTER 11 TRUSTEE, DATED AUGUST 8, 2018

## TABLE OF CONTENTS

I.    INTRODUCTION AND SUMMARY ................................................................................. 1

    A.    Executive Overview ................................................................................................ 1

    B.    Overview of Chapter 11 ......................................................................................... 1

    C.    Summary of Classification and Treatment Under the Plan .................................... 2

    D.    Voting Procedures .................................................................................................. 4

    E.    Litigation Trust Election ........................................................................................ 6

    F.    Withdrawal of Ballots ............................................................................................ 7

    G.    Confirmation ........................................................................................................... 7

    H.    Best Interest Test and Liquidation Analysis .......................................................... 8

    I.    The Plan Must Be Feasible ..................................................................................... 9

II.    GENERAL INFORMATION REGARDING THE DEBTOR ......................................... 9

    A.    The Debtor's Organizational Structure and History ............................................... 9

    B.    Capital Structure and Debtor's Pre-Petition Indebtedness ................................... 10

III.    EVENTS LEADING TO CHAPTER 11 FILING ........................................................ 11

IV.    THE CHAPTER 11 CASE ............................................................................................ 11

    A.    PRE-TRUSTEE APPOINTMENT CASE ACTIVITY ....................................... 11

    B.    POST-TRUSTEE APPOINTMENT CASE ACTIVITY ..................................... 16

V.    COMPROMISES AND TRANSACTIONS
    CONTEMPLATED UNDER THE PLAN .................................................................... 21

VI.    OVERVIEW OF THE PLAN ........................................................................................ 24

    A.    Treatment of Claims Under the Plan .................................................................... 25

    B.    Plan Settlements as a Means of Implementing the Plan ....................................... 29

    C.    Distributions and Voting Under the Plan .............................................................. 33

    D.    Executory Contracts and Unexpired Leases ......................................................... 36

    E.    Provisions for Resolving Disputed Claims ........................................................... 37

F.    The Litigation Trust ................................................................................... 39

G.    Conditions Precedent ............................................................................... 44

Section 1.1.    Waiver of Conditions .................................................................... 45

H.    Modifications, Revocation or Withdrawal of the Plan ............................. 46

I.    Retention of Jurisdiction ......................................................................... 46

J.    Discharge;  Injunctive Provisions;  Exculpation and Releases ................ 48

K.    Miscellaneous Provisions ........................................................................ 52

VII.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ..... 54

A.    U.S. Federal Income Tax Consequences to the Debtor. ........................... 55

B.    U.S. Federal Income Tax Consequences to Holders of Class III and IV Claims .... 55

C.    Withholding and Reporting. ...................................................................... 56

VIII.    RISK FACTORS ........................................................................................ 56

A.    Certain Bankruptcy Related Considerations ........................................... 57

IX.    ALTERNATIVES TO THE PLAN AND CONSEQUENCES OF REJECTION ........ 58

A.    Alternative Plans ..................................................................................... 58

B.    Chapter 7 Liquidation ............................................................................. 58

X.    RECOMMENDATION AND CONCLUSION ............................................... 59

# I.   INTRODUCTION AND SUMMARY

## A.   Executive Overview

STEPHEN S. GRAY, not individually but solely in his capacity as Chapter 11 trustee (the "Trustee") of the estate (the "Estate") of WonderWork, Inc. (the "Debtor"), filed his amended Chapter 11 plan with the Bankruptcy Court on August 8, 2018 (the "Plan"). A copy of the Plan is attached as **Exhibit A** to this Disclosure Statement. The Trustee is the proponent of the Plan and is now seeking to solicit the votes of certain creditors in favor of the Plan. This Disclosure Statement contains information, including a description of the terms of the Plan, to enable creditors to make an informed decision in voting on the Plan. Capitalized terms not otherwise defined herein shall have the meaning given to such terms in the Plan.

The Plan is a product of certain consensual discussions among the Trustee, the NYSAG, pre-appointment Professional Persons and other major claimholders in the case, including HMS and the Thompson Family Foundation. The Trustee believes the terms of the Plan are fair to all holders of Claims, taking into account the financial situation of the Debtor and the legal priority of such Claims. At this time, the Trustee believes the Plan is in the best interests of all the relevant parties in interests and does not believe that there is a viable alternative for completing the Chapter 11 Case other than through confirmation of the Plan.

## B.   Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. The commencement of a Chapter 11 case creates an Estate that is comprised of all of the legal and equitable Interests of the Debtor as of the filing date. Confirmation and consummation of a plan of reorganization or liquidation are the principal objectives of a Chapter 11 case. In this Chapter 11 Case, the Plan contemplates a liquidation of the Debtor and is therefore referred to as a "plan of liquidation."

In general, confirmation of a plan by the Bankruptcy Court makes the plan binding upon a debtor, any Person acquiring assets under the plan, and any holder of a Claim or Interest of a debtor whether or not they vote to accept the plan. Before soliciting acceptances of a proposed plan, however, section 1125 of the Bankruptcy Code requires a trustee to prepare a disclosure statement containing "adequate information" of a kind, and in sufficient detail, to enable a creditor to make an informed judgment in voting to accept or reject the plan. The Trustee is submitting this Disclosure Statement to holders of Claims against the Estate to satisfy the requirements of § 1125 of the Bankruptcy Code.

**C.      Summary of Classification and Treatment Under the Plan**

In general, and as more fully described herein, the Plan (i) divides Claims into three (3) unclassified categories and four (4) Classes, (ii) sets forth the treatment afforded to each category and Class, and (iii) provides the means by which the proceeds of the Debtor's Assets will be distributed.  The following table sets forth a summary of the treatment of each Class of Claims under the Plan:[1]

### CLASSES OF CLAIMS

| Class Number | Type of Claim Class | Treatment of Allowed Claims | Projected Recovery |
|---|---|---|---|
| 1 | Allowed Secured Claims | Each holder of an Allowed Secured Claim, in full and final satisfaction, release and settlement of such Claim, shall receive one of the following alternative treatments, at the election of the Plan Administrator:  (a) payment in full in Available Cash from the Plan Distribution Fund on or as soon as reasonably practicable after the later of (i) the Effective Date and (ii) the date the Claim becomes an Allowed Claim;  (b) the legal, equitable and contractual rights to which such Claim entitles the holder, unaltered by the Plan;  (c) the treatment described in section 1124(2) of the Bankruptcy Code;  or (d) the possession of all collateral securing such Claim, without representation or warranty by, or recourse against the Estate.  To the extent that the value of the Collateral securing any Allowed Secured Claim is less than the amount of such Allowed Secured Claim, the undersecured portion of such Claim shall be treated for all purposes under the Plan as an General Unsecured Claim in Class IV and shall be classified as such. | 100% |
| 2 | Allowed Other | After the payment of any Allowed Secured Claims, and except to the extent that a |  |

---

[1] This summary contains only a brief simplified description of the classification and treatment of Claims under the Plan.  It does not describe every provision of the Plan.  Accordingly, reference should be made to the entire Disclosure Statement (including exhibits) and the Plan for a complete description of the classification and treatment of Claims.

| | Priority Claims | holder of an Allowed Other Priority Claim has been satisfied prior to the Effective Date or agrees to a different treatment, the Plan Administrator shall pay to each holder of an Allowed Other Priority Claim, in full and complete settlement, satisfaction and discharge of its Allowed Other Priority Claim, Available Cash from the Plan Distribution Fund in an amount equal to such Allowed Other Priority Claim on the later to occur of (a) the Effective Date or (b) the date such Other Priority Claim becomes an Allowed Other Priority Claim, or as soon as is practicable thereafter. | 100% |
|---|---|---|---|
| 3 | **Allowed HMS General Unsecured Claim** | In accordance with the HMS Settlement Agreement, HMS has agreed to waive its right to any Distribution from the Plan Distribution Fund on account of the Allowed HMS General Unsecured Claim, and will accept on the Effective Date in full and final settlement of its Allowed HMS General Unsecured Claim, the HMS Settlement Restricted Funds plus Litigation Trust Interests in respect of the Net HMS Claim, provided, however, in no case shall HMS receive an amount on account of its Litigation Trust Interests in excess of the Net HMS Claim (except in respect of any separate Litigation Trust Interest to which HMS may be entitled on account of the HMS Substantial Contribution Claim). | **58.11%** |
| 4 | **Allowed General Unsecured Claims** | After the payment of any Allowed Administrative Expense Claims, Allowed Professional Fees, Allowed Secured Claims and Allowed Priority Claims, on the later to occur of (a) the Effective Date or (b) the date such General Unsecured Claim becomes an Allowed General Unsecured Claim, or as soon as is practicable thereafter, each holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction, release and settlement of such Allowed Claim, its Pro Rata share of Available Cash from the Plan Distribution Fund in an amount up to, but not to exceed, its Allowed General Unsecured Claim; provided, however, in accordance with the Thompson Family | **58.11%** |

3

|  |  | Foundation Settlement, the Thompson Family Foundation has agreed to waive its right to (i) receive any Distribution from the Plan Distribution Fund on account of the Thompson Family Foundation Claim, or (ii) acquire a Litigation Trust Interest.<br><br>In addition to receiving its Pro Rata Share of Available Cash from the Plan Distribution Fund on the Effective Date, each holder of an Allowed General Unsecured Claim shall be eligible to make the Litigation Trust Election as set forth in the Litigation Trust Agreement and described more fully in Section 9.5 of the Plan; provided, however, holders of Disputed General Unsecured Claims shall not be eligible to make the Litigation Trust Election.  Any holder of an Allowed General Unsecured Claim that makes the Litigation Trust Election shall acquire a Litigation Trust Interest in accordance with the terms and conditions of the Plan and the Litigation Trust Agreement; provided, however, in no case shall a holder of an Allowed General Unsecured Claim receive an amount on account of its General Unsecured Claim and Litigation Trust Interest in excess of its Allowed General Unsecured Claim. |  |
|--|--|--|--|

## D.    Voting Procedures

Under the Bankruptcy Code, the only Classes that are entitled to vote to accept or reject a Plan are classes of Claims that are Impaired under the Plan.  Accordingly, Classes of Claims that are Unimpaired, or those Classes deemed to reject the Plan, are not entitled to vote on the Plan.

Under the Plan, only holders of Claims in Classes III and IV are entitled to vote on the Plan. Votes on the Plan will be counted only with respect to Classes III and IV Claims:  (i) which have been Allowed by a Final Order;  (ii) which are Allowed under the terms of the Plan;   or (iii) (a) which have been scheduled by the Debtor as not disputed, not contingent and not unliquidated, or (b) for which a proof of claim was timely and otherwise properly filed on or before the Bar Date with the Bankruptcy Court, and with respect to Claims described in this clause (iii) as to which no objection to the allowance thereof has been interposed as of the deadline for voting, or as to which any objection has been determined by a Final Order of the Bankruptcy Court allowing such Claim or any portion thereof.  A holder of a Claim as to which an objection has been filed and that has not been temporarily Allowed pursuant to the

4

Bankruptcy Rules for purposes of voting on the Plan may not vote, but a holder of a Claim that has been temporarily Allowed pursuant to the Bankruptcy Rules for purposes of voting on the Plan is entitled to vote. A holder of a contingent or unliquidated Claim may not vote on the Plan.

Voting on the Plan by the holder of Allowed Claims in Impaired Classes III and IV is important. After carefully reviewing the Plan and Disclosure Statement, each holder of such a Claim should vote on the enclosed Ballot either to accept or to reject the Plan, and then return the Ballot by mail as provided herein so that it is received by the Voting Deadline (defined below). Any Ballot that does not appropriately indicate acceptance or rejection of the Plan will not be counted. A Ballot that is not received by the Voting Deadline will not be counted. If a Ballot is damaged, lost, or missing, the replacement Ballot may be obtained by sending a written request to the Voting Agent (defined below).

By signing and returning the Ballot, each holder of a Claim in Classes III and IV entitled to vote will also be confirming that (a) such holder and/or any agents acting on its behalf has read this Disclosure Statement and the Plan; (b) such holder and/or any agents acting on its behalf has had the opportunity to ask questions of and receive answers from the Trustee concerning the terms of the Plan and related matters; (c) the Trustee has made available to such holder or its agents all documents or information relating to the Plan as set forth in this Disclosure Statement; and (d) except for information provided by the Trustee or his agents in writing as set forth in this Disclosure Statement, such holder has not relied on any statements made or other information received from any person with respect to the Plan.

All votes to accept or reject the Plan must be made by using the form of Ballot. No votes other than the ones using such Ballot will be counted except to the extent the Bankruptcy Court orders otherwise. The Bankruptcy Court has established July 18, 2018 as the date (the "Voting Record Date") for the determination of holders of record of Allowed Claims who are entitled to (a) receive a copy of the Disclosure Statement and all of the related materials and (b) vote to accept or reject the Plan. The Disclosure Statement Approval Order sets forth the deadlines for voting to accept or reject the Plan and for filing objections to Confirmation of the Plan. In addition, detailed voting instructions accompany each Ballot. Each holder of a Class III and Class IV Allowed Claim entitled to vote on the Plan should read this Disclosure Statement, the Plan, and the Disclosure Statement Approval Order and the instructions accompanying each Ballot in their entirety before voting on the Plan. These documents contain, among other things, important information concerning the classification and valuation of Claims for voting purposes and the tabulation of votes. After carefully reviewing the Plan, the Disclosure Statement Approval Order and this Disclosure Statement, please indicate your acceptance or rejection of the Plan on the appropriate Ballot and return such Ballot in the enclosed envelope to Togut, Segal & Segal LLP (the "Voting Agent"), counsel for the Trustee, at the following address:

**IF BY FIRST CLASS MAIL, OVERNIGHT MAIL OR HAND DELIVERY:**

**SCOTT RATNER, ESQ**
**TOGUT, SEGAL & SEGAL LLP**
**ONE PENNSYLVANIA PLAZA, SUITE 335**
**NEW YORK, NEW YORK 10119**

**BALLOTS MUST BE PHYSICALLY RECEIVED BY THE VOTING AGENT ON OR BEFORE 4:00 P.M. (PREVAILING EASTERN TIME) ON SEPTEMBER 7, 2018 (THE "VOTING DEADLINE").    ANY BALLOT TRANSMITTED TO THE VOTING AGENT BY FACSIMILE OR OTHER ELECTRONIC MEANS WILL NOT BE ACCEPTED.**

## E.    Litigation Trust Election

Each holder of an Allowed Claim in Class IV shall also have the opportunity to make the Litigation Trust Election and thereby receive Litigation Trust Interests in exchange for such holder's agreement to contribute Litigation Trust Funds to the Litigation Trust in accordance with the terms of the Litigation Trust Agreement.

The Ballot provided to holders of Allowed Claims in Class IV will provide the holders of such Claims with the opportunity to make the Litigation Trust Election.[2]  All holders of Allowed Claims in Class IV are eligible to make the Litigation Trust Election and may do so whether such holder votes to accept or reject the Plan.

Under the terms of the Litigation Trust Agreement, each holder of an Allowed Claim in Class IV that makes the Litigation Trust Election shall be required to contribute (i) an initial funding amount that is equal to the same percentage of its net claim (*i.e.*, the difference between the Allowed amount of its General Unsecured Claim and any Distribution it receives or is anticipated to receive on account of such Claim under the Plan) as the percentage of the Net HMS Claim contributed by HMS to the Litigation Trust[3];  and (ii) to the extent that the Litigation Trustee determines that the Litigation Trust requires additional funding, contribute its pro rata share of the amount

---

[1]  Unless a Claim in Class IV is Disputed at the time of solicitation, all holders of such Claims shall receive a Ballot and be entitled to make the Litigation Trust Election;  provided, however,  only holders of Allowed Claims may hold a Litigation Trust Interest and such holders whose Claims are ultimately disallowed by Final Order shall not be entitled to participate in the Litigation Trust whatsoever or be required to contribute to the Litigation Trust Funds.

[3]  As an example with respect to a holder of an Allowed Unsecured Claim of $100,000, and assuming that (i) the Net HMS Claim were $6 million and (ii) holders of Allowed Claims in Class IV received a 59% distribution under the Plan, then the applicable percentage amount would be 1.67% (*i.e.*, $100,000, the amount to be funded by HMS to the Litigation Trust, divided by $6 million), and the holder of the $100,000 claim would need to make an initial contribution to the Litigation Trust equal to $6,847 (*i.e.*, 1.67% multiplied by its net claim of $41,000).

of such additional funding, calculated based on such holder's proportionate share of Litigation Trust Interests.

**IN CONSIDERING WHETHER TO MAKE THE LITIGATION TRUST ELECTION, HOLDERS OF ALLOWED CLAIMS IN CLASS IV SHOULD BE ADVISED THAT TO THE EXTENT THAT ANY HOLDER OF A LITIGATION TRUST INTEREST FAILS TO MAKE ANY FUNDING CONTRIBUTION REQUIRED BY THE LITIGATION TRUSTEE, IT WILL FORFEIT ITS LITIGATION TRUST INTEREST IN ITS ENTIRETY.**

F.    **Withdrawal of Ballots**

Any party who delivers a valid Ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Trustee before the Voting Deadline.  A notice of withdrawal is valid if it (a) contains the description of the Claim(s) to which it relates and the aggregate principal amount represented by such Claim(s);  (b) is signed by the withdrawing party in the same manner as the Ballot being withdrawn;  (c) contains a certification that the withdrawing party owns the Claim(s) and possesses the right to withdraw the Ballot; and (d) is received by the Trustee on or before the Voting Deadline.  Unless ordered by the Bankruptcy Court, any attempts to withdraw a Ballot except as set forth above will be ineffective.

