Benjamin Mintz
Vincent Sama
Peta Gordon
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, New York 10019-9710
Telephone: (212) 836-8000
Fax: (212) 836-8689

*Counsel for Help Me See, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| WONDERWORK, INC., | Case No. 16-13607 (SMB) |
| Debtor. | Hearing: January 10, 2019 at 10:00 a.m. |
| | Objection Deadline: January 3, 2019 at 4:00 p.m. |

### APPLICATION OF HELP ME SEE, INC. PURSUANT TO
### SECTIONS 503(B)(3)(D) AND 503(B)(4) OF THE BANKRUPTCY CODE
### FOR ALLOWANCE AND REIMBURSEMENT OF REASONABLE PROFESSIONAL
### <u>FEES IN MAKING A SUBSTANTIAL CONTRIBUTION IN THIS CHAPTER 11 CASE</u>

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................................1

JURISDICTION AND VENUE ...........................................................................................4

FACTUAL BACKGROUND.................................................................................................4

HELPMESEE'S SUBSTANTIAL CONTRIBUTION.............................................................6

    I.     Legal Fees Expended in Monitoring and Correcting Debtors' Filings.................8

    II.    Legal Fees Expended in Connection with Rule 2004 Discovery .........................10

    III.   Legal Fees Expended in Connection with HelpMeSee's Motion to Appoint a Chapter 11 Trustee ............................................................................................12

    IV.   Legal Fees Expended in Connection with the Examiner Investigation ...............13

    V.    Legal Fees Expended in Connection with Motion Practice .................................15

    VI.   Legal Fees Expended in Connection with the Negotiation and Confirmation of the Plan .....................................................................................16

    VII.  Legal Fees Expended to Settle Administrative Claims in the Interest of Creditors...............................................................................................................17

RELIEF REQUESTED .......................................................................................................18

BASIS FOR RELIEF ..........................................................................................................19

NOTICE ..............................................................................................................................23

CONCLUSION....................................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**:

*In re Bayou Grp., LLC*,
   431 B.R. 549 (Bankr. S.D.N.Y. 2010) ............................................................. 19, 20, 21, 22

*In re Granite Partners*,
   213 B.R. 440 (Bankr. S.D.N.Y. 1997) ..................................................................... 19, 20, 23

*In re Grasso*,
   519 B.R. 137 (Bankr. E.D. Pa. 2014)..................................................................................21

*In re Petit*,
   291 B.R. 582 (Bankr. D. Maine 2003) ........................................................................22, 23

*In re Richton Intern. Corp.*,
   15 B.R. 854 (Bankr. S.D.N.Y. 1981) ........................................................................20, 21

**Statutes & Rules**:

11 U.S.C. § 330.......................................................................................................................21

11 U.S.C. § 503(b) ..................................................................................................... 4, 18, 19, 23

11 U.S.C. § 503(b)(3)(D) ...................................................................................................... 1, 19

11 U.S.C. § 503(b)(4)............................................................................................................ 1, 21

11 U.S.C. § 1104(c)(1)...............................................................................................................13

28 U.S.C. § 157..........................................................................................................................4

28 U.S.C. § 157(b) .....................................................................................................................4

28 U.S.C. § 1334.........................................................................................................................4

28 U.S.C. § 1408.........................................................................................................................4

28 U.S.C. § 1409.........................................................................................................................4

Local Bankr. Rule 9013-1(b).....................................................................................................23

By this motion (the "Motion"), Help Me See, Inc. ("HelpMeSee"), a creditor of the above-captioned debtor (the "Debtor"), by and through its undersigned attorneys, respectfully seeks the issuance and entry of an order, pursuant to sections 503(b)(3)(D) and 503(b)(4) of title 11 of the United States Code (the "Bankruptcy Code"), allowing HelpMeSee a claim on account of reasonable professional fees for making a substantial contribution in this chapter 11 case in the amount of $2.75 million (the "HMS Substantial Contribution Claim") (attached hereto as Appendix A is a complete itemized list of the fees for the work HelpMeSee performed that provided a substantial contribution totaling in excess of $2.9 million) to be treated in accordance with the terms of the *Amended Chapter 11 Plan of Liquidation for the Bankruptcy Estate of WonderWork, Inc. As Proposed by the Chapter 11 Trustee* [ECF No. 436-1] (the "Plan"). Under the Plan, which was confirmed by Order dated September 21, 2018 [ECF No. 475] and became effective on October 19, 2018, *see* Plan, at § 10.2(e),[1] the HMS Substantial Contribution Claim is not entitled to payment from the Debtor or the Plan Administrator and instead will only be entitled to payment from the Litigation Trust (as defined in the Plan) after all other Litigation Trust Interests (as defined in the Plan) have been paid in full. *See id.*, at § 2.2. **In other words, under the Plan, the HMS Substantial Contribution Claim is not treated as an administrative expense claim, but is a subordinated claim, which is only eligible to receive payment if the Litigation Trust obtains net recoveries in excess of the net claims held by participating creditors in the Litigation Trust.**

## PRELIMINARY STATEMENT

1.      HelpMeSee, with the assistance of its counsel Arnold & Porter Kaye Scholer LLP ("Arnold & Porter"), has been a crucial contributor throughout this chapter 11 case. Unassisted

---

[1]      October 19, 2018 is the date when the Litigation Trust Assets were transferred to the Litigation Trust, fulfilling the remaining condition for the Effective Date to occur. *Id.*

by a creditors' committee or any other active party, HelpMeSee worked tirelessly to preserve estate assets, which inured to the benefit of all creditors. In the initial stages of the case, HelpMeSee repeatedly alerted the Court and other parties in interest to the numerous misrepresentations and illegal actions taken by WonderWork, Inc. ("WonderWork" or the "Debtor"), its former CEO Brian Mullaney ("Mullaney"), and its CFO Hana Fuchs ("Fuchs"), including the improper dissipation of estate assets.