G.    **Confirmation**

Section 1129(a) of the Bankruptcy Code establishes conditions for the confirmation of the Plan.  The findings required for confirmation include, without limitation, the following:  (a) the Plan classifies Claims in a permissible manner;  (b) the Plan complies with applicable provisions of the Bankruptcy Code;  (c) the Trustee, as the Plan proponent, has complied with applicable provisions of the Bankruptcy Code; (d) the Plan has been accepted by the requisite votes of holders of Claims (except to the extent that confirmation is available under section 1129(b) of the Bankruptcy Code); (e) the Plan has been proposed in good faith and not by any means forbidden by law; (f) the disclosure requirements of section 1125 of the Bankruptcy Code have been met; (g) the Plan is feasible and confirmation will likely not be followed by liquidation or the need for further reorganization of the Debtor, unless such liquidation or reorganization is proposed in the Plan;  (h) the Plan is in the best interests of all holders of Claims in an Impaired Class by providing to such holders on account of their Claims property of a value that is not less than the amount that such holder would receive or retain in a Chapter 7 liquidation, unless each holder of a Claim in such Class has accepted the Plan;  and (i) all fees and expenses payable under 28 U.S.C. § 1930 have been paid or the Plan provides for their payment.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of Impaired Claims as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of Claims in that class, who actually vote to accept or reject the Plan.  Thus, eligible holders of Allowed Claims in Class III and Class IV will have voted to accept the Plan if two-thirds (2/3) in amount and a majority in number who actually vote on the Plan, cast their ballots in favor of acceptance.

7

This description is non-exhaustive. Parties are encouraged to seek independent legal counsel to answer any questions concerning the Chapter 11 Plan process and/or the requirements for Plan confirmation.

**H.    Best Interest Test and Liquidation Analysis**

To confirm the Plan, the Bankruptcy Court must determine that the Plan meets the requirements of section 1129(a)(7) of the Bankruptcy Code and, therefore, must find that the Plan is in the best interests of holders of Claims in the Impaired Classes under the Plan. Under the best interest of creditors test, the Plan is confirmable if, with respect to Class III and Class IV, each holder of an Allowed Claim in such Class has either (i) accepted the Plan, or (ii) receives or retains under the Plan, on account of its Claim, Assets of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtor were to be liquidated under Chapter 7 of the Bankruptcy Code.

To determine what the holders of Class III and Class IV Claims would receive if the Debtor were to be liquidated under Chapter 7 of the Bankruptcy Code, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtor's Assets in a Chapter 7 liquidation case. The amount that would be available for satisfaction of the Allowed Claims would consist of the proceeds resulting from the disposition of the Assets of the Debtor, as augmented by Available Cash held by the Debtor at the time of the commencement of the Chapter 7 case. Such amounts would then be reduced by the costs and expenses of the liquidation and by such additional Administrative Expense Claims and Priority Claims that might result from the Chapter 7 case (as well as the Chapter 11 Case before its conversion), with any remaining amounts then available to holders of Allowed Claims in Class III and Class IV.

The Trustee's liquidation analysis is attached hereto as **Exhibit B**. The Plan as proposed by the Trustee contemplates the approval of the Sale of the Acquired Assets to the Purchasers in exchange for approximately $1,119,000 in Cash. Accordingly, the Sale results in an approximate twenty-five (25%) total increase in Available Cash to make Distributions to Allowed Claims under the Plan. Moreover, the Plan also contemplates approval of the HMS Settlement Agreement and the Thompson Family Foundation Settlement. Together, these settlements result in a significant reduction of anticipated Allowed General Unsecured Claims from nearly $26,640,000 to approximately $2,600,000. Under the Plan as contemplated, the Trustee believes that Allowed General Unsecured Claims in Class III and Class IV, as reduced by these settlement payments, will receive a recovery of approximately fifty eight percent (58%) on the Effective Date.[*] Absent confirmation of the Plan, General Unsecured Claims would remain at a minimum of approximately $26,640,00, the Chapter 11 Estate would not receive the

---

[*]    A table of sources and uses of Available Cash and Restricted Funds as contemplated under the Plan is attached hereto as **Exhibit C**.

Cash payments of approximately $1,119,000, and holders of Allowed Claims would run the significant risk of receiving far less on account of their Claims.

The Debtor's remaining Assets consist primarily of intellectual property, including its trademark portfolio, medical outcome database, donor database, and fundraising technology. Assuming that a Chapter 7 trustee could market and dispose of these remaining Assets on an "as is, where is" basis, the Trustee believes such Assets would yield significantly less for the benefit of the holders of Allowed Claims than as contemplated under the Plan. Therefore, under a hypothetical Chapter 7 liquidation scenario there would be far less Cash available to the Estate to satisfy a far larger pool of Claims (including the approximately $16 million Claim of HMS and $7.9 million Claim of Thompson Family Foundation). In fact, absent the Sale and two settlements under the Plan, the Trustee is confident that holders of Allowed General Unsecured Claims would receive a *zero-percent* Distribution on account of their Allowed Claims.

Additionally, administrative expenses and the fees and expenses of Professional Persons would drastically increase in a liquidation under Chapter 7. Such costs of administration in the liquidation case would be in addition to any unpaid expenses incurred during the Chapter 11 Case, such as compensation for the retained Professional Persons of the Debtor, the Examiner and the Trustee.

Based on the foregoing reasons, the Trustee believes that in all likelihood holders of Allowed Claims in Class III and Class IV will receive a far greater recovery under the Plan than they would if the Debtor were liquidated by a Chapter 7 trustee. The Trustee therefore submits that the Plan meets the "best interests" requirement of the Bankruptcy Code.

## I.    The Plan Must Be Feasible

To be confirmed, the Plan must also be feasible, meaning that it is not likely to be followed by liquidation or further financial restructuring, unless such liquidation or further financial restructuring is proposed in the Plan. Here, the Plan contemplates the liquidation of the Debtor. Accordingly, the Trustee believes the Plan is feasible.

## II.    GENERAL INFORMATION REGARDING THE DEBTOR

### A.    The Debtor's Organizational Structure and History

On March 7, 2011, the Debtor was organized as a Delaware not-for-profit corporation under the name Surgery for the Poor, Inc.[5] On September 1, 2011, the Debtor was granted tax-exempt status as a charitable organization under section 501(c) of the Internal Revenue Code.

---

[5]    On April 13, 2012, the Debtor filed a Certificate of Amendment to reflect a change in its name from Surgery for the Poor, Inc. to WonderWork, Inc.

Since its inception, the Debtor's stated mission has been to raise funds via direct-mail solicitation to facilitate "free, life changing surgeries for children and adults who are blind, severely burned or crippled with clubfoot. Instead of sending American doctors on missions, WonderWork empowers local doctors through free training, equipment and financial aid." To date, according the Examiner's Report (defined below), the Debtor has raised a total of approximately $54.4 million towards these charitable causes.

Beginning in August 2012, in addition to raising money under its registered name, WonderWork, Inc., the Debtor began soliciting donations under separate registered d/b/a's (the "DBA's"), including FirstStep (on behalf of those suffering from clubfoot), BurnRescue (on behalf of burn victims), and 20/20/20 (on behalf of the blind). Of the $54.4 million raised, according to the Examiner's report, the Debtor has raised nearly $26.4 million under the names of the respective DBA's, with approximately $17 million of that amount solicited in support of 20/20/20.

As described below, however, the Debtor deviated from its stated charitable purpose.

### B.   Capital Structure and Debtor's Pre-Petition Indebtedness

As of the Petition Date, the Debtor scheduled $9.63 million in impact loan liabilities (the "Impact Loans"). The Impact Loans are unsecured loans to charitable organizations that allow lenders "to achieve a return on capital while also creating a positive social impact."

As of the Petition Date, the outstanding amount owed on account of each of the respective Impact Loans was as follows:

| Claim No. | Claimant | Description | Amount |
|---|---|---|---|
| 19 | Thompson Family Foundation[6] | Impact Loan | $7,987,808.22 |
| Sch E | Bill & Ann Ziff Foundation | Impact Loan Scheduled, no POC filed. | $846,898.63 |
| Sch E | Detter Family Foundation | Impact Loan Scheduled, no POC filed. | $106,816.44 |

---

[6]   As detailed below, the Thompson Family Foundation agreed to waive its right to a Distribution from the Plan Distribution Fund under the Plan.

10

| Sch E | Joseph Mullaney | Loan Scheduled, no POC filed. | $110,561.64 |
| Sch E | Meadowlark Foundation | Impact Loan Scheduled, no POC filed. | $525,457.53 |
| Sch E | Raphael & Diana Vinoly Foundation | Impact Loan Scheduled, no POC filed. | $60,153.42 |

## III.   EVENTS LEADING TO CHAPTER 11 FILING

On August 31, 2011, the Debtor entered into a fundraising agreement (the "<u>Agreement</u>") with HMS, whereby the Debtor agreed, in exchange for a $2 million yearly management fee, to create, manage, and monitor HMS's various fundraising and marketing programs, and to provide strategic advice and services regarding HMS's charitable programs. On August 8, 2012, HMS terminated the Agreement for cause.

On March 21, 2013, the Debtor commenced arbitration proceedings against HMS and alleged that HMS's termination was without cause. Ultimately, however, on October 13, 2016 and December 21, 2016, respectively, the arbitrator issued (i) a partial award in favor of HMS finding the Debtor to have breached its fiduciary and contractual duties to HMS and awarded HMS $8,342,414.68 in damages (the "<u>Partial Arbitration Award</u>") and (ii) a final fee award in favor of HMS for costs and attorney's fees in the amount of $4,706,553.18 (the "<u>Final Fee Award</u>" together with the Partial Arbitration Award, the "<u>Arbitration Awards</u>").

On December 2, 2016, the New York Supreme Court confirmed, and denied the Debtor's motion to vacate, the Partial Arbitration Award. Shortly thereafter, the Debtor filed a notice of appeal of the confirmation order. Pending prosecution of its appeal, the Debtor sought an interim stay of enforcement of the confirmation order, however, such relief was denied.

In the *Declaration of Brian Mullaney Co-Founder and CEO of WonderWork, Inc. in Support of Chapter 11 Petition and First Day Pleadings* [Dkt. No. 2] (the "First Day Declaration"), Brian Mullaney stated that it was the inability of the Debtor to satisfy the Arbitration Awards from unrestricted Cash flow that precipitated the commencement of this Chapter 11 Case.

## IV.   THE CHAPTER 11 CASE

### A.   PRE-TRUSTEE APPOINTMENT CASE ACTIVITY

#### (i)   Commencement of the Chapter 11 Case

On December 29, 2016, the Debtor filed a voluntary petition in this Bankruptcy Court for relief under Chapter 11 of the Bankruptcy Code. Prior to the Trustee's appointment, the Debtor continued to operate its business and manage its affairs as a debtor in possession under section 1107 of the Bankruptcy Code. No official committee of unsecured creditors has been appointed in this case.

11

### (ii)    Debtor's Schedules and Statement of Financial Affairs;  Proofs of Claim Asserted against the Debtor

According to the Debtor's Schedules, the Debtor's Assets of the Petition Date consisted of the following:

- A total of $20,645,786.88 (comprised of commingled unrestricted Cash and Restricted Funds) held in checking, savings, money market or financial brokerage accounts as follows:
- A total of $2,049,357 in checking accounts maintained at HSBC Bank, identified as:  (i) HSBC WW in the amount of $553,269;  (ii) HSBC 20/20/20 in the amount of $802,650;   (iii) HSBC Burnrescue in the amount of $336,228; and (iv) HSBC 1stStep in the amount of $357,210.
- A total of $374,189.83 in PayPal credit card processing accounts, identified as: (i) wonderwork.org in the amount of $56,990.29;   (ii) 20x20x20.org in the amount of $186,912.08;  (iii) Burnrescue.org in the amount of $65,143.73;  and (iv) 1stStep.org in the amount of $65,143.73.
- A total of $17,948,454.71 held in a money market account and $333,541.82 in a brokerage account maintained at Vanguard.
- A total of $1,042,500 in accounts receivable (current and past due).[7]
- Commercial lease (the "Lease") with 411 Fifth Avenue Associates a/k/a the Adams & Company Real Estate, LLC (the "Landlord") for use of a portion of real property at 411 Fifth Avenue, Suite 702, New York, New York (the "Premises"), the value of which was scheduled as unknown.
- Kyocera copy machine (leased), the value of which was scheduled as $5,430.
- Office furniture and equipment, the value of which in the aggregate was scheduled as $20,352.

According to the Schedules and filed proofs of Claim, no parties assert Secured Claims or Other Priority Claims against the Debtor.   General Unsecured Claims asserted against the Debtor in the aggregate total approximately **$26,640,044** (of which $16,054,347 is asserted by HMS and $7,987,808.22 by the Thompson Family Foundation – both of whom have agreed to waive their right to a Distribution from the Plan Distribution Fund on account of their General Unsecured Claims) as set forth in the attached **Exhibit D.**

---

[7]    The Debtor subsequently reduced this amount to zero because it reflected two uncollected pledges received in FY 2016 that were written off as of April 2017 on the advice of Debtor's auditors.  [Dkt. No. 280, at 9].

### (iii)    Retention of Debtor Professional Persons

The Debtor obtained orders of the Bankruptcy Court authorizing it to retain a number of Professional Persons to assist it with conducting the Chapter 11 Case.  These Professional Persons included:

- Carter, Ledyard & Milburn LLP ("CLM"), retained as bankruptcy counsel to the Debtor [Dkt. No. 47].

- BDO USA, LLP ("BDO"), retained as auditor and tax advisor to the Debtor [Dkt. No. 112].

### (iv)    Confirmation and Appeal of the Arbitration Awards

On February 17, 2017, the Bankruptcy Court entered its order lifting the automatic stay solely to allow the Debtor to pursue its appeal of the New York state court's confirmation of the Partial Arbitration Award.  [Dkt. No. 48].  On January 4, 2018, the Appellate Division of the New York Supreme Court for the First Department affirmed the December 2, 2016 decision and order confirming the Partial Arbitration Award.

On September 21, 2017, the Bankruptcy Court entered its order lifting the automatic stay solely to allow HMS to move in the New York State Supreme Court to confirm, and the Debtor to move to vacate, the Final Arbitration Award. [Dkt. No. 247]. On October 5, 2017, HMS filed its petition in the New York Supreme Court to confirm the Final Award.

On November 27, 2017, the New York State Supreme Court heard oral argument on HMS's motion to confirm the Final Arbitration Award, and, subsequently, on December 8, 2017, confirmed the award.  The Trustee filed its notice of appeal of the confirmation on January 5, 2018, however, ultimately determined to abandon its pursuit of the appeal in favor of achieving a consensual resolution with HMS on account of its Claim.

### (v)    HMS Motion for Appointment of a Chapter 11 Trustee

On January 18, 2017, HMS filed its motion seeking the appointment of a Chapter 11 trustee (the "Trustee Motion") [Dkt. No. 16]. In its motion, HMS argued, among other things, that Brian Mullaney, the Debtor's then CEO, had a long history of fraudulent conduct which rendered him and the other officers under his control unfit to operate the Debtor as a debtor in possession in the Chapter 11 Case.  In further support of its position, HMS argued and referenced the following:

- The Arbitrator's finding that Debtor violated its fiduciary duties to HelpMeSee in "repeated, multiple ways," including that Mr. Mullaney represented to HelpMeSee "time and time again that he was fundraising from major [] donors on HelpMeSee's behalf when, in fact, he was fundraising from these major donors on [Debtor's] behalf."  *Declaration of Benjamin Mintz in Support of Help Me See, Inc.'s Motion for the Entry of an*

13

> *Order Directing the Appointment of a Chapter 11 Trustee*, Ex. A, Final Award,
> at ¶ 99.

- In the course of conducting such fundraising, Debtor and Mr. Mullaney
  took credit for the "substantial blindness work of HelpMeSee when, in
  fact, [Debtor] and Mullaney had nothing to do with that work." The
  Arbitrator described Mr. Mullaney's conduct towards HelpMeSee as both
  "unconscionable" and "reprehensible." Final Award, at ¶¶ 99, 123,

- Finally, the Arbitrator found that Mullaney was "not a credible witness;"
  that Debtor "declined to comply with discovery orders from the beginning
  to the end of this arbitration, with the result that the conduct of the
  arbitration was decidedly less efficient and cost-effective than would
  otherwise have been the case." Final Award, at ¶ 132(2)-(3).

On February 24, 2017, the Debtor filed its opposition to the Trustee Motion,
supported by thirteen (13) declarations submitted by members of the Debtor's Board of
Directors, holders of certain of the Impact Loans, and other parties related to the
Debtor. On March 3, 2017, HMS filed its reply in further support of the Trustee Motion.