2.  As a direct result of HelpMeSee's contributions:

- The Court restricted the Debtor from making grants during the chapter 11 case. Before the Court imposed that limitation, the Debtor had transferred $2 million out of the estate in violation of its prior representations to the Court that it would not spend restricted money without approval from the Court and New York Attorney General. Had Debtor continued to make "grants" and other distributions as it intended, Debtor would have drained millions more out of the estate to the detriment of all creditors;

- The Court restricted Debtor in its illegal campaign to retroactively recharacterize unrestricted funds as restricted funds and thereby remove them from the reach of creditors;

- The Court imposed strict budgetary and other controls to curb Debtor's profligate spending;

- Debtor was forced to amend and correct virtually every Operating Report and schedule filed with the Court due to material misrepresentations;

- The Court appointed an examiner, who confirmed extensive fraud and abuse by Debtor's management and recommended the appointment of a chapter 11 trustee; and

- The Court confirmed a chapter 11 plan, premised on HelpMeSee's funding contribution, settlement and other accommodations, providing for approximately 60 percent cash distributions to general unsecured creditors.

There can be no dispute that HelpMeSee benefited the estate and public interest by being a diligent watchdog over Debtor's actions in the chapter 11 case and repeatedly bringing its concerns regarding Debtor to the Court's attention. Indeed, without HelpMeSee's tireless advocacy, Mullaney would have continued Debtor's business as usual: defrauding donors;

abusing the public trust; using Debtor as his personal piggy bank to fund his lavish lifestyle; and rapidly dissipating estate assets to avoid creditors.

3.　　　The rampant fraud by Debtor's senior management, which would not have been uncovered but for HelpMeSee's efforts, ultimately resulted in the appointment of a chapter 11 trustee (the "Chapter 11 Trustee"). Following the appointment of the Chapter 11 Trustee, HelpMeSee continued to play a central role in driving this chapter 11 case to an orderly and consensual resolution through the confirmed Plan, including:

- Securing the cooperation and participation of the Thompson Family Foundation as a *de facto* plan funder. Although the Thompson Family Foundation was Debtor's second largest creditor after HelpMeSee, having provided Debtor with a $7.9 million "impact" loan, the Thompson Family Foundation generously agreed to waive its right to a distribution to maximize the money flowing to charities under the Plan in recognition of the public benefit;

- Coordinating with the New York Attorney General regarding the disposition of the estate's restricted assets, including allowing a portion of the restricted funds to be used to help defray administrative expenses;

- Negotiating and settling administrative claims, including objecting to the settlement that the Chapter 11 Trustee reached with Debtor's counsel Carter Ledyard & Milburn LLP ("CLM"), which ultimately resulted in CLM agreeing to waive entitlement to any further payment from Debtor;

- Agreeing to key concessions and settlements in connection with the Plan including (1) accepting restricted funds and waiving any claim against the Debtor's unrestricted funds, (2) funding cash sufficient to insure that all allowed administrative claims are paid in full and that general unsecured creditors receive approximately a 60% distribution under the Plan, (3) providing $100,000 of seed funding for the Litigation Trust, and (4) agreeing that its substantial contribution claim would only be entitled to payment from the Litigation Trust on a subordinated basis behind all other Litigation Trust beneficiaries; and

- Assisting in drafting the Plan and related agreements.

4.　　　Importantly, while HelpMeSee seeks and has earned its right to substantial contribution in this case, HMS has agreed under the Plan that the HMS Substantial Contribution Claim, if allowed, will not be treated as an administrative claim and will not in any way impact

the distributions to be made to the unsecured creditors from the estate under the Plan. Rather, HelpMeSee will only recover the HMS Substantial Contribution Claim from the net proceeds of the Litigation Trust, and only if the Litigation Trust recovers sufficient funds to pay all of the holders of the Litigation Trust Interests in full. *See* Plan, at § 2.2. In other words, the HMS Substantial Contribution Claim is totally subordinated and the money, if any, flowing to HelpMeSee on account of the HMS Substantial Contribution Claim will be the last money distributed by the Litigation Trust and will not in any way prejudice any other creditors.

## JURISDICTION AND VENUE

5. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue of this case and proceeding is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

6. The statutory predicate for the relief sought herein is section 503(b) of the Bankruptcy Code.

## FACTUAL BACKGROUND

7. On December 29, 2016, Debtor filed its petition for chapter 11 relief following the confirmation of an arbitration award (the "Arbitration Award") that awarded HelpMeSee a claim in excess of $16 million. [ECF No. 1]. HelpMeSee and the Thompson Family Foundation comprised the estate's largest creditors, with unsecured claims of $16,059,833.50 and $7,987,808.22, respectively. Beyond those two creditors, the other general unsecured claims aggregate approximately $1.9 million (excluding Mullaney's $641,320 claim, which HelpMeSee believes will be disallowed).

8. Based on Mullaney's prior conduct, as detailed in the Arbitration Award [ECF No. 17-1], HelpMeSee moved for the appointment of a chapter 11 trustee on January 18, 2017. [ECF No. 16] (the "Chapter 11 Trustee Motion"). In addition, HelpMeSee sought Rule 2004

4

discovery due to various misstatements in the Debtors' first-day filings. [ECF No. 27]. While those two motions were pending, the case was reassigned to Judge Mary Kay Vyskocil [ECF No. 68].

9. On April 21, 2017, in lieu of appointing a trustee, Judge Vyskocil entered an order directing the appointment of an examiner and, at HelpMeSee's request, placed a series of controls on Debtor pending release of the examiner's report. [ECF No. 185] (the "Examiner and Controls Order"). The Court ordered that Debtor not make any grants, donations, or spend restricted funds without Court approval; not incur expenses for premium travel; not take any action to redesignate restricted funds as unrestricted; submit a detailed budget and unaudited schedule of restricted and unrestricted funds, including the nature of any alleged restrictions; and approve expenditures not included in the budget or over a 10% variance by the chair of the Debtor's audit committee. *Id.*

10. On May 10, 2017, Jason R. Lilien, Esq., former Bureau Chief of the New York Attorney General's Charities Bureau, was appointed as the examiner (the "Examiner"). [ECF No. 136]. On November 3, 2017, the Examiner issued a 227-page report (the "Examiner's Report") that documented in detail the rampant fraud and mismanagement at Debtor, both before and after the filing of the bankruptcy case, and recommended the appointment of a chapter 11 trustee. [ECF No. 302].