### (vi)    Examiner Appointment and Budgetary Control of the Debtor

After a hearing held on March 10, 2017, at which the Trustee Motion was
considered, the Bankruptcy Court entered its Order requesting, among other things,
any party to show cause (i) why the Bankruptcy Court should not order the
appointment of an examiner pursuant to section 1104(c)(1) of the Bankruptcy Code; and
(ii) what cautions or controls could be put in place to address concerns regarding the
operation of the Debtor raised in HMS's motion and at the hearing [Dkt. No. 80]. In
respective pleadings filed on April 5, 2017, both HMS and the Debtor indicated that
neither party opposed the appointment of an examiner.

Ultimately, on April 21, 2017, after a hearing on April 12, 2017 on the Trustee
Motion, the Bankruptcy Court entered its order directing the appointment of an
examiner and establishing temporary budgetary controls regarding the Debtor's
fundraising efforts and operations [Dkt. No. 110].[8] As part of its order, the Bankruptcy
Court required that the examiner shall investigate, among other things: (a) the Debtor's
collection, use, allocation and transfers of Restricted Funds, (b) grants made by the
Debtor to other organizations, (c) potential claims and causes of action of the Debtor,
(d) payments to Brian Mullaney, and (e) the Debtor's corporate governance structure
and practice. The order further required the examiner to file a report detailing his
investigation within ninety (90) days from the date of his appointment.

Pending completion of the Examiner's report, the Bankruptcy Court prohibited
the Debtor from, among other things, making any further grants, donations or spending

---

[8]    The Bankruptcy Court's order was subsequently amended on June 20, 2017 [Dkt. No. 185].

any Restricted funds without Bankruptcy Court approval, and required the Debtor to submit a thirteen (13) week budget.

On May 5, 2017, the U.S. Trustee appointed Jason R. Lillien (the "Examiner") as examiner [Dkt. No. 130], and, on May 10, 2017, such appointment was approved by the Bankruptcy Court [Dkt. No. 136].

To assist him with his investigation and preparation of his report, the Examiner obtained authorization from the Bankruptcy Court to employ and retain Professional Persons as follows:

- Loeb & Loeb LLP ("Loeb & Loeb"), retained as counsel to the Examiner [Dkt. No.198].

- Goldin Associates, LLC ("Goldin"), retained as Examiner's financial advisor [Dkt. No. 207].

### (vii)   Examiner's Investigation and Report

On November 3, 2017, the Examiner submitted its completed report (the "Examiner's Report") that detailed the results of his investigation into the Debtor and its operations [Dkt. No. 302], a copy of which was shared and delivered to the NYSAG on November 15, 2017 [Dkt. No. 325]. The Examiner's Report concluded, among other things, the following:

- The Debtor had "abused the public trust from its inception" and that the Debtor had "misapplied and misused millions in charitable dollars."

- The Examiner described Debtor as "a case study on how a dominant CEO, left unchecked by a passive and overly deferential Board of Directors, can damage a charity beyond repair."

- The Examiner found that, "under Brian Mullaney's charge, WonderWork operated in disregard of legal requirements and industry standards regarding charitable solicitation, restricted gift practices, financial reporting, and compensation standards."

- Among other issues, Debtor misclassified approximately $5 million as unrestricted Cash, which should have been classified Restricted Funds and had failed to properly account for "roll-forward" of the Restricted Fund balances;

- As a result, of the approximately $20.2 million of Cash on hand as of the Petition Date, nearly $16.25 million should have qualified as Restricted Funds;

- In addition, there existed certain potential Causes of Action including potential Avoidance Actions against, among others, Brian Mullaney, the remaining officers, and the Board of Directors.

- Sufficient grounds existed warranting the appointment of a Chapter 11 trustee.

On October 31, 2017, the Bankruptcy Court entered its order to show cause why the court should not issue an order appointing a Chapter 11 trustee under sections 105(a) and 1104(a) of the Bankruptcy Code [Dkt. No. 294].

## B.    POST-TRUSTEE APPOINTMENT CASE ACTIVITY

### (i)    Appointment of the Trustee

On November 9, 2017, the Bankruptcy Court entered its order directing the appointment of a Chapter 11 trustee [Dkt. No. 308], and, on November 22, 2017, approved the appointment of Stephen S. Gray as Trustee [Dkt. No. 337].

### (ii)    Retention of Trustee Professional Persons

Since his appointment, the Trustee has retained, and the Bankruptcy Court has approved the retention of, the following Professional Persons to represent and assist the Trustee with his administration of the Chapter 11 Case[9]:

- Togut, Segal & Segal LLP ("Togut"), retained as the Trustee's bankruptcy and reorganization counsel [Docket No. 374];

- Garfunkel Wild, P.C. ("Garfunkel"), retained as special counsel to assist the Trustee with non-profit law and Sale related issues [Docket No. 380]; and

- CR3 Partners, LLP ("CR3"), retained as the Trustee's accountant [Dkt. No. 381].

### (iii)    Trustee's Coordination with Various Parties in Interest and Coordination with NYSAG

Immediately after his appointment, the Trustee, and/or his Professional Persons, met or conferenced with all of the major economic stakeholders and other interested parties in this Chapter 11 Case, including, but not limited to, the following:

---

[9]    Retention applications for Gordon Brothers Corporation, retained to provide appraisal services related to the Debtor's intellectual property, and Verdolino and Lowey, P.C., retained as the Trustee's special accountant to provide tax services are with the U.S. Trustee for review and approval.

- In person meetings and telephonic conferences with the Debtor's counsel and former CEO Brian Mullaney regarding the events leading up to this Chapter 11 Case and the Trustee's appointment.

- Multiple teleconferences with the Examiner, his counsel and accountant, regarding the Examiner's Report, Professional Fee Claims, and ways to achieve a resolution of this Chapter 11 Case.

- An in person meeting and numerous telephonic conferences with counsel for HMS regarding its Claim, the status of the Chapter 11 Case and other matters.

- Numerous telephonic conferences with counsel to the Thompson Family Foundation.

- And finally, several in person meetings and numerous telephonic conferences with the NYSAG regarding all aspects of this case, and reconciliation of Restricted Funds balances and working toward the ultimate goal of finding appropriate grant recipients for the Restricted Funds, while simultaneously maximizing this estate for the benefit of the Debtor's creditors.

Based on these discussions, the Trustee determined, among other things, to: (i) achieve a consensual resolution with HMS, and (ii) explore a transaction, or transactions, for the disposition of substantially all of the Debtor's remaining Assets.

### (iv)    Restricted Funds Reconciliation

According to the Debtor, as of the Petition Date, anywhere from approximately $5 million to $13 million of the Debtor's available $20.5[10] million in Cash qualified as Restricted Funds under the applicable charities laws.

Under applicable law, a not-for-profit corporation has full ownership rights in all funds donated to it. *See, e.g.,* New York Not-for-Profit Corporation Law (the "NPCL") § 513(a); However, a not-for-profit corporation must apply all assets that are donated for a particular charitable purpose (as specified in the gift instrument or materials soliciting the gift) towards the purpose for which the particular asset was contributed. NPCL § 513(b); New York Executive Law § 172-d(4) Thus, funds donated for a particular charitable purpose cannot be allocated for other corporate purposes, including the satisfaction of claims held by the corporation's creditors. *See In re Friends for Long Island's Heritage*, 911 N.Y.S.2d 412, 420 (App. Div., 2d Dep't 2010) (finding that "New

---

[10]    On November 27, 2017, all Cash was transferred from the Debtor's various operating and investment accounts to the Trustee's account maintained at Union Bank of California.

York's long-standing policy honoring donors' restrictions on the use of the property they donate has greater weight than the claims of creditors.  To hold otherwise would be to sanction a gap in the protection of the donors' expressed limitations").  Cf. 12 Del. Code, Ch. 47 §§ 4703(a) (in managing and investing an institutional fund, an institution "(1) May only incur costs that are appropriate and reasonable in relation to the assets"); 4704(a) (in making a determination to appropriate from an endowment fund, an institution shall consider, if relevant . . . (2) The purposes of the institution and the endowment fund"); 4706 ("Release or modification of restrictions on management, investment, or purpose" of institutional funds).

In light of the conclusions reached in the Examiner's Report, the Trustee, and his retained Professional Persons, in coordination with the NYSAG, have undertaken extensive efforts to reconcile the Debtor's Cash pools in order to accurately delineate between Restricted Funds and unrestricted Available Cash.  As a result of these efforts, the Trustee has determined that the Debtor has $18,730,330 in Cash as of the date hereof, of which $15,860,734 qualifies as Restricted Funds under applicable non-bankruptcy law.  This leaves the Debtor with $2,869,596 in Cash currently available to satisfy creditors' claims in this Chapter 11 Case.

The total $15,860,734 in Restricted Funds may be subdivided as follows: (i) $3,029,982 were solicited under the Debtor's registered name, WonderWork, Inc., for the purpose of funding general surgery programs and training on any of the Debtor's stated causes;  (ii) $6,629,891 were solicited under the 20/20 DBA for the purpose of funding corrective surgery programs for the blind;  (iii) $1,720,528 were solicited under the BurnRescue DBA for the purpose of funding surgery programs to care for burn victims;  and (iv) $2,549,690 were solicited under the FirstStep DBA for the purpose of funding treatment programs for those suffering from clubfoot.

### (v)     Thompson Family Foundation Waiver of Right to Distribution or to Participate in Litigation Trust

During the course of negotiations with the Trustee, the Thompson Family Foundation expressed its view that any Distribution that it may be entitled to receive on account of its Claim should be otherwise directed to charitable purposes that would fulfill the stated charitable mission of the Debtor, for which its loan funds were originally intended.  With this goal in mind, the Thompson Family Foundation took part in extensive negotiations with the Trustee, HMS, and the NYSAG, to reach a mutually agreeable resolution that would ensure that any Cash that the Thompson Family Foundation's may be entitled to in a Distribution on account of its Claim be redirected to appropriate charitable recipients that have been approved by the NYSAG.

After approving the Trustee's proposed recipients for the Restricted Funds as described in detail in this Disclosure Statement (such transactions having been accomplished in coordination with the NYSAG) and to further facilitate the Trustee's efforts to resolve this Chapter 11 Case, the Thompson Family Foundation has agreed to waive its right to a Distribution from the Plan Distribution Fund under the Plan, or acquire a Litigation Trust Interest under the Litigation Trust Agreement, on account of its Claim totaling $7,987,808.22.  By itself, such results in a reduction of estimated General Unsecured Claims from approximately $26.64 million to $18.65 million.

### (vi)    The Trustee's Negotiations with Professional Persons Regarding Pre-Appointment Professional Fees

Upon his appointment, the Trustee took immediate notice of the outsized amount of fees and expenses asserted by pre-Trustee appointment Professional Persons in this Chapter 11 Case.  At the time of the Trustee's appointment, Professional Persons retained by the Debtor and the Examiner had asserted Professional Fee Claims in the approximate total aggregate amount of $5,810,000.

Since his appointment, the Trustee has engaged in numerous discussions and negotiations with these Professional Persons to achieve significant reductions in the asserted amount of fees that will result in a meaningful Distribution to holders of Allowed Claims under a Plan. As a result of those negotiations, the Trustee has achieved, and the Professional Persons have agreed to, reductions in the approximate total amount of $1,737,705 and as follows:

<u>The Debtors' Professionals</u>

- BDO agreed to a reduction of its asserted total amount of fees and expenses of $373,298.75 to $210,000, and further agreed to waive any additional Claims for amounts incurred since its most recently filed fee application or the Trustee's appointment (which are estimated at approximately $37,000).  [Dkt. No. 393]  On May 25, 2018, the Court entered an Omnibus Order approving the applications for allowance of compensation and reimbursement of expenses, which awarded BDO $210,000 in fees.  [Dkt. No. 402.]

- CLM has agreed to a reduction of its asserted total amount of fees and expenses of nearly $2.9 million to $750,000, and further agreed to waive any additional Claims for amounts incurred since its most recently filed fee application or the Trustee appointment.  [Dkt. No. 403].  By motion dated June 6, 2018, the Trustee moved for approval of the settlement with CLM pursuant to Bankruptcy Rule 9019.  On June 20, 2018, HMS objected to the proposed settlement. HMS also filed a motion for contempt and sanctions against CLM.  At the June 27, 2018 hearing on the matters, the Court raised a number of points and issues it wanted the Trustee and CLM to consider and address.  The hearing was ultimately continued to August 7, 2018 and was further adjourned by the Trustee to September 12, 2018.  CLM is going to file a final application for approval of its fees to be heard on September 12, 2018. The Trustee is currently evaluating whether to go forward with the settlement or to seek a further reduction of CLM's fee request.

<u>The Examiner and His Professionals</u>

- The Examiner and Loeb & Loeb agreed to a reduction of their asserted total amount of fees and expenses of $2,036,976.87 to $1,811,986.87 and further agreed to waive any additional Claims for amounts incurred since their most recently filed fee application or the Trustee's appointment (which are estimated at $100,000).  [Dkt. No. 390].  On May 25, 2018, the Court entered an Omnibus

Order approving the applications for allowance of compensation and reimbursement of expenses, which awarded the Examiner $380,595.60 in fees and Loeb & Loeb $1,431,391.27 in fees.

- Goldin agreed to a reduction of its asserted total amount of fees and expenses of $495,000 to $470,250, and further agreed to waive any additional Claims for amounts incurred since its most recently filed fee application or the Trustee appointment (which are estimated at $55,000).  [Dkt. No. 391].  On May 25, 2018, the Court entered an Omnibus Order approving the applications for allowance of compensation and reimbursement of expenses, which awarded Goldin $470,250.00 in fees.

### (vii)   Allocated Restricted Funds

In accordance with N-PCL § 513(b), which allows a portion of the Restricted Funds to be applied toward the reasonable and proper expenses of the administration of such funds, the Trustee has arranged, with the approval of the NYSAG, for the Estate's use of $1,586,073 or ten-percent (10%) of the Restricted Funds to be allocated toward the satisfaction of Allowed Administrative Claims including Allowed Professional Fee Claims in this Chapter 11 Case (the "Allocated Restricted Funds").

### (viii)   Settlement with the Debtor's Former Landlord

Prior to the Petition Date, on February 19, 2016, the Debtor entered into the Lease with the Landlord for the use of the Premises beginning on April 1, 2016 and terminating on December 31, 2020.

Prior to the Trustee's appointment, on April 27, 2017, the Debtor, as then debtor in possession, moved to assume Lease pursuant to section 365(a) of the Bankruptcy Code [Dkt. No. 115] (the "Assumption Motion").  After a hearing on May 18, 2017, the Court entered its Order authorizing the assumption of the Lease [Dkt. No. 154].  On June 27, 2017, the Landlord asserted Claim No. 11 against the Debtor for an undetermined amount based on any amounts potentially due under the Lease (the "Landlord Claim").

To further facilitate the Trustee's orderly wind-down of the Debtor's operations, including at the Premises, the Trustee and his retained Professional Persons determined to enter into good-faith, arm's-length negotiations with the Landlord regarding the Lease.  Consequently, on April 30, 2018, the parties executed a settlement agreement whereby in exchange for a one time settlement payment in the total amount of $64,189.22[11], the Landlord agreed to terminate and cancel the Lease effective on April 30, 2018 (subject to Bankruptcy Court approval) and resolve any and all claims associated with the Lease, including, but not limited to, the Landlord Claim and any potential

---

[11]   The settlement payment is comprised of:  (i) a security deposit held by the Landlord in the amount of $56,625.12, and (ii) a one time payment of $7,564.21 upon approval of the Landlord Settlement Agreement by the Bankruptcy Court.

claims that the Landlord may be entitled to under sections 502(b)(6) and 503(b)(7) of the Bankruptcy Code (the "Landlord Settlement Agreement").

As provided in the Landlord Settlement Agreement, the Trustee has vacated and surrendered possession of the Premises to the Landlord as of April 30, 2018. Likewise, the Landlord has acknowledged in the Landlord Settlement Agreement that the Premises have been vacated and surrendered in a condition that is consistent with the terms and conditions of the Lease. Subject to the approval of the Landlord Settlement Agreement in the Bankruptcy Court, the Lease shall be considered canceled and terminated as of April 30, 2018, and the parties shall have no remaining rights, duties, or obligations thereunder.

On May 22, 2018, the Trustee filed the *Application for Entry of an Order Approving the Settlement Agreement By and Between the Chapter 11 Trustee and the Debtor's Landlord Pursuant to Bankruptcy Rule 9019* [Dkt. No. 400] seeking Bankruptcy Court approval of the Landlord Settlement Agreement. As provided in the application, the Landlord Settlement Agreement relieves the Estate from its most significant ongoing administrative expense of nearly $8,800 per month and, more importantly, eliminates the Estate's exposure to any potential claims related to the termination of the Lease, including those under sections 502(b)(6) or 503(b)(7) that could otherwise total more than $240,000. On June 28, 2018, the Court entered an order approving the Landlord Settlement. [Dkt. No. 426].