11. On November 22, 2017, the Court appointed the Chapter 11 Trustee. [ECF No. 337]. After seven (7) months of negotiations among the Chapter 11 Trustee, the New York Attorney General, HelpMeSee, and the Thompson Family Foundation, the parties arrived at a consensual Plan structure that: (a) brought value into the estate through a combination of the sale of WonderWork's burns and clubfoot assets and funding by HelpMeSee; (b) effectuated the

transfer of the Debtor's donor-restricted monies to charities including HelpMeSee that could fulfill the donors' intent; (c) satisfied the Thompson Family Foundation's desire to maximize the distribution of the donor-restricted funds to charities that could fulfill the donors' intent; (d) allowed the general unsecured creditors to receive a substantial recovery of approximately 60%; and (e) provided for the creation of a litigation trust to pursue estate claims including against those responsible for the Debtor's fraud and mismanagement. On September 21, 2018, the Court approved the Plan. On October 19, 2018, the effective date of the Plan occurred.

12. Under Section 2.2 of the Plan, HelpMeSee has agreed that the HMS Substantial Contribution Claim, to the extent allowed, is not entitled to any distribution from the Plan Distribution Fund and, on account thereof, it "shall receive a Litigation Trust Interest which will be subordinated to other holders of Litigation Trust Interests and only receive a distribution on account of such Litigation Trust Interest after all other holders of Litigation Trust Interests have been paid in full pursuant to the terms and conditions of the Litigation Trust."

## HELPMESEE'S SUBSTANTIAL CONTRIBUTION

13. Due to its prior history with Debtor, including Debtor and Mullaney's "reprehensible" and "unconscionable" behavior towards HelpMeSee as set forth in the Arbitration Award that precipitated Debtor's bankruptcy filing [ECF No. 17-1], HelpMeSee believed that there was a real and substantial risk that Mullaney would cause Debtor to dissipate assets or otherwise seek to harm creditors when Debtor filed for bankruptcy.[2] Consequently, HelpMeSee closely monitored Debtor from the outset of this case. Unfortunately, HelpMeSee's unusual vigilance was required.

---

[2] Debtor's bankruptcy filing occurred as part of Mullaney's effort to avoid a judgment that arose from Debtor's loss of the arbitration proceeding it commenced against HelpMeSee. During the arbitration, HelpMeSee proved that Mullaney ran Debtor as a fraudulent charity and that Mullaney had a decades-long history of exploiting and harming charities, including HelpMeSee. *See* [ECF No. 17-1, at 3-21].

14. During the chapter 11 case, HelpMeSee, as the Debtor's largest creditor, essentially played the role of a creditor's committee since none was appointed in the case. Debtor's various actions resulted in HelpMeSee repeatedly alerting the Court to fraudulent and deceitful conduct by Debtor and its management. This conduct continued unabated until the Court directed the appointment of the Chapter 11 Trustee, notwithstanding the Court's appointment of an Examiner and imposition of strict budgetary controls. HelpMeSee's actions, which ultimately saved the estate millions, did not solely benefit HelpMeSee but instead benefited the estate and all creditors.

15. Following the appointment of the Chapter 11 Trustee, HelpMeSee continued to play an active role in the proceedings. HelpMeSee was involved in virtually every aspect of the formulation of the Plan, including securing the cooperation of the Thompson Family Foundation as a Plan funder, negotiating the steep reductions of the administrative claims, and coordinating with the New York Attorney General.

16. As set forth below, HelpMeSee seeks to be awarded a substantial contribution claim in the amount of $2.75 million, which are only a portion of the multimillion dollar legal fees and expenses it incurred in connection with WonderWork's bankruptcy.[3]

17. Specifically, HelpMeSee seeks reimbursement of the legal fees HelpMeSee incurred in: (a) monitoring and correcting Debtor's filings, including its schedules, operating reports, and budgets; (b) Rule 2004 discovery; (c) moving for the appointment of a chapter 11 trustee; (d) responding to the Court's Order to Show Cause relating to the appointment of an

---

[3] HelpMeSee is not seeking the full amount of the fees and expenses for which it made a substantial contribution and instead is limiting its request to $2.75 million. As set forth herein and in the attached exhibits, HelpMeSee has identified more than $2.9 million of fees for which it has made substantial contribution to the bankruptcy case and also incurred significant out-of-pocket expenses in connection with that substantial contribution, which expenses have not been quantified for purposes of this Motion and are not included in the $2.75 million request.

Examiner, establishing the appropriate cautions and controls pending the Examiner investigation, and working with the Examiner to facilitate his investigation; (e) raising various issues with respect to Debtor's conduct throughout the bankruptcy; (f) working with the Chapter 11 Trustee on virtually all aspects of the Plan and related documents, including securing a settlement with the Thompson Family Foundation and working with the New York Attorney General to resolve issues relating to the distribution of Debtor's restricted funds; and (g) working to secure settlements from all of the administrative claimants, including the Examiner and his professionals, and the Debtor's professionals, CLM, and BDO USA, LLP ("BDO") (auditor).

## I.    **Legal Fees Expended in Monitoring and Correcting Debtors' Filings**

18.    HelpMeSee incurred $155,492 for its work in monitoring, correcting, and questioning Debtor's various Court filings.  Throughout the bankruptcy, HelpMeSee brought numerous issues to Debtor's and the Court's attention regarding inaccuracies in Debtor's filings to the Court and representations to the other parties in interest.  Indeed, the record shows that almost every filing made by Debtor was replete with errors.  Through HelpMeSee's review of Debtor's filings, it was revealed that:

- Debtor's Schedules A/B, D, E/F, G, H (together, the "Schedules" [ECF No. 12]) and its Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy (the "Statement of Financial Affairs" [ECF No. 13]) contained numerous material omissions, including omitting hundreds of thousands of dollars in preferential payments to Mullaney and CLM (*see* Chapter 11 Trustee Motion, at ¶¶ 28, 36-37 [ECF No. 16]);[4]

- Debtor transferred the majority of its assets from a low-risk Vanguard money market fund to high-risk investments in violation of its prior representations to the Court and the Court's

---

[4]    At the hearing on January 5, 2017 in front of this Court, Debtor and Debtor's counsel falsely represented to the Court that Mullaney had not taken salary since October 2015 and again in its schedules filed on January 12, 2017, which also did not disclose any preferential payments to Mullaney or that Mullaney had any claims against the estate. *Declaration of B. Mintz in Support of HelpMeSee's Motion for Contempt* ("Mintz Contempt Decl."), Ex. C, Transcript of Proceedings ("Tr.") 13:6-7 (Jan. 5, 2017) [ECF No. 405-3]. Debtor later amended its Schedules to acknowledge (as was self-evident based on the Debtor's own books and records) that Mullaney was paid $475,000 in June 2016 within the one-year insider preference period. *Amended Statement of Financial Affairs* [ECF. No. 77], at 19.