In connection with the Landlord Settlement Agreement, the Trustee also filed the *Notice of Trustee's Abandonment of Debtor's Interest in Used Furniture and Office Equipment Located at Debtor's Former Business Premises* [Dkt. No. 401] whereby Trustee seeks to abandon the Estate's interest in the used furniture and equipment located at the Premises to the current tenant occupying the space. The proposed abandonment relieves the Trustee from the obligation of storing, removing or marketing for sale the furniture and equipment and further facilitates the Landlord Settlement Agreement by allowing the Trustee to vacate the Premises by April 30, 2018. The abandonment became effective on June 7, 2018.

## V.    COMPROMISES AND TRANSACTIONS CONTEMPLATED UNDER THE PLAN

### (i)    The HMS Settlement

After years of litigation between the Debtor and HMS, the Trustee determined to engage in good faith, arm's length discussions with HMS to achieve a consensual compromise of the Arbitration Awards that support its Claim, which would allow for a resolution of this Chapter 11 Case as well as, potentially, a meaningful Distribution to the Debtor's remaining creditors. As a result of those discussions, the Trustee now

proposes and will seek approval of the HMS Settlement Agreement[12] pursuant to the Bankruptcy Rule 9019 in full satisfaction of the General Unsecured Claim and other claims of HMS.  The Plan is based on and incorporates the HMS Settlement Agreement.

Pursuant to the HMS Settlement Agreement, as approved by the NYSAG, HMS has agreed to accept $10,004,436 in Restricted Funds on account of its General Unsecured Claim in the amount of $16,054,348.  The Allowed amount of HMS's Claim shall be reduced by transfer of the HMS Settlement Restricted Funds  and HMS shall waive any right to any Distribution of Available Cash from the Plan Distribution Fund.

Furthermore, to ensure that the percentage Pro Rata Distribution to HMS is equal to that of the other holders of General Unsecured Claims in Class IV under the Plan, in the event the percentage Pro Rata Distribution on account of the General Unsecured Claims in Class IV is any less than the percentage Pro Rata Distribution received by HMS on account of its General Unsecured Claim via the transfer of the HMS Settlement Restricted Funds then HMS will be required to either:  (i) with the consent of the Trustee, approach the NYSAG about an increase in the amount of Allocated Restricted Funds to be used for the benefit of Professional Fee Claims;  (ii) pay into the Estate (and/or Plan Distribution Fund) the amount necessary to resolve the shortfall;  or (iii) reduce the amount of HMS Settlement Restricted Funds transferred to HMS on account of its General Unsecured Claim.

The HMS Settlement Agreement further provides for the creation of a Litigation Trust whereby all potential Causes of Actions, including any and all Avoidance Actions and D & O Claims, are transferred to the Litigation Trust for the benefit of HMS on account of the Net HMS Claim and any holders of Allowed General Unsecured Claims that make the Litigation Trust Election.  Upon the execution of the Litigation Trust Agreement, HMS shall contribute an initial $100,000 to fund the Litigation Trust.  HMS shall have the right to appoint the Litigation Trustee.

The foregoing is not a complete recital of all of the terms of the HMS Settlement Agreement.  A copy of the HMS Settlement Agreement is attached as Exhibit A to the Plan.

### (ii)    The Thompson Family Foundation Settlement

The Confirmation Order shall approve the Thompson Family Foundation Settlement that, among other things, provides for the waiver of the Thompson Family Foundation's right to (i) receive any Distribution under the Plan on account of the

---

[12]   The HMS Settlement Agreement is conditioned on the following:  (i) NYSAG approval of both the Sale and HMS Settlement Agreement;  (ii) Thompson Family Foundation waiver of Distribution on account of its Claim;  (iii) no material changes to the Restricted Fund balance calculations;  (iv) the Sale Closing Date;  (v) Bankruptcy Court approval;  and (iv) consummation of the Plan.  Based on the Trustee's understanding, conditions contained in (i)-(iii) have occurred and the parties are prepared to proceed with the HMS Settlement Agreement on its terms.

Thompson Family Foundation Claim, or (ii) make the Litigation Trust Election in accordance with the Litigation Trust Agreement.

### (iii)    The Grants of the Debtor's Remaining Restricted Assets

The Confirmation Order shall also approve two grant agreements with respect to the Restricted Funds dedicated to the treatment of individuals suffering from burns and clubfoot (the "Grant Agreements"). The respective Grant Agreements provide for the transfer of the remaining Restricted Funds (not otherwise transferred to HMS as part of the HMS Settlement) to MiracleFeet and Resurge (collectively, the "the Charitable Recipients"). Prior to entering into the respective Grant Agreements, the Charitable Recipients were vetted by the NYSAG and were identified as having missions consistent with that of the Debtor and charitable activities consistent with the donor-specified purposes of the Restricted Funds and, therefore, qualified as appropriate recipients of Restricted Funds. Subject to the approval of the Bankruptcy Court, therefore, the Restricted Funds[13] will be transferred to the Charitable Recipients on the Grant Distribution Date, as follows:

- MiracleFeet will be granted $2,556,131 in Restricted Funds restricted to the treatment of clubfoot which shall be used in a manner consistent with the charitable purposes for which such Restricted Funds were contributed to the Debtor; and Resurge will be granted $1,724,203 in Restricted Funds restricted to burn care programs which shall be used in a manner consistent with the charitable purposes for which such Restricted Funds were contributed to the Debtor.

### (iv)    The Sale and Transfer of Substantially All of the Debtor's Remaining Assets

Trustee shall also seek approval of a private sale of the Debtor's remaining Assets (defined as the Acquired Assets under the Plan) to MiracleFeet and Resurge, as Purchasers, on the terms and conditions of the Purchase Agreements and pursuant to sections 363, 1123(a)(5), 1123(b)(4), 1129(b)(2)(A), 1141, 1145 and 1146(a) of the Bankruptcy Code, and to the extent applicable, sections 510 and 511 of the New York Not-For-Profit Corporation Law, free and clear of all, Claims, Interests, liens or other encumbrances (the "Sale").

As set forth in the respective Purchase Agreements, the Acquired Assets being sold to the Purchasers include, *inter alia*, the Debtor's intellectual property as it relates to its business, including: (i) donor lists,[14] (ii) database of contact information and

---

[13]    To the extent the amount of Restricted Funds transferred to HMS or granted to the Charitable Recipients has increased, such increase is on account of donations that were made to the Debtor after the Trustee conducted the Restricted Funds reconciliation.

[14]    For the purposes of section 363(b)(1) of the Bankruptcy Code, the Debtor may have previously disclosed to one or more Persons included on its donor lists a policy prohibiting the transfer of

historical dealings with the Debtor's partners for service delivery, (iii) the Debtor's medical outcomes database, (iv) proprietary fundraising methodologies and other intellectual property related to direct mailing campaigns, (v) domain names, (vi) trademarks and (vii) all goodwill and other intangible assets owned by the Debtor and exclusively used in connection with the Debtor's charitable purposes.

Prior to entering into the respective Purchase Agreements, the Trustee engaged in an extensive marketing process and consulted with the NYSAG.. In the first instance, the Trustee sent an initial teaser to 279 separate organizations that the Trustee determined may qualify as potentially interested parties, in order to gauge interest in the Acquired Assets. Of that number, twenty (20) of these organizations indicated a potential interest in acquiring all or a portion of the Acquired Assets and remained in active discussions with the Trustee.

Ultimately, eighteen (18) organizations entered into non-disclosure agreements with the Trustee in order to perform diligence with respect to the Acquired Assets and, furthermore, thirteen (13) organizations provided the Trustee with a Letter of Intent (collectively, the "Letters of Intent").

Of the thirteen (13), the Trustee identified nine (9) organizations that provided Letters of Intent as potential purchasers of the Acquired Assets, with offers that that provided a viable solution to this Chapter 11 Case. Finally, the Trustee determined to enter into the Purchase Agreements with the Purchasers.

## VI.    OVERVIEW OF THE PLAN

**THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE, CLASSIFICATION, TREATMENT, AND IMPLEMENTATION OF THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH ACCOMPANIES THIS DISCOSURE STATEMENT, AND THE EXHIBITS ATTACHED THERETO.**

**THE PLAN ITSELF AND THE DOCUMENTS REFERENCED THEREIN WILL CONTROL THE TREATMENT OF CLAIMANTS AND OTHER PARTIES IN INTEREST UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON HOLDERS OF CLAIMS AGAINST THE DEBTOR.    AS INDICATED ABOVE, ANY CAPITALIZED TERMS THAT ARE NOT DEFINED IN THIS SECTION OF THE DISCLOSURE STATEMENT ARE DEFINED IN THE**

---

"personally identifiable information," as defined in section 101(41A) of the Bankruptcy Code. However, the Sale and transfer of any such donor lists is consistent with those policies, and no "consumer privacy ombudsman" need be appointed here, because the Purchasers have agreed to comply and adhere to any such privacy policy applicable to the Debtor, as set forth in the Purchase Agreements. *See In re Escada (USA) Inc.*, No. 09-15008(SMB), 2010 WL 4916435, at *4 (Bankr. S.D.N.Y. Jan. 7, 2010); *In re Velocity Express Corp.*, No. 09-13294 (MFW), 2009 WL 6690931, at *7 (Bankr. D. Del. Nov. 3, 2009); *In re THQ Inc.*, No. 12-13398 MFW, 2013 WL 428623, at *14 (Bankr. D. Del. Jan. 24, 2013).

**PLAN. IT IS RECOMMENDED THAT ONE REFER TO THOSE DEFINITIONS WHEN READING THIS DOCUMENT.**

### A.    Treatment of Claims Under the Plan

The following describes the Plan's classification of Claims against the Debtor and the treatment that holders of Allowed Claims would receive under the Plan. The treatment of Claims set forth below is consistent with the requirements of Section 1129(a)(9)(A) of the Bankruptcy Code.

### (i)    Non-Classification

As provided in section 1123(a) of the Bankruptcy Code, Administrative Expense Claims, Priority Tax Claims, and Professional Fee Claims are not classified for purposes of voting on or receiving Distributions under the Plan. All such Claims are instead treated separately in accordance with the terms and conditions set forth in Article II of the Plan.

### (ii)    Administrative Expense Claims and Statutory Fees

Administrative Expense Claims are Claims for any cost or expense of administration in connection with the Chapter 11 Case, including, without limitation, any actual, necessary costs and expenses of preserving the Debtor's Estate, and all fees and charges assessed against the Debtor's Estate, as defined in the Plan, pursuant to 28 U.S.C. § 1930 and 31 U.S.C § 3717. The term Administrative Expense Claim does not include Professional Fee Claims or Priority Claims, as defined in the Plan and which are treated separately in the Plan.

Except to the extent that any entity entitled to payment of an Allowed Administrative Expense Claim agrees to a different treatment (including HMS in respect of the HMS Substantial Contribution Claim), each holder of an Allowed Administrative Expense Claim (other than Administrative Expense Claims that have already been satisfied prior to the Effective Date in the ordinary course of business or prosecute to Final Order of the Bankruptcy Court) shall receive Cash from the Plan Distribution Fund in an amount equal to such holder's Allowed Administrative Expense Claim on the Effective Date, or as soon as practicable after the Administrative Expense Claim becomes an Allowed Administrative Expense Claim; provided, however, the Plan Administrator shall be responsible for the satisfaction of United States Trustee Fees arising under 28 U.S.C. § 1930 and 31 U.S.C. §3717 from the Effective Date through the entry of a final decree closing, dismissal of, or conversion of the Chapter 11 Case; provided, further, under the HMS Settlement Agreement, HMS has agreed that any HMS Substantial Contribution Claim, to the extent allowed by the Bankruptcy Court, (i) shall not receive any payment from the Plan Distribution Fund, and (ii) shall receive a Litigation Trust Interest which will be subordinated to other holders of Litigation Trust Interests and only receive a distribution on account of such Litigation Trust Interest after all other holders of Litigation Trust Interests have been paid in full pursuant to the terms and conditions of the Litigation Trust Agreement.

25

Each holder of an Administrative Expense Claim is required to file a proof of Administrative Expense Claim within thirty (30) days after the Effective Date. Nothing herein extends any Bar Date previously established by the Bankruptcy Court. Any request for payment of an Administrative Expense Claim that is not timely filed as set forth above shall be forever barred, and holders of such Claims shall not be able to assert such Claims in any manner against the Debtor, the Estate, the Litigation Trust, the Litigation Trustee, the Trustee or the Plan Administrator or any of the foregoing parties' accountants, advisors, agents, attorneys, consultants, directors, employees, members, officers, or representatives.

The estimated total Administrative Expense Claims on account of the Estate as of the Effective Date will equal less than approximately $30,000.

### (iii)    Priority Tax Claims

Priority Tax Claims are certain Claims of taxing authorities that are accorded priority treatment under the Bankruptcy Code, as further defined in the Plan. Except to the extent that the Plan Administrator determines to make payments to the holder of a Priority Tax Claim in accordance with the provisions of section 1129(a)(9)(C) of the Bankruptcy Code, or the holder of an Allowed Priority Tax Claim has been satisfied prior to the Effective Date or agrees to a different treatment, the Plan Administrator shall pay to each holder of an Allowed Priority Tax Claim, in full and complete settlement, satisfaction and discharge of its Allowed Priority Tax Claim, Cash in an amount equal to such Allowed Priority Tax Claim on the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon as is practicable thereafter, with interest as may be required by the Bankruptcy Code and provided under applicable non-bankruptcy law.

The estimated total Priority Tax Claims on account of the Estate as of the Effective Date will equal less than approximately $1,500. On May 8, 2018, the Internal Revenue Service filed its Claim, as amended, against the Estate in the amount of $1,417.34.

### (iv)    Professional Fee Claims

All Persons and Entities seeking an allowance of their Professional Fee Claim for services rendered and expenses incurred through and including the Confirmation Date under sections 330 or 331 of the Bankruptcy Code (a) shall, except to the extent such fees have previously been approved by a Final Order, file their respective applications for allowance of their Professional Fee Claim by not later than the Professional Fee Claims Bar Date or such other date as may be fixed by the Bankruptcy Court, and (b) to the extent granted, the Allowed Professional Fee Claim shall be paid by the Plan Administrator in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court, first from the Allocated Restricted Funds and thereafter from the Plan Distribution Fund: (i) on the date upon which such Professional Fee Claim becomes an Allowed Claim or as soon thereafter as is practicable; (ii) upon such terms as may be mutually agreed upon between the holder of an Allowed Professional Fee Claim and the Plan Administrator, or (iii) in accordance with the terms and conditions of any applicable order entered by the Bankruptcy Court.

The estimated total Professional Fee Claims as asserted by various Professional Persons in the Chapter 11 Case that remain outstanding is approximately $4,922,000 million.  As set forth above, the Trustee undertook discussions and negotiations with retained Debtor and Examiner Professional Persons and the Trustee achieved significant reductions in asserted amounts of Professional Fee Claims.

### (v)      Class I – Allowed Secured Claims

(1)      Claims in Class:

Section 4.1(a) of the Plan classifies Allowed Secured Claims as Class I Claims. Class I consists of Claims that are not Administrative Expense Claims, Priority Claims, Professional Fee Claims, HMS General Unsecured Claims or General Unsecured Claims.

(2)      Treatment:

Each holder of an Allowed Secured Claim, in full and final satisfaction, release and settlement of such Claim, shall receive one of the following alternative treatments, at the election of the Plan Administrator:  (a) payment in full in Available Cash from the Plan Distribution Fund on or as soon as reasonably practicable after the later of (i) the Effective Date and (ii) the date the Claim becomes an Allowed Claim;  (b) the legal, equitable and contractual rights to which such Claim entitles the holder, unaltered by the Plan;  (c) the treatment described in section 1124(2) of the Bankruptcy Code;  or (d) the possession of all collateral securing such Claim, without representation or warranty by, or recourse against the Estate.  To the extent that the value of the Collateral securing any Allowed Secured Claim is less than the amount of such Allowed Secured Claim, the undersecured portion of such Claim shall be treated for all purposes under the Plan as a General Unsecured Claim in Class IV and shall be classified as such.

The Trustee is not aware of any Secured Claims asserted against the Estate in this Chapter 11 Case, and does not anticipate making any Distributions on account of such.

(3)      Voting:

Class I is unimpaired by the Plan.  Pursuant to section 1126(f) of the Bankruptcy Code, each holder of an Allowed Secured Claim in Class I is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

### (vi)     Class II – Other Priority Claims

(1)      Claims in Class:

Section 4.2(a) of the Plan classifies Other Priority Claims as Class II Claims.  Class II consists of Claims that are not Administrative Expense Claims, Secured Claims, Priority Tax Claims, HMS General Unsecured Claims or General Unsecured Claims.

(2)    Treatment:

After the payment of any Allowed Secured Claims, and except to the extent that a holder of an Allowed Other Priority Claim has been satisfied prior to the Effective Date or agrees to a different treatment, the Plan Administrator shall pay to each holder of an Allowed Other Priority Claim, in full and complete settlement, satisfaction and discharge of its Allowed Other Priority Claim, Available Cash from the Plan Distribution Fund in an amount equal to such Allowed Other Priority Claim on the later to occur of (a) the Effective Date or (b) the date such Other Priority Claim becomes an Allowed Other Priority Claim, or as soon as is practicable thereafter

The Trustee is not aware of any Other Priority Claims asserted against the Debtor in this Chapter 11 Case, and does not anticipate making any Distributions on account of such.