8

interim orders restricting it from doing so[5] (*see Amended February 2017 Operating Report* [ECF No. 281], at 56; *Motion for Entry of Interim and Final Orders (I) Authorizing Debtor to (A) Continue Existing Cash Management System, (B) Honoring Certain Prepetition Obligations Related Thereto, And (C) Maintain Business Forms and Existing Bank Accounts; (II) Extending Time to Comply with 11 U.S.C. § 345; and (III) Granting Related Relief* [ECF No. 4], at ¶ 12; *Declaration of Brian Mullaney, Co-Founder and CEO of Wonder Work Inc., In Support of Chapter 11 Petition and First Day Pleadings* [ECF No. 2], at ¶ 16; Mintz Contempt Decl., Ex. C, Tr. 19:23-20:5 (Jan. 5, 2017) [ECF No. 405-3]);

- Debtor expended approximately $2 million in restricted funds without notice to the Court and the New York Attorney General in violation of its representations to the Court and the Court's interim orders (*see Amended January and February 2017 Operating Reports* [ECF Nos. 280 & 281]);[6]

- Debtor thereafter violated the Examiner and Controls Order and improperly used its restricted funds, including for payment to CLM (*see Amended June 2017 Operating Report* [ECF No. 285], at 28); *see also* Mintz Contempt Decl., Ex. E, Tr. 13:5-6 (Apr. 12, 2017) [ECF No. 405-5];

- HelpMeSee reviewed Debtor's restricted funds schedule and alerted Debtor that it understated its assets by $1 million;

- HelpMeSee repeatedly questioned the Debtor about its inexplicable audit delay, but was misled by CLM as to the reason for the delay (*see Help Me See, Inc.'s Response to Order to Show Cause, dated September 25, 2017* [ECF No. 258] (detailing CLM's attempts to evade HelpMeSee's requests for information about the audit)). As a result of HelpMeSee's repeated questions regarding the status of the audit, including at the September 19, 2017 hearing (*Declaration of Benjamin Mintz in Support of HelpMeSee's Objection to Trustee's Motion for Entry of an Order Approving the Settlement Agreement* ("Mintz Settlement Objection Decl."), Ex. G, Tr. 30:25-32:20 (Sept. 19, 2017) [ECF No. 416-7]), and the Examiner's concerns about the delayed audit, the Court ultimately issued a *sua sponte* order to show cause why Debtor should not be held in contempt for the failed audit. [ECF No. 249]. The resulting hearing revealed to the Court and parties in interest the troubling depths of the issues surrounding Debtor's financial reporting and condition.

- HelpMeSee informed Debtor and the Court that every Operating Report filed by Debtor was incorrect, including that Debtor reported that it was operating at a profit when, in actuality, it

---

[5]     Those funds were restored after HelpMeSee challenged the transfer.

[6]     As a result of Debtor's improper dissipation of restricted funds and transfer to the Vanguard investment account, HelpMeSee formally objected to Debtor's cash management and bank account motions. *See HelpMeSee, Inc.'s (A) Objection to Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing Debtor to (A) Continue Existing Cash Management System, (B) Honoring Certain Prepetition Obligations Related Thereto, And (C) Maintain Business Forms and Existing Bank Accounts; (II) Extending Time to Comply with 11 U.S.C. § 345; and (III) Granting Related Relief and (B) Request a Status Conference.* [ECF No. 87], at ¶ 2. The time spent drafting those motions is discussed and accounted for in Section E: Legal Fees Expended in Connection with Motion Practice. *See* p. 15, below.

was operating at a loss. *See* Mintz Contempt Decl., Ex. T, Tr. 25:10-26:1 (Oct. 12, 2017) [ECF No. 405-20]; Mintz Settlement Objection Decl., Ex. E, Sept. 21, 2017 email from P. Gordon to L. Trivigno [ECF No. 416-5]; Amended Operating Reports January-July 2017 [ECF Nos. 281-286];

- HelpMeSee alerted the Court that, on the eve of release of the Examiner's Report, Debtor made two non-ordinary course payments totaling approximately $400,000 to Mullaney without Court approval. [ECF No. 290].

As is clear from the record above, by continuously monitoring Debtor, HelpMeSee forced Debtor to correct its numerous misrepresentations to the Court and helped preserve the estate for all creditors. In addition, by monitoring Debtor, HelpMeSee helped identify causes of action that the estate had against Mullaney and others, including for preferential payments, improper non-ordinary course distributions, and the improper dissipation of restricted funds. These issues led to the Court imposing strict budgeting and other controls on Debtor pending the Examiner investigation and will form the basis of the actions that were transferred to the Litigation Trust. *See* Examiner and Controls Order [ECF No. 185] ("Debtor shall not make any further grants, donations, or spend restricted funds without prior Court approval."); [ECF No. 454-5] (Plan Supplement, Schedule 5 describing the claims to be pursued by the Litigation Trust). These actions protected the estate and benefited all creditors.

## II.     Legal Fees Expended in Connection with Rule 2004 Discovery

19.     HelpMeSee incurred $357,276 for amounts expended in connection with its motion for Rule 2004 discovery, including negotiating with Debtor over the production of documents, reviewing the documents received, posing questions to the Debtor regarding certain of the documents received, and raising issues with Debtor's production and/or the documents received with the Court. HelpMeSee requested Rule 2004 discovery because it needed basic financial information about Debtor. The need for financial information was particularly acute because, as HelpMeSee explained, "[e]ach financial disclosure produced by Debtor to date [in

the bankruptcy] presents new and contradictory information that, at best, appears to reflect incompetence and inadequate oversight over Debtor's financial condition." [ECF No. 16], at ¶ 36.