(3)    Voting:

Class II is unimpaired by the Plan. Pursuant to section 1126(f) of the Bankruptcy Code, each holder of an Allowed Other Priority Claim in Class II is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

**(vii)    Class III – HMS General Unsecured Claim**

(1)    Claims in Class:

Section 4.3(a) of the Plan classifies the HMS General Unsecured Claim as a Class III Claim.  Class III consists of a Claim that is not an Administrative Expense Claim, a Secured Claim, Priority Claim, Professional Fee Claim or General Unsecured Claim.

(2)    Treatment:

In accordance with the HMS Settlement Agreement, HMS has agreed to waive its right to any Distribution from the Plan Distribution Fund on account of the Allowed HMS General Unsecured Claim, and will accept on the Effective Date in full and final settlement of its Allowed HMS General Unsecured Claim, the HMS Settlement Restricted Funds plus Litigation Trust Interests in respect of the Net HMS Claim, provided, however, in no case shall HMS receive an amount on account of its Litigation Trust Interests in excess of the Net HMS Claim (except in respect of any separate Litigation Trust Interest to which HMS may be entitled on account of the HMS Substantial Contribution Claim).

(3)    Voting:

Class III is Impaired.  The holder of the Allowed HMS General Unsecured Claim is entitled to vote to accept or reject the Plan.

### (viii)   Class IV – General Unsecured Claims

(1)   Claims in Class:

Section 4.4(a) of the Plan classifies General Unsecured Claims as Class IV Claims. Class IV consists of Claims that are not Administrative Expense Claims, Secured Claims, Priority Claims, HMS General Unsecured Claims or Professional Fee Claims.

(2)   Treatment:

After the payment of any Allowed Administrative Expense Claims, Allowed Professional Fees, Allowed Secured Claims and Allowed Priority Claims, on the later to occur of (a) the Effective Date or (b) the date such General Unsecured Claim becomes an Allowed General Unsecured Claim, or as soon as is practicable thereafter, each holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction, release and settlement of such Allowed Claim, its Pro Rata share of Available Cash from the Plan Distribution Fund in an amount up to, but not to exceed, its Allowed General Unsecured Claim;   provided, however, in accordance with the Thompson Family Foundation Settlement, the Thompson Family Foundation has agreed to waive its right to (i) receive any Distribution from the Plan Distribution Fund on account of the Thompson Family Foundation Claim, or (ii) acquire a Litigation Trust Interest.

In addition to receiving its Pro Rata Share of Available Cash from the Plan Distribution Fund on the Effective Date, each holder of an Allowed General Unsecured Claim shall be eligible to make the Litigation Trust Election as set forth in the Litigation Trust Agreement and described more fully in Section 9.5 of the Plan;   provided, however, holders of Disputed General Unsecured Claims shall not be eligible to make the Litigation Trust Election.  Any holder of an Allowed General Unsecured Claim that makes the Litigation Trust Election shall acquire a Litigation Trust Interest in accordance with the terms and conditions of the Plan and the Litigation Trust Agreement;   provided, however, in no case shall a holder of an Allowed General Unsecured Claim receive an amount on account of its General Unsecured Claim and Litigation Trust Interest in excess of its Allowed General Unsecured Claim.

If the Plan is confirmed, and the settlements contemplated therein are approved, the total amount of anticipated General Unsecured Claims will be $1,949,189.

(3)   Voting:

Class IV is Impaired.  The holder of an Allowed General Unsecured Claim is entitled to vote to accept or reject the Plan.

### B.   Plan Settlements as a Means of Implementing the Plan

(i)   Plan Settlements

The Plan is predicated upon and incorporates the HMS Settlement Agreement and Thompson Family Foundation Settlement as described in more particularity above,

and shall be deemed a motion for approval of the settlements pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019.

        (ii)       The Sale and Grant

The Plan is also predicated upon and incorporates the Sale of the Acquired Assets to the Purchasers as described in more particularity above, and shall be deemed a motion for approval of the Sale and Grant pursuant to sections 363, 1123(a)(5), 1123(b)(4), 1129(b)(2)(A), 1141, 1145 and 1146(a) of the Bankruptcy Code, and to the extent applicable, sections 510 and 511 of the New York Not-For-Profit Corporation Law. The Confirmation Order shall also approve the Grant of a portion of the Restricted Funds to the Charitable Recipients in accordance with applicable law and on the terms and conditions as set forth in the Grant Agreements.

        (iii)      Plan Funding.

On the Effective Date, the Trustee shall transfer the Litigation Trust Assets to the Litigation Trust and all remaining Assets of the Estate to the Plan Distribution Fund. The funds utilized to make Distributions from the Plan Distribution Fund have been or will be generated from, among other things, Available Cash on hand, including the proceeds of the Sale and any payment from HMS pursuant to the terms and conditions of the HMS Settlement Agreement, and the proceeds of the liquidation or other disposition of the remaining Assets of the Debtor, excluding Litigation Trust Assets.

        (iv)      Liquidation of Remaining Assets

From and after the Effective Date, except as otherwise expressly provided herein, the Plan Administrator may, without further approval of the Bankruptcy Court, use, sell at public or private sale, assign, transfer, or otherwise dispose of any remaining Assets and convert same to Cash to be Distributed in accordance with the terms of the Plan.

        (v)      Deemed Dissolution Under Applicable Nonbankruptcy Law

The Confirmation Order will provide that, upon the date a final decree is entered in the Chapter 11 Case, the Debtor will be deemed dissolved under applicable nonbankruptcy law without further Order of the Court or any other court.

        (vi)      Corporate Action.

On, and after, the Effective Date, the appointment of the Plan Administrator, and any and all other matters provided for under the Plan involving corporate action by the Debtor, the Estate, or the Trustee including, without limitation, the transfer of management responsibilities of the Debtor from the Trustee to the Plan Administrator, shall be deemed to have occurred and shall be in effect from and after the Effective Date pursuant to applicable law, without any requirement of further action by the Trustee.

On the Effective Date, the Plan Administrator shall be authorized to issue, execute and deliver the agreements, documents, securities and instruments contemplated by the Plan (or necessary or desirable to effect the transactions

contemplated by the Plan) in the name of and on behalf of the Debtor and the post-Confirmation Estate, including, without limitation, the Litigation Trust Agreement. Upon the entry of a final decree in this Chapter 11 Case, the Debtor shall be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Debtor or payments to be made in connection therewith; provided, however, that the Plan Administrator on behalf of the Estate may take any appropriate or necessary action to dissolve under applicable law. From and after the Effective Date, the Plan Administrator or the Trustee, as applicable, shall not be required to file any document, or take any action, to withdraw its business operations from any states where the Debtor previously conducted business; provided, further, upon the Confirmation Date, the Plan Administrator shall not accept any further donations made to or received by the Debtor.

(vii)    Powers and Obligations of the Plan Administrator.

The Confirmation Order shall provide for the appointment of the Plan Administrator. The compensation of the Plan Administrator shall be as set forth in the Plan Supplement. The Plan Administrator shall be deemed the Estate representative in accordance with section 1123 of the Bankruptcy Code and shall have all powers, authority and responsibilities specified under sections 704 and 1106 of the Bankruptcy Code.

The Plan Administrator will act for the Debtor's Estate in a fiduciary capacity for the Estate, subject to the provisions of the Plan. On the Effective Date, the Plan Administrator shall succeed to all of the rights of the Trustee with respect to the Assets, other than the Litigation Trust Assets. The powers and duties of the Plan Administrator shall include, without further order of the Court, except where expressly stated otherwise, the rights or obligations:

(1)    to take such steps as may be necessary or otherwise desirable to administer and close any and all of the transactions as may be contemplated by the terms of the Purchase Agreement, the HMS Settlement Agreement or the Plan;

(2)    to invest Cash and withdraw and make Distributions of Cash to holders of Allowed Claims and pay taxes and other obligations owed by the Estate or incurred by the Plan Administrator in connection with the wind-down of the Estate in accordance with the Plan;

(3)    to receive, manage, invest, supervise, and protect the Assets, including paying taxes or other obligations incurred in connection with administering the Assets;

(4)    to engage attorneys, consultants, agents, employees and all professional persons, to assist with respect to the Plan Administrator's responsibilities;

(5)    to pay the fees and expenses for the attorneys, consultants, agents, employees and professional persons engaged by the Plan Administrator and to pay all other expenses in connection with administering the Plan

31

and for winding down the affairs of the Debtor and this Estate in accordance with the Plan;

(6)    to satisfy any liabilities, expenses and other Claims incurred by the Plan Administrator in the ordinary course of business and without further order of the Court;

(7)    to execute and deliver all documents, and take all actions, necessary to consummate the Plan and wind-down the Debtor's business;

(8)    to dispose of, and deliver title to others of, or otherwise realize the value of, all the remaining Assets in accordance with the terms provided for herein;

(9)    to coordinate the storage and maintenance of the Debtor's books and records (other than those books and records constituting Litigation Trust Assets and transferred to the Litigation Trust);

(10)    to oversee compliance with the Estate's accounting, finance and reporting obligations;

(11)    to prepare United States Trustee monthly reports;

(12)    to oversee the filing of final tax returns, audits and other corporate dissolution documents if as may be required;

(13)    to perform any additional corporate actions as necessary to carry out the wind-down, liquidation and ultimate dissolution of the Debtor;

(14)    except as otherwise provided for in the Plan, to object to Claims against the Debtor;

(15)    except as otherwise provided for in the Plan, to compromise and settle Claims against the Debtor; provided, however, the Plan Administrator shall not settle any Claim that may adversely affect the Litigation Trust Claims without the prior written consent of the Litigation Trustee.

(16)    to implement and/or enforce all provisions of the Plan;

(17)    to implement and/or enforce all agreements entered into prior to the Effective Date;

(18)    perform the duties, exercise the powers, and assert the rights of a trustee under sections 704 and 1106 of the Bankruptcy Code, including, without limitation, enforcing contracts, and asserting claims, defenses, offsets and privileges; and

to use such other powers as may be vested in or assumed by the Plan Administrator pursuant to the Plan or Bankruptcy Court Order or as may be necessary and proper to carry out the provisions of the Plan.

(viii)   Resignation, Death or Removal of Plan Administrator

In the event of the resignation, removal, death or incapacity of the Plan Administrator, the Oversight Committee shall designate another Person to become the Plan Administrator, and thereupon the successor Plan Administrator, without further act, shall become fully vested with all of the rights, powers, duties and obligations of his predecessor.  No successor Plan Administrator hereunder shall in any event have any liability or responsibility for the acts or omissions of his or her predecessors.

(ix)   Litigation Trust Arrangements

On the Effective Date, the Trustee, Plan Administrator and the Litigation Trustee will enter into the Litigation Trust Agreement pursuant to which the Litigation Trust Assets will be transferred to the Litigation Trust and the Litigation Trust Funds will be advanced to the Litigation Trust.  The Litigation Trustee shall take such actions as may be necessary to implement the Litigation Trust and the terms of the Litigation Trust Agreement in accordance with Article IX of the Plan.  To the extent provided in section 1145 of the Bankruptcy Code and under applicable nonbankruptcy law, the issuance under the Plan of the Litigation Trust Interests will be exempt from registration under the Securities Act of 1933, as amended, and the Investment Company Act of 1940, as amended, pursuant to section 7(a) and 7(b) of that Act, and all rules and regulations promulgated under any of the foregoing.

(x)   Preservation of Causes of Action

In accordance with section 1123(b)(3)(B) of the Bankruptcy Code, the Litigation Trust may pursue all reserved rights of action, including, without limitation, all Causes of Action including Avoidance Actions and D&O Claims.  Any Distributions provided for in the Plan and the allowance of any Claim for the purpose of voting on the Plan is and shall be without prejudice to the rights of the Litigation Trustee to pursue and prosecute any and all Causes of Action .  Except as otherwise set forth in the Plan, all Causes of Action shall survive Confirmation of the Plan.

(xi)   Termination of Appeals Relating to HMS.

Promptly following the Effective Date, the Trustee and/or Plan Administrator shall dismiss with prejudice all pending appeals relating to the HMS General Unsecured Claim

**C.   Distributions and Voting Under the Plan**

(i)   Plan Distributions.

The Plan Administrator shall make Distributions to holders of Allowed Claims in accordance with Article IV of the Plan on, or as soon as reasonably practicable after, the Effective Date.  From time to time, the Plan Administrator shall make Pro Rata Distributions to holders of Allowed Class IV Claims in accordance with Article IV of the Plan.

Notwithstanding Section 6.1(a) of the Plan, the Plan Administrator may retain such amounts (i) as are reasonably necessary to meet contingent liabilities and to maintain the value of the Assets of the Estate during liquidation, (ii) to pay reasonable administrative expenses (including the costs and expenses of the Plan Administrator and the fees, costs and expenses of all professionals retained by the Plan Administrator, and any taxes imposed in respect of the Assets), (iii) to satisfy other liabilities to which the Assets are otherwise subject, in accordance with the Plan, and (iv) to establish any necessary reserve. All Distributions to the holders of Allowed Claims shall be made in accordance with the Plan. The Plan Administrator may withhold from amounts distributable to any Person any and all amounts determined in the Plan Administrator's reasonable sole discretion to be required by any law, regulation, rule, ruling, directive or other governmental requirement. Holders of Allowed Claims shall, as a condition to receiving Distributions, provide such information and take such steps as the Plan Administrator may reasonably require to ensure compliance with withholding and reporting requirements and to enable the Plan Administrator to obtain certifications and information as may be necessary or appropriate to satisfy the provisions of any tax law. In the event that a holder of an Allowed Claim does not comply with the Plan Administrators requests in the preceding sentence within ninety (90) days, no Distribution shall be made on account of such Allowed Claim, such holder shall have forfeited its right to Distributions under the Plan, and the Plan Administrator shall reallocate such Distribution for the benefit of all other holders of Allowed Claims as the case maybe, in accordance with the Plan.

(ii)     Address for Delivery of Distributions

If any Distribution is returned to the Plan Administrator as undeliverable, no Distributions shall be made to such holder unless the Plan Administrator is notified of such holder's then current address within ninety (90) days after such Distribution was returned. After such date, if such notice was not provided, a holder shall have forfeited its right to such Distribution, and the undeliverable Distributions shall be reallocated and distributed to holders of Allowed Claims in accordance with the Plan.

(iii)     Distributions under Twenty-Five Dollars

The Plan Administrator shall not be required to make any Cash payment of less than twenty-five dollars ($25.00) with respect to any Claim unless a request therefor is made in writing to the Plan Administrator on or before twenty (20) days after the Effective Date. Any such Distributions not subject to a timely request for payment shall be distributed by the Plan Administrator to the other holders of Allowed Claims in accordance with the provisions of the Plan.

(iv)     Time Bar to Cash Payments.

Checks issued in respect of Allowed Claims shall be null and void if not negotiated within ninety (90) days after the date of issuance thereof. Requests for reissuance of any voided check shall be made directly to the Plan Administrator by the holder of the Allowed Claim to whom such check was originally issued within one hundred eighty (180) days of the date of issuance thereof. If no request is made as provided in the preceding sentence, any Claims in respect of such void check shall be

34

discharged and forever barred and such unclaimed Distribution shall be reallocated and distributed to those holders of Allowed Claims set forth in the Plan.

(v)    Distributions to Holders as of the Confirmation Date

As of the close of business on the Confirmation Date, the claims register shall be closed, and there shall be no further changes in the record holders of any Claims. Neither the Trustee, the Plan Administrator, nor the Litigation Trustee, as applicable, shall have any obligation to recognize any transfer of any Claims occurring after the close of business on the Confirmation Date, and shall instead be entitled to recognize and deal for all purposes under the Plan (except as to voting to accept or reject the Plan) with only those holders of record as of the close of business on the Confirmation Date.

(vi)    Abandoned Assets

Upon the election of the Plan Administrator, with the approval of the Oversight Committee, the Plan Administrator may abandon any Assets, which book value shall not exceed $10,000, without the need for additional approval of the Bankruptcy Court, and upon such abandonment, such Assets shall cease to be Assets of the Estate.

(vii)    Windup

After (a) the Plan has been fully administered, (b) all Disputed Claims have been resolved, and (c) all Assets not transferred to the Litigation Trust have been reduced to Cash or abandoned, the Plan Administrator shall (i) effect a final Distribution of all Cash remaining (after reserving sufficient Cash to pay all unpaid expenses of administration of the Plan and all expenses reasonably expected to be incurred in connection with the final Distribution) to holders of Allowed General Unsecured Claims in accordance with the Plan.

(viii)    Distribution of Unclaimed Property.

Any Distribution of Assets (Cash or otherwise) provided for under the Plan which is unclaimed after ninety (90) days following such Distribution shall irrevocably revert to the Estate for re-Distribution in accordance with the Plan.

(ix)    Saturday, Sunday, or Legal Holiday

If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next Business Day.