20. As HelpMeSee highlighted for the Court at the February 16, 2017 hearing, it sought Rule 2004 discovery from Debtor on behalf of the entire estate because "there's no creditor's committee that has been appointed in this case. And as a result, we are effectively trying to perform those functions that a creditor's committee might otherwise ordinarily undertake." *See* Mintz Contempt Decl., Ex. D, Tr. at 14:17-20 (Feb. 16, 2017) [ECF No. 405-4]. The issues that HelpMeSee highlighted for the Court as to why it needed Rule 2004 discovery, became major issues in the case. For instance, in its January 27, 2017 request for relief, HelpMeSee outlined the various misstatements and contradictions in the Schedules and other materials Debtor filed in connection with its initial petition, including the lack of clarity on the amount of restricted funds and Mullaney's salary. [ECF No. 27], at ¶¶ 9, 12. The amount of restricted and unrestricted funds and Mullaney's salary became key issues in this case and in the Examiner's Report.

21. In addition, HelpMeSee sought information about Debtor's grant program, explaining that Debtor's "ability to secrete assets overseas as 'donations' or 'grants' while insolvent" was "of paramount concern to its creditors." [ECF No. 27], at ¶ 13. Later, HelpMeSee discovered that Debtor had, in violation of Court order, dissipated over $1.1 million in restricted funds in the form of grant payments. *See* Mintz Contempt Decl., Ex. E, Tr. 12:12-25; 62:4-14 (Apr. 12, 2017) [ECF No. 405-5]. Had HelpMeSee not alerted the Court to this issue at the April 12, 2017 hearing, Debtor would have continued utilizing its restricted funds and sending its funds outside as grants dissipating amounts far in excess of its ordinary course

practices. In addition, as a result of HelpMeSee raising concern with respect to Debtor's grant-making programs, the Examiner investigated Debtor's grants and uncovered that "WonderWork abused the public trust from its inception," including misreporting the number of countries it operated in, the price and number of surgeries it performed, and the type of patients it serviced. *See* Examiner's Report at 1, 189-194.

22. Finally, HelpMeSee used the information learned from the production to alert the Court and other parties in interest to potential issues of serious concern. For instance, on April 18, 2017, HelpMeSee informed the Court and other parties in interest that, in February 2017 *during the pendency of the bankruptcy case*, Mullaney sent letters to Debtor's past donors in an attempt to retroactively reclassify unrestricted donations as restricted donations to remove them from the reach of creditors. [ECF No. 102]. The Examiner and Controls Order ended this practice, [ECF No. 185], and the Examiner concluded that this "conduct was a departure from [Debtor's] prior business practices" and that "the estate has causes of action based on theories of fraudulent transfer under section 548 and 549" as a result of Mullaney's actions. *See* Examiner's Report, at 250; 252-256.

## III.  Legal Fees Expended in Connection with HelpMeSee's Motion to Appoint a Chapter 11 Trustee

23. HelpMeSee incurred $309,864 for its work in securing a chapter 11 trustee, which includes drafting and arguing the motion for a trustee and responding to the Order to Show Cause following the issuance of the Examiner's Report. At the first hearing in this case, HelpMeSee alerted the Court that it had serious concerns regarding Debtor, and in particular Mullaney, and that an independent fiduciary should be appointed to manage and run Debtor. *See* Mintz Contempt Decl., Ex. C, Tr. 15:10-16:12 (Jan. 5, 2017) [ECF No. 405-3]. On January 18, 2017, HelpMeSee formally moved for the appointment of a trustee (the "Trustee Motion"),

indicating Mullaney's unfitness to run a public charity. [ECF No. 16] at ¶ 3. In the Trustee Motion, HelpMeSee reiterated the need for an independent fiduciary explaining that "[t]he appointment of an independent fiduciary is critical to ensure that this Chapter 11 proceeding is conducted in a fair and honest manner, including that Debtor pursue all options available to maximize recovery to the creditors." [ECF No. 16], at ¶ 4.

24.     The Court opted not to appoint a trustee, but instead appointed the Examiner and implemented strict controls on the Debtor's spending. After a five-month investigation, it became clear to all parties that, as HelpMeSee had indicated from the start, a chapter 11 trustee had to be appointed due to extensive fraud by Debtor's senior management. Thus, following the Examiner's Report, HelpMeSee again submitted briefing indicating that the appointment of an independent fiduciary was in the best interest of the estate and public interest, including the remaining unsecured creditors in this case. [ECF No. 306]. Thus, not only did HelpMeSee protect the creditors in seeking the appointment of a chapter 11 trustee but, without HelpMeSee's initial request to appoint a trustee, the Court never would have appointed the Examiner or put operating controls in place. Instead, Debtor would have continued to dissipate assets, commit tax fraud, and run its fraudulent charity to the detriment of creditors and the public interest.

## IV.     Legal Fees Expended in Connection with the Examiner Investigation

25.     HelpMeSee incurred $491,389 for (i) negotiating the Examiner and Controls Order and (ii) working with the Examiner on his investigation, including providing the Examiner with detailed information on Debtor. On March 13, 2017, in response to the Trustee Motion, the Court entered an Order to Show Cause asking why "pursuant to section 1104(c)(1) of the Bankruptcy Code, the Court should not order the appointment of an examiner to conduct an investigation of debtor, and what cautions or controls can be put in place to address the concerns raised both in [HelpMeSee's Trustee] Motion and on the record at" the March 10, 2017 hearing.

[ECF No. 80]. In response to the Order to Show Cause, HelpMeSee again urged the Court to appoint a Trustee, explaining that Mullaney "is a serial fraudster who has no business running a public charity." [ECF No. 92]. HelpMeSee also stated that Debtor's "actions during the three months in bankruptcy further evidence the need for the appointment of a trustee," including "numerous transfers in the form of extravagant expense reimbursements . . . made to or for the benefit of Mullaney (and certain other insiders)" that were not disclosed in Debtor's original or amended Schedules, the transfer of the Vanguard Funds outside of the money market account, and Debtor's improper invasion of its donor-restricted funds. *Id.*

26.     While HelpMeSee urged the appointment of an examiner, it also set forth an outline of the topics for investigation and the controls needed during the pendency of that investigation, which included a 13-week budgeting process, the production of an unaudited schedule of restricted and unrestricted funds, and a direction that Debtor cease all grant-making activities pending the Examiner investigation. [ECF No. 92]. The Court thereafter entered the Examiner and Controls Order,[7] which placed severe constraints on Debtor due to the various issues that HelpMeSee raised with the Court regarding Debtor, including that Mullaney limit travel expenses, Debtor provide a schedule of unrestricted funds by a date certain, Debtor operate under a 13-week budget, and Debtor "not make any further grants, donations or spend restricted funds without prior Court approval." [ECF No. 185, at 6].