(x)    Voting of Claims

Each holder of an Allowed Claim in an Impaired Class (Class III and Class IV) which receives or retains Assets under the Plan shall be entitled to vote separately to accept or reject the Plan and indicate such vote on a duly executed and delivered Ballot as provided in such order as is entered by the Bankruptcy Court establishing certain procedures with respect to the voting to accept or reject the Plan.  Each holder of an Allowed Claim in Class IV shall also be afforded the opportunity to make the Litigation

Trust Election, and is entitled to make the Litigation Trust Election whether or not such holder votes to accept or reject the Plan.

### D.   Executory Contracts and Unexpired Leases

(i)   Assumption or Rejection of Executory Contracts

Effective on the Effective Date, all Executory Contracts are hereby specifically deemed rejected, except for any Executory Contract (a) that has been specifically assumed, or assumed and assigned, by the Debtor or Trustee on or before the Confirmation Date with the approval of the Court, (b) in respect of which a motion for assumption or assumption and assignment has been filed with the Court on or before the Confirmation Date, or (c) that is specifically designated as a contract to be assumed on a schedule to be included as part of the Plan Supplement.

(ii)   Approval of Assumption or Rejection of Executory Contracts

Entry of the Confirmation Order, but subject to the occurrence of the Effective Date, shall constitute (a) the approval pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code of the assumption, or assumption and assignment, of the Executory Contracts assumed, or assumed and assigned, in accordance with Section 7.1 of the Plan, and (b) the approval pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code of the rejection of the Executory Contracts rejected in accordance with Section 7.1 of the Plan.

(iii)   Bar Date for Filing Proofs of Claim Relating to Executory Contracts Rejected Pursuant to the Plan

Claims against the Debtor arising out of the rejection of Executory Contracts pursuant to the Plan must be filed with the Court no later than forty-five (45) days after the later of service of (a) notice of entry of an order approving the rejection of such Executory Contract which Order may be the Confirmation Order, and (b) notice of occurrence of the Effective Date.  Any such Claims not filed within such time shall be forever barred from assertion against the Estate, and any and all of the Assets of the Estate.

(iv)   Compensation and Benefit Programs

To the extent not previously terminated, and except as set forth in a schedule to be included in the Plan Supplement, all employment and severance agreements and policies, and all employee compensation and benefit plans, policies and programs of the Debtor applicable generally to its current employees or officers as in effect on the Confirmation Date, including, without limitation, all savings plans, retirement plans, health care plans, disability plans, severance benefit plans, incentive plans and life, accidental death and dismemberment insurance plans, shall be terminated as of the Confirmation Date.

(v)      Insurance Policies

The D&O Insurance Policies[13] and any agreements, documents or instruments relating thereto shall be treated as Executory Contracts of the Debtor under the Plan and the Bankruptcy Code and shall be assumed by the Debtor pursuant to section 365 of the Bankruptcy Code, and shall continue in full force and effect thereafter in accordance with their respective terms.  Continuing obligations of third parties to the Debtor under any D&O Insurance Policies that have otherwise ceased to be executory or have otherwise expired on or prior to the Effective Date, including, without limitation, continuing obligations to pay insured claims, to defend against and process claims, to refund premiums or overpayments, to provide indemnification, contribution or reimbursement, to maintain confidentiality, or to honor releases, shall continue and shall be binding on such third parties unless otherwise specifically terminated by the Litigation Trust or otherwise by order of Bankruptcy Court.

## E.      Provisions for Resolving Disputed Claims

(i)      Funding of the Disputed Claims Reserve.

As soon as practicable following the Effective Date, the Disputed Claims Reserve shall be established by the Plan Administrator.  The portion of the Available Cash attributable to Disputed Claims as determined by the Plan Administrator, shall be held by the Plan Administrator in the Disputed Claims Reserve.

The holder of a Disputed Claim, to the extent it has been determined by Final Order to be an Allowed Claim, shall receive a Distribution from the Disputed Claims Reserve on account of its Disputed Claim in an amount equal to that which it would have been entitled if the portion of its Claim so Allowed had been Allowed as of the Effective Date.  Any remaining amount in the Disputed Claims Reserve attributable to the disallowed portion of a Disputed Claim shall be paid first to HMS in return of any payment funded by HMS on account of such Disputed Claim and second shall be distributed to holders of Allowed Claims in Class IV in accordance with Section 4.4 of the Plan.

For the purposes of effectuating the Distributions to the holders of Allowed Claims, the Bankruptcy Court may estimate the amount of Disputed Claims pursuant to section 502(c) of the Bankruptcy Code, in which event the amounts so estimated shall be deemed the amounts of the Disputed Claims for purposes of Distribution under the Plan.  In lieu of estimating the amount of any Disputed Claim for purposes of allowance and Distribution, the Bankruptcy Court may also estimate the amount to be reserved in the Disputed Claim Reserve for such Disputed Claim (singularly or in the aggregate), or such amount may be fixed by agreement in writing by and between the Plan

---

[13] As set forth in the Plan, there are two director and officer liability policies under which the Debtor is an insured:  (i) $2 million of coverage under a policy with Great American Insurance Companies and (ii) $2 million of excess coverage under a policy with Westchester Specialty Group (Chubb).  Notice of a potential claim was provided to each insurer within the required reporting period.

Administrator and the holder of a Disputed Claim.  The amount as determined by the Court or agreed upon by the Plan Administrator and the holder of a Disputed Claim to be reserved in the Disputed Claim Reserve in respect of any Disputed Claim  shall constitute a maximum limitation on such Claim under the Plan.

        (ii)     Disputed Claims

Except as otherwise provided including Section 9.14 of the Plan, the Plan Administrator shall have the right to object to all Claims on any basis, including those Claims that:  (i) are listed in the Schedules, (ii) are listed therein as disputed, contingent, and/or unliquidated, (iii) are listed therein at a lesser amount than asserted by the respective Creditor, or (iv) are listed therein at for a different category of claim than asserted by the respective Creditor.  Subject to further extension by the Bankruptcy Court, the Plan Administrator may object to (i) the allowance of Class IV Claims up to one hundred eighty (180) days after the Effective Date, (ii) the allowance of Administrative Expense Claims, Priority Claims and Secured Claims up to the later of (A) ninety (90) days after the Effective Date or (B) the deadline for filing an objection established by order of the Bankruptcy Court;  provided, however, that an objection to a Claim based on section 502(d) of the Bankruptcy Code may be made at any time in any adversary proceeding against the holder of any relevant Claim.  The filing of a motion to extend the deadline to object to any Claims shall automatically extend such deadline until a Final Order is entered on such motion.  In the event that such motion to extend the deadline to object to Claims is denied by the Bankruptcy Court, such deadline shall be the later of the current deadline (as previously extended, if applicable) or thirty (30) days after the Court's entry of an order denying the motion to extend such deadline. Except as otherwise provided including Section 9.14 of the Plan, from and after the Effective Date, the Plan Administrator shall succeed to all of the rights, defenses, offsets, and counterclaims of the Estate in respect of all Claims, and in that capacity shall have the power to prosecute, defend, compromise, settle, and otherwise deal with all such objections, subject to the terms of the Plan;  provided, further, the Litigation Trust shall have the exclusive right to object to and resolve the Mullaney Claim.

        (iii)    Settlement of Disputed Claims

Except as otherwise provided including Section 9.14 of the Plan, pursuant to Bankruptcy Rule 9019(b) the Plan Administrator, and/or Litigation Trustee, as applicable, may settle any Disputed Claim (or aggregate of Claims if held by a single Creditor) without notice, a Bankruptcy Court hearing or Bankruptcy Court approval.

The Plan Administrator shall give notice to the Oversight Committee,  the Litigation Trustee, and HMS of (i) a settlement of any Disputed Class IV Claim (or aggregate of Claims if held by a single Creditor) that results in the Disputed portion of such Disputed Class IV Claim(s) being Allowed in an amount in excess of $10,000, (ii) a settlement of any Disputed Administrative Expense Claims or Priority Claims, or (iii) settlement of any Disputed Secured Claims.   The Oversight Committee, the Litigation Trustee, and/or HMS shall have ten (10) days after service of such notice to object to such settlement.  Any such objection shall be in writing and sent to the Plan Administrator and the settling party.  If no written objection is received by the Plan Administrator and the settling party prior to the expiration of such ten (10) day period,

the Plan Administrator and the settling party shall be authorized to enter into the proposed settlement without a hearing or Bankruptcy Court approval.  If a written objection is timely received, the Plan Administrator, the settling party and the objecting party shall use good-faith efforts to resolve the objection.  If the objection is resolved, the Plan Administrator and the settling party may enter into the proposed settlement (as and to the extent modified by the resolution of the objection) without further notice of hearing or Bankruptcy Court approval;  provided, however, that the Claim of the settling party against the Estate shall not be greater under the proposed settlement than that disclosed in the notice.  Alternatively, the Plan Administrator may seek Bankruptcy Court approval of the proposed settlement upon notice and a hearing.

(iv)    No Distributions Pending Allowance

Notwithstanding any provision in the Plan to the contrary, no partial payments and no partial Distributions shall be made by the Plan Administrator with respect to any portion of any Claim if such Claim or any portion thereof is a Disputed Claim.  In the event and to the extent that a Claim becomes an Allowed Claim after the Effective Date, the holder of such Allowed Claim shall receive a Distribution in accordance with the terms and conditions of the Plan.

F.    **The Litigation Trust**

(i)    Establishment and Implementation of the Litigation Trust

On the Effective Date, the Trustee, the Plan Administrator and the Litigation Trustee shall execute the Litigation Trust Agreement and shall take all other steps necessary to establish the Litigation Trust for the benefit of the holders of Litigation Trust Interests in accordance with the terms and conditions of the Plan and the Litigation Trust Agreement.

(ii)    Transfer of Litigation Trust Assets.

On the Effective Date, the Plan Administrator shall transfer to  the Litigation Trust all of the Estate's right, title, and interest in the Litigation Trust Assets, including, without limitation, the Litigation Trust Claims.   Any recoveries on account of the Litigation Trust Assets shall be distributed to holders of Litigation Trust Interests.  All Persons necessary shall execute any documents or other instruments as necessary to cause title to the applicable Assets to be transferred to and vested in the Litigation Trust in accordance with the terms and conditions of the Litigation Trust Agreement.  For purposes of section 553 of the Bankruptcy Code, the transfer of the Litigation Trust Assets to the Litigation Trust shall not affect the mutuality of obligations which otherwise may have existed prior to the effectuation of such transfer.

To the extent that any Litigation Trust Assets cannot be transferred to the Litigation Trust because of a restriction on transferability under applicable non-bankruptcy law that is not superseded or preempted by section 1123 of the Bankruptcy Code or any other provision of the Bankruptcy Code, such Litigation Trust Assets shall be deemed to have been retained by the Estate and the Litigation Trustee shall be deemed to have been designated as a representative of the Estate, as applicable,

pursuant to section 1123(b)(3)(B) of the Bankruptcy Code to enforce and pursue such Litigation Trust Assets on behalf of the Estate. Notwithstanding the foregoing, all net proceeds of such Litigation Trust Assets shall be transferred to the Litigation Trust to be distributed to holders of the Litigation Trust Interests consistent with the terms of the Plan and the Litigation Trust Agreement.

The Litigation Trustee shall be deemed hereby substituted as plaintiff, defendant, or in any other capacity for the Debtor or Trustee in all pending matters involving Litigation Trust Claims without the need for filing any motion for such relief.

The Litigation Trust shall also be responsible for, and respond on behalf of the Estate to, any subpoenas and requests for production of documents in connection with Litigation Trust Claims.  To the extent necessary, the Plan Administrator shall provide reasonable cooperation in the response to any such requests for the production of documents.

Any attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) together with all books and records associated with and related to the Litigation Trust Claims shall be transferred to the Litigation Trust and shall vest in the Litigation Trustee on the terms and conditions of the Litigation Trust Agreement.  The Plan Administrator and the Litigation Trustee are authorized to take all necessary actions to effectuate the transfer of such privileges.  Privileged communications may be shared among the Litigation Trust and the Oversight Committee without compromising the privileged nature of such communications in accordance with the "common interest" doctrine.

(iii)    Purpose of the Litigation Trust

The Litigation Trust shall be established for the sole purpose of liquidating the Litigation Trust Assets, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.  The Litigation Trust Agreement may be amended, with the consent of the Litigation Trustee and the Oversight Committee, as applicable, to the extent necessary to maintain the tax status of the Litigation Trust.

(iv)    Funding Expenses of the Litigation Trust

In accordance with the Litigation Trust Agreement, upon the creation of the Litigation Trust, the Litigation Trust Funds shall be transferred to the Litigation Trust to finance the operations of the Litigation Trust.  On the Effective Date, holders of Litigation Trust Interests shall be required to contribute their allocable share of Litigation Trust Funds to the Litigation Trust.  Following the Effective Date, the holders of the Litigation Trust Interests shall provide any additional Litigation Trust Funds as may be required by the Litigation Trustee to finance the operations of the Litigation Trust in accordance with the Litigation Trust Agreement.

(v)    The Litigation Trust Election

Each holder of an Allowed Claim in Class IV shall also have the opportunity to make the Litigation Trust Election and thereby receive Litigation Trust Interests in exchange for such holder's agreement to contribute Litigation Trust Funds to the Litigation Trust in accordance with the terms of the Litigation Trust Agreement.

The Ballot provided to holders of Allowed Claims in Class IV will provide the holders of such Claims with the opportunity to make the Litigation Trust Election. All holders of Allowed Claims in Class IV are eligible to make the Litigation Trust Election and may do so whether such holder votes to accept or reject the Plan.

Under the terms of the Litigation Trust Agreement, each holder of an Allowed Claim in Class IV that makes the Litigation Trust Election shall be required to contribute (i) an initial funding amount that is equal to the same percentage of its net claim (i.e., the difference between the Allowed amount of its General Unsecured Claim and any Distribution it receives or is anticipated to receive on account of such Claim under the Plan) as the percentage of the Net HMS Claim contributed by HMS to the Litigation Trust, and (ii) to the extent that the Litigation Trustee determines that the Litigation Trust requires additional Litigation Trust Funds, contribute its Pro Rata share of the amount of such additional funding, calculated based on such holder's proportionate share of Litigation Trust Interests.

**IN CONSIDERING WHETHER TO MAKE THE LITIGATION TRUST ELECTION, HOLDERS OF ALLOWED CLAIMS IN CLASS IV SHOULD BE ADVISED THAT TO THE EXTENT THAT ANY HOLDER OF A LITIGATION TRUST INTEREST FAILS TO MAKE ANY FUNDING CONTRIBUTION REQUIRED BY THE LITIGATION TRUSTEE, IT WILL FORFEIT ITS LITIGATION TRUST INTEREST IN ITS ENTIRETY.**

(vi)    Litigation; Responsibilities of Litigation Trustee.

In accordance with the Litigation Trust Agreement, the Litigation Trustee in the exercise of its reasonable business judgment, shall, in an expeditious but orderly manner, liquidate and convert to Cash the Litigation Trust Assets, make timely Distributions, and not unduly prolong the duration of the Litigation Trust. The liquidation of the Litigation Trust Assets may be accomplished either through the prosecution, compromise and settlement, abandonment, or dismissal of any or all claims, rights, or Litigation Trust Claims (whether or not such suits are brought in the name of the Litigation Trust), or otherwise. The Litigation Trustee may incur any reasonable and necessary expenses in liquidating and converting the Litigation Trust Assets to Cash and shall be reimbursed in accordance with the provisions of the Litigation Trust Agreement.

The Litigation Trustee in the exercise of its reasonable business judgment shall have the power to (i) prosecute for the benefit of the Litigation Trust all Claims, rights, and Litigation Trust Claims (whether such suits are brought in the name of the Litigation Trust or otherwise) and (ii) otherwise perform the functions and take the actions provided for or permitted herein or in any other agreement executed by the

Litigation Trustee pursuant to the Plan.   Any and all proceeds generated from the Litigation Trust Assets shall be the property of the Litigation Trust for the benefit of holders of Litigation Trust Interests (after payment of all expenses of the Litigation Trust).

> (vii)   No Liability of Litigation Trust

The Litigation Trust shall have no liability on any Claims or other liabilities of the Debtor, the Trustee, or the Plan Administrator.   The Litigation Trust shall not be deemed a successor-in-interest of the Debtor other than as specifically set forth in the Plan or the Litigation Trust Agreement.

> (viii)   Litigation Trustee.

Pursuant to the Plan and the Litigation Trust Agreement, the Litigation Trustee shall act in a fiduciary capacity on behalf of the holders of the Litigation Trust Interests.

The Litigation Trustee shall be entitled to compensation and reimbursement of expenses from the Litigation Trust.   The terms of such compensation shall be set forth in the Plan Supplement.

On and after the Effective Date, subject to the terms of the Litigation Trust Agreement, the Litigation Trustee may engage such professionals and experts as may be deemed necessary and appropriate by the Litigation Trustee to assist the Litigation Trustee in carrying out the provisions of the Plan and the Litigation Trust Agreement. Subject to the terms of the Litigation Trust Agreement, for services performed from and after the Effective Date, Professionals retained by the Litigation Trustee shall receive compensation and reimbursement of expenses from the Litigation Trust in a manner to be determined by the Litigation Trustee in consultation with the Oversight Committee.