27.     In addition, HelpMeSee worked closely with the Examiner to ensure that the Examiner had the benefits of HelpMeSee's investigation. To facilitate the transfer of information, HelpMeSee met with the Examiner in person, spoke to the Examiner's counsel over the telephone, and prepared detailed outlines of the issues it had uncovered to date. These

---

[7]     The original Examiner and Controls Order was amended once. *See* [ECF Nos. 110 & 185]. The controls in the Examiner and Controls Order have since been extended indefinitely. [ECF No. 267].

outlines formed the backbone of many of the issues raised in the Examiner's Report, including the serious issues raised regarding Mullaney's excess compensation, both with respect to Mullaney's improper, excessive, and/or undocumented expenses as well as his use of his "limbo pay" to avoid taxation. In addition, HelpMeSee provided the Examiner with evidence regarding Debtors attempts to hinder, delay, and defraud creditors both before and after the bankruptcy was filed, including Debtor's attempts to improperly reclassify unrestricted money as restricted money following the Arbitration Award. Finally, it was HelpMeSee who told the Examiner that Debtor's entire enterprise was likely a sham because it seemed impossible that Debtor performed as warranted in its solicitation materials. In the Examiner's Report, the Examiner confirmed that all of HelpMeSee's fears were warranted and that Debtor had no business operating as a public charity.

## V. Legal Fees Expended in Connection with Motion Practice

28. HelpMeSee incurred $284,038 for amounts it expended in connection with opposing and/or questioning Debtor's proposed course of conduct throughout the bankruptcy. As the record evidences, HelpMeSee remained involved throughout the case and voiced its opposition to multiple actions Debtor sought to take, both via formal motions as well as via direct communications with the Debtor, just as a creditors committee would have had one been appointed. These included:

- Opposing Debtor's motion that the Court enter cash management and bank account orders *after* Debtor had violated its own representations in those motions and the Court's interim order;

- Opposing Debtor's motion to expend an additional $1,346,400 in grants following the appointment of the Examiner and implementation of the Examiner and Controls Order that forbade such conduct;[8]

- Opposing Debtor's two motions to extend exclusivity despite the lack of any meaningful progress towards reorganization;

- Opposing CLM's first application for fees, in which it sought recovery for amounts incurred prepetition and did not propose a holdback; and

- Opposing Debtor's motion to retain BDO at double the market rate.

## VI.    Legal Fees Expended in Connection with the Negotiation and Confirmation of the Plan

29.    HelpMeSee incurred $836,469.50 for amounts it expended in connection with formation of the Plan. As soon as the Chapter 11 Trustee was appointed, HelpMeSee began to work with the Chapter 11 Trustee and his counsel to bring this case to conclusion. In that regard, HelpMeSee spent considerable time working with all of the key parties in the case, including the Chapter 11 Trustee, the other major creditors, and the New York Attorney General. Specifically, the Chapter 11 Trustee and HelpMeSee spent several months negotiating a plan and settlement of HelpMeSee's claim. Once the basic deal terms were agreed to, HelpMeSee and the Chapter 11 Trustee worked together to draft the Plan, the Litigation Trust Agreement, the Disclosure Statement, and the HelpMeSee Settlement Agreement.

30.    In addition, HelpMeSee acted as the key conduit to the Thompson Family Foundation. HelpMeSee and the Thompson Family Foundation ultimately agreed to forego their right to a distribution of the unrestricted funds, without which a plan would likely not have been possible. Moreover, to ensure that the other general unsecured creditors received the same proportionate recovery that HelpMeSee received on account of receiving WonderWork's

---

[8]    HelpMeSee did not formally object to the grant motion because Debtor voluntarily adjourned the motion following correspondence with HelpMeSee and the Examiner. [ECF No. 163]. Debtor then voluntarily adjourned the motion several more times as the result of HelpMeSee's requests. [ECF Nos. 214 & 233].

blindness and surgery restricted funds, HelpMeSee agreed to make a payment into the estate. As a result, HelpMeSee provided a $843,449 payment to the estate on closing. Finally, HelpMeSee worked with the Chapter 11 Trustee and the New York Attorney General to obtain approval for HelpMeSee to receive certain of WonderWork's restricted funds and to permit a portion of the restricted funds to be used to satisfy administrative expenses, thereby ensuring a distribution to the general unsecured creditors.

## VII.    Legal Fees Expended to Settle Administrative Claims in the Interest of Creditors

31.    HelpMeSee incurred $552,502 for amounts it expended in connection with negotiating reductions of the administrative claims, which resulted in millions of dollars of estate savings. Specifically:

- BDO originally sought $373,298.75 for its work on Debtor's aborted audit. The Chapter 11 Trustee (using HelpMeSee's work product) negotiated a discount of $280,000 [ECF No. 386], which HelpMeSee reduced through further negotiations to $210,000. [ECF No. 402].

- HelpMeSee and the Chapter 11 Trustee, collectively worked together to convince the Examiner's professionals to take a significant haircut on their fees. Specifically, Loeb & Loeb, counsel to the Examiner, agreed to reduce its compensation from $1,572,695.59 to $1,431,391.27, a reduction of over $140,000.00. *Id.* Goldin Associates, financial advisors to the Examiner, agreed to reduce its compensation from $495,000 to $470,250.00, a reduction of approximately $25,000. *Id.*

- CLM, counsel to the Debtor, who permitted, if not enabled, Debtor to act in contravention of the Bankruptcy Code and Court order, agreed to reduce its compensation for its Second and Third Fee Applications from $2,800,000 to $0 after HelpMeSee formally objected to the Trustee's proposed settlement of $750,000 and made a motion for contempt. [*See* ECF Nos. 404, 415, 473]. As this Court recognized, HelpMeSee should receive compensation in connection with the CLM settlement because it "did the work that frankly [the Chapter 11 Trustee's counsel] should have been doing in connection with negotiating" the CLM Settlement. Tr. 59:18-25 (July 20, 2018) ("You conceded at the outset that the motion that was brought by Mr. Mintz was used by you in connection with negotiating this settlement. At a minimum, I think that there ought to be compensation to HelpMeSee -- not to the estate, but to HelpMeSee -- for the expense of putting that motion together and giving you the work that frankly your office should have

been doing in connection with negotiating what you're trying to put in front of me."); *see also id.*, 8:14-15 ("So we did have the benefit of HMS's draft contempt motion.").[9]

32.     Consequently, through HelpMeSee's efforts, the administrative claims were lowered by over $3 million, and HelpMeSee drove settlements with both BDO and CLM that were $800,000 less than what would have been agreed to by the Chapter 11 Trustee.  HelpMeSee therefore saved the estate millions in fees, either by directly negotiating agreements with the administrative claimants or by providing the Chapter 11 Trustee with the work product that he used to obtain the settlements.  As a result, HelpMeSee ensured that the unsecured creditors received a substantial distribution, even though HelpMeSee waived its right to receive a distribution from the Plan Liquidation Fund.