> (ix)   Oversight Committee

The terms of the appointment and authority of the Oversight Committee shall be described and defined in the Litigation Trust Agreement.   The duties and powers of the Oversight Committee shall terminate upon the liquidation of the Litigation Trust.   The Oversight Committee's role shall be to consult with, and review the actions of, the Litigation Trustee, and to perform the functions set forth in the Litigation Trust Agreement.

> (x)   Limitation on Liability of Litigating Trustee and Oversight Committee.

Neither the Litigating Trustee, the Oversight Committee, their respective members, designees or professionals, nor any duly designated agent or representative of the Litigating Trustee or the Oversight Committee, nor their respective employees, shall be liable for the act or omission of any other member, designee, agent, or representative of such Litigating Trustee or Oversight Committee, nor shall such Litigation Trustee, nor any member of the Oversight Committee, be liable for any act or omission taken or omitted to be taken in its capacity as Litigating Trustee, or as a

member of the Oversight Committee, respectively, other than for specific acts or omissions resulting from such Litigating Trustee's or such member's own willful misconduct, gross negligence, or fraud. The Litigating Trustee shall be entitled to enjoy all of the rights, powers, immunities and privileges applicable to a chapter 7 trustee and the Oversight Committee shall be entitled to enjoy all of the rights, powers, immunities and privileges of an official committee of unsecured creditors.

The Litigation Trust shall indemnify and hold harmless the Litigating Trustee, the Oversight Committee and its members, and all duly designated agents, professionals and representatives thereof (in their capacity as such), from and against and in respect of all liabilities, losses, damages, claims, costs and expenses (including reasonable attorneys' fees, disbursements, and related expenses) which such parties may incur or to which such parties may become subject in connection with any action, suit, proceeding or investigation brought by or threatened against such parties arising out of or due to their acts or omissions, or consequences of such acts or omissions, with respect to the implementation or administration of the Litigating Trust or the Plan or the discharge of their duties under the Litigating Trust Agreement; provided, however, that no such indemnification will be made to such persons for actions or omissions as a result of willful misconduct, gross negligence, or fraud.  Persons dealing with the Litigating Trustee shall look only to the Litigating Trust Assets to satisfy any liability incurred by the Litigating Trustee or the Oversight Committee to such person in carrying out the terms of the Litigating Trust Agreement, and neither the Litigating Trustee nor the Oversight Committee (or any member thereof) shall have any personal obligation to satisfy any such liability.

The Oversight Committee shall have the power and authority to utilize the services of its counsel, which shall be the same as the professionals retained by the Litigation Trustee, as necessary to perform the duties of the Oversight Committee and to authorize and direct such Persons to act on behalf of the Oversight Committee in connection with any matter requiring its attention or action.

(xi)     Distribution; Withholding.

From time to time, in accordance with the terms and conditions of the Litigation Trust Agreement, the Litigation Trustee shall distribute to the holders of the Litigation Trust Interests, all net Cash income plus all net Cash proceeds from the liquidation of the Litigation Trust Assets and/or prosecution of the Litigation Trust Claims; provided, however, that the Litigation Trust may retain such amounts (i) as are reasonably necessary to meet contingent liabilities and to maintain the value of the Litigation Trust Assets during liquidation, (ii) to pay reasonable administrative expenses (including any taxes imposed on the Litigation Trust or in respect of the Litigation Trust Assets), (iii) to satisfy other liabilities incurred or assumed by the Litigation Trust (or to which the assets are otherwise subject) in accordance with the Plan or the Litigation Trust Agreement, and (iv) to fund the operations of the Litigation Trust.  The Litigation Trustee may withhold from amounts distributable to any Person any and all amounts, determined in the Litigation Trustee's reasonable discretion, to be required to be withheld by any law, regulation, rule, ruling, directive, or other governmental requirement.

43

(xii)   Non-transferability of Litigation Trust Interests

Except as provided in the Litigation Trust Agreement, the Litigation Trust Interests may not be transferred or assigned, except by operation of law or by will or the laws of descent and Distribution.

(xiii)   Termination.

The Litigation Trust shall be dissolved at such time, and in accordance with the terms, as set forth in the Litigation Trust Agreement.

(xiv)   Net Litigation Trust Recovery.

Notwithstanding anything contained herein to the contrary, in the event that a defendant in a litigation brought by the Litigation Trustee for and on behalf of the Litigation Trust (i) is required by a Final Order to make payment to the Litigation Trust and (ii) is permitted by a Final Order to assert a right of setoff under sections 553 of the Bankruptcy Code or applicable non-bankruptcy law against the judgment amount, (A) such defendant shall be obligated to pay only the excess, if any, of the amount of the judgment amount over the setoff, and (B) none of the Litigation Trust or the holders of the Litigation Trust Interests shall be entitled to assert a claim against the Estate or the Plan Administrator with respect to the setoff.

## G.   **Conditions Precedent**

**(i)**   Conditions to Confirmation

The following conditions are conditions precedent to Confirmation of the Plan unless waived by the Trustee pursuant to Section 10.3 of the Plan:  (i) the Confirmation Order must be in a form and substance reasonably acceptable to the Trustee and HMS, and (ii) the Confirmation Order shall:

(1)   authorize the appointment of all parties appointed under or in accordance with the Plan, including, without limitation, the Plan Administrator, the Litigation Trustee and the Oversight Committee, and direct such parties to perform their obligations under such documents;

(2)   approve in all respects the transactions, agreements, and documents to be effected pursuant to the Plan, including, without limitation, the Litigation Trust Agreement, the Sale, the Grant, the HMS Settlement Agreement and the Thompson Family Foundation Settlement;

(3)   authorize the Plan Administrator, the Litigation Trustee and the Oversight Committee to assume the rights and responsibilities fixed in the Plan and Litigation Trust Agreement;

(4)   approve the exculpatory provisions, releases and injunctions granted and created by the Plan;

(5)     order, find, and decree that the Plan complies with all applicable provisions of the Bankruptcy Code, including that the Plan was proposed in good faith;

(6)     contain such findings and decrees as required by the terms of, and as set forth in the definition of "Confirmation Order" contained in, the Purchase Agreement;  and

(7)     except as otherwise specifically provided in the Plan, order that nothing herein operates as a discharge, release, exculpation, or waiver of, or establishes any defense or limitation of damages to, any Claim or Cause of Action belonging to the Estate.

(ii)     Conditions to Effective Date

The Plan shall not become effective unless and until the following conditions shall have been satisfied or waived pursuant to Section 10.3 of the Plan:

(1)     the Confirmation Date shall have occurred and the Confirmation Order, in a form consistent with the requirements of Section 10.1 of the Plan, shall have become a Final Order;

(2)     no stay of the Confirmation Order shall then be in effect, unless the Plan shall have been substantially consummated before entry of any stay;

(3)     the Sale Closing Date shall have occurred;

(4)     the Plan Administrator shall have been appointed;

(5)     the Litigation Trust Agreement shall have been executed, the Litigation Trust Assets shall have been transferred to the Litigation Trust, and the Litigation Trustee shall have been appointed;

(6)     the NYSAG shall have approved the transactions contemplated by the Plan including the Sale and the Grant;

(7)     the Effective Date shall have occurred prior to September 30, 2018;

(8)     all actions, documents and agreements necessary to implement the provisions of the Plan, and such actions, documents, and agreements shall have been effected or executed and delivered;  and

(9)     all other actions required by the Plan to occur on or before the Effective Date shall have occurred.

Section 1.1.   <u>Waiver of Conditions</u>

Any of the conditions set forth in this Article X may be waived by the Trustee, Plan Administrator, or HMS, as applicable, to the extent such waiver does not adversely affect the Distributions hereunder.  Notwithstanding the foregoing, only the Trustee

and the Purchasers (in respect to each of their Purchase Agreement and Grant Agreement) together can waive the conditions contained in sections 10.1(f) and 10.2(f) of the Plan as such conditions are applicable to the Sale and Grant.

## H.    Modifications, Revocation or Withdrawal of the Plan

(i)    Modification of Plan:  Generally

The Trustee and/or the Plan Administrator, as applicable, may alter, amend or modify the Plan pursuant to section 1127 of the Bankruptcy Code at any time prior to the Confirmation Date; provided, however, any alteration, amendment or modification that affects the Litigation Trust or the rights, claims or obligations of HMS shall be reasonably acceptable to HMS.  After such time and prior to substantial consummation of the Plan, the Trustee may, so long as the treatment of holders of Claims under the Plan is not adversely affected, institute proceedings in Bankruptcy Court to remedy any defect or omission or to reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, and any other matters as may be necessary to carry out the purposes and effects of the Plan;  provided, however, notice of such proceedings shall be served in accordance with Bankruptcy Rule 2002 or as the Bankruptcy Court shall otherwise order.

(ii)    Revocation or Withdrawal of Plan

The Trustee reserves the right to revoke or withdraw the Plan at any time prior to the Effective Date.  If the Trustee revokes or withdraws the Plan prior to the Effective Date, then the Plan shall be deemed null and void, and nothing contained in the Plan shall be deemed to constitute a waiver or release of any Claims by or against the Estate, or any other Person, or to prejudice in any manner the rights of the Trustee or any Person in any further proceedings involving the Estate (or the Debtor).

## I.    Retention of Jurisdiction

(i)    Exclusive Jurisdiction of the Bankruptcy Court

Except as otherwise provided for in the Plan, following the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction of the Chapter 11 Case for the following purposes:

(1)    to hear and determine any pending applications for the assumption or rejection of Executory Contracts, and the resulting allowance of Claims against the Debtor;

(2)    to recover all Assets of the Estate, wherever located;

(3)    to hear and determine any issues or disputes relating to the Sale, the Grant, the HMS Settlement Agreement, and/or any other transactions contemplated thereby on or after the Effective Date;

(4)    to determine any adversary proceedings, applications, contested matters and other litigated matters pending on the Effective Date;

(5)     to hear and determine any actions commenced on or after the Effective Date by the Plan Administrator, the Litigation Trustee, or, to the extent applicable, the Oversight Committee, including, but not limited to, the Litigation Trust Claims;

(6)     to ensure that Distributions to holders of Allowed Claims are accomplished as provided in the Plan;

(7)     to hear and determine objections to or requests for estimation of Claims against the Estate, including any objections to the classification of any Claims, and to allow, disallow and/or estimate Claims, in whole or in part;

(8)     to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

(9)     to issue any appropriate orders in aid of execution of the Plan or to enforce the Confirmation Order;

(10)    to hear and determine any applications to modify the Plan, to cure any defect or omission or to reconcile any inconsistency in the Plan or in any order of the Court, including, without limitation, the Confirmation Order;

(11)    to hear and determine all applications for compensation and reimbursement of expenses of Professional Persons;

(12)    to hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan;

(13)    to hear and determine other issues presented or arising under the Plan;

(14)    to hear and determine other issues related to the Plan to the extent not inconsistent with the Bankruptcy Code;  and

(15)    to enter a final decree closing the Case.

(ii)    Failure of the Bankruptcy Court to Exercise Jurisdiction

If the Bankruptcy Court abstains from exercising or declines to exercise jurisdiction over any matter arising under, arising in or related to the Chapter 11 Case, including with respect to the matters set forth above in this Article XIII, shall not prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such subject matter.

47

J.      **Discharge;  Injunctive Provisions;  Exculpation and Releases**

(i)      Term of Bankruptcy Injunction or Stays.

Subject to the rights of the holders of Allowed Secured Claims under Section 4.1 of the Plan, unless otherwise provided in the Confirmation Order, any injunctions or stays provided for in the Chapter 11 Case under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until this Plan has been fully performed.

(ii)      Discharge.

As the Debtor will not engage in business after the Effective Date except as otherwise provided for in the Plan, the Debtor will not obtain a discharge pursuant to section 1141(d) of the Bankruptcy Code.

(iii)   **Injunctions**

(1)   **Injunctions Against Interference with Consummation or Implementation of Plan.**

**Except as provided herein, upon the Effective Date all Persons shall be enjoined from commencing or continuing any judicial or administrative proceeding, employing any process, or taking any action whatsoever against the Debtor, the Estate, the Trustee, the Plan Administrator, the Litigation Trust, the Litigation Trustee, or the Oversight Committee that interferes with the consummation and implementation of (i) this Plan, (ii) the Sale, (iii) the Grant (iv) the Litigation Trust, the Litigation Trust Agreement or the Litigation Trust Assets, (v) the HMS Settlement Agreement, or (vi) the transfers, payments and Distributions to be made in accordance with the Plan and the Litigation Trust Agreement.**

(2)   **Cause of Action Injunction.**

**On and after the Effective Date, all Persons (other than the Litigation Trustee or Plan Administrator, as applicable) shall be permanently enjoined from commencing or continuing in any manner any action or proceeding (whether directly, indirectly, derivatively or otherwise) on account of, or respecting any, Claim, debt, right or Cause of Action that the Plan Administrator, or the Litigation Trust and the Litigation Trustee retains authority to pursue in accordance with the Plan and the Litigation Trust Agreement.**

(3)   **Injunction Against Prosecution.**

**Except as otherwise specifically provided for by this Plan, as of the Effective Date, all holders of Claims shall be enjoined from taking any of the following actions in respect to any such Claims:**

(I)      **the commencement or continuation of any action or proceedings against the Debtor, the Estate, the Trustee, the Plan**

48

Administrator, the Litigation Trust, the Litigation Trustee, or the Oversight Committee or their respective property;

(II)    the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree, or order against the Debtor, the Estate, the Trustee, the Plan Administrator, the Litigation Trust, the Litigation Trustee, or the Oversight Committee or their respective property;

(III)    the creation, perfection or enforcement of any encumbrance of any kind against the Debtor, the Estate, the Trustee, the Plan Administrator, the Litigation Trust, the Litigation Trustee, or the Oversight Committee; and/or

(IV)    the assertion of any right of setoff, subrogation or recoupment of any kind against any obligation due from any such entity to the Debtor, the Estate, the Trustee, the Plan Administrator, the Litigation Trust, the Litigation Trustee, or the Oversight Committee.

(iv)    Exculpation.

To the extent consistent with section 1125(e) of the Bankruptcy Code, except as otherwise specifically provided in the Plan, including Section 13.7 of the Plan, no Exculpated Party shall have or incur, and each Exculpated Party shall be released and exculpated from, any Exculpated Claim, or obligation, cause of action or liability for any Exculpated Claim, and shall be entitled to rely reasonably on the advice of counsel with respect to their duties and responsibilities pursuant to this Plan. Each Exculpated Party and their respective affiliates, agents, directors, members, managers, officers, officials, employees, advisors and attorneys have, and upon the Effective Date shall be deemed to have, participated in the promulgation of this Plan and in good faith and in compliance with the applicable provisions of the Bankruptcy Code and applicable non-bankruptcy law and shall not be liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of this Plan or Distributions made pursuant to this Plan. From and after the Effective Date, a copy of the Confirmation Order and the Plan shall constitute, and may be submitted as, a complete defense to any claim or liability satisfied, enjoined or subject to exculpation pursuant to this Article XIV; provided, however, that nothing in the Plan or the Confirmation Order shall, or shall be deemed to, release or exculpate the Trustee or his retained Professional Persons and representatives with respect to, their obligations or covenants arising from bad faith, willful misconduct, gross negligence, breach of fiduciary duty, malpractice, fraud, criminal conduct, unauthorized use of confidential information that causes damages, and/or ultra vires acts. Upon the Confirmation Date, creditors will be unable to pursue any Claims that are satisfied, enjoined or subject to exculpation under the Plan, but creditors may pursue Claims or claims that may arise in the future, or pursuant to the Plan or Confirmation Order.

49

(v)    Releases by the Debtor and its Estate

Except as otherwise specifically provided in the Plan including Section 13.7 of the Plan, as of the Effective Date, the Trustee, on behalf of the Debtor and its Estate, and any Person or Entity seeking to exercise the rights of the Debtor's Estate, including, without limitation, the Plan Administrator, the Litigation Trust and the Litigation Trustee and any successor to the Debtor or any estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, shall be deemed to forever release, waive and discharge the Released Parties and any of the Released Parties' predecessors, successors and assigns, subsidiaries, affiliates, current and former officers, directors, principals, employees, agents, advisory board members, consultants, representatives, attorneys, and financial advisors from any and all Claims, demands, Causes of Action and the like, arising from or related to this Chapter 11 Case or the Debtor and existing as of the Effective Date or thereafter arising from any act, omission, event, or other occurrence that occurred on or prior to the Effective Date, whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, at law, in equity or otherwise;  provided, however, such release, waiver and discharge shall not operate as a release, waiver or discharge of any Released Parties in respect of any express contractual obligation of any such party effective from and after the Effective Date;  provided, further, that notwithstanding the foregoing or any other provision of the Plan, nothing in the Plan, any Plan Supplement, or any order confirming the Plan shall affect any Causes of Action, Claims, or counter-Claims that may be asserted by the Plan Administrator in connection with an objection to a Claim that has not been Allowed, in each case as determined by the Bankruptcy Court;  provided, further, such release, waiver and discharge shall not in any way limit the rights of the holders of Claims under the terms of the Plan;  provided, further, such release, waiver and discharge shall not extend to the Debtor's current and former officers, directors, principals, employees, agents, advisory board members, consultants, representatives, attorneys, and financial advisors.