## RELIEF REQUESTED

33.     By this Application, HelpMeSee seeks reimbursement of its legal fees under section 503(b) of the Bankruptcy Code in the amount of $2.75 million (an amount which is less than the $2.9 million in legal fees described herein for which HelpMeSee made a substantial contribution and which does not include related expenses, which have not been quantified).

---

[9]     On June 6, 2017, CLM filed its first interim fee application seeking an award of $1.1 million in fees for services rendered from the Petition Date through April 30, 2017.  [ECF No. 167].  On June 28, 2017, the Court entered an order approving that application as modified, allowing fees of just over $1 million, subject to a 20% holdback and excluding the fees for services performed prior to the Petition Date.  [ECF No. 199].  Debtor paid CLM the sum of $829,494.80 with respect to its first application.  On October 13, 2017, CLM filed its second interim fee application seeking compensation for over $1 million in fees.  [ECF No. 262]. As part of HelpMeSee's settlement agreement with the Chapter 11 Trustee, the Chapter 11 Trustee and HelpMeSee agreed to amounts that they believed would be a fair resolution of the pending administrative claims.  In that waterfall, HelpMeSee and the Chapter 11 Trustee scheduled CLM at zero.  HelpMeSee also drafted a contempt motion that outlined the claims against CLM, which it provided to the Chapter 11 Trustee to aid the Trustee in his negotiations with CLM.  In addition, HelpMeSee provided the Trustee with an outline of the fees charged by CLM that it found objectionable, either because the services provided no benefit to the estate or the fees were billed in violation of law and/or the United States Trustee Guidelines.  Using HelpMeSee's materials, the Chapter 11 Trustee then engaged in direct negotiations with CLM.  Following those negotiations, CLM  and the Chapter 11 Trustee entered into a settlement that awarded CLM $750,000 in fees.  [ECF No. 403].  HelpMeSee strongly objected.  [ECF No. 415].  The Court refused to approve the settlement because, among other things, the Chapter 11 Trustee failed to show that he had properly analyzed CLM's fees or evaluated the claims against CLM, which would have been waived as a result of the fee payment.  *See* Tr. 59:3-10 (July 20, 2017).  Following the Court's order, CLM, HelpMeSee, and the Chapter 11 Trustee resumed negotiations and CLM agreed to forego its right to any further payment from the estate in exchange for a release.  [ECF No. 463].

Specifically, HelpMeSee incurred more than $2.9 million legal fees in making a substantial contribution in this case as follows: (a) $155,492 for monitoring and correcting Debtor's filings, including its schedules, Operating Reports, and budgets; (b) $357,276 for moving for Rule 2004 discovery, reviewing discovery received, and negotiating with Debtor regarding the nature and scope of its production; (c) $309,864 moving for the appointment of a Trustee; (d) $491,389 for responding to the Court's Order to Show Cause relating to the appointment of an Examiner, establishing the appropriate cautions and controls pending the Examiner investigation, and working with the Examiner to facilitate his investigation; (e) $284,038 for raising issues with respect to Debtor's conduct throughout the bankruptcy, including opposing Debtor's motions to extend exclusivity, assume its lease, retain BDO, and enter cash management and bank account orders, after Debtor had violated its own representations in those motions; (f) $836,469.50 for playing a vital and integral role in creation of the Plan; and (g) $552,502 for resolving the administrative claims.

## BASIS FOR RELIEF

34.     HelpMeSee respectfully submits that its contribution to this case is squarely within the purview and spirit of section 503(b) of the Bankruptcy Code.  Section 503(b)(3)(D) permits a creditor to recover its "actual, necessary expenses" if the creditor can show that it has made a "substantial contribution in a case."  To meet that burden, the creditor must show that it has made "a direct benefit" to the estate, which is a "substantial net benefit," that is not duplicative of that made by other professionals in the estate.  *In re Bayou Grp., LLC*, 431 B.R. 549, 561-566 (Bankr. S.D.N.Y. 2010).  "Compensation based on substantial contribution is designed to promote meaningful participation in the reorganization process, but at the same time, discourage mushrooming administrative expenses."  *In re Granite Partners*, 213 B.R. 440, 445 (Bankr. S.D.N.Y. 1997) (Bernstein, J.).  Substantial contribution awards are therefore reserved

for "extraordinary creditor actions which lead directly to tangible benefits to the creditors, debtor or estate." *In re Bayou Grp., LLC*, 431 B.R. at 560-61 (for an individual creditor to receive a claim for substantial contribution, he or she must show that the work done was in connection with a "rare and extraordinary circumstance, when the creditors involvement truly enhances the *administration* of the estate.") (original emphasis); *see also In re Granite Partners*, 213 B.R. at 445-446 ("[C]ompensation is limited to those extraordinary actions that lead to an actual and demonstrable benefit to the debtor's estate, the creditors, and to the extent relevant, the stockholders.") (omitting internal citations and quotations). Unlike a regular fee application, "[t]he substantial contribution test is applied in hindsight, and scrutinizes the actual benefit to the case" and the "applicant must show a causal connection between the service and the contribution." *In re Granite Partners*, 213 B.R. at 448 (omitting internal quotations).