(vi)    Releases by Holders of Claims

Except as otherwise specifically provided in the Plan including Section 13.7 of the Plan, as of the Effective Date, each holder of a Claim against the Debtor, including, but not limited to HMS, shall be deemed to forever release, waive and discharge the Released Parties and any of the Released Parties' predecessors, successors and assigns, subsidiaries, affiliates, current and former officers, directors, principals, employees, agents, advisory board members, consultants, representatives, attorneys, and financial advisors from any and all Claims, demands, Causes of Action and the like, arising from or related to this Chapter 11 Case or the Debtor and existing as of the Effective Date or thereafter arising from any act, omission, event, or other occurrence that occurred on or prior to the Effective Date, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, at law, in equity or otherwise;  provided, however, such release, waiver and discharge shall not operate as a release, waiver or discharge of any Released Parties in respect of any express contractual obligation of any such party effective from and after the Effective Date;  provided,

50

**further**, that notwithstanding the foregoing or any other provision of the Plan, nothing in the Plan, any Plan Supplement, or any order confirming the Plan shall affect any Causes of Action, Claims, or counter-Claims that may be asserted by the Plan Administrator in connection with an objection to a Claim that has not been Allowed, in each case as determined by the Bankruptcy Court; **provided**, **further**, such release, waiver and discharge shall not in any way limit the rights of the holders of Claims under the terms of the Plan; **provided**, **further**, such release, waiver and discharge shall not extend to the Debtor's current and former officers, directors, principals, employees, agents, advisory board members, consultants, representatives, attorneys, and financial advisors.

(vii)    Indemnification

The Plan Administrator shall be indemnified and receive reimbursement against and from all loss, liability, expense (including counsel fees) or damage which the Plan Administrator may incur or sustain in the exercise and performance of any of their respective powers and duties under the Plan, to the full extent permitted by law, except if such loss, liability, expense or damage is finally determined by a court of competent jurisdiction to result solely from the Plan Administrator's member's fraud, willful misconduct, or gross negligence. The amounts necessary for such indemnification and reimbursement shall be paid by the Plan Administrator out of Cash held by the Plan Administrator in the Plan Distribution Fund. The Plan Administrator shall not be personally liable for this indemnification obligation or the payment of any expense of administering the Plan or any other liability incurred in connection with the Plan, and no Person shall look to the Plan Administrator personally for the payment of any such expense or liability. This indemnification shall survive the death, resignation or removal, as may be applicable, of the Plan Administrator and shall inure to the benefit of the Plan Administrator's and their respective successors, heirs and assigns, as applicable.

(viii)    Limitation on Exculpations, Injunctions and Release

Notwithstanding anything to the contrary contained herein, this Plan shall not exculpate or release, or provide injunctive protection to, any Person or Entity identified in the Plan Supplement as a potential defendant to a Cause of Action which shall include, without limitation, all of the Debtor's current and former directors, officers, principals, employees, agents, advisory board members, consultants, representatives, attorneys, financial advisors and insurers.

(ix)    Preservation and Application of Insurance

The provisions of the Plan, including, without limitation, the injunctive provisions contained in this Article XIII, shall not diminish or impair in any manner the enforceability and/or coverage of any insurance policies (and any agreements, documents, or instruments relating thereto) that may cover Claims including D&O Claims, any directors, trustees or officers of the Debtor, or any other Person, other than as expressly set forth herein.

### K.   **Miscellaneous Provisions**

(i)   Payment of Statutory Fees.

All outstanding fees payable pursuant to section 1930 of Title 28 of the United States Code shall be paid on or before the Effective Date; provided, however, the Plan Administrator shall be responsible for the satisfaction of United States Trustee Fees arising under 28 U.S.C. § 1930 and 31 U.S.C. §3717 from the Effective Date through the entry of a final decree closing, dismissal of, or conversion of the Chapter 11 Case.

(ii)   Reports

Until a final decree closing the Chapter 11 Case is entered, the Plan Administrator shall comply with any requisite reporting requirements established pursuant to the guidelines of the U.S. Trustee.

(iii)   Governing Law

Except to the extent the Bankruptcy Code, the Bankruptcy Rules, or other federal laws are applicable, the laws of the State of New York shall govern the construction and implementation of the Plan and all rights and obligations arising under the Plan.

(iv)   Withholding and Reporting Requirements

In connection with the Plan and all instruments issued in connection therewith and Distributions made therefrom, the Plan Administrator shall comply with all withholding, reporting, certification and information requirements imposed by any federal, state, local or foreign taxing authority and all Distributions hereunder shall, to the extent applicable, be subject to any such withholding, reporting, certification and information requirements. Persons entitled to receive Distributions hereunder shall, as a condition to receiving such Distributions, provide such information and take such steps as the Plan Administrator may reasonably require to ensure compliance with such withholding and reporting requirements, and to enable the Plan Administrator to obtain the certifications and information as may be necessary or appropriate to satisfy the provisions of any tax law. Any Person that fails to comply with any such request of the Plan Administrator within ninety (90) days of any such request, shall not be entitled to participate in any Distribution under the Plan and no such Distribution shall be made on account of any such persons Allowed Claim, and the Plan Administrator shall reallocate such Distribution for the benefit of all other holders of Allowed Claims in accordance with the Plan.

(v)   Section 1146 Exemption

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of any security under the Plan, the execution, delivery, or recording of an instrument of transfer pursuant to, in implementation of or as contemplated by the Plan, or the vesting, transfer, or sale of any real property of the Estate pursuant to, in implementation of or as contemplated by the Plan shall not be taxed under any state or local law imposing a stamp tax, transfer tax, or similar tax or fee. Consistent with the

foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.

(vi)     Severability

In the event that the Bankruptcy Court determines, prior to the Confirmation Date, that any provision in the Plan is invalid, void or unenforceable, such provision shall be invalid, void or unenforceable with respect to the holder or holders of such Claims as to which the provision is determined to be invalid, void or unenforceable. The invalidity, voidness or unenforceability of any such provision shall in no way limit or affect the enforceability and operative effect of any other provision of the Plan and shall not require the resolicitation of any acceptance or rejection of the Plan unless otherwise ordered by the Bankruptcy Court.

(vii)     Reservation of Rights

If the Plan is not confirmed for any reason, the rights of all parties in interest in the Chapter 11 Case are and shall be reserved in full.  Any concession reflected or provision contained herein, if any, is made for purposes of the Plan only, and if the Plan does not become effective, no party in interest in the Chapter 11 Case shall be bound or deemed prejudiced by such concession.

(viii)   Binding Effect;  Counterparts

The provisions of the Plan shall bind all holders of Claims against the Estate, whether or not they have accepted the Plan.  The Plan may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which counterparts, when so executed and delivered, shall be deemed to be an original and all of which counterparts, taken together, shall constitute but one and the same Plan.

(ix)     Notices

All notices, requests, and demands to or upon the Trustee, the Plan Administrator, Litigation Trust/Trustee or the Oversight Committee must be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission or by electronic mail, when received and telephonically confirmed, addressed as follows:

If to the Trustee, to:
Stephen S. Gray, as Chapter 11 Trustee
c/o Togut, Segal & Segal LLP
Scott Ratner
One Pennsylvania Plaza, Suite 3335
New York, New York 10119
Tel:  (212) 594 - 5000

Fax:  (212) 967 - 4258
Email:  SERatner@TeamTogut.com

If to the Plan Administrator, to:
Stephen S. Gray, as Plan Administrator
c/o Togut, Segal & Segal LLP
Scott Ratner
One Pennsylvania Plaza, Suite 3335
New York, New York 10119
Tel:  (212) 594 - 5000
Fax:  (212) 967 - 4258
Email:  SERatner@TeamTogut.com

If to the Oversight Committee, to:
As provided in the Litigation Trust Agreement

If to the Litigation Trust and/or the Litigation Trustee, to:
As provided in the Litigation Trust Agreement

$\qquad$ (x)    Computation of Time

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

$\qquad$ (xi)    Plan Controls

In the event and to the extent that any provision of the Plan is inconsistent with the provisions of the Disclosure Statement, the provisions of the Plan shall control and take precedence.

## VII.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain of the material U.S. federal income tax consequences expected to result from the implementation of the Plan. The following summary does not address the U.S. federal income tax consequences to holders whose Claims are entitled to payment in full in Cash under the Plan (e.g., holders of Allowed Administrative Expense Claims). This discussion is based on current provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), applicable Treasury Regulations, judicial authority and current administrative rulings and pronouncements of the Internal Revenue Service ("IRS"). There can be no assurance that the IRS will not take a contrary view, and no ruling from the IRS has been or will be sought. Legislative, judicial or administrative changes or interpretations may be forthcoming that could alter or modify the statements and conclusions set forth herein. Any such changes or interpretations may or may not be retroactive and could affect the tax consequences to, among others, the Debtor and the holders of Claims.

The following summary is for general information only. The U.S. federal income tax consequences of the Plan are complex and subject to significant uncertainties. This

54

summary does not address foreign, state or local tax consequences of the Plan, nor does it purport to address all of the U.S. federal income tax consequences of the Plan. This summary also does not purport to address the U.S. federal income tax consequences of the Plan to taxpayers subject to special treatment under the U.S. federal income tax laws, such as broker-dealers, tax exempt entities, financial institutions, insurance companies, S corporations, small business investment companies, mutual funds, regulated investment companies, foreign corporations, and non-resident alien individuals.

**EACH HOLDER OF A CLAIM IS STRONGLY URGED TO CONSULT ITS OWN TAX ADVISOR REGARDING THE POTENTIAL U.S. FEDERAL, STATE, LOCAL OR FOREIGN TAX CONSEQUENCES OF THE PLAN TO SUCH HOLDER BASED ON ITS PARTICULAR CIRCUMSTANCES.**

**IRS CIRCULAR 230 NOTICE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS IN CIRCULAR 230, YOU ARE HEREBY INFORMED THAT (I) ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF AVOIDING PENALTIES UNDER THE IRC AND (II) THE ADVICE IS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED IN THE DISCLOSURE STATEMENT.**

A.    <u>U.S. Federal Income Tax Consequences to the Debtor.</u>

The Debtor is exempt from U.S. federal income tax pursuant to § 501 of the IRC. Accordingly, the Debtor does not believe that the implementation of the Plan, including the extinguishment of the Debtor's outstanding indebtedness pursuant to the Plan, will result in any material tax liability to the Debtor.

B.    <u>U.S. Federal Income Tax Consequences to Holders of Class III and IV Claims.</u>

(1)    <u>Gain or Loss Recognized</u>.  Except with respect to a Claim (or portion thereof) for accrued but unpaid interest (discussed below), for U.S. federal income tax purposes, each holder of an Allowed Class III or IV Claim generally should recognize gain or loss as a result of receiving a Distribution pursuant to the Plan equal to the difference between (i) the amount of Cash received by such holder and (ii) the adjusted tax basis of such holder's Allowed Claim. The amount and timing of such gain or loss, as well as the character of any gain or loss as long-term or short-term capital gain or loss or ordinary income or loss will depend on a number of factors that should be addressed with your own tax advisor.

(2)    <u>Receipt of Interest</u>.  The Plan does not address the allocation of the aggregate consideration to be distributed to holders between principal and interest and the Trustee cannot make any representations as to how the IRS will address the allocation of consideration under the Plan. In general, to the extent that any amount of consideration received by a holder is treated as received in satisfaction of unpaid interest that accrued during such holder's holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income

and not otherwise exempt from U.S. federal income tax). Conversely, a holder may be allowed a bad debt deduction to the extent any accrued interest was previously included in its gross income but subsequently not paid in full. However, the IRS may take the position that any such loss must be characterized based on the character of the underlying obligation, such that the loss will be a capital loss if the underlying obligation is a capital asset.

C.    **Withholding and Reporting.**

The Trustee and, after the Effective Date, the Plan Administrator and/or the Litigation Trustee, as applicable, will withhold all amounts required by law to be withheld from payments to holders of Allowed Claims and or Litigation Trust Interests, as applicable. For example, under U.S. federal income tax law, interest, dividends and other reportable payments may, under certain circumstances, be subject to backup withholding at the then applicable rate. Backup withholding generally applies only if the holder (i) fails to furnish its social security number or other taxpayer identification number ("TIN"); (ii) furnishes an incorrect TIN; (iii) fails properly to report interest or dividends; or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in overpayment of tax. Certain persons are exempt from backup withholding, including corporations and financial institutions.

Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. The types of transactions that require disclosure are very broad;  _however_, there are numerous exceptions which may be applicable to a holder.

**THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

## VIII.   RISK FACTORS

**HOLDERS OF ALL CLASSES OF CLAIMS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE HEREIN), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.**

A.    **Certain Bankruptcy Related Considerations**

(1)    Risk of Non-Confirmation of the Plan

Although the Trustee believes that the Plan will satisfy all requirements necessary for Confirmation by the Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion.    There can also be no assurance that modifications of the Plan will not be required for Confirmation, that any negotiations regarding such modifications would not adversely affect the holders of the Allowed Claims or that any such modifications would not necessitate the re-solicitation of votes.

(2)    Nonconsensual Confirmation

In the event any impaired class of claims does not accept a plan of reorganization or liquidation, a bankruptcy court may nevertheless confirm such plan of reorganization or liquidation at the proponent's request if at least one impaired class has accepted the plan of reorganization (with such acceptance being determined without including the acceptance of any "insider" in such class) and, as to each Impaired Class that has not accepted the plan of reorganization or liquidation, the Bankruptcy Court determines that the plan of reorganization or liquidation "does not discriminate unfairly" and is "fair and equitable" with respect to non-accepting Impaired Classes.    In the event that any Impaired Class of Claims fails to accept the Plan in accordance with § 1129(a)(8) of the Bankruptcy Code, the Trustee reserves the right to request nonconsensual Confirmation of the Plan in accordance with § 1129(b) of the Bankruptcy Code.

(3)    Risk that Conditions to Effectiveness Will Not Be Satisfied

Article X of the Plan contains certain conditions precedent to the effectiveness of the Plan.    There can be no assurances that the conditions contained in Article X of the Plan will be satisfied.

(4)    Risk that the Sale Will Not Close

Article X of the Plan provides as part of the means of implementation that the Acquired Assets be sold and a portion of the Restricted Funds be transferred via a private transaction to be approved by the Confirmation Order.    While the Trustee anticipates closing on these transactions, there can be no assurances that all of the conditions precedent to each transaction will be satisfied.    Moreover, there can be no assurances that one or more of the Purchasers will not default on their obligations in connection with the proposed transactions.

(5)    Claims Objection/Reconciliation Process, Litigation Trust Prosecution and Success of Avoidance Actions

The Trustee's estimate of the potential recovery to holders of Class IV Claims depends on, among other things, the outcome of the claims reconciliation and objection process as well as the results of the Litigation Trust's prosecution of the Litigation Trust Claims against certain former officers and the Board of Directors.    Therefore, actual

recoveries could differ from the Trustee's estimates and such difference could be material. Thus, there is no guarantee that the actual recovery to holders of Class IV Claims will approximate the Trustee's estimates.

## IX. ALTERNATIVES TO THE PLAN AND CONSEQUENCES OF REJECTION

Among the possible consequences if the Plan is rejected or if the Bankruptcy Court refuses to confirm the Plan are the following: (1) an alternative plan could be proposed or confirmed; or (2) the Chapter 11 Case could be converted to liquidation case under Chapter 7 of the Bankruptcy Code.

## A. Alternative Plans

As previously mentioned, with respect to an alternative plan, the Trustee and its professional advisors have explored various alternative scenarios and believe that the Plan enables the holders of Claims to realize the maximum recovery under the circumstances. The Trustee believes the Plan is the best plan that can be proposed and serves the best interests of the Estate and other parties-in-interest.

## B. Chapter 7 Liquidation

As discussed above with respect to Class III and IV Claims, either each holder of a Claim of such Class has accepted the Plan, or will receive or retain under the Plan on account of such Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would receive or retain if the Debtor were liquidated on such date under Chapter 7 of the Bankruptcy Code. The Trustee believes that significant costs would be incurred by the Trustee as a result of the delay and additional expense that would be caused by conversion of the case to a case under Chapter 7 resulting in a significantly reduced Distribution to holders of Class III and IV Claims.

## X.    <u>**RECOMMENDATION AND CONCLUSION**</u>

The Trustee believes that the Plan provides for the fair and equitable treatment to creditors and therefore recommends that holders of eligible Allowed Class III and IV Claims vote to accept the Plan.

Date:   August 8, 2018
         New York, New York

STEPHEN S. GRAY, not individually but solely in his capacity as Trustee

By: /s/ Stephen S. Gray
         Stephen S. Gray

TOGUT, SEGAL & SEGAL LLP
One Penn Plaza
Suite 3335
New York, New York 10119
(212) 594-5000
Albert Togut
Scott E. Ratner