35. "[T]he majority of cases" allowing a substantial contribution claim occur when, as was the case here, "the creditor played a leadership role that normally would be expected of an estate-compensated professional but was not so performed," including, but not limited to situations in which a creditor "actively facilitate[s] the negotiation of and substantial confirmation of the chapter 11 plan." *In re Bayou Grp., LLC*, 431 B.R. at 562. Courts have also awarded substantial contribution claims, where the "movants performed functions that normally would have been undertaken by estate-compensated professionals, or that had to be performed because estate compensated professionals were not doing the job." *Id.* (awarding substantial contribution when the unofficial committee performed tasks that "a debtor compensated professional should have made but did not," represented the interests of the "creditors as a whole," and whose efforts resulted in the appointment of a "strong central fiduciary"); *see also In re Richton Intern. Corp.*, 15 B.R. 854, 855-56 (Bankr. S.D.N.Y. 1981) (finding that attorney

for creditor substantially aided reorganization, in part, because counsel participated in virtually every aspect of the reorganization process); *In re Grasso*, 519 B.R. 137, 142-43 (Bankr. E.D. Pa. 2014) (compensating creditor for its rule 2004 and trustee motions, which culminated in the Court's decision to appoint a trustee and exposed debtor's diversion of estate assets). Finally, while the evaluation of the reasonableness of attorney's fees, pursuant to section 503(b)(4), should generally follow the approach of section 330, "the Court need not necessarily enforce time record requirements as strictly as with requests under section 330 . . . because the professional may not know that he or she will be submitting a fee and expense request." *In re Bayou Grp.*, 431 B.R. at 566.

36. This case presents a "rare and extraordinary circumstance when [a creditor's] involvement truly enhance[d] the *administration* of the estate." *In re Bayou Grp.*, 431 B.R. at 553, 562-64 (original emphasis). From the beginning of the case, HelpMeSee assumed a "leadership role that normally would be expected of an estate-compensated professional . . . ." *Id.* No creditors committee was formed and CLM abdicated its responsibilities as Debtor's counsel, instead protecting senior management and, in particular, Mullaney — who continued his fraudulent and dishonest practices throughout the bankruptcy proceeding. Absent the significant efforts of HelpMeSee and its legal advisors, who were involved in virtually every aspect of the reorganization process, Debtor's principals would have continued to defraud Debtor, its creditors, and its donors. Among other things, HelpMeSee's efforts resulted in the Debtor ceasing to make illegal "grant" payments, ceasing its illegal campaign to retroactively convert unrestricted assets into restricted assets, the Court implemented controls to prevent Mullaney from continuing to fund his extravagant lifestyle with estate funds, and finally, as a direct result

of HelpMeSee's efforts, an independent fiduciary was appointed to investigate and, ultimately, run Debtor, thereby protecting all of the parties in interest.

37.     Moreover, following Mullaney's departure and the appointment of the Chapter 11 Trustee, HelpMeSee continued to work on behalf of all creditors, including playing an integral role in bringing this case to an orderly and consensual resolution.  HelpMeSee assisted with Plan formation, including obtaining the support of the Thompson Family Foundation as a Plan co-founder.  Without the Thompson Family Foundation's and HelpMeSee's support, the Plan, and perhaps any plan, would not be possible.  In addition, through HelpMeSee's efforts, the Administrative Claims, which could have crippled the Debtor, were reduced by millions of dollars.  HelpMeSee also assisted in negotiating and drafting the Plan and related documents and engaged in repeated communications with the New York Attorney General who further agreed to contribute to the Plan by permitting Debtor to use a portion of the restricted funds for administrative expenses.

38.     The fees and expenses incurred by HelpMeSee's legal advisors, Arnold & Porter, were both reasonable and necessary to the substantial contribution made by HelpMeSee in this chapter 11 case and are based upon their regular hourly rates.  In addition, HelpMeSee has eliminated all fees for actions that inured solely to HelpMeSee's advantage, including the fees incurred in connection with Debtor's state court litigation seeking to reverse the Arbitration Award.

39.     This is therefore the precise type of circumstance that should result in a substantial contribution claim; HelpMeSee's efforts benefited the estate as a whole and the fees requested are directly tied to the contribution it made.[10]  Finally, in accordance with the Plan, the

---

[10]     Indeed, Courts have awarded substantial contribution claims in similar circumstances.  *See, e.g.*, *In re Bayou Grp.*, 431 B.R. at 562-66; *see also In re Petit*, 291 B.R. 582, 591, 592 & n.4 (Bankr. D. Maine 2003)

HMS Substantial Contribution Claim will not be treated as an administrative expense claim and instead will be fully subordinated and limited to recoveries by the Liquidating Trust. Specifically, the HMS Substantial Contribution Claim will be paid only from the proceeds of the Litigation Trust *after all other Litigation Trust Interests have been paid in full*.

40.     Accordingly, HelpMeSee submits that it is entitled to reimbursement from the Debtor's estate for the $2.75 million in legal fees that it has incurred in making the substantial contribution described herein.

**NOTICE**

41.     A copy of this Motion has been served upon counsel for the Debtor, counsel for the Chapter 11 Trustee, the United States Trustee, and those parties which have filed a notice of appearance and request for service of papers in these cases.  HelpMeSee respectfully submits that no other or further notice hereof is necessary or appropriate under the circumstances.

42.     HelpMeSee respectfully requests that the Court waive the requirement contained in Rule 9013-1(b) of the Local Bankruptcy Rules for the Southern District of New York that Plaintiffs file a separate memorandum of law in support of this Motion.

43.     No prior motion for the relief requested herein has been made to this or any other Court.

---

(compensating creditor for "bringing an end [to debtor's] fraudulent scheme" . . . and . . . "exposing the Debtor's actions and bringing [its] chicanery to light . . . more than any other participant. . . .  [F]or this the Court is, and creditor and other applicants should be thankful"); *In re Granite Partners*, 213 B.R. at 453 (Bernstein, J.) (allowing substantial contribution claim where claimant played a crucial role in the confirmation process).

## CONCLUSION

WHEREFORE, for all of the foregoing reasons, HelpMeSee respectfully requests that the Court issue and enter an order, pursuant to Section 503(b) of the Bankruptcy Code, (i) determining that HelpMeSee has made a substantial contribution in this chapter 11 case (ii) awarding HelpMeSee reimbursement in the amount of $2.75 million, to be treated in accordance with the Plan, and (iii) granting HelpMeSee such other and further relief as is just and proper.

Dated: December 7, 2018
      New York, New York

Respectfully submitted,

/s/ Benjamin Mintz
Benjamin Mintz

ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, New York 10019-9710
Telephone: (212) 836-8000
Fax: (212) 836-8689
benjamin.mintz@arnoldporter.com

*Counsel for Help Me See, Inc.*